UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CAYMAN SECURITIES CLEARING
AND TRADING LTD; THE HURRY
FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

     Plaintiffs,

v.                                  Case No. 8:18-cv-02869-VMC-CPT

CHRISTOPHER FRANKEL,

     Defendant.

_____/

# EXHIBIT "1"

BEFORE THE NATIONAL ADJUDICATORY COUNCIL

FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | |
|---|---|
| In the Matter of | |
| Department of Enforcement, | DECISION |
| Complainant, | Complaint No. 2014041724601 |
| vs. | Dated: July 20, 2018 |
| Scottsdale Capital Advisors Corporation Scottsdale, AZ, | |
| John Joseph Hurry Paradise Valley, AZ, | |
| Timothy Brian DiBlasi Surprise, AZ, | |
| and | |
| Darrel Michael Cruz Scottsdale, AZ, | |
| Respondents. | |

**Scottsdale Capital Advisors sold unregistered and nonexempt microcap securities, failed to establish and maintain supervisory systems, including written supervisory procedures, that were reasonably designed to prevent the sale of unregistered microcap securities, and failed to supervise, and adequately respond to red flags indicative of, the unlawful sale and distribution of microcap securities. Held, findings and sanctions affirmed.**

**John Hurry engaged in unethical conduct when he created, managed, and controlled a foreign broker-dealer to distance Scottsdale Capital Advisors from its offshore microcap liquidations. Held, findings and sanctions affirmed in relevant part.**

**Timothy DiBlasi failed to establish and maintain supervisory systems, including written supervisory procedures, that were reasonably designed to prevent the firm's sale of unregistered microcap securities. Held, findings and sanctions affirmed.**

**Darrel Michael Cruz failed to supervise, and adequately respond to red flags indicative of, the firm's unlawful sale and distribution of microcap securities. Held, findings and sanctions affirmed.**

### Appearances

For the Complainant: Laura Leigh Blackston, Esq., Gregory Firehock, Esq., Heather Freiburger, Esq., Leo Orenstein, Esq., Jeffrey Pariser, Esq., Department of Enforcement, Financial Industry Regulatory Authority

For the Respondents: Michael Edney, Esq., Kevin Harnish, Esq., Ryan Meltzer, Esq.

# TABLE OF CONTENTS

**PAGE**

I.    Respondents' Background ......................................................................................2

    A.    Scottsdale Capital Advisors......................................................................2

    B.    John Joseph Hurry ....................................................................................2

    C.    Timothy Brian DiBlasi ..............................................................................3

    D.    Darrel Michael Cruz .................................................................................3

II.    Procedural History..............................................................................................3

III.    Discussion............................................................................................................4

    A.    Scottsdale Capital Advisors Liquidated Unregistered and Nonexempt Microcap Securities.................................................................................................4

        1.    FINRA Rule 2010.........................................................................4

        2.    Section 5 of the Securities Act of 1933 ........................................5

        3.    Scottsdale Capital Advisors' First Claimed Exemption: Rule 144 of the Securities Act.........................................................................6

            a.    Rule 144's Limited Application to Restricted Securities and Control Securities ...............................................................6

            b.    Rule 144's Prohibition on the Offer and Sale of Unregistered and Nonexempt Securities ......................................................7

            c.    Rule 144's Safe Harbor for Underwriters...........................7

            d.    Rule 144's Five Conditions ................................................7

            e.    Rule 144's One-Year Holding Period and the Rule's Applicability to "Affiliates"....................................................................8

            f.    Rule 144's Caveat..............................................................9

        4.    Scottsdale Capital Advisors' Second Claimed Exemption: Section 4(a)(4) of the Securities Act.........................................................................9

        5.    The Duty of Inquiry Under Rule 144 and Section 4(a)(4) of the Securities Act.............................................................................10

- ii -

## TABLE OF CONTENTS (cont'd)

PAGE

6.    Scottsdale Capital Advisors' Liquidation of 74 Million Unregistered
Microcap Shares ...........................................................................................11

    a.    Scottsdale Capital Advisors' Rule 144 Team ....................................12

    b.    Scottsdale Capital Advisors' Due Diligence Packages .....................13

    c.    Scottsdale Capital Advisors' Process for Approving Deposits of
Microcap Securities and Determining the Beneficial Owners of the
Deposited Securities .........................................................................14

    d.    Scottsdale Capital Advisors' Beneficial Ownership Declaration
Did Not Account for the Selling Customers' Use of Nominees........14

    e.    The Selling Customers and the Liquidating Transactions ................15

           i.    The Selling Customers: Cayman Securities, Montage
Securities, Titan International Securities, and Unicorn
International Securities ...........................................................16

           ii.    The Neuro-Hitech, Inc. (NHPI) Transactions (Sky Walker,
Swiss National Securities, and Ireland Offshore Securities
Deposits) ...............................................................................16

                 (a)    The Issuer – NHPI .....................................................17

                 (b)    Scottsdale Capital Advisors' Due Diligence
Packages for the Three NHPI Deposits ....................19

                      (1)    The Deposited Securities Checklists .............19

                      (2)    The Beneficial Ownership Declarations........20

                      (3)    The Attorney Opinion Letters and
Underlying Transactional Documents ..........21

                      (4)    The Nonaffiliate and Non-Shell Company
Representations.............................................27

                      (5)    Promotional Activity in Shares of NHPI
During the Relevant Period ...........................29

- iii -

## TABLE OF CONTENTS (cont'd)

PAGE

iii. The Voip-Pal.com (VPLM) Transaction (Third VHB
International Deposit) ............................................................31

(a) The Issuer – VPLM ....................................................31

(b) Scottsdale Capital Advisors' Due Diligence
Package for the VPLM Deposit.................................32

(1) The Deposited Securities Checklist...............32

(2) The Beneficial Ownership Declaration..........33

(3) The Attorney Opinion Letter and
Underlying Transactional Documents ...........34

(4) The Nonaffiliate Representations ..................39

(5) The Non-Shell Company Representations.....42

(6) Promotional Activity in Shares of VPLM
During the Relevant Period ...........................43

iv. The Orofino Gold Corporation (ORFG) Transaction (Media
Central Deposit)....................................................................43

(a) The Issuer – ORFG....................................................43

(b) Scottsdale Capital Advisors' Due Diligence
Packages for the ORFG Deposit................................45

(1) The Deposited Securities Checklist...............45

(2) The Beneficial Ownership Declaration..........45

(3) The Attorney Opinion Letters and
Underlying Transactional Documents ...........46

(4) The Nonaffiliate and Non-Shell Company
Representations...............................................53

(5) Promotional Activity in Shares of ORFG
During the Relevant Period ...........................55

(6) Promotional Activity in ORFG and the
Florida-Based Media Central Corp.
(MCC)..............................................................56

- iv -

## TABLE OF CONTENTS (cont'd)

PAGE

7.   Scottsdale Capital Advisors Violated FINRA Rule 2010 Because the Firm
     Sold Unregistered and Nonexempt Microcap Securities.................................58

     a.   Scottsdale Capital Advisors Failed to Conduct a Searching Inquiry
          into the Selling Customers' Resales of Restricted Securities............59

          i.    Scottsdale Capital Advisors' Due Diligence Was
                Cursory and Incomplete...........................................................59

          ii.   Scottsdale Capital Advisors' Due Diligence Was
                Standardized and Not Tailored to Address the Risks
                Associated with Its Microcap Securities Business ................62

     b.   Scottsdale Capital Advisors Cannot Rely on the Rule 144
          Exemption Because the Firm Failed to Establish the Nonaffiliate
          Status of the Selling Customers...........................................................63

     c.   Scottsdale Capital Advisors Cannot Rely on the Rule 144
          Exemption Because the Firm Failed to Prove That the Liquidations
          Satisfied the One-Year Holding Period for the Resale of Restricted
          Securities..............................................................................................66

          i.    Satisfaction of the One-Year Holding Period Through
                Tacking to the Issuer's Same Securities .................................66

          ii.   Application of *Reves* Family Resemblance Test to
                Determine Whether the Underlying Instruments Are
                Securities..................................................................................67

                (a)   The Collins/NHPI Promissory Note ..........................68

                (b)   The Locksmith Financial/VPLM Verbal Line of
                      Credit .........................................................................70

                (c)   The Forward/ORFG Convertible Promissory
                      Note.............................................................................71

     d.   Scottsdale Capital Advisors Cannot Rely on the Rule 144
          Exemption Because the Firm Failed to Establish That NHPI and
          ORFG Are Not Shell Companies .........................................................72

     e.   Scottsdale Capital Advisors Cannot Rely on the Rule 144
          Exemption Because the Firm Failed to Establish That Its
          Questionably Technical Compliance with Rule 144 Was Not Part
          of a Plan or Scheme to Evade the Registration Requirements of the
          Securities Act.......................................................................................74

- v -

## TABLE OF CONTENTS (cont'd)

PAGE

B.  Hurry's Unethical Creation, Management, and Control of Cayman Securities ........75

    1.  Scottsdale Capital Advisors' Regulatory Landscape Prior to Hurry's Creation of Cayman Securities ......................................................................76

        a.  *Ruettiger* ..........................................................................76

        b.  *Gibraltar I*........................................................................77

        c.  *Gibraltar II* ......................................................................77

        d.  *Tavella* ............................................................................78

    2.  Hurry Created, Managed, and Controlled Cayman Securities.......................78

        a.  Hurry Created Cayman Securities ......................................79

        b.  Hurry Hired Ruzicka, Ostensibly to Manage Cayman Securities........................................................................79

        c.  Hurry Managed and Controlled Cayman Securities..........................80

        d.  Hurry Concealed His Management and Control of Cayman Securities........................................................................81

    3.  Hurry's Creation, Management, and Control of Cayman Securities Was Unethical, Hampered Scottsdale Capital Advisors' Compliance with Section 5 of the Securities Act, and Violated FINRA Rule 2010 .................83

C.  Scottsdale Capital Advisors' WSPs Were Not Reasonably Designed to Ensure Compliance with Section 5 of the Securities Act .......................................................83

    1.  DiBlasi Had Responsibility for Scottsdale Capital Advisors' WSPs ............84

    2.  Scottsdale Capital Advisors' WSPs Did Not Accurately Describe the Firm's Microcap Securities Business ............................................................85

    3.  Scottsdale Capital Advisors' WSPs Did Not Require a Reasonable Inquiry into the Selling Customers' Beneficial Ownership ......................................86

D.  Cruz and Scottsdale Capital Advisors Failed to Supervise the Firm's Microcap Liquidation Business .......................................................................................................87

E.  Procedural Arguments ...................................................................................................90

- vi -

## TABLE OF CONTENTS (cont'd)

**PAGE**

1.      FINRA's Authority over Cases Involving Unregistered Securities Sales ...........................................................................................................91

2.      The Hearing Panel's Reliance on Ruzicka's On-the-Record Testimony ..................................................................................................91

     a.      Ruzicka's On-the-Record Testimony ................................................91

     b.      The Respondents' Motion and Supplemental Motion to Adduce Ruzicka's Criminal Court Records ....................................................93

IV.    Sanctions (By Respondent)................................................................................93

    A.     Scottsdale Capital Advisors ...................................................................94

       1.      Disciplinary History.....................................................................94

       2.      Scottsdale Capital Advisors' Sales of Unregistered and Nonexempt Microcap Securities .....................................................................95

       3.      Scottsdale Capital Advisors' Supervisory Violations....................................100

    B.     Hurry: Unethical Creation, Management, and Control of Cayman Securities ..........101

    C.     DiBlasi: Maintaining a Deficient Supervisory System and Inadequate WSPs Related to Scottsdale Capital Advisors' Microcap Liquidation Business .................102

    D.     Cruz: Failing to Supervise Scottsdale Capital Advisors' Microcap Liquidation Business ...........................................................................................................103

V.    Conclusion ....................................................................................................104

### Decision

Scottsdale Capital Advisors Corporation ("Scottsdale Capital Advisors" or the "Firm"), John Joseph Hurry ("Hurry"), Timothy Brian DiBlasi ("DiBlasi"), and Darrel Michael Cruz ("Cruz") (collectively, the "Respondents") appeal an amended extended Hearing Panel decision issued on June 20, 2017. The Hearing Panel's decision concerns Scottsdale Capital Advisors' liquidation of unregistered microcap securities over a six-month period.

Between December 2013 and June 2014, Scottsdale Capital Advisors liquidated over 74 million unregistered shares of three microcap issuers – Neuro-Hitech, Inc. ("NHPI"), Voip-Pal.com ("VPLM"), and Orofino Gold Corporation ("ORFG"). The entity that deposited the shares at Scottsdale Capital Advisors was Cayman Securities Clearing and Trading, Ltd., SECZ ("Cayman Securities"). The company that provided clearing services for the unregistered microcap trades was Alpine Securities Corporation ("Alpine Securities"). Scottsdale Capital Advisors' founder, owner, and director, Hurry, founded and owns each of the entities involved in a vertically integrated microcap liquidation business – the liquidating broker-dealer, Scottsdale Capital Advisors, the foreign broker-dealer that represented the selling customers, Cayman Securities, and the clearing firm, Alpine Securities. The matters that are the subject of this appeal relate to the circumstances surrounding Scottsdale Capital Advisors' liquidation of the unregistered microcap shares.

This appeal focuses on five issues. First, we examine whether Rule 144 and Section 4(a)(4) of the Securities Act of 1933 ("Securities Act") apply to Scottsdale Capital Advisors' unregistered microcap securities sales. We find that the exemptions do not apply. Scottsdale Capital Advisors failed to make the searching inquiry that Rule 144 and Section 4(a)(4) require, and, in so doing, the Firm failed to prove that it satisfied the technical aspects of Rule 144, such as the nonaffiliate status of the selling customers, the one-year holding period that applies to resales of this category of restricted securities, and the non-shell company status of the relevant issuers.

Second, we examine whether Hurry, Scottsdale Capital Advisors' founder, owner, and director, engaged in unethical conduct when he created, managed, and controlled Cayman Securities, the foreign broker-dealer that deposited the shares at Scottsdale Capital Advisors. We find that Hurry's creation, management, and control of Cayman Securities was unethical because he intentionally organized the foreign broker-dealer as a buffer between Scottsdale Capital Advisors and its suspicious foreign customers to facilitate the firm's evasion of the federal securities laws.

Third, we examine whether Scottsdale Capital Advisors and its chief compliance officer ("CCO"), DiBlasi, established and maintained supervisory systems and written supervisory procedures ("WSPs") tailored to the Firm's microcap liquidation business. We have determined that they did not. Scottsdale Capital Advisors and DiBlasi abdicated their responsibilities, failed to ensure that Scottsdale Capital Advisors' WSPs reflected the Firm's operations, and failed to tailor the Firm's WSPs to address the risks associated with the Firm's primary business function, the deposit and liquidation of microcap securities.

- 2 -

Fourth, we examine whether Scottsdale Capital Advisors and its former president, Cruz, supervised, and adequately responded to red flags concerning, the Firm's microcap liquidation business. We find that they did not. Scottsdale Capital Advisors and Cruz engaged in perfunctory and ineffectual supervision, ignored conspicuous red flags, and failed to ensure that the five deposits at issue in this case were exempt from registration.

Finally, we impose sanctions on Scottsdale Capital Advisors, Hurry, DiBlasi, and Cruz for each of these violations. We fine Scottsdale Capital Advisors $1.25 million ($250,000 per violative deposit) for its unregistered and nonexempt microcap securities sales, impose an additional $250,000 fine on the Firm as an aggregate sanction for its supervisory violations, and order that Scottsdale Capital Advisors engage an independent consultant to monitor the Firm's acceptance and liquidation of microcap securities deposits and review the firm's supervisory procedures related to its microcap securities liquidation business. We bar Hurry in all capacities, suspend DiBlasi in all capacities for two years and fine him $50,000, and suspend Cruz in all capacities for two years and fine him $50,000.

I.      Respondents' Background

The period relevant to the conduct discussed in this decision is the six-month period between December 2013 and June 2014 (the "relevant period"). During their tenures with Scottsdale Capital Advisors, Hurry, DiBlasi, and Cruz each maintained various roles. For purposes of this decision, however, we focus only on the positions that these individuals held at Scottsdale Capital Advisors during the relevant period.

A.      Scottsdale Capital Advisors

In June 2001, Hurry formed Scottsdale Capital Advisors. The Firm became a member of FINRA in May 2002. Between December 2013 and June 2014, Scottsdale Capital Advisors had 14 to 20 employees and operated from a single location in Scottsdale, Arizona. The Firm remains in operation.

B.      John Joseph Hurry

In May 1991, Hurry entered the securities industry when he registered with a FINRA member firm as a general securities representative and as an investment company products and variable contracts representative. Hurry has been registered continuously since his initial registration.

After establishing Scottsdale Capital Advisors in June 2001, Hurry registered with the Firm in January 2002. Hurry is currently registered with Scottsdale Capital Advisors in several capacities, including as a general securities representative, general securities principal, financial and operations principal ("FinOp"), and registered options principal. Between December 2013 and June 2014, Hurry served as Scottsdale Capital Advisors' "director," and he maintained an indirect ownership interest in the Firm.[1]

---

[1]     A holding company, Scottsdale Capital Advisors Holding, LLC (the "Holding Company"), is the sole equity shareholder of Scottsdale Capital Advisors. A family trust is the

[Footnote continued on next page]

- 3 -

### C.    Timothy Brian DiBlasi

In December 2002, DiBlasi entered the securities industry when he registered with a FINRA member firm. DiBlasi associated with that firm until he joined Scottsdale Capital Advisors in April 2012. DiBlasi remains registered with Scottsdale Capital Advisors. DiBlasi is currently registered with Scottsdale Capital Advisors in several capacities, including as a FinOp, general securities representative, general securities principal, and municipal securities principal. Between December 2013 and June 2014, DiBlasi served as the Firm's CCO, a position that he continues to occupy.

### D.    Darrel Michael Cruz

In January 1994, Cruz entered the securities industry when he registered with a FINRA member firm. Between January 1994, when Cruz first associated with a FINRA member firm, and May 2008, when Cruz joined Scottsdale Capital Advisors, Cruz was registered with four FINRA member firms. Cruz remained registered with Scottsdale Capital Advisors until January 2015.

During his tenure with Scottsdale Capital Advisors, Cruz was registered as a general securities representative, general securities principal, investment banking representative, and operations professional. Cruz currently serves as the General Counsel for the Holding Company. Between December 2013 and June 2014, Cruz served as Scottsdale Capital Advisors' president, chief legal counsel, and assistant corporate secretary.

### II.    Procedural History

This matter began when FINRA initiated an investigation into the activities of several offshore broker-dealers. As the investigation developed, FINRA focused on Cayman Securities, the offshore broker-dealer that Hurry founded and owned. In May 2015, FINRA's Department of Enforcement ("Enforcement") filed a three-count complaint against Scottsdale Capital Advisors, Hurry, DiBlasi, and Cruz.

The first cause of action alleged that Scottsdale Capital Advisors violated FINRA Rule 2010 because the Firm sold unregistered and nonexempt microcap securities in contravention of the Securities Act, and that Hurry violated FINRA Rule 2010 because he was a necessary participant and substantial factor in the Firm's unregistered microcap securities sales.[2] The second cause of action alleged Scottsdale Capital Advisors and DiBlasi violated NASD Rule 3010(a), (b) and FINRA Rule 2010 because they failed to establish and maintain supervisory systems, including WSPs, that were tailored to the Firm's microcap liquidation business. The third cause of action alleged that Scottsdale Capital Advisors and Cruz violated NASD Rule

---

[cont'd]

sole member and owner of the Holding Company. Hurry and his wife, Justine Hurry, are the trustees of the family trust.

[2]      We discuss the rules in effect when the conduct occurred.

- 4 -

3010(b) and FINRA Rule 2010 because they failed to supervise, and adequately responded to red flags concerning, the Firm's microcap liquidation business.

The Hearing Panel issued an amended decision in June 2017.[3]  The Hearing Panel found that each of the Respondents engaged in the violations as alleged in the complaint.  The Hearing Panel fined Scottsdale Capital Advisors $1.5 million, barred Hurry in all capacities,[4] suspended DiBlasi and Cruz in all capacities for two years, and ordered that DiBlasi and Cruz each pay a fine of $50,000.  This appeal followed.

III.    Discussion

We affirm, in relevant part, the Hearing Panel's findings for each cause of action as it relates to Scottsdale Capital Advisors, Hurry, DiBlasi, and Cruz.

A.    Scottsdale Capital Advisors Liquidated Unregistered Microcap Securities

The Hearing Panel found that Scottsdale Capital Advisors violated FINRA Rule 2010 because the Firm acted in contravention of Section 5 of the Securities Act and sold 74 million shares of unregistered microcap securities without the benefit of a registration exemption.  When the Hearing Panel made this determination, the Hearing Panel also found that Enforcement had established a prima facie violation of Section 5 of the Securities Act, and that Scottsdale Capital Advisors' claimed exemptions from securities registration did not apply.  We affirm the Hearing Panel's findings.

1.    FINRA Rule 2010

FINRA Rule 2010, FINRA's ethical standards rule, requires that associated persons "observe high standards of commercial honor and just and equitable principles of trade."  FINRA Rule 2010; *see Dep't of Enforcement v. Mielke*, Complaint No. 2009019837302, 2014 FINRA Discip. LEXIS 24, at *39 (FINRA NAC July 18, 2014), *aff'd*, Exchange Act Release No. 75981, 2015 SEC LEXIS 3927, at *1-2 (Sept. 24, 2015).  The reach of FINRA Rule 2010 is not limited to rules of legal conduct, but states a broad ethical principle.  *See Timothy L. Burkes*, 51 S.E.C. 356, 360 n.21 (1993).  The principal consideration underscoring FINRA Rule 2010 is whether the conduct at issue "reflects on the associated person's ability to comply with the regulatory requirements of the securities business."  *Mielke*, 2015 SEC LEXIS 3927, at *46.  Selling unregistered and nonexempt securities, in contravention of Section 5 of the Securities Act, violates FINRA Rule 2010.  *See Midas Sec., LLC*, Exchange Act Release No. 66200, 2012 SEC

---

[3]    On March 31, 2017, the Hearing Panel issued a decision in this case.  The Hearing Panel's amended decision states, "[t]he original Extended Hearing Panel Decision has been amended to correct a factual error.  The amendment does not change the substance of the decision."  For purposes of this appellate decision, we reference only the Hearing Panel's amended decision, which the Hearing Panel issued on June 20, 2017.

[4]    The Hearing Panel stated that Hurry's conduct also warranted the imposition of a $100,000 fine, but the Hearing Panel declined to assess the fine in light of the bar.

- 5 -

LEXIS 199, at *46 n.63 (Jan. 20, 2012) ("[a] violation of Securities Act Section 5 also violates [the predecessor to FINRA Rule 2010]").

## 2.     Section 5 of the Securities Act of 1933

Section 5 of the Securities Act prohibits the sale of securities in interstate commerce unless a registration statement is in effect as to the offer and sale of the securities, or there is an applicable exemption from the registration requirement. 15 U.S.C. § 77e(a), (c) (2014); *see Midas Sec.*, 2012 SEC LEXIS 199, at *25-26.  The purpose of these registration requirements is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *Midas Sec.*, 2012 SEC LEXIS 199, at *26.

To establish a prima facie case of a violation of Section 5 of the Securities Act, Enforcement must show that: (1) no registration statement was in effect as to the securities; (2) Scottsdale Capital Advisors sold or offered to sell the securities; and (3) Scottsdale Capital Advisors sold or offered to sell the securities using interstate facilities or mails. *See Midas Sec.*, 2012 SEC LEXIS 199, at *27.  Violations of Section 5 of the Securities Act are based on a strict liability standard.  "Scienter – i.e., an intent to deceive – is not a requirement." *Id.*

The parties do not dispute that no registration statement was in effect for the 74 million microcap shares at issue, that Scottsdale Capital Advisors liquidated, or sold, the 74 million microcap shares, and that Scottsdale Capital Advisors sold the shares using interstate means. Consequently, Enforcement has established a prima facie case of a violation of Section 5 of the Securities Act, and the burden shifts to Scottsdale Capital Advisors to show that the transactions at issue were exempt from the Securities Act's registration requirements. *See Robert G. Leigh*, 50 S.E.C. 189, 192 (1990) ("It is well settled that the burden of establishing the availability of [a Section 5] exemption rests on the person claiming it.").

Exemptions from the registration requirements are affirmative defenses that must be established by the person claiming the exemption. *See Midas Sec.*, 2012 SEC LEXIS 199, at *28; *Zacharias v. SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009) ("[k]eeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable").  Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public. *See Midas Sec.*, 2012 SEC LEXIS 199, at *28-29.  "Evidence in support of an exemption must be explicit, exact, and not built on conclusory statements." *Id.* at 29.  "A broker, as an agent for its customers, ha[s] a responsibility to be aware of the requirements necessary to establish an exemption from the registration requirements of the Securities Act and should be reasonably certain such an exemption is available."[5] *Id.* at *33.  Scottsdale Capital Advisors

---

[5]     Scottsdale Capital Advisors acknowledges that: (1) Enforcement had the initial burden of proof to establish a prima facie case of a violation of Section 5 of the Securities Act; (2) Enforcement met that initial burden of proof; and (3) the burden of proof shifted to Scottsdale Capital Advisors to establish the applicability of an exemption from securities registration.  From there, however, Scottsdale Capital Advisors asserts that the Firm must demonstrate "prima facie compliance" with a registration exemption, and that, once the Firm does so, "Enforcement

[Footnote continued on next page]

- 6 -

claims that two exemptions apply to its liquidation of the securities at issue – Rule 144 and Section 4(a)(4) of the Securities Act.

### 3. Scottsdale Capital Advisors' Claimed Exemption: Rule 144

Scottsdale Capital Advisors' first claimed exemption is Rule 144 of the Securities Act. Rule 144 permits the public resale of restricted securities and control securities subject to the satisfaction of five specific conditions. *Rule 144: Selling Restricted and Control Securities* (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html (last visited July 20, 2018). Before we examine Rule 144's five conditions, there are certain aspects of the rule that require emphasis.

### a. Rule 144's Limited Application to Restricted Securities and Control Securities

First, Rule 144 limits its application to restricted securities or control securities. *Rule 144: Selling Restricted and Control Securities*, *supra* page 3. "Restricted securities" include "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering." 17 C.F.R. § 230.144(a)(3) (2013) (definitions). "Control securities" are securities "held by an affiliate of the issuing company." *Rule 144: Selling Restricted and Control Securities*, *supra* page 3.

---

[cont'd]

cannot establish a violation of [Section] 5 [of the Securities Act] unless it proves that the sales were part of a plan or scheme to evade the registration requirements of the [Securities] Act."

Scottsdale Capital Advisors misconstrues the allocation of the burdens of proof in this case. As an initial matter, the language that Scottsdale Capital Advisors cites is limited to Rule 144 of the Securities Act, not all exemptions claimed pursuant to the Securities Act. *Cf.* 17 C.F.R. § 230.144 (2013) (Rule 144 of the Securities Act states that the rule's "safe harbor is not available to any person with respect to any transaction or series of transactions that, although in technical compliance with Rule 144, is part of a plan or scheme to evade the registration requirements of the [Securities] Act"). Second, the language that Scottsdale Capital Advisors cites does not create an additional burden of proof for Enforcement; rather, it clarifies that the safe harbor of Rule 144 is unavailable where there is a plan or scheme to evade the registration of securities, even if an individual or entity technically complies with the rule. 17 C.F.R. § 230.144 (2013) (preliminary note). Finally, Scottsdale Capital Advisors' burden of proof to establish the applicability of an exemption from securities registration "imposes the burden of persuasion, not simply the burden of establishing a prima facie case." *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries Director*, 512 U.S. 267, 274 (1994). In order to prevail on this cause of action, Scottsdale Capital Advisors must prove by a preponderance of the evidence that the 74 million shares that the Firm liquidated were exempt from the registration requirements of the Securities Act. *See KCD Fin. Inc.*, Exchange Act Release No. 80340, 2017 SEC LEXIS 986, at *12 (Mar. 29, 2017) (upholding preponderance of evidence standard in FINRA disciplinary proceeding involving unregistered securities sales).

- 7 -

Scottsdale Capital Advisors acknowledges that the 74 million shares that it liquidated in this case were restricted securities.

b.   Rule 144's Prohibition on the Offer and Sale of
Unregistered and Nonexempt Securities

Second, Rule 144 underscores Section 5's prohibition on the offer or sale of unregistered and nonexempt securities. 17 C.F.R. § 230.144 (2013) (preliminary note). Rule 144 states that "[i]f any person sells a non-exempt security to any other person, the sale must be registered unless an exemption can be found for the transaction." 17 C.F.R. § 230.144 (2013) (preliminary note); *see also* 15 U.S.C. § 77e(a), (c) (2014). Despite the general prohibition on the offer and sale of unregistered securities, Rule 144 asserts that Section 4(a)(1) of the Securities Act "provides one such exemption for a transaction 'by a person other than an issuer, underwriter, or dealer.'" 17 C.F.R. § 230.144 (2013) (preliminary note) (citing 15 U.S.C. § 77d(a)(1) (2014) ("The provisions of [S]ection 5 [of the Securities Act] . . . shall not apply to . . . transactions by any person other than an issuer, underwriter, or dealer.")).

c.   Rule 144's Safe Harbor for Underwriters

Third, Rule 144 focuses on the definition of "underwriter."[6] 17 C.F.R. § 230.144 (2013) ("Persons deemed not to be engaged in a distribution and therefore not underwriters"). If a seller satisfies the five conditions of Rule 144, Rule 144 may provide the seller with a safe harbor from the definition of underwriter, which, in turn, may permit the application of the Section 4(a)(1) exemption to the seller's unregistered securities sales. 17 C.F.R. § 230.144 (2013) (preliminary note). Rule 144, however, cautions that sellers "may be 'underwriters' if they act as links in a chain of transactions through which securities move from an issuer to the public." 17 C.F.R. § 230.144 (2013) (preliminary note).

d.   Rule 144's Five Conditions

Fourth, Rule 144 establishes five specific conditions to determine whether a seller has "satisf[ied] the applicable conditions of the Rule 144 safe harbor," "is deemed not to be engaged in a distribution of the securities," and "therefore [is] not an underwriter of the securities for purposes of Section 2(a)(11) [of the Securities Act]." 17 C.F.R. § 230.144 (2013) (preliminary note). If a seller does so, i.e., complies with the applicable conditions of Rule 144, "[a]ny affiliate or other person who sells restricted securities will be deemed not to be engaged in a distribution and therefore not an underwriter for that transaction;" "[a]ny person who sells restricted or other securities on behalf of an affiliate of the issuer will be deemed not to be engaged in a distribution and therefore not an underwriter for that transaction;" and "[t]he

---

[6]   Section 2(a)(11) of the Securities Act defines underwriter. Section 2(a)(11) of the Securities Act states that an underwriter is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates, or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(a)(11) (2014); 17 C.F.R. § 230.144 (2013) (preliminary note).

- 8 -

purchaser in such transaction will receive securities that are not restricted securities." 17 C.F.R.
§ 230.144 (2013) (preliminary note).

Rule 144's five conditions relate to the: (1) period of time that the seller holds the
securities, or, the securities' "holding period" (Rule 144(d)); (2) current public information about
the issuer of the securities (Rule 144(c)); (3) limitations on the amount of the securities sold, or,
the securities' "trading volume formula" (Rule 144(e)); (4) manner of the securities' sales, i.e.,
the transactions must be "ordinary brokerage transactions" that are unsolicited, sold directly to
market makers, or sold in "riskless principal transactions" (Rule 144(f)); and (5) notice of the
sales of the securities via the Commission's Form 144 (Notice of Proposed Sale of Securities
Pursuant to Rule 144 Under the Securities Act of 1933) (Rule 144(h)). 17 C.F.R. § 230.144(c)-
(f), (h) (2013); *see also Rule 144: Selling Restricted and Control Securities*, *supra* page 3. In
addition, the protections of Rule 144 do not extend to "shell companies," or issuers "with no or
nominal operations and no or nominal non-cash assets." 17 C.F.R. § 230.144(i) (2013).

> e.    Rule 144's One-Year Holding Period and the Rule's
> Applicability to "Affiliates"

Fifth, the applicability of the five conditions vary based on two factors – whether the
issuer is a reporting or nonreporting company and whether the selling customers are affiliates or
nonaffiliates of the issuer. Scottsdale Capital Advisors concedes that the three issuers at issue –
NHPI, VPLM, and ORFG – were nonreporting companies during the relevant period, and that a
one-year holding period applied to resales of the restricted securities. *See Rule 144: Selling
Restricted and Control Securities*, *supra* page 3.

For these reasons, we focus our discussion on the definition of "affiliate," which turns on
the definition of "control." "An affiliate of an issuer is a person that directly, or indirectly
through one or more intermediaries, controls, or is controlled by, or is under common control
with, such issuer." 17 C.F.R. § 230.144(a)(1) (2013) (definitions); *see also Rule 144: Selling
Restricted and Control Securities*, *supra* page 3 (explaining that an affiliate is "a person, such as
an executive officer, a director or large shareholder, in a relationship of control with the issuer").

"Control means the power to direct the management and policies of the company in
question, whether through the ownership of voting securities, by contract, or otherwise." *Rule
144: Selling Restricted and Control Securities*, *supra* page 3. In order to be deemed a
nonaffiliate of an issuer, the selling customer must "not [be] an affiliate of the issuer at the time
of the sale [of the restricted securities], and [must] not [have] been an affiliate [of the issuer]
during the . . . three months [prior to the sale of the restricted securities] . . . ."[7] 17 C.F.R. §
230.144(b)(1) (2013). The Commission admonishes that purchasers who "buy securities from a
controlling person or 'affiliate,' . . . take restricted securities, even if they were not restricted in
the affiliate's hands." *Rule 144: Selling Restricted and Control Securities*, *supra* page 3.

---

[7]    Owners of at least 10 percent of an issuer's securities are presumptive affiliates of the
issuer. *See* J. William Hicks, Resales of Restricted Securities at § 4:38 (2017 ed. (March 2017
Update)).

- 9 -

The determination of the selling customer's status as an affiliate or nonaffiliate of the issuer is critical for Scottsdale Capital Advisors' reliance on the Rule 144 exemption for its liquidation of the 74 million shares. If an affiliate of the issuer, or a person selling the securities on behalf of an affiliate of the issuer, resells the restricted securities, the securities are subject to Rule 144's one-year holding period *and* the four other conditions listed in Rule 144. On the other hand, if a nonaffiliate seeks to resell his or her restricted securities, no Rule 144 condition applies, except for the one-year holding period. In our estimation, Scottsdale Capital Advisors' reliance on the Rule 144 exemption comes down to three factors – the selling customer's status as an affiliate or nonaffiliate of NHPI, VPLM, or ORFG, the calculation of the selling customer's holding period for purposes of compliance with Rule 144's one-year holding period, and NHPI's, VPLM's, and ORFG's status as a shell or non-shell company. We reach, and resolve, each of these issues in Part III.A.7.

> f.  Rule 144's Caveat

Sixth, Rule 144 contains a warning for individuals who may attempt to circumvent or evade the registration requirements of the Securities Act by laying claim to the safe harbor protections of Rule 144. Rule 144 advises that "[t]he Rule 144 safe harbor is not available to any person with respect to any transaction or series of transactions that, although in technical compliance with Rule 144, is part of a plan or scheme to evade the registration requirements of the [Securities] Act." 17 C.F.R. § 230.144 (2013) (preliminary note).

> 4.  Scottsdale Capital Advisors' Second Claimed Exemption: Section 4(a)(4) of the Securities Act

Section 4(a)(4) of the Securities Act is commonly referred to as the "brokers' exemption." *Midas Sec.*, 2012 SEC LEXIS 199, at *30. The exemption applies to "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market[,] but not the solicitation of such orders." 15 U.S.C. § 77d(a)(4) (2014).

Section 4(a)(4) operates in concert with Rule 144. When read together, Rule 144 and Section (4)(a)(4) permit a broker-dealer who participates in the resale of restricted securities to claim an exemption under Section 4(a)(4), but only if the broker-dealer does not become an "underwriter" in the transactional process, as defined in Rule 144 of the Securities Act and Section 2(a)(11) of the Securities Act. *See* Hicks, *supra* note 10, at §§ 4:8 (Broker's Duties – General), 4:10 (Rule in Context: Sections 4(a)(1) and 4(a)(4)). By interpreting the terms "underwriter," "distribution," and "brokers' transactions" in Sections 4(a)(l), 2(a)(11), and 4(a)(4) of the Securities Act, respectively, broker-dealers have a basis to claim an exemption pursuant to Section 4(a)(4). Hicks, *supra* note 10, at § 4:10.

