UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CAYMAN SECURITIES CLEARING
AND TRADING LTD; THE HURRY
FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

     Plaintiffs,

v.                                   Case No. 8:18-cv-02869-VMC-CPT

CHRISTOPHER FRANKEL,

     Defendant.

_____/

# EXHIBIT "1"

# COR Clearing, LLC

## Microcap and Unregistered Securities Correspondent Guidebook

**Updated June 26, 2013**

### NOTICE TO CORRESPONDENTS:

COR Clearing LLC ("COR") is fully committed to the processing of microcap and unregistered securities under the policies and procedures defined herein.  Securities submitted for processing in a manner that deviates from these policies will not be approved for trading.

### PENALTIES FOR FAILURE TO ADHERE TO POLICIES:

**Correspondents who fail to adhere to the policies in this guidebook and sell microcap or unregistered positions before receiving COR's written approval to do so will be penalized as follows:**

| | |
|---|---|
| First infraction | Correspondent firm will be penalized in an amount equal to the greater of $500 or the commission charged on the subject trade (ie. no commission will be paid to the correspondent) |
| Second infraction | Correspondent firm will be penalized in an amount equal to the greater of $1,000 or 2X the commission charged on the subject trade |
| Third infraction | Correspondent firm will be penalized in an amount equal to the greater of $2,500 or 3X the commission charged on the subject trade |

# MICROCAP AND UNREGISTERED SECURITIES
# CORRESPONDENT GUIDEBOOK

| I. | **General Policies for Microcap and Unregistered Securities** | **3** |
|---|---|---|

A.   Purpose of Policies
B.   Key Definitions
C.   General Procedures Regarding Receipt
D.   General Procedures for ACAT's and Non-ACAT's
E.   Special Policies for $5,000 BD
F.   Special Policies for $50,000 BD
G.   Certificate Processing Procedures Prior to Sale
H.   Trading Windows for Prior Shell Companies
I.   "Follow on" Conversions Stock Review
J.   Bulk Pricing
K.   Canadian Securities

| II. | **Physical Certificate Receipt Policy (supplementary to Section I.)** | **11** |
|---|---|---|

A.   Purpose of Policies
B.   General Policies

| III. | **DWAC AND DRS Receipt Policy (supplementary to Section I.)** | **14** |
|---|---|---|

A.   Purpose of Policies
B.   General Policies

| IV. | **Third Party or Private Transaction Policy (supplementary to Section I.)** | **16** |
|---|---|---|

A.   Purpose of Policies
B.   Key Definitions
C.   General Policies

| V. | **Frequently Asked Questions** | **19** |
|---|---|---|

| VI. | **Check List of Document Requirements** | **23** |
|---|---|---|

| VII. | **Sample Standard Documents (referenced in check list)** | **28** |
|---|---|---|

A.   Client Acknowledgement
B.   Correspondent Questionnaire
C.   Issuer Letter
D.   Transfer Agent Letter

| VIII. | **DTCC Eligibility Requests** | **38** |
|---|---|---|
| IX. | **FINRA Regulatory Notice 09-05** | **40** |
| X. | **Microcap Fee Schedule** | **Attached** |

# Microcap and Unregistered Securities

# General Policies

# I.      Microcap and Unregistered Securities -- <u>General Policies</u>

A.   <u>Purpose of Policies:</u>

COR Clearing ("COR") has established the microcap securities policies and procedures in this guidebook to assure compliance with the securities regulations promulgated under the Securities Act of 1933 and the Securities Exchange Act of 1934, as well as FINRA Reg. Notice 09-05 and other relevant FINRA rules.

The trading of microcap securities entails a high degree of risk for brokerage firms and their clients.   These securities often involve high volatility, limited liquidity, issuer instability, and heightened regulatory burdens.  As a result of these factors, many clearing firms have imposed blanket prohibitions against the deposit and subsequent sale of securities priced below a certain dollar amount (ie. below $5.00, $3.00 or $2.00).

Clearing firms that continue to accept the deposit of microcap securities face the following economic risks:

1) **"Buy in" exposure**—where a firm is forced to buy back an illiquid position at a very high price due to a client's failure to comply with the securities regulations mentioned above
2) **"Regulatory penalty" exposure**—where a firm is forced to pay penalties for permitting transactions which are out of compliance after "red flags" should have alerted the firm to maintain a higher standard of care
3) **"Money laundering" exposure**—where a firm is implicated in a money laundering scheme that has been made possible through a private transaction with limited documentation or unconventional consideration

COR has chosen to accept microcap deposits under a set of rigorous compliance procedures in order to mitigate the risks above.

Microcap securities that are submitted to COR for deposit and sale are compartmentalized into the following groups for review:

1) Registered microcap securities
2) Registered, but restricted microcap securities
3) Unregistered microcap securities*

*Unregistered non-microcap securities must also go through this same level of review.*

B.   <u>Key Definitions:</u>

The definitions below may be helpful in understanding COR's review procedures.

**Microcap Securities, as Defined by COR:**

COR defines **"microcap securities"** as all low-priced securities trading below $3.00 in any market or exchange (with the exception of the NYSE) and all securities, regardless of price, trading in the over the counter markets (OTC and Pink Sheets).   Microcap securities usually trade over the counter via OTCBB or OTC Markets.

COR defines **"registered microcap securities"** as microcap securities that have been registered and listed as owned by a specific shareholder in a current and effective registration statement.

COR defines **"restricted microcap securities"** as microcap securities that (a) carry a restrictive legend, or (b) were not purchased on the open market (ie. the prior purchase cannot be verified with a trade confirmation).

**Unregistered Securities, as Defined by COR:**

COR Clearing defines **"unregistered securities"** as securities not registered in a current and effective registration statement.  Unregistered securities are typically obtained through a private placement, convertible debt instrument, service agreement, employee compensation agreement, share exchange agreement, settlement agreement, or other private transaction.

Unregistered securities may be held in companies that are listed on a major exchange.  Further, unregistered securities may be held in companies with share prices above $3.00.  **The price at which a company's shares trade has no bearing on whether COR will classify a shareholder's shares as "unregistered."**

C. <u>General Policies on Receipt of Microcap and Unregistered Securities:</u>

- These policies are applicable to all microcap and unregistered securities as defined above.
- These policies will be applied to any and all assets coming into COR via physical deposit, DWAC, ACAT, partial ACAT, DRS, or via a correspondent conversion.
- No receipt of shares or assets convertible into such shares (including restricted stock or warrants) via DWAC deposit, or free delivery through DTCC, or partial ACATS will be accepted in stocks on the lower two tiers of Pink Sheets (See Attachment).  Although ACAT'ing of accounts holding these securities may be accepted in securities represented on the lower two tiers, no sales of the securities falling in the lower two tiers of Pink Sheets will be allowed.
- Any and all receipts will be deposited only in accounts of the registered owner.
- Positions will not be moved via journal entry or other mechanism between and/or among accounts.
- Positions will not be "delivered free" or "DTC'd" to third parties.
- Positions will only be accepted as a free delivery from DTC if documentation is presented showing the delivering account is like titled.
- Assets attained through a third party transaction will be subject to additional review prior to being accepted and approved for deposit (See Third Party Transaction Policy).

- **<u>Sales of microcap and unregistered securities in any account are prohibited unless such assets have been reviewed and approved prior to the sale transaction taking place.</u>**
- Sales of microcap and unregistered securities are prohibited in DVP accounts.
- Payment of proceeds from sales of microcap and unregistered stocks may be sent via wire, ACH or check once the transaction has settled. COR will only allow disbursements to be made to the registered owner of the account. COR will not honor any disbursement requests to third parties.
- Any position in microcap and unregistered stocks that is received into an account that is larger than the limits provided in the procedures that follow, can only be liquidated in accordance with COR's illiquid policy (See procedures on "Illiquid Policy").
- COR reserves the right to deny any transaction in which a transfer agent has failed to promptly transfer securities or have been identified as problematic.
- All correspondents are responsible for ensuring their complicity with FINRA Regulatory Notice 09-05 regarding Unregistered Resale of Restricted Securities.  A letter of responsibility signed by a Supervising Principal of the correspondent must accompany all certificate deposits, DWAC requests, ACATs or free receipt of shares via DTCC for approval.


D.  <u>General Procedures for ACAT's and Partial ACAT's:</u>

- Upon receipt of information via the ACAT form or via the ACAT system, COR's Account Transfer Department will notify the correspondent firm of an incoming transfer that includes microcap and unregistered securities.
- At that time the correspondent will be instructed that these positions will need to be reviewed and approved prior to any sales occurring in that security.
- All documentation and information applicable to these policies will need to be sent to COR's Stock Review area to initiate that process.
- In the event the securities were purchased in the open market, trade confirmations will need to be submitted to document that activity. (A $100 review fee will be assessed for reviewing trade confirmations or statements that exceed 10 pages.)
- The security position will be moved to a "pending review" contra security position until the review and approval has been completed.
- Upon completion of the approval, COR's Stock Receipt department will move the position back to the original security and it will reflect as free trading in the customer account.

E.  Special Procedures for Deposit of Certificates by $5,000 BD:

- Certificates may be sent directly to COR's Stock Receipt Department by the client, providing all customer signatures are notarized.
- Certificates will be received into the client account and held in safekeeping (not saleable) until correspondent review and approval is received by COR.
- Copies of the certificates and accompanying paperwork will be sent to the correspondent for review and approval.
- Upon receipt of approval from the correspondent, processing of the certificates will proceed as described below.
- Certificates will be returned to the depositing client after being held by COR for 10 business days if correspondent approval is not received or unless otherwise instructed by the correspondent. All costs associated with the return of certificates or safekeeping will be assessed to the correspondent.

