**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

THE HURRY FAMILY REVOCABLE
TRUST; SCOTTSDALE CAPITAL
ADVISORS CORPORATION and
ALPINE SECURITIES CORPORATION,

        CASE NO.:  8:18-cv-02869

      Plaintiffs,

vs.

CHRISTOPHER FRANKEL,

      Defendant.

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, the Hurry Family Revocable Trust, Scottsdale Capital Advisors and Alpine Securities Corporation, (collectively "Plaintiffs"), sue Defendant, Christopher Frankel ("Defendant"), and allege:

## NATURE OF THIS ACTION

1.    This action arises from Defendant's unlawful use of confidential information obtained from Plaintiffs to destroy their businesses, abscond with their clients, and unfairly compete with Plaintiffs.

## PARTIES, JURISDICTION, AND VENUE

2.    This is an action for damages in excess of $75,000.00, exclusive of interest, costs and attorneys' fees.

3.    Plaintiff, the Hurry Family Revocable Trust (the "Hurry Trust"), is a Nevada trust, and its trustees are permanent citizens of Nevada and Arizona.

1

4.      Plaintiff Scottsdale Capital Advisors Corporation ("Scottsdale") is a corporation organized and existing under the laws of the State of Arizona, with its principal place of business in Maricopa County, Arizona.

5.      Plaintiff Alpine Securities Corporation ("Alpine") is a corporation organized and existing under the laws of the State of Utah, with its principal place of business in Salt Lake County, Utah.

6.      Defendant is an individual who resides in Hillsborough County, Florida.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1).

8.      This Court has personal jurisdiction over Defendant because Defendant resides in Florida, is engaged in business in the state, and committed many of the tortious acts alleged herein in the state.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and a substantial part of the events giving rise to the claims herein occurred in this district.

## GENERAL ALLEGATIONS

10.     Scottsdale and Alpine are each involved in the broker-dealer business.  Scottsdale is a full service broker-dealer focused on serving the OTC (over the counter) securities market. Alpine is a registered broker-dealer that is an industry leader for clearing OTC stock. Scottsdale and Alpine were previously indirectly owned and/or controlled by the Hurry Trust.

11.     In 2015, Plaintiffs considered hiring Defendant to help run their broker-dealer businesses.  They engaged in discussions with him about the businesses.

12.     Plaintiffs were aware that these discussions would expose Defendant to, and entrust him with, information that is commercially valuable to Plaintiffs and not generally known

or readily ascertainable in the broker-dealer securities industry or the public at large, including *inter alia*, Plaintiffs' business practices, financial relationships and terms of those relationships, client lists, pricing information, and private financial information of Plaintiffs and their clients. In order to protect this information, Plaintiffs (and others) required Defendant to enter into a written non-disclosure agreement (the "Original NDA") that would limit his use of Plaintiffs' numerous trade secrets and confidential information.   Attached hereto as Exhibit 1 and incorporated by this reference is a true and correct copy of the Original NDA.

13.     According to the Original NDA, it "shall be governed and construed in accordance with the laws applicable tin the State of Arizona."

14.     As acknowledged in the Original NDA, Defendant was exposed to information that is the "sole property" of the Plaintiffs "and highly confidential in nature."

15.     According to the Original NDA: "Confidential Information" means any data or information that is proprietary to the Plaintiffs and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed."

16.     Per the Original NDA, Defendant agreed that "[w]ithin ten business days of receipt of the [Plaintiffs'] written request, the [Defendant] will return to the [Plaintiffs] all documents, records and copies thereof containing Confidential Information."

17.     Plaintiffs ultimately hired Defendant.  From approximately July 2015 through July 2018, Defendant served as CEO of Alpine, and from July 2018 through September 2018 was a consultant to Alpine.

18.     On July 1, 2015, Alpine, Scottsdale, and Defendant entered into a second nondisclosure agreement entitled the "Employee Nondisclosure & Computer Use Agreement" ("Employee NDA"), which superseded the Original NDA with regard to protecting Alpine and

Scottsdale's numerous trade secrets and confidential information. Attached hereto as Exhibit 2 and incorporated by this reference is the Employee NDA.

19.    Alpine and Scottsdale require all of their employees to enter into similar employee nondisclosure agreements to limit the use and exposure of their confidential information.

