UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE HURRY FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

     Plaintiffs,

v.                                                                          Case No. 8:18-cv-02869-VMC-CPT

CHRISTOPHER FRANKEL,

     Defendant.

_____/

CHRISTOPHER L. FRANKEL,

     Counter-claimant,

v.

CAYMAN SECURITIES CLEARING
AND TRADING LTD; THE HURRY
FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

     Counter-defendants.

_____/

### Frankel's Answer, Defenses, and Counterclaim to Second Amended Complaint

The defendant, Christopher L. Frankel ("**Frankel**"), through counsel, restates and responds to the allegations of the plaintiffs, The Hurry Family Revocable Trust ("**Hurry Trust**"), Scottsdale Capital Advisors Corporation ("**Scottsdale Capital**"), and Alpine Securities Corporation ("**Alpine Securities**"), in the Second Amended Complaint, as follows:

### Nature Of This Action

1.    This action arises from Defendant's unlawful use of confidential information

1

obtained from Plaintiffs to destroy their businesses, abscond with their clients, and unfairly compete with Plaintiffs.

**Response:** Denied.

**Parties, Jurisdiction, and Venue**

2.      This is an action for damages in excess of $75,000.00, exclusive of interest, costs and attorneys' fees.

**Response:** Admitted for purpose of jurisdiction. Otherwise denied.

3.      Plaintiff, the Hurry Family Revocable Trust (the "Hurry Trust"), is a Nevada trust, and its trustees are permanent citizens of Nevada and Arizona

**Response:** Without knowledge and therefore denied.

4.      Plaintiff Scottsdale Capital Advisors Corporation ("Scottsdale") is a corporation organized and existing under the laws of the State of Arizona, with its principal place of business in Maricopa County, Arizona.

**Response:** Admitted.

5.      Plaintiff Alpine Securities Corporation ("Alpine") is a corporation organized and existing under the laws of the State of Utah, with its principal place of business in Salt Lake County, Utah.

**Response:** Admitted.

6.      Defendant is an individual who resides in Hillsborough County, Florida.

**Response:** Admitted.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1).

**Response:** Admitted for purpose of jurisdiction. Otherwise denied.

8.      This Court has personal jurisdiction over Defendant because Defendant resides in Florida, is engaged in business in the state, and committed many of the tortious

2

acts  alleged herein in the state.

> **Response:**  Admitted that the Court has personal jurisdiction over Frankel because he lives in this District.  Otherwise denied.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and a substantial part of the events giving rise to the claims  herein occurred in this district.

> **Response:**  Admitted that venue is proper in this District because Frankel lives in this District.  Otherwise denied.

## General Allegations

10.     Scottsdale  and  Alpine  are  each  involved  in  the  broker-dealer  business. Scottsdale  is a full service broker-dealer focused on serving the OTC (over the counter) securities market.  Alpine is a registered broker-dealer that is an industry leader for clearing OTC stock. Scottsdale  and Alpine were previously indirectly owned and/or controlled by the Hurry Trust.

> **Response**:  Admitted that Alpine is a registered broker-dealer which clears over-the-counter stocks.  Otherwise denied.

11.     In 2015, Plaintiffs considered hiring Defendant to help run their broker-dealer businesses.  They engaged in discussions with him about the businesses.

> **Response:**   Admitted that Frankel discussed employment with Alpine in 2015. Otherwise denied.

12.     Plaintiffs were aware that these discussions would expose Defendant to, and entrust him with, information that is commercially valuable to Plaintiffs and not generally known or readily ascertainable in the broker-dealer securities industry or the public at large, including

*inter alia*, Plaintiffs' business practices, financial relationships and terms of those relationships, client lists, pricing information, and private financial information of Plaintiffs and their clients. In order to protect this information, Plaintiffs (and others) required Defendant to enter into a written non-disclosure agreement (the "Original NDA") that would limit his use of Plaintiffs' numerous trade secrets and confidential information. Attached hereto as **Exhibit 1** and incorporated by this reference is a true and correct copy of the Original NDA.

