## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO. 8:18-cv-02869-VMC-CPT

THE HURRY FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS CORPORATION;
and ALPINE SECURITIES CORPORATION,

    Plaintiffs,

-vs-

CHRISTOPHER FRANKEL,

    Defendant.
_____/

CHRISTOPHER FRANKEL,

    Counter-claimant,

-vs-

CAYMAN SECURITIES CLEARING
AND TRADING LTD; THE HURRY
FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

    Counter-defendants.
_____/

DEPOSITION OF:    JOHN JOSEPH HURRY
DATE TAKEN:    Wednesday, August 7, 2019
TIME:    9:27 a.m. to 2:38 p.m.
PLACE:    Bush Ross, P.A.
    1801 North Highland Avenue
    Tampa, Florida
REPORTED BY:    Niki Noojin, RPR, FPR
    Notary Public
    State of Florida at Large

## Page 2

```
 1   APPEARANCES:
 2   JORDAN SUSMAN, ESQUIRE
       Harder LLP
 3     132 South Rodeo Drive
       Suite 301
 4     Beverly Hills, California 90212-2406
       424.203.1600
 5     jsusman@harderllp.com
 6       Appearing on behalf of the Plaintiffs
 7
     DAVID C. BANKER, ESQUIRE
 8   HAROLD D. HOLDER, ESQUIRE
       Buss Ross, P.A.
 9     1801 North Highland Street
       Tampa, Florida 33602
10     813.224.9255
       dbanker@bushross.com
11     hholder@bushross.com
12       Appearing on behalf of the Defendants
13
14   ALSO PRESENT:
15     Mr. Christopher Frankel
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                    I N D E X
 2   TESTIMONY OF JOHN JOSEPH HURRY:          PAGE
 3   Direct Examination by Mr. Banker         7
 4   Certificate of Reporter                  206
 5   Certificate of Oath                      207
 6   Errata Sheet                             208
 7   Letter to Deponent                       209
 8             - - - - -
 9
                  E X H I B I T S
10
     EXHIBIT NUMBER                       PAGE
11
     Exhibit Number 1                     15
12     Notice of Taking Depositions
13   Exhibit Number 2                     20
       Second Amended Complaint and Demand
14     for Jury Trial
15   Exhibit Number 3                     23
       Scottsdale Capital Advisors,
16     Non-Disclosure and Confidentiality
       Agreement
17
18   Exhibit Number 4                     36
       Employee Nondisclosure & Computer Use
19     Agreement
20   Exhibit Number 5                     82
       Alpine Trade Run
21   Exhibit Number 6                     91
       E-mail from Chris Frankel dated
22     October 7, 2018, with attachments,
       Bates Number 1581 to 2242
23
     Exhibit Number 7                     105
24     E-mail from Chris Frankel dated
       October 7, 2018, with attachments,
25     Bates Number 1511 to 1568
```

## Page 4

```
 1   Exhibit Number 8                     113
 2     E-mail from Chris Frankel dated
       October 7, 2018, with attachments,
 3     Bates Number 1502 to 1510
 4   Exhibit Number 9                     116
       E-mail from Chris Frankel dated
 5     September 18, 2018 with attachments,
       Bates Number 1497 to 1501
 6   Exhibit Number 10                    120
       E-mail from Chris Frankel dated
 7     August 8, 2018, and Employment
       Agreement
 8
 9   Exhibit Number 11                    122
       E-mail from Chris Frankel dated
10     August 8, 2018 with attachment, Bates
       Number 1456 to 1458
11   Exhibit Number 12                    124
       E-mail from Chris Frankel dated July
12     31, 2018, with attachment, Bates
       Number 1424 to 1429
13
14   Exhibit Number 13                    133
       E-mail from Chris Frankel dated
15     August 31, 2017, with attachment,
       Bates Number 1235 to 1239
16   Exhibit Number 14                    135
       E-mail from Chris Frankel dated July
17     31, 2017 with attachment, Bates
       Number 1212 to 1222
18
19   Exhibit Number 15                    138
       E-mail from Chris Frankel dated July
20     13, 2017, with attachments, Bates
       Number 1223 to 1230
21   Exhibit Number 16                    139
       E-mail from Chris Frankel dated May
22     2, 2017, with attachment, Bates
       Number 1186 to 1195
23
     Exhibit Number 17                    140
24     E-mail from Chris Frankel dated April
       12, 2017, with attachment, Bates
25     Number 1169 to 1174
```

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

## Page 5

| | | |
|---|---|---|
| 1 | Exhibit Number 18 | 141 |
| 2 | E-mail from Chris Frankel dated January 3, 2017, Bates Number 1031 | |
| 3 | Exhibit Number 19 | 142 |
| 4 | E-mail from Chris Frankel dated January 3, 2017, Bates Number 1029 and 1030 | |
| 5 | | |
| 6 | Exhibit Number 20 | 143 |
| | E-mail from Chris Frankel dated November 8, 2016, with attachment, | |
| 7 | Bates Number 1016 to 1019 | |
| 8 | Exhibit Number 21 | 144 |
| 9 | E-mail from Chris Frankel dated October 14, 2016, Bates Number 1007 to 1009 | |
| 10 | | |
| 11 | Exhibit Number 22 | 146 |
| | E-mail from Chris Frankel dated October 14, 2016, with attachment, | |
| 12 | Bates Number 1002 to 1006 | |
| 13 | Exhibit Number 23 | 147 |
| 14 | E-mail from Chris Frankel dated October 13, 2016, with attachments, Bates Number 976 to 1001 | |
| 15 | | |
| 16 | Exhibit Number 24 | 148 |
| | E-mail from Chris Frankel dated October 6, 2016, with attachment, | |
| 17 | Bates Number 957 to 973 | |
| 18 | Exhibit Number 25 | 150 |
| 19 | E-mail from Chris Frankel dated September 9, 2016, with attachments, Bates Number 944 to 949 | |
| 20 | | |
| 21 | Exhibit Number 26 | 151 |
| | E-mail from Chris Frankel dated August 28, 2016, Bates Number 933 to | |
| 22 | 935 | |
| 23 | Exhibit Number 27 | 152 |
| 24 | E-mail from Chris Frankel dated August 15, 2016, with attachment, Bates Number 917 to 922 | |
| 25 | | |

## Page 6

| | | |
|---|---|---|
| 1 | Exhibit Number 28 | 154 |
| 2 | E-mail from Marcie Moreno dated June 25, 2019, and Plaintiffs' Disclosure of Expert Testimony | |
| 3 | | |
| 4 | Exhibit Number 29 | 156 |
| | Trend Report for 12 Periods Ending 5/31/2019 | |
| 5 | | |
| 6 | Exhibit Number 30 | 156 |
| | Trend Report For 12 Periods Ending 12/31/2018 | |
| 7 | | |
| 8 | Exhibit Number 31 | 156 |
| | Financial and Operational Combined Uniform Single Report | |
| 9 | | |
| 10 | Exhibit Number 32 | 156 |
| | SCA Profit & Loss statements | |
| 11 | Exhibit Number 33 | 156 |
| | Trend Report | |
| 12 | | |
| 13 | Exhibit Number 34 | 156 |
| | SCA Profit & Loss January through June 2019 | |
| 14 | | |
| 15 | Exhibit Number 35 | 177 |
| | E-mail from Chris Frankel dated August 15, 2016, with attachment, | |
| 16 | Bates Number 917 to 922 | |
| 17 | Exhibit Number 36 | 179 |
| | Complaint | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

## Page 7

1   THE REPORTER:  Would you raise your right
2 hand, please, sir.
3   Do you solemnly swear the testimony you are
4 about to give will be the truth, the whole truth,
5 and nothing but the truth?
6   THE WITNESS:  I do.
7   JOHN JOSEPH HURRY,
8 having been first duly sworn, was examined and testified
9 upon his oath as follows:
10   DIRECT EXAMINATION
11 BY MR. BANKER:
12   Q   Please state your full name.
13   A   John Joseph Hurry.
14   Q   Where do you live?
15   A   I have a couple different residences, but my
16 U.S. residence is 1466 Pittman Terrace, Glenbrook,
17 Nevada.
18   Q   What is your occupation?
19   A   I would say semiretired.
20   Q   Semiretired implies that you're -- you have
21 some part-time occupation perhaps?
22   A   Businesses, other businesses within the family
23 trust.
24   Q   Okay.  What do you mean "other businesses
25 within the family trust"?

## Page 8

1   A   Just businesses.
2   Q   Okay.  Running those businesses?
3   A   I don't run them, no.
4   Q   Okay.  What -- what -- I'm just trying to
5 understand.  When you said "semiretired," what is your
6 role with those businesses in the trust?
7   A   Some of those businesses I have control over.
8   Q   Okay.  What about the businesses at issue in
9 this case, specifically Cayman, Scottsdale Capital, and
10 Alpine Securities?
11   A   Cayman I do have control of.
12   Q   Okay.  And what about Alpine and Scottsdale?
13   A   Well, I can have control.  Right now my wife
14 is exercising that control.
15   Q   Why did you not -- why can't you have control?
16   A   I actually can.  I just choose not to.
17   Q   Okay.  You could have control?
18   A   Sure.
19   Q   Okay.  I don't begin to understand all the
20 regulatory stuff involving your -- your business, but
21 was there some type of an order by FINRA or the SEC that
22 prevented you from having control over Alpine and
23 Scottsdale?
24   A   For a brief period, maybe two weeks.
25   Q   But that's over with now?

2 (Pages 5 to 8)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 9

```
 1      A   Yes.
 2      Q   Okay.  But -- and so what you're doing now is
 3   that you exercise control through your wife, Justine?
 4      A   No.  I'm just representing the company for the
 5   personal knowledgeable to answer these questions today.
 6      Q   Yeah.  I'm sorry.  That was a bad question.  I
 7   did not make myself clear.
 8          In terms of control, not for this deposition,
 9   but control over Alpine and Scottsdale, you could have
10   control over those companies --
11      A   Yes.
12      Q   -- today, but you choose to exercise control
13   through your wife.  Is that what's going on?
14      A   No.  I think that's not phrased properly, no.
15      Q   Your wife has control?
16      A   My wife is the person who is actually in
17   control of the managers of the LLCs that own the
18   companies.
19      Q   Okay.  What is your ownership interest in --
20   either directly or indirectly in Scottsdale and Alpine
21   and Cayman?
22      A   I'm a beneficiary of the trusts that own the
23   holding companies.
24      Q   Okay.  So the trust -- that is The Hurry
25   Family Revocable Trust described in your complaint?
```

Page 10

```
 1      A   At the time when that was signed, it was the
 2   trust.  It's no longer.
 3      Q   The trust doesn't exist anymore?
 4      A   No.  It's no longer the indirect owner of the
 5   holder companies.
 6      Q   Okay.  But when the complaint was filed, the
 7   Hurry trust was the owner of the holding companies?
 8      A   It was not.
 9      Q   Okay.  When did it cease being the owner of
10   the holding companies?
11      A   I don't recall, but it was probably two, three
12   years ago.
13      Q   Okay.  So I guess what I'm asking is how are
14   you a beneficial owner of Cayman?
15      A   The trusts -- the trusts are the
16   beneficiaries.  There is trusts set up that own the
17   holding companies.
18      Q   But it's a trust other than The Hurry Family
19   Revocable Trust?
20      A   That is correct.
21      Q   Okay.  And what is the name of the trust that
22   owns the holding --
23      A   I don't recall off the top of my head.  There
24   is several of them.
25      Q   And what is the extent of your beneficial
```

Page 11

```
 1   interest?
 2      A   My wife and myself are the beneficiaries and
 3   all four children.
 4      Q   Okay.  The children are contingent
 5   beneficiaries?
 6      A   Correct.
 7      Q   And you and your wife are 50/50 owners of the
 8   trust?
 9      A   There is no such thing as an owner of a trust.
10      Q   You're 50/50 beneficiaries of the trust?
11      A   I wouldn't say it's phrased that way, no.
12      Q   How --
13      A   We are beneficiaries.
14      Q   Okay.  But you're the only two beneficiaries?
15      A   Other than the kids who are contingent.
16      Q   Right.  You are the only two primary
17   beneficiaries.  So how does that translate in terms of
18   ownership of the holding company that owns the companies
19   at issue in this case?
20      A   The trusts own the holding companies.
21      Q   Okay.  And are you the trustee of the trust?
22      A   I am not the administrative trustee.  I'm what
23   they call a management trustee.
24      Q   And is your wife a trustee of the trust?
25      A   She is also a management trustee.
```

Page 12

```
 1      Q   Okay.  So you -- you and your wife as managers
 2   control the holding company?
 3      A   We actually do not control it.  There is a
 4   manager that controls it.  There is an LLC that is a
 5   manager of the holding companies that controls the
 6   trusts.
 7      Q   And you are not the manager of the holding
 8   company?
 9      A   I am not.
10      Q   And your wife is not the manager?
11      A   My wife is the manager of the holding -- of
12   the LLC that is the manager of the holding companies.
13      Q   Okay.  That was painful, but I think I
14   understand.
15      A   Okay.
16      Q   All right.  Let me hand you -- have you ever
17   been convicted of a crime?
18      A   No.
19      Q   Have you ever been -- pled guilty to a crime?
20      A   No.
21      Q   Do you have any licenses, securities license?
22      A   I do.
23      Q   And what is -- what securities licenses do you
24   have?
25      A   The 7, 63, 24, 4, 55, 27.  That's all I can
```

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 13

1    recall off the top of my head.
2        Q   Has any disciplinary action been taken
3    involving your licenses?
4        A   I have -- I'm fighting an issue right now,
5    yes.
6        Q   Under which license or licenses?
7        A   Under all of them, I would imagine.
8        Q   Okay.  And is that -- that's a pending
9    disciplinary?
10       A   It's been stayed.
11       Q   Okay.  Just tell me briefly what the nature of
12   that disciplinary action is?
13       A   Essentially, as I understand it, I set up a
14   foreign broker-dealer.
15       Q   And FINRA did not like that?
16       A   Evidently not.
17       Q   Okay.  And so -- and I've read some of the
18   opinions about that.  You have been, I think they say,
19   barred from doing what?  FINRA has barred you --
20       A   No, I'm not barred.
21       Q   I know it's subject to a stay, but FINRA
22   proposed that you be barred from doing what?
23       A   Being associated with the member firm.
24       Q   Okay.  And if you're barred from being
25   associated with a member firm, what impact does that

Page 14

1    have on your license?
2        A   Well, I wouldn't be licensed with an
3    associated firm.
4        Q   Because you have to have your license with an
5    associated firm; is that true?
6        A   With FINRA.
7        Q   With FINRA?
8        A   Right.
9        Q   I'm sorry.  You know, you can't be basic
10   enough with me.  So tell me the -- the -- what FINRA is
11   seeking through this disciplinary action?
12       A   They are seeking that I not be associated with
13   a FINRA member firm.
14       Q   Okay.  And what is the impact of not being
15   able to be associated with a FINRA member firm?
16       A   That's exactly what I just stated.
17       Q   You can't work in the business?
18       A   No.  I can work in the securities business.  I
19   just can't be associated with a FINRA member firm.
20       Q   But you still have -- you would still have
21   your licenses?
22       A   Well, if I license with the firm that wasn't a
23   FINRA member, theoretically, yes.
24       Q   Okay.  Any other -- have any other
25   disciplinary actions been taken against you involving

Page 15

1    your licenses?
2        A   No.
3        Q   Okay.  Let me hand you what I'm going to mark
4    as Exhibit 1 to your deposition and ask you if you have
5    seen this notice of taking corporate representative
6    depositions of Cayman Securities, The Hurry Family
7    Revocable Trust, Scottsdale Capital Advisors, and Alpine
8    Securities Corporation.  Have you seen that?
9            (Exhibit Number 1 marked for identification.)
10   BY MR. BANKER:
11       Q   Have you seen that?
12       A   I believe I have.
13       Q   And as a matter of fact, this is the notice by
14   which you're appearing today; correct?
15       A   I believe so.
16       Q   And so these entities, these four entities
17   have designated you as their representative to testify
18   concerning the following matters set forth on Page 2:
19       1, "Each plaintiff's and former plaintiff's
20   allegations in the current and prior complaints."
21       You are prepared to testify about that; is
22   that correct?
23       A   Yes.
24       Q   And -- and you're also prepared to testify
25   about Topic 2, "Each plaintiff's and former plaintiff's

Page 16

1    interrogatory responses and document production";
2    correct?
3        A   Yes.
4        Q   And Number 3, you are prepared to testify
5    about "Each plaintiff's and former plaintiff's initial
6    disclosures"; is that correct?
7        A   Yes.
8        Q   Okay.  Have you been in charge of this
9    litigation?
10           MR. SUSMAN:  Objection; vague and ambiguous.
11       A   No.
12   BY MR. BANKER:
13       Q   Okay.  What has been your role in this
14   lawsuit?
15       A   I'm a knowledgeable person about the facts.
16       Q   What do you mean you're not a knowledgeable
17   person?
18       A   I am a knowledgeable person about the facts.
19       Q   Okay.  Did you cause the lawsuit to be
20   brought?
21           MR. SUSMAN:  Objection; vague and ambiguous.
22       A   The firms recognized some issues and thought
23   it was in the best interest of the firm to bring the
24   suit.
25   BY MR. BANKER:

4 (Pages 13 to 16)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 17

1    Q   Are you the person to whom Mr. Susman reports
2  regarding the litigation?
3        MR. SUSMAN:  I'm going to object and tell the
4    client not to answer that.  It's attorney-client
5    privilege.
6  BY MR. BANKER:
7    Q   Who is the decision-maker regarding this
8  lawsuit on behalf of each of these entities?
9        MR. SUSMAN:  Objection; vague and ambiguous,
10   lacks foundation.
11   A   I think each company has a president.
12 Obviously, I'm the trustee of the trust, which I
13 understand the information was given about that, and
14 also a control person in the Cayman.
15 BY MR. BANKER:
16   Q   And the what?
17   A   I'm the control person of Cayman.  So
18 collectively we realized there was information that was
19 being used, trade secrets, and information that was
20 being used a collective action.  It wasn't anything
21 specific to one person.  The damage is to all those
22 firms.
23   Q   Okay.  And who are the people that have made
24 decisions regarding these lawsuits, this lawsuit?
25       MR. SUSMAN:  Objection; vague and ambiguous.

Page 18

1    A   Well, advice of counsel to all the people
2  involved.
3  BY MR. BANKER:
4    Q   And I'm not asking advice of counsel.  I'm
5  just asking about the people at the companies who have
6  participated in the decisions about this lawsuit?
7    A   It would be pretty much numerous people.
8    Q   And who are they?
9    A   Well, you can say that the -- our general
10 counsel.
11   Q   Which would be Cruz?
12   A   Mike Cruz.
13   Q   Right.  Who else?
14   A   Chris Doubek.
15   Q   How do you spell Doubek?
16   A   I'm not sure.
17   Q   D-O-U-B-E-K?
18   A   Um-hum.
19   Q   Yes?
20   A   Um-hum.  Yes.
21   Q   You'll need to say "yes" or "no" --
22   A   Yes.
23   Q   -- so she can record your answer.
24       Who else?
25   A   Well, the other people that were involved in

Page 19

1  Scottsdale, the person is no longer there, but the prior
2  president there was Henry Diekmann.
3    Q   Oh, he's no longer there?
4    A   He's no longer president.
5    Q   Okay.  Anybody else that has been involved in
6  the decisions regarding production?
7    A   Those are the senior people.  There is other
8  people that brought other information to our attention,
9  but those are the senior people.
10   Q   Then what about you?  You would have been a
11 senior person?
12   A   I was notified.
13   Q   Yeah.  I mean, you would have been a
14 decision-maker?
15   A   As a trustee or capital financial, yes.
16   Q   Right.  Right.
17       So between those people, Mike Cruz, Chris
18 Doubek, and Henry Diekmann and yourself, those were --
19   A   And Justine Hurry.
20   Q   And Justine Hurry.  Those would be the
21 decision-makers regarding the lawsuit; is that correct?
22   A   Correct.
23   Q   And you, of course, were the representative of
24 the plaintiffs at the mediation; is that correct?
25   A   That is correct.

Page 20

1    Q   Because you were the decision-maker, at least
2  for purposes of the mediation and settlement
3  negotiations, for all of the companies in the trust?
4    A   I was given instructions.
5    Q   What?
6    A   I had instructions.
7    Q   Okay.  And you were the decision-maker with
8  full authority to --
9        (Crosstalk.)
10   Q   -- act on behalf of the companies?
11       MR. SUSMAN:  Objection; vague and ambiguous,
12   lacks foundation.
13   A   Yes.
14 BY MR. BANKER:
15   Q   Okay.  All right.  Let me hand you what I'm
16 going to mark as Exhibit 2.
17       (Exhibit Number 2 marked for identification.)
18 BY MR. BANKER:
19   Q   And ask you if you recognize that document.
20   A   Yes.
21   Q   Okay.  And for the record, this is a copy of
22 the second amended complaint which The Hurry Family
23 Trust and Scottsdale Capital and Alpine Securities have
24 filed against Mr. Frankel; is that correct?
25   A   That is correct.

5 (Pages 17 to 20)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 21

1     Q    And I take it you would have reviewed this
2   complaint and approved this complaint before it was
3   filed?
4     A    Myself and others, sure.
5     Q    No.  No.  I didn't mean to say to you.
6          You --
7     A    I reviewed it.
8     Q    Right.  And you approved it, correct, before
9   it was filed?
10    A    I reviewed it and acknowledged it as being
11  what we think is true.
12    Q    Okay.  And the same would be true for the
13  prior complaints.  You reviewed and approved the initial
14  complaint that was filed in this lawsuit; correct?
15         MR. SUSMAN:  Objection; vague and ambiguous.
16    A    I would have reviewed it and looked at it and
17  would have thought it was correct with all information
18  we had at the time.
19  BY MR. BANKER:
20    Q    Okay.  And if anything was incorrect or you
21  didn't want it to be filed, you would have said so and
22  it would not have been filed; correct?
23    A    For if I was given such advice.
24    Q    Okay.  Okay.  So I think there's been maybe
25  one or two other complaints, but you reviewed each of

Page 22

1   them, and you've authorized the filing of each of the
2   complaints in this lawsuit.  Is that true?
3          MR. SUSMAN:  Objection; lacks foundation,
4     vague and ambiguous.
5     A    On -- on portions that I had control of, yes.
6   BY MR. BANKER:
7     Q    Was there any portion of this complaint --
8   let's look at Exhibit 2 -- that you didn't have control
9   over to authorize or not authorize the filing?
10         MR. SUSMAN:  He's already told you that he
11    doesn't have control over Scottsdale or Alpine.
12         MR. BANKER:  No speaking objection, please.
13    A    What's the question?
14  BY MR. BANKER:
15    Q    Is there any -- did you not have authority to
16  approve any portion of the second amended complaint,
17  Exhibit 2?
18    A    I was given the complaint; I reviewed it; and
19  I thought it was accurate.
20    Q    Okay.  And you approved filing it; correct?
21    A    I --
22         MR. SUSMAN:  Excuse me.  Excuse me.  Wait.
23    Wait.  Wait.
24         I'm going to object.  It lacks foundation.
25    We've already established that he doesn't have

Page 23

1   approval authority.
2          MR. BANKER:  No speaking objections.  We do
3   not permit that in Florida.
4          MR. SUSMAN:  Well, you are going to get them,
5   David --
6          MR. BANKER:  Well --
7          MR. SUSMAN:  -- if you keep badgering the
8   witness with the same foundationless question.
9          MR. BANKER:  Jordan, please.  Please.
10    A    With the --
11  BY MR. BANKER:
12    Q    You reviewed the complaint.  You approved it.
13  You thought it was correct; true?
14    A    Reviewed the complaint with the information we
15  had, and I thought that the complaint was in order, yes.
16    Q    Okay.  All right.  Let me hand you what I will
17  mark as Exhibit 3.
18         (Exhibit Number 3 marked for identification.)
19  BY MR. BANKER:
20    Q    I'm sorry.  I didn't put a number on that.
21  Here.  Give that one to your lawyer, and you take this
22  one.
23         Do you recognize Exhibit 3?
24    A    Yes.
25    Q    What is it?

Page 24

1     A    It's a nondisclosure and confidentiality
2   agreement.
3     Q    Okay.  And have you reviewed that
4   nondisclosure and confidentiality agreement?
5     A    I have.
6     Q    Okay.  And speaking on behalf of the -- well,
7   first of all, who -- when did you review this agreement
8   for the first time?
9     A    I don't recall.
10    Q    Would you have reviewed it at the time that
11  Mr. Frankel signed the agreement, which looks like it's
12  on or about June 22nd of 2015?
13    A    Very well could have.
14    Q    But you don't recall?
15    A    I don't recall.
16    Q    Okay.  Did you -- were you the one that asked
17  him to sign this nondisclosure?
18    A    There was once that I did ask him to sign,
19  yes.
20    Q    Okay.  And I've got two.  I'm going to ask you
21  about the other one as well.
22    A    Right.
23    Q    But you may have asked him to sign this one,
24  this Exhibit 3?
25    A    The first one, yes.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 25

1    Q   Okay. Okay. And why -- that implies to me --
2  and maybe I'm getting ahead of myself. I don't want to
3  read too much into your answer, but that implies to me
4  that perhaps you did not ask him to sign the Employee
5  Nondisclosure & Computer Use Agreement that I'm going to
6  hand you in a minute?
7    A   Okay.
8    Q   I mean, is that what you're implying with that
9  answer?
10   A   I had him sign this one. I think when he
11 actually got employed there were some other ones that
12 were signed.
13   Q   And somebody else would have asked him to sign
14 that?
15   A   Somebody else would have asked him to sign.
16   Q   Okay. And why did you ask Mr. Frankel to sign
17 Exhibit 3?
18   A   Because we are going to give him a lot of
19 information that he wouldn't have had access to any
20 other way. We always do that with anybody, especially
21 anybody that's looking at getting hired or anybody in a
22 senior position or pretty much anybody that works for us
23 in general.
24   Q   When you say "for us," who are you talking
25 about?

Page 26

1    A   I'm sorry. For the companies, and at that
2  particular time The Hurry Family Trust, revocable trust
3  owned -- indirectly owned most of the companies we had.
4    Q   Okay. Well, who did you understand were the
5  parties to this nondisclosure agreement attached as
6  exhibit -- or that I have marked as Exhibit 3?
7       MR. SUSMAN: Objection. The document speaks
8  for itself.
9  BY MR. BANKER:
10   Q   You can answer.
11   A   Well, specifically any company that we were
12 giving him access to that was basically beneficially
13 owned by our trusts or where we were the beneficiaries.
14   Q   Okay. So did you understand that the parties
15 to the agreement that were protected by the agreement
16 were Scottsdale Capital Advisors, Alpine Securities, and
17 Cayman Securities?
18   A   Certainly.
19   Q   Okay. Anybody else?
20   A   The trust and any of their businesses.
21   Q   Okay. If you look in the middle agreement --
22 in the middle of the agreement at Paragraph 1(a),
23 next-to-last sentence.
24      Do you find that?
25   A   It's a pretty bad copy. So give me a second.

