## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO. 8:18-cv-02869-VMC-CPT

THE HURRY FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS CORPORATION;
and ALPINE SECURITIES CORPORATION,

    Plaintiffs,

-vs-

CHRISTOPHER FRANKEL,

    Defendant.
_____/

CHRISTOPHER FRANKEL,
    Counter-claimant,

-vs-

CAYMAN SECURITIES CLEARING
AND TRADING LTD; THE HURRY
FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

    Counter-defendants.
_____/

VIDEOTAPED
DEPOSITION OF:    CHRISTOPHER FRANKEL
DATE TAKEN:    Wednesday, August 7, 2019
TIME:    2:45 p.m. to 6:26 p.m.
PLACE:    Bush Ross, P.A.
    1801 North Highland Avenue
    Tampa, Florida
REPORTED BY:    Niki Noojin, RPR, FPR
    Notary Public
    State of Florida at Large

## Page 2

1    APPEARANCES:
2    JORDAN SUSMAN, ESQUIRE
3      Harder LLP
      132 South Rodeo Drive
4      Suite 301
      Beverly Hills, California 90212-2406
5      424.203.1600
      jsusman@harderllp.com
6      Appearing on behalf of the Plaintiffs
7
    DAVID C. BANKER, ESQUIRE
8    HAROLD D. HOLDER, ESQUIRE
      Buss Ross, P.A.
9      1801 North Highland Street
      Tampa, Florida 33602
10      813.224.9255
      dbanker@bushross.com
11      hholder@bushross.com
12      Appearing on behalf of the Defendants
13
14    ALSO PRESENT:
15      Michael Peterman, videographer
16
17
18
19
20
21
22
23
24
25

## Page 3

I N D E X

TESTIMONY OF CHRISTOPHER FRANKEL:    PAGE
Direct Examination by Mr. Susman    7
Cross-Examination by Mr. Banker    170
Certificate of Reporter    174
Certificate of Oath    175
Errata Sheet    176
Letter to Deponent    177
    - - - - -

E X H I B I T S

EXHIBIT NUMBER    PAGE

Exhibit Number 1    15
  Scottsdale Capital Advisors
  Non-Disclosure and Confidentiality
  Agreement
Exhibit Number 2    40
  E-mail from Chris Frankel dated
  October 7, 2018, and trust documents
Exhibit Number 3    46
  Letter from Mr. Sussman dated
  November 9, 2018
Exhibit Number 4    50
  E-mail from Chris Frankel dated
  November 12, 2018
Exhibit Number 5    54
  Employee Nondisclosure & Computer Use
  Agreement
Exhibit Number 6    59
  E-mail from Chris Frankel dated
  September 18, 2018, with attachment,
  Bates Number Hurry 76 to Hurry 79

## Page 4

Exhibit Number 7    66
  E-mail from Chris Frankel dated
  August 8, 2018, with attachment,
  Bates Number Hurry 202 to Hurry 214
Exhibit Number 8    75
  E-mail from Chris Frankel dated
  October 13, 2018, with attachment,
  Bates Number Hurry 81 to Hurry 105
Exhibit Number 9    79
  E-mail from Chris Frankel dated
  October 6, 2016, with attachment,
  Bates Number Hurry 106 to Hurry 121
Exhibit Number 10    86
  E-mail from Chris Frankel dated July
  31, 2018, with attachment, Bates
  Number Hurry 127 to 132
Exhibit Number 11    91
  E-mail from Chris Frankel dated
  August 31, 2017, with attachment,
  Bates Number Hurry 122 to Hurry 126
Exhibit Number 12    114
  E-mail from Chris Frankel dated
  October 7, 2018, with attachments,
  Bates Number Hurry 133 to Hurry 201
Exhibit Number 13    122
  E-mail from Chris Frankel dated July
  13, 2017, with attachments, Bates
  Number Hurry 215 to 222
Exhibit Number 14    124
  E-mail from Chris Frankel dated May
  2, 2017, with attachment, Bates
  Number Hurry 229 to 238
Exhibit Number 15    128
  E-mail from Chris Frankel dated April
  12, 2017, with attachment, Bates
  Number Hurry 223 to Hurry 228
Exhibit Number 16    130
  E-mail from Chris Frankel dated
  January 3, 2017, Bates Number Hurry
  239 to Hurry 240

1 (Pages 1 to 4)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)
13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 5

1   Exhibit Number 17            132
    E-mail from Chris Frankel dated
2   August 28, 2016, Bates Number Hurry
    241 to Hurry 242
3
    Exhibit Number 18            134
4   E-mail from Chris Frankel dated
    August 15, 2016, with attachment
5
    Exhibit Number 19            138
6   E-mail from Chris Frankel dated
    January, 24, 2019, with attachments
7
    Exhibit Number 20            152
8   E-mail from Chris Frankel dated
    November 13, 2018, with attachment
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1        THE VIDEOGRAPHER:  Good afternoon.  We are
2   going on the record at 2:45 p.m. on August 7th,
3   2019.  This is Media Unit 1 of the videotaped
4   deposition of Christopher Frankel in the matter of
5   The Hurry Family Revocable Trust, et al. versus
6   Christopher Frankel being taken at 1801 North
7   Highland Avenue, Tampa, Florida 33602.
8        My name is Michael Peterman.  I'm the
9   videographer.  The court reporter is Niki Noojin.
10       Will counsel please introduce themselves.
11       MR. SUSMAN:  Jordan Susman, S-U-S-M-A-N of
12   Harder LLP for plaintiffs.
13       MR. BANKER:  David Banker and Harold Holder
14   for Mr. Frankel.
15       THE VIDEOGRAPHER:  Will the court reporter
16   please swear in the witness.
17       THE REPORTER:  Would you raise your right
18   hand, please, sir.
19       Do you solemnly swear the testimony you are
20   about to give will be the truth, the whole truth,
21   and nothing but the truth?
22       THE WITNESS:  I do.
23       CHRISTOPHER FRANKEL,
24   having been first duly sworn, was examined and testified
25   upon his oath as follows:

Page 7

1            DIRECT EXAMINATION
2   BY MR. SUSMAN:
3        Q   Good afternoon, Mr. Frankel.  As you know, I'm
4   Jordan Susman, attorney for the plaintiffs in this
5   matter.
6        Have you ever had your deposition taken
7   before?
8        A   Yes, in regulatory matters.
9        Q   Was that an OTR, or was that an actual
10   deposition?
11       A   You know, I actually had a deposition on a
12   civil matter once, and then I think it was a deposition
13   on an SEC issue years ago.
14       Q   Okay.  So you understand it's a -- basically a
15   question and answer.  I'll ask you questions, ask you to
16   give answers in the matter -- in this matter.  You --
17   you know that you just took an oath there; correct?
18       A   Correct.
19       Q   You know that that's the same oath that one
20   would take in a courtroom.  So that even though we are
21   in an informal environment, that you are still obligated
22   to give your testimony under penalty of perjury.
23       Do you understand?
24       A   That's what you say.
25       Q   Okay.  All right.  I want to talk a little bit

Page 8

1   about your employment history.  This -- this lawsuit
2   arises -- you previously worked at Alpine Securities.
3   But prior to Alpine you worked at a place
4   called GunnAllen; is that correct?
5        A   For a time, yes.
6        Q   When did you work at GunnAllen?
7        A   I don't recall the exact dates, but it would
8   be in the public record.  I mean, I just don't remember
9   the exact dates of it.
10       Q   And what did you do at GunnAllen?
11       A   I was the chief operating officer.
12       Q   What was your role there?
13       A   I was responsible for operations, recruiting;
14   for a time supervision and products.
15       Q   And what does GunnAllen do?
16       A   GunnAllen was an introducing broker.
17       Q   What does that mean?
18       A   They didn't self-clear.  So they didn't carry
19   accounts.  They introduced accounts to another firm.  So
20   they were in the retail and institutional brokerage
21   business.
22       Q   And what sort of clients did GunnAllen have?
23       A   Everything from retail to institutional.
24       Q   And did you interact with the clients?
25       A   Occasionally.  Yes.

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 9

1     Q   What sort of interactions?
2     A   Oh, you know, most of the time when there was
3   a problem.
4     Q   But you generally did not have clients of your
5   own?
6     A   No.
7     Q   And where did you go after GunnAllen?
8     A   I went to Legent Clearing.
9     Q   And how long were you at Legent?
10    A   I think with the combination of the sale -- it
11  changed it's name to COR Clearing.  So I think it was
12  seven years.
13    Q   So you went from GunnAllen to Legent, which
14  then became COR; correct?
15    A   That is correct.
16    Q   So if we talk about it, is it okay if I just
17  refer to it as COR?
18    A   Sure.
19    Q   Okay.  And what did you do at COR Clearing?
20    A   I was the chief executive officer.
21    Q   And tell me what COR Clearing is.  What do
22  they do?
23    A   The majority of what they did is they were a
24  correspondent clearing firm.
25    Q   Explain that to me in laymen's terms what that

Page 10

1   is.
2     A   They basically would do the back-end
3   processing, trade execution, and custody of securities.
4     Q   Did you bring any clients with you from
5   GunnAllen to COR?
6     A   From GunnAllen to COR?
7     Q   Yes.
8     A   No.
9     Q   Okay.  And --
10    A   Not that I recall.
11    Q   And what was your role at COR?
12    A   I was a chief executive officer.
13    Q   I understand that, but what did you actually
14  do?
15    A   You know, well, I dealt with the firm in its
16  entirety.  I mean, everything from, you know, operations
17  to accounting to marketing, sales, customer service.
18    Q   Did your role change while you were there?
19    A   It did.
20    Q   And how did it change?
21    A   Eventually, you know, after the business was
22  sold to the COR group, I stayed on as the CEO.  And I
23  think, like, maybe the last six months, I stepped down
24  as CEO, and I was in charge of marketing and customer
25  relations.

Page 11

1     Q   And did you interact with clients at COR?
2     A   Yes.
3     Q   What sort of interactions?
4     A   Most of the time when there were problems or
5   issues.
6     Q   And did you actually have clients of your own
7   while at COR?
8     A   I don't -- you'll have to define what you mean
9   by that.
10    Q   Sure.
11        Did you have, like, what you would -- one
12  would call a book of business at COR, clients that you
13  considered to be yours?
14    A   Every account was ours at COR.
15    Q   I know, but did you personally have clients
16  that you considered to be your clients?
17    A   Personally?
18    Q   Yes.
19    A   No.
20    Q   Okay.  What about with -- with COR's financial
21  relations?  Did you interact with COR's financial
22  relations?
23    A   I'm not sure what you mean by "COR's financial
24  relations."
25    Q   Did COR have any banks that lent it money?

Page 12

1     A   Oh, yes.
2     Q   Okay.  Did you interact with the banks?
3     A   Yes.
4     Q   Okay.  What were those banks?  Do you recall?
5     A   Yeah.  It was -- we dealt with -- our primary
6   banks were BMO Harris, and we also at one point had Bank
7   of New York.  We had First National Bank of Omaha.  We
8   had -- you're talking about just the ones that lent
9   money?
10    Q   Yeah.
11    A   Just the lenders.
12        We had U.S. Bancorp for a time.  I'm trying to
13  remember.  I think there was one other.  But I think
14  that was it in terms of lenders.
15    Q   Okay.  And in terms of the type clients that
16  COR had, were they generally brokers?
17    A   They were broker-dealers mostly.
18    Q   Okay.  So the accounts at COR were owned by
19  the broker-dealer, not by the clearing firm; correct?
20        MR. BANKER:  Object to form.
21    A   I don't know what you mean by "owned."  They
22  were on the books of the clearing broker.  So from a
23  regulatory perspective, they would -- the regulators
24  would tell you it's the clearing brokers.
25  BY MR. SUSMAN:

3 (Pages 9 to 12)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 13

```
 1      Q   So -- so it's fair to say, though, that the
 2  accounts were the broker-dealer's, not the clearing
 3  firm; correct?
 4          MR. BANKER:  Object to form; legal conclusion.
 5      A   No.  I wouldn't say that.
 6  BY MR. SUSMAN:
 7      Q   How would you characterize it?
 8      A   The relationship?
 9      Q   Yes.
10      A   You have the introducing broker and the
11  carrying broker, the clearing broker.
12      Q   Okay.  And what role did COR play in that?
13      A   We were the carrying and clearing broker on
14  those.  We had some proprietary business, but the
15  overwhelming majority of it was as a carrying, clearing
16  broker.
17      Q   Then you eventually left COR?
18      A   That is correct.
19      Q   And why did you leave COR?
20      A   I ended up taking an opportunity with John at
21  Alpine.
22      Q   And how did that come to be?
23      A   To the best of my recollection, I think, you
24  know, John was looking for a new CEO for Alpine to
25  replace their senior-most officer.  I think we were
```

Page 14

```
 1  introduced from a mutual friend, Billy, who was a trader
 2  at vFinance.  And he hooked us up, and we started having
 3  some conversations via phone for a couple of months.
 4      Q   And why did you want to work at Alpine?
 5      A   Well, I was thinking about starting my own
 6  firm back then, and I was looking at buying a firm and
 7  trying to get it approved for clearing.  And then I
 8  talked to John, and John presented what I thought was
 9  a -- was a good opportunity.
10      Q   And was Alpine similar to COR, the type work
11  that they do?
12      A   Similar, yes.
13      Q   How are they different?
14      A   I think that, in my judgment, Alpine -- you
15  know, Alpine was in the clearing business to a much,
16  much smaller extent than COR.  It was quite a bit
17  smaller firm overall, and then Alpine actually had
18  certainly, as a percentage basis, far more direct
19  customer business.  In terms of the processing of
20  microcap securities, COR might have actually processed
21  more.  I really don't know empirically, but --
22      Q   And you eventually came over to Alpine;
23  correct?
24      A   That is correct.
25      Q   And when was that approximately?
```

Page 15

```
 1      A   I think I joined the firm in August 5th, I
 2  think, of 2015.
 3      Q   Okay.  Did you bring any clients from COR over
 4  to Alpine?
 5      A   Any correspondent firms, no.
 6      Q   Any other types of clients?
 7      A   Did I open them up after I got there?  Sure.
 8  But did I bring them over there, no.
 9      Q   And who are the ones that you opened up after
10  you got there?
11      A   I mean, there are a handful, but probably the
12  most significant one in terms of revenue was Bryan
13  Collins and Sam Oshana's business.
14      Q   Do you know the name of that?
15      A   They had Northbridge, Greystone, Silverback.
16  They had a handful of entities.
17      Q   Um-hum.  Call this Exhibit 1.
18          (Exhibit Number 1 marked for identification.)
19  BY MR. SUSMAN:
20      Q   It's Bates marked Hurry 1 and 2.  It's a
21  nondisclosure agreement.  Have a look at that.
22          Do you know if --
23          MR. BANKER:  Did you -- is this -- what number
24  is this?
25          MR. SUSMAN:  I'm calling it 1.
```

Page 16

```
 1          MR. BANKER:  Okay.  So we are going to start
 2  over again with each deposition?
 3          MR. SUSMAN:  I find that easier.
 4          MR. BANKER:  Okay.  That's fine.
 5  BY MR. SUSMAN:
 6      Q   Going back, though, to Bryan Collins real
 7  quick, do you know if Bryan Collins already had a
 8  relationship with Alpine before he opened the account
 9  there?
10      A   I don't recall.  I don't think so.
11      Q   Okay.  What about -- do you know if
12  Mr. Collins had an account with Scottsdale before he
13  opened that account when you were there?
14      A   You know, I think -- I think Bryan did say
15  that he had an account at Scottsdale, but they hadn't
16  used it in quite sometime.
17      Q   Okay.  All right.  So we are looking at
18  Exhibit 1 here.  Do you recognize this document?
19      A   Yes, sir, I do.
20      Q   All right.  And what is this document?
21      A   It's a -- it says the "Scottsdale Capital
22  Advisors Non-Disclosure and Confidentiality Agreement."
23      Q   All right.  And turning to the second page, is
24  that your signature?
25      A   Yes, it is.
```

4 (Pages 13 to 16)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 17

1    Q   And the date on this agreement is -- very top
2  line, first page -- June 22, 2015.
3       Do you see that?
4    A   Yes, I do.
5    Q   And that's before you were -- you began your
6  employment at Alpine; correct?
7    A   It is correct.
8    Q   Why did you sign this document?
9    A   Well, at the time that John and I were talking
10 about me coming over, one of the sort of main things, I
11 mean, John was sort of telling me about -- primarily
12 about regulatory issues and stuff, and I wanted to kind
13 of -- to see sort of what their -- there was a letter
14 that was alluded to the SEC, and I wanted to see that
15 kind of stuff and see what their e-mail procedures were.
16 And so it was -- I was asked to sign this in order to
17 perform due diligence on the opportunity.
18   Q   Okay.  And in your experience, is it customary
19 for broker-dealers to want people to sign and NDA like
20 this prior to coming over?
21   A   You know, I've seen it before.  I don't -- you
22 know, I would say probably my best guess is it's
23 probably a 50/50 deal.
24   Q   Okay.
25   A   I think in this case, though, to, you know,

Page 18

1  correct -- to sort of put context, this was before I
2  came over.  So John wanted to give me information to
3  make a decision.  So I don't think -- I wasn't part of
4  the firm.
5    Q   And can you tell --
6    A   So I think that's pretty customary.
7    Q   And can you tell me what information was
8  shared with you prior to actually joining Alpine?
9    A   I don't remember everything, but I remember
10 the -- to the best of my recollection, the primary thing
11 was related to the SEC exams that, I think, the firm had
12 in 2015.
13   Q   And what sort of information related to that
14 exam?
15   A   It was, namely, I think the letter that was
16 back and forth from the exam results from the SEC and
17 then the answer from Alpine.
18   Q   And would you -- in your opinion, is that
19 the -- sort of material confidential?
20       MR. BANKER:  Object to form.
21   A   Is it confidential?
22 BY MR. SUSMAN:
23   Q   Sure.
24       Is it confidential to Alpine?
25   A   Yeah.  I suppose so.

Page 19

1    Q   Is it your -- so it lists here four different
2  entities:  Scottsdale Capital -- Scottsdale Capital
3  Advisors -- I'll call it Scottsdale -- Alpine Securities
4  Corps, Alpine; Cayman Securities Clearing and Trading
5  LTD -- I'll call that one Cayman -- and then any
6  associate company of The Hurry Family Revocable Trust.
7       Do you see all that?
8    A   I do.
9    Q   Okay.  Is it your understanding that
10 Scottsdale had confidential information that they would
11 want to protect with this agreement?
12   A   I never really saw anything from Scottsdale
13 during the period of this agreement.  So -- but it says
14 it on the paper.
15   Q   But is there any sort of material that you
16 believe that Scottsdale would have wanted to protect?
17       MR. BANKER:  Object to form.
18   A   Sure.
19 BY MR. SUSMAN:
20   Q   What sort of material is that?
21       MR. BANKER:  Object to form.
22   A   Whatever they would deem to want to protect.
23 BY MR. SUSMAN:
24   Q   And is it your belief that anything that they
25 deemed protectable under this agreement is, in fact,

Page 20

1  protected under this agreement?
2       MR. BANKER:  Object to form; legal conclusion,
3  statement of opinion or belief.
4    A   Can you ask the question again.
5       MR. SUSMAN:  Can you restate the question.
6       (Requested portion of the record was read back
7  by the Reporter.)
8       MR. BANKER:  Object to form.
9    A   No, I don't think so.
10 BY MR. SUSMAN:
11   Q   Why not?
12   A   I'm not a lawyer.
13   Q   I'm asking your --
14   A   I don't know that --
15   Q   I'm asking your --
16   A   -- necessarily that --
17   Q   I'm asking your opinion.
18   A   Yeah, I --
19       MR. BANKER:  Same objection.
20   A   My opinion would be that I'm not sure that
21 anything they deem to be protected is protected by the
22 agreement.
23 BY MR. SUSMAN:
24   Q   Okay.  Are customer lists protected?
25       MR. BANKER:  Object to form; legal conclusion.

5 (Pages 17 to 20)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 21

1      A   I would have to look and see if it says it.
2   BY MR. SUSMAN:
3      Q   Sure.
4          If you go to Paragraph 1(a)(iii), it says
5   "Customer lists and account information"?
6      A   Yes.
7      Q   So do you believe that Scottsdale's customer
8   lists and account information are confidential?
9          MR. BANKER:  Object to form.
10     A   Yeah, to whatever extent that it wasn't
11   previously known.
12   BY MR. SUSMAN:
13     Q   Okay.  And do you believe that Alpine's
14   customer list and account information are confidential?
15         MR. BANKER:  Object to form.
16     A   Same answer.  To whatever extent it wasn't
17   previously known.
18   BY MR. SUSMAN:
19     Q   Previously known by whom?
20     A   In this case, by me.
21     Q   Okay.  Did you know prior to June 22nd, 2015,
22   all of Scottsdale's customers?
23     A   No.
24     Q   Did you know prior to June 22nd, 2015, all of
25   Alpine's customers?

