## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

Department of Enforcement,

              Complainant,

v.

Alpine Securities Corporation
(CRD No. 14952),

              Respondent.

Disciplinary Proceeding
No. 2019061232601

### COMPLAINT

The Department of Enforcement alleges:

### SUMMARY

1.      By late August 2018, Alpine Securities Corporation ("Alpine" or the "Firm"), in the face of significant and mounting financial difficulties, implemented a series of exorbitant and arbitrary fees. Among other unreasonable fees, Alpine instituted a $5,000 *monthly* account fee which represented an astounding increase of approximately 60,000% from the Firm's prior $100 *annual* account fee. Alpine then used the fees as a pretext to convert its retail customers' securities. Indeed, the fees caused customers to incur significant debits in their accounts, at which point Alpine told its customers that it would liquidate their securities or transfer them to proprietary accounts belonging to Alpine in order to satisfy the debits. In June 2019 alone, Alpine moved over $950,000 of customer securities to Alpine proprietary accounts in order to cover these debits.

2.      Alpine's conversion and misuse of customers' securities did not stop there. In or around early 2019, Alpine unilaterally determined that customer securities it valued at $1,500 or less were "worthless" and entitled to be purchased by Alpine for *one penny per position.* Since



EXHIBIT   36
Deponent:   HURLEY
Depo Date:   8 · 7 · 19 ·
Reporter:   Niki Nbo[in
Anthem Reporting, LLC

approximately March 2019, Alpine has purchased or moved to its proprietary accounts nearly $910,000 of purportedly "worthless" customer securities. In so doing, Alpine has converted millions of shares of securities from its customers for its own benefit.

3.      To make matters even worse, Alpine only announced its decision to purchase customers' "worthless" securities positions for a penny per position after the fact. For example, in a letter backdated May 31, 2019—but not mailed to customers until on or around June 11, 2019—Alpine informed its retail customers that their **"positions with a market value of $1,500 or less have been deemed worthless"** and were "**removed via a worthless security sell transaction,"** and that effective June 1, 2019, Alpine would "**take action to close all remaining accounts**." In other words, Alpine's customers learned after June 11, 2019 that the Firm—*more than ten days earlier*—had taken their securities without their knowledge, much less their authorization.

4.      Subsequently, Alpine deemed securities remaining in certain customer accounts to be "abandoned," and moved those securities into Alpine's abandoned securities accounts. Those securities had not in fact been abandoned.

5.      Not surprisingly, scores of concerned and confused Alpine customers attempted to contact Alpine to find out what had happened to their securities. Instead, they found out that Alpine had gone dark. Alpine closed its office. Many customers were unable to access their account information via Alpine's web portal. Customers could only communicate with Alpine by emailing a generic email address, where replies were sporadic and largely unresponsive. Ultimately, customers had no way to verify their remaining securities positions, what securities Alpine had taken without their consent, and what, if any, cash proceeds remained in their accounts following Alpine's unauthorized transactions and acts of conversion.

6.     Since early 2019, Alpine also has been looting the Firm. Specifically, Alpine

effected six capital withdrawals, totaling approximately $2.8 million, without FINRA's approval,

in violation of FINRA Rules 4110(c) and 2010. Alpine effected these withdrawals in the guise

of two types of sham "expense" payments to affiliates. First, in February 2019, Alpine amended

its pre-existing loan agreement with its affiliate lender, Alpine Securities Holding Corporation

("Alpine Holding"), to dramatically increase its payments to Alpine Holding for its line of credit.

During March 2019, Alpine began paying Alpine Holding a $400,000 "monthly fee," and 120%

interest on amounts borrowed, for the same line of credit for which it previously paid only

$75,000 per month, a $500,000 annual fee, and 36% annual interest on amounts borrowed.

Second, in April 2019, Alpine paid its affiliate landlord, SCAP 9, LLC ("SCAP"), over $600,000

in response to SCAP's purported request for payment of so-called "common area maintenance"

("CAMs") charges, in addition to Alpine's usual monthly rent of approximately $50,000 and

monthly CAMs and insurance expenses of approximately $5,000.

7.     Without immediate intervention, Alpine's retail customers face the permanent

loss of their funds and securities. The Department of Enforcement seeks expedited relief to halt

Alpine's ongoing unauthorized trading and conversion and misuse of customer assets, to prevent

further customer losses, to avoid the dissipation of assets, and protect investors from other

significant harm.

## RESPONDENT AND JURISDICTION

8.     Alpine has been a FINRA member firm since May 1984 and maintains its

principal place of business in Salt Lake City, Utah. Alpine is a self-clearing broker-dealer that

carries accounts for retail customers and provides clearing services for introducing broker-

dealers. Alpine's retail customer base primarily consists of those with over-the-counter ("OTC")

stock holdings. Alpine has two registered branch offices and approximately 12 registered representatives.

9.      In 2011, John Joseph Hurry acquired Alpine. Hurry also owns Scottsdale Capital Advisors Corp. ("Scottsdale"), a retail and institutional broker-dealer located in Scottsdale, Arizona. In July 2018, the National Adjudicatory Council ("NAC") affirmed the Office of Hearing Officers' decision barring Hurry in all capacities, following its finding that Hurry had intentionally created a foreign broker-dealer as a buffer between Scottsdale and its customers for the purpose of facilitating Scottsdale's evasion of federal securities laws. Hurry appealed the NAC's decision to the Securities and Exchange Commission ("SEC"), and in August 2018, the SEC issued a stay of his bar, so long as Hurry "remains uninvolved in the stock deposit review process" and otherwise refrains from managing the affairs of Alpine, Scottsdale, or any other SEC-registered broker-dealer.

10.     FINRA possesses jurisdiction over Alpine because the Firm currently is a FINRA member.

## FACTS

## I.      Alpine has experienced mounting financial difficulties since 2018, including the prospect of a multi-million-dollar SEC fine.

11.     On or about June 5, 2017, the SEC filed a complaint against Alpine in the United States District Court for the Southern District of New York, alleging several thousands of failures to file suspicious activity reports.

12.     On or about December 11, 2018, the court granted in part the SEC's motion for summary judgment, concluding as a matter of law that Alpine had failed to file thousands of suspicious activity reports ("SARs"), and had filed thousands of other SARs with deficient information.

4

13.     The SEC filed a Motion for Remedies on or about May 3, 2019, requesting that the court impose a fine against Alpine exceeding $22 million.

14.     Alpine maintains nowhere near that amount of capital. In fact, the Firm reported to FINRA that it maintained only $1,753,679 in excess net capital in its May 2019 Financial and Operational Combined Uniform Single ("FOCUS") filing.

15.     While litigating the SEC's action, Alpine experienced financial difficulties. It posted net losses of approximately $44,700 in the second quarter of 2018, and approximately $71,200 in the third quarter of 2018.

16.     Moreover, at all times relevant to the Complaint, Alpine has been subject to an excess net capital requirement of $1 million by the National Securities Clearing Corporation ("NSCC"), and Alpine was barely able to meet that requirement in the third quarter of 2018, when it reported excess net capital of only approximately $1.04 million.

17.     Adding to the Firm's financial difficulties, on or about July 11, 2019, the Depository Trust & Clearing Corporation ("DTCC") notified Alpine that it would be imposing on the Firm a minimum clearing fund requirement of $2.3 million, effective July 12, 2019. DTCC imposed this restriction because Alpine had failed to comply with DTCC's weekly net capital reporting requirements and to provide responses to DTCC's information requests.

## II.     Alpine is depleting customer funds and securities through its assessment of newly-implemented, excessive fees.

18.     As of January 2018, the Firm's excess net capital was more than $1.4 million above the NSCC requirement. As of August 2018, the Firm's excess net capital had fallen to less than $200,000 above the NSCC requirement. As of September 2018, the Firm's excess net capital was only $42,267 above the NSCC requirement.

5

19.     On or about August 31, 2018, Alpine replaced its prior Schedule of Miscellaneous Account and Service Fees with a revised one.  The revised Schedule of Miscellaneous Account and Service Fees increased many of Alpine's existing fees, and introduced new fees.

20.     Many of the fees on the revised fee schedule were excessive, unreasonable, and arbitrary.  Among the fees contained in Alpine's revised fee schedule were: (1) a new $5,000 monthly account fee; (2) a $1,000 fee—which Alpine later increased to $1,500—for each certificate withdrawal from the Depository Trust Company ("DTC"); and (3) an "illiquidity and volatility" fee.

## A.     Alpine has assessed a $5,000 monthly account fee to customers, increasing their monthly account fees by approximately 60,000%.

21.     Alpine's $5,000 *monthly* account fee was assessed to customers simply for having an account at Alpine.  Previously, Alpine charged customers a $100 account fee, to be assessed on an *annual* basis.  With its introduction of the $5,000 *monthly* account fee, Alpine increased the fees assessed to each customer account from $100 per year to $60,000 per year—a *600-fold*, or *approximately 60,000%*, increase in fees.

22.     When Hurry discovered, during an Alpine shareholder call that took place on or about October 15, 2018, that Alpine had not billed customers for the $5,000 monthly account fee on the first day of that month, he directed Firm personnel to begin assessing the fee by the end of the month.

23.     Subsequently, Alpine charged the $5,000 monthly account fee to approximately 3,006 customer accounts in or around the end of October 2018.  In so doing, the Firm assessed a total of approximately $15,030,000 to its retail customer accounts—for *one month*.

24.     But the Firm subsequently waived or reversed the fee for certain customers who had complained or those whose accounts generated high commissions.  As a result, as of on or

about May 13, 2019, of the approximately $15,030,000 that the Firm assessed to Alpine customer accounts in or around October 2018, the Firm had reversed $11,585,000 of that amount. Of the remainder, Alpine debited $2,092,122 from retail customers' accounts, and actually collected approximately $1,352,878.

25.     The $5,000 monthly account fee has been listed on Alpine's fee schedule since the Firm introduced it on or about August 31, 2018, and the fee remains on Alpine's current Schedule of Miscellaneous Account and Service Fees.

**B.    Alpine cornered customers into re-certificating their shares, and applied a 100% or 200% markup to the DTC certificate withdrawal fee.**

26.     Since at least October 2016, Alpine had charged customers a $1,000 fee for DTC certificate withdrawals. That changed in early 2019, when Alpine increased the fee to $1,500.

27.     At all times relevant to the Complaint, however, the fee that DTC assessed to Alpine to obtain a certificate was $500. After covering any pertinent transfer agent fees, Alpine then applied a markup of up to $500 or $1,000 to the DTC re-certification fee. This amounted to an upcharge of 100% or 200% of Alpine's cost for a simple administrative request.

28.     At the same time that Alpine applied these additional charges, it took actions that had the effect of forcing customers to withdraw their shares via re-certification, rather than transferring or liquidating their shares.

29.     First, the Firm included in customer account statements for the month of January 2019 a notice that it would be closing all retail accounts at some unspecified date in the future.[1]

30.     Second, in or about February 2019, the Firm announced, in a notice included with customer account statements, that it would not permit customers who had deposited shares by

---

[1] Although, as described below, not all customers received account statements.

physical certificate to free-transfer them out, but would require customers either to liquidate those shares or to re-certificate them.

31.     Then, in or about April 2019, with customer account statements, Alpine announced that the Firm would no longer permit customers with free-trading OTC shares to liquidate their positions—leaving them with no choice but to re-certificate their securities (or to forfeit them to Alpine).

32.     The $1,500 re-certification fee remains on Alpine's current Schedule of Miscellaneous Account and Service Fees.

### C.     Alpine has charged customers an "illiquidity and volatility fee," through which the Firm has collected at least $1 million from customers.

33.     The Schedule of Miscellaneous Account and Service Fees that Alpine introduced on or about August 31, 2018, also included an "Illiquidity and Volatility Fee," which the Schedule described as a fee that Alpine would assess to customers for each transaction at "1% per day of the Illiquidity and Volatility charge assessed to Alpine by NSCC."[2]

34.     Because NSCC generally clears and settles trades on a T+2 basis, Alpine's illiquidity and volatility fee amounts to at least an additional 2% (*i.e.*, 1% per day, with two days minimum to clear) of the entire trade deposit requirement assessed to Alpine by NSCC.

35.     Moreover, the Firm has assessed the illiquidity and volatility fee to customers at a minimum of $150 per transaction, even though it has never disclosed this $150 minimum amount on its Schedule of Miscellaneous Account and Service Fees.

36.     Indeed, the Firm has charged customers at least the $150 minimum fee even for trades that were never executed. Specifically, if a customer received pre-approval to place a

---

[2] NSCC requires firms to maintain on deposit specific funds in connection with the volatility and mark-to-market risk presented by the transaction. Due to the nature of Alpine's credit rating at NSCC, the Firm is required to make a deposit related to these factors and an illiquidity assessment, as well.

trade but never reached out to Alpine again to place the trade, or if the customer was unable to get execution, Alpine still charged the customer a minimum of $150.

37.     The amounts that NSCC requires Alpine to deposit are fully refundable, so Alpine does not actually expend the amounts that it deposits with NSCC.

38.     From on or about September 1, 2018 to March 31, 2019, Alpine assessed and collected from customers more than $1 million in illiquidity and volatility fees.

39.     The illiquidity and volatility fee remains on Alpine's current Schedule of Miscellaneous Account and Service Fees.

**D.     Alpine announced that it would liquidate customer securities to cover the $5,000 monthly account fee and other fees, and moved customer securities to a proprietary Firm account to cover those debits.**

40.     Beginning in or around January 2019, the Firm included with customer account statements a series of notices concerning its plan to close retail accounts, assess the $5,000 monthly account fee (although it had already begun assessing it), and liquidate customer positions to satisfy outstanding debits.

41.     However, many customers never received these notices, for a variety of reasons of which Alpine was well aware, including:

> a.  Alpine sent account statements to its customers on a quarterly basis only (unless there was activity in an account during a given month, in which case Alpine sent a monthly statement for the account).
>
> b.  Many customers received only electronic (not paper) account statements from Alpine.
>
> c.  In or around August 2018, in connection with the Firm's conversion to a new back-office system, Alpine changed customer account numbers. As a result, many customers effectively did not have access to their online account

9

statements because they were unaware of their new account numbers and the
requisite login credentials.

42.     That said, on or about February 28, 2019, Alpine included with customer account
statements a notice that if the Firm did not receive customers' "direct instructions to close your
account by May 1, 2019[,] we will have to liquidate positions to cover all outstanding fees[,]
including the $5,000 Monthly Account Fee."

43.     In a notice dated on or about April 30, 2019, which Alpine included in customer
account statements for the month of April 2019, the Firm again stated that if it did not receive
customers' direct instructions to close their accounts, Alpine would "liquidate positions to cover
all outstanding fees including the $5,000 Monthly Account Fee." This notice extended
customers' deadline to close their accounts from May 1, 2019, to June 1, 2019.

44.     The next month, in a letter dated May 31, 2019, Alpine informed customers that,
effective June 1, 2019, the Firm "will take action to close all remaining accounts," and "will
liquidate enough positions in your account that have an active market to cover open debits."

45.     Notably, although this letter was dated May 31, 2019, it was not mailed to
customers until on or about June 11, 2019—after the effective date set forth in the letter for the
closing of customer accounts and liquidation of securities. The letter was not emailed to
customers until on or about June 13, 2019—again, well after the effective date set forth in the
letter.

46.     The backdated May 31, 2019 letter was the first time that Alpine had directly
contacted customers—rather than relying on notices in monthly account statements that many
customers never received—to inform them that the Firm would be closing all retail accounts,

10

assessing a $5,000 monthly account fee, and liquidating customer securities to satisfy outstanding debits.

47.     On or about June 14, 2019, after receiving Alpine's backdated May 31, 2019, letter, Customer A asked, "So if I do nothing, you will charge each account a $5K fee for June, and then once the account balance hits $0 or less you will simply write off the shares?" Alpine's response, three days later, was pithy: "Hello -- That is correct."

48.     In or around June 2019, Alpine moved 207 positions, representing 118 unique securities, from customer accounts to a proprietary Firm account (the "Alpine House Account"), to cover outstanding customer debits.  The value associated with these securities on or about June 30, 2019, was nearly $1 million.

49.     Alpine made 99 additional journals of securities on or about July 3, 2019, involving the same Alpine House Account.

50.     Alpine did not obtain customer authorization before moving customer positions to the Alpine House Account to cover outstanding debits.

51.     Alpine seized these securities in contravention of the terms of its own Customer Agreement, which provided that the Firm could liquidate customer securities to satisfy debts related to "reasonable charges...to cover its services and facilities."  The Firm's 600-fold increase from its previous annual account fee was not reasonable or necessary to cover the Firm's "services and facilities."

52.     In an undated letter that it emailed to customers on or about July 10, 2019, Alpine announced that it would now assess the $5,000 monthly account fee *retroactive to November 2018*, on all retail accounts that remain open at Alpine as of July 31, 2019, and for which the Firm has a valid mailing address.

53.    Alpine had already made preparations for these anticipated debits and

liquidations. Even before the Firm had emailed its July 10 letter, it had retitled the Alpine House

Account into which it had been journaling customer securities. The Alpine House Account had

been titled "Alpine Securities Corporation Debit W/O," but in or around June 2019, the Firm

retitled it to "Alpine Securities Corporation Liquidate to Cover Cust Debit."[3]

## III.    Alpine attempted to induce customers to surrender marketable securities as "worthless," based on its unreasonable fees.

54.    In or around late 2018 and early 2019, Alpine attempted to induce customers into

surrendering their securities as "worthless" by offering to waive or reverse its excessive fees (in

particular, the $5,000 monthly account fee) for customers who agreed to execute Alpine's

Worthless Securities Form. By executing the Form, customers agreed to sell their securities to

Alpine "at $.01 (one cent) for the entire equity position," thus allowing Alpine to "become the

owner of" the securities and "retain any proceeds of future sales [those securities] may realize."

55.    Alpine further tried to push customers towards executing the Worthless Securities

Form by limiting the options available to customers who had deposited shares via certificate to

move those positions (*i.e.*, by only allowing them to re-certificate their securities, as described

above). Thus, Alpine effectively presented customers with two options: pay Alpine's exorbitant

fees or execute the Firm's Worthless Securities Form and give their shares to the Firm.

---

[3] During on-the-record testimony on July 17, 2019, Alpine's COO, Joseph Walsh, claimed that the Firm would be reversing $5,000 debits for customers who have not paid it and returning securities it seized from customer accounts to pay those debits. During on-the-record testimony on July 18, 2019, Alpine's CEO, Christopher Doubek, claimed for the first time that Alpine was considering a plan to return cash to customers who paid the fee as a direct response to regulatory scrutiny. The Firm has not yet been able to confirm to Enforcement that these representations are true.

**IV.    Alpine became more aggressive in its approach in or around May 2019, seizing so-called "worthless" customer securities without even seeking customer authorization.**

56.     Alpine further escalated its approach in or around May 2019—not just for customers with cleared OTC positions, but for *all* of Alpine's remaining approximately 1,100 retail customer accounts.

57.     In the letter dated May 31, 2019, Alpine announced that "all positions with a market value of $1,500.00 or less have been deemed worthless," and "*have been removed*" via a worthless security "sell transaction."

58.     Customers accordingly received no notice of Alpine's intention to deem and take their "worthless" securities positions until after Alpine had already done so.

59.     Moreover, prior to this seizure, Alpine also never informed customers that it had altered its definition of "worthless" from "$400 or less," to "$1,500 or less."

60.     Customers expressed surprise and concern when they discovered that Alpine had deemed their securities "worthless" and taken them.  For example, on or about June 5, 2019, Customer B wrote to Alpine, "I finally got access to my account again and saw that Alpine had unceremoniously liquidate[d] my 1.8 million shares of LOGL as worthless!!!!   WTF!!!!!!   How do you get away with liquidating stock and closing an account without discussing with the client any changes to your processes. . . .  I did not authorize any of this to be done without my permission."[4]

61.     Since on or about March 4, 2019, Alpine has purchased or moved nearly $910,000 of purportedly "worthless" customer securities from customer accounts to a proprietary Firm account.

---

[4] Notably, Alpine has failed to report this complaint—and many other similar complaints—as the Firm is obligated to do pursuant to FINRA Rule 4530.

A.      **The customer securities that Alpine has transferred to its worthless securities account are not, in fact, "worthless."**

62.     The nearly $910,000 increase in the value of the Alpine Worthless Securities Account is itself evidence that Alpine's definition of what constituted a "worthless" security bore no relation to whether the security was in fact worthless.

63.     Alpine deemed securities worth $1,500 or less "worthless," regardless of the liquidity or per-share price of each position.

64.     Many of the "worthless" customer positions that Alpine moved to the Alpine Worthless Securities Account had active markets and possessed meaningful value. Alpine's customers expressed this sentiment in emails to the Firm. For example, after Alpine advised him that it had closed his account, Customer C responded by email on or about June 18, 2019, writing, "I had +-$500 in cash and 360M shares of BANI. the stock is worth $36,000. This is not worthless to me."

65.     Between on or about March 4, 2019 and June 20, 2019, Alpine, through the Alpine Worthless Securities Account, purchased over 1,600 unique securities through more than 3,000 transactions. Of these, 64 "worthless" securities were listed on the NYSE, NASDAQ, or AMEX, with an aggregate value of approximately $20,000.[5] Indeed, on or about June 11, 2019, after receiving an email from Alpine stating that it had deemed his shares worthless, Customer D replied, "I disagree with the fact that you sold it for 0 when it is a Nasdaq traded company. You should have sold it at market and returned the cash."

66.     For more than 700 purchases effected by the Alpine Worthless Securities Account, involving more than 600 unique securities, the security had a priced bid (*i.e.*, any non-

---

[5] During testimony on July 18, 2019, COO Walsh claimed the Firm planned to return to customers those "worthless" positions that were exchange-listed. Enforcement is unaware of whether or not Alpine has done so.

zero active bid) on the date of the purchase, and trade volume in the previous 30 days. Based on the market share price listed on Alpine's account statements, the aggregate value of these "active bid" securities was more than $250,000.

67.     Alpine's valuation of the "worthless" securities that it purchased from customers also exceeded its own $1,500 "worthless" threshold on multiple occasions. For example, Alpine executed 14 purchases from customers on or about May 30 and 31, 2019, for a penny a position, and subsequently valued the newly-acquired positions at more than $1,500 each.

68.     In some instances, Alpine purchased customer securities for the Alpine Worthless Securities Account *on the very same day* that it liquidated those same securities for other customers. For example, on or about May 30, 2019, Alpine purchased three different customers' positions in two "worthless" securities. That same day, Alpine liquidated positions in the same two securities for customers of Scottsdale. Based on the share price at which Alpine was able to liquidate the securities for the Scottsdale customers, the values of the positions of the three Alpine customers' purportedly "worthless" securities were $1,067.14, $1,396.81, and $1,403.78. Yet Alpine paid each customer only a penny apiece.

**B.      Alpine effected trades in customers' "worthless" securities, but neither obtained customer consent nor reported the trades to FINRA, as it was required to do.**

69.     To effect many of these "worthless" securities transfers, Alpine entered sell transactions for a value of $0.01 per position on behalf of the respective customer accounts.

70.     The affected customers did not authorize these transactions.

71.     In fact, many customers never even had notice of Alpine's $5,000 monthly account fee, the Firm's plan to close retail accounts, Alpine's definition of "worthless," or even that the Firm was acquiring so-called "worthless" customer securities for its own account, until

15

in or around the middle of June 2019, when the Firm belatedly mailed its backdated May 31, 2019 letter to customers.

72.    Alpine did not report a majority of the sell transactions for the "worthless" securities that it had "purchased" for the Alpine Worthless Securities Account as it should have. Alpine's failure to do so obscured its misconduct from FINRA, which would have been alerted to the fact that tradeable securities were being sold at prices significantly lower than actual market value.

## V.    Alpine seized customer securities as "abandoned" and moved those securities to Firm accounts, even though the securities had not been abandoned by those customers.

73.    Alpine's backdated May 31, 2019, letter notified retail customers that, effective June 1, 2019, after "liquidat[ing] enough positions in your account that have an active market to cover any open debits," the Firm would move "[a]ll remaining positions" to "an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state."

74.    In or around June 2019, after Alpine had moved customer securities to the Alpine House Account to cover the $5,000 monthly account fee, the Firm also moved securities that remained in customer accounts into other Firm accounts, deeming them "abandoned."[6]

75.    On or about June 25, 2019, Alpine set up an automated reply that it sent to all customers who emailed the Firm that day. The automated reply informed customers: "[A]ll Alpine Securities Accounts which had positions or balances and were not transferred per customer request have been deemed 'abandoned'. All assets in your accounts have been submitted for processing to your state of residence for Unclaimed Property/Escheatment. Please contact your state for instructions on how to reclaim your assets."

---

[6] During testimony on July 17, 2019, COO Walsh claimed that the Firm had reversed these transfers and returned the securities to customer accounts. Enforcement is unaware of whether or not Alpine has done so.

76.     Among those who received the automated reply was Customer E, a widow who emailed Alpine on or about June 12, 2019, to claim the assets in the account of her late husband, who had passed away in or around March 2019. Alpine initially responded that her late husband's shares were "worthless," but then informed her that it was mistaken. Alpine later stated, "We are still currently review [sic] the statements from the account and will let us [sic] you know what is discovered."

77.     Customer E emailed Alpine on or about June 20, 21, and 24, 2019, to ask if the Firm had any updates for her, and to instruct the Firm to transfer the shares in her late husband's account to the transfer agent. Alpine did not respond to any of those emails. When Customer E again emailed Alpine on or about June 25, 2019, noting that she had not received "any responses from [Alpine] in the past few days," Alpine sent her an automatic reply that day, informing her that "[a]ll assets" in her late husband's account had been "submitted for processing to your state of residence for Unclaimed Property/Escheatment."

78.     Over the course of June 2019, many customers made clear to Alpine that they had not, in fact, abandoned their securities, and that the Firm had seized their securities before ever giving notice that it would do so. For example:

>    a.   On or about June 21, 2019, Customer F contacted the Firm by email and wrote, "I did not receive the [backdated May 31, 2019 letter] prior to June 1. I did not abandon the account and the value was substantial."
>
>    b.   On or about June 24, 2019, Customer G instructed Alpine to transfer his securities, valued at approximately $70,000, to another broker-dealer. In response, Alpine informed him by email that day that his "account is closed and holds no cash or security value. No further action is required." Then,

later that day, Alpine informed Customer B that it had placed his entire position into the Firm's "Abandoned Securities account."

c.  On or about June 24, 2019, Customer H emailed Alpine to ask, "Where is my stock position . . .?  The current value is over US $10,000.00. . . .  I did not owe any money to Alpine before you closed my position.  I need clarification of where funds or capital or stocks are immediately."  Two hours later, Alpine replied with boilerplate language that quoted from its backdated May 31, 2019 letter—including the portion of the letter in which Alpine stated that after liquidating positions to cover open debits, the Firm would move "[a]ll remaining positions" to "an Alpine Customer Abandoned Securities Account."

d.  On or about June 19, 2019, Customer I wrote to the Firm, "Please note I have requested numerous times for Alpine to return all of my certificates. And per this email thread, advised that my shares were not to be considered worthless or abandoned.  Please accept this as my final attempt to get your firm to return my certificates prior to proceeding with the necessary legal options that I am afforded."

## VI.  Alpine has cut off most lines of communication with customers, leaving them with little to no information or recourse.

79.  When Alpine announced in early 2019 that it was exiting the retail business, the Firm directed customers to submit their questions and requests to a generic Alpine email address: ▬▬▬▬▬▬ the "House Accounts Email Address").

80.  At some point prior to May 17, 2019, Alpine placed a sign on its door indicating that "Alpine Securities is closing all retail accounts.  There are no representatives at this

location." The sign further instructed customers to direct all inquiries to the same House Accounts Email Address.

81.     All of the Alpine representatives who took customer orders and answered customer phone calls, and who were employed at Alpine before the Firm introduced the $5,000 monthly account fee, have since left the Firm.

82.     Alpine's responses to customer emails sent to the House Accounts Email Address have been sporadic, untimely, and/or non-responsive.

83.     Many Alpine customers have been unable to access their account information electronically. As a result, customers have encountered difficulties obtaining information about the current status of their accounts, as well as the transactions that Alpine has effected without their authorization.  For example:

> a. On or about June 14, 2019, Customer J emailed the House Accounts Email Address, writing, "I have tried contacting your firm by both phone and email, in which I've received ZERO response.  Further more [sic] I cannot acces [sic] any online statements, as your system and/or site has continually been down or not accessible in any manner.  I have held an active and current account with Alpine Securities since 2015, in which I have traded upon several times.  As my previous emails and calls have stated (in which I have recorded) I am seeking my login credentials or access to my account, so that I may access statements and or information. But I have been ignored now for several month[s]. . . .  I have not been notified of any changes or fees associated with this account since the time of opening."

      b.  On or about June 17, 2019, Customer K wrote to the House Accounts Email Address, "I need someone to call me immediately I have no access to the account online nor a statements. No answer when I call. I would like a [sic] email copy of my statements going back to January 2019 to see what fees were assessed so I can reconciliation [sic] for myself. . . . I have not been contacted in well over 6 months." Not having received a response from Alpine, Customer K again contacted the House Accounts Email Address, writing, "I'm still waiting for a resolution. Please answer my questions . . . ."

      c.  On or about June 17, 2019, Customer L wrote to the House Accounts Email Address, "[W]hy are there no longer statements available online for me to look at? As of last Friday there were statements available for viewing—today they [sic] are none. I can't even trace back when you decided to start charging this exorbitant fee on my account. This feels like extortion."

84.    By erecting barriers to customers' access to information and to their lines of communication with Alpine, the Firm has made it ever more difficult for customers to: (1) understand the actions that Alpine has taken since in or around the middle of 2018 that have affected the value of their accounts; and (2) attempt to halt or reverse Alpine's conversion of customer assets.

**VII.**    **Since March 2019, Alpine has been dissipating Firm assets through sham payments to affiliates.**

    **A.**    **Alpine's made sham payments under a loan agreement with Alpine Holding.**

85.    On February 6, 2019, Alpine filed a financial notification requesting FINRA's approval to withdraw $1,393,119 in equity capital.

86.    In response, FINRA made inquiries about this request.

87.     On February 20, 2019, Alpine inquired about when FINRA would provide a response on the Firm's request to withdraw capital.

88.     Also on February 20, 2019, while Alpine's request for approval was pending, Alpine amended its existing lending arrangement with Alpine Holding by entering into a Third Amended and Restated Senior Loan Agreement for Daily Liquidity Advances ("Third Amended Loan Agreement").

89.     The Third Amended Loan Agreement contained commercially unreasonable terms. Under the Third Amended Loan Agreement, Alpine Holding agreed to provide Alpine with a line of credit in the same amount it had provided under Alpine's previous loan agreement, $5 million. Under its previous loan agreement, Alpine paid a monthly fee of $75,000, an annual fee of $500,000, and annual interest of 36%. However, under the Third Amended Loan Agreement, Alpine agreed to pay a dramatically higher monthly fee of $400,000 for this line of credit and annual interest of 120% on the amounts borrowed.[7]

90.     In other words, under the Third Amended Loan Agreement, Alpine agreed to pay $4.8 million dollars annually for the right to borrow up to $5 million (at an annual interest rate of 120%).

91.     From March 1, 2019 to the present, Alpine has paid $400,000 on or around the first of every month to the Alpine Holding, for a total payment to date of $2 million. Alpine has also made over $200,000 in interest payments to Alpine Holding under the Third Amended Loan Agreement.

92.     Each of these payments exceeded 10% of Alpine's excess net capital.

---

[7] The Third Amended Loan Agreement was also terminable immediately by Alpine Holding   but not Alpine—in the event it "deem[ed] itself insecure."

21

Alpine did not seek FINRA's approval, and FINRA did not provide its approval, for any of these payments to Alpine Holding.

**B.     Alpine made sham payments to SCAP for "Common Area Maintenance" charges.**

93.     On March 13, 2019, Alpine filed a financial notification requesting FINRA's approval to withdraw $300,000 in equity capital.

94.     FINRA responded with inquiries about this request.

95.     On March 20 and March 21, 2019, Alpine inquired about when FINRA would provide a response to the Firm's request to withdraw capital and claimed that Alpine's parent, SCA Clearing LLC, had been adversely affected by the length of time it was taking FINRA to review the request.

96.     On or about March 21, 2019, as Alpine's request to withdraw $300,000 in additional equity capital was pending, SCAP issued an invoice to Alpine in the amount of $610,372.98 in purported "common area maintenance charges" (the "Affiliate Invoice").

97.     The Affiliate Invoice was not accompanied by any supporting documentation or line-item explanations, stating only "CAMs 2018 Expense Not Billed Management Fees, Partnership Tax, Depreciation Expense, and Interest Expense for 2018."

98.     The Firm paid the Affiliate Invoice on April 3, 2019.

99.     This payment exceeded 10% of Alpine's excess net capital.

100.    Alpine did not seek FINRA's approval, and FINRA did not provide its approval, for this payment. In total, Alpine and its affiliates looted over $2.8 million from the Firm through these affiliate payments.[8]

---

[8] The Firm was taking these unapproved capital withdrawals in addition to approximately $1.9 million in other approved capital withdrawals.

101.    These disguised capital withdrawals commenced while Alpine was effecting

approximately $1.9 million in other capital withdrawals, in a series of six withdrawals from

February 2019 through June 2019, for which the Firm either obtained FINRA approval or did not

seek approval because the withdrawn amounts constituted less than 10% of excess net capital in

a rolling 35-day period.

### FIRST CAUSE OF ACTION
### Conversion
### (FINRA Rules 2150 and 2010)

102.    The Department of Enforcement realleges and incorporates by reference all

preceding paragraphs.

103.    FINRA Rule 2150 prohibits members or persons associated with a member firm

from making improper use of a customer's securities or funds.

104.    FINRA Rule 2010 requires that members and associated persons, in the conduct

of their business, "observe high standards of commercial honor and just and equitable principles

of trade."

105.    A violation of FINRA Rule 2150 constitutes a violation of FINRA Rule 2010.

106.    Conversion is an independent and distinct violation of FINRA Rule 2010.

107.    Conversion generally is an intentional and unauthorized taking of and/or exercise

of ownership over property by one who neither owns the property nor is entitled to possess it.

108.    From in or around October 2018 to July 2019, Alpine converted customer funds

and securities ostensibly to pay Alpine's exorbitant fees, including the $5,000 monthly account

fee.  Alpine took these actions intentionally and without customer authorization.

109.    Moreover, from approximately March 2019 to July 2019, Alpine converted

customer securities by misappropriating every customer position valued at $1,500 or less on the

23

grounds that such securities were "worthless." Alpine took these positions intentionally and without customer authorization.

110. Finally, Alpine converted customer securities from in or around June 2019 to July 2019 by deeming those securities "abandoned," and moving them into the Firm abandoned securities accounts. Alpine moved these positions intentionally and without customer authorization.

111. Alpine was not entitled to any of the customer funds or securities over which it took ownership.

112. Alpine took customer funds and securities with the intent of depriving customers of their account assets.

113. As a result of Alpine's conduct, customers were deprived of their account assets.

114. By virtue of the foregoing conduct, Alpine committed conversion in violation of FINRA Rules 2150 and 2010, both by virtue of its violation of Rule 2150 and independently.

## SECOND CAUSE OF ACTION
### Misuse of Customer Assets
### (FINRA Rules 2150 and 2010)

115. The Department of Enforcement realleges and incorporates by reference all preceding paragraphs.

116. FINRA Rule 2150 prohibits members or persons associated with a member firm from making improper use of a customer's securities or funds.

117. A violation of FINRA Rule 2150 constitutes a violation of FINRA Rule 2010.

118. Misuse of customer assets is an independent and distinct violation of FINRA Rule 2010.

119.    By taking customer funds and securities in the manners already described, Alpine used them for purposes not directed by the customers and also commingled them with non-customer funds and securities.  This was an improper use of customer funds and securities.

120.    By virtue of the foregoing conduct, Alpine misused customer assets in violation of FINRA Rules 2150 and 2010, both by virtue of its violation of Rule 2150 and independently.

## THIRD CAUSE OF ACTION
### Unauthorized Trading
### (FINRA Rule 2010)

121.    The Department of Enforcement realleges and incorporates by reference all preceding paragraphs.

122.    Unauthorized trading is the execution of a securities transaction in a customer's account without first obtaining the customer's authorization or consent.

123.    Unauthorized trading is a violation of FINRA Rule 2010.

124.    From in or about early 2019 to July 2019, Alpine moved customer securities from customer accounts to the Firm's proprietary account to cover outstanding debits resulting from excessive fees, including the $5,000 monthly account fee.  The customers did not authorize those transactions.

125.    From approximately March 2019 to July 2019, Alpine sold hundreds customer positions to itself for a penny per position.  The customers did not authorize those transactions.

126.    From approximately June 2019 to July 2019, Alpine moved customer securities to Alpine's abandoned securities accounts.  The customers did not authorize those transactions.

127.    By virtue of the foregoing conduct, Alpine committed unauthorized trading in violation of FINRA Rule 2010.

### FOURTH CAUSE OF ACTION
### Unfair Prices and Commissions
### (FINRA Rules 2121 and 2010)

128.    The Department of Enforcement realleges and incorporates by reference all preceding paragraphs.

129.    FINRA Rule 2121 requires a member that buys for its own account from its customer to "buy or sell at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that [the member] is entitled to a profit."

130.    A violation of FINRA Rule 2121 constitutes a violation of FINRA Rule 2010.

131.    Supplementary Material .01 to FINRA Rule 2121 provides that it is a violation of FINRA Rules 2121 and 2010 "for a member to enter into any transaction with a customer in any security at any price not reasonably related to the current market price of the security."

132.    From approximately March 2019 to July 2019, Alpine sold hundreds of customer positions to itself for a penny per position. That price was unfair, and not reasonably related to the current market prices of the securities.

133.    By virtue of the foregoing conduct, Alpine charged unfair prices and commissions in violation of FINRA Rules 2121 and 2010.

### FIFTH CAUSE OF ACTION
### Unreasonable and Discriminatory Fees
### (FINRA Rules 2122 and 2010)

134.    The Department of Enforcement realleges and incorporates by reference all preceding paragraphs.

135.    FINRA Rule 2122 requires that "[c]harges, if any, for services performed, including . . . miscellaneous services such as . . . exchange or transfer of securities; appraisals,

26

safe-keeping or custody of securities, and other services shall be reasonable and not unfairly discriminatory among customers."

136.    A violation of FINRA Rules 2122 constitutes a violation of FINRA Rule 2010.

137.    The $5,000 monthly fee that Alpine charged to customers, simply for having an account at the Firm, was unreasonable. The fee was not necessary to cover any services provided by the Firm.

138.    In addition, Alpine assessed the $5,000 monthly account fee inconsistently by waiving or reversing the fee for certain customers, simply because those customers complained or had more profitable accounts. The fee is therefore unfairly discriminatory among customers.

139.    The $1,500 fee that Alpine charged for DTC certificate withdrawals was unreasonable.

140.    Finally, the illiquidity and volatility fee that Alpine charged customers was unreasonable.

141.    By virtue of the foregoing conduct, Alpine assessed unreasonable and discriminatory fees in violation of FINRA Rules 2122 and 2010.

### SIXTH CAUSE OF ACTION
### Unauthorized Capital Withdrawals
### (FINRA Rules 4110(c) and 2010)

142.    The Department of Enforcement realleges and incorporates by reference all preceding paragraphs.

143.    FINRA Rule 4110(c)(2) provides: "A carrying or clearing member shall not, without the prior written approval of FINRA, withdraw capital, pay a dividend or effect a similar distribution that would reduce such member's equity, or make any unsecured advance or loan to a stockholder, partner, sole proprietor, employee or affiliate, where such withdrawals, payments,

27

reductions, advances or loans in the aggregate, in any 35 rolling calendar day period, on a net basis, exceeds 10% of its excess net capital."

144. A violation of FINRA Rule 4110 constitutes a violation of FINRA Rule 2010.

145. On March 1, 2019, Alpine paid $400,000 to Alpine Holding, after amending its loan agreement, in the connection with the Third Amended Loan Agreement.

146. On April 3, 2019, Respondent paid $610,372.98 to SCAP pursuant to the Affiliate Invoice.

147. Each of these payments to affiliates (the "March Payments") exceeded 10% of the Firm's excess net capital.

148. On April 1, 2019, Alpine paid $400,000 to Alpine Holding pursuant to the Third Amended Loan Agreement. On April 11, 2019, Alpine also paid interest of $136,666.67 to Alpine Holding under the Third Amended Loan Agreement (together with the $400,000 payment, the "April Payment"). These payments to an affiliate exceeded 10% of the Firm's excess net capital.

149. On May 2, 2019, Alpine paid $400,000 to Alpine Holding pursuant to the Third Amended Loan Agreement. On May 10, 2019, Alpine also paid interest of $75,333.33 to Alpine Holding under the Third Amended Loan Agreement (together with the $400,000 payment, the "May Payment"). These payments to an affiliate exceeded 10% of the Firm's excess net capital.

150. On June 3, 2019, Alpine paid $400,000 to the Alpine Holding pursuant to the Third Amended Loan Agreement (the "June Payment"). This $400,000 payment to an affiliate exceeded 10% of the Firm's excess net capital.

151.    On or around July 1, 2019, Alpine paid $400,000 to Alpine Holding pursuant to the Third Amended Loan Agreement (the "July Payment"). This $400,000 payment to an affiliate exceeded 10% of the Firm's excess net capital.

152.    The Firm did not obtain FINRA's approval for the March, April, May, June, or July Payments.

153.    The purpose of the March, April, May, June, and July Payments was to withdraw capital without FINRA's approval, as part of a coordinated effort to dissipate Firm assets. In total, through these payments, Alpine withdrew over $2.8 million from the Firm in a four-month period.

154.    By virtue of the foregoing conduct, Alpine effected unapproved capital withdrawals in violation of FINRA Rules 4110(c)(2) and 2010.

## RELIEF REQUESTED

**WHEREFORE**, the Department of Enforcement respectfully requests that the Panel:

A.    make findings of fact and conclusions of law that Respondent committed the violations charged and alleged herein;

B.    order that one or more of the sanctions provided under FINRA Rule 8310(a) be imposed, including that Respondent be required to disgorge fully any and all ill-gotten gains and/or make full and complete restitution, together with interest; and

C.    order that Respondent bears such costs of proceeding as are deemed fair and appropriate under the circumstances in accordance with FINRA Rule 8330.

**FINRA DEPARTMENT OF ENFORCEMENT**

Date:   July 25, 2019

Heather Freiburger, Senior Counsel
FINRA Department of Enforcement
4600 S. Syracuse Street, Suite 1400
Denver, CO 80237
Phone: (303) 446-3111
E-mail: Heather.Freiburger@finra.org

Douglas Ramsey, Senior Director
FINRA Department of Enforcement
300 South Grand Avenue, Suite 1600
Los Angeles, CA 90071
Phone: (213) 613-2616
E-mail: Douglas.Ramsey@finra.org

Christopher Perrin, Chief Counsel
FINRA Department of Enforcement
100 Pine Street, Suite 1800
San Francisco, CA 94111
Phone: (415) 217-1121
E-mail: Christopher.Perrin@finra.org

Amanda Fein, Counsel
Pearline M. Hong, Counsel
Kevin Hartzell, Director
Lisa M. Colone, Chief Counsel
Christopher J. Kelly, Senior Vice President
FINRA Department of Enforcement
581 Main Street, Suite 710
Woodbridge, NJ 07095
Phone: (732) 596-2079 (Fein)
Phone: (732) 596-3569 (Hong)
Phone: (732) 596-2048 (Hartzell)
Phone: (732) 596-2078 (Colone)
Phone: (732) 596-2082 (Kelly)
E-mail: Amanda.Fein@finra.org
E-mail: Pearline.Hong@finra.org
E-mail: Kevin.Hartzell@finra.org
E-mail: Lisa.Colone@finra.org
E-mail: Christopher.Kelly@finra.org

Daniel Hibshoosh, Director
Christina L. Stanland, Director
Gina M. Petrocelli, Chief Counsel
FINRA Department of Enforcement
One World Financial Center
200 Liberty Street
New York, NY 10281
Phone: (212) 416-0681 (Hibshoosh)
Phone: (646) 315-8617 (Stanland)
Phone: (646) 315-7310 (Petrocelli)
Email: Daniel.Hibshoosh@finra.org
Email: Christina.Stanland@finra.org
Email: Gina.Petrocelli@finra.org