UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE HURRY FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

     Plaintiffs,

v.                                     Case No. 8:18-cv-02869-VMC-CPT

CHRISTOPHER FRANKEL,

     Defendant.

_____/

CHRISTOPHER L. FRANKEL,

     Counter-claimant,

v.

CAYMAN SECURITIES CLEARING
AND TRADING LTD; THE HURRY
FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

     Counter-defendants.

_____/

### FRANKEL'S REPLY TO (DOC. 126-1) PLAINTIFFS' RESPONSE TO FRANKEL'S MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| **Frankel's Material Fact** | **Plaintiffs' Response** | **Frankel's Reply** |
|---|---|---|
| **1.** Frankel has worked in the securities business since 1989. Frankel Decl. ¶ 3 (Doc. 16-1). | Admit. | |
| **2.** Frankel has been in a management role in "clearing trades" for securities transactions since 1994. Frankel Decl. ¶ 4 (Doc. 16-1). | Admit. | |
| **3.** From June 5, 2009 through July 24, 2015, Legent/COR employed Frankel as its CEO. Frankel Decl. ¶ 7 (Doc. 16-1). | Admit. | |
| **4.** Legent/COR was one of Alpine's chief competitors, until September 28, 2018, in the business of clearing trades of micro-cap securities. Frankel Decl. ¶ 7 (Doc. 16-1). | Deny.<br><br>Cruz Decl. ¶ 4 (COR was not a competitor of Alpine). | Cruz's declaration does not refute that Legent/COR and Alpine were both in the business of clearing trades in micro-cap securities. *See* Cruz Decl. ¶ 4.<br><br>Cruz's denial that Legent/COR was one of Alpine's chief competitor is immaterial; the plaintiffs cannot deny that Frankel knew and worked with Alpine's largest clients or their beneficial owners while working for prior employers. *See* Material Fact ¶ 6 *infra*. |
| **5.** As CEO of Legent/COR, Frankel co-authored a comprehensive guidebook on clearing trades of micro-cap securities in 2009. Frankel Decl. ¶ 8 (Doc. 16-1). | Admit. | |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| 6. Before working for Alpine as its CEO, Frankel knew and worked with most of Alpine's largest clients (based on commissions and fees), or their beneficial owners, while working for prior employers. Frankel Decl. ¶ 15 (Doc. 16-1). | Deny.<br><br>Frankel Depo. 15:3-5; 22:25-23:3 (Frankel brought no clients to Alpine).<br><br>Frankel depo. 23:4-18 (Frankel was introduced to Jim Kelly while working at Alpine).<br><br>Frankel depo. 24:13-23 (Frankel was introduced to John Fife while working at Alpine).<br><br>Frankel Depo. 35:7-9 (Frankel was introduced to Lakeside Bank while working at Alpine). | The cited testimony does not refute that Frankel knew and worked with most of Alpine's largest clients or their beneficial owners while working for prior employers.<br><br>Jim Kelley was not one of Alpine's clients. *See* Frankel Dep. 23:13–24:4 (discussing that Frankel consulted with Kelly while working at Alpine so that Kelly could assist Alpine with an issue Alpine was having with international wires).<br><br>Frankel did not testify that Hurry or anyone working for the plaintiffs introduced him to John Fife. *See* Frankel Dep. 24:13–25:3. Frankel knew of John Fife before Frankel started working at Alpine. Dep. 24:13–15. Frankel met Fife in Salt Lake after Fife called Frankel to introduce himself to Frankel. Dep. 24:21–25:8. After Frankel stopped working as Alpine's CEO, Fife called Frankel to find out what Frankel's future plans were. Dep. 25:12–26:1.<br><br>Lakeside Bank was not one of Alpine's clients. *See* Frankel Dep. 35:10–24. |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| 7. "Clearing" trades of micro-cap securities is the process by which micro-cap securities are transferred in compliance with federal securities laws and regulations. Frankel Decl. ¶ 5 (Doc. 16-1). | Admit. | |
| 8. "Clearing trades" for securities transactions has long been a standard process widely known and commonly utilized in the securities business. Frankel Decl. ¶ 6 (Doc. 16-1). | Admit. | |
| 9. The process for "clearing trades" is not confidential or a trade secret. Frankel Decl. ¶ 6 (Doc. 16-1). | Deny.<br><br>Cruz Decl. ¶ 5 (The manner in which Alpine and Scottsdale process trades with their clients is confidential.). | The plaintiffs admit that clearing trades is a standard process widely known and commonly utilized in the securities business. *See* Material Fact ¶ 8 *infra*.<br><br>Cruz's Declaration does not state that the manner in which Alpine and Scottsdale processes trades with their clients is a trade secret. *See* Cruz Decl. ¶ 5.<br><br>Cruz's Declaration states in a conclusory fashion that the manner in which Alpine and Scottsdale processes trades is "confidential" but does not include any facts to support this conclusory statement or any explanation of how Alpine and Scottsdale's process is supposedly different from the standard process widely |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | | known and commonly utilized in the securities business. *See* Cruz Decl. ¶ 5. |
| 10. Alpine is an SEC regulated broker-dealer and publishes its financial statements, fee schedules, commission schedules, and its Non-DTC Eligible Securities Policy on its web site and other public websites including the SEC's website. Frankel Decl. ¶ 23 (Doc. 16-1). | Deny.<br><br>Cruz Decl. ¶ 6 (Not all information Alpine's balance sheets is published.).<br><br>Frankel Depo. 119:23-120:16 (Not all information on Alpine's financial statements is publically available.). | There is no evidence that Frankel has used or disclosed to any third parties any information from Alpine's financial statements. *See* Plfs.' Additional Material Facts (Doc. 126-1); Plfs.' Opp. to Frankel's MSJ (Doc. 126). |
| 11. Scottsdale is an SEC regulated broker-dealer and publishes its financial statements, fee schedules, and commission schedules on its web site and other public websites including the SEC's website. Frankel Decl. ¶ 23 (Doc. 16-1). | Cruz Decl. ¶ 7 (Not all information Scottsdale's balance sheets is published.). | There is no evidence that Frankel has used or disclosed to any third parties any information from Alpine's financial statements. *See* Plfs.' Additional Material Facts (Doc. 126-1); Plfs.' Opp. to Frankel's MSJ (Doc. 126). |
| 12. On August 4, 2015, Alpine Securities Corporation hired Frankel as its CEO. Frankel Decl. ¶ 9 (Doc. 16-1). | Admit. | |
| 13. Alpine Securities hired Frankel as CEO based on Frankel's extensive experience in the securities business and particularly his experience with clearing trades of micro-cap securities. Frankel Decl. ¶ 10 (Doc. 16-1); Hurry Dep. 43:20– | Deny.<br><br>Hurry Depo. 44:24-45:9 (Hurry doubts Frankel's experience with clearing firms.). | The cited testimony does not refute that Frankel was hired based on his extensive experience. *See* Hurry Dep. 44:24-45:9. |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| 45:5 (Doc. 115). | | |
| **14.** In late July 2018, Alpine terminated Frankel's employment as CEO. Frankel Decl. ¶ 11 (Doc. 16-1); Hurry Dep. 56:12–23 (Doc. 115). | Admit. | |
| **15.** Alpine Securities employed Frankel as its CEO until August 1, 2018. Frankel Decl. ¶ 9 (Doc. 16-1). | Admit. | |
| **16.** From August 2, 2018, through October 31, 2018, Alpine engaged Frankel as a non-exclusive consultant. Frankel Decl. ¶ 11 (Doc. 16-1). | Admit. | |
| **17.** During Frankel's tenure as CEO of Alpine and as a non-exclusive consultant for Alpine, Frankel worked remotely from his home. Frankel Dep. 81:10–16; 95:2–7 (Doc. 116). | Admit. | |
| **18.** While working remotely for Alpine, Frankel emailed documents to his personal email accounts so that he could access the documents on his home computer and work remotely on projects for Alpine. Frankel Dep. 81:10–16; 95:2–7 (Doc. 116). | Deny.<br><br>Frankel depo. 62:24-63:17; 121:2-16 (Frankel used documents he sent himself for personal use.). | Frankel testified that he thought about using the template of the document in Exhibit 6, but that he never actually used the template. Dep. 62:10–15 ("I thought about using this template to draft an idea to raise capital. But I never attempted to raise any capital or solicited any capital. It wasn't going to be this exact structure at all. But, you know, the template in terms of |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | | borrower, lender, instrument, maturity, that type of thing."). Frankel did not even think about using anything other than the document's template. *Id.* And he never actually used the document's template. *Id.*<br><br>Frankel testified that he forwarded himself Exhibit 12 so that he would have the contact information for people he had known for 20-plus years. Frankel Dep. 121:5–16. Frankel did not use or disclose any of the other information in Exhibit 12. Frankel Dep. 117:11–14 ("I assure you, it [had] nothing to do with any of the attachments to this e-mail. Never sent them to anybody, never forwarded them to anybody."); Frankel Dep. 170:7–171:4. The contacts were not "Confidential Information" under the Employee NDA because they were known to Frankel before his employment with Alpine. *See* Doc. 61 at 22, § 2(a). For the same reason, the contacts are not trade secrets of Alpine. |
| **19.** Neither Hurry Trust nor Scottsdale ever employed Frankel or engaged him as a consultant. Frankel Decl. ¶ 17 (Doc. 16-1). | Admit. | |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| **20.** The Non-Disclosure and Confidentiality Agreement dated June 22, 2015, which the second amended complaint defines as the Original NDA, only protects "Confidential Information" of the "Discloser." (Doc. 61 at 19). | Admit. | |
| **21.** Hurry Trust is not included in the definition of "Discloser" under the Original NDA. (Doc. 61 at 19). | Deny.<br><br>Second Amended Complaint ("SAC") [Dkt. 61], Exh. 1 (Original NDA defines "Discloser" as Scottsdale, Alpine, Cayman Securities, and "any associated company of the Hurry Family Revocable Trust."). | The Hurry Family Revocable Trust is not an "associated company of the Hurry Family Revocable Trust." The Hurry Trust does not own itself, is not an associate of itself, and is not a company. |
| **22.** The Original NDA does not prohibit competition with the Discloser or solicitation of the Discloser's clients. (Doc. 61 at 19–20). | Deny.<br><br>SAC [Dkt. 61], Exh. 1, ¶ 2(b) (Agreement requires Frankel to use confidential information solely for the benefit of Plaintiffs.). | The plaintiffs have not cited and cannot cite any provision of the Original NDA that prohibits competition with the Discloser or solicitation of the Discloser's clients. |
| **23.** The Employee Nondisclosure & Computer Use Agreement dated July 1, 2015, which the second amended complaint defines as the Employee NDA, only protects "Confidential Information" of the "Company." Second Am. (Doc. 61 at 22). | Deny.<br><br>SAC [Dkt. 61], Exh. 2, ¶ 3 (Agreement states Frankel will not disclose to Scottsdale or Alpine, or use in Scottsdale or Alpine's business or cause Scottsdale or Alpine to use any trade secrets of others.).<br><br>SAC [Dkt. 61], Exh. 2, ¶ 4 | The plaintiffs did not sue Frankel for breaching § 3. The plaintiffs have not alleged that Frankel disclosed to Alpine or Scottsdale any trade secrets of others.<br><br>The plaintiffs did not sue Frankel for breaching § 6. And Frankel did not breach § 6. *See* discussion *infra* regarding Plaintiffs' |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | (Agreement states that Frankel will return to Scottsdale and Alpine all equipment, files, software programs and other personal property of Scottsdale and Alpine.).<br><br>SAC [Dkt. 61], Exh. 2, ¶ 6 (Agreement limits Frankel's computer access and use, including a prohibition against sending confidential information to a non-company email address). | Additional Material Facts ¶ 8. |
| **24.** Hurry Trust is not included in the definition of the "Company" under the Employee NDA. Second Am. Compl. Ex. 1 (Doc. 61 at 22). | Admit. | |
| **25.** With respect to Alpine and Scottsdale, the Employee NDA replaced the Original NDA. Hurry Dep. 41:17–22 (Doc. 115). | Admit. | |
| **26.** The Employee NDA defines Frankel as "Employee" and provides that "Employee shall have no obligation to treat as confidential any information which: (a) was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company; (b) is or becomes public knowledge through a source other than | Admit. | |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| Employee and through no fault of Employee; or (c) is or becomes lawfully available to Employee from a source other than the Company." Employee NDA § 2 (Doc. 61 at 22). | | |
| **27.** The Employee NDA provides that Frankel's confidentiality obligation under the Employee NDA "continues for so long as such Confidential Information remains a trade secret." Employee NDA § 5 (Doc. 61 at 23). | Deny.<br><br>SAC [Dkt. 61], Exh. 2 ¶ 5 (The provision cited by Frankel only applies to the confidentiality of things deemed Confidential Information under the agreement; it does not cover other information protected by the agreement.). | The Employee NDA only protects "Confidential Information"; it does not protect any other type of information. (Doc. 61 at 22–24). Furthermore, the second amended complaint's allegations regarding the Employee NDA all concern the Employee NDA's provisions regarding "Confidential Information." (Doc. 61). |
| **28.** The Employee NDA does not prohibit competition with the Company or solicitation of the Company's clients. (Doc. 61 at 22–24). | Deny.<br><br>SAC [Dkt. 61], Exh. 2 ¶ 5 (Agreement requires Frankel to maintain confidentiality and security of Plaintiffs' confidential information.). | The plaintiffs have not cited and cannot cite any provision of the Employee NDA that prohibits competition with the Company or solicitation of the Company's clients. |
| **29.** Frankel never entered into a non-compete, non-solicitation, or any other agreement that would prohibit Frankel from competing with Hurry Trust, Scottsdale, or Alpine, or from soliciting their clients. Frankel Decl. ¶¶ 13, 14 (Doc. 16-1). | Deny.<br><br>SAC [Dkt. 61], Exh. 2, ¶¶ 1, 2, 5 (Agreement restricts Frankel's use of client information.). | The plaintiffs have not cited and cannot cite any provision of the Employee NDA that prohibits competition with the Company or solicitation of the Company's clients. |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| **30.** After Frankel stopped working as a non-exclusive consultant for Alpine, Frankel received from counsel for the plaintiffs, Jordan Susman, a demand letter (the "**Demand Letter**") on behalf of Cayman Securities Clearing and Trading Ltd. ("**Cayman**"), Hurry Trust, Scottsdale, and Alpine. Frankel Decl. ¶ 18 (Doc. 16-1); Frankel Decl. Ex. 2 (Doc. 16-4). | Admit. | |
| **31.** The Demand Letter demanded that Frankel cease and desist from "any and all further disclosure and/or usage of Confidential Information," but did not identify any instances of Frankel using or disclosing Confidential Information. (Doc. 16-4). | Admit. | |
| **32.** The Demand Letter demanded that Frankel "return to this firm any and all documents, records, and/or copies thereof in your possession, custody, or control that contain any Confidential Information," but did not identify a single document that Frankel should return. (Doc. 16-4). | Admit. | |
| **33.** Frankel received the Demand Letter by email on Friday, November 9, 2018, and responded by email on Monday, November 12, 2018. Frankel. Decl. ¶ 19 (Doc. 16-1); Frankel Decl. Ex. 3 (Doc. 16-5). | Admit. | |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| **34.** Frankel offered to return documents to Susman in compliance with the Demand Letter. (Doc. 16-5). Frankel stated: "In accordance with your demand, I am willing to search for any Confidential documents that may be in my possession. Please let me know what documents you believe I have that are confidential and I will provide those to you. If you are not able to provide specifics pertaining to the documents you seek, simply let know and I will provide a copy of all documents and communication from clients which are in my possession." (Doc. 16-5). | Admit. | |
| **35.** Frankel waited for instructions on complying with the demand for return of documents, but Frankel never received a response. Frankel Decl. ¶ 20 (Doc. 16-1). | Deny.<br><br>Frankel Depo. 46:23-25 (Frankel retained confidential until Plaintiffs commenced this action.).<br><br>Frankel Depo. 152:13-23; 155:7-156:5; 156:13-17; Exh. 20; Susman Decl. ¶¶ 4-7, Exhs. 1, 2 (After Plaintiffs requested the return of their information, Frankel sent confidential documents to the owner of a broker-dealer.). | Frankel offered to return documents in compliance with the plaintiffs' request the next business day after the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>The sample blotter that Frankel sent to Ziv was not subject to the Employee NDA. The Employee NDA applied to information exposed to Employee "[i]n the performance of |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | | Employee's job duties with Company." (Doc. 61 at 22, § 1). Frankel did not receive the blotter "in the performance of [his] job duties with Company." Frankel Dep. 152:15–153:19. Frankel received the blotter after his employment as CEO and his engagement as a non-exclusive consultant ended. *Id.* Frankel asked Randy Jones for a sample trade blotter, and Jones sent Frankel a sample blotter. *Id.* The blotter does not include any confidential information of Alpine or even a reference to Alpine. Frankel Dep. Ex. 20. All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.* |
| 36.  Instead, on November 21, 2018, Susman filed on behalf of Cayman, Hurry Trust, Scottsdale, and Alpine the original complaint in this action, which alleged that Frankel misappropriated the plaintiffs' confidential information, without identifying a single instance of misappropriation and without identifying a single piece of confidential information.  (Doc. | Deny.<br><br>Original Complaint [Dkt. 1], ¶ 20 ("Defendant knowingly, willfully, and maliciously breached his obligations to Plaintiffs under the NDA and used confidential information obtained from Plaintiffs to solicit capital, establish banking relations, recruit Plaintiffs' clients, and | Neither the original complaint nor the amended complaint identified with sufficient specificity the confidential information allegedly misappropriated. (Docs. 38, 47). |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| 1). | compete with Plaintiffs' businesses. Among other things, Plaintiffs are informed and believe Defendant used the foregoing confidential information obtained from Plaintiffs to make a bid for a broker-dealer in Chicago.").<br><br>Original Complaint [Dkt. 1], ¶ 57 ("Defendant engaged in unfair methods of competition and deceptive and/or unfair business practices by using Plaintiffs' confidential information and Trade Secrets to solicit Plaintiffs' clients, establish relationships with their financial institutions and investors, and attempt to acquire a broker- dealer in Chicago."). | |
| **37.** On December 17, 2018, Frankel filed an answer (Doc. 14) denying the original complaint's conclusory allegations of misappropriation; and Frankel moved to require the plaintiffs to post a bond under FDUTPA. (Doc. 16). | Admit.<br><br>Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | |
| **38.** On January 7, 2019, John Hurry signed a declaration in which he stated that soon after Frankel left Alpine in October 2018, Alpine learned that Frankel "was using | Deny.<br><br>Plaintiffs' Opposition to Motion to Dismiss [Dkt. 24], pg. 4. ("Complaint | The plaintiffs have not cited and cannot identify a single instance of misappropriation or single piece of confidential information in |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| Alpine's and the other Hurry Parties' confidential information and trade secrets for the benefit of his new business ventures." Hurry Decl. ¶ 7 (Doc. 24-1). The plaintiffs filed this declaration with their opposition to Frankel's motion for bond. (Doc. 24). Neither the declaration nor the opposition brief identified a single instance of misappropriation or a single piece of confidential information. (Docs. 24, 24-1). | clearly states that Defendant violated the NDA by using the Hurry Parties' trade secrets and confidential information for his own business purposes. (Complaint at ¶ 20) ("Defendant knowingly, willfully, and maliciously breached his obligations to Plaintiffs under the NDA and used confidential information obtained from Plaintiffs to solicit capital, establish banking relations, recruit Plaintiffs' clients, and compete with Plaintiffs' businesses. Among other things, Plaintiffs are informed and believe Defendant used the foregoing confidential information obtained from Plaintiffs to make a bid for a broker-dealer in Chicago.")).<br><br>Plaintiffs' Opposition to Motion to Dismiss [Dkt. 24], pg. 6. ("As stated in the Complaint, Defendant used the Hurry Parties' trade secrets and confidential information to solicit capital, establish banking relations, recruit the Hurry Parties' clients, and make a bid on a Chicago-based broker-dealer.").<br><br>Subject to Motion to Strike because it proffers facts | Hurry's declaration or the plaintiffs' opposition brief. (Docs. 24, 24-1). |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | |
| **39.** On February 1, 2019, Frankel served initial disclosures (Doc. 35-3) with which he produced the documents that he originally offered to return to the plaintiffs in response to the Demand Letter. (Doc. 16-5). Frankel used an independent, third-party vendor to collect all of the files stored in his personal email accounts, then retrieved all emails and documents received from Alpine and Scottsdale email addresses, as well as John Hurry and Justine Hurry's personal email addresses. (Doc. 35-3 at 3). Frankel produced with his initial disclosures all of these emails and documents as portable document files bates numbered FRANKEL_000001 to FRANKEL_002246. (Doc. 35-3 at 3). | Deny.<br><br>Frankel Depo. 46:23-25 (Frankel did not return documents by the date requested.). | Frankel offered to return documents in compliance with the plaintiffs' request the next business day after the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)). |
| **40.** After Frankel served his initial disclosures, the plaintiffs realized that Alpine and Scottsdale sued under the wrong agreement. (Doc. 34). | Deny.<br><br>Plaintiffs' Motion for Leave to File Amended Complaint [Dkt. 34], pg. 2 ("Upon reviewing their files to respond to the document requests, the Hurry Parties realized that Scottsdale Capital Advisors, Alpine Securities Corporation, and Frankel | The plaintiffs filed their motion for leave on February 12, 2019, eleven days after Frankel served his initial disclosures on February 1, 2019. (Docs. 34, 35-3). |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
|  | had entered into a second nondisclosure agreement . . . that superseded the Original NDA as to those parties.").  The other claims in the Complaint were not affected. |  |
| **41.**  On February 26, 2019, the plaintiffs filed their first amended complaint, which did not identify a single instance of misappropriation or a single piece of confidential information (Doc. 37). | Deny.<br><br>First Amended Complaint ("FAC") [Dkt. 37], ¶ 24 ("Defendant knowingly and willfully breached his obligations to them under the NDA and under the Employee Nondisclosure Agreement by using confidential information obtained from the Hurry Parties to solicit capital, establish banking relations, recruit clients of the Hurry Parties, and compete with the Hurry Parties' businesses. Among other things, the Hurry Parties are informed and believe that Defendant has used the foregoing confidential information obtained from the Hurry Parties to make a bid for a broker-dealer in Chicago.").<br><br>FAC [Dkt. 37] ¶ 27 ("Defendant engaged in deceptive and/or unfair practices by using the Hurry Parties' confidential information and trade secrets to solicit the Hurry Parties' clients, establish | Neither the original complaint nor the amended complaint identified with sufficient specificity the confidential information allegedly misappropriated. (Docs. 38, 47). |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
|  | relationships with the Hurry Parties' financial institutions and investors, and attempt to acquire broker-dealer in Chicago."). |  |
| **42.** On April 29, 2019, the Court granted Frankel's motion to dismiss (Doc. 38) the first amended complaint for failing to identify the confidential information misappropriated. (Doc. 47). The court authorized plaintiffs to file a second amended complaint. (Doc. 47). | Deny.<br><br>Court Order [Dkt. 47] (Court granted motion to dismiss for reasons stated on record at the hearing on April 26, 2019, namely the trade secret information needed to be identified with more specificity.). | The plaintiffs concede that the amended complaint was dismissed for failing to identify with sufficient specificity the confidential information allegedly misappropriated. |
| **43.** Cayman did not join in the second amended complaint. | Admit. |  |
| **44.** On May 10, 2019, the remaining plaintiffs, Hurry Trust, Alpine, and Scottsdale filed their second amended complaint. (Doc. 61). | Admit. |  |
| **45.** The second amended complaint identified documents that Frankel allegedly misappropriated (Doc. 61). But every single document identified in the second amended complaint came from the documents bates numbered FRANKEL_000001 to FRANKEL_002246 that Frankel produced with his initial disclosures (Doc. 35-3). | Admit. |  |
| **46.** On June 7, 2019, Alpine and Scottsdale served supplemental | Deny. | Frankel's first interrogatory asked the plaintiffs to "State |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| interrogatory answers (Doc. 118-8) that identified documents allegedly misappropriated by Frankel, which the plaintiffs produced and bates numbered as HURRY 0006 to HURRY 0260. Every single document identified in the interrogatory answers and produced by the plaintiffs came from the documents bates numbered FRANKEL_000001 to FRANKEL_002246 that Frankel produced with his initial disclosures (Doc. 61). | Supplemental Interrogatory Responses [Dkt.118-8], Nos. 5, 6, 9 ("Based on documents received from Ziv [Investment Company], including a November 13, 2018, email from Defendant to Peter Ziv, Plaintiffs believe that Defendant disclosed their Confidential Information to Ziv and Peter Ziv in an attempt to purchase Ziv."). | in detail all Confidential Information and the owners of all Confidential Information which you contend Chris Frankel has used unlawfully." (Doc. 118-8 at 2). The plaintiffs' supplemental answer to Frankel's first interrogatory did not identify the document that Frankel sent to Ziv in the November 13, 2018 email. (Doc. 118-8 at 2–3). |
| **47.** The plaintiffs designated the documents bates numbered HURRY 0006 to HURRY 0260 as confidential under a discovery confidentiality agreement entered in this case. Therefore, Frankel cannot attach those documents to this motion without moving to file them all under seal. | Admit. | |
| **48.** Thus, more than six months after the plaintiffs sued Frankel, the only instances of misappropriation that the plaintiffs alleged were based on emails that Frankel produced with his initial disclosures when he returned all of the communications and documents that he had ever received from the plaintiffs. (Doc. 61). | Deny.<br><br>Supplemental Interrogatory Responses [Dkt.118-8], No. 6 ("Plaintiffs state that they learned Defendant had and was using their Confidential Information from Jim Kelley. Jim Kelly alerted Plaintiffs after Defendant contacted him, seeking an indication of interest, and informed him that Defendant had entered into an agreement to purchase a broker dealer in Chicago, Ziv Investment | The plaintiffs' interrogatory responses only offered speculation and surmise. (Doc. 118-8). |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | Company ("Ziv"). Defendant told Kelley that Ziv would have capabilities equal, if not superior, to those at Alpine, and made reference to trading that mimicked that of Alpine with a similar customer base. Defendant also informed Kelley that he had sufficient clients and capital to outperform Alpine. Kelley knew that Defendant had no clients of his own or the financial wherewithal to consummate such an endeavor and surmised that Defendant was using Plaintiffs' Confidential Information to purchase Ziv."). Supplemental Interrogatory Responses [Dkt.118-8], Nos. 5, 6, 9 ("Based on documents received from Ziv, including a November 13, 2018, email from Defendant to Peter Ziv, Plaintiffs believe that Defendant disclosed their Confidential Information to Ziv and Peter Ziv in an attempt to purchase Ziv."). Subject to Motion to Strike because legal argument should not be included in the statement of material facts. | |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| **49.** Plaintiffs outrageously contend that Frankel was plotting against the plaintiffs (rather than working on their business) by forwarding emails from his work email account to his personal account during the entire 3 years and 3 months that he worked for Alpine. | Deny.<br><br>Frankel Depo. 40:8-41:19; 43:19-44:7; 44:14-17; 59:15-60:10; 60:23-62:2; 62:16-63:17; 66:18-67:1; 67:15-17: 69:13-70:14; 70:24-71:2: 71:21-23; 76:2-77:16; 78:11-14; 79:20-80:15; 81:6-8; 86:15-20; 89:11-90:15; 91:5-7; 92:1-12; 92:19-93:6; 114:5-14; 115:3-18; 116:11-117:2: 117:16-121:14; 122:10-124:1; 124:10-18; 125:10-22; 128:14-129:20; 130:7-131:20; 132:6-133:19; 134:1; 135:14-136:25; 137:6-8; 152:13-153:13; 155:2-156:5; Exhs. 2, 6-19 (On numerous occasions, without Plaintiffs' knowledge or consent, Frankel would access Plaintiffs' Confidential Information for his own personal uses.).<br><br>Frankel Depo. 152:13-153:13; 155:2-6; Exh. 20 (Frankel directed an Alpine employee to gather and give him two days' worth of Alpine's trade runs.).<br><br>Cruz Decl. ¶ 8; Frankel Depo. 155:2-6 (The blotter of Alpine's trade runs is proprietary to Alpine as it is shows all of the trades cleared through Alpine on those dates. This | Frankel emailed documents to his personal email address so that he could work for Alpine on Alpine's business at his home, on his home computer.  Frankel Dep. 81:9–82:10.  Frankel used his Alpine laptop when working at home, but his Alpine laptop was not connected or linked to his home printer.  *Id.* Frankel preferred to work with printed documents and often needed to print documents to sign them, so he emailed Alpine documents to his home email address to print and work on them for Alpine at home. *Id.*<br><br>Alpine permitted employees to work remotely on Alpine's business from their personal computers that were not owned by Alpine. Jarvis Decl. ¶ 4. It was relatively common for Alpine's employees to work remotely, in most instances from their own personal computers or devices that were not owned by Alpine. Jarvis Decl. ¶ 5. It was also common for Alpine's employees to forward emails from their Alpine email accounts to their personal email accounts to work on Alpine's business. Jarvis Decl. ¶ 6.<br><br>The sample blotter that |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | information is not publicly available, and Alpine derives economic advantages by the public not knowing this information.).<br><br>Frankel Depo. 44:24-45:4; 63:18-22; 64:16-19; 66:2-4; 71:21-23; 75:18-24: 78:11-14; 78:18-20; 85:8-18; 90:19-24; 96:12-14; 122:1-7; 124:3-8; 127:25-128:13; 129:21-130:4; 131:21-132:3; 133:20-25: 137:13-21 (Upon his termination, Frankel did not notify Plaintiffs that he had their documents in his possession, nor did Frankel delete or return confidential documents.).<br><br>Frankel Depo. 152:13-23; 155:7-156:5; 156:13-17; Exh. 20 (Shortly after Frankel's termination from Alpine and after Plaintiffs requested the return of their information, Frankel sent the trade run document to the owner of a broker-dealer that he was attempting to purchase as evidence of the amount of daily activity that he believed he could achieve.).<br><br>Susman Decl. ¶¶ 4-7, Exhs. 1, 2 (Frankel provided Alpine's trade runs to Ziv, Atlas, Koonce, and the | Frankel sent to Ziv was not subject to the Employee NDA. The Employee NDA applied to information exposed to Employee "[i]n the performance of Employee's job duties with Company." (Doc. 61 at 22, § 1). Frankel did not receive the blotter "in the performance of [his] job duties with Company." Frankel Dep. 152:15–153:19. Frankel received the blotter after his employment as CEO and his engagement as a non-exclusive consultant ended. *Id.* Frankel asked Randy Jones for a sample trade blotter, and Jones sent Frankel a sample blotter. *Id.* The blotter does not include any confidential information of Alpine or even a reference to Alpine. Frankel Dep. Ex. 20. All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.*<br><br>Frankel offered to return documents in compliance with the plaintiffs' request the next business day after the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)). |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | DTCC.).<br><br>Subject to Motion to Strike because legal argument should not be included in the statement of material facts. | Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)). |
| **50.** There is no evidence that Frankel used or disclosed the documents bates numbered HURRY 00006 to HURRY 02620 and identified in the Second Amended Complaint as "Confidential Information." | Deny.<br><br>Frankel depo. 62:24-63:17; 121:2-16 (Frankel admitted using documents he sent himself for personal use.). | Frankel testified that he thought about using the template of the document in Exhibit 6, but that he never actually used the template. Dep. 62:10–15 ("I thought about using this template to draft an idea to raise capital. But I never attempted to raise any capital or solicited any capital. It wasn't going to be this exact structure at all. But, you know, the template in terms of borrower, lender, instrument, maturity, that type of thing."). Frankel did not even think about using anything other than the document's template. *Id.* And he never actually used the document's template. *Id.*<br><br>Frankel testified that he forwarded himself Exhibit 12 so that he would have the contact information for people he had known for 20-plus years. Frankel Dep. 121:5–16. Frankel did not use or disclose any of the other information in Exhibit 12. Frankel Dep. 117:11–14 ("I assure you, it [had] |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
|  |  | nothing to do with any of the attachments to this e-mail. Never sent them to anybody, never forwarded them to anybody."); Frankel Dep. 170:7–171:4. The contacts were not "Confidential Information" under the Employee NDA because they were known to Frankel before his employment with Alpine. *See* Doc. 61 at 22, § 2(a). For the same reason, the contacts are not trade secrets of Alpine. |
| 51. In their initial interrogatory responses (served February 13, 2019), the plaintiffs could only offer their speculation that Frankel must have misappropriated their allegedly confidential information in attempting to purchase a broker-dealer because the plaintiffs believed that Frankel "was not a producer" and "had no clients of his own" and did not have "the financial wherewithal to consummate such an endeavor." (Doc. 35-1 at 4–5). | Deny.<br><br>Plaintiffs' Interrogatory Responses [Dkt. 35-1], No. 6; Susman Decl. ¶¶ 4-8, Exhs. 1, 2; Frankel Depo. 152:13-23; 155:7-156:5; 156:13-17; Exh. 20 (Plaintiffs provided circumstantial evidence of Frankel's misappropriation. This evidence was later substantiated by documents received from third parties in response to subpoenas.). | The plaintiffs have not refuted that their interrogatory responses offered mere speculation. (Doc. 35-1 at 4–5).<br><br>As explained elsewhere, the speculation was not substantiated in discovery. |
| 52. The plaintiffs' supplemental interrogatory responses added no evidence, only the "surmise" of Jim Kelly that Frankel must somehow have been using the plaintiffs' confidential information to attempt to purchase a broker-dealer in | Deny.<br><br>Supplemental Interrogatory Responses [Dkt.118-8], No. 6 ("Plaintiffs state that they learned Defendant had and was using their Confidential Information | The plaintiffs have not refuted that their supplemental interrogatory responses added only the "surmise" of Jim Kelly. (Doc. 118-8 at 7).<br><br>As explained elsewhere, the |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| Chicago. (Doc. 118-8 at 7). | from Jim Kelley. Jim Kelly alerted Plaintiffs after Defendant contacted him, seeking an indication of interest, and informed him that Defendant had entered into an agreement to purchase a broker dealer in Chicago, Ziv Investment Company ("Ziv"). Defendant told Kelley that Ziv would have capabilities equal, if not superior, to those at Alpine, and made reference to trading that mimicked that of Alpine with a similar customer base. Defendant also informed Kelley that he had sufficient clients and capital to outperform Alpine. Kelley knew that Defendant had no clients of his own or the financial wherewithal to consummate such an endeavor and surmised that Defendant was using Plaintiffs' Confidential Information to purchase Ziv."). <br><br> Supplemental Interrogatory Responses [Dkt.118-8], Nos. 5, 6, 9 ("Based on documents received from Ziv, including a November 13, 2018, email from Defendant to Peter Ziv, Plaintiffs believe that Defendant disclosed their Confidential Information to Ziv and Peter Ziv in an | speculation and surmise was not substantiated in discovery. <br><br> The sample blotter that Frankel sent to Ziv was not subject to the Employee NDA. The Employee NDA applied to information exposed to Employee "[i]n the performance of Employee's job duties with Company." (Doc. 61 at 22, § 1). Frankel did not receive the blotter "in the performance of [his] job duties with Company." Frankel Dep. 152:15–153:19. Frankel received the blotter after his employment as CEO and his engagement as a non-exclusive consultant ended. *Id.* Frankel asked Randy Jones for a sample trade blotter, and Jones sent Frankel a sample blotter. *Id.* The blotter does not include any confidential information of Alpine or even a reference to Alpine. Frankel Dep. Ex. 20. All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.* |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | attempt to purchase Ziv."). | |
| **53.** Frankel's attempt to purchase a broker-dealer in Chicago arose when a client—with whom Frankel had worked when he was CEO of Legent/COR—contacted Frankel about the opportunity to purchase the broker-dealer. Frankel Decl. ¶ 18 (Doc. 16-1); Frankel Dep. 33:9–34:16 (Doc. 116). Frankel did not learn of the opportunity through any confidential information of the plaintiffs. Frankel Decl. ¶ 18 (Doc. 16-1). | Admit. | |
| **54.** No evidence supports the plaintiffs' damages allegations. The plaintiffs admitted in their initial disclosures that their "damages and losses arising from Defendant's misconduct continues to be discovered, and are unknown at this time." (Doc. 35-2). The plaintiffs' initial response (served February 13, 2019) to Frankel's request for production of "All documents which support the damage allegations in your complaint" indicated that the plaintiffs would provide "documents sufficient to show their damages." (Doc. 35-4). Then, the plaintiffs served a supplemental response (on June 7, 2019) in which they stated that "they have no responsive documents in their possession, custody, or control." (Doc. 118-9). Then, the plaintiffs served a further supplemental response (on | Deny. Hurry Depo. 156:4-157:1, Exhs. 29-34 (Plaintiffs produced documents showing losses of revenue that coincide with Frankel's wrongful activities.). Subject to Motion to Strike because legal argument should not be included in the statement of material facts. | The plaintiffs cannot deny that they made those statements in their initial disclosures (Doc. 35-2), responses to production requests (35-4), supplemental responses to production requests (118-9), and further supplemental responses to production requests (118-10). |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| August 5, 2019) in which they stated that they would provide "documents sufficient to show their damages." (Doc. 118-10). | | |
| **55.** The documents that the plaintiffs produced that supposedly support their damages allegations were marked as Exhibits 29 to 34 of the deposition of John Hurry as corporate representative for Hurry Trust, Alpine, and Scottsdale. Hurry Dep. 156 (Doc. 115). But as corporate representative of Alpine and Scottsdale, Hurry could only testify that the documents show drops in revenue during certain time periods that he thinks Frankel somehow caused. Hurry Dep. 156–177 (Doc. 115). Hurry admitted that the plaintiffs have no damages analysis. Hurry Dep. 157 (Doc. 115). | Deny.<br><br>Hurry Depo. 156:4-157:13, Exhs. 29-34 (Plaintiffs produced documents showing losses of revenue that coincide with Frankel's wrongful activities. Hurry stated that no expert has performed an analysis.).<br><br>Subject to Motion to Strike because legal argument should not be included in the statement of material facts. | Exhibits 29 to 34 do not show any coincidence with Frankel's unspecified "wrongful activities."<br><br>Exhibits 29 to 34 do not show any losses in revenue.<br><br>Exhibits 29 to 34 show monthly revenue, with no explanation or analysis of the reasons for the amount of monthly revenue and no evidence that there should have been or would have been more or less revenue in any given month. |
| **56.** No evidence supports the plaintiffs' allegations of irreparable harm. The plaintiffs' initial response (served February 13, 2019) to Frankel's request for production of "All documents which support your allegations of irreparable harm in your complaint" indicated that the plaintiffs "have no responsive documents in their possession, custody, or control." (Doc. 35-4). | Deny.<br><br>Frankel Depo. 138:10-23, 152:13-23, 155:2-6, Exhs. 19, 20; Susman Decl. ¶¶ 4-8, Exhs. 1, 2 (Frankel continued to send Plaintiffs' confidential information to third parties after Plaintiffs requested their return and after Plaintiffs commenced this lawsuit. These documents were obtained from third parties in discovery.)<br><br>Subject to Motion to Strike | The plaintiffs cannot deny their own statement made in response to Frankel's production requests (35-4).<br><br>The plaintiffs have not presented any evidence supporting their allegations of irreparable harm. |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | because legal argument should not be included in the statement of material facts. | |
| **57.** As Hurry acknowledged in his deposition, the plaintiffs have done no analysis to support any claim for damages. Hurry Dep. 157:15–25 (Doc. 115). | Deny.<br><br>Hurry depo. 157:2-13 (Hurry stated that there had been no "expert analysis."). | Hurry testified as Alpine and Scottsdale's corporate representative that "we are still piecing that together" when asked about whether anybody has done a damages analysis in this case on behalf of the plaintiffs. Hurry Dep. 155:15–20. Hurry testified that the plaintiffs are still "in the process" of putting together their damages analysis. Hurry Dep. 173:24–174:5 |
| **58.** There is no evidence of any wrongdoing by Frankel causing Hurry Trust, Alpine, or Scottsdale to suffer any harm or damages. | Deny.<br><br>Hurry Depo. 156:4-157:1, Exhs. 29-34 (Plaintiffs produced documents showing losses of revenue that coincide with Frankel's wrongful activities.).<br><br>Subject to Motion to Strike because legal argument should not be included in the statement of material facts. | Exhibits 29 to 34 do not show any coincidence with Frankel's unspecified "wrongful activities."<br><br>Exhibits 29 to 34 do not show any losses in revenue.<br><br>Exhibits 29 to 34 show monthly revenue, with no explanation or analysis of the reasons for the amount of monthly revenue and no evidence that there should have been or would have been more or less revenue in any given month. |
| **59.** On July 20, 2018, FINRA barred Hurry from participating in the securities markets regulated by | Deny.<br><br>Request for Judicial | The entry of a stay does not refute that FINRA decided to bar Hurry and fine |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| FINRA and imposed a $1.5 million fine against Scottsdale (Doc. 15-2). | Notice, 1 at pp. 4, 5, 6 (The decision referenced by Frankel was stayed by the SEC as to Hurry on appeal "because [the SEC] find[s] that Hurry has at least raised serious legal questions about the NAC's findings, and that the balance of hardships tips decidedly in favor of a stay . . . at this [preliminary stage of appeal] we find that Hurry has raised a serious legal question as to whether FINRA provided him with fair notice of the allegation forming the basis of its finding that he violated Rule 2010 . . . FINRA now admits that Hurry's conduct was 'not a direct violation of Section 5 [of the Act].'").<br><br>Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | Scottsdale.<br><br>FINRA's bar and fine are material to damages and must be considered in any meaningful damage analysis. |
| **60.** The National Adjudicatory Council concluded that "Hurry knowingly facilitated the evasion of federal securities laws enacted to protect investors and, in doing so, made millions of dollars"; that "Hurry's misconduct was purposeful, egregious, and antithetical to the underpinnings of securities regulation as a | Deny.<br><br>Request for Judicial Notice, 1 at pp. 4, 5, 6 (The decision referenced by Frankel was stayed by the SEC as to Hurry on appeal "because [the SEC] find[s] that Hurry has at least raised serious legal | The entry of a stay does not refute the National Adjudicatory Council's conclusions.<br><br>The National Adjudicatory Council's conclusions are material to damages and must be considered in any meaningful damage |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| whole"; and that "Hurry presents a threat to investors and the integrity of the securities markets." (Doc. 15-2 at 101–02). | questions about the NAC's findings, and that the balance of hardships tips decidedly in favor of a stay . . . at this [preliminary stage of appeal] we find that Hurry has raised a serious legal question as to whether FINRA provided him with fair notice of the allegation forming the basis of its finding that he violated Rule 2010 . . . FINRA now admits that Hurry's conduct was 'not a direct violation of Section 5 [of the Act]."). <br><br> Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | analysis. |
| **61.** The SEC is seeking to impose a $22 million fine against Alpine. Hurry Dep. 192:12–13 (Doc. 115). | Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | The plaintiffs have not denied and cannot deny this material fact. <br><br> The SEC's fine is material to damages and must be considered in any meaningful damage analysis. |
| **62.** On July 25, 2019, FINRA filed a Disciplinary Complaint against Alpine alleging that Alpine: (a) had "implemented a series of exorbitant and arbitrary fees" including a "$5,000 *monthly* | Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary | The plaintiffs have not denied and cannot deny this material fact. <br><br> FINRA's allegations and requested sanctions and |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| account fee – which represented an astounding increase of approximately 60,000% from the firm's prior $100 *annual* account fee"; (b) had used the increased account fee as "a pretext to convert its [Alpine's] retail customers' securities"; (c) had "convert[ed] millions of shares of securities [worth nearly $910,000] from its customers for its own benefit"; and (d) had been "looting" Alpine by capital withdrawals not authorized by FINRA "under the guise of sham expense  payments to affiliates ultimately owned and controlled by John Joseph Hurry."  FINRA Disciplinary Complaint at 1– 2, 20–23 (Hurry Dep. Ex. 36 (Doc. 118-5)). | judgment. | discipline are material to damages and must be considered in any meaningful damage analysis. |
| **63.** The FINRA Disciplinary Complaint alleged a "sham" loan to remove capital from Alpine, without required authorization from FINRA, under which Alpine "agreed to pay $4.8 million dollars annually for the right to borrow up to $5 million (at an annual interest rate of 120%)." FINRA Disciplinary Complaint at 21 (Doc. 118-5). | Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | The plaintiffs have not denied and cannot deny this material fact.<br><br>FINRA's allegations and requested sanctions and discipline are material to damages and must be considered in any meaningful damage analysis. |
| **64.** The FINRA Disciplinary Complaint alleged "purported common area maintenance charges" of $610,372.98 paid by Alpine on April 3, 2019, to remove capital from Alpine without required authorization from FINRA.  FINRA | Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | The plaintiffs have not denied and cannot deny this material fact.<br><br>FINRA's allegations and requested sanctions and discipline are material to damages and must be |

31

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| Disciplinary Complaint at 22 (Doc. 118-5). | | considered in any meaningful damage analysis. |
| 65. Hurry agreed that Alpine implemented the fee increase to $5,000 per month. Hurry Dep. 182:7–9 (Doc. 115). | Deny.<br><br>Hurry Depo. 182:24-185:12 (Hurry testified that the fee was waived for customers who did a significant amount of business or took their business elsewhere.).<br><br>Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | Hurry acknowledged that Alpine had implemented in October of 2018 the exponential fee increase described in FINRA's complaint. Hurry Dep. 182, 7-16.<br><br>The exponential fee increase, which coincides with Alpine's termination of Frankel's role as a non-exclusive consultant is material to damages and must be considered in any meaningful damage analysis. |
| 66. Hurry acknowledged ownership and control over Alpine and the affiliates to whom Alpine made the "sham" loan and purported maintenance payment described in the FINRA Disciplinary Complaint. Hurry Dep. 196:13–22, 203:13–19 (Doc. 115). | Deny.<br><br>Hurry Depo. 8:12-16 (Hurry does not control Alpine.)<br><br>Hurry Depo. passim (Hurry did not say anything about a purported "sham" loan in his deposition.).<br><br>Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | Hurry testified that he has "indirect control" of Alpine: the CFO of Alpine's holding company reports to a company that Hurry controls.  Hurry Dep. 200:5–18.<br><br>Hurry acknowledged that FINRA accurately stated the terms of the loan, including the 120% interest rate and the $400,000 per month fee. Hurry Dep. 197, 6-25; 198, 1-25; 199, 1-10. FINRA alleged that these terms demonstrated that the loan was "sham" to extract capital from Alpine without |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| | | authorization.<br><br>FINRA's allegations and requested sanctions for unauthorized capital extractions through a sham loan and a purported maintenance payment are material to damages and must be considered in any meaningful damage analysis. |
| 67. Hurry agreed that FINRA accurately characterized the terms of the loan and maintenance payment. Hurry Dep. 197:6–199:10, 202:12–204:20 (Doc. 115). | Deny.<br>Hurry depo. 197:21-199:1; 199:22-200:1 (Hurry disputed FINRA's characterization of the loan transaction.).<br><br>Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | Hurry agreed that Alpine is paying $400,000 per month, $4.8 million annually, for the right to borrow up to $5 million (at an annual rate of 120%). Hurry Dep. 199:2–199:10; 199:18–200:3. Hurry disputed FINRA's "characterization" but agreed that it was "in the ballpark." Hurry Dep. 199:22-200:3.<br><br>FINRA's allegations are material to damages and must be considered in meaningful damage analysis. |
| 68. On August 15, 2019, FINRA suspended Alpine and Scottsdale's membership in FINRA. *Dep't Enforcement v. Alpine & Scottsdale*, Expedited Proceeding Nos. FPI190001, FPI190002. The suspension is under an interim stay pending briefing on whether there should be stay during Alpine and | Subject to Motion to Strike because it proffers facts that are not necessary for the Court to determine the issues presented in the motion for summary judgment. | The plaintiffs have not denied and cannot deny this material fact.<br><br>FINRA's suspension is material to damages and must be considered in meaningful damage analysis. |

| Frankel's Material Fact | Plaintiffs' Response | Frankel's Reply |
|---|---|---|
| Scottsdale's appeal of the suspension. *See* In the Matter of Alpine, Scottsdale, SEC Admin. Proc. File No. 3-19360, *available at*  https://www.sec.gov/litigation/opinions/2019/34-86719.pdf. | | |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| **1.** [Frankel] sent over a dozen of Plaintiffs' confidential documents to his personal email account.<br><br>Frankel Depo. 40:8-41:19; 43:19-44:7; 44:14-17; 59:15-60:10; 60:23-62:2; 62:16-63:17; 66:18-67:1; 67:15-17; 69:13-70:14; 70:24-71:2; 71:21-23; 76:2-77:16; 78:11-14; 79:20-80:15; 81:6-8; 86:15-20; 89:11-90:15; 91:5-7; 92:1-12; 92:19-93:6; 114:5-14; 115:3-18; 116:11-117:2; 117:16-121:14; 122:10-124:1; 124:10-18; 125:10-22; 128:14-129:20; 130:7-131:20; 132:6-133:19; 134:1; 135:14-136:25; 137:6-8; 152:13-153:13; 155:2-156:5; Exhs. 2, 6–19 | Deny.<br><br>Frankel emailed documents to his personal email address so that he could work for Alpine on Alpine's business at his home, on his home computer.  Frankel Depo. 81:9–82:10.  Frankel used his Alpine laptop when working at home, but his Alpine laptop was not connected or linked to his home printer.  *Id.*  Frankel preferred to work with printed documents and often needed to print documents to sign them, so he emailed Alpine documents to his home email address to print and work on them for Alpine at home. *Id.*<br><br>Alpine permitted employees to work remotely on Alpine's business from their personal computers that were not owned by Alpine. Jarvis Decl. ¶ 4. It was relatively common for Alpine's employees to work remotely, in most instances from their own personal computers or devices that were not owned by Alpine. Jarvis Decl. ¶ 5. It was also common for Alpine's employees to forward emails from their Alpine email accounts to their personal email accounts to work on Alpine's business. Jarvis Decl. ¶ 6. |
| **2.** [Frankel] retained those documents until Plaintiffs commenced this litigation.<br><br>Frankel Depo. 46:23-25 | Deny.<br><br>On the next business day after the plaintiffs' request, Frankel offered to return documents in compliance with the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)). |
| **3.** [Frankel] used at least some of these confidential documents for his own | Deny.<br><br>Frankel did not use the template of the document |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| personal purposes.<br><br>Frankel depo. 62:24-63:17; 121:2-16 | in Exhibit 6. Dep. 62:10–15 ("I thought about using this template to draft an idea to raise capital. But I never attempted to raise any capital or solicited any capital. It wasn't going to be this exact structure at all. But, you know, the template in terms of borrower, lender, instrument, maturity, that type of thing."). Frankel did not even think about using anything other than the document's template. *Id.* And he never actually used the document's template. *Id.*<br><br>Frankel testified that he forwarded himself Exhibit 12 so that he would have the contact information for people he had known for 20-plus years. Frankel Dep. 121:5–16. Frankel did not use or disclose any of the other information in Exhibit 12. Frankel Dep. 117:11–14 ("I assure you, it [had] nothing to do with any of the attachments to this e-mail. Never sent them to anybody, never forwarded them to anybody."); Frankel Dep. 170:7–171:4. The contacts were not "Confidential Information" under the Employee NDA because they were known to Frankel before his employment with Alpine. *See* Doc. 61 at 22, § 2(a). For the same reason, the contacts are not trade secrets of Alpine. |
| **4.** [A]fter his termination from Alpine, [Frankel] wrongfully directed an Alpine employee to create and give him a confidential blotter showing two days' of Alpine's trade runs.<br><br>Frankel Depo. 152:13- 153:13; 155:2-6; Exh. 20; Cruz Decl. ¶ 8 | Deny.<br><br>Frankel did not wrongfully direct any employees of Alpine. Frankel Dep. 152:15–153:19. Frankel asked Randy Jones for a sample trade blotter, and Jones sent Frankel a sample blotter. *Id.* The blotter does not include any confidential information of Alpine and does not reference Alpine or customers. Frankel Dep. Ex. 20. All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. |
| **5.** [Frankel] sent Alpine's confidential blotter of trade runs to a broker dealer in | Admitted that Frankel sent Exhibit 20 to Ziv.<br><br>Denied that Exhibit 20 contains any confidential |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| Chicago.<br><br>Frankel Depo. 152:13-23; 155:7-156:5; 156:13-17; Exh. 20; Cruz Decl. ¶ 8; Susman Decl. ¶ 6, 7, Exh. 2 | information of Alpine or even a reference to Alpine. Frankel Dep. Ex. 20. All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. |
| **6.** [Frankel] failed to return confidential documents belonging to the Trust within ten business days of a written request by the Trust.<br><br>Frankel Depo. 46:23-25 | Deny.<br><br>On the next business day after the plaintiffs' request, Frankel offered to return documents in compliance with the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>The plaintiffs sued Frankel less than ten business days after they requested that he return (unidentified) confidential documents. (Doc. 1). |
| **7.** The Original NDA, [] requires the return of such material in said timeframe [within ten business days of a written request by the Trust]<br><br>Frankel Depo. 16:17-25; Exh. 1 ¶ 5; SAC [Dkt. 61], Exh. 1 ¶ 5 | Denied as vague. |
| **8.** the Employee NDA, [] prohibits the transmission of confidential information to any non-company email address<br><br>Frankel Depo. 16:17-17; 18:7-25; Exh. 2 ¶ 6(f); SAC [Dkt. 61], Exh. 2 ¶ 6(f) | Section 6 of the Employee NDA is irrelevant because the plaintiffs did not allege in their second amended complaint that Frankel breached section 6 of the Employee NDA. Frankel did not have an opportunity to conduct discovery regarding section 6 of the Employee NDA.<br><br>Section 6 of the Employee NDA only prohibits non-company transmission of confidential information; it does not prohibit internal transmission of confidential information to |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| | persons who work for the company. |
| | It was also common for Alpine's employees to forward emails from their Alpine email accounts to their personal email accounts to work on Alpine's business. Jarvis Decl. ¶ 6. |
| | It was also common, and was part of Alpine's employees job responsibilities to send emails containing Alpine's business information to, among others: John Hurry, via email to jhurry@jhurry.com; Mike Cruz, via email to mike@scalawyer.com;  and Richard Nummi, via email to rnummi@mac.com. Jarvis Decl. ¶ 7. |
| **9.** the Employee NDA, which prohibits the retention of such documents<br><br>Frankel Depo. 54:18-55:8; Exh. 5 ¶ 4; SAC [Dkt. 61], Exh. 2 ¶ 4 | Denied as vague. |
| **10.** Frankel's admission that he sent the confidential trade blotter to a third party constitutes an additional breach of the Employee NDA<br><br>Frankel Depo. 54:18-55:8; Exh. 5 ¶ 2; SAC [Dkt. 61], Exh. 2 ¶ 2 | Deny.<br><br>The sample blotter that Frankel sent to Ziv was not subject to the Employee NDA. The Employee NDA applied to information exposed to Employee "[i]n the performance of Employee's job duties with Company." (Doc. 61 at 22, § 1). Frankel did not receive the blotter "in the performance of [his] job duties with Company." Frankel Dep. 152:15–153:19. Frankel received the blotter after his employment as CEO and his engagement as a non-exclusive consultant ended. *Id.* Frankel asked Randy Jones for a sample trade blotter, and Jones sent Frankel a sample blotter. *Id.* The blotter does not include any confidential information of Alpine or even a reference to Alpine or customers. Frankel Dep. Ex. 20. All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| **11.** On or about June 22, 2015, Frankel entered into the Original NDA.<br><br>Frankel Depo. 16:17-25; Exh. 1; SAC [Dkt. 61], Exh. 1 | Admit. |
| **12.** The first sentence of the Original NDA provides: "This NON- DISCLOSURE AND CONFIDENTIALITY AGREEMENT (the "Agreement") is made as of June 22nd, 2015 by Christopher Lee Frankel (the "Recipient") and SCOTTSDALE CAPITAL ADVISORS CORPORATION, an Arizona corporation, Alpine Securities Corporation an Utah corporation, Cayman Securities Clearing and Trading LTD a Cayman Limited Company and any associated company of the Hurry Family Revocable Trust (the "Discloser")."<br><br>Frankel Depo. 16:17-25; Exh. 1; SAC [Dkt. 61], Exh. 1 | Admit. |
| **13.** The Original NDA defines "Confidential Information" as "any data or information that is proprietary to the Plaintiffs and not generally known to the public, whether in tangible or intangible form, whenever and however disclosed."<br><br>Frankel Depo. 16:17-25; Exh. 1 ¶ 1; SAC [Dkt. 61], Exh. 1 ¶ 1 | Deny.<br><br>The full definition of "Confidential Information" in the Original NDA is set forth in the Original NDA. |
| **14.** Paragraph 5 of the Original NDA provides in relevant part: "Within ten (10) business days of receipt of the Discloser's written request, the | Admit. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| Recipient will return to the Disclosure all documents, records and copies thereof containing Confidential Information."<br><br>Frankel Depo. 16:17-25; Exh. 1 ¶ 5; SAC [Dkt. 61], Exh. 1 ¶ 5 | |
| **15.** The Original NDA is governed by Arizona law.<br><br>Frankel Depo. 16:17-25; Exh. 1 ¶ 8; SAC [Dkt. 61], Exh. 1 ¶ 8 | Deny.<br><br>The Original NDA states: "This Agreement shall be governed and construed in accordance with the laws applicable in the State of Arizona." |
| **16.** INTENTIONALLY OMITTED | |
| **17.** At the time of his receipt of the Demand Letter, Frankel had in his possession the First Amendment to the Hurry Family Revocable Trust and the Certificate of Trust for The Hurry Family Revocable Trust (collectively, the "Trust Documents").<br><br>Frankel Depo. 40:8-41:19; 43:19-44:7; 46:23-25; Exh. 2 | Deny.<br><br>The Demand Letter did not request that Frankel return the Trust Documents or identify any documents that Frankel should return. On the next business day after receiving the plaintiffs' request, Frankel offered to return documents in compliance with the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)). Frankel offered to search for documents identified by the plaintiffs or to return all of the documents he ever received from the plaintiffs if they did not wish to identify the documents that they were requesting for him to return. *Id.*<br><br>Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)). |
| **18.** The Trust Documents contain information that is proprietary to the Trust and not generally known to the public. | Deny.<br><br>Cruz's declaration states legal conclusions without any supporting facts. *See* Cruz Decl. ¶ 9. Frankel cannot ascertain from Cruz's declaration |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| Cruz Decl. ¶ 9 | what information is supposedly proprietary and thus cannot respond to Cruz's conclusory statement. *See id.* |
| **19.** Frankel did not return the foregoing documents to Plaintiffs within ten business days of receiving Plaintiffs' request for their return.<br><br>Frankel Depo. 45:7-46:1; 46:15-25 | Deny.<br><br>Frankel offered to return documents in compliance with the plaintiffs' request the next business day after the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>The plaintiffs sued Frankel less than ten business days after they requested that he return (unidentified) confidential documents. (Doc. 1). |
| **20.** On July 1, 2015, Alpine, Scottsdale, and Frankel entered into a second nondisclosure agreement entitled the "Employee Nondisclosure & Computer Use Agreement" (the "Employee NDA"), which superseded the NDA with regard to Alpine and Scottsdale.<br><br>Frankel Depo. 54:18-55:8; Exh. 5; SAC [Dkt. 61], Exh. 2 | Admit. |
| **21.** The first sentence of the Employee NDA states: "This agreement (the "Agreement") is entered into by Alpine Securities/Scottsdale Capital and its subsidiaries and affiliates ("Company") and Christopher L. Frankel ("Employee")."<br><br>Frankel Depo. 54:18-55:8; Exh. 5; SAC [Dkt. 61], Exh. 2 | Admit. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| **22.** Paragraph 1 of the Employee NDA defines "Confidential Information" as inter alia: . . . (b) information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information, purchasing techniques, supplier lists and supplier information and advertising strategies; (c) information concerning Company's employees, including salaries, strengths, weaknesses and skills; (d) information submitted by Company's customers, suppliers, employees, consultants or co-venture partners with Company for study, evaluation or use; and (e) any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business.<br><br>Frankel Depo. 54:18-55:8; Exh. 5, ¶ 1; SAC [Dkt. 61], Exh. 2 ¶ 1 | Deny.<br><br>The Employee NDA's full definition of "Confidential Information" is set forth in the Employee NDA and excludes "information which: (a) was in Employee's possession or known to Employee, without an obligation to keep it confidential, before such information was disclosed to Employee by Company; is or becomes public knowledge through a source other than Employee and through no fault of Employee; or (c) is or becomes lawfully available to Employee from a source other than Company." Employee NDA § 2. |
| **23.** Paragraph 2 of the Employee NDA provides in relevant part: "Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than Company."<br><br>Frankel Depo. 54:18-55:8; Exh. 5, ¶ 2; | Frankel admits that the quoted language appears in paragraph 2 of the Employee NDA but denies that paragraph 2 of the Employee NDA has been quoted in its entirety. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| SAC [Dkt. 61], Exh. 2 ¶ 2 | |
| **24.** Paragraph 4 of the Employee NDA provides: "When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information. Employee will also return to Company all equipment, files, software programs and other personal property belonging to Company.<br><br>Frankel Depo. 54:18-55:8; Exh. 5, ¶ 4; SAC [Dkt. 61], Exh. 2 ¶ 4 | Frankel admits that the quoted language appears in paragraph 4. |
| **25.** Paragraph 6 of the Employee NDA provides in relevant part: "Prohibited actions using Company's ECS [Electronic Communication Systems] include, but are not limited to the following . . . transmitting confidential patient, business or risk management information to any non-Company email address."<br><br>Frankel Depo. 54:18-55:8; Exh. 5, ¶ 6; SAC [Dkt. 61], Exh. 2 ¶ 6 | Frankel admits that the quoted language is an excerpt from paragraph 6 of the Employee NDA. |
| **26.** Frankel did not return any of those documents until Plaintiffs commenced this lawsuit, and even then waited until February 2019.<br><br>Frankel Depo. 45:24-46:1; 66:2-4; 75:21-24: 85:14-18; 90:22-24; 122:5-7; 124:6-8; 128:8-13; 130:2-4; 132:1-3; 133:23-25:137:19-21 | Deny.<br><br>On the next business day after receiving the plaintiffs' request, Frankel offered to return documents in compliance with the plaintiffs' request. (Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>Frankel was waiting for the plaintiffs to tell him which documents to return when they sued him. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| | (Doc. 16-1, ¶ 20; Doc. 126-1 at 4 (admitting Doc. 118, ¶ 34)).<br><br>The plaintiffs sued Frankel less than ten business days after they requested that he return (unidentified) confidential documents. (Doc. 1). |
| **27.** Frankel admitted at his deposition that on September 18, 2018, he sent a term sheet for a secured revolving credit facility belonging to Alpine to his personal email.<br><br>Frankel Depo. 59:15- 60:10; 60:23-62:2; 62:16-18; Exh. 6 | Deny.<br><br>Frankel only admitted that he sent the email reflected in Exhibit 6. |
| **28.** Frankel further admitted that the document was marked confidential and Plaintiffs wanted to keep it confidential.<br><br>Frankel Depo. 61:24-62:5 | Deny.<br><br>Frankel did not admit that the plaintiffs wanted to keep Exhibit 6 confidential. Frankel testified that it was his understanding that the plaintiffs shared Exhibit 6 and the information contained therein with a lot of people outside of Alpine. Frankel Dep. 61:7–13. |
| **29.** Frankel admitted that he later used the document for his personal use.<br><br>Frankel Depo. 62:24-63:17 | Deny.<br><br>Frankel testified that he thought about using the template of the document in Exhibit 6, but that he never actually used the template. Dep. 62:10–15 ("I thought about using this template to draft an idea to raise capital. But I never attempted to raise any capital or solicited any capital. It wasn't going to be this exact structure at all. But, you know, the template in terms of borrower, lender, instrument, maturity, that type of thing."). Frankel did not even think about using anything other than the document's template. *Id.* And he never actually used the document's template. *Id.* |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| **30.** Frankel admitted at his deposition that on October 7, 2018, he emailed confidential financial document regarding Alpine and Scottsdale to his personal email address.<br><br>Frankel Depo. 40:8-41:19; 43:19-44:7; 114:5-14; 115:3-8; 116:11-117:3;117:16-20; 119:1-121:4; Exhs. 2, 12 | Deny.<br><br>Frankel only admitted that he sent the emails in Exhibits 2 and 12. Frankel did not admit that the documents are confidential. Frankel<br><br>Frankel testified that he forwarded himself Exhibits 2 and 12 so that he would have the contact information for people he had known for 20-plus years. Frankel Dep. 44:8–13; 121:5–16. Frankel did not use or disclose any of the other information in Exhibits 2 or 12. Frankel Dep. 44:17–18 ("I did not consider the attachments at all."); 117:11–14 ("I assure you, it [had] nothing to do with any of the attachments to this e-mail. Never sent them to anybody, never forwarded them to anybody."); Frankel Dep. 170:7–171:4. The contacts were not "Confidential Information" under the Employee NDA because they were known to Frankel before his employment with Alpine. *See* Doc. 61 at 22, § 2(a). For the same reason, the contacts are not trade secrets of Alpine. |
| **31.** Frankel further admitted that he sent this information to himself in order "to help another group [i.e., not Plaintiffs] try to become a nonbank custodian."<br><br>Frankel Depo. 121:2-9 | Deny.<br><br>Frankel testified that he forwarded himself Exhibits 2 and 12 so that he would have the contact information for people he had known for 20-plus years. Frankel Dep. 44:8–13; 121:5–16. Frankel did not use or disclose any of the other information in Exhibits 2 or 12. Frankel Dep. 44:17–18 ("I did not consider the attachments at all."); 117:11–14 ("I assure you, it [had] nothing to do with any of the attachments to this e-mail. Never sent them to anybody, never forwarded them to anybody."); Frankel Dep. 170:7–171:4. |
| **32.** After he was terminated from Alpine, Frankel contacted an employee there and requested a blotter of Alpine's trade | Deny.<br><br>Frankel asked Randy Jones for help putting together a sample trade blotter. Frankel Dep. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| runs.<br><br>Frankel Depo. 152:13-153:13; 155:2-6; Exh. 20 | 153:14–19. He did not request that Jones send him a blotter of Alpine's trade runs. *Id.* |
| **33.** The blotter of Alpine's trade runs is proprietary to Alpine as it is shows all of the trades cleared through Alpine on those dates.<br><br>Cruz Decl. ¶ 8; Frankel Depo. 155:2-6 | Deny.<br><br>All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.* |
| **34.** This information is not publicly available, and Alpine derives economic advantages by the public not knowing this information.<br><br>Cruz Decl. ¶ 8; Frankel Depo. 155:2-6 | Deny.<br><br>All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.* |
| **35.** Frankel admitted that the information on the blotter could not be obtained from a public source in the format he received.<br><br>Frankel Depo. 155:2-6 | Deny.<br><br>Frankel testified that all of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.* |
| **36.** Frankel further admitted that he sent the trade blotter to Ziv Investment Company ("Ziv"), a broker dealer in Chicago that he was attempting to purchase.<br><br>Frankel Depo. 152:13-23; 155:7-156:5; 156:13-17; Exh. 20 | Admit. |
| **37.** The trade blotter and Frankel's emails containing it are responsive to Request | Deny. Frankel complied with his discovery obligations, and the plaintiffs never challenged |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| for Production number 2, which requested, "All Documents and Communications containing Plaintiffs' business practices, financial relationships and terms of those relationships, client lists, pricing information, and private financial information of Plaintiffs and their clients that You sent from Your personal email addresses to yourself or anyone else since June 1, 2015." The trade blotter and Frankel's emails containing it are also responsive to Request for Production number 9, which requested, "All Documents and Communications that pertain to Your attempts, inquiries, preparations, or desire to purchase any broker-dealer since August 1, 2018." The trade blotter and Frankel's emails containing it are also responsive to Request for Production number 10, which requested, "All Documents and Communications between You and any broker-dealers that you have considered purchasing since August 1, 2018." The trade blotter and Frankel's emails containing it are also responsive to Request for Production number 11, which requested, "All Documents and Communications between You and Ziv Investment Company since August 1, 2018."<br><br>Susman Decl. ¶ 9, Exh. 3 | his compliance or demonstrated otherwise.<br><br>The trade blotter does not include any confidential information. All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.* |
| **38.** Frankel did not produce the confidential trade blotter in discovery in this matter.<br><br>Susman Decl. ¶ 8 | Frankel admits that he did not produce Exhibit 20 to Frankel's deposition. Frankel complied with his discovery obligations, and the plaintiffs never challenged his compliance or demonstrated otherwise. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| **39.** Nor did Frankel produce the email in which he sent the trade blotter to Ziv. <br><br> Susman Decl. ¶ 8 | Frankel admits that he did not produce Exhibit 20 to Frankel's deposition. Frankel complied with his discovery obligations, and the plaintiffs never challenged his compliance or demonstrated otherwise. |
| **40.** Plaintiffs obtained this from third parties in response to subpoenas. <br><br> Susman Decl. ¶ 8 | Denied as vague. |
| **41.** Frankel sent the same confidential blotter of Alpine's trade runs to two additional broker dealers and the Depository Trust and Clearing Corporation ("DTCC"). <br><br> Susman Decl. ¶¶ 4, 5, Exh. 1 | Deny. <br><br> All of the trade data in the blotter is publicly available. Frankel Dep. 153:23–155:6. The only thing that would be different if the trade information was obtained from a public source would be the format. *Id.* |
| **42.** Frankel did not produce these communications in discovery. <br><br> Susman Decl. ¶ 8 | Frankel admits that he did not produce the communications. Frankel complied with his discovery obligations, and the plaintiffs never challenged his compliance or demonstrated otherwise. |
| **43.** Plaintiffs obtained Frankel's emails to third parties in response to subpoenas to those parties. <br><br> Susman Decl. ¶ 8 | Denied as vague. |
| **44.** Frankel was terminated as an employee in August 2018 and terminated as a consultant in October 2018 <br><br> Hurry Depo. 48:9-25; 56:16-18; 61:24-62:6; Frankel Depo. 22:13-20; 26:4-13 | Admit. |

| Plaintiffs' Additional Material Fact | Frankel's Response |
|---|---|
| **45.** Frankel emailed a confidential internal communications regarding customer fee schedules to FINRA after the lawsuit commenced.<br><br>Frankel Depo. 130:7-131:20 | Deny.<br><br>The testimony cited does not discuss include any testimony about Frankel emailing FINRA communications regarding fee schedules after the lawsuit commenced. *See* Frankel Dep. 130:7–131:20. |
| **46.** Alpine and Scottsdale produced statements of income, trend reports, and profit & loss statements showing the loss of hundreds of thousands of dollars in revenue.<br><br>Hurry Depo. 156:4-157:13, Exhs. 29-34 | Frankel admits that the plaintiffs produced Exhibits 29 to 34.<br><br>Frankel denies that Exhibits 29 to 34 show "the loss of hundreds of thousands of dollars in revenue."<br><br>The documents do not show and there is no evidence establishing that any revenue was "lost." There is no evidence that monthly changes in the amount of revenue were the result of losing revenue in those months. |

Dated: September 20, 2019  By: */s/ Harold Holder*
          David C. Banker (Fla. Bar No. 352977)
          Harold D. Holder (Fla. Bar No. 118733)
          BUSH ROSS, PA
          1801 N. Highland Avenue
          Tampa, Florida 33602
          Phone: 813-224-9255
          Fax: 813-223-9620
          Primary: dbanker@bushross.com;
          hholder@bushross.com
          Secondary: aflowers@bushross.com
          *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that on September 20, 2019, all counsel of record who consented to electronic service are being served with a copy of this document via the Court's CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to any non-CM/EFC participants:

   Shane B. Vogt, Esquire
   Kenneth G. Turkel, Esquire
   BAJO | CUVA | COHEN | TURKEL
   100 North Tampa Street, Suite 1900
   Tampa, FL  33602
   kturkel@bajocuva.com
   svogt@bajocuva.com

   Charles J. Harder, Esquire
   Jordan Susman, Esquire
   HARDER LLP
   132 South Rodeo Drive, Suite 301
   Beverly Hills, CA 90212-2406
   charder@harderllp.com
   jsusman@harderllp.com
   *Attorneys for Plaintiffs*

        By: *Harold Holder*