UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE HURRY FAMILY REVOCABLE TRUST;   CASE NO.: 8:18-cv-02869-VMC-CPT
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; ALPINE SECURITIES
CORPORATION,

    Plaintiffs,

vs.

CHRISTOPHER FRANKEL,

    Defendant.
_____/

## PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE

Plaintiffs the Hurry Family Revocable Trust, Scottsdale Capital Advisors, and Alpine Securities Corporation (collectively "Plaintiffs"), through counsel and under Federal Rule of Evidence 201, requests judicial notice of the following evidence:

**Exhibit 1**: Transcript Excerpt from Hearing in F*INRA Dept. of Enforcement v. Scottsdale Capital Advisors, et al.*, FINRA Disciplinary Proceeding in Enforcement Matter 2014041724601 (June 24, 2016).

### MEMORANDUM OF LAW

The Court may take judicial notice of facts that are not subject to reasonable dispute in that they are "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). The Court "may take judicial notice of records and reports of administrative bodies." *Interstate Nat. Gas Co. v. S. California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953).

1

## LOCAL RULE 3.01(G) CERTIFICATION

The undersigned counsel certifies that counsel for the Plaintiffs has conferred with counsel for the Defendant, and the Defendant does not oppose the relief requested.

>	*/s/ Jordan Susman*
>	Charles J. Harder, Esq.
>	Jordan Susman, Esq.
>	HARDER LLP
>	132 South Rodeo Drive, Fourth Floor
>	Beverly Hills, CA  90212-2406
>	Tel: (424) 203-1600
>	Fax: (424) 203-1601
>	E-mail:  charder@harderllp.com
>	E-mail:  jsusman@harderllp.com
>
>	Kenneth G. Turkel – FBN 867233
>	Shane B. Vogt – FBN 257620
>	BAJO | CUVA | COHEN | TURKEL
>	100 North Tampa Street, Suite 1900
>	Tampa, Florida 33602
>	Tel:  (813) 443-2199
>	Fax: (813) 443-2193
>	E-mail:  kturkel@bajocuva.com
>	E-mail:  svogt@bajocuva.com
>
>	*Attorneys for Plaintiffs*

# Exhibit 1

```
                                                          Page 2240
 1   FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA)
     OFFICE OF HEARING OFFICERS
 2   DISCIPLINARY PROCEEDING
     NO. 2014041724601
 3   ------------------------------------------x
 4   Hearing in the Matter of:
 5   FINRA DEPARTMENT OF ENFORCEMENT,
 6                      Complainant,
            vs.
 7
     SCOTTSDALE CAPITAL ADVISORS CORPORATION
 8   (CRD No. 118786),
 9
     JOHN J. HURRY
10   (CRD No. 4623652),
11
     TIMOTHY B. DIBLASH
12   (CRD No. 4623652),
13   and
14   D. MICHAEL CRUZ
     (CRD No. 2450344
15
                        Respondents.
16   ------------------------------------------x
                             300 South Grand Avenue
17                           Los Angeles, CA
                             June 24, 2016
18                           8:04 a.m.
19   B E F O R E:
20       LUCINDA O. McCONATHY, ESQ., Hearing Officer
         FINRA OFFICE OF HEARING OFFICERS
21       1735 K Street, NW, 2nd Floor
         Washington, D.C. 20006
22
23       DAVID JAINDL MARTIN, Panelist
24
25       MICHELLE D. THOMAS, Panelist
```

Page 2337

1  DiBlasi. However, this is a very important issue
2  regarding the charges against Mr. DiBlasi and it's
3  complex. It involves more than just the testimony of the
4  Respondents.
5      And we think it requires us to carefully
6  consider the charges upon a thorough review of the
7  evidence that is relevant to those charges and that's
8  complex and that takes time. And it also should be a
9  determination that is made in the context of precedence
10 concerning the role of a chief compliance officer, and we
11 want to make sure that we have thoroughly understood the
12 entire applicable standards.
13     So for that reason, we deny the motion for
14 directed verdict at this time. Thank you.
15     Respondents' Counsel, what are we doing going
16 forward?
17     MR. HARNISCH: Sure. We're going to call Chris
18 Frankel.
19     HEARING OFFICER MCCONATHY: Thank you.
20     MR. HARNISCH: I'll just go get him.
21     HEARING OFFICER MCCONATHY: Mr. Frankel, just to
22 put you in the picture, as you can see, Respondents'
23 counsel and Respondents are sitting over there on one
24 side of the room, the team for Enforcement is on the
25 other side of the room. I'm the Chief Hearing Officer

Page 2338

1  and these are my fellow Panel Members here. The three of
2  us will be making the determinations about the charges in
3  this case.
4      And we have a court reporter who is going to
5  transcribe what is said. It's very important to create a
6  clear record, and I would appreciate it if you would
7  project when you speak and that you listen closely to the
8  questions that are asked and let the questioner finish
9  the question before responding so that we can -- we don't
10 talk over one another.
11     And if at any time you do not understand a
12 question, please let us know so that it can be rephrased.
13     Do you have any questions about the process?
14     MR. FRANKEL: I do not.
15     HEARING OFFICER MCCONATHY: Thank you.
16     The court reporter will swear the witness,
17 please.
18          CHRISTOPHER LEE FRANKEL,
19 called as a witness, having been duly sworn, was examined
20 and testified as follows:
21     THE REPORTER: Thank you. Could you state your
22 full name for the record, please?
23     THE WITNESS: Christopher Lee Frankel.
24     HEARING OFFICER MCCONATHY: Yes.
25          DIRECT EXAMINATION

Page 2339

1  BY MR. HARNISCH:
2      Q. All right, Mr. Frankel. Thank you for spending
3  some time with us today. We, on behalf of the
4  Respondents, certainly appreciated it. So just a few
5  questions, and we'll try to keep this relatively short.
6      Where do you work?
7      A. I currently am the chief executive officer of
8  Alpine Securities.
9      Q. Can you just tell us what is Alpine Securities?
10     A. Alpine Securities is a FINRA-registered
11 broker/dealer and clearing firm in Salt Lake City, Utah.
12     Q. And about how long have you been in the
13 securities business?
14     A. In the business? Well, I started at an Alex
15 Brown office when I was 15 years old.
16     Q. So a long time at this point?
17     A. 30 years. Around it.
18     Q. Out of that 30 years or so, how long have you
19 been on the clearing side of the business?
20     A. On the clearing side since about 1994 at Sterne,
21 Agee & Leach.
22     Q. And how long were you at Sterne Agee?
23     A. 13 or 14 years.
24     Q. Generally, what were you doing at Sterne Agee?
25     A. Well, at the end of the period, I was the

Page 2340

1  president of Sterne Agee and I was the chief executive
2  officer of two other broker/dealer subsidiaries --
3  actually three; two subsidiaries, one co-op owned by
4  credit unions. And I was responsible for the operations
5  group, the compliance group, the legal group, the
6  independent contractor broker/dealer, the clearing
7  broker/dealer, risk management, IT.
8      Virtually most of the firm reported to me with
9  the exception of the private client group, the fixed
10 income department, research and investment banking.
11     Q. And where did you go after Sterne Agee?
12     A. I spent a short time at GunnAllen with the idea
13 to start a bank in Tampa, Florida and take that firm self
14 clearing.
15     Q. How long were you at GunnAllen?
16     A. Couple years.
17     Q. About when did you leave GunnAllen?
18     A. I think 2007.
19     Q. Okay. And then where did you go?
20     A. To what was called Legent Clearing, which is
21 today called COR Clearing.
22     Q. And how long were you there?
23     A. Until August of last year, I think, August of
24 the '15.
25     Q. And then where did you go?

26 (Pages 2337 - 2340)

Page 2341

1  A. Then to Alpine.
2  Q. All right. I just want to ask you a few
3  questions about Alpine. And you may hear me refer to
4  something called "the relevant time period," if you will.
5  The relevant time period for purposes of this proceeding
6  is December of 2013 through June of 2014. Just to --
7  A. Okay.
8  Q. -- have you keep that in mind.
9     But before we get into those types of details,
10 could you just explain for us why you decided to go to
11 Alpine?
12 A. Well, I thought that -- look, I started the
13 clearing business at Sterne Agee from scratch. You know,
14 I did a, you know, sort of turn around in a sale at
15 Legent, now COR Clearing.
16    And after meeting with -- I was referred to Mr.
17 Hurry from a mutual acquaintance in the business. He
18 talked with him about what he had with regard to Alpine,
19 Scottsdale and CSCT. I thought that it was an
20 interesting opportunity to kind of build up that firm.
21 Q. So when you joined Alpine, did you do anything
22 to try to familiarize yourself with the various practices
23 or procedures that Alpine had in place with respect to
24 CSCT?
25 A. Certainly. When I spoke to Mr. Hurry -- and,

Page 2342

1  you know, I'll tell you one of the deciding factors for
2  me in my desire to kind of come on board was the
3  existence of CSCT. And, you know, I felt that especially
4  when you have a small what I would call a boutique
5  clearing operation, look, you're just not going to be
6  able to effectively compete for somebody buying, you
7  know, a hundred shares of IBM with the likes of Pershing
8  and National Financial.
9     So you have to look at areas of the business
10 that, quite frankly, that the large firms don't want to
11 transact in. They don't want to do exception processing.
12 And I thought given the climate, that I believe that
13 there's a huge opportunity in the marketplace for an
14 entity like CSCT to introduce business, both to the US
15 and abroad, because the large firms, quite frankly, in
16 the AML space are just scared to touch anybody.
17    So, you know, when you have outside of the Tier
18 1 financial institutions in most foreign countries right
19 now --
20    HEARING OFFICER MCCONATHY: Could you slow down?
21 Because it's very hard for the court reporter to capture
22 everything that you're saying.
23    THE WITNESS: Yeah, I'm from the south. Usually
24 people don't tell me I speak too quickly. But yeah, I'll
25 try to slow down.

Page 2343

1  So I mean, look, one of the things that I've
2  been thinking about in the last couple years was that,
3  again, almost anybody that's a foreign entity right now,
4  especially in South America, Central America, but really
5  almost throughout the world, if you're not sort of viewed
6  as a Tier 1 institution, it's almost gotten impossible to
7  have an account because everybody is scared to death of
8  the AML risk, and rightly so.
9     To those type of institutions, you have to do a
10 very deep dive. And again, when it goes back to that
11 exception processing and that risk return, the larger
12 financial institutions have just said that we're not
13 going to take the risk.
14    So you have, you know, a plethora of whether
15 they're kind of broker/dealer equivalents and banks in
16 foreign countries that can't get to the US market
17 anymore.
18    And so I thought that CSCT, in particular, was a
19 good avenue to start to pursue that strategy. And so
20 that was a huge reason why I decided to kind of join the
21 business.
22 Q. BY MR. HARNISCH: Did Alpine have other foreign
23 financial institution entities making certificate
24 deposits during the relevant time period other than CSCT?
25 A. Yes.

Page 2344

1  Q. Did you -- in learning practices and the like
2  that were in place during the relevant time period with
3  respect to CSCT, did you have any understanding as to
4  what Alpine had in place, so to speak, with respect to
5  titling of stock certificates?
6  A. I have a cursory understanding of that, yes.
7  Q. Okay. And what is that understanding?
8  A. Well, Alpine had a process in place where they
9  required FFIs, foreign financial intermediaries, to have
10 certificates retitled in the name of the underlying
11 account.
12    So when I say "the underlying account," if it
13 was ABC FFI, they wanted a certificate registered in the
14 name of ABC FFI.
15 Q. So meaning if we were talking about CSCT, Alpine
16 wanted the certificate to be in the name of CSCT?
17 A. That's correct.
18 Q. Or as you said, if it was another financial
19 institution, it would be in the name of that foreign
20 financial institution?
21 A. That's correct.
22 Q. Did you have -- did you develop any
23 understanding as to why Alpine wanted that to be?
24 A. Well, I've asked the question, because I've seen
25 it done two different ways. And, you know, the answer

27 (Pages 2341 - 2344)

Page 2357

1  MR. PARISER: A tiny thing, which is I think the
2  parties can confer about the length of closings within
3  reason and we can bring it to you all, and you can tell
4  us if that makes sense.
5  HEARING OFFICER MCCONATHY: That seems fine to
6  me. The understanding is that this further proceeding
7  will involve the testimony of the two experts and that
8  potentially the closings could follow the next day if the
9  testimony takes the entire first day.
10  Is there anything else that should be put on the
11  record?
12  MR. PARISER: Nothing other than thanks for
13  accommodating the location on the next part of the
14  hearing. It's very much appreciated.
15  MR. HARNISCH: I would like to reiterate that.
16  We do appreciate it.
17  HEARING OFFICER MCCONATHY: All right. Now,
18  is -- are you putting on any more witnesses?
19  MR. HARNISCH: That's right, we haven't actually
20  talked to you about that. I know we've been discussing
21  it.
22  HEARING OFFICER MCCONATHY: I see.
23  MR. HARNISCH: No, our next witness would be Mr.
24  Menchel and at this point our only witness.
25  HEARING OFFICER MCCONATHY: Oh, I see. So this

Page 2358

1  would be the conclusion of today's proceeding?
2  MR. HARNISCH: Yes.
3  HEARING OFFICER MCCONATHY: All right. Is there
4  anything else? I don't think any exhibits were admitted
5  today. Is that correct?
6  MR. HARNISCH: I don't believe so.
7  MR. PARISER: That's our understanding.
8  HEARING OFFICER MCCONATHY: All right. In that
9  case, we're adjourned.
10  MR. PARISER: Thank you very much.
11  HEARING OFFICER MCCONATHY: Thank you.
12  MR. HARNISCH: Thank you.
13  (Time noted: 12:23 p.m.)
14        --oOo--

Page 2359

1           CERTIFICATE
2
3
4  STATE OF CALIFORNIA  )
               : ss.:
5  COUNTY OF LOS ANGELES )
6
7
8  I, LESLIE ROCKWOOD, a Shorthand Reporter
9  and Notary Public of the State of California, do hereby
10  certify:
11  That the within is a true and accurate
12  transcript of the proceedings taken before the FINANCIAL
13  INDUSTRY REGULATORY AUTHORITY (FINRA) on the 24th Day of
14  June, 2016.
15  I further certify that I am not related to
16  any of the parties to this action by blood or marriage
17  and that I am in no way interested in the outcome of this
18  matter.
19  IN WITNESS WHEREOF, I have hereunto set my
20  hand this 27th day of June, 2016.
21
22
23
24    LESLIE ROCKWOOD, RPR, CSR NO. 3462
25

31 (Pages 2357 - 2359)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 4, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Jordan Susman*
Attorney