# EXHIBIT "C"

# 19-3272

## United States Court of Appeals
## For the Second Circuit

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Plaintiffs - Appellees,*

— v. —

ALPINE SECURITIES CORPORATION,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK IN CASE NO. 17 CV 4179

## DECLARATION OF MARANDA FRITZ IN SUPPORT
## OF DEFENDANT-APPELLANT'S EMERGENGY
## MOTION FOR A STAY PENDING APPEAL

MARANDA E. FRITZ
THOMPSON HINE LLP
335 MADISON AVENUE, 12TH FLOOR
NEW YORK, NY 10017
212-344-5680
MARANDA.FRITZ@THOMPSONHINE.COM

# TABLE OF CONTENTS

I.      The SEC's Complaint [Dkt. 1] ...................................................................1

II.     Alpine's Opposition to the SEC's Motion for Summary Judgment................3

III.    Alpine's Cross Motion for Summary Judgment on
        SEC's Lack of Authority .................................................................................8

IV.     District Court's March 30, 2018 Order on the SEC's Motion for Partial
        Summary Judgment and Alpine's Cross-Motion for Summary Judgment
        [Dkt. 101].....................................................................................................14

V.      Alpine's Motion for Reconsideration regarding the SEC's Lack of Authority
        and Failure to Comply with the APA and Submission of an Expert
        Declaration [Dkt. 111] .................................................................................16

VI.     Alpine's Writ of Mandamus to the Second Circuit [Dkt. 170] ...................18

VII.    Briefing Schedule for Summary Judgment ..................................................19

VIII.   Fact Disputes On the SEC's Motion for Partial Summary Judgment on
        Liability.........................................................................................................20

        A.      Guidance Regarding the Purpose of Red Flags ................................20

        B.      Alpine's Expert Testimony Regarding the Purpose of Red Flags,
                Identification of Red Flags, and When to Include those Red Flags in a
                SAR Narrative ..................................................................................21

        C.      Alpine's Testimony Regarding Identification of Red Flags, Review of
                Red Flags, and When to Include a Red Flag in a SAR Narrative.......28

        D.      SAR Content Requirements ...............................................................33

        E.      Deficiencies in Navigant's [SEC's Expert's] Presentation.................37

        F.      Material Facts in Dispute regarding Facially Deficient Narratives ....39

                1.      Basic Customer Information.......................................................39

                2.      Criminal or Regulatory History .................................................45

                3.      Shell Company or Derogatory History of a Stock....................49

                4.      Stock Promotion.........................................................................55

                5.      Unverified Issuer........................................................................58

                6.      Low Trading Volume..................................................................60

                7.      Foreign Actor or Jurisdiction ....................................................63

i

G.     Material Facts in Dispute Regarding Whether the SARs at Issue Were Mandatory Filings under the BSA ......................................................68

H.     Guidance Does Not Have the Force of Law .......................................72

I.      Material Facts in Dispute Regarding Failure to File SARs on Liquidations...........................................................................................74

J.      Material Facts in Dispute Regarding Failure to Maintain Support Files....................................................................82

IX.    District Court's December 11 Order Granting, in Part, the SEC's Motion for Summary Judgment on Liability...............................84

X.     Alpine's Motion for Reconsideration based on The U.S. Supreme Court's Ruling in *Kisor v. Wilkie* ................................................................85

XI.    District Court's September 12 Order on Remedies......................................85

XII.   Entry of Final Judgment and Permanent Injunction....................................86

XIII.  Alpine's Inability to Pay or Bond the Judgment Amount for Appeal...........86

XIV.  Impracticability of Moving Before the District Court.................................88

I, Maranda E. Fritz, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

1.      I am a partner at the firm of Thompson Hine, LLP, one of the attorneys representing the Defendant Alpine Securities Corporation ("Alpine") in the above entitled matter.  I am over the age of eighteen, a resident of Essex County, New Jersey, am competent to make this Declaration and have personal knowledge regarding matters set forth herein.

2.      This Declaration is provided to set forth the key facts, disputed material facts from dispositive motions, and the procedural posture of the above-referenced case.  All references are to the docket of the district court.

## I.      The SEC's Complaint [Dkt. 1]

3.      The SEC filed its Complaint in the Southern District of New York on June 5, 2017.  *See* Compl. [Dkt. 1].  The Complaint alleged one claim for relief, a violation of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder, premised on the allegation that Alpine violated the Bank Secrecy Act, 31 U.S.C. § 5311-5330 ("BSA"), and "its implementing regulations [that] require broker-dealers to file SARs with FinCEN to report certain suspicious transaction conducted by, at, or through their firms.  *See* 31 C.F.R. § 1023.320(a)(2)."  *See* Compl., at ¶¶ 2, 11-13, 34, 39, 42, 45 [Dkt. 1].

1

4.     The SEC alleged that Alpine violated the SAR provisions of the BSA *not* by failing to file SARs – the conduct that had previously formed the bases for filed BSA actions -- but rather by filing SARs that were "deficient" because they failed to include certain items of information in the narrative portion of the filing. *Id*.

5.     The Complaint separated out the BSA violations into four separate categories: (a) "Alpine Omitted Material Red Flag Information From at Least 1,950 SARs"; (b) "Alpine Failed to File any SARs at All on the Liquidation of Approximately 1,900 Deposits Identified by Alpine as Suspicious"; (c) "Alpine Failed to File More than 250 SARs Within the Required 30 days After the Date the Suspicious Activity was Detected"; and (d) "Alpine Failed to Maintain and/or Retain Approximately 1,000 Underlying Files Supporting its SAR Filings."  *Id*. at pp. 12, 16-18 [Dkt. 1].

6.     At a hearing concerning discovery disputes on November 2, 2017, the district court, *sua sponte*, decided that the parties would file motions for summary judgment even though fact discovery was in its infancy and the commencement of expert discovery was still months away. When the district court directed that the SEC would immediately file a summary judgment motion, Alpine expressed concern that any motion by the SEC was "premature" because the issues relating to the filing of SARs under the BSA are by definition fact-intensive, dependent on the

facts and circumstances of a particular transaction and the particular industry, and could only be evaluated in the context of information that would be developed through both fact and expert discovery. *Id*. at 26:10-29:10; 30:14-22, 31:10-15, 32:11-13, 35-37 [Dkt. 61]. The district court nonetheless ordered that summary judgment briefs be submitted in November of 2017, months before the close of discovery and before any depositions were taken in the case.

## II. Alpine's Opposition to the SEC's Motion for Summary Judgment

7.      Alpine filed a Memorandum in Opposition to the SEC's Motion for Partial Summary Judgment [Dkt. 87], attached as **Exhibit A** to this Declaration, and also filed its own Cross-Motion for Summary Judgment regarding the SEC's lack of authority to enforce provisions of the BSA and failure to comply with the APA [Dkt. 84], attached as **Exhibit B**.

8.      Alpine's Rule 56.1 Statement of Additional Facts in Support of it Opposition to the SEC's Motion for Partial Summary Judgment [Dkt. 88] included, among other things, the following key facts regarding the fact-intensive and subjective nature of the decision-making process of filing SARs.

9.      In the Federal Financial Institutions Examination Counsel's online manual, it confirms that the decision whether to file a Suspicious Activity Report ("SAR") is a subjective determination: "The decision to file a SAR is an inherently subjective judgment.  Examiners should focus on whether the bank has an effective

3

SAR decision-making process, not individual SAR decisions. Examiners may review individual SAR decisions as a means to test the effectiveness of the SAR monitoring, reporting, and decision-making process. In those instances where the bank has an established SAR decision-making process, has followed existing policies, procedures, and processes, and has determined not to file a SAR, the bank should not be criticized for the failure to file a SAR unless the failure is significant or accompanied by evidence of bad faith." *See Online Manual BSA Infobase, Federal Financial Institutions Examination Council*, Ex. 7, (excerpt only) found at: https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_015.htm. Alpine's Add'l SOF, at ¶ 11 [Dkt. 88].

10. The GAO Report on the Bank Secrecy Act, states: "The SAR guidance in the interagency examination manual that regulators use states that the decision to file a SAR is inherently subjective and directs examiners to focus on whether the institution has an effective SAR decisionmaking process, rather than on individual SAR filing decisions. According to the manual, in those instances where the institution has an established SAR decisionmaking process; has followed existing policies, procedures, and processes; and has decided not to file a SAR, examiners generally should not criticize the institution for not filing a SAR." GAO-09-226, "Suspicious Activity Report Use Is Increasing, but FinCEN Needs

4

to Further Develop and Document Its Form Revision Process," at p. 19 (Feb.

2009), Ex. 8. Alpine's Add'l SOF, at ¶ 12 [Dkt. 88].

11.     William J. Fox, Director of FinCEN, made the following statement

before the House of Representatives regarding FinCEN's approach to compliance

under the BSA:

> The cornerstone of the Bank Secrecy Act, suspicious activity reporting,
> requires financial institutions to make judgment calls. If we fail in
> properly implementing this regime, if we get it wrong, then the system
> will fail. For example, if as regulators we are either too aggressive or
> too passive in supervising and examining the financial industries that
> we regulate, there could be two equally acceptable outcomes.
> Compliance should not be about second guessing individual judgment
> calls on whether a particular transaction is suspicious. If we are
> overzealous in our examination, financial institutions, as small "c"
> conservative institutions, will merely defensively file SARs file on
> anything and everything to protect themselves from regulatory risk.

Statement of William J. Fox, Director Financial Crimes Enforcement United States

Department of Treasury Before the House of Representatives, June 16, 2004, Ex.

9. Alpine's Add'l SOF, at ¶ 13 [Dkt. 88].

12.     Mr. Fox also emphasized that it is FinCEN that is charged with

responsibility for administration of the BSA which "means exercising oversight,

coordination *and ensuring consistency of application*", a goal that would be

defeated by colliding interpretations of the requisites of the BSA and the elements

of a violation. *Id*. (emphasis added). Alpine's Add'l SOF, at ¶ 14 [Dkt. 88].

5

13.     FinCEN guidance states the following regarding the evolving nature of suspicious activities and the need for firms to consider "all" facts and "circumstances": "The means of commerce and the techniques of money launderers are continually evolving, and there is no way to provide an exhaustive list of potentially suspicious transactions.  A mutual fund must consider ***all of the facts and circumstances related to the transaction*** and the customer in question." *See* FinCEN Guidance (FIN-2006-G013), October 4, 2006, at pp. 3-4, Ex. 10 (emphasis added). Alpine's Add'l SOF, at ¶ 15 [Dkt. 88].

14.     William F. Baity, Deputy Director, FinCEN, before the House Financial Services Subcommittee on Oversight and Investigations, stated that "[f]inancial institutions file Suspicious Activity Reports (SARs) after a subjective review of numerous variables . . . .".  *See* Statement of William F. Baity, Deputy Director, FinCEN, May 10, 2007, before the House Financial Services Subcommittee on Oversight and Investigations, attached as Ex. 11. Alpine's Add'l SOF, at ¶ 16 [Dkt. 88].

15.     NASD Special Notice to Members 02-21 states, in part, that "[b]roker/dealers need to look for signs of suspicious activity that suggest money laundering. If a broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding with the transaction."  *See* NASD Notice 02-21, at p.

10, April 2002, "NASD Notice 02-21", Ex. 12. Alpine's Add'l SOF, at ¶ 17 [Dkt. 88 (emphasis added)].

16.    NASD Notice 02-21 further states that "an awareness of the 'red flags' will help ensure that broker/dealer personnel can identify circumstances *warranting further due diligence*." *Id.* at p. 11 (emphasis added). Alpine's Add'l SOF, at ¶ 18 [Dkt. 88].

17.    NASD Notice 02-47, refers to NASD Notice 02-21 as being pertinent to a determination of "whether activities *vary substantially from normal practice* as to raise suspicions of possible illegality." NASD Notice 02-47, at p. 459, August 2002, attached as Ex. 13. Alpine's Add'l SOF, at ¶ 19 (emphasis added) [Dkt. 88].

18.    NASD Notice 02-47 explains that the provisions of 31 C.F.R. 1023.320(a)(2), which requires broker-dealers to disclose transactions that "'involve use of the broker/dealer to facilitate criminal activity,'" is "intended to detect activities that appear to have a criminal purpose but apparently involve legally derived funds."  *Id.* Alpine's Add'l SOF, at ¶ 20 [Dkt. 88].

19.    The SEC, in correspondence dated December 22, 2017, admitted it did not consult or even communicate with FinCEN in relation to the substantive allegations in this case, confirming it "did not discuss any specific SARs or their content, and did not discuss interpretation of FinCEN guidance with individuals at

FinCEN in connection with this case at any time." *See* SEC Letter, December 22, 2017, at 5, Ex. 14. Alpine's Add'l SOF, at ¶ 21 [Dkt. 88].

## III. Alpine's Cross Motion for Summary Judgment on SEC's Lack of Authority

20.     Alpine filed its own motion for summary judgment on the basis that the SEC lacks authority to pursue an action for violations of the BSA.  *See* Alpine's Cross-Mot. for Summ. Jd. [Dkt. 83].  Alpine's Memorandum in Support of its Cross-Motion for Summary Judgment and Reply Memorandum in Support are found at Dkt. 84 and 94 respectively.

21.     Alpine's Rule 56.1 Statement of Facts in Support of its Cross-Motion for Summary Judgment regarding the SEC's Lack of Authority [Dkt. 85] included the following key facts regarding the SEC's lack of authority to bring an enforcement action for violations of the BSA.

22.     The SEC admitted in a response to an interrogatory that "the Commission states that it possesses no documents reflecting any grants of authority to you from FinCEN, the United States Department of the Treasure, or other governmental authority to pursue an enforcement action including but not limited to seeking penalties or other remedies, for violations of the BSA against broker dealers or other financial institutions, including but not limited to the instant Action against Alpine, aside from the Securities Exchange Act and Rules promulgated thereunder."  Alpine's SOF, at ¶ 1 [Dkt. 85].

23.    The SEC, in correspondence dated December 22, 2017, admitted it did not consult or even communicate with FinCEN in relation to the substantive allegations in this case, confirming it "did not discuss any specific SARs or their content, and did not discuss interpretation of FinCEN guidance with individuals at FinCEN in connection with this case at any time."  Alpine's SOF, at ¶ 2 [Dkt. 85].

24.    The Treasury Department and FinCEN prepared a manual entitled, "Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act," explaining that FinCEN uses various other agencies examine to assess compliance but has retained ultimate enforcement authority:

> While FinCEN is responsible for ensuring compliance with the Bank Secrecy Act and implementing regulations, FinCEN does not itself examine financial institutions for compliance.  Instead, FinCEN has delegated its authority *to examine* financial institutions for BSA compliance to the primary federal regulators of those financial institutions.  FinCEN thereby can leverage the resources and expertise of other Federal agencies and self-regulatory organizations by relying on these agencies to conduct compliance exams.  FinCEN has delegated its examination responsibility to the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, Securities and Exchange Commission, the Commodity Futures Trading Commission, and the Internal Revenue Service (Small Business / Self-Employed Division) . . .  *FinCEN has retained the authority to pursue civil enforcement actions against financial institutions for non-compliance with the Bank Secrecy Act and the implementing regulations.*  Under the Bank Secrecy Act, FinCEN is empowered to assess civil monetary penalties against, or require corrective action by a financial institution committing negligent or willful violations of the Bank Secrecy Act.  Generally, FinCEN identifies potential enforcement cases through: (1) referrals from the agencies examining for Bank

9

Secrecy Act compliance; (2) self-disclosures by financial institutions; and, (3) FinCEN's own inquiry to the extent it becomes aware of possible violations.

*See* FinCEN Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act, App. A – Financial Crimes Enforcement Network Programs, at 39-40, Ex. 3, (only Appendix A attached) (emphasis added). Alpine's SOF, at ¶ 3 [Dkt. 85].

25.    The following statement regarding FinCEN's enforcement of the BSA was published in a Banking and Financial Services Policy Report in December of 2016:  "FinCEN is responsible for the overall administration and enforcement of the BSA.  Although it delegates BSA compliance examination authority to other federal regulators, FinCEN retains enforcement authority, including the authority to impose CMPs [civil monetary penalties] for violations.  FinCEN investigates potential BSA violations or deficiencies referred by federal and state regulators, as well as those referred by its own Enforcement Division.  After investigating a BSA case referral, FinCEN determines which enforcement action to pursue, if any. FinCEN typically resolves a case in one of three ways: (1) sending a warning letter to the violator; (2) assessing a CMP; or (3) taking no action."  *See Bank Regulation*, Banking & Fin. Services Pol'y Rep., Dec. 2016, at 36, 39-40, Ex. 4. Alpine's SOF, at ¶ 4 [Dkt. 85].

26.    In FinCEN's 2011 Annual Report, it states that "[r]esponsibility for ***conducting examinations*** for compliance with FinCEN's regulations has been

delegated to the following Federal regulatory agencies with respect to the financial institutions they supervise: U.S. Securities and Exchange Commission [listed among others]." *See* FinCEN 2011 Annual Report, at 85, Ex. 5 (excerpts only) (emphasis added). Furthermore, "FinCEN assists and supports all of these agencies to promote effective and uniform application of its regulations, and they [Federal regulatory agencies] refer to FinCEN cases of significant non-complaince. *FinCEN retains responsibility for enforcement actions for violations of the BSA* and FinCEN's implementing regulations." *Id*. (emphasis added). Alpine's SOF, at ¶ 5 [Dkt. 85].

27.     Peter Alvarado, as Deputy Director of FinCEN, gave the following remarks regarding enforcement of the BSA at a Federal Financial Institutions Examination Council Advanced BSA/AML Specialist Conference on September 25, 2012: "FinCEN retains authority to take enforcement actions for violations of the BSA found by the regulatory agencies acting under delegated authority." See Remarks by Peter Alvarado, Dep. Dir. of FinCEN, Sep. 25, 2012, Ex. 6. Alpine's SOF, at ¶ 6 [Dkt. 85].

28.     James H. Freis, Jr., as Director of FinCEN, stated the following at an ABA Conference regarding enforcement authority of the BSA: "FinCEN retains authority to take enforcement actions for violations of the BSA found by the regulatory agencies acting under delegated authority. The FBAs [federal banking

11

agencies] retain separate authority to conduct enforcement actions, such as cease and desist proceedings for unsafe or unsound practices or violations of law, rule or regulation. While FinCEN and the FBAs operate under distinct jurisdictional authorities, we have built an infrastructure that fosters close collaboration on BSA enforcement matters. As a result, we are normally able to proceed jointly and concurrently, as warranted, to better ensure a consistent and uniform approach to BSA enforcement.  Since January 1, 2005, 68 percent of civil money penalty cases undertaken at FinCEN have involved joint or concurrent penalty actions with other stakeholder federal or state agencies, including the U.S. Department of Justice. A vast majority of the penalty actions not concluded jointly involved non-bank financial institutions, particularly casinos and money services businesses, for which FinCEN retains exclusive regulatory penalty authority."  Prepared Remarks of James H. Freis, Jr., Director of FinCEN, "The Objectives and Conduct of Bank Secrecy Act Enforcement," delivered at the ABA Money Laundering Enforcement Conference, Wash. D.C., Oct. 20, 2008, at p. 9-10, Ex. 7.  Alpine's SOF, at ¶ 7 [Dkt. 85].

29.     Samuel W. Bodman, as Deputy Secretary of the U.S. Treasury Department, gave the following testimony before the House Financial Services Subcommittee on Oversight and Investigations regarding FinCEN's retention of authority to pursue civil enforcement actions for noncompliance with the BSA:

"According to Treasury regulations and orders, the Secretary has delegated the overall authority for enforcement and compliance of this system to one of Treasury's bureaus, the Financial Crimes Enforcement Network (FinCEN). ***The Director of FinCEN retains the authority from the Secretary to pursue civil enforcement actions against financial institutions for non-compliance with the BSA and the implementing regulations.*** FinCEN has been empowered to assess civil monetary penalties against, or require corrective action by, a financial institution committing negligent or willful violations." *See* Written Testimony of Samuel W. Bodman, Deputy Sec'y U.S. Dep't of the Treasury Before the House Fin. Servs. Subcomm. On Oversight & Investigations, Tres. JS-1728 (June 16, 2004), Ex. 8, (emphasis added). Alpine's SOF, at ¶ 8 [Dkt. 85].

30.     William J. Fox, Director of FinCEN, before the House of Representatives regarding FinCEN's approach to compliance under the BSA, emphasized that it is FinCEN that is charged with responsibility for administration of the BSA which "means exercising oversight, coordination *and ensuring consistency of application*" a goal that would be defeated by colliding interpretations of the requisites of the BSA and the elements of a violation. *Id*. (emphasis added). Alpine's SOF, at ¶ 9 [Dkt. 85].

13

IV.     **District Court's March 30, 2018 Order on the SEC's Motion for Partial Summary Judgment and Alpine's Cross-Motion for Summary Judgment [Dkt. 101]**

31.     The district court issued its Opinion and Order on the SEC's Motion for Partial Summary Judgment and Alpine's Cross-Motion for Summary Judgment on March 30, 2018 ("March 30 Opinion").  *See* Dkt. 101.

32.     In relation to the SEC's motion for summary judgment, the March 30 Opinion expressly acknowledged that it was the SEC's burden to establish that each of the SARs at issue was a required filing under 31 C.F.R. § 1023.320, and found that the SEC failed to carry this burden. *Id.* at 46. However, *instead of denying the motion*, the district court proceeded apace to grant "partial summary judgment," endorsing the SEC's claims of entirely new, unworkable and unfounded SAR requirements that supposedly exist regardless of the facts and circumstances relating to a particular transaction.

33.     Even as the district court fashioned new BSA requirements, based on the SEC's cobbling together of various forms of FinCEN and FINRA "guidance," the district court also expressed concern regarding the lack of relevant "lay and/or expert testimony." the district court also acknowledged that the parties' failure to provide expert testimony was likely due to the Court's scheduling of the motions months before expert discovery.  March 30 Opinion, at 46 n.21 [Dkt. 101].

34.     The SEC had selected purported "red flags" mentioned in various forms of industry "guidance" and argued that those "flags" had to be included in the narrative portion of the SAR. According to the SEC, failure to discuss those "red flags" – and apparently countless other "red flags" scattered across periodic industry issuances – constitutes an actual violation of the BSA subject not to the penalties set forth in the BSA but to the much harsher penalties under the Exchange Act.

35.     Alpine cited extensive authority confirming that there is no automatic requirement that any particular "flag" be included in a SAR narrative. A broker-dealer is only required to describe the factors that caused the filer to consider the transaction as indicative of criminal activity.  As stated in the SAR Form, "[f]ilers" should "provide a clear, complete, and concise description of the activity, including what was unusual or irregular that ***caused suspicion.***" (*See* SAR Form at 110, emphasis added). By making an assumption that the SAR filings were "required," without consideration of the firm's reason for the filing, the district court literally reversed the analysis ordained by FinCEN and replaced this analysis with an unprecedented shortcut: adoption of a bright-line rule that a SAR narrative is deficient as a matter of law unless it mechanically lists all red flags identified in guidance even if they have no relevance to the underlying transaction or to the reason why the SAR was actually filed.

15

36.     In relation to the cross-motion filed by Alpine, predicated on the fact that the SEC does not have authority to enforce the SAR provisions of the BSA and that it failed to comply with the APA in relation to the rule on which it relied, the district court failed even to consider the clear and detailed history and content of the BSA, the express and incontrovertible delegation of enforcement authority only to Treasury, or the extensive case law that demonstrated that the SEC lacked that authority.  The district court effectively ignored the pertinent provisions of the BSA and instead looked only at the Exchange Act, concluding that the SEC has broad authority to impose reporting and recordkeeping requirements on those in the securities industry. With respect to the SEC's failure to promulgate properly any rule that addressed the SAR provisions, the district court held, without citation to any authority, that the SEC had managed to prospectively incorporate into its 1981 issuance of Rule 17a-8 any and all subsequently enacted provisions of the BSA -- without any need to comply with the APA.

37.     In a lengthy opinion that tracked and endorsed the SEC's contentions, the district court devoted only 6 pages to a rejection of all of the various issues relating to the SEC's enforcement authority.

**V.      Alpine's Motion for Reconsideration regarding the SEC's Lack of Authority and Failure to Comply with the APA and Submission of an Expert Declaration [Dkt. 111]**

38.     Because the district court failed to acknowledge or engage in any

legal analysis regarding the background and history of the BSA or the authorities confirming that the Congressional delegation of authority precluded usurpation of that authority by the SEC, Alpine filed a motion for reconsideration. In light of the district court's own description of its decision as "preliminary," its invitation to the parties to provide additional authority, and its avowed concern regarding the lack of expert testimony, Alpine accompanied that motion with a Motion for Leave [Dkt. 114] to file relevant testimony including the declaration from Alpine's expert witness, Beverly E. Loew, a former FinCEN employee who was directly involved in issues relating to the allocation of authority for the BSA.  A copy of Alpine's Memorandum in Support of its Motion for Reconsideration [Dkt. 111], is attached hereto as **Exhibit C**. A copy of Ms. Loew's eventual Report, detailing FinCEN's exclusive authority to interpret and enforce the BSA, and an explanation of the importance of FinCEN's ability to ensure consistency of interpretation across various financial sectors, is found at Dkt. 137.

39.     Alpine also provided deposition testimony from current and former Alpine employees that countered various factual assumptions made by the district court – deposition testimony that occurred *after* the briefing on summary judgment because of the district court's peculiar scheduling of this case. Alpine also provided additional SARs that rebutted the claim that Alpine had failed to prepare and file detailed SARs in support of Alpine's Motion for Reconsideration of the

17

district court's grant of the SEC's Motion for Partial Summary Judgment. [Dkt. 113].

40.     On the first business day after the reconsideration filing and request for leave to submit additional evidence, without any response from the SEC, the district court denied Alpine's request for leave to submit the additional material, including the declaration from a former FinCEN employee and expert, without opinion and with one word: "Denied." [Dkt. 117].  The district court did not offer any explanation for its refusal to consider precisely the information that it had invited and that would certainly elucidate the issues, nor did it acknowledge its own statement that expert submissions had not previously been available because of the briefing schedule set by the district court which asked for summary judgment at the *beginning* of fact discovery, before depositions, and prior to expert discovery.

41.     The district court denied Alpine's Motion for Reconsideration of its Cross Motion for Summary Judgment, and also denied Alpine's Motion for Reconsideration of the district court grant of the SEC's Motion for Partial Summary Judgment. [Dkt. 129].

**VI.   Alpine's Writ of Mandamus to the Second Circuit [Dkt. 170]**

42.     After the district court denied Alpine's motions for reconsideration, Alpine filed a Writ of Mandamus stating, in part, that the district court has charted

a course designed to enable it to grant judgment to the SEC in short order and without allowing proper expert discovery.  Alpine further stated that the SEC would then proceed to seek penalties under the Exchange Act that are exponentially higher than those set forth in the BSA, without the need to demonstrate the elements of scienter and fault that exist in the BSA, and *"will be able to literally put Alpine out of business and avoid any appeal." See* Writ of Mandamus, Dkt. 18-1875, at 11 (emphasis added).

43.     The Second Circuit denied Alpine's writ of mandamus stating, "Petitioner has not demonstrated that it lacks an adequate, alternative means of obtaining relief…" [Dkt. 170].

**VII.   Briefing Schedule for Summary Judgment**

44.     The district court then ordered a new summary judgment briefing schedule that Alpine attempted to extend in order to complete expert discovery *prior* to responding to the SEC's motion for summary judgment. [Dkt. 162].  The SEC would not agree to an extension, and the district court did not allow the requested extension, giving Alpine only two weeks to file an opposition to the SEC's Motion after the deposition of the SEC's expert.  The district court did grant the SEC an extension to file its reply memorandum, notwithstanding the district court's previous denial to Alpine. [Dkt. 163].

## VIII.  Fact Disputes On the SEC's Motion for Partial Summary Judgment on Liability

45.     Alpine filed its Memorandum in Opposition to the SEC's Motion for

Summary Judgment on Liabilities on August 14, 2018 [Dkt. 158].  A copy of

Alpine's memorandum is attached hereto as **Exhibit D**.

46.     Alpine's Rule 56.1 Additional Statement of Fact included, among

other things, the following material facts at issue in this case.

### A.     *Guidance Regarding the Purpose of Red Flags*

47.     "Red flags" are not indicative of criminality; they are factors

indicating a need to review the transaction. As stated in NASD Special Notice to

Members 02-21, "[b]roker/dealers need to look for signs of suspicious activity that

suggest money laundering. If a broker/dealer detects 'red flags,' it should perform

additional due diligence before proceeding with the transaction."  *See* NASD

Notice 02-21, at p. 10, Ex. 11. Add'l SOF, ¶ 149 [Dkt. 154].

48.     NASD Notice 02-21 further states that "an awareness of the 'red

flags' will help ensure that broker/dealer personnel can identify circumstances

***warranting further due diligence***," and indicates that "[a]ppropriate 'red flags'

should be described in the written policies and AML compliance procedures of the

broker/dealer." *Id.* at p. 11, Ex. 11 (emphasis added). Add'l SOF, ¶ 150 [Dkt. 154].

49.     NASD Notice 02-47, refers to NASD Notice 02-21 as being pertinent

to a determination of "whether activities vary substantially from normal practice as

20

to raise suspicions of possible illegality." NASD Notice 02-47, at p. 459, August 2002, Ex. 69. Add'l SOF, ¶ 151 [Dkt. 154].

**B.**      ***Alpine's Expert Testimony Regarding the Purpose of Red Flags, Identification of Red Flags, and When to Include those Red Flags in a SAR Narrative***

50.      Fundamentally, the SEC's expert witness's view regarding SAR filing requirements appeared to be that when a broker-dealer is alerted to a potential red flag regarding customer activity in the context of microcap or penny stocks, the firm is required to file a SAR, and to include in the SAR narrative every possible red flag the firm knows or should have known about that customer, the transaction, the issuer, the security and its trading history, and whether there is any foreign involvement whatsoever.  That view ignores the SAR regulations themselves, as well as the well-established SAR-filing principles and practice, particularly with respect to clearing firms, and it depended for its validity on cherry-picked guidance, settled (not litigated) disciplinary actions, a skewed view of the penny stock and microcap spaces, and the supposed inability of users of the SAR database to understand the purpose and content of the SAR filing.  *See* Loew Expert Decl., at ¶ 184, Ex. 5 (citing the Navigant Report). Add'l SOF, ¶ 59(a) [Dkt. 154].

51.      In addition to improperly relying on guidance, the SEC's expert witness's analysis fundamentally misstated the significance of red flags, as

demonstrated even by the very guidance she relied upon.  The SEC's expert witness ultimately took the position in her Report that if a firm identifies "red flags" associated with a customer's activity, the firm must, as a matter of law, file a SAR and include such "red flags" in the SAR narratives. Not only is that inaccurate, but such a requirement would hopelessly muddy the SAR database with useless information.  To try to figure out what the issue is in connection with a particular SAR, a law enforcement or supervisory agency would have to weed through all the "red flags" that turned out to be red herrings to try to determine which one may have turned out, after examination, to have been an actual indicator of suspicious activity and, thus, triggered the SAR filing.  *Id*., at ¶ 193, Ex. 5 (citing the Navigant Report). Add'l SOF, ¶ 59(b) [Dkt. 154].

52.     Notwithstanding its final conclusions, even the Navigant Report actually confirmed that the presence of supposed "red flags" does not mean "that a transaction is suspicious and reportable."  The SEC's Office of Compliance Inspections and Examinations ("OCIE") has expressly acknowledged as much in guidance as well. Thus, as OCIE itself concedes: "[t]he Staff does not contend that the existence of any of these examples, which may indicate suspicious activity, necessarily triggers the broker-dealer's obligation to file a SAR.  Whether the broker-dealer has such an obligation depends on the totality of facts and circumstances in a particular situation."  *Id*., at ¶ 194, Ex. 5 (citing and quoting

from the Navigant Report and OCIE's National Examination Program Risk Alert).
Add'l SOF, ¶ 59(c) [Dkt. 154].

53.    Moreover, Navigant also agreed that red flags should not be viewed as automatic triggers; instead they "require the firm to 'ask the next logical question' to understand whether there is a reasonable explanation for the transaction.  If there is no reasonable explanation, the firm must file a SAR."  That focus on whether there is a "reasonable explanation" for a transaction is appropriate and critical: money laundering transactions frequently involve economically unreasonable transfers.  Yet the Navigant Report then abandoned that rational approach in favor of its myopic focus on the mere presence of a red flag.  The SEC expert never went the next step of applying its own analysis, and did not reach any conclusion that Alpine failed to conclude that there were reasonable explanations for the transactions at issue.  Rather, the SEC's expert witness presumed as much from the fact that there is no written record outlining the firm's rationale. *Id*., at ¶ 195, Ex. 5 (citing and quoting from the Navigant Report); *accord* Angotti Dep., at 68-69, Ex. 10 (confirming that if there is a reasonable explanation for a transaction, there is no basis to believe that it is facilitating criminality). Add'l SOF, ¶ 59(d) [Dkt. 154].

54.    Nor is there any requirement in the SAR instructions or guidance requiring the discussion of specific, or any, "red flags."  While FinCEN has

provided instructions in the SAR Form regarding items to consider including in the narrative, none of the "red flags" articulated in the Navigant Report are included in that list. To read these requirements into the rule imposes obligations over and above what is mandated. Loew Expert Decl., at ¶ 196, Ex. 5. Add'l SOF, ¶ 59(e) [Dkt. 154].

55.    Based on Alpine's expert witness's experience, "red flags" are not *per se* suspicious scenarios, but rather, are indicators that might prompt an inquiry into an activity that may or may not rise to the level of reportable activity. "Red flags" are, in other words, simply a means by which a firm may identify activity that should be examined to determine if there may be suspicious activity for which a SAR should be filed. However, the "red flag" often will have nothing to do with suspicious activity that may ultimately be identified. *Id.*, at ¶ 197, Ex. 5. Add'l SOF, ¶ 59(f) [Dkt. 154].

56.    If firms are required to identify and include every "red flag" in the firm's possession in the SAR narrative, regardless of whether such "red flag," upon investigation, is truly indicative of suspicious activity, there is a significant risk that SAR narratives will include irrelevant and extraneous information, which will water down the information contained in the BSA database and ultimately be counterproductive to law enforcement that utilizes the database. In other words, if firms are required to include in their narratives every potential red flag regarding

the transaction and relevant parties, the basis for the firm's decision that the activity is suspicious may well get lost in the weeds. Moreover, it is also not always possible for a firm to develop "red flag" information because that information may be unavailable to the firm and the firm will not have, as law enforcement and regulatory authorities do, police powers that may be used to compel production of the information. *Id*., at ¶ 198, Ex. 5. Add'l SOF, ¶ 59(g) [Dkt. 154].

57.    Insofar as the SEC's expert witness argues that particular "red flags" must necessarily be included in the SAR narrative as a matter of law whenever such information is available to the firm, that position is not consistent with the fundamental purpose of the narrative: to identify the firm's basis for concluding that the activity at issue is suspicious. If that "red flag" did not lead to the firm's decision to file a SAR, it is not a required element of the SAR narrative. Indeed, firms may well conclude, after investigating, that the "red flags" that prompted their investigation were not sufficient to warrant a SAR filing, but that other information the firm uncovers in its investigation does warrant a SAR filing. In that instance, the information that led to the SAR filing should be included in the SAR narrative, not the "red flags" that the firm concluded after investigation could be explained or were irrelevant. *Id*., at ¶ 199, Ex. 5. Add'l SOF, ¶ 59(h) [Dkt. 154].

58.     Further, the "red flag" rule created by Navigant is, as a practical matter, unfair and unworkable. There is no published, comprehensive list of "red flags" that industry participants can use to satisfy the standard the SEC's expert witness would have the district court adopt.  While there are some advisories and various and sundry pieces of guidance that discuss certain potential "red flags" for particular kinds of activity, products, clients, and markets, those lists are neither comprehensive nor stagnant.  Rather, as demonstrated by the fact that the SEC was relegated to relying on settled enforcement cases to identify certain "red flags" it claims Alpine should have included in its SAR narratives, regulators and industry participants are continually identifying new "red flags" as criminals become more sophisticated or change strategies, financial products change and evolve, and as industry participants and regulators identify new ways of identifying potentially illegal conduct.  *Id*., at ¶ 200, Ex. 5 (citing from FinCEN guidance). Add'l SOF, ¶ 59(i) [Dkt. 154].

59.     To suggest that firms are required to include in each SAR narrative each "red flag" that the SEC has in its mind, when those "red flags" are not defined in a comprehensive manner in any particular piece (or even pieces) of guidance by the SEC (or any other regulator) is fundamentally unfair to industry participants and sets a changing and evolving standard that, practically speaking, no firm can ever live up to.  Moreover, insofar as the SEC and the SEC's expert witness have

26

relied on "red flags" identified for the first and only time in settled cases, the SEC and SEC's expert witness seek to elevate not only guidance but also settled cases to settled law, bypassing appropriate rule-making procedures or even independently adjudicated decision-making.  *Id*., at ¶ 201, Ex. 5 (citing *In re Albert Fried & Co.*, SEC Release No. 77971, 2016 WL 3072175, at *5 (June 1, 2016)). Add'l SOF, ¶ 59(j) [Dkt. 154].

60.    Not only is it fundamentally unfair, unwieldy, and inconsistent with regulatory guidance to require firms to include in each SAR narrative every "red flag" it happens to have information about, it is also unnecessary.  It should be recognized that there are all types of SARs.  Some necessitate more explanation than others, and, in the case of some SARs, the checkboxes associated with common "red flags" on the SAR form, combined with a concise narrative, provide sufficient information to law enforcement and applicable regulators.  *Id*., at ¶ 202, Ex. 5. Add'l SOF, ¶ 59(k) [Dkt. 154].

61.    Indeed, as noted above, the SAR form, now established in electronic form, contains searchable fields separate from the narrative component that answer these questions with sufficient detail to permit enforcement agencies to query persons, types of transactions, common suspicious activities, and geographic locations, and unlike the narrative, are far more efficiently queried because of their standardization than the narrative, which is free form.  Regardless of what is in the

narrative, a search result permits an enforcement agency to query the filing firm and seek additional information about the transaction in the form of the SAR supporting information. *Id.*, at ¶ 203, Ex. 5. Add'l SOF, ¶ 59(l) [Dkt. 154].

62.    Alpine's expert testified that the SEC's expert witness's analysis with respect to the SAR narratives is erroneous not just for the reasons set forth above, but also because (i) the selection of the particular red flags she has identified as a basis for critiquing Alpine is arbitrary, providing no cogent methodology for the identification of required red flags or adequate explanation for the selection of the particular red flags she chose to highlight, and (ii) her analysis and application of the red flags selected is misguided. *Id.*, at ¶ 204, Ex. 5. Add'l SOF, ¶ 59(m) [Dkt. 154].

C.    *Alpine's Testimony Regarding Identification of Red Flags, Review of Red Flags, and When to Include a Red Flag in a SAR Narrative*

63.    Alpine's review process of each stock deposit from an introducing broker-dealer included an initial review by a compliance analyst and initial draft of a SAR if necessary, and then further reviews by the AML Officer, CCO, and/or a legal analyst. The stock deposit would be vetted by Alpine's operations group for both clearing and settlement issues as well as other AML red flags. If Alpine's legal group and/or operations group found AML red flags, then the deposit would receive further review and assessment from the AML group "to make a determination of whether a SAR[] should be filed. Some of those determinations

28

were objective. Some of them were subjective." *See* Alpine Dep., at 37, Ex. 3; *see also id*. at 153, Ex. 3 (discussing the "highly subjective" nature of SAR filings on the filer on what is deemed suspicious). Add'l SOF, ¶¶ 41-45 [Dkt. 154].

64. There may be circumstances where the file may contain a red flag but would not cause Alpine to file a SAR because the process of determining whether activity is suspicious is a subjective one. There may be times when Alpine's AML Officer will determine not to file a SAR on certain referred activity due to the firm's familiarity with the client and whether the activity is consistent with their normal course of business. *See* L. Farmer Dep., at 69-70, Ex. 16. Add'l SOF, ¶ 47 [Dkt. 154].

65. The existence of any particular circumstance did not automatically trigger a duty to include that factor in the SAR narrative or file a SAR at all. Those circumstances only triggered a duty to further investigate and consider all facts before an ultimate decision was made as to whether any particular factor or fact raised suspicion to the degree that it was appropriate to file a SAR or include certain information in a SAR narrative. *See* E. Zipprich Decl., at ¶ 32, Ex. 1; *see also* NASD Notice 02-21, at p. 10, Ex. 11 ("[b]roker/dealers need to look for signs of suspicious activity that suggest money laundering. If a broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding with the transaction."). Add'l SOF, ¶ 48 [Dkt. 154].

66.    The SEC's expert acknowledged in her Rebuttal Report that a SAR does not have to include all red flags.  *See* Navigant Rebuttal Report, at 11, Ex. 17. Continuing, the SEC's expert stated that it is not necessary to include all red flags; what is required is "enough details in the SAR to advise regulators and law enforcement officials ***why*** the financial institution filed it."  *Id*. (emphasis added); *see also* Angotti Dep., at 277, Ex. 10 (confirming that identified red flags generally might need to be included in the narrative, but "it depends on what the fact is"); *see also id*. at 280-281, Ex. 10 (confirming that a red flag itself does not mean that a transaction is reportable; it means it's something that the firm should look at, and if the activity is suspicious, it needs to be included in the SAR); *id*. at 282, Ex. 10 (stating that red flag should be discussed in the narrative when they are "material"); *see also* the Navigant Report, SEC's Ex. 2 ("The presence of red flags alone, of course, does not mean that a transaction is suspicious and reportable.") Add'l SOF, ¶ 49 [Dkt. 154].

67.    Leia Farmer, Alpine's AML Officer during the relevant time period, testified that a red flag "is simply a trigger.  It's simply a flag or something that we would then review, monitor more carefully, look more closely to determine whether it really truly – whether the activity, based on what we knew about the client either directly or indirectly, meaning through the introducing broker-dealer, would be enough to determine whether to file or not file a SAR."  Thus, the

"trigger" is not a trigger to file a SAR but a trigger to review and determine

whether "that activity is suspicious in nature" and determine "whether, if it is

suspicious, to file a SAR." *See* L. Farmer Dep., at 82-83, Ex. 16; *see also* Alpine

Dep., at 68, Ex. 3 ("In general, Alpine would use red flags in its program to cause

the activity that would trigger a red flag to be subject to further review."); *id*. at 68-

70, Ex. 3 ("if that red flag was relevant to the reason why the SARs was filed, it

should be on the SARs" but if a red flag is not included in the SAR narrative then

"the filer of that SAR didn't feel it was relevant to the reason why the SAR was

filed"); *id*. at 76, Ex. 3 ("I'd say generally these were red flag indicators that would

cause a transaction to come under heightened scrutiny" and "…merit looking

further into."); E. Green Dep., at 119, Ex. 2 ("Red flags should be considered."); R.

Jones Dep., at 75-76, Ex. 15 ("If I determine something to be suspicious and

needed it to be included in the SAR, I would have put it in the SAR."). Add'l SOF,

¶ 50 [Dkt. 154].

68.     "The Alpine process was designed to identify red flags that would

merit further review, to determine its ***relevancy***, as well as – as well as its

***applicability***" to the transaction. *See* L. Farmer Dep., at 186, Ex. 16 (emphasis

added). Add'l SOF, ¶ 54 [Dkt. 154].

69.     The SEC's expert herself, in her Rebuttal Report, acknowledged that

SAR filing decisions incorporate a "subjective element" and that "a reasonable

31

broker dealer could have come to a different conclusion in considering whether to file a particular SAR." *See* Navigant Rebuttal Report, at 15, Ex. 17. She concedes that "reasonable people can sometimes disagree," and thus "[i]f a reasonable broker-dealer could have come to a different decision, *then a decision to file or not to file should be left to the broker-dealer.*" *Id.,* Ex. 17. (emphasis added); *accord* Angotti Dep., at 63, Ex. 10. Add'l SOF, ¶ 57 [Dkt. 154].

70.     Notably, the SEC's expert also advocated a risk-focused approach for a particular business and clientele: "the BSA requires financial institutions to design programs tailored to the risk of their particular businesses, clients, produces and services and geographies," and "focus its compliance efforts" on those "parts of its business that present the most risk." *See* Navigant Rebuttal Report, at 17, Ex. 17. The SEC's expert also conceded that the focus must be on the program: "The fact that such risks exist does not always mean that there is some kind of inherent criminality in a particular client type, securities type, jurisdiction or other risk attribute." *Id*., Ex. 17. Add'l SOF, ¶ 58 [Dkt. 154].

71.     Prior to Alpine's 2015 OCIE Examination, Alpine never received notice during its previous exams with regulators that Alpine was supposed to include in the SAR narratives every single red flag. *See* L. Farmer Dep., at 57-58, 64, Ex. 16 (stating that Alpine was not told during a 2014 OCIE Examination that a

SAR narrative must automatically include all red flags). Add'l SOF, ¶ 101 [Dkt. 154].

72.      Regulators had never communicated to Alpine an identifiable list of red flags that would have to be included in a SAR narrative.  *See* L. Farmer Dep., at 58, Ex. 16. Add'l SOF, ¶ 102 [Dkt. 154].

73.      In fact, the SEC's expert witness added to the illusive nature of what is a red flag and where they can be found by confirming that "there is not complete list of red flags of suspicious information". A red flag is a red flag."  *See* Rebuttal at 7; Angotti Dep., at 357, Ex. 10. Add'l SOF, ¶ 103 [Dkt. 154].

74.      To Alpine's understanding the SAR narrative should include the pertinent details of the transaction and answer the "why" aspect of the filing, meaning, articulate why the broker-dealer believes the activity may be suspicious in nature and what is it about this activity that deviates from what the broker-dealer knows about that customer.  *See* L. Farmer Dep., at 58-59, Ex. 16; *see also id*. at 88-89 (In discussing the five "Ws", in regards to the question "why", "the intent was to address why the firm believed the activity to be suspicious in nature."). Add'l SOF, ¶ 104 [Dkt. 154].

### D.      SAR Content Requirements

75.      The purpose of the narrative is to explain why the firm, *in its subjective determination*, concluded—based on, among other things, the firm's

knowledge of the client, the client's historic and anticipated activity, and the product at issue—that the particular transaction at issue was potentially suspicious. The "why," in other words, is the *firm's rationale* for filing the SAR at the time, not the rationale of another hypothetical third party who might have filed the SAR for different, or additional reasons, typically with the benefit of hindsight and additional time. *See* Loew Expert Decl., at ¶ 139, Ex. 5. Add'l SOF, ¶ 159 [Dkt. 154].

76.    Contrary to the suggestions by the SEC's expert witness, the instructions to SAR forms used by the securities industry between 2002 and 2012 (Form 101 or SAR-SF) and 2012 to the present (FinCEN Form 111, which is an electronic form submitted online through the BSA E-filing portal) (collectively, "SAR-BD Forms") do not require that any specific circumstances must be included in a SAR narrative. The instructions for the narrative section of the SAR-BD Forms state "Filers *must* provide a clear, complete and concise description of the activity, including what was unusual or irregular *that caused suspicion*." The SAR-BD Forms, then, require only that the broker-dealer provide in the narrative section an account of what *the broker- dealer determined, with its experience in the particular market and information concerning the transaction,* was suspicious about the transaction. Indeed, that is the very point of the narrative: to help law enforcement understand what the firm concluded about the nature and

circumstance of the activity at issue that led to the judgment that the activity at issue was suspicious.  *Id*., at ¶ 144, Ex. 5 (citing and quoting from FinCEN guidance and SAR instructions); *see also* FinCEN Form 101, SAR BD Form, Ex. 71. Add'l SOF, ¶ 160 [Dkt. 154].

77.    The instructions also include "checklists" couched in permissive, rather than mandatory language: "[f]ilers *should* use the following checklist as a *guide* for preparing the narratives." This checklist on the SAR Form is as close as FinCEN has come to defining what should be included by the filer in the SAR narrative but even then, by using permissive language, FinCEN chose not to require inclusion of even those items in the SAR narrative. Purposely, there is no requirement concerning what must be included in a SAR narrative in either the SAR regulations itself (31 C.F.R. § 1023.320 (2016)) or in the instructions to the SAR-BD Form. This is directly a result of the fact that the decisions to file a SAR and what to include in a SAR narrative are subjective ones and the circumstances that give rise to the suspicion vary.  Loew Expert Decl., at ¶ 145, Ex. 5 (citing SAR instructions). Add'l SOF, ¶ 161 [Dkt. 154].

78.    Notably, even if the SAR Form checklists were considered mandatory – not the "guides" that they are -- those checklists do not even contain the various "red flag" categories identified by the SEC and so actually contradict the SEC's position.  *Id*., at ¶ 146, Ex. 5. Add'l SOF, ¶ 162 [Dkt. 154].

79.     Seeking to justify the SEC's theory that thousands of SARs that were

filed by Alpine were "fatally deficient," the Navigant Report concludes that SAR

narratives "should" "include any information readily available to the filer

regarding the transactions or the customers that has been obtained through the

account opening process and during any due diligence effort."  Although

ultimately stopping just short of pronouncing a rule that each and every red flag

must be included in each and every SAR narrative, as applied, that is effectively

the rule that would be established if Navigant's analysis were adopted.  Indeed, the

majority of the SEC expert witness's analysis of the SARs in Category A, which

are the filed SARs the SEC claims are deficient, consists of identifying red flags

that were missing from the SAR narratives and concluding that, on the basis of

those missing red flags, the relevant SARs were "inadequate on their face,"

"deficient" or otherwise "improper."  *Id*., at ¶ 187, Ex. 5 (citing the Navigant

Report); *see also* Beverly E. Loew Decl., *generally*, and at ¶¶ 57-88, Ex. 72

(addressing the "fatally deficient" SAR theory). Add'l SOF, ¶ 163 [Dkt. 154].

80.     But that standard is plainly overbroad and untethered to applicable

regulations.  In fact, the SAR narrative need only include "a clear, complete and

concise description" of the activity *that caused the firm suspicion*.  There is no rule

or regulation that requires a firm to include "all information readily available to the

filer," and the Report does not consider the authority confirming that the content of

a SAR narrative is also a subjective determination by the firm. *See* Loew Expert

Decl., at ¶ 188, Ex. 5 (citing materials from FinCEN's electronic filing

requirements). Add'l SOF, ¶ 164 [Dkt. 154].

81.    There is no provision of the SAR rules that would support penalizing

a firm that filed a SAR that contains the requisite data—the identification of an

account, a description of the transaction, the rationale for filing the SAR if one can

be articulated beyond the mere fact that the transaction occurred, and other

information that enables a querying law enforcement or regulatory or supervisory

agency to request additional information during an investigation or proceeding

related to some aspect of the report—or that would support imposing penalties on

the filer to the same extent as if no SAR had been filed at all. *Id*., at ¶ 189, Ex. 5.

Add'l SOF, ¶ 165 [Dkt. 154].

### E.    *Deficiencies in Navigant's [SEC's Expert's] Presentation*

82.    As an initial factual matter, the SEC relied on its tables and

conclusions from its expert that the individual SARs were deficient as a matter a

law, without providing the district court with a single SAR narrative to review.

Thus, the district court was asked to rule that thousands of SAR narratives are

defective without analyzing a single document, relying on the Navigant tables.  In

fact, multiple times during the SEC's expert deposition, she was unable to address

specific questions about a specific SAR by only looking at her Tables and without

the aid of the file. *See e.g.* Angotti Dep., at 237-241, Ex. 10 (stating that she would need to go back and look at the files for information which is not in her report). Add'l SOF, ¶ 166 [Dkt. 154].

83.     The SEC did not provide the district court with any SARs or support files for ***any*** of the alleged violations with its Motion. The SEC only provided a Bates number for many of the alleged deficient SAR narratives. *See* Add'l SOF No. 186(b), *infra*, stating Table A-2 identifies 476 SARs only by Bates Number, without any other information regarding what the violation is or who it is about – and more importantly – without providing the district court with the actual support files and the cited Bates Number pages). Add'l SOF, ¶ 172 [Dkt. 154].

84.     The SEC's expert confirmed in her deposition that she did not conduct any comprehensive review of the documents herself, but relied on others at Navigant to perform the review who were not subject to cross-examination. *See* Angotti Dep., at 138-144, Ex. 10 (stating, among other things, "I verified some SARs in each category."); *see also id*. at 136-137 (stating the Navigant started their analysis of the SARs at issue, based on their own categories not the SEC's before the Court's decision and then realigned the categories once the district court ruled). Add'l SOF, ¶ 173 [Dkt. 154].

85.     The SEC's expert testified during her deposition that the finding of a violation for failure to disclose a shell, where the firm's file clearly reflects Form

10-Qs and 10-Ks or when the actual support file says, "not a shell," would be error. *See* Angotti Dep., at 351-354, Ex. 10; *see also id*. at 143-144, Ex. 10 (stating that if there were handwritten notes of information in the support file that is inconsistent with the categories or claimed deficiency, then the SEC's expert would have expected her staff to see that and take it into account). Add'l SOF, ¶ 174 [Dkt. 154].

86.     Alpine's expert discussed the SEC's expert's methodological failing at length during her deposition, including stating that the SEC's expert's methodology of reviewing SARs and support files is not sufficient to determine whether a SAR was required or insufficient because it would require a review of Alpine's program as a whole, including discussion with Alpine's compliance personnel who were making decisions on individual transactions.  *See* Loew Dep., at 160-165, Ex. 82; *see also id*. at 130 (discussing an example of Martha Stewart in highlighting the SEC's expert's methodological failings in assessing violations). Add'l SOF, ¶ 176 [Dkt. 154].

## F.     *Material Facts in Dispute regarding Facially Deficient Narratives*

### 1.     Basic Customer Information

87.     Alpine's expert witness provided the following material facts in dispute as part of her rebuttal testimony to the SEC's expert witness regarding what basic information is required in a SAR narrative and how Alpine's SARs

comply with that requirement.

88.     The SEC's expert witness criticizes 1,015 of Alpine's filed SARs, and particularly the SARs that contained Alpine's narrative template language, on the basis that the SARs did not adequately describe the "Who, What, When, Where, and Why" relating to the transactions being reported. Specifically, as asserted by Navigant, many SARs filed by Alpine contained a bare-bones narrative, "identifying only the name of the depositor, introducing firm, and the security, the quantity, ticker symbol, price, and the value of the transaction." What is particularly interesting about the Navigant discussion of the SAR deficiencies it identified with respect to "basic customer and suspiciousness information" is that it provides nothing but bare-bones, conclusory statements as to why certain information should have been included in an Alpine SAR.  *See* Loew Expert Decl., at ¶ 206, Ex. 5. Add'l SOF, ¶ 177(a) [Dkt. 154]. Navigant's criticisms with respect to the alleged deficiencies in this category are also misplaced for the following reasons:

89.     There is no regulatory requirement that firms report in every SAR the information the SEC's expert witness now claims is required as a matter of law. The SEC's expert witness's opinion is based entirely on selected excerpts from various forms of guidance, which plainly does not have the force of law.  *See* Loew Expert Decl., at ¶ 207, Ex. 5. Add'l SOF, ¶ 177(b) [Dkt. 154].

90.     Second, the SEC's expert witness is wrong insofar as she claims that

many, if not most, of Alpine's SARs did not contain sufficient information to

comply with the broker-dealer SAR rule. This includes not only those that were

filed using the two templates criticized by the SEC and its expert witness, but also

a substantial number of the SARs described by the SEC's expert witness in

Exhibits to the Navigant Report.  *See* Loew Expert Decl., at ¶ 208, Ex. 5.Add'l

SOF, ¶ 177(c) [Dkt. 154].

91.     As reflected by the example that Navigant itself uses, the information

that Alpine included in its SAR narratives did present the

"who/what/where/when/why" that the SEC and Navigant claim was missing from

the SARs:

NAVIGANT EXAMPLE

Alpine Narrative: John Doe is a client of Scottsdale Capital a firm for which
Alpine Securities provides clearing services. On or around 06/21/2012, John
Doe deposited a large quantity (1,234,567 shares) of ABCDEFG (ABCD), a
"low-priced" ($0.001/share) security. This transaction amounted to
approximately $1,234.00.

| Who: | John Doe, through Scottsdale Capital |
|------|--------------------------------------|
| What: | Deposit of 1,234,567 shares of ABCDEFG (ABCD) |
| When: | On or about 6/21/2012 |
| Where: | Through Alpine, via Scottsdale Advisors |
| Why: | Deposit of large quantity of a "low-priced" security (cited by Navigant and the SEC as a red flag) |

*See* Loew Expert Decl., at ¶ 209, Ex. 5. Add'l SOF, ¶ 177(d) [Dkt. 154].

92. The "customer and suspiciousness" information provided by Alpine, together with the standardized and searchable fields in the electronic form would have permitted any enforcement agency seeking information about large quantity, "low-priced" securities, which are common traits of transactions in penny stocks and microcap securities, or about persons who were reported in the SAR, to identify the Alpine transactions and make inquiries of the firm. *See* Loew Expert Decl., at ¶ 210, Ex. 5. Add'l SOF, ¶ 177(e) [Dkt. 154].

93. Because Alpine's SARs obviously explained the actual transaction being reported, *e.g.*, a specific quantity of low priced securities deposited by an identified customer at a particular time, the Navigant Report is left to argue only the claimed absence of a "why," the reason for the filing. Given the fact that Navigant insists that a large deposit of "low-priced" securities is a red flag in and of itself, it cannot also claim that the identification of that transaction would leave the reader mystified as to the reason for the filing. *See* Loew Expert Decl., at ¶ 211, Ex. 5. Add'l SOF, ¶ 177(f) [Dkt. 154].

94. The Navigant Report also criticizes SARs that stated in the narrative that the subject was on Alpine's Heightened Supervisory List. In addition to the information provided in the narrative, of course, Alpine provided other information in the SAR, specifically in the searchable, non-free form fields of the SAR form. These completed fields include, for example, subject information, including

identifying information; suspicious activity information, including what the SEC and the SEC's expert witness would call "red flag" information, such as the customer's location (domestic or foreign), any identifiable securities fraud, transaction out of pattern for customer(s), transaction with no apparent business or lawful purpose, proceeds sent to or received from an unrelated third party, insider trading, market manipulation; product information, such as microcap securities; instrument type or "payment mechanism" including "market where traded;" and sub-type of financial institution, including clearing broker— securities and introducing broker—securities. *See* Loew Expert Decl., at ¶ 212, Ex. 5 (citing the Navigant Report and *Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields*). Add'l SOF, ¶ 177(g) [Dkt. 154].

95. Third, although the Navigant Report contains a discussion of allocations of responsibilities between clearing and introducing firms, and the authorities the SEC's expert witness cites acknowledge that clearing firms generally do not have as much information regarding the customer, in particular, as the introducing firms, the SEC's expert witness apparently disregards these allocations and relative disparities in both information and emphasis. In reaching her conclusions regarding what information Alpine was required to include in its SARs, the SEC's expert witness has wholly overlooked FinCEN's plain statement that the SAR filing standard is meant to be "a flexible standard that adequately

takes into account the differences in operating realities among various types of broker-dealers". *See* Loew Expert Decl., at ¶ 213, Ex. 5 (citing the Navigant Report). Add'l SOF, ¶ 177(h) [Dkt. 154].

96.     Finally, to the extent the SEC's expert witness's general criticism is premised on the fact that the SARs did not provide sufficient information for law enforcement, it is Alpine's expert witness's view that the template narrative, together with other information provided elsewhere in the SAR narrative, should, as a general matter, have provided law enforcement with sufficient information to perform their jobs. This is particularly true given that law enforcement has the right to request any supporting documentation for the SARs Alpine filed, and the SEC's expert witness herself implicitly acknowledges that such supporting documentation provides additional information not necessarily discussed in the SAR narratives. *See* Loew Expert Decl., at ¶ 214, Ex. 5. Add'l SOF, ¶ 177(i) [Dkt. 154].

97.     Moreover, if those SARs were required filings, law enforcement should have had access to SARs from at least two other sources to fill in any information it purportedly needed. Specifically, the introducing broker would have filed a SAR with respect to the same general transaction. Likewise, if the transaction involved moving customer funds in and out of bank accounts, U.S. banks would have been involved; those institutions also have SAR reporting

obligations. No single financial institution is required to be the source of all potentially helpful information.  *See* Loew Expert Decl., at ¶ 215, Ex. 5. Add'l SOF, ¶ 177(j) [Dkt. 154].

98.   Alpine provided to the district court examples of SARs taken from the SEC's Table A-1 alleging violations for failure to include basic client information, Alpine's SAR narratives do give very detailed information and clearly answer the question as to "why" Alpine was filing the SAR. Add'l SOF, ¶¶ 178(a)-(e) [Dkt. 154].

### 2.   Criminal or Regulatory History

99.   The following material facts in dispute come from Alpine's expert witness' rebuttal testimony of the SEC's expert witness, statements from the SEC's expert herself, and from Alpine's past AML Officer regarding Alpine's understanding and practice in regards to this red flag.

100.   The SEC's expert witness's conclusion that 675 SARs were deficient because they lacked information about criminal or regulatory history is flawed for several reasons.  Loew Expert Decl., at ¶ 216, Ex. 5 (citing to the Navigant Report). Add'l SOF, ¶ 179(a) [Dkt. 154].

101.   First, the SEC's expert witness fails to point to any basis for the requirement to include in the narrative that particular item of information, and fails even to acknowledge that the SAR Form Instruction is much narrower, noting on

45

the checklist the existence of "related litigation." Loew Expert Decl., at ¶ 217, Ex. 5. Add'l SOF, ¶ 179(b) [Dkt. 154].

102.    There is no basis in law or regulation that requires the contents that Navigant asserts is critical, and it fails to demonstrate any that the regulatory histories formed the basis for Alpine's determination to file the SARs in question. Loew Expert Decl., at ¶ 218, Ex. 5. Add'l SOF, ¶ 179(c) [Dkt. 154].

103.    Perhaps because there is no such articulated requirement, the SEC's expert witness herself is not even consistent about whose criminal or regulatory history is relevant. At some points, she suggests that it is the history of Alpine's customers, at other points it is the history of the SAR subjects (which may not be Alpine's customers), and at yet other points, it is the history of undefined "related parties." Likewise, the standard she has articulated – that the firm must "refer to, or adequately describe" criminal or regulatory history – is entirely too vague. Is it sufficient to mention the criminal or regulatory history? Or does the narrative have to go into specifics with regard to that history? To suggest that Alpine should be penalized for failing to include information, but not even be clear about what information was omitted, or about whom, is simply not a fair standard, nor is such a rule consistent with industry standard. Loew Expert Decl., at ¶ 219, Ex. 5 (citing Navigant Report). Add'l SOF, ¶ 179(d) [Dkt. 154].

104.    Second, the fact that a person or entity with a criminal or regulatory history – information equally accessible to law enforcement – conducts a financial transaction does not necessarily indicate that the transaction is inherently suspicious. If so, every transaction over $5,000 of every felon who is now gainfully employed, including a routine paycheck, would trigger a suspicious activity inquiry and filing. The fact that an issuer's CEO was convicted of a DUI when he was 22, with no subsequent criminal history in the next 40 years, may well not be relevant to an analysis as to whether that issuer's stock is the subject of market manipulation. And providing that information in a SAR will not likely be helpful to law enforcement. Accordingly, creating a bright-line rule, for the first time in the history of the BSA, that criminal or regulatory history must be included in the narrative as a matter of law simply does not advance the fundamental purpose of SARs; in fact, it is counterproductive.  Loew Expert Decl., at ¶ 220, Ex. 5. Add'l SOF, ¶ 179(e) [Dkt. 154].

105.    Of course, there may be circumstances in which a firm determines that the history is relevant to its actual determination that the activity being investigated is suspicious. But the fact that information about past criminal or regulatory history may have been contained in Alpine SAR documentation does not mean it should be contained in all SARs.  Loew Expert Decl., at ¶ 221, Ex. 5. Add'l SOF, ¶ 179(f) [Dkt. 154].

106.   The SAR form does not ask anywhere on the form whether the customer has a criminal or regulatory history.  *See* L. Farmer Dep., at 98, Ex. 16. Add'l SOF, ¶ 180 [Dkt. 154].

107.   Leia Farmer, Alpine's AML Officer during the relevant time period of this action, testified that evidence of criminal or regulatory history may "not necessarily" be included in a SAR narrative.  *See* L. Farmer Dep., at 70, Ex. 16. For example, Alpine will "look at the specific activity occurring in the account to determine its relevance to that adverse history."  *Id*.  Factors which may make a customer's history relevant or not relevant "depends on the facts and circumstances in that case" including, the "proximity of the activity" to the transaction at hand, and whether the specific criminal or regulatory history is relevant to the transaction at hand.  *Id*. at 70-71, Ex. 16. Add'l SOF, ¶ 181 [Dkt. 154].

108.   In fact, the SEC's expert also reinforces the common-sense conclusion that past abuses in a particular market does not create an objective reason to suspect a crime may be occurring in a specific transaction in that market, stating, "The fact that such risks exist does not always mean that there is some kind of inherent criminality in a particular client type, securities type, jurisdiction or other risk attribute."  *See* Navigant Rebuttal Report, at 17, Ex. 17. Add'l SOF, ¶ 182 [Dkt. 154].

109.    Moreover, the SEC's expert confirmed during her deposition that if there is a reasonable explanation for a transaction.  *See* Angotti Dep., at 68-69, Ex. 10. Add'l SOF, ¶ 183 [Dkt. 154].

110.    Alpine would not include information regarding a customer when Alpine was not aware of particular activity, or has determined that the particular activity is not necessarily relevant or specific to a deposit transaction.  *See* L. Farmer Dep., at 78-79, Ex. 16. Add'l SOF, ¶ 184 [Dkt. 154].

111.    Furthermore, when a criminal or regulatory action is pending, not concluded, Alpine again may or may not find that activity suspicious and "would look at that to determine relevancy" to the SAR.  *See* L. Farmer Dep., at 79-80, Ex. 16. Add'l SOF, ¶ 185 [Dkt. 154].

112.    Notably, Alpine provided to the district court examples of SARs taken from the SEC's table A-2 alleging violations for failure to include criminal or regulatory history, the SAR narrative does discuss the relevant history or the support file supports Alpine's omission of such irrelevant information, including 98 SARs where the criminal or regulatory history is alleged against a "3rd party." Add'l SOF, ¶¶ 186-188 [Dkt. 154].

### 3.    Shell Company or Derogatory History of a Stock

113.    The following material facts in dispute come from Alpine's expert witness' rebuttal testimony of the SEC's expert witness, statements from the SEC's

expert herself, and from Alpine's past AML Officer regarding Alpine's understanding and practice in regards to this red flag.

114. The SEC's expert witness claims that 241 SARs omitted "shell company involvement or derogatory history of stock." As support for this "red flag" category, the Navigant Report relies on a 2006 FinCEN issuance concerning money laundering risks relating to shell companies. But that FinCEN guidance specifically explains that "[t]he term 'shell company' . . . refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence." Likewise, the SAR Activity Review uses the term "shell company" or "shell corporation" to describe a company that "is registered or licensed in the state or country in which it is incorporated, is not traded on a securities exchange, and does not operate on its own." In other words, "shell companies" – as that term is defined and applied by FinCEN – are not publicly traded; the SEC expert witness's criticism of Alpine for purportedly failing to disclose in certain SARs "information about the issuer of stock being a shell," which by definition confirms that the company is publicly trading, is nonsensical. Loew Expert Decl., at ¶ 224, Ex. 5 (citing to the Navigant Report and FinCEN guidance). Add'l SOF, ¶ 189(a) [Dkt. 154].

115. The SEC's expert witness's analysis of shell company involvement, moreover, is not tethered to any discussion of how such involvement would have

50

contributed to a conclusion that the activity being reported was suspicious. Nor does the Navigant Report suggest in any manner that shell company involvement was the basis for Alpine's decision to file the SAR. Loew Expert Decl., at ¶ 225, Ex. 5. Add'l SOF, ¶ 189(b) [Dkt. 154].

116. Moreover, to the extent the SEC's expert witness is suggesting that the fact that an issuer is "a shell or former shell company" is a red flag that must automatically be reported in a SAR, that reflects a fundamental misunderstanding of the relevant guidance. Specifically, the SEC's expert witness's analysis fails to acknowledge that there is no guidance that would support the creation of a red flag where the issuer was formerly a shell company at some time previous to the issuance of the securities that are involved in the transaction at issue. Yet of the 241 SARs with which she takes issue, 104 of those SARs involved issuers that were "formerly" shell companies. Loew Expert Decl., at ¶ 226, Ex. 5. Add'l SOF, ¶ 189(c) [Dkt. 154].

117. Contrary to the SEC's expert witness's view, however, FinCEN guidance says nothing at all about a former shell company being a potential risk factor, let alone inherently suspicious. In fact, FinCEN recognizes that most shell companies are formed and used for legitimate business purposes. For that reason, the guidance explains that a financial institution should file a SAR and report shell company involvement in the narrative "if a financial institution discovers

suspicious activities such as those listed above and knows, suspects or has reason
to suspect the transactions involve the use of United States or foreign-based shell
business entities to launder illicit funds or to enable the furtherance of a crime."
That is, according to FinCEN, the key is not the presence of a shell company in a
transaction; the key is whether there are indications that a company is presently a
shell company that is being used for money laundering or in furtherance of a crime.
Loew Expert Decl., at ¶ 227, Ex. 5 (citing FinCEN guidance). Add'l SOF, ¶ 189(d)
[Dkt. 154].

118.  Alpine's WSPs also state the following regarding the use of a shell
company, cited by the SEC as a red flag: "Shell companies can represent a
potential money laundering risk.  Most shell companies are formed for legitimate
business reasons, but some have been used for illicit purposes. . . . Shell companies
***are subject to review*** which may include [multiple issues]."  *See* WSPs, April 11,
2013, at pp. 176-177, Ex. 12; WSPs, August 29, 2014, at p. 194, Ex. 13; WSPs,
October 1, 2015, at pp. 208-209, Ex. 14. Add'l SOF, ¶ 190 [Dkt. 154].

119.  Alpine's WSPs regarding shell companies derive from FinCEN
guidance from November of 2006.  The FinCEN guidance does not state that the
fact that an issuer is or was a shell is a red flag.  Rather, FinCEN states that "[m]ost
shell companies are formed by individuals and businesses for legitimate reasons,"
but warns that "these entities have also been used for illicit purposes," and thus

reminds financial institutions to "assess the risks involved in each shell company

relationship and take steps to ensure that the risks are appropriately and effectively

identified and managed in accordance with their BSA obligations." *See* FIN-2006-

G014, November 9, 2006, Ex. 139. Add'l SOF, ¶ 191 [Dkt. 154].

120.    The FinCEN guidance also includes a list of potentially suspicious

activities that commonly involve a shell company, such as an "inability to obtain . .

. information necessary to identify originators or beneficiaries of wire transfers," or

that the "goods and services of the [shell] company do not match the company's

profile based on information previously provided to financial institutions," or

"multiple high-value payments or transfers between shell companies with no

apparent legitimate business purpose." *See* FIN-2006-G014, November 9, 2006,

Ex. 139.  Importantly, in accordance with 31 C.F.R. § 1023.320(a)(2), FinCEN

then states that "if a financial institution discovers suspicious activities such as

those listed above *and* knows, suspects or has reason to suspect the transactions

involve the use of a United States or foreign-based shell business entities *to*

***launder illicit funds or enable the furtherance of a crime***, the institution must file

a [SAR]" and use the narrative to describe the suspicious conduct that prompted

the SAR.  *Id.* (emphasis added). Add'l SOF, ¶ 192 [Dkt. 154].

121.    Leia Farmer, Alpine's AML Officer during the relevant time period,

testified that the fact that an issuer was at some point in its life a shell company

was not necessarily suspicious or included in a SAR narrative. Stating further, "the mere fact that a company was a shell company and no longer ceases to be a shell company wasn't necessarily indicative of suspicious activity. It is something that we would look at on a facts and circumstance analysis to determine whether that specific fact was relevant to that particular filing." *See* L. Farmer Dep., at 104-106, Ex. 16. Add'l SOF, ¶ 193 [Dkt. 154].

122.   In fact, the SEC's expert concedes in her Rebuttal Report, as she must, that not all shell companies are always suspicious." *See* Navigant Rebuttal Report, at 5, Ex. 17. Add'l SOF, ¶ 194 [Dkt. 154].

123.   Furthermore, the SEC's expert testified during her deposition that the finding of a violation for failure to disclose a shell where the file clearly reflects Form 10-Qs and 10-Ks, or when the actual support file states "not a shell" Would be an error. *See* Angotti Dep., at 353-354, Ex. 10; *see also id*. at 143-144, Ex. 10 (stating that if there were handwritten notes of information in the support file that is inconsistent with the categories or claimed deficiency, then the SEC's expert would have expected her staff to see that and take it into account). Add'l SOF, ¶ 195 [Dkt. 154].

124.   Finally, the SEC's expert testified during her deposition that there is no specific guidance that she is aware of that would suggest that former shell status

is actually a red flag that needs to be considered. *See* Angotti Dep., at 356, Ex. 10. Add'l SOF, ¶ 196 [Dkt. 154].

125. Alpine provided to the district court examples of the different categories of SARs taken from the SEC's Table A-3, the support file contradicting the SEC's position or showing that the subject issue has been cured. Add'l SOF, ¶¶ 197(a)-(g) [Dkt. 154].

126. Alpine also provided to the district court a Table that shows in column (1) each alleged SAR violation on Table A-3 (SEC's Ex. 5), in column (2) the SEC's expert's allegation for the claim with citation to the support file but without providing the support file to the district court for confirmation or foundation, and in column (3) Alpine's submitted citations in each support file, all attached as Exhibits, refuting the SEC's expert's claim and allegations. In other words, *every* SARs at issue in this red flag category contained information in the SAR support file that refuted the SEC's allegation. Add'l SOF, ¶ 198 (Table) [Dkt. 154].

### 4. **Stock Promotion**

127. The following material facts in dispute come from Alpine's expert witness' rebuttal testimony of the SEC's expert witness, statements from the SEC's expert herself, from Alpine's past AML Officer regarding Alpine's understanding and practice in regards to this red flag, and an SEC action.

128.   The SEC's expert witness claims that 55 of the SARs Alpine filed omitted "evidence of stock promotion."  Loew Expert Decl., at ¶ 228, Ex. 5 (citing the Navigant Report). Add'l SOF, ¶ 199(a) [Dkt. 154].

129.   Stock promotion, like missing information, is a "red flag" of Navigant's making. The Report does not and cannot claim that promotion is unlawful; it is actually lawful conduct expressly regulated by the securities laws. Nor does it offer any support for the claim that a filer must report every instance in which stock promotion has occurred or is occurring.  Loew Expert Decl., at ¶ 230, Ex. 5. Add'l SOF, ¶ 199(b) [Dkt. 154].

130.   Further, even if "stock promotion" was a recognized "red flag," as with the other categories of red flags, the SEC's expert witness's analysis is not tied to any discussion of how such evidence would have contributed to a conclusion that the activity being reported was suspicious. Nor does the SEC's expert witness suggest in any manner that evidence of stock promotion or lack of issuer verification was the basis for Alpine's decision to file the SAR.  Loew Expert Decl., at ¶ 231, Ex. 5. Add'l SOF, ¶ 199(c) [Dkt. 154].

131.   Leia Farmer, Alpine's AML Officer during the relevant time period, testified that the fact that a stock promotion is occurring during the time of a deposit is not necessarily viewed as suspicious or something that should be included in a SAR narrative.  A stock promotion would be relevant to a filing if

"the client is somehow involved or associated with the promotional activity." For

example, if the actual promoter was depositing stock, although relevant, does not

automatically require a SAR filing or inclusion in a SAR narrative, but Alpine

would investigate it further and give it a closer look to see if it is suspicious. *See*

L. Farmer Dep., at 80-82, Ex. 16 ("Where the firm's investigation reveals that the

promotion activity is not germane to the intent of the SAR filing, the firm employs

its best judgment on which information may be relevant to provide."). Add'l SOF,

¶ 200 [Dkt. 154].

132.    *In re Albert Fried & Co.*, relied upon by the district court in its Partial

Summary Judgment Decision, states that the company "had ***ongoing*** penny stock

promotional campaigns . . ." and that "Albert Fried knew or should have known

that two of the issuers were the subject of promotional campaigns ***at the time of***

***Customer A's trading***." *In re Albert Fried & Co.*, SEC Release No. 77971, 2016

WL 3072175, at *3, 5 (June 1, 2016) (emphasis added). *See also* Court's Opinion

and Order dated 03/30/18, at 54, Dkt. 101 (the Court cites *Albert Fried* for support

regarding legal standard of promotional campaign as a red flag). Add'l SOF, ¶ 201

[Dkt. 154].

133.    Alpine provided to the district court examples of SARs taken from the

SEC's table alleging violations for failure to include information regarding a stock

promotion, the SEC's table simply cites pages in the SAR support file but fails to

includes such pages which give more details regarding the promotional activity and either answers the question as to "why" the activity was not included in the SAR narrative or, at the very least, creates a factual question. Add'l SOF, ¶¶ 202(a)-(c).

134. Alpine also provided to the district court a Table that shows in column (1) each alleged SAR violation on Table A-4 (SEC's Ex. 6), in column (2) the date of the SAR filing, in column (3) the SEC's expert's allegation of a stock promotion and citation to the support file but without providing the support file to the district court for confirmation or foundation, and in column (4) Alpine's submitted citations in each support file, all attached as Exhibits, addressing the SEC's claims. In other words, *every* SARs at issue in this red flag category contained information in the SAR support file that refuted the SEC's allegation. Add'l SOF, ¶ 203 (Table) [Dkt. 154].

### 5. Unverified Issuer

135. The following material facts in dispute come from Alpine's expert witness' rebuttal testimony of the SEC's expert witness, statements from the SEC's expert herself, and from Alpine's past AML Officer regarding Alpine's understanding and practice in regards to this red flag.

136. The SEC's expert witness claims that 42 of the SARs Alpine filed omitted information "showing that issuers could not be verified." Loew Expert Decl., at ¶ 228, Ex. 5 (citing the Navigant Report). Add'l SOF, ¶ 204(a) [Dkt. 154].

137. Alpine's expert explained that the SEC's expert witness's suggestion that the SAR narratives at issue were deficient because they were "missing information about unverified issuers" is wrong because it is a made-up "red flag." The SEC expert not only does not explain what this term means, but does not cite to even a single law, regulation, rule, or guidance that uses this term. There is no support for the proposition that Alpine can or should be penalized for failing to include in its narratives a category of information that is conjured by an expert witness years after the SARs at issue were filed. Loew Expert Decl., at ¶ 229, Ex. 5 (citing the Navigant Report). Add'l SOF, ¶ 204(b) [Dkt. 154].

138. Further, even if "unverified issuers" and "stock promotion" were recognized "red flags," as with the other categories of red flags, the SEC's expert witness's analysis is not tied to any discussion of how such evidence would have contributed to a conclusion that the activity being reported was suspicious. Nor does the SEC's expert witness suggest in any manner that evidence of stock promotion or lack of issuer verification was the basis for Alpine's decision to file the SAR. Loew Expert Decl., at ¶ 231, Ex. 5. Add'l SOF, ¶ 204(c) [Dkt. 154].

139. Leia Farmer, Alpine's AML Officer during the relevant time period, testified that that the fact that Alpine was unable to, for example, access an issuer's website, would not necessarily, in and of itself, be viewed suspicious or indicative

of criminal activity. *See* L. Farmer Dep., at 107, Ex. 16. Add'l SOF, ¶ 205 [Dkt. 154].

140. Alpine provided the district court with examples of SARs taken from the SEC's Table A-5 alleging various omissions regarding "unverified issuers", such as company website not functioning, not current in SEC filings, and expiration of business licenses, the support file contradicts the SEC's assertions or provided a factual basis for the omission. Add'l SOF, ¶¶ 206(a)-(g) [Dkt. 154].

141. Alpine provided the district court with a Table that showed in column (1) each alleged SAR violation on Table A-5 (SEC's Ex. 7), in column (2) the SEC's expert's allegation for the claim with citation to the support file but without providing the support file to the district court for confirmation or foundation, and in column (3) Alpine's submitted citations in each support file, all attached as Exhibits, refuting the SEC's expert's claim and allegations. In other words, *every* SARs at issue in this red flag category contained information in the SAR support file that refuted the SEC's allegation. Add'l SOF, ¶ 207 (Table) [Dkt. 154].

### 6. Low Trading Volume

142. The following material facts in dispute come from Alpine's expert witness' rebuttal testimony of the SEC's expert witness, statements from the SEC's expert herself, and from Alpine's past AML Officer regarding Alpine's understanding and practice in regards to this red flag.

143.    The SEC's expert witness claims that 707 SARs that Alpine filed

failed to explicitly mention that the securities identified in the SARs had low

trading volumes. This criticism is not well-founded for at least three reasons.

Loew Expert Decl., at ¶ 232, Ex. 5 (citing Navigant Report). Add'l SOF, ¶ 208(a)

[Dkt. 154].

144.    As explained by Alpine's expert, low trading volume is not a red flag.

To the contrary, it is a hallmark of microcap stocks and it does not provide any

basis to conclude that a transaction is being used to facilitate criminal activity.

Further, to the extent it is clear from the filed SARs that the stock involved in the

transaction was a microcap, low trading volume should – and would have been –

understood and assumed by law enforcement and the SEC regulators reviewing the

SARs. The converse also is true: if low volume were a red flag, then filing would

be required on the majority of microcap transactions.  Loew Expert Decl., at ¶ 233,

Ex. 5 (citing guidance). Add'l SOF, ¶ 208(b) [Dkt. 154].

145.    Second, the SEC's expert witness has not defined what "low trading

volume" means. If, as she claims, low trading volume must be reported as a matter

of law and in every circumstance it exists, one would expect that regulators would

have provided clarity about what quantity of trading volume would qualify as

sufficiently "low" to require reporting. The SEC's expert witness posits a

calculation of 300 percent of average trading volume over the three months

preceding the deposit. Once again, the Navigant Report cites to no authority to support that purported SAR filing obligation. Loew Expert Decl., at ¶ 234, Ex. 5 (citing Navigant Report). Add'l SOF, ¶ 208(c) [Dkt. 154].

146. Third, as with many of the other categories of information the SEC's expert witness claims renders Alpine's filed SARs fatally deficient, information about trading volumes is publicly available, and certainly available to law enforcement. Accordingly, while perhaps helpful to law enforcement, information about the stock's trading volume is not critical information for SAR narratives or information that is uniquely within Alpine's knowledge. Loew Expert Decl., at ¶ 235, Ex. 5. Add'l SOF, ¶ 208(d) [Dkt. 154].

147. Of the 707 SARs the SEC claims omits "low trading volume" (Table A-7), in 256 of those SARs, low trading volume is the only red flag identified. *See* SEC's Ex. 10. Add'l SOF, ¶ 209 [Dkt. 154].

148. Low trading volume may be something to consider, but by itself, it is not necessarily suspicious. Randy Jones, a past AML Officer at Alpine, was asked during his deposition whether "the size of a deposit, relative to the average trading volume, have anything to do, in your mind, with those kinds of market manipulations . . .?" Mr. Jones answered as follows: "It can. I don't think it always does. Just, I mean, there's – there's a laundry list of items that you would bring into consideration when you look at manipulative trading. It's not just the deposit

and the number of shares that were deposited. This – in this case this client could have taken six months to get out of that. Could have taken a week. I don't know the time line in which they got out of that stock. You could have an instance where the CEO of an issuer wants to deposit stock. They have a large block. It has low trading volume, but they have a large block, and they just want to put it in for safe keeping. So they give us this large block, knowing that they will need to sell under 144, have these 90 day windows. They will need to notify the SEC when they're – they're selling through the 144 grid. But I don't – I don't think it's necessarily suspicious to have that CEO put the stock in just for safe keeping. And I don't know specifically what the trading was on this account with this security after this. So I – I wouldn't be able to tell you whether this is suspicious or not." *See* R. Jones Dep., at 72-73, Ex. 15. Add'l SOF, ¶ 210 [Dkt. 154].

149.    Alpine provide the district court with examples of SARs taken from the SEC's table alleging violations for failure to include information regarding low trading volume, the SARs at issue actually discuss the trading volume alleged to be ignored by the SEC and clearly answer the question of "why" Alpine is filing the SAR. Add'l SOF, ¶¶ 211(a)-(g) [Dkt. 154].

### 7.    Foreign Actor or Jurisdiction

150.    The following material facts in dispute come from Alpine's expert witness' rebuttal testimony of the SEC's expert witness, statements from the SEC's

expert herself, and from Alpine's past AML Officer regarding Alpine's
understanding and practice in regards to this red flag.

151. The SEC's expert witness opines that 298 SARs were deficient
because they omitted information regarding foreign involvement. The Navigant
Report is flawed insofar as it contains this opinion, for several reasons. Loew
Expert Decl., at ¶ 236, Ex. 5 (citing the Navigant Report). Add'l SOF, ¶ 212(a)
[Dkt. 154].

152. First, like other categories of red flags discussed above, the SEC's
expert witness's analysis does not include any discussion of how or whether the
involvement of foreign individuals or entities were the basis for the SAR filings at
issue. The obligation on financial institutions in completing a SAR narrative is to
"provide a clear, complete, and concise description of the activity, including what
was unusual or irregular that caused suspicion." The SEC's expert witness,
however, does not purport to claim that the foreign involvement was, in fact, what
was unusual or irregular that caused Alpine suspicion. Nor does the SEC's expert
witness provide any rationale as to why the foreign involvement should have
caused Alpine to view the transaction as unusual or irregular, or otherwise
suspicious. Loew Expert Decl., at ¶ 237, Ex. 5 (citing FinCEN guidance). Add'l
SOF, ¶ 212(b) [Dkt. 154].

153.   In sum and substance, therefore, the SEC's expert witness's opinion would effectively create a bright line rule that every transaction involving a foreign person or entity will be a suspicious transaction for which a SAR should be filed, and whether or not that foreign involvement is, in fact, suspicious or irregular, it must be included in the SAR narrative. That is not the law, nor should it be. The fact that there may be an international aspect to a particular transaction does not necessarily indicate that the transaction is inherently suspicious, and where it is not, including such information in the SAR narrative is likely to cause confusion and runs counter to the principle that SAR narratives must be concise.  Loew Expert Decl., at ¶ 238, Ex. 5. Add'l SOF, ¶ 212(c) [Dkt. 154].

154.   Second, the SEC's expert witness's analysis is flawed insofar as it assumes that any and all non-U.S. involvement in the transaction should be reported, even if that activity involves a jurisdiction that is not high-risk, such as the United Kingdom or Canada. And, in fact, Canada and the United Kingdom are among the "foreign jurisdictions" that were involved in the 298 SARs that the SEC's expert witness criticizes.  Loew Expert Decl., at ¶ 239, Ex. 5 (citing information from Financial Action Task Force). Add'l SOF, ¶ 212(d) [Dkt. 154].

155.   Third, the SAR form itself identifies the pertinent information relating to the foreign nature of the transaction, specifically seeking information about transfers to foreign jurisdictions. The SEC's expert witness asserts that Alpine's

SARs were deficient because the narratives failed to report foreign involvement. She implicitly acknowledges that foreign involvement will be indicated in other fields of the SAR form, for example, when the SAR filer reports foreign addresses for the persons and entities that are subject of the SARs, or completes the "Country Code", or "Non-US Financial Institution" fields. She argues, however, that completing such information does not satisfy the filer's obligations, and that the BSA was nonetheless violated. The SEC's expert witness offers no authority for this position, nor is Alpine's expert witness aware of any. Loew Expert Decl., at ¶ 240, Ex. 5 (citing Fields 12 and 24 from the Electronic SAR Test Form). Add'l SOF, ¶ 212(e) [Dkt. 154].

156. Notably, any information in the data fields on the SAR form is searchable. *Id*. at ¶ 101, Ex. 5. Perhaps most importantly, the information contained in SARs has been used to establish a database, available to law enforcement to gather information relating to any of the innumerable data fields and transactions that are reported in a SAR. The significance of a SAR filing lies not in the information presented in any individual filing but in the fact that data is continuously collected from multiple sources across the financial industry and compiled in a searchable database. Based on my professional experience, law enforcement does not expect that all of the information about suspicious activity will come from any one source. It is not seeking to have a financial institution do

its investigatory footwork for it or describe in narrative fashion the elements of criminal conduct.  Rather, it is seeking from financial institutions the pieces of a puzzle that law enforcement can put together to initiate a new investigation or support one that is ongoing.  Loew Expert Decl., at ¶¶ 203, 210, and 212, Ex. 5. Add'l SOF, ¶ 212(f) [Dkt. 154].

157.   Leia Farmer, Alpine's AML Officer during the relevant time period, testified that Alpine never learned from a regulator or from AML guidance that a "red flag" includes any involvement of a foreigner.  Thus, Alpine did not view as a red flag or indicator of criminal activity if a client resided in another country. However, Alpine would review and adhere to any country listed by The Office of Foreign Assets Control ("OFAC") or any other rule or regulation.  *See* L. Farmer Dep., at 100-102, Ex. 16. Add'l SOF, ¶ 213 [Dkt. 154].

158.   The SEC's expert testified during her deposition deposits by offshore companies of large blocks of low-priced securities which are then sold with the money wired are not automatically requirements for the filing of a SAR and explicitly testified, "We've never said they were automatic requirements for the filing of the SAR. They are risk indicators."  *See* Angotti Dep., at 70-71, Ex. 10. Add'l SOF, ¶ 214 [Dkt. 154].

159.   Alpine provide the district court with examples of SARs taken from the SEC's table alleging violations for failure to include information regarding

involvement of a foreign jurisdiction or entity, the SARs included the information alleged to be omitted either in SAR form or in the narrative. Add'l SOF, ¶ 215(a)-(c) [Dkt. 154]. Notably, on each SAR on Table A-7 where the SEC alleges that "Belize" was omitted from the SAR, the SEC's fails to account for an address in Belize on page 2 of the SAR. *See* SEC's Table A-7, Ex. 182. Add'l SOF, ¶ 215(d) [Dkt. 154].

### G. *Material Facts in Dispute Regarding Whether the SARs at Issue Were Mandatory Filings under the BSA*

160. The SEC's case against Alpine is unique because, unlike other SAR cases wherein a defendant allegedly failed to file a SAR, here, Alpine filed SARs but the SEC claims that the SAR narratives were insufficient *as a matter of law* for failure to address one or more red flags found in the support file.

161. Based on evolving standards in the industry as found in various changes and updates to FINRA and FinCEN guidance, communications with regulators, including during exams, and Alpine's own risk assessment of policies and procedures in filing SARs, Alpine routinely filed voluntary SARs on transactions that did not meet the requirements for when "[a] SAR must be filed," under Alpine's WSPs and the governing BSA regulation 31 C.F.R. § 1023.320. *See* E. Zipprich Decl., at ¶ 27, Ex. 1; *see also* E. Green Dep., at 110, Ex. 2 (discussing evolving industry standards and stating, "Standards of what Alpine should consider in – in making risk assessments and SAR determinations,

changing policies and procedures. Constantly working towards culture of compliance every day. Taking everything that I can that's applicable into account."). Add'l SOF, ¶ 60 [Dkt. 154].

162. NASD states that "voluntary reporting is useful to the government and helpful to firms in order to provide a defense to charges of aiding and abetting money laundering violations." at 11. *See* NASD Notice 02-21, at 11, Ex. 11. Add'l SOF, ¶ 61 [Dkt. 154].

163. Thus, Alpine understood that outside of the four fundamental tenets of the BSA, the firm may file a voluntary SAR. *See* Alpine Dep., at 44, Ex. 3. Alpine "very often" filed SARs that it did not think were suspicious during the relevant time period. *See* Alpine Dep., at 45, 97, Ex. 3. As an objective example, Alpine filed many SARs involving transactions which did not meet the $5,000 threshold, including 213 SARs at issue in this matter. *See* Navigant Report, at 37, n. 142, SEC's Ex. 2. Add'l SOF, ¶¶ 62-64 [Dkt. 154].

164. Mr. Frankel testified during Alpine's deposition that the "firm basically had a practice in place that, for example, where they would file on a voluntary SARs on a large deposit of microcap securities. And the criteria for making that determination was largely a very objective criteria for commencing with that action." *See* Alpine Dep., at 43, Ex. 3. Mr. Frankel also testified that "for the most part" filing a SAR on a large deposit of microcap securities was an

69

automatic filing "in an attempt to comply with what the firm felt FINRA was looking for the firm to do." *See* Alpine Dep., at 43-45, 95, Ex. 3. Add'l SOF, ¶¶ 65-66 [Dkt. 154].

165.    Thus, Alpine's voluntary filings of SARs included transactions of large deposits of low-priced securities, that Alpine did not believe were suspicious, but filed because of regulatory notices and comments that regulators may view those deposits as suspicious. *See* L. Farmer Dep., at 51-54, Ex. 16 (discussed the "balancing act" for defensive filing by trying to comply with the regulators but filing on transactions that are not suspicious). Add'l SOF, ¶ 67 [Dkt. 154].

166.    The SEC's expert not only agrees that penny and microcap stocks are neither illegal nor criminal, but also stated in regards to large deposits: "[i]n fact, large deposits of penny stocks *are often not suspicious without [a] subsequent liquidation*, because it is the liquidation that is the mechanism to consummate the market manipulation or sale of unregistered securities." *See* Navigant Rebuttal Report, at 17 – 18, Ex. 17. Add'l SOF, ¶ 70 [Dkt. 154].

167.    The SEC's expert states that a large deposit of a penny stock is not "on its face unlawful and reportable. . . " *See* Navigant Rebuttal Report, at 3, Ex. 17; *see also* Angotti Decl., at ¶¶ 37-38, SEC's Ex. 1 (stating that a large deposit of a low-priced securities "can" provide a reason to suspect, not automatically); *see also* Angotti Dep., at 227-228, Ex. 10 (testifying that a large deposit of low-priced

securities, in and of itself, would not automatically be deficient because there could be a "reasonable explanation that makes sense" that makes it not reportable, even though the transaction appears to be very suspicious); *id*. at 230, Ex. 10 (stating that a large deposit of low-priced securities does not always require a filing of a SAR). Add'l SOF, ¶ 71 [Dkt. 154].

168.   Alpine's expert witness stated that when determining whether some or all of the SARs filed by Alpine were "mandatory" or voluntary SARs, the SEC's expert witness erroneously asserts that there are standards that would apply to voluntary SARs. Contrary to the suggestion of the SEC's expert witness, there is no requirement that voluntary SARs be identified as such on the face of the SAR, that a SAR can only be considered to be voluntary when it does not meet the $5,000 aggregate threshold, or that the SAR narrative or supporting documentation must show that the firm conducted an investigation and "uncovered facts to negate a reason to suspect criminal activity." *Id*., at ¶ 178, Ex. 5. Add'l SOF, ¶ 75(d) [Dkt. 154].

169.   Alpine's expert witness stated that the SEC's expert witness cited no authority for the propositions above, nor is there any authority she could cite to support those views. There is no rule requiring that firms expressly provide that a SAR is being filed voluntarily. Nor is there any rule requiring firms that file voluntary SARs to justify their conclusion that the activity is not, in the firm's

view suspicious, or that the SAR may not actually be required. *Id.*, at ¶ 179, Ex. 5. Add'l SOF, ¶ 75(e) [Dkt. 154].

170.    Instead of going through a factual analysis to show that each SAR was a mandatory filing because it gave Alpine a reason to suspect criminal activity, the SEC created a ***new test*** for mandatory filings arguing that any large deposit of low-priced securities plus any combination or variation of a red flag, as discussed above, constitutes a mandatory filing because "a large deposit of low-priced securities provides a reason to suspect an unregistered offer or sale of securities," as well as "pump and dump and other market manipulation schemes." Alpine's Mem. in Opp., at 22, 31-32 [Dkt. 158] (quoting SEC's Mem., at 10).

171.    The district court recognized that the SEC was providing a new test stating, "Alpine argues as well that the 'sizeable LPS transaction – plus red flag' test proposed by the SEC for deposits of LPS fails to establish the reasonable suspicion that exists in criminal law pursuant to the Fourth Amendment." Order, at 48-49 [Dkt. 174]. Ultimately, the district court agreed with the SEC and ruled that "The SEC's proposed test – which begins with the large deposit of LPS and adds other red flags – is faithful to the language and purpose of Section 1023.320." *Id.* at 52.

## H.    *Guidance Does Not Have the Force of Law*

172.    On November 16, 2017, the United States Department of Justice

("DOJ") disseminated a memorandum prohibiting DOJ employees "from issuing guidance documents that effectively bind the public without undergoing the notice-and-comment rulemaking process." That memorandum, among other things, "prohibits the Department from using its guidance documents to coerce regulated parties into taking any action or refraining from taking any action beyond what is required by the terms of the applicable statute or lawful regulation." Loew Decl., at ¶ 125, [Dkt. 137] (citing the Memorandum from The Associate Attorney General to Heads of Civil Litigating Components United States Attorneys titled "Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018)).

173. In addition, on January 25, 2018, the Department of Justice issued a second memorandum further reminding DOJ employees that "[g]uidance documents cannot create binding requirements that do not already exist by statute or regulation," and, accordingly, "the Department may not use its enforcement authority to effectively convert agency guidance documents into binding rules." Simply put, guidance is not law, a principle even the United States Attorney General has articulated in the last year, and ought not be treated as such. The SEC's expert witness, however, does just that. Loew Decl., at ¶ 126 [Dkt. 137] (citing Memorandum from The Associate Attorney General to Heads of Civil

Litigating Components United States Attorneys titled "Limiting Use of Agency

Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018)).

## I.   *Material Facts in Dispute Regarding Failure to File SARs on Liquidations*

174.   The following material facts in dispute come from Alpine's expert

witness' rebuttal testimony of the SEC's expert witness, statements from the SEC's

expert herself, and from Alpine's past AML Officer, CEO, and other employees

regarding Alpine's efforts in market surveillance and filing of SARs when

suspicion of criminal activity occurred.

175.   The SEC's expert witness opines in conclusory fashion that Alpine

should have filed SARs on the liquidations listed on Table B. In support of her

position, the SEC's expert witness argues that if the deposits of the securities at

issue were suspicious and reported on SARs, the liquidations, too, are necessarily

suspicious and were required to be reported "to continue to advise law enforcement

and regulators of further potentially fraudulent activity in microcap securities." The

SEC's expert witness's opinion and reasoning for her opinion are, in Alpine's

expert witness's view, overly simplistic and misguided.  Loew Expert Decl., at ¶

241, Ex. 5 (citing to the Navigant Report). Add'l SOF, ¶ 216(a) [Dkt. 154].

176.   First, the decision whether to file a SAR is a judgment call by a firm

based on all the facts and circumstances and information available to the firm at

the time of its determination as to whether to file a SAR. Regulators have clearly

stated that those judgment calls ought not be second-guessed absent good reason. Loew Expert Decl., at ¶ 242, Ex. 5. Add'l SOF, ¶ 216(b) [Dkt. 154].

177. Second, given that SAR decision-making is based on the facts and circumstances available to the firm, rendering an opinion without reference to the testimony of or rationales from the individuals at the firm who actually reviewed the transaction, and if necessary, made the decision not to file a SAR, to understand why they determined that a SAR was not necessary, is improper, particularly considering there is no requirement that a firm document the bases for the conclusion that activity does not warrant a SAR filing. Loew Expert Decl., at ¶ 243, Ex. 5 (citing that FFIEC Examination Manual 2014 at 68; FFIEC Examination Manual 2010 at 75-76). Add'l SOF, ¶ 216(c) [Dkt. 154].

178. Third, it is not the case, based on Alpine's expert witness's experience, that every liquidation following a deposit is necessarily suspicious. Of note, it is relatively common in the markets associated with this case that liquidations of securities follow deposits of "low-priced" securities, including those in the form of physical certificates, and that fact alone is not *per se* suspicious. Consistent with the relevant guidance, courts and regulators need to understand the facts and circumstances surrounding the liquidations to determine whether the liquidation is, in fact, potentially suspicious. Loew Expert Decl., at ¶ 244, Ex. 5. Add'l SOF, ¶ 216(d) [Dkt. 154].

179.   Fourth, the SEC's expert witness's argument that it is "crucial" to law enforcement to report liquidations of "low-priced" securities where a firm previously filed a SAR on deposits of those "low-priced" securities is not accurate. When a firm files a SAR on deposits of "low-priced" securities, and identifies the depositor, the securities, and the size of the position, law enforcement has sufficient information to follow up on the transaction if they think there is misconduct occurring in the market for that security. Requiring SARs in these circumstances is overkill, requiring firms to over-paper the SAR database, making the data therein more difficult to parse through and less useful for law enforcement and regulatory authorities.  Loew Expert Decl., at ¶ 245, Ex. 5. Add'l SOF, ¶ 216(e) [Dkt. 154].

180.   Fifth, insofar as the SEC's expert witness concluded that SARs needed to be filed on liquidations because the liquidations were a "pattern of activity," as the SEC's expert witness herself acknowledges, the "AML/BSA regulations do not define the term 'pattern of transactions' found in the FinCEN rule." The notice of final rulemaking that the expert herself cites, however, makes clear that "[t]he language in the rule requiring the reporting of patterns of transactions is not intended to impose an additional reporting burden on broker-dealers," but instead is simply meant to make explicit the rule that if transactions viewed in isolation do not trigger suspicion, but, taken together, a "series of

76

transactions" form a suspicious pattern of activity, a SAR ought to be filed. Loew Expert Decl., at ¶ 246, Ex. 5 (citing and quoting from the Navigant Report, which quotes FinCEN, Amendment to the Bank Secrecy Act Regulations – Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048, 44,053 (July 1, 2002)). Add'l SOF, ¶ 216(f) [Dkt. 154].

181.  Here, to Alpine's expert witness's knowledge, there is no allegation that each liquidation was part of a pattern of transactions, other than that it related to a deposit, which does not in and of itself make a pattern. Indeed, one liquidation is not a pattern of transactions, as a pattern involves a series of transactions. Moreover, if a SAR is filed on the deposit, the liquidation standing alone is not part of a series of transactions, and therefore a SAR is not required. Indeed, without more, a pattern of activity in and of itself is not suspicious.  Loew Expert Decl., at ¶ 247, Ex. 5. Add'l SOF, ¶ 216(g) [Dkt. 154].

182.  Finally, insofar as the SEC's expert witness's opinion was premised on a view that firms are required to file continuing activity SARs, Alpine's expert notes that the SEC apparently did not rely on a continuing activity theory. Nor could it have, given that FinCEN's instructions regarding continuing activity SARs are guidance and are not required by law. In fact, the SEC could not rely on a continuing activity theory because a liquidation or sale is not the same as a deposit, and certainly is not a continuation of the same activity. As a result, by definition, a

continuing activity SAR would not have been required as a matter of law. Loew
Expert Decl., at ¶ 248, Ex. 5 (citing from the Navigant Report and additional
sources in support). Add'l SOF, ¶ 216(h) [Dkt. 154].

183.  Deposits and close in proximity sales of securities at Alpine may
differ from other broker-dealers or financial institutions because Alpine
specializes only in clearing OTC microcap securities.  Alpine's current CEO,
Christopher Frankel, testified during Alpine's Rule 30(b)(6) deposition that based
on the nature of the microcap industry and Alpine's customers participating in that
industry, "People didn't deposit securities generally at Alpine to leave securities
long in their brokerage account.  So [the deposit and quick sale of that deposit]
was kind of one and the same."  *See* Alpine Dep., at 41, Ex. 3. Add'l SOF, ¶ 217
[Dkt. 154].

184.  Elaborating further, Mr. Frankel stated: "I don't know whether this is
purposeful or not purposeful, but I think one of the things where there's a, a
miscommunication is that, I think, Alpine views that any time somebody deposits
a security, there's going to be a sale. Nobody deposits securities in general and
parks them in Alpine's coffers.  It's not the business that they are in."  *See* Alpine
Dep., at 175, Ex. 3. Add'l SOF, ¶ 218 [Dkt. 154].

185.  For example, Alpine stated in response to its 2015 OCIE Examination,
"As the majority of Alpine's business involves the deposit of penny stock, Alpine

strives to achieve balance between understanding when the activity is suspicious and acknowledging when the activity aligns with the client's typical account activity.  In these cases, the AML Officer has the sole and exclusive right to determine whether a transaction in question is or is not suspicious in nature." *See* L. Farmer Dep., at 68-69, Ex. 16 (confirming statement from Alpine's response to the 2015 OCIE Examination). Add'l SOF, ¶ 219 [Dkt. 154].

186.   Leia Farmer, Alpine's former AML Officer, testified that "the deposit and liquidation of low-priced securities, even when done repeatedly – need not, without more, be considered suspicious." *See* L. Farmer Dep., at 54-55, Ex. 16. Add'l SOF, ¶ 220 [Dkt. 154].

187.   Because a SAR filing on a large deposit of a low-priced security did not necessarily mean that Alpine believed the transaction was suspicious, in turn, Alpine did not necessarily file a SAR on subsequent liquidations of such transactions.  *See* L. Farmer Dep., at 85, Ex. 16. Add'l SOF, ¶ 221 [Dkt. 154].

188.   In order to evaluate whether a SAR should be filed in connection with the sales of the stock, Alpine would look at the history of the client, consult with introducing brokers to assess whether the activity deviated from what Alpine knew about that particular client, and, if it did, Alpine would file a SAR.  *See* L. Farmer Dep., at 86, Ex. 16. Add'l SOF, ¶ 222 [Dkt. 154].

189.   Alpine's CEO, Christopher Frankel, testified that he believed the

SEC's theory that filing a SAR on a deposit automatically necessitated a filing of a SAR on all subsequent sales of the stock is a "novel" and "new" theory. *See* Alpine Dep., at 177, Ex. 3. Add'l SOF, ¶ 223 [Dkt. 154].

190.   Alpine also reviewed trading activity that was occurring in connection with liquidations of stock, and for patterns of trading activity occurring in the marketplace. *See* L. Farmer Dep., at 86, Ex. 16. Add'l SOF, ¶ 224 [Dkt. 154].

191.   When reviewing trades, Alpine's employees in the market surveillance and trading departments look for any sudden spikes in share prices or volume of a stock.  In addition, Alpine looks for any signs of wash trades, match trades, or coordinated sales and give referrals to the current AML Officer regarding any suspicion. *See* R. Jones Supp. Decl., at ¶ 28, Ex. 67; *see also* T. Groskreutz OTR, at 41, Ex. 4 (stating that a review would be triggered by a "sudden increase in the price or volume"). Add'l SOF, ¶ 225 [Dkt. 154].

192.   Alpine has a market surveillance analyst in the compliance department that reviews trades and patterns and looks for activities that move the market, or for other indications that there is some kind of improper conduct or manipulation occurring. *See* L. Farmer Dep., at 86-87, Ex. 16; *see also* examples of SARs showing market surveillance, *infra*, at ¶¶ 230(a)-(e). Add'l SOF, ¶ 226 [Dkt. 154].

193.    Alpine reviews every sale of securities for potential SAR and AML issues and has a supervisor sign off on trade blotters every day.  *See* Alpine Dep., at 177, 179, Ex. 3; *see also* E. Green Dep., at 133, Ex. 2 (states that trades are reviewed); L. Farmer Dep., at 86, Ex. 16 (Alpine did "look at the pattern of trading activity occurring in the marketplace . . . in connection with liquidations of stock"); R. Jones Dep., at 77-78, Ex. 15 (testifying that he reviews trading information for manipulative trading practices and makes referrals to the AML Officer accordingly). Add'l SOF, ¶ 227 [Dkt. 154].

194.    Thus, when a SAR is filed *after* a liquidation had occurred, the liquidation is not mentioned in the SAR filing because the filer did not find the liquidation suspicious.  *See* Alpine Dep., at 176, Ex. 3. Add'l SOF, ¶ 228 [Dkt. 154].

195.    Mr. Frankel testified on behalf of Alpine in response to the SEC's question of whether there is some safeguard, procedure, or control in which somebody reviewing a potential sale would know that a SAR was filed on a related deposit as follows: "The AML officer would know.  I mean all those things are – they are indeed, you know, so they can sit there and see when they go to file a SAR if it's on a particular security or a particular account or a particular account number or a date range.  I mean there's six or seven different indexing fields that they would know that a SAR was filed for that particular stock for that

81

particular client. They could look at it and see why. Generally they would have approved the filing." *See* Alpine Dep., at 173-174, Ex. 3. Add'l SOF, ¶ 229 [Dkt. 154].

196.    Alpine provided multiple SARs to the district court showing that Alpine performed trading surveillance, all of which the SEC's expert found that there are no violations related to these SARs as no red flag are omitted (*see* Add'l SOF ¶ 169 [Dkt. 154], discussing 205 SARs omitted on the SEC's experts Table A-8 and deposition testimony confirming):Add'l SOF, ¶¶ 230(a)-(e) [Dkt. 154].

## J.    *Material Facts in Dispute Regarding Failure to Maintain Support Files*

197.    Alpine provided the following material facts in dispute regarding its production of support files to the SEC.

198.    Prior to the commencement of this action, the SEC served document subpoenas on Alpine to produce both SARs and their supporting files.  During 2016, Alpine produced in good faith all the supporting files that the SEC requested. *See* E. Zipprich Decl., at ¶ 40, Ex. 1. Add'l SOF, ¶ 254 [Dkt. 154].

199.    After completing the production of supporting files pursuant to the SEC's requests, Alpine received a spreadsheet from the SEC listing SAR files as to the SEC alleged it could not locate the supporting files in Alpine's production.  *See* E. Zipprich Decl., at ¶ 41, Ex. 1. Add'l SOF, ¶ 255 [Dkt. 154].

200.    The SEC alleged that 31 C.F.R. § 1023.320(d) requires broker-dealers

to "maintain a copy of any SAR filed and the original or business record equivalent of any supporting documentation for a period of five years," and that Alpine violated this requirement for as many as 1,000 support files because "the underlying files either never existed or were lost by Alpine." SEC Complaint, ¶¶42-43 [Dkt. 1].

201.   Erin Zipprich, Alpine's AML Officer, who worked on the initial production of Alpine's supporting files to the SEC, again copied the supporting files listed on the SEC's spreadsheet. *See* E. Zipprich Decl., at ¶ 42, Ex. 1; *see also* E. Green Dep., at 135-139, Ex. 2 (confirming her statements made in her Declaration). Add'l SOF, ¶ 256 [Dkt. 154].

202.   The SEC's Table E, provided by the SEC during this litigation to identify the SAR support files at issue, appeared to Ms. Zipperich to be the same list as the spreadsheet that was previously sent to Alpine during 2016. *See* E. Zipprich Decl., at ¶ 43, Ex. 1. Add'l SOF, ¶ 257 [Dkt. 154].

203.   Ms. Zipperich testified as to her recollection and belief that the supporting files listed on Table E have been previously produced to the SEC. *See* E. Zipprich Decl., at ¶ 44, Ex. 1. Add'l SOF, ¶ 258 [Dkt. 154].

204.   Alpine again copied the supporting files for the SARs listed on Table E and produced all files to the SEC labeled as ALPINE_LIT000001-ALPINE_167366, during the litigation, and the SEC relied on these files to

identify additional SARs that it claimed had inadequate narratives. Add'l SOF, ¶ 259 [Dkt. 154].

205.   In light of the fact that Alpine maintained all of the SAR support files at issue, the SEC shifted theories in summary judgment to hold that Alpine failed to produce 496 support files during investigation.  The SEC acknowledged it located the remaining support files at issue by conducting a new search, on more limited terms, of Alpine's pre-suit production. *See* SEC's Rule 56.1 SOF, Ex. 15, Lyman Decl., at ¶ 9(a)-(c) [Dkt. 148-15].

206.   The district court granted summary judgment for the SEC on this unpled theory on these 496 support files, disregarding evidence that Alpine maintained and produced all of the support files at issue. *See* December 11 Order, at pp. 97-100 [Dkt. 174].

## IX.   District Court's December 11 Order Granting, in Part, the SEC's Motion for Summary Judgment on Liability

207.   The district court entered its Opinion and Order granting, in part, the SEC's Motion for Summary Judgment on Liability, on December 11, 2018. [Dkt. 174].

208.   In that ruling, the district court took the "red flag" rules that it had constructed in its prior opinion, to and _____ them to the SEC's evidence that references to those "red flag" items existed within Alpine's files.  That combination, the district court concluded, automatically established the violation of

the BSA regardless of the firm's own analysis, the evidence reflecting that the firm had identified "green flags" as to a particular circumstance, or the expert's conclusions that the information did not need to be referenced in the narrative..

## X. Alpine's Motion for Reconsideration based on The U.S. Supreme Court's Ruling in *Kisor v. Wilkie*

209. On July 3, 2019, the Supreme Court issued its decision in *Kisor v. Wilkie*. Given the district court's reliance on deference in its rulings, and that court's arguable failure to adhere to the specific requirements discussed in Kisor, Alpine filed a Motion for Reconsideration of the Court's December 11 Opinion and Order. [Dkt. 209].

210. A copy of Alpine's Memorandum in Support of its Motion for Reconsideration based on *Kisor v. Wilkie* [Dkt. 210] is attached hereto as **Exhibit E**.

211. The district court denied Alpine's Motion for Reconsideration based on *Kisor v. Wilkie* on August 29, 2019. [Dkt. 224].

## XI. District Court's September 12 Order on Remedies

212. The SEC filed its Motion for Remedies seeking a permanent injunction and a Tier I civil monetary penalty in the amount of $22,736,000 [Dkt. 196, Mem. in Supp. at 197].

213. Alpine filed its Memorandum in Opposition to the SEC's Motion for Remedies which is found at Dkt. 205.

214.    On September 12, 2019, the district court issued its Order granting the SEC a permanent injunction and civil monetary penalty against Alpine in the amount of $12 million. [Dkt. 226].

## XII.  Entry of Final Judgment and Permanent Injunction

215.    The district court entered a permanent injunction and final judgment on October 9, 2019. [Dkt. 241].

## XIII.  Alpine's Inability to Pay or Bond the Judgment Amount for Appeal

216.    Alpine's CEO, Christopher Doubek, has provided a Declaration, attached hereto as **Exhibit F**, confirming that Alpine is unable to pay the penalty nor has it been able to obtain a bond from any source for the Judgment amount.

217.    The SEC's case against Alpine has substantially and negatively altered Alpine's business.  As a result of this case, Alpine's competitors have been contacting Alpine's customers and predicting the demise of the firm as a way to draw these customers away from Alpine. Doubek Decl., at ¶ 5, Ex. F.

218.    Alpine is also facing severe collateral regulatory consequences, with FINRA and Depository Trust Company ("DTC") representatives citing the fact of this case and the penalty amount as an issue in relation to whether Alpine should be able to continue as a member or be allowed to continue trading.  If Alpine is found to have failed to satisfy its net capital and deposit requirements, it will no

longer be allowed to trade, and regulators have contended that the judgment, if not stayed, will impact those calculations. Doubek Decl., at ¶ 6, Ex. F.

219. Also, Alpine is a clearing broker member in good standing of the National Securities Clearing Corporation ("NSCC") and a DTC participant and must use the NSCC's services to settle all of its trades. Doubek Decl., at ¶ 7, Ex. F.

220. During this same period of time as Alpine's case with the SEC, NSCC has continuously increased the fees and deposits required for microcap transactions to the point where the volume of transactions that can be conducted by Alpine is dramatically reduced. NSCC also has cited this case as a reason why it is imposing on Alpine deposit requirements, based on criteria associated with their credit risk parameters, that are literally double the amount required of similar firms conducting similar transactions. Doubek Decl., at ¶ 8, Ex. F.

221. Alpine previously held a line of credit with Alpine Securities Holding Corporation, however that line has recently been terminated by the lender. This has negatively impacted Alpine's ability to trade and thereby generate revenue. Doubek Decl., at ¶ 9, Ex. F.

222. Alpine has also recently lost multiple critical executing relationships, directly impacting its ability to trade, for reasons directly related to the SEC issue and concerns raised regarding the amount of the penalty imposed by the district court.

223.   Thus, Alpine is facing enormous financial challenges and is currently operating at a loss. Doubek Decl., at ¶ 11, Ex. F.

224.   Given the relatively small size of the firm, the fact that it is already financially struggling, that its business has been substantially reduced, and that its compliance and legal costs continue to increase, Alpine has not been able to access additional capital at this point either from third parties or from its direct or indirect owners to pay the penalty or secure a bond for the judgment entered in this case for $12,000,000. Doubek Decl., at ¶ 12, Ex. F.

225.   Alpine has attempted to obtain a supersedeas bond but has been unable to do so because Alpine does not possess and cannot pledge assets required to secure the bond. Doubek Decl., at ¶ 13, Ex. F.

## XIV.  Impracticability of Moving Before the District Court

226.   Rule 8(a)(2) allows a motion for a stay to be made initially to the court of appeals if the party can "show that moving first in the district court would be impracticable." *Id.* 8(a)(2)(A)(i).  In this particular case, a motion to the district court would be impracticable because of the standard that applies in the district court, the prior proceedings in the case, and the fact that time is of the essence.

227.   First, Alpine has only a limited amount of time, 30 days, to obtain a stay to avoid the impact of that judgment on its ability to continue to operate its business.

228.   Further, because Alpine is not able to post a bond to secure a stay pending appeal, application to the district court under Rule 62(b) would be futile. Obtaining a stay from this Court is Alpine's only option.

229.   Finally, Alpine has already sought reconsideration from the district court as to each of the appealable issues discussed herein, and every application has been denied. The district court is unquestionably wedded to the view that the SEC has the power to enforce the SAR requirements and that the court can formulate new SAR filing requirements that can now be deployed throughout the financial industry. Another effort by Alpine to again try to convince the district court that Alpine would have a substantial likelihood of success on appeal would be equally unsuccessful.

WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct.

DATED this 10th day of October, 2019.

/s / *Maranda E. Fritz*
Maranda E. Fritz