Once again, the seller's status as an affiliate or nonaffiliate of the issuer is an important factor in the applicability of the Section 4(a)(4) exemption. Specifically, Rule 144(f) states that affiliate-sellers of restricted securities who intend to rely on Rule 144 must resell their restricted

- 10 -

securities in "[b]rokers' transactions within the meaning of [S]ection (4)[(a)](4) of the [Securities] Act." 17 C.F.R. § 230.144(f)(1)(i) (2013).[8]

The counter-part of Rule 144(f), which focuses on the manner that affiliate-sellers of restricted securities resell the securities, is Rule 144(g). Hicks, *supra* note 10, at § 4:8. Rule 144(g) defines the term "brokers' transactions," and, in doing so, sets forth the obligations of a broker-dealer that seeks an exemption pursuant to Section 4(a)(4). *See id.* Rule 144(g) states that "[t]he term brokers' transactions in [S]ection 4[(a)](4) of the [Securities] Act . . . include transactions" where the broker-dealer:

> (1) [d]oes no more than execute the order or orders to sell the securities as agent for the person for whose account the securities are sold [Rule 144(g)(1)]; (2) [r]eceives no more than the usual and customary broker's commission [as remuneration] [Rule 144(g)(2)]; (3) [n]either solicits nor arranges for the solicitation of customers' orders to buy the securities in anticipation of or in connection with the transaction [Rule 144(g)(3)];[9] and (4) [a]fter reasonable inquiry[,] is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer [Rule 144(g)(4)].[10]

17 C.F.R. § 230.144(g)(1)-(4) (2013); *see* Hicks, *supra* note 10, at § 4:8.

5.    The Duty of Inquiry Under Rule 144(g)(4) and Section 4(a)(4) of
the Securities Act

Although Section 4(a)(4) of the Securities Act is designed to exempt "ordinary brokerage transactions," the exemption "is not available if the broker[-dealer] knows or has reasonable grounds to believe that the selling customer's part of the transaction is not exempt from Section 5 of the Securities Act." *Midas Sec.*, 2012 SEC LEXIS 199, at *30; *see* 17 C.F.R. § 230.144(g)(4) (stating that the term "brokers' transactions" in Section 4(a)(4) would not be deemed to include, for purposes of Rule 144, transactions in which the broker does not conduct a "reasonable inquiry"). Consequently, in order to determine whether the selling customer's part of the

---

[8]    In addition to brokers' transactions, Rule 144(f) permits affiliate-sellers of restricted securities to resell their restricted securities in: "[1] transactions directly with a market maker, as that term is defined in [S]ection 3(a)(38) of the [Securities] Exchange Act [of 1934]; or [2] [r]iskless principal transactions," as defined in the "Note to § 230.144(f)(1)." 17 C.F.R. § 230.144(f) (2013).

[9]    Rule 144(g)(3) is subject to four qualifications that are not relevant to this case. *See* 17 C.F.R. § 230.144(g)(3)(i)-(iv) (2013).

[10]    The broker-dealer is "deemed to be aware of any facts or statements contained in the [Form 144 (Notice of Proposed Sale of Securities Pursuant to Rule 144 Under the Securities Act of 1933)] . . . required by paragraph (h) of this section." 17 C.F.R. § 230.144(g)(4) (2013).

- 11 -

transaction is exempt from Section 5, and satisfy the reasonable inquiry requirements of Rule 144(g)(4) and Section 4(a)(4), the broker-dealer has a "duty of inquiry" that requires an examination of the facts surrounding a proposed sale. *Midas Sec.*, 2012 SEC LEXIS 199, at *30.

The amount of inquiry required necessarily varies with the circumstances of the proposed transaction. *See id.* at *31. For example,

> "A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security . . . where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for."

*Id.* at *31-32 n.42 (quoting *Distribution by Broker-Dealers of Unregistered Securities*, Exchange Act Release No. 6721, 1962 SEC LEXIS 74, at *4 (Feb. 2, 1962)).

A broker-dealer's duty of inquiry becomes "particularly acute where substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration under the Securities Act of 1933." *Distribution by Broker-Dealers of Unregistered Securities*, 1962 SEC LEXIS 74, at *4. Under these circumstances, "it must be assumed that these securities emanate from the issuer or from persons controlling the issuer," and the broker-dealer "must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer or an underwriter." *Id.* at **3, 4. "It is not sufficient for [the broker-dealer] merely to accept self-serving statements of [its] sellers and their counsel without reasonably exploring the possibility of contrary facts." *Id.* at *3.

6.     Scottsdale Capital Advisors' Liquidation of 74 Million
       Unregistered Microcap Securities

Our review of the law in this area has identified three factors that affect the applicability of the Rule 144 and Section 4(a)(4) exemptions that Scottsdale Capital Advisors has claimed in these proceedings: (1) the selling customer's status as an affiliate or nonaffiliate of the issuer (NHPI, VPLM, or ORFG); (2) the calculation of the holding period for purposes of satisfying Rule 144's requirement of a one-year holding period for certain categories of restricted securities; and (3) Scottsdale Capital Advisors' "reasonable inquiry" into the facts surrounding the selling customer's sale of the restricted securities to determine whether the selling customer's transaction was exempt from Section 5 of the Securities Act. To address these issues, and assess the applicability of the Rule 144 and Section 4(a)(4) exemptions, we examine Scottsdale Capital Advisors' operations, specifically, the Firm's Rule 144 Team, in addition to the transactions at issue.

- 12 -

a.    Scottsdale Capital Advisors' Rule 144 Team

Scottsdale Capital Advisors' principal business is the deposit and liquidation of microcap securities for its customers.[11]  During the relevant period, microcap deposits and liquidations accounted for more than 95 percent of the transactions that Scottsdale Capital Advisors executed for its customers and served as the primary source of the Firm's revenue.  Because most of the securities that Scottsdale Capital Advisors sold on behalf of its customers were unregistered, the Firm relied heavily on Rule 144 exemptions for its liquidations, and, as a consequence, the Firm had a dedicated Rule 144 Team to review the microcap securities that were deposited for resale.

The Rule 144 Team was comprised almost exclusively of attorneys.  The attorneys on the Rule 144 Team reviewed the microcap security deposits, collected and assembled information and documents related to the deposited microcap securities and depositing customers, and prepared a "Due Diligence Package" for the Rule 144 Team manager's review.

During the relevant period, Henry Diekmann, Scottsdale Capital Advisors' current president, was the Rule 144 Team's manager.  Despite Diekmann's designation as manager of the Rule 144 Team, Cruz had final approval authority over Rule 144 transactions, including the transactions that occurred in this case.  In his role as final approver of Rule 144 transactions, Cruz reviewed the documents and information that the Rule 144 Team had assembled in the Due Diligence Packages, and he determined whether the documents and information were sufficient to approve the microcap security deposit.

---

[11]    The term "microcap" security applies to a company that has a low or "micro" capitalization, meaning the total value of the company's stock.  *Microcap Stock: A Guide for Investors* (Sept. 18, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html (lasted visited June 26, 2018).  The typical definition of a microcap security applies to a company that has a market capitalization of less than $250 or $300 million.  *Id.*  Microcap companies typically have limited assets and operations, and microcap stocks tend to be low priced and trade in low volume.  *Id.*  The Commission has cautioned that "all investments involve risk, [but] microcap stocks are among the most risky."  *Id.*  The Commission also has warned that many microcap companies are new and have no proven track record, and that some microcap companies have no assets, operations, or revenues, lack publicly available information, and do not submit to minimum listing standards, such as a minimum amount of net assets or a minimum number of shareholders.  *Id.*

- 13 -

    b.    Scottsdale Capital Advisors' Due Diligence Packages

The Due Diligence Packages that Scottsdale Capital Advisors' Rule 144 Team prepared contained all the information that the Rule 144 Team had gathered for deposited microcap securities that were intended for resale. The Due Diligence Packages "represent[ed] the state of the [F]irm's knowledge with regard to beneficial owners" and "the parties to the underlying agreements" "as of the time [that] the deposits were approved." As the Hearing Panel summarized, "[e]verything that Scottsdale [Capital Advisors] knew about a deposit when the Firm concluded that it could sell the deposited securities pursuant to the Rule 144 exemption is contained in a [D]ue [D]iligence [P]ackage for the deposit."

The record contains the Rule 144 Team's Due Diligence Packages for the deposits of NHPI, VPLM, and ORFG that are the subject of this case. The first item in Scottsdale Capital Advisors' Due Diligence Package is a two-page document, a "Deposited Securities Checklist." The Deposited Securities Checklist identifies the "client" depositing the microcap security, the client's account number, a description of the security, and the security's trading symbol. The Deposited Securities Checklist lists the number of shares that the issuer has outstanding, the client's percentage ownership of the issuer's outstanding shares, and the percentage of the client's owned shares that the client intended to deposit at Scottsdale Capital Advisors. The Deposited Securities Checklist discloses the "free-trading basis" for the deposited securities, which was Rule 144 for all of the deposits at issue. The Deposited Securities Checklist also contains "due diligence steps" for the Rule 144 Team's completion. The due diligence steps included actions such as identifying the issuer's periodic reporting requirements with the Commission,[12] determining whether the client is an affiliate or control person of the issuer, calculating the Rule 144 holding period applicable to the transaction, and verifying that the issuer is not a shell company for purposes of application of the Rule 144 exemption.

The Deposited Securities Checklist contained two signature approvals, a "144 Compliance Approval" and a "Broker Approval." Cruz signed the 144 Compliance Approval. When Cruz signed the Deposited Securities Checklist, he attested that, "[b]ased on the information received and reviewed as described in this Deposited Securities Checklist, SCA [Scottsdale Capital Advisors] reasonably believes the subject securities are free-trading."

Jay Noiman, Scottsdale Capital Advisors' former manager of trading and sales and the Firm's CCO prior to DiBlasi, signed the Broker Approval section of the Deposited Securities Checklist. Noiman's signature certified that he had "carefully reviewed this Deposited Securities Checklist and the appropriate supporting documents, and represent[ed] to SCA [Scottsdale Capital Advisors] and its clearing firm [Alpine Securities] that to [his] best knowledge[,] the information is true and correct and any resale will be made in compliance with firm policy and

---

[12]    The Deposited Securities Checklists for NHPI and ORFG state that the two issuers did not file periodic reports with the Commission during the relevant period. The Deposited Securities Checklist for VPLM states that the issuer was a reporting company, but, at the oral argument for this appeal, counsel for the Respondents represented that was not the case, that the three issuers at issue – NHPI, VPLM, and ORFG – were all nonreporting companies during the relevant period, and that a one-year holding period applied to resales of the securities.

- 14 -

all applicable laws." At the hearing, however, Noiman testified (and the parties stipulated) that Noiman's signature on the Deposited Securities Checklist confirmed that the Due Diligence Packages, including any supporting documentation, were complete, not that Noiman had substantively reviewed the Due Diligence Packages, or that he had determined that any exemption applied to the transaction.

Various other documents followed the Deposited Securities Checklist in the Due Diligence Packages, which we refer to as the "Due Diligence Supporting Documents." The Due Diligence Supporting Documents included an Attorney Opinion Letter stating that the shares had no resale restrictions; documents pertaining to the underlying transactions that resulted in the selling customer's ownership of the shares; unaudited financial statements and other documents to demonstrate that the issuer was not a shell company; and printouts from internet searches related to the individuals and entities involved in the transactions. Most notable among the Due Diligence Supporting Documents was the "Beneficial Ownership Declaration." The Beneficial Ownership Declaration consisted of check boxes and blank fields "to be completed by beneficial owner." The Beneficial Ownership Declaration included a description of how the beneficial owner acquired the shares and asked whether the beneficial owner was the exclusive beneficial owner of the shares intended for resale. The Beneficial Ownership Declaration certified that the shares were free-trading, that the shares were not subject to any resale restrictions, and that, to the beneficial owner's knowledge, the issuer was not a shell company. The Beneficial Ownership Declaration was not sworn, witnessed, or notarized, nor did it provide any contact information for the person signing the form.

c.   Scottsdale Capital Advisors' Process for Approving
     Deposits of Microcap Securities and Determining the
     Beneficial Owners of the Deposited Securities

Once a member of the Rule 144 Team assembled the Due Diligence Package, including all supporting documentation, the Rule 144 Team member would set a meeting for Cruz and the Rule 144 Team member to review the documents in the Due Diligence Package. Depending on the complexity of the deposit, these meetings would take between 15 minutes and one hour. Cruz did not review every page or every document in the Due Diligence Package. Rather, as Henry Diekmann, Scottsdale Capital Advisors' former Rule 144 Team manager, testified, "[h]e [Cruz] reads through the [Deposited Securities] [C]hecklist first. Then he'll ask me a series of questions, ask to see certain documents in the file, and he might do [internet] searches or research on his computer while we're sitting there together." Scottsdale Capital Advisors, specifically, Cruz, relied on the representations in the Beneficial Ownership Declaration to determine whether the identified beneficial owner of the deposited shares was an affiliate of the issuer, and to ascertain whether the identified beneficial owner was the person who had the actual economic interest in the deposited shares.

d.   Scottsdale Capital Advisors' Beneficial Ownership
     Declaration Did Not Account for the Selling Customers'
     Use of Nominees

Cruz asserted that the Beneficial Ownership Declaration was "unequivocal," and that the parties to the transactions understood Scottsdale Capital Advisors' expectations concerning the

- 15 -

beneficial ownership of the deposited shares. But, as Cruz acknowledged, Scottsdale Capital Advisors' Beneficial Ownership Declaration, and the Firm's processes and procedures overall, failed to account for the selling customers' use of nominees in the transactions. Cruz testified, "[the parties to the transaction] understood what their expectation was. And that was to disclose the underlying beneficial owner on that depositor. It could be nominees in there. I really didn't care if they were using a nominee. But I needed to know who the owner is."[13]

Because Cruz focused on the beneficial ownership of deposited shares, and not the involvement of nominees acting on behalf of beneficial owners, Scottsdale Capital Advisors did not conduct a specific search for nominees in its liquidating transactions at any point during the relevant period. In the context of this case, the selling customers' use of nominees clouds the identity of the actual beneficial owner of the deposited shares, muddles the determination of whether the identified beneficial owner is the person with the actual economic interest in the deposited shares, and complicates the critical determination of the affiliate or nonaffiliate status of the selling customer for purposes of the application of the Rule 144 exemption. *See* Part III.A.3.e. (Rule 144's One-Year Holding Period and the Rule's Applicability to "Affiliates").

     e.    The Selling Customers and the Liquidating Transactions

Before we examine the transactions, it is important to note that all 74 million liquidations occurred within a vertically integrated microcap liquidation enterprise that John Hurry founded and owns. Hurry formed (and owns) Scottsdale Capital Advisors. Hurry established (and owns) Cayman Securities,[14] the broker-dealer that served as the qualified intermediary for the liquidating transactions and represented the selling customers who deposited the microcap shares at Scottsdale Capital Advisors.[15] Hurry also founded (and owns) the firm that cleared the shares, Alpine Securities.[16]

---

[13]    A "nominee" is a person or entity that takes possession of securities or other assets for the purpose of making transactions on behalf of the owner of the securities or other assets. https://www.merriam-webster.com/dictionary/nominee.

[14]    Hurry indirectly owns Cayman Securities through a succession of holding companies, limited liability companies, and the family trust.

[15]    A "qualified intermediary" is "any foreign intermediary (or foreign branch of a US intermediary) that has entered into a qualified intermediary withholding agreement with the IRS." https://www.irs.gov/businesses/international-businesses/ miscellaneous-qualified-intermediary-information. Once a foreign entity qualifies as a qualified intermediary, the qualified intermediary "is entitled to certain simplified withholding and reporting rules." *Id.* For example, "[a qualified intermediary] is not required to forward documentation obtained from foreign account holders to the US withholding agent from whom the [qualified intermediary] receives a payment of US source income." *Id.*

[16]    Alpine Securities' Form BD identifies Hurry as the firm's "Director." Alpine Securities' report in BrokerCheck identifies Hurry as the "Chairman of Alpine [Securities'] Board of Directors." Hurry indirectly owns Alpine Securities through his ownership of a limited liability company (SCA Clearing, LLC) and the family trust.

- 16 -

Scottsdale Capital Advisors, Cayman Securities, and Alpine Securities, together, constituted a self-contained system for the processing, liquidation, and distribution of microcap securities. Cayman Securities worked exclusively with Scottsdale Capital Advisors, and, in turn, Scottsdale Capital Advisors cleared all of its securities transactions through Alpine Securities. Gregory Ruzicka,[17] the individual who Hurry hired to manage Cayman Securities' day-to-day operations in the Cayman Islands, described Cayman Securities as an "adjunct" of Hurry's operations at Scottsdale Capital Advisors, and he stated that Cayman Securities never considered using a broker-dealer other than Scottsdale Capital Advisors for its microcap security deposits.

Alpine Securities' CEO, Christopher Frankel, corroborated Ruzicka's statements about the relationship among Hurry's enterprises. For example, at the hearing, Frankel testified that Alpine Securities was a "small" "boutique clearing operation" that focused on the kind of business that Cayman Securities brought to it.[18] No individual or entity outside of Hurry's vertically integrated microcap liquidation enterprise was involved in the preparation, approval, or clearing of the microcap securities that Cayman Securities deposited for resale at Scottsdale Capital Advisors.

i.      The Selling Customers: Cayman Securities, Montage Securities, Titan International Securities, and Unicorn International Securities

It is also important to note that, while Cayman Securities was Scottsdale Capital Advisors' "customer" for all 74 million liquidations (i.e., Cayman Securities deposited the 74 million shares at Scottsdale Capital Advisors), Cayman Securities made the deposits "FBO," or "for the benefit of," of three foreign financial institutions – Montage Securities Corporation ("Montage Securities"), Titan International Securities, Inc. ("Titan International Securities"), and Unicorn International Securities, LLC ("Unicorn International Securities"). Montage Securities was located in Panama. Titan International Securities and Unicorn International Securities were entities located in Belize. To complicate matters further, Montage Securities, Titan International Securities, and Unicorn International Securities purported to act "FFBO," or "for the further benefit of" other entities or individuals.

ii.     The Neuro-Hitech, Inc. (NHPI) Transactions (Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits)

Between February 7, 2014 and March 12, 2014, Cayman Securities deposited a total of 60 million shares of microcap issuer, NHPI, at Scottsdale Capital Advisors for resale. Cayman

---

[17]      Gregory Ruzicka did not testify at the hearing, but Enforcement entered the entirety of Ruzicka's on-the-record testimony as an exhibit during the hearing before the Hearing Panel.

[18]      Christopher Frankel, Alpine Securities' CEO, explained that small clearing firms like Alpine Securities are "not going to be able to effectively compete . . . with the likes of [large clearing firms]. So you have to look at areas of the business that, quite frankly, that the large [clearing] firms don't want to transact in."

- 17 -

Securities made the deposits for the benefit of Belize-based Unicorn International Securities. Unicorn International Securities purported to act for the further benefit of three other Belizean corporations, Sky Walker, Inc. ("Sky Walker"), Swiss National Securities, SA ("Swiss National Securities"), and Ireland Offshore Securities, SA ("Ireland Offshore Securities").[19] Between February 26, 2014 and May 7, 2014, Scottsdale Capital Advisors liquidated all 60 million shares of NHPI from Cayman Securities' account at the Firm. The liquidations generated net proceeds of $264,711.70 for the selling customers (Sky Walker, Swiss National Securities, and Ireland Offshore Securities) and commissions of $4,727.68 for Scottsdale Capital Advisors. Scottsdale Capital Advisors wired out the proceeds of the NHPI sales to Cayman Securities' bank account. After it did so, Scottsdale Capital Advisors did not follow the funds, did not know where the funds flowed, and did not know who received the economic benefit of the funds.

(a)    The Issuer – NHPI

Although NHPI was not a reporting company and had no shares registered with the Commission between December 2013 and June 2014,[20] NHPI had been registered previously with the Commission and made several periodic filings with the Commission between June 2005 and August 2009.[21] NHPI filed its last annual periodic report, the Form 10-K, with the Commission on March 31, 2009. The issuer filed an amended Form 10-K on April 30, 2009 (the "NHPI Amended Form 10-K"). The NHPI Amended Form 10-K covers the annual period ended on December 31, 2008. We have consulted the NHPI Amended Form 10-K to inform our discussion of the issuer.

The NHPI Amended Form 10-K states that NHPI "was originally formed on February 1, 2005, as Northern Way Resources, Inc., a Nevada corporation, for the purpose of acquiring

---

[19]    On February 7, 2014, Cayman Securities deposited 20 million shares of NHPI for the benefit of Unicorn International Securities for the further benefit of Sky Walker (the "Sky Walker Deposit"). On March 12, 2014, Cayman Securities made two deposits of 20 million shares of NHPI, for a total deposit of 40 million shares of NHPI. Cayman Securities deposited 20 million shares of NHPI for the benefit of Unicorn International Securities for the further benefit of Swiss National Securities (the "Swiss National Securities Deposit"), and Cayman Securities deposited 20 million shares of NHPI for the benefit of Unicorn International Securities for the further benefit of Ireland Offshore Securities (the "Ireland Offshore Securities Deposit").

[20]    We obtained NHPI's, VPLM's, and ORFG's periodic filings from the Commission's EDGAR system, and, accordingly, we took official notice of the periodic filings discussed in this decision. Cf. FINRA Rule 9145(b).

[21]    In August 2009, NHPI filed a Form 15 (Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934) to terminate its securities registration and status as a reporting company under the Exchange Act. NHPI has made no periodic filings with the Commission since that time.

- 18 -

exploration and early stage natural resource properties."[22] The NHPI Amended Form 10-K discloses that NHPI changed its name to Neuro-Hitech Pharmaceuticals in January 2006, and that the issuer changed its name to Neuro-Hitech, Inc. in August 2006. The NHPI Amended Form 10-K describes NHPI as "a specialty pharmaceutical company focused on developing, marketing and distributing branded and generic pharmaceutical products primarily in the cough and cold markets."

Between August 2009 (the date of NHPI's last periodic report filing with the Commission) and November 2013 (the date of NHPI's first periodic report filing with OTC Markets), NHPI did not provide any public information about its operations or financial condition.[23] OTC Markets Website (Filings and Disclosures). In November 2013,[24] however, NHPI published on the OTC Markets website: (1) unaudited quarterly reports for each quarter dating back to the period ended on March 31, 2012; (2) an annual report for the year ended on December 31, 2012; (3) an "Information and Disclosure Statement for the Period Ending December 31, 2012;"[25] (4) an "Interim Information and Disclosure Statement [T]hrough November 20, 2013;" and (5) two attorney letters from NHPI's "corporate counsel,"[26] which state that the issuer's quarterly and annual reports "constitute[] 'adequate current public information' concerning the common stock of [NHPI] quoted on the OTC Markets . . . and [NHPI] itself, and 'is available within the meaning of Rule 144(c)(2) under the Securities Act' . .

---

[22]    Although the NHPI Amended Form 10-K states that NHPI was founded in February 2005, the Attorney Opinion Letters in the Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits are identical and state that NHPI was formed in 1996.

[23]    We took official notice of NHPI's, VPLM's, and ORFG's disclosures, filings, and financials, as published on the OTC Markets website (https://www.otcmarkets.com/home). *See* FINRA Rule 9145(b).

[24]    After more than four years of not publishing public information about its operations or financial condition, NHPI published all of the noted documents on the OTC Markets website within a four-day period between November 19, 2013 and November 22, 2013.

[25]    On November 20, 2013, NHPI published on the OTC Markets website an annual "Information and Disclosure Statement for the Period Ending December 31, 2012." The Annual Information and Disclosure Statement noted that, since 2008, NHPI was "principally engaged in the business of development, marketing, sales[,] and distribution of specialty [p]harmaceuticals."

Two days later, on November 22, 2013, NHPI published an "Interim Information and Disclosure Statement [T]hrough November 20, 2013" on the OTC Markets website. The Interim Information and Disclosure Statement stated, "[i]n August of 2013, [NHPI] began to move its business model toward new oil and natural gas exploration."

[26]    The individual identified as NHPI's corporate counsel in the attorney letters from the OTC Markets website is the same person who provided the Attorney Opinion Letters in Scottsdale Capital Advisors' Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits.

- 19 -

. ."  In the months preceding the relevant period (December 2013 to June 2014), specifically, the quarterly period ended on September 30, 2013, NHPI reported negative net income of $498,166.

(b)     Scottsdale Capital Advisors' Due Diligence
        Packages for the Three NHPI Deposits

        Scottsdale Capital Advisors prepared a Due Diligence Package for each of the three NHPI deposits at issue in this case: (1) 20 million shares from Cayman Securities for the benefit of Unicorn International Securities for the further benefit of Sky Walker (the Sky Walker Deposit); (2) 20 million shares from Cayman Securities for the benefit of Unicorn International Securities for the further benefit of Swiss National Securities (the Swiss National Securities Deposit); and (3) 20 million shares from Cayman Securities for the benefit of Unicorn International Securities for the further benefit of Ireland Offshore Securities (the Ireland Offshore Securities Deposit).  At the hearing before the Hearing Panel, the Respondents proffered the Due Diligence Packages that Scottsdale Capital Advisors prepared as evidence to "[d]emonstrate the diligence that [Scottsdale Capital Advisors] performed on the subject deposits[,] . . . [and to] show that the sales were exempt from registration, including under Rule 144 and/or Rule 4(a)(4) . . . ."  In order to understand the transactions that culminated in the deposit of the NHPI shares at Scottsdale Capital Advisors, and to ascertain what information the Firm had in hand when it approved the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits, we have carefully scrutinized the contents of the Due Diligence Packages.[27]

(1)     The Deposited Securities Checklist

        The Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits each included a Deposited Securities Checklist.  Henry Diekmann reviewed the Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits.  Cruz signed the Rule 144 Compliance Approval on each of the Deposited Securities Checklists.  Jay Noiman signed the Broker Approval section of the forms.

---

[27]     Scottsdale Capital Advisors claims that the Firm may have taken additional steps or conducted additional due diligence that may not be reflected or documented in the Due Diligence Packages contained in the record.  Be that as it may, Scottsdale Capital Advisors produced the Due Diligence Packages in support of its defense, and, accordingly, it was incumbent on the Firm, as the Respondent asserting that defense, to ensure that it provided the supporting evidence needed to corroborate its representations about the due diligence that it conducted.  *See Ernst & Young LLP*, Initial Decisions Release No. 249, 2004 SEC LEXIS 831, at *118 (Apr. 16, 2004) (explaining that the applicant "bears the burden of proof as to the applicability of the exception to its situation because a party asserting an affirmative defense has the burden of establishing it by the necessary proof").  For this reason, we have decided to focus our analysis on the documentary evidence contained in the record, i.e., the Due Diligence Packages, and not the Firm's pro hoc, self-serving, and unsubstantiated representations about other due diligence steps that it may or may not have taken.

- 20 -

The Deposited Securities Checklists for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits reveal two important facts common to all three deposits. First, the Deposited Securities Checklists show that all three deposits occurred within a one-month period between February 7, 2014 and March 12, 2014.  And second, most notably, the Deposited Securities Checklists disclose that each of the three deposits originated from a $10,000 promissory note from NHPI as debtor to an individual named "Thomas Collins" (Collins) as noteholder (the "Collins/NHPI Promissory Note").

    (2)  The Beneficial Ownership
         Declarations

The Due Diligence Supporting Documents follow the Deposited Securities Checklist. The first of the Due Diligence Supporting Documents in the Due Diligence Packages is the Beneficial Ownership Declaration.  In the context of these transactions, the beneficial owners of the shares deposited at Scottsdale Capital Advisors were the individuals who may have owned or controlled Sky Walker, Swiss National Securities, and Ireland Offshore Securities.  The Beneficial Ownership Declaration discloses the identity of each beneficial owner.

The Beneficial Ownership Declaration for the Sky Walker Deposit identifies Sky Walker's president, Patrick Gentle ("Gentle"), as the beneficial owner of the 20 million NHPI shares deposited at Scottsdale Capital Advisors on February 7, 2014.[28]  The Beneficial Ownership Declaration for the Swiss National Securities Deposit identifies Swiss National Securities' president, Talal Fouani ("Fouani"), as the beneficial owner of the 20 million NHPI shares deposited at Scottsdale Capital Advisors on March 12, 2014.[29]  The Beneficial Ownership Declaration for the Ireland Offshore Securities Deposit identifies an individual named Jeff Cox

---

[28] A "CSCT [Cayman Securities] Subaccount List" identifies Patrick Gentle as the beneficial owner of several unconnected customers of Cayman Securities.  For example, in addition to the NHPI shares, Cayman Securities deposited shares of VPLM at Scottsdale Capital Advisors for the benefit of Titan International Securities for the further benefit of an entity named Cumbre Company, Inc. ("Cumbre Company").  Cayman Securities also deposited shares of issuer, Medican Enterprises, Inc. (Symbol: MDCN), for the benefit of Unicorn International Securities for the further benefit of an entity named Keyhole Kapital, Inc. ("Keyhole Kapital").  Patrick Gentle is listed as the beneficial owner of Cumbre Company and Keyhole Kapital.

[29] The Deposited Securities Checklist for the Swiss National Securities Deposit lists "Talal Fanni" as the beneficial owner of the deposited NHPI shares.  This is a misspelling because the person who signed the Beneficial Ownership Declaration and other transactional documents in the Due Diligence Package for the Swiss National Securities Deposit did so as "Talal Fouani."  It is important to note that this misspelling, "Talal Fanni," carried throughout almost all of the forms that Scottsdale Capital Advisors prepared as part of the Due Diligence Package for the Swiss National Securities Deposit.  Consequently, as Scottsdale Capital Advisors prepared its due diligence for the Swiss National Securities Deposit, which included internet searches, the Firm did its research, and conducted its internet searches, based on an incorrect spelling of Talal Fouani's name.

- 21 -

("Cox") as the beneficial owner of the 20 million NHPI shares deposited at Scottsdale Capital Advisors on March 12, 2014.[30]

Gentle, Fouani, and Cox signed the Beneficial Ownership Declarations to "represent and certify" that they were not affiliates of NHPI, that NHPI was not a shell company "to the beneficial owner's best knowledge," and that the NHPI securities were "free-trading with no resale restrictions" under Rule 144. The Beneficial Ownership Declarations that Gentle, Fouani, and Cox signed were neither witnessed nor notarized, and the forms provided no address, telephone number, or other contact information for Gentle, Fouani, or Cox.

Scottsdale Capital Advisors also took no steps to verify the identities of Gentle, Fouani, or Cox. The extent of Scottsdale Capital Advisors' investigation of Gentle, Fouani, and Cox consisted of searching for their names on the Commission's website (https://www.sec.gov/), FINRA's "OFAC [US Department of Treasury's Office of Foreign Asset Control] Search Tool,"[31] and web-based internet searches. For example, Scottsdale Capital Advisors conducted web-based internet searches combining "Patrick Gentle," "Talal Fanni", and "Jeff Cox" with the words "securities fraud." But the Firm did not search for Gentle's, Fouani's, or Cox's name alone, did not search for Gentle's, Fouani's, or Cox's names in combination with the names of the entities through which they acquired the NHPI shares (Sky Walker, Swiss National Securities, and Ireland Offshore Securities, respectively), and did not search for Gentle's, Fouani's, Cox's names (or their entities' names) in connection with NHPI or NHPI's principals. Scottsdale Capital Advisors also did not document any due diligence that may have resulted from its web-based internet search results.

        (3)     The Attorney Opinion Letters and
                   Underlying Transactional
                   Documents

An Attorney Opinion Letter and several transactional documents are in Scottsdale Capital Advisors' Due Diligence Packages. The Attorney Opinion Letter and transactional documents purport to explain the transactions that resulted in shares of NHPI going from the issuer, NHPI, to Thomas Collins, and from Thomas Collins to Sky Walker, Swiss National Securities, and Ireland Offshore Securities and the beneficial owners of those entities (Patrick Gentle, Talal Fouani, and Jeff Cox, respectively). The Attorney Opinion Letter provides a chronological explanation of the transactions that occurred and culminates with a legal opinion that states that

---

[30]     The Due Diligence Package for the Ireland Offshore Securities Deposit does not disclose Jeff Cox's role within Ireland Offshore Securities.

[31]     FINRA offers an automated method of searching the OFAC Sanctions Program Listings. *See* https://ofac.finra.org/#/. OFAC regulations prohibit transactions with certain persons and organizations listed on the OFAC website as "Terrorists" and "Specially Designated Nationals and Blocked Persons," as well as listed embargoed countries and regions. *See id.* FINRA advises that member firms check the list on an ongoing basis to ensure that potential customers and existing customers are not prohibited persons or entities, and that they are not from embargoed countries or regions. *See id.*

- 22 -

the "shares of [NHPI] ('the Company'), owned by . . . (the 'Shareholder[s]') [Sky Walker, Swiss National Securities, and Ireland Offshore Securities] can be issued without restricted legend and . . . said [s]hares are eligible to be sold by the Shareholder[s] under Rule 144 as free-trading stock."[32] The transactional documents purportedly support the representations and conclusions in the Attorney Opinion Letter.

The Attorney Opinion Letter begins with a disclaimer, which states:

> As to questions of fact material to such opinions, I have, where relevant facts were not independently established, relied upon certifications by principal officers of [NHPI]. I have made such further legal and actual examination and investigation as I deem necessary for the purposes of rendering this opinion. In my examination, I have assumed the genuineness of all signatures, the legal capacity of natural persons, the correctness of facts set forth in certificates, the authenticity of all documents submitted to me as originals, the conformity to original documents of all documents submitted to me as certified or photostatic copies, and the authenticity of the originals of such copies. I have also assumed that such documents have been duly authorized, properly executed, and delivered by each of the parties thereto other than [NHPI].

The Attorney Opinion Letter then lists the NHPI transfer transactions in chronological order.

*The First Transactional Link: The Collins/NHPI Promissory Note.* The Attorney Opinion Letter states that each of the three deposits originated with the Collins/NHPI Promissory Note. The Collins/NHPI Promissory Note is dated May 1, 2012. The Attorney Opinion Letter notes that NHPI issued the Collins/NHPI Promissory Note as a "fee for services"[33] "for unpaid monies owed for the period beginning May 1, 2012, which was due on July 1, 2012 . . . ." Without any explanation, but, presumably based on the terms of the Collins/NHPI Promissory Note, the Attorney Opinion Letter asserts that the "Shareholder[s] [Sky Walker, Swiss National Securities, and Ireland Offshore Securities] may convert the debt into [NHPI's] common shares at [$].0001."

The Due Diligence Packages for the Sky Walker (Patrick Gentle) and Ireland Offshore Securities (Jeff Cox) Deposits contain identical copies of the Collins/NHPI Promissory Note. The Due Diligence Package for the Swiss National Securities (Talal Fouani) Deposit does not include a copy of the Collins/NHPI Promissory Note. The Collins/NHPI Promissory Note states that the note was due and payable no later than July 1, 2012. The Collins/NHPI Promissory Note provides that, "[i]n the event this note is not paid by the [sic] July 1, 2012, the above named person [Collins] has the right to convert the debt into common shares of the company [NHPI] at

---

[32]    The Attorney Opinion Letters contained in the three Due Diligence Packages are identical, except for the identified owner, or "shareholder," of the NHPI shares – Sky Walker, Swiss National Securities, and Ireland Offshore Securities, respectively.

[33]    Unaudited financial statements contained in the Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits indicate that the Collins/NHPI Promissory Note was for consulting services that Collins had provided to NHPI.

- 23 -

par value [$](.0001)." The Collins/NHPI Promissory Note explains that Collins had a right of conversion if NHPI defaulted on the note, but the note contained no interest rate and no provision for either party to provide the other party with notice in the event of default.[34] The Collins/NHPI Promissory Note, however, stated that a five percent default rate applied if NHPI did not comply with the terms of the note.

Collins and an individual named "David Ambrose" executed the Collins/NHPI Promissory Note.[35] Ambrose was identified as NHPI's CEO and signed the Collins/NHPI Promissory Note on behalf of the issuer. The Collins/NHPI Promissory Note contained an address for Collins,[36] but the note did not include a telephone number for Collins or any contact

---

[34]   As the Hearing Panel explained, "there is no provision for where and how payment should be made[,]" which is "odd" because "[i]t is almost as though there is no expectation of payment."

[35]   The Attorney Opinion Letter incorrectly states that the Collins/NHPI Promissory Note was "signed by David Ambrose, CEO of [NHPI] and by the Shareholder[s] [Sky Walker, Swiss National Securities, and Ireland Offshore Securities]." But Collins, not the Shareholders, signed the Collins/NHPI Promissory Note.

[36]   Although the Collins/NHPI Promissory Note contained an address for Collins, Scottsdale Capital Advisors did not conduct an internet search of Collins' name in connection with the address. The Firm also failed to research whether Collins had any connection to other persons identified on an NHPI shareholder list contained in the Due Diligence Packages. (Each of the three Due Diligence Packages contains an identical copy of an NHPI shareholder list, dated November 14, 2013, and time-stamped 3:29 p.m.). Rather, Scottsdale Capital Advisors conducted an internet search of Collins' name with the terms "securities fraud," and the Firm searched for Collins' name on the Commission's website (https://www.sec.gov/). The search for Collins' name on the Commission's website returned several results, which largely focused on a single lawsuit that the Commission had filed against brothers – Thomas Collins and Edward Collins. The results list included several documents related to the Commission's lawsuit against the brothers, but Scottsdale Capital Advisors printed only one document – Litigation Release No. 15491 (the "Collins Litigation Release") – from the results list. *See* https://www.sec.gov/litigation/litreleases/lr15491.txt (last visited July 20, 2018). The Collins Litigation Release states that the Commission's "[c]omplaint, which was filed on December 5, 1995, alleged that, from December 1984 to June 1994 [Edward] Collins, along with his now deceased brother, Thomas Collins, through their company[,] Lake States, Inc., raised $120 million from 460 investors residing in 15 states." *Id.* Scottsdale Capital Advisors printed the Collins Litigation Release, circled the date of the Collins Litigation Release (September 12, 1997), and underlined the portion of the Collins Litigation Release related to Thomas Collins being deceased. Based on the information contained in the Collins Litigation Release, Scottsdale Capital Advisors notated the Commission's search results list, which is contained in each of the three Due Diligence Packages, as follows, "[n]ot same person . . . . [t]his person is deceased." Interestingly, although the Firm conducted its internet searches of Collins on the Commission's website on January 28, 2014, April 9, 2014, and April 23, 2014, for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits, respectively, the Collins Litigation Release contained in each of the Due Diligence Packages is identical and was printed on January 28, 2014, the date that the Firm conducted its internet research for the first NHPI deposit, the Sky Walker Deposit.

[Footnote continued on next page]

- 24 -

information (address or telephone number) for NHPI or David Ambrose. In addition, neither Ambrose's nor Collins' signature was witnessed or notarized.

*The Second Transactional Link: The Collins/NHPI Stock Conversion Agreement.* The Attorney Opinion Letter cites to a "Note Conversion Agreement" (the "Collins/NHPI Stock Conversion Agreement") to explain how the $10,000 Collins/NHPI Promissory Note converted to shares of NHPI common stock. Each of the Due Diligence Packages for the Sky Walker, Swiss National, and Ireland Offshore Securities Deposits contains an identical copy of the Collins/NHPI Stock Conversion Agreement.

The Collins/NHPI Stock Conversion Agreement is dated November 15, 2013, 16 months after the default date of the Collins/NHPI Promissory Note. The Collins/NHPI Stock Conversion Agreement converts the "remainder" of the Collins/NHPI Promissory Note into shares of NHPI common stock. According to the Collins/NHPI Stock Conversion Agreement, the remainder of the Collins/NHPI Promissory Note was "90% of the [n]ote to [NHPI]," or $9,000, which converted to 90 million shares of NHPI's common stock. The Sky Walker, Swiss National, and Ireland Offshore Securities Deposits account for 60 million of the converted NHPI shares that Thomas Collins received. The record does not contain any information about Collins' remaining 30 million shares.

Collins and an individual named "Patrick Thomas" executed the Collins/NHPI Stock Conversion Agreement.[37] Patrick Thomas was identified as NHPI's president and signed the Collins/NHPI Stock Conversion Agreement on behalf of the issuer. The Collins/NHPI Stock Conversion Agreement did not contain any contact information (address or telephone number) for Collins, Patrick Thomas, or NHPI, and the agreement did not contain a witnessed or notarized signature for Patrick Thomas or Collins.

*The Third Transactional Link: The Transfer of the NHPI Shares from Thomas Collins to Sky Walker (Patrick Gentle), Swiss National Securities (Talal Fouani), and Ireland Offshore Securities (Jeff Cox).* To explain the third transactional link that resulted in the transfer of the NHPI shares from Thomas Collins to Sky Walker, Swiss National Securities, and Ireland Offshore Securities, the Attorney Opinion Letter cites to a: (1) Promissory Note, dated September 1, 2013 (the "SSI [Sky Walker, Swiss National Securities, Ireland Offshore Securities]/Collins Promissory Note"); (2) Stock Pledge Agreement, dated September 1, 2013 (the "SSI/Collins Stock Pledge Agreement"); (3) Note Satisfaction Agreement, dated September

---

[cont'd]

Scottsdale Capital Advisors did not take any additional steps to identify the specific Thomas Collins involved in the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits, and it never determined his identity.

[37] The Attorney Opinion Letter incorrectly states that NHPI and the "Shareholder[s]" (Sky Walker, Swiss National Securities, and Ireland Offshore Securities) entered into the Collins/NHPI Stock Conversion Agreement. But Patrick Thomas and Collins, not the Shareholders, executed the Collins/NHPI Stock Conversion Agreement.

- 25 -

16, 2013 (the "SSI/Collins Note Satisfaction Agreement"); and (4) Stock Purchase Agreement, dated November 25, 2013 (the "SSI /Collins Stock Purchase Agreement").

Chronologically, the first document is the SSI/Collins Promissory Note. The Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits each contain a copy of the SSI/Collins Promissory Note. Each of the three SSI/Collins Promissory Notes is dated September 1, 2013, and each document contains identical terms, except for the "Lender," which is identified as Sky Walker, Swiss National Securities, or Ireland Offshore Securities, respectively. The SSI/Collins Promissory Note is based on a $50,000 loan that Sky Walker, Swiss National Securities, and Ireland Offshore Securities each provided to Collins. (Accordingly, Collins purportedly received a total of $150,000.). In exchange for the funds from the lenders, Sky Walker, Swiss National Securities, and Ireland Offshore Securities, Collins promised to repay the lenders in full, plus seven percent interest, on or before November 7, 2013. The SSI/Collins Promissory Note specifies that, in the event of default, "the entire principal sum and accrued interest shall, at the option of the holder hereof, become at once due and collectible without notice . . . ."

Collins and Patrick Gentle (as president of Sky Walker), Talal Fouani (as president of Swiss National Securities), and Jeff Cox signed the SSI/Collins Promissory Note. The SSI/Collins Promissory Note, like the Collins/NHPI Promissory Note, contains no provision for either party to give notice to the other party in the event of default, provides no address or contact information for Sky Walker, Swiss National Securities, Ireland Offshore Securities, Gentle, Fouani, Cox, or Collins, and is not witnessed or notarized.

The SSI/Collins Promissory Note references the second document noted in the Attorney Opinion Letter. Chronologically, the second document in the Attorney Opinion Letter is the SSI/Collins Stock Pledge Agreement.[38] The Due Diligence Packages for the Sky Walker and Ireland Offshore Securities Deposits each contain a copy of the SSI/Collins Stock Pledge Agreement. The Due Diligence Package for Swiss National Securities Deposit does not contain a copy of the SSI/Collins Stock Pledge Agreement.

Each SSI/Collins Stock Pledge Agreement contains identical terms, with the exception of the identified "Company," Sky Walker or Ireland Offshore Securities, respectively. In the SSI/Collins Stock Pledge Agreement, Collins pledges 20 million shares of NHPI to Sky Walker and 20 million shares of NHPI to Ireland Offshore Securities. The SSI/Collins Stock Pledge Agreement states that "[o]f even date herewith, the company [Sky Walker or Ireland Offshore Securities] has loaned to pledger [Collins] the sum of $50,000, which had been memorialized by the Promissory Note (the "Note") [the SSI/Collins Promissory Note] . . . ." The SSI/Collins Stock Pledge Agreement adds that the "[p]ledger [Collins] has agreed that the repayment of the Note [the SSI/Collins Promissory Note] will be secured by the pledge of 20,000,000 shares of common stock of [NHPI] held in the name of the [p]ledger [Sky Walker or Ireland Offshore Securities] . . . pursuant to the [p]ledge [a]greement [the SSI/Collins Stock Pledge Agreement]."

---

[38]     The SSI/Collins Promissory Note states that "[t]his [n]ote is secured by a [p]ledge [a]greement of even date herewith."

- 26 -

Collins, Gentle, and Cox  signed the SSI/Collins Stock Pledge Agreement.  The SSI/Collins Stock Pledge Agreement provides no address or contact information for Sky Walker, Ireland Offshore Securities, Gentle, Cox, or Collins.  The SSI/Collins Stock Pledge Agreement is neither witnessed nor notarized.  Finally, and, most notably, each SSI/Collins Stock Pledge Agreement (the one for the Sky Walker Deposit and the one for the Ireland Offshore Securities Deposit) is dated September 1, 2013, more than two months before Collins received his 90 million shares of NHPI via the Collins/NHPI Stock Conversion Agreement.[39]

The third document in the chronology is the SSI/Collins Note Satisfaction Agreement.  The Due Diligence Packages for Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits each contain a copy of the SSI/Collins Note Satisfaction Agreement.  Each SSI/Collins Note Satisfaction Agreement contains identical terms, except for the "Company," which is identified as Sky Walker, Swiss National Securities, or Ireland Offshore Securities, respectively.  According to the terms of the SSI/Collins Note Satisfaction Agreement, the SSI/Collins Promissory Note was due on November 7, 2013, and Sky Walker, Swiss National Securities, and Ireland Offshore Securities accepted a portion of Collins' interest in the NHPI shares in exchange for full satisfaction of the SSI/Collins Promissory Note.  The SSI/Collins Note Satisfaction Agreement states:

> On September 1[], 2013[,] Transferor [Collins] delivered to the Company [Sky Walker, Swiss National Securities, or Ireland Offshore Securities] his Promissory Note ("Note") [the SSI/Collins Promissory Note] and Pledge Agreement ("Pledge Agreement") [the SSI/Collins Stock Pledge Agreement] to memorialize and secure a loan of $50,000 from Company [Sky Walker, Swiss National Securities, or Ireland Offshore Securities] to Transferor [Collins].  Pursuant to the Pledge Agreement [the SSI/Collins Stock Pledge Agreement], Transferor [Collins] pledged 20,000,000 shares of common stock of [NHPI], held in the name of Transferor [Collins] (the "Shares").

Collins and Gentle , Fouani , and Cox, respectively, signed the SSI/Collins Note Satisfaction Agreement.  The SSI/Collins Note Satisfaction Agreement is not witnessed or notarized, but each document contains an address for Collins and an address, the same address, for Sky Walker, Swiss National Securities, and Ireland Offshore Securities.[40]  In addition, the

---

[39]   Collins did not obtain his NHPI shares until he signed the Collins/NHPI Stock Conversion Agreement on November 15, 2013.  Collins, Sky Walker, and Ireland Offshore Securities signed the SSI/Collins Promissory Notes and SSI/Collins Stock Pledge Agreements on September 1, 2013.

[40]   The SSI/Collins Note Satisfaction Agreement identifies 72 Dean Street, Belize City, Belize as the address for Sky Walker, Swiss National Securities, and Ireland Offshore Securities.  Other documents in the record provide varying addresses for these entities and the beneficial owners of these entities.  For example, a CSCT [Cayman Securities] Subaccount List states that Sky Walker's address is "Fourth Floor, The Matalon, Coney Drive, Belize City, Belize," while an OTCBB/Pink Sheet Security Deposit Correspondent Representation Letter, signed by a representative of Unicorn International Securities, states that Sky Walker's address is 76 Dean Street, Belize City, Belize.  The CSCT [Cayman Securities] Subaccount List noted above identifies 76 Dean Street, Belize City, Belize as the address for Jeff Cox and Ireland Offshore

[Footnote continued on next page]

- 27 -

SSI/Collins Note Satisfaction Agreement is dated September 16, 2013, nearly two months before the declared default date (November 7, 2013) of the SSI/Collins Promissory Note that forms the basis of the issuance of the SSI/Collins Note Satisfaction Agreement.

The fourth, and final, document that purports to explain the transfer of the NHPI shares from Collins to Sky Walker (Patrick Gentle), Swiss National Securities (Talal Fouani), and Ireland Offshore Securities (Jeff Cox) is the SSI/Collins Stock Purchase Agreement. The Attorney Opinion Letter states that the SSI/Collins Stock Purchase Agreement is dated November 25, 2013, and, on that date,[41] "Thomas Collins as Seller and the Shareholder [Sky Walker, Swiss National Securities, and Ireland Offshore Securities] as Purchaser . . . purchased . . . 20,000,000 . . . [s]hares through the payment of an administration fee and the forgiveness of a . . . $50,000 . . . loan (the "Loan") which Shareholder [Sky Walker, Swiss National Securities, and Ireland Offshore Securities] had previously made to . . . Collins . . . ." The Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits do not contain a copy of the SSI/Collins Stock Purchase Agreement referenced in the Attorney Opinion Letter.

> (4)  The Nonaffiliate and Non-Shell
> Company Representations

Scottsdale Capitol Advisors' Rule 144 Team and Due Diligence Packages concentrated on documenting the facts necessary to claim the exemption. The Beneficial Ownership Declarations, the Attorney Opinion Letters, and the Due Diligence Supporting Documents were singularly focused on establishing the nonaffiliate status of the individuals and entities depositing shares for liquidation at the Firm, demonstrating that the one-year holding period for the resale of

---

[cont'd]

Securities, "Talal Fanni" and Swiss National Securities, and Patrick Gentle and Keyhole Kapital, a second entity for which Gentle serves as a beneficial owner. The CSCT [Cayman Securities] Subaccount List also notes that Gentle is the beneficial owner of a third entity, Cumbre Company, and that Cumbre Company's address is 70 Dean Street, Belize City, Belize.

[41]     The Beneficial Ownership Declarations for Patrick Gentle, Talal Fouani, and Jeff Cox list each beneficial owner's stock acquisition date as November 25, 2013, similar to the SSI/Collins Stock Purchase Agreement. The Attorney Opinion Letters for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits also list the stock acquisition date as November 25, 2013. Other documents, however, give conflicting dates for Sky Walker's, Swiss National Securities', and Ireland Offshore Securities' acquisitions of the NHPI shares. For example, the "Alpine Securities Deposited Securities Request Forms" in the Due Diligence Packages for the Swiss National Securities and Ireland Offshore Securities Deposits state that Swiss National Securities and Ireland Offshore Securities, respectively, acquired their NHPI shares on September 16, 2013. The Alpine Securities Deposited Securities Request Form for the Sky Walker Deposit of NHPI shares notes that Sky Walker acquired the NHPI shares on November 15, 2013, which is the same date that Collins and NHPI entered into the Collins/NHPI Stock Conversion Agreement, and NHPI issued the shares to Collins. Scottsdale Capital Advisors did not resolve these discrepancies.

- 28 -

restricted securities has been satisfied, and proving that the issuer of the restricted securities that were subject to resale was not a shell company.

To establish the nonaffiliate status of the individuals and entities involved in the Sky Walker (Patrick Gentle), Swiss National Securities (Talal Fouani), and Ireland Offshore Securities (Jeff Cox) Deposits, the Due Diligence Packages for each of the three deposits contain a Beneficial Ownership Declaration,[42] in addition a statement from Collins (the "Collins Nonaffiliate Statement"). The Collins Nonaffiliate Statement contained in each of the three Due Diligence Packages is identical. The Collins Nonaffiliate Statement is dated November 19, 2013, typewritten, purportedly signed by Collins, and states, in its entirety, "I am not and have never been an officer, director, control person, or beneficial owner of more than 10% of any class of [NHPI,] and I am not and have never been an affiliate of the Company as that term is defined by Rule 144 of the Securities Act of 1933." The Collins Nonaffiliate Statement is not witnessed or notarized. Nor does it provide any contact information for Collins.

To prove that NHPI was not a shell company for purposes of Rule 144, Scottsdale Capital Advisors relied on the representations in the Beneficial Ownership Declarations for Gentle, Fouani, and Cox,[43] the Attorney Opinion Letter in the Due Diligence Packages for the deposits,[44] and the representations of Patrick Thomas (the "Patrick Thomas Non-Shell Company Statement"), the person identified as NHPI's president on the Collins/NHPI Stock Conversion Agreement and the Patrick Thomas Non-Shell Company Statement. The Patrick Thomas Non-Shell Company Statement is dated November 19, 2013 (like the Collins Non-Affiliate Statement), typewritten, purportedly signed by Thomas, and states, in its entirety, "As reflected in the filings of [NHPI] available at OTCMarkets.com, the Company is not now and has never been a 'shell' as defined by Rule 12b-2 of the Securities Exchange Act of 1934." The Patrick Thomas Non-Shell Company Statement is not witnessed or notarized, and it does not provide any contact information for Thomas.

Scottsdale Capital Advisors also relied on portions of two of the unaudited financial statements, which NHPI published on the OTC Markets website on November 19, 2013, to establish that NHPI was not a shell company. The two unaudited financial statements contained

---

[42]   The Beneficial Ownership Declarations for Patrick Gentle, Talal Fouani, and Jeff Cox, which were discussed in Part III.A.6.e.ii.(b)(2) (The [NHPI] Beneficial Ownership Declarations), served as Scottsdale Capital Advisors' proof that Gentle, Fouani, and Cox were not affiliates of NHPI.

[43]   The Beneficial Ownership Declaration asked the beneficial owner to check "yes" or "no" in response to the question, "To Beneficial Owner's best knowledge, has the issuer ever been a *shell* company as defined in Rule 144(i)(1) of the Securities Act[]?" Gentle, Fouani, and Cox checked "no" on each of their respective Beneficial Ownership Declarations.

[44]   The Attorney Opinion Letter states that NHPI's "latest OTC Information and Disclosure Statement shows that the Company is actively pursuing the acquisition of mineral rights leases and other avenues within the oil and gas space . . . . [and,] [a]ccording to this documentation, the Company does not meet the definition of a "shell" under Rule 144 . . . ."

- 29 -

in the Due Diligence Packages for the Sky Walker (Patrick Gentle), Swiss National Securities (Talal Fouani), and Ireland Offshore Securities (Jeff Cox) Deposits are identical, as evidenced by certain unintelligible handwritten notations located at the top of the two statements. The first unaudited financial statement is an NHPI balance sheet for the quarterly period ended on June 30, 2012. The second unaudited financial statement is a consolidated balance sheet for the annual period ended on December 31, 2012. Scottsdale Capital Advisors suggests that the unaudited financial statements demonstrate that NHPI had assets and liabilities, had operations and non-cash assets, and was not a shell company within the meaning of Rule 144(i).

> (5)     Promotional Activity in Shares of
> NHPI During the Relevant Period

Between February 7, 2014 and March 12, 2014, Cayman Securities deposited 60 million unregistered shares of NHPI at Scottsdale Capital Advisors for the benefit of Unicorn International Securities for the further benefit of Sky Walker (Patrick Gentle), Swiss National Securities (Talal Fouani), and Ireland Offshore Securities (Jeff Cox). Between February 26, 2014 and May 7, 2014, Scottsdale Capital Advisors liquidated all 60 million unregistered shares of NHPI from Cayman Securities' account at the Firm. There was promotional activity in NHPI prior to, and during, this period (February 7, 2014 (date of first NHPI-related deposit) to May 7, 2014 (date of last NHPI-related liquidation)).

The Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits each contain a printout of "Stock Promotions by Symbol" from stockpromoters.com (the "Stock Promotions Printout"). The Stock Promotions Printout for the Sky Walker Deposit shows that NHPI had been promoted five times on four specific dates – one date in February 2013 and three dates in December 2013.[45] The promotional activity in December 2013 took place approximately two weeks after Collins and NHPI entered into the Collins/NHPI Stock Conversion Agreement and three months after Collins entered into a promissory note with (via the SSI/Collins Promissory Note), and transferred his shares of NHPI to Sky Walker, Swiss National Securities, and Ireland Offshore Securities.[46]

The Stock Promotions Printout for the Swiss National Securities Deposit showed NHPI promotional activity between February 2011 and February 2013, a range that is outside of the period relevant to the deposits and liquidations of the NHPI shares discussed in this case. The Stock Promotions Printout for the Ireland Offshore Securities Deposit was incomplete. Although the Stock Promotions Printout showed that NHPI had been promoted 22 times during the researched period, the Stock Promotions Printout for the Ireland Offshore Securities Deposit

---

[45]     The promotional activity in December 2013 occurred on December 3, 2013, December 4, 2013, and December 5, 2013, respectively.

[46]     The Collins/NHPI Stock Conversion Agreement is dated November 15, 2013. The SSI/Collins Promissory Note and SSI/Collins Stock Pledge Agreement is each dated September 1, 2013. The SSI/Collins Note Satisfaction Agreement is dated September 16, 2013. The SSI/Collins Stock Purchase Agreement, which is not located in the record, is purportedly dated November 25, 2013.

- 30 -

contained only the first 10 promotions of that 22-promotions list.  Notably, however, all 10 instances of promotional activity from the incomplete Stock Promotions Printout for the Ireland Offshore Securities Deposit occurred on three dates in March 2014 – March 12, 2014, March 13, 2014, and March 14, 2014.  These dates in March 2014 are about one month after the Sky Walker Deposit on February 7, 2014, and within days of the deposit date (March 12, 2014) for the Swiss National Securities and Ireland Offshore Securities Deposits.

At the hearing, Enforcement introduced a complete Stock Promotions Printout for NHPI for the period between February 2013 and June 2014.[47]  Enforcement's Stock Promotions Printout showed that NHPI had been promoted 17 times between the date of the first NHPI deposit on February 7, 2014 and the date of the last NHPI liquidation on May 7, 2014.[48]  Of these 17 occasions, two promotions occurred on February 10, 2014 and February 11, 2014, respectively, within days of the Sky Walker Deposit on February 7, 2014, and 15 promotions occurred between March 11, 2014 and March 14, 2014, within days of the Swiss National Securities and Ireland Offshore Securities Deposits on March 12, 2014.[49]

---

[47]     Enforcement also introduced an NHPI Stock Alert from stockreads.com.  The NHPI Stock Alert touted a "91% Accurate Stock Signal" and stated that NHPI was a "Breakout Alert." The NHPI Stock Alert advised readers that "*NHPI* New Crowd Favorite Could Run!"  The NHPI Stock Alert also added that NHPI was then-trading at $0.035, and that "we [the writer, identified as Penny Stock Crowd] believe that NHPI [c]ould [b]e [t]he #1 [p]ercentage [l]eader [i]n [t]he [w]hole [m]arket[.]  [O]ver the next 2-3 days[,] we could have a monster 200-300% [g]ain!"  The NHPI Stock Alert is dated March 11, 2014, one day before the Swiss National Securities and Ireland Offshore Securities Deposits on March 12, 2014.

[48]     Enforcement's Stock Promotions Printout showed that NHPI had been promoted 24 times between February 2013 and June 2014 – two times in February 2013, three times in December 2013, two times in February 2014, 15 times in March 2014, one time May 2014, and one time in June 2014.

[49]     Henry Diekmann testified that he would have examined NHPI's promotional activity as part of his Rule 144 review for deposits of restricted securities, but he did not recall doing so for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits that are the subject of this case.  When Enforcement asked Diekmann, more generally, whether "promotional activity going on at the time of the deposit . . . is . . . suspicious to you[,]" Diekmann responded, "No.  A promotion generally is not necessarily a red flag."  After some thought, Diekmann revised his answer.  Diekmann testified, "I mean, we . . . try to link it to the customer . . . . [W]e'll often follow up and get promotion representations from the customer . . . [or] the issuer." Diekmann, however, acknowledged that linking an issuer's promotional activity to a customer "would be something difficult to reveal" if a nominee were involved in the transaction.

- 31 -

iii.      The Voip-Pal.com (VPLM) Transaction (Third
VHB International Deposit)

There is one VPLM deposit at issue in this case – the "Third VHB International
Deposit."[50] On February 6, 2014, Cayman Securities deposited a total of 9.32 million shares of
microcap issuer, VPLM, at Scottsdale Capital Advisors for resale. Cayman Securities made the
deposit for the benefit of Panama-based Montage Securities. Montage Securities purported to act
for the further benefit of a Bolivian entity named VHB International, Ltd. ("VHB International").
Between February 20, 2014 and June 6, 2014, Scottsdale Capital Advisors liquidated 7.81
million shares of VPLM from Cayman Securities' account at the Firm.[51] The sales generated net
proceeds of $1.41 million for VHB International and commissions of $22,172.92 for Scottsdale
Capital Advisors.[52] Scottsdale Capital Advisors wired out the proceeds of the VPLM sales to
Cayman Securities' bank account. The Firm did not follow the funds, did not know where the
funds flowed, and did not know who received the economic benefit of the funds.

(a)      The Issuer – VPLM

Between December 2013 and June 2014, VPLM was not a reporting company and had no
shares registered with the Commission. VPLM, however, did publish several periodic reports on
the OTC Markets website during that period. We have consulted an annual report (the "VPLM
Annual Report") that VPLM published on the OTC Markets website close to the relevant period
for our discussion of VPLM, its financials, and its operations. VPLM published the VPLM
Annual Report on the OTC Markets website on November 6, 2013. The VPLM Annual Report
covers the annual period ended on September 30, 2013.

---

[50]      The Respondents proffered Due Diligence Packages for four VPLM-related deposits: (1)
the First VHB International Deposit on October 10, 2013; (2) the Second VHB International
Deposit on January 16, 2014; (3) the Third VHB International Deposit on February 6, 2014; and
(4) the Cumbre Company Deposit on May 28, 2014. *See* Part III.A.6.e.ii.(b) (Scottsdale Capital
Advisors' Due Diligence Packages for the Three NHPI Deposits). It is the Third VHB
International Deposit that is the subject of Enforcement's complaint. In its decision, the Hearing
Panel thoroughly examined the Due Diligence Packages for two VPLM-related deposits – the
Third VHB International Deposit (the deposit that was the subject of Enforcement's complaint)
and the Cumbre Company Deposit. The Hearing Panel explained that it reviewed the Cumbre
Company Deposit "as evidence of other similar conduct for purposes of sanctions." On appeal,
we have decided to provide an in depth analysis of only the Third VHB International Deposit
because it forms the basis of Enforcement's allegations against the Respondents.

[51]      The record does not disclose what happened with the remaining 1.51 million shares of
VPLM that were in the Cayman Securities' account for the further benefit of VHB International.

[52]      VHB International purportedly acquired its shares of VPLM at a cost of $0.008186 per
share. Based on that per share price, VHB International's total acquisition cost for the 7.81
million VPLM shares was $63,932.66. VHB International therefore obtained a profit of $1.35
million (or more than 2,000 percent) on the transactions.

- 32 -

The VPLM Annual Report states that, in 1997, VPLM was incorporated in Nevada as All American Casting International, Inc. The VPLM Annual Report discloses that VPLM changed its name from All American Casting International to VOIP MDI.com in 2004, and that the issuer changed its name from VOIP MDI.com to Voip-Pal.com in 2006. The VPLM Annual Report states that the issuer is headquartered in Bellevue, Washington.[53] The VPLM Annual Report describes VPLM as a "technical leader in the broadband Voice-over-Internet Protocol ('VoIP') market with the ownership and development of a portfolio of leading edge VoIP Patent Applications."

The VPLM Annual Report states that "the VoIP services market . . . had revenues of $63 billion in 2012 and is experiencing double digit year-over-year growth." But the VPLM Annual Report also discloses that VPLM's revenues for the annual period ended on September 30, 2013 was $151, and that the issuer's revenues for the annual period ended on September 30, 2012 was $187. In fact, for the annual period ended on September 30, 2013, the VPLM Annual Report reports a deficit of $5.91 million and expenses totaling more than $3.38 million, which includes a $2.80 million line item described as "[s]tock based compensation."[54]

(b)    Scottsdale Capital Advisors' Due Diligence Package for the VPLM Deposit

Scottsdale Capital Advisors prepared a Due Diligence Package for Cayman Securities' deposit of 9.32 million shares of VPLM for the benefit of Montage Securities for the further benefit of VHB International. We have reviewed that Due Diligence Package to determine what information Scottsdale Capital Advisors had gathered when it approved the Third VHB International Deposit.

(1)    The Deposited Securities Checklist

The Due Diligence Package for the Third VHB International Deposit followed Scottsdale Capital Advisors' standardized order for all Due Diligence Packages. The first document in the Due Diligence Package for the Third VHB International Deposit is the Deposited Securities Checklist. A member of the Rule 144 Team reviewed the Due Diligence Package for the Third VHB International Deposit. Cruz signed the 144 Compliance Approval on the Deposited Securities Checklist, and Jay Noiman signed the Broker Approval section of the form.

---

[53]    The VPLM Annual Report describes VPLM's facilities as "[o]ffice space . . . leased for administrative purposes only for $79 a month . . . . [, and] a month to month rent of $30 per month . . . to store MagicJack hardware acquired over [four] years ago with the intent of selling MagicJacks to the public." The VPLM Annual Report notes that sales of MagicJacks are no longer part of the issuer's operations.

[54]    Three pages of the 20-page VPLM Annual Report appears in the Due Diligence Package for the VHB International Deposit.

- 33 -

(2)     The Beneficial Ownership
        Declaration

The Due Diligence Supporting Documents follow the Deposited Securities Checklist in the Due Diligence Package for the Third VHB International Deposit. The first key document located among the Due Diligence Supporting Documents is the Beneficial Ownership Declaration. The Beneficial Ownership Declaration for the Third VHB International Deposit identifies Victor Hugo Bretel ("Bretel") as the beneficial owner of the 9.32 million shares of VPLM deposited at Scottsdale Capital Advisors on February 6, 2014. Some documents in the Due Diligence Package for the Third VHB International Deposit identify Bretel as VHB International's "owner" or "managing member," while other documents state that he is the company's "president." Bretel signed the Beneficial Ownership Declaration in the Due Diligence Package for the Third VHB International Deposit to "represent" that he was not an affiliate of VPLM, that VPLM was not a shell company, and that the VPLM securities were free-trading under Rule 144. The Beneficial Ownership Declaration that Bretel signed was not witnessed or notarized, and the form provided no address, telephone number, or other contact information for Bretel or VHB International.

Scottsdale Capital Advisors obtained a copy of Bretel's Bolivian passport, but did not otherwise seek to verify Bretel's identity.[55]  For example, the Firm searched for Bretel's and VHB International's names on the Commission's website (https://www.sec.gov/), FINRA's OFAC Search Tool, and web-based internet searches. The Firm also conducted web-based internet searches combining "Victor Hugo Bretel" with "securities fraud" and "VHB International Ltd." and "securities fraud." Scottsdale Capital Advisors, however, failed to search for Bretel's name in combination with VHB International, and it failed to search for Bretel's or VHB International's names in connection with VPLM or VPLM's officers.[56]  Scottsdale Capital Advisors also did not document any due diligence that may have resulted from its web-based internet search results.

---

[55]     The Due Diligence Package for the Third VHB International Deposit contains a letter from Bretel, which is dated November 8, 2013 (the "Victor Bretel Letter"). The Victor Bretel Letter seeks "to confirm . . . the physical address for VHB International . . . and to further confirm that VHB [International] is **[n]ot** engaged in promoting VPLM stock . . . ." Bretel signed the Victor Bretel Letter and provided a Bolivian address for VHB International, but the Victor Bretel Letter was not witnessed or notarized.

[56]     Scottsdale Capital Advisors obtained a list of VPLM's officers (the "VPLM Officers List") from the website of the Nevada Secretary of State on February 7, 2014. The VPLM Officers List provides the names of five VPLM officers. Using the VPLM Officers List, Scottsdale Capital Advisors searched for VPLM (as "VOIP Pal.com Inc."), and VPLM's officers, when it conducted its web-based internet research. As was the case with "Talal Fanni" in lieu of Talal Fouani, the Firm, once again, incorrectly searched for the name of one of VPLM's five officers.

- 34 -

(3)    The Attorney Opinion Letter and
Underlying Transactional
Documents

The Due Diligence Package for the Third VHB International Deposit suggests that VHB
International obtained its VPLM shares from an entity named Locksmith Financial Corporation
("Locksmith Financial"), and that Locksmith Financial obtained its VPLM shares directly from
the issuer, VPLM. The Attorney Opinion Letter and supporting transactional documents, which
follow the Deposited Securities Checklist and Beneficial Ownership Declaration in the Due
Diligence Package for the Third VHB International Deposit, purport to explain the transactions.

*The First Transactional Link: The Locksmith Financial/VPLM Verbal Line of Credit.*
The Attorney Opinion Letter for the Third VHB International Deposit focuses on the first
chronological transaction, a verbal line of credit between Locksmith Financial as lender and
VPLM as borrower (the "Locksmith Financial/VPLM Verbal Line of Credit"). The Attorney
Opinion Letter states:[57]

> [B]eginning in July 2010[,] Locksmith [Financial] loaned [VPLM] monies to pay
> various operating expenses . . . . On or about August 13, 2013, [VPLM] entered
> into a settlement agreement by which the parties agreed to settle $58,636.24 of
> [the] debt in exchange for common stock in [VPLM] . . . . On or about August 15,
> 2013, [VPLM's] Board of Directors resolved to issue [29.32 million] shares of
> [VPLM's] common stock [to Locksmith Financial] pursuant to the settlement
> agreement.

The Due Diligence Package for the Third VHB International Deposit contains a "Loan
Agreement," dated August 15, 2013, between Locksmith Financial as "Lender" and VPLM as
"Borrower" (the "Locksmith Financial/VPLM Loan Agreement"). The Locksmith
Financial/VPLM Loan Agreement memorializes the Locksmith Financial/VPLM verbal line of
credit and states:

> On August 1, 2012, the "Lender" [Locksmith Financial] agreed to advance funds
> as loans against a revolving line of credit to a limit of [$1.5 million] to the
> "borrower" [VPLM]. The borrower [VPLM] agreed to pay simple interest at an
> annual rate of 5.5 [percent] on outstanding amounts. The loans can be repaid in
> full or in part by the borrower [VPLM] at any time without penalty. The lender
> [Locksmith Financial] has the right to demand payment in full or in part at
> anytime. This agreement is to document and formalize the verbal arrangement
> entered into on Aug[ust] 1, 2012.

---

[57]    The Due Diligence Package for the Third VHB International Deposit contains the results
of a search on the California State Bar's website for the name of the attorney who drafted the
Attorney Opinion Letter. The search returned nothing of importance.

- 35 -

An individual named Dennis Chang signed the Locksmith Financial/VPLM Loan Agreement on behalf of VPLM,[58] and a person named Richard Kipping ("Kipping") signed the loan agreement on behalf of Locksmith Financial.[59] The Locksmith Financial/VPLM Loan Agreement is neither witnessed nor notarized.

The Due Diligence Package for the Third VHB International Deposit contains a "Debt Settlement Agreement," dated August 15, 2013, between VPLM and Locksmith Financial (the "Locksmith Financial/VPLM Debt Settlement Agreement"). The Locksmith Financial/VPLM Debt Settlement agreement identifies as Locksmith Financial as the "Creditor." The Locksmith Financial/VPLM Debt Settlement Agreement states:

> The Creditor [Locksmith Financial] has[,] from time to time starting July 1, 2010[,][60] loaned the Company [VPLM] monies to pay outstanding bill[s]. The Company [VPLM] is indebted to the Creditor [Locksmith Financial] in the amount of $58,636.24 as of July 31, 2012 (the "Debt") to Locksmith Financial Corporation; and

> The Company [VPLM] wishes to settle partial Debt, namely $58,636.24, by allotting and issuing securities in the capital of the Company [VPLM] to the Creditor [Locksmith Financial] and the Creditor [Locksmith Financial] is prepared to accept such securities in full satisfaction of the Debt mentioned above.[61]

---

[58]    The VPLM Officers List identifies Dennis Chang as VPLM's "president," "secretary," "treasurer," and "director."

[59]    The Attorney Opinion Letter states, "I have been informed that Locksmith [Financial] is controlled by Richard Kipping." Other documents in the Due Diligence Package for the Third VHB International Deposit identify Kipping as Locksmith Financial's "president" or the company's "Authorized Signatory."

[60]    The Attorney Opinion Letter and Locksmith Financial/VPLM Debt Settlement Agreement each state that the payments from Locksmith Financial to VPLM date back to July 2010. The Due Diligence Package for the Third VHB International Deposit contains redacted portions of Locksmith Financial's "Business Banking Statement[s]" between July 2010 and November 2010, which purport to show payments from Locksmith Financial to VPLM during that period. The Locksmith Financial/VPLM Loan Agreement, however, asserts that Locksmith Financial's payments to VPLM date back to August 2012. Scottsdale Capital Advisors did not resolve the discrepancy.

[61]    The Locksmith Financial/VPLM Loan Agreement states that the Locksmith Financial agreed to advance funds to VPLM against a revolving line of credit to a limit of $1.5 million. The Locksmith Financial/VPLM Debt Settlement Agreement, which was executed on the same day as the Locksmith Financial/VPLM Loan Agreement states that VPLM owed Locksmith Financial $58,636.24 as of July 31, 2012. The Locksmith Financial/VPLM Debt Settlement Agreement, however, also states that the Locksmith Financial/VPLM Debt Settlement Agreement was "to settle *partial* Debt, namely, $58,636.24," and that Locksmith Financial

[Footnote continued on next page]

- 36 -

\*      \*      \*

The Company [VPLM] agrees to allot and issue to the Creditor [Locksmith Financial] . . . a total [29.32 million] shares in the capital of the Company (the "Shares") at a deemed price of $0.002 per Share for each $0.002 of indebtedness, as payment of the Debt, and the Creditor [Locksmith Financial] agrees to accept the Shares as payment of the partial Debt, leaving the Company [VPLM] indebted to the Creditor [Locksmith Financial] in the amount of $0 following this transaction.

The same individuals who signed the Locksmith Financial/VPLM Loan Agreement also signed the Locksmith Financial/VPLM Debt Settlement Agreement – Dennis Chang on behalf of VPLM and Kipping on behalf of Locksmith Financial.  In addition, two other VPLM representatives, Carl Mattera and Thomas Sawyer,[62] signed the Locksmith Financial/VPLM Debt Settlement Agreement.  The Locksmith Financial/VPLM Debt Settlement Agreement is not witnessed or notarized.

The Due Diligence Package for the Third VHB International Deposit also contains an undated Notice of Conversion of Debt (the "Locksmith Financial Notice of Conversion").  The Locksmith Financial Notice of Conversion reiterated the "amount of debt to be converted" ($58,636.24), "price per share of conversion" ($0.002), and "total number of shares issued" (29.32 million), as detailed in the Locksmith Financial/VPLM Debt Settlement Agreement.  The Locksmith Financial Notice of Conversion also notified VPLM of Locksmith Financial's intent to "convert $58,636.24 of the debt . . . that it owns in [VPLM] . . . into shares of common stock of the Company [VPLM]," and it requested that VPLM issue the shares to the company.  Kipping signed the Locksmith Financial Notice of Conversion as the company's "authorized signatory," but the Locksmith Financial Notice of Conversion is not witnessed or notarized, and it contains no contact information for Locksmith Financial or Kipping.

-----

[cont'd]

agreed "to accept the [VPLM] Shares as payment of the *partial* Debt, leaving [VPLM] indebted to [Locksmith Financial] in the amount of $0 following the transaction."  (emphasis added). Although the total amount of VPLM's indebtedness to Locksmith Financial was not readily apparent from Scottsdale Capital Advisors' Deposited Securities Checklist, the Locksmith Financial/VPLM Loan Agreement, or the Locksmith Financial/VPLM Debt Settlement Agreement, a document titled "Locksmith [Financial] Payment to [VPLM] by Category" states that VPLM received "total credits" of $187,887.67 from Locksmith Financial and VPLM paid "total debits" of $129,251.43 to Locksmith Financial.  Subtracting the total debits from the total credits leaves a balance of $58,636.24, but it remains unclear whether the Locksmith Financial/VPLM Debt Settlement Agreement is extinguishing VPLM's debt based on a full or partial payment of monies due to Locksmith Financial.

[62]     The VPLM Officers List identifies Carl Mattera and Thomas Sawyer as "Directors" of VPLM.

- 37 -

Finally, the Due Diligence Package for the Third VHB International Deposit contains a letter, dated December 16, 2013, from an individual named Thomas Sawyer (the "Thomas Sawyer Statement"). The Thomas Sawyer Statement identifies Thomas Sawyer as VPLM's Chairman and CEO.[63] The Thomas Sawyer Statement adds some context for the representations contained in the Locksmith Financial/VPLM Loan Agreement, Locksmith Financial/VPLM Debt Settlement Agreement, Locksmith Financial Notice of Conversion, and Attorney Opinion Letter. The Thomas Sawyer Statement "represent[s] and certif[ies]" that the:

> Security [the VPLM shares] derives from a verbal line of credit, whereby Locksmith Financial . . . agreed to make periodic advances to [VPLM] and the Security [the VPLM shares] derives from Credit Line [the verbal line of credit] advances made by Seller [Locksmith Financial] to [VPLM] over one year ago. On or about August 15, 2013, [VPLM] and Seller [Locksmith Financial] agreed to settle a portion of debt derived from the Credit Line [the verbal line of credit] for no additional consideration.

The Thomas Sawyer Statement provides VPLM's name, address, telephone number, website, and trading symbol, but it does not contain any specific contact information for Sawyer, including Sawyer's address, telephone number, or email address. In addition, although Sawyer purportedly signed the Thomas Sawyer Statement, the statement is not witnessed or notarized.

*The Second Transactional Link: The VHB International/Locksmith Financial Stock Purchase Agreement.* To explain Locksmith Financial's transfer of its 29.32 million shares of VPLM to VHB International, the Due Diligence Package for the Third VHB International Deposit contains only a "Stock Purchase Agreement," dated August 23, 2013,[64] between Locksmith Financial as "Buyer" and VHB International as "Seller" (the "VHB International/Locksmith Financial Stock Purchase Agreement"). The VHB International/Locksmith Financial Stock Purchase Agreement does not explain the circumstances that resulted in Locksmith Financial becoming indebted to VHB International. Rather, the VHB International/Locksmith Financial Stock Purchase Agreement identifies Locksmith Financial as owning 29.32 million shares of VPLM, that VHB International is the buyer, and that the purchase price is $240,000. It further states:

---

[63]    The VPLM Officers List identifies Thomas Sawyer as a VPLM "Director," not as VPLM's Chairman or CEO. *See* notes 77 and 84.

[64]    The Locksmith Financial/VPLM Loan Agreement and Locksmith Financial/VPLM Debt Settlement Agreement are each dated August 15, 2013. The VHB International/Locksmith Financial Stock Purchase Agreement is dated August 23, 2013. Despite the temporal proximity of the transactions resulting in the preparation and execution of these documents, none of the documents between Locksmith Financial and VPLM contemplates the near-contemporaneous transaction between Locksmith Financial and VHB International. The only document that speaks directly to the transfer of the VPLM shares from Locksmith Financial to VHB International is the VHB International/Locksmith Financial Stock Purchase Agreement, which is the operative document for the transfer of the shares from Locksmith Financial to VHB International.

- 38 -

\*     \*     \*

> Purchase and Sale . . . . Seller [Locksmith Financial] agrees to sell the Shares to Buyer [VHB International] and Buyer [VHB International] agrees to purchase the Shares from Seller [Locksmith Financial], free and clear of all liens, claims, pledges, mortgages, restrictions, obligations, security interests and encumbrances of any kind, nature and description.[65]

\*     \*     \*

The VHB International/Locksmith Financial Stock Purchase Agreement provides addresses for Locksmith Financial and VHB International.[66]  Richard Kipping, as "president," signed the VHB International/Locksmith Financial Stock Purchase Agreement on behalf of Locksmith Financial.  An individual named Andrew Godfrey,[67] identified as the "president" of VHB International, signed the VHB International/Locksmith Financial Stock Purchase Agreement on behalf of VHB International.  Kipping's and Godfrey's signatures on the VHB International/Locksmith Financial Stock Purchase Agreement are not witnessed or notarized.

---

[65]     As part of the VHB International/Locksmith Financial Stock Purchase Agreement, Locksmith Financial "represents and warrants" to VHB International that Locksmith Financial "is the lawful owner of the Shares with good and marketable title thereto, and [Locksmith Financial] has the absolute right to sell, assign, convey, transfer and deliver the Shares and any and all rights and benefits incident to the ownership thereof . . . ."

[66]     The VHB International/Locksmith Financial Stock Purchase Agreement lists Locksmith Financial's address at a location in Vancouver, British Columbia, Canada.  The VHB International/Locksmith Financial Stock Purchase Agreement lists VHB International's address as "The Matalon, Coney Dr., Suite 404, Belize City, Belize."  A CSCT [Cayman Securities] Subaccount List provides the same address for Sky Walker (NHPI Deposit, Beneficial Owner, Patrick Gentle).  Bretel, however, "confirms" in the Victor Bretel Letter that VHB International's physical address is in "La Paz, Bolivia."  Scottsdale Capital Advisors did not resolve this discrepancy.

[67]     Henry Diekmann emailed Cayman Securities' representatives, Gregory Ruzicka and Craig D'Mura, to ask for "an explanation [of] why VHB International has Andrew Godfrey signing the purchase agreement and[, why Andrew Godfrey] is listed as an authorized person for VHB [International]."  Ruzicka and D'Mura obtained a response to Diekmann's inquiry from a representative at Montage Securities and forwarded that response to Diekmann.  Montage Securities' response stated, "Mr. Andrew Godfrey handles day-to-day operations due to Mr. Victor Bretel's travel schedule; Mr. Bretel remains the beneficial owner of VHB International Ltd.  Find attached a copy of Mr. Bretel's passport."  When asked, at the hearing, whether Montage Securities' response to his inquiry was "satisfactory," Diekmann responded, "yes."

- 39 -

(4)    The Nonaffiliate Representations

        Scottsdale Capital Advisors relied heavily on the Beneficial Ownership Declarations, the Attorney Opinion Letters, and the Due Diligence Supporting Documents to establish the nonaffiliate status of the selling customers, demonstrate the one-year holding period for resales of restricted securities, and prove the non-shell company status of the issuer. As it relates to the nonaffiliate status of the individuals and entities involved in the Third VHB International Deposit, the Due Diligence Package for the deposit contained Bretel's Beneficial Ownership Declaration,[68] the Thomas Sawyer Statement,[69] and the Attorney Opinion Letter.

        *Richard Kipping, Current president of Locksmith Financial and Former CEO of VPLM.* The Attorney Opinion Letter for the Due Diligence Package for the Third VHB International Deposit raised specific concerns about the potential affiliate status of Locksmith Financial and Richard Kipping. The Attorney Opinion Letter discloses that, "Locksmith [Financial] is controlled by Richard Kipping . . . . [, and] Richard Kipping was previously the CEO of [VPLM]." The Attorney Opinion Letter, however, sets aside these concerns, stating that, "I have reviewed the documents filed with the [Commission][70] and have determined that Locksmith [Financial] is not and has not been an affiliate or control person of [VPLM]." Concerning Kipping's status as a potential affiliate of VPLM, the Attorney Opinion Letter adds, "[w]hile Richard Kipping was previously the CEO of [VPLM][,] he resigned as CEO more than [two] years ago." The Attorney Opinion Letter concludes that "nothing related to this application for

---

[68]    Bretel's Beneficial Ownership Declaration served as Scottsdale Capital Advisors' proof that Bretel was not an affiliate of VPLM.

[69]    The Thomas Sawyer Statement "represented and certified" that, "[t]o the Company's [VPLM's] best knowledge, none of the [p]arties is a beneficial owner of 10 [percent] or more of any class of equity securities of the Company [VPLM]." *See* Hicks, *supra* note 10, at § 4:38 (explaining that owners of at least 10 percent of an issuer's securities are presumptive affiliates of the issuer). The Thomas Sawyer Statement also represented and certified that "[n]one of the [p]arties is, or was 90 days prior to the sale, a director, officer, or an '[a]filliate' of the Company [VPLM] as that term is used in . . . Rule 144 of the Securities Act . . . (i.e., a person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under control with the Company [VPLM])." *See* Part III.A.3.e. (Rule 144's One-Year Holding Period and the Rule's Applicability to "Affiliates") (explaining that the Rule 144 exemption applies to transactions involving selling customers who are nonaffiliates of the issuer when the sales occur and selling customers who were nonaffiliates of the issuer in the three months preceding the sales). As previously mentioned, the Thomas Sawyer Statement was not witnessed or notarized.

[70]    The Attorney Opinion Letter does not identify "the documents filed with the [Commission]." The Due Diligence Package for the Third VHB International Deposit does not contain copies of any documents filed with the Commission. Nor does the Due Diligence Package for the Third VHB International Deposit provide any evidence to support that Scottsdale Capital Advisors made any inquiry about the Attorney Opinion Letter's referenced documents. Consequently, the reference to Commission-filed documents in the Attorney Opinion Letter remains unclear.

- 40 -

clearance of the restricted stock has any evidence that would implicate the issuer or Locksmith [Financial] in taking a direct or indirect part in an illegal distribution of securities."

The Attorney Opinion Letter also examined the number of VPLM shares that Locksmith Financial and Kipping owned in order to respond to the question, "[i]s Locksmith [Financial] [a]n [a]ffiliate [o]f [VPLM]." To respond to that question, the Attorney Opinion Letter asserts:

> Locksmith [Financial] currently holds only the subject debt convertible into [29.32 million] shares. As of August 6, 2013, the Company [VPLM] reports [831.10 million] shares of common stock outstanding. Therefore, Locksmith [Financial] holds approximately 3.5 [percent] of the outstanding common stock and the subject securities do not and would not make Locksmith [Financial] a control person. Furthermore, Locksmith [Financial] and Richard Kipping have represented to me that they are not controlled by any of the officers or directors of the [i]ssuer [VPLM].[71]

The information, specifically, the numbers, contained in the Attorney Opinion Letter for the Third VHB International Deposit is at odds with other information and documents contained in the Due Diligence Package for the deposit. The information and documents in the Due Diligence Package for the Third VHB International Deposit suggest that Locksmith Financial and Richard Kipping may have owned additional shares of VPLM. For example, an "Issuance History" from the VPLM Annual Report, which covers the annual period ended on September 30, 2013, provides a table showing "VPLM['s] stock issuance from Sept[ember] 30, 2011 to Sept[ember] 30, 2013." The table reports that, between June 7, 2012 and August 15, 2013, Locksmith Financial received 70.32 million shares of VPLM from the issuer. The table also shows that Kipping received 10 million shares of VPLM directly from the issuer in June 2012. Accordingly, Locksmith Financial and Kipping, together, may have owned a total of 80.32 million shares of VPLM.

The Deposited Securities Checklist for the Third VHB International Deposit provides some context for Locksmith Financial's and Kipping's ownership of VPLM and records that VPLM had 730.46 million shares outstanding at the time of the deposit, not 831.10 million, as stated in the Attorney Opinion Letter. Based on these numbers, Locksmith Financial and Kipping, together, may have owned 11 percent of VPLM.[72] Concerning these shares, the VPLM

---

[71]   "Even after resignation, retirement, or dismissal, a former director or officer may be an affiliate if a present member of the board of directors or an officer is deemed to be his representative." Hicks, *supra* note 10, at § 4:38 (citing *Documation, Inc.*, 1976 SEC No-Act. LEXIS 2206, *2 (Oct. 13, 1976) (explaining that a former officer or director, who is deemed to have a representative on the board or among present officers, is considered to be a part of the control group and an affiliate for Rule 144)).

[72]   *See* Hicks, *supra* note 10, at § 4:38 (asserting that owners of at least 10 percent of an issuer's securities are presumptive affiliates of the issuer). We acknowledge that these numbers are based on Locksmith Financial's and Kipping's ownership of VPLM shares before Locksmith Financial sold 29.32 million VPLM shares to VHB International pursuant to the VHB International/Locksmith Financial Stock Purchase Agreement. After the sale of the 29.32

[Footnote continued on next page]

- 41 -

Annual Report states, "During the past two fiscal years[,] the company issued stock for conversions of convertible promissory notes . . ., per acquisition agreements, and for services rendered. All of these issuances were issued under an exemption from registration . . . . all shares have been issued with the appropriate restrictive legend."

*VHB International's Accumulation, Deposits, and Liquidations of VPLM Shares.* The Due Diligence Package for the Third VHB International Deposit also raises concerns about the potential affiliate status of VHB International and suggests that VHB International may have been accumulating, depositing, and liquidating VPLM shares throughout 2013. For example, the Issuance History from the VPLM Annual Report reports that VHB International received 2.45 million shares of VPLM directly from the issuer in May 2013. The Issuance History notes that VHB International received the shares at a per share price of \$0.00613, and that VHB International obtained the shares as part of a "debt settlement" with the issuer.

Three months later, in August 2013, VHB International received an additional 29.32 million shares of VPLM from Locksmith Financial via the VHB International/Locksmith Financial Stock Purchase Agreement. Accordingly, between the transactions that occurred in May 2013 and August 2013, respectively, VHB International may have owned 31.77 million shares of VPLM, which, based on the 730.46 million shares outstanding listed on the Deposited Securities Checklist for the Third VHB International Deposit, suggests that VHB International may have owned 4.35 percent of VPLM.

It is also worth noting that VHB International deposited at Scottsdale Capital Advisors all 29.32 million shares of VPLM that it received from Locksmith Financial,[73] and that it did so in three separate deposits over a four-month period: (1) on October 10, 2013, Caledonian Bank Limited ("Caledonian Bank") deposited 10 million shares of VPLM for the benefit of VHB

---

[cont'd]

million VPLM shares, Locksmith Financial and Kipping may have owned a total of 51 million shares of VPLM, representing a 6.98 percent interest in the issuer. This percentage is based on 730.46 shares outstanding, as stated in the Deposited Securities Checklist for the Third VHB International Deposit, not 831.10 VPLM shares outstanding, as stated in the Attorney Opinion Letter for the deposit. If based on the 831.10 figure, Locksmith Financial's and Kipping's post-sale ownership of VPLM drops to 6.14 percent.

[73]     Locksmith Financial sold to VHB International the entire allotment of VPLM shares (29.32 million shares) that it received from VPLM pursuant to the Locksmith Financial/VPLM Debt Settlement Agreement and Locksmith Financial Notice of Conversion. The Locksmith Financial/VPLM Debt Settlement Agreement and Locksmith Financial Notice of Conversion state that Locksmith Financial received 29.32 million shares of VPLM in exchange for the settlement of its \$58,636.24 debt with the issuer. The transactions that resulted in shares of VPLM going from the issuer to Locksmith Financial, and from Locksmith Financial to VHB International *all* occurred within an eight-day period between August 15, 2013 and August 23, 2013.

- 42 -

International (the First VHB International Deposit);[74] (2) on January 16, 2014, Caledonian Bank deposited 10 million shares of VPLM for the benefit of VHB International (the Second VHB International Deposit); and (3) on February 6, 2014, Cayman Securities deposited 9.32 million shares of VPLM for the benefit of Montage Securities for the further benefit of VHB International (the Third VHB International Deposit). VHB International's accumulation of VPLM shares, and deposits and liquidations of VPLM shares through Scottsdale Capital Advisors, raises concerns that VHB International may be an affiliate of VPLM, may be acting on behalf of affiliates of the issuer, or may be coordinating its acquisitions and resales of VPLM shares with other individuals or entities who may be affiliates of the issuer. There is no evidence that Scottsdale Capital Advisors inquired into, or addressed, any of these concerns.

(5)     The Non-Shell Company
Representations

To prove that VPLM was not a shell company for purposes of Rule 144, Scottsdale Capital Advisors relied on Bretel's Beneficial Ownership Declaration,[75] the Attorney Opinion Letter, the Thomas Sawyer Statement, portions of unaudited financial statements from the VPLM Annual Report,[76] and information published on the "Company Information" section of the OTC Markets website.[77] The Attorney Opinion Letter and the Thomas Sawyer Statement each relied on VPLM's own representations concerning the issuer's status as a non-shell company.

The Attorney Opinion Letter states, "The Company [VPLM] has indicated it is not a shell . . . in each of its information disclosure filings on OTC Markets. Further, the Company [VPLM] reports active and ongoing operations and therefore would not meet the . . . required element[s] of the definition of a 'shell company.'" The Thomas Sawyer Statement, which identified Sawyer

---

[74]     Caledonian Bank is a Cayman Islands-based foreign financial institution, which, for purposes of this decision, we found operates similar to Montage Securities, Titan International Securities, and Unicorn International Securities. Caledonian Bank served as the intermediary for several deposits at Scottsdale Capital Advisors.

[75]     Bretel's Beneficial Ownership Declaration asked Bretel to check "yes" or "no" in response to the question, "To Beneficial Owner's best knowledge, has the issuer ever been a *shell* company as defined in Rule 144(i)(1) of the Securities Act[]?" Bretel checked no.

[76]     The portions of the unaudited financial statements contained in the Due Diligence Package for the Third VHB International Deposit does not provide any information about VPLM's assets and liabilities, revenues and expenses, or operations and non-cash assets. Rather, VPLM's unaudited financial statements show that the issuer routinely issued swaths of shares to compensate individuals and entities for "debt settlement" and fees for "professional services" rendered.

[77]     VPLM's corporate profile on OTC Markets showed that the issuer was trading at $0.25 on February 7, 2014.

- 43 -

as VPLM's Chairman and CEO,[78] asserts, "The Company [VPLM] has never been and was not at the time of issuance of the [s]ecurity a 'shell company' as defined in Rule 144(i)(1)(i). It then quotes Rule 144's definition of a shell company and concludes, "the US Broker Dealer [Scottsdale Capital Advisors] [is] permitted to rely on the above representations in accepting the deposit of the [VPLM] [s]hares into a brokerage account for resale."

> (6)    Promotional Activity in Shares of
> VPLM During the Relevant Period

On February 6, 2014, Cayman Securities deposited 9.32 million unregistered shares of VPLM at Scottsdale Capital Advisors for the benefit of Montage Securities for the further benefit of VHB International.  Between February 20, 2014 and June 6, 2014, Scottsdale Capital Advisors liquidated 7.81 million shares of VHB International's 9.32 million VPLM shares from Cayman Securities' account at the Firm.  There was very limited promotional activity in VPLM prior to, and after, the period from deposit to the last sale.  There was no significant VPLM promotional activity during the period.

> iv.    The Orofino Gold Corporation (ORFG) Transaction
> (Media Central Deposit)

There is one ORFG deposit at issue in this case – the "Media Central Deposit."  On June 5, 2014, Cayman Securities deposited a total of 13.28 million shares of microcap issuer, ORFG, at Scottsdale Capital Advisors for resale.  Cayman Securities made the deposit for the benefit of Belize-based Unicorn International Securities.  Unicorn International Securities purported to act for the further benefit of another Belize-based entity named Media Central Corp. ("Media Central").  Between June 11, 2014 and June 30, 2014, Scottsdale Capital Advisors liquidated 6.40 million shares of ORFG from Cayman Securities' account at the Firm.[79]  The sales generated net proceeds of $91,408.43 for Media Central and commissions of $1,911.07 for Scottsdale Capital Advisors.  Scottsdale Capital Advisors wired out the proceeds of the ORFG sales to Cayman Securities' bank account.  After it did so, Scottsdale Capital Advisors did not follow the funds, did not know where the funds flowed, and did not know who received the economic benefit of the funds.

> (a)    The Issuer – ORFG

ORFG was not a reporting company and had no shares registered with the Commission between December 2013 and June 2014.[80]  ORFG, however, had been registered previously with the Commission and made several periodic filings with the Commission during the period

---

[78]    As previously noted, the VPLM Officers List identifies Thomas Sawyer as a VPLM "Director," not as the issuer's Chairman or CEO.

[79]    The record does not disclose what happened with the remaining 6.88 million shares of ORFG that were in the Cayman Securities' account for the further benefit of Media Central.

[80]    *See* FINRA Rule 9145(b);

- 44 -

between July 2008 and April 2013. In April 2013, ORFG filed a Form 15 to terminate its securities registration and status as a reporting company under the Exchange Act.[81]

Between April 2013 and March 2016, ORFG made no periodic filings with the Commission.[82] On March 25, 2016 and March 28, 2016, ORFG filed with the Commission *all* quarterly and annual periodic reports for the fiscal years between 2011 and 2015. One of the periodic reports that ORFG filed with the Commission in March 2016 was an annual report, a Form 10-K, for the annual ended on May 31, 2014 (the "ORFG Form 10-K"). We have consulted the ORFG Form 10-K to inform our discussion of the issuer.

The ORFG Form 10-K reports that the issuer was incorporated in Nevada in April 2005, and, in September 2007, the issuer started operations as "Clean 'N Shine," "a full service automotive car wash, cleaning, detailing, and polishing business."[83] The ORFG Form 10-K states that the issuer operated as SNT Cleaning, Inc. throughout 2008 and 2009, and, in December 2009, the issuer changed its name to ORFG. The ORFG Form 10-K explains that ORFG passed a resolution to change its name to Bakken Energy Corp. in March 2014. The ORFG Form 10-K reports that an individual named Ning Shi Long (alternatively, Shi Long Ning) ("Shi Long") served as the issuer's CEO, chairman, president, and acting CFO between 2012 and 2014, but the ORFG Form 10-K also notes that "[another individual] is taking over as CEO."

When describing its business, the ORFG Form 10-K states that ORFG is "an exploration stage gold mining company with its efforts focused on mineral concessions and [the] development of existing high grade artisanal mining operations." The ORFG Form 10-K advises that ORFG "has achieved no operating revenues to date," and that the issuer "is presently looking at oil and gas properties."

The ORFG Form 10-K also reinforces the issuer's financial difficulties. For the annual period ended on May 31, 2014, the ORFG Form 10-K reports that ORFG had no revenues, $2,000 in cash, total assets of $62,000, total liabilities of $1.95 million, which includes loans payable of $698,366 and convertible loans of $792,638, and a cumulative net loss of nearly $650,000. For the period between April 2005, when ORFG incorporated in Nevada, and May 2014, the reporting period of the ORFG Form 10-K, the ORFG Form 10-K states that the issuer had accumulated net losses of $3.69 million.

---

[81]     The Form 15 is the Commission's Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934.

[82]     When ORFG ceased filing periodic reports with the Commission, it began publishing quarterly and annual reports on OTC Markets website. Throughout 2013 and 2014, ORFG published on the OTC Markets website quarterly and annual reports covering its fiscal years between 2011 and 2014.

[83]     The ORFG Form 10-K discloses that the issuer had no operations from inception to November 2007.

- 45 -

    (b)    Scottsdale Capital Advisors' Due Diligence
                Package for the ORFG Deposit

Scottsdale Capital Advisors prepared a Due Diligence Package for Cayman Securities' deposit of 13.28 million shares of ORFG for the benefit of Unicorn International Securities for the further benefit of Media Central. We have reviewed that Due Diligence Package to determine what information Scottsdale Capital Advisors had gathered when it approved the Media Central Deposit.

    (1)    The Deposited Securities Checklist

The Due Diligence Package for the Media Central Deposit followed Scottsdale Capital Advisors' standardized order for all Due Diligence Packages. The first document in the Due Diligence Package for the Media Central Deposit is the Deposited Securities Checklist. The Due Diligence Package does not disclose which member of Scottsdale Capital Advisors' Rule 144 Team conducted a review, but, Cruz signed the 144 Compliance Approval on the Deposited Securities Checklist, and Jay Noiman signed the Broker Approval section of the form.

    (2)    The Beneficial Ownership
                Declaration

The first key document located among the Due Diligence Supporting Documents is the Beneficial Ownership Declaration. The Beneficial Ownership Declaration for the Media Central Deposit identifies Geovanni Moh ("Moh") as the beneficial owner of the 13.28 million shares of ORFG deposited at Scottsdale Capital Advisors on June 5, 2014.[84] The Due Diligence Package for the Media Central Deposit identifies Moh as Media Central's president. Moh signed the Beneficial Ownership Declaration in the Due Diligence Package for the Media Central Deposit to "represent" that he was not an affiliate of ORFG, that ORFG was not a shell company, and that the ORFG securities were free-trading under Rule 144. The Beneficial Ownership Declaration that Moh signed was not witnessed or notarized, and the form provided no address, telephone number, or other contact information for Moh or Media Central.

Scottsdale Capital Advisors asked Unicorn International Securities to provide Moh's "physical address" in Belize, obtained a copy of Moh's Belizean passport, and obtained a copy of a bill for water and sewer services from Belize Water Services Limited directed to Moh at an address in Belize. The Firm, however, failed to otherwise verify Moh's identity.[85] For example,

---

[84]    Moh's Beneficial Ownership Declaration discloses that Moh directly or indirectly owned or controlled 15 million shares of ORFG, and that Moh had sold 1.72 million of his ORFG shares during the last three months through FINRA member firm, Interactive Brokers, LLC. The remaining balance of Moh's shares is the 13.28 million that Media Central deposited at Scottsdale Capital Advisors on June 5, 2014.

[85]    The Due Diligence Package for the Media Central Deposit contains a letter from Moh as president of Media Central, dated May 20, 2014 (the "Geovanni Moh Letter"). The Geovanni Moh Letter sought to confirm that Media Central "has never been engaged in any promotion nor

[Footnote continued on next page]

- 46 -

the Firm searched for Moh's and Media Central's names on the Commission's website (https://www.sec.gov/), FINRA's OFAC Search Tool, and web-based internet searches. The Firm also conducted web-based internet searches combining Media Central's or Moh's names with "penny stock," "ORFG," and "securities fraud." But Scottsdale Capital Advisors did not conduct any web-based internet research for Moh's or Media Central's names standing alone, nor did it conduct any web-based internet research for Moh's name in connection with Media Central.[86]  In addition,  Scottsdale Capital Advisors may have documented some, but not all, of the due diligence that resulted from its web-based internet search results.

> (3)     The Attorney Opinion Letters and
>           Underlying Transactional
>           Documents

The Due Diligence Package for the Media Central Deposit suggests that Media Central obtained its ORFG shares from an entity named Anything Media, Inc. ("Anything Media"), Anything Media obtained its ORFG shares from an individual named James Casey Forward (alternatively, Casey Forward) ("Forward"), and Forward obtained his shares of ORFG directly from the issuer.  The Attorney Opinion Letters and supporting transactional documents purport to explain the transactions.[87]

---

[cont'd]

maintains a market for ORFG's securities . . . ."  Moh signed the Geovanni Moh Letter, but the letter was not witnessed or notarized.

The Geovanni Moh Letter noted that Media Central's address was "76 Dean Street, Belize City, Belize, Central America."  Documents in the Due Diligence Package for the Sky Walker Deposit associate that address with Sky Walker and Patrick Gentle.  In addition, a CSCT [Cayman Securities] Subaccount List connects that address with Jeff Cox and Ireland Offshore Securities, "Talal Fanni" and Swiss National Securities, and Patrick Gentle and Keyhole Kapital. Moh's bill for water and sewer services, however, identified another address for Moh – "8 Neals Pen Road U/F, Belize City, Belize 00000."  Scottsdale Capital Advisors did not inquire into, or resolve, these discrepancies.

[86]     On February 14, 2014, Media Central incorporated under the name, Lock Investments Ltd.  ("Lock Investments").  Two weeks later, on February 27, 2014, the company changed its name from Lock Investments to Media Central.  Nothing in the Due Diligence Package for the Media Central Deposit explains the basis for the name change or examines whether the company's name change relates to a change in the executives, directors, or officers of the company.

[87]     The Due Diligence Package for the Media Central Deposit contains two Attorney Opinion Letters.

ORFG, Anything Media, and Media Central retained a law firm to prepare the first Attorney Opinion Letter (the "OAM [ORFG, Anything Media, Media Central] Attorney Opinion Letter").  The OAM Attorney Opinion Letter is dated March 18, 2014.  Unicorn International Securities retained a law firm to prepare the subsequent Attorney Opinion Letter (the "Unicorn

[Footnote continued on next page]

- 47 -

*The First Transactional Link: The Forward/ORFG Convertible Promissory Note.* The OAM and Unicorn Attorney Opinion Letters for the Media Central Deposit each point to a convertible promissory note between Forward, as noteholder, and ORFG, as borrower, as the first chronological transaction for the deposit (the "Forward/ORFG Convertible Promissory Note"). The Forward/ORFG Convertible Promissory Note is dated September 1, 2012. The Forward/ORFG Convertible Promissory Note states that ORFG "promises unconditionally, for loans, advances, and debt . . . to pay . . . Casey Forward ("Holder"), the principal amount of [$600,000] together with interest on the principal balance outstanding from time to time . . . ."[88] The Forward/ORFG Convertible Promissory Note had a non-default interest rate of 12 percent, a default interest rate of 15 percent, and a maturity date of June 1, 2013.

The Forward/ORFG Convertible Promissory Note contained a provision for the "Optional Conversion of All or Part of the Note into Common Stock of the Company." The optional conversion feature of the Forward/ORFG Convertible Promissory Note allowed Forward to "convert all or any lesser amount of the unpaid principal amount of th[e] Note plus all accrued but unpaid interest and [a]dditional [s]ums outstanding . . . into shares of the Company's [ORFG] registered common stock . . . at the conversion price ("Conversion Price") defined below." Under the heading "Conversion Price," the Forward/ORFG Convertible Promissory Note explained that the debt that ORFG owed to Forward "shall be converted into shares of the Company's [ORFG] [c]ommon restricted stock at a ratio of [$0.0025] per share."

The Forward/ORFG Convertible Promissory Note also limited Forward's ability to exercise his options in two distinct ways. First, if Forward chose to convert his debt into shares of ORFG common restricted stock, he had to do so "upon the 90th day after the Maturity Date [June 1, 2013]." Second, the Forward/ORFG Convertible Promissory Note "limited [Forward] to convert no more than 4.99 [percent] of the issued and outstanding common stock at [the] time of conversion at any one time." Forward did not exercise his options under the terms of the Forward/ORFG Convertible Promissory Note, and he did not convert his ORFG debt into shares of ORFG common restricted stock.

---

[cont'd]

Attorney Opinion Letter"). The Unicorn Attorney Opinion Letter is dated June 4, 2014. The OAM and Unicorn Attorney Opinion Letters each determine that the ORFG shares at issue may be resold based on the applicability of the Rule 144 exemption. Each letter also contains the standard disclaimers concerning the genuineness of all signatures, the authenticity of all documents, and the accuracy of the parties' representations and certifications. The Unicorn Attorney Opinion Letter, however, addresses events that occurred after the issuance of the OAM Attorney Opinion Letter. We discuss these events in Part III.A.6.e.iv.(b)(6) (Promotional Activity in ORFG and the Florida-Based Media Central Corp.).

[88]     The OAM Attorney Opinion Letter references a "verification of payments made by Casey Forward to [ORFG] for his $600,000 note [the Forward/ORFG Convertible Promissory Note]." The Due Diligence Package for the Media Central Deposit does not contain a copy of the referenced document, and the Unicorn Attorney Opinion Letter references no "verification of payments" document at all.

- 48 -

Forward signed the Forward/ORFG Convertible Promissory Note as the "[note]holder." Shi Long and an individual named Dr. Hans J. Bocker ("Bocker") signed the Forward/ORFG Convertible Promissory Note on behalf of ORFG. The Forward/ORFG Convertible Promissory Note identifies Shi Long as ORFG's president and director, and it lists Bocker as the chairman of the issuer's board of directors.[89] The Forward/ORFG Convertible Note is not witnessed or notarized, and it contains no contact information for Forward.

*The Second Transactional Link: The Anything Media/Forward Assignment and Modification Agreement and Anything Media/ORFG Convertible Promissory Note.* The OAM and Unicorn Attorney Opinion Letters identify an Assignment and Modification Agreement, dated January 18, 2014, among ORFG, Forward, and Anything Media (the "Anything Media/Forward Assignment and Modification Agreement") as the second transactional link resulting in Media Central's deposit of 13.28 million ORFG shares at Scottsdale Capital Advisors in June 2014. The copy of the Anything Media/Forward Assignment and Modification Agreement contained in the Due Diligence Package for the Media Central Deposit is illegible.[90] Consequently, we must rely on the representations in the OAM and Unicorn Attorney Opinion Letters to inform our understanding of this transactional link.

The earlier Attorney Opinion Letter, the OAM Attorney Opinion Letter, describes the Anything Media/Forward Assignment and Modification Agreement as "dated January 18, 2014, between [ORFG], Casey Forward[,] and Anything Media[], whereby Anything Media[] acquired a portion, $50,000, of Casey Forward's $600,000 debt in [ORFG] for 20,000 Preferred B shares of Anything Technologies Media, Inc. stock." The subsequent Attorney Opinion Letter, the Unicorn Attorney Opinion Letter, also contains representations about the Anything Media/Forward Assignment and Modification Agreement. But the Unicorn Attorney Opinion Letter fails to mention Forward's receipt of shares of Anything Technologies Media, Inc. ("Anything Technologies Media") as a part of the agreement. The Unicorn Attorney Opinion Letter describes the Anything Media/Forward Assignment and Modification Agreement as "dated January 18, 2014, by and among, the Issuer [ORFG], Casey Forward, and Anything Media[], pursuant to which Casey Forward assigned a $50,000 portion of Note No. 1 [the ORFG/Forward Convertible Promissory Note] to Anything Media[]. *[Note: In paragraph 1.3 of the* [Anything Media/Forward] *Assignment and Modification Agreement, the Issuer* [ORFG] *confirmed receipt or funds represented by Note No. 1* [the ORFG/Forward Convertible Promissory Note] *on or before September 1, 2012] . . . ."*[91]

---

89    The Forward/ORFG Convertible Promissory Note reported that ORFG was "a Nevada Corporation with offices at 93342 Xinliu Street, Zhong Shan District, Dalian, Liaoning 16001, China."

90    The legible portion of the Anything Media/Forward Assignment and Modification Agreement, the pages numbers, suggests that the copy of the document in the Due Diligence Package for the Media Central Deposit is incomplete. The Anything Media/Forward Assignment and Modification Agreement consists of pages 10 to 13 of the document.

91    Based on our calculations, after the execution of the Anything Media/Forward Assignment and Modification Agreement, ORFG still owed Forward $550,000 pursuant to the

[Footnote continued on next page]

- 49 -

Because the Due Diligence Package for the Media Central Deposit does not contain a legible copy of the Anything Media/Forward Assignment and Modification Agreement, or any other document that purports to explain the Anything Media/Forward Assignment and Modification Agreement, we are unable to determine what events (outside of, perhaps, Forward's receipt of "20,000 Preferred B shares of Anything Technologies Media[] stock") may have led to Forward's assignment of a portion of his ORFG debt to Anything Media. Similarly unclear are the relationships that may have existed among the parties to the Anything Media/Forward Assignment and Modification Agreement (ORFG, Forward, and Anything Media), in addition to what relationship, if any, that may have existed between Anything Media and Anything Technologies Media. Nothing in Scottsdale Capital Advisors' Due Diligence Package for the Media Central Deposit seeks to address or resolve these issues.

In conjunction with the Anything Media/Forward Assignment and Modification Agreement, on January 18, 2014, ORFG issued a $50,000 "Eight Percent (8%) Convertible Note" to Anything Media (the "Anything Media/ORFG Convertible Promissory Note"). The copy of the Anything Media/ORFG Convertible Promissory Note contained in the Due Diligence Package for the Media Central Deposit is illegible,[92] and the OAM and Unicorn Attorney Opinion Letters for the Media Central Deposit contain scant information about the note.[93] The Shi Long Statement,[94] which serves as the basis for some of the representations in the Unicorn Attorney Opinion Letter, however, "represent[s] and certif[ies]" that:

---

[cont'd]

Forward/ORFG Convertible Promissory Note. No document in the Due Diligence Package for the Media Central Deposit addresses this fact.

[92]     The legible portion of the Anything Media/ORFG Convertible Promissory Note, the pages numbers, suggests that the copy of the document in the Due Diligence Package for the Media Central Deposit is incomplete. The Anything Media/ORFG Convertible Promissory Note consists of pages 14 to 16 of the document.

[93]     The OAM Attorney Opinion Letter only references the Anything Media/ORFG Convertible Promissory Note as a "Convertible $50,000 Note Anything Media[] in [ORFG], dated January 18, 2014." The Unicorn Attorney Opinion Letter describes the Anything Media/ORFG Convertible Promissory Note as a "Convertible Note, dated January 18, 2014, made by the Issuer [ORFG] and payable to Anything Media[] in the amount of $50,000, such note having been issued as a replacement for the assigned $50,000 portion of Note No. 1 [the Forward/ORFG Convertible Promissory Note] . . . ." The Unicorn Attorney Opinion Letter designates the Anything Media/ORFG Convertible Promissory Note as "Note No. 2."

[94]     The Due Diligence Package for the Media Central Deposit contains two statements on behalf of ORFG from Shi Long. The statements are dated January 30, 2014 and May 19, 2014, respectively, and each statement corresponds to one of the Attorney Opinion Letters in the Due Diligence Package for the Media Central Deposit. The Shi Long statement, dated January 30, 2014, corresponds to the OAM Attorney Opinion Letter, which is dated March 18, 2014. This Shi Long statement is illegible, and we do not reference it. The Shi Long Statement, dated May 19, 2014, corresponds to the Unicorn Attorney Opinion Letter, which is dated June 4, 2014. This document is legible, and we reference it as the "Shi Long Statement."

[Footnote continued on next page]

- 50 -

The Security [the ORFG shares] is derived from a Convertible Promissory Note dated September 1, 2012 (the "Note") in the principal amount of $600,000 issued to Casey Forward (the "Original Holder") [the Forward/ORFG Convertible Promissory Note].  On or about January 18, 2014, the Original Holder [Forward] assigned a portion of the Note (the "Assignment") to Anything Media[] (the "Seller") in a private transaction [the Anything Media/Forward Assignment and Modification Agreement].

Concurrent with the Assignment, Company [ORFG] and Seller [Anything Media] agreed to amend the terms of the Note [the Forward/ORFG Convertible Promissory Note] for no additional consideration [, which resulted in the issuance of the Anything Media/ORFG Convertible Promissory Note].[95]

*The Third Transactional Link: The Media Central/Anything Media Stock Purchase Agreement and the Anything Media Notice of Conversion.*[96]  To explain Anything Media's transfer of its interest in shares of ORFG to Media Central, the Due Diligence Package for the Media Central Deposit contains a "Stock Purchase/Debt Payment Agreement," dated April 16, 2014 (the "Media Central/Anything Media Stock Purchase Agreement"), and a Notice of Conversion, dated April 22, 2014 (the "Anything Media Notice of Conversion").[97]  Neither the Media Central/Anything Media Stock Purchase Agreement nor the Anything Media Notice of Conversion explains the circumstances that resulted in Anything Media becoming indebted to Media Central.  Rather, the Media Central/Anything Media Stock Purchase Agreement states:

---

[cont'd]

The Shi Long Statement identifies Shi Long as the co-chairman of ORFG's board of directors and notes that Shi Long is the issuer's executive director.  The Shi Long Statement provides ORFG's name, in addition to a Nevada address, telephone number, and facsimile number.  The Shi Long Statement does not contain any specific contact information for Shi Long, including Shi Long's address, telephone number, or email address.  In addition, although Shi Long purportedly signed the Shi Long Statement, the statement is not witnessed or notarized.

[95]     The entirety of this quoted language from the Shi Long Statement mirrors the language contained in the Thomas Sawyer Statement.  *See* Part III.A.6.e.iii.(b)(3) (The [VPLM] Attorney Opinion Letter and Underlying Transactional Documents).  Other provisions in the Shi Long Statement also mimic the Thomas Sawyer Statement.  These provisions include representations that "[t]he debt represented by the Note [the Forward/ORFG Convertible Promissory Note] was lawfully incurred for valuable consideration received and reflected in [ORFG's] financials as a liability as of September 1, 2012," and that "[t]here is no agreement or other arrangement between [ORFG] and [Forward, Anything Media, and Media Central] to remit any portion of the proceeds from the resale of the [the ORFG shares] to [ORFG]."

[96]     The OAM Attorney Opinion Letter cites additional documents that purport to "verify" the transactions underlying the Anything Media/Forward Assignment and Modification Agreement and the Anything Media/ORFG Convertible Promissory Note.  The OAM Attorney Opinion Letter cites: (1) a "[v]erification of transfer of 20,000 Preferred B shares by Anything Media[] to Casey Forward for purchase of $50,000 of his debt in [ORFG], dated January 20, 2014;" (2) a "Certificate of Good Standing [ORFG], dated January 22, 2014;" (3) an "Irrevocable Board

[Footnote continued on next page]

- 51 -

THIS AGREEMENT is made and entered into this day of April 16, 2014 by and between Anything Media[] ("Seller") and Media Central [] ("Buyer") with regard to certain capital stock of [ORFG].

WHEREAS, the Seller [Anything Media] is the record owner and holder of certain issued and outstanding shares of capital stock of ORFG which is the subject of this Agreement;[98]

---

[cont'd]

Resolution from [ORFG] to issue the shares, dated January 30, 2014;" and (4) an "Island [S]tock [T]ransfer irrevocable transfer letter from [ORFG] to reserve shares for [Anything Media's] conversion, dated March 12, 2014." The Unicorn Attorney Opinion Letter does not reference any of these documents.

Of the documents cited in the OAM Attorney Opinion Letter, the Due Diligence Package for the Media Central Deposit contains the "verification of transfer" documents, which consist of a letter from Anything Media's president, Chris Jensen ("Jensen"), an irrevocable stock power certificate, and a corporate resolution authorizing Jensen to "sell, assign, or transfer" shares of Anything Media) (no. 1 above), an illegible copy of the Irrevocable Board Resolution from ORFG (no. 3 above), and the irrevocable transfer letter from ORFG to Island Stock Transfer (no. 4 above). The Due Diligence Package for the Media Central Deposit does not contain a copy of ORFG's Certificate of Good Standing (no. 2 above). The Due Diligence Package for the Media Central Deposit also contains a second irrevocable transfer letter from ORFG to Island Stock Transfer related to another ORFG convertible promissory note, but this document appears to have been erroneously included in the Due Diligence Package for the Media Central Deposit.

[97]    The OAM and Unicorn Attorney Opinion Letters list the Media Central/Anything Media Stock Purchase Agreement and the Anything Media Notice of Conversion among the documents that the attorneys reviewed to prepare the letters. The OAM and Unicorn Attorney Opinion Letters, however, do not provide any information about the events that ended with Anything Media's indebtedness to Media Central and Anything Media's execution of the Anything Media Notice of Conversion. Nor do the OAM and Unicorn Attorney Opinion Letters explain why Media Central and Anything Media decided to enter into the Media Central/Anything Media Stock Purchase Agreement in the first place. Scottsdale Capital Advisors' Due Diligence Package for the Media Central Deposit does not provide any documentary or other evidence to demonstrate that the Firm inquired into the background of Anything Media's indebtedness to Media Central.

[98]    On April 16, 2014, Anything Media owned no shares of ORFG. At that juncture, Anything Media had entered into the Anything Media/Forward Assignment and Modification Agreement, which transferred $50,000 of Forward's ORFG-owed debt to Anything Media (in exchange for Forward's receipt of 20,000 Preferred B shares of Anything Technologies Media). Anything Media also had obtained the $50,000 Anything Media/ORFG Convertible Promissory Note from ORFG. Although the Anything Media/ORFG Convertible Promissory Note allowed Anything Media to convert its debt into shares of ORFG, as of April 16, 2014, Anything Media had not exercised the option. Anything Media did not become the owner of any shares of ORFG until the company executed the Anything Media Notice of Conversion on April 22, 2014, six

[Footnote continued on next page]

- 52 -

WHEREAS, the Seller is willing to transfer 15 [million] freely trading shares of ORFG common stock for payment of $75,000[].

The Media Central/Anything Media Stock Purchase Agreement provides addresses for Anything Media and Media Central.[99]  Jensen, Anything Media's president, signed the Media Central/Anything Media Stock Purchase Agreement on behalf of Anything Media.  Moh, as "president," signed the Media Central/Anything Media Stock Purchase Agreement on behalf of Media Central.  The signatures on the Media Central/Anything Media Stock Purchase Agreement are not witnessed, and the document is not notarized.

The Anything Media Notice of Conversion is the second document that purports to explain Anything Media's transfer of its interest in ORFG to Media Central.  The Anything Media Notice of Conversion states that Anything Media "elect[ed] to convert $9,000 [of the] principal amount of the Note [Anything Media/ORFG Convertible Promissory Note] . . . into Shares of [the] Common Stock of [ORFG] . . . according to the conditions of the convertible Note[] [Anything Media/ORFG Convertible Promissory Note] of the Borrower [ORFG][,] dated as of September 1, 2012 . . . ."  The Anything Media Notice of Conversion noted the date of conversion (April 22, 2014), the per share conversion price ($0.0006),[100] the number of shares to be delivered (15 million), and the number of ORFG shares outstanding at the time of the conversion (340 million).[101]  The Anything Media Notice of Conversion also reported that the conversion was below the conversion threshold of 4.99 percent, and that ORFG still owed Anything Media a principal balance of $33,200 plus $4,000 in interest after the conversion.[102]

---

[cont'd]

days *after* Media Central and Anything Media executed the Media Central/Anything Media Stock Purchase Agreement.  At the hearing, Cruz testified that the execution of the Media Central/Anything Media Stock Purchase Agreement prior to the Anything Media Notice of Conversion was not "a red flag that required [him] to engage in further due diligence in assessing the [Media Central] [D]eposit."

[99]     Media Central's address in the Media Central/Anything Media Stock Purchase Agreement is listed as 76 Dean Street, Belize City, Belize.

[100]     The Forward/ORFG Convertible Promissory Note explained that Forward could convert his ORFG-owed debt into shares of ORFG at a rate of $0.0025 per share.  *See* Part III.A.6.e.iv.(b)(3) (The Attorney Opinion Letters and Underlying Transactional Documents).

[101]     The Unicorn Attorney Opinion Letter, citing the "OTC [Markets] Disclosure & News Service," notes that ORFG had 261.40 shares outstanding as of November 2013.  The Anything Media Notice of Conversion states that ORFG had 340 million shares outstanding as of April 2014.  The ORFG Form 10-K discloses that the issuer had 413.40 shares outstanding as of May 2014.  The Deposited Securities Checklist in the Due Diligence Package for the Media Central Deposit reports that ORFG had 303.40 million shares outstanding as of June 2014.

[102]     Anything Media recognized a 733 percent profit when it sold its shares of ORFG to Media Central pursuant to the Media Central/Anything Media Stock Purchase Agreement.  Anything Media carved out $9,000 of its $50,000 of ORFG debt, converted that $9,000 into 15

[Footnote continued on next page]

- 53 -

Jensen signed the Anything Media Notice of Conversion, but the Anything Media Notice of Conversion was not witnessed or notarized.

 (4)    The Nonaffiliate and Non-Shell
 Company Representations

 Scottsdale Capital Advisors relied heavily on the Beneficial Ownership Declarations, the Attorney Opinion Letters, and the Due Diligence Supporting Documents to establish the nonaffiliate status of the selling customers, demonstrate the one-year holding period for resales of restricted securities, and prove the non-shell company status of the issuer. For the Media Central Deposit, Scottsdale Capital Advisors points to Moh's Beneficial Ownership Declaration,[103] the Shi Long Statement,[104] and the OAM and Unicorn Attorney Opinion Letters to establish the nonaffiliate status of the individuals and entities involved in the deposit.[105] To

---

[cont'd]

million shares of ORFG, and sold those 15 million shares to Media Central for $75,000. Scottsdale Capital Advisors' Due Diligence Package for the Media Central Deposit does not contain any information to explain how $9,000 of ORFG's debt converted to 15 million shares for Anything Media (per share price of $0.0006), but those same shares equated to $75,000 in value when transferred to Media Central within a six-day timeframe (per share price of $0.005). At the hearing, Cruz testified that Anything Media's profit margins were not "a red flag that required [him] to engage in a searching inquiry to assess the [Media Central] [D]eposit."

 In addition, based on our calculations, ORFG still owed Anything Media $41,000 plus interest after the $9,000 conversion. (The Anything Media/ORFG Convertible Promissory Note had a principal amount due of $50,000.). The Due Diligence Package for the Media Central Deposit does not explain why the Anything Media Notice of Conversion states that the principal balance that ORFG owed to Anything Media was only $33,200 plus interest. (The Shi Long Statement and Deposited Securities Checklist for the Media Central Deposit each state that remaining balance on the Anything Media/ORFG Convertible Promissory Note was $33,800.).

[103]    Moh's Beneficial Ownership Declaration served as Scottsdale Capital Advisors' proof that Moh was not an affiliate of ORFG.

[104]    The Shi Long Statement "represented and certified" that, "[t]o the Company's [ORFG's] best knowledge, the Parties [Forward, Anything Media, and Media Central] are not beneficial owners of 10 [percent] or more of any class of equity securities of the Company [ORFG]." *See* Hicks, *supra* note 10, at § 4:38 (explaining that owners of at least 10 percent of an issuer's securities are presumptive affiliates of the issuer). The Shi Long Statement also represented and certified that "the [p]arties are not, or were not 90 days prior to the sale, a director, officer, or an '[a]ffiliate' of the Company [ORFG] as that term is used in . . . Rule 144 of the Securities Act . . . (i.e., a person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under control with the Company [ORFG])."

[105]    The OAM Attorney Opinion Letter states that "[Anything Media] is not an 'affiliate' of the Company [ORFG and has not been for at least the last 90 days," and that "[h]older [Media Central] is not an affiliate of the Company [ORFG] and has not been." The OAM Attorney

[Footnote continued on next page]

prove that ORFG was not a shell company, Scottsdale Capital Advisors relied on portions of one of ORFG's unaudited quarterly financial statements, portions of one of ORFG's quarterly information and disclosure statements,[106] ORFG's trade volume data from the OTC Markets website,[107] Moh's Beneficial Ownership Declaration,[108] the Shi Long Statement,[109] and the OAM and Unicorn Attorney Opinion Letters.[110]

---

[cont'd]

Opinion Letter concludes "[i]t is therefore my opinion that the safe harbor provided by Rule 144 is available to [h]older [Media Central], and the [ORFG] [s]hares should be issued as free-trading."

     The Unicorn Attorney Opinion Letter reaches a similar conclusion. "[B]ased on representations made by [ORFG]," the Unicorn Attorney Opinion Letter opines that "Casey Forward and Anything Media[] were not affiliates of [ORFG]," "the [s]eller [Media Central] did not acquire the [ORFG] [s]hares from an 'affiliate' of [ORFG], and "the [s]eller [Media Central] was not an affiliate of [ORFG] and had not been an affiliate of [ORFG] during the prior 90 days. The Unicorn Attorney Opinion Letter surmises that "the [s]eller [Media Central] will not be deemed to be an underwriter of the [ORFG [s]hares within the meaning of Section 2(a)(11) of the [Securities] Act . . . ."

[106]    The unaudited quarterly financial statement and quarterly information and disclosure statement in the Due Diligence Package for the Media Central Deposit are incomplete.  The unaudited quarterly financial statement, located in the Due Diligence Package for the Media Central Deposit, contains only one page of the document's four pages.  The quarterly information and disclosure statement contains only two of the document's four pages.  On appeal, we took official notice of the complete unaudited quarterly financial statement and quarterly information and disclosure statement, as published on the OTC Markets website on April 19, 2013 and April 22, 2014, respectively.

[107]    Scottsdale Capital Advisors obtained a trade volume report for ORFG from the OTC Markets website.  The trade volume report is dated June 5, 2014, the same date as the Media Central Deposit, and it provides trade volume data for ORFG for the period between April 29, 2014 and June 5, 2014.  On June 5, 2014, ORFG was trading at $0.0181.

[108]    Moh's Beneficial Ownership Declaration asked Moh to check "yes" or "no" in response to the question, "To Beneficial Owner's best knowledge, has the issuer ever been a *shell* company as defined in Rule 144(i)(1) of the Securities Act[]?"  Moh checked no.

[109]    The Shi Long Statement explains that "[t]he Company [ORFG] has never been and was not at the time of issuance of the [s]ecurity a 'shell company' as defined in Rule 144(i)(1)(i).  For purposes of Rule 144(i)(1)(i), a shell company is a company that has no or nominal operations and either: (i) no or nominal assets; (ii) assets consisting solely of cash and cash equivalents; or (iii) assets consisting of any amount of cash and cash equivalents and nominal other assets."

[110]    The OAM and Unicorn Attorney Opinion Letters base their legal opinions concerning ORFG's non-shell company status on the representations in the Shi Long Statement.  The OAM Attorney Opinion Letter states that "[ORFG] is incorporated in the State of Nevada, . . . is not a

[Footnote continued on next page]

- 55 -

(5)     Promotional Activity in Shares of
        ORFG During the Relevant Period

On June 5, 2014, Cayman Securities deposited 13.28 million unregistered shares of ORFG at Scottsdale Capital Advisors for the benefit of Unicorn International Securities for the further benefit of Media Central. Between June 11, 2014 and June 30, 2014, Scottsdale Capital Advisors liquidated 6.40 million of the ORFG shares from Cayman Securities' account at the Firm. There was promotional activity in ORFG prior to, during, after this period (June 5, 2014 (date of the Media Central Deposit) to June 30, 2014 (date of the last liquidation from the Media Central Deposit)).

The Due Diligence Package for the Media Central Deposit contains a Stock Promotion Printout that was printed on the day of the deposit, June 5, 2014.   The Stock Promotions Printout for the Media Central Deposit shows that ORFG had promotional activity on 88 occasions, but the Stock Promotions Printout is incomplete and lists only 10 promotional activity dates between May 8, 2014 and June 2, 2014.

At the hearing, Enforcement introduced a complete Stock Promotions Printout for ORFG for the period between January 2010 and July 2014.[111]  Enforcement's Stock Promotions Printout shows that ORFG had been promoted 160 times during that period.  Between June 5, 2014, the date of the Media Central Deposit, and June 30, 2014, the date of the last liquidation from the Media Central Deposit, ORFG was promoted on five occasions.[112]

---

[cont'd]

reporting company . . . . [, and] would [not] . . . be considered a 'shell company' within the meaning of . . . the Securities Act . . . ."  The OAM Attorney Opinion Letter also notes that [ORFG] is not subject to the reporting requirements of . . . the Exchange Act and is not now, nor has it or any of its predecessors ever been, a shell or blank check company."  The Unicorn Attorney Opinion provides a more truncated shell company analysis and asserts only, "[b]ased on the [Shi Long Statement] . . ., [ORFG] has never been a shell company, so Rule 144 may be used for the resale of the [i]ssuer's common stock."

[111]     Enforcement also introduced an ORFG Stock Alert from hotstocked.com.  The ORFG Stock Alert stated that there was a "growing ORFG buzz [that] is the talk of the small markets this morning May 05, 2014 09:07."  (This is one month before the Media Central Deposit.).  The ORFG Stock Alert advised readers that "[t]his morning's 02 mega play . . . ORFG . . . is in a class by itself."  The ORFG Stock Alert noted that "ORFG entered an MOU [memorandum of understanding] to acquire an [o]il [r]efinery in Southern Utah."  The ORFG Stock Alert also emphasized that "[t]he [o]il [r]efinery was valued at over **[$]16.5 [million] in 2006** and the company [ORFG] believes it is worth much more as the value of oil has increased dramatically from the $60 per barrel range in 06' (sic) to around $100 per barrel in 2014."  The ORFG Stock Alert concluded that "ORFG has a lot of high points.  To find such impressive assets on a 2 cent company is incredible . . . . **ORFG could be the talk of the OTC today . . . let's get this week started with something to be excited about.**"

[112]     The promotional activity occurred on the following five dates: June 5, 2014, June 6, 2014, June 11, 2014, June 23, 2014, and June 30, 2014.

- 56 -

Because of the limited amount of time between the Media Central Deposit and the last liquidation from the Media Central Deposit, we examined the Stock Promotions Printout that Enforcement introduced to review promotional activity in ORFG for a three-month period – May 2014, June 2014, and July 2014. During that three-month period, there was promotional activity in ORFG on 97 occasions. ORFG was promoted 23 times in May 2014 (the month before the Media Central Deposit),[113] seven times during the entirety of June 2014 (the month of the Media Central Deposit), and 67 times in July 2014 (the month after the Media Central Deposit).[114]  At the hearing, Cruz testified that he knew that ORFG had multiple promotions within the month before the Media Central Deposit, and that, in response, he "probably would have perused a couple of the pages of the [promotional] printouts."[115]

>       (6)     Promotional Activity in ORFG and
>               the Florida-Based Media Central
>               Corp. (MCC)

On May 27, 2014, nine days before the Media Central Deposit, amid the flurry of ORFG promotional activity, Scottsdale Capital Advisors "discovered" that a Florida-based entity named Media Central Corp. ("MCC") owned and operated two websites that had promoted ORFG.[116]

---

[113]    Of the 23 instances of promotional activity in ORFG in May 2014, 15 instances occurred on a single date, May 5, 2014, exactly one month before the Media Central Deposit on June 5, 2014.

[114]    Of the 67 instances of promotional activity in ORFG in July 2014, 50 instances occurred during the four-day period between July 7, 2014 and July 10, 2014, approximately one month after the Media Central Deposit and two weeks after the last liquidation from the Media Central Deposit.

[115]    The Deposited Securities Checklist for the Media Central Deposit notes that Scottsdale Capital Advisors "[c]hecked stockpromoters.com – multiple promos in last 30 days . . . ."  When Enforcement asked Cruz whether ORFG's promotional activity raised suspicions for Scottsdale Capital Advisors' acceptance of the Media Central Deposit, Cruz testified that "promos are always a red flag that we do an inquiry on."  When Enforcement asked Cruz to elaborate on the Firm's inquiry in connection with the Media Central Deposit and the promotional activity in ORFG in the month before the deposit, Cruz stated "[t]he inquiry that we do as part of our procedure is to determine whether our customer potentially has any involvement with the promos and to assess whether these promos are having any effect on the . . . trading of the securities being deposited."  The Due Diligence Package for the Media Central Deposit does not document Scottsdale Capital Advisors' efforts to determine customer-involvement in the ORFG promotional activity and does not provide any evidence that the Firm assessed the effect of the ORFG promotional activity on the stock's trading activity.

[116]    The two websites that MCC owned and operated were named pennystockcrowd.com and stockblaster.com.  The pennystockcrowd.com website explained that the website was "engaged in the business of marketing and advertising companies for monetary compensation . . . . [and was] owned and operated by [MCC]."  The stockblaster.com website stated that the website was "wholly owned and operated by [MCC] [, that] [e]mployees of [MCC] are not registered as an

[Footnote continued on next page]

- 57 -

Scottsdale Capital Advisors made the discovery when it conducted its web-based internet searches, inputting the search terms "media central corp + penny stock" and "Media Central Corp + penny stock website." Scottsdale Capital Advisors, in conjunction with the intermediaries for the Media Central Deposit, Cayman Securities and Unicorn International Securities, conducted additional due diligence to determine whether the Belize-based Media Central that had proposed to deposit shares of ORFG at Scottsdale Capital Advisors had any connection to the Florida-based MCC that had promoted ORFG on the internet.[117]

The additional due diligence that Scottsdale Capital Advisors, Cayman Securities, and Unicorn International Securities conducted consisted of the following activities: (1) Unicorn International Securities retained an attorney, David Wise,[118] to examine the matter; (2) Wise (or another individual) obtained, or Media Central submitted, an undated document entitled, "Memorandum of Association and Articles of Association of Media Central [], a company organized under the laws of Belize, Central America;"[119] (3) Cayman Securities obtained the Shi Long Statement, dated May 19, 2014;[120] (4) Wise "spoke with Dana Salvo, president of the

---

[cont'd]

Investment Adviser in any jurisdiction whatsoever[, and that] [s]tocks profiled on [s]tock[b]laster.com . . . are for informational purposes only."

[117]    The Due Diligence Package for the Media Central Deposit contains printouts of pennystockcrowd.com's and stockblaster.com's promotion of ORFG, but it does not disclose the date(s) of the ORFG promotional activity. The only date on the printouts is May 27, 2014, the date that Scottsdale Capital Advisors printed the result of its web-based internet searches.

[118]    Cruz identified Wise as an attorney who "Scottsdale [Capital Advisors] uses . . . frequently." Diekmann testified that Wise had prepared attorney opinion letters for Scottsdale Capital Advisors and reviewed pending deposits on behalf of the Firm. Other excerpts of the hearing transcripts identify Wise as "a veteran securities lawyer, with deep experience in Rule 144 and related issues . . . ." When Thomas Sawyer notified VPLM's shareholders of an impending blackout period for trading activity in the issuer's securities, Wise was the individual who sent Sawyer an email on behalf of several of Scottsdale Capital Advisors' customers threatening litigation if VPLM "attempt[s] . . . to slow down or prevent the transfer of shares by my clients . . . ." In addition, after Craig D'Mura resigned from Cayman Securities, John Hurry "immediately sent" Wise to the Cayman Islands "for at least a couple of weeks" to ensure that Gregory Ruzicka, the individual who Hurry had hired to manage Cayman Securities' day-to-day operations, had an "understanding [of] what needed to be done and how to analyze . . . the[] issues."

[119]    The Unicorn Attorney Opinion Letter cites to Media Central's undated Memorandum of Association and Articles of Association, but only the first page, the title page, of the document is contained in the Due Diligence Package for the Media Central Deposit.

[120]    The Shi Long Statement is addressed to Cayman Securities, and, as it relates to promotional activity in ORFG, "certifies and represents" that "[ORFG] has not engaged Parties [Casey Forward, Anything Media, and Media Central] to directly or indirectly promote or

[Footnote continued on next page]

- 58 -

Florida corporation called [MCC]" on May 30, 2014;[121] (5) Media Central submitted a letter, dated June 2, 2014;[122] (6) MCC submitted a letter, dated June 4, 2014;[123] and (7) Wise prepared an attorney opinion letter, the second attorney opinion letter for the Media Central Deposit, i.e., the Unicorn Attorney Opinion Letter, dated June 4, 2014. On June 5, 2014, Scottsdale Capital Advisors accepted the Media Central Deposit.

7.    Scottsdale Capital Advisors Violated FINRA Rule 2010 Because the Firm Sold Unregistered and Nonexempt Securities

Scottsdale Capital Advisors' primary argument against liability for the unregistered securities sales focuses on the reasonableness of the Firm's due diligence. The Firm states that it took "a holistic view of a company's financial state, with an eye toward identifying issuers that may be ripe for exploitation through a pump-and-dump scheme." The documentary evidence in the record, specifically, the Due Diligence Packages for the five deposits that are the subject of Enforcement's complaint,[124] however, belies Scottsdale Capital Advisors' claims of reasonable due diligence, and, on appeal, we find that Scottsdale Capital Advisors' unreasonable due

---

[cont'd]

maintain a market for [ORFG's] securities, including the distribution of electronic media, press releases, or newsletters; not is [ORFG] aware that Parties have engaged any third party to provide such services."

[121]    In the Unicorn Attorney Opinion Letter, Wise represents that, "Salvo disavowed any affiliation with [] Moh or Media Central [] – Belize . . . ."

[122]    The Unicorn Attorney Opinion Letter references a "[l]etter, dated June 2, 2014, . . ., in which [] Moh, acting in his capacity of [p]resident of Media Central [], and individually, certified and represented . . . that they [Moh and Media Central] had never engaged in any promotional activity in the [i]ssuer's [ORFG] securities . . . and that . . . Media Central [] – Belize was not affiliated with a Florida corporation . . . called [MCC]." The Due Diligence Package for the Media Central Deposit does not contain a copy of the Moh letter referenced in the Unicorn Attorney Opinion Letter. (The "Geovanni Moh Letter" that we have referenced throughout our discussion of the Media Central Deposit is dated May 20, 2014, not June 2, 2014.

[123]    The Unicorn Attorney Opinion Letter references a "[l]etter, dated June 4, 2014, from [MCC,] a Florida corporation, signed by Dana Dalvo as president of [MCC] and in his individual capacity, in which they certified and represented that [MCC,] the Florida corporation had no interest or affiliation whatsoever with Media Central [], the Belizean company, or its owner, [Moh] . . . ." The Due Diligence Package for the Media Central Deposit does not contain a copy of the Dana Salvo letter referenced in the Unicorn Attorney Opinion Letter.

[124]    The five deposits consist of the three NHPI deposits (the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits, the one VPLM deposit (the VHB International Deposit), and the one ORFG deposit (the Media Central Deposit).

- 59 -

diligence left the Firm unable to conduct the searching inquiry required to qualify for an exemption under Rule 144 and Section 4(a)(4) of the Securities Act.[125]

    a.    Scottsdale Capital Advisors Failed to Conduct a Searching
          Inquiry into the Selling Customers' Resales of Restricted
          Securities

Rule 144 and Section 4(a)(4) of the Securities Act require a broker-dealer to "take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer or an underwriter." *Distribution by Broker-Dealers of Unregistered Securities*, 1962 SEC LEXIS 74, at *3. To meet this standard, a broker-dealer must demonstrate that it "conduct[ed] a *searching inquiry* to assure itself that [the] proposed sales were exempt from the registration requirements and not part of an unlawful distribution." *Midas Sec.*, 2012 SEC LEXIS 199, at *33 (emphasis added); *see Quinn and Co., Inc.*, 44 S.E.C. at 467 (stating that "[Section 4(a)(4)] cannot be available when the broker knows or has reasonable grounds to believe that the selling customer's part of the transaction is not exempt since in that event the broker likewise violates Section 5 by participating in a non-exempt transaction."). We find that Scottsdale Capital Advisors failed to conduct a searching inquiry into the five deposits at issue because the Firm's due diligence was cursory, incomplete, and not tailored to address the risks associated with depositing and liquidating of millions of shares of microcap securities.[126]

    i.    Scottsdale Capital Advisors' Due Diligence Was
          Cursory and Incomplete

We find that Scottsdale Capital Advisors failed to conduct a searching inquiry into the five subject deposits because the Firm's due diligence was cursory and incomplete in light of suspicious circumstances surrounding the deposits and the transactions underlying the deposits. In the case of the three NHPI deposits,[127] we note that the transactional documents in the Due

---

[125]    The conduct of the registered representatives and associated persons who accepted the five deposits and liquidated the unregistered shares of NHPI, VPLM, and ORFG is imputed to Scottsdale Capital Advisors. *See CE Carlson, Inc. v. SEC*, 859 F.2d 1429, 1435 (10th Cir. 1988) ("[The broker-dealer] is responsible for the actions of its agents, including [its 'registered broker and president']."); *Midas Sec.*, 2012 SEC LEXIS 199, at *28 n.35 (explaining that the misconduct of the firm's registered representatives was imputed to the firm).

[126]    Scottsdale Capital Advisors argues that the searching inquiry standard is satisfied upon a showing of reasonableness. Although the standard is a searching inquiry, we recognize that industry practice may help provide context for evaluating the contours of a searching inquiry. *See World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1248-49 (9th Cir. 2014).

[127]    Two specific aspects of the issuer, NHPI, should have raised Scottsdale Capital Advisors' suspicions and caused the Firm to conduct a more thorough inquiry into the NHPI deposits. First, NHPI had recently switched its business model from a core focus on pharmaceuticals to an emphasis on oil and gas exploration. Second, NHPI had ceased to be a reporting company in August 2009, and it did not publish any financial statements or reports until November 2013,

[Footnote continued on next page]

- 60 -

Diligence Packages for the deposits raised a number of concerns that required Scottsdale Capital Advisors' further inquiry. For example, there was no evidence of a bona fide business transaction outside of the note itself. The Collins/NHPI Promissory Note provided for the payment of principal and interest from NHPI to Collins without specifying an interest rate. The Collins/NHPI Promissory Note contained no provision to explain where and how payments between Collins and NHPI should be made. Collins did not seek to convert the Collins/NHPI Promissory Note until nearly a year and a half after NHPI defaulted, and there is no evidence that Collins sought payment from NHPI in the interim. The beneficial owners of the NHPI shares deposited at Scottsdale Capital Advisors – Gentle (Sky Walker), Fouani (Swiss National Securities), and Cox (Ireland Offshore Securities) – were purportedly unrelated, but maintained the same or similar business addresses and acquired their shares of NHPI from Collins through identical transactional documents with identical terms. Even odder, Collins conveyed his ownership interest in NHPI to Sky Walker, Swiss National Securities, and Ireland Offshore Securities before he actually owned the NHPI shares. And finally, and most notably, there is no evidence that any money changed hands in any of these transactions.[128]

For the VPLM deposit – the Third VHB International Deposit – we note that the issuer's own representations concerning its issuance of shares for services, and the Due Diligence Package's references to the involvement of VPLM's former president, Kipping, in the transactions, raised concerns that should have lead Scottsdale Capital Advisors to conduct a searching inquiry into the transactions underlying the deposit. For example, the VPLM Annual Report disclosed that VPLM had issued more than 80 million shares of stock to Kipping and Locksmith Financial, which represented an amount greater than 10 percent of the issuer's then-current outstanding shares.[129] The VPLM Annual Report reflected that VPLM issued millions of shares to company insiders and had a regular practice of paying for services with stock. The VPLM Annual Report also showed that VPLM had issued more than 2.4 million shares to VHB International, and VHB International obtained those shares nine months before VHB

---

[cont'd]

around the time that the transactions involving Collins, Sky Walker, Swiss National Securities, and Ireland Offshore Securities occurred. In November 2013, in order to satisfy the "adequate current public information" requirement for nonreporting companies under Rule 144, NHPI published retroactive financial statements and reports for periods dating back to 2012.

[128]    If the documents underlying the NHPI deposits are accurate, the following transactions occurred. Collins received the $10,000 Collins/NHPI Promissory Note for unspecified consulting services. Collins then accepted shares of NHPI in exchange for extinguishing the debt that NHPI owed to Collins. Thereafter, Collins borrowed $50,000 from Sky Walker, $50,000 from Swiss National Securities, and $50,000 from Ireland Offshore Securities. Nothing in the documents explains how, when, or where Collins should receive the money. Nor is there any evidence that any money changed hands. Collins merely entered into the SSI/Collins Promissory Note with Sky Walker, Swiss National Securities, and Ireland Offshore Securities, pledging to give them stock if he defaulted. And then Collins defaulted.

[129]    A portion of the VPLM Annual Report is contained in the Due Diligence Package for the Third VHB International Deposit.

- 61 -

International deposited its VPLM shares at Scottsdale Capital Advisors for liquidation. In addition, as we reviewed the Due Diligence Package for the Third VHB International Deposit, we noted the following additional areas of concern: the first transaction underlying the Third VHB International Deposit was a verbal line of credit (the Locksmith Financial/VPLM Verbal Line of Credit); VHB International acquired its VPLM shares directly from VPLM's former president, Kipping, by way of Kipping's corporate entity, Locksmith Financial; VHB International realized more than a 2,000 percent profit margin on the transaction in just under six months; and Locksmith Financial retained the law firm that prepared the Attorney Opinion Letter for Scottsdale Capital Advisors' Due Diligence Package for the Third VHB International Deposit.

Similar concerns permeated Media Central's deposit of ORFG shares at Scottsdale Capital Advisors, which, in turn, should have prompted the Firm to inquire further into the Media Central Deposit. As an initial matter, it is unclear why an individual, Forward, would loan $600,000 to ORFG.[130] ORFG reported no revenue, no cash, liabilities in excess of $2 million, and a deficit in excess of $3 million. Second, if Forward had converted the entire $600,000 Forward/ORFG Convertible Promissory Note to shares of ORFG at the specified conversion price ($0.0025), Forward would have owned 240 million shares of ORFG, or 92 percent, of ORFG's then-current outstanding shares. Third, Forward's corporate entity, Anything Media, obtained 15 million shares of ORFG at a cost of $9,000 in April 2014 and sold the shares to Media Central *that same month* for $75,000, realizing an instantaneous return of 733 percent. Finally, Scottsdale Capital Advisors should have been wary of the beneficial owner of the deposited ORFG shares, Media Central. Media Central provided the same business address as the beneficial owners and entities of other unregistered securities deposits, such as the beneficial owners of the three NHPI deposits, and Media Central had the same name as a Florida-based company that was promoting ORFG on two websites at the same time that Scottsdale Capital Advisors was selling shares of the issuer on behalf of Media Central and its beneficial owner, Moh.

The coincidence of beneficial owners among deposits, the coincidence of similar addresses among beneficial owners, the near-contemporaneous execution of several of the transactions underlying the deposits, and, in the case of the NHPI and ORFG deposits,[131] the

---

[130]     Scottsdale Capital Advisors' "OTC Restricted Stock [Procedures]" explains that, when the Firm receives deposits of unregistered securities derived from convertible debt, the Firm should take steps to substantiate the debt. The OTC Restricted Stock Procedures stresses that "[v]erifying the debt is critical to avoid being involved in a fraudulent scheme to issue unregistered securities." There is no evidence that Scottsdale Capital Advisors verified Forward's loan to ORFG or inquired into whether ORFG actually received any funds from Forward. In addition, we note that the Deposited Securities Checklist for the Media Central Deposit states that "[t]he [Forward/ORFG] debt is generally disclosed in P[ink] S[heet] Quarterly Report filed 4/19/13 period ending 11/30/12." Our review of the Pink Sheet Quarterly Report, however, highlights the inaccuracies of the Firm's notation on the Deposited Securities Checklist for the Media Central Deposit. The specified Pink Sheet Quarterly Report notes only that, as of November 30, 2012, ORFG had unspecified convertible loans totaling $703,131.

[131]     There was no promotional activity in VPLM during the relevant period.

- 62 -

coincidence of promotional activity in the issuer prior to, during, and after Scottsdale Capital Advisors' acceptance and liquidation of the deposits, all required further inquiry. Scottsdale Capital Advisors' cursory and incomplete due diligence foreclosed the Firm's ability to conduct a searching inquiry into the transactions underlying the NHPI, VPLM, and ORFG deposits.[132]

ii.      Scottsdale Capital Advisors' Due Diligence Was
         Standardized and Not Tailored to Address the Risks
         Associated with Its Microcap Securities Business

Scottsdale Capital Advisors also failed to prove that it made a searching inquiry because the Firm's due diligence was standardized and not tailored to address the risks associated with Firm's deposits and liquidations of millions of shares of microcap securities. Scottsdale Capital Advisors' Due Diligence Packages for the five deposits demonstrate that the Firm followed a standardized approach to due diligence, and that it collected due diligence without evaluating and independently verifying the information that it had gathered.

While we acknowledge that Scottsdale Capital Advisors gathered large volumes of paper in the Due Diligence Packages for the deposits, we note that the Firm did not analyze the information that it collected, did not identify issues that its research raised, and did not conduct the type of searching inquiry necessary to resolve those issues. As Brian Underwood, Enforcement's expert witness testified, a searching inquiry "means asking questions . . . . [i]t means not just assuming an answer that is possible to explain the transaction when there are other answers that might not properly explain or satisfy the question . . . . [i]t means asking and inquiring and doing it independently . . . ." Two glaring examples of the inadequacies of Scottsdale Capital Advisors' standardized due diligence stand out.

The first example relates to the three NHPI deposits. Although the Sky Walker Deposit, Swiss National Securities Deposit, and Ireland Offshore Securities Deposit purported to be unrelated deposits with unrelated beneficial owners, the overwhelming majority of the documents in the Due Diligence Packages for the three deposits are identical. These identical documents include the Attorney Opinion Letter and transactional documents for the three deposits, in addition to deposit-specific documents that were clearly photocopied and placed in each Due Diligence Package.[133]

---

[132]    We also find that Scottsdale Capital Advisors failed to prove that it made a searching inquiry because the Firm's due diligence was sloppy. For example, the Firm's web-based searches for Talal Fanni, instead of Talal Fouani, and the Firm's use of the incorrect spelling of the name of the VPLM officer all but assured that the Firm's due diligence would not return useful or applicable results.

[133]    The web browser date at the bottom of the photocopied documents, and certain handwritten notations on the documents, indicate that Scottsdale Capital Advisors obtained these documents in connection with its due diligence for the earliest of the three NHPI deposits, the Sky Walker Deposit, and that the Firm photocopied that research for inclusion in the Swiss National Securities Deposit and Ireland Offshore Securities Deposit.

- 63 -

The second example concerns Scottsdale Capital Advisors' web-based internet research among all five deposits. Scottsdale Capital Advisors' web-based internet research for all five deposits was formulaic. In fact, the Firm conducted the same searches for all five deposits. Scottsdale Capital Advisors did nothing to identify with specificity the purported beneficial owners of the NHPI, VPLM, or ORFG shares deposited at the Firm. In addition, while the Firm conducted its web-based internet research combining the name of the beneficial owner with the words "securities fraud," the Firm did not search for the beneficial owner's name alone, did not search for the beneficial owner's name in combination with the name of the entity through which the beneficial owner acquired the shares, and did not search for the beneficial owner's name in connection with the name of the issuer or the issuer's executives, officers, or directors. We also note that, in several instances, when Scottsdale Capital Advisors' web-based internet research did return a "hit," there is nothing in the Due Diligence Package to reflect that the Firm conducted any additional inquiry into those research results.[134] Scottsdale Capital Advisors' standardized due diligence foreclosed the Firm's ability to conduct a searching inquiry into the transactions underlying the NHPI, VPLM, and ORFG deposits.

*    *    *

In the sections that follow, we examine the parties' arguments concerning the applicability of the more technical aspects of Rule 144 and Section 4(a)(4) of the Securities Act. To summarize, we find that Scottsdale Capital Advisors failed to conduct the searching inquiry that is required under Rule 144 and Section 4(a)(4). We also find that, as a consequence of Scottsdale Capital Advisors' failure to conduct the required searching inquiry, the Firm is unable to satisfy its burden of proof for the more technical aspects of Rule 144 that the parties discuss in their briefing, such as proving that the selling customers were not affiliates of the issuers, establishing that the selling customers met the requisite one-year holding period for resales of restricted securities, and demonstrating that the issuers of the subject deposits and liquidations were not shell companies.

> b.    Scottsdale Capital Advisors Cannot Rely on the Rule 144
>        Exemption Because the Firm Failed to Establish the Nonaffiliate
>        Status of the Selling Customers

Scottsdale Capital Advisors relied heavily on the representations in the Beneficial Ownership Declarations to establish that the beneficial owners depositing their shares at the Firm were not affiliates of the issuer, and that the beneficial owners were the individuals who had the economic interest in the deposited shares.[135] But Scottsdale Capital Advisors' approach to due

---

[134]    Only the first page of the initial index of search results from Scottsdale Capital Advisors' web-based internet research is contained in the Due Diligence Packages for the NHPI, VPLM, and ORFG deposits.

[135]    Cruz testified that Scottsdale Capital Advisors relied on the selling customers representations in the Beneficial Ownership Declarations because the selling customers understood Scottsdale Capital Advisors' expectations concerning the beneficial ownership of the deposited shares.

- 64 -

diligence, and, specifically, due diligence related to the verification of the identity of the beneficial owners, failed to account for the selling customers' use of nominees. Scottsdale Capital Advisors' failures in confirming the identities of the beneficial owners and unmasking nominees, if nominees participated in the transactions, left the Firm unable to prove that the individuals and entities involved in the transactions were not affiliates of the issuer. *See Consol. Bankshares of Florida*, 1972 SEC No-Act. LEXIS 7, at \*3 (Nov. 23, 1972) ("[A]s a matter of law, a person who claims that he is not an affiliate in order to use an exemption from registration has the burden of proving the availability of the exemption.").

As it relates to the five specific Beneficial Ownership Declarations for the deposits in this case, we note that the documents raised several concerns. First, the Beneficial Ownership Declarations were unauthenticated, unsworn, and unwitnessed, and, yet, without any basis, Scottsdale Capital Advisors accepted as genuine the signatures on the documents. Second, the Beneficial Ownership Declarations failed to explain how the beneficial owners came to own the shares that they had deposited at the Firm. Rather, as discussed in the prior section, the transactional documents only raised more questions about the transactions. Finally, nothing in the Due Diligence Packages, or the other documentary or testimony evidence in the record, supports that Scottsdale Capital Advisors had any semblance of a preexisting relationship with the beneficial owners that may have permitted the Firm to accept the Beneficial Ownership Declarations as trustworthy without inquiry.[136]

To the contrary, we note that, in at least one instance, Scottsdale Capital Advisors had evidence of potential affiliate-involvement in a deposit and failed to conduct a further inquiry into the circumstances surrounding that deposit. The subject deposit is the Third VHB International Deposit and the potential affiliate was VPLM's former president, Kipping. The documentary and testimony evidence in the record establishes that Scottsdale Capital Advisors knew that Kipping had been an affiliate of VPLM,[137] and, when confronted with that information, the Firm still failed to inquire into whether Kipping remained one.

---

[136]    Although Diekmann and Cruz testified that they were familiar with Bretel (beneficial owner of VPLM shares deposited through VHB International), their testimony focuses on Bretel's Bolivian nationality, and largely supports that their claims of familiarity were based on Bretel's other liquidations of VPLM stock through the Firm.

[137]    Documents in the Due Diligence Package for the Third VHB International Deposit establish that Scottsdale Capital Advisors knew that Kipping had been an affiliate of VPLM. For example, the Deposited Securities Checklist for the Third VHB International Deposit contains the following notations: "Locksmith Financial [] (Richard Kipping) – nonaffiliate per [l]egal;" and "Kipping is former [P]resident of issuer (resigned more than two years ago per legal)." In addition, other documents in the Due Diligence Package for the deposit show that Kipping, both directly and through Locksmith Financial, had received more than 80 million shares of VPLM between October 2011 and August 2013. Based on the 730 million shares that VPLM had outstanding when Scottsdale Capital Advisors evaluated the Third VHB International Deposit, the Firm should have realized that Kipping and Locksmith Financial owned nearly 11 percent of VPLM, and that Kipping may be deemed an affiliate regardless of whether he was still an officer of the issuer. *See* Hicks, *supra* note 10, at § 4:38 (explaining that owners of at least 10 percent of an issuer's securities are presumptive affiliates of the issuer).

- 65 -

For example, the Due Diligence Package for the Third VHB International Deposit does not contain a copy of a resignation letter for Kipping, and it is apparent from the Due Diligence Package for the deposit that the Firm did not have a specific resignation date for Kipping's departure from VPLM. *See generally Rule 144 – Persons Deemed Not to be Engaged in a Distribution and therefore Not Underwriters – General Guidance*,[138] at 528.06 (Jan. 26, 2009) (explaining that, "[t]he cessation of affiliate status is a facts-and-circumstances determination, and counsel should not assume that it ceases instantly when, for example, the former affiliate resigns from his or her position at the company."). Instead of conducting its own inquiry into Kipping's resignation from VPLM to satisfy itself that Kipping was not a VPLM-affiliate,[139] the Firm relied on the representations in the Attorney Opinion Letter for the Third VHB International Deposit to make that determination. This fact is even more troubling because Locksmith Financial and Kipping retained the law firm that prepared the Attorney Opinion Letter for the Third VHB International Deposit. *See Sales of Unregistered Securities by Broker-Dealers*, 1971 SEC LEXIS 19, at *7 ("In this regard, it should be noted that information received from little-known companies or their officials, transfer agent or counsel must be treated with great caution as these are the very parties that may be seeking to deceive the firm.").

The true identity of beneficial owners, and any relationship they may have to issuers or affiliates of issuers, is critical to the application of an exemption under Rule 144 and Section 4(a)(4) of the Securities Act. Although Scottsdale Capital Advisors created voluminous Due Diligence Packages for its deposits, the Firm, in fact, knew little to nothing about the identities of the beneficial owners of the deposited shares. Without independent due diligence and verification of the beneficial owners' identities, we find that Scottsdale Capital Advisors is unable to prove that the individuals and entities involved in the five subject deposits were not affiliates of the issuers.[140] *See Distribution by Broker-Dealers of Unregistered Securities*, 1962 SEC LEXIS 74, at *3 ("It is not sufficient for [the broker-dealer] merely to accept self-serving statements of [its] sellers and their counsel without reasonably exploring the possibility of contrary facts"). Consequently, we conclude that Scottsdale Capital Advisors cannot rely on exemptions under Rule 144 or Section 4(a)(4) based on potential affiliate involvement in the deposits.

---

[138]    https://www.sec.gov/divisions/corpfin/guidance/securitiesactrules-interps.htm.

[139]    Diekmann's testimony underscores how little Scottsdale Capital Advisors did to confirm that Kipping was not a VPLM-affiliate for purposes of the Third VHB International Deposit. Diekmann testified that he was unaware of anything that anyone at Scottsdale Capital Advisors did to confirm that Kipping no longer had any duties as president of VPLM.

[140]    Scottsdale Capital Advisors states that "[n]o documents or information found through numerous internet searches suggested that . . . the named beneficial owners were not who they purported to be or that those individuals or their companies were affiliates [of the issuers]." We, however, find that the Firm's standardized web-based internet searches, using search terms such as "[name] + securities fraud," would not have confirmed the identities of the beneficial owners, unmasked nominees serving as beneficial owners, or clarify the affiliate status of the selling customers.

- 66 -

c.      Scottsdale Capital Advisors Cannot Rely on the Rule 144
        Exemption Because the Firm Failed to Prove That the Liquidations
        Satisfied the One-Year Holding Period for the Resale of Restricted
        Securities

In the five deposits at issue, the purported beneficial owners claimed that neither they nor their predecessors were affiliates of the issuer. The nonaffiliate status of the beneficial owners and their predecessors was critical to the beneficial owners' ability to resell their restricted shares pursuant to Rule 144 and Section 4(a)(4) of the Securities Act because, typically, shorter holding periods and fewer restrictions apply to nonaffiliates. *See* Part III.A.3.e. (Rule 144's One-Year Holding Period and the Rule's Applicability to "Affiliates"). Equally important, however, is the issuer's status as a reporting or nonreporting company. Rather than delve into the technicalities of the applicable holding periods for affiliates versus nonaffiliates and reporting versus nonreporting issuers, subject to the parties' consensus, we will focus on the one-year holding period for the resale of certain categories of restricted securities.[141]

i.      Satisfaction of the One-Year Holding Period
        Through Tacking to the Issuer's Same Securities

To satisfy Rule 144's one-year holding period for restricted securities, under certain circumstances, selling customers may tack their holding period to the holding period of their predecessors. 17 C.F.R. § 230.144(d)(3) (2013). This tacking may occur only "[i]f the securities sold were acquired from the issuer solely in exchange for other *securities* of the *same issuer*."[142] 17 C.F.R. § 230.144(d)(3)(ii) (2013) (emphasis added).

In this case, none of the beneficial owners held his or her restricted shares for one year (or longer). As a consequence, in order for the beneficial owner to satisfy the one-year holding

---

[141]    We note that, under Rule 144, a one-year holding period applies to resales of restricted securities of nonreporting issuers, regardless of the selling customers' status as an affiliate or nonaffiliate of the issuer. *See Revisions to Rules 144 and 145*, Securities Act Release No. 8869, 2007 SEC LEXIS 2850, at *33 (Dec. 6, 2007); Louis Loss, Joel Seligman, Troy Paredes, *Securities Regulations*, § 3-D-2, at 429 (4th ed. 2008). Consequently, our earlier findings concerning the affiliate or nonaffiliate status of the individuals and entities involved in the five deposits has no bearing on our determination of the length of the holding period for the resold shares. To be clear, for purposes of calculating the holding period of the resold shares, we considered only whether NHPI, VPLM, and ORFG are reporting or nonreporting issuers, and we have determined that, as nonreporting issuers, the one-year holding period applied to the resales of the restricted securities in the five deposits at issue. *See Revisions to Rules 144 and 145*, 2007 SEC LEXIS 2850, at *33.

[142]    "Conversions and exchanges. If the securities sold were acquired from the issuer solely in exchange for other securities of the same issuer, the newly acquired securities shall be deemed to have been acquired at the same time as the securities surrendered for conversion or exchange, even if the securities surrendered were not convertible or exchangeable by their terms." 17 C.F.R. § 230.144(d)(3)(ii) (2013).

- 67 -

period for the potential application of the Rule 144 exemption, the beneficial owner must be able to tack his or her holding period to that of his or her predecessor. On appeal, we find that each of the beneficial owners' securities – the restricted shares of NHPI, VPLM, and ORFG that were subject to resale – emanated from the same issuer as the predecessors' instruments – the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note. Accordingly, the dispositive issue here is whether the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note constitute securities in order for the beneficial owners to tack their acquired shares of NHPI, VPLM, and ORFG to their predecessors' holding period to satisfy Rule 144's one-year holding period requirement. The Respondents bear the burden of proof to establish that these instruments are securities, and that the one-year holding period of Rule 144 has been met. *See Midas Sec.*, 2012 SEC LEXIS 199, at *28 (explaining that exemptions from the registration requirements are affirmative defenses that must be established by the person claiming the exemption). On appeal, we find that the Respondents have failed to meet their burden of proof because the subject instruments – the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note – are not securities.[143]

> ii.     Application of the *Reves* Family Resemblance Test
> to Determine Whether the Underlying Instruments
> Are Securities

Section 3(a)(10) of the Exchange Act defines security to include "any note," but limits that definition of security to notes that exceed nine months. 15 U.S.C. § 78c(a)(10) (2013) (stating that the definition of security "shall not include any note . . . which has a maturity at the time of issuance not exceeding nine months."). Although the Exchange Act begins with the

---

[143]     The Respondents claim that the issue of whether the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note constitute securities "was never placed into contention during the proceeding." The Respondents therefore argue that they "were completely deprived of an opportunity to defend themselves on this issue." We disagree. As an initial matter, the specific issue of whether the Locksmith Financial/VPLM Verbal Line of Credit constituted a security was placed squarely in contention during the hearing because it was an allegation in Enforcement's complaint, and the parties made arguments concerning the issue in their prehearing and post hearing submissions. Moreover, in light of the questions surrounding the categorization of the Locksmith Financial/VPLM Verbal Line of Credit as a security, we find that the Respondents, as the party bearing the burden of proof concerning the applicability of an exemption, was put on notice that it should be prepared to present evidence to support its position that the Collins/NHPI Promissory Note and the Forward/ORFG Convertible Promissory Note also constituted securities for purposes of the applicability of Rule 144's one-year holding period. *See Ernst & Young LLP*, 2004 SEC LEXIS 831, at *118 (Apr. 16, 2004) (the applicant "bears the burden of proof as to the applicability of the exception to its situation because a party asserting an affirmative defense has the burden of establishing it by the necessary proof"); *see also* Section 15A(h)(1) of the Exchange Act (15 U.S.C. § 78o-3(h)(1) (requiring that FINRA proceedings be fair)); 15 U.S.C. § 78o-3(b)(8);.

- 68 -

"presumption that *any* note with a term of more than nine months is a 'security,'" the Supreme Court has recognized that "not all notes are securities" and has adopted a test to identify notes that "are obviously not securities." *Reves v. Ernst & Young*, 494 U.S. 56, 63-64, 67 (1990) (stating that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities [and Exchange] Acts."). The Supreme Court's test to identify notes that are not securities is the "family resemblance test." *Id.* at 67.

In application, the family resemblance test rebuts the presumption that a note is a security if the note in question "bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument[s]." *Id.* (explaining that, "[i]f an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors."); *Exch. Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976) (stating that types of notes that are not securities include "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a character loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business . . . ."). The four factors of the family resemblance test examine: (1) "the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it;"[144] (2) "the plan of distribution of the instrument . . . to determine whether it is an instrument in which there is common trading for speculation or investment;" (3) "the reasonable expectations of the investing public;"[145] (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities [and Exchange] Acts unnecessary." *Reves*, 494 U.S. at 66-67.

(a)     The Collins/NHPI Promissory Note

Gentle, Fouani, and Cox, the beneficial owners of Sky Walker, Swiss National Securities, and Ireland Offshore Securities, respectively, acquired their shares of NHPI on September 1, 2013 via the SSI/Collins Stock Pledge Agreement. Between February 2014 and May 2014, Scottsdale Capital Advisors liquidated Sky Walker's, Swiss National Securities', and Ireland Offshore Securities' shares of NHPI. Consequently, in order to satisfy Rule 144's one-year holding period, Sky Walker, Swiss National Securities, and Ireland Offshore Securities must tack

---

[144]     "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.' If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'" *Reves*, 494 U.S. at 66.

[145]     The instruments will be determined to "be securities on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not securities as used in that transaction." *Id.*

- 69 -

their holding period to the Collins/NHPI Promissory Note.[146]  The Collins/NHPI Promissory Note is dated May 1, 2012.  We find that Sky Walker, Swiss National Securities, and Ireland Offshore Securities may not tack their holding period to Collins' holding period because the Collins/NHPI Promissory Note is not a security.

We begin with the Exchange Act's clearly articulated presumption that notes of a duration shorter than nine months do not constitute securities, and we note that the Collins/NHPI Promissory Note had a duration of only two months.  The Collins/NHPI Promissory Note is dated May 1, 2012, and it became payable on July 1, 2012.  That factor, standing only, favors our finding that the Collins/NHPI Promissory Note is not a security.  We therefore turn our attention to the family resemblance test to determine if the application of those factors supports finding that the Collins/NHPI Promissory Note is a security.  They do not.

As an initial matter, NHPI did not enter into the Collins/NHPI Promissory Note in order to finance its general business or make a substantial investment in the issuer.  Rather, the Collins/NHPI Promissory Note documented the debt that NHPI purportedly already owed to Collins for consulting services already provided.  Second, the Collins/NHPI Promissory Note was not a source of profit for Collins.  According to the Collins/NHPI Promissory Note, Collins had already completed the consulting work and was entitled to payment for his services.  Collins' choice to permit NHPI to default on the note, and delay payment of the note for more than 16 months after the default, suggests that Collins was not motivated by profit or the five percent default rate that the note contained.[147]  Third, the Collins/NHPI Promissory Note was issued in a single transaction, and we note that a note that "merely reflects a single transaction" and is "not offered to the public" is not a security.  *New Earthshell Corp. v. Jobookit Holdings Ltd.*, 2015 U.S. Dist. LEXIS 27141, at *10-11 (S.D.N.Y. Mar. 5, 2015).  Finally, based on these facts, we find that there was no public expectation that the Collins/NHPI Promissory Note, which promised to pay monies for an individual's consulting services to an issuer, should be deemed a security.[148]  We therefore find that the Collins/NHPI Promissory Note is not a security, and that Sky Walker, Swiss National Securities, and Ireland Offshore Securities may not tack their holding period to it to satisfy the one-year holding period of Rule 144.

---

[146]     The Deposited Securities Checklists for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits note that the one-year holding period has been satisfied through tacking to the Collins/NHPI Promissory Note.

[147]     The Collins/NHPI Promissory Note did not contain an interest rate, only a default rate of five percent.

[148]     For our applications of the family resemblance tests to all five deposits, we have determined that the fourth factor, whether another regulatory scheme diminished the need for treating the instrument as a security, was not relevant to our analysis.

- 70 -

(b)     The Locksmith Financial/VPLM Verbal
Line of Credit

Bretel, the beneficial owner of VHB International, acquired his shares of VPLM on
August 23, 2013 via the VHB International/Locksmith Financial Stock Purchase Agreement.
Between February 2014 and June 2014, Scottsdale Capital Advisors liquidated VHB
International's shares of VPLM. Consequently, in order to satisfy Rule 144's one-year holding
period, VHB International must tack its holding period to the Locksmith Financial/VPLM Verbal
Line of Credit.[149] The Locksmith Financial/VPLM Verbal Line of Credit dates back to July
2010 or August 2012. We find that VHB International may not tack its holding period to
Locksmith Financial's holding period because the Locksmith Financial/VPLM Verbal Line of
Credit is not a security.

As an initial matter, the Locksmith Financial/VPLM Verbal Line of Credit had the
hallmarks of an "open-account debt incurred in the ordinary course of business,"[150] and we note
that open-account debts do not qualify as securities. *Exch. Nat'l Bank*, 544 F.2d at 1138.
Second, the verbal nature of the Locksmith Financial/VPLM Verbal Line of Credit suggests a
lack of formality and permanency that is found in instruments that are not normally considered
securities. Third, the Locksmith Financial/VPLM Verbal Line of Credit constituted a
commercial financing arrangement between private parties that advanced VPLM's day-to-day
business operations, not the issuer's capital investment initiatives. *See generally SEC v.
Thompson*, 732 F.3d 1151, 1167 (10th Cir. 2013) (explaining that, when institutions make loans
as a part of their ordinary course of business those loans are not considered to be securities).
Finally, we note that the Locksmith Financial/VPLM Verbal Line of Credit lacked a connection
to the general investing public, and that the general investing public would not expect that the
Locksmith Financial/VPLM Verbal Line of Credit would be deemed a security. Based on these
facts, we find that the Locksmith Financial/VPLM Verbal Line of Credit is not a security, and

---

[149]     The Deposited Securities Checklist for the Third VHB International Deposit
acknowledges that the one-year holding period has been satisfied through tacking to the
Locksmith Financial/VPLM Verbal Line of Credit. The Locksmith Financial/VPLM Loan
Agreement and the Locksmith Financial/VPLM Debt Settlement Agreement are each dated
August 15, 2013. Consequently, the Locksmith Financial/VPLM Loan Agreement and
Locksmith Financial/VPLM Debt Settlement Agreement are too temporally close to VHB
International's VPLM liquidations to satisfy Rule 144's requirement of a one-year holding
period.

[150]     Open-account debts are shareholder advances that are not evidenced by a note and
typically involve multiple loans made from a shareholder to a corporation throughout the year.
*See* 26 C.F.R. § 1.1367-2 (2018) (Adjustments to Basis of Indebtedness to Shareholder) (stating
that "[t]he term open account debt means shareholder advances not evidenced by separate
written instruments and repayments on the advances"); *see also SEC v. Greenstone Holdings,
Inc.*, 2012 U.S. Dist. LEXIS 44192, at *20 (S.D.N.Y. Mar. 28, 2012) (holding that "open-
account debts cannot be converted to securities simply by issuing notes").

- 71 -

that VHB International may not tack its holding period to it in order to satisfy the one-year holding period of Rule 144.[151]

          (c)    The Forward/ORFG Convertible Promissory Note

Moh, the beneficial owner of Media Central, acquired his shares of ORFG on April 16, 2014 via the Media Central/Anything Media Stock Purchase Agreement. Two months later, in June 2014, Scottsdale Capital Advisors liquidated Media Central's shares of ORFG. In order to satisfy Rule 144's one-year holding period, Media Central must tack its holding period to the Forward/ORFG Convertible Promissory Note.[152] The Forward/ORFG Convertible Promissory Note is dated September 1, 2012. We find that Media Central may not tack its holding period to Forward's holding period.

As an initial matter, we note that the Forward/ORFG Convertible Promissory Note failed to qualify for Rule 144 exemption protection because Forward did not exchange the Forward/ORFG Convertible Promissory Note for shares of ORFG. When Forward assigned a portion of his ORFG-owed debt to Anything Media via the Anything Media/Forward Assignment and Modification Agreement, Forward exchanged his ORFG-owed debt for shares of a different issuer, Anything Technologies Media.[153] *See* 17 C.F.R. § 230.144(d)(3)(ii) (2013) (stating that tacking may occur only "[i]f the securities sold were acquired from the issuer solely in exchange for other securities of the *same issuer*.") (emphasis added).

Moreover, we find that Media Central may not tack its holding period to Forward's holding period because the Forward/ORFG Convertible Promissory Note is not a security.

---

[151]    It is also necessary to find that Kipping had ceased to be an affiliate of VPLM prior to the inception of the Locksmith Financial/VPLM Verbal Line of Credit, in order for VHB International to tack its holding period to the Locksmith Financial/VPLM Verbal Line of Credit. As discussed in Part III.A.7.b., however, we find that Scottsdale Capital Advisors failed to prove that Kipping was not a VPLM-affiliate when the transaction occurred. Kipping had check-writing authority for VPLM's accounts, and he was a presumptive affiliate of the issuer based on his direct and indirect (through Locksmith Financial) ownership of more than 10 percent of VPLM's outstanding shares. Accordingly, VHB International may not tack to the Locksmith Financial/VPLM Verbal Line of Credit based on Kipping's status as a potential affiliate of VPLM.

[152]    The Deposited Securities Checklists for the Media Central Deposit notes that the one-year holding period has been satisfied through tacking to the Forward/ORFG Convertible Promissory Note.

[153]    We also note that Media Central may not tack its interest in ORFG to the Anything Media/Forward Assignment and Modification Agreement or the Anything Media/ORFG Convertible Promissory Note because those two documents were executed in January 2014 and are too temporally close to Media Central's ORFG liquidations to satisfy Rule 144's requirement of a one-year holding period.

- 72 -

Although the Forward/ORFG Convertible Promissory Note is presumed to be a security under the Exchange Act,[154] we find that the application of the family resemblance test rebuts the presumption that the Forward/ORFG Convertible Promissory Note is a security. Specifically, we find that the Forward/ORFG Convertible Promissory Note had attributes similar to an open-account debt, which does not qualify as a security. *Exch. Nat'l Bank*, 544 F.2d at 1138.

According to its terms, the Forward/ORFG Convertible Promissory Note provided ORFG with funds "for loans, advances, and debt." The Forward/ORFG Convertible Promissory Note also was an individual transaction that was not designed to trade as an investment. *See New Earthshell Corp.*, 2015 U.S. Dist. LEXIS 27141, at *10-11. Finally, we find that the general investing public would not view the Forward/ORFG Promissory Note as a security. Based on our application of the family resemblance test, we conclude that the Forward/ORFG Convertible Promissory Note is not a security, and that Media Central may not tack its holding period to it to satisfy the one-year holding period of Rule 144.[155]

> d.   Scottsdale Capital Advisors Cannot Rely on the Rule 144
>      Exemption Because the Firm Failed to Establish That NHPI and
>      ORFG Are Not Shell Companies

The safe harbor of Rule 144 does not extend to "shell companies," or issuers "with no or nominal operations and no or nominal non-cash assets." 17 C.F.R. § 230.144(g)(4)(i) (2013). In order to satisfy itself that NHPI and ORFG were not shell companies,[156] Scottsdale Capital Advisors relied on the Attorney Opinion Letters, which generally came from attorneys retained by interested parties, the issuers' self-serving representations, and the issuers' unaudited financial statements. Our review of these documents, and the Due Diligence Packages for the five deposits more generally, leads us to conclude that Scottsdale Capital Advisors cannot rely on the Rule 144 exemption because the Firm failed to prove that NHPI and ORFG were not shell companies.

---

[154]   The duration of the Forward/ORFG Convertible Promissory Note is exactly nine months. The Forward/ORFG Convertible Promissory Note is dated September 1, 2012, and it became payable on June 1, 2013.

[155]   In connection with our findings concerning Scottsdale Capital Advisors' failure to prove that the five deposits met Rule 144's requirement of a one-year holding period, we also find that the Firm's cursory, incomplete, and standardized due diligence left the Firm unable to verify the underlying transactions for purposes of calculating and establishing the applicable holding period, and, consequently, unable to prove that the one-year holding period requirement had been met.

[156]   The Hearing Panel did not reach the issue of whether Scottsdale Capital Advisors proved that VPLM was not a shell company, and we decline to examine this issue on appeal.

- 73 -

First, Scottsdale Capital Advisors' cursory, incomplete, and standardized due diligence did not respond to the basic question of whether NHPI and ORFG were shell companies.[157] As Enforcement's expert witness, Brian Underwood, testified, it is not enough to obtain a representation from the issuer related to its own non-shell company status. To the contrary, as Underwood reported, common industry practice included obtaining a "Bradstreet [R]eport," which provides information about "[the issuer's] operations, revenues, assets, who the key officers and directors are, shareholders – a great deal of information that is not necessarily available simply by going on the internet." Scottsdale Capital Advisors did not obtain Bradstreet Reports.

Second, although Scottsdale Capital Advisors relied on descriptions of NHPI's and ORFG's assets and liabilities in certain unaudited financial statements that the issuers had published, the unaudited financial statements that Scottsdale Capital Advisors referenced were vague, showed unspecific cash assets, failed to show physical assets, failed to provide any indication of the nature of issuers' expenses, and failed to report the business activities that may have led the issuer to incur the expenses in the first instance. In short, the unaudited financial statements, which Scottsdale Capital Advisors used to conduct its due diligence and satisfy itself that NHPI and ORFG were not shell companies, contained no verifiable facts.

Third, distinct from the issue of Scottsdale Capital Advisors' failure of proof, we note that the record contains evidence that NHPI and ORFG were, in fact, shell companies. The NHPI Amended Form 10-K disclosed that NHPI had changed operations from a pharmaceutical business to an oil and gas business, without providing any additional explanation or information about why, when, and how the change had occurred.[158] Similarly, the ORFG Form 10-K reported that the issuer was changing operations from an automotive detailing service to an oil and gas operation. The ORFG Form 10-K stressed the point and reported that ORFG "has achieved no operating revenues to date," and that the issuer "is presently looking at oil and gas properties." *See generally FINRA Regulatory Notice 09-05*, 2009 FINRA LEXIS 7, at *8 (Jan. 2009) (advising FINRA member firms that additional scrutiny may be required if "[t]he issuer has been through several recent name changes, business combinations or recapitalizations . . . .").[159]

---

[157]   For example, the Due Diligence Packages for the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits, the three NHPI deposits, contained no financial statements showing NHPI's expenses or income.

[158]   Scottsdale Capital Advisors argues that NHPI was not a shell company, and that the issuer "had substantial operations and significant documented operating expenses." In support of its claims, the Firm highlights the fact that NHPI "had completed a Phase II FDA clinical trial." In so doing, however, Scottsdale Capital Advisors failed to report that the study was completed in November 2007, more than six years before Scottsdale Capital Advisors accepted and liquidated the Sky Walker, Swiss National Securities, and Ireland Offshore Securities Deposits.

[159]   Scottsdale Capital Advisors asserts that ORFG had "substantial operations and significant operating expenses." In support of its claims, the Firm cites an unaudited balance sheet, which failed to report expenses, and an unaudited financial statement that reported a few expenses, such as a "[m]ineral exploration expense" of $87,840, a "[w]rite off of mineral acquisition cost" of

[Footnote continued on next page]

- 74 -

e.   Scottsdale Capital Advisors Cannot Rely on the Rule 144
Exemption Because the Firm Failed to Establish That Its
Questionably Technical Compliance with Rule 144 Was Not Part
of a Plan or Scheme to Evade the Registration Requirements of the
Securities Act

Finally, we find that Scottsdale Capital Advisors may not rely on an exemption pursuant
to Rule 144 because the Firm failed to establish that its questionably technical compliance with
Rule 144 was not part of a plan or scheme to evade the registration requirements of the Securities
Act. The five deposits that are the subject of this appeal were strikingly similar.[160] The deposits
involved selling customers who sought to sell large blocks of thinly traded, little-known
microcap securities acquired in a chain of private transactions originating with the issuer; the
selling customers sought to resell their shares almost immediately after acquiring them from their
predecessors; and the transactions raised a number of questions, included a host of discrepancies,
and involved several circumstances that should have raised Scottsdale Capital Advisors'
suspicions. When confronted with these issues, Scottsdale Capital Advisors did not engage in
the searching inquiry required under Rule 144 and Section 4(a)(4) of the Securities Act, opting,
instead, to prepare voluminous Due Diligence Packages that only provided the false appearance
of due diligence.

On appeal, as we reviewed the Due Diligence Packages that Scottsdale Capital Advisors
proffered, we determined that the Due Diligence Packages were essentially meaningless for the
identification of potentially unlawful distributions of microcap securities, and that the primary
goal of the Due Diligence Packages was to qualify the subject deposit for a registration
exemption pursuant to Rule 144 or Section 4(a)(4) of the Securities Act. The Due Diligence
Packages, and Scottsdale Capital Advisors' handling of due diligence generally, confirm our
findings in this area. Scottsdale Capital Advisors did not evaluate the information contained in
the Due Diligence Packages, did not investigate red flags when its due diligence did identify a

---

[cont'd]

$450,000, and an interest expense of $177,033. This does not establish that ORFG had actual
operations.

[160]   Scottsdale Capital Advisors states that it "regularly" and "routinely" rejected deposits and
argues that the frequency of its rejections demonstrates "[t]he rigor of [Scottsdale Capital
Advisors' due] diligence." As proof, the Firm points to RX-40, a summary exhibit that shows
rejection rates during the relevant period. Our review of RX-40, however, leads us to conclude
that the document is not reliable because there is no identification of the source of the numbers
contained in it, and there is no explanation concerning how Henry Diekmann, the document's
creator, compiled it. At the hearing, Diekmann testified only that he created the document, and
then read the percentages shown in the "% Rejected" column of the document. Diekmann did
not testify about how he created the document. He did not identify the sources of the numbers
shown in it. He did not explain the bases for deposits that were "rejected" or discuss whether
any deposit shown on the document was later resubmitted and accepted. We therefore reject
Scottsdale Capital Advisors' assertion that the frequency of its deposit rejections demonstrates
the "rigor" of its due diligence reviews.

- 75 -

potential issue, and did not independently verify the information received from interested parties to the transactions. Based on these findings, we conclude that Scottsdale Capital Advisors may not rely on an exemption under Rule 144 of the Securities Act because the Firm failed to prove that its Due Diligence Packages were not part of a plan or scheme to evade the registration requirements of the Securities Act.

\*    \*    \*

On appeal, we find that Scottsdale Capital Advisors violated FINRA Rule 2010 because the Firm acted in contravention of Section 5 of the Securities Act and sold millions of shares of unregistered microcap securities without the benefit of a registration exemption.

B.    Hurry's Unethical Creation, Management, and Control of Cayman Securities

Enforcement alleged that Hurry was a "necessary participant and substantial factor" in Scottsdale Capital Advisors' sales of the unregistered shares of NHPI, VPLM, and ORFG.[161] Enforcement explained that Hurry was a necessary participant and substantial factor in the transactions "as a result of his establishment, indirect ownership, management, and control of [Cayman Securities], as well as his prospecting on behalf of [Cayman Securities], and his indirect ownership of, and ability to control, Scottsdale [Capital Advisors] and Alpine [Securities]." Enforcement argued that Hurry's "establishment of [Cayman Securities], indirect ownership of [Cayman Securities], management of [Cayman Securities'] business, control over [Cayman Securities] and its personnel, and prospecting for [Cayman Securities'] customers played a significant role in the occurrence of the violative sales of NHPI, VPLM, and ORFG . . . ." Enforcement also asserted that Hurry's role as a necessary participant and substantial factor in the unregistered securities sales caused Hurry to act in contravention of Section 5 of the Securities Act and caused Hurry to violate FINRA Rule 2010.

The Hearing Panel did not adopt Enforcement's recommended approach to Hurry's conduct, noting that "[i]t is not clear that the 'necessary participant [and] substantial factor' test is appropriate here." The Hearing Panel reasoned that "Hurry [was] not charged with offering or selling securities in violation of Section 5. He is charged with an ethical violation under Rule 2010." Nevertheless, the Hearing Panel used the necessary participant and substantial factor analysis to measure whether Hurry's conduct was sufficiently linked to the transactions to hold him liable for violating FINRA Rule 2010. The Hearing Panel concluded that there was a sufficient nexus between Hurry's conduct and the unlawful sales of NHPI, VPLM, and ORFG, and the Hearing Panel found that Hurry violated FINRA Rule 2010.

---

[161]    Although Section 5 of the Securities Act makes it unlawful for persons to offer or sell unregistered securities, that liability is not limited only to persons who ultimately pass title to the securities. It includes other persons involved in the transactions, such as persons who serve as necessary participants and substantial factors in the transactions by directly or indirectly offering or selling the securities in violation of Section 5. *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013); *SEC v. Boock*, 2011 U.S. Dist. LEXIS 95363, at \*48 & n.17 (S.D.N.Y. Aug. 25, 2011).

- 76 -

On appeal, we do not examine Hurry's conduct within the construct of the necessary participant and substantial factor analysis. Rather, on appeal, we examine whether Hurry's establishment of Cayman Securities, indirect ownership of Cayman Securities, management of Cayman Securities' business, control over Cayman Securities and its personnel, and prospecting for Cayman Securities' customers was unethical, regardless of whether Hurry was a necessary participant and substantial factor in the unlawful sales of NHPI, VPLM, and ORFG.

Our review of the record leads us to conclude that Hurry's conduct was unethical, particularly as it related to Hurry's creation, management, and control of Cayman Securities. Hurry was the mastermind of a vertically integrated microcap-focused enterprise that served as the conduit for foreign customers to unload their risky microcap shares into an unsuspecting US securities market. As regulatory scrutiny of microcap liquidations increased, Hurry created Cayman Securities as the out-of-reach, offshore buffer that would allow the US-based Scottsdale Capital Advisors to distance itself from its risky activities involving foreign financial institutions, such as Montage Securities, Titan International Securities, and Unicorn International Securities. Hurry not only created the vertically integrated microcap liquidation machine that consisted of Cayman Securities, Scottsdale Capital Advisors, and Alpine Securities, Hurry took on an intimate role in Cayman Securities, managing the broker-dealer and controlling its day-to-day operations – all while taking concerted steps to mask his involvement with Cayman Securities. Based on these facts, we find that Hurry's creation, management, and control of Cayman Securities was unethical and violated FINRA Rule 2010. *See Mielke*, 2015 SEC LEXIS 3927, at \*46 (explaining that the principal consideration underscoring FINRA Rule 2010 is whether the conduct at issue "reflects on the associated person's ability to comply with the regulatory requirements of the securities business").

1.      Scottsdale Capital Advisors' Regulatory Landscape Prior to
        Hurry's Creation of Cayman Securities

Between 2011 and 2013, Scottsdale Capital Advisors' employees and customers were the subject of four lawsuits that involved the use of nominees to mask the unlawful distribution of microcap securities through the Firm.[162] The regulatory landscape during this period informs our understanding of Hurry's creation of Cayman Securities.

a.      *Ruettiger*

In December 2011, the Commission sued two of Scottsdale Capital Advisors' registered representatives in a federal regulatory action involving the assignment of portions of a convertible note to satisfy the applicable Rule 144 holding period, the use of nominees to conceal

---

[162]    The Respondents argue that the "evidence of other government actions was irrelevant" and "unduly prejudicial." We disagree, and we note that we relied only on the four regulatory actions discussed in this section, and that these four federal regulatory actions, involving Scottsdale Capital Advisors' registered representatives and customers, informed the Firm's approach to its microcap securities liquidation business and Hurry's approach to the creation of Cayman Securities. (The Hearing Panel's decision cites to an additional two cases that occurred subsequent to the relevant period, and we did not consider those two cases.)

the identity of the true beneficial owners of the securities, the use of a fraudulent scheme to manipulate the market for the stock, and the unlawful distribution of securities without registration.[163] *See SEC v. Ruettiger*, No. 2:11-cv-2011 (D. Nev. filed Dec. 16, 2011), https://www.sec.gov/litigation/complaints/2011/comp22198.pdf (*"Ruettiger"*). According to the *Ruettiger* complaint, Scottsdale Capital Advisors' registered representatives handled several of the accounts involved in the lawsuit, and one of the representatives had an interest in an entity that received and sold some of the subject securities. The *Ruettiger* complaint noted that in one instance an individual defendant had used 16 Panamanian corporations to conceal his identity and enable him to sell approximately $6 million of unregistered and nonexempt securities.[164] The court entered judgments against the two Scottsdale Capital Advisor representatives, ordering them to pay more than $5.2 million in civil penalties, disgorgement, and prejudgment interest.

### b.   *Gibraltar I*

In March 2013, the Commission filed a complaint against several individuals and entities alleging that Scottsdale Capital Advisors' customer, Gibraltar Global Securities, Inc. ("Gibraltar Global Securities"), had facilitated a fraudulent scheme. *See SEC v. Carrillo Huettel LLP*, No. 13 Civ. 1735 (S.D.N.Y. filed March 15, 2013), https://www.sec.gov/litigation/complaints/2013/comp-pr2013-39.pdf (*"Gibraltar I"*). The *Gibraltar I* complaint alleged that the defendants had secretly sold several issuers' shares through Gibraltar Global Securities while simultaneously promoting the issuers' securities and encouraging others to buy them. Among other allegations, the *Gibraltar I* complaint alleged that Gibraltar Global Securities had provided false affidavits and misleading statements to facilitate the other defendants' secret sales and promotions of the subject securities. The court entered judgments against the majority of the defendants, including Gibraltar Global Securities. The court ordered that Gibraltar Global Securities pay more than $12 million in disgorgement and prejudgment interest.

### c.   *Gibraltar II*

In April 2013, the Commission filed a second lawsuit against Gibraltar Global Securities. *See SEC v. Gibraltar Global Sec., Inc.*, No. 13 Civ. 2575 (S.D.N.Y. filed Apr. 18, 2013), https://www.sec.gov/litigation/complaints/2013/comp22683.pdf (*"Gibraltar II"*). The *Gibraltar II* complaint alleged that the company had facilitated the unlawful sale of unregistered and nonexempt securities through the use of nominees. The *Gibraltar II* complaint asserted that Gibraltar Global Securities had liquidated low-price, thinly traded stocks on behalf of its customers, often during periods of promotion. The *Gibraltar II* complaint also alleged that Gibraltar Global Securities had assisted customers by including foreign financial institutions, had unnecessarily complicated these transactions, and had encouraged their customers to use nominee officers and directors to mask the customers' true identities. Finally, the *Gibraltar II* complaint noted that two individuals had opened "fake nominee accounts" at Scottsdale Capital

---

[163]   Cruz signed the declaration in support of the representatives' motion for judgment to determine the monetary remedies.

[164]   In response to the *Ruettiger* lawsuit, Scottsdale Capital Advisors eliminated the branch office involved in the case.

- 78 -

Advisors.[165]  The court entered a judgment against Gibraltar Global Securities and order the company to pay nearly \$21 million in civil penalties and disgorgement.

d.    *Tavella*

In July 2013, the Commission filed suit in federal court against 10 Argentinians, four of whom had opened accounts at Scottsdale Capital Advisors.[166]  *See SEC v. Tavella*, No. 13-cv-4609 (S.D.N.Y. filed July 3, 2013), https://www.SEC.gov/litigation/ complaints/2013/comp-pr2013-122.pdf ("*Tavella*").  The *Tavella* complaint alleged that the defendants had submitted false documentation to accompany their Deposited Securities Checklist at Scottsdale Capital Advisors, and that they sold millions of shares of unregistered and nonexempt securities into the public markets in violation of Section 5 of the Securities Act.  The *Tavella* defendants claimed that they had purchased their shares from former shareholders of the issuers.  Investigations, however, revealed that the former shareholders had already sold their shares years earlier, and that the underlying transactions that the defendants had claimed as the basis of their acquired shares were sham transactions.[167]  The court entered judgments against all, but two, of the defendants and ordered each liable defendant to pay nearly \$35 million.

2.    Hurry Created, Managed, and Controlled Cayman Securities

Prior to 2013, Scottsdale Capital Advisors occupied the role that Hurry created Cayman Securities to fill.  Specifically, Scottsdale Capital Advisors did business directly with foreign financial institutions, such as Gibraltar Global Securities, and the three foreign financial institutions that are involved in this case, Montage Securities, Titan International Securities, and Unicorn International Securities.  In the wake of the regulatory developments discussed above, however, Hurry formed Cayman Securities in early 2013.  Cayman Securities was a foreign broker-dealer that added an offshore buffer to the already-existing vertically integrated microcap

---

[165]    Gibraltar Global Securities had been a direct customer of Scottsdale Capital Advisors since 2010, at least two years before the Commission filed *Gibraltar I*, and, subsequently, *Gibraltar II*.  Gibraltar Global Securities shuttered after the Commission filed the two lawsuits against it.  Some of Gibraltar Global Securities' customers transferred their accounts to one of the three foreign financial institutions involved in this case, Titan International Securities.  At the hearing, Cruz testified that the misconduct identified in *Gibraltar I* and *Gibraltar II* was "isolated."

[166]    Diekmann testified that he could not remember if Scottsdale Capital Advisors investigated the four *Tavella* defendants who had accounts at the Firm.

[167]    Scottsdale Capital Advisors changed some of its operating procedures as a result of the *Tavella* lawsuit.  For example, the Firm no longer would accept more than 9.9 percent of a particular security at any one time from any customer, and it instituted a stock watch list to monitor specific stock trading and promotions.  Even with these changes, however, Diekmann testified that he could not recall doing anything different to address the problem of nominees after the *Tavella* lawsuit.

- 79 -

liquidation enterprise that included the US-based broker-dealer, Scottsdale Capital Advisors, and its clearing firm, Alpine Securities.

### a.   Hurry Created Cayman Securities

Hurry testified that he created Cayman Securities because Alpine Securities needed relief from certain tax withholding obligations. Hurry explained that Alpine Securities wanted to limit its business dealings to include only those foreign financial institutions that had agreed to take on tax withholding obligations, and those ones that had agreed to become qualified intermediaries. Hurry testified that he established Cayman Securities because tax-withholding obligations are complicated, there are risks and penalties associated with the submission of inaccurate or incorrect paperwork related to tax withholdings, and there are tax advantages to generating and retaining funds offshore.

### b.   Hurry Hired Ruzicka, Ostensibly to Manage Cayman Securities

When Hurry established Cayman Securities, he named himself as Cayman Securities' director and positioned himself to manage and control Cayman Securities and its business operations.[168]  Although Hurry seemed poised to be the public persona of Cayman Securities, in late 2013, Hurry switched gears and decided to hire Gregory Ruzicka to manage Cayman Securities and its day-to-day operations.[169]

Prior to joining Cayman Securities, Ruzicka was a real estate attorney in California. He began his legal career advising exclusively on real estate issues and continued in the real estate field. He did not advise on federal securities laws. Before working at Cayman Securities, Ruzicka had no experience with the liquidation of microcap securities, the registration requirements of the federal securities laws, or the exemptions that may apply to the offer or sale of certain categories of securities.[170]

---

[168]   The record contains a "Business Summary" used by Cayman Securities for marketing and promotion purposes. The Business Summary provides Hurry's title at Cayman Securities, "Director," and touts Hurry's experience with Scottsdale Capital Advisors and Alpine Securities as an asset of Cayman Securities' business operations.

[169]   Hurry hired a second individual, Craig D'Mura, to work with Ruzicka at Cayman Securities. In January 2014, D'Mura flew with Hurry in Hurry's private airplane to the Cayman Islands to view Cayman Securities' operations and decide whether he wanted to accept a position with the foreign broker-dealer. Later that same month, D'Mura began working at Cayman Securities. D'Mura was employed with Cayman Securities for six weeks. Citing "stress" and "high pressure," D'Mura left Cayman Securities in 2014. D'Mura testified at the hearing.

[170]   Diekmann testified that Ruzicka would not have been his choice to run Cayman Securities because Ruzicka lacked securities experience, seemed disorganized, failed to follow instructions, and routinely sent materials to Scottsdale Capital Advisors in a piecemeal and disorganized manner.

- 80 -

In 2002, Ruzicka met Hurry when Hurry hired him to do some work on a commercial real estate deal. Thereafter, Ruzicka worked for Hurry from time to time, but none of that work involved the securities laws, Scottsdale Capital Advisors, or Alpine Securities. At some point, Ruzicka became unemployed and began experiencing financial hardships. Ruzicka approached Hurry about obtaining employment at a bicycle shop that Hurry owned. Hurry proposed that Ruzicka go to the Cayman Islands to run Cayman Securities. Ruzicka testified that Hurry told him that he would be running Cayman Securities and acting as Hurry's attorney.[171] Ruzicka also stated that, when Hurry hired him to run Cayman Securities, Hurry told him that he had 30 days to read about Rule 144 of the Securities Act. Ruzicka reported that he read the Securities Act, Rule 144, and internet-based information on the Rule 144 exemption to prepare for his employment with Cayman Securities.

In October 2013, Hurry flew with Ruzicka in Hurry's private plane to the Cayman Islands, so Ruzicka could begin working at Cayman Securities. Ruzicka remained with Cayman Securities for about one year, until October 2014.

c.     Hurry Managed and Controlled Cayman Securities

Hurry's involvement in Cayman Securities' operations did not subside after he hired Ruzicka to manage the foreign broker-dealer's day-to-day operations. For example, Hurry located and rented office space for Cayman Securities before Ruzicka began working there, and he continued supervising the details of establishing and opening the office after Ruzicka arrived. Hurry obtained a floor plan from Ruzicka, told Ruzicka it was not correct, and asked Ruzicka to take measurements and create a revised plan. Hurry provided Ruzicka with contact information for shippers to ship furniture that Hurry had found for the office. Hurry reviewed the proposed Cayman Securities website design and asked about the costs. Hurry made the final decision on hiring a bookkeeper, and he made all the decisions on entering contracts.

Hurry instructed Ruzicka on fundamental business operations, explaining to Ruzicka, for example, that Ruzicka should open a separate bank account for customer funds to keep their funds separate from Cayman Securities' funds. Hurry decided that Cayman Securities should be located in the Special Economic Zone within the Cayman Islands, and that it should apply to be exempt from regulation by the Cayman Islands Monetary Authority. Hurry advised Ruzicka to apply to the IRS to obtain qualified intermediary status for Cayman Securities. And Hurry determined the fees and commissions that Cayman Securities' customers paid.[172]

---

[171]     Ruzicka did not testify at the hearing. Enforcement entered the entirety of Ruzicka's on-the-record testimony as an exhibit.

[172]     When determining Cayman Securities' fee and commission schedule, Hurry instructed Ruzicka to add 200 basis points to the amount that Scottsdale Capital Advisors had charged Cayman Securities. Hurry, in turn, obtained a discount from Scottsdale Capital Advisors on its charges to Cayman Securities. By adopting this approach, Hurry kept the cost of doing business through Cayman Securities roughly the same as doing business directly with Scottsdale Capital Advisors.

- 81 -

Hurry tracked Cayman Securities' business with Scottsdale Capital Advisors and its foreign financial institution customers – Montage Securities, Titan International Securities, and Unicorn International Securities.[173] Cayman Securities did not advertise or engage in cold calling to generate business. Hurry's business plan relied on networks and referrals to develop customers. But Ruzicka had no prior securities industry experience and had no network that he could cultivate for customers. Consequently, the responsibility for prospecting for customers laid with Hurry. Hurry referred customers to Cayman Securities, or, alternatively, representatives of Scottsdale Capital Advisors and Alpine Securities directed customers to the foreign broker-dealer. Ruzicka testified that he had an "express representation" that Hurry had referred two of the foreign financial institutions involved in this case Titan International Securities and Unicorn International Securities. Ruzicka stated that he did not know how Montage Securities "found" Cayman Securities.

Hurry also set up Cayman Securities' technical systems. Hurry made the arrangements for computer software for Cayman Securities and instructed Ruzicka on what computer software to use. Hurry set up the office network and selected the computer equipment for Cayman Securities, and he personally delivered the computer equipment to Cayman Securities when he and D'Mura visited in January 2014. As Ruzicka and D'Mura testified, they only served as intermediaries while they worked at Cayman Securities. Hurry dictated what should be done, and they complied. For example, on one occasion, when Ruzicka protested that he was not comfortable with signing off on Cayman Securities' qualified intermediary application, Hurry responded, "[s]tupid, just do it." On another occasion, when Ruzicka asked why Scottsdale Capital Advisors' pre-existing business was going to flow through a new entity, Cayman Securities, Ruzicka testified that Hurry told him to "shut up." Ruzicka explained that he generally "dropped the subject at that point," because he knew that, if he did not, "there is a ticket back to [Los Angeles] coming tomorrow."[174]

> d.    Hurry Concealed His Management and Control of Cayman
>        Securities

Secrecy was paramount to Hurry.[175] The record demonstrates that Hurry made concerted efforts to conceal his involvement with Cayman Securities, its customers, and its business operations. First, Hurry changed his email address to make it anonymous. When Ruzicka started working at Cayman Securities, he used as his work email address gr@csct.ky. The

---

[173]    Neither Ruzicka nor D'Mura could terminate a customer relationship. That authority rested with Hurry.

[174]    As Ruzicka noted with respect to Hurry, "[y]ou don't discuss; you do as you are ordered."

[175]    Ruzicka testified that Hurry "flat told me, 'I'm going to Caymans, because that way I don't have to give anything to anybody.'" D'Mura testified that, when he flew to the Cayman Islands with Hurry to view Cayman Securities' operations, Hurry discussed the Cayman Islands' privacy laws with him, including the serious consequences that could result if the person failed to adhere to the privacy laws.

- 82 -

address identified him by his initials, the firm by its initials, and the Cayman Islands location by the last two letters. Ruzicka set up a similar email address for Hurry, using Hurry's first initial and last name: jhurry@csct.ky. Ruzicka testified that Hurry had an extreme reaction to the email address, and that Hurry "just crucified me." In response, Hurry told Ruzicka that the address was too long, and he instructed Ruzicka to change the individual identifier to x. Accordingly, during the relevant period, Hurry's email address at Cayman Securities was x@csct.ky.[176]

Second, Hurry insisted on asserting attorney-client privilege on almost all communications with Ruzicka. Hurry asserted the privilege even when the communications did not include legal advice, such as when Hurry emailed Ruzicka to ask Ruzicka to call him or when Hurry emailed Ruzicka concerning floor plans and office furniture. In contrast, Ruzicka rarely marked his emails to Hurry as privileged, even though Hurry instructed Ruzicka that he should do so.[177]

Third, Hurry communicated with Cayman Securities' customers, including Montage Securities, Titan International Securities, and Unicorn International Securities, using a cumbersome, double connection.[178] Hurry would call Ruzicka at Cayman Securities using FaceTime and ask Ruzicka to call a customer on Cayman Securities' landline telephone.[179] Ruzicka would then hold his cellular phone next to the landline telephone, so Hurry and the customer could talk. Ruzicka did not participate in the calls, although he had to be present to hold the telephones together. Hurry's use of FaceTime in this manner allowed him to conceal his contacts with Cayman Securities' customers because, to the extent there was any record of the telephone call, it would appear that Cayman Securities had only called the customer.[180]

---

[176]     At the hearing, Hurry provided the same explanation for changing his email address, testifying that he wanted an email address that was short. The Hearing Panel found that Hurry's explanation was not credible.

[177]     At the hearing, Hurry testified that he marked his emails privileged because Ruzicka advised him to use the privilege designation. The Hearing Panel found that Hurry's testimony was not credible.

[178]     Ruzicka and D'Mura testified that Hurry did not want a written record of his involvement with Cayman Securities' business. By way of example, Ruzicka recounted a specific instance when he emailed Diekmann to inform Diekmann that Hurry had directed him to take a particular deposit, specified with the trading symbol, SVLE. Diekmann forwarded the email to Hurry and DiBlasi, and Ruzicka testified that, when Hurry saw the email, he "tore" into Ruzicka "like you wouldn't believe." Ruzicka recalled that Hurry told him to "[n]ever put in writing that I am directly involved in business decisions."

[179]     D'Mura also recounted at least one instance of a FaceTime call involving Hurry during his hearing testimony.

[180]     Hurry explained that he used FaceTime because it was cost-effective (free), and he found it difficult to do a conference call using his cellular phone. The Hearing Panel did not find that Hurry's explanation was credible.

- 83 -

3.    Hurry's Creation, Management, and Control of Cayman Securities
      Was Unethical and Violated FINRA Rule 2010

FINRA Rule 2010 states a broad ethical principle that focuses on whether the conduct at issue "reflects on the associated person's ability to comply with the regulatory requirements of the securities business." *Mielke*, 2015 SEC LEXIS 3927, at *46; *see Burkes*, 51 S.E.C. at 360 n.21. We find that Hurry's creation, management, and control of Cayman Securities was unethical conduct that violated FINRA Rule 2010 because Cayman Securities operated to insulate Scottsdale Capital Advisors from regulatory scrutiny.

Cayman Securities was Hurry's invention. It served solely as a conduit to funnel microcap liquidation business to Scottsdale Capital Advisors from the foreign financial institutions that brought Cayman Securities' business to it.

Hurry also managed and controlled Cayman Securities' operations. He supplied its business. He identified an easy-to-control employee in Ruzicka, an individual that he knew was unqualified for the job and desperate for employment. He deliberately concealed his involvement in Cayman Securities' business operations and his interactions and conversations with its customers. He owned and controlled the downstream broker-dealer, Scottsdale Capital Advisors, and the clearing firm that consummated the sales, Alpine Securities, all but assuring the seamless ushering of restricted microcap shares from an individual owner to the securities market.

Hurry's vertically integrated microcap liquidation enterprise was the efficient distribution mechanism for the deposit and resale of restricted microcap shares with minimal inquiry, oversight, and enforcement of the federal securities laws. In our estimation, the goal of Hurry's enterprise was singular – evasion – evade the protections that regulatory oversight and the federal securities laws provide, evade liability for Scottsdale Capital Advisors' unlawful distributions, and evade accountability for flooding the securities markets with millions of shares of unregistered microcap securities from issuers that may, in fact, be shell companies.

Cayman Securities existed only because Hurry established and closely managed it. Given Ruzicka's lack of experience, qualifications, and contacts, Cayman Securities could not have survived without Hurry's involvement in it. Hurry's creation, management, and control of Cayman Securities was designed to avoid the protections that federal securities laws afford to the investing public, and his attempt to evade regulatory scrutiny was contrary to his duties as a securities professional. We therefore find that Hurry failed to adhere to high standards of commercial honor and just and equitable principles of trade, and, accordingly, violated FINRA Rule 2010.

C.    Scottsdale Capital Advisors' WSPs Were Not Reasonably Designed to
      Ensure Compliance with Section 5 of the Securities Act

The second cause of action alleged that Scottsdale Capital Advisors and DiBlasi failed to establish and maintain supervisory systems, including WSPs, that were reasonably designed to achieve compliance with Section 5 of the Securities Act. The Hearing Panel found Scottsdale Capital Advisors and DiBlasi liable for this violation and we affirm the Hearing Panel's findings.

- 84 -

A firm's obligation to supervise, contained in NASD Rule 3010, includes that "[e]ach member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules." A specific requirement of NASD Rule 3010 is that qualified individuals must be identified, including: "[t]he designation . . . of appropriately registered principal(s) with authority to carry out the supervisory responsibilities of the member for each type of business in which it engages". NASD Rule 3010(a)(2). NASD Rule 3010(b)(3) further requires that the WSPs include the titles, registration status, locations and responsibilities of each of its supervisory personnel, for the types of business the firm conducts.

1.    DiBlasi Had Responsibility for Scottsdale Capital Advisors' WSPs

The relevant period for Scottsdale Capital Advisors' liquidation of the five microcap securities was December 1, 2013 to June 30, 2014. DiBlasi became CCO in October 2013 and continues to hold that position.

At the beginning of the relevant period, Scottsdale Capital Advisors' WSPs were dated May 2013 (the "May 2013 WSPs"). These remained in effect until the Firm issued modified WSPs that became effective in May 2014 (the "May 2014 WSPs"). The May 2013 WSPs and May 2014 WSPs assigned to the CCO responsibility to "[e]stablish, maintain and update, as required," Scottsdale Capital Advisors' rules and procedures. Specifically, with regard to the sales of unregistered securities, the May 2013 WSPs imposed several responsibilities on the CCO. The main body of the May 2013 WSPs included a section that addressed Rule 144 transactions. That section of the May 2013 WSPs was titled "Rule 144 Restricted and Control Stock Sales." In that section, the May 2013 WSPs set forth that the CCO was responsible for establishing procedures reasonably designed to ensure that a stock certificate was validly issued and owned by the customer. The May 2013 WSPs further stated that the CCO should establish procedures to ensure that the resale of a security was made in reasonable reliance on an exemption from registration, and they specified that the CCO was responsible for "developing and implementing policies and procedures that provide for the review, approval and resale of Rule 144 transactions."

The May 2013 WSPs and May 2014 WSPs each included an Appendix A and an Appendix B, which assigned responsibilities by name. Appendix A listed principals of the Firm and branches. Appendix B assigned to DiBlasi, by name, the responsibility to establish, maintain, and update Scottsdale Capital Advisors' rules and procedures, including Appendix A and Appendix B. Although Appendix B assigned to Cruz, Diekmann, and others operational tasks in conducting Rule 144 due diligence, it did not assign them responsibility for the WSPs. That was DiBlasi's responsibility.

On appeal, DiBlasi argues that he had absolutely no responsibilities with respect to the WSPs for Rule 144 transactions. He maintains that the WSPs, which identified the CCO as responsible for developing and implementing procedures for the review of Rule 144 transactions,

- 85 -

were incorrect and did not reflect Scottsdale Capital Advisors' actual practice.[181]  DiBlasi asserts that the May 2014 WSPs correctly stated that the "General Principal" was responsible for maintaining Scottsdale Capital Advisors' WSPs related to Rule 144 transactions.  The record does not support DiBlasi's argument.

Once DiBlasi became CCO in October 2013, he had both the authority and responsibility under the WSPs to update them to reflect the Firm's current assignment of responsibilities.  As an initial matter, we note that DiBlasi did not update the WSPs even as to the scope of his own responsibilities, and he did not name another principal as responsible for maintaining the WSPs for Rule 144 transactions.

Moreover, we find that the May 2014 WSPs do not support DiBlasi's contention.  In the main body of the May 2014 WSPs, the "General Principal" is designated as responsible for developing procedures to ensure that a stock certificate was validly issued and owned by the customer, and that the resale of the security was made in reasonable reliance on a registration exemption.  The May 2014 WSPs also state that the General Principal was responsible for developing and implementing Rule 144 policies and procedures.  General Principal is defined in the May 2014 WSPs as the "Management Committee."  The May 2014 WSPs explain that the Management Committee had been set up to serve in the role of president of the Firm.  The WSPs listed four people as the Management Committee:  DiBlasi, Cruz, Jay Noiman, and a fourth individual, Liz Arndt.  Given that the Management Committee was disbanded in the two months that are important here, May and June 2014, we find that DiBlasi had not transferred responsibility for the WSPs based on the May 2014 WSPs.

Finally, we find that, even after the May 2014 WSPs were issued, DiBlasi was responsible for the WSPs for Rule 144 transactions.[182]  The WSPs still assigned – via Appendix B – DiBlasi by name as responsible for the WSPs for Rule 144 transactions.[183]  As we discuss in the next section, we find that Scottsdale Capital Advisors' WSPs were deficient.

        2.        Scottsdale Capital Advisors' WSPs Did Not Accurately Describe
                    the Firm's Microcap Securities Business

Scottsdale Capital Advisors' WSPs were not reasonably designed to ensure compliance with Section 5 of the Securities Act because they did not accurately describe how Scottsdale

---

[181]    DiBlasi contends that witness testimony showed that Cruz was responsible for the WSPs as it related to Rule 144 transactions.  But Cruz's testimony undermines this point.  Cruz testified that he did not recall anyone specifically delegating to him the responsibility for creating the WSPs for Rule 144 transactions.

[182]    DiBlasi argues that he should not be held liable based on his title as CCO.  We acknowledge the point and reiterate that we are finding DiBlasi responsible for the WSPs based on the evidence that Scottsdale Capital Advisors *assigned him* this supervisory responsibility.

[183]    Our conclusion is bolstered by the description in the main body of the May 2014 WSPs that the CCO's duties included responsibility for the Firm's policies and procedures.

- 86 -

Capital Advisors conducted its Rule 144 business. Cruz testified that he created the procedures for the Rule 144 transactions that were in effect during the relevant period, the "OTC Restricted Stock Deposit Procedures," that DiBlasi had responsibility for updating those procedures, and that DiBlasi never had any role in the Rule 144 review process. DiBlasi, for his part, disagreed on this point, testifying that Cruz was responsible for Rule 144 compliance and the establishment of policies and procedures relating to that business.

Written supervisory procedures must accurately reflect how a firm is operating its business to be part of an effective supervisory system. Based on our findings as to supervisory responsibilities, as well as the testimony related to those supervisory responsibilities, we find that Scottsdale Capital Advisors' WSPs failed to clarify who was responsible for updating the WSPs and who supervised the Rule 144 review process.

This is particularly true for the May 2014 WSPs. We find that the May 2014 WSPs were inaccurate because they delegated responsibility for developing procedures to comply with Rule 144 to a "Management Committee" that no longer existed. DiBlasi testified that the Management Committee disbanded in January 2014, that Justine Hurry took on the Management Committee duties in February 2014, and that Cruz officially became Scottsdale Capital Advisors' president, and displaced the Management Committee, in March 2014. Despite the fact that Scottsdale Capital Advisors' management did not reappoint the Management Committee, the Firm modified its WSPs in May 2014 to supposedly give Rule 144 compliance to this now-defunct Management Committee.[184]

   3. Scottsdale Capital Advisors' WSPs Did Not Require a Reasonable Inquiry into the Selling Customers' Beneficial Ownership

Written supervisory procedures must provide a "reliable mechanism" for identifying securities sales that should be investigated or halted. *See Midas Sec.*, 2012 SEC LEXIS 199, at *51. We find that Scottsdale Capital Advisors' WSPs were not reasonably designed to achieve compliance with Section 5 of the Securities Act because they failed to require a searching inquiry into the identity of the purported beneficial owners of the microcap securities that the Firm was selling. The WSPs do not discuss the concept of nominees, and Diekmann and Cruz did not focus on the potential problem of nominees in conducting their supervisory review. The Due Diligence Packages for the five deposits at issue demonstrate that the Firm's general practice for reviewing stock deposits was heavy on the papers it gathered, but there was no identification or investigation of circumstances in which nominees might be concealing the identity of the true beneficial owners of the securities. For example, Diekmann testified that he knew nothing about the supposed beneficial owner of Sky Walker (Patrick Gentle), except that the person was a customer of Unicorn International Securities. As we reviewed the record, we determined that Scottsdale Capital Advisors' inadequate WSPs contributed to the Firm's failure to consider if nominees were being used to conceal the identities of the beneficial owners its deposits. This failure is nothing short of spectacular in light of the four regulatory actions that

---

[184] We also find that Scottsdale Capital Advisors' WSPs contained incorrect information on the important topic of who supervised the Firm's Rule 144 review process.

- 87 -

involved Scottsdale Capital Advisors' registered representatives and customers and included allegations that nominees had been used to facilitate fraud.

Based on these facts, we find that DiBlasi failed to maintain Scottsdale Capital Advisors' WSPs, in violation of NASD Rule 3010(b) and 2010, and that Scottsdale Capital Advisors violated 3010(b) and 2010 by failing to establish and maintain WSPs that were reasonably designed to ensure compliance with Section 5 of the Securities Act.[185]

> D.     Cruz and Scottsdale Capital Advisors Failed to Supervise the Firm's
>        Microcap Liquidation Business

The third cause of action alleged that Cruz and Scottsdale Capital Advisors failed to supervise the Firm's microcap liquidation business.  As part of this cause of action, the complaint alleged that Cruz and Scottsdale Capital Advisors did not respond appropriately to red flags that strongly indicated that the transactions discussed in this decision did not qualify for an exemption from the registration requirements of Section 5 of the Securities Act.  *See ACAP Fin., Inc.*, Exchange Act Release No. 70046, 2013 LEXIS 2156, at *33 (July 26, 2013) (explaining that the duty to supervise "includes the responsibility to investigate red flags that suggest that misconduct may be occurring and to act upon the results of such investigation."), *aff'd*, 783 F.3d 763 (10th Cir. 2015).  On appeal, we affirm the Hearing Panel's findings, and we find that Cruz and Scottsdale Capital Advisors violated NASD Rule 3010.

As an initial matter, we find that Cruz had supervisory responsibility for Scottsdale Capital Advisors' microcap liquidation business.  Cruz had final approval authority over Rule 144 transactions, including the five deposits that occurred in this case.  Cruz reviewed the Due Diligence Packages that the Rule 144 Team assembled, and he determined whether the documents and information contained in the Due Diligence Packages were sufficient to approve the microcap securities deposit.  Cruz signed the Deposited Securities Checklist, which signified that he had given Rule 144 compliance approval.  As Cruz testified, he was the second level of review for the microcap securities deposits in this case and he made "sure that the proper documentation was obtained and reviewed."

Second, we find that Cruz's supervision was deficient in two aspects: (1) Cruz failed to analyze whether the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note were securities for purposes of the Rule 144 holding period; and (2) Cruz failed to investigate red flags associated with the five deposits.  Concerning the Rule 144 holding period, Cruz failed to supervise the Rule 144 team member's conclusions that the tacking basis for the five deposits – the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note – created a holding period of longer than one year. As we discussed in Part III.A.7.c. (Scottsdale Capital Advisors Cannot Rely on the Rule 144

---

[185]     A violation of FINRA's supervision rule, NASD Rule 3010, is inconsistent with the securities industry's high standards of commercial honor and just and equitable principles of trade, and, accordingly, constitutes a violation of FINRA Rule 2010.  *See Midas Sec.*, 2012 SEC LEXIS 199, at *2.

- 88 -

Exemption Because the Firm Failed to Prove That the Liquidations Satisfied the One-Year Holding Period for the Resale of Restricted Securities), the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note were not securities. Without tacking the beneficial owners' holding periods to the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note, the beneficial owners held less than one year and could not rely on Rule 144 for an exemption.

Cruz did not raise the question of whether the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note were, in fact, securities. Nor did he apply the relevant legal test – the family resemblance test – to determine whether the instruments were securities. Yet Cruz was a lawyer with years of experience with the securities laws. He should have recognized the issue and addressed it. When he failed to do so, he failed to reasonably supervise Scottsdale Capital Advisors' microcap liquidation business as it relates to the five specific deposits that are the subject of this case.

We also note that Cruz failed to investigate a parade of red flags, including many of the red flags discussed in FINRA Regulatory Notice 09-05:

- The NHPI, VPLM, and ORFG deposits consisted of large blocks of thinly traded, low-priced stocks that were issued by obscure companies.

- Cayman Securities established a pattern of making large deposits of thinly traded microcap stocks, selling the stocks, and wiring out the proceeds immediately.

- The NHPI, VPLM, and ORFG shares were recently issued, which is a warning that the issuer or its control persons could be conducting a distribution.

- Two of the issuers had business histories that suggested they were shell corporations.

  - NHPI, which had been a pharmaceutical company, announced it was going into the oil and gas business only a few months before the deposit of NHPI securities at Scottsdale Capital Advisors.

  - ORFG, which had been an automotive detailing company, indicated it was considering conducting mineral exploration and set forth an anticipated payment schedule for three mining concessions.

- Scottsdale Capital Advisors' approach to verifying that an issuer was not a shell corporation was mainly to rely on representations by a principal of the issuer that the company was not a shell.

- 89 -

Cruz and Scottsdale Capital Advisors should have, but did not, investigate these red flags. "Decisive action is necessary whenever supervisors are made aware of suspicious circumstances, particularly those that have an obvious potential for violations." *George J. Kolar*, 55 S.E.C. 1009, 1016 (2002). As to the red flag for large deposits followed by wiring out the proceeds, there are additional details that make this situation more acute. Cruz knew that Cayman Securities was acting on behalf of its foreign financial institution customers (Montage Securities, Titan International Securities, and Unicorn International Securities) involved in the transactions, and that the foreign financial institutions engaged, in turn, in the same pattern while acting on behalf of other entities and individuals. Despite these red flags, Cruz and Scottsdale Capital Advisors did not investigate who ultimately received the funds from the microcap securities sales. Cruz and Scottsdale Capital Advisors did not know that path the funds traveled and did not know who ultimately received the funds.

Third, we find that, when Cruz did respond to a red flag, he would be satisfied with an answer from an interested party. For example, Cruz testified that he did not recall seeing on Unicorn International Securities' website the discussion of appointing a nominee officer or director to make sure that a person's name will not appear as an officer or director of a company. Cruz agreed that this discussion could have been a red flag. But his response to this red flag would have been to emphasize to the interested parties that "they need – to disclose the underlying beneficial owner." This approach – seeking further assurances from the interested parties – is a failure to adequately respond to red flags. Cruz should have sought independent verification of the identity of Unicorn International Securities' customers. Cruz's essentially passive approach to red flags is a central feature in his failure to supervise, and his failure is deeply troubling because he testified that he knew that Scottsdale Capital Advisors was acting as a gatekeeper, and that broker-dealers play a critical role in helping to prevent illegal unregistered distributions of restricted securities into the public markets.

On appeal, Cruz maintains that he was an effective supervisor and argues several points to show that the Hearing Panel's decision was incorrect. Cruz argues that the failure to supervise finding was erroneous because Enforcement did not prove that underlying rule violations occurred, that the inadequacies were brought to his attention, and that he failed to follow-up on them. Cruz also contends that he was applying "his reasoned business judgment to approve the deposits," but that his judgment was second-guessed. Finally, Cruz claims that he oversaw Scottsdale Capital Advisors' rigorous review of deposits from Cayman Securities and overall these deposits were rejected a total of 45.7 percent of the time. These arguments are unpersuasive.

Cruz is incorrect when he asserts that a supervisor is liable only when an underlying violation has occurred, it is brought to the supervisor's attention, and the supervisor does not follow-up. FINRA's supervision rule covers such a failure to be sure, but the rule requires more than supervisors responding only when violations are pointed out to them.[186] A supervisor must

---

[186]    Cruz is incorrect to cite to *KCD Financial* to support this requirement for a violation of NASD Rule 3010. *See KCD Fin., Inc.*, 2017 SEC LEXIS 986, at *1. While we found in *KCD Financial* that the firm was "aware[ ] of indications that its representatives were selling unregistered securities," our finding of liability was based on the firm's failure to respond adequately to those red flags. *Dep't of Enforcement v. KCD Fin., Inc.*, Complaint No.

[Footnote continued on next page]

- 90 -

respond to red flags and *suggestions* of irregularities. *Christopher J. Benz*, 52 S.E.C. 1280, 1283 n.13 (1997). Red flags are not always rule violations. Effective supervision involves asking probing questions to uncover deeper problems.

Cruz is also incorrect to rely on *ACAP Financial, Inc.* and *KCD Financial, Inc.* to argue that his supervision was reasonable because he took more steps than the respondents did in those cases. The fact that a failure to supervise in another case was more obvious does not mean that Cruz's supervision was reasonable. *See William J. Murphy*, Exchange Act Release No. 69923, 2013 SEC LEXIS 1933, at *33 (July 2, 2013) (stating that a failure to supervise depends on the particular circumstances of each case), *aff'd sub nom.*, *Birkelbach v. SEC*, 751 F.3d 472 (7th Cir. 2014). The basis for Cruz's supervision violation is that he failed to adequately and meaningfully analyze the documents and information that he had. Despite the numerous red flags, he did not further investigate the five deposits to ensure that Scottsdale Capital Advisors did not participate in an unregistered distribution of securities.

Finally, Cruz incorrectly relies on Scottsdale Capital Advisors' deposit rejection rate to minimize his inadequate supervision. The five deposits at issue were reviewed and approved by Cruz when they should have been rejected. We are considering if Cruz's supervision of the five deposits was reasonably exercised to prevent violations of Section 5 of the Securities Act. *See Ronald Pellegrino*, Exchange Act Release No. 59125, 2008 SEC LEXIS 2843, at *50-51 (Dec. 19, 2008) (explaining that respondent's other supervisory steps were not a defense to the specific supervision violations that the Commission found). It was not. The actions that Cruz may or may not have taken for other proposed deposits is beside the point.

Based on these facts, we find that Cruz was aware of the numerous red flags that surrounded the five deposits at issue, and that he failed to supervise Scottsdale Capital Advisors' microcap liquidation business when he did not address those red flags. Moreover, as president of Scottsdale Capital Advisors, we find that Cruz took his actions on behalf of the Firm, and, as a consequence, Scottsdale Capital Advisors failed to supervise its microcap liquidation business. Cruz's and Scottsdale Capital Advisors' failures to supervise violated NASD Rule 3010 and FINRA Rule 2010.

### E.    Procedural Arguments

The Respondents raise several procedural arguments in this appeal. Their procedural arguments have no merit.

---

[cont'd]

2011025851501, 2016 FINRA Discip. LEXIS 38, at *72 (FINRA NAC Aug. 3, 2016), *aff'd*, 2017 SEC LEXIS 986. This is consistent with our finding against Cruz.

- 91 -

1.    FINRA's Authority over Cases Involving Unregistered Securities
       Sales

The Respondents argue that FINRA lacks "statutory authority to bring proceedings that are premised on alleged violations of the Securities Act." The Respondents cite the Exchange Act and note that "[t]he Exchange Act gave a specific and limited grant of authority to FINRA." The Respondents misconstrue the Exchange Act.

In this disciplinary proceeding, Enforcement alleged, the Hearing Panel found, and we have affirmed Scottsdale Capital Advisors' violation of FINRA Rule 2010 based on its unregistered and nonexempt securities sales. To be clear, this was not a disciplinary proceeding to enforce the Securities Act. It is a disciplinary proceeding to examine Scottsdale Capital Advisors' conduct under FINRA Rule 2010,[187] and our findings in this case are consistent with how we have treated members firms and associated persons who have participated in unregistered securities sales in the past. *See, e.g.*, *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243 (9th Cir. 2014); *Kunz v. SEC*, 64 F. App'x 659, (10th Cir. 2003); *Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982).[188]

2.    The Hearing Panel's Reliance on Ruzicka's On-the-Record
       Testimony

Citing Ruzicka's on-the-record testimony, the Respondents argue that the Hearing Panel improperly relied on hearsay evidence. The Respondents state that, "[t]he Hearing Officer freely admitted, and the [Hearing] Panel unhesitatingly relied on, hearsay evidence from witnesses who refused to attend the hearing and therefore were not subject to cross-examination." The Respondents argue that Ruzicka's on-the-record testimony is "particularly untrustworthy and uniquely prejudicial," and that the Hearing Panel's reliance on it presents grounds for reversal of the Hearing Panel's decision. We disagree.

a.    Ruzicka's On-the-Record Testimony

Enforcement offered Ruzicka's on-the-record testimony as an exhibit at the hearing. The Respondents objected to the admission of the exhibit. The Hearing Panel accepted the on-the-

---

[187]    Although this argument appears to have been asserted on behalf of all four Respondents, we note that it is only applicable to Scottsdale Capital Advisors. Our findings related to Hurry's misconduct focuses on his creation, management, and control of Cayman Securities as a mechanism to insulate Scottsdale Capital Advisors from regulatory scrutiny. Our findings concerning DiBlasi and Cruz relate to their supervisory failures.

[188]    We also note that the SEC has expressly endorsed the principle that "[a] violation of Securities Act Section 5 also violates [the predecessor to FINRA Rule 2010]." *Midas Sec.*, 2012 SEC LEXIS 199, at *46 n.63.

- 92 -

record testimony over the Respondents' objection and entered the testimony into the record in its entirety.[189]  We find that the Hearing Panel properly admitted Ruzicka's on-the-record testimony.

We acknowledge that Ruzicka's on-the-record testimony is hearsay evidence.  But we note that formal rules of evidence do not apply to FINRA disciplinary proceedings, and that hearsay evidence is admissible in FINRA disciplinary proceedings "and can provide the basis for findings of violation, regardless of whether the declarants testify."  *Dep't of Enforcement v. McGuire*, FINRA Complaint No. 20110273503, 2015 FINRA Discip. LEXIS 53, at *23 (FINRA NAC Dec. 17, 2015); *see* FINRA Rule 9145(a) (explaining that formal rules of evidence do not apply in FINRA disciplinary cases).  Although Ruzicka's on-the-record testimony qualifies as admissible evidence, the question before us on appeal is whether the on-the-record testimony is reliable.  We have determined that it is.

In assessing reliability, we consider "the possible bias of the declarant, the type of hearsay at issue, whether the statements are signed and sworn to rather than anonymous, oral or unsworn, whether the statements are contradicted by direct testimony, whether the declarant was available to testify, and whether the hearsay is corroborated." *Scott Epstein*, Exchange Act Release No. 59328, 2009 SEC LEXIS 217, at *47 (Jan. 30, 2009) (quoting *Charles D. Tom*, 50 S.E.C. 1142, 1145 (1992)), *aff'd*, 416 F. App'x 142 (3d Cir. 2010).  The application of these factors leads us to conclude that Ruzicka's on-the-record testimony is reliable.

Ruzicka testified under oath, and a professional court reporter transcribed his testimony. Ruzicka was not subject to FINRA's jurisdiction, was not available to testify at the hearing, and declined to appear voluntarily to provide in person testimony at the hearing because of Respondents' counsel's messages to him.  Documentary evidence and testimony contained in the record, specifically, D'Mura's hearing testimony, corroborate Ruzicka's on-the-record testimony.  Finally, although Hurry contradicted some aspects of Ruzicka's on-the-record testimony,[190] the Hearing Panel found that Hurry was not a credible witness.

---

[189]    The Hearing Panel's decision provides context for why it chose to admit the evidence over the Respondents' objections.  The Hearing Panel notes that Ruzicka was never registered with FINRA and was never subject to its jurisdiction.  As the Hearing Panel explains, Ruzicka voluntarily appeared for his on-the-record testimony, and he indicated that he would voluntarily appear to provide in-person testimony at the hearing.  The Hearing Panel, however, states that Ruzicka changed his my mind about appearing at the hearing two days before he was scheduled to do so, and that he changed his mind in response to a text message that he had received from Respondents' counsel.  The Hearing Panel reports that the Respondents' text message told Ruzicka that FINRA (Enforcement) had been characterizing him as "hapless," "malleable," and "bereft of other options."  The Hearing Panel found that the text message angered Ruzicka, and that Ruzicka decided not appear to testify at the hearing in response to the message.

[190]    The Respondents argue that Ruzicka's on-the-record testimony was unreliable because Ruzicka was biased against Hurry.  On this point, we defer to the Hearing Panel's assessment of Ruzicka's credibility and demeanor and note, as they did, "Ruzicka evidently did not like the way Hurry treated him, [but] Ruzicka was truthful as to the facts and as to Hurry's intimidating and controlling manner."

- 93 -

b.    The Respondents' Motion and Supplemental Motion to
Adduce Ruzicka's Criminal Court Records

During the pendency of this appeal, the Respondents filed a motion for leave to introduce additional evidence and a supplemental motion to introduce additional evidence. *See* FINRA Rule 9346(b) (explaining that leave to introduce new evidence on appeal may be granted if a party demonstrates that the evidence is material and there was good cause for failing to introduce the evidence previously). Enforcement objected to the introduction of the additional evidence.

The proposed evidence consisted of "court records from the Superior Court of California – County of Orange . . . . [that] . . . . reflect that [] Ruzicka was charged with the felony offense of second-degree robbery." The proposed evidence discussed in the motion to adduce included minutes from the California Superior Court noting that the court intends to hold "a hearing to determine [] Ruzicka's mental competency under [the] California Penal Code . . . ." The proposed evidence discussed in the supplemental motion to adduce included court records that evidence that the California Superior Court determined that Ruzicka was "a 'mentally incompetent person' under [the] California Penal Code." The Respondents explained that the "current, unrelated criminal proceedings against [] Ruzicka provide additional material evidence of [] Ruzicka's lack of credibility – and further grounds for reversing the [Hearing] Panel's decision."

We deny the Respondents' motion and supplemental motion to adduce. The admission of evidence pursuant to FINRA Rule 9346(b) is reserved for extraordinary circumstances, where the respondent demonstrates that the evidence is material, and that there was good cause for the failure to introduce the evidence at the proceedings before the Hearing Panel. In these appellate proceedings, we have determined that the Respondents have demonstrated good cause for failing to introduce the evidence before the Hearing Panel. We, however, find that the Respondents failed to prove that their proposed evidence is material because we have determined that the California Superior Court's findings concerning Ruzicka's mental competency in June 2018 have no bearing on Ruzicka's capacity to provide FINRA with competent testimony in May 2015 (the date that FINRA took Ruzicka's on-the-record testimony).[191]

IV.    Sanctions

In the proceedings below, the Hearing Panel applied FINRA's Sanction Guidelines,[192] fined Scottsdale Capital Advisors' $1.5 million as a unitary sanction for the unregistered

---

[191]    The Respondents also argue that the Hearing Panel's reliance on Scottsdale Capital Advisors' employee, Eric Miller, was improper. We do not reach this issue because we did not consult or rely on Miller's emails in the rendering of this decision.

[192]    *See FINRA Sanction Guidelines* (May 2018), http://www.finra.org/sites/default/files/ Sanctions_Guidelines.pdf. In assessing the appropriate sanctions for the Respondents' misconduct, we apply the applicable Guidelines in place at the time of this decision and consider the specific Guidelines related to each violation. *See id.* at 8. We also consult the General Principles Applicable to All Sanction Determinations and Principal Considerations in Determining Sanctions, which adjudicators consult in every disciplinary case. *See id.* at 2-8.

- 94 -

securities sales and supervisory violations, barred Hurry and fined him $100,000,[193] suspended DiBlasi in all capacities for two years and fined him $50,000, and suspended Cruz in all capacities for two years and fined him $50,000.  We affirm these sanctions in relevant part. [194]

### A.     Scottsdale Capital Advisors

We affirm the $1.5 million fine that the Hearing Panel imposed on Scottsdale Capital Advisors, but we have decided to construct the fine as follows: (1) a $250,000 fine for each of the five violative deposits that was the subject of this case, for a total fine amount of $1.25 million for the unregistered securities sales; and (2) a $250,000 fine imposed as a unitary sanction for the Firm's two supervisory violations.  As discussed below, we also have decided to order that Scottsdale Capital Advisors engages an independent consultant to monitor the Firm's acceptance and liquidation of microcap securities deposits and review the firm's supervisory procedures related to its microcap securities liquidation business.

### 1.     Disciplinary History

Scottsdale Capital Advisors has a disciplinary history, which is an aggravating factor for purposes of sanctions.[195]  Specifically, we note that Scottsdale Capital Advisors has been disciplined previously for selling unregistered securities and having inadequate supervisory procedures and WSPs to detect and prevent the sale of unregistered securities.[196]  In October 2011, the Firm settled these charges and agreed to a censure and fine of $125,000.

---

[193]     The Hearing Panel declined to assess Hurry's fine in light of the bar that it had imposed on him.

[194]     The Respondents argue that the sanctions imposed on them are higher than the sanctions imposed in several litigated and settled cases involving similar misconduct.  As an initial matter, we find it inappropriate to compare sanctions imposed in litigated cases with those imposed in negotiated settlements.  *Id.* at 1 (stating that it is a "broadly recognized principle that settled cases generally result in lower sanctions than fully litigated cases to provide incentives to settle").  Moreover, we cite our well-founded principal in this area, and we reiterate that the appropriateness of sanctions depends on the facts and circumstances of the particular case and cannot be determined by comparison to sanctions in other cases that involve different facts and circumstances. *See William Scholander*, Exchange Act Release No. 77492, 2016 SEC LEXIS 1209, at *42 & n.65 (Mar. 31, 2016).

[195]     *See Castle Sec. Corp.*, 58 S.E.C. 826, 836-37 (2005) (explaining that disciplinary history is a significant aggravating factor and an important consideration in weighing sanctions); *see also Guidelines*, at 2 (General Principles Applicable to All Sanction Determinations, No. 2) (considering the respondent's disciplinary history), 7 (Principal Considerations in Determining Sanctions, No. 1) (same).

[196]     *Guidelines*, at 2 (General Principles Applicable to All Sanction Determinations, No. 2) (explaining that adjudicators should consider imposing more severe sanctions when the respondent's disciplinary history includes past misconduct that is similar to the misconduct at issue).

- 95 -

Scottsdale Capital Advisors has also settled other types of disciplinary actions against it. In 2009, for example, the Firm agreed to a censure and a $7,500 fine to settle charges that it had bought bonds from customers at unfair prices. In August 2012, the Firm settled charges that it had failed to take appropriate action after being on notice that one of its registered representatives had been using his name and CRD number in stock promotion press releases. The Firm agreed to a censure and a $7,500 fine for that violation. Finally, in 2015, the Firm agreed to a censure and a fine of $10,000 to settle charges that it had submitted reports to FINRA for the Order Audit Trail System (OATS) that were inaccurate, incomplete, or in the wrong format.

Scottsdale Capital Advisors' disciplinary history demonstrates that the Firm is unwilling or unable to comply with FINRA's rules or the securities laws, and that more severe sanctions are needed to "emphasize[] the need for corrective action after a violation has occurred, discourage[] future misconduct by the same respondent, and deter[]others from engaging in similar misconduct."[197]

2.     Scottsdale Capital Advisors' Sales of Unregistered and Nonexempt<br/>Microcap Securities

Mindful of Scottsdale Capital Advisors' disciplinary history, and the fact that the Firm has been previously sanctioned for similar misconduct, we examine the specific violations that are the subject of this decision, beginning with the Firm's unregistered securities sales. The Guidelines for the sale of unregistered securities recommend that adjudicators consider a fine of $2,500 to $73,000.[198] Where the respondent's conduct involves a high volume of recurring transactions in microcap securities, or penny stocks,[199] the Guidelines suggest a fine between $5,000 and $146,000.[200] The Guidelines advise adjudicators to consider a higher fine if aggravating factors predominate the respondent's conduct.[201]

The Guidelines contemplate suspensions and expulsions for firms that are involved in unlawful distributions of securities. The Guidelines advise adjudicators to consider suspending a firm with respect to any or all relevant activities or functions for up to 30 business days or until procedural deficiencies are remedied.[202] Where aggravating factors predominate, or where a

---

[197]    *Id.*

[198]    *Id.* at 24 (Sales of Unregistered Securities).

[199]    *Id.* The Guidelines use the term "penny stock" as it is defined in Section 3(a)(51) of the Securities Exchange Act of 1934 or related Exchange Act Rule 3a51-1. *See id.*

[200]    *Id.*

[201]    *Id.*

[202]    *Id.*

- 96 -

firm's conduct involved a high volume of or recurring transactions in penny stocks, the Guidelines suggest that adjudicators consider a longer suspension or an expulsion.[203]

The Guidelines also set forth seven specific considerations for such violations, six of which are applicable here: (1) whether the respondent's unregistered securities sales resulted from an intentional act, recklessness or negligence; (2) share volume of transactions, dollar amount of transactions, and amount of compensation earned by the respondent or the respondent's firm on the transactions involved; (3) whether the sales of unregistered securities were made in connection with an attempt to evade regulatory oversight; (4) whether the respondent had implemented procedures that were reasonably designed to ensure that it did not participate in an unregistered distribution; (5) whether the respondent disregarded "red flags" suggesting the presence of unregistered distribution; and (6) whether the respondent's conduct involved a high volume of, or recurring transactions in, penny stocks.[204] The application of these factors demonstrate that aggravating factors predominate Scottsdale Capital Advisors' misconduct.

As an initial matter, we consider the share volume and dollar amount of the transactions at issue, and we note that the transactions involved millions of shares of microcap issuers and resulted in proceeds of more than $1.75 million. The amounts involved are substantial and constitute an aggravating factor.

Second, we find that Scottsdale Capital Advisors' conduct was intentional, and that it involved a high volume of, and recurring transactions in, penny stocks. Despite the fact that microcap securities liquidations comprised the bulk of Scottsdale Capital Advisors' business, the Firm failed to take meaningful steps to ensure its compliance with the federal securities laws in this already risky enterprise. For example, although the members of Scottsdale Capital Advisors' Rule 144 Team were attorneys, and Cruz himself also was an attorney with significant experience with the securities laws, Scottsdale Capital Advisors failed to inquire into the basic legal question of whether the Collins/NHPI Promissory Note, the Locksmith Financial/VPLM Verbal Line of Credit, and the Forward/ORFG Convertible Promissory Note constituted securities for purposes of complying with the Rule 144 holding period.

Third, we find that Scottsdale Capital Advisors' inadequate WSPs and laissez faire attitude toward the due diligence for its risky transactions ensured that red flags would be missed or outright ignored. The Due Diligence Packages that the Firm compiled were voluminous, to be sure, but they were incomplete, standardized, and rife with discrepancies and suspicious circumstances that should have triggered a searching inquiry by the Firm. When confronted with red flags, however, Scottsdale Capital Advisors turned a blind eye.

---

[203]    *Id.*

[204]    *Id.*

- 97 -

Finally, we consider the evidence of other deposits that the Respondents have proffered in this case,[205] and we find that the Due Diligence Packages for these additional deposits are wrought with the same problems as the five deposits that are the subject of Enforcement's complaint. This evidence of a pattern of misconduct,[206] coupled with the Firm's history of similar misconduct,[207] presents a powerful aggravating factor.[208]

As we reviewed the record to assess the appropriate sanctions for Scottsdale Capital Advisors' unregistered securities sales, we conclude that the Firm's due diligence was lackadaisical. Scottsdale Capital Advisors did not question the unauthenticated documents in its Due Diligence Packages. It did not question whether the unwitnessed signatures on the documents in the packages were authentic or whether the signatories were even real people. It did not consider whether the curious transactions underlying the securities deposits were shams. It did not require proof of any money having changed hands. It did not consider on whose behalf the attorney who supplied the Attorney Opinion Letter was acting or question the attorney's reliance on uncorroborated information supplied by the issuer. It did nothing to verify representations made by the purported depositors regarding the depositors' own intentions or their status as nonaffiliates of the issuers. It did nothing to determine whether, contrary to appearances, the issuers were bona fide operating companies. Instead, Scottsdale Capital Advisors uncritically accepted and relied upon conspicuously unreliable information and materials from untrustworthy sources, and, in so doing, it utterly failed to discharge its gatekeeper responsibilities to prevent the unlawful distribution of unregistered securities.[209]

---

[205]   The Respondents proffered the Due Diligence Packages for the five deposits that are the subject of Enforcement's complaint *and* three additional VPLM-related deposits – the First VHB International Deposit, the Second VHB International Deposit, and the Cumbre Company Deposit.

[206]   *See Guidelines*, at 7 (Principal Considerations in Determining Sanctions, No. 8) (considering whether the respondent engaged in a pattern of misconduct).

[207]   *See id.* at 2 (General Principles Applicable to All Sanction Determinations, No. 2) (considering respondent's disciplinary history), 7 (Principal Considerations in Determining Sanctions, No. 1) (same).

[208]   We find that the Commission's and FINRA's guidance on unlawful distributions of securities, and the Commission's regulatory actions involving Scottsdale Capital Advisors' registered representatives and customers (*Ruettiger*, *Gibraltar I*, *Gibraltar II*, and *Tavella*), put the Firm on notice of the risk of sham transactions, the use of nominees to conceal beneficial ownership, and its potential to facilitate the unlawful distribution of securities. *See id.* at 8 (Principal Considerations in Determining Sanctions, No. 14) (considering whether the respondent engaged in the misconduct notwithstanding prior warnings from FINRA or another regulator).

[209]   Scottsdale Capital Advisors argues that it should receive mitigation credit for its "voluntary adoption of corrective measures." We disagree, and we note that the Guidelines call for the implementation of corrective measures *prior to* detection by a regulator. We find that the "corrective measures" that Scottsdale Capital Advisors may have employed, if any, came *after*

[Footnote continued on next page]

- 98 -

Based on these facts, we find that significant sanctions are required to remind Scottsdale Capital Advisors, and other similarly situated Firms acting in risky areas such as microcap deposits and liquidations, of their compliance obligations in this area. Accordingly, we fine Scottsdale Capital Advisors $250,000 for each violative deposit that is at issue in this case, for a total fine amount of $1.25 million for its unregistered securities sales, and we order the Firm to comply with the following procedures related to the retention of an independent consultant:

1.      Scottsdale Capital Advisors shall retain, within 60 days of this decision becoming FINRA's final disciplinary action, an independent consultant, not unacceptable to Enforcement. For a two-year period, the independent consultant will: (1) monitor the Firm's acceptance and liquidation of microcap securities deposits; and (2) conduct a comprehensive review of each of the Firm's policies, systems, and procedures (written and otherwise) related to the Firm's microcap securities liquidation business.[210]

2.      Scottsdale Capital Advisors shall exclusively bear all costs, including compensation and expenses, associated with the retention of the independent consultant.

3.      Scottsdale Capital Advisors shall cooperate with the independent consultant in all respects, including providing staff support. The Firm shall place no restrictions on the independent consultant's communications with FINRA staff and, upon request, shall make available to FINRA staff any and all communications between the independent consultant and the Firm and documents reviewed by the independent consultant in connection with his or her engagement. Once retained, the Firm shall not terminate its relationship with the independent consultant without Enforcement's written approval.

4.      Scottsdale Capital Advisors shall not have an attorney-client relationship with the independent consultant and shall not seek to invoke the attorney-client privilege or other doctrine or privilege to prevent the independent consultant from transmitting any information, reports, or documents to FINRA.

5.      Scottsdale Capital Advisors shall require the independent consultant to submit to the Firm and FINRA staff an "Initial Report." At a minimum, the Initial Report shall provide: (1) a description of the review performed and the conclusions reached; (2) recommended changes to the Firm's policies, systems, procedures, and training based on the independent consultant's monitoring of the Firm's acceptance and liquidation of microcap securities deposits; and (3) the independent consultant's recommendations for modifications and additions to the

---

[cont'd]

regulatory action or intervention. *See id.* at 7 (Principal Considerations in Determining Sanctions, No. 3).

[210]      If Scottsdale Capital Advisors fails to retain an independent consultant within 60 days of this decision becoming FINRA's final disciplinary action, the Firm must cease its acceptance for deposit, and its liquidation of previously deposited, microcap securities until such time that the Firm retains the independent consultant.

- 99 -

Firm's policies, systems, procedures, and training based on the independent consultant's review of the Firm's microcap liquidation business.

6.      Scottsdale Capital Advisors shall require that the independent consultant enter into a written agreement that provides that, for the period of engagement, and, for a period of two years from completion of the engagement, the independent consultant shall not enter into any other employment, consultant, attorney-client, auditing, or other professional relationship with the Firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. In addition, any firm with which the independent consultant is affiliated in performing his or her duties pursuant to this decision shall not, without prior written consent of FINRA staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the Firm or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

7.      Within 60 days after delivery of the Initial Report, Scottsdale Capital Advisors shall adopt and implement the recommendations of the independent consultant or, if it determines that a recommendation is unduly burdensome or impractical, propose an alternative procedure to the independent consultant designed to achieve the same objective. The Firm shall submit such proposed alternatives in writing simultaneously to the independent consultant and FINRA staff. Within 30 days of receipt of any proposed alternative procedure, the independent consultant shall: (a) reasonably evaluate the alternative procedure and determine whether it will achieve the same objective as the independent consultant's original recommendation; and (b) provide the Firm with a written decision reflecting his or her determination. The Firm will abide by the independent consultant's ultimate determination with respect to any proposed alternative procedure and must adopt and implement all recommendations deemed appropriate by the independent consultant.

8.      Scottsdale Capital Advisors shall provide to FINRA staff, within 30 days after the issuance of the later of the independent consultant's Initial Report or written determination regarding alternative procedures (if any), a written implementation report, certified by an officer of the Firm, attesting to, containing documentation of, and setting forth the details of the Firm's implementation of the independent consultant's recommendations.

9.      Scottsdale Capital Advisors shall retain the independent consultant to conduct a follow-up review and submit an "Interim Report" to the Firm and to FINRA staff no later than one year after engaging the independent consultant. In the Interim Report, the independent consultant shall address the Firm's implementation of the systems, policies, procedures, and training and make any further recommendations he or she deems necessary. Within 30 days of receipt of the independent consultant's Interim Report, the Firm shall adopt and implement the recommendations contained in the Interim Report.

10.     Scottsdale Capital Advisors shall retain the independent consultant to conduct a follow-up review and submit a "Final Report" to the Firm and to FINRA staff no later than two years after engaging the independent consultant. In the Final Report, the independent consultant shall address the Firm's implementation of the systems, policies, procedures, and training and

- 100 -

make any further recommendations he or she deems necessary. Within 30 days of receipt of the independent consultant's Final Report, the Firm shall adopt and implement the recommendations contained in the Final Report.

        3.     Scottsdale Capital Advisors' Supervisory Violations

      We have decided to aggregate Scottsdale Capital Advisors' supervisory violations for purposes of sanctions.[211]  For deficient WSPs, the Guidelines recommend a fine between $1,000 and $37,000.[212]  In egregious cases, the Guidelines recommend that adjudicators consider suspending a firm with respect to any or all relevant activities or functions for up to 30 business days and thereafter until the supervisory procedures are amended to conform to the rule requirements.[213]  The Guidelines for deficient WSPs direct adjudicators to consider: (1) whether deficiencies allowed the violative conduct to occur or to escape detection; and (2) whether the deficiencies made it difficult to determine the individual or individuals responsible for specific areas of supervision or compliance.[214]

      For a failure to supervise, the Guidelines recommend a fine between $5,000 and $73,000.[215]  In egregious cases, the Guidelines suggest that adjudicators consider limiting the activities of the appropriate department for up to 30 business days.[216]  In egregious cases, the Guidelines recommend limiting the activities of the department for a longer period or suspending the firm with respect to any or all activities or functions for up to 30 business days.[217]  The Guidelines for a failure to supervise advise that adjudicators consider the following factors: (1) whether respondent ignored "red flag" warnings that should have resulted in additional supervisory scrutiny; (2) whether individuals responsible for underlying misconduct attempted to conceal misconduct from respondent; (3) the nature, extent, size and character of the underlying misconduct; and (4) the quality and degree of supervisor's implementation of the firm's supervisory procedures and controls.[218]  The application of these factors solidify the egregious nature of Scottsdale Capital Advisors' supervisory violations.

---

[211]    *See id.* at 4 (General Principles Applicable to All Sanction Determinations, No. 4) (explaining that the aggregation or "batching" of violations may be appropriate for purposes of determining sanctions in disciplinary proceedings).

[212]    *See id.* at 107 (Supervisory Procedures – Deficient WSPs).

[213]    *See id.*

[214]    *See id.*

[215]    *See id.* at 104 (Supervision – Failure to Supervise).

[216]    *See id.*

[217]    *See id.*

[218]    *See id.*

- 101 -

We find that Scottsdale Capital Advisors' deficient WSPs facilitated the Firm's unlawful securities sales and allowed the unlawful securities sales to escape detection. The WSPs failure to provide guidance on dealing with discrepancies and suspicious circumstances as the Firm conducted its due diligence for microcap securities deposits allowed the members of Scottsdale Capital Advisors' Rule 144 team to handle their due diligence in a rote fashion, without analyzing the information that they had collected.

We also find that the deficient WSPs made it difficult to determine the individuals responsible for particular areas of supervision or compliance. Specifically, we find that the WSPs' failure to clearly and accurately delineate responsibility lessened transparency and accountability at Scottsdale Capital Advisors and made regulatory oversight of the Firm's risky business activities even more difficult.

Finally, we find that the nature, extent, size, and character of the underlying misconduct presents an aggravating factor for purposes of the sanctions. The transactions at issue in this case were substantial, typical of the bulk of the Firm's business, and seemingly built into the Firm's standard practice for processing deposits of microcap securities. Based on the facts before us, we find that an upward departure from the Sanction Guidelines is necessary to address Scottsdale Capital Advisors' supervisory failures, and we impose a $250,000 fine for these two causes of action.

B.     Hurry: Unethical Creation, Management, and Control of Cayman
        Securities

There is no specific Guideline applicable to Hurry's misconduct, so we look to the General Principles Applicable to All Sanction Determinations and the Principal Considerations in Determining Sanctions, which we apply in all disciplinary cases, to guide our assessment sanctions against Hurry.[219] Hurry created, managed, and controlled Cayman Securities, an enterprise whose primary purpose was to enable foreign nationals, or US citizens acting through foreign nominees, to sell large blocks of unregistered microcap securities of little-known issuers into the US securities markets.[220] Hurry established Cayman Securities in a bank secrecy jurisdiction to avoid regulatory oversight.[221] Instead of heeding the warnings from earlier regulatory actions and improving Scottsdale Capital Advisors' due diligence, Hurry knowingly facilitated the evasion of federal securities laws enacted to protect investors and, in doing so,

---

[219]     *See id.* at 2-8.

[220]     *See id.* at 8 (Principal Considerations in Determining Sanctions, No. 13) (considering whether the respondent's misconduct was the result of an intentional act, recklessness, or negligence).

[221]     *See id.* at 7 (Principal Considerations in Determining Sanctions, No. 10) (considering whether the respondent attempted to conceal his misconduct).

- 102 -

made millions of dollars.[222]  He sought by a variety of means to conceal his participation in the enterprise.

The Guidelines state that "[t]he purpose of FINRA's disciplinary process is to protect the investing public, support and improve the overall business standards in the securities industry, and decrease the likelihood of recurrence of misconduct by the disciplined respondent."[223] Hurry's misconduct was purposeful, egregious, and antithetical to the underpinnings of securities regulation as a whole.  Based on the facts before us, we find that Hurry presents a threat to investors and the integrity of the securities markets, and we bar him.[224]

      C.      DiBlasi: Maintaining a Deficient Supervisory System and Inadequate
                     WSPs Related to Scottsdale Capital Advisors' Microcap Liquidation
                     Business

For an individual respondent who is responsible for deficient WSPs, the Guidelines recommend a fine between $1,000 and $37,000.[225]  In egregious cases, the Guidelines recommend that adjudicators consider suspending the responsible individual for up to one year.[226]

Scottsdale Capital Advisors' WSPs created the appearance of a set of procedures designed to achieve compliance, but they did not accurately reflect the way that the Firm actually handled its Rule 144 deposits.  For example, the WSPs did not even accurately reflect DiBlasi's role at the Firm.  Although DiBlasi was Scottsdale Capital Advisors' CCO, he insisted he had nothing to do with the Firm's core, and nearly exclusive, business.  DiBlasi testified that he generally performed back-office functions for the Firm.

Be that as it may, Scottsdale Capital Advisors' May 2013 WSPs specified that the Firm's CCO, at that time, DiBlasi, was responsible for developing and implementing policies and procedures that provide for the review, approval and resale of Rule 144 transactions.  The May 2014 WSPs listed DiBlasi by name as responsible for the WSPs for Rule 144 transactions.

---

[222]     *See id.* at 8 (Principal Considerations in Determining Sanctions, No. 16) (considering whether the respondent's misconduct resulted in the potential the respondent's monetary or other gain).

[223]     *Id.* at 2 (General Principles Applicable to All Sanction Determinations, No. 1).

[224]     The Hearing Panel also found that Hurry's conduct warranted the imposition of a $100,000 fine, but it declined to assess the fine in light of the bar.  We deem to the bar sufficient to address the misconduct at issue here, and we decline to assess or impose any fine for Hurry's misconduct in light of the bar.  *See id.* at 10 (Monetary Sanctions – Imposition and Collection of Monetary Sanctions) (adjudicators generally should not impose a fine if an individual is barred and there is no evidence of customer loss).

[225]     *See id.* at 107 (Supervisory Procedures – Deficient Written Supervisory Procedures).

[226]     *See id.*

- 103 -

DiBlasi abdicated his responsibilities and failed to ensure that Scottsdale Capital Advisors' WSPs reflected the Firm's operations and were tailored to address the risks associated with the Firm's primary business function, the deposit and liquidation of microcap securities. The result of DiBlasi's abdication – serious infractions of the federal securities laws occurred and regulatory efforts to determine the persons responsible for those violations were hindered.

Based on these facts, we find that the egregiousness of DiBlasi's violation, and his demonstrated failure to appreciate the extent and seriousness of the responsibilities he took on, warrant significant sanctions in excess of the Guidelines recommended range. Accordingly, we suspend DiBlasi from associating with any FINRA member firm in any capacity for two years and fine him $50,000.

D.   Cruz: Failing to Supervise Scottsdale Capital Advisors' Microcap
     Liquidation Business

For an individual who fails to supervise, the Guidelines recommend a fine between $5,000 and $73,000.[227] The Guidelines also advise adjudicators to consider suspending the responsible individual in all supervisory capacities for up to 30 business days.[228] In egregious cases, the Guidelines recommend a suspension of the responsible individual in any or all capacities for up to two years or barring the responsible individual.[229]

Cruz's misconduct in this case was profoundly troubling. Everyone at Scottsdale Capital Advisors relied on Cruz for Rule 144 compliance. As an attorney and an experienced securities industry veteran, Cruz was better equipped than others at the Firm to recognize and respond to red flags to prevent the Firm's unregistered securities sales. In fact, Cruz was the principal at the Firm who gave final approval to the sales of deposited securities, signing under certification that the transactions were lawful.

Yet, in approving the five deposits at issue, Cruz ignored conspicuous red flags. Under Cruz's supervision, Scottsdale Capital Advisors, following its established and deficient WSPs, failed to ensure that the liquidations were exempt from registration. As we consider the increased risk associated with Scottsdale Capital Advisors' handling of transactions for foreign nationals acting through foreign financial institutions, we find that Cruz's perfunctory and ineffectual supervision was inexcusable. Cruz knew that he was critical to Scottsdale Capital Advisors' performance of its gatekeeping duty, and he did little to prevent the unlawful securities sales that occurred in this case. Based on these facts, we have decided to suspend Cruz from associating with any FINRA member firm in any capacity for two years and to fine him $50,000.[230]

---

[227]   *See id.* at 104 (Supervision – Failure to Supervise).

[228]   *See id.*

[229]   *See id.*

[230]   We choose to suspend Cruz in all capacities because his supervisory failures reached all aspects of how Scottsdale Capital Advisors operated.

- 104 -

V.     Conclusion

We affirm the Hearing Panel's findings that: (1) Scottsdale Capital Advisors sold unregistered and nonexempt microcap securities, in violation of FINRA Rule 2010 (cause one); (2) Hurry engaged in unethical conduct through his creation, management, and control of Cayman Securities as an entity to insulate Scottsdale Capital Advisors from regulatory scrutiny, in violation of FINRA Rule 2010 (cause one); (3) Scottsdale Capital Advisors and DiBlasi failed to establish and maintain supervisory systems, including WSPs, that were reasonably designed to prevent the sale of unregistered microcap securities, in violation NASD Rule 3010(a), NASD Rule 3010(b), and FINRA Rule 2010 (cause two); and (4) Scottsdale Capital Advisors and Cruz failed to supervise, and adequately respond to red flags related to, the Firm's microcap liquidation business, in violation of NASD Rule 3010(b) and FINRA Rule 2010 (cause three).

For sanctions, we fine Scottsdale Capital Advisors $1.25 million ($250,000 per violative deposit) for its unregistered and nonexempt microcap securities sales under cause one, impose an additional $250,000 fine on the Firm as an aggregate sanction for its supervisory violations under causes two and three, and order the Firm to obtain an independent consultant to monitor the Firm's acceptance and liquidation of microcap securities deposits and review the Firm's supervisory procedures related to its microcap securities liquidation business.  We bar Hurry in all capacities.[231]  We suspend DiBlasi in all capacities for two years and fine him $50,000.  We also suspend Cruz in all capacities for two years and fine him $50,000.  Finally, we affirm the Hearing Panel's order that Scottsdale Capital Advisors, Hurry, DiBlasi, and Cruz, jointly and severally, pay hearing costs of $22,124.29, and we impose appeal costs of $1,394.20 on each Respondent.[232]

On Behalf of the National Adjudicatory Council,

Jennifer Piorko Mitchell,
Vice President and Deputy Corporate Secretary

---

[231]     The bar that we have imposed on Hurry is effective as of the date of this decision.

[232]     Pursuant to FINRA Rule 8320, the registration of any person associated with a member who fails to pay any fine, costs, or other monetary sanction, after seven days' notice in writing, will summarily be revoked for non-payment.