F.  Special Procedures for Deposit of Certificates by $50,000 or greater BD:

- Certificates and all appropriate paperwork must be approved by the correspondent prior to delivery to COR's Stock Receipt Department.
- Certificates and all paperwork sent to COR's Stock Receipt Department must be accompanied by a Letter of Transmittal, detailing all items included in the package.
- Upon receipt of completed paperwork (see section on Document Requirements) and instruction from the correspondent, the certificate deposit and paperwork will be put through the review process.

G.  Certificate Processing Procedures for Unregistered and Registered Microcap Securities Prior to Sale:

- All shareholders seeking to sell unregistered securities or restricted microcap securities are required to submit a complete packet of the relevant items described in the Checklist of Required Documents incorporated this guidebook.
- All shareholders seeking to sell registered microcap securities are required to submit only: 1) a Correspondent Questionnaire, 2) an Illiquid Policy Disclosure, and 3) a Client Acknowledgment.
- Upon obtaining the items listed in the Checklist of Required Documents (completed in their entirety), COR's Stock Review will begin to process the deposit. COR will attempt to process the transaction on the day of receipt; however, transaction processing may take up to 15 business days after receipt of required documents per deposit.  Rush service is available at a premium charge.
- **COR's legal review of "unregistered" securities involves:** 1) review of the issuer's SEC filings to determine if the issuer is a shell or was a prior shell, 2) review of the chain of consideration, to assure that the shares have been validly acquired, 3)

review of the client's position within the issuer to determine if the client should be deemed an affiliate, and 4) review of the client's deposit application as a whole for general red-flags per FINRA Reg. Notice 09-05, which may put COR on notice of an illegal, unregistered distribution of securities.

- **COR's legal review of "registered" microcap securities involves:** 1) review of the issuer's registration statement to verify that the selling shareholder is listed by name, 2) review of the issuer's registration statement to determine if the information contained therein should be deemed stale, 3) review of the issuer's reporting status, 4) review of whether the client should be deemed an affiliate of the issuer, and 5) a general review of the shareholder's recent trading history for unusual activity.

- No sales of <u>registered</u> microcap securities may be made until the subject certificates have been approved for trading by COR. When a deposit has been approved for sale, COR's Stock Receipt Department will notify the correspondent firm that the trading restriction has been lifted.  In the event a registered microcap security is sold prior to approval, the sale may be bought in by COR.  Any losses will be assessed to the correspondent firm.  Approvals for the sale of registered microcap securities will be granted for a maximum of 6 months.  During an approval period, a selling shareholder may sell approved shares through multiple trades without incurring multiple review fees.

- Unless otherwise stated herein (see Section I. below), no sales of <u>unregistered or restricted</u> microcap shares may be made until the subject certificates have been approved for trading by COR.  When a deposit has been approved for sale, COR's Stock Receipt Department will notify the correspondent firm that the trading restriction has been lifted.  In the case of a certificate, it must clear transfer once it has been approved for deposit prior to any sales taking place.  If this is a restricted stock deposit, the trading restriction will be lifted once the deposit is approved.

- In the event a firm sells unregistered or restricted microcap securities from a deposit prior to being notified by COR that sales have been approved, that sale may be bought in.  Any losses will be assessed to the correspondent firm.  The remedy for this policy violation in this regard is not limited to a potential buy in.  COR reserves the right to impose any appropriate remedy for a violation of these policies.

- All correspondents are responsible for ensuring their complicity with FINRA Regulatory Notice 09-05 regarding Unregistered Resale of Restricted Securities. A letter of responsibility signed by a Supervising Principal of the correspondent must accompany all deposits (except for "follow on" deposits, where the same shareholder acquires an addition interest in the same security through a note conversion).


H.  <u>Trading Windows for Prior Shell Companies:</u>

- COR will not permit the trading of securities in current shell companies when a selling shareholder is not listed by name in a current and effective registration statement.

- In the event that COR deems an issuer to be a prior shell, COR will require the issuer to

maintain status as a current reporting company under the Securities Exchange Act of 1934 in order to permit trading in the issuer's securities.

- Deposits in prior shells can only be  approved for predetermined trading windows—with each trading window expiring on the date that the issuer's next quarterly financials are due.
- During a trading window, a selling shareholder may sell approved shares through multiple trades without incurring multiple review fees.
- In the event that a client executes a trade after a trading window expires, without first getting approval from COR, the client will be charged a trading window penalty (See Microcap Fee Schedule).
- In order to avoid a trading window penalty, a client will have three options:

    1) Notify COR that it wishes to extend into the next trading window for the fee referenced in the Microcap Fee Schedule*, and agree to stop trading on the date the current window expires until the issuer's new quarterly financials are published on EDGAR;
    2) Notify COR that is wishes to stop trading and place its securities in safe-keeping; or,
    3) Notify COR that it wishes to stop trading and have its certificates returned or DWAC'd to another firm.

    *No fee will be imposed to extend a trading window for a security that was approved for sale 30 days or less prior to the current trading window expiring.*

I.  "Follow on" Conversion Stock Reviews:

- In the event a client acquires a position in an unregistered or microcap security through the conversion of preferred shares into common shares, or through a convertible note into common shares, the client will be subject to COR's procedures for unregistered stock review.
- In the event a client makes a "follow on" conversions of the same preferred shares or the same note previously reviewed by COR, the client will be charged a "follow on" review fee (also known as a review fee for the same stock/same issuer), so long as the follow on conversion occurs within six months of the previous conversion.
- The correspondent for the client in a follow on conversion is responsible for submitting a new Client Questionnaire, Client Acknowledgement, Illiquid Disclosure and a copy of the conversion notice that the client has already submitted to the issuer.
- Securities obtained in a follow on conversion may be traded as soon as the correspondent provides COR with the documents described above.
- Should COR determine that a client has sold shares obtained in a follow on conversion that the client does not have a right to sell, the client will be immediately bought back

in to the position that was sold.
- Clients will have ten business days after selling shares obtained in a follow on conversion to transfer converted shares into their account before being subject to a buy in.


J.  Bulk Pricing:

- COR offers correspondents and their clients bulk pricing for stock review services in the following situations:

    1.  Employee compensation plans with 15+ participants
    2.  Investment banking transactions with 15+ investors
    3.  Simultaneous deposits by 15+ clients in the same issuer

- Pricing in the first two scenarios is outlined in the attached Microcap Fee Schedule
- Pricing in the third scenario is offered on a case-by-case basis


K.   Canadian Securities:

- Clients of COR's US correspondents that wish to deposit unregistered or microcap Canadian securities with COR will be subject to COR's standard procedures for microcap stock review, plus the following additional requirements:

    1.  Any legal opinion supplied must be from a recognized international law firm with offices in both the US and Canada
    2.  Deposits will be subject to a supplementary review by a broker/dealer of COR's choosing located in Canada, familiar with Canadian securities law

# Microcap and Unregistered Securities

# Physical Certificate Receipt Policy

# II.    Microcap and Unregistered Securities -- <u>Certificate Receipt Policy</u>

A.  <u>Purpose of Policies:</u>

Positions in microcap and unregistered securities are often delivered in physical certificate form. This can create heighted risk for introducing firms and clearing firms for a number of reasons.

- First, issuers have the ability to cancel certificates after certificates have been deposited and sold through a clearing firm.  When this occurs, DTCC places a short in the clearing firm's account that results in an immediate "buy in" of the position.  Many times when this occurs, the clearing firm is not notified of the "stop transfer" placed on the certificate for extended periods of time (this can be up to 6 months or longer after the initial deposit).   These incidents have resulted in, among other things, capital violations which have forced introducing firms out of business and caused millions of dollars in losses to clearing firms.

- Second, issuers and shareholders have the ability to instruct transfer agents to issue share certificates without valid proof of consideration.  Physical certificates are often issued without a trade confirmation from a purchase on an open market.  Therefore, physical certificates can be used and manipulated to launder money and/or potentially defraud other investors in the same issuer.

COR Clearing LLC ("COR") believes that microcap transactions involving physical certificates should be accommodated, so long as certain risk management mandates and protocols are followed.

B.  <u>General Policies for Certificate Receipt:</u>

- Deposits of physical certificates (via ACATs, conversions or free delivery) in any securities, including restricted securities or assets that are convertible into securities will not be accepted for the purpose of sale and/or liquidation if the issuer of the security is in the lower two tiers of the pink sheet rating system with OTC Markets (See Attachment).  Such deposits may be accepted into accounts, but sales in such securities will be restricted.
- Positions will not be moved via journal entry or other mechanism between and/or among accounts.
- Positions will not be "delivered free" to other firms other than by a settlement of a sale. Certificates will only be reissued in the name of the registered account holder.
- Assets obtained through a third party or private transaction will be subject to additional review documentation prior to being accepted for deposit. (See Third Party or Private Transaction Policy)
- Payment of proceeds from sales of microcap stocks can be sent via wire, ACH or check once the transaction has settled. COR will only allow disbursements to be made to the registered owner of the account. COR will not honor any

disbursement requests to third parties.

- Any position in microcap stocks that is received into an account that is larger than the limits provided in the procedures that follow, can only be liquidated in amounts according to the formula in procedures for "Sale of Illiquid Securities." (See Procedures in Illiquid Policy)
- COR reserves the right to deny transactions for shareholders whose transfer agents have failed to promptly transfer securities or have been identified as problematic.
- Restricted security deposits (including restricted warrants or assets convertible into securities covered under this policy) will also need to be reviewed prior to sales occurring unless the transactions are considered sales under prospectus.

# Microcap and Unregistered Securities

# DWAC Receipt Policy

# III.   Microcap and Unregistered Securities – <u>DWAC/DRS Receipt Policy</u>

A.   <u>Purpose of Policies:</u>

To mitigate the risks previously discussed, COR has established the following policies and procedures for the receipt of microcap and unregistered securities via DWAC and DRS.

B.   <u>General policies:</u>

- No receipt of shares will be accepted in stocks on the lower two tiers of the OTC Markets pink sheet rating system (See Attachment).
- DWACs and DRS will be deposited only in accounts of the registered owner.
- Positions will not be moved via journal entry or other mechanism between and/or among accounts.
- Positions will not be "delivered free" or "DTC'd" to third parties.
- DWACs and DRS will be accepted with applicable paperwork. (See section on required documentation)
- Assets obtained through a third party transaction will be subject to additional requirement prior to being accepted for deposit. (See Third Party Transaction Policy)
- No sales may occur for positions being DWAC'd or DRS'd into an account until the asset has been reviewed and approved prior to sales taking place.
- Payment of proceeds from sales of OTCBB/Pink Sheet stocks may be sent via wire, ACH or check once the transaction has settled.  COR will only allow disbursements to be made to the registered owner of the account.  COR will not honor any disbursement requests to third parties.
- COR reserves the right to deny transactions with transfer agents that have failed to promptly transfer securities or have been identified as problematic.

# Microcap and Unregistered Securities

# Third Party and Private Transaction Policy

## IV.    Microcap and Unregistered Securities – <u>Third Party or Private Transactions</u>

A.   <u>Purpose of Policies:</u>

To mitigate the risks previously discussed, COR has established the following policies and procedures for the receipt of microcap and unregistered securities acquired in Third Party or Private Party Transactions.

B.   <u>Key Definitions:</u>

COR defines **"Third Party Transactions"** or **"Private Party Transactions"** as transactions that occur when the current holder of a security has not purchased his security in a public market.  Rather, the shareholder has obtained his shares (or an asset which can be converted into shares) from someone other than the issuer, or from the issuer in a transaction other than a private placement. Third party transactions include debt conversions, securities acquired as part of a reverse merger, securities acquired as payment for investment banking services, securities acquired as payment for consulting services (other than those paid directly by the issuer), etc.

COR is willing to facilitate the receipt and sale of securities obtained through Third Party or Private Party Transactions so long as the processes and procedures outlined in this section are followed.

C.   <u>General Policies:</u>

- No positions acquired through Third Party or Private Party Transactions will be approved for sale in stocks on the lower two tiers of the OTC Markets pink sheet rating system (See Attachment). Positions in these lower tiers (including restricted stock or warrants) may be accepted into accounts for deposit via ACAT, but the sale of such positions will be prohibited.
- Positions will not be moved via journal entry or other mechanism between and/or among accounts.
- Positions will not be "delivered free" or "DTC'd" to third parties.
- **Assets obtained through a third party transaction will be subject to additional review prior to being accepted for deposit.**
- No sale of assets may occur until the position has been reviewed and approved per these procedures.
- Payment of proceeds from sales of securities obtained through Third Party and Private Party Transactions can be sent via wire, ACH or check once the transaction has settled.  COR will only allow disbursements to be made to the registered owner of the account.  COR will not honor any disbursement requests to third parties.
- Any position in microcap and unregistered stocks received into an account that are larger than the limits provided in the procedures that follow, can only be liquidated in amounts according to the formula in procedures for "Sale of Illiquid Securities." (See Procedures in Illiquid Policy)
- COR reserves the right to deny transactions with Transfer Agents that fail to promptly transfer

securities or have been identified as problematic.

# Microcap and Unregistered Securities

# Frequently Asked Questions

# V. Microcap and Unregistered Securities – <u>Frequently Asked Questions</u>

1. **Does COR charge for performing its review services?**  Yes we do.  All costs will be charged direct to the correspondent unless the correspondent instructs us in writing to bill the customer account in which the certificate(s) will be deposited. Any such written instructions to bill the customer must also contain an affirmative statement by the correspondent that it has disclosed the fee to its customer, and that it is directing COR to assess such charges to the client. Please see the section titled "Fee Schedule" for further details.

2. **Does COR's review service charge cover the processing/DTCC deposit fee if the deposit is approved?**  No, the DTCC processing fee or restrict stock processing fee, whichever is applicable, can and will be charged in addition to the review fee.

3. **If my deposit request is rejected will I receive a written response explaining the reason for just rejection?**  Yes you will.  COR will provide you with a summary explaining the findings based upon the information provided.

4. **When a security is deposited, how long does it typically take until an "okay to sell" notice is given?**

   This depends on the type of security under review, as outlined below.

   <u>Prospectus Sales:</u>
   In instances where registered microcap securities are held by a shareholder who is specifically listed by name in an issuer's S-1 registration statement (also known as "Prospectus Sales"), the shareholder may sell upon submission of a Correspondent Questionnaire, Illiquid Policy Disclosure and Client Acknowledgement, and an approval by COR.   A "Okay to Sell" notice for the sale of registered shares is typically given within 24 hours from the time of submission.

   <u>Non-prospectus Sales:</u>
   In instances where microcap securities are held by a shareholder who is not specifically listed by name in the issuer's S-1 registration statement (also known as "Non-prospectus Sales"), the "Okay to Sell" notice is typically given within 4-15 business days from the time of submission of a complete review packet, depending on the method of submission (See Checklist of Required Documents For Unregistered Securities).

   - Physical certificate deposits typically receive the "okay to sell" notice in 10-15 business days.
   - DWAC deposits typically receive the "okay to sell" notice in 4-6 business days.

The rapidity, or lack thereof, with which the transfer agent and issuer operate can impact the time to issue an "Okay to Sell" notice. If COR is requested to obtain the "Transfer Agent Authentication" form as well as the "Authentication Letter" from the issuer in lieu of these documents being provided by Introducing Broker, the approval cycle becomes dependent on performance of the Agent and Issuer. In addition, in the instance where COR is required to seek documentation from the Agent or Issuer, the deposited certificate(s) will be placed in "legal transfer" in safekeeping pending the required approvals.

Non-prospectus sales can be reviewed and approved for sale within a 48 hour time period for an additional rush fee (See Fee Schedule).

5. **Do these deposit review requirements include restricted stock and warrants**?  Yes. All restricted stock sales are prohibited prior to review.  All restricted stock or warrant deposits will need to go through the same review and approval process as outlined in these procedures.

6. **Do these review requirements include assets coming into an account from another broker/dealer via the ACAT system?**  Yes, the same requirements apply. Such assets will not be saleable until they have gone through the review and approval process.

7. **Do the restriction on sales in microcap and unregistered securities apply to DVP (Institutional u5B) accounts?**  Yes, they do.  No sales in restricted microcap or unregistered securities may be made prior to review.

8. **What does COR mean when utilizing the term "third party transaction?"** COR considers transactions to be third party transactions where the current holder did not purchase the security in a public market, but rather, obtained the shares or a convertible asset from someone other than the issuer/company. Third party transactions include debt conversions, private sales, payment for consulting services (other than those paid directly by the issuer), etc. See Third Party Transaction Policy for further details.

9. **What happens if certificates are received lacking documentation**? COR's Stock Receipts Department will return certificates to the customer or correspondent after a 10 business day waiting period subsequent to COR's receipt, along with a blank Microcap Stock Deposit Acknowledgement document to be completed and returned to COR in order to continue the process, unless otherwise directed to safe keep the certificate by the correspondent in which case safekeeping fees will be charged to the client.

10. **Does COR need original documents?**  COR needs the original stock certificate and "Stock Power" and/or "Corporate Authorization to Transfer Form."  The remaining required documents may be transmitted via e-mail or facsimile.  COR's Stock Receipt Department's contact information is stockrec@corclearing.com or fax number 402-384-6161.

11. **Is it required that a completed Questionnaire be sent in along with all other paperwork?**  Yes, in order for the Stock Review to proceed the signed correspondent questionnaire is required.

12. **If a correspondent uses a different Questionnaire format, can that be used instead of the documents provided in this policy?**  No.  To ensure we receive complete information the Questionnaire needs to be the COR approved form.

13. **What happens if the sale occurs on a physical certificate prior to COR granting an "okay to sell" notice?** Unapproved sales by the correspondent may be subject to an immediate "buy in" by COR.  Any associated loss will be charged to the Introducing Firm.

14. **Should I send in certificates and all other paperwork along with any Third Party Transaction review request?**  You can if you wish, but you do not need to submit the certificate in order to complete the Third Party Transaction review.  The certificates will be held in safekeeping until the review is complete. In the event the deposit is rejected there will be additional out-of-pocket costs incurred for the return of the documents to you or your client.

15. **Would COR accept DWAC's from the holders of securities derived from third party transactions if the Issuer provided the documents required by COR's policies?** It is COR's policy not to accept securities obtained via a third party transaction unless the transaction has gone through the review and approval process described in the "Third Party Transaction Policy" section of this document.

# Microcap and Unregistered Securities

# Document Requirements

# VI. Microcap Deposit Document Requirements and Checklist

**A.** <u>Core requirements:</u>

**The following is a check list of the documentation that should be submitted along with your deposit requests.**

☐ **Correspondent questionnaire** (signed by CCO or Supervisory Principal)
☐ **Client Acknowledgement** (signed by client and CCO or Supervisory Principal)
☐ **Copy of Seller's Representation Letter**(singed by seller, confirming whether or not seller is to be treated as an affiliate)
☐ **Issuer Letter\***
   o Required with <u>all certificated deposits</u> when (1) a shareholder is depositing shares <u>without a restrictive legend</u>, or (2) a shareholder is depositing shares <u>with a restrictive legend</u>, and said shareholder wishes to sell after the restrictive period has elapsed, but before the issuer's transfer agent removes the legend.  The issuer letter must be signed by the issuer, and either notarized or attested to by a principal of the correspondent.
   o Type of Issuer Letters that can be used:
      a.  Issuer Letter for certificates without a legend
      b.  Issuer Letter for certificates with a legend
      c.  Issuer Letter for convertible securities

   <u>Exceptions:</u>
      a.  Not required when the shareholder is referenced by name as a selling shareholder in an effective registration statement
      b.  Not required when shares were issued by a court order
      c.  Not required when an issuer supplies a letter directly to the transfer agent directing issuance of the subject shares, and a copy of such letter is provided
      d.  Not required in follow-on transactions when shares have been issued via a convertible note, convertible preferred shares, or exercisable warrants, <u>when (i) the issuance of the original convertible/exercisable security can be verified by a signed board resolution **and** (ii) a signed issuer letter directed to the issuer's transfer agent to make shares available</u> in the event of a conversion/exercise has been provided
      e.  Not required in follow-on transactions (ie. note conversions, preferred shares conversions, and warrant exercises), if an Issuer Letter for Convertible Securities has been provided previously for the relevant convertible security

☐ **Transfer Agent Warranty Letter \***
   o Only required with initial <u>certificated deposits</u> of "free trading shares" that <u>do not carry a restrictive legend</u> (this letter must be signed and notarized by the TA OR signed by the TA and correspondent together)

*This piece of documentation is not required for a DWACs, ACATS, DRS or for the initial review and approval of restricted securities.*

**Special Note for Follow-on Transactions:*
*Selling shareholders may elect not to provide an issuer letter or transfer agent letter for follow-on conversions of preferred shares or promissory notes.  However, in such cases, selling shareholders will only have ten business days after selling their shares obtained in a follow-on transaction to transfer shares into their account before being subject to a buy in.*

B.  <u>Supplementary Requirements:</u>

**The following additional items may be required based upon the response to Question #12 of correspondent questionnaire.**

1. **Acquired from issuer, when selling shareholder is listed in an effective registration statement:**

   ☐ **Copy of the front cover of the registration statement (S-1 or S-3), and the section listing the selling shareholder by name and referencing the shares to be deposited**
   ☐ **Copy of legal opinion letter contained in the registration statement**
   ☐ **Copy of representation from independent accounting firm in the registration statement**

2. **Acquired from issuer, but not through a private placement:**

   ☐ **Evidence of investment terms** (purchase agreements, subscription agreements, promissory notes, consulting agreements, etc.)
   ☐ **Evidence of public disclosure of issuance** (public filing, minutes of meeting of issuer's board of directors authorizing issuance)
   ☐ **Evidence of consideration paid to the issuer** (i.e. front and back copies of checks, front copy of check with copy of bank statement, or wire confirmations of funds being transmitted to, and/or received by, the issuer.)
   ☐ **Opinion of counsel** (Opinion of counsel will not be accepted from attorneys whose names appear on OTC Markets prohibited attorney's list, from an issuer's staff attorney, or from law firms based outside of the United States, unless an attorney, not the law firm, that issues and executes the opinion is admitted to practice and in good standing in at least one State of the United States and the issuing attorney is located within the United States.)
   ☐ **Evidence of public disclosure of the issuance**

3. **Acquired from Issuer via a private placement:**

- ☐ **Copy of the executed and accepted subscription agreement**
- ☐ **Notice to convert** (if applicable)
- ☐ **Evidence of consideration paid to the issuer** (i.e. front and back copies of checks, front copy of check with copy of bank statement, or wire confirmations evidencing the payee and the payer.) If an escrow agent is used for the private placement, we typically will require evidence of the payment made to the escrow agent and evidence of payment made from the escrow agent to the issuer.
- ☐ **Evidence of public disclosure of issuance**
- ☐ **Opinion of counsel** (Opinion of counsel will not be accepted from attorneys whose names appear on OTC Markets' prohibited attorney's list, from an issuer's staff attorney or from law firms based outside of the United States, unless an attorney, not the law firm, that issues and executes the opinion is admitted to practice and in good standing in at least one State of the United States and the issuing attorney is located within the United States.)
- ☐ **Evidence the issuer has publicly reported** any private placements, debt issuances, convertible debt, etc.

*In cases whereby a COR correspondent firm has managed a private placement, such required documentation may be submitted in bulk in its entirety for all participating clients. If requested in advance by the correspondent, such placements may undergo one bulk review and approval process. Any subsequent deposits that can be confirmed back to the original documentation will also need to go through the full review and approvals prior to sales will need to be confirmed by COR's Stock Receipts Department upon completion of the review. These deposits will be processed in order of acceptance. See Fee Schedule under Investment Banking Fees and Employee Compensation Plan Fees.*

4. **Acquired in a private transaction, but not from the issuer:**

- ☐ **Documents evidencing acquisition transaction** including customer attestation on date asset was acquired (purchase agreement, consulting agreements, etc.)
- ☐ **Evidence of consideration paid on all transactions back to the original issuance** (i.e. front and back copies of checks, front copy of check with copy of bank statement, or wire confirmations evidencing the payee and the payer.) If an escrow agent is used for the private placement, we will require evidence of the payment made to the escrow agent and evidence of payment made from the escrow agent to the issuer.
- ☐ **Documents evidencing original issuance of asset** (offering memorandum, public filing)
- ☐ **History of transfer of stock to current holder** (tracking back to original issuance)
- ☐ **Opinion of counsel** (Opinion of counsel will not be accepted from attorneys whose names appear on OTC Markets' prohibited attorney's list, from an issuer's staff attorney or from law firms based outside of the United States. Unless an attorney, not the law firm, that issues and executes the opinion is admitted to practice and in good standing at least one State of the United States and the issuing attorney is located within the United States.)

❑ **Evidence the issuer has publicly reported** any private placements, debt issuances, convertible debt, etc.


5. **Acquired in accordance with a debt conversion:**

❑ **Documents evidencing investment in debt agreement**
❑ **Evidence of consideration paid back to original issuer** (i.e. front and back copies of checks, front copy of check with copy of bank statement showing check clearance, or wire confirmations evidencing the both the payee and the payer.) If an escrow agent is used for the private placement, we will require evidence of the payment made to the escrow agent and evidence of payment made from the escrow agent to the issuer.
❑ **Evidence of debt obligation in public filing**
❑ **Evidence that corporate formalities were followed in issuance of third party acquisition, if applicable** (minutes of meeting of issuer's board of directors)
❑ **Opinion of counsel** (Opinion of counsel will not be accepted from attorneys whose names appear on OTC Markets' prohibited attorney's list, from an issuer's staff attorney or from law firms based outside of the United States, unless an attorney, not the law firm that issues and executes the opinion, is admitted to practice and in good standing at least one State of the United States and the issuing attorney is located within the United States.)


*In instances where a shareholder has gone through a stock review for a debt conversion, and subsequently received approval from COR to deposit and sell converted shares, the shareholder may qualify for more limited reviews "follow-on conversions" that take place within six months of the initial conversion.


6. **Acquired in accordance with a follow-on conversion of an already-approved deposit from a convertible note:**

Shareholders converting debt instruments in follow-on conversions must submit only those items listed below to sell.

❑ A new Client Questionnaire
❑ A copy of the conversion notice that was used to convert the shares

# Microcap Securities

# Standard Documents

**Client Acknowledgement**
**Correspondent Questionnaire**
**Issuer Letter**
**Transfer Agent Letter**
**Transfer Agent Letter (Refusal)**

## Microcap and Unregistered Security Deposits
## Client Acknowledgement

**To**: My introducing broker dealer ("my broker dealer" or "introducing broker") and COR Clearing, LLC, its officers, directors, parents, subsidiaries and affiliates (hereinafter collectively "COR").  COR and my broker dealer and/or introducing broker are hereinafter collectively referred to as "You" or "Your."

I, the undersigned, acknowledge and affirm in connection with my desire to deposit and/or sell the below referenced security, or any other security in the same issuer obtained through a follow on conversion of a convertible promissory note or convertible preferred shares, that I am aware of and agree to the following terms and conditions:

1. I understand that delivery by me of these securities in certificate form does not constitute "good delivery" according to the policies of COR.
2. I acknowledge that these securities are owned by me and were acquired in a bona fide and legal transaction. Furthermore, I acknowledge there is no reason for concern by COR that these security positions will be called back by the issuer or subject to a stop transfer by the transfer agent.
3. I am aware that a sale of these securities may not be permitted by COR until such time that COR is satisfied that they are eligible for sale and transfer, without fear of impairment or violation of law or industry rule. I am also aware that my broker dealer and COR will take reasonable precautions to determine that, at present, there are no pending restrictions or a STOP transfer pertaining to any certificate. Finally, I understand that COR may require confirmation that the shares are fully paid and non assessable.
4. I acknowledge that I may not be able to sell the securities at the time of my choosing and the market price for these securities may change substantially between the time that I initially make the deposit and the time when I am actually able to make a sale. I acknowledge and accept the risk in this regard.
5. I acknowledge that it is the policy of COR to not allow microcap and unregistered securities to be transferred between and/or among accounts.
6. I acknowledge that it is the policy of COR to not facilitate the "free delivery" of securities deposited in certificate form to other DTC members. Should I desire to receive my securities, I acknowledge that COR will request a certificate representing my ownership in the issue to be delivered to me or my broker dealer, whichever is appropriate, through the issuer's transfer agent and I will be responsible for all costs associated with such request..
7. I acknowledge that it is the policy of COR to deny the facilitation of third party wires. Should I desire that funds be wired out of my account I acknowledge that COR will only wire those proceeds to a like name account and accept full responsibility for the information provided to COR instructing it to send the wire.
8. I acknowledge that COR (at the instruction of my broker dealer) may impose reasonable charges for its services in connection with, inter-alia, the receipt, verification, and cost of financing of the referenced securities and agree to be bound by such. I acknowledge that I have been informed of the associated charges included in the attached Microcap and Unregistered Securities Fee Schedule and Exhibit A to this Client Acknowledgement.
9. I acknowledge these securities are not the subject of any unrestricted sales of unregistered securities.
10.  In consideration of Your acceptance of these securities, I agree to indemnify and hold You harmless against any liability, loss or expense (including any legal fees and expenses reasonably incurred by You) arising out of the sale and/or transfer of these securities including but not limited to failure of these securities to transfer promptly or buy-in resulting from failure to deliver shares to the purchasing broker.

| | |
|---|---|
| _____ | _____ |
| Client Print Name/Title | Date |
| _____ | _____ |
| Client Signature | Corporation Name |
| _____ | _____ |
| **Introducing Broker Principal Acknowledgement** | **Print Name/Title** |
| _____ | _____ |
| Signature | Date |
| _____ | _____ |
| Certificate Number | Number of Shares/Issuer |

*Page 1 of 2 (Client Acknowledgement)*

**Policy Relating to Microcap and Unregistered Security Deposits**
**Client Acknowledgement**

**Exhibit A**

**Deposit Review Fees:**

**See attached Microcap Fee Schedule**

The review fee for the deposit of unregistered shares is generally $1,000 per deposit, unless otherwise specified, and $400 per "follow on" conversion for multiple conversions of the same promissory note (or preferred shares) within a six month time frame.   The review fee for the deposit of registered microcap shares, in which the depositing shareholder is listed by name in a registration statement, is generally $250 per deposit, unless otherwise specified.

**Illiquid Transaction Fees:**

Charges for transactions in what NSCC deems to be illiquid securities will be imposed based on the value attributed to the position by NSCC.

Illiquid charges will apply to any sales of microcap or unregistered securities, whether such securities are sold after an initial deposit review, or after a follow on conversion.

- $.00 to $3 Million – Broker Call plus 4% from trade date through and including settlement date;

- Greater than $3.0 Million to $5 Million – Broker Call plus 5% from trade date through and including settlement date;

- Greater than $5.0 Million to $10 Million – Broker Call plus 6% from trade date through and including settlement date; and

- Greater than $10.0 Million – Broker Call plus 8% from trade date through and including settlement date.

**I understand that I can contact my broker for further details relating to these fees.**

_____          _____
**Client Initials**                            **Date**

_____          _____
**Principal Initials**                       **Date**

## COR Clearing LLC
## Microcap and Unregistered Security Policy Questionnaire
*(This questionnaire must be executed by the CCO or a supervisory principal of the correspondent firm prior to submission to COR Clearing)*

1.    Account Name:  _____

2.    Account Number:  _____

3.    Account Address:  _____

4.    Issuer Name: _____

_____

5.    Issuer Symbol: _____

6.    Number of Shares to be received, deposited or DWAC'd in:  _____

7.    Number of Shares currently beneficially owned or controlled by client:  _____

8.    Total Aggregate Number of Shares beneficially owned or controlled by client (including family members, corporations, partnerships, etc.) in the last twelve (12) months: _____

_____

9.    List all Options, Warrants, other Derivative Securities, Promissory Notes, and other items readily convertible into equity and debt of the issuer beneficially owned or controlled by client (including family members, corporations, partnerships, etc):

_____

Provide the Aggregate Number of Shares that would be beneficially owned or controlled by client (including family members, corporations, partnerships, etc.), if Options, Warrants, Derivative Securities, Promissory Notes, etc., are converted to the equity securities of the issuer:_____

10.  Certificate Number(s) and Issue Dates (where applicable) (please attach copies of front and back):_____

11.  Where traded: _____

12.  How did client acquire the shares:_____

_____

13.  When did client acquire the shares: _____

14.  From whom or what entity did client acquire the shares: _____

15.  What consideration was given by client for acquisition of the shares:  _____

16.  Is the client now or has the client ever been an officer, director, control person, or person or entity who owns or controls 5% of the issued and outstanding shares of the issuer (for purposes of calculating 5%, the clients ownership and/or interest in anything readily convertible into shares of the issuer must also be considered):_____

_____

17.  Were the shares issued the client under an effective registration statement? (If so, please provide information regarding the type of registration statement, date filed, and evidence of issuance in accordance with the registration statement):

_____

18.  Does the certificate currently contain a restrictive legend: _____

***Page 1 of 2 (Policy Questionnaire)***

## COR Clearing LLC
## Microcap and Unregistered Security Policy Questionnaire (cont'd)

19.     For certificates not issued in accordance with an effective registration statement, or in accordance with an exemption or exception from registration, please provide all documents and information (including an opinion of counsel) that support removal of the restrictive legend. Please also provide your understanding as to why the certificates do not contain any restrictive legend and/or were issued in accordance with an exemption or exception from the registration requirements; _____

20.     Is the issuer a shell issuer or development stage company, or has it been one within the preceding twelve(12) months: _____

21.     Is the issuer fully reporting in accordance with the Securities Act of 1933 or the Securities Exchange Act of 1934 (which one): _____

22.     Is the issuer current in its reporting obligations: _____

23.     Does the client have any relationship with the issuer or its subsidiaries: _____

24.     Has the customer made, or will the customer make, any payment to any person or entity in connection with the customer's proposed sale of the securities: _____
_____



_____          _____
Signature of CCO or Supervisory Principal          Date



_____
Printed Name of CCO or Supervisory Principal



_____          _____
Signature of Client          Date



_____
Printed Name of Client


*Page 2 of 2 (Policy Questionnaire)*

### ISSUER LETTER FOR CERTIFICATES <u>NOT</u> CARRYING A LEGEND

### *"ISSUER LETTERHEAD"*

*<Date>*

*Principal of Broker Dealer*
*Name of Broker Dealer*
*Street Address*
*City, ST Zip code*

Dear *<Principals Name>*:

We understand that *<Name of Customer>* has delivered *<number of shares and issue>* in the following denominations to *<Name of Broker Dealer>*, as negotiable and free trading shares:

**Certificate Number**

**Number of Shares**

**Total Number of Shares**

As a condition of accepting these shares for deposit to the account of *<Customer>* carried by your clearing firm, you have requested this letter which serves to confirm the authenticity of the certificates referenced above.

*<Issuer>* confirms that the above referenced shares are fully registered, unrestricted, without encumbrance, negotiable, free-trading, and are issued as fully paid and non-assessable shares. There is no action, proceeding or investigation pending or threatened which questions the validity of the issuance of the shares to *<Customer>* or any of the forgoing representations*.*

*<Issuer>* hereby acknowledges that for purposes of settling the contemplated sale transaction by *<Customer>* that we have no claims pending that would adversely affect the settlement of any sale transaction engaged in by *<Customer>*. We further acknowledge and agree that there is no other agreement or understanding between *<Customer>* and *<Issuer>* that would preclude *<customer>* from selling or otherwise disposing of shares represented above.

*<Issuer>* has notified its transfer agent to confirm with you that there are no "stop transfer" orders or other restrictions against the certificates referenced above.

Yours Truly,


Signature
Officer of the Issuer

**Witnessed** before me in the
**City of** _____
**In the State of** _____
**This** _____ **day of  , 20___**


_____

**Notary /Principal of Correspondent**

***ISSUER LETTER FOR CERTIFICATES <u>CARRYING A LEGEND</u>***

***"ISSUER LETTERHEAD"***

*<Date>*

*Principal of Broker Dealer*
*Name of Broker Dealer*
*Street Address*
*City, ST Zip code*

Dear *<Principals Name>*:

We understand that ***<Name of Customer>*** has delivered ***<number of shares and issue>*** in the following denominations to *<**Name of Broker Dealer**>:*

**Certificate Number**

**Number of Shares**

**Total Number of Shares**

As a condition of accepting these shares for deposit to the account of <***Customer***> carried by your clearing firm, you have requested this letter which serves to confirm the authenticity of the certificates referenced above.

***<Issuer>*** confirms that the above referenced shares are without encumbrance, are issued as fully paid, non-assessable shares, and are now freely tradable.  Any restrictive legend currently existing on said shares can now be lifted under Section 4 (1) and/or Rule 144 of the Securities Act of 1933. Further, there is no action, proceeding or investigation pending or threatened which questions the validity of the issuance of the shares to ***<Customer>*** or any of the forgoing representations**.**

***<Issuer>*** hereby acknowledges that for purposes of settling the contemplated sale transaction by <***Customer***> that we have no claims pending that would adversely affect the settlement of any sale transaction engaged in by <***Customer***>. We further acknowledge and agree that there is no other agreement or understanding between ***<Customer>*** and ***<Issuer>*** that would preclude <***customer***> from selling or otherwise disposing of shares represented above.

Yours Truly,

Signature
Officer of the Issuer

**Witnessed** before me in the
**City of _____**
**In the State of _____**
**This _____ day of  , 20____**

_____
**Notary /Principal of Correspondent**

### ISSUER LETTER <u>FOR CONVERTIBLE SECURITIES</u>

### "ISSUER LETTERHEAD"

*<Date>*

*Principal of Broker Dealer*
*Name of Broker Dealer*
*Street Address*
*City, ST Zip code*

Dear *<Principals Name>*:

This letter shall confirm that ***<Name of Customer>*** has entered a ***<Name of Convertible/Exercisable Securities Agreement>*** dated ***<Date>*** for the principal sum of ***<Amount of Consideration>*** (the "Securities Agreement").

As a condition of accepting common shares from the conversion/exercise of the Securities Agreement (the "Common Shares") for deposit to the account of *<**Customer**>* carried by your clearing firm, you have requested this letter to verify the authenticity of the Common Shares.

Per the terms of the Securities Agreement, ***<Customer>*** has a right to convert or exercise into ***<Number of Shares>*** Common Shares as of today's date, and up to ***<Number of Shares>*** Common Shares at future conversion/exercise dates under the conversion metrics available .

***<Issuer>***hereby confirms that the above referenced Common Shares have been and will continue to be issued as fully paid, non-assessable, without encumbrance.  Any restrictive legend existing on the Common Shares at the time of issuance can be lifted under Section 4 (1) and/or Rule 144 of the Securities Act of 1933 as of ***<Date>.***   After such date, the Common Shares shall be freely tradable. Further, there is no action, proceeding or investigation pending or threatened which questions the validity of the issuance of the Common Shares to ***<Customer>*** or any of the forgoing representations***.***

***<Issuer>*** hereby acknowledges that for purposes of settling the contemplated sale transaction by *<**Customer**>* that we have no claims pending that would adversely affect the settlement of any sale transaction engaged in by *<**Customer**>*. We further acknowledge and agree that there is no other agreement or understanding between ***<Customer>*** and ***<Issuer>*** that would preclude *<**Customer**>* from selling or otherwise disposing of the Common Shares represented above.

Yours Truly,



Signature
Officer of the Issuer

**Witnessed** before me in the
**City of** _____
**In the State of** _____
**This** _____ day of  , 20___


 _____
**Notary /Principal of Correspondent**

## TRANSFER AGENT'S STATEMENT OF WARRANTY FOR
## CERTIFICATED SECURITIES

Transfer Agent: _____   Fax: _____

To : <*Issuer's Transfer Agent* >

Please confirm that there are no **STOPS** regarding the certificate specified below, a copy of which is attached hereto (see attached). Furthermore, kindly confirm that the certificate identified is validly issued as indicated on its face and that to your knowledge there are no adverse claims pertaining to this certificate.

Please sign and return this form together with the additional document(s) requested below to COR Clearing, LLC (COR), via facsimile or mail, at your earliest convenience. The fax number for COR is 402-384-6161.By executing your signature below, pursuant to U.C.C. Article 8, you as transfer agent, warrant to COR that:

    (1)  the certificate is genuine, validly issued and freely transferable;
    (2)  the transfer agent's own participation in the issue of the security is within its capacity and within the scope of the authority received by the transfer agent from the issuer; and
    (3)  the transfer agent has reasonable grounds to believe that the certificated security is in the form and within the amount the issuer is authorized to issue.

Moreover U.C.C. Article 8 imposes on transfer agents strict liability for failure to satisfy certain affirmative obligations in registering the transfer of a certificate. Among other things, the transfer agent has an express statutory obligation to confirm that:

    (1)  the person seeking registration of the transfer is eligible to have the security registered in its name; (2) the endorsement is made by the appropriate person or his authorized agent; (3) reasonable assurance is given that the endorsement is genuine and authorized; (4) the transfer does not violate certain restrictions; and (5) the transfer is in fact rightful or to a protected purchaser.

**Attn**: COR – Certificate Transfer Dept        Date: _____
**From :**_____
(

**Transfer Agent Name)**

_____Certificate Description
(Name of Security) (Cusip) (Number of Shares ) (Certificate Number)

(Certificate Holder of Record)

This is a letter to notify you that there are no **STOPS** regarding the above specified certificate.  Moreover, this certificate is validly issued as indicated on its face and as of this date, there are no adverse claims pertaining to this certificate. If at any subsequent time we, as the transfer agent, are made aware of ***any*** _____adverse claim with respect to this certificate we further warrant that we shall immediately notify COR within 24 hours in <u>writing.</u>

_____

(Representative of Transfer Agent) (Title)

(Printed Name)

Notary Stamp or Medallion:

# TRANSFER AGENT'S STATEMENT OF
## WARRANTY FOR
## CERTIFICATED SECURITIES

Transfer Agent:  _____  Fax:  _____

To : *<Issuer's Transfer Agent >*

Please confirm that there are no **STOPS** regarding the certificate specified below, a copy of which is attached hereto (see attached). Furthermore, kindly confirm that the certificate identified is validly issued as indicated on its face and that to your knowledge there are no adverse claims pertaining to this certificate.

Please sign and return this form together with the additional document(s) requested below to COR Clearing, LLC (COR), via facsimile or mail, at your earliest convenience. The fax number for COR is 402-384-6161.

By executing your signature below, pursuant to U.C.C. Article 8, you as transfer agent, warrant to COR that:
1. the certificate is genuine, validly issued and freely transferable;
2. the transfer agent's own participation in the issue of the security is within its capacity and within the scope of the authority received by the transfer agent from the issuer; and
3. the transfer agent has reasonable grounds to believe that the certificated security is in the form and within the amount the issuer is authorized to issue.

Moreover U.C.C. Article 8 imposes on transfer agents strict liability for failure to satisfy certain affirmative obligations in registering the transfer of a certificate.

Among other things, the transfer agent has an express statutory obligation to confirm that:
(1) the person seeking registration of the transfer is eligible to have the security registered in its name; (2) the endorsement is made by the appropriate person or his authorized agent; (3) reasonable assurance is given that the endorsement is genuine and authorized; (4) the transfer does not violate certain restrictions; and (5) the transfer is in fact rightful or to a protected purchaser.

**Attn:** COR – Certificate Transfer Dept                    Date: _____

**From :** _____

**(Transfer Agent Name)**

_____

Certificate Description (Name of Security) (Cusip) (Number of Shares ) (Certificate Number)

_____

(Certificate Holder of Record)

This is a letter to notify you that there are no **STOPS** regarding the above specified certificate.  Moreover, this certificate is validly issued as indicated on its face and as of this date, there are no adverse claims pertaining to this certificate. If at any subsequent time we, as the transfer agent, are made aware of *any* adverse claim with respect to this certificate we further warrant that we shall immediately notify COR within 24 hours in writing.

*This confirms that (Correspondent Firm) attempted to obtain the above information from:*

_____

*Transfer agent (Full name and phone number)*


☐ *This agent has refused to sign and/or medallion the requested information.*


_____

*Correspondent Firm Principal Signature and Date*

# NASDAQ/OTCBB/Pink Sheet Securities


# DTCC Eligibility Requests

## VIII.   Requests for eligibility through DTCC

**The following documentation should be submitted to COR's Stock Receipt Department in conjunction with any requests for "Older Issue Eligibility" at DTCC:**

- Completed older eligibility form
- Copy of share certificate (front and back), without legend
- Transfer agent attestation form
- Legal opinion (if required)
- Most current SEC filings
- An explanation of the reason for and/or purpose of the request.
- A copy of the issuer's 15c211 application and approval

**COR will carefully review the request along with:**

- The operating history of the applicant via relevant SEC filings and the submitted 15c211 form
- Reporting status of the issue
- The legal opinion
- Officer and Director history
- Trading history of the issuer
- The basis for the request

COR's review will be conducted by a Senior Manager.  Any questions, concerns or issues will be discussed directly with the correspondent.  If the request is rejected, COR will provide the correspondent the reason(s) for the rejection.

All correspondent requests to process securities for "Older Issue Eligibility" will result in a charge to the correspondent in the amount of $10,000.00 <u>per review request,</u> along with all out-of-pocket costs and expenses incurred by COR.

# FINRA
# Regulatory Notice 09-05

# Regulatory Notice

# 09-05

# Unregistered Resales of Restricted Securities

**FINRA Reminds Firms of Their Obligations to Determine Whether Securities are Eligible for Public Sale**

## Executive Summary

FINRA reminds firms [1] of their responsibilities to ensure that they comply with the federal securities laws and FINRA rules when participating in unregistered resales of restricted securities. These responsibilities are particularly important in situations where the surrounding circumstances place the firm on notice that it may be participating in illegal, unregistered resales of restricted securities, such as when a customer physically deposits certificates or transfers in large blocks of securities and the firm does not know the source of the securities.

Recent FINRA investigations have revealed instances in which firms failed to recognize certain "red flags" that signaled the possibility of an illegal, unregistered distribution. This *Notice* identifies situations in which firms should conduct a searching inquiry to comply with their regulatory obligations under the federal securities laws and FINRA rules. FINRA also has reviewed procedures provided by a number of large, medium and small firms that are designed to address compliance. This *Notice* describes and discusses those procedures.

Questions concerning this *Notice* should be directed to:

- Gary L. Goldsholle, Vice President and Associate General Counsel, Office of the General Counsel, at (202) 7288104;
- Joseph E. Price, Vice President, Corporate Financing, at (240) 386- 4623; or
- Lisa Jones Toms, Counsel, Corporate Financing, at (240) 3864661.

## January 2009

**Notice Type**
- ➤ Guidance

**Suggested Routing**
- ➤ Compliance
- ➤ Registered Representatives
- ➤ Trading
- ➤ Training

**Key Topic(s)**
- ➤ Unregistered Resale of Restricted Securities
- ➤ Unregistered Distributions

**Referenced Rules & Notices**
- ➤ NASD Rule 2710
- ➤ NASD Rule 2720
- ➤ NASD Rule 2810
- ➤ NASD Rule 3010
- ➤ SEC Rule 144
- ➤ Section 4(1) of the Securities Act
- ➤ Section 4(2) of the Securities Act
- ➤ Section 4(4) of the Securities Act



## Background & Discussion

Firms play a critical role in helping prevent illegal, unregistered resales of restricted securities into the public markets. It is a violation of the federal securities laws for a firm to offer or sell a security without an effective registration statement or an applicable exemption from the Securities Act of 1933 (Securities Act). In addition, such sales may violate NASD Rules 2710 (Corporate Financing Rule – Underwriting Terms and Arrangements) , 2720 (Distribution of Securities and Affiliates – Conflicts of Interest) and 2810 (Direct Participation Programs). [2] [3]

All firms must have procedures reasonably designed to avoid becoming participants in the potential unregistered distribution of securities. The nature of those procedures and the required level of firm inquiry concerning the customer and the source of the securities will depend on the particular circumstances. In addition, firms may not rely solely on others, such as clearing firms, transfer agents, or issuers' counsel, to fulfill these obligations. Firms' specific obligations are discussed in more detail below.

The Securities Act prohibits the sale of securities unless the sale is made pursuant to an effective registration statement, or falls within an available exemption from registration. Before selling securities in reliance on an exemption, a firm must take reasonable steps to ensure that the transaction qualifies for the exemption, regardless of whether the sale is for its own accounts or on behalf of customers. This includes taking whatever steps necessary to ensure that the sale does not involve an issuer, a person in a control relationship with an issuer, or an underwriter with a view to offer or sell the securities in connection with an unregistered distribution.

Section 4(1) of the Securities Act provides an exemption for the routine trading of alreadyissued securities. It does not, however, exempt sales by an issuer, or a control person of the issuer, or an underwriter or dealer. Section 4(2) of the Securities Act exempts sales made by an issuer not involving a public offering. Whether a sale is one that involves a public offering, however, is a question of fact which requires an inquiry regarding the surrounding circumstances, including such factors as the relationship between the seller and the issuer, and the nature, scope, size, type and manner of the offering. Section 4(4) of the Securities Act provides an exemption for unsolicited brokers' transactions. However, this exemption is available only if a broker is not aware, after a reasonable inquiry, of circumstances indicating that the selling customer is participating in a distribution of securities.

Recently, FINRA has investigated and brought several enforcement actions concerning unregistered distributions. [5] A common theme in these cases was that firms resold large amounts of lowpriced equity securities in overthecounter transactions. Among the allegations in these cases are that the inquiries necessary to uncover the facts of the unregistered distribution were not done or were inadequate, and the firms lacked proper supervisory controls to ensure that their written procedures were being followed. More specifically, in some instances, firms failed to take steps to determine when or how their customers had received the share certificates at issue, whether their customers were control persons of the issuers, or what percentage of the outstanding shares of these companies their customers owned. In some instances, physical certificates for shares were repeatedly deposited into accounts and then sold by firms that participated in unregistered distributions.

## Red Flags and the Duty to Make an Inquiry

Firms typically serve as the channel of distribution through which issuers, affiliates and promoters can access the public securities markets. Firms that do not adequately supervise or manage their role in such distributions run the risk of participating in an illegal, unregistered distribution. As recent investigations have shown, problems can arise when firms fail to recognize or take appropriate steps when confronted with "red flags" that signal the possibility of an illegal, unregistered distribution.
The following are examples of red flags (these are by no means comprehensive and should not be considered a "roadmap" for compliance purposes):

- A customer opens a new account and delivers physical certificates representing a large block of thinly traded or lowpriced securities;
- A customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale;
- A customer deposits share certificates that are recently issued or represent a large percentage of the float for the security;
- Share certificates reference a company or customer name that has been changed or that does not match the name on the account;
- The lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired the securities or the nature of the transaction in which the securities were acquired;
- There is a sudden spike in investor demand for, coupled with a rising price in, a thinly traded or lowpriced security;
- The company was a shell company when it issued the shares;

• A customer with limited or no other assets under management at the firm receives an electronic transfer or journal transactions of large amounts of lowpriced, unlisted securities;

• The issuer has been through several recent name changes, business combinations or recapitalizations, or the company's officers are also officers of numerous similar companies;

• The issuer's SEC filings are not current, are incomplete, or nonexistent.


As noted above, these examples are merely illustrative. There are many other situations that may signal that a firm should take a closer look at the circumstances of a proposed resale transaction.

Regarding the duty of firms to determine whether restricted securities are eligible for public sale, the SEC has said that:

> [A] dealer who offers to sell, or is asked to sell a substantial amount of securities must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer or an underwriter. For this purpose, it is not sufficient for him merely to accept "selfserving statements of his sellers and their counsel without reasonably exploring the possibility of contrary facts."(footnote omitted)

> The amount of inquiry called for necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a littleknown security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called fTohr.e problem becomes particularly acute where substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration under the Securities Act of 1933. In such situations, it must be assumed that these securities emanate from the issuer or from persons controlling the issuer, unless some other source is known and the fact that the certificates may be registered in the names of various individuals could merely indicate that those responsible for the distribution are attempting to cover their tracks. [6]

## Inquiry Obligations under Securities Act Rule 144

A firm that distributes securities for its own account or on behalf of a customer may be considered a statutory underwriter. Securities Act Rule 144 establishes a non- exclusive "safe harbor" from being deemed an underwriter if the securities are sold in compliance with its requirements. Unregistered securities that are not freely transferable are considered "restricted securities" when they are acquired in a private

transaction or are acquired by a control person of the issuer. [7]

The SEC recently revised Rule 144 and made substantial changes to the requirements governing resales of restricted securities. [8] The amendments, which became effective on February 15, 2008, continue to impose a oneyear holding period prior to any public resale on restricted securities of companies that are not subject to the Exchange Act reporting requirements. The amendments eliminated the sales volume and manner of sale limitations on resales made by nonaffiliates. Revised Rule 144 also includes more stringent restrictions on the resale of shares issued by shell companies. Accordingly, firms should review whether the company that issued the subject shares was a shell company when the shares were issued.

Before reselling restricted securities, firms must take reasonable steps to ensure that the transaction complies with Rule 144 or another available exemption. The factors set forth in the Notes to Rule 144(g) serve as a pragmatic guideline in determining what questions firms should ask their customers before engaging in an unregistered resale of securities: [9]

- How long has the customer held the security?
- How did the customer acquire the securities?
- Does the customer intend to sell additional shares of the same class of securities through other means?
- Has the customer solicited or made any arrangement for the solicitation of buy orders in connection with the proposed resale of unregistered securities?
- Has the customer made any payment to any other person in connection with the proposed resale of the securities? and
- How many shares or other units of the class are outstanding, and what is the relevant trading volume?

Firms should also try to physically inspect share certificates, if possible, as an opportunity to identify red flags and deter risks from forgery and fraudulent certificates.

Case 8:18-cv-02869-VMC-CPT   Document 16-3   Filed 12/17/18   Page 47 of 53 PageID 299

## Supervisory Procedures and Controls
## for Unregistered Resales of Securities

NASD Rule 3010 (Supervision) requires a firm to establish a supervisory system and corresponding written procedures to supervise its businesses and associated persons' activities. Accordingly, firms that accept delivery of large quantities of low- priced OTC securities, in either certificate form or by electronic transfer, and effect sales in these securities, should have written procedures and controls in place to prevent participation in an illegal, unregistered distribution of securities.

To help firms evaluate their procedures for supervising these resale transactions, FINRA has reviewed the procedures of a number of large, medium and small firms. The procedures noted below are not intended to be a comprehensive roadmap for compliance and supervision with respect to unregistered resales of restricted securities, but rather highlight measures that some firms are using to ensure better compliance with their obligations. While a particular practice may work well for one firm, the same approach may not be effective or economically feasible for another. Firms must adopt procedures and controls that are effective given their size, structure and operations. The procedures we surveyed varied depending on the firms' business models; nevertheless, the most comprehensive ones tended to include a mandatory, standardized process that requires formal approval of the proposed resale transaction and thorough accompanying documentation that:

- Clearly communicates each step in the review, approval and post-approval process through the various stages of background inquiry, information gathering, required documentation, review, final approval, execution and recordkeeping of the transaction;

- Assigns clear "ownership" of each step of the transaction review, approval and execution process to the responsible representative, principal, legal or compliance specialist, business unit or department; and

- Is easily accessible to the personnel involved in the process, often through internal Webbased applications that are clear, instructive and encourage process standardization.

Standardized procedures should be accompanied by supervisory controls to ensure that a reasonable and meaningful investigation of the surrounding circumstances is conducted and that the information obtained is evaluated to identify whether a proposed resale transaction could amount to an illegal, unregistered distribution of a restricted security on behalf of an underwriter, an issuer, or a control person of the issuer. As a general matter, the procedures and controls should apply to not only proposed resales, but also the transfer of securities from one account to another by journal or book entry.

Among the compliance procedures FINRA reviewed

are: **A. Initial Assessment and Review**

A number of firms had procedures that required a comprehensive initial review of the proposed resale, which includes gathering information concerning how, when, and under what circumstances a customer obtained the securities; whether the securities are registered pursuant to an effective Securities Act registration statement; how much of the stock is owned by or under the control of the customer; whether the stock was paid for by the customer; what relationship, if any, the customer has with the issuer or its control persons; and how much stock has been sold by the

customer. Some procedures also contained brief descriptions of how holders of unregistered securities may acquire them, such as via private placements, corporate reorganizations, business combinations and stock options plans, and explained that the requirements for resales of such securities can vary depending on the nature of the transaction and the status of the seller, *i.e.*, whether the seller is considered an affiliate of the issuer.

Some firms prohibited their representatives from accepting large blocks of securities in certificate form or required supervisory approval before a transfer of restricted securities would be accepted.

Many firms required the results of the initial review to be documented and held the persons performing the review accountable for completion of the factgathering and documentation process. As part of this process, firm procedures required the use of questionnaires completed by the selling customer regarding the proposed resale transaction, form letters completed by the customer and registered representative, and other standardized documentation depending on the transaction.

Some firms deferred the documentation requirements to the person or department responsible for approval. Most firms required the completed documentation to be reviewed for any unusual circumstances and for completeness before submitting it for formal approval of the transaction. This assessment may also alert the firm to unusual or suspicious circumstances that may trigger other compliance procedures (such as AntiMoney Laundering (AML) reporting) or additional approvals given the size or nature of the transaction.

Case 8:18-cv-02869-VMC-CPT   Document 16-3   Filed 12/17/18   Page 49 of 53 PageID 301

**B. Formal Review and Approval**

Most of the procedures we reviewed required formal approval by a person, unit or department that is independent of the initial assessment and review of the proposed resale transaction. The person or department responsible for such approval was required to document the steps taken and was accountable for the final approval. For many firms, the final approval process is more than a verification of the adequacy of the documentation. It included an investigation of the customer's and issuer's background; a formal process to confirm the seller's affiliation status and the conditions upon which the shares can be resold; verification that the issuer is current in its filings and the issuer's information is publicly available; and a thorough review of the opinion of counsel, restricted stock legend, offering materials or prospectus, and other documents for reasonableness of the information and representations. It also took into account any previous sales by the customer through any accounts at the firm. Approval from a designated principal or legal and compliance specialist generally is required in these instances *before* executing or submitting the trade for execution. The approval document also specifies whether there are any conditions to the resale, such as volume, manner of sale or other applicable requirements.

**C. Recordkeeping Obligations and PostApproval Review**

Because of the manner of sale and other requirements that apply to unregistered resales of restricted securities by affiliates, some firms' procedures included steps to monitor executions of approved transactions to ensure they comply with applicable volume or manner of sale requirements. Other firms have a process in place, postapproval of the resale transaction, to examine repeated resales by the same account or accounts under common control and to review and monitor aggregated resales in the same securities.

Some procedures we reviewed did not assign specific recordkeeping obligations. Other procedures designated a registered representative at the firm as the person responsible for retaining all documents related to the resale as opposed to having another entity such as the firm's legal or compliance group or securities transfer unit designated as primarily responsible for document retention or, at least, to receive and retain copies of the documentation related to the resale.

### Other Considerations

**A. Reliance on Third Parties**

In considering their obligations, firms should be aware that there are limitations on their ability to discharge those obligations by relying on others. FINRA, the SEC and the courts have repeatedly held that firms cannot rely on outside counsel, clearing firms, transfer agents, issuers, or issuer's counsel to discharge their obligations to undertake an inquiry. Moreover, the fact that securities have been issued by a transfer agent without a restrictive legend, or have been put into trading status by a clearing firm, does not mean that those securities can be resold immediately and without limitation under the Securities Act.[10]

**B. AML Compliance**

A firm must also ensure that its AML compliance program adequately addresses red flags that may be associated with unregistered resales conducted through the firm.[11] In recent investigations, FINRA has found that firms that participated in unregistered resales of restricted securities also may have ignored a number of red flags that indicate not only that the resale was part of an unregistered distribution, but also that action may have been required under AML reporting requirements.[12] Failure to conduct appropriate inquiry and respond to red flags may have consequences under both the federal securities laws and AML requirements.

## Conclusion

Firms must have written procedures that are reasonably designed to avoid becoming participants in the illegal, unregistered resale of restricted securities into the public markets. As noted above, these procedures and the required level of firm inquiry depend on the facts and circumstances of the proposed resale. FINRA urges firms to pay careful attention to these obligations and the implementation of these procedures.

Case 3:18-cv-02869-VMC-CPT   Document 16-3   Filed 12/17/18   Page 51 of 53 PageID 303

## Endnotes

1       This *Notice* refers to brokerdealers and their associated persons collectively as "firms" unless otherwise specified.

2       NASD Rule 2710 is being re-designated as FINRA Rule 5110. See SRFINRA-2008039.

3       *See, e.g.,* FINRA's Corporate Financing Rules (NASD Rules 2710, 2720 and 2810), which apply to public offerings, and NASD Rule 2110, which requires firms to act under just and equitable principles of trade. Regulation M under the Exchange Act and other FINRA and SEC rules may also apply to an unregistered public distribution in addition to civil liabilities under the Securities Act.

4       The term "underwriter" is broadly defined in the Securities Act to include any person or entity that purchases securities from an issuer with a view to distribute, or offers or sells for an issuer in connection with a distribution, and any person or entity participating, directly or indirectly, in a distribution of securities. The term "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. *See* Sec. 2(a)(11), Securities Act of 1933. Whether a customer is acting as an underwriter, is a control person, or is acting on behalf of an underwriter or control person, depends on the particular facts and circumstances of the transaction.

5       *See, e.g., Network 1 Financial Securities, Inc.* NASD AWC No. EAF0400940001, July 11, 2007; *NevWest Securities Corporation*, NASD AWC E022004011201, March 21, 2007, and related case SEC v. CMKM Diamonds, Inc., *et. al*, U.S. Dist. Court for the District of Nevada, Civil Action No. 08CV 0437 (Lit. Rel. No. 20519 / April 7, 2008); and *Cardinal Capital Management, Inc.* NASD AWC E072003004201, July 22, 2005. In addition, FINRA has numerous ongoing investigations involving allegations of unregistered distributions. *Barron Moore, Inc.*, Disc. Proceeding No. 2005000075703, July 21, 2008.

6       *See*, Securities Act Rel. No. 4445, 1962 SEC LEXIS 74 (February 2, 1962); *see also* Section 21(a) Report, *Transactions in the Securities of Laser Arms Corp. by Certain BrokerDealers,* 50 S.E.C. 489 (1991).

7       *See* Preliminary Note to Securities Act Rule 144. 17 CFR 230.144. The term "restricted securities" is defined in Rule 144(a)(3), and includes securities acquired directly or indirectly from the issuer or an affiliate of the issuer in a transaction or chain of transactions not involving a public offering.

8 Securities Act Release No. 8869, 72 FR 71546 (December 17, 2007).

9       Securities Act Rule 144(g). 17 CFR 230.144(g).

©2009. FINRA. All rights reserved. *Regulatory N...* that is easily understandable. However, please ... language prevails.

10      Recent investigations have uncovered fact patterns in which firms inappropriately relied on stock certificates issued without restrictive legends or certificates accompanied by false attorney opinions, or assumed that their clearing agent had the responsibility to determine if shares could be sold without restriction. FINRA has noted in previous guidance that firms are still responsible for the discharge of their obligations, even if they rely on third parties to perform certain activities and functions related to their business operations and regulatory responsibilities. Additionally, FINRA guidance makes clear that firms may not contract supervisory and compliance activities away from their direct control. *See Notice to Members 0548* (Members' Responsibilities When Outsourcing Activities to ThirdParty Service Providers).

11      *See* NASD Rule 3011 (AntiMoney Laundering Compliance Program) and *Notice to Members 0221* (Guidance to Member Firms Concerning AntiMoney Laundering Compliance Programs Required by Federal Law).

12      *See, e.g, NevWest Securities Corporation*, and related case SEC v. CMKM Diamonds, Inc., *et. al*, U.S. Dist. Court for the District of Nevada, Civil Action No. 08CV 0437 (Lit. Rel. No. 20519 / April 7, 2008) (failure to take action in response to the suspicious circumstances surrounding accounts controlled by certain customers, including the practice of depositing penny stocks, liquidating them and wiring the proceeds to bank accounts.) *Barron Moore, Inc.*, Disc. Proceeding No. 2005000075703, July 21, 2008.