20.    According to the Employee NDA, it "shall be governed in accordance with the laws of the State of Arizona."

21.    Per paragraph 2 of the Employee NDA, "Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company."

22.    Under the Employee NDA, Confidential Information is defined as:

(a) technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence; (b) information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies; (c) information concerning Company's employees, including salaries, strengths, weaknesses and skills; (d) information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and (e) any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

23.    Paragraph 4 of the Employee NDA provides: "When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all

originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information."

24.     Beginning in or about June 2015, and continuing through September 2018, Defendant received Confidential Information from each of Plaintiffs, including *inter alia*, the Plaintiffs' business practices, financial relationships and terms of those relationships, client lists, pricing information, and private financial information of the Plaintiffs and their clients.

25.     Unbeknownst to Plaintiffs, and in violation of the Original NDA and the Employee NDA, on August 15, 2016, August 28, 2016, September 9, 2016, October 6, 2016, October 13, 2016, October 14, 2016, November 8, 2016, January 3, 2017, April 12, 2017, May 2, 2017, July 13, 2017, August 31, 2017, July 31, 2018, August 8, 2018, September 18, 2018, October 7, 2018,  Defendant forwarded emails containing Confidential Information from his employee email account to his personal email account.

26.     Defendant's employment was terminated in September 2018.

27.     On November 9, 2018, Plaintiffs sent a letter to Defendant, requesting the return of all documents, records, and/or copies thereof in his possession, custody, or control that contain any Confidential Information.

28.     In violation of the Original NDA and the Employee NDA, Defendant did not return numerous documents containing Confidential Information to Plaintiffs.

29.     Rather, after his termination, Defendant continued to access his work email and forward himself additional Confidential Information, including three on October 7, 2018.

30.     Plaintiffs are informed and believe that after leaving Alpine, if not earlier, Defendant knowingly and willfully used Confidential Information obtained from Plaintiffs for

his own benefit. Specifically, Defendant used Plaintiffs' Confidential Information to solicit capital and establish financial relations so that it could make a bid for a broker-dealer in Chicago.

31.     Defendant further engaged in unfair competition against Plaintiffs by using the Plaintiffs' Confidential Information to create a broker-dealer that could provide fees and services competitive to Alpine and then using Plaintiffs' Confidential Information to solicit their top clients.

## COUNT I:  BREACH OF CONTRACT

32.     Plaintiffs incorporate by reference all of the preceding paragraphs as though fully restated herein.

33.     The Original NDA, to which Defendant agreed to be bound, constitutes a valid and enforceable contract between the Hurry Trust, on the one hand, and Defendant, on the other hand.

34.     On October 7, 2018, Defendant sent an email from his Alpine email account to his personal email account that contained The First Amendment to the Hurry Family Revocable Trust, a Certificate of Trust regarding the Hurry Trust, and portions of the Hurry Trust document (collectively, "Confidential Trust Information").  The foregoing Confidential Trust Information constitutes Confidential Information under paragraph 1(a) of the Original NDA in that such information is proprietary to the Hurry Trust and not generally known to the public.

35.     Per paragraph 5 of the Original NDA, on November 9, 2018, the Hurry Trust, through counsel, sent a written request to Defendant demanding the return of all documents, records and copies thereof that contain any Confidential Information, which would include the Confidential Trust Information.

36.     In breach of paragraph 5 of the Original NDA, Defendant failed and refused to return to the Hurry Trust the Confidential Trust Information within ten (10) business days of the Hurry Trust's demand.

37.     As a direct and proximate result of Defendant's breaches of the Original NDA, the Hurry Trust has suffered and will continue to suffer irreparable harm and economic damages.

38.     Moreover, it was foreseeable that the Hurry Trust would suffer damages if Defendant withheld its Confidential Information, despite the Hurry Trust's request for its return.

WHEREFORE, Plaintiff, the Hurry Family Revocable Trust, demands judgment against Defendant, Christopher Frankel, for damages, including, but not limited to, actual damages, special damages, injunctive relief pursuant to the Original NDA, reasonable attorneys' fees pursuant to Arizona Revised Statute § 12-341.01, interest, costs, and such further relief as the Court deems just and proper.

## COUNT II:  BREACH OF CONTRACT

39.     Plaintiffs incorporate by reference all of the preceding paragraphs as though fully restated herein.

40.     The Employee NDA, to which Defendant agreed to be bound, constitutes a valid and enforceable contract between Alpine and Scottsdale, on the one hand, and Defendant, on the other hand.

41.     Notwithstanding Defendant's obligations under the Employee NDA, Alpine and Scottsdale are informed and believe that he knowingly disclosed the following Confidential Information to third parties in breach of paragraph 2 of the Employee NDA:

    a.     Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income,

statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

b.    Statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market;

c.    A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

d.    A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

e.    An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

f.    An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer.

42.    In addition, Defendant breached paragraph 2 of the Employee NDA by using the following Confidential Information of Alpine and Scottsdale for his own benefit:

a.    Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

b.    Statements of accounts for Alpine and Scottsdale on April 10, 2017, including

number of accounts, market value and cash/money market;

c.   Alpine's blanket fidelity bond for fiscal year ending November 1, 2017;

d.   A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

e.   An April 13, 2018 email from the general counsel for Alpine with a draft employment agreement (that Defendant requested for use as a template);

f.   A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

g.   An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

h.   A July 12, 2017 email from a consultant for Alpine that included the consulting agreement between consultant and Alpine;

i.   An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer;

j.   Internal emails from September and October 2016 that included Financial and Operations Principal's report dated April 18, 2016;

43.   Defendant also breached paragraph 3 of the Employee NDA by failing to promptly return all documents containing Confidential Information to Alpine and Scottsdale upon his termination, including but limited to the following documents:

a.   Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for

determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

b.   Statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market;

c.   Alpine's blanket fidelity bond for fiscal year ending November 1, 2017;

d.   A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

e.   An April 13, 2018 email from the general counsel for Alpine with a draft employment agreement (that Defendant requested for use as a template);

f.   A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

g.   An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

h.   A July 12, 2017 email from a consultant for Alpine that included the consulting agreement between consultant and Alpine;

i.   A confidential letter dated February 22, 2017 from FINRA to Alpine with a request for information;

j.   An April 12, 2017 email from counsel for Alpine that contained a consultant agreement with the law firm to support its representation of Alpine and Scottsdale;

k.   January 3, 2017 email from FINRA to Alpine regarding due diligence documents;

l.   Internal email correspondence from September 2016 and October 2016 regarding Alpine and Scottsdale's proposed fee schedule;

m.   An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance

officer;

n.   Internal emails from September and October 2016 that included Financial and Operations Principal's report dated April 18, 2016;

o.   Internal emails from August 2016 that included drafts of Alpine's correspondent fees and customer fee schedules;

p.   An August 19, 2016 email from FINRA regarding certain proposed changes in Scottsdale's business operations.

44.   As a direct and proximate result of Defendant's breaches of the Employee NDA, Alpine and Scottsdale have suffered and will continue to suffer irreparable harm and economic damages.

45.   Moreover, it was foreseeable that Alpine and Scottsdale would suffer damages if Defendant disclosed Confidential Information to third parties, and used Confidential Information for his own benefit.

WHEREFORE, Plaintiffs, Scottsdale Capital Advisors and Alpine Securities Corporation demand judgment against Defendant, Christopher Frankel, for damages, including, but not limited to, actual damages, special damages, injunctive relief pursuant to the Employee Nondisclosure Agreement, reasonable attorneys' fees and costs pursuant to paragraph 7(e) of the Employee Nondisclosure Agreement, interest, and such further relief as the Court deems just and proper.

## <u>COUNT III:  VIOLATION OF DEFEND TRADE SECRETS ACT</u>

46.   Plaintiffs incorporate by reference all of the preceding paragraphs as though fully restated herein.

47.     During the course of his relationship with Alpine and Scottsdale, Defendant had access to confidential financial, business, and economic information of independent economic value, including *inter alia*:

a.   Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

b.   Statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market;

c.   Alpine's blanket fidelity bond for fiscal year ending November 1, 2017;

d.   A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

e.   A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

f.   An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

g.   An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer;

h.   Internal emails from September and October 2016 that included Financial and Operations Principal's report dated April 18, 2016 (collectively, the "Trade Secrets").

48.     Alpine and Scottsdale took reasonable measures to safeguard their Trade Secrets by, among other things, requiring employees and consultants to enter into Employee Nondisclosure Agreements, restricting access to the Trade Secrets, and taking other security measures to protect their confidentiality.

49.     Alpine and Scottsdale derive independent economic value, actual and potential, from their Trade Secrets not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

50.     Defendant gained access to Alpine's and Scottsdale's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

51.     Without Alpine's or Scottsdale's express or implied consent, Defendant misappropriated, disclosed, and used the Trade Secrets for his own benefit. Specifically, Alpine and Scottsdale are informed and believe that Defendant used (1) Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements; (2) statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market; (3) Alpine's blanket fidelity bond for fiscal year ending November 1, 2017; (4) a May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility; (5) a July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount; (6) an August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a

loans to Alpine to fund National Securities Clearing Corporation calls; (7) an internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer; and (8) a Financial and Operations Principal's report dated April 18, 2016 to solicit capital and establish financial relations so that he could make a bid for a broker-dealer in Chicago.

52.     At the time of Defendant's misappropriation, disclosure, and use of Alpine's and Scottsdale's Trade Secrets, Defendant knew or had reason to know that his knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

53.     As a direct and proximate result of Defendant's misappropriation, Alpine and Scottsdale suffered and will continue to suffer economic damages.

54.     Pursuant to 18 U.S.C. § 1836, Alpine and Scottsdale are entitled to an injunction to prevent the actual or threatened misappropriation of their Trade Secrets and/or requiring affirmative actions to protect the Trade Secrets, an award of damages for the actual loss caused by Defendant's misappropriation, damages for unjust enrichment caused by the misappropriation, and/or a reasonable royalty, as well as attorneys' fees and costs.

55.     Because Defendant willfully and maliciously misappropriated Alpine and Scottsdale's Trade Secrets, Plaintiffs also are entitled to exemplary damages.

WHEREFORE, Plaintiffs, Scottsdale Capital Advisors and Alpine Securities Corporation demand judgment against Defendant, Christopher Frankel, for injunctive relief, compensation for actual damages and unjust enrichment, imposition of a reasonable royalty, exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D), interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT IV: VIOLATION OF FLORIDA UNIFORM TRADE SECRET ACT

56.     Plaintiffs incorporate by reference all of the preceding paragraphs as though fully restated herein.

57.     During the course of his relationship with Alpine and Scottsdale, Defendant had access to Alpine's and Scottsdale's Trade Secrets.

58.     Alpine and Scottsdale lawfully owned the Trade Secrets.

59.     Alpine and Scottsdale took reasonable measures to safeguard their Trade Secrets by, among other things, requiring employees and consultants to enter into nondisclosure agreements, restricting access to the Trade Secrets, and taking other security measures to protect their confidentiality.

60.     Alpine and Scottsdale derive independent economic value, actual and potential, from their Trade Secrets not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

61.     Defendant gained access to Alpine's and Scottsdale's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

62.     Without Plaintiffs' express or implied consent, Defendant misappropriated, disclosed, and used the Trade Secrets for his own benefit and to unfairly compete against Alpine and Scottsdale. Specifically, Alpine and Scottsdale are informed and believe that Defendant used (1) Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements; (2)

statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market; (3) Alpine's blanket fidelity bond for fiscal year ending November 1, 2017; (4) a May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility; (5) a July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount; (6) an August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls; (7) an internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer; and (8) a Financial and Operations Principal's report dated April 18, 2016 to solicit capital and establish financial relations so that he could make a bid for a broker-dealer in Chicago.

63.     Defendant is a competitor of Alpine and Scottsdale for a common pool of customers and clients, financial institutions, and investors in the broker-dealer business.

64.     As a direct and proximate result of Defendant's unauthorized misappropriation and use of the Alpine's and Scottsdale's Trade Secrets, Alpine and Scottsdale, and each of them, have suffered and will continue to suffer irreparable harm and economic damages.

WHEREFORE, Plaintiffs, Scottsdale Capital Advisors and Alpine Securities Corporation, demand judgment against Defendant, Christopher Frankel, for injunctive relief, compensation for all actual damages and unjust enrichment, exemplary damages, reasonable attorneys' fees because Defendant's misappropriation and wrongful use of the Hurry Parties' trade secrets was willful and malicious, interest, costs, and such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on issues so triable.


Dated this 10th day of May 2019

/s/ Jordan Susman
Charles J. Harder, Esq.
Admitted Pro Hac Vice
Jordan Susman, Esq.
Admitted Pro Hac Vice
HARDER LLP
132 South Rodeo Drive, Suite 301
Beverly Hills, CA  90212-2406
Tel: (424) 203-1600
Fax: (424) 203-1601
Email:  charder@harderllp.com
Email:  jsusman@harderllp.com


-and-


Kenneth G. Turkel, Esq.
Florida Bar No. 867233
Shane B. Vogt, Esq.
Florida Bar No. 0257620
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax: (813) 443-2193
Email:  kturkel@bajocuva.com
Email:  svogt@bajocuva.com

# EXHIBIT 1



# SCOTTSDALE CAPITAL ADVISORS

7170 E. McDonald Road, Suite 6, Scottsdale, Arizona  Tel. 480-603-4900 Fax. 480-603-4901

## NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT

This NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT (the "Agreement") is made as of _June 22nd_, 2015, by _Christopher Lee Frenkel_ (the "Recipient") and SCOTTSDALE CAPITAL ADVISORS CORPORATION, an Arizona corporation, Alpine Securities Corporation an Utah corporation, Cayman Securities Clearing and Trading LTD a Cayman Limited Company and any associated company of the Hurry Family Revocable Trust (the "Discloser").

### RECITALS:

**WHEREAS,** Recipient and Disclosure have entered into discussions to form a business or employment relationship in connection with the Disclosure's business; and

**WHEREAS,** in connection with such discussions, the Discloser will communicate to the Recipient and grant the Recipient access to Confidential Information (as defined below) pertaining to Discloser's business, which Confidential Information the Recipient recognizes to be the sole property of the Discloser and highly confidential in nature and the transmission of which is granted in consideration of the Recipient's acceptance to sign this Agreement.

**NOW, THEREFORE**, THE PARTIES HERETO HEREBY AGREE AS FOLLOWS:

1.  CONFIDENTIAL INFORMATION DEFINITION

(a)  For purposes of this Agreement, "**Confidential Information**" means any data or information that is proprietary to the Discloser and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to: (i) any marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities of such party, its affiliates, subsidiaries and affiliated companies; (ii) plans for products or services, (iii) customer lists and account information; (iv) any scientific or technical information, invention, design, process, procedure, formula, improvement, technology or method; (v) any concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and trade secrets; and (vi) any other information that should reasonably be recognized as confidential information of the Discloser. Confidential Information need not be novel, unique, patentable, copyrightable or constitute a trade secret in order to be designated Confidential Information. The Recipient acknowledges that the Confidential Information is proprietary to the Discloser, has been developed and obtained through great efforts by the Discloser and that Discloser regards all of its Confidential Information as trade secrets under the Arizona Trade Secrets Act, as amended (A.R.S. §44-401 set seq.).

(b)  Notwithstanding anything in the foregoing to the contrary, Confidential Information shall not include information which: (i) was known by the Recipient prior to receiving the Confidential Information from the Discloser; (b) becomes rightfully known to the Recipient from a third-party source not known (after diligent inquiry) by the Recipient to be under an obligation to Discloser to maintain confidentiality; (c) is or becomes publicly available through no fault of or failure to act by the Recipient in breach of this Agreement; (d) is required to be disclosed in a judicial or administrative proceeding, or is otherwise requested or required to be disclosed by law or regulation, although the requirements of paragraph 4 hereof shall apply prior to any disclosure being made; and (e) is or has been independently developed by employees, consultants or agents of the Recipient without violation of the terms of this Agreement or reference or access to any Confidential Information.

2.  NON-DISCLOSURE AND NON-USE OF CONFIDENTIAL INFORMATION.

(a)  With respect to Confidential Information obtained by Recipient, Recipient (i) will not, and will not permit its officers, directors, employees, agents, independent contractors, advisors and affiliates (the "Representatives") to disclose, publish or disseminate Confidential Information to anyone other than its employees and agents on a need-to-know basis; (ii) advise its Representatives of the proprietary nature of the Confidential Information and of the obligations set forth in this Agreement; and require such Representatives to keep the Confidential Information confidential; (iii) shall keep all Confidential Information strictly confidential by using a reasonable degree of care, but not less than the degree of care used by it in safeguarding its own confidential information; and (iv) not disclose any Confidential Information received



CONFIDENTIALITY AGREEMENT

by it to any third parties (except as otherwise provided for herein).

(b)     The Recipient agrees to use the Confidential Information solely in connection with the current or contemplated business relationship between the parties and not for any purpose other than as authorized by this Agreement without the prior written consent of an authorized representative of the Discloser. No other right or license, whether expressed or implied, in the Confidential Information is granted to the Recipient hereunder. Title to the Confidential Information will remain solely in the Discloser. All use of Confidential Information by the Recipient shall be for the benefit of the Discloser and any modifications and improvements thereof by the Recipient shall be the sole property of the Discloser.

3.      NO WARRANTY. All information is provided "AS IS" and without any warranty, whether express or implied, as to its accuracy or completeness.

4.      DISCLOSURE BY LAW. If Recipient or its Representatives is requested or required by any law, courtor governmental order to disclose any Confidential Information, Recipient agrees to provide Disclosure with prompt written notice of each such request, to the extent practical, so that Discloser may seek an appropriate protective order or waive compliance by the Recipient with the provisions of this Agreement or both. If, absent the entry of a protective order or the receipt of a waiver under this Agreement, the Recipient or its Representatives is legally compelled or required to disclose such Confidential Information, Recipient may disclose such information to the persons and to the extent required without liability under this Agreement.

5.      RETURN OF DOCUMENTS. Within ten (10) business days of receipt of the Discloser's written request, the Recipient will return to the Discloser all documents, records and copies thereof containing Confidential Information. For purposes of this section, the term "documents" includes all information fixed in any tangible medium of expression, in whatever form or format.

6.      EQUITABLE RELIEF. The Recipient hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to the Discloser. Accordingly, the Recipient agrees that the Discloser will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have.

7.      NOTICE OF BREACH. Recipient shall notify the Discloser immediately upon discovery of any unauthorized use or disclosure of Confidential Information by Recipient or its Representatives, or any other breach of this Agreement by Recipient or its Representatives, and will cooperate with efforts by the Discloser to help the Discloser regain possession of Confidential Information and prevent its further unauthorized use.

8.      ENTIRE AGREEMENT AND GOVERNING LAW. This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions, representations and agreements with respect to same. No modification to this Agreement shall be binding unless in writing and signed by both parties. This Agreement shall be governed and construed in accordance with the laws applicable in the State of Arizona.

9.      EXECUTION. This agreement may be executed by facsimile or other electronic signature. In the event that any signature is delivered by facsimile transmission or by email delivery of an electronic format data file (e.g., .pdf, .tiff, etc.), such signature shall create a valid and binding obligation of the party executing with the same force and effect as if such facsimile or electronic data file signature page were an original thereof.

RECIPIENT

By: _C Fahl_

Name: _Christopher Franke_

Title: _N/a_

ADDRESS: _4301 W Waterous Av_
_Tampa FL 33629_

PHONE: 

EMAIL:

# EXHIBIT 2

## EMPLOYEE NONDISCLOSURE & COMPUTER USE AGREEMENT

This agreement (the "Agreement") is entered into by _Alpine Securities / Scottsdale Capital_ and its subsidiaries and affiliates ("Company") and _Christopher L Frankel_ ("Employee").

In consideration of the commencement of Employee's employment with Company and the compensation that will be paid, Employee and Company agree as follows:

### 1. Company's Confidential Information

In the performance of Employee's job duties with Company, Employee will be exposed to Company's Confidential Information. "Confidential Information" shall mean all written or oral information of a proprietary, intellectual or similar nature relating to Company's business, projects, operations, activities or affairs whether of a technical or financial nature or otherwise. Confidential Information includes, but is not limited to:

(a)  technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence;

(b)  information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies;

(c)  information concerning Company's employees, including salaries, strengths, weaknesses and skills;

(d)  information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and

(e)  any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.

### 2. Nondisclosure of Trade Secrets

Company's Confidential Information are 'trade secrets' as defined in Arizona Revised Statutes, Sections 44-401 et seq.  Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company.

However, Employee shall have no obligation to treat as confidential any information which:

(a)  was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company;

(b)  is or becomes public knowledge through a source other than Employee and through no fault of Employee; or

(c)  is or becomes lawfully available to Employee from a source other than Company.

### 3. Confidential Information of Others

Employee will not disclose to Company, use in Company's business, or cause Company to use, any trade secret of others.

### 4. Return of Materials

When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and

(EE NDA:01-2013)

CF

other materials containing any Confidential Information. Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.

## 5.   Confidentiality Obligation Survives Employment

Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and continues for so long as such Confidential Information remains a trade secret.

## 6.   Computer Access and Use

As part of Employee's duties, Employee will have access to Company's Electronic Communication Systems (ECS), which includes without limitation, its computers, network systems, Internet connection, Intranet, electronic mail, voicemail, facsimiles, telephones and other information systems used for the transmission of electronic communications.  As a condition of employment, Employee agrees to the following restrictions on the access and use of Company's ESS:

(a) Any access and use of ESS is strictly limited for purposes relating to Employee's duties and responsibilities as an employee, official business within Company and other activities approved in writing (including e-mail approval) by Company.

(b) All information or messages that are created, sent, received or stored using Company's ESS remain the property of Company. Company has the absolute right to monitor and log all aspects of its ESS. Employee understands and agrees that electronic communications are neither private nor secure.

(c) Employee is the sole person authorized to use the computer account(s) issued to him/her by Company, and Employee will not share his/her password(s) with anyone.  If Employee suspects that someone else knows his/her password(s), Employee will notify his/her supervisor immediately.

(d) Employee will only access those computing resources that he/she has authorization from Company to use and will only use such resource in carrying out his/her job duties.

(e) Employee is responsible for all computing activities that occur under his/her personal computer account(s).  If Employee suspects or knows that activities by any individual or entity are in violation of this agreement, Employee agrees to immediately report it to his/her supervisor.

(f) Prohibited actions using Company's ECS include, but are not limited to the following: (1) entering data under another person's computer account or permitting another to enter data under his/her account; (2) helping an unauthorized person gain access to a Company computer or information asset; (3) accessing personal Internet email accounts (e.g., Hotmail, Yahoo, AOL, etc.); (4) sending or displaying materials that are sexually explicit, threatening, discriminatory, harassing, illegal or otherwise inappropriate; (5) using the system for illegal or criminal activities, commercial ventures, private profit, religious or political causes, any form of solicitation (except those approved by Company); (6)sending or receiving documents in violation of copyright laws; (7) transmitting confidential patient, business or risk management information to any non-Company email address; (8) attaching unauthorized devices to Company's computer network; and (9) attempting to gain access to an unauthorized area of any computing system or disabling it in any way.

## 7.   General Provisions

(a) Affiliates and Subsidiaries. For purposes of sections 1, 2, 3, 4, and 5 of this Agreement, the term "Company" shall include all affiliates and subsidiaries of Company, all directors, shareholders, and officers of Company, and all directors, shareholders and officers of Company's affiliates and subsidiaries.

(b) Relationships: Nothing contained in this Agreement shall be deemed to make Employee a partner or joint venturer of Company for any purpose.

*CF*

(c)  Severability: If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of Company and Employee.

(d)  Integration: This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both Company and Employee.

(e)  Waiver: The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

(f)  Injunctive Relief: Any misappropriation of any of the Confidential Information in violation of this Agreement may cause Company irreparable harm, the amount of which may be difficult to ascertain, and therefore Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate. This right is to be in addition to the remedies otherwise available to Company.

(g)  Indemnity: Employee agrees to indemnify Company against any and all losses, damages, claims or expenses incurred or suffered by Company as a result of Employee's breach of this Agreement.

(h)  Attorney Fees and Expenses: In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

(i)  Governing Law. This Agreement shall be governed in accordance with the laws of the State of Arizona.

(j)  Jurisdiction. Employee consents to the exclusive jurisdiction and venue of the federal and state courts located in Maricopa County, Arizona in any action arising out of or relating to this Agreement. Employee waives any other venue to which Employee might be entitled by domicile or otherwise.

(k)  Successors & Assigns. This Agreement shall bind each party's heirs, successors and assigns. Company may assign this Agreement to any party at any time. Employee shall not assign any of his or her rights or obligations under this Agreement without Company's prior written consent. Any assignment or transfer in violation of this section shall be void.

## 8.  Signatures

Employee has carefully read all of this Agreement and agrees that all of the restrictions set forth are fair and reasonably required to protect Company's interests. Employee has received a copy of this Agreement as signed by Employee.

**Employee**:

_____ (Signature)

Chris Frenkel (Typed or Printed Name)

Date: 07/01/2015