> **Response**: Admitted that Frankel entered into the written Non-Disclosure Agreement with Scottsdale, Alpine, and Cayman on or about June 22, 2015, and that the Non-Disclosure Agreement is attached as Exhibit 1 to both the Second Amended Complaint and Frankel's Answer, Defenses, and Counterclaim. Otherwise denied.

13.     According to the Original NDA, it "shall be governed and construed in accordance with the laws applicable tin the State of Arizona."

> **Response**: Admitted.

14.     As acknowledged in the Original NDA, Defendant was exposed to information that is the "sole property" of the Plaintiffs "and highly confidential in nature."

> **Response:** Denied.

15.     According to the Original NDA: "Confidential Information" means any data or information that is proprietary to the Plaintiffs and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed."

> **Response:** Denied.

16.     Per the Original NDA, Defendant agreed that "[w]ithin ten business days of receipt of the [Plaintiffs'] written request, the [Defendant] will return to the [Plaintiffs] all documents, records and copies thereof containing Confidential Information."

**Response:**  Denied.

17.    Plaintiffs ultimately hired Defendant.  From approximately July 2015 through July 2018, Defendant served as CEO of Alpine, and from July 2018 through September 2018 was a consultant to Alpine.

> **Response:**  Admitted that Alpine employed Frankel from approximately August 2015 through July 2018, and that Alpine thereafter engaged Frankel as a consultant from approximately August 2018 through October 2018.  Otherwise denied.

18.    On July 1, 2015, Alpine, Scottsdale, and Defendant entered into a second nondisclosure agreement entitled the "Employee Nondisclosure & Computer Use Agreement" ("Employee NDA"), which superseded the Original NDA with regard to protecting Alpine and Scottsdale's numerous trade secrets and confidential information.  Attached hereto as **Exhibit 2** and incorporated by this reference is the Employee NDA.

> **Response**:  Admitted that Frankel entered into the Employee Nondisclosure & Computer Use Agreement with Alpine and Scottsdale on or about July 1, 2015, attached as Exhibit 2 both to the Second Amended Complaint and Frankel's Answer, Defenses, and Counterclaim.  Otherwise denied.

19.    Alpine and Scottsdale require all of their employees to enter into similar employee nondisclosure agreements to limit the use and exposure of their confidential information.

> **Response:**  Without knowledge and therefore denied.

20.    According to the Employee NDA, it "shall be governed in accordance with the laws of the State of Arizona."

> **Response:**  Admitted.

21.     Per paragraph 2 of the Employee NDA, "Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company."

**Response:** Denied.

22.     Under the Employee NDA, Confidential Information is defined as:

(a) technical information concerning Company's products and services, including product know-how, formulas, designs, devices, diagrams, software code, test results, processes, inventions, research projects and product development, technical memoranda and correspondence; (b) information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies; (c) information concerning Company's employees, including salaries, strengths, weaknesses and skills; (d) information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and (e) any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business. Response:

**Response:** Denied.

23.     Paragraph 4 of the Employee NDA provides: "When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information."

**Response:** Denied.

24.     Beginning in or about June 2015, and continuing through September 2018, Defendant received Confidential Information from each of Plaintiffs, including *inter alia*, the Plaintiffs' business practices, financial relationships and terms of those relationships, client lists,

pricing information, and private financial information of the Plaintiffs and their clients.

     **Response**: Denied.

     25.    Unbeknownst to Plaintiffs, and in violation of the Original NDA and the Employee NDA, on August 15, 2016, August 28, 2016, September 9, 2016, October 6, 2016, October 13, 2016, October 14, 2016, November 8, 2016, January 3, 2017, April 12, 2017, May 2, 2017, July 13, 2017, August 31, 2017, July 31, 2018, August 8, 2018, September 18, 2018, October 7, 2018, Defendant forwarded emails containing Confidential Information from his employee email account to his personal email account.

     **Response**: Denied.

     26.    Defendant's employment was terminated in September 2018.

     **Response**: Denied.

     27.    On November 9, 2018, Plaintiffs sent a letter to Defendant, requesting the return of all documents, records, and/or copies thereof in his possession, custody, or control that contain any Confidential Information.

     **Response**:  Admit that counsel for the plaintiffs sent Frankel the letter and email attached to this Answer, Defenses, and Counterclaim as Exhibits 3(a) and 3(b). Otherwise denied.

     28.    In violation of the Original NDA and the Employee NDA, Defendant did not return numerous documents containing Confidential Information to Plaintiffs.

     **Response**: Denied.

     29.    Rather, after his termination, Defendant continued to access his work email and forward himself additional Confidential Information, including three on October 7, 2018.

     **Response**: Denied.

30.     Plaintiffs are informed and believe that after leaving Alpine, if not earlier, Defendant knowingly and willfully used Confidential Information obtained from Plaintiffs for his own benefit. Specifically, Defendant used Plaintiffs' Confidential Information to solicit capital and establish financial relations so that it could make a bid for a broker-dealer in Chicago.

**Response**: Denied.

31.     Defendant further engaged in unfair competition against Plaintiffs by using the Plaintiffs' Confidential Information to create a broker-dealer that could provide fees and services competitive to Alpine and then using Plaintiffs' Confidential Information to solicit their top clients.

**Response:** Denied.

## COUNT I:  BREACH OF CONTRACT

32.     Plaintiffs incorporate by reference all of the preceding paragraphs as though fully restated herein.

**Response**:  Frankel incorporates his preceding responses in response to this paragraph.

33.     The Original NDA, to which Defendant agreed to be bound, constitutes a valid and enforceable contract between the Hurry Trust, on the one hand, and Defendant, on the other hand.

**Response**: Denied.

34.     On October 7, 2018, Defendant sent an email from his Alpine email account to his personal email account that contained The First Amendment to the Hurry Family Revocable Trust, a Certificate of Trust regarding the Hurry Trust, and portions of the Hurry Trust document (collectively, "Confidential Trust Information").  The foregoing Confidential Trust Information constitutes Confidential Information under paragraph 1(a) of the Original NDA in that such

information is proprietary to the Hurry Trust and not generally known to the public.

**Response**: Denied.

35.     Per paragraph 5 of the Original NDA, on November 9, 2018, the Hurry Trust, through counsel, sent a written request to Defendant demanding the return of all documents, records and copies thereof that contain any Confidential Information, which would include the Confidential Trust Information.

**Response**: Denied.

36.     In breach of paragraph 5 of the Original NDA, Defendant failed and refused to return to the Hurry Trust the Confidential Trust Information within ten (10) business days of the Hurry Trust's demand.

**Response**: Denied.

37.     As a direct and proximate result of Defendant's breaches of the Original NDA, the Hurry Trust has suffered and will continue to suffer irreparable harm and economic damages.

**Response**: Denied.

38.     Moreover, it was foreseeable that the Hurry Trust would suffer damages if Defendant withheld its Confidential Information, despite the Hurry Trust's request for its return.

**Response**: Denied.

### <u>COUNT II:  BREACH OF CONTRACT</u>

39.     Plaintiffs incorporate by reference all of the preceding paragraphs as though fully restated herein.

**Response**:  Frankel incorporates his responses to the preceding paragraphs in response to this paragraph.

40.     The Employee NDA, to which Defendant agreed to be bound, constitutes a valid

and enforceable contract between Alpine and Scottsdale, on the one hand, and Defendant, on the other hand.

**Response**: Denied.

41.　　Notwithstanding Defendant's obligations under the Employee NDA, Alpine and Scottsdale are informed and believe that he knowingly disclosed the following Confidential Information to third parties in breach of paragraph 2 of the Employee NDA:

a.　　Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

**Response**: Denied.

b.　　Statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market;

**Response**: Denied.

c.　　A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

**Response**: Denied.

d.　　A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

**Response**: Denied.

e.      An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

**Response**:  Denied.

f.      An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer.

**Response**:  Denied.

42.     In addition, Defendant breached paragraph 2 of the Employee NDA by using the following Confidential Information of Alpine and Scottsdale for his own benefit:

a.      Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

**Response**:  Denied.

b.      Statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market;

**Response**:  Denied.

c.      Alpine's blanket fidelity bond for fiscal year ending November 1, 2017;

**Response**:  Denied.

d.      A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

**Response**:  Denied.

e.      An April 13, 2018 email from the general counsel for Alpine with a draft employment agreement (that Defendant requested for use as a template);

**Response**: Denied.

f.      A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

**Response**: Denied.

g.      An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

**Response**: Denied.

h.      A July 12, 2017 email from a consultant for Alpine that included the consulting agreement between consultant and Alpine;

**Response**: Denied.

i.      An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer;

**Response**: Denied.

j.      Internal emails from September and October 2016 that included Financial and Operations Principal's report dated April 18, 2016;

**Response**: Denied.

43.     Defendant also breached paragraph 3 of the Employee NDA by failing to promptly return all documents containing Confidential Information to Alpine and Scottsdale upon his termination, including but limited to the following documents:

a.      Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's

income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

**Response**: Denied.

b.      Statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market;

**Response**: Denied.

c.      Alpine's blanket fidelity bond for fiscal year ending November 1, 2017;

**Response**: Denied.

d.      A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

**Response**: Denied.

e.      An April 13, 2018 email from the general counsel for Alpine with a draft employment agreement (that Defendant requested for use as a template);

**Response**: Denied.

f.      A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

**Response**: Denied.

g.      An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

**Response**: Denied.

h.      A July 12, 2017 email from a consultant for Alpine that included the

consulting agreement between consultant and Alpine;

**Response**: Denied.

i.      A confidential letter dated February 22, 2017 from FINRA to Alpine

with a request for information;

**Response**: Denied.

j.      An April 12, 2017 email from counsel for Alpine that contained a

consultant agreement with the law firm to support its representation of Alpine and

Scottsdale;

**Response**: Denied.

k.      January 3, 2017 email from FINRA to Alpine regarding due diligence documents;

**Response**: Denied.

l.      Internal email correspondence from September 2016 and October 2016

regarding Alpine and Scottsdale's proposed fee schedule;

**Response**: Denied.

m.      An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance

officer;

**Response**: Denied.

n.      Internal emails from September and October 2016 that included Financial

and Operations Principal's report dated April 18, 2016;

**Response**: Denied.

o.      Internal emails from August 2016 that included drafts of Alpine's

correspondent fees and customer fee schedules;

**Response**: Denied.

p.      An August 19, 2016 email from FINRA regarding certain proposed changes
in Scottsdale's business operations.

**Response**: Denied.

44.     As a direct and proximate result of Defendant's breaches of the Employee
NDA, Alpine and Scottsdale have suffered and will continue to suffer irreparable harm and
economic damages.

**Response**: Denied.

45.     Moreover, it was foreseeable that Alpine and Scottsdale would suffer damages
if Defendant disclosed Confidential Information to third parties, and used Confidential
Information for his own benefit.

**Response**: Denied.

## COUNT III:  VIOLATION OF DEFEND TRADE SECRETS ACT

46.     Plaintiffs incorporate by reference all of the preceding paragraphs as though
fully restated herein.

**Response**: Frankel incorporates his responses to the preceding paragraphs in response
to this paragraph.

47.      During the course of his relationship with Alpine and Scottsdale, Defendant had
access to confidential financial, business, and economic information of independent economic
value, including *inter alia*:

a.      Alpine's annual audit report for the fiscal year ending September 20, 2016 that
included a statement of Alpine's financial condition, statement of Alpine's income,

statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements;

**Response**: Denied.

b.      Statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money market;

**Response**: Denied.

c.      Alpine's blanket fidelity bond for fiscal year ending November 1, 2017;

**Response**: Denied.

d.      A May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

**Response**: Denied.

e.      A July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount;

**Response**: Denied.

f.      An August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls;

**Response**: Denied.

g.      An internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer;

**Response**: Denied.

h.      Internal emails from September and October 2016 that included Financial and

16

Operations Principal's report dated April 18, 2016 (collectively, the "Trade Secrets").

**Response**: Denied.

48.     Alpine and Scottsdale took reasonable measures to safeguard their Trade Secrets by, among other things, requiring employees and consultants to enter into Employee Nondisclosure Agreements, restricting access to the Trade Secrets, and taking other security measures to protect their confidentiality.

**Response**: Denied.

49.     Alpine and Scottsdale derive independent economic value, actual and potential, from their Trade Secrets not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

**Response**: Denied.

50.     Defendant gained access to Alpine's and Scottsdale's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

**Response**: Denied.

51.     Without Alpine's or Scottsdale's express or implied consent, Defendant misappropriated, disclosed, and used the Trade Secrets for his own benefit. Specifically, Alpine and Scottsdale are informed and believe that Defendant used (1) Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements; (2) statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value and cash/money

market; (3) Alpine's blanket fidelity bond for fiscal year ending November 1, 2017; (4) a May 7, 2018 email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility; (5) a July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount; (6) an August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls; (7) an internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer; and (8) a Financial and Operations Principal's report dated April 18, 2016 to solicit capital and establish financial relations so that he could make a bid for a broker-dealer in Chicago.

**Response**: Denied.

52.     At the time of Defendant's misappropriation, disclosure, and use of Alpine's and Scottsdale's Trade Secrets, Defendant knew or had reason to know that his knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

**Response**: Denied.

53.     As a direct and proximate result of Defendant's misappropriation, Alpine and Scottsdale suffered and will continue to suffer economic damages.

**Response**: Denied.

54.     Pursuant to 18 U.S.C. § 1836, Alpine and Scottsdale are entitled to an injunction to prevent the actual or threatened misappropriation of their Trade Secrets and/or requiring affirmative actions to protect the Trade Secrets, an award of damages for the actual loss caused by Defendant's misappropriation, damages for unjust enrichment caused by the  misappropriation, and/or a reasonable royalty, as well as attorneys' fees and costs.

**Response**:  Denied.

55.     Because Defendant willfully and maliciously misappropriated Alpine and Scottsdale's Trade Secrets, Plaintiffs also are entitled to exemplary damages.

**Response**:  Denied.

COUNT IV: VIOLATION OF FLORIDA UNIFORM TRADE SECRET ACT

56.     Plaintiffs incorporate by reference all of the preceding paragraphs as though fully restated herein.

**Response**:  Frankel adopts his preceding responses in response to this paragraph.

57.     During the course of his relationship with Alpine and Scottsdale, Defendant had access to Alpine's and Scottsdale's Trade Secrets.

**Response**:  Denied.

58.     Alpine and Scottsdale lawfully owned the Trade Secrets.

**Response**:  Denied.

59.     Alpine and Scottsdale took reasonable measures to safeguard their Trade Secrets by, among other things, requiring employees and consultants to enter into nondisclosure agreements, restricting access to the Trade Secrets, and taking other security measures to protect their confidentiality.

**Response**:  Denied.

60.     Alpine and Scottsdale derive independent economic value, actual and potential, from their Trade Secrets not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

**Response**:  Denied.

61.    Defendant gained access to Alpine's and Scottsdale's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

**Response**: Denied.

62.    Without Plaintiffs' express or implied consent, Defendant misappropriated, disclosed, and used the Trade Secrets for his own benefit and to unfairly compete against Alpine and Scottsdale. Specifically, Alpine and Scottsdale are informed and believe that Defendant used (1) Alpine's annual audit report for the fiscal year ending September 20, 2016 that included a statement of Alpine's financial condition, statement of Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, computation for determination of PAB account reserve requirements; (2) statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of  accounts, market value and cash/money market; (3) Alpine's blanket fidelity bond for fiscal year  ending November 1, 2017; (4) a May 7, 2018 email from an attorney for Alpine that included a  term sheet for a multi-million dollar secured revolving credit facility; (5) a July 31, 2018 internal email regarding Alpine's fee schedule that included a listing of Alpine's top-50 accounts by commission amount; (6) an August 21, 2017 email from the general counsel of Scottsdale that included a term sheet for a loans to Alpine to fund National Securities Clearing Corporation calls; (7) an internal audit report dated May 1, 2016 prepared by Alpine's chief compliance officer; and (8) a Financial and Operations Principal's report dated April 18, 2016 to solicit capital and establish financial relations so that he could make a bid for a broker-dealer in Chicago.

**Response**: Denied.

63.     Defendant is a competitor of Alpine and Scottsdale for a common pool of customers and clients, financial institutions, and investors in the broker-dealer business.

**Response**:  Denied.

64.     As a direct and proximate result of Defendant's unauthorized misappropriation and use of the Alpine's and Scottsdale's Trade Secrets, Alpine and Scottsdale, and each of them, have suffered and will continue to suffer irreparable harm and economic damages.

**Response**:  Denied.

<u>**Affirmative Defenses**</u>

1.     The Second Amended Complaint fails to state causes of action by failing to make plausible, factual allegations to support the claims alleged against Frankel, all of which are based on misappropriation.  Specifically, the Second Amended Complaint fails to identify any "third party" to whom Frankel allegedly disclosed confidential information, fails to allege how Frankel allegedly used the confidential information for his own benefit, and fails to allege what Frankel did to misappropriate the confidential information.

2.     The Hurry Trust is not a "Discloser" company under the Non-Disclosure Agreement, so the Hurry Trust has no claim under the Non-Disclosure Agreement.  The Hurry Trust apparently took no steps to protect its confidential information because the Hurry Trust chose not to join in the Non-Disclosure Agreement.  The Hurry Trust thus has no claim.

3.     The plaintiffs have no claims because they failed to designate any information as confidential, as required by the Non-Disclosure Agreement.  The Non-Disclosure Agreement required the plaintiffs to designate information as confidential.  Paragraph 1(a) thus stated in pertinent part: "Confidential Information need not be novel, unique, patentable, copyrightable or constitute a trade secret in order to be *designated* Confidential Information."  (Italics

added).   The   plaintiffs   did   not   designate   as   confidential   the   information   allegedly misappropriated by Frankel.

4.      The   plaintiffs   failed   to   perform   a   condition   precedent   before   suing   Frankel because the plaintiffs ignored Frankel's timely response and offer to comply with their pre-suit demand letter.   On November 9, 2018, plaintiffs' counsel sent Frankel the email and letter attached as **Exhibits 3(A)** and **3(B)**, demanding that Frankel "**cease and desist** from any and all further disclosure and/or usage of Confidential Information…." The plaintiffs demanded further that Frankel return "any and all documents, records, and/or copies thereof in your possession, custody, or control that contain any Confidential Information no later than the close of business on **November 26, 2018.**  Please confirm in writing by **12 p.m. PST on November 12, 2018** that the foregoing demands will be, and are being, fully complied with."

Frankel timely responded to plaintiffs' counsel's demand at 10:40 am EST on November 12, 2018, and offered to comply with their demand.  Frankel sent the email attached as **Exhibit 4**, in which he responded: "I have not knowingly committed a breach of any component of my agreement.  If you are in possession of any specifics regarding the alleged breach, kindly reply and I will respond appropriately."

Frankel wrote further: "I am willing to search for any Confidential documents that may be  in  my  possession.   Please  let  me  know  what  documents  you  believe  I  have  that  are confidential and I will provide those to you.  If you are not able to provide specifics pertaining to the  documents  you  seek,  simply  let  me  know  and  I  will  provide  a  copy  of  all  documents  and communications from your clients which are in my possession."

The plaintiffs ignored Frankel's timely offer to comply with their demand, opting instead to  sue  on  November 21, 2018.   The  plaintiffs  thus  failed  to  fulfill  a  condition  precedent  to

bringing this action by refusing to notify Frankel what the plaintiffs believed he had done to misappropriate their information, by refusing to identify which documents the plaintiffs considered confidential, and by ignoring Frankel's offer to return all of the plaintiffs' documents if the plaintiffs could not identify the documents which the plaintiffs considered confidential.

5.      By their inequitable conduct and unclean hands alleged in the preceding defense, the plaintiffs forfeited any claim for injunctive or other equitable relief.

6.      The Non-Disclosure and Employee Non-Disclosure Agreements attached to the Second Amended Complaint and this Answer, Defenses, and Counterclaim are unenforceable under Arizona law because the Agreements purport to be unlimited in time and geographic scope.

7.      Frankel is entitled to set-off and judgment against the plaintiffs for all damages, attorney's fees, costs, and litigation expenses awarded on his counterclaim.

8.      Frankel is entitled to set-off and judgment against the plaintiffs, including Cayman Securities Clearing and Trading Ltd ("**Cayman Securities**"), for his attorney's fees and costs on the plaintiffs' unsuccessful, withdrawn, and / or abandoned claims based on the fee provisions in the operative Agreements and in the statutes under which the plaintiffs sued.

9.      Paragraph 5 of the Employee Non-Disclosure Agreement (attached as Exhibit 2) required information to qualify as a trade secret to be confidential.  Paragraph 5 thus states: "Employee's obligation to maintain the confidentiality and security of Confidential Information remains even after Employee's employment with Company ends and *continues for so long as such Confidential Information remains a trade secret.*"  (Italics added).  Plaintiffs have no claims because their alleged confidential information does not (and did not) qualify for protection under trade secret law.

10.     The plaintiffs knew that Frankel worked from home using his home computer and personal email accounts, and the plaintiffs permitted him to do so.  The plaintiffs have waived and / or are estopped from asserting any claim the Frankel breached the Agreements or misappropriated information based on the plaintiffs' knowledge and authorization of Frankel's work on his home computer and personal email accounts.

WHEREFORE, Frankel requests that the Second Amended Complaint be dismissed; that Frankel be awarded his costs, litigation expenses, and attorney's fees under all statutes under which the plaintiffs have sued including Arizona Revised Statute §12-341.01, 18 USC § 1836(b)(3)(D), Fla. Stat. § 688.005, and Fla. Stat. §§ 501.2105 and 501.211, and the Non-Disclosure and Employee Non-Disclosure Agreements attached as Exhibits 1 and 2; that Frankel be awarded his costs and attorney's fees on the plaintiffs' unsuccessful, abandoned, and/or withdrawn claims; and that Frankel be awarded such other relief as the Court deems proper.  Frankel further demands trial by jury.

## Frankel's Counterclaim Against Plaintiffs and Demand for Jury Trial

Frankel counter-sues all of the plaintiffs, Cayman Securities, Hurry Trust, Scottsdale Capital, and Alpine Securities, for a declaratory judgment under 28 U.S.C. § 2201, counter-sues Cayman Securities for malicious prosecution, and alleges:

## Count I – Declaratory Judgment Against All Plaintiffs

1.     In their complaints, the plaintiffs asserted spurious claims against Frankel for breaches of contract, misappropriation of trade secrets under the Federal and Florida Trade Secret Acts, violation of Florida's Unfair and Deceptive Trade Practices Act, and common law unfair competition.

2.      The plaintiffs had and have no probable cause or evidence to support their spurious allegations.

3.      Frankel did not breach the Non-Disclosure or Employee Non-Disclosure Agreements attached as Exhibits 1 and 2, did not misappropriate the plaintiffs' trade secrets and / or confidential information, did not violate Florida's Unfair and Deceptive Trade Practices Act, and did not compete unfairly against the plaintiffs.

4.      The plaintiffs never designated any of their information as confidential, as required by the Non-Disclosure and/or Employee Non-Disclosure Agreements.

5.      The plaintiffs refused to disclose to Frankel what documents the plaintiffs considered to be confidential.

6.      The plaintiffs ignored Frankel's offer to return all of their documents.

7.      The information belatedly alleged by plaintiffs to be confidential is not confidential or protected by the trade secret law.

8.      The plaintiffs knew that Frankel worked from home and used his home email to work for Alpine, and the plaintiffs authorized him to do so.

9.      By their spurious allegations of depraved misconduct, the plaintiffs have damaged, and are continuing to damage, Frankel's reputation, and employment and business opportunities.

10.      The plaintiffs never obtained or requested a non-competition or non-solicitation agreement from Frankel.

11.      Frankel is entitled to re-enter the securities business, to compete with the plaintiffs, and to solicit the plaintiffs' clients if Frankel wishes to do so.

12.     The plaintiffs allegedly dispute Frankel's ability to re-enter the securities business, compete with the plaintiffs, and solicit their clients. Through their complaints in this lawsuit, the plaintiffs have been maliciously prosecuting Frankel by unlawfully attempting to convert the Non-Disclosure and Employee Non-Disclosure Agreements into non-compete or non-solicitation agreements and thereby to damage Frankel's reputation and to impair his employment and business opportunities.

13.     The plaintiffs' lawsuit has caused doubt about Frankel's obligations under the Non-Disclosure and Employee Non-Disclosure Agreements and specifically what information, if any, is confidential under the Agreements.

14.     Absent the declaratory relief sought by Frankel, the plaintiffs' allegedly substantial and continuing controversy with Frankel regarding the Agreements will continue.

15.     There is a real and immediate threat that Frankel's unresolved dispute with the plaintiffs regarding the Agreements will continue to damage Frankel's reputation and to impair Frankel's employment and business opportunities.

16.     An actual controversy exists for which a declaratory judgment is appropriate to restore Frankel's reputation, and to remove the cloud on his employment and business opportunities caused by the plaintiffs' malicious, abusive, and frivolous lawsuit.

17.     Frankel reserves his right to amend his counterclaim to sue for malicious prosecution (and all other available claims) upon termination of the plaintiffs' lawsuit in his favor.

WHEREFORE, Frankel requests a jury trial and entry of a declaratory judgment under 28 U.S.C. § 2201 against all plaintiffs, Cayman Securities, Hurry Trust, Scottsdale Capital, and Alpine Securities, as follows:

(a) declaring Frankel's obligations under the Agreements and identifying the confidential information, if any, that Frankel is prohibited from using or disclosing;

(b) declaring that Frankel is entitled to compete with plaintiffs and solicit plaintiffs' clients and that such competition and solicitation does not breach the Agreements, does not constitute misappropriation of the plaintiffs' trade secrets or confidential information, does not violate Florida's Unfair and Deceptive Trade Practices Act, and does not constitute unlawful, unfair, or dishonorable competition with the plaintiffs; and

(c) awarding Frankel his costs and attorney's fees incurred in bringing this counterclaim and granting any further relief deemed appropriate to protect Frankel's rights and interests.

## Count II – Malicious Prosecution Against Cayman Securities

18.     Frankel reasserts in this paragraph the preceding allegations in his counterclaim.

19.     Cayman Securities has admitted that it owns no confidential information allegedly misappropriated by Frankel.

20.     Cayman Securities caused its claims in this lawsuit to be brought against Frankel without probable cause and with malicious intent unlawfully to impair Frankel's employment and investment opportunities in the securities business and to damage his reputation.

21.     The Court dismissed Cayman Securities' claims against Frankel, and Cayman Securities did not file amended claims within the time period that the Court authorized Cayman Securities to file amended claims.

22.     The dismissal of Cayman Securities' claims and failure to file amended claims within the authorized time period against Frankel is a bona fide determination of Cayman Securities' lawsuit against Cayman Securities and for Frankel.

23.     Cayman Securities' malicious prosecution of Frankel, unlawfully to impair his employment and investment opportunities in the securities business, and to damage his reputation, warrants an award of exemplary damages against Cayman Securities.

24.     Cayman Securities' malicious prosecution of Frankel has caused damages including damage to reputation, loss of employment and investment opportunities, and attorney's fees and costs incurred in successfully defending Cayman Securities' dismissed lawsuit.

WHEREFORE, Frankel demands judgment against Cayman Securities for compensatory and punitive damages, attorney's fees and costs, interest, and such other relief as the Court deems proper.  Frankel further demands trial by jury.

Dated: July 16, 2019

*/s/ David C. Banker*
David C. Banker (Fla. Bar No. 352977)
Harold D. Holder (Fla. Bar No. 118733)
BUSH ROSS, PA
1801 N. Highland Avenue
Tampa, Florida 33602
Phone: 813-224-9255
Fax:    813-223-9620
Primary: dbanker@bushross.com;
hholder@bushross.com
Secondary: aflowers@bushross.com
ahill@bushross.com
*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 16, 2019, all counsel of record who consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to any non-CM/EFC participants:

Shane B. Vogt, Esquire
Kenneth G. Turkel, Esquire
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, FL  33602
kturkel@bajocuva.com
svogt@bajocuva.com

Charles J. Harder, Esquire
Jordan Susman, Esquire
HARDER LLP
132 South Rodeo Drive, Suite 301
Beverly Hills, CA 90212-2406
charder@harderllp.com
jsusman@harderllp.com
*Attorneys for Plaintiffs*

By:  */s/ David C. Banker*

6B0977702.DOCX