Page 27

1    Q   I'll tell you this is the copy that we got
2  attached to the complaint.
3    A   Which one?
4    Q   If you look at Paragraph 1(a) in the
5  next-to-last sentence where it says -- I can point it
6  out to you if you are having a hard time finding it.
7       Okay. Right here where it says, and I quote,
8  see if you can follow along with me, "Confidential
9  Information need not be novel, unique, patentable,
10 copyrightable or constitute a trade secret in order to
11 be designated Confidential Information."
12      Do you see that?
13   A   Yeah, I do.
14   Q   Okay. And what did you understand that to
15 mean?
16   A   Pretty much any information he gets that is
17 not really known to the public would be trade secret or
18 confidential.
19   Q   Okay. And what about designated confidential
20 information, did you ever -- did the companies ever
21 designate any information as confidential?
22   A   All the information would have been that's not
23 relevant to the public.
24   Q   I'm sorry?
25   A   All the information that's not readily

Page 28

1  available to the public would be confidential.
2    Q   But I guess what I'm asking is what did the
3  companies do to designate any information as
4  confidential?
5    A   Companies have strict policies, particularly
6  regarding customer information and trade commissions and
7  all that kind of stuff. So each company's different.
8  Is that your question?
9    Q   No. I'm probably not doing a very good job,
10 and I apologize. If you don't understand a question,
11 you know, please -- please let me know.
12      But what did -- let's say what did Alpine do
13 to designate any information?
14   A   All information given to him from Alpine or
15 Scottsdale that wasn't in the public domain was
16 considered trade secret and confidential. It's not a
17 matter of -- specifically all of it.
18   Q   Okay. But what I'm asking is designate.
19 Did --
20   A   It designated all of it.
21   Q   So how did -- how did Alpine designate all of
22 its information as confidential?
23   A   One, there is privacy laws in these companies
24 are abiding by. It's all private. Okay. So you
25 don't -- anybody in the securities industry with a

7 (Pages 25 to 28)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 29

1  license or anybody that's familiar with the business
2  would know that.
3      Q   Still not sure we are communicating, and I'm
4  sure that it's my fault.
5          Did Alpine put "confidential" thereby
6  designating a document as confidential if Alpine
7  considered the document to be confidential?
8      A   They don't put confidential on customer
9  accounts.  They don't put confidential on customer
10  information because it's always assumed to be
11  confidential and not readily available to the public.
12         So the short answer is do account statements
13  have "confidential" on them?  They may.  I don't know if
14  they actually do.  But that would be considered
15  confidential.
16     Q   Okay.  Let's forget about account statements.
17  I understand that.  I get that.  But what about other
18  internal records that Alpine might be using to conduct
19  its business, such as financial information.
20     A   That's all confidential.
21     Q   Okay.  But does -- did Alpine designate it as
22  confidential?
23     A   That's why we have the agreement written up
24  the way it's written up so that everybody understands
25  that that's confidential information, it's not really

Page 30

1  made available to the public, so we don't have to go
2  through and put "confidential" on everything.
3      Q   So the answer to my question is, to your
4  knowledge, Alpine never designated any information?
5      A   No, I don't believe --
6          MR. SUSMAN:  Wait.  Wait.  Yeah, objection
7  misrepresents testimony, lacks foundation.
8  BY MR. BANKER:
9      Q   Did -- do you know of any instance in which
10  Alpine actually designated a document as confidential?
11         MR. SUSMAN:  You mean actually stamped on it
12  "confidential"?
13         MR. BANKER:  Yeah.
14  BY MR. BANKER:
15     Q   Stamped on it or wrote on it as
16  "confidential"?
17     A   It very well -- I'm sure they did in certain
18  cases, but that confidential -- there is two types of --
19  first of all, if it's internally confidential, it would
20  be attorney-client privilege or maybe something that a
21  certain staff member shouldn't have, and then there is
22  also trade secrets and information, which would include
23  that, and also include everything else that doesn't have
24  a stamp on it.
25     Q   Okay.  So are you saying that -- that Alpine

Page 31

1  did use a stamp to stamp some things confidential?
2      A   I can't specifically tell you or recall that
3  they had.  I'm sure they have a stamp.
4      Q   Do you know how -- who would decide when the
5  stamp would be used and when it would not be used?
6      A   I don't think it was done that way, but I -- I
7  don't know that question.
8      Q   Well, who would know that question about
9  designation of Alpine's documents as confidential?
10         MR. SUSMAN:  And, again, by "designation" --
11     A   I think I answered that.
12         MR. BANKER:  By "designation" I mean --
13         MR. SUSMAN:  -- you mean putting a stamp on
14  it?
15  BY MR. BANKER:
16     Q   -- putting a stamp or writing "confidential"
17  or typing "confidential"?
18     A   I think if it went to an outside party
19  potentially that wasn't an employee or maybe it was in
20  litigation or something along those lines, but employees
21  would know that all the information that's not readily
22  available to the public would be confidential.
23     Q   Well, you say "employees would know."  I'm
24  asking a different question.  I'm asking what did Alpine
25  do to designate documents as confidential?

Page 32

1      A   The confidential agreement signed --
2      Q   -- if anything?
3      A   -- by employees that's what they did.
4          MR. SUSMAN:  Wait.  Wait.  You're using
5  "designate" now in a different sense than you
6  previously did.
7          MR. BANKER:  I'm not using it in a different
8  sense.
9          MR. SUSMAN:  Yes, you are.
10  BY MR. BANKER:
11     Q   So the answer is --
12         MR. SUSMAN:  David, let's be very clear on
13  this because --
14         MR. BANKER:  Jordan.
15         MR. SUSMAN:  -- you are changing the
16  definition.
17         MR. BANKER:  Jordan, we got to get through
18  these quickly, and you are not allowed to make
19  speaking objections.  I'm not going to make
20  speaking objections.
21         MR. SUSMAN:  You keep changing the definition
22  of "designate."  Is your question did they stamp
23  documents?
24         MR. BANKER:  I don't care if they stamped
25  them, if they wrote it on them, if they typed it in

8 (Pages 29 to 32)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 33

1    the -- in the caption line.
2    BY MR. BANKER:
3        Q   Designate documents?
4        A   There wasn't a formal process that I'm aware
5    of for that other than internally you had different
6    types of confidential information and information
7    internally that wasn't to go to other employees.  And
8    then you had confidential information and trade secrets
9    that was internal to the firm.
10       They are both trade secrets.  They are both
11   confidential.  They are just different layers of
12   confidential.
13       So in a situation with attorney-client
14   privilege, something along those lines, sure, it would
15   be marked with "privilege."  So any attorney-client
16   privilege information, it should be marked with
17   "privilege," "confidential."  So if you're asking me if
18   there was a process for that, that should have been
19   marked "attorney-client privilege" with any type of
20   communications with attorneys.
21       There may have been other issues regarding
22   information about certain employees that may have been
23   marked "confidential" in situations that were -- that
24   didn't pertain to other employees.  There is not a
25   specific process for that; but if there was a situation

Page 34

1    where there was an issue with one employee that was not
2    information another employee should have, then it was --
3    could have been marked "confidential."
4        Certainly attorney-client privilege stuff
5    would be marked "confidential."
6        Q   So the answer is you don't know what policy
7    Alpine had, if any, regarding designating documents as
8    confidential?
9        MR. SUSMAN:  I'm going to object.  Its vague
10   and ambiguous, and it lacks foundation, and counsel
11   keeps changing the definition.
12       A   I think it has to do with a case-by-case
13   situation in terms of how they are going to apply that.
14   BY MR. BANKER:
15       Q   All right.  Let's ask it a different way:  Can
16   you tell me what the policy was of Alpine regarding
17   designation of documents as confidential?
18       MR. SUSMAN:  Objection; lacks foundation.
19   It's vague and ambiguous.  Terms keep changing
20   definitions.
21       A   All documents that were not available to the
22   public, all, meaning A-L-L, every single one was
23   confidential and a trade secret.  That's why we
24   specifically had employees sign this agreement so there
25   wasn't any mistake about it.

Page 35

1    BY MR. BANKER:
2        Q   Where would I find that policy of Alpine
3    written?
4        MR. SUSMAN:  Objection; lacks foundation.
5        A   If it was a written policy, not all policies
6    are written, it would be in the rules and procedures
7    manual.
8    BY MR. BANKER:
9        Q   But you don't know if it is or not?
10       A   It was a policy, certainly, to have these
11   signed of all employees.  Whether it was written or not
12   I don't recall.
13       Q   Okay.  And what about Scottsdale?  Did
14   Scottsdale have a written confidentiality policy?
15       A   Similar just like this one.  In fact, other
16   companies do as well.
17       Q   Okay.  And do you know what the policy said
18   regarding designation, that is, marking documents as
19   "confidential"?
20       A   All documents that are not available to the
21   public would be considered a trade secret and
22   confidential.
23       Q   And is that in written policy that Scottsdale
24   has?
25       A   It's in this form that we had every employee

Page 36

1    sign so there's no mistake about what is and what it
2    isn't.
3        Q   I don't consider Exhibit 3, the nondisclosure
4    agreement, to be a policy, do you?
5        MR. SUSMAN:  Objection; argumentative.
6        A   The policy is to get that done so employees
7    know, without a doubt, that any information that I give
8    them verbally, written, or otherwise or any other person
9    in the company that's not generally known to the public
10   would be confidential.
11   BY MR. BANKER:
12       Q   Okay.  So you don't know if Scottsdale has a
13   written policy regarding designation?
14       A   I don't recall if they have a written policy.
15   They do have a policy of getting this from employees.
16       MR. SUSMAN:  And I'll object.  Again, lacks
17   foundation, vague and ambiguous, argumentative.
18       (Exhibit Number 4 marked for identification.)
19   BY MR. BANKER:
20       Q   Let me hand you what I've marked as Exhibit 4
21   and ask you if you can identify that.
22       A   Yes.
23       Q   What is Exhibit 4?
24       A   This is the Employee Nondisclosure & Computer
25   Use Agreement.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 37

1    Q   Okay.  And were you involved in having
2   Mr. Frankel sign this?  It looks like he signed it on or
3   about July 1, 2015.
4    A   I don't recall.  There was -- there was the
5   original one that I did.  I don't recall being in on
6   this one, no.
7    Q   Okay.  And when is the first time that you
8   reviewed this agreement?
9    A   I don't recall.
10   Q   Would you have reviewed it at or about the
11  time that Mr. Frankel signed it?
12   A   I would have probably reviewed the general
13  agreement well before that.
14   Q   So you were familiar with the agreement --
15   A   Sure.
16   Q   -- and understood what it meant?
17   A   Sure.
18   Q   -- and what it was supposed to accomplish?
19       Okay.  So looking at the first lead-in part of
20  the agreement, it says "This agreement (the 'Agreement')
21  is entered into by Alpine Securities/Scottsdale Capital
22  and its subsidiaries and affiliates ('Company') and
23  Christopher L. Frankel ('Employee')."
24       Do you see that?
25   A   What number are you on, sir?

Page 38

1    Q   I'm on the very first paragraph where it says
2   "This agreement."
3    A   Okay.  Yes.
4    Q   Okay.  So who did you understand that this was
5   an agreement between?
6    A   I think it speaks for itself.
7    Q   Well, it may speak for itself, but what did
8   you understand?  To whom did you --
9    A   I think it means Alpine Securities,
10  Scottsdale, and its subsidiaries and affiliates.
11   Q   Okay.  And who would -- would there be any
12  subsidiaries and affiliates that were -- that you
13  consider to be parties to this agreement?
14   A   Well, at the time when this agreement was
15  signed, Capital Financial certainly would be that and so
16  would The Hurry Family Revocable Trust.
17   Q   And at some point did they cease being a party
18  to this agreement?
19   A   I don't think, so no.
20   Q   Okay.  And why would you consider The Hurry
21  Family Trust as being a party to this agreement?
22   A   There's information in The Hurry Family Trust
23  that's trade secret and confidential.
24   Q   Okay.
25   A   And also the indirect beneficial owners of

Page 39

1   these companies at the time.
2    Q   Okay.  But it doesn't say "indirect beneficial
3   owner."  It says sub -- and it doesn't say trust.
4    A   It says "subsidiaries and affiliates."  So it
5   depends on how you want to define that.
6    Q   Well, what did you understand "subsidiaries
7   and affiliates" to mean?
8    A   Certainly -- certainly any of the companies
9   that were beneficially owned by that trust or which
10  myself and my wife are beneficiaries.
11   Q   Okay.  But that would be companies owned by
12  the trust, not the trust; right?
13   A   You asked me which companies.  Okay.  You
14  asked me what the definition of "subsidiaries and
15  affiliates" was.  Okay.  Certainly Scottsdale and
16  Alpine, Capital Financial and The Hurry Family Revocable
17  Trust.  There was other companies that we would have
18  divulged -- I don't recall any specifically at this
19  point -- that would have also been included.
20   Q   So are --
21   A   But certainly Alpine Securities, Scottsdale
22  Capital, and at that time The Hurry Family Revocable
23  Trust and Capital Financial.
24   Q   Okay.  So show me how you formulated this
25  understanding that you're claiming that The Hurry Family

Page 40

1   Trust was somehow a party to this Employee Nondisclosure
2   & Computer Use Agreement.
3        What language do you rely on?
4    A   "Affiliates."
5    Q   Okay.  So you -- by putting affiliate in, you
6   meant that that was supposed to include The Hurry Family
7   Trust?
8    A   Well, you're asking what I think.
9    Q   No.  I'm asking what your position is as the
10  corporate representative of The Hurry Family Trust and
11  of --
12   A   Yes.
13   Q   -- and of Cayman?
14   A   I think it -- I think it would include all of
15  them.  Yes.
16   Q   Okay.  So your position as the corporate
17  representative of the plaintiff entities in this case is
18  that when the word "affiliates" was used in the Employee
19  Nondisclosure & Computer Use Agreement that that
20  referred -- was supposed to include The Hurry Family
21  Trust?
22   A   Yes.
23   Q   Do you think that was a poor choice of words?
24   A   Possibly.
25   Q   Okay.  Did you have an understanding that this

10 (Pages 37 to 40)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 41

1    Employee Nondisclosure & Computer Use Agreement
2    superseded the pre-employment nondisclosure agreement
3    which we reviewed as Exhibit 3?
4         MR. SUSMAN: Objection. The document speaks
5    for itself.
6         A   Yes. That was my understanding.
7    BY MR. BANKER:
8         Q   Okay. So your understanding is that the
9    initial agreement, Exhibit 3, no longer had any impact,
10   was legally replaced by this Exhibit 4; is that correct?
11        MR. SUSMAN: Objection; vague and ambiguous.
12        A   I would say that the document speaks for
13   itself, but my understanding would have been that the
14   substance of these parties would be the same.
15   BY MR. BANKER:
16        Q   That's not the question.
17        Was your understanding as the corporate
18   representative of the plaintiffs in this case that
19   having Mr. Frankel sign the Employee Nondisclosure &
20   Computer Use Agreement, that agreement that you had him
21   sign, replaced, took the place of the --
22        A   That's my understanding.
23        Q   Okay. Okay. Good.
24        (Off-the-record discussion held.)
25

Page 42

1    BY MR. BANKER:
2         Q   All right. Look at Paragraph 5 on the second
3    page of Exhibit 4. And let me -- let me read that. See
4    if I read this correctly.
5         "Employee's obligation to maintain the
6    confidentiality and security of Confidential
7    Information," capitalized, "remains even after
8    Employees's employment with the Company ends and
9    continues for so long as such Confidential Information
10   remains a trade secret."
11        A   What -- I'm sorry. What line are you on, sir?
12        Q   I just read Provision 5.
13        A   Okay.
14        Q   Did I read that correctly?
15        A   I believe you did.
16        Q   Okay. What did you as representative of the
17   plaintiffs understand that to mean?
18        A   All information verbally and written that was
19   given to him as a result of his connections with the
20   company, employment with the company or otherwise, was
21   not generally known to the public would fit that
22   definition.
23        Q   Okay. What about information that was known
24   to him from his 20, 25 years in the business before he
25   came to you?

Page 43

1         MR. SUSMAN: Objection; lacks foundation.
2         A   He didn't have any of that information prior
3    to being here, as far as I know.
4    BY MR. BANKER:
5         Q   Okay. So what about -- it says in the last
6    clause "for as long as such Confidential Information
7    remains a trade secret."
8         As corporate representative of the plaintiffs
9    in this case, what did you understand that to mean?
10        A   Exactly what it says.
11        Q   But what does it mean? Explain it to me.
12        A   As long as it's not readily available and made
13   to the public.
14        Q   Okay. As long as it remains a trade secret;
15   right?
16        A   As long as it remains a trade secret or
17   whether it's confidential or whether it's not relayed to
18   the public would be something that he should not act on,
19   use, or promote in any way.
20        Q   Okay. Did you hire Chris Frankel?
21        A   I was instrumental in getting Mr. Frankel
22   hired, yes. It wasn't just my decision, but, yes.
23        Q   It wasn't just your decision?
24        A   No.
25        Q   Okay. But were you the ultimate

Page 44

1    decision-maker?
2         A   I'm married. So I'm never the ultimate
3    decision-maker.
4         Q   Um-hum.
5         A   It was an input. I had an input, and I
6    brought him into the firm. I basically introduced him
7    into the firm and to other people, and everybody had an
8    input. That input was a positive one. He was hired.
9         Q   Were you the one that identified Chris Frankel
10   as somebody to bring on board?
11        A   I was referred to Chris Frankel.
12        Q   By whom?
13        A   MeFin, MeFinance, which is a market making
14   company.
15        Q   Okay. And just tell me about the process by
16   which you brought Chris Frankel to Alpine.
17        A   Chris Frankel was evidently looking for a
18   role. He was being let go at COR, and he was looking
19   for a clearing firm role. He had advised us he had a
20   lot of clearing firm experience in running clearing
21   firms. We talked. Made some introductions to him and
22   the other firm. People talked to him, looked at his
23   resumé, and we hired him.
24        Q   Okay. What -- what did you conclude about
25   Chris in terms of his competence and qualifications?

11 (Pages 41 to 44)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 45

1    A   Well, according to Chris and his resumé, he
2  had clearing firm experience.
3    Q   Okay.  And as far as you knew, that is
4  correct; right?
5    A   As far as I know at that time, yes.
6    Q   I mean, do you have any reason to disbelieve
7  that now?
8    A   I think based on his performance there, I -- I
9  have some doubts, yes.
10   Q   Okay.  Well, what is your understanding of his
11 history and the clearing business before he came on
12 board with you?
13   A   He worked in the clearing business.
14   Q   Okay.  He worked for --
15   A   Before us.
16   Q   He worked for COR for a number of years?
17   A   In the clearing business.
18   Q   Okay.  And what did you understand the
19 circumstances of his leaving COR were?
20   A   Then I wasn't clear.  My understanding now is
21 he was asked to leave.
22   Q   Okay.  And where did you get that
23 understanding?
24   A   From various sources, nothing specific.
25   Q   Give me a source.

Page 46

1    A   Well, comments like "Thanks for taking Chris
2  Frankel off our hands" from Sugarman, who was the prior
3  director of COR.
4    Q   So Sugarman said that?
5    A   And Chris Frankel -- yes, he did.  No,
6  actually, Sugarman said that.
7        (Reporter clarification.)
8        THE WITNESS:  His last name is Sugarman.  I
9  don't recall his first name.
10 BY MR. BANKER:
11   Q   Okay.  And Chris said he -- COR let him go?
12   A   He said they were -- they were winding his
13 position down, yes.  He was in the process of being let
14 go.
15   Q   Okay.  Do you know if COR continued in
16 business after Chris left?
17   A   I'm sorry.  What was the question?
18   Q   Do you know if COR continued in business after
19 Chris left?
20   A   COR as it's known today is no longer in
21 business.
22   Q   Do you know when COR ceased doing business as
23 COR?
24   A   Well, they sold the firm.  That was an ongoing
25 process.  I don't know exact closing date was -- I think

Page 47

1  they were trying to sell the firm for some time.
2    Q   And COR was a competitor of Alpine?
3    A   Not really, no.
4    Q   Okay.  Explain that to me.
5    A   COR was simply a clearing firm.  It didn't
6  have its own customers.  So its customers were
7  essentially other broker-dealers, didn't have its own
8  customers, very different business model.
9    Q   Okay.  And Alpine was a clearing firm, but it
10 also had its own customers?
11   A   Alpine had its own customers, developed much
12 more of a niche in the business, and it focused
13 primarily on over-the-counter securities.
14   Q   Okay.  And what did you understand about
15 Chris's history before COR?
16   A   He was in the clearing business.
17   Q   Do you know with whom he worked?
18   A   He worked -- according to Chris, he worked at
19 Sterne Agee in clearing over there and COR Clearing.
20   Q   Okay.  So you understood his prior experience
21 was first with Sterne Agee and then with COR?
22   A   Yes.
23   Q   Did you know that he had co-authored or
24 co-published a book on clearing?
25   A   I would say that's a big stretch as far as

Page 48

1  co-authored, but I would hardly call it that.
2    Q   Well, tell me what you know about it.
3    A   I know what he's -- what he wrote, but -- I
4  think in his complaint, but that's about it.
5    Q   Well, I mean, had you seen that before you
6  brought him on board?
7    A   No.  That's the first time I saw it.  I didn't
8  know anything about it.
9    Q   Okay.  Did -- did you and your wife decide to
10 hire Chris as CEO of Alpine?
11   A   Yes.
12   Q   And why?
13   A   Along with input from other employees too.
14   Q   I'm not -- I don't mean to exclude others;
15 but, ultimately, you and your wife made the decision?
16   A   It was a collective decision.
17   Q   Okay.  And what -- what did y'all bring him on
18 board as at Alpine?
19   A   CEO of Alpine.
20   Q   CEO; correct?
21   A   Correct.
22   Q   And when -- for what period of time was he CEO
23 at Alpine?
24   A   From probably mid to late 2015 to the end of
25 July 2018.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 49

1    Q    How did he do as CEO of Alpine?
2    A    I would say it was poor.
3    Q    Why would you say it was poor?
4    A    Numerous reasons.
5    Q    Did you ever tell Chris that it was poor?
6    A    Yes.
7    Q    Okay.  I mean, did you ever put that in
8    writing anywhere?
9    A    No.
10   Q    Why not?
11   A    Well, I -- as far as know, the firm didn't.
12   We did have a -- towards the end of his employment
13   there, he was given a resolution to let at least one
14   person go that was not let go because of the business.
15   And they were instructed to let people go because of the
16   performance of the business.
17   Q    I don't understand.
18   A    I don't think it was in writing, though.
19   Q    I don't --
20   A    The resolution was in writing.
21   Q    Okay.  I don't understand.  Let me see if I
22   understand what you just said.  Alpine decided that it
23   needed to let an employee go; correct?
24   A    The board, specifically my wife and the board,
25   had decided there was a specific employee there that was

Page 50

1    not a good fit for Alpine, and they didn't -- at that
2    particular time couldn't afford that employee, and they
3    had also given verbal instructions to let other people
4    go.
5    Q    Okay.  And what period of time was this when
6    Alpine --
7    A    2018, I believe.  Maybe late 2017.  Probably
8    2018.
9    Q    Okay.  It certainly would have been before the
10   end of July when Chris --
11   A    Yes.
12   Q    -- Chris's employment terminated.
13        Who were the employees or -- employee or
14   employees who had to be let go?
15   A    David Jarvis was one.  And some of the other
16   attorneys, Nate Simmons.
17   Q    Anybody else?
18   A    Specifically probably -- I don't recall
19   specifically.  Those were two, and there were some other
20   staff members who were probably not needed as well.
21   Q    And when you -- and why -- why were the
22   attorneys and staff members no longer needed?
23   A    Well, I think David Jarvis had some other
24   issues; but the other ones, the business had dropped
25   significantly.

Page 51

1    Q    And why had the business dropped
2    significantly?
3    A    My understanding was that there were some
4    counterparties that had disappeared over a period of
5    time and the management team at Alpine had not been able
6    to replace them.
7    Q    What do you mean by a counterparty?
8    A    Counterparty would be somebody that you would
9    send trades to.
10   Q    Somebody would what?
11   A    Send trades to.
12   Q    Okay.  What does that mean exactly?
13   A    It means that you would route certain trades
14   for certain types of executions.
15   Q    Okay.  Why couldn't you just get other
16   counterparties?
17   A    Well, based on the type of business and how
18   Alpine did its business, they needed to be certain types
19   of instructions on the handling of those orders.
20   Q    Okay.
21   A    Only certain participants would do it.  Other
22   ones decided not to do it.
23   Q    So --
24   A    Because it's -- so you need that counterparty
25   to execute those trades.

Page 52

1    Q    So Alpine was running out of counterparties.
2    Is that what you're saying?
3    A    They had not gone out and replaced the
4    counterparties.
5    Q    Um-hum.  Has Alpine replaced the
6    counterparties since?
7    A    Yes.
8    Q    When did Alpine replace counterparties?
9    A    Shortly after Chris Frankel was terminated.
10   Q    And who are the replacement counterparties?
11   A    I don't recall specifically.
12   Q    So let's go back to these employees that the
13   company decided needed to be let go.  Was Chris
14   instructed to let them go?
15   A    Yes.
16   Q    And you're saying he didn't do that?
17   A    Yes.
18   Q    Did he say why he wouldn't do that?
19   A    I think there was different excuses used, but
20   not specifically, no.
21   Q    Well, did you have any conversations with him
22   about it?
23   A    Not over that specific time frame, no.
24   Q    Do you know who did?
25   A    My wife, the other board member, Rick Nummi.

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 53

1     Q   And what do you understand that the
2   conversations were between Nummi and your wife and Chris
3   about letting these people go?
4     A   Specifically David Jarvis, that was in
5   writing.
6         MR. SUSMAN:  Counsel, I'm going to ask what
7   this has to do with any of the topics noticed for
8   this deposition?
9         MR. BANKER:  It has everything to do with it.
10        MR. SUSMAN:  Can you point to a part of the
11  complaint that this is in?
12        MR. BANKER:  I'm going to just ignore that,
13  and we are going to keep going.
14  BY MR. BANKER:
15    Q   And so have Nummi and your wife related --
16        MR. SUSMAN:  I'm going to ask that he not
17  answers these questions, at least not as a
18  corporate representative, because it's not in the
19  deposition notice.  If you can point to something
20  in the complaint, I'm happy to let you continue.
21        MR. BANKER:  You have produced yesterday a
22  bunch of damage documents that, you know, talk
23  about the welfare of the business and what was
24  going on in the business.  And that is -- this is
25  all very much about what's going on in the

Page 54

1   business, why these parties are let go, why the
2   counterparties disappeared, why the revenue was
3   falling before Chris Frankel left.  It has
4   everything to do with everything in the case.
5         MR. SUSMAN:  Continue.
6         MR. BANKER:  Okay.  All right.
7   BY MR. BANKER:
8     Q   So what do you understand the conversations
9   were between Nummi and your wife and Frankel regarding
10  letting --
11    A   Let him go.
12    Q   -- Jarvis go --
13    A   Go ahead.  Finish your question.
14    Q   -- and the others?
15    A   Yes.  I think they gave him some discretion on
16  that, but they wanted particularly the staff that wasn't
17  going to be needed with the lower volume of business.
18  So some discretion on his part.
19    Q   They said that he had some discretion on his
20  part?
21    A   Well, there is, obviously, some specifics
22  there.  There is multiple attorneys.  There is multiple
23  other people.  He can pick and choose.  They certainly
24  wanted Dave Jarvis gone.
25    Q   What was the problem with Jarvis?

Page 55

1     A   I think from my -- best of my recollection was
2   issues with trust with him, potentially with his
3   performance.  I think it's not one specific issue.
4     Q   Okay.  Did Chris ultimately let the staff
5   members and the lawyers go that the company wanted to be
6   let go?
7     A   No.
8     Q   And so is that the reason why you're critical
9   of him?
10    A   I'm not critical of him.  No, that's --
11    Q   Okay.  I thought --
12    A   The reason he was -- that was the reason he
13  was terminated, asked to resign.
14    Q   Okay.  Chris -- so tell me about that.  What
15  were the circumstances of Chris's termination?
16    A   He hadn't replaced counterparties.  He hadn't
17  downsized people.  He hadn't gotten rid of Dave Jarvis.
18  He wasn't doing his job.  Essentially, insubordinate.
19    Q   When you said wasn't doing his job, he wasn't
20  doing his job in terms of getting rid of people he was
21  supposed to get rid of?
22    A   And replacing counterparties, and there was
23  other issues that he was instructed to do or had said he
24  was going to do and he did not do.
25    Q   Okay.  So the criticisms were a failure to

Page 56

1   replace counterparties, failure to terminate attorneys
2   and staff.  Anything else?  Any other decision --
3     A   Failure -- failure to --
4     Q   -- that led to his termination?
5     A   There is multiple items.  But also failure to
6   implement agreed-upon fee schedules, failure to
7   implement the business plan that they had agreed to with
8   the board.
9     Q   Anything else?
10    A   I'm sure there are.  Those things are what I
11  can recall at the moment.
12    Q   Okay.  Who fired Chris?
13    A   My wife fired Chris.
14    Q   Do you know what she said to him?
15    A   No.
16    Q   Okay.  Now, as I understand it, Chris
17  continued, after end of July 2018, as a consultant?
18    A   Yes.
19    Q   And to whom was he a consultant?
20    A   Alpine.
21    Q   And he was CEO of Alpine; right?
22    A   He was CEO of Alpine prior to his termination,
23  yes.
24    Q   Right.  I didn't mean to be confusing with
25  that question.  In other words, he was -- his only

                              14 (Pages 53 to 56)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 57

1   employee was Alpine.  He was not employed by Scottsdale
2   nor Hurry Trust or Cayman; correct?
3        A   I don't recall specifics of that, but I
4   imagine the spirit of that would have been to help out
5   with anything that might need clarification.
6        Q   I understand that might have been the spirit
7   as you say, but his only employer was Alpine as far as
8   you know; right?
9        A   I actually would have to go back and look at
10  the agreement.  Do you have a copy of it?
11       Q   The employment agreement?
12       A   Yeah.
13       Q   Did he have a written employment agreement?
14       A   I don't know if he did or not.
15       Q   Okay.  Did -- did Chris have a written
16  consulting agreement with Alpine?
17       A   That's what I was referring to.  I don't know
18  if it was written or not.
19       Q   Okay.  And I was referring to, while he was
20  CEO of Alpine, did he have a written employment
21  agreement?
22       A   Not that I'm aware of.
23       Q   Okay.  And you don't recall whether he had a
24  written consulting agreement?
25       A   He had entered into a consulting agreement.  I

Page 58

1   do not know off the top of my head if it was written or
2   not.
3        Q   It was a nonexclusive consulting arrangement?
4        A   I do not know, but I don't -- I don't recall.
5        Q   Okay.  And what was his --
6        A   It should have been, but -- in terms of the
7   business, but I don't know.
8        Q   Right.  I mean, that was everybody's intent
9   that there be a nonexclusive consulting arrangement;
10  correct?
11       A   No.
12       Q   No?
13       A   Depends on how you want to use "conclusive."
14  What's your definition?
15       Q   I didn't say conclusive.  I said,
16  "nonexclusive."
17       A   "Nonexclusive," what's your definition of
18  that?
19       Q   An exclusive consulting agreement would be
20  that Chris could only consult for a particular company.
21  A nonexclusive consulting agreement --
22       A   I think that the consulting agreement was
23  designed if we had thought that Chris Frankel was trying
24  to steal our customers, steal our trade secrets, he
25  would have not been given that consulting agreement.

Page 59

1   The consulting agreement was not to pay him so he could
2   go out and compete unfairly with us and use our trade
3   secrets and our information.
4        The agreement was simply to give him an
5   opportunity to wind out of the firm and help us with any
6   issues, and a conversion that he got burned into was one
7   of the issues as well.
8        Q   The what?
9        A   There was a conversion that Chris Frankel
10  entered into.
11       Q   What do you mean "conversion"?
12       A   Converting software in the firm.
13       Q   Chris converted software?
14       A   Entered into an agreement to convert our old
15  software system that was in the process.
16       Q   Oh.  Oh.  Okay.  So you were replacing your
17  software?
18       A   Chris Frankel entered into an agreement to
19  replace the software.  That was one of the other reasons
20  he was put on that consulting agreement.
21       Q   Okay.  So I understand.
22       So you said to wind down the business.  He was
23  on the consulting agreement to wind down the business?
24       A   No, his business with Alpine and continue with
25  helping Alpine through that software; in other words,

Page 60

1   not Alpine's business, but to wind down his business
2   with Alpine.
3        Q   I understand.  I understand.
4        Was the software ultimately converted?
5        A   It's in the process.  We've had major problems
6   with it, but it's -- it's -- it's been converted with
7   issues.
8        Q   Okay.  Did -- did -- are you aware of any
9   written criticism of Chris Frankel at any time during
10  his employment or after his termination or during his
11  consulting agreement or after termination of the
12  consulting agreement, any written criticism?
13       A   Other than the resolution that really wasn't
14  directed at him specifically and then his termination,
15  no.
16       Q   Okay.  Well, the termination wasn't written.
17  That was your wife telling him he was let go; right?
18       A   That's my understanding, yes.
19       Q   All right.  So I'm a little unclear.  What was
20  Chris to be paid under the consulting agreement?
21       A   I don't recall.
22       Q   It was, like, 2,500 bucks a month?
23       A   I don't recall.
24       Q   Okay.  Under the consulting agreement, he was
25  free to consult with other companies, though; right?

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 61

```
 1      A   Certainly if he wasn't trying to compete with
 2  Alpine and use Alpine's information, customers, and
 3  trade secrets, there was nothing preventing him from
 4  doing that.
 5      Q   Okay.  What --
 6      A   As far as I know.
 7      Q   What -- you said that he was not free to
 8  compete with Alpine?  Is that what you said?
 9      A   No.  I said he wouldn't have been offered that
10  consulting agreement so he could be paid to use Alpine's
11  trade secrets unfairly against it.  You can certainly
12  read back the question.
13      Q   Okay.  Did you ever have any understanding
14  that Chris was, indeed, consulting for other companies
15  during his tenure under the consulting agreement with
16  Alpine?
17      A   The company was not aware of that, no.
18      Q   Okay.  Alpine wasn't aware of it?
19      A   No.
20      Q   Okay.  And how long did the consulting
21  agreement last?
22      A   Best of my knowledge, it was terminated
23  sometime in late September, October that year.
24      Q   All right.  I'm going to suggest to you that
25  the consulting agreement ran through October 31 of 2018.
```

Page 62

```
 1  Does that sound correct to you?
 2      A   To the best of my knowledge, it was sometime
 3  between September and October.
 4      Q   If you said that in your declaration, you
 5  would agree that was the correct day?
 6      A   Sure.
 7      Q   And why -- who terminated the consulting
 8  agreement?
 9      A   Alpine terminated.
10      Q   Who at Alpine terminated the consulting
11  agreement?
12      A   I believe at the time it would have been a
13  combination of David Brant?  And Justine and --
14      Q   You said "David Bryant"?
15      A   David Brant.
16      Q   Brant.
17      A   He had recommended that there was no need for
18  it anymore.
19      Q   Okay.  So was that the reason for termination
20  that consulting agreement had -- Chris had done what he
21  was supposed to be accomplished under the consulting
22  agreement?
23      A   According to David Brant nobody had used him
24  or consulted with him for some time so they canceled it.
25      Q   Okay.  All right.  You want to take a
```

Page 63

```
 1  couple-minute break?
 2      A   Sure.
 3      Q   And, you know, I should have told you.  You
 4  have the right to ask for a break any time.  So the
 5  only -- the only time I won't let you take a break, not
 6  that I have control over you, is if a question is
 7  pending.  So, you know, I want to get the answer to the
 8  question.  But you can ask for a break any time.  Okay?
 9      A   Okay.
10      Q   All right.
11         MR. SUSMAN:  Thank you.
12         (Off the record from 10:30 a.m. until
13  10:43 a.m.)
14      A   I would like to correct something for the
15  record.  I was mistaken.  The trusts were -- lawsuit was
16  filed under the original agreement, not the second
17  agreement.
18  BY MR. BANKER:
19      Q   The trust --
20      A   The trust, The Hurry Family Revocable Trust.
21      Q   -- is claiming rights under the agreement that
22  was superseded?
23      A   The second I was mistaken.
24      Q   Okay.
25      A   It was filed under the original agreement.
```

Page 64

```
 1      Q   Okay.  Did Mr. Susman help you with that?
 2      A   He pointed that out, yes.
 3      Q   Okay.  All right.  Mr. Hurry, the plaintiffs
 4  have alleged in their complaint that Mr. Frankel
 5  misappropriated the plaintiffs' confidential
 6  information.
 7         You understand that; right?
 8      A   Yes.
 9      Q   What information, what confidential
10  information did Mr. Frankel misappropriate?
11      A   Customer information regarding customers'
12  names, addresses, financial information, trade run
13  information, financials, probably a multitude of other
14  things.
15      Q   Well, let me ask you this:  Do you have
16  personal knowledge, that is, do you know for a fact that
17  Mr. Frankel has misappropriated any piece of
18  confidential information that belongs to any of the
19  plaintiffs?
20      A   He contacted Jim Kelley, who was specifically
21  introduced to him, who was the chosen nominee for
22  Capital Financial, who was also assisting Alpine
23  Securities in raising money and specifically tried to
24  get indication of interest to invest in a company, as I
25  understand it, that he was trying to buy.  And he
```

16 (Pages 61 to 64)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 65

1    referenced specific information regarding Alpine's
2    revenues.
3        Q   In other words, Kelley told you that
4    Frankel --
5        A   The numbers that he gave Kelley were
6    corresponding to Alpine's revenues that he's claimed
7    that he could get. Chris didn't have customers. He
8    mentioned that he has customers. Jim Kelley can speak
9    to that better than I can.
10       Q   Yeah. And I didn't mean to mislead you. I
11   was asking personal knowledge. And when I -- when I say
12   "personal knowledge," that means do you know because you
13   were there or because you participated in the call or
14   because you witnessed something, saw it with your own
15   eyes or you heard something from --
16       A   With my own eyes, I certainly saw some trade
17   information from Alpine that was disclosed.
18       Q   Okay. What are you talking about there?
19       A   On -- on discovery from Ziv.
20       Q   You're talking about the trade blotter?
21       A   Yes.
22       Q   Okay. So let me ask you this. And I'm trying
23   to understand this because I know about your
24   interrogatory answers with Mr. Kelley, and we are going
25   to talk to Mr. Kelley about that phone conversation.

Page 66

1    But you weren't a party to that phone conversation?
2        A   I was not.
3        Q   Right. So any information that you got about
4    that phone conversation that Kelley had with Frankel you
5    got from Kelley; correct?
6        A   Correct.
7        Q   Okay. So that's one piece of evidence that
8    you would say supports misappropriation. And then the
9    other that you would say that you have knowledge about
10   is the trade blotter in the trade blotter e-mail?
11       A   Yes.
12       Q   Okay. Anything else other than the trade
13   blotter or trade blotter e-mail and the Kelley
14   conversation that --
15       A   Well, some discovery all the customer lists,
16   particularly Curt Kramer and some of those other
17   customers that were mentioned in there, some of the
18   disclosure that was given.
19       Q   Okay. You're talking about -- you're talking
20   about based on disclosures that Mr. Frankel has made in
21   the case?
22       A   And others, yes.
23       Q   And documents that he's produced in the case?
24       A   Yes. And others.
25       Q   Okay. What do you mean by others?

Page 67

1        A   Ziv production.
2        Q   Okay. All right. So tell me -- what piece of
3    information or pieces of information do you as the
4    representative of the plaintiffs consider to be the most
5    damaging to Alpine or any of the other plaintiffs that
6    you think that Mr. Frankel has misappropriated in this
7    case?
8        MR. SUSMAN: Objection. What do you mean by
9    "damaging"? Vague and confusing as to "damaging."
10   BY MR. BANKER:
11       Q   You can answer.
12       A   Chris Frankel unfairly used information that
13   he gathered from Alpine regarding revenues of customers,
14   who these customers were specifically. And what I mean
15   by that is on a personal level, not from afar like I
16   know who Warren Buffett is. But on a very personal
17   level, he had access to the way Alpine did its business,
18   the way the customers did the business with Alpine, the
19   commission rates, all kinds of information.
20       Some of those customers he didn't know on a
21   personal level until he worked at Alpine and worked with
22   those customers. He used that information unfairly, we
23   think, to compete. So it was a combination of all the
24   information that he was given verbally and had access to
25   in writing that Alpine and Scottsdale and potentially

Page 68

1    other places.
2        Q   What do you mean "potentially other places"?
3        A   We don't know what other places he got that.
4    For instance, Capital Financial and some of these other
5    things, we don't know if he's used that information. We
6    do not know that at this point.
7        Q   Okay. Well, how did he use this -- you know,
8    this information that you've described to disadvantage
9    or harm Alpine or Scottsdale or any of your
10   companies?
11       A   Well, I think that, if you have proprietary
12   information about customers and information about Alpine
13   and its processes, its revenue, its commission runs, and
14   the customers, you have an unfair -- all the trade
15   secrets, all the confidential, you have an unfair
16   advantage when you are using that information to
17   specifically compete against us.
18       Q   Well, how did he compete against you?
19       A   Well, for starters all the people that -- a
20   lot of people, not all the people, Chris Frankel was
21   involved, at my request and others, to assemble -- we
22   introduced him to certain customers we were trying to
23   raise money for Alpine, given the circumstances that it
24   had.
25       He developed relationships with those people

17 (Pages 65 to 68)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 69

1    he did not have before.  That was one example.  He
2    simply tried to use those people to essentially help him
3    by a broker-dealer.  That's one trade secret
4    information --
5        Q   Okay.
6        A   -- right there.
7        Q   Okay.  I don't mean to cut you off.  Is
8    that -- we finished number one?  We finished one?  Are
9    you finished with your answer?
10       A   That's one example, yes.
11       Q   Okay.  Who is the person or the entity that
12   Frankel used that was your company's client or
13   relationship that Frankel used for his advantage
14   unfairly or in violation of the agreement?
15       A   We don't know all of them.
16       Q   No.  No.  You said Example 1.  That example.
17       A   There was multiple customers.  A lot of them
18   was -- there was a list that Frankel e-mailed to himself
19   of the top 50 customers.  Most of those customers were
20   involved at some form or fashion in looking to assist
21   Alpine in raising money.
22       Q   I don't understand.  You gave this Example 1.
23   You were referring to a particular person or customer of
24   yours that Chris was going to use to raise money to by a
25   broker-dealer.  Who was the person?

Page 70

1        A   There was more than one.  One of those
2    customers was Curt Kramer.
3        Q   Curt Kramer?
4        A   Yes.  That was one of those customers.
5        Q   All right.  Did -- did Mr. Frankel have a
6    relationship with Curt Kramer before he ever came on
7    board?
8        A   He said he didn't.
9        Q   He said he didn't?
10       A   He said he didn't.
11       Q   When did he say that?
12       A   Told it to me.
13       Q   He what?
14       A   He told it to me.  He asked me if he could
15   call him in this thing.  He had never talked to him
16   before.  He knew of him, didn't talk to him.
17       Q   When did he ask you to talk to Kramer?
18       A   This was involved when we were trying to do
19   the fund-raise, raise money for Alpine.
20       Q   When were you doing the fund-raise for Alpine?
21       A   That probably started sometime in 2017 maybe.
22       Q   Okay.  Why did Alpine need to raise money?
23       A   To help and assist it with NSCC capital calls.
24       Q   Wasn't Alpine struggling with capital for a
25   long time?

Page 71

1        MR. SUSMAN:  Objection; vague and ambiguous.
2        A   It's not capital it's struggling with.  It's
3    struggling with meeting NSCC calls.  So it's not
4    necessarily capital.
5    BY MR. BANKER:
6        Q   But the firm has to have a minimum level of
7    capital to operate; right?
8        A   It wasn't having a problem with that part of
9    the capital.
10       Q   Okay.
11       A   It was having -- it's a very specific, narrow
12   area in the business where these calls aren't
13   necessarily regulatory calls in a sense.  They are
14   basically calls that DTC has for certain types of
15   transactions.
16       Q   Okay.  So you're -- I think what you're saying
17   is that you think that -- that Chris misappropriated
18   confidential information of Alpine because he contacted
19   Curt Kramer to help him raise money to buy a
20   broker-dealer.  Is that what you're saying?
21       A   What I'm saying is that Chris Frankel had a
22   lot of access to nonpublic information and trade secrets
23   and used that to unfairly complete against Alpine and
24   potentially Scottsdale and others.
25       Q   Okay.

Page 72

1        A   And some of that includes detailed information
2    on customers, relationships he was allowed to build with
3    customers that he never built before, it's a combination
4    of a lot of things.
5        Q   All right.  What if Curt Kramer contacted
6    Chris Frankel and said -- after Chris Frankel left
7    Alpine, after you say you terminated or your wife
8    terminated his employment at the end of July, what if
9    Curt Kramer came to him and said, "You know, I've got a
10   deal for you, and I would like you to, you know, see if
11   we can put together to buy a broker-dealer"?  Would you
12   have any problem with that?
13       MR. SUSMAN:  Objection; incomplete
14       hypothetical.
15       A   I think it's more complicated than that.  I
16   think it's more along, probably worked out like Chris
17   Frankel was telling people that "Alpine's not long for
18   this world, and you should probably look for another
19   place.  And rather than invest money into Alpine, maybe
20   you should invest money into a new project I'm looking
21   at."
22       So based on those comments, if somebody were
23   to contact him, I still would have a problem with that.
24   I think that's a violation.
25   BY MR. BANKER:

18 (Pages 69 to 72)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 73

1    Q   All right.  Well, let's -- let's --
2    A   It's called indication of interest.  So if I'm
3  calling people like Jim Kelley and I'm seeking
4  indications of interest because I only know these people
5  because I've been introduced to them or I had those
6  introductions only because of my relationship with
7  Alpine and Scottsdale, I think it's more complicated
8  than what your an analogy was.
9    Q   All right.  Well, just deal with my facts.
10  Okay?  My facts.
11      If Chris Frankel knew of Curt Kramer at COR,
12  had dealt with Curt Kramer before he ever came on board
13  with Alpine, would you have any problem with Chris
14  approaching -- Chris approaching Kramer to put together
15  a deal to buy a broker-dealer?
16    A   Chris Frankel did not --
17      MR. SUSMAN:  Let me just object.  Lacks
18  foundation, incomplete hypothetical.
19    A   If Curt Kramer was Frankel's customer, Frankel
20  was his broker, then I would say that's correct.  Chris
21  Frankel never had any customers.  Chris Frankel didn't
22  bring over any customers.  Chris Frankel, as far as I
23  know, never worked for a firm that had a lot of OTC
24  customers where he was the point man for that prior to
25  working at Alpine and associated with us.

Page 74

1  BY MR. BANKER:
2    Q   All right.  Second question.  If Curt Kramer
3  reached out to Frankel after Frankel left Alpine, after
4  you say your wife terminated Frankel's employment, and
5  said, "I would like to talk to you about putting
6  together a deal to buy a broker-dealer," would you
7  consider that a violation of any of the agreements that
8  you had with Frankel?
9      MR. SUSMAN:  And I'll object again; incomplete
10  hypothetical.
11    A   I think the answer to that question, I think
12  the extenuating circumstances about how that
13  communication would have happened would have a great
14  part in this, and I don't think that the customer would
15  have done that unless he had had some indication from
16  Chris that either his relationship at Alpine would be
17  jeopardized or that Chris had led him to believe that
18  there is a better place for him to put his money.  I
19  think that that probably had all the difference in the
20  world to do with your analogy.
21  BY MR. BANKER:
22    Q   Okay.  So you want to add your speculation
23  about what you think that Chris --
24    A   I'm adding to your speculation.
25    Q   Okay.  But given my fact, right, just my fact

Page 75

1  in a vacuum, if Kramer approaches Chris about buying a
2  broker-dealer, that's not a violation of these
3  agreements, is it?
4      MR. SUSMAN:  Objection; incomplete
5  hypothetical, asked and answered.
6    A   I think I answered the question.
7  BY MR. BANKER:
8    Q   That's the best answer you can give?
9      MR. SUSMAN:  Objection; badgering the witness.
10  BY MR. BANKER:
11    Q   Can you answer that question?  If this is the
12  fact, if Kramer --
13    A   I don't think he --
14    Q   -- had approached Chris -- wait a minute.
15      If Kramer had approached Chris about buying a
16  broker-dealer, in other words, Kramer brings the deal to
17  Chris and Chris pursues that, that fact alone, is that a
18  violation of the agreement?  Can you answer that
19  question?
20      MR. SUSMAN:  Objection; asked and answered.
21    A   Based on the example I gave you before, I
22  don't believe that would be the exact case.  That
23  couldn't happen that way.  He doesn't know Curt in that
24  way prior to working at Scottsdale and Alpine.
25  BY MR. BANKER:

Page 76

1    Q   Okay.  So you can answer the question?
2    A   I don't think that --
3      MR. SUSMAN:  Wait a minute.  Objection.  You
4  don't have to answer that question.
5      MR. BANKER:  I disagree.
6  BY MR. BANKER:
7    Q   What -- can you think of -- are there any
8  other examples that you point to that Chris
9  misappropriated the plaintiffs' confidential information
10  other than this example that you've given with Kramer?
11    A   Oh, yes.
12      MR. SUSMAN:  Wait.  Objection; misstates prior
13  testimony.  That's not the only example given.
14    A   No, there is multiple examples that I think I
15  mentioned to you so far.
16  BY MR. BANKER:
17    Q   Well, you mentioned the conversation with
18  Kelley?
19    A   The discovery.
20    Q   The discovery.
21      Yeah, but I'm talking about any other
22  incident.  What do you -- do you have any knowledge of
23  what Chris has done unfairly to compete with your
24  businesses?
25      MR. SUSMAN:  Objection; asked and answered.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 77

1      A   I think I've tried to answer that the best I
2   can.  I've asked and answered.
3   BY MR. BANKER:
4      Q   Asked and answered?
5      A   You've asked; I've answered.
6      Q   Okay.  What is Chris doing now?
7      A   I don't know specifically what Chris is doing
8   now.  I believe he is trying to unfairly compete with
9   us.  Currently at Vision and maybe some other firms.
10     Q   Okay.  Do you know if he's working at Vision?
11     A   I know that he is registered on the CRD at
12   Vision.
13     Q   Okay.  Is Chris allowed to work at Vision?
14     A   Sure.
15     Q   Okay.  And what is -- what do you contend the
16   restriction is on Chris working at vision?
17     A   No restriction.  There is only -- he just
18   can't unfairly compete using our confidential
19   information on trade secrets.
20     Q   Okay.  So you think that perhaps Chris might
21   somehow be competing unfairly with you while he's
22   working at Vision.  Is that what you're saying?
23     A   Yes.  He is using -- we believe he is using
24   our trade secrets and confidential information in an
25   unfair manner to compete, yes.

Page 78

1      Q   At Vision?
2      A   We don't know if it's Vision.  We suspect it
3   would be Vision today because he's registered at Vision.
4      Q   Okay.  Well, let's assume that he's working at
5   Vision.  Okay?  Let's assume that that's where he's
6   working.  What's he doing there to compete unfairly or
7   to violate these agreements that you had him sign?
8      A   That's -- I think we've gone through that.
9   But he is using information from the customers,
10   financial information, trade information, top customer
11   information.  All the information that he gathered at
12   Alpine he's using it unfairly.
13     Q   That's awfully vague.  Tell me --
14     A   It's very broad, and it encompasses a lot of
15   things.  So it's not an easy answer.  So all I can tell
16   you is that he's using that stuff and continues to use
17   it and has reached out, from what we can see, to other
18   people that he did not have those kind of relationships
19   with prior to being at Alpine.
20     Q   Okay.  Fair to say that the companies have no
21   personal knowledge of whether Chris is competing
22   unfairly at Vision or not?  Is that true?
23     A   We -- no.  I think that we don't have any
24   knowledge other than what we've discussed already.
25   We've obviously heard and seen some things from

Page 79

1   different customers, Jim Kelley examples, that would
2   lead us to believe that.  And, of course, the discovery
3   is showing that to be true.
4      Q   Of course.  Tell me -- identify for me any
5   third party to whom Chris has disclosed confidential
6   information, if any, of the companies that he was not
7   supposed to disclose that information to?
8      A   It would appear that he's disclosed some of it
9   to Ziv, Jim Kelley, potentially, and to others.
10     Q   Okay.  You're saying that Kelley would be a
11   third party to whom Chris disclosed confidential
12   information?
13     A   As I understand what Jim Kelley told me, he
14   used terms that would be almost identical to the
15   revenues of Alpine in his ability to take revenue,
16   essentially take revenue -- the numbers that he used was
17   the exact revenues or within the ballpark revenues of
18   Alpine at the time that he could simply move to another
19   firm.
20     Q   All right.  And what confidential information
21   did Chris disclose?
22     A   That would be revenue information.  Revenue
23   information of Alpine is confidential.
24     Q   Okay.  Isn't the revenue information in the
25   audit?

Page 80

1      A   Not in the public one.
2      Q   Okay.  What is the public audit versus the
3   private audit?
4      A   Public audit has no financial information such
5   as profit and loss, cash flow statements, simply a
6   balance sheet.
7      Q   Okay.  So other than Ziv and Kelley are there
8   any other third parties?
9      A   We believe there are.  Vision, potentially
10   other firms that he may try to acquire, which we don't
11   know what all those could be at this point.
12     Q   Well, what firm is he -- do you know what firm
13   he's tried to acquire?
14     A   Ziv is one.  Potentially another one Koontz,
15   potentially Quantex.
16     Q   Anybody else?
17     A   Not that I'm aware of.
18     Q   Okay.  And do you know whether Chris has used
19   any of your confidential information to acquire any of
20   those firms or to try to acquire them?
21     A   Other than what I've already mentioned.
22     Q   Which is Ziv in the trade blotter?
23     A   And the customer information, revenue
24   information stuff about the customers.
25     Q   What customers are we talking about?

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 81

1      A    Looks like all of them.
2      Q    No.  No.  I'm asking you, what -- what
3    customers --
4      A    It would appear that it's a lot of the top
5    50-plus customers that he was using.
6      Q    What are you basing that on, on the customer
7    list that he e-mailed himself?
8      A    That and the fact that there's been some
9    communications, multiple communications with some of
10   those same customers.
11     Q    Who?  With whom?  Which customers?
12     A    It would appear that Chris is soliciting those
13   customers.
14     Q    Which customers is he soliciting?
15     A    The ones on the top 50 list.
16     Q    All of them?
17     A    It would appear so.  I don't -- we are in the
18   process of getting that discovery.
19     Q    Why do you say "It would appear so"?  What
20   gives you a basis for saying that it would appear that
21   he's soliciting your top 50 customers?
22     A    Customers calling and saying that he had
23   gotten contacted by individuals that are either part of
24   Chris in a group or people that are working with Chris
25   in a group.  Some of the customers that were in

Page 82

1    discovery are ones that had mentioned that to either
2    associates at Alpine or associates at Scottsdale.
3      Q    Give me the name of a customer.
4      A    I don't have the name right off the top of my
5    list, but I would be happy to pull up the list of those
6    customers and some of that discovery and go through
7    those with you.
8      Q    Well, we'll go through that.  We'll go through
9    that, but you can't -- you can't tell me -- without
10   looking at that list, you cannot identify any customer
11   that you think that Chris has done something
12   inappropriate with?
13     A    I think there is multiple customers, and do I
14   remember all the customers off the top of my head?  No,
15   I don't.
16     Q    Okay.  Let me hand you what I'll mark as
17   Exhibit 5.
18         (Exhibit Number 5 marked for identification.)
19         MR. SUSMAN:  Thank you.
20   BY MR. BANKER:
21     Q    Can you tell me what Exhibit 5 is?
22     A    This is an Alpine trade run.
23     Q    Is trade blotter another name for trade run?
24     A    Can be, yes.
25     Q    Okay.  What does that mean, "trade blotter" or

Page 83

1    "trade run"?
2      A    It's all the trades that Alpine did --
3      Q    Okay.
4      A    -- on those respective days.
5      Q    How do you know that it's Alpine that did
6    those trades?
7      A    We had our operations person, Joe, take a look
8    at this and confirm it.
9      Q    Okay.  And this is a document that your
10   lawyers obtained by a subpoena to Ziv; correct?
11     A    That's my understanding.
12     Q    Yeah.  Okay.  And do you know how Chris got
13   this trade blotter?
14     A    No, I do not.
15     Q    Do you consider the trade blotter to be
16   confidential?
17     A    The way it's put together, yes.
18     Q    What do you mean "the way it's put together"?
19     A    Specifically all of Alpine's trades on two
20   specific days.
21     Q    And what is confidential about that?
22     A    If you know all the customers and you know all
23   the trades, you have information that the market does
24   not have.
25     Q    Okay.  This trade blotter --

Page 84

1      A    It's confidential and trade secret.
2      Q    I'm sorry?
3      A    That's not publicly readily available.
4      Q    Okay.  I understand that trade blotter may not
5    be publicly available, but I'm wondering how it's
6    confidential.  It doesn't give the names of customers,
7    does it?
8      A    Any information at all, Scottsdale, Capital,
9    or any other firm, how it's compiled, how it's known to
10   be compiled, put together that would not be known to the
11   general public who the individuals who picked those
12   trades, any of that information whatsoever would be
13   confidential and a trade secret at Alpine, Scottsdale.
14   So no matter what format it is and how it is doesn't
15   change that fact.
16     Q    How -- why did Chris want this information?
17   Do you know?
18         MR. SUSMAN:  Objection; calls for speculation.
19     A    It looks like, since we are speculating, that
20   Chris Frankel is essentially telling Ziv that he's going
21   to basically take all of Alpine's business and giving
22   them a sample of all the business he's going to take,
23   because he knows all the customers and basically ran
24   Alpine, has access to all kinds of confidential trade
25   secrets that he can just move it over.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 85

1    BY MR. BANKER:
2        Q   Okay.
3        A   Which is consistent with exactly what Jim
4    Kelley said.
5        Q   Is there a reason why you want to have -- why
6    you want to anticipate your trade volume, why you want
7    to know what your trade volume is going to be in this
8    business?
9        A   I don't understand your question.
10       Q   In other words, are there capital
11   requirements, are there depository requirements that you
12   have to meet, depending upon the volume of business that
13   you are going to do through a broker-dealer?
14       A   Doesn't work quite that way.
15       Q   Okay.  How does it work?
16       A   Well, there is all different types of capital
17   requirements.  So you have to be specific on what type
18   of trade and what type of capital requirement.
19       Q   Okay.  Was this information, this trade
20   blotter useful to Ziv?
21           MR. SUSMAN:  Objection; calls for speculation.
22       A   I think Chris was trying to convey, since we
23   are speculating, that he could simply take all of
24   Alpine's business because he was the CEO and had all
25   this information, confidential and trade secret, that he

Page 86

1    could just move it from Alpine to Ziv, based on his deal
2    with Ziv, that Ziv would benefit somehow from this.
3    BY MR. BANKER:
4        Q   Okay.
5        A   Because he would still have an ownership
6    interest in this.
7        Q   I understand that.  I get that point.  I get
8    that is your belief about this.  But would this trade
9    blotter be useful to Ziv?
10       A   Yes, it was useful to anybody.
11       Q   How would -- how would this trade blotter have
12   been useful to Ziv?
13       A   Typically, when you are trying to generate
14   business, you want to show them the kind of business,
15   okay, that you've done.  Okay.  This business, that
16   business would be Alpine's business.  That would also be
17   a trade secret:  The kind of business, the revenue that
18   comes from that business, the commissions that come from
19   that business, the customers related to that business.
20           So, essentially, he was using that to
21   basically say, "I can move all of this business because
22   I know it all.  I have this confidential trade secret
23   information and just move it over to Ziv."
24           If he hadn't worked at Alpine and he didn't
25   have any customers, like he didn't prior to working at

Page 87

1    Alpine, he would have nothing to sell anybody because
2    he's never had a customer.
3        Q   You've made that point clear, and I get that.
4    Let's -- let me ask you this.  Let's assume that this
5    trade blotter that is part of Exhibit 5 is sent
6    anonymously and randomly to Ziv on November 13, 2018.
7    This document comes to Ziv out of the blue.  Is that
8    useful to Ziv?
9            MR. SUSMAN:  Objection; incomplete
10       hypothetical.
11       A   It could be useful to Ziv, but it's much more
12   useful to Ziv if he knows that the individuals that is
13   responsible for this miraculous trade blotter knows the
14   people behind it, also knows a lot about those people,
15   and can simply unfairly compete with stealing those
16   people because they know information that the rest of
17   the market doesn't have.
18   BY MR. BANKER:
19       Q   Okay.  Eliminate all the facts that you want
20   to add.  The trade blotter in Exhibit 5 anonymously
21   comes to Ziv on November 13, 2018.  What can -- what
22   benefit would that be to Ziv, if any?
23           MR. SUSMAN:  Again, same objection.
24       A   I think I've tried to answer that, but it goes
25   to a collective group of business.  But one trade by

Page 88

1    itself in a stand-alone probably wouldn't help him much
2    but collectively grouped together with other information
3    is a very powerful thing, and it would be confidential
4    and a trade secret.
5    BY MR. BANKER:
6        Q   All right.  So let's say that this trade
7    blotter it's collectively grouped, right.  It's got all
8    the trades -- or appears to have trades from August 27,
9    2018, through August 2008, 2018.  It's grouped together
10   just like this.  No customer names, you know, is that --
11   how does that help Ziv if that's all he has?
12           MR. SUSMAN:  Objection; calls for speculation.
13       A   It can help a lot, but it helps even more if I
14   know that I have all the other information behind it
15   including the revenue information, the commissions
16   structure, all the other information that would be
17   confidential on top of that.  Very powerful weapon.
18   Even that by itself is potentially -- if you're looking
19   in the right spots for it and you're targeting something
20   could be very useful information.
21           It's kind of -- it would -- I would say that,
22   you know, if I had just a chemical in a drug, only one
23   chemical, it may not be valuable; but if I have them
24   collectively and how it puts them together, then it
25   would be very, very, very potent.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 89

1    Q   What benefit would this trade blotter be to
2  Ziv in and of itself?  That's the only piece of --
3    A   Show you how it --
4        MR. SUSMAN:  All right.  I'm going to object.
5  It's has been asked and answered.
6        MR. BANKER:  It hasn't been answered, Jordan.
7        MR. SUSMAN:  It hasn't been answered to your
8  satisfaction maybe, but it's been answered.  I'm
9  sorry he's not giving you the answer you want,
10  David.
11        MR. BANKER:  Jordan, I'm going to ask you to
12  quit talking.  Okay.
13        MR. SUSMAN:  I going to ask you to quit
14  badgering the witness with the same question.
15  BY MR. BANKER:
16    Q   What benefit -- can you answer this question?
17  What benefit is this trade blotter in and of itself to
18  Ziv without any other information?
19        MR. SUSMAN:  Objection.  It's been asked, and
20  it's been answered.
21    A   Asked and answered.
22        MR. SUSMAN:  And -- wait, wait.  And it calls
23  for speculation, and it's an incomplete
24  hypothetical.
25    A   I've answered it.

Page 90

1  BY MR. BANKER:
2    Q   So you can't describe for me any benefit that
3  this trade blotter by itself would have provided to Ziv?
4    A   I have given you that answer multiple
5  different ways.  I'm not really sure -- if you would
6  like to read back all the questions and answers, we can
7  go do that.
8    Q   Does the trade blotter by itself yield any
9  benefit?
10    A   Yes.
11    Q   And what is the benefit?
12    A   The benefit is he knows that information
13  collectively.  If I get all the information collectively
14  on a day, that tells me a lot.  Now --
15    Q   Okay.  Let me stop you there.  So let's do it
16  this way.  You get this trade blotter on this day from
17  Ziv's broker-dealer, what it is, whatever it is.
18        On November 13, 2018, you get Ziv's trade
19  blotter for these dates with this information.  What are
20  you going to do with that?
21        MR. SUSMAN:  Wait, wait.  I'm going to object.
22  Lacks foundation, calls for speculation, incomplete
23  hypothetical.
24    A   Yes.  So if Ziv's CEO came up to me and in the
25  process of coming up to me telling me how much business

Page 91

1  I'm going to bring me and I've actually got a trade run
2  of all the business that he claimed he was going to
3  bring over from his prior firm, it would help a lot.
4  BY MR. BANKER:
5    Q   I'm not talking about business that can be
6  brought.  You just get the trade blotter out of the
7  blue.  What --
8    A   I didn't get it out of the blue.  I got it out
9  of the blue in context with business that was going to
10  come over.
11    Q   Okay.  I got to use the restroom real quick.
12  I'll be right back.
13        (Recess taken from 11:19 a.m. until
14    11:21 a.m.)
15        (Exhibit Number 6 marked for identification.)
16  BY MR. BANKER:
17    Q   All right.  Mr. Hurry, I've marked as
18  Exhibit 6 a miserable stack of documents that run from
19  Frankel Bates Number 1581 through 2242.  And I will
20  represent to you that what we've done is we have gone to
21  your second amended complaint and we've pulled out the
22  dates referenced in the complaint for the e-mails that
23  Mr. Frankel sent to his personal e-mail account that
24  allegedly transmitted the confidential information on
25  which you're suing.

Page 92

1        So Exhibit 6 purports to be one of the dates
2  e-mails referenced in your complaint to orient you, and
3  that's what I'm going to do.  I'm going to take you
4  through each date referenced in the complaint.
5        So if you looked at -- I know we are going to
6  need to go page by page because it's so thick, have
7  you looked at -- does Exhibit 6 look familiar?  Does
8  this e-mail transmittal from Frankel to himself and --
9    A   Yes.
10    Q   Okay.  You've seen that?
11    A   Not familiar, but I've reviewed some of these,
12  yes.
13    Q   Okay.  And then you can see it's transmitting
14  an e-mail from Nathan -- is it Simmons or Simons?
15    A   Simmons.
16    Q   Simmons to Tammy Schultz at Ascensus and to
17  Mike Cruz.  And the subject is "Non" -- "Nonbank trustee
18  application - email 2."
19        Do you see that?
20    A   Um-hum.
21    Q   If you look up at the top under Frankel's
22  e-mail to himself, you can see it's got a number of
23  attachments.  Do you see that under the attachments?
24    A   Yes.
25    Q   Okay.  Let me ask you, first of all, did --

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 93

1    Frankel worked on his computer throughout his tenure at
2    Alpine, didn't he?
3         MR. SUSMAN:  Objection; calls for speculation.
4         MR. BANKER:  I shouldn't -- I don't mean to --
5    I don't want you to speculate.
6    BY MR. BANKER:
7         Q   Do you know whether Frankel worked on his home
8    computer during his entire tenure at Alpine?
9         A   He was supposed to work on a company computer.
10        Q   Do you -- was there any policy that told him
11   not to work on his home computer?
12        A   I'm not -- I don't recall if there was at the
13   time, but I believe he had his own company computer.
14        Q   What do you mean "his own company" --
15        A   He had a computer issued to him by the
16   company.
17        Q   A laptop?
18        A   I believe a laptop and a desktop.
19        Q   Okay.  But I guess what I'm asking is, do you
20   know whether Alpine had any written policy that
21   prohibited Frankel from working on his home computer?
22        A   I don't recall anything at this point, no.
23        Q   Okay.  Do you know if anybody told him, "You
24   can't work on your home computer"?
25        A   He's the CEO.  So I would imagine that they

Page 94

1    did not.
2         Q   Okay.  Are you aware that his home computer
3    had a printer, a print station so that he if he wanted
4    to print something off and work with it that that would
5    be a convenience for him?
6         A   No, I was not aware how his office at home was
7    set up, personal office.
8         Q   Okay.  But you knew that he had to travel, I
9    guess, what, each week from Tampa to Salt Lake City to
10   work for Alpine; right?
11        A   That was my understanding.
12        Q   So he's back and forth between his home and
13   Alpine almost every week; right?
14        A   My understanding was not quite that organized,
15   but he had regular travel back and forth.
16        Q   Okay.  And you wouldn't have any problem as a
17   corporate representative of these companies if Frankel
18   is trying to work diligently on Alpine's business at his
19   home by using perhaps a larger computer screen that's
20   easier to read and by -- and by using a printer so that
21   he could print things out and make notes on them and
22   manipulate them and to do Alpine's business; correct?
23        A   I think the company would have a problem with
24   people putting confidential stuff on a noncompany
25   computer.

Page 95

1         Q   Do you know if anybody expressed that concern
2    to him?
3         A   He's the CEO.  I would imagine he would have
4    known better.
5         Q   Okay.  So the answer is, no, you don't know if
6    anybody expressed that to him?
7         THE WITNESS:  This is one of the exhibits?
8         MR. SUSMAN:  Yeah, this is part of the
9    exhibit.
10   BY MR. BANKER:
11        Q   Are you there?
12        MR. SUSMAN:  No, I'm just showing him the -- I
13   guess the WSP.
14        A   So it was in the written rules and procedures.
15   BY MR. BANKER:
16        Q   What are you looking at?
17        A   Frankel-001776.
18        Q   Okay.  Let me find that.  All right.  I'm
19   looking at one?
20        MR. SUSMAN:  1776, page 43 of the WSP.
21   BY MR. BANKER:
22        Q   Okay.  And where are you looking on 1776?
23        A   Yes.
24        Q   What provision?
25        A   3.17, 3.17.5, 3.17.1.

Page 96

1         Q   Okay.  So you're saying 3.17.5 prohibited
2    downloading?
3         A   And 3.17.1.
4         Q   Okay.  All right.  And what is this document
5    that you're looking at, 1716 through -- it looks like
6    WSP Manual Alpine Securities Corporation.  What is that?
7         A   That's the -- WSP is every employee's required
8    to review when they come on board with Alpine.  It's the
9    rules and procedures for the firm.
10        Q   Okay.  Now, Alpine is required to -- is it
11   FINRA or the SEC that requires Alpine to keep all
12   e-mails?
13        A   Both.
14        Q   Okay.  And so how did Alpine go about doing
15   that?  How were -- how were e-mails stored?
16        A   Well, I'm not a technician, but there is a
17   server that stores the e-mails, and I believe there is a
18   backup company that stores those e-mails as well.
19        Q   Okay.  So while Mr. Frankel is e-mailing stuff
20   to him, all of that -- those e-mails to himself are
21   required to be stored on Alpine's server or its backup
22   system; correct?
23        A   Yes.
24        Q   Okay.  So for the entire time that Frankel is
25   working at Alpine, Alpine knows that he is sending

24 (Pages 93 to 96)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 97

1   documents to himself to work on at home; correct?
2       A   Chris Frankel's running Alpine.  So Chris
3   Frankel would have known or Chris Frankel would have
4   been in control of that whole process.  The board
5   doesn't look at e-mails.  Since he ran the company, he
6   did that.  I might -- since we are on that topic, he's
7   also the only one that would know if he spent 4- or 5-
8   or 600- or $700,000 in company money on a credit card
9   that he also didn't provide receipt -- receipt either.
10          That doesn't mean that it was right.  You
11  would think somebody in that capacity would know better.
12  But he ran the company.  He was the one that ultimately
13  was responsible for that.
14      Q   Okay.  Was -- did anybody else have any
15  compliance responsibilities in Alpine?
16      A   They did, but they all reported to Chris
17  Frankel.
18      Q   Did you have a lawyer that was responsible for
19  compliance?
20      A   He also reported to Chris Frankel.
21      Q   Who would that have been, Cruz?
22      A   No.  Cruz was the holding company counsel.  At
23  the time, it would have been Nate Simmons at Alpine.
24      Q   So Nate Simmons would have been counsel for
25  Alpine in-house?

Page 98

1       A   Yes.
2       Q   And he would have had compliance
3   responsibilities?
4       A   Not necessarily, no.  He would have been
5   general counsel.  There would be a chief compliance
6   officer as well.
7       Q   Who would have been the chief compliance
8   officer?
9       A   There was probably several people at that time
10  frame.  I don't recall.
11      Q   Can you recall any of them?
12      A   Lea Farmer was the one who was the compliance
13  officer originally; and then after that, I believe Chris
14  Frankel took dual roles as the compliance officer and
15  CEO.
16      Q   Okay.  So you think --
17      A   But there may have been somebody in between,
18  but I think that it was Lea Farmer, and then Chris
19  Frankel resumed the role of both chief compliance
20  officer and CEO.
21      Q   Okay.  All right.  Let's go through Exhibit 6,
22  and I want to try and move quickly, but I don't want to
23  rush you.  The first thing that we come to is the
24  audited, the annual audited report for the period from
25  October 1, 2015, through September 30, 2016, for Alpine

Page 99

1   Securities Corporation.
2       Q   Do you see that?
3       A   Yes.
4       Q   Is that confidential?
5       A   All the information in this report that's not
6   publicly listed would be confidential.
7       Q   Can you tell me what, if any, information in
8   this report, this audit report, is not confidential --
9   is confidential?
10      A   Well, I think I mentioned that before to you
11  that all the revenues, cash flow statements would not be
12  publicly disclosed.  There is probably other items in
13  here that relate to that that would not also be publicly
14  disclosed.  Any type of revenue items, cash flow items.
15      Q   So you are saying the revenues and cash flows
16  in the audit would not be publicly available?
17      A   Anything to do with the revenues, yes.
18      Q   That doesn't get filed with the SEC or on
19  the -- on your website?
20      A   It's not public, no.  Just the balance sheet
21  information.
22      Q   But the balance sheet information gets filed
23  on the website?
24      A   Just the balance sheet information.
25      Q   Okay.  Do you know whether Mr. Frankel

Page 100

1   misappropriated any information from this audit to
2   disadvantage any of your companies?
3       A   Yes.  Looks like he was using it to try to
4   steal the business.
5       Q   The audit for the period ending September 30,
6   2016?
7       A   Yes.
8       Q   How would that -- how would that have
9   benefited him?
10      A   The revenue numbers were almost the identical
11  revenues, numbers that Chris Frankel had touched saying
12  that he had the clients that could do this much
13  business.  They are almost exactly the same as what's on
14  those revenue statements.
15      Q   Okay.  What about the next document, Frankel
16  1610, "Number of Accounts For Ascensus Nonbank Trustee
17  Application," is that a confidential document?
18      A   Yes.
19      Q   And why is it confidential?
20      A   Anything that's not readily available to the
21  market that's maintained by Alpine or Scottsdale would
22  be a trade secret or confidential or both.
23      Q   Do you know what, if anything, Hurry did with
24  this -- I mean, what, if anything, Frankel did with
25  Frankel 1610?

25 (Pages 97 to 100)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 101

1      A   We believe that he was trying to use this
2   information to unfairly compete.
3      Q   Okay.  What about Frankel 1609, this document
4   that says "Accounts Payable Policy," April 4, 2017?  Is
5   that confidential?
6      A   If this information was not disseminated to
7   the public and it was an internal document it would be
8   considered confidential information.  Anything
9   whatsoever that is not disseminated to the public would
10  be considered confidential information.
11     Q   So are you able to say whether this accounts
12  payable policy dated 4-4-17 was confidential or not?
13     A   I can't say on the surface, but if it was
14  not -- if it was only an internal document, it would
15  have been.
16     Q   Okay.  All right.  Let's look at this Frankel
17  1611, which is the Talisys Service Organization Controls
18  Report, October 1, '15 through September 30th, '16,
19  Deloitte, is that confidential?
20     A   Any information that was not disseminated to
21  the public would have been confidential, including this.
22     Q   Do you know whether this was confidential or
23  not, this Deloitte report?
24     A   I don't recall specifically this report, but
25  it looks like it was sent specifically to Alpine.  It

Page 102

1   does not look like it was something that was used or put
2   out for the public.  But I don't know that for certain.
3      Q   Do you know how or whether Frankel would have
4   used this to disadvantage any of your companies or
5   benefit himself?
6      A   Sure.  If you know about the vendors that they
7   use, how they use them, stuff about them, any of that
8   kind of stuff can be used again you, any information
9   like that.
10     Q   Okay.  Let's look at the National Union Fire
11  Insurance Company blanket fidelity bond for securities
12  dealers, which begins at Frankel 1675.  Is that a
13  confidential document?
14         MR. SUSMAN:  Hang on.  Let's get that here.
15  1675?
16     A   This more than likely would be.  Again,
17  anything that wasn't readily available to the public
18  would be confidential information.  I don't believe this
19  was readily available to the public.  So it would be.
20  BY MR. BANKER:
21     Q   Do you know whether Frankel misappropriated
22  this in any way?
23     A   He would have -- could have used this in -- in
24  some way to try to acquire another firm, potentially.
25     Q   To what?

Page 103

1      A   He could have used a lot of this information
2   collectively to unfairly compete in buying another firm.
3      Q   How?  How would he use the blanket fidelity
4   bond?
5      A   By giving the recipe of anything that you
6   needed to make the greatest cookie in the world and you
7   had it collectively together, then, yes, you would
8   certainly be able to compete with the best cookie in the
9   world.
10     Q   Because Alpine is the best cookie in the
11  world?
12     A   Alpine is the largest OTC -- Alpine,
13  Scottsdale collectively, as far as I know, are the
14  largest OTC clearing firm in the United States.
15     Q   Okay.  What about -- let's not collectively.
16  What about Alpine by itself?  Would it --
17     A   Probably still in that neighborhood, but
18  certainly Scottsdale and Alpine.  I would say even
19  Alpine by itself too.
20     Q   All right.  What about the WSP Manual,
21  Frankel 1716?  Is that a confidential document of
22  Alpine?
23     A   Yes, anything that would be -- I believe this
24  was something that was never shared with the public.
25  Anything that would not be readily available to the

Page 104

1   public would be confidential and trade secret of Alpine.
2   And WSPs have obviously a lot of private information in
3   there and detailed information about the process of the
4   firm.
5      Q   All right.  What about 2238, is that a -- a
6   confidential Alpine document?
7      A   Hard for me to tell from this; but, again, if
8   it was something that wasn't readily available to the
9   public, it would be considered confidential.  But it's
10  hard for me to tell from the surface of these two
11  documents.
12     Q   Okay.  Well, it's just a two-page document?
13     A   I understand.  This one or this one?
14     Q   The -- the -- I'm looking at the Bates number
15  2238.
16     A   Okay.
17     Q   "About Haynie," H-A-Y-N-E [sic]?
18     A   Yes.  I don't know how this was originally
19  obtained; but, again, I'll answer that if it was
20  something that was not available readily to the public
21  and it was something given specifically in confidence or
22  something specific for Alpine, it would be.  I cannot
23  tell by looking at this -- these two pages.  So I don't
24  know where it came from.  So I can't -- I can't answer
25  that question other than what I said already.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 105

1      Q   Okay.  And then the final document in this
2   stack is Frankel 2240.  Is this a confidential document?
3      A   I would give you the same answer:  If it's
4   something that's not readily available to the public, it
5   would be confidential and a trade secret.
6          Looking at these two documents, it's hard to
7   say whether it was or wasn't.
8      Q   You are only looking at one document right
9   now.
10     A   I'm sorry.
11     Q   2240.
12     A   At this one document.
13     Q   You can't say if it's confidential or not; but
14  if it's not readily available, your position is it's
15  confidential?
16     A   Absolutely.
17     Q   Okay.
18         (Exhibit Number 7 marked for identification.)
19  BY MR. BANKER:
20     Q   Let me hand you what I'll -- keep those -- I
21  would suggest you keep those in order.
22         I've handed you what I've marked as Exhibit 7,
23  which is another of the e-mails referenced in the second
24  amended complaint with documents attached.
25         Do you see that?

Page 106

1      A   I do.
2      Q   And if you look at the first attachment that
3   we come to, it is Frankel 1513, an e-mail from Nathan
4   Simmons.  That's counsel for Alpine; right?
5      A   Yes.
6      Q   To Tammy Schultz at Ascensus with a copy to
7   Frankel and Cruz on April 20, 2017.
8          Do you see that?  And it says "Application of
9   Alpine Securities to become Non-Bank Trustee."  Do you
10  see that?
11     A   Yes.
12     Q   Is this document confidential?
13     A   If it was something that was not readily
14  available to the public.
15     Q   Okay.  Now, this is interesting because if
16  you -- if you look at this e-mail, 1513, the memorandum,
17  it says at the top "confidential," doesn't it?
18     A   That's because it probably was marked
19  attorney-client privilege because I see it comes from
20  Nate to Chris.
21     Q   Do you know why "confidential" appears in the
22  top right-hand corner?  You're making an assumption that
23  because it comes from Nate, but do you -- other than
24  that assumption, do you know why?
25     A   You would have to probably ask Nate, but

Page 107

1   anything generally that would come from an attorney
2   would be marked confidential, attorney-client privilege,
3   or both.
4      Q   Okay.  And then what about 1517, certified
5   copy of articles of incorporation and amendments for
6   Alpine?  Is that confidential?
7      A   If it was something that was not made to the
8   public, okay -- so if it was something that was actually
9   put up on the website for the public to see, then it
10  obviously would not be.  But I can't tell you by looking
11  at just this paper if all this stuff was public or not
12  public.  But if it wasn't, then it would be
13  confidential.
14     Q   What about 1541, bylaws of Alpine?  Is that
15  confidential?
16     A   If the bylaws were not readily available to
17  the public, they would be confidential.
18     Q   But you don't know whether they were or not?
19     A   In some cases, I don't believe these were; but
20  it's -- I don't believe these were.  But if it was not
21  made readily available to the public, it would be
22  confidential.
23     Q   Why do you believe that the bylaws were not
24  readily available to the public?
25     A   I'm not an attorney, but I think there is some

Page 108

1   cases where certain articles are made public.  So I
2   can't speak to the legalities of that.  I think in some
3   cases in certain states they do make those public.
4      Q   Okay.
5      A   But I don't know in this case if they were
6   one.
7      Q   All right.  Next document we come to is
8   Frankel 1555, articles of organization for SCA Clearing,
9   LLC.  Do you claim that that document is confidential
10  information?
11     A   It would be the same question.  This one may
12  be made to the public, in which case it wouldn't.  But I
13  would add that if you had collectively public
14  information that was only known collectively to Alpine,
15  then it could be considered confidential.  So if I
16  collectively got public information but only knew how to
17  assemble it in such a way because I have access to
18  information at Alpine, then we would consider that
19  confidential.  The sourcing and collection of that
20  information; how it's collected and how it's put
21  together.
22     Q   What about 1557, Arizona Limited Liability
23  Company Operating Agreement for SCA Clearing?
24     A   I don't think I have 1557.
25         MR. SUSMAN:  Yeah, we don't have that.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    dd12650c-7912-41c0-8012-067a3fbc3fcd

| Page 109 | Page 111 |
|---|---|

**Page 109**

1     MR. BANKER: 1557?

2     MR. SUSMAN: Yeah, it's not in our stack.

3     MR. BANKER: Hum.

4     MR. SUSMAN: Skips ahead to 1569. At least

5 that's what mine does.

6     MR. BANKER: Huh. I'm sorry.

7 BY MR. BANKER:

8     Q   Well, let me do this -- I don't know how that

9 happened.

10     MR. SUSMAN: I've never made a mistake like

11 this in my career. I mean, I just can't believe

12 this, David.

13     MR. BANKER: All right. Well, let's do this.

14 Let's put it in your stack, and we'll replace this.

15 BY MR. BANKER:

16     Q   But 1557 to 1568, the Arizona Limited

17 Liability Company Operating Agreement for SEA Clearing,

18 is that a confidential document?

19     A   Same answer. My understanding is this is not

20 made available to the public, but -- this particular

21 one. But the same answer, if it's not readily made

22 available to the public, it would be confidential. I do

23 not believe this one was.

24     Q   You don't believe it was available to the

25 public. So you think it was confidential?

**Page 111**

1     A   That would be confidential information.

2     Q   Okay. Why is 1571 confidential?

3     A   Because it's not information that would be

4 made readily available to the public.

5     Q   Okay. What is the purpose -- how is this

6 first amendment to The Hurry Family Revocable Trust

7 used?

8     MR. SUSMAN: Objection; vague and ambiguous.

9     A   I mean, anything to do with the trust is

10 confidential.

11 BY MR. BANKER:

12     Q   Okay. I mean, but wouldn't this -- and if you

13 look at 1573, Certificate of Trust The Hurry Family

14 Revocable Trust, do you see that?

15     A   Yes.

16     Q   Aren't these documents that the trust would

17 use to present to banks and other third parties?

18     A   Still wouldn't be -- still would not be

19 something that's readily available to the public,

20 specific case-by-case basis.

21     Q   No. No. But I'm -- I hear your answer about

22 whether or not it's made available to the public. But

23 wouldn't these two trust documents, this first amendment

24 and the certificate of trust, wouldn't these be used to

25 present to banks and other third parties that dealt with

| Page 110 | Page 112 |
|---|---|

**Page 110**

1     A   I think that, if it was not made available to

2 the public, it would be confidential.

3     Q   And whose confidential information is it?

4     A   Well, SCA Clearing would be the owner of

5 Scottsdale Capital.

6     Q   Oh, that's a holding company?

7     A   Yes.

8     Q   Okay. All right. And then what about 1569,

9 Arizona Corporation Commission -- just put that in the

10 proper order in your stack that the court reporter will

11 have, and we'll get -- we'll get a replacement copy of

12 that for everybody.

13     A   All right.

14     Q   1569, Arizona Corporation Commission

15 Corporations Division Website Entity Detail for SEA

16 Clearing, is that confidential information?

17     A   Same answer. If it was not available to the

18 public, it would be. This may or may not have been. If

19 it was not available to the public, then it would be

20 considered confidential information.

21     Q   Okay. And what about 1571, First Amendment to

22 the Hurry Family Revocable Trust, November 26th, 2012,

23 is that confidential information?

24     A   1571.

25     Q   1571.

**Page 112**

1 the trust to show that you and your wife had authority

2 to act on behalf of the trust?

3     MR. SUSMAN: Objection; incomplete

4 hypothetical.

5     A   It would be confidential information that was

6 shared with a bank on the same premise that that

7 information is kept confidential. The bank has the same

8 privacy laws that any financial institution would have,

9 and it would not be made readily available to the

10 public.

11 BY MR. BANKER:

12     Q   But is that -- is that what I understand the

13 purpose of those two documents is, 1571 and 1573, is to

14 authorize you and your wife to deal with third parties

15 on behalf of the trust so that you have documents --

16     A   Not necessarily. It's to show somebody in a

17 certain situation, very narrow audience, typically,

18 maybe a bank or a lender of who the trustees and what

19 they have authorization for. It's still not something

20 that's readily available and made to the public.

21     Q   Okay. What in the world do you think that

22 Frankel would do with that?

23     A   I have no idea.

24     Q   I mean, that's of no benefit to him, is it?

25     A   Look, I don't know what Frankel did or didn't

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 113

1   do.  But from what I've been seeing in some of this
2   discovery any of that information could be used against
3   us unfairly.
4       Q   How could this -- how could these two trust
5   documents be used against "us" -- who is "us," the
6   plaintiffs -- unfairly?
7       A   Probably in the same way -- in some way as --
8   as knowing the revenue.  Knowing who some of these
9   owners are that may or may not be public information and
10  what their controls are and what their controls aren't
11  certainly could be.
12      Q   Knowing the trustees of the trust?  How --
13  what advantage does that give any other broker-dealer?
14      A   I can't think of something off the top of my
15  head; but when you have information and it's put
16  collectively in the group, it's hard to know how it's
17  going to be used and what it's going to be used for.
18      Q   All right.  Let me hand you -- don't you get
19  these out of order now.  The court reporter is going to
20  be very upset.
21          Hand you what I'll mark as Exhibit 8.
22          (Exhibit Number 8 marked for identification.)
23  BY MR. BANKER:
24      Q   And ask if you can identify this document.
25  And let's deal with it subsequently.  The first portion

Page 114

1   of the document is Frankel 1502 to 1504, which is an
2   e-mail thread that involves Wendy Tibbetts at National
3   Sales -- I mean, I'm sorry -- at -- is it Essential --
4           MR. FRANKEL:  Ascensus.
5   BY MR. BANKER:
6       Q   Ascensus; right?  Do you see that?
7       A   Yes.
8       Q   Is this e-mail, which is 1502 to 1504, is that
9   confidential?
10      A   If it was not made available to the public, it
11  would be considered confidential.
12      Q   Do you know whether it was available to the
13  public or not?
14      A   I don't believe this was.  I don't know that
15  for certain, but I don't believe it was.
16      Q   Okay.  And what about the beginning at 1505,
17  the Ascensus Nonbank Trustee Powers, this brochure?  Is
18  that confidential information of the plaintiffs?
19      A   If it was something that Ascensus used to
20  market.  If it's marketing in general, I would say no.
21  But the fact that it was being marketed and targeted
22  directly at Alpine, the fact that they were using it
23  directly at Alpine, if that information was not readily
24  known to the public, it would be confidential
25  information.

Page 115

1       Q   So the fact that --
2       A   How is it being used?  So, in other words, if
3   how it's being used is not really known to the public,
4   then collectively it would be considered confidential
5   information.
6       Q   Okay.  I think I understand what you're
7   saying.  You are saying what determines whether
8   something is confidential is how it's used; right?
9       A   In this particular case.
10      Q   Okay.  And you would say that, in determining
11  whether something is misappropriated, it also depends on
12  how it's used; right?
13          MR. SUSMAN:  Objection; misstates prior
14  testimony.
15      A   No.  There is some stuff that's clearly
16  confidential.  If I took a public document that's
17  clearly public and I internally use it for different
18  things or directing certain things, how it was being
19  used internally, it would be confidential.  The document
20  by itself and only by itself wouldn't be.
21  BY MR. BANKER:
22      Q   Okay.  Do you know why Chris Frankel sent this
23  Ascensus e-mail string and Ascensus brochure and
24  Ascensus services to himself?
25      A   I don't know why he would do that any more

Page 116

1   than I would know why he would send my trust to himself.
2       Q   Okay.
3           (Exhibit Number 9 marked for identification.)
4       A   Other than, of course, to potentially compete
5   unfairly.
6   BY MR. BANKER:
7       Q   Let me hand you what I've marked as Exhibit 9.
8   And ask you if you can identify this document.
9       A   Yes.
10      Q   What is this?
11      A   This was a -- part of the financing that
12  Alpine was trying to obtain, one of the documents that
13  was going to be used in it.
14      Q   Okay.  And that's the attachment, the New
15  World Fortuity Fund L.P.?
16      A   That's one of the funds, yes, that they were
17  trying to put together.
18      Q   That who was trying to put together?
19      A   Alpine, it's one company.
20      Q   Did the funding ever come to pass?
21      A   No.
22      Q   Okay.  Do you know why Frankel e-mailed this
23  e-mail from Czarnik and the attachment to himself on
24  September 18, 2018?
25      A   Does raise some really serious concerns

29 (Pages 113 to 116)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 117

1  looking back on it today.
2      Q   What concerns does it raise, looking back on
3  it today?
4      A   That he's using this to -- basically as a
5  prototype to try to raise himself money to buy something
6  else, not in Alpine's interest.
7      Q   Okay.  Well, who put together the funding
8  structure, the term sheets, secured revolving credit
9  facility?
10     A   Well, one of our clients was assisting us
11  with -- it was a group effort between one of our
12  customers and his attorney and myself.
13     Q   When you say "attorney," it's Steve Czarnik?
14     A   Yes.
15     Q   And the customer is Kramer or PowerUp Lending?
16     A   PowerUp Lending, Curt Kramer?
17     Q   Same thing?
18     A   Yes.  Curt Kramer -- Curt Kramer would be part
19  of that group.
20     Q   Kramer's the principal or the face of PowerUp
21  Lending?
22     A   He's -- I don't know the specific structure of
23  that, but they would all be together.
24     Q   Okay.  Okay.  And so you don't -- again, I
25  think you've said you don't know why Mr. Frankel

Page 118

1  e-mailed this, Czarnik's e-mail and the attachment, to
2  himself on September 18, 2018; right?
3      A   You want me to speculate?
4      Q   No, I don't want you to speculate.  You can --
5      A   There would be no reason for him to have
6  e-mailed this to himself on September 18, 2018, unless
7  he was going to use that information to unfairly
8  compete.
9      Q   Okay.  And the next question is do you know
10  whether he's used Exhibit 9 unfairly to compete?
11     A   Based on some of the discovery he has, it
12  looks like he has.
13     Q   Okay.  And what -- how did he use Exhibit 9
14  unfairly to compete?  What did he do?
15     A   He used all the people, confidential
16  information and trade secrets, that we were using to
17  essentially try to help Alpine to not only fund his own
18  business but, in the process, try to steal all the
19  customers as well.
20     Q   What business did he fund?
21     A   He was in the process of trying to fund a
22  business, Ziv.
23     Q   Did he fund that business?
24     A   We don't know if he funded Ziv or not.  I
25  don't know.

Page 119

1      Q   Okay.  Did he fund any business?
2      A   We don't know that.
3      Q   Did he start any business?
4      A   We don't know that.
5      Q   All right.  You said -- you filed a
6  declaration in this case, and you said that he was using
7  your information in his new business ventures?
8      A   The discovery that we got, the information we
9  have, we don't know whether he closed it.  He certainly
10  was trying to.
11     Q   What --
12     A   Whether he closed or not, we don't know.
13     Q   What -- what were his business ventures?
14     A   A competing firm with Alpine to try to
15  unfairly compete with us buy a firm, essentially use our
16  connections and our confidential information to not only
17  fund it but to steal all the business.
18     Q   Okay.  But don't know whether he did any of
19  that; right?
20         MR. SUSMAN:  Object.  It's been asked and
21  answered.
22     A   He certainly was in the process of doing it,
23  and looking at the trade stuff going on at -- he had
24  certainly had one of the customers make trades over
25  there.  How that was compensated to him, we don't know.

Page 120

1  BY MR. BANKER:
2      Q   Had customers make trades where?
3      A   Looks like in that discovery that one of the
4  customers, particularly maybe PowerUp or Curt Kramer,
5  were making trades at Ziv.
6      Q   You got discovery from Frankel that shows that
7  PowerUp was making trades at Ziv?
8      A   Ziv provided that discovery.
9      Q   Okay.  Well, how do you know that -- I mean,
10  don't these clients do business with a lot of
11  broker-dealers?
12     A   There is not that many broker-dealers that do
13  what we do.
14     Q   Well, I understand but the clients are -- use
15  multiple broker-dealers, don't they?
16     A   In our business, there is very few
17  broker-dealers.  This particular broker would have never
18  in a million years known to contact Curt Kramer without
19  the assistance of Chris Frankel.
20     Q   That's your speculation?
21     A   It is.
22     Q   Okay.
23         MR. BANKER:  All right.  We got to keep
24  moving.
25         (Exhibit Number 10 marked for identification.)

30 (Pages 117 to 120)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 121

BY MR. BANKER:

1  BY MR. BANKER:
2      Q   All right.  Let me hand what you I will mark
3  as Exhibit 10.  And ask you to identify that document.
4      A   Okay.
5      Q   What is it?
6      A   Looks like a e-mail from our general counsel
7  to Chris Frankel.
8      Q   Okay.  And are you claiming this as Alpine's
9  confidential information?
10     A   Any information that wouldn't be readily made
11 available to the public would be considered Alpine's
12 confidential information.
13     Q   In this case, are you claiming Exhibit 10, the
14 e-mail and the attachment, as Alpine's confidential
15 information?  Was it confidential information of any of
16 the plaintiffs?
17     A   If the information was not made available to
18 the public, it would be confidential.  This actually
19 happens to also be sent by general counsel.
20     Q   And not marked confidential; right?  No, it
21 does say "confidential."
22     A   It does say "confidential" on it.
23     Q   Yeah, it does say "confidential."
24     A   "Privileged and confidential."
25     Q   Yeah.

Page 122

1          All right.  Did you -- do you know why Frankel
2  e-mailed this to himself on August 8, 2018?
3      A   We can only speculate that it was to
4  somehow --
5      Q   I don't want you to speculate.
6      A   I do not know why.
7      Q   Okay.  And, by the way, I don't believe you're
8  a mind reader.  I don't expect that you could possibly
9  know why Frankel would e-mail something to himself.
10 Unless he told you why he e-mailed it to himself?
11     A   No, I don't know why he e-mailed himself, but
12 it violates company policy doing it.
13     Q   All right.  And let me hand you Exhibit 11.
14         (Exhibit Number 11 marked for identification.)
15 BY MR. BANKER:
16     Q   Can you tell me what this document is?
17     A   Looks like an EIN number.
18     Q   For the record it's Frankel 1456 to Frankel
19 1458.  Right.  And it concerns Securities Settlement
20 Solutions, LLC.
21         Do you see that?
22     A   Um-hum.
23     Q   Yes?
24     A   Yes.
25     Q   Is this Alpine's confidential information?

Page 123

1      A   Well, that's a more complicated question.  By
2  itself, as it sits, it wouldn't be Chris Frankel's
3  information; but, again, if he used it in conjunction
4  somehow with Alpine that's not known to the public, then
5  it would be considered confidential information.
6      Q   Of whom?
7      A   Of Alpine's.
8      Q   How does it become Alpine's confidential
9  information?
10     A   Because the contract or how he used this --
11 and, again, I'm speculating; but if you don't want me to
12 speculate, I'll give you the same answer.  Same answer
13 is, is that I took public information and it was
14 combined with information with Alpine books and records
15 that was not public and how it was combined or what it
16 was used for, how it was used and what it was used for
17 would, if it's not made available to the public, public
18 does not know, would be confidential information.  The
19 actual form itself may be somebody else's confidential
20 information.  A good example of that would be any
21 customer or employee who had given us information that
22 was their information.  Okay.  It's confidential
23 information.  We don't disclose that to the public or
24 anybody else.
25     Q   Let me hand you Exhibit 12.

Page 124

1          (Exhibit Number 12 marked for identification.)
2  BY MR. BANKER:
3      Q   Do you recognize this document?
4      A   Yes.
5      Q   What is 12?
6      A   This is a document of what appears to be
7  revenue numbers, some commission amounts for top
8  customers at Alpine.
9      Q   Okay.  And what was the genesis of -- looks
10 like the e-mail started with Josh Boyer -- or started
11 with Chris Frankel to Josh Boyer on July 30th and then
12 from Josh Boyer to Frankel on July 31st.
13         Do you know what's going on in this e-mail
14 thread?
15     A   They are talking about the top customers and
16 obviously a fee schedule.
17     Q   Right.  As I understand it, it -- at about
18 this time in July of 2018, Alpine was thinking about
19 implementing a fee schedule increase?
20     A   Actually, from my understanding the fee
21 schedule increase was supposed to be implemented
22 significantly prior to this time.  In fact, I think on
23 July 31st Frankel would have already been terminated.
24 So there really wouldn't have been any reason for him to
25 even have had this document e-mailed to himself.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 125

1    Q   Okay.  Well, let's put that aside for a
2 minute.  But tell me, what was the fee schedule increase
3 that was supposed to be -- have been implemented well
4 before July 31st, 2018?
5    A   It was a schedule that they had talked about
6 for some time going into the early part of 2018, I
7 believe.
8    Q   Okay.  And what -- tell me what the --
9    A   Because of the -- well, we would have to get
10 the schedule itself, but the -- it was about the
11 increasing costs and trying to account for some of those
12 higher costs so we could conduct our business another
13 way in a more profitable manner.
14    Q   Okay.  And -- and, of course, you don't know,
15 right, why Frankel e-mailed Exhibit 12 to himself on
16 July 31st?
17    A   There would be no reason for him to do that
18 other than for him to unfairly compete.
19    Q   What about if he was going to work on it at
20 home, work on the fee schedule?
21    A   Why would you work on it at home?  Why would
22 you need the top 50 customers and their revenue numbers
23 to work on it at home?
24    Q   Okay.  You don't know, do you?
25    A   When you've already been given notice that you

Page 126

1 are going to be terminated officially on the first of
2 August.
3    Q   Okay.  Now, this is -- I think this is the
4 list, right, of customers that you referenced earlier in
5 your testimony; right?
6       MR. SUSMAN:  Objection; vague and ambiguous.
7    A   This is one of them.
8 BY MR. BANKER:
9    Q   Okay.  I'm not aware of another one.  Are you
10 aware of another list?
11    A   This is the list that he e-mailed himself.
12 There are probably, I'm sure, other lists of top
13 customers.
14    Q   Okay.  Well, you're not aware of any other
15 list?
16    A   That he e-mailed himself?
17    Q   Yeah.
18    A   This is the only stuff we know that he
19 e-mailed himself.
20    Q   Okay.  All right.  Now, looking at this list,
21 I mean, do you contend that he did anything improper
22 with any of these clients listed on this list?
23    A   Yeah.  We believe he intended to and more
24 likely is using our confidential information, trade
25 secrets to unfairly compete against us.

Page 127

1    Q   More specific.  Can you identify any client on
2 this list with whom Frankel has done anything
3 inappropriate?
4    A   The same customers on these lists -- we can go
5 through them if you would like -- they are some of the
6 disclosure information that came from Ziv and from Chris
7 Frankel himself were also on this list.  Some of the
8 principals, some of the companies it would appear that
9 he is using that information to unfairly compete.
10    Q   I need a more specific answer.  Can you tell
11 me -- can you identify any one of these clients on this
12 list that Frankel did anything in your view is
13 inappropriate with?
14    A   I think I just answered that, but I'll try it
15 again.  The list of those customers from the
16 discovery -- and I would have to go through them, if you
17 would like to spend all day doing that, match them up
18 with the companies -- there are multiple customers that
19 were on those disclosure lists, including in the Ziv
20 production, that are on also on this list.
21       Now, they are not all on that list, but we
22 have reason to believe through brokers at Scottsdale and
23 others that he has contacted all those people.
24    Q   Well, let me ask you this.  That's a good
25 question.  Do you claim in this lawsuit on behalf of the

Page 128

1 plaintiffs that it would have been inappropriate for
2 Frankel to have any communication with any of these
3 clients on this list, Exhibit 12?
4    A   I think it would be very inappropriate for
5 Chris Frankel to use confidential information and
6 secrets about these customers to unfairly compete
7 against us.
8    Q   Not the question.  Do you contend in this
9 lawsuit as the representative of the plaintiffs that
10 Frankel could not could not compete -- could not
11 communicate with any of the clients on this list in
12 Exhibit 12?
13    A   If he was communicating with these clients
14 specifically on the information that he had from us that
15 was not public to unfairly communicate, like knowing how
16 much commission they did, what their payments were, how
17 they conducted their business, what their trade ones
18 were and use that information specifically to try to
19 steal that business, then I believe that would be a
20 problem.  And I think that he used confidential
21 information to unfairly compete and try to steal our
22 business.
23    Q   All right, Mr. Hurry.  Frankel calls Chicago
24 Venture yesterday and says, "I would love to do business
25 with you."  Is that a violation of anything?

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 129

1    MR. SUSMAN:  Objection; incomplete
2    hypothetical.
3    A    Compounded with a lot of other information
4    that he may have about those people, considering that he
5    may -- my understanding is he never knew these people on
6    that level as a customer, probably never spoke to these
7    people as a customer.  Prior to leaving Scottsdale, he
8    knew a lot of people I would say that could very well be
9    an unfair competition using trade secrets.
10   BY MR. BANKER:
11   Q    You elected, right, you chose not to have
12   Frankel sign a nonsolicitation agreement; correct?
13   A    We did not have him sign one, no.
14   Q    Okay.  That was a choice that you made, that
15   you would not require him to sign a nonsolicitation
16   agreement.  True?
17   A    I don't know if it was a choice.  He did not
18   sign one.
19   Q    You don't make anybody sign a nonsolicitation
20   agreement?
21   A    No.  The people we hire don't have customers.
22   They don't bring customers with them.  They don't have
23   these relationships with them.  People who -- we had
24   those kind of relationships before.  We don't have those
25   kind of relationships today.

Page 130

1    Q    Um-hum.
2    A    So people that come to us don't have
3    customers.  They are basically hired to do a specific
4    task, like manage the clearing.  They don't have
5    customers.
6    Q    Okay.  You elected, you chose not to have
7    Frankel sign a noncompetition agreement, didn't you?
8        MR. SUSMAN:  Objection.  That's already been
9    answered.
10   A    I already answered that.
11   BY MR. BANKER:
12   Q    No, you didn't.  You said nonsolicitation
13   agreement.  I said noncompetition agreement.  Do you
14   know the difference?
15   A    I'm not an attorney, sir; but what I would
16   tell you and I'll tell you again, Chris Frankel didn't
17   have any customers coming to Alpine, never had any
18   customers, as far as I know, told us he never had any
19   customers, didn't bring any business as far as I know
20   that Alpine didn't already know.
21        If you have all that information and you
22   create those relationships -- I know who Warren Buffett
23   is, but if I got a warm fuzzy introduction because I
24   working with Bill Gates and got all kinds of information
25   about Warren Buffett that I never knew before, that's a

Page 131

1    little different than knowing Warren Buffett before.
2        So Chris Frankel had an environment where he
3    was never in before with a firm that's the largest of
4    what they do in the business, with proprietary trade
5    secret information and confidential information, and he
6    had all that information, and it would appear that he's
7    used that information to unfairly compete with us.
8    Q    Let me ask you this:  Could you have required
9    Chris Frankel as a condition of coming on board with
10   Alpine to sign a noncompetition agreement that would
11   have prohibited him from working for a broker-dealer or
12   opening a broker-dealer for some period of time after he
13   left your employment?  Could you have done that?
14       MR. SUSMAN:  Objection; calls for a legal
15   conclusion.
16   A    Sure, we could have.
17   BY MR. BANKER:
18   Q    Okay.  And why didn't you do that?
19   A    Because Chris Frankel didn't have any
20   customers and didn't have these kind of relationships
21   with his customers.
22       MR. SUSMAN:  David, how much longer you got?
23       MR. BANKER:  Oh, gosh.  I got to get through
24   these documents.
25   A    By the way, I'll add to that, if we thought he

Page 132

1    did, we wouldn't have hired him.
2        (Reporter clarification.)
3    A    If we thought he had customers, in other
4    words, he was a customer broker and these were his
5    customers, we wouldn't have hired him.
6    BY MR. BANKER:
7    Q    Okay.  Well, let me understand this.
8    Scottsdale -- doesn't Alpine have sales representatives,
9    people that are responsible to generate --
10   A    Not commission people.  They are all -- they
11   basically -- they don't bring those customers in.
12   Q    Okay.  What about Scottsdale?
13   A    Same.
14   Q    No?
15   A    No.
16   Q    So you don't have noncompetition agreements or
17   nonsolicitation agreements --
18   A    We have confidentiality agreements.
19   Q    That's it.
20   A    Because we don't hire people that have books
21   of business and their own customers.
22   Q    Okay.
23       MR. BANKER:  You want to take a break for a
24   second?
25       MR. SUSMAN:  Yeah.  Yeah.

33 (Pages 129 to 132)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 133

1    (Recess taken from 12:20 p.m. until
2    12:28 p.m.)
3  BY MR. BANKER:
4    Q   All right.  Mr. Hurry, let me hand you what
5  I've marked as Exhibit 13 and ask you if you can
6  identify that document.
7    (Exhibit Number 13 marked for identification.)
8    A   Yep.
9  BY MR. BANKER:
10   Q   And you can see that Mr. Frankel forwarded it
11  to himself at his home computer, an e-mail from Mike
12  Cruz to -- actually it starts --
13   MR. SUSMAN:  Let me object.  Lacks foundation
14   that it was forwarded to a home computer or to his
15   personal e-mail.
16  BY MR. BANKER:
17   Q   Right.  I didn't mean to -- forwarded to his
18  personal e-mail, which looks like an e-mail thread
19  concerning NSC call funding facility that Mr. Frankel
20  forwarded to his personal e-mail at August 31, 2017?
21   A   I see it.
22   Q   Okay.  And, you know, this originates from
23  Mike Cruz, general counsel, but it doesn't say
24  "confidential" on it anywhere?
25   MR. SUSMAN:  It does, actually.

Page 134

1    MR. BANKER:  Where does it say "confidential"?
2    MR. SUSMAN:  Right there, 1238, down at the
3    bottom, "Confidential -- Not for General
4    Distribution."
5    MR. BANKER:  Where?
6    MR. SUSMAN:  In the actual term sheet itself.
7    MR. HOLDER:  The attachment.
8    MR. BANKER:  Oh, oh, oh.  Right, in the term
9  sheet.  Right.
10  BY MR. BANKER:
11   Q   Do you know why Mr. Frankel sent this term
12  sheet to himself in August 2017?
13   A   I would suspect it's to unfairly compete at
14  some future time.
15   Q   Okay.  I mean, did this call funding facility
16  between Alpine and Curt and Seth Kramer, the Kramer
17  Group, ever go through?
18   A   No.
19   Q   Do you know why?
20   A   I would have to speculate.
21   Q   I'm not -- I mean, did it not go through --
22  when did it fail?  Do you know when it failed?  That's
23  not the right word.  When did it not go forward?
24   A   Around the time that Chris Frankel left.
25   Q   Okay.  And you have some speculation as to why

Page 135

1  it didn't go forward?
2    A   Sure.
3    Q   Okay.  And that would be that Chris said to
4  Kramer, "Don't do business with" --
5    A   I think he was telling people not to do it and
6  essentially telling them to go put money in his company.
7    Q   Okay.  That's your spec --
8    A   Or his target company.
9    Q   Okay.  That's your speculation?
10   A   We got a lot of circumstantial evidence that
11  is starting to be true that -- for which we can see.
12   Q   Okay.  And do you contend that 13 is
13  confidential?
14   A   Any information that's not readily available
15  to the public would be considered confidential and trade
16  secret.
17   (Exhibit Number 14 marked for identification.)
18  BY MR. BANKER:
19   Q   All right.  Let me hand you 14.
20   A   I add to this, attorney -- general speaking,
21  if not always, communications by attorneys would be
22  attorney-client privilege.
23   Q   Okay.  You can see Exhibit 14 is an e-mail
24  that Chris Frankel forwarded to his personal e-mail
25  address on July 13, 2017, and the attachment is a "NRS

Page 136

1  Fire Blaze Platform, including training content and
2  related materials."
3    Do you know what this attachment is about?
4    A   Not off the top of my head, no.
5    Q   Do you know why Mr. Frankel sent this to
6  himself on July 13, 2017?
7    A   No, other than how I already answered.  It
8  would be speculating.
9    Q   And your speculation would be that he was
10  somehow using this unfairly to compete?
11   A   He could have been, yes.
12   Q   Okay.  Would a -- would the far more likely
13  speculation be that he's simply sending this to work at
14  home, to work at it at home?
15   A   Absolutely not.  So you got a CEO and chief
16  compliance officer violating his own rules?  That he's
17  actually hired to uphold.
18   Q   Um-hum.
19   A   I would say that's not right.
20   Q   Okay.  So you don't want him working at home
21  on your business?
22   A   That's not what I said.
23   Q   Okay.  You don't mind him working at home;
24  right?
25   A   No, as long as he's in compliance with the

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 137

1  rules and procedures and not violating trade secrets and
2  confidential information.
3      Q   Okay.  What about if he's working at home and
4  not violating the confidentiality agreement or the trade
5  secrets and he's not unfairly competing, he's just using
6  his computer screen and his printer in order to better
7  be able to work on your information?  Are you down with
8  that?
9      A   I'm not okay with that.  I think I answered
10  that before.
11          MR. SUSMAN: Objection.  It's an incomplete
12  hypothetical.
13      A   I think I answered that too.
14  BY MR. BANKER:
15      Q   And why are you not okay with that?
16      A   He shouldn't be taking any confidential
17  information and putting it on your personal stuff.  And
18  I believe, as we went through earlier, it's also
19  actually a violation of the rules and procedures.
20      Q   Okay.  So I don't know.  Did I ask you is
21  Exhibit 14 -- do the plaintiffs claim that as
22  confidential?
23      A   I think I'll go back to the earlier question
24  is that this document itself, as it sits, may or may not
25  be confidential.  That, I don't know.  NRS.  But if it's

Page 138

1  used in conjunction with private information of Alpine,
2  then it very well could be.  And if it was used in
3  conjunction with other stuff that only Alpine had and
4  was not made available to the public, it would be
5  considered confidential.
6          (Exhibit Number 15 marked for identification.)
7  BY MR. BANKER:
8      Q   Okay.  Hand you Exhibit 15 and ask you to
9  identify that.
10      A   Okay.
11      Q   Do you -- it appears to be an e-mail thread
12  and a consulting agreement for Steven M. Gribben that
13  Frankel forwarded to himself on July 13, 2017.  You, of
14  course, don't know why Frankel sent that to himself on
15  that date; correct?
16      A   Other than what we discussed before, no.
17      Q   Right.  And do you content that Exhibit 13 --
18  Exhibit 15 including the attachment and/or the
19  attachment are confidential?
20      A   As was priorly discussed, if it was not made
21  readily available to the public, they would be
22  considered confidential and/or trade secret.
23      Q   How do you distinguish between confidential
24  and trade secret?  Is trade secret kind of the next
25  level?

Page 139

1      A   It's very difficult to distinguish that.  It
2  could be, depending on how they are used, one and the
3  same.
4      Q   Okay.  I know it may be difficult, but in your
5  own words describe the difference between confidential
6  information and information that's trade secret?
7          MR. SUSMAN: Objection; calls for a legal
8  conclusion.
9  BY MR. BANKER:
10      Q   I'm not asking for a legal conclusion.  I'm
11  asking for your understanding.
12      A   They could be the same thing because, if I
13  took an employment agreement that nobody else had access
14  to, then I would be able to steal that employee or do
15  things that somebody else wouldn't be able to do.  So
16  how it's being used in compilation with a lot of other
17  things as could easily be used as a trade secret.  How
18  we pay our employees, how we do all these things in
19  compilation with everything else is part of the trade
20  secret, confidential information.
21      Q   All right.  Let me hand you Exhibit 16.
22          (Exhibit Number 16 marked for identification.)
23  BY MR. BANKER:
24      Q   And ask you to identify that?
25          And let me help.  This is an e-mail that

Page 140

1  Frankel forwarded to his Yahoo e-mail address on May 2,
2  2017, and it concerns an e-mail thread about -- is it
3  ACAP fees?  I guess ACAP Financial.  It attaches a FINRA
4  notice to Frankel dated February 22, 2017.
5      A   Yes, I see it.
6      Q   Okay.  Do you as the corporate representative
7  of the plaintiffs consider Exhibit 16 to be
8  confidential?
9      A   Yes.
10      Q   And why?
11      A   It's information that certainly wouldn't be
12  available to the public.
13      Q   Do you know why?
14      A   It could be disparaging to Alpine, and the
15  only reason I think it could have been e-mailed to
16  himself, it could have been used be disparage us against
17  our customers in order for him to unfairly steal them.
18      Q   Okay.  But you don't know why Frankel sent
19  this to himself on May 2, 2017?
20      A   That would be the circumstantial evidence as
21  I've seen it so far.
22      Q   Right.
23          (Exhibit Number 17 marked for identification.)
24  BY MR. BANKER:
25      Q   Let me hand you Exhibit 17 and ask you to

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 141

1   identify that.
2       This appears to be an e-mail that Frankel
3   forwarded to himself on April 12, 2017, concerning an
4   engagement letter with Gasthalter, G-A-S-T-H-A-L-T-E-R.
5       Q   Do you see that?
6       A   Yep.
7       Q   Do you know why Frankel sent this e-mail to
8   himself?
9       A   Other than for the reasons discussed prior,
10  no.
11      Q   Okay. And what was Gasthalter? Was this
12  agreement ever signed?
13      A   I don't recall.
14      Q   Do you know what Gasthalter did for --
15      A   They were --
16      Q   -- Alpine or Scottsdale?
17      A   I believe they were a PR company.
18      Q   Okay. But you don't know whether -- you don't
19  know whether the companies hired them or not?
20      A   I do not know for certain, no.
21          (Exhibit Number 18 marked for identification.)
22  BY MR. BANKER:
23      Q   Okay. Let me hand you Exhibit 18, which
24  appears to be an e-mail that Frankel forwarded to his
25  Yahoo account on January 3, 2017. The e-mail concerns

Page 142

1   some kind of property Northpoint Asset Management in
2   Utah.
3       Did the companies consider Exhibit 18 to be
4   confidential?
5       A   Well, my answer to the same question, because
6   I don't know what he was doing or why he was doing it.
7   But if it wasn't available to the public, because we
8   don't know what he was doing. Was it just something he
9   was looking for for the company, looking for himself
10  personally, but we consider all information that's from
11  the company to be confidential.
12      Was it relevant? That I can't tell you. Was
13  it personal? I don't know. From looking at this, it
14  came from the server as a company. Why he was doing it?
15  You have to ask Chris.
16          (Exhibit Number 19 marked for identification.)
17  BY MR. BANKER:
18      Q   Let me hand you Exhibit 19.
19      Wait a minute. Did I give you two copies?
20      A   No.
21      Q   Are two stapled together?
22      MR. SUSMAN: Yeah.
23  BY MR. BANKER:
24      Q   And this appears to be an e-mail that Frankel
25  forwarded to himself on January 3, 2017, concerning

Page 143

1   correspondent onboarding documents. And the e-mail
2   forwarded is an e-mail from Stacie Jungling at FINRA to
3   Mr. Frankel.
4       Do you consider 19 to be confidential
5   information of Alpine and/or Scottsdale?
6       A   As I said before, yes, if it was something
7   that was not available to the public.
8       Q   Do you know why Mr. Frankel forwarded this
9   e-mail to himself on January 3, 2017?
10      A   Other than reasons already discussed, no.
11      Q   Let me hand you Exhibit 20.
12          (Exhibit Number 20 marked for identification.)
13  BY MR. BANKER:
14      Q   20 is an e-mail that Frankel forwarded to his
15  Yahoo account on November 8, 2016, concerning DynaQuest
16  vendor due diligence.
17      Do you know what this is?
18      A   It's a due diligence review form.
19      Q   Who is going to conduct the due diligence?
20      A   It would depend on who it was assigned to, I
21  would imagine.
22      Q   Was Alpine going to do the due diligence?
23      A   Alpine could. That would have been up to
24  Chris Frankel who did it.
25      Q   Okay. And do you consider this on behalf of

Page 144

1   the plaintiffs, 20, to be confidential information of
2   Alpine?
3       A   Based on the prior answers, yes. If it's
4   something not readily available to the public and we
5   don't make it publicly available, yes.
6       Q   Okay.
7           (Exhibit Number 21 marked for identification.)
8   BY MR. BANKER:
9       Q   Hand you 21, which is an e-mail that Frankel
10  forwarded to his Yahoo account on October 14, 2016,
11  which appeals -- appears to be a schedule of fees.
12      Do you see that?
13      A   Yes.
14      Q   Okay. And do you consider on behalf of the
15  plaintiffs that 21 is confidential?
16      A   Yes. Same answer, as long as it's something
17  that's not available -- available to the public. In
18  this case, it would look like this could be work
19  product, attorney-client work product or certainly work
20  product in process. It's hard to say.
21      Q   These schedule of fees, I mean, wouldn't
22  Alpine publish that on its website?
23      A   The fee schedule, if it was made public, but
24  not the work in process that goes into the fee schedule.
25  That is not public.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 145

1    Q   What do you mean "the work in process that
2  goes into" --
3    A   Kind of what you guys do as attorneys, when
4  you have process, work in process for a customer would
5  be privileged.  So if you have work in process with
6  Chris Frankel or I had work in process with my company,
7  this would be internal work in process.  From looking at
8  this, it's hard to tell.
9        It was addressed in some part to Nate Simmons.
10  It very well could have been seeking legal advice about
11  certain fees, different ideas about certain fees, but
12  it's certainly work in process.  So it's not a public
13  finished working schedule that's actually posted on the
14  site.  So if you took an actual schedule that was
15  actually made public and you printed that specific
16  schedule all by itself, that itself would not be
17  confidential because it's made public.
18    Q   Okay.  But --
19    A   This is a work product, and it's not going to
20  be public information.
21    Q   On Alpine's website, did it ultimately -- does
22  it ultimately have a public schedule of charges for
23  domestic checks, international checks, third-party
24  checks, check rejects, check traces?
25    A   It's got a lot of fees on the schedule.  How

Page 146

1  they deduce those fees is not necessarily public.  In
2  fact, in most cases, it's not.  The work product that
3  goes into that is not public.  The fee schedule that's
4  public is public.  The drafts and versions that went
5  into that and the notes that go under that are not
6  public.
7        (Exhibit Number 22 marked for identification.)
8  BY MR. BANKER:
9    Q   Can you identify 22, which appears to be a
10  schedule of fees that Frankel forwarded to his Yahoo
11  e-mail account on October 14, 2016?  And it's
12  attached -- attached, it says "Schedule of Miscellaneous
13  Accounts Service Fees, Alpine Securities."
14        Do you see that?
15    A   Yes, I do.
16    Q   Okay.  And this says at the bottom, it says
17  "Fee Schedule Effective:  11/1/16."
18        Do you see that?
19    A   I do.
20    Q   Would this schedule be something that the
21  final version of which would be published on the
22  website?
23    A   The final version would be, but not this work
24  in process.
25    Q   Okay.  And does the fact that it says fee

Page 147

1  schedule effective November 1, 2016, tell you that that
2  was the fee schedule that was in effect at that time?
3    A   Doesn't tell you anything.  Just tells you
4  it's work -- looks like the e-mails, just a work in
5  progress.  Could be, may not be.  But, certainly, in
6  this context, work in process.
7    Q   Okay.  But, ultimately, as a result of these
8  communications and discussions, the end work product
9  would be some variant of the attachment to this e-mail,
10  which is Frankel 1004 through 1006, and that would be
11  published on the website; right?
12    A   Yeah.  Same with your brief that you would do
13  for your customer.
14    Q   Same with your what?
15    A   Same as a brief an attorney would do for a
16  customer.  If they have work in product, that's not
17  public.  If they publish the actual complaint, that
18  would be public, but not all the things that go into it
19  are necessarily public.
20        This is work in process, and it's not
21  something -- this in its entirety is not something
22  that's made generally available to the public.
23    Q   Okay.
24        (Exhibit Number 23 marked for identification.)
25  BY MR. BANKER:

Page 148

1    Q   All right.  Let me hand you 23, and for the
2  record I will tell you that 23 appears to consist of
3  multiple documents, beginning at Frankel 976 and
4  continuing through Frankel 1001.
5        And you would agree that this appears to be an
6  e-mail that Frankel forwarded to his Yahoo address on
7  October 13, 2016?
8    A   Yes.
9    Q   Okay.  And it appears that the people on this
10  e-mail thread have been working on -- what are they
11  working on?
12    A   Looks like compliance, internal audits, audit
13  stuff.
14    Q   Is exhibit -- do you know why Frankel sent
15  himself this e-mail at his Yahoo address?
16    A   Other than what I've already discussed, no.
17    Q   Do you consider 23 to be confidential?
18    A   Yes, especially if it wasn't disseminated to
19  the public.  It's work product.
20    Q   All right.  Let me hand you 24.
21        (Exhibit Number 24 marked for identification.)
22  BY MR. BANKER:
23    Q   And ask you what 24 is.  Let me help you.  It
24  appears to be an e-mail that Frankel forwarded to
25  himself on October 6, 2016.  And it appears to involve

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 149

1    request for -- let's see -- financial operations cycle
2    exam request involving FINRA.
3         Do you know what that is?
4         A   I think you hit it on the nut.  Financial
5    operations cycle exam request.
6         Q   But what does that mean in really simple
7    terms?
8         A   FINRA's doing an exam.
9         Q   Some type of financial exam?
10        A   That's what it appears so.
11        Q   Okay.  And do you know why Mr. Frankel
12   forwarded this information to himself in Exhibit 24 on
13   October 6, 2016?
14        A   Other than what we already discussed, no.
15        Q   Okay.  Would -- do you know of any way this
16   information in 24 would be of any benefit to
17   Mr. Frankel --
18        A   Sure.
19        Q   -- in trying to compete unfairly?
20        A   Sure.
21        Q   How would it be --
22        A   I think anything that could be negative about
23   Alpine, if I'm trying to steal the business, I would use
24   that negative information to disparage customers and
25   other firms from doing business with Alpine and using it

Page 150

1    to try to get business for me.
2         Q   Okay.  You could have had your employees sign
3    nondisparagement agreements; correct?
4         A   We have a confidential and trade secret
5    agreement that protects this information from going out.
6         Q   That wasn't the question.  You could have had
7    your employees at Alpine and Scottsdale sign
8    nondisparage agreements -- disparagement agreements that
9    would prohibit them from disparaging companies; correct?
10        A   Well, we could have done that, but we really
11   didn't need to because, if somebody took something this
12   confidential and talked about it, then they would be
13   violating the confidential trade secret agreement.
14        Q   Okay.  Let me hand you what I've marked as
15   Exhibit 25.
16            (Exhibit Number 25 marked for identification.)
17   BY MR. BANKER:
18        Q   And I know we are really going way back in
19   time here, but I've got to get through them all.
20            And ask you if you have claimed in your
21   complaint, your second amended complaint that Exhibit 25
22   is confidential?
23        A   Same answer as before.  If it's part of a work
24   product, okay, or simulated with some type of
25   information within the firm collectively, it's

Page 151

1    confidential, if it's not given to the public.  If the
2    fee schedule, again, was the actual one that was made
3    public, the fee schedule itself by itself and alone by
4    itself, would not be.  But if was any type of
5    communications, privileged or work product, it would be.
6         Q   Okay.
7            (Exhibit Number 26 marked for identification.)
8    BY MR. BANKER:
9         Q   Hand you 26.  And let me ask you why the
10   plaintiffs have claimed in their second amended
11   complaint that Exhibit 26 is confidential?
12        A   Why is it confidential is your question?
13        Q   I'm saying, yeah, why have you claimed that
14   this, Exhibit 26 in your second amended complaint is
15   confidential?  It's an e-mail that Frankel forwarded to
16   himself on August 28, 2016.
17        A   Any communications with the regulator to a
18   broker-dealer would be confidential.  That's held in the
19   strictest confidence not only with the regulator but
20   actually with the broker-dealer.  But, again, going back
21   to the prior answers, if it's information not readily
22   available to the public, it would be confidential.
23        Q   But your speculation was Frankel used this in
24   some way to disparage Alpine and/or Scottsdale and
25   thereby to steal its customers and take its business?

Page 152

1         A   A lot of the information would indicate that,
2    yes.
3         Q   Okay.  And what -- what is the information
4    that indicates that?
5         A   Some of his own e-mails, not long for this
6    world, talking to customers, basically contacting our
7    customers and funding sources and telling them he was
8    going to take the business, et cetera.  Could be used in
9    a lot of different.
10        Q   Who did he say we are going to take the
11   business to?
12        A   I'm sorry.  I've got a million dollars a month
13   in business to do.  Would you like to invest in this or
14   however -- Jim Kelley can tell you the story better than
15   I can.
16        Q   Okay.  So you are referring to Kelley's
17   conversation?
18        A   Yes.  And some of the discovery as well.
19        Q   Got you.  You mean our -- Frankel's discovery
20   responses?
21        A   Sure.
22        Q   Got you.  Got you.
23        A   And Ziv's discovery.
24            MR. BANKER:  Okay.  I'm sorry.  Thank you.
25            (Exhibit Number 27 marked for identification.)

38 (Pages 149 to 152)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 153

1    BY MR. BANKER:
2        Q    And then -- I believe -- I believe that this
3    is the last document.
4            MR. HOLDER:  There is one more after that.
5            MR. BANKER:  Son of a gun.
6    BY MR. BANKER:
7        Q    All right.  Let me hand you what I've marked
8    as 27, which I thought was the last document claimed as
9    confidential in the second amended complaint, but my
10   colleague says that I may have missed one.
11           But, first of all, would you agree that
12   Exhibit 27 appears to be an e-mail that Frankel
13   forwarded to his Yahoo e-mail account on August 15,
14   2016, and the e-mail thread that he forwarded appears to
15   concern a correspondent fee schedule of Alpine?
16       A    Yes.
17       Q    And, of course, you don't know why Frankel
18   forwarded this e-mail to himself on August 15, 2016;
19   correct?
20       A    I do not know.
21       Q    And -- but you consider -- I think I'm
22   catching on.  You consider this fee schedule to be
23   confidential for two reasons --
24       A    I consider -- go ahead.
25       Q    -- for two reasons because you say that it

Page 154

1    perhaps had not been completed yet and had not been
2    published on the website and that, if that were true,
3    then it would not have been information that was
4    circulated to the public; is that true?
5        A    I think my comments speak clearly for
6    themselves, but if I took -- if this was not -- even if
7    it was public and I took notes and I talked about it
8    internally, that communication about this specific
9    thing -- it was not made available to the public --
10   would be confidential.
11           MR. BANKER:  Okay.  What's the last one.
12           (Off-the-record discussion held.)
13   BY MR. BANKER:
14       Q    All right.  Let me hand you what I will mark
15   as Exhibit 28.
16           (Exhibit Number 28 marked for identification.)
17   BY MR. BANKER:
18       Q    And I will represent to you that this is a --
19   an expert witness -- a purported expert witness
20   disclosure that the lawyer for the plaintiffs made on --
21   on or about June 25, 2019, disclosing Bryce Cook as an
22   expert witness.
23           Do you know who Bryce Cook is?
24       A    I believe I do, but I don't recall.  I think
25   he may have done some other work for us in the past.

Page 155

1        Q    Okay.  Do you know if he's done any work on
2    this case?
3        A    Other than through attorneys, anything he's
4    done would be attorney-client work product.
5        Q    And I'm not -- I'm not asking you to reveal
6    any discussions with your lawyers.  The question is do
7    you know if Mr. Cook has done any work on this case in
8    particular?
9        A    I believe he's -- how much, I don't know.  I
10   think he has done some, but I don't recall exactly if
11   he's done any other or how much.  I'm not --
12       Q    You haven't seen any work product?
13       A    I have not, no.
14       Q    Okay.  Let me ask you this:  Has anybody done
15   a damages analysis in this case for -- on behalf of the
16   plaintiffs?
17       A    We've looked at the evidence and the timeline,
18   and we've seen revenues significantly drop accordingly.
19   At this point, without having the full discovery, we are
20   still piecing that together.
21       Q    And I'm going to hand you --
22           MR. BANKER:  I don't know how to do this
23   because they just came to me as a bunch of
24   documents.  Oh, gosh.  Oh jeez.
25   BY MR. BANKER:

Page 156

1        Q    Let's take all these together, because I think
2    maybe that's the most efficient way to do it.
3            (Off-the-record discussion held.)
4            (Exhibit Number 29, Exhibit Number 30, Exhibit
5    Number 31, Exhibit Number 32, Exhibit Number 33,
6    and Exhibit Number 34 marked for identification.)
7    BY MR. BANKER:
8        Q    All right.  Thank you for your patience,
9    Mr. Hurry.  I have handed you what I've marked as
10   Exhibits 29, 30, 31, 32, 33, and 34; is that correct?
11       A    I believe so.
12       Q    Okay.  And these are financial documents that
13   the plaintiffs' lawyer provided to us yesterday?
14           MR. SUSMAN:  On Monday.
15           MR. BANKER:  On Monday?  Was it Monday?
16           MR. SUSMAN:  Um-hum.
17           MR. BANKER:  Okay.  I'm not --
18           MR. SUSMAN:  They all came together.
19           MR. BANKER:  They all go in together.  There
20   is really no difference.
21   BY MR. BANKER:
22       Q    Do you know why these documents have been
23   produced in this case?
24       A    Because they are showing on a timeline of
25   events where revenues drop off is coinciding very

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 157

1    closely to the time Chris Frankel's done certain things.
2        Q   Okay.  Well, I mean, has anybody done an
3    analysis to determine what damages, if any, Frankel's
4    alleged misconduct has caused?
5        A   Yeah.  In terms of analysis, I don't know
6    analysis, but it's pretty actually blatant, actually.
7    If you look --
8            MR. SUSMAN:  His question, though, has anyone
9        done an analysis?  I mean, are you asking if there
10       has been an expert analysis?
11           MR. BANKER:  Yeah.  Yeah.
12       A   No.  I can't tell you if that's been done yet
13   or not.
14   BY MR. BANKER:
15       Q   Okay.  And by "expert analysis," I mean, do
16   you have anybody internally in the company with Alpine
17   or Scottsdale or anybody else that has done an analysis
18   that -- of what damages were caused -- allegedly caused
19   by Frankel?
20       A   When we looked at the financials, we had a
21   massive drop in revenue that does not look -- it
22   coincides almost exactly with when Chris Frankel --
23   right before Chris Frankel or about the same time Chris
24   Frankel went to Vision, and it's also about the same
25   time that Chris Frankel and other -- we believe others

Page 158

1    that may have been working with Frankel were contacting
2    customers.  There was a big drop in revenue between June
3    and May.
4        Q   June and May of what year?
5        A   June and May of this year.  And then you
6    can -- you can also see correlations between the time
7    when we suspected Chris Frankel may have been doing some
8    things, such as looking at broker-dealers, but we're not
9    sure.
10       (Off-the-record discussion held.)
11       A   There's some drops in revenue that aren't
12   really explainable other than the CEO -- some of the
13   facts that we know, obviously, today, such as Chris
14   Frankel, when you look at some of these e-mails, like
15   customer lists, et cetera, the drop in the business got
16   very bad two or three months in before Chris Frankel was
17   terminated.  Then after, the business was repaired and
18   fixed and on track to do really well and then dropped
19   again between May and June, which coincides almost
20   identically with the time Chris Frankel was -- whether
21   he's doing anything at Vision or not, the circumstantial
22   evidence would indicate that about the time Chris
23   Frankel went to Vision, along with other folks, this
24   revenue dropped substantially about 35 percent.  That's
25   what we saw in the numbers.

Page 159

1    BY MR. BANKER:
2        Q   Okay.  Let me see if I understand what you're
3    saying.  You're saying that these documents, Exhibits 29
4    through 34 --
5        A   Particularly 34.
6        Q   Okay.  But we'll -- let's deal with them all.
7        A   Okay.
8        Q   You are saying that 29 through 34 either
9    individually or collectively show a significant decrease
10   in revenue which occurred you said right after Chris
11   left.  Do you have --
12       A   On or about.
13       Q   Was it after he left as employee or after he
14   left --
15       A   Before he left.  The revenue started to drop
16   approximately on or about or right after we told Chris
17   Frankel we weren't selling him any part of Alpine.
18       Q   Wait.  Wait.  Wait.  Wait.  Wait.  You weren't
19   selling him any part of Alpine?
20       A   That is correct.
21       Q   Okay.  What was that conversation?  That's
22   news to me.
23       A   He wanted to know if he could buy Alpine or
24   buy part of Alpine.
25       Q   When did that conversation come up?

Page 160

1        A   Would have been sometime in -- between
2    probably July and the end of the year, 2017.
3        Q   So he approached you and your wife about
4    buying Alpine?
5        A   Myself too.
6        Q   That's what I'm saying.  Oh, he approached you
7    directly?
8        A   Yes.
9        Q   And he wanted to buy an interest in Alpine?
10       A   Yes.
11       Q   And what did you -- what was the resultant
12   conversation?
13       A   We weren't interested in selling, essentially,
14   end of the day.
15       Q   Okay.  And so then what happened?
16       A   Started to see the revenues starting to drop
17   off right after that.  In fact, didn't think much of it,
18   other than now that we are getting into discovery, you
19   can see a timeline almost of what appears to be certain
20   information going out and revenue dropping off.  Things
21   that didn't make sense before, like why wouldn't you lay
22   people off, why weren't you out there trying to find
23   counterparties, why were you telling investors,
24   evidently, not to invest in this loan?  Multiple
25   factors.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 161

1    Q   Investors not to invest in what loan?  In the
2  Czarnik?
3    A   Kelley can testify to that a little bit better
4  than I can regarding Chris Frankel seemed to -- giving
5  customers the indication that they shouldn't invest in
6  any line of credit with Alpine.  And if you look at the
7  timeline of when things started to happen, as we are
8  starting to get discovery, it would appear that somehow
9  between the time that we told him we weren't going to
10  sell Alpine, he probably was at least looking for
11  options to buy a competitor and take the business, which
12  would explain a lot of the reasons why a lot of these
13  e-mails, which were confidential, were sent to his
14  personal e-mail address.
15       Again, speculating to some extent, but there
16  is some, in terms of Jim Kelley, facts about him for
17  whatever crazy reason not wanting people to invest in
18  this.  And if you look at the timeline of events, the
19  revenue started to drop.  Things weren't explainable,
20  like why wouldn't you lay off -- we had a board
21  resolution.  Why wouldn't you lay off or terminate an
22  employee with a board resolution?  It had been over
23  60 days.  Employees weren't getting laid off.
24       It almost looked like he was trying to put
25  Alpine out of business and steal the business and take

Page 162

1  it somewhere else.  If you look at the timeline of
2  events, it -- that's what the circumstantial evidence
3  would certainly indicate.
4    Q   Okay.  So when does the first revenue drop?
5    A   2017.  After 2017 it became noticeable and had
6  gotten more exponential.  And it probably didn't get
7  fixed, ironically, until Chris Frankel's consulting
8  agreement was completely terminated and the revenues
9  started to take a shift shortly after that.
10    Q   Okay.  And what is your speculation for why
11  the revenue went up after --
12    A   Don't know.  It would appear on the discovery
13  that -- from what -- when you piece it together, that he
14  was essentially trying to put Alpine out of business and
15  essentially move the business somewhere else and taking
16  our own clients who were trying to raise money for
17  Alpine, raise money for his own firm, in a sense trying
18  to put Alpine out of business and essentially move all
19  the business across the street.
20    Q   All right.  And then you said that so the
21  revenue starts going back up after the consulting
22  agreement ends.  When does it go down again?
23    A   The month that Chris Frankel joins Vision.
24    Q   Okay.  What month did Chris Frankel join
25  Vision?

Page 163

1    A   I believe it was June, according to the CRD.
2  We don't have the exact timeline when he agreed to go,
3  or we can speculate, but on the CRD it says June.
4    Q   Okay.  So -- and so your speculation is that
5  what did --
6    A   Also, there is a lot of customers being
7  contacted over this period.  We started getting calls
8  from customers that customers were being contacted by a
9  group led by Chris Frankel.  That started happening in
10  later May and June.  And then we saw Chris Frankel
11  actually get registered with Vision.  And then we saw
12  the big drop in revenue in June, corresponds with the
13  evidence that we're getting.
14    Q   Who are the customers that contacted you that
15  said that Frankel had contacted them?
16    A   A lot of them are on that list, and we have
17  some specifics.  I don't have them all memorized.
18    Q   I'm not asking for all of them.  I'm asking
19  for any of them.  Can you give me --
20    A   I could pull up a list.  A lot of the
21  customers that were on that 50 list.  I think we know of
22  at least a third, if not half, that were contacted, some
23  of which you have discovery on, by a group led by Chris
24  Frankel, as we understand.
25    Q   All right.  Let me just tell you.  I have no

Page 164

1  discovery showing any customers --
2    A   The e-mails of those customers, there must be
3  five or six, maybe seven.
4    Q   I have seen no such e-mails.
5    A   Chris Frankel produced them.  The individuals
6  on those e-mails were either part of companies on this
7  list, there may be individual names, but they
8  represented these companies.  If you want to pull out
9  all those discoveries, we can pull out some of Chris
10  Frankel's e-mail.
11    Q   I've been through every e-mail that you claim
12  where he --
13    A   I'm sorry.  My memory is not as good as it
14  used to be.  I'm getting a little bit older; but if we
15  can go through those e-mails, I would be happy to point
16  the names out to you.
17    Q   I don't know what e-mails you are talking
18  about.
19    A   The e-mails that Chris Frankel just produced
20  in his last production, the Ziv production, there is
21  individual names of people he contacted that are
22  associated with these groups and potentially groups that
23  aren't on here.  I don't -- I certainly could get that
24  information.  It's actually some of those names you have
25  on the e-mails.  We also have these same people that

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 165

1  have called, the majority of these people have called
2  and said they have been contacted by a group of Chris.
3     Q   Okay.  I want to be clear.  You have been
4  designated as the corporate representative of these
5  plaintiffs to testify about the allegations in your
6  complaint and your claims in this case.  And sitting
7  here today, you cannot tell me the name of a single
8  customer that Chris Frankel --
9     A   Chicago Ventures.
10    Q   -- inappropriately contacted?
11    A   Chicago Ventures.  Auctus Fund.
12    Q   Wait.  Let's take them down.
13    A   I believe -- I can get you a list.  I just
14 don't have it memorized.  If I go to my computer, I'll
15 be happy to pull up a list.
16    Q   Chicago Ventures -- and you are looking at
17 Exhibit -- what exhibit is it, 12?
18    A   Yeah.
19    Q   Chicago Ventures, Auctus Fund.  Anybody else?
20    A   Yeah.  There's a lot of others.  I just don't
21 know necessarily the companies' names with the people.
22 Tangiers I believe was one.
23    Q   Anybody else?
24    A   Yeah, the PowerUp.  Most of the people on this
25 name -- on this list.  So you have individuals that are

Page 166

1  principals of these companies.
2         MR. BANKER:  Wait a minute.  Your lawyer is
3  handing you his phone.
4         MR. SUSMAN:  No, I've got that --
5     A   On the discovery, on those e-mails that
6  Frankel produced, like Pete Alford.  There was a couple
7  other names in there.
8  BY MR. BANKER:
9     Q   Pete who?
10    A   Pete Alford.
11    Q   Pete Alford?
12    A   Yes.  He's a banking contact that specifically
13 referred to Frankel to help get Alpine a loan.  He
14 wouldn't know who he was.
15    Q   Pete Alford, who does he work for, Lakeside?
16    A   Another bank.  No.  Another bank.  We actually
17 introduced him to Lakeside too.
18    Q   Service First?
19    A   Service First, that's Christopher's
20 relationship.  He brought that along.
21    Q   I don't understand.  All right.  Here are the
22 names that I've gotten so far.
23        THE WITNESS:  Why don't we pull up the
24 exhibits.  Can you do that?
25        MR. SUSMAN:  Which one?

Page 167

1         THE WITNESS:  The one from Chris Frankel and
2  Ziv.  The ones he just produced late.
3         MR. SUSMAN:  The ones yesterday?
4         THE WITNESS:  Yeah, and actually --
5         MR. BANKER:  I have to get them from him.
6         MR. SUSMAN:  I don't --
7         THE WITNESS:  We've got a list from Mike.  So
8  can I print that out and read them off them?
9         MR. SUSMAN:  Yeah.  Sure.  If we can get them.
10 Sure.
11        Go off the record.
12        (Off-the-record discussion held.)
13    A   Okay.  And, actually, it's on the Frankel
14 production, but some of those names -- I've been advised
15 from the company --
16 BY MR. BANKER:
17    Q   Wait.  Wait.  We are back on the record now.
18    A   All right.  John Fife, Chicago Ventures -- and
19 the reason it's hard is because they have different
20 companies.  So I can't remember all the companies.
21    Q   Okay.  So Chicago Ventures, who is the person?
22    A   He's got different companies.
23    Q   What's his name?
24    A   John Fife.  He's got other people that work
25 for him as well.

Page 168

1     Q   John Fife?
2     A   John Fife.
3     Q   F-I-F-E?
4     A   Yes.  Steve Hicks.
5     Q   And who is Steve Hicks with?
6     A   You know, he's got different companies too.
7  Tarden Bay Partners, Southridge.
8     Q   Wait, wait.  Tarden or Harden?
9     A   You know, they wrote down Tarden, so I mean
10 again, these --
11    Q   Tarden, T-A-R-D-E-N, Bay Partners?
12    A   Yes.
13    Q   Okay.
14    A   Vince Sbarra.
15    Q   Vince?
16    A   Which is -- he probably has some different
17 ones too.  He has the EROP fund.
18    Q   Samarra is S-A-M-A --
19    A   See, they got some of the spellings wrong.  I
20 think it's Sabarra.
21    Q   How would you spell it?
22    A   Kind of like the pizza place used to be.
23    Q   Okay.  S-A-B-A-R-R-A [sic]?
24    A   You got it right, John.
25    Q   Okay.  Who else?

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 169

1      A   Pretty much everybody on that list that you've
2  got --
3      Q   What list are you talking about?  What
4  document?
5      A   The e-mail production that Frankel had with
6  Scottsdale Capital or Chris had with the Scottsdale
7  Capital/Alpine customers.  They produced a list.  There
8  were several names on it.  We've also -- like, for
9  instance --
10     Q   What are you looking at right now?
11     A   I'm just looking at lists of customers that
12  had called in and said they had been contacted by
13  Frankel, Vision, like Sbarra, evidently --
14     Q   Can I see the list?
15     A   I could print it off and have you look at
16  this.
17        MR. SUSMAN:  Who prepared this list?
18        THE WITNESS:  Mike.  So it's work product.
19        MR. SUSMAN:  Yeah, work product.
20     A   If you show me his protection, I'll be happy
21  to point the names out to you.
22  BY MR. BANKER:
23     Q   You are the one here who is testifying as the
24  representative of the company?
25     A   Well, I had told you multiple times it was

Page 170

1  that 50 list.  There are principals in those companies
2  have -- have -- the majority of them had been contacted.
3  In the discovery, you obviously have PowerUp.  You have
4  Curt Kramer.  I believe Steve Hicks was in that list.
5  You have Sbarra.  And he produced on that e-mail list.
6  There was several other names.  It's a lady's name that
7  escapes me at the moment that was on that list that has
8  a fund at Scottsdale.
9        MR. SUSMAN:  It's the list the top 50?
10        THE WITNESS:  Yeah.  Top 50.
11  BY MR. BANKER:
12     Q   Well, you've got that e-mail.
13     A   They're not --
14        MR. SUSMAN:  He's trying to figure out the
15  names of --
16     A   The names are very different.  I don't have
17  all the names.  I can certainly get those to you.  I'd
18  be happy to get those to you.  I don't have them all
19  memorized.
20  BY MR. BANKER:
21     Q   Well, the time to get those to me is today.  I
22  mean today is --
23     A   I can probably get you those today.
24     Q   Well, I mean when you are here to testify
25  about them --

Page 171

1      A   Well --
2      Q   -- so that you can explain.
3      A   I testified that they were most of the people,
4  if not all the people, on that list.
5        MR. SUSMAN:  Right.
6      A   Directly or indirectly, principals or
7  associates.  Several of them are actually in e-mail
8  discovery that are associated with those companies too.
9  So I -- I don't have -- I'm sorry, but that would be a
10  hundred plus names.  I don't have them all in my head.
11  BY MR. BANKER:
12     Q   All right.  But what you need to do is you
13  need to tell me what customers contacted you and said
14  anything to you that suggests that Frankel did anything
15  wrong?
16     A   I don't believe I said that the customer
17  called us and said Frankel did anything wrong.  I think
18  what I told you was they had been contacted by Frankel
19  or a group of people representing Frankel, and the only
20  way that they would have known that these people had the
21  business and type of business that they had and they
22  know all about those customers, business that they did,
23  like in that e-mail, they know how much business they
24  did, they know what kind of business they did, they have
25  trade runs, they have financial information.

Page 172

1        So, collectively, I could say here's 50 of
2  these top customers.  Here's all the revenue.  Here's
3  Alpine's trade run.  This is what I'm going to take.  So
4  when you talk about unfair advantage, having that
5  information, okay, and mailing it to yourself,
6  collectively using that information to take the
7  customers, it would be in violation of the trade secrets
8  agreement and confidentiality agreement.
9        And, yes, the majority -- you have at least
10  six or seven names that were contacted there.  I didn't
11  say -- we don't -- I don't know what the customer said
12  to him.  I wasn't there.  But customers have called in,
13  some of the ones on that list, and told them that they
14  had been contacted with -- by Chris Frankel and some
15  others at Vision, I believe, to bring that business over
16  to Vision.
17     Q   And you think that that somehow demonstrates
18  that Frankel somehow misappropriated some of your
19  information, your confidential information?
20     A   I think collectively with the information we
21  got, it would simply appear that he's trying to steal
22  the entire business using our confidential information
23  and trade secrets.  Absolutely.  Even the revenue.  It's
24  indicated there in the Ziv productions.  Flat out says
25  there's a half million, $1 million here.

43 (Pages 169 to 172)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 173

1    You correlate with the revenue numbers,
2  correlate that with Jim Kelley's testimony, the
3  production from Ziv, the e-mails that have gone out to
4  customers, and a lot of the other production that we
5  know we don't have yet, such as the stuff from Vision
6  and Randy Jones and some other sources, yes, I believe
7  it's going to be pretty clear.
8    Q   You're not able to tell me the amount of
9  damage that you think that has been caused by Frankel?
10   A   It would appear that approximately $700,000
11 worth of revenue, give or take, somehow was related to
12 the move that he did to Vision.  Now, we don't have that
13 empirically set up yet, but there is a super high
14 correlation of the move to Vision and a big drop in
15 revenue, which all happens -- it's not -- it's more than
16 a coincidence.
17   Q   All right.  Well, of course, it's not a drop
18 in revenue.  It's a drop in profit; right?
19   A   Those are drops -- well, you can say it
20 goes -- in this case, it would go to the bottom line,
21 yes.
22   Q   Okay.
23   A   Some of it.
24   Q   When -- who is going to do, and when are they
25 going to do it, a damage analysis to determine --

Page 174

1    A   It's in the process.
2    Q   -- what you say the damages are?
3    A   They are in the process, as we get the
4  discovery, of putting that together.  We haven't got all
5  the discovery yet.
6    Q   Okay.  And when do you anticipate that that
7  will be done?
8    A   I hope soon, but we are still missing a lot of
9  discovery.
10   Q   Okay.  And these financial documents that you
11 produced, 29 through 33, are those the documents that
12 you would use to determine what the alleged damaged are?
13   A   They certainly could be some of them, yes.
14   Q   Well, what else would you need?
15   A   We probably want to see all the trade runs and
16 stuff at Vision, which customers were ours, how they got
17 over there, and what kind of commissions they did over
18 there.
19   Q   Okay.  And what analysis, if any, have you
20 done to determine what --
21   A   We haven't been able to get that discovery.
22 They have been avoiding giving it.
23   Q   Okay.  What analysis have you done to
24 determine other reasons for upticks and declines in the
25 business other than your speculation as to what

Page 175

1  Frankel did?
2    A   It was a very big drop, and it correlates
3  almost exactly with a lot of things taking place.  So to
4  answer your question, generally speaking, drops in
5  revenue don't drop that sharply and quickly based on
6  certain events.
7    Q   Okay.  So --
8    A   There wasn't any other event that happened
9  that could have dropped it like that.
10   Q   I see.  So I got -- and you did say that.  So
11 you're -- you think that you have damages because you've
12 noticed two big drops in revenue that corresponded with,
13 number one, your rejection of Frankel's offer to buy an
14 interest in Alpine and, number two, with the termination
15 of the consulting agreement?
16   A   It seems to correlate with the discovery we
17 are getting, yes.
18   Q   And I guess three would be the Frankel's
19 joinder with -- with Vision.  You think there is a
20 revenue drop there, and you -- that corresponds to when
21 Frankel joined Vision, so you attribute that drop to --
22   A   And also corresponds with some of the contacts
23 with customers.  Information that was given corresponds,
24 to some extent right, after some of the stuff that we've
25 gotten in discovery.

Page 176

1    Q   Okay.  Has any customer told you or anyone
2  else with Alpine or Scottsdale or any of the other
3  plaintiffs that Frankel did anything wrong?
4    A   I think Jim Kelley can probably allude to that
5  a little bit better than I can.  Customers -- I have no
6  personal information other than what I've told you.
7  Companies advised me that people have called and said
8  that they reached out to them.  Some of them had
9  comments about it, but no one specifically said that
10 they did something wrong.
11   Q   What do you mean "comments about it"?  What
12 the heck does that mean?  You are saying that people in
13 your company relayed to you that customers had called
14 them and said what?
15   A   Well, you would have to talk to those
16 individuals.  But, I mean, it is a little odd when you
17 are working with someone, such as if I was a law firm,
18 for instance, and had worked with a law firm for a long
19 time and one of their associates left and then is
20 calling me, I would probably call the senior partner and
21 just tell him, "Yeah, he was calling me, and I thought
22 that was kind of in bad taste."  But, you know, maybe
23 comments along those lines, but they have been telling
24 us that certain customers been telling us that they have
25 been contacted by that group.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 177

```
 1      Q   To be precise, you believe that customers had
 2  contacted people in your company, Alpine or in
 3  Scottsdale, and have said that Frankel has contacted --
 4  Frankel or somebody on his behalf has contacted them?
 5  That's the extent of what you're prepared to testify to
 6  as the corporate representative of the plaintiffs in
 7  this case?
 8      A   That's what we know today.  Okay.  So in other
 9  words, we have tried to get the discovery from Randy
10  Jones and from Vision, and I believe some other places.
11      MR. SUSMAN:  Including defendant.
12  BY MR. SUSMAN:
13      Q   Okay.  All right.  Let me hand you what I've
14  marked as Exhibit 35.
15      (Exhibit Number 35 marked for identification.)
16      MR. SUSMAN:  David, are we almost done?
17      MR. BANKER:  Yep.  I am almost done.
18  BY MR. BANKER:
19      Q   And I think that this may be the last bit of
20  information that you have claimed or that the plaintiffs
21  have claimed in your complaint is confidential.
22          Would you agree with me that Exhibit 35
23  appears to be an e-mail that Frankel forwarded to his
24  Yahoo e-mail on August 15, 2016, concerning fee
25  schedules?
```

Page 178

```
 1      A   Yes.
 2      Q   I thought we had already covered this, but
 3  maybe we haven't.  And are you claiming -- is Alpine
 4  claiming this as confidential?
 5      A   As I answered prior, anything that was a work
 6  product internally that was sent around that was not
 7  available to the public would be confidential.
 8      MR. SUSMAN:  Also note for the record this
 9  document is incomplete.  The actual attachment have
10  notes on them, sticky notes to the PDF.  They are
11  not included here.
12      MR. BANKER:  917.
13      MR. SUSMAN:  Yeah, the actual attachment, the
14  fee schedules.  See how it says "Some thoughts on
15  changes.  Please advise."  The actual document, the
16  fee schedule, actually has highlighted and then
17  little PDF sticky notes with John's notes on them.
18      MR. HOLDER:  You want to --
19      MR. SUSMAN:  I'll be asking Chris about them
20  so they will be included.
21      MR. BANKER:  That's your version of what you
22  produced on this?
23      MR. SUSMAN:  Yeah, correct, and also what we
24  received from you guys.
25      MR. BANKER:  Okay.
```

Page 179

```
 1      MR. HOLDER:  Correct.  Your saying it didn't
 2  print.
 3      MR. SUSMAN:  It didn't print.  It's
 4  problematic printing it, but it -- when it says
 5  some notes, he actually does have some notes on it.
 6      MR. HOLDER:  We can fix that.  We can just --
 7      (Off-the-record discussion held.)
 8  BY MR. BANKER:
 9      Q   All right.  Let me hand what I'm going to
10  mark as the final exhibit.
11      (Exhibit Number 36 marked for identification.)
12  BY MR. BANKER:
13      Q   Which is Exhibit 36.  Let me ask you to
14  identify that.
15      A   It's a complaint against Alpine.
16      Q   Okay.  You've obviously reviewed that
17  carefully; right?
18      A   I reviewed it.
19      Q   Okay.  Can you give me a summary of what the
20  allegations are that FINRA is making against Alpine in
21  this complaint?
22      A   There are a lot of allegations, all of them
23  untrue.  Alpine initiated a -- essentially a minimum or
24  a fee if people weren't doing a certain amount of
25  business.  They either needed to do the business, pay
```

Page 180

```
 1  the fee, or move their account.  Alpine gave customers
 2  in some cases almost nine notices almost over a
 3  ten-month, and then finally decided it was time to start
 4  charging them.
 5      Q   Okay.
 6      A   In every case, a customer complained.  Alpine
 7  gave them back all the money, as long as they agreed to
 8  get their account out.  So FINRA has twisted this around
 9  in a very strange way.  There's already been another
10  regulator that looked at it, didn't seem to have a
11  problem with it when he realized essentially what was
12  going on.  This guy's got lots of notices.  FINRA is
13  trying to spin this into something that it's not.
14          You know, it's not like the OTC business,
15  doesn't seem to change, but it's -- you know, we
16  concluded ultimately that essentially whether they think
17  this fee is a good fee or a bad fee, we don't feel that
18  they can tell us to allow the public to squat on our
19  property for free.  We think that these people can
20  either move their account, which we have asked them to
21  do, pay the fee we told them to pay, or do the business.
22          But we can't afford to just have customers
23  sitting around costing us all kinds of money doing
24  nothing.  And essentially that's what the decision of
25  the firm was.  And FINRA decided to make a case out it,
```

45 (Pages 177 to 180)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 181

1    and they brought one.
2        Q   All right.  According to the allegations that
3    FINRA has made, the annual account fee at Alpine was a
4    hundred dollars; correct?
5        A   That's actually not -- there was an account
6    fee, I believe, that was a hundred dollars.  I think I
7    don't have the prior fee schedule, but I believe that
8    the dormant fee and the other fee were probably closer
9    to 250 or 300.  There was a point where the fee was a
10   hundred, and so that's also not clear in their complaint
11   which fee schedule they are looking at.
12       Q   Um-hum.
13       A   There was multiple fee schedules, and it had
14   moved up.
15       Q   Okay.
16       A   It did make a sizeable jump from where it was.
17       Q   Okay.
18       A   And we also gave customers a significant
19   amount of time and multiple notices in order to move.
20       Q   All right.  Well, let's -- let's put aside the
21   notice issue.  I don't want to get in the weeds in that.
22   But the point is that Alpine had an annual fee that was
23   perhaps somewhere between $100 and $250.  Is that what
24   you're saying?
25       A   I believe so.  And we could figure that out by

Page 182

1    pulling up the actual fees.  So it --
2        Q   Okay.
3        A   I think at one point it was a hundred and
4    changed a couple of times.
5        Q   Okay.  But it would be less than $500?
6        A   It would be less than $500.
7        Q   Okay.  Then at some point that fee jumped from
8    less than $500 a year to $5,000 a month.  Is that true?
9        A   That's true.
10       Q   Okay.  And when did the $5,000 per month
11   account fee kick in?
12       A   That would have kicked in at the -- I believe
13   in October.
14       Q   October of 2018?
15       A   Um-hum.
16       Q   Yes?
17       A   Yes.
18       Q   Okay.  How did that help your business?
19       A   Actually went up.
20       Q   Really?
21       A   Sure did.
22       Q   Because people wanted to pay a monthly account
23   fee of $5,000?
24       A   We had started focusing on the customers that
25   made us money, started getting rid of the customers that

Page 183

1    were costing us money.
2        Q   Okay.
3        A   We had at one point, Alpine had almost 29,000
4    accounts.
5        Q   Okay.  So let me ask you this:  Since October
6    of 2018 when you think that Alpine --
7        A   Since October --
8            MR. SUSMAN:  Let him finish the question.
9    BY MR. BANKER:
10       Q   Yeah.  You have to let me finish.
11       A   All right.
12       Q   You just don't know what I'm going to ask.
13   Since Alpine implemented this account maintenance fee
14   increase from less than 500 to $5,000 per month probably
15   in October of 2018, Alpine has certainly had an awful
16   lot of customers leave; right?
17       A   Customers that were leaving were producing no
18   revenue for the firm or very little.  Most of them
19   creating far more costs than the revenue.
20       Q   Okay.  And is that -- is that -- that $5,000
21   monthly fee that -- that Alpine's been charging since
22   October, has that been uniformly applied to all customer
23   accounts?
24       A   Customers had two choices.  They could move
25   and get their money back.  Okay.  If they were doing

Page 184

1    business, if they agreed to either start doing business
2    or make an attempt to do at least 60 or a hundred
3    thousand dollars plus a month, it was waived.  If there
4    were already doing a significant amount, it was waived.
5    If they were doing no business, they were basically
6    given an opportunity to either leave, have -- not
7    be charged 5,000, just go somewhere else.
8        Q   Okay.
9        A   But if they insisted on staying there --
10       Q   Um-hum.
11       A   -- then they needed to either do the business
12   or pay the fee.
13       Q   Okay.  Now, what is Austin Trust?
14       A   Austin Trust is a trust company.
15       Q   Okay.  And it's kicking your butt, isn't it?
16       A   Actually, no.  It's --
17           MR. SUSMAN:  I'm going to object that that's
18   vague and ambiguous.  To the extent you understand,
19   you can answer.
20       A   I think there was a period where some
21   customers went over there, but it was brief and --
22   BY MR. BANKER:
23       Q   Yeah, but --
24       A   To answer your question, it's not -- it's not
25   kicking our butt today.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 185

1    Q   Okay.  Well -- and that was not a good
2    question, obviously.
3        But Austin Trust had a competitive advantage
4    over Alpine, correct, because of the way it was
5    structured with this trust arrangement?
6        MR. SUSMAN:  Objection; lacks foundation.
7    A   Its competitive advantage, it wasn't regulated
8    by FINRA.
9    BY MR. BANKER:
10   Q   Right.  And that's a competitive advantage;
11   right?
12   A   It was, but it's -- the Austin Trust situation
13   was a situation that was compiled some other issue that
14   happened on or about I believe -- you know, on or about
15   the time Chris Frankel was terminated.  And it was a
16   compilation of several things.  It wasn't just Austin
17   Capital Trust.  We fixed the problems with the firm
18   towards the later part of the year.  We started getting
19   a lot of business back.  So it was -- it was an issue
20   for a brief period of time, but it's not so much an
21   issue today.
22   Q   So what was -- what were the problems with the
23   firm that allowed Austin Trust to poach your customers?
24   A   Same problem we talked about earlier was the
25   counterparties that we were -- we did not replace over

Page 186

1    that period and lost, which stifled our business for a
2    brief period of time.  And I think the company or the
3    firm engaged in the new business model that for whatever
4    reason was not engaged on or moved on while Chris
5    Frankel was there.  Towards the end of that period, that
6    business was put in place and turned around.  In fact, I
7    think we had one of its most profitable months in the
8    first part of 2019 and all of a sudden --
9    Q   Alpine had one of the most profitable months?
10   A   Alpine and Scottsdale, both, yes.
11   Q   In early 2019?
12   A   Actually, compared to the prior periods.  In
13   other words, you had a -- you had a slow drop.  Then you
14   had a bad drop.  Then you started coming back in
15   November, December.  January, February, April, May, and
16   then the big drop was in June.  So actually things were
17   actually coming along pretty well.  So once that
18   obstruction took place.  It's not that they are doing
19   horribly now, but there was a big drop, huge drop that
20   corresponded directly to the time that he registered at
21   Vision.
22   Q   Okay.  What was the structural change that
23   Alpine made to compete with Austin?
24   A   We got rid of a lot of the retail business.
25   We decided to focus on our top 50 customers, maybe the

Page 187

1    top 200 customers.  Get rid of the bottom 29,000.  We
2    started focusing on the fact that Alpine was just going
3    to be a clearing firm today.  Scottsdale Capital was
4    going to focus on just servicing customers.  So we got
5    rid of a lot of correspondence that we should have gotten rid
6    of over the years.  You know, we restructured the
7    business.
8    Q   Okay.  So has anybody set out to determine
9    what the revenue loss was that was attributable to
10   Austin Trust?
11   A   The short answer is no.  We know there was
12   some, but we don't think it was -- we think what was odd
13   about the Austin Trust situation is that they all went
14   to the same place at the same time, which is very
15   similar to what's happening in June, which it would
16   appear.
17   Q   Um-hum.
18   A   So -- so the answer is no.  It was a little
19   suspect when you have everybody going to the same place,
20   but after reviewing that, those guys ultimately, from my
21   understanding, reduced some of that business or decided
22   that it wasn't exactly what they wanted to do.  And from
23   my understanding, a lot of it was -- was not done.  At
24   the same time, we turned the business around.
25   Q   You accused Chris Frankel of luring your

Page 188

1    business to Austin Trust, didn't you?
2    A   I don't know if we accused Chris Frankel of
3    doing it.  We suspected, based on the evidence that we
4    had, that Chris Frankel was behind something to take the
5    Alpine business.
6    Q   To Austin Trust?
7    A   We suspected it could have been Austin Trust,
8    but we didn't know.
9    Q   Um-hum.  The fact of the matter is that any
10   revenue decline that -- or adversity, financial
11   adversity that Alpine has suffered Alpine has chosen to
12   blame on Mr. Frankel, has it not?
13       MR. SUSMAN:  Objection.  Closing statement.
14       MR. BANKER:  It's a good one.
15       MR. SUSMAN:  It's a beautiful one.
16       MR. BANKER:  It's a good one because it's
17   true.
18   A   Anyways I would disagree with that.
19       MR. SUSMAN:  I'll object to the form of the
20   question.
21   BY MR. BANKER:
22   Q   All right.  I'll tell you what.  Okay.  I
23   understand you disagree.  You say that the plaintiffs
24   have not blamed --
25   A   We did not see a big drop in revenue in Austin

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 189

1    Trust.  The revenue actually dropped before Austin
2    Trust.  We saw a bunch of clients go to Austin Trust,
3    but the revenue had already dropped.  That had to do
4    with the other things we had discussed with how Chris
5    Frankel was running that business.
6         The revenue really dropped when he got
7    licensed at Vision.  But everything had actually already
8    dropped before we found out about Austin Trust and
9    people going there.  It dropped a little bit, but the
10   bulk of the revenue was actually already dropped before
11   the Austin Trust.
12        Part of the reason that we feel they went to
13   Austin Trust was that period of time when we lost our
14   counterparties, we literally couldn't do some of the
15   business the way we were structured.  So when you say
16   lost revenue to Austin, I would say a lot of business
17   had already been down.  We lost -- we had some customers
18   open some accounts there.
19        The actual drop in the revenue, from what I
20   understand, wasn't -- it had already dropped before that
21   happened, and it was more of a function of customers
22   trying to find an alternative place to do their business
23   rather than the business just dropped as a result of
24   Austin Capital Trust.
25        Q    What financial adversity, what downturns has

Page 190

1    Alpine suffered since, let's say, January 1st of 2018,
2    other than what you would blame on Mr. Frankel?  What
3    had been the adverse setbacks that the company has had
4    to deal with other than Mr. Frankel?
5         A    The company's always had to deal with
6    regulatory issues.  So if that's -- that's an ongoing
7    issue.  The -- the issues in terms of constantly having
8    to rebuild the business model, that's been true for --
9    since I've been in the business for 28 years.
10        So, you know, what's concerning about all this
11   and circumstantial evidence is there seems to be a
12   pattern between the time that -- that he wasn't buying
13   the company and he was out there using our connections,
14   I think, unfairly to compete and essentially would
15   appear is telling customers not to put any money with
16   Alpine or do any business with Alpine, but give the
17   money to him, let him buy the firm, steal the business
18   out of Alpine.
19        The only way he would have known all that
20   information is if he had access to trade secrets and
21   confidential information.  And there is a pattern and
22   circumstantial evidence that would lead us to that.  You
23   know, that's why we brought the suit.
24        Q    Wasn't the question.
25        Has Alpine suffered any -- or faced any

Page 191

1    adverse financial factors or circumstances other than
2    what you believe Frankel has caused since
3    January 1, 2019?  For example, regulatory capital, has
4    that been a problem for Alpine?
5         A    Alpine's in regulatory capital, so no.
6         MR. SUSMAN:  I need to take a break, go to the
7    restroom.
8         MR. BANKER:  Okay.
9         (Recess taken from 2:05 p.m. until 2:11 p.m.)
10   BY MR. BANKER:
11        Q    Let me ask you this:  Was the regulatory
12   ban -- the ban against you from -- how do we state
13   it? -- the decision barring Hurry in all capacities from
14   working in the -- or from doing whatever you're supposed
15   to do, has that been -- that's caused some problems for
16   Alpine, hasn't it?
17        A    Believe it or not, it really is not what you
18   think.  I think you've got some people that have gotten
19   concerned over it, but generally speaking, Alpine's
20   continued to do well very well, despite that.
21        Q    Okay.  I mean, hasn't the publicity with that
22   been devastating?
23        A    Well, the publicity in the OTC market's never
24   good, but it's kind of an ongoing process.  And, you
25   know, it's kind of like, you know, yes, it sounds

Page 192

1    horrible, but did it -- it may sound kind of crazy, but
2    the short answer is, no, it didn't actually hurt
3    Alpine's business.  It might have hurt some of our
4    vendors and like that.  But once they actually
5    understand what's really going on and the stupidity of
6    some of the stuff that FINRA does, they get through it.
7         Q    In the FINRA complaint, it says "Alpine has
8    experienced mounting financial difficulties since 2018,
9    including the prospect of an multimillion-dollar SEC
10   fine."  Right?
11        A    That's what it says.
12        Q    Okay.  The SEC fine, isn't it $22 million --
13        A    No.  They are asking for $22 million.
14        Q    Okay.  And has that been a problem for Alpine?
15        A    Well, all regulatory scrutiny, especially when
16   it's public, is not helpful.  But it's -- you know,
17   the -- we don't feel like the $22 million is going to be
18   an issue.  We think the facts in that case are
19   completely wrong, like I -- we thought that the facts in
20   that FINRA case were completely wrong, which is why it's
21   stayed by the SEC, and I believe that if it's not
22   negligible in the circuit court, it will most likely be
23   tossed by the Second Circuit.
24        Q    Well --
25        A    So we are not -- we are not overly concerned

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 193

1 about that. Certainly, it's not a great thing to have.
2    Q   Um-hum.
3    A   But we believe that everything points to an
4 automatic stay there as well.
5    Q   To what extent has the specter of a
6 $22 million fine driven away business from Alpine?
7        MR. SUSMAN:  Objection; calls for speculation.
8    A   Yeah.  I don't think -- I think that the SEC
9 thing has been ongoing for some time, and there's been
10 some stories out there in the public about it.  So that
11 number is not necessarily new.  Okay.  So there is --
12 there was an attorney that talked about that before, I
13 believe, that wrote a story.
14        So that specific announcement that they are
15 talking about I don't think had any specific result of
16 the business.  It's not necessarily new information, I
17 guess, is what I'm telling you.
18 BY MR. BANKER:
19    Q   Okay.
20    A   It's been out there for some time.  And, in
21 fact, there was a story probably written -- I'm going to
22 speculate.  It was sometime before the SEC actually made
23 that public in their request.
24    Q   The SEC says, "Alpine's experiencing mounting
25 financial difficulties since 2018."  What are those

Page 194

1 mounting financial difficulties?
2        MR. SUSMAN:  Objection; calls for speculation.
3    A   Yeah, I don't know.  I mean, their business
4 certainly dropped like we talked about already today
5 around the time that Chris Frankel had been terminated
6 both before and after.  The turning point was
7 approximately, I would say, November, was when the firm
8 started turning around.
9 BY MR. BANKER:
10    Q   Um-hum.
11    A   It's certainly not where we would like it to
12 be, but it's certainly not where it was in July, for
13 instance, or August of 2018.
14    Q   Okay.  Has Alpine struggled to meet the
15 capital requirements of the National Securities Clearing
16 Corporation, particularly in the third quarter of 2018?
17    A   No.
18    Q   No?
19    A   It had the money.
20    Q   Okay.  Okay.  What about the decision of the
21 Depository Trust & Clearing Corporation on or about
22 July 11th, 2019, notifying Alpine that the firm would
23 have a minimum clearing fund requirement of 2.3 million
24 effective July 12, 2019?  Has that had any impact on
25 Alpine's business?

Page 195

1    A   No.
2    Q   Really?
3    A   Yes.
4    Q   Okay.  And how has Alpine managed to deal with
5 that minimum clearing fund requirement of 2.3 million?
6    A   They have a line of credit that they can
7 easily borrow from to cover that.
8    Q   The line of credit, is that the line of credit
9 that's referred to in this FINRA complaint?
10    A   It most likely is, yes.
11    Q   Okay.  That's the one where it's 120 percent
12 interest rate that the affiliate's charging to?
13    A   It's not quite that, but it's -- it's a
14 combination of commitment fees and interest rates.
15    Q   Okay.
16    A   Probably a little higher than that.
17    A   Yeah.  Yeah.  Oh.  Higher than 120 percent --
18    Q   Sure.
19    Q   -- interest?
20    A   I don't know exactly, but I would say that it
21 could be, depending on how often they use it.
22    Q   Okay.
23    A   It's not quite that high if they don't use it
24 a lot, and it could be a little more if they use it all
25 the time.

Page 196

1    Q   Why in the world would Alpine pay 120 percent
2 interest for a loan?
3    A   Well, you know, that's a good question.
4 Probably the same reason a lot of people in Tampa when
5 they have unsecured loans for $250,000 pay the same
6 120 percent to get their $100,000 loan too, and they are
7 unsecured.
8        And in Alpine's case, I don't even know of a
9 lender that would make a loan under the current scenario
10 right now.  Alpine's loan is pretty much committed and
11 available from one investor for a very large amount of
12 money.  Very hard to do.
13    Q   And that investor is -- who is the lender
14 under the Third Amended Loan Agreement referenced in the
15 FINRA complaint?
16    A   Alpine Securities Holding -- let's see --
17 Alpine Securities Holding Corp, I believe is the name.
18    Q   And that's a company owned by you; right?
19    A   No.  It's not owned by me.
20    Q   It's owned by you and your wife?  You have a
21 beneficial interest?
22    A   I'm the ultimate beneficiary.
23    Q   Okay.  So it's an affiliate of Alpine; right?
24    A   Actually, in this particular case, it's really
25 not.  It's actually owned by a completely set --

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 197

1  different set of trusts. It's managed by another
2  individual that works as the president of the company.
3      Q   Um-hum.
4      A   So from a legal perspective, the ownership and
5  indirect ownership is completely different.
6      Q   Okay. But let me -- let me read what this
7  says about this Third Amended Loan Agreement. It says
8  "Alpine Holding agreed to provide Alpine with a line of
9  credit in the same amount that Alpine had under its
10  previous loan agreement, $5 million." Is that right?
11  $5 million line of credit?
12      A   Yes.
13      Q   All right. "Under the prior loan agreement,
14  Alpine paid a monthly fee of $75,000 and an annual fee
15  of $500,000, and annual interest at 36%." Is that
16  right?
17      A   I don't recall exactly what the terms were but
18  could be.
19      Q   Sounds about right?
20      A   Yeah.
21      Q   Okay. And then it goes on to say "Under the
22  Third Amended Loan Agreement, Alpine agreed to pay a
23  dramatically higher monthly fee of 400,000 for this line
24  of credit and annual interest of 120% on the amounts
25  borrowed."

Page 198

1      A   Yeah, they left out a lot of details. What I
2  can tell you about the other loan was the other had a
3  commitment fee of approximately 15 percent per year and
4  a 10 point -- in other words, basically, a 25 --
5  10 points plus 1 1/2 half percent commitment fee. So
6  about 25 percent a year plus a 3 -- I believe it was a
7  3 percent a year or 3 percent a month rate plus a lot of
8  ancillary charges regarding moving the money around.
9  And it was committed for by Alpine for three years; in
10  other words, Alpine could not cancel the agreement for
11  three years.
12          In exchange for the cancellation of the
13  agreement, we offered Alpine a three-day cancellation
14  note. So, in other words, they could cancel that. So
15  what we did was, instead of front loading the loan where
16  they had to pay us essentially 10 points up front and
17  the other 1 1/2 percent plus the interest used plus
18  they're locked into it for three years, we changed it to
19  where they could cancel at any time. Okay.
20          And so the interest was basically paid per
21  month. So if Alpine at any time wanted to cancel the
22  agreement, it could. So, in other words, they left out
23  a lot of those details in there. So, in other words,
24  they're -- Alpine's -- the lender has to commit to that
25  money, and Alpine could basically cancel at any time.

Page 199

1  Three days' notice.
2      Q   Okay. Let's accept that. Okay? Let's say
3  that Alpine can cancel at any time. But before it
4  cancels, it's paying 400 -- $400,000 per month for this
5  loan?
6      A   Yes.
7      Q   At an interest rate of a 120 percent?
8      A   Um-hum.
9      Q   Right?
10      A   Yes, that is correct.
11      Q   Okay. Has that been tough for Alpine?
12      A   No.
13      Q   No?
14      A   No.
15      Q   That's incredible.
16      A   Isn't it?
17      Q   Yeah. That's unbelievable.
18          So as FINRA breaks it down, they say, "Under
19  the Third Amended Loan Agreement, Alpine agreed to pay
20  $4.8 million annually for the right to borrow up to
21  $5 million (at an annual rate of 120%)."
22          Is that a fair characterization of the
23  transaction?
24      A   It's -- it's their characterization. It's not
25  exactly how it was written, but it's their

Page 200

1  characterization.
2      Q   Is it close enough? I mean, is it --
3      A   It's in the ballpark.
4      Q   That's unbelievable.
5          And just to be clear, the people that decide
6  whether this arrangement continues are you and your wife
7  because you are the ultimate beneficial owners of both
8  companies, Alpine and the holding company that's making
9  this wonderful loan to Alpine; right?
10      A   Well, we actually have a CFO that's monitoring
11  that and who can actually cancel that or not cancel
12  that; but if we wanted to hold the funding, ultimately,
13  we have the indirect control in that case to do that.
14  Sure.
15      Q   Yeah. So the CFO ultimately reports to you
16  and Justine; right?
17      A   He reports to another company in which were
18  the control -- or I'm the control person of.
19      Q   Yeah. That's a tough job.
20      A   I might throw something else in because I know
21  you might think that rate is high.
22      Q   Oh. I don't think it's high. I'm astounded.
23      A   When you get those little -- watch the -- for
24  the record, when you watch those little advertisements,
25  come get your money in five days, $250,000, those rates

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 201

1    are what they call add-on rates, and the APRs generally
2    run between 95 and 125 percent per annum.
3        So when you have -- and they are capped out
4    typically at a quarter of a million.  You probably
5    couldn't find one lender to give you 5 million, not even
6    our clients.  Nobody will give you that much money.  So
7    when you have a combination of unsecured and a large
8    amount, it's not uncommon to have very rigorous terms.
9        Q   Okay.  That's how you characterize it?
10   Rigorous?
11       A   Actually, if you want my personal opinion, I
12   think those terms, given the circumstances, are probably
13   pretty good for Alpine.
14       Q   And they are pretty good for Alpine because
15   Alpine is not creditworthy.  It can't possibly get a
16   loan because it doesn't make any money?
17       A   Alpine actually does make money.  Between the
18   two firms, they are making money.  Now, give or take
19   each month.  They actually did really well in May and
20   didn't do so well in June.
21       Q   Um-hum.
22       A   The numbers that we gave you, I might add are
23   revenue numbers, not net numbers.  Typically, the costs,
24   as you eloquently put it, on the line of credit are
25   fixed costs primarily.  So you would add that most of

Page 202

1    Alpine's costs are fixed.  So when you lose revenue,
2    that about 90-plus percent of it goes straight to the
3    bottom line.
4        Q   Why did Alpine do so well in May?  I'm sorry.
5    Really well.  Why did Alpine do really well --
6        A   It's been increasingly doing better.
7        Q   Okay.  And that about coincided with
8    Mr. Frankel moving to Vision?
9        A   The drop coincided with him moving over to
10   Vision.
11       Q   Okay.  I got you.
12           Now, what about Alpine's rent from it's
13   landlord SCAP 9, LLC?  Has that been a challenge for
14   Alpine to be profitable or -- to be profitable?
15       A   The short answer is depends what month.
16       Q   Well, why don't we talk about March 2019?
17       A   Okay.
18       Q   Okay.  So on March -- I'm sorry.  Yeah, I
19   guess it would be for March.
20       A   Just -- just for the record, the numbers we
21   produced to you were gross revenues, not net revenues.
22   Go ahead.
23       Q   I understand that, and I understand you
24   haven't done the damage analysis yet.  But I'm just
25   asking you --

Page 203

1        A   Alpine's been able to pay all the bills, stay
2    in capital, including the CAM charges, doesn't have a
3    capital issue.  Do we -- do we like to make more money?
4    Of course, we would like to make more money.  But the
5    short -- to answer your question, no, they are paying
6    the bills.  They pay the bills.  They are still in
7    capital.
8        Q   I understand that.  But in order to make
9    money, Alpine has to -- had to pay common area
10   maintenance charges to SCAP the landlord, which is a
11   company ultimately owned by you and Justine; right?
12       A   Wrong.
13       Q   Beneficially, ultimately owned by you and
14   Justine; right?
15       A   We are the beneficiaries.  Ultimately owned by
16   a set the trusts.
17       Q   Set of trusts of which you were the
18   beneficiaries, you and your wife?
19       A   That's true.
20       Q   Right?
21           And this landlord charged for common area
22   maintenance charged for -- sent a bill in -- of
23   $610,372.98 in March-April 2019?
24       A   Yes.  Those CAM bills are sent in arrears.
25       Q   Okay.  I mean, that's a huge --

Page 204

1        A   Triple-net lease.
2        Q   Triple-net lease.  And so how often does
3    Alpine get whacked with that charge?
4        A   Well, if they were doing it properly, it would
5    be once a month.  But the CFO who was in charge of that
6    was -- was probably not allocating that the way he
7    should have been.  Now it's been allocated properly.
8        Q   So now you're doing it monthly instead of --
9    okay.
10       A   It was in arrears, and they have the right to
11   do this.  Nothing says they can't do it.  But,
12   typically, they try to get the monthly estimates of the
13   CAMs.
14       Q   Okay.  Well, how did that $610,000 common area
15   maintenance charge in March-April of 2019, how did that
16   help Alpine's performance?
17       A   Really didn't have anything to do with the
18   performance.  It's a net number.  In terms of the
19   revenue performance, it didn't have anything to do with
20   it.
21       Q   Well, it would certainly kill the profit,
22   wouldn't it?
23       A   Well, going back to my original question, the
24   profit, okay, we are talking about revenue decline.  So
25   the profit and revenue decline is two separate things.

51 (Pages 201 to 204)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 205

1    A lot of those costs existed for some time.  So the
2    Alpine bill, if you were to go back, would have been
3    adjusted going back into the prior year, if not even
4    potentially beyond that.  I don't know exact
5    calculations for that CAM bill.
6         So the short answer is for that month when
7    they took it, certainly.
8    Q   Okay.
9    A   But it wouldn't have affected the revenue.
10        MR. BANKER:  All right.  Let me take a quick
11   break, and I think we are finished.
12        (Off the record from 2:29 p.m. until
13   2:38 p.m.)
14        MR. BANKER:  We have no more questions.  And
15   do you have any -- do you have any cross, Jordan?
16        No cross.
17        And do you want to read and sign, or do you
18   want to waive.
19        THE WITNESS:  I'll read and sign.
20        MR. SUSMAN:  He's going to read and sign.
21        (The deposition ended at 4:38 p.m.)
22
23
24
25

Page 206

1              CERTIFICATE OF REPORTER
2
3    STATE OF FLORIDA
4    COUNTY OF HILLSBOROUGH
5
6         I, NIKI MAURINE NOOJIN, certify that I was
7    authorized to and did stenographically report the
8    deposition of JOHN JOSEPH HURRY; that a review of the
9    transcript was requested, and that the foregoing
10   transcript, Pages 1 through 209 is a true record of the
11   testimony given by the witness.
12
13        I further certify that I am not a relative,
14   employee, attorney, or counsel of any of the parties,
15   nor am I a relative or employee of any of the parties'
16   attorney or counsel connected with the action, nor am I
17   financially interested in the action.
18
19        Dated:  08/19/2019.
20
21
22         NIKI MAURINE NOOJIN
23
24
25

Page 207

1              CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
4    COUNTY OF HILLSBOROUGH
5
6         I, NIKI MAURINE NOOJIN, Notary Public, State
7    of Florida, certify that JOHN JOSEPH HURRY personally
8    appeared before me on August 7, 2019, and was duly
9    sworn.
10
11        WITNESS my hand and official seal this date:
12   08/19/2019.
13
14   Identification:
15        JOHN JOSEPH HURRY produced Nevada Driver's License.
16
17
18         NIKI MAURINE NOOJIN
          Notary Public
19        State of Florida
          My Commission Expires 3/20/20
20        Commission No. FF 972564
21
22
23
24
25

Page 208

1              ERRATA SHEET
2    IN RE:  THE HURRY FAMILY REVOCABLE TRUST; SCOTTSDALE
     CAPITAL ADVISORS CORPORATION; and ALPINE SECURITIES
3    CORPORATION vs CHRISTOPHER FRANKEL
     DEPOSITION OF:  JOHN JOSEPH HURRY  TAKEN:  08/07/2019
4    DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE
5    Please sign, date and return this sheet to our office if
6    additional lines are required for corrections, attach
     additional sheets.
7
8    At the time of the reading and signing of the
     deposition, the following changes were noted.
9
     PAGE LINE CHANGE          REASON
10
     _____
11
     _____
12
     _____
13
     _____
14
     _____
15
     _____
16
     _____
17
     _____
18
     _____
19
     _____
20
     _____
21
     Under penalty of perjury, I declare that I have read my
22   deposition and that it is true and correct, subject to
     any changes in form or substance entered here.
23
24   SIGNATURE OF DEPONENT: _____
25   DATE: _____

52 (Pages 205 to 208)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd

Page 209

1   08/19/2019
2   JORDAN SUSMAN, ESQUIRE
    Harder LLP
3   132 South Rodeo Drive
    Suite 301
4   Beverly Hills, California 90212-2406
5
    Re:  THE HURRY FAMILY REVOCABLE TRUST; SCOTTSDALE
6   CAPITAL ADVISORS CORPORATION; and ALPINE SECURITIES
    CORPORATION vs CHRISTOPHER FRANKEL
7
    Dear Mr. Susman:
8
    Please find the original errata sheet with your copy of
9   the transcript so JOHN JOSEPH HURRY may read and sign
    the transcript.  Please have him make whatever changes
10  are necessary on the errata sheet and sign it.  Please
    make a copy of the errata sheet and place it in your
11  transcript.  Please then forward the original errata
    sheet back to our office at 101 South Franklin Street,
12  Suite 101, Tampa, Florida 33602.
13  If the errata sheet is not signed by the witness within
    30 days after this letter has been furnished, we will
14  then process the transcript without a signed errata
    sheet.  If your client wishes to waive his signature,
15  please have him sign his name at the bottom of this
    letter and send it back to our office.
16
    Your prompt attention to this matter is appreciated.
17
18  Sincerely,
19
    NIKI MAURINE NOOJIN, Professional Court Reporter
20
21
22  I do hereby waive my right to sign.
23
    JOHN JOSEPH HURRY
24
25  cc:  DAVID  C. BANKER, ESQUIRE

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

dd12650c-7912-41c0-8012-067a3fbc3fcd