Page 22

1      A   Not all of them.
2      Q   Prior to June 22, 2015, did you know all of
3   Cayman Securities's customers?
4      A   Still know none of them.
5      Q   Okay.  So do you believe that Cayman
6   Securities's customers list and account information is
7   confidential?
8          MR. BANKER:  Object to form.
9      A   Again, I think the document speaks to itself.
10   I mean, it's confidential inasmuch as if you didn't have
11   prior knowledge.
12   BY MR. SUSMAN:
13     Q   Okay.  So you were eventually hired by Alpine;
14   correct?
15     A   That is correct.
16     Q   For what role?
17     A   The chief executive officer of Alpine
18   Securities.
19     Q   Do you recall what -- when you began there?
20     A   I think it was August 5th, 2015.
21     Q   And tell me what you did as the CEO of Alpine?
22   What was your role?
23     A   You know, customer service, dealt with
24   operations, accounting.
25     Q   Did you bring any clients with you to Alpine

Page 23

1   from COR?
2      A   No.  I previously stated that I didn't bring
3   any clients with me, no.
4      Q   Okay.  Prior to working at Alpine, did you
5   know Jim Kelley?
6      A   No.
7      Q   Did you, in fact, meet Jim Kelley through your
8   work at Alpine?
9      A   I was introduced to Jim Kelley by John
10   hurry -- or actually not formally introduced.  John
11   asked me to give him a call or him to call me.  I don't
12   recall which one it was.
13     Q   So you met Jim Kelley through your work at
14   Alpine; correct?
15     A   I met it -- exactly what I said, through an
16   introduction by John Hurry.
17     Q   Okay.  What was the --
18     A   If that's Alpine, then so be it.
19     Q   And what was the nature of your communications
20   with -- with Mr. Kelley prior to leaving Alpine?
21     A   I hadn't talked to him very often.  The
22   first -- the first reason for the introduction, my
23   recollection was, was that Alpine was having an issue
24   with international wires.  And, you know, John somehow
25   had met Jim Kelley -- again, this is my recollection --

Page 24

1   is that John said, "Hey, this guy might have a solution
2   that will help out with that issue."
3      Q   That issue with Alpine?
4      A   Yes.
5      Q   Okay.  And you, in fact, contacted Jim Kelley
6   after you left Alpine; correct?
7      A   I did.
8      Q   Prior to working at Alpine, did you know Peter
9   Alford?
10     A   Peter Alford?
11     Q   Yep.
12     A   I don't know if I know Peter Alford now.
13     Q   Okay.  Prior to working at Alpine, did you
14   know John Fife?
15     A   I knew of John Fife, yes.
16     Q   But did you personally know John Fife?
17     A   No.
18     Q   Did you -- were you personally introduced to
19   him while working at Alpine?
20     A   Was I personally introduced to him?
21     Q   Yes.  Did you actually meet him while working
22   at Alpine?
23     A   Yes.
24     Q   And who made that introduction?
25     A   I think he called me.

6 (Pages 21 to 24)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 25

1    Q   And why did he call you?
2    A   He just wanted to have a meeting.  They were
3  in Salt Lake.
4    Q   And what did -- did you meet with John Fife?
5    A   Yeah.  John Fife and Coby Neuenschwander.
6    Q   And you met with him in Salt Lake about what?
7    A   Just about business in general that they were
8  conducting with the firm.
9    Q   And have you been in contact with John Fife
10  since you left Alpine?
11    A   Occasionally, yes.
12    Q   And did you contact Mr. Fife after you left
13  Alpine?
14    A   I think he initiated contact with me.
15    Q   When did he contact you?
16    A   I don't recall specifically.
17    Q   Approximately?
18    A   I don't know, you know, August, September of
19  2018.
20    Q   August, September 2018, weren't you still a
21  consultant at Alpine?
22    A   Yes.
23    Q   And what did Mr. Fife contact you about while
24  you were still working at Alpine in August
25  September 2018?

Page 26

1    A   Just asked me what my plans were.
2    Q   And what did you say?
3    A   "I don't know at this juncture."
4    Q   And when did you -- you were the CEO of Alpine
5  until July 31, 2018?
6    A   I think officially it was August 1st, 2018.
7    Q   Okay.  Thank you.
8       And then you stayed on as a consultant for
9  about three months; is that correct?
10    A   That is correct.
11    Q   Until what date?  Do you recall?
12    A   I think the official cancel date was
13  October 31st?
14    Q   Okay.  So since October 31st, 2018, have you
15  spoken to John Fife?
16    A   Since then, yes.
17    Q   What about?
18    A   Spoke to him about, you know, business.
19    Q   What kind of business?
20    A   About the securities business.
21    Q   Were you trying to encourage him to bring his
22  business to you?
23    A   I haven't been in business until about 45 days
24  ago.
25    Q   Well, then what were you talking to John Fife

Page 27

1  about?  Tell me about -- tell me about the conversation.
2    A   About future plans.
3    Q   How many conversations have you had with John
4  Fife since November 1, 2018?
5    A   I don't -- you know, I don't know the exact
6  number.
7    Q   Estimate.
8    A   Three, four.
9    Q   Okay.  Let's go through them all.  When was
10  the first conversation you had with John Fife since
11  November 1, 2018?
12    A   I don't recall.
13    Q   Approximately?
14    A   I honestly don't know.
15    Q   Was it before January 2019?
16    A   I'm sorry.  What was the question again?  The
17  first conversation I had --
18    Q   Yeah.
19    A   -- with him after November?
20    Q   Yep.  You said you had approximately three
21  conversations with John Fife since November 1, 2018.  I
22  want to dig into those conversations.
23    A   Gosh, I don't really -- I guess, you know,
24  maybe -- maybe I talked to him briefly in mid November.
25    Q   And who contacted who?

Page 28

1    A   I don't recall.  I think I might have
2  contacted him.
3    Q   And what was the purpose of your call?
4    A   I think I told them that I was going to try to
5  buy a brokerage firm.
6    Q   And why were you calling and telling him that?
7    A   Because they had called me asking what my
8  future plans were.
9    Q   Were you hoping to do business with Mr. Fife?
10    A   Oh, sure.  If I got in business, I would --
11  you know, in that business, I would love to have their
12  business.
13    Q   And would that business be one that would
14  compete with Alpine?
15    A   Yeah.  I think it would be a competitor.
16    Q   And would it have been competing with
17  Scottsdale Capital?
18    A   I mean, I think Alpine and Scottsdale to a
19  great extent are in the same business, so, yes.
20    Q   Okay.  So you were speaking to John Fife about
21  perhaps bringing business to a competing business of
22  Scottsdale Capital; correct?
23    A   Yeah, if there was a business there.
24    Q   And you're speaking to him about bringing his
25  business to a competing business of Alpine; correct?

7 (Pages 25 to 28)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 29

1    A   Yes.
2    Q   Okay.  And what happened with those
3  conversations?
4    A   What do you mean what happened with the
5  conversation?
6    Q   Well, you reached out to him.  You -- you
7  wanted him to bring his business to a competing
8  business, whatever happened?
9        MR. BANKER:  Object to form.
10 BY MR. SUSMAN:
11   Q   How did --
12   A   Well, there was no business there.  The firm
13 that I was trying to buy didn't materialize.
14   Q   Is that Ziv?
15   A   Yes.
16   Q   Okay.  Did you attempt to buy any other
17 broker-dealers?
18   A   I mean, I guess, you know, I tried to put a
19 letter of intent out for one other firm.
20   Q   What was that one?
21   A   Quantex Clearing.
22   Q   And what happened?
23   A   They didn't respond.
24   Q   And you're currently working at Vision?
25   A   I am.

Page 30

1    Q   And that's Vision Financial Markets; correct?
2    A   That is correct.
3    Q   And has Mr. Fife brought any business to
4  Vision?
5    A   He has.
6    Q   About approximately how much business?
7    A   I don't know.
8    Q   Can you estimate how much on a monthly basis?
9    A   You know, I guess a back-of-the-napkin guess
10 was he's probably done a couple hundred grand worth of
11 business.
12   Q   Per month or total?
13   A   I think maybe total, but I don't know for
14 sure.  I'm giving you a guess.
15   Q   What about quarterly?
16   A   I haven't been there a quarter.
17   Q   And he only came over there after you were
18 there; correct?
19   A   That's when they opened the account.  My
20 understanding was that they tried to open there prior to
21 my going there.
22   Q   Okay.  Just because we are talking about "he"
23 and "they" and "it," I want to be very clear.  We are
24 talking about John Fife opening an account at Vision;
25 correct?

Page 31

1    A   Well, we're talking about entities.  John Fife
2  personally doesn't have an account.
3    Q   Okay.  What are those entities?
4    A   He's got Chicago Ventures, Iliad Research, St.
5  George.  Those are the three that come to mind.
6    Q   Are you aware of any of those entities being
7  customers of Alpine Securities?
8    A   I don't know that any of them were customers
9  of Alpine.  They were -- they were carried by Alpine.
10   Q   Okay.  Prior to working at Alpine, did you
11 know Steve Hicks?
12   A   I knew his business.
13   Q   But you didn't know him personally?
14   A   I think I had spoken to him before.
15   Q   When?
16   A   When I was at COR.
17   Q   About what?
18   A   His business.
19   Q   Okay.  Did you speak to him when you worked at
20 Alpine?
21   A   I don't think so.
22   Q   Not one time?
23   A   Not that I remember.
24   Q   Prior to working at Alpine, did you know John
25 Schaible?

Page 32

1    A   John Schaible?
2    Q   Thank you.
3    A   Yes.
4    Q   And how did you know John Schaible?
5        MR. SUSMAN:  That's spelled S-C-H-A-I-B-L-E.
6  BY MR. SUSMAN:
7    Q   How did you know John Schaible?
8    A   I've known him for a number of years, but I'm
9  trying to remember exactly how we met.  I know I --
10 among other things, he had a firm that we cleared for at
11 COR, and I'm not -- I can't remember what the origin of
12 that meeting was.
13   Q   And prior to working at Alpine, did you know
14 Steve Czarnik?
15   A   Yes.
16   Q   How did you know Steve?
17   A   From COR.
18   Q   What were your interactions with Steve?
19   A   He represented clients that did deposits at
20 COR.
21   Q   And then did you interact with him while you
22 worked at Alpine?
23   A   Yes, I think so briefly not -- not a lot.
24   Q   What were the nature of those interactions
25 when you were at Alpine?

8 (Pages 29 to 32)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 33

1    A   I guess about -- I had a peripheral
2  involvement initially when they were talking about doing
3  a capital raise.
4    Q   Okay.
5    A   Steve was involved in that.
6    Q   And you interfaced with Steve Czarnik on
7  behalf of Alpine?
8    A   Yeah, very briefly on that.
9    Q   And then prior to working at Alpine, did you
10 know Curt Kramer?
11   A   Yes.
12   Q   And how did you know Curt Kramer?
13   A   Same thing, he did a ton of business at COR.
14   Q   Did you speak to Mr. Kramer while you worked
15 at Alpine?
16   A   Maybe once.
17   Q   And you've spoken to Mr. Kramer, though, after
18 you've left Alpine; correct?
19   A   Yes.
20   Q   What have you spoken to Mr. Kramer about since
21 you left Alpine?
22   A   Business.
23   Q   When you say "business," did you want
24 Mr. Kramer and his entity PowerUp to invest in the
25 broker-dealer you were interested in purchasing?

Page 34

1    A   No, not necessarily.
2    Q   Well, tell me what you did want Mr. Kramer to
3  do.
4    A   I didn't necessarily want Mr. Kramer to do
5  anything. It's what he wanted me to do.
6    Q   What did he want you to do?
7    A   Well, Mr. Kramer and Mr. Czarnik called me and
8  solicited me to ask me if I would interested in an
9  opportunity to buy a broker-dealer. I didn't solicit
10 them.
11   Q   Was that broker-dealer Ziv?
12   A   Yes.
13   Q   Do you know why Kramer and Mr. Czarnik reached
14 out to you?
15   A   I think they thought that -- my -- this is --
16 do you want me to speculate?
17        MR. BANKER: No. We don't want you to
18 speculate.
19   A   I'm not a mind reader.
20 BY MR. SUSMAN:
21   Q   Do you have an understanding as to why they
22 reached out to you?
23   A   Well, you know, I think that -- look, I think
24 those guys would love to own their own firm, but I don't
25 think that they think they could get regulatory approval

Page 35

1  to do it, and they thought that they would introduce an
2  opportunity to me because they thought I could get
3  regulatory approval to buy something.
4    Q   Prior to working at Alpine, did you ever work
5  with Lakeside Bank?
6    A   No.
7    Q   Were you introduced to Lakeside Bank while
8  working at Alpine?
9    A   Yes.
10   Q   And what was the nature of your interactions
11 with Lakeside Bank while you were at Alpine?
12   A   Very, very little. I had a -- I think that we
13 had -- I know that -- I think there was one meeting, and
14 I think -- I think John in attendance for the one
15 physical meeting that we had. We might have had a
16 second one.
17   Q   What were those about?
18   A   Just about, you know, one meeting was about
19 just sort of an introductory meeting. We also talked
20 about potentially trying to get, I think in the initial
21 meeting, a secured credit facility to extend margin to
22 customers. And then the second meeting I think was sort
23 of just about kind of regulatory issues and making sure
24 they were okay with them.
25   Q   And have you been in contact with Lakeside

Page 36

1  Bank since leaving Alpine?
2    A   Yes.
3    Q   What would have been the nature of those --
4  context with Lakeside?
5    A   Very brief. It was -- has to do with a
6  consulting deal that I have.
7    Q   A consulting deal you have with whom?
8    A   With Atlas Bank Panama.
9    Q   What is that consulting deal that you have
10 with Atlas Bank Panama?
11   A   They have been trying to buy a brokerage firm
12 that's a client of Lakeside.
13   Q   And what is that brokerage firm?
14   A   I don't know if I'm at liberty to say.
15   Q   You're at liberty to say.
16        MR. BANKER: No. No. No. He might be under
17 a nondisclosure agreement with Atlas Bank.
18        MR. SUSMAN: We have --
19   A   I am under a nondisclosure.
20        MR. SUSMAN: We have a confidentiality
21 agreement in place. I mean, you're in response to
22 a deposition notice. You can tell us what it is.
23        MR. BANKER: Look, I don't -- I don't think
24 that's right. So can you describe -- is there some
25 way you can -- is it a U.S. broker-dealer?

9 (Pages 33 to 36)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                                     13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 37

1      A   Yeah.  Yeah.  They were trying to buy a U.S.
2   broker-dealer that they thought was a -- was a firm that
3   was eligible to clear.  They found out that that's not
4   the case, but the firm used to clear, and it's had a
5   long-standing relationship with Lakeside Bank.  So my
6   one interaction with Lakeside Bank lasted probably less
7   than three minutes.
8   BY MR. SUSMAN:
9      Q   And who is your nondisclosure agreement with?
10     A   Atlas Bank Panama.
11     Q   Okay.  Prior to working at Alpine, did you
12  know Howard Rothman?
13     A   No.
14     Q   Were you introduced to Howard Rothman while
15  working at Alpine?
16     A   No.
17     Q   When did you first meet Howard Rothman?
18     A   Probably in -- as a matter of fact, not
19  probably.  I think in, you know, probably mid May of
20  2019.
21     Q   You never spoke to Mr. Rothman prior to
22  May 2019?
23     A   No.
24     Q   You had -- okay.  Prior to working at Alpine,
25  did you know anyone at Vision Financial Markets?

Page 38

1      A   No.
2      Q   When did you first meet someone at Vision?
3      A   May of 2019.
4      Q   While you were working at Alpine, did you have
5   client interaction?
6      A   Yes, some.
7      Q   What kind of interaction?
8      A   Again, mostly problems, problem resolution.
9      Q   Were you provided information regarding
10  clients that you would consider confidential?
11     A   Yes.
12     Q   What sort of information?
13     A   Well, I think information about customers'
14  accounts, information about their -- things about
15  clients that are not, you know, publicly available, and
16  it could certainly cover it under federal reg S-P.
17     Q   Such as?
18     A   Again, stuff about their accounts, their
19  account numbers, their activity.
20     Q   Anything else?
21     A   Nothing jumps right out at me, no.
22     Q   While working at Alpine, were you exposed to
23  information that you did not know prior to your
24  employment there?
25         MR. BANKER:  Object to form.

Page 39

1      A   Like what?
2   BY MR. SUSMAN:
3      Q   You tell me.
4      A   You asked the question.  I'm not sure what you
5   mean by that.
6      Q   Sure.
7      A   I mean, yeah, I didn't know where the building
8   was in Salt Lake.  I mean, so I didn't -- I think there
9   is all kinds of stuff that I didn't know.  It's a pretty
10  wide swath.
11     Q   So you didn't know where the building was.
12     A   That's right.
13     Q   You didn't know certain client information
14  prior working there; correct?
15     A   Yeah.  I didn't know about particular
16  transactions, or, you know, quite frankly, I didn't
17  really keep up with particular transactions.  But I was
18  exposed to information, yes, that I didn't -- was not
19  aware of before I went to Alpine.
20     Q   Were you exposed to contact information for
21  clients?
22     A   I could access it if I wanted to, yes.
23     Q   Were you exposed to financial information
24  regarding Alpine that you did not have prior to going to
25  Alpine?

Page 40

1      A   Yes.
2      Q   After you signed the NDA, which was Exhibit 1,
3   did you receive or have access to Hurry Family Trust
4   documents?
5      A   I don't think so.  I'm pretty sure about that.
6   I don't think there was any reason to have anything to
7   do with the Hurry Family Trust.
8          MR. SUSMAN:  I'll call this Exhibit 2.
9          (Exhibit Number 2 marked for identification.)
10         MR. SUSMAN:  Thanks.
11  BY MR. SUSMAN:
12     Q   So this is a -- what is this?  It's an e-mail
13  dated October 7, 2018, from Chris Frankel at Alpine
14  Securities to Chris Frankel.  The subject is "Nonbank
15  Trustee Application."  There is a number of attachments
16  that were included with this.  I only included a few of
17  them, not all of them.  So the document goes from Hurry
18  6 and 7 to Hurry 66 through --
19     A   Oh, you're looking at the bottom.
20     Q   I am.  -- Hurry 75.  Yeah, those are called
21  Bates numbers.
22     A   Yeah.
23     Q   To help us keep track of stuff.
24         All right.  Do you recognize this e-mail?
25     A   I do.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 41

1    Q   All right.  Do you recognize these
2    attachments?
3    A   No.
4    Q   You do not.  Do you have any reason to believe
5    that you did -- that you did not send these attachments
6    to your own e-mail?
7    A   No, I know I did.
8    Q   You know that you did?
9    A   Yeah.
10   Q   Okay.  So can you read to me the title of the
11   document on Hurry 66?
12   A   Hurry 66.
13   Q   Yep.
14   A   "First Amendment to The Hurry Family Revocable
15   Trust."
16   Q   Okay.  And can you read to me the title of the
17   document on Hurry 68?
18   A   "Certificate of Trust The Hurry Family
19   Revocable Trust."
20   Q   Can you tell me what these documents are, in
21   your opinion?
22   A   I have to look at them.  This is -- I've never
23   looked at them before.
24   Q   So after you've had a chance to review, just
25   let -- let me know your understanding of what these

Page 42

1    documents are.
2    A   It looks like -- I haven't read it, the whole
3    thing in detail, but the one marked 66, First Amendment
4    to The Hurry Family Trust, looks like they made an
5    amendment to it, just to change of domicile.
6    Q   Okay.
7    A   Says that they are now from Mar -- Maricopa
8    County, Arizona, to Douglas County, Nevada.
9    Q   Okay.  And what's your understanding of the
10   other document, 68 through 75?
11   A   I'm sorry.  What was the question again?  You
12   asked --
13   Q   Yeah.  What's your understanding --
14   A   -- me the purpose of it?
15   Q   Yeah.  What's your understanding of what it
16   is?
17   A   I mean, it looks like to me -- I mean, if you
18   want me to read the whole thing, I will, but it looks
19   like to me that it's basically stating kind of who has
20   the authority to act on behalf of the trust.
21   Q   It's your understanding that these documents
22   were well known to the public?
23   A   These particular documents?
24   Q   Yeah.
25   A   I really have no idea.

Page 43

1    Q   Do you believe that plaintiffs considered
2    these documents confidential?
3         MR. BANKER:  Object to form.
4    A   I don't know.
5    BY MR. SUSMAN:
6    Q   Now, this was sent to you by Nate Simmons on
7    April 20, 2017.  Do you see that?
8    A   Yes.
9         MR. BANKER:  Wait, wait.  Object to form.  You
10   said "this," the indefinite pronoun.
11        MR. SUSMAN:  Yeah.
12        MR. BANKER:  And you -- which the only
13   attachments you've referred to are the two trust
14   documents, but there are a whole boatload of
15   documents that apparently combine -- comprise a
16   nonbank trustee application.  So I think we need to
17   say what "this" is.
18   BY MR. SUSMAN:
19   Q   So is it your understanding that these trust
20   documents were sent to you by Nate Simmons on April 20,
21   2017?
22   A   Yes.
23   Q   And Nate Simmons is an attorney; correct?
24   A   Nate was a staff attorney at Alpine.
25   Q   General counsel for Alpine; is that correct?

Page 44

1    A   Yeah, I think he was general counsel for
2    Alpine.
3    Q   And then he sent these to you on April 20th,
4    2017.  You sent them to yourself almost a year and half
5    later, October 7, 2018.
6         Do you see that?
7    A   I do.
8    Q   Why did you send them to your personal e-mail
9    account?
10   A   It was -- the reason why I sent them to myself
11   was, first and foremost, for the contact for the nonbank
12   custodian.  It had nothing to do with the attachments
13   that I --
14   Q   Did you tell the trust, anyone at the trust
15   that you were sending these documents to your personal
16   e-mail account?
17   A   I did not.  I did not consider the attachments
18   at all.
19   Q   Did you show these to anyone else?
20   A   No.
21   Q   Did you delete them after you sent them to
22   yourself?
23   A   Not immediately, no.
24   Q   When you were terminated from Alpine or,
25   pardon me, when you left Alpine did you delete this

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 45

1    information from your personal e-mail?
2         A    At the time, I left Alpine.
3         Q    Yeah.
4         A    No.
5         Q    Why not?
6         A    Didn't think about it.
7         Q    Did -- do you recall the plaintiffs, including
8    the trust, request in writing that you return their
9    documents?
10        A    I recall getting a letter from you, yes.
11        Q    Did you return any documents to plaintiffs at
12   that time?
13        A    As soon as practical, I responded to your
14   letter.
15        Q    And did you return any documents, though?
16        A    Yes.
17        Q    You did?
18        A    Certainly.
19        Q    When did you return those documents?
20        A    I don't know.  I mean, I responded to your
21   letter saying, "Let me know what you want.  If you don't
22   know, I'll give you everything," and then you slapped me
23   with a lawsuit.
24        Q    Right.  Did you -- prior to being slapped with
25   a lawsuit, did you return any documents?

Page 46

1         A    It was, like, five days later, no.
2         Q    Why not?
3         A    Because I was awaiting your response to what
4    you wanted me to do.
5         Q    So we'll call this Exhibit 3.
6              (Exhibit Number 3 marked for identification.)
7    BY MR. SUSMAN:
8         Q    The letter from me to Mr. Frankel dated
9    November 9, 2019.  Is this the letter you were referring
10   to from me?
11        A    I believe so, yes.
12        Q    Okay.  And in response to this request, it
13   says we demand that you return to the firm any -- I'll
14   ready it to you.
15             "The SCA Parties further demand that you
16   return to this firm and" -- "this firm any and all
17   documents, records, and/or copies thereof in your
18   possession, custody, or control that contain any
19   Confidential Information no later close of business on
20   November 26, 2018."
21             Do you see that?
22        A    Yes.
23        Q    And did you, in fact, return the documents
24   requested by that day?
25        A    I did not.

Page 47

1         Q    Did you delete any documents after receiving
2    this letter?
3         A    Ever?  Yes.
4         Q    Yeah.  Did you --
5         A    Yes.
6         Q    -- delete any documents responsive to this
7    letter after receiving this letter?
8         A    Yes.
9         Q    What documents did you delete?
10        A    Yes.  Once we hired the forensic firm to take
11   all the documents, I deleted all those documents.
12        Q    So you turned them all over to a forensic
13   firm?
14        A    Yes.
15        Q    And then you deleted them?
16        A    Yeah, because I didn't want to be in
17   possession of anything.
18        Q    And when would that have been?
19        A    I guess -- I'm trying to remember whenever we
20   did production.  I mean, was it --
21             MR. BANKER:  I think it would have been in --
22             MR. SUSMAN:  You did production this week.
23             MR. BANKER:  No.  No.  No.
24        A    No, I'm talking about that was responsive to
25   this.

Page 48

1              MR. BANKER:  We did initial disclosures and
2    produced the documents in our initial disclosures
3    sometime in January.
4         A    You said the stuff that was in my possession.
5              MR. BANKER:  I don't know the day, but it was
6    sometime in December of 2019 [sic].
7    BY MR. SUSMAN:
8         Q    After receiving Exhibit 3 from me, did you
9    search your files and see if you had any responsive
10   documents?
11        A    Yes.
12        Q    And did you find any responsive documents?
13        A    Well, I don't know -- again, I was waiting for
14   your response to tell me what you wanted me to do.  So
15   what I did -- I don't know if they were responsive or
16   not, but I did a search.
17        Q    You did a search, and did you find anything
18   responsive?
19        A    Responsive to what exactly?
20        Q    To my letter.
21        A    Well, I don't know what you were looking for
22   because I wasn't sure what was confidential and what was
23   not confidential, which is why I said, "If you know what
24   I have that you want back, let me know.  If not, I will
25   give you everything."

12 (Pages 45 to 48)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                         13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 49

1   Q  Um-hum.
2   A  And so what I did is I did a search for
3  anything that, you know, came or sent to
4  alpinesecure- -- hyphen securities.com, Scottsdale -- I
5  can't find if it's scottsdalecapital.com, and I think
6  it was hurry.com and justinehurry.com, and I dumped them
7  in folders.
8   Q  And -- but you did not bother to return any of
9  them; correct?
10   A  Not at that point, because I was waiting for
11  instructions from you.
12   Q  But didn't you respond that you don't believe
13  that you had any responsive documents to my letter?
14   A  I said, "I don't" -- that's the way I
15  initially responded.  I said, "I don't know what is
16  confidential."  It says, if you look at my response, I
17  said, "I don't know what's confidential.  If you don't
18  know, I will give you everything I have.  Let me know."
19   Q  Do you not believe that the trust document
20  that we identified in Exhibit 2 was confidential?
21   A  It's not marked "confidential."
22   Q  You don't believe its confidential?
23   A  It's not marked "confidential," and I didn't
24  even think I had it at the time.
25   Q  Excuse me.  Excuse me.  Answer the question.

Page 50

1      You don't believe that the trust document is
2  confidential?
3   A  No.
4   Q  Okay.  So is it fair to say that you did not
5  return to the Hurry Trust the confidential trust
6  information within ten days of receiving the demand?
7      MR. BANKER:  Object to form.  You said -- you
8      put an adjective, "confidential."  He's already
9      said he didn't even know he had the trust
10      documents.  So you -- your question assumes a bunch
11      of facts that he has testified contrary to.
12  BY MR. SUSMAN:
13   Q  Okay.  You can answer.
14   A  I would say that I did not return those trust
15  documents within ten days.
16   Q  Okay.  And, in fact, you didn't return any
17  documents within ten days; correct?
18   A  That is correct.
19      You want me to flip these over when you go to
20  the next one or --
21      MR. BANKER:  Yeah.  I would turn them upside
22      down and just keep them in that order, Chris, so
23      they stay in the right order for the court
24      reporter.
25      (Exhibit Number 4 marked for identification.)

Page 51

1      MR. SUSMAN:  Call this Exhibit 4.  Are we on
2      4?
3      MR. BANKER:  Yes, we are on 4.
4  BY MR. SUSMAN:
5   Q  4.  So this is the letter -- the e-mail that
6  you sent back to me on November 12, 2018, responding to
7  my letter of November 9th; correct?
8   A  Yes.  It appears to be.
9   Q  Okay.  Did you speak to anyone about this
10  e-mail before you sent it to me?
11      MR. BANKER:  Object -- wait.  Wait.  Wait.
12      Object to form to the extent it calls for
13      attorney-client privilege.
14      You can say that -- if you spoke to somebody,
15      that's fine, but I don't want you to reveal what
16      was said, if you spoke to a lawyer.
17   A  Yes, I did.
18  BY MR. SUSMAN:
19   Q  Who did you speak with?
20      MR. BANKER:  You can reveal an identity.
21   A  Carter Anderson.
22  BY MR. SUSMAN:
23   Q  Is that an attorney?
24   A  Yes.
25   Q  And Mr. Anderson gave you advice on how to

Page 52

1  respond?
2      MR. BANKER:  Object to form.  No.  No.  No.
3      MR. SUSMAN:  I don't want to know --
4      MR. BANKER:  No.
5      MR. SUSMAN:  -- anything he said to you.  I
6      just want to know --
7      MR. BANKER:  Whether or not --
8      MR. SUSMAN:  -- did he give you advice.
9      MR. BANKER:  -- Mr. Anderson gave you advice
10      is privileged, and we are not going to let it go
11      any further.
12  BY MR. SUSMAN:
13   Q  Did Mr. Anderson give you advice?  You don't
14  have to listen to your attorney.
15      MR. BANKER:  You don't need to -- don't answer
16      that.
17   A  I'm not going to answer it because it's
18  privileged.
19  BY MR. SUSMAN:
20   Q  Okay.  So -- but you and Mr. Anderson, though,
21  did speak about the response prior to you sending this;
22  correct?
23      MR. BANKER:  Object to form.
24      Don't answer what the subject matter of what
25      you and Mr. Carter -- Mr. Anderson spoke about.

13 (Pages 49 to 52)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 53

1     MR. SUSMAN:  You're actually wrong on this,
2  David.  When you do a privilege log, it says
3  attorney-client subject.
4     MR. BANKER:  You know, Jordan, I'm going to --
5  I'm going to say to you that I think you may be
6  right on this and so --
7     MR. SUSMAN:  Every now and then.
8     MR. BANKER:  No.  No.  Not every now and then,
9  not every now and then, but, you know, we will
10  stipulate that they discussed your cease and desist
11  demand.
12  BY MR. SUSMAN:
13     Q   So you guys discussed it?
14     MR. BANKER:  But we are not going further than
15  that.
16  BY MR. SUSMAN:
17     Q   Correct?
18     A   We discussed the response.
19     Q   All right.  Very good.
20        So it says here, your second paragraph, "In
21  accordance with your demand, I am willing to search for
22  any Confidential documents that may be in my
23  possession."
24        Do you see that?
25     A   Yes.

Page 54

1     Q   But it's your testimony now that you, in fact,
2  did do a search for confidential documents prior to
3  sending this; correct?
4     MR. BANKER:  Object to form; misstates his
5  testimony.
6     A   No.  I don't know when I did it.
7  BY MR. SUSMAN:
8     Q   You don't?
9     A   No.
10     Q   Okay.
11     A   And -- can I add something here?  And I wasn't
12  looking for specifically confidential documents because
13  I wouldn't have any kind of way to search.  I was just
14  looking for all documents at some juncture.  Again,
15  whether it was prior to the response or after, I don't
16  know.
17     Q   Okay.
18     MR. SUSMAN:  We'll call this Exhibit 5.
19     (Exhibit Number 5 marked for identification.)
20     MR. SUSMAN:  Here we go.
21     MR. BANKER:  All right.
22  BY MR. SUSMAN:
23     Q   It's an Employee Nondisclosure & Computer Use
24  Agreement between Alpine Securities and Scottsdale
25  Capital and Mr. Frankel dated July 1, 2015.

Page 55

1     You're familiar with this document,
2  Mr. Frankel?
3     A   I am now, somewhat.
4     Q   That's your signature on the last page?
5     A   Yes.
6     Q   And you believe you actually signed it on the
7  date indicated?
8     A   Yes.
9     Q   July 1, 2015.  And was this when your
10  employment formally began?
11     A   No, I don't think so.
12     Q   When did your employment formally begin?
13     A   I think it was August 5th, 2015.
14     Q   Okay.  So prior to actually beginning?
15     A   I think it was prior to, yes.
16     Q   Okay.  And after you signed this document, did
17  you receive documents from Alpine Securities and
18  Scottsdale Capital related to their business?
19     A   I don't recall.
20     MR. BANKER:  Jordan, when you get to a good
21  breaking point, we've been going about an hour so
22  let's take --
23     MR. SUSMAN:  Take a break.
24     MR. BANKER:  I don't want to disrupt your
25  train.

Page 56

1     MR. SUSMAN:  I have no flow.
2     THE VIDEOGRAPHER:  Going off the record at
3  3:40.
4     (Off the record from 3:40 p.m. until
5  3:54 p.m.)
6     THE VIDEOGRAPHER:  Going back on the record at
7  3:54.
8  BY MR. SUSMAN:
9     Q   All right.  Circle back on a couple things.
10  You mentioned you were interested in purchasing Quantex?
11     A   Well, I had -- I -- your question was any
12  broker-dealers that I had considered purchasing, and
13  that was one, yes.
14     Q   And when was that?
15     A   Oh, you know, I don't know.  Soon after
16  leaving Alpine.  I don't remember exactly what it was,
17  but I did send an LOI out on it.
18     Q   And would that have been the end of last year?
19     A   Yeah, it was sometime after my departure from
20  Alpine.
21     Q   But before January 1st of this year?
22     A   I believe so.  Oh, yeah.  Yeah.  For sure.
23     Q   And did you have any people that were
24  potential partners on that deal?
25     A   There were two existing shareholders of that

14 (Pages 53 to 56)

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 57

1   deal whose -- well, one minority shareholder called me,
2   said, "Hey, you ought to try to buy Quantex," and then
3   there was another larger shareholder deal -- or guy in
4   the deal.  He talked about staying in, but nobody else.
5   Q   All right.
6   A   I never got far enough.
7   Q   Here's a name for you.  Randy Jones.  Do you
8   know Randy Jones?
9   A   I do.
10   Q   How do you know Randy?
11   A   He worked with me at Alpine.
12   Q   Okay.  And is Mr. Jones now working at Vision?
13   A   He is.
14   Q   Is that how you found out about Vision?
15   A   No.
16   Q   How did you find out about Vision?
17   A   There was a gentleman by the name of Bob
18   Jersey, who owns a firm called Gar Wood Securities in
19   Chicago.  And he introduced me to Vision.
20   Q   And when approximately was that?
21   A   Again, May of this year.
22   Q   And what's your title over at Vision?
23   A   VP of corporate service group and
24   correspondent services.
25   Q   And does Mr. Jones work there as well?

Page 58

1   A   He does.
2   Q   And what's Randy Jones doing over at Vision?
3   A   He's working in a corporate securities group.
4   He's a VP as well.
5   Q   Do you have any understanding of Randy Jones
6   contacting customers at Scottsdale Capital?
7   A   You know, you would have to give me specifics.
8   Q   Are you aware of Randy Jones contacting any
9   clients at Scottsdale Capital?
10   A   You know, I don't really know for sure what
11   clients are Scottsdale and what clients are Alpine.  So
12   I can't tell you specifically.
13   Q   Okay.  So let's combine Scottsdale and Alpine.
14   Are you aware of Randy Jones contacting any
15   clients of either Scottsdale or Alpine?
16   A   Yes.  I think he's been in contact with some
17   clients of Scottsdale and/or Alpine.
18   Q   And what are the nature of those contacts to
19   the best of your knowledge?
20   A   He's conducting business with them.
21   Q   Meaning what?
22   A   He's taking transactions.
23   Q   So is it your understanding that Randy Jones
24   is contacting Scottsdale/Alpine customers to bring them
25   over to Vision?

Page 59

1   A   I -- well, let me think about that question.
2   I would tell you that -- I wish I could give you
3   specifics.  I can't give you specifics, but I think
4   that's a fair assumption.
5   Q   All right.  Do you know if Randy Jones has a
6   nondisclosure agreement with Alpine?
7   A   I don't.
8   Q   Do you presume he does?
9   A   He has stated he does not.
10   Q   Okay.  All right.  Where are we?  We are on?
11   A   This.
12   Q   Yeah, that was 5.
13   (Exhibit Number 6 marked for identification.)
14   BY MR. SUSMAN:
15   Q   So then this will be 6.  This is Exhibit 6.
16   It's Bates stamped Hurry 76 through 79.  It's a e-mail
17   from Chris Frankel at Alpine Securities to Chris Frankel
18   dated September 18, 2018.  It's got an exhibit to it,
19   which is a Term Sheet for Secure Revolving Credit
20   Facility with New World Fortuity Fund L.P.
21   Looking at this, Mr. Frankel, is this term
22   sheet a document that you received after signing the
23   second nondisclosure agreement?
24   A   Yes.
25   Q   And is it your understanding that this term

Page 60

1   sheet -- term sheet for a secured revolving credit
2   facility contains information concerning Alpine's
3   business?
4   A   Can you ask the question again?
5   (Requested portion of the record was read back
6   by the Reporter.)
7   A   I don't know if I would phrase it that way.
8   Let me look at Page 2.  I think it was contemplated as a
9   possibility to aid with Alpine's business, yes.  If
10   that's responsive.
11   BY MR. SUSMAN:
12   Q   Is it your --
13   A   I don't think it talks about Alpine's
14   business, per se.
15   Q   Okay.  But if you go on the first page of the
16   term sheet, it says that the use of the proceeds "shall
17   be used to lend...to the Company's wholly owned
18   subsidiary, Alpine Securities Corporation."
19   Do you see that?
20   A   Oh, under "Use of Proceeds"?
21   Q   Yeah.
22   A   Yes.
23   Q   Okay.  So this was a term sheet for a loan
24   basically for Alpine's use; correct?
25   A   I think it was a contemplated term sheet for

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 61

1    that, yes.
2        Q    Okay.  And is this information that was
3    generally known to the public?
4        A    That there was a contemplation of this?
5        Q    Yeah.
6        A    Yeah, I think it is, actually.
7        Q    The actual term sheet is something that would
8    be known to the public?
9        A    I'm telling you what I think, not what I know.
10    But, yes, I think it was.  I guess you would have to
11    define the public.  My understanding, which, again, I
12    don't have firsthand knowledge of, was that they went
13    out to a lot of people with this.
14        Q    Is there --
15        A    Whether it was this particular sheet, I really
16    don't know.
17        Q    Is there somewhere in the public where a
18    member of the public could obtain a copy of this term
19    sheet?
20        A    Oh, not that I'm aware of.
21        Q    Was it your understanding that the plaintiffs
22    tried to keep this document confidential?
23        A    It was not my understanding, no.
24        Q    So you do not believe that the plaintiffs
25    wanted to keep this document confidential?

Page 62

1        A    Oh, I do in looking at it now.  Yes, I do,
2    certainly.
3        Q    And in fact, it says "confidential" on it;
4    correct?
5        A    Yes, it does.
6        Q    This document was sent to you it appears
7    originally on May 7th, 2018.  Do you see that?
8        A    I do.
9        Q    Do you know why you were sent this document?
10        A    I was sort of in the group, as I recall, that
11    when they were initially discussing putting together a
12    structure.
13        Q    And did you do anything with this document at
14    that time?
15        A    No.
16        Q    And did you send this document to your
17    personal e-mail account on September 18, 2018?
18        A    I did.
19        Q    And that's four months after you initially --
20    or pardon me -- three months after you initially
21    received it, correct -- four months?  Pardon me.  Four
22    months after you initially received it; correct?
23        A    Yeah, approximately.
24        Q    And why did you send this document to yourself
25    four months after you received it?

Page 63

1        A    I was actually looking at the contemplated
2    structure.
3        Q    And why were you looking at the contemplated
4    structure four months after you received it?
5        A    Well, because, again, I, you know, was
6    contemplating buying a broker-dealer and, you know, as
7    part of your assertions, you know, if I bought one I
8    could probably write a check for certain ones myself,
9    but I would have to raise capital to fund it for
10    additional capital.  And so I thought about using this
11    template to draft an idea to raise capital.  But I never
12    attempted to raise any capital or solicited any capital.
13    It wasn't going to be this exact structure at all.  But,
14    you know, the template in terms of borrower, lender,
15    instrument, maturity, that type of thing.
16        Q    So you wanted to use it for your personal use?
17        A    Yes, the template.
18        Q    And when you left Alpine, did you delete this
19    document from your personal e-mail?
20        A    Immediately upon leaving Alpine?
21        Q    Um-hum.
22        A    No.
23        Q    Why not?
24        A    Didn't dawn on me to do it.
25        Q    Okay.  Would it be fair to say that, when your

Page 64

1    employment ended with Alpine, that you failed to
2    promptly deliver this to Alpine upon leaving Alpine?
3        MR. BANKER:  Object to form.
4        MR. SUSMAN:  Yeah, it's a terribly formed --
5    formed question.
6    BY MR. SUSMAN:
7        Q    Is it fair to say that -- that, when your
8    employment with Alpine came to an end, that you did not
9    delete this document; correct?
10        MR. BANKER:  Object to form.  You're saying
11    employment ending on August 1, 2018, or are you
12    saying consulting arrangement ending on
13    October 31st?
14        MR. SUSMAN:  Good distinction.
15    BY MR. SUSMAN:
16        Q    When your consulting arrangement with Alpine
17    came to an end on October 31, 2018, you did not delete
18    this document; correct?
19        A    On October 31st, no.
20        Q    And nor did you return this document; correct?
21        A    Eventually, yes.
22        Q    But you did not do so -- when you say you
23    returned it, you returned it only in discovery in this
24    lawsuit; correct?
25        A    No.  I returned it voluntarily.

16 (Pages 61 to 64)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 65

1   Q   When was that?
2   A   When I hired the forensic firm, which I told
3   them to do, so I would do exactly what I said I was
4   going to do.
5   Q   So you did not return this document until you
6   delivered it to Alpine in discovery in this lawsuit;
7   correct?
8   A   I don't know that that was part of discovery.
9   Q   Really.  So when did you deliver it to Alpine?
10  A   When I hired the law firm, and I said, "Let's
11  return all the documents because that's what I said I
12  would do."
13  Q   And when was that?
14  A   I don't know the exact date.
15  Q   And it's your understanding that that was not
16  part of discovery when you finally --
17  A   I don't know that it was part of discovery
18  initially.  I don't know if it was something that you
19  guys requested.
20      MR. BANKER:  I think it was part of initial
21  disclosures is what it was.
22      MR. SUSMAN:  That is correct, which would be
23  discovery.
24      MR. BANKER:  You don't need to know the nuance
25  of discovery.

Page 66

1   BY MR. SUSMAN:
2   Q   But it's fair to say that you never delivered
3   this to Alpine outside of this lawsuit; correct?
4   A   I think that's correct.
5   Q   Oh, real quick, going back to Randy Jones, do
6   you know how Randy Jones got hired at Vision?
7   A   How he got hired?
8   Q   Yeah.
9   A   He was introduced to Vision at the same time I
10  was.
11  Q   By whom?
12  A   Bob Jersey at Gar Wood.
13  Q   And did you know Randy Jones prior to working
14  at Alpine?
15  A   No.
16      (Exhibit Number 7 marked for identification.)
17  BY MR. SUSMAN:
18  Q   Call this Exhibit 7.  This is a e-mail and
19  attachment.  It's Bates stamped Hurry 202 through 214.
20      Looking at the attachment to the e-mail, it's
21  a draft employment agreement for Ken Ralston.
22      Do you see that?
23  A   Yes.
24  Q   And is it your understanding that this
25  document is confidential?

Page 67

1   A   It's marked "confidential," yes.
2       MR. SUSMAN:  Let me -- wait.  Wait.  Wait.
3   Let me -- Mr. Frankel, you see "confidential" in
4   the subject line of the document; right?
5       THE WITNESS:  Yeah, I was looking at the --
6   well, I was looking at the attachment.  It says
7   "confidential" right at the top.
8       MR. BANKER:  Well, it -- but that's what they
9   put on there when they produced it.
10      THE WITNESS:  Oh, okay.
11      MR. BANKER:  So your -- the "confidential" at
12  the top is a litigation marking of confidential.
13      MR. SUSMAN:  Correct.
14  BY MR. SUSMAN:
15  Q   And underneath that it says "privileged and
16  confidential"; correct?
17  A   Yes, it says it.
18  Q   Okay.
19      MR. BANKER:  Well, wait.  Wait.  Wait.  Wait.
20  It says "confidential."
21      MR. SUSMAN:  And then underneath that, it says
22  "privileged and confidential" on the original
23  document.
24      MR. BANKER:  Where are you looking at now?
25      MR. SUSMAN:  I'm looking at the employment

Page 68

1   agreement.
2       MR. BANKER:  Right.  And so that "privileged
3   and confidential" is original, but when it's
4   "confidential" with a black line under it, that's
5   something that --
6       THE WITNESS:  I understand what you just said.
7       MR. SUSMAN:  We agree.
8       MR. BANKER:  But when you looked at
9   Exhibit 7 --
10      MR. HOLDER:  6.  6.
11      MR. BANKER:  -- Exhibit 6, that doesn't have
12  confidential on it except for what they put on it
13  in the lawsuit.
14      THE WITNESS:  Okay.  I understand.
15      MR. BANKER:  Yeah, but you -- so there was
16  nothing -- there was nothing written on the
17  document itself before they put "confidential" in
18  producing it in this lawsuit that said it was
19  confidential.
20      MR. SUSMAN:  Okay.
21      MR. BANKER:  Do you understand that?
22      THE WITNESS:  I understand what you're saying,
23  but I thought what Mr. Susman was inferring was
24  that the thing that said "privileged and
25  confidential" was there prior.

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 69

1        MR. SUSMAN:  That is correct.
2        MR. BANKER:  But that's -- that's Exhibit 7.
3    But I just don't want you to get confused by the
4    "confidential" that they put on the top of all
5    these documents.  That's something they put on
6    there after the fact.  That's not there --
7        THE WITNESS:  I understand.
8        MR. BANKER:  Okay.
9        THE WITNESS:  I understand what you're saying.
10       MR. BANKER:  Okay.
11       MR. SUSMAN:  I'm in agreement.  Okay.
12   BY MR. SUSMAN:
13       Q    To be clear, though, the attachment on
14   Exhibit 7 says "privileged and confidential"; correct?
15       A    It does.
16       Q    And, in fact, if you look at the first page
17   where it says "Subject," it says forward -- the
18   "Subject" line says "confidential," all caps, colon,
19   "Employment Agreement."
20       Do you see that?
21       A    Yes.
22       Q    Is it your understanding that, in fact, this
23   draft employment agreement was considered confidential
24   by plaintiffs?
25       A    Yes.

Page 70

1        Q    Okay.
2        A    Well, I mean, I think it was marked
3    "confidential" by Nate Simmons that prepared it, I
4    believe.
5        Q    And Nate's an attorney; correct?
6        A    He is an attorney, correct.
7        Q    Okay.  And is this employment agreement
8    publicly available in any place that you're aware of?
9        A    No, not that I'm aware of.
10       Q    And is this an employment agreement that
11   plaintiffs generally try to keep confidential to the
12   best of your knowledge?
13       MR. BANKER:  Object to form.
14       A    Yes.
15   BY MR. SUSMAN:
16       Q    Do you know why this document was sent to you
17   on April 13, 2018, by Nate Simmons?
18       A    Yes.
19       Q    Why is that?
20       A    Well, because this gentleman, Ken Ralston, had
21   another job offer; and in order to try to prevent him
22   from going elsewhere, we agreed to engage in an
23   employment arrangement with him.
24       Q    And you then forwarded this document to
25   yourself on August 8, 2018, approximately four months

Page 71

1    later; correct?
2        A    That is correct.
3        Q    And why did you do that?
4        A    You know, the best -- I'm trying to remember
5    exactly what the story was with this.  Would you like me
6    to speculate on it?
7        Q    I don't want you to speculate.
8        A    I just can't remember exactly what it was.
9    I'm going to tell you what I think.  Well, I guess you
10   just told me not to; right?  I mean, I'm trying to be
11   responsive to you.
12       Q    I understand.  I appreciate that.
13       Do you -- do you know why you sent this to
14   yourself --
15       A    What I think --
16       Q    -- without speculating?  And if you don't
17   recall, you don't recall.
18       A    I wish David Brant were here.  He would
19   probably remember.  You know, I just don't recall for
20   certain.
21       Q    Okay.  Did you tell plaintiffs that you
22   forwarded this document to your personal e-mail account?
23       A    No, but they would know that.
24       Q    How would they know that?
25       A    Because every single e-mail in a brokerage

Page 72

1    firm is saved in a WORM format for seven years.
2        Q    And --
3        MR. BANKER:  You said -- wait a minute.  You
4    said in what format?
5        A    Write once read many format.  So any time --
6        MR. BANKER:  Wait.  Wait.  It's an acronym.
7    Did you get it?  Okay.
8        A    Anything you send to yourself would be
9    available to the firm.  Anything that comes in or goes
10   out of a brokerage firm's e-mail system.
11   BY MR. SUSMAN:
12       Q    So is it your understanding that Alpine went
13   through the e-mails of its employees every single day to
14   see what they were e-mailing to themselves?
15       A    Oh, no.  There was a lexicon search, but they
16   had -- all the data was there.
17       Q    Right.  The data is there, in fact, because
18   we, in fact, have this document; correct?
19       A    Well, you have -- I thought you had the
20   document because I produced the document.
21       Q    No.  This was produced by Hurry.
22       MR. BANKER:  Whoa.  Whoa.  Whoa.  It was --
23       A    I think I produced it too.
24       MR. BANKER:  -- it was -- it was produced by
25   Hurry after Frankel produced his documents.  You

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 73

1    just turned around and put your Bates numbers on
2    them and marked them all confidential.
3         MR. SUSMAN:  Not necessarily true.
4    BY MR. SUSMAN:
5         Q   Anyway --
6         MR. BANKER:  Close enough.
7         MR. SUSMAN:  Close enough.
8         A   And you could be right, Jordan.
9    BY MR. SUSMAN:
10        Q   Um-hum.  So is it your belief that in order to
11   police their employees Alpine should be looking at its
12   employees' e-mails every single day to see what they are
13   e-mailing themselves?
14        MR. BANKER:  Object to form.
15   BY MR. SUSMAN:
16        Q   Is that your testimony that that's what Alpine
17   should be doing --
18        A   I don't think that I said --
19        Q   -- looking at your e-mails every day and
20   seeing what you're e-mailing to yourself?
21        A   You just made that up.  I never said that.
22        Q   And, therefore, you don't have to tell -- and,
23   therefore, you don't have to tell Alpine what you're
24   sending yourself because --
25        A   Who did I tell at Alpine?

Page 74

1         Q   I asked.  I asked.  Did you tell plaintiffs
2    that you were e-mailing this document to yourself?  You
3    said, "No, I don't need to.  They have a record of it."
4         A   I didn't say, "No, I don't need to."
5         Q   Okay.  So then tell me, did you tell anyone at
6    Alpine that you sent this document to yourself?
7         A   Not specifically that I am aware.
8         Q   Generally, did you --
9         MR. BANKER:  Wait a minute.  Wait a minute.
10   BY MR. SUSMAN:
11        Q   -- tell anyone generally that, "Hey, I'm
12   e-mailing this document to myself four months after I
13   received it," yes or no?
14        A   I don't recall.
15        Q   Did you show this draft employment agreement
16   to anyone?
17        A   No.
18        Q   Did you delete --
19        A   Wait.  Wait.  Wait.  Let me back up on that --
20        Q   Yes.
21        A   -- Jordan.
22        Did I show it to anybody after I sent it to
23   myself?
24        Q   Yeah.
25        A   No.

Page 75

1         Q   Okay.  Did you delete this document after you
2    sent it to yourself?
3         A   Yes.
4         Q   When did you delete it?
5         A   After the forensic firm took the shot, I
6    believe -- you know, the -- took the archive of the
7    e-mails, I believe.
8         Q   Whose responsibility in the firm would it be
9    to monitor employee e-mails?
10        MR. BANKER:  Object to form.
11        A   It depends on when that was.
12   BY MR. SUSMAN:
13        Q   August 8, 2018?
14        A   I think it was Joey --
15        Q   Joey who?
16        A   -- at that time.  I can't remember his last
17   name.
18        Q   Okay.  So you did not delete this until this
19   lawsuit began; correct?
20        A   I don't believe so.
21        Q   Okay.  And you did not return this document to
22   Alpine until this lawsuit began; correct?
23        A   I guess the same thing as what we said about
24   the other documents.  I think that is correct.
25        (Exhibit Number 8 marked for identification.)

Page 76

1    BY MR. BANKER:
2         Q   Call this Exhibit 8.  This is an e-mail and
3    attachment Bates stamped Hurry 81 through 105.
4         Have a look at this.  And, again, this is an
5    e-mail from Chris Frankel to salfrankel@yahoo.  That's
6    your personal e-mail account; correct?
7         A   It is.
8         Q   And attached to it is a -- well, you tell me.
9    What is attached to this e-mail?
10        A   This is the annual FINRA 3120 report.
11        Q   Okay.
12        A   It's a draft of it.
13        Q   And you received this document on May 31,
14   2016; correct?
15        Look, you go down --
16        A   I don't think that -- I don't know that
17   that's --
18        Q   If you go down from where you sent it to
19   yourself, the next e-mails from May 31, 2016, from Erin,
20   E-R-I-N, Zipprich, Z-I-P-P-R-I-C-H, to you, and it says
21   "Chris, please see attached."
22        A   Yes.
23        Q   Do you see that?
24        A   Yes.
25        Q   So is it your understanding Ms. Zipprich sent

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 77

1    this to you on May 31, 2016?
2        A   Yes.
3        Q   Okay.  After you had signed the nondisclosure
4    agreement; correct?
5        A   Oh, yes.
6        Q   All right.  And does this document contain
7    information concerning Alpine's business?
8        A   Yes.
9        Q   And is this information regarding Alpine's
10   supervisory procedures something that plaintiffs
11   publicly disclosed?
12       A   No.
13       Q   Was this the type of information that you
14   believe Alpine generally kept -- tried to keep
15   confidential?
16       A   Yes.
17       Q   Do you know why you were sent this document on
18   May 31?
19       A   Yes, because I was responsible for reviewing
20   it and signing off on it.
21       Q   Okay.  And is that, in fact, what you did in
22   May or June of 2016?
23       A   I assume so.
24       Q   And then you sent it to yourself --
25       A   Well --

Page 78

1        Q   No?
2        A   No.  You said in May of --
3        Q   I said May or June 2016.
4        A   I'm not sure when this was signed off on.  I
5    guess we?  Would could look and see.  I'm -- I -- I don't
6    recall.  I really don't.
7        Q   But you sent it to yourself four months
8    later -- four and a half months later on October 13,
9    2016; correct?
10       A   Apparently so, yes.
11       Q   And did you tell anyone at Alpine that you
12   were sending this document to your personal e-mail
13   account?
14       A   No.
15       Q   Did you show this document to anyone after you
16   sent it to yourself?
17       A   No.
18       Q   Did you delete this document after you sent it
19   to yourself?
20       A   I don't know.
21       Q   Did you -- strike that.
22           Do you know why you sent this to yourself on
23   October 13 --
24       A   Well, I'm --
25       Q   -- 2016?

Page 79

1        A   I'm scratching my head when I look at the
2    dates. I really don't.  I don't know if I didn't sign
3    off on it back at the end of May or if we had to do a
4    new one and we were using it as a template.  I just
5    don't recall.
6        Q   And you did not deliver this document to
7    Alpine until it was delivered as part of discovery in
8    this lawsuit; correct?
9        A   I -- I don't know.  Quite frankly, you got me
10   a little bit baffled on that now.
11           Let me correct that if you -- if you would.
12   Is your question that I didn't deliver it to Alpine
13   until discovery?
14       Q   Correct.
15       A   I guess what I'm saying is that I'm not sure
16   whether I delivered it or you pulled it.  If I delivered
17   it, it would have been your -- I would agree with your
18   statement.
19       Q   Okay.
20           (Exhibit Number 9 marked for identification.)
21   BY MR. SUSMAN:
22       Q   This is an e-mail with attachment, Hurry 106
23   through 121. So it's got an e-mail from Chris Frankel
24   to salfrankel@yahoo dated October 6, 2016.  And attached
25   to it is a FINOP Pre-Exit Meeting Report for the

Page 80

1    Examination of Alpine Securities Corporation.  Is this
2    attachment something that you received after signing the
3    nondisclosure agreement?
4        A   Yes.
5        Q   Does this document contain information
6    concerning Alpine's business?
7        A   Yes.
8        Q   And is this information concerning Alpine's
9    supervisory system that's not publicly disclosed?
10       A   I think there are certainly -- yeah, I would
11   say there are certainly parts of this that's not
12   publicly disclosed.
13       Q   Is this the type of information that Alpine
14   generally tries to keep confidential?
15       A   I think generally, yes.
16       Q   And you were sent this by -- looks -- Heather
17   Noble on October -- October 5th, 2016.
18           Does that seem correct?
19       A   Yes.
20       Q   Do you know why it was sent to you?
21       A   Well, I mean, I originally got something on
22   September 23rd, if you look below.
23       Q   Yeah, I see that.
24       A   Then I was copied on the 26th.  Then it's the
25   5th, and then I sent it to myself on the 6th.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 81

1    Q   Do you know why this document would have been
2  sent to you?
3    A   Yeah.  I mean, some of the stuff I would have
4  been responsible for answering and looking at the
5  overall answers.
6    Q   And then you sent it to yourself on
7  October 6th, 2016; correct?
8    A   That is correct.
9    Q   And do you know why you sent it to yourself?
10   A   I probably -- I would oftentimes send stuff
11 when I was working from Florida to my personal e-mail if
12 I had something that I wanted to print or work on a
13 spreadsheet.  I would -- my work computer at the time
14 was not hooked to a printer.  So I sent it to a personal
15 e-mail so I could print it out.  So I suspect that
16 that's why I did it.
17   Q   And let me just understand this arrangement.
18 This is at your personal residence?
19   A   Yes.
20   Q   That your -- and then you have two different
21 computers or two different e-mails?  Explain to me this
22 arrangement.
23   A   Yeah, I had a -- I had a small laptop from
24 Alpine, and I used to travel with that, but it wasn't
25 hooked to a printer in Florida.  So, like, if I had a

Page 82

1  document that -- most of the time, if I had a document
2  that I had to sign, I would forward it to my personal
3  e-mail, print it out, sign it, scan it, e-mail it back
4  to myself, and then e-mail from my Alpine address to
5  wherever it needed to go or who it needed to go to.
6        You know, if I had something that, you know,
7  that -- like, my guess on this thing -- and I kind of
8  remember this -- is that I had to work on some of these
9  responses.  So I wanted to actually have the physical
10 document in front of me.
11   Q   And then what would you do by work on it,
12 quote/unquote?
13   A   I had to -- this was a work product.  I had to
14 answer stuff for regulators.
15   Q   So -- but aren't you putting those answers
16 actually in the electronic version of this?
17   A   Eventually, yes.
18   Q   But you're saying that your practice was to
19 print it out and write on the piece of paper?
20   A   No.  No.  No.  No.  No, I'm saying sometimes
21 like if I -- let's say if you take this document,
22 Jordan, that is -- the one that's in here, the -- I
23 don't know if that's the FINRA one.  "See details."  So
24 generally we would have to basically write an answer to
25 these alleged findings by FINRA.  So --

Page 83

1        MR. BANKER:  You're -- you're referring to
2  page --
3        THE WITNESS:  Yeah.  Hurry --
4        MR. BANKER:  -- 111?
5        THE WITNESS:  Yes.
6        MR. BANKER:  Hurry 111.
7        THE WITNESS:  Hurry 111.
8    A   So -- and I'm not sure on this particular one,
9  but -- so if we had to write answers to these things,
10 then oftentimes I would print it out so I could have the
11 document right here that I'm looking through, and then I
12 would type up on my work computer the document.
13 BY MR. BANKER:
14   Q   So you're not writing on this document?
15   A   No.  No.  No.  Not necessarily.  I mean, I
16 might occasionally or something if I'm looking at it on
17 an airplane or something.
18   Q   So, for example, where would you put
19 information on this document?  This is a Word document
20 that was sent to you; correct?
21   A   I don't know that -- was it a Word document,
22 or was it a PDF?
23   Q   If you look at the attachment, it's a .docx,
24 which I believe is a Word document; correct?
25   A   I think you're right.  I think so.

Page 84

1    Q   So aren't you actually making additions,
2  corrections, on the Word document itself?
3    A   I'm not sure -- I'm not sure on this
4  particular document.  But, yeah.  Usually, if I had a
5  Word document, I would generally do it to that document.
6  But I also oftentimes would sit there and print the
7  document because printed paper is just easier for me to
8  read than sitting there trying to read a longer document
9  like this on a little computer screen.
10   Q   But this document is actually a report by
11 FINRA; correct?
12   A   It is a report by FINRA.  That's what I'm
13 saying.  I'm sitting there looking to try to see exactly
14 what it is, but -- like, these things here, we had to
15 write, I think, answers to.
16   Q   What are you looking at?
17   A   Like, this part.
18        MR. BANKER:  The Bates number what?
19        THE WITNESS:  Starting 107.
20 BY MR. SUSMAN:
21   Q   That's part of the e-mail, though, but not
22 part of the attachment; correct?
23   A   Yes.  That's part of the e-mail, but that's
24 probably why I sent it to myself looking at it.  I mean,
25 you're asking me, you know, what I did back in, you

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)
13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 85

1   know, October of 2016. I don't remember what I had for
2   breakfast yesterday, but I'm telling you the way that I
3   would work is oftentimes I would print something like
4   this out and then start working on the answers.
5       Q   Okay.
6       A   I mean, I can assure you that this was never
7   shared with anyone.
8       Q   Okay. And, again, you did not delete this
9   document until when?
10      A   I don't know. Again, if you're telling me
11  that this is one of the documents that I produced, then
12  I would tell you I deleted it after my e-mail was
13  archived by the third-party vendor.
14      Q   Okay. And it's fair to say, then, that you
15  did not return it to Alpine until this lawsuit began;
16  correct?
17      A   Once again, if you're telling me that this is
18  a document I produced, then you're correct.
19      Q   Okay.
20          MR. BANKER: Or another way to state it would
21  be after he refused to respond to your offer to
22  return; right? That would be another way --
23  perhaps that would be a more accurate way --
24          MR. SUSMAN: A more accurate --
25          MR. BANKER: -- to answer Jordan's question,

Page 86

1   after he ignored your offer to return everything.
2           MR. SUSMAN: -- I was trying to steal -- I was
3   trying to steal confidential information from you;
4   isn't that correct? David, if you want to have a
5   shouting match, we can take it outside.
6           MR. BANKER: Well, I know, but you love your
7   speaking objections, and I just couldn't resist --
8           MR. SUSMAN: It was a good one.
9           MR. BANKER: -- the characterization.
10      A   Why in the world would I want to steal this?
11  What is the motivation to do that? Are you seriously
12  accusing me of that?
13          (Exhibit Number 10 marked for identification.)
14  BY MR. SUSMAN:
15      Q   This is Exhibit 10, and it's Hurry
16  Document 127 through 132. Going to the last page of
17  this, there is an e-mail from you to Josh Boyer on
18  July 30, 2018.
19          Do you see that?
20      A   Yes.
21      Q   You ceased employment as the CEO of Alpine on
22  July 31, 2018; correct?
23      A   August 1st, 2018.
24      Q   Okay. So August 1st was your last day. Did
25  you actually work on August 1st or was that --

Page 87

1       A   Yeah.
2       Q   Okay. And August 1st --
3       A   I think -- well, I don't know if it was a
4   Saturday or Sunday.
5       Q   It would have been a Wednesday, according to
6   this.
7       A   Okay.
8       Q   Right?
9       A   If you say so. But, yeah, it looks like that
10  would be two days after the Monday.
11      Q   At least we agree on math.
12          Did you know on July 30th that August 1st
13  would be your last day?
14      A   Did I know August 1st would be my --
15      Q   Yeah.
16      A   Sure.
17      Q   You already knew --
18      A   Would be my last day as an employee of the
19  firm.
20      Q   You already knew at the time --
21      A   Yes.
22      Q   -- when you sent this e-mail?
23      A   Yes.
24      Q   When did you -- when did you learn that
25  August 1st would be your last day at Alpine?

Page 88

1       A   I don't know the exact date, but it was
2   somewhere -- you know, somewhere within the -- I want to
3   say probably within the previous week.
4       Q   Okay. So you write to Joshua Boyer. You say,
5   Number -- Question 2 here, "Need list of top 50 accounts
6   showing how much business they have done -- YTD," year
7   to date, "is fine."
8           Do you see that?
9       A   Yes.
10      Q   Why were you asking for that?
11      A   Because just like John had alluded to in his
12  testimony, there were -- I was a consultant and there
13  were things that I was trying to wrap up for the firm.
14      Q   What sort of things were you trying to wrap
15  up?
16      A   Well, there is somewhere -- Alpine has this --
17  but I had asked Josh Boyer for this information prior.
18  I knew this was one of the things that the Hurrys wanted
19  to get done, was to implement the fee schedule. So that
20  was one of the things. I also was going to need to look
21  at what accounts were going to affect it, and one of the
22  other things that we had talked about was moving
23  accounts -- whatever accounts that we had at Alpine to
24  Scottsdale. So I was trying to get a handle on, okay,
25  what's our best customers, because John was talking

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 89

1   about consolidating to that at that point.
2       Q   And that was --
3       A   And I thought I would be involved with helping
4   move that business over to Scottsdale.
5       Q   You thought that would be part of your -- part
6   of your job tasks as a consultant?
7       A   Correct.
8       Q   And then --
9       A   Just to wind up stuff I was already involved
10  in.
11      Q   So Josh Boyer sends this to you on July 31,
12  2018, and you forward it to yourself on the same day;
13  correct?
14      A   Correct.
15      Q   Your understanding of this document is what
16  exactly?  What is this list?
17      A   The list?
18      Q   Yeah.
19      A   You mean Item Number 2?
20      Q   Item Number 2, correct.
21      A   -- starting on --
22      Q   Tell me what that information is.
23      A   It's a list of the top 50 clients on Alpine's
24  books in terms of commission dollars paid year to date.
25      Q   Okay.  So -- and it gives the name of the

Page 90

1   client and the amount of commissions year to date;
2   correct?
3       A   Yes.
4       Q   And you e-mailed this to yourself on July 31,
5   2018; correct?
6       A   I did.
7       Q   And is it your understanding this e-mail
8   contains information concerning Alpine's business?
9       A   Yes.
10      Q   Is it your understanding that this is
11  information that's not publicly available?
12      A   Yes.
13      Q   And is it your information that this is
14  information that Alpine would try to keep confidential?
15      A   Sure.
16      Q   And then after you e-mailed it to yourself on
17  July 31, 2018, what did you do with this information?
18      A   I didn't do anything with it.
19      Q   Okay.  Did you keep this e-mail until this
20  lawsuit began?
21      A   Yes.
22      Q   And did you not return this e-mail until this
23  lawsuit began?
24      A   Yes.  This one I know.
25      Q   Did you show this information to anyone?

Page 91

1       A   No.
2       Q   Did you use this information for any personal
3   business?
4       A   No.
5       Q   Did you tell plaintiffs that you sent this
6   information to your personal e-mail?
7       A   No.
8       Q   Would this information -- strike that.
9           If this information were publicly known, could
10  it be harmful to Alpine?
11      A   Which information?
12      Q   The information of Alpine's top 50 clients and
13  commission amounts?
14      A   Can you repeat the question?
15      Q   Sure.
16          Would this sort of information be harmful to
17  Alpine if it were publicly known?
18      A   I don't know.
19      Q   You don't have an opinion?
20      A   I don't have an opinion.  I think it could be,
21  and then it could not be.
22      Q   If a competitor of Alpine had this
23  information, would it be helpful for that competitor?
24      A   Oh, yeah, I think it would be helpful.
25          (Exhibit Number 11 marked for identification.)

Page 92

1           MR. SUSMAN:  Call this Document 11.
2   BY MR. SUSMAN:
3       Q   This is an e-mail and attachment.  Hurry 122
4   through 126.  And, again, this is a -- if you look at
5   the attachment, what's your understanding of that
6   attachment?
7       A   What do you mean what's my understanding of
8   it?
9       Q   What is it?  Can you explain to us what that
10  attachment is, starting on Page 125?
11      A   It is a proposed structure for a term sheet to
12  Curt and Seth Kramer.
13      Q   Okay.  And do you know what happened with
14  this?
15      A   What happened with it?
16      Q   Yeah.  Did this -- did this agreement actually
17  go through?
18      A   Not that I'm aware of.
19      Q   Okay.  And this is something that you received
20  after signing your NDA; correct?
21      A   I assume so, yes.  Yes.
22      Q   And --
23      A   Yes.
24      Q   -- does this document contain information
25  about Alpine's business?

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 93

1    A   Yes.
2    Q   And is this information that's publicly
3  available?
4    A   The proposed term sheet?
5    Q   Yeah.
6    A   No, not that I'm aware of.
7    Q   Is this the type of information that
8  plaintiffs would generally try to keep confidential?
9    A   I don't know.  I mean, we had the same --
10 similar proposed structure with the same group when I
11 was at COR.
12   Q   So --
13   A   It wasn't the exact same, but it was the same
14 concept.
15   Q   So you believe that Alpine would not care if
16 this were made public?
17   A   I don't know if they would care or not.  I
18 mean --
19   Q   So it's your understanding that where it
20 says --
21   A   Let's -- wait.  Wait.
22   Q   Yes, sir.
23   A   Let me take a look at it for a second.  I
24 think --
25   Q   Yes, sir.

Page 94

1    A   -- I think -- I don't think this was ever
2  done, to the best of my knowledge.  But I think that, if
3  it was structured in this manner, it may well be
4  publicly available because it would be a loan -- the way
5  that I believe this thing is proposed is a loan directly
6  to the broker-dealer.
7    Q   Um-hum.  So where it says "The Funding
8  Facility" in the paragraph there, and it says "the
9  Kramer Group will provide a zero interest loan in the
10 amount of up to $3 million," it's your belief that
11 that's not something that Alpine would want to keep
12 confidential?
13   A   Oh, I think that -- I think -- you know, I'm
14 not real sure, but I don't think the rate would be
15 public.
16   Q   Okay.  So that would not be public?
17   A   No.  No.  I don't think so.
18   Q   And isn't that something that Alpine would
19 want to keep private; correct?
20     MR. BANKER:  Object to form.
21   A   I mean, I'm not sure why they care one way or
22 another on this thing, to be honest with you.
23 BY MR. SUSMAN:
24   Q   Okay.  And do you know why you sent this to
25 yourself?

Page 95

1    A   I was working on stuff with Mike at the time.
2    Q   And why would you send it to your personal
3  e-mail?
4    A   Because I probably printed it out to work on
5  it.  I mean, I'm pretty sure about this one.  I remember
6  working on this because I think I provided comments to
7  Mike on it.
8    Q   And, again, you did not delete this e-mail and
9  attachment until this lawsuit was commenced; correct?
10   A   Can I ask for a time out for a second to make
11 life a little easier for us here?
12     MR. BANKER:  Are you responding to his
13   question?
14     THE WITNESS:  No, I'm not responding to his
15   question, I don't think.
16   A   I'm just trying to -- and, look, if you're
17 trying to do something for effect, I understand, and
18 it's fine, but you've got me thinking about something
19 here.
20     And what I'm thinking about is you're saying
21 that, you know, Hurry produced this.  So I don't know
22 whether this is a document that was produced by me or a
23 document produced by Hurry.  And that's okay if you want
24 to ask it over and over again.  I don't have any problem
25 with it.  But I'm trying to save you a little bit of

Page 96

1  time, is that, if it's something produced by me, then
2  the answer would be no, I didn't delete it every time
3  until this lawsuit.  Is that fair enough?  But like I
4  said, if you want to ask it every time, that's okay.
5  BY MR. SUSMAN:
6    Q   Okay.  Got to do it every time.
7    A   That's fine, but then what I would ask is that
8  if there is some document that is not produced by me,
9  just let me know, and then I'll know to answer, no, I
10 didn't delete it because I didn't -- I didn't delete it
11 at that time.
12   Q   But it's your understanding that you did not
13 delete this document until this lawsuit began; correct?
14   A   That is correct.
15   Q   And it's your understanding you did not return
16 this document and deliver this document to the
17 plaintiffs until this lawsuit commenced; correct?
18     MR. BANKER:  No, until you ignored his offer
19   to return the document.
20     MR. SUSMAN:  David, please.
21     MR. BANKER:  You keep asking the question.
22   Hey, you love speaking objections, my brother.  You
23   love them.
24     MR. SUSMAN:  I love them.
25     MR. BANKER:  You love them.

24 (Pages 93 to 96)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 97

1    MR. SUSMAN: I love them.
2    MR. BANKER: You love them.
3    MR. SUSMAN: Hallelujah, I love them.
4    MR. BANKER: Yeah.
5    MR. SUSMAN: Hallelujah, I love them.
6    MR. BANKER: Yeah.
7    MR. SUSMAN: Hallelujah.
8    MR. BANKER: Yeah. Oh, you don't like what
9    I'm saying? Do you not like what I'm saying
10   really? Really. You don't like it?
11   MR. SUSMAN: Can we get the camera on this
12   guy? I think he -- he wants to come out to
13   Hollywood. I think he wants to work in Beverly
14   Hills.
15   THE WITNESS: You two are having fun, and John
16   and I are writing the checks here.
17   MR. SUSMAN: I know.
18   MR. BANKER: It's America.
19   MR. SUSMAN: Right. God bless it. Love it or
20   leave it.
21   BY MR. SUSMAN:
22   Q   Let's see here. Oh, God. On fire.
23   MR. BANKER: You know what, it's about an
24   hour. So when you're ready to take a break, why
25   don't we take another break.

Page 98

1    MR. SUSMAN: Yeah, take a break.
2    THE WITNESS: You want to -- I'm good if you
3    want to --
4    MR. BANKER: Just let me -- let me run to
5    the --
6    THE WITNESS: Oh, you got to go to the
7    restroom.
8    MR. BANKER: It will take -- it will take me a
9    minute.
10   MR. SUSMAN: After that performance, I
11   think --
12   THE VIDEOGRAPHER: Going off the record at
13   4:40.
14   (Off the record from 4:40 p.m. until
15   4:50 p.m.)
16   THE VIDEOGRAPHER: Going back on the record
17   4:50.
18   BY MR. SUSMAN:
19   Q   I want to circle back to some of your earlier
20   testimony. You mentioned that Gar Wood Securities
21   referred you to Vision?
22   A   Yes, they introduced me.
23   Q   Who was it at Gar Wood?
24   A   Bob Jersey.
25   Q   You said that. Thank you.

Page 99

1    Is it your understanding that Gar Wood
2    Securities actually clears trades for Vision?
3    A   They do not clear trades for Vision.
4    Q   They don't?
5    A   No.
6    Q   Okay. Does -- go on, explain the
7    relationship.
8    A   Well, you just said it backwards. I mean --
9    and so --
10   Q   Vision clears --
11   A   Not that I'm trying to be helpful --
12   Q   No. No.
13   A   -- but they -- Vision clears -- Vision -- my
14   understanding is Vision used to clear a fair amount of
15   business for Gar Wood. Gar Wood is predominantly kind
16   of an institutional firm, and now Gar Wood entered into
17   a relationship with Vision to clear again. And, you
18   know, a lot of -- quite frankly, it was a lot of
19   foreign-type stuff is what they were going to try to do.
20   Q   Okay. I see. And when did Gar Wood and
21   Vision enter into that relationship, the recent -- the
22   more recent one?
23   A   I don't know when their original relationship
24   started. I don't have knowledge of that, but the most
25   recent one was in May, to the best of my knowledge.

Page 100

1    Q   So when you started at Vision?
2    A   Correct.
3    Q   Okay.
4    A   Well, I didn't start at Vision in May. I
5    started in June.
6    Q   And are you selling OTC securities at Vision?
7    A   I don't sell OTC securities, no.
8    Q   Okay. We mentioned that Randy Jones is over
9    at Vision with you.
10   Do you know David Jarvis?
11   A   Yes.
12   Q   Who is David Jarvis?
13   A   David's an attorney that -- he's an attorney.
14   Q   What sort of attorney is David?
15   A   I don't -- I don't exactly know. I mean, what
16   kind of attorney are you? I mean, I'm not sure how
17   to -- I mean, honestly --
18   Q   He's got a strong opinion on that.
19   A   No, I don't mean that. But David has a
20   specialty.
21   Q   And what's his specialty?
22   A   He, you know, is -- does a lot of
23   broker-dealer work.
24   Q   Okay. And when did you first meet Mr. Jarvis?
25   A   First met Jarvis in probably -- think back on

25 (Pages 97 to 100)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 101

1   this.  I probably first met him back in late '90s maybe,
2   2000.
3       Q   And have you ever worked with Mr. Jarvis?
4       A   Yes.
5       Q   And where did you work with Mr. Jarvis?
6       A   I worked with him for a time at GunnAllen, and
7   then I worked with him for a time at Legent/COR, and
8   then I worked with him for a time at Alpine.
9       Q   And have you worked with him since you left
10  Alpine?
11      A   Yeah, just most recently.
12      Q   Doing what?
13      A   Well, when you say -- like, work for the same
14  company?
15      Q   Yeah.
16      A   Yeah.  At -- at Vision.
17      Q   So Mr. Jarvis is working at Vision now also?
18      A   He is.
19      Q   And what's he doing there.
20      A   He's doing Section 5 reviews.
21      Q   And is Mr. Jarvis providing any legal services
22  for you personally?
23      A   Right at the moment?
24      Q   Yeah.
25      A   He was, but I don't know that he's doing

Page 102

1   anything for me right now.
2       Q   When did he last provide legal services for
3   you?
4       A   For me personally, I guess not terribly long
5   before we joined Vision.
6       Q   What sort of services was he providing?
7       A   You know, mostly what he was helping me do is,
8   you know -- I guess, yeah, that's privileged.
9           MR. BANKER:  Well, you can describe very
10          broadly what he might be helping you with, but, you
11          know, other than describing the subject matter do
12          not disclose detail.
13      A   He -- he definitely did work on when I was
14  contemplating buying Ziv.
15  BY MR. SUSMAN:
16      Q   What sort of work?
17      A   Help draft an LOI.
18      Q   Do you know if Mr. Jarvis represented John
19  Hurry?
20      A   Not that I'm aware of.
21      Q   Do you know if Mr. Jarvis ever represented
22  Alpine?
23      A   I know he worked at Alpine.  I don't really
24  know the nuance of representation, but he worked at
25  Alpine for sure.

Page 103

1       Q   And he currently works at Vision?
2       A   He does.
3       Q   Steve Gribben, do you know Steve Gribben?
4       A   I do.
5       Q   How long have you known Steve Gribben?
6       A   I've known Steve -- I'm trying to remember the
7   exact year.  I -- well, I want to say it's 2011, I
8   think, that -- I was introduced to him when I sold the
9   Legent business to the privileged equity group in LA,
10  COR.
11      Q   And is Mr. Gribben an attorney as well?
12      A   He is.
13      Q   And does he do the same kind of work as
14  Mr. Jarvis?
15      A   Among things that he does, some -- some of
16  that type of stuff.  He does -- I think he does a little
17  bit more transactional stuff, but he does Section 5.
18      Q   Have you been working with Mr. Gribben since
19  you left Alpine?
20      A   I was working with him for a time; again, on
21  the Ziv acquisition.
22      Q   Was he providing legal services to you?
23      A   Yes.
24      Q   And is Mr. Gribben working at Vision now?
25      A   No.

Page 104

1       Q   Has he provided any services for Vision as far
2   as you know?
3       A   No.
4       Q   But you, David Jarvis, and Randy Jones are all
5   at Vision now; correct?
6       A   That is correct.
7       Q   And mere happenstance that you-all ended up
8   there at the same time, or is there some sort of
9   connection?
10      A   Well, the -- Bob Jersey at Gar Wood introduced
11  Randy and I.  And he met Randy independent of myself.
12  And my understanding from Bob Jersey contacted me --
13  do you want me to go through this?
14      Q   Go on.  Yeah, please.
15      A   So I had gotten a call -- I'm trying to stick
16  to the -- so I got a call -- the whole thing, like I
17  said, I didn't know anything about Ziv.  I got a call
18  from Curt Kramer and Steve Czarnik about Ziv.
19          So I said, "Yeah, I would have been interested
20  in doing it."
21          We couldn't put a deal together.  Couldn't
22  agree on a price.  I never tried to raise a dollar.
23  Never got an LOI executed.  Did I desire to buy the
24  firm?  Yeah.  I thought it might be a good opportunity
25  if you could buy it at the right price.

26 (Pages 101 to 104)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 105

1      So the deal died. Right? So then there's
2  sort of Ziv part two where Czarnik resurrects the deal
3  and says, "Oh, I think there's still a deal to be done
4  here."
5      Still couldn't agree on price. Never tried to
6  raise a dollar. Never executed an LOI.
7      During sort of resurrection part two, I get a
8  phone call from this guy Bob Jersey. And, actually, I
9  peripherally had met him literally 25 years ago. He
10  used to work for ABN AMRO that used to execute on some
11  transfers --
12      MR. BANKER: Wait. Wait. Wait. Used to work
13  for what?
14      THE WITNESS: ABN AMRO in Chicago.
15      MR. BANKER: You got to -- how do you spell
16  AB --
17      THE WITNESS: A-B-N, the letters A-B-N. It's
18  a Dutch bank.
19      A   So he used to work for ABN AMRO that uses to
20  do a lot of options execution around the street. So
21  they used to do our option execution at Sterne Agee. So
22  I had met him years ago, peripherally.
23      But then he says, "Hey, my
24  understanding is you're a guy to talk to. I'm trying to
25  buy a clearing firm right now, and I need a CEO for a

Page 106

1  clearing firm." And he starts to describe the firm
2  without saying who it is, and then I immediately because
3  of some characteristic things, I was like, "Wait. Stop.
4  I know the firm you are talking about. I've tried to
5  put a bid in on the firm. So I don't want to get in any
6  kind of conflict here."
7      So that's -- and my understanding is that Bob
8  Jersey was referred to me by Rick Nummi. That's my -- I
9  don't know that for sure, but that's my understanding.
10      Q   Just to complete that circle, who is Rick
11  Nummi?
12      A   Rick is a -- he was a fellow board member
13  towards the end with me at Alpine, and he's somebody
14  that I've known him for probably -- probably met him in,
15  I don't know, you know, 2005 or something like that.
16      Q   Have you been in contact with Mr. Nummi since
17  you left Alpine?
18      A   Yeah.
19      Q   What have been the nature of those
20  communications?
21      A   I think, you know, there was a little bit
22  about Ziv because he was doing work with -- with
23  Gar Wood. They were trying to buy Ziv, completely
24  independent of me. I mean, like I said, they just
25  called and said they needed a CEO.

Page 107

1      So I think Rick did due diligence on behalf of
2  Gar Wood on it. And my understanding -- and I've never
3  seen this, but my understanding is they executed an LOI,
4  but I don't think a deal ever got done.
5      Q   And so you spoke to Rick Nummi about your
6  potential acquisition of Ziv; correct?
7      A   No.
8      Q   So tell me more about your communications with
9  Rick Nummi?
10      A   That was pretty much it, you know. He was
11  working for Bob Jersey at Gar Wood doing certain things,
12  and I think he had the same kind of -- and I'm telling
13  you what I think. And, look, you can ask Rick this.
14  But I think he had the same sort of relationship to some
15  extent that he had with Gar Wood that he had with maybe
16  Alpine/Scottsdale where Rick had some kind of program
17  where -- and one of the things that was never clear to
18  me, and, you know, again, maybe John can clarify this,
19  but is whether Rick was acting as a lawyer or acting as
20  a consultant.
21      But, you know, my understanding of it, at
22  Alpine, we paid Rick, like, a flat $5,000 a month fee,
23  and he did certain things. And I think he had the same
24  program at Gar Wood, and my understanding is he has it
25  at multiple firms.

Page 108

1      Q   Does he do any work for Vision?
2      A   No.
3      Q   Has Rick Nummi ever provided you with any
4  legal services?
5      A   Legal?
6      Q   Yeah.
7      A   No.
8      Q   Do you know if Rick Nummi ever represented
9  Alpine?
10      A   Yeah, he did represent Alpine.
11      Q   Do you know if Rick Nummi every represented
12  John Hurry personally?
13      A   I don't know that. I know he represented --
14  the thing where I think he was representation -- again,
15  in my opinion, I'm not a lawyer, but I think that this
16  one is -- and, again, John could validate this, but I
17  think he was -- he represented us in a -- right after I
18  joined there in a FINRA appeal.
19      Q   When -- when you were at Alpine, you were the
20  CEO; correct?
21      A   Yes.
22      Q   Were you also the CCO?
23      A   For a time, yes.
24      Q   And what does COO stand for?
25      A   Chief compliance officer.

27 (Pages 105 to 108)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 109

1    Q    And when were you the CCO?
2    A    I acted as the CCO probably about, to the best
3    of my recollection, from about six months after I joined
4    the firm, because our CCO left, and I didn't want -- you
5    know, just like John said earlier, they have a pretty
6    big target on us.  And so to me the two big targets are
7    the CCO and CEO.  So I just took on the role from a
8    title standpoint after our CCO left.
9    Q    Who was that?
10   A    Lea Farmer.
11   Q    And then as the CEO, were you responsible for
12   monitoring employees' e-mails?
13   A    Look, I think ultimately I'm responsible for
14   everything, but I didn't do the monitoring on a
15   day-to-day basis.
16   Q    Okay.  But it would be -- fall within your
17   bailiwick of responsibilities; correct?
18   A    I think -- again, I think underlying I'm
19   responsible for everything as a CEO.
20   Q    Including the monitoring of employee e-mails?
21   A    Everything -- that's part of it.  That was not
22   my particular job, but I think it was potentially part
23   of my job to ensure that it was going on.
24   Q    Does -- do you know if Vision has its own OTC
25   accounts?

Page 110

1    A    You have to define that for me.
2    Q    Do you know what OTC means?
3    A    Well, it can mean all kinds of stuff.
4    Q    Okay.
5    A    Why don't you tell me what it means.
6    Q    Oh, did you -- (makes sound)
7    A    I think in the context of this, yeah, I think
8    I know what you're -- what you're meaning.
9    Q    Tell me what -- tell me what you understand
10   OTC accounts to mean?
11   A    Can I ask you a question?  Do you mean
12   over-the-counter?
13   Q    That is what I mean.
14   A    Okay.  Why don't you just say it?  I mean,
15   so -- so the question is does Vision have
16   over-the-counter accounts, and I'm going to construe
17   that to mean do they have accounts that seem to conduct
18   the majority of their business in over-the-counter
19   securities.  The answer is yes.
20   Q    Okay.  And do you know how long they have been
21   in that business?
22   A    I know it predates me.  I don't know how long
23   it's been, though.
24   Q    Okay.  Are -- right.  Do you know if Vision
25   has any of its own customers?  And by that I mean not

Page 111

1    correspondent customers?
2    A    Oh, yeah.  They have a lot.
3    Q    How many would you estimate?
4    A    I don't know.  I've not really seen the count,
5    but they have a lot of house accounts.
6    Q    And how long have they had those, to the best
7    of your knowledge?
8    A    I think that firm's been around for a while.
9         THE VIDEOGRAPHER:  Mr. Frankel.
10        (Off-the-record discussion held.)
11   BY MR. SUSMAN:
12   Q    Do you know --
13        MR. SUSMAN:  One more time.
14   BY MR. SUSMAN:
15   Q    Do you know how many customers of Alpine
16   Vision has?
17   A    No.
18   Q    You have no idea?
19   A    No, I don't know.
20   Q    Do you know how many Alpine customers Vision
21   had prior to you arriving?
22   A    No.
23   Q    Do you know if the number of Alpine customers
24   at Vision has increased since you've been there?
25   A    Meaning customers that are also Vision

Page 112

1    customers?
2    Q    Yeah.
3    A    That had an account at Alpine or Scottsdale.
4    Q    Correct?
5    A    I think it's increased.
6    Q    Okay.
7    A    Not by much, I don't think, though.
8    Q    And what do you attribute that increase to?
9    A    The fact that we've put a concerted effort as
10   an organization to conduct that business.
11   Q    To take that Vision -- that business away from
12   Alpine and Scottsdale?
13   A    Absolutely not.
14   Q    So what do you mean by to --
15   A    Conduct the business.
16   Q    -- conduct the business?  What do you mean?
17   A    All these accounts have -- they have accounts
18   everywhere they can get accounts.  So if Alpine and
19   Scottsdale is doing a great job with their customers,
20   their customers aren't going to go anywhere.
21        Quite frankly, I would prefer that Alpine and
22   Scottsdale stay around.
23   Q    Did Vision, in fact, hire you to try and lure
24   away Scottsdale and Alpine customers?
25   A    No.

28 (Pages 109 to 112)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 113

1     Q   Have you, in fact, been contacting Alpine and
2  Scottsdale's customers to take them to Vision?
3     A   Ask the question again.
4        (Requested portion of the record was read back
5  by the Reporter.)
6     A   I don't know exactly who is an Alpine and
7  Scottsdale customer at this juncture, but I do know that
8  I have spoken to a few customers that at one time were
9  Alpine or Scottsdale customers.
10 BY MR. SUSMAN:
11    Q   Who are those?
12    A   You know, the couple that come to mind to me
13 is, like I said, the -- the Chicago Ventures, they tried
14 to get an account there, supposedly before I got there,
15 but they couldn't get an account open.  So they got an
16 account open after I got there.
17       I have talked to the PowerUp group.  They had
18 an account there before I got there.  Trying to sit
19 there and think -- I'm trying to think who -- who was it
20 opened that I know was a customer.
21    Q   Do you know if any of these accounts came from
22 Randy Jones?
23    A   No.  I don't really know offhand.  Like I
24 said, they -- they had a fair amount of accounts opened
25 before we got over there.  The -- I will tell you, I

Page 114

1  mean -- I'm just trying to be transparent -- what
2  probably changed, it was less about opening accounts and
3  more about the sort of profile of the business that they
4  were doing with those accounts changed a little bit.
5     Q   I'm going to call this Exhibit 12.
6        (Exhibit Number 12 marked for identification.)
7  BY MR. SUSMAN:
8     Q   This is a e-mail from Chris Frankel to Chris
9  Frankel dated October 7, 2018.  It's got a number of
10 attachments.  I didn't include all the attachments,
11 honestly.  The attachments that are included are the
12 Alpine Securities 2016 financial statement and reports,
13 the number of accounts in dollar values, and the
14 fidelity bond 2017 PDF.
15       MR. BANKER:  For -- for the record, this
16 exhibit is confusing to me because it's got Hurry
17 Bate stamps --
18       MR. SUSMAN:  Correct.
19       MR. BANKER:  -- with the confidential marking
20 three pages in, but it doesn't have anybody's Bate
21 stamp on the first two pages.  And the second page
22 is blank.  So I don't know what the second page is
23 supposed to be.
24       MR. SUSMAN:  Second page is blank, which is
25 irrelevant.  The first page, though, is the e-mail.

Page 115

1        It does not have a Bates stamp on it.
2  BY MR. SUSMAN:
3     Q   But if you look at this, Mr. Frankel, do you
4  have any reason to believe you did not send these
5  documents to yourself --
6     A   No.
7     Q   -- on October 7th?
8     A   No.  I know I did.
9     Q   Okay.  And if you look at it -- turn the third
10 page, third page is Bates stamped Hurry 174.
11       Do you see that?
12    A   Yes.
13    Q   What is that?
14    A   It appears to be a list of the number of
15 accounts at different firms, including Alpine and
16 Scottsdale, the market value of the securities, the cash
17 or money market value and the market value of cash,
18 which I assume they are talking about fee credits.
19    Q   And is that -- that's a document --
20    A   Wait a minute.  Wait a minute.
21    Q   Yeah.
22    A   Wait a minute.  Oh, market value plus cash.
23 Okay.
24    Q   All right.  And it's a document received after
25 signing the nondisclosure agreement?

Page 116

1     A   I -- I've never received this thing.
2     Q   You never received this?
3     A   Well, I've never looked at it.  I can't say I
4  never -- I received it in conjunction with this
5  application, but I've never looked at it before.
6     Q   But you've actually received it, though?
7     A   Yeah.  Yeah.  I received it.
8     Q   As part of your employment with Alpine;
9  correct?
10    A   Yes.
11    Q   Okay.  Is this information that you consider
12 confidential?
13    A   Yeah.  I think it's confidential.
14    Q   And this is information concerning Alpine and
15 Scottsdale's business; correct?
16    A   Yes.
17    Q   And this is information that's not publicly
18 available, to the best of your knowledge?
19    A   Um -- I'm trying to think of whether this is
20 or not in the call reports.  I don't think it is.  I
21 don't think it's publicly available.
22    Q   And you sent this document to yourself on
23 October 7, 2018; correct?
24    A   Yep.
25    Q   And why did you send to it yourself?

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 117

1    A   Again, I was looking to help somebody become a
2  nonbank IRA custodian.  Believe me.  I regret sending it
3  to myself.  The attachments had nothing to do with it.
4    Q   So what purpose did it have to send this
5  document to yourself?
6    A   Well, there was two things.  Is one I had done
7  business with Ascensus and their derivatives before.
8    Q   All right.
9    A   And so I wanted to make sure that I had the
10  contacts and an idea of sort of what was needed to get
11  an application to be a nonbank custodian.  I assure you,
12  it nothing to do with any of the attachments to this
13  e-mail.  Never sent them to anybody, never forwarded
14  them to anybody.  Like I said, I wish I never sent it to
15  myself.
16    Q   And if you turn to the next document, which is
17  Bates stamp Hurry 133 through 173.
18    A   133?  I got 174 is -- oh, okay.  Here we go.
19    Q   Yeah, 133 through 173.
20    A   Yep.
21    Q   Which I understand is all part of one
22  document?
23        MR. BANKER:  The Bates numbers are out of
24  order.
25        MR. SUSMAN:  Are they?

Page 118

1        MR. BANKER:  Yeah, it's --
2        THE WITNESS:  Well, there is a 1 -- there is
3  a --
4        MR. BANKER:  It goes from 174 --
5        THE WITNESS:  174.
6        MR. BANKER:  -- to 133.
7    A   That first document you asked me about,
8  Jordan, with the number of accounts and stuff.
9        MR. SUSMAN:  Correct.  We're going -- then we
10  turn the page, and it goes to 133.
11        MR. BANKER:  Right.  I'm just saying that
12  it's --
13        MR. SUSMAN:  Yeah, correct.
14        MR. BANKER:  -- it's not sequential.
15        MR. SUSMAN:  That's correct.  We are in
16  agreement.
17        So that the next document is the next
18  attachment, and it's -- it's Hurry 133 through 173.
19  BY MR. SUSMAN:
20    Q   Which would be the Broker-Dealer Guard Blanket
21  Fidelity Bond for Security Dealers Declarations.
22        Do you see that?
23    A   Through 173?
24    Q   Correct.
25    A   Yeah, I'm with you.

Page 119

1    Q   All right.  So what is that document?
2    A   It is the blanket fidelity bond for Alpine
3  Securities.
4    Q   And does this contain information concerning
5  Alpine's business?
6    A   I don't know that it really does.  I don't --
7    Q   No?
8    A   This thing -- these things are so boilerplate,
9  and every firm's required to have it.  I don't really
10  think that there is that much in the way of confidential
11  information in here.
12        Again, I've never looked through the whole
13  thing.  So I can't tell you that for sure, but I've seen
14  a million of these things, and I haven't really seen a
15  great deal of difference between one and another.
16    Q   Do you consider it to be public -- is it
17  publicly available, to the best of your knowledge?
18    A   No.  To the best of my knowledge, it's not
19  publicly available.
20    Q   And you, in fact, sent it to yourself on
21  October 7, 2018; correct?
22    A   Yes.
23    Q   And then the final document starts at Hurry
24  175 through 201.  Do you see that?
25    A   Yes.

Page 120

1    Q   And what is that?
2    A   Well, let me see.  175 through 201.  I assume
3  that through 201 is part of the 2000 -- 10-1-2015 to
4  9-30-2016 audited financials.
5    Q   Correct.  What is that?
6    A   What is it?
7    Q   Yeah.
8    A   The annual audited financials.
9    Q   Okay.  Good.  And is this information -- does
10  this document contain information related to Alpine's
11  business?
12    A   Yes.
13    Q   Is this information publicly available?
14    A   Some of it is.
15    Q   But not all of it; correct?
16    A   No, not all of it.
17    Q   And is it -- and that nonpublic information is
18  the type of information that Alpine would generally try
19  to keep private; correct?
20    A   If you say so.
21    Q   Well, yes or no?
22    A   I mean, I --
23        MR. BANKER:  Object to form.
24    A   Well, I mean, I heard Mr. Hurry testify to
25  that earlier.  So I'll go with him on that.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 121

BY MR. SUSMAN:

1  Q   Okay.  And you sent this to your personal
2  e-mail on October 7, 2018; correct?
3  A   Correct.
4  Q   And you've already told us why.  You want to
5  tell us again why you sent that to yourself on
6  October 7, 2018?
7  A   Yeah, because I was going to help another
8  group try to become a nonbank custodian.
9  Q   Okay.  So you were using it for personal
10  reasons?
11  A   I was using the contacts for personal reasons,
12  yes, readily admit, but I also knew these people for
13  20-plus years.
14  Q   Which contacts were you using for personal?
15  A   The people at Ascensus.
16  Q   I see.  And, again, this --
17  A   But I was also working on this for Alpine.
18  You know, in all fairness, I was working on the same
19  thing.
20  Q   In October --
21  A   No, no.  At the time, I guess it was still
22  open, but I did the same thing before.  We used to get
23  prototype documents from them at Sterne Agee.  But, yes,
24  this was definitely for personal benefit.

Page 122

1  Q   And, again, this e-mail and the attachments,
2  you did not delete those until this lawsuit began;
3  correct?
4  A   Correct.
5  Q   And you did not deliver it to -- to plaintiffs
6  until this lawsuit began; correct?
7  A   Correct.
8  Q   All right.
9  (Exhibit Number 13 marked for identification.)
10  MR. SUSMAN:  Call this Exhibit 13.
11  BY MR. SUSMAN:
12  Q   E-mail from Chris Frankel to Chris Frankel
13  dated July 13, 2017 Bates stamped Hurry 215 through 222.
14  This is a document -- the attachment is a consulting
15  agreement for Steven Gribben.
16  Do you see that?
17  A   Yes.
18  Q   And this is a document you sent to yourself
19  after you signed the non- -- nondisclosure agreement
20  with Alpine; correct?
21  A   Um-hum.
22  Q   That's a "yes"?
23  A   Yes.  Sorry.
24  Q   Okay.
25  A   Probably because I needed to execute it, scan

Page 123

1  it, and send it back.
2  Q   Is this --
3  A   Check your e-mail.
4  Q   Does this document contain confidential
5  information regarding the company's business?
6  A   No, not really that I'm aware of.
7  Q   You don't believe that the consulting
8  agreement would be considered confidential?
9  A   I don't really see anything to be gained or
10  lost by anybody knowing about a consulting agreement.
11  Q   Okay.  So you don't think that consulting
12  agreements are generally things that Alpine would try to
13  keep confidential?
14  A   I don't know necessarily.  Obviously, I was
15  the CEO of Alpine, and I didn't -- it didn't -- to me,
16  it wasn't confidential.  They might change their mind
17  now.  They might have a different mind-set before.
18  Q   Do you believe that this -- this document
19  would fall within the nondisclosure agreement?
20  MR. BANKER:  Object to form.
21  A   I'm not sure.
22  BY MR. SUSMAN:
23  Q   Okay.
24  A   I would -- I would -- I'm supposed to -- I
25  should shut up.  I am.  I think it's not in the public

Page 124

1  domain.  But, I mean, to me, there is nothing -- there
2  is no great state secret about it.
3  Q   And, again, you didn't delete that until this
4  lawsuit commenced; correct?
5  A   That is correct.
6  Q   And you did not deliver it to plaintiffs until
7  this lawsuit commenced; correct?
8  A   Correct.
9  Q   All right.  This is exhibit -- what am I on,
10  14?  14.
11  (Exhibit Number 14 marked for identification.)
12  BY MR. SUSMAN:
13  Q   It's an e-mail from Chris Frankel to Chris
14  Frankel dated May 2nd, 2017, Bates stamped Hurry 229
15  through 238.
16  Can you tell me what this attachment is to the
17  e-mail you sent to yourself?
18  A   Yeah.  Looks like it's an inquiry from FINRA.
19  Q   And this is something you received after
20  signing the nondisclosure agreement; correct?
21  A   Yeah.
22  Q   Okay.  And does this inquiry letter from FINRA
23  contain information regarding Alpine's business?
24  A   I assume so, yes.
25  Q   And is this -- this document from FINRA, do

31 (Pages 121 to 124)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 125

1    you believe it's confidential?
2        MR. BANKER:  Object to form.
3    BY MR. SUSMAN:
4        Q   I'll help you out.  If you go to Hurry 231,
5    look at the letter itself, not the upper right-hand
6    corner, but the upper left-hand corner.  Under "FINRA,"
7    it says "Confidential."
8        Do you see that?
9        A   Yes.
10       Q   Do you believe this was sent to FINRA in
11   confidence?
12       A   It wasn't sent to FINRA in confidence.  It was
13   from FINRA.
14       Q   Thank you.
15       It was sent to Alpine from FINRA in
16   confidence; correct?
17       A   It was sent to me.
18       Q   It was sent to you in your capacity as the
19   CCO; correct?
20       A   Correct.
21       Q   In confidence; correct?
22       A   Yes.
23       Q   And this talks a lot about orphaned accounts,
24   as I understand that.  Do you know what a -- what that
25   would mean, an orphaned account?

Page 126

1        A   I think in the context of this they were
2    talking about there was a correspondent firm that we had
3    called ACAP that basically did a -- I don't know if they
4    did a BDW or they were thrown out of business --
5    actually, I think they were -- I can't remember which
6    one it is.  Maybe John recalls.
7        One way or another they had some regulatory
8    issues, and then we were stuck with all these accounts.
9    And so when they say orphaned, the firm and the original
10   brokers were not attached to the account.
11       Q   Is this information that's publicly available?
12       A   What part?
13       Q   The --
14       A   The fact that ACAP went out of business?
15   Sure.  The fact that ACAP cleared at Alpine.  Sure.
16       Q   What about the information regarding the
17   orphaned accounts?
18       A   I'm not sure what information.
19       Q   Let me -- let me ask it this way:  Do you
20   believe that --
21       A   I don't know --
22       Q   -- any regulatory request is confidential?
23       A   I don't know if I would say "any," but I think
24   most are.
25       Q   Well, how about this one?

Page 127

1        A   Is the request confidential?  Yeah.  Yeah.  I
2    think it's confidential.
3        Q   And you sent this to yourself on May 2nd,
4    approximately two months after you initially received
5    it; correct?
6        A   Yeah.  May 2nd, 2017.
7        Q   And you received it in March 2017; correct?
8        A   Um-hum.
9        Q   Is that a "yes"?
10       A   Yes.
11       Q   Okay.  And do you have an understanding why
12   you sent it to yourself two months after you received
13   it?
14       A   Let me take a look.  I'm sure it was something
15   that I was working on, but I'm trying to see why.  I
16   just don't recall.  I mean, again, my -- my best guess
17   is it was a document I was working on on behalf of the
18   firm.
19       Q   Two months after you received it?
20       A   Yeah.
21       I mean, you guys want to know for sure.  I'm
22   sure you could look and see when our response was to it.
23   And if there were any supplemental responses, it would
24   be part of the firm's books and records.
25       Q   And just to be clear, you did not delete this

Page 128

1    upon leaving Alpine; correct?
2        A   No.
3        Q   And --
4        A   Didn't know I had it.
5        Q   -- you did not delete this until this lawsuit
6    commenced; correct?
7        A   Correct.
8        Q   And you did not deliver it to plaintiffs until
9    this lawsuit commenced; correct?
10       A   Say the last one again, Jordan.  Did not
11   deliver it until the lawsuit commenced?
12       Q   Correct.
13       A   Correct.
14       Q   This is Exhibit 15.
15       (Exhibit Number 15 marked for identification.)
16   BY MR. SUSMAN:
17       Q   This is an e-mail from Chris Frankel to Chris
18   Frankel dated April 12, 2017, Hurry Documents 223
19   through 228.
20       What's your understanding of this document?
21       A   I actually kind of recall some stuff about
22   this because this was something I had never really done
23   before, that this was -- my recollection was that I
24   think this was right -- I think it was after the initial
25   FINRA arbitration came out against Scottsdale.  I don't

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                              13ba10ce-bc42-4e36-9972-30aa0e79fb15

**Page 129**

1  know if it was the initial or the appeal.  I just can't
2  remember which one it was.
3      But our attorney that was engaged in that,
4  Kevin Harnisch -- and, you know, I'm sure John was
5  involved because he was part of the subject matter that
6  talked about hiring a PR firm, and I think this is a
7  contract for the PR firm.  So they were going to get
8  hired by Alpine and Scottsdale.  So it was asking me to
9  sign off on behalf of Alpine, I believe.
10     Q   And do you consider this to be information
11  concerning Alpine's business?
12     A   Yes.  Sure.
13     Q   And information concerning Scottsdale's
14  business?
15     A   Yes.
16     Q   Okay.  And this is something that would not be
17  known to the public; correct?
18     A   What, that they hired a PR firm?
19     Q   Correct.
20     A   Yeah, not that I'm aware of.
21     Q   And to the best of your knowledge, you did not
22  delete that document until after this lawsuit commenced;
23  correct?
24     A   No.  It's like -- this is typical.  If I had
25  to sign something, this is what -- the way I would get

**Page 130**

1  it done if I wasn't in the office.
2      Q   And you did not deliver it to plaintiffs until
3  after this lawsuit commenced; correct?
4      A   Correct.
5      Q   All right.
6      A   Nor has it ever been shared with anybody.
7      Q   This is Exhibit 16.
8         (Exhibit Number 16 marked for identification.)
9  BY MR. SUSMAN:
10     Q   E-mail from Chris Frankel to Chris Frankel
11  dated January 3rd, 2017, Bates stamped hurry 239 through
12  240.  This is an e-mail from stacie.jungling --
13  jungling --
14     A   Jungling.
15     Q   -- @finra.org.  What's your understanding of
16  this e-mail from Ms. Jungling?
17     A   Give me a second.  So this appears to be an
18  e-mail from Ms. Jungling regarding an item in Request
19  Manager.  And Request Manager is a tool for FINRA
20  members that is provided by FINRA for the -- when they
21  request things in the examination process or on an
22  ongoing request, they put it in there.
23        And so, essentially, you could have looked in
24  there and seen this.  So this is her cutting and pasting
25  it into an e-mail for me so I didn't have to go look at

**Page 131**

1  Request Manager.
2      Q   And is this information concerning Alpine
3  business?
4      A   Yes.
5      Q   Is this information generally known?
6      A   No.
7      Q   And --
8      A   Well, the fact that they clear for these firms
9  is known, but the fact that they -- according to her,
10  that they were missing a few due diligence documents
11  would not be generally known.
12     Q   Right.  The fact that they are getting this
13  request from FINRA would not be generally known;
14  correct?
15     A   That is correct.
16     Q   And cannot be discovered anywhere as far as
17  you know?
18     A   Publicly?
19     Q   Yeah.
20     A   No.  No.  Not that I'm aware of.
21     Q   And, again, you did not delete this e-mail
22  until this lawsuit commenced --
23     A   No.
24     Q   -- to the best of your knowledge; correct?
25     A   No.

**Page 132**

1      Q   You did not return it to plaintiffs until this
2  lawsuit commenced; correct?
3      A   Correct.
4         (Exhibit Number 17 marked for identification.)
5  BY MR. SUSMAN:
6      Q   Call this Exhibit 17.  It's an e-mail from
7  Chris Frankel to Chris Frankel dated August 28th, 2016,
8  Hurry 241 through 242.  Have a look at this.
9         Tell me what your understanding of this e-mail
10  is.
11     A   This is an e-mail from Ross Marlin at FINRA to
12  me.
13     Q   Who is Ross Marlin?
14     A   Some FINRA staffer.
15     Q   Okay.  And what's the nature of this e-mail?
16     A   2016, oh, this was -- we had thought about at
17  the time trying to move the retail business back in 2016
18  from Alpine to Scottsdale, and this is, I guess, a
19  response where FINRA wanted to put us through the paces
20  on it and say that it was a material event, we needed to
21  file a 1017 to do it, and I can't remember whether it
22  was -- honestly, I'm trying to remember whether it was
23  Scott -- Alpine to Scottsdale or Scottsdale to Alpine.
24  I think it was Scottsdale to Alpine, as a matter of
25  fact.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 133

1      And they were trying to -- even though the
2  accounts were all carried by Alpine, they were trying to
3  basically tell us that we needed to potentially file a
4  1017.
5      Q   So this is information regarding Scottsdale
6  and Al- -- and Alpine; correct?
7      A   Yes.
8      Q   And is this information that would be
9  generally known to the public?
10     A   No.
11     Q   And would this inquiry from Ms. --
12 Ms. Marlin -- no, Mr. Marlin.
13     A   I can't remember what it is either.
14     Q   -- from Ross Marlin at FINRA be publicly
15 available?
16     A   No.
17     Q   Okay.  And you e-mailed it to yourself on
18 August 28th, 2015?
19     A   It appears to be so.
20     Q   All right.  And you did not delete this until
21 this lawsuit commenced; correct?
22     A   Correct.
23     Q   And you did not return it to plaintiffs until
24 this lawsuit commenced; correct?
25     A   Correct.

Page 134

1      MR. SUSMAN:  Call this Exhibit 18.
2      (Exhibit Number 18 marked for identification.)
3  BY MR. SUSMAN:
4      Q   This is an e-mail from Chris Frankel to Chris
5  Frankel dated August 15, 2016 -- dated -- Hurry 255
6  through -- actually 255 through 256, and then the
7  attachment does not have Bates stamps on it.  However, I
8  will -- and this is one that we were talking about.
9      A   I remember this is the one that you
10 referenced.
11     Q   Yeah, this is the one I referenced.
12     MR. BANKER:  These show up somehow
13 electronically --
14     MR. SUSMAN:  Correct --
15     MR. BANKER:  -- but not -- you can't --
16     MR. SUSMAN:  It's a total pain in the butt
17 too.  And one way that they were produced by either
18 you or us, it had the highlighted but not -- first
19 of all, in this deposition they were produced
20 without any highlights.  Then there is also you can
21 produce it with just the highlights, and then --
22     MR. BANKER:  Okay.
23     MR. SUSMAN:  -- then that's why there is not
24 the Bates stamp on it is that to actually get the
25 stickies, they have not been produced.  So here

Page 135

1  they are now.  I will, though, represent that these
2  are, in fact, the complete and accurate attachments
3  for the -- for the exhibit.
4      MR. HOLDER:  What's the starting Bates number
5  again?
6      MR. SUSMAN:  255.
7  BY MR. SUSMAN:
8      Q   And, again, yeah, they -- and this e-mail was
9  sent by Mr. Frankel to himself several times, but let's
10 just deal with this one.
11     Mr. Frankel, do you see what I'm looking at
12 here?
13     A   Yes.  The stuff with the sticky notes on it?
14     Q   Yeah.  What's your understanding of what
15 those -- what those documents are?
16     A   Well, these are our customers -- our customer
17 fee schedule at Alpine, and I think -- I don't know if
18 Scottsdale's is included in here or not; but it is
19 related to conversations between, you know, Henry
20 Diekmann, myself, and John about tweaking the fee
21 schedule.
22     Q   Okay.  And this actually contains what appears
23 to be John Hurry's notes on it; correct?
24     A   Yeah.  It appears to be, and that's pretty
25 typical of, you know, what John might do if I asked his

Page 136

1  opinion about something.
2      Q   So if you look at the top page where it's an
3  e-mail from John Hurry to you, Mike, and Henry Diekmann,
4  dated August 14th, and it says "Some thoughts on
5  changes.  Please advise," so that seems to corroborate
6  with your understanding that these were actual notes
7  from John Hurry on these themes; correct?
8      A   Yeah, well, it appears if you look down
9  before, it's -- where I'm saying "John/Henry, Attached
10 are the fee schedules," blah, blah, blah, "if you guys
11 have ideas for changes, just write them on," et cetera,
12 et cetera, et cetera.
13     Q   Okay.
14     A   So these do appear to be John's sort of
15 suggestions as it relates to the question that I posted
16 to him.
17     Q   And are these sort of internal discussions
18 regarding fee schedules something that are publicly
19 known?
20     A   Are the internal discussions publicly known?
21     Q   Yeah.
22     A   No.
23     Q   And you sent this document to yourself on
24 August 15, 2016; correct?
25     A   Correct.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 137

1    Q   And do you know why you did that?
2    A   I was probably printing it out to look at
3  stuff.
4    Q   Did you ever show this document to anyone?
5    A   No.
6    Q   Did you tell plaintiffs that you were sending
7  this document to your personal e-mail account?
8    A   No.
9    Q   And, again, when you left Scottsdale, did
10  you --
11    A   I never was at Scottsdale.
12    Q   Thank you.
13       When you left Alpine, you did not delete this
14  document, to the best of your knowledge; correct?
15    A   No.
16    Q   No, that's not correct?
17    A   No, I meant to affirm -- I did not delete it
18  when I left is what I was trying to say.
19    Q   And you did not deliver this to plaintiffs
20  until this lawsuit commenced; correct?
21    A   That is correct.
22    Q   All right.  Did you ever send this document to
23  FINRA?
24    A   I don't think so.  I know I sent -- I will
25  tell you that that I did send one document that they

Page 138

1  8210'd me because they asked if I had anything regarding
2  fee schedules.  And whether it was this or something
3  else, I'm not sure.
4    Q   Okay.  So --
5    A   It was pretty innocuous, though.
6    Q   Well, you previously said you don't share
7  these documents with anyone; correct?
8    A   Not that I'm aware of.  I can -- I can try to
9  check and see which one it is.
10    Q   Going to make it really easy.  Call this
11  Document 19.
12       (Exhibit Number 19 marked for identification.)
13  BY MR. SUSMAN:
14    Q   The correspondence between you and Heather
15  Freilburger (as pronounced) at FINRA.
16    A   Freiburger.
17    Q   Freiburger.  Thank you.
18       Where it looks like you are forwarding this to
19  Ms. Freiburger.  Do you see that?
20    A   Yes.
21    Q   You sent that to Ms. Freiburger on January 24,
22  2014.  Do you recall sending it to Ms. Freiburger?
23    A   Yes.  I don't recall this particular document
24  because, like I said, when I looked at it there was no
25  stickies.  But I do remember forwarding a document

Page 139

1  pursuant to the regulatory request.
2    Q   And what was the regulatory request?
3    A   I would have to look it up and see, but I
4  think it was asking if I had any documents in my
5  possession related to our fee schedule.
6    Q   And --
7    A   And this was from years before, but --
8    Q   When did you receive that request?
9    A   You know, I would imagine it was probably
10  somewhere close to the date sent.
11    Q   And have you had other communications with
12  FINRA about plaintiffs in this matter?
13    A   In which matter?
14    Q   The plaintiffs in this matter.  Have you had
15  any --
16    A   Oh, about the plaintiffs --
17    Q   Yeah.
18    A   -- in this matter.  I got OTR'd back in I
19  think it was the first couple of days in March maybe.
20    Q   March of 2019?
21    A   Yes.
22    Q   What was the nature of the OTR?
23    A   It was really about the -- the exam that
24  was -- that FINRA was conducting; and I think they
25  started conducting it, you know, sometime in the fall,

Page 140

1  early winter towards -- whenever the exam was I think at
2  the end of 2018.
3    Q   The exam of who?
4    A   Alpine.
5    Q   And --
6    A   It was nothing about Scottsdale.
7    Q   -- when did FINRA first contact you regarding
8  Alpine regarding that exam?
9    A   Maybe a week before or something like that.
10  Maybe two weeks.
11    Q   And --
12    A   I don't recall.
13       MR. BANKER:  And, Chris --
14       THE WITNESS:  I'm sorry.
15       MR. BANKER:  Chris, I don't know the rules on
16  this stuff, but, you know -- and I don't know the
17  extent to which you're permitted to disclose.
18    A   I'm not -- I can -- I can disclose whatever I
19  want.
20       MR. BANKER:  Okay.  If you say so, but I
21  don't --
22    A   Yes.  No.
23       MR. BANKER:  I don't know what the rules are.
24    A   There is no secret there.  It's part of the
25  record.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 141

1  BY MR. SUSMAN:
2      Q   All right.  You left Alpine October 31, 2018.
3  We have this e-mail that you sent to Heather Freiburger
4  January 24, 2019.  Do you have other communications with
5  FINRA regarding Alpine in that time frame?
6      A   Not that I recall, no.
7      Q   And between this e-mail on January 24, 2019,
8  and when you were OTR'd in March of this year, did you
9  have other communications with FINRA about Alpine?
10     A   Between January and March?
11     Q   Yep.
12     A   No, not that I'm aware of.
13     Q   So --
14     A   Certainly don't recall anything.
15     Q   -- any other communications with FINRA
16  regarding Alpine that you recall, as you sit here?
17     A   Um --
18     Q   That is, since you left Alpine?
19     A   Since I left Alpine?  I -- trying to think.
20  You know, yeah.  I did get a phone call several weeks
21  ago from the same individual, Heather Freiburger, saying
22  that they were going to send me an 8210, but I haven't
23  seen anything.
24     Q   What's an 8210?
25     A   Basically, produce or else or answer or else.

Page 142

1      Q   Answer what?
2      A   Their questions, whatever questions they have.
3      Q   Do you know what the question concerned?
4      A   No, I don't.
5      Q   And when you say "or else," what?
6      A   Well, basically, that you have no choice but
7  to answer their questions when they pose them to you.
8  It's just an official way of saying, "Here's our
9  questions.  Answer."
10     Q   Are they questions regarding Alpine?
11     A   Yeah, I would assume so.
12     Q   Why do you assume so?
13     A   Because I think she said that it was about
14  Alpine.  I guess it's about the exam.
15     Q   Looking at Exhibits 18 and 19 --
16     A   You're talking about these two things.
17     Q   Yeah, these two things.  The original --
18     A   Yeah.
19     Q   -- the original e-mails went from John Hurry
20  to you, Mike, and Henry Diekmann.  Mike's an attorney;
21  correct?
22     A   He is an attorney.
23     Q   Do you believe that these documents are
24  attorney-client privilege?
25     A   No.

Page 143

1      Q   Okay.
2      A   Not as I understand the privilege to be, but
3  I'm not an expert on it.  My understanding was I thought
4  it was just supposed to be for legal advice.  I don't
5  think there is anything wrong with anything -- look, I
6  could call a spade a spade.  I don't think there is
7  anything wrong with anything in these documents at all
8  whether they are John's comments or not.  He didn't do
9  anything wrong.
10     Q   Did you ever contemplate purchasing Alpine?
11     A   No.
12     Q   You never --
13     A   No.
14     Q   -- approached Mr. Hurry about purchasing
15  Alpine?
16     A   I talked to him about it.  I've talked to
17  him -- you know, I heard about that.  I wasn't in the
18  room.  I think I mentioned it to John -- you know, once
19  I remember mentioning it to him about potentially buying
20  in, not outright purchasing, and then we talked very
21  briefly -- I mean, we were probably talking about a 15-,
22  20-minute thing -- and he dismissed it that he was
23  talking about some of the issues that he was going
24  through, and I think, "Well, maybe you ought to" -- I
25  don't know if I said, "Sell to it me."

Page 144

1          I don't have the money to buy it, but I
2  thought that, you know, my advice to John at the time --
3  and this was probably -- I don't know exactly what the
4  time was, but I know what was surrounding it.  Was you
5  know, "John, you ought to -- if I were you I would be
6  thinking about slipping out of the pool quietly."
7      Q   What were the issues surrounding it that you
8  refer to?
9      A   That, you know, this was when at one point in
10  time that, you know, I think -- look, I don't want to
11  put words in his mouth, and I can't tell you, but I
12  think that John -- and I think rightly so, and I'm not
13  sure he deserved it either, but where you had the
14  government sniffing around, threatening -- potentially
15  threatening him with stuff.
16         And when you talk about a threat of, you know,
17  prospective jail time, I think you got to question, you
18  know, do I want to face that or not, and I think he was
19  questioning that.  I'm not saying that he invited me to
20  bid on the firm.  He never did any such thing.  But I
21  said, "Well, maybe you ought to think about selling it
22  and carry back a big note."  It was pretty damn
23  innocuous.
24     Q   And how long did that conversation last, about
25  15 minutes you said?

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 145

1    A   Oh, I don't even know if it lasted that long
2  because I kind of recall not his direct response but his
3  general response was that he thought it would just be
4  way too complicated to even think about doing that from
5  a tax standpoint, from other issues that were not
6  discussed and minutia.
7    Q   And that was the only conversation you ever
8  had about potentially buying into Alpine?
9    A   You know, we had a very brief conversation.  I
10  remember throwing it out there to him on the phone.  You
11  got to remember, John and I -- you know, for a long
12  time, I mean, too, I'd probably spend three or four
13  hours on the phone with him, you know, on a regular
14  basis.
15    Q   Had you prior to that ever considered
16  purchasing a broker-dealer?
17    A   Yeah.
18    Q   Which one?
19    A   Well, before I joined Alpine -- and, you know,
20  I talked to John about this too.  I told him what my
21  plans were before I joined there -- was I looked at
22  potentially purchasing a firm called Spartan that was
23  here in St. Petersburg, and I was going to maybe try to
24  take it self-clearing.  And then there was a clearing
25  firm -- and I can't even remember the name of it, but

Page 146

1  they really just cleared for proprietary business down
2  in South Florida that I considered purchasing as well.
3    Q   Do you recall the name?  If you don't --
4    A   Not the South Florida operation.
5    Q   Okay.  If you were to have bought into Alpine,
6  where would you have gotten the financing?
7    A   My bank account.
8    Q   You had sufficient funds?
9    A   Never discussed a number, but I wouldn't -- I
10  wouldn't write a check for any more money than I have.
11  It would be like rubber.
12    Q   What does that mean?
13    A   That means that, if you write a check for more
14  money than you have in the bank, the check doesn't
15  clear.
16    Q   So it bounces?
17    A   That's what some people say.
18    Q   That's what "like rubber" means?
19    A   Yes.
20    Q   So you left Alpine October 31st.
21    A   I left Alpine October 1st -- or August 1st.
22    Q   But then you continued as a consultant until
23  October 31st?
24    A   Correct.
25    Q   And when you were a consultant for -- for

Page 147

1  Alpine during that time that -- August 1st through
2  October 31st, did you consult at other places?
3    A   I think there was a little bit of overlap,
4  yes.
5    Q   Where at?
6    A   For Atlas Bank Panama.
7    Q   What did you do for them?
8    A   I was consulting for them.  Again, they had a
9  contract to purchase a broker-dealer that I think that
10  they executed back in September of 2017, and they were
11  trying to get FINRA approval to consummate the purchase.
12  They thought that a broker-dealer basically -- because
13  the firm used to self-clear.  What they -- they found
14  out, you know, about I would say 45 days after I signed
15  the agreement, they got the approval to purchase the
16  firm.  But then what they found out was FINRA told them
17  that they needed to go through a 1017 process to
18  self-clear.  So they never consummated the purchase.
19    Q   Were you interested in purchasing a
20  broker-dealer when you left Alpine?
21    A   Was I interested?
22    Q   Yeah.
23    A   I mean, yeah, I've always had a peripheral
24  interest in purchasing a broker-dealer, but it wasn't --
25  I wasn't necessarily on a mission to do it.  The two

Page 148

1  entities that I considered purchasing, I didn't seek
2  them out, you know.  I had shareholders at Quantex call
3  me and said, okay, you know, this looks like an
4  interesting opportunity.  And the same thing with Ziv.
5  I didn't seek it out.  I had people seek me out in it.
6    Q   Did they know that you were interested in
7  purchasing a broker-dealer?
8       MR. BANKER:  Object to form.
9    A   I don't -- you know, I don't know what they
10  would know or not know.  Not that I'm aware of.
11  BY MR. SUSMAN:
12    Q   And --
13       MR. BANKER:  Probably about time for a break.
14       MR. SUSMAN:  Let's take a five-minute break,
15  and I've got about 15 more minutes.
16       MR. BANKER:  Okay.  I'm not trying to rush
17  you, but every hour --
18       THE WITNESS:  I can keep going if you guys
19  want to keep going.
20       (Off-the-record discussion held.)
21       MR. BANKER:  Yeah, Chris, an hour is long
22  enough.
23       THE VIDEOGRAPHER:  Going off the record at
24  5:47.
25       (Off the record from 5:47 p.m. until

37 (Pages 145 to 148)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                          13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 149

```
1     5:56 p.m.)
2         THE VIDEOGRAPHER:  Going back on the record at
3     5:56.
4  BY MR. SUSMAN:
5     Q   Just want to circle back on things.  You
6  mentioned that you were contacted regarding purchasing
7  two broker-dealers; correct?
8     A   Correct.
9     Q   Did you put the word out there that you were
10 interested in purchasing a broker-dealer?
11    A   No.
12    Q   These were just out-of-the-blue calls to you?
13    A   Totally separate people.  The people that
14 contacted me on Quantex were people that -- the one guy
15 is a guy I've known for a long time, a guy named John
16 Tabacco.  He's a minority shareholder.  The two parties
17 have nothing to do with the other.
18    Q   And is it your understanding that Alpine and
19 Scottsdale are two of the most profitable broker-dealers
20 in the OTC market?
21    A   I don't know if I can quantify that.  I will
22 tell you that -- I -- I can't really comment to that.  I
23 could comment on the profitability of those as
24 broker-dealers.  I've seen a lot of broker-dealer P&Ls
25 being in the clearing business.
```

Page 150

```
1     Q   Okay.  And what's your understanding of --
2     A   They are very profitable businesses.
3     Q   Since you've been at Vision, have you tried to
4  implement anything to mimic the model that you saw at
5  Alpine?
6     A   No.  There is no -- no secret sauce to their
7  model.
8     Q   There is not?
9     A   No.  None.  The biggest thing to that model
10 is, you know, it's not any kind of process.  It's not
11 any kind of procedure.  We did the same stuff at COR.
12 We just didn't capture the commission.  It was being
13 captured mostly by the introducing firm.  We had the
14 same -- you know, very similar structure in terms of
15 review, Section 5 review, AML review.
16       You know, the biggest thing to me -- and,
17 look, I think that to some extent he ought to be, you
18 know -- I don't know if applauded is the right word, but
19 I certainly respect it is, you know, John's willingness
20 to engage in that type of business, and he's been well
21 rewarded for it.
22    Q   Have you made -- have you tried to implement
23 any changes in Vision that replicate what you saw at
24 Alpine?
25    A   No.  No.  The -- like I told you, probably the
```

Page 151

```
1  biggest change at Vision is that Vision had some
2  parameters in terms of kind of they were a little --
3  they had things that I thought were a bit restrictive
4  and not necessarily well thought out about the
5  transactions that they would take.  So a lot of it has
6  to do with the underlying price of the securities.
7     Q   Go on?
8     A   So, like, I think they had a policy in place.
9  They wouldn't -- you know, they wouldn't take a stock
10 under a dime or something like that.  So, you know, when
11 I've gotten there, we've definitely taken lower-priced
12 securities.
13    Q   But isn't the difference that Alpine and
14 Scottsdale actually know their customers and COR doesn't
15 know their customers?
16    A   No.  COR knows the customers in that space for
17 sure.
18    Q   They do.  They don't have -- wait.  Wait.  So
19 is COR under the same know-your-customer regulations
20 that FINRA puts on Alpine and Scottsdale?
21       MR. BANKER:  Object to form.  You said COR?
22       THE WITNESS:  Yeah.  He's talking about COR.
23 I know where they are going.
24    A   Yeah.  We believe that we had that
25 responsibility in that space.
```

Page 152

```
1  BY MR. SUSMAN:
2     Q   Who did?
3     A   COR/Legent.
4     Q   Did the broker-dealers know the customers, not
5  COR?  You are saying that COR actually knew the
6  customers?
7     A   Yeah --
8       MR. BANKER:  Object to form.
9     A   -- in that space, yes.  We reviewed every
10 transaction.
11 BY MR. SUSMAN:
12    Q   Okay.
13       (Exhibit Number 20 marked for identification.)
14 BY MR. SUSMAN:
15    Q   Document we've looked at before today.  It's
16 an e-mail to Chris Frankel to Peter Ziv dated
17 November 13, 2018, and then it's got -- the subject is
18 "Trade Blotter," and the attachment is a Copy of Sample
19 TradeBlotterOTCStocks.  It's an Excel sheet.
20       You seen this before?
21    A   Yes.
22    Q   And what's -- what is this document?
23    A   It's a sample trade blotter.
24    Q   And where did you obtain this?
25    A   From Randy Jones.
```

38 (Pages 149 to 152)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 153

1    Q    And where was Randy Jones when you obtained it
2    from him?
3    A    I don't know whether he was at Scottsdale or
4    at Alpine.  I don't -- I don't know which one.
5    Q    But he was working for one of the plaintiffs,
6    and you --
7    A    Yeah.
8    Q    -- got this from him?
9    A    Yeah, he was.
10   Q    When did you ask him to give you this?
11   A    Probably around that time that it was sent.
12   Q    So approximately after you had left Alpine?
13   A    I believe so.
14   Q    And how did you contact Mr. Jones and ask him
15   for this?
16   A    I imagine I called him.
17   Q    And what did you say?
18   A    I said, "Hey, do you think you could help me
19   put together a sample trade blotter."
20   Q    And why did you ask him for this?
21   A    Because Randy was in charge of trading and
22   trading supervision when I was at Alpine.
23   Q    Is this information publicly available?
24   A    This particular information?
25   Q    Yes.

Page 154

1    A    Yeah, I think it is.
2    Q    Really?  In this format?
3    A    Well, what do you mean in this format?
4    Q    Where could I obtain --
5    A    You could obtain that particular --
6    Q    -- all of this information in one place?
7    A    OTC Markets.
8    Q    And they would tell me -- it would give me a
9    record just like this?
10   A    It would be pretty doggone -- when you say
11   "just like this" --
12   Q    Yeah.
13   A    -- define that for me.
14   Q    Well, why didn't you go to OTC Markets to
15   obtain why did you call Randy Jones?
16   A    I could have gone and pulled stuff off of OTC
17   Markets, but it just would have just been sort of
18   random.  Here's a little bit here.  Here's a little bit
19   there.  And you could have pulled up some of this stuff
20   as well.
21   Q    But could you -- could you pull up all of this
22   information from OTC Markets?
23   A    In one -- in sort of -- in consolidated, I
24   think you could get all the information, but the chances
25   of it coming out in this fashion are, like, slim and

Page 155

1    none.
2    Q    Okay.  So it's fair to say you could not
3    obtain this information from a public source in this
4    format?
5    A    In its totality, no.  I mean, it's there, but
6    you wouldn't know it verbatim.
7    Q    And why did you want this information?
8    A    Because at the time when I was talking about
9    purchasing Ziv, when you -- when you buy a broker-dealer
10   as a regulated entity, if you reach an agreement to
11   purchase, right, you can't just go in there and buy it
12   the next day.  You have to go through a regulatory
13   approval process.
14       And so, you know, what was contemplated is
15   that, you know, if we could execute a letter of intent,
16   then if we could execute a purchase agreement, then we
17   would go in there and start actually working at the
18   firm.
19       And so the idea was, if we went in there and
20   started working at the firm, was, you know, what would
21   sort of the business look like, what's a representative
22   sample?  Where he said at the time, he was, like, "Well
23   maybe I would let you run, like, five trades a day."
24       And I was, like, "Oh, you know, that's not
25   going to work."  I said, "Well, let me give you a

Page 156

1    representative sample of what it might look like," in
2    that interim period between executing a purchase and
3    being able to get regulatory approval to close on a
4    purchase transaction.  And so that was the context of
5    what this was showed to him.
6    Q    So it's showing him what the trades per day
7    are at Alpine; correct?
8    A    I don't know if it's Alpine for sure or not.
9    I heard John say it was.
10   Q    But you don't know if it's Alpine or
11   Scottsdale?
12   A    No.
13   Q    And aren't you telling Mr. Ziv that this is
14   the type business that you'll be able to do at Ziv if
15   you were to purchase it?
16   A    I said that that would be a representative
17   sample of what we would like to do.
18   Q    Okay.  So it's basically taking Alpine's
19   business?
20   A    Doesn't necessarily say taking Alpine's
21   business.
22   Q    Well, where would this come from?
23   A    What do you mean where would it come from?
24   Q    Where would you get these kinds of trades?
25   A    This kind of business is done every day.

39 (Pages 153 to 156)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 157

1    Q   Was Ziv doing these kind of trades?
2    A   No.  No.  No.  No, they were --
3    Q   So then where were you going to get these
4  trades that would you bring to Ziv?
5    A   Oh, we would have to solicit customers to get
6  the trades.
7    Q   And did you solicit customers from Alpine?
8    A   To go to Ziv?
9    Q   Yeah.
10   A   No.
11   Q   Were you planning on soliciting customers from
12 Alpine?
13   A   If I could -- if I could have bought it, I
14 would solicit customers that I knew, some of which had
15 accounts at Alpine.
16   Q   And, in fact, you are now soliciting customers
17 from Alpine?
18   A   I had customers of which I knew, some of which
19 had an account at Alpine, yes.  I just gave you the --
20 you know, like I said, I definitely -- even though they
21 tried to open an account before, I circled back to
22 Chicago.
23   Q   And have you contacted other customers of
24 Alpine to bring them over to Vision?
25   A   I'm trying to think if there is anybody that

Page 158

1  didn't have an account over there that I talked to.  You
2  know, yeah, like I talked to Felecia Preston at EMA, but
3  she solicited me.  So once I landed over there, I went
4  back to her and said, "Hey, I'm over here now."
5        Trying to think of who else there is.  The
6  Continuation Capital guys, I don't think they have done
7  any business, but I've talked to them.
8    Q   But you have contacted them to try and solicit
9  their business division; correct?
10   A   Yes.
11   Q   Okay.  Who is Jim Kelley?
12   A   We talked about that before.
13   Q   Who is he?
14   A   He's some guy.  I mean --
15   Q   How do you know Jim Kelley?
16   A   Same thing that I said earlier.  I said that
17 the way that I met Jim Kelley was John asked me to give
18 him a call, and John had met him before I did.
19   Q   You contacted Jim Kelley after you left
20 Alpine; correct?
21   A   Yes.
22   Q   When was that?
23   A   I don't know the exact date that that
24 occurred.
25   Q   When was the -- what was the purpose of the

Page 159

1  call?
2    A   The primary purpose of the call was that, when
3  I had gotten introduced to Ziv, one of the main things
4  about Ziv is Ziv is what's called an OCC member firm.
5  And what that means, it's the Options Clearing
6  Corporation.  So supposedly -- and I know something
7  about options, but I'm far from an expert about
8  options -- is that they are sort of peddling the firm
9  that there was some unique value because they were
10 grandfathered as an OCC member.
11        And so, you know, John definitely introduced
12 me, you know, not formally, but said, "Hey, call this
13 guy."  I don't deny that.  So -- and then, you know, as
14 I had gotten to know Jim Kelley a little bit -- and I
15 don't know him that well -- you know, he told me he was
16 originally from Chicago.
17        He represented that he knows all these options
18 people.  So I was sitting there trying to reconcile the
19 dollar amount that Ziv wanted for the firm versed
20 upon -- verse what I thought it was worth.  So I was
21 sitting there thinking, geese, you know, maybe this
22 options functionality is worth more than I know.
23        So I picked up the phone to call Jim Kelley
24 and say, "Hey, Jim, you know, I'm looking at this firm.
25 It's an OCC member.  I know you're from Chicago.  Do you

Page 160

1  think there is really any value there, and would that
2  be?"
3    Q   And what did he say?
4    A   You know, he didn't -- he thought there was
5  some value there, but he said that he had thought that
6  he would have to check with some other people that he
7  knew in Chicago.
8    Q   Did you speak to him after that call?
9    A   No.
10   Q   It was just one phone call?
11   A   Just one phone call.
12   Q   Have you told me everything you recall about
13 that call?
14   A   I know that Jim talked about he was literally
15 loading up a truck getting ready to go visit his son or
16 bring some stuff out to his son in Denver.  I would
17 dispute some of what Jim Kelley said and some of what
18 John said today.
19   Q   I want to know what actually was said.
20   A   I don't remember exactly what he said, but I
21 can tell you that, if Jim Kelley said I solicited money
22 from Jim Kelley, to the best of my knowledge, Jim Kelley
23 doesn't have any money.  I wouldn't solicit money from
24 him.
25   Q   Were you soliciting for him to make --

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 161

```
1       A   An introduction to money?
2       Q   -- introductions?
3       A   No.
4       Q   No?
5           Were you -- did you tell Jim Kelley that you
6   were planning on competing with Alpine?
7       A   Not that I can recall, but that -- I'll put it
8   this way:  I wouldn't have said anything to Jim Kelley
9   in that conversation that I wouldn't have said directly
10  to John Hurry.
11      Q   Did you say anything about John Hurry to Jim
12  Kelley?
13      A   Not that I recall, no.
14      Q   Did you tell Mr. Kelley the type of numbers
15  that you were planning on doing at Ziv?
16      A   No.
17      Q   And you were not trying to solicit Jim Kelley?
18      A   No.  I was trying to solicit his advice as to
19  the value of the options component of this firm.  That
20  was the purpose of the phone call.
21      Q   And since you left Alpine, have you contacted
22  Sam Oshana?
23      A   Yeah, I've talked to Sam.
24      Q   Who is Sam?
25      A   Sam works with Bryan Collins.
```

Page 162

```
1       Q   Who we talked about previously.  And who
2   introduced you to Sam Oshana originally?
3       A   Bryan Collins.
4       Q   And who introduced you to Bryan Collins, just
5   refresh my memory?
6       A   Bob Eide, ten years ago.
7       Q   And since you left Alpine, have you spoken to
8   Adam Long?
9       A   Yes.
10      Q   Who is Adam Long?
11      A   Adam is a guy that lives down in Puerto Rico
12  that I've known for ten-plus years.  He was a broker at
13  several correspondents of mine.
14      Q   What have you spoken to him about?
15      A   Most recently I spoke to Adam about -- he's
16  been trying to open an account at Vision, but he wants
17  to pay nothing.  So we haven't opened an account for
18  him.
19      Q   Did Mr. Long have an account at Alpine or
20  Scottsdale?
21      A   I think Adam had an account -- he didn't
22  individually, but an entity that he worked with that I
23  don't think is still intact had an account at Alpine, I
24  believe.
25      Q   And you contacted him to solicit his business
```

Page 163

```
1   to Vision?
2       A   No.  I told you, he's been contacting me
3   trying to get an account open, of which I've refused to
4   do.
5       Q   So he contacted you after you left Alpine?
6       A   Yes.
7       Q   What about Lou Posner?
8       A   Who?
9       Q   Lou Posner?
10      A   Oh, he works with Al at Auctus.  What about
11  him.
12      Q   How do you know Lou Posner?
13      A   From Al.
14      Q   Who is Al?
15      A   Al is one of the principals at Auctus.
16      Q   And how did you meet Mr. Posner?
17      A   They used to have an account with us at COR.
18  I've never -- I've actually never physically met the
19  guy.
20      Q   And who is Al?  What's Al's last name?
21      A   Al Sollami.
22      Q   And how do you know Al Sollami?
23      A   They had accounts at COR.
24      Q   And who is Vince Sbarra?
25      A   Vince has a fund called EROP, E-R-O-P.
```

Page 164

```
1       Q   When did you first meet Vince Sbarra?
2       A   I think I first met him at -- while I was at
3   Alpine.
4       Q   And --
5       A   Not -- I don't think I physically met him at
6   Alpine, but that's when I became -- came to know him.
7       Q   In what capacity did you come to know him?
8       A   He did business at Alpine and some conference
9   calls and stuff that we would have with clients.
10      Q   And have you solicited him to bring business
11  to Vision?
12      A   No, he solicited me.
13      Q   He just called you --
14      A   And he --
15      Q   -- out of the blue?
16      A   He calls me on a regular basis.
17      Q   And he called you on a regular basis after you
18  left Alpine?
19      A   Yes.
20      Q   Who is Matthew Myers?
21      A   Don't know offhand.
22      Q   Do you know Charles Cleland?
23      A   Yeah.
24      Q   Who is Charles Cleland?
25      A   Chip was actually the big brother of my
```

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 165

1    fraternity's best friend at Florida State.  He's a
2    lawyer down in Sarasota.  Chip actually did -- for years
3    did a ton of 3(A)(10) transactions down there, and now
4    he is a partner in a fund down there called Continuation
5    Capital.
6        Q    Did he have any business at Alpine?
7        A    Yes.  They opened up at Alpine because of me.
8        Q    And do they continue to work at Alpine --
9    business at Alpine?
10       A    I don't know.
11       Q    He has he brought business over to Vision?
12       A    I do -- I know they are one of the ones
13   that -- because they told me they did a bunch of
14   business at that Austin Trust.
15       Q    And have they brought business over to Vision?
16       A    No.
17       Q    And you mentioned Felecia Preston.  Who is
18   Felecia Preston?
19       A    She's with EMA Financial.
20       Q    And how were you introduced to Ms. Preston?
21       A    She called me -- they actually had accounts at
22   COR, but I don't think I ever spoke to her until after I
23   left.  It was -- I never spoke to her at Alpine.  I
24   spoke to her after I left Alpine.  She called me, and
25   she was referred to me by John Paul with Inteliclear.

Page 166

1        MR. SUSMAN:  All right.  Let's take a
2    two-minute break.
3        THE VIDEOGRAPHER:  Going off the record at
4    6:13.
5        (Recess taken from 6:13 p.m. until 6:17 p.m.)
6        THE VIDEOGRAPHER:  Going back on the record at
7    6:17.
8    BY MR. SUSMAN:
9        Q    We were talking about -- remember we had that
10   list of the top 50 clients, top 50 customers at Alpine?
11       A    Yes.
12       Q    Do you know how many of those had accounts at
13   Vision prior to you starting there?
14       A    I don't know how many.  I could -- I'm happy
15   to go through it real quick, if you guys want, and tell
16   you which ones that I'm aware of.
17       Q    Sure.
18       A    But I can't represent that it's a
19   comprehensive list by any stretch, though.
20       Q    Let me ask you this:  Do you know if any of
21   them were doing OTC business at Vision?
22       A    Yeah.
23       Q    All of them?
24       A    The -- the ones that I would identify were.
25       Q    They were selling OTC stocks directly to

Page 167

1    Vision?
2        A    Yes.
3        Q    Not as correspondent but as direct OTC stocks?
4        A    That's my understanding, yes.
5        Q    Okay.  Well then --
6        A    Again, I'm not -- I'm not ultimately familiar
7    with all the business that's gone on there.  I mean, I
8    just haven't been there very long.
9        Q    And just real quick, just so I'm clear, Randy
10   Jones started at Vision before you?
11       A    Yes, slightly before.
12       Q    And do you know if these OTC -- pardon me --
13   these clients that you are going to name had business at
14   Vision prior to Randy being there?
15       A    I believe they did.
16       Q    Okay.
17       A    Again, I -- you know, I'm just telling you
18   that I'll give you an attempt.  You to got to take it
19   with a grain of salt.
20       Q    Okay.
21       A    As a matter of fact, I -- it would be
22   speculation on my part, but I know --
23       MR. BANKER:  Well, Chris --
24       A    -- a few of them.
25       MR. BANKER:  -- Chris, nobody wants you to

Page 168

1    speculate.  Okay.
2    BY MR. SUSMAN:
3        Q    Do you know?
4        A    I'll tell you the ones that I know.
5        Q    Let's do that.
6        A    Okay.  Do you know how far back it was?
7        Q    It's Number 10?
8        A    I think I'm screwing up this order.
9        THE REPORTER:  No, you're not, are you?  Okay.
10       A    Okay.  I got it.
11   BY MR. SUSMAN:
12       Q    Got it.
13       A    So I believe Auctus had an account over there.
14   I believe GHS and Crown Bridge had an account there.
15   PowerUp definitely had an account there.  I -- again, I
16   think LG Capital had an account there.  Continuation had
17   an account there.
18       Q    And all these are not correspondent accounts?
19       A    As far as I know, yes.
20       That's the only ones that jump out at me.
21       MR. SUSMAN:  All right.
22       THE WITNESS:  Nope you said you were done.
23   You're done.
24       MR. SUSMAN:  I know, right.  Hold me to it.
25   BY MR. SUSMAN:

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 169

1      Q   Are there any others that have opened accounts
2  since you got there?
3      A   Chicago.
4      Q   Yep.
5      A   I think Eagle.  I think that's really recent.
6  Blue Citi has put in an application, but it's Rob Malin.
7  I mean, I've known him for 25 years.  He doesn't have an
8  account open yet, though.  I think maybe JSJ I've seen.
9  I guess you're asking me what I know, but --
10     Q   What you know.
11     A   So I'm not sure about JSJ.
12     Q   Okay.
13     A   Did I tell you -- I think I said -- I told you
14  guys EMA, and EROP has opened --
15     Q   Wait.  EMA has opened since you've been there?
16     A   Yes.
17     Q   Okay.
18     A   EROP opened an account.  I don't think they
19  have done anything.  I think that's -- that's it.
20  That's all that jumps out at me.
21     Q   Okay.  All right.
22     A   Again, I'm answering it to the best of my
23  knowledge.
24     Q   Do you know if Randy Jones opened any of these
25  accounts?

Page 170

1      A   I don't.
2      MR. SUSMAN:  Okay.  All right.  We are done.
3      THE WITNESS:  Okay.
4            CROSS-EXAMINATION
5  BY MR. BANKER:
6      Q   Okay.  Just a couple of quick questions.
7      Mr. Frankel, would you pull up Exhibit 12 that
8  you testified about earlier.
9      That was 10; right?
10     MR. SUSMAN:  That was 10, correct.
11     A   Okay.
12  BY MR. BANKER:
13     Q   Okay.  And you sent this e-mail to yourself?
14     A   Yes.
15     Q   Concerning the nonbank trustee application?
16     A   Yes.
17     Q   On October 7, 2018, and you said that you sent
18  this e-mail to yourself for your benefit.  What were you
19  sending to yourself for your benefit?
20     A   The contact information for Ascensus.
21     Q   The tammyschultz@ascensus.com?
22     A   Yeah.  And then there was another girl over
23  there too.
24     Q   Okay.  So you wanted the e-mail addresses;
25  right?

Page 171

1      A   Correct.
2      Q   And the rest of the stuff, the attachments,
3  you didn't give a flip about, did you?
4      A   No.
5      Q   All right.
6      A   Never -- I can -- I can say I've never opened
7  them, never looked at them.
8      Q   Okay.  And then on Exhibit 6, I know that I've
9  cleared it up in an objection, but you've -- look at
10  Exhibit 6.  And you referred to this e-mail chain, which
11  began with Czarnik and this New World Fortuity Fund,
12  L.P., revolving credit facility?
13     A   Um-hum.
14     Q   And you referred to the "confidential" legend
15  up at the top of that exhibit on each page of the
16  exhibit; correct?
17     A   I don't -- I'm not quite following you on that
18  one.
19     Q   Do you understand that on Exhibit 6, the
20  "confidential" at the top with the underline is
21  something that Hurry put on in producing this document?
22     A   Well, I think Jordan put it on.  But, yes.
23     Q   Well, Mr. Susman put it on.
24     So when you referred to a "confidential"
25  reference, you were referring to the "confidential" up

Page 172

1  at the top right-hand corner on all these pages; right?
2      A   I don't -- I just don't recall that specific
3  thing.
4      Q   Okay.  Well, you don't see anything in the
5  e-mail subject lines or any other confidential reference
6  in any of these transmissions, do you?
7      A   I don't see a "confidential" reference, no.
8      Q   Okay.
9      MR. SUSMAN:  I would actually direct you to
10  the first page where it says Confidential --
11  "Confidentiality Notice."
12     MR. BANKER:  Right, the standard this is only
13  intended for the recipient?
14     MR. SUSMAN:  Right.  Right.  This is
15  privileged and confidential.  But other than that,
16  not confidential.  You're right confidential
17  doesn't mean what it says.
18  BY MR. BANKER:
19     Q   Okay.  I just want to make sure you understand
20  now that the "confidential" --
21     A   I understand the stamp at the top.
22     Q   Okay.  Good.
23     MR. BANKER:  That's all I'm asking.  We are
24  done.
25     He'll read.

43 (Pages 169 to 172)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15

**Page 173**

```
1          THE VIDEOGRAPHER:  Going off the record at
2   6:26.
3          (The deposition ended at 6:26 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 174**

```
1              CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA
4   COUNTY OF HILLSBOROUGH
5
6          I, NIKI MAURINE NOOJIN, certify that I was
7   authorized to and did stenographically report the
8   deposition of CHRISTOPHER FRANKEL; that a review of the
9   transcript was requested, and that the foregoing
10  transcript, Pages 1 through 177 is a true record of the
11  testimony given by the witness.
12
13         I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the parties,
15  nor am I a relative or employee of any of the parties'
16  attorney or counsel connected with the action, nor am I
17  financially interested in the action.
18
19         Dated: 08/21/2019.
20
21
22            NIKI MAURINE NOOJIN
23
24
25
```

**Page 175**

```
1              CERTIFICATE OF OATH
2
3   STATE OF FLORIDA
4   COUNTY OF HILLSBOROUGH
5
6          I, NIKI MAURINE NOOJIN, Notary Public, State
7   of Florida, certify that CHRISTOPHER FRANKEL personally
8   appeared before me on August 7, 2019, and was duly
9   sworn.
10
11         WITNESS my hand and official seal this date:
12  08/21/2019.
13
14  Identification:
15     CHRISTOPHER FRANKEL produced Florida Driver
16  License.
17
18
19     NIKI MAURINE NOOJIN
       Notary Public
20     State of Florida
       My Commission Expires 3/20/20
21     Commission No. FF 972564
22
23
24
25
```

**Page 176**

```
1              ERRATA SHEET
2   IN RE:  THE HURRY FAMILY REVOCABLE TRUST; SCOTTSDALE
    CAPITAL ADVISORS CORPORATION; and ALPINE SECURITIES
3   CORPORATION vs CHRISTOPHER FRANKEL
    DEPOSITION OF:  CHRISTOPHER FRANKEL
4   TAKEN:  08/07/2019
5
    DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE
6
    Please sign, date and return this sheet to our office if
7   additional lines are required for corrections, attach
    additional sheets.
8
    At the time of the reading and signing of the
9   deposition, the following changes were noted.
10  PAGE LINE CHANGE            REASON
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  Under penalty of perjury, I declare that I have read my
    deposition and that it is true and correct, subject to
22  any changes in form or substance entered here.
23
    SIGNATURE OF DEPONENT: _____
24
    DATE: _____
25
```

                                          44 (Pages 173 to 176)

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)                    13ba10ce-bc42-4e36-9972-30aa0e79fb15

Page 177

```
 1    08/21/2019
 2    DAVID C. BANKER, ESQUIRE
      Buss Ross, P.A.
 3    1801 North Highland Street
      Tampa, Florida 33602
 4
      Re:  THE HURRY FAMILY REVOCABLE TRUST; SCOTTSDALE
 5    CAPITAL ADVISORS CORPORATION; and ALPINE SECURITIES
      CORPORATION vs CHRISTOPHER FRANKEL
 6
      Dear Mr. Banker:
 7
      Please find the original errata sheet with your copy of
 8    the transcript so CHRISTOPHER FRANKEL may read and sign
      the transcript.  Please have him make whatever changes
 9    are necessary on the errata sheet and sign it.  Please
      make a copy of the errata sheet and place it in your
10    transcript.  Please then forward the original errata
      sheet back to our office at 101 South Franklin Street,
11    Suite 101, Tampa, Florida 33602.
12    If the errata sheet is not signed by the witness within
      30 days after this letter has been furnished, we will
13    then process the transcript without a signed errata
      sheet.  If your client wishes to waive his signature,
14    please have him sign his name at the bottom of this
      letter and send it back to our office.
15
      Your prompt attention to this matter is appreciated.
16
17    Sincerely,
18
      NIKI MAURINE NOOJIN, Professional Court Reporter
19
20
21    I do hereby waive my right to sign.
22
      CHRISTOPHER FRANKEL
23
24    cc:  JORDAN SUSMAN, ESQUIRE
25
```

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Niki Noojin (501-395-295-5430)
Electronically signed by Niki Noojin (501-395-295-5430)

13ba10ce-bc42-4e36-9972-30aa0e79fb15