UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE HURRY FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

      Plaintiffs,

v.                                                                    Case No. 8:18-cv-02869-VMC-CPT

CHRISTOPHER FRANKEL,

      Defendant.

_____/

CHRISTOPHER L. FRANKEL,

      Counter-claimant,

v.

CAYMAN SECURITIES CLEARING
AND TRADING LTD; THE HURRY
FAMILY REVOCABLE TRUST;
SCOTTSDALE CAPITAL ADVISORS
CORPORATION; and ALPINE SECURITIES
CORPORATION,

      Counter-defendants.

_____/

**Frankel's Request for Judicial Notice of
Alpine's Admissions in Mandamus Pleadings**

The defendant, Christopher L. Frankel ("**Frankel**"), through counsel and under Federal

Rule of Civil Procedure 201(b)(2), (c)(2), and (d), requests the Court to take judicial notice of the

petition for writ of mandamus and supporting pleadings, filed by the plaintiff, Alpine Securities

Corporation ("**Alpine**"), on October 23, 2019, with the United States Court of Appeals for the

District of Columbia Circuit ("**Appeals Court**").  Alpine requested the Appeals Court to issue a

writ of mandamus compelling the Securities Exchange Commission ("**SEC**") to rule on Alpine's application for relief from charges and deposit requirements of the National Securities Clearing Corporation ("**NSCC**").  As explained in this request for judicial notice, Alpine has represented in its mandamus pleadings that NSCC's charges and deposit requirements have been destroying Alpine's business since April 2018, eight months before Alpine terminated its consulting relationship with Frankel on October 31, 2018 (Hurry Declaration (Doc 24-1) at p. 1, ¶ 5), and Alpine has disclosed in the mandamus pleadings information which Alpine claimed as confidential in its lawsuit against Frankel.

Frankel requests the Court to take judicial notice of the following mandamus pleadings filed on October 23, 2019: **Alpine's Mandamus Petition** (Doc 1812264) attached as **Exhibit "1"**; **Alpine's Mandamus Petition Exhibits** (part of Doc 1812264) including the Declaration of David Brant, Alpine's Chief Financial Officer, dated December 19, 2018 ("**Brant Declaration**") attached as **Exhibit "2"**; and **Alpine's Emergency Motion to Stay** (Doc 1812269) attached as **Exhibit "3"**.

### Alpine's SEC Application / Mandamus Procedural History

1. Alpine petitioned the Appeals Court for a writ of mandamus on October 23, 2018, requesting the Appeals Court to order the SEC to rule on Alpine's application to invalidate charges and deposit requirements of NSCC, the organization through which Alpine conducts its business, which is clearing trades in the microcap and over-the-counter securities markets. *See* Alpine's Mandamus Petition (Doc 1812264) at p. 8 (attached as Exhibit "1").

2. According to Alpine's mandamus petition, Alpine initially applied to the SEC on December 19, 2018, and requested the SEC to invalidate and stay the NSCC's charges and deposit requirements. Mandamus Petition at p. 8.

3.      Alpine's SEC application and the resulting administrative proceeding against NSCC are not publicly available, so Frankel did not know about Alpine's representations in the SEC proceeding until after Alpine filed the mandamus petition and exhibits on October 23, 2019.

4.      Alpine represented in its SEC application that NSCC's charges and deposit requirements were "strangling" Alpine's business and threatened Alpine's existence.  Mandamus Petition at p. 9.   Alpine requested the SEC to stay the NSCC's charges and deposit requirements "so that Alpine would not be driven from business before the issue [the validity of NSCC's charges and deposit requirements] could be resolved."  Mandamus Petition at p. 12.

5.      Alpine asserted in its mandamus petition that the damage caused by the "strangling" charges and deposit requirements of NSCC had become even more "increasingly acute" during 2019, and that had Alpine filed a second application requesting SEC relief on August 2, 2019, because the SEC had not ruled.  Mandamus Petition at pp. 8 – 9.

6.      Alpine asserted in its mandamus petition that the SEC had not ruled by October 23, 2019, so Alpine petitioned the Appeals Court to issue a writ of mandamus compelling the SEC to do so.  Mandamus Petition at p. 8.

7.      Alpine filed with its mandamus petition an emergency motion to stay requesting the Appeals Court to stay NSCC's charges and deposit requirements.  *See* Alpine's Emergency Motion to Stay (Doc 1812269) (attached as Exhibit "3").

**Alpine's Damage Representations in SEC / Mandamus Proceedings**

8.      In the mandamus petition, Alpine protested NSCC's charges and deposit requirements as "unreasonable", "onerous", "anti-competitive", "discriminatory", and "destructive to the microcap market [in which Alpine conducted its business]."  Mandamus Petition at p. 9.

9.      Alpine represented in its emergency motion to stay that NSCC's charges and deposit requirements were destroying Alpine's business.  "Alpine has provided testimony that its survival is on the line; the [NSCC's] Illiquid Charge itself is astronomical and threatens to destroy Alpine's business."  Emergency Motion to Stay at p. 21.

10.      Alpine wrote in the mandamus petition that Alpine is a small broker-dealer in the business of clearing trades of microcap and over-the-counter stock transactions.  "Alpine is a small, self-clearing broker-dealer, registered with the SEC.  Alpine's business primarily involves the clearing and settlement services for microcap and over-the-counter ('OTC') stock transactions for other brokerage firms."  Mandamus Petition at p. 14 (citing Brant Declaration attached in Exhibit "2").

11.      Alpine represented in the Brant Declaration that it had managed to avoid the deleterious impact of the NSCC's charges and deposit requirements through April 2018, by using "ex-clearing partnerships," but that the last of Alpine's "ex-clearing partnerships" ended in April 2018.  Paragraph 32 of Brant Declaration at p. 75.

12.      The Brant Declaration, signed on December 19, 2018, stated that Alpine's liquidation business was down by 75% and its commission revenue was down by 78% "as a direct result" of NSCC's charges and deposit requirements.

> Alpine's liquidation business is down approximately 75% as a result [sic] *as a direct result* of the Required Deposit charges targeted at the microcap and OTC market segment. *Almost every one of Alpine's large customers is now bringing in significantly less business as a result of fall out due to the Required Deposit charges at issue.* To illustrate this, *Alpine's revenue from commissions in November 2017 was $555,647. By comparison, Alpine's revenue from commissions in November 2018 was $122,901.* As discussed above, Alpine was able to use its use [sic] ex-clearing contra-party partnerships to avoid clearing through NSCC, and thus avoid the Required Deposit, prior to April 2018.

Paragraph 40 of Brant Declaration at p. 78 (italics added).

13.     Alpine asserted in the mandamus petition that NSCC's charges and deposit requirements had significantly damaged the business of all broker-dealers who cleared trades in the microcap and OTC markets, and that the charges and deposit requirements were "destroying" and "choking off" the microcap and OTC markets.

> *As a direct result* of NSCC's Required Deposit charges, the number of independent or small clearing broker members of NSCC providing clearing services for firms and investors holding microcap or OTC stocks is down significantly. Alpine is aware of only a handful of firms that currently provide clearing services for these types of stocks [footnoting Brandt Declaration]. *Alpine's liquidation business alone is down more than 75% due to the capital constraints necessary to fund the Required Deposit* [footnoting Brandt Declaration]. SEC review of the NSCC's actions, and an interim stay, were sought to prevent NSCC from *destroying* its small broker-dealer constituents and *choking off* a significant, lawful segment of the market, including Alpine's business, through the imposition of onerous and unjust factors to calculate and impose the Required Deposit Charges.

Mandamus Petition at pp. 16 – 17 (italics added).

14.     Alpine wrote in the mandamus petition that NSCC's charges and deposit requirements had a "chilling effect … upon Alpine's ability to provide clearing services to its customers, including the number of transactions it can clear per day, and upon the OTC and microcap markets in general." Mandamus Petition at p. 22.

15.     Alpine wrote in the mandamus petition that Alpine had "already suffered significant damages from the NSCC's arbitrary imposition of its fees and deposits" which had "devastating impact" and were causing "manifest" and "undisputed" "irreparable harm" to Alpine.

> *Alpine has already suffered significant damages from the NSCC's arbitrary imposition of its fees and deposits.* Because of the enormous capital commitment required even for a single small trade, Alpine can only execute a limited number of transactions. During the last few months, Alpine has been operating at a loss and, unless Alpine can obtain some relief, matters will only become worse. As stated above, Alpine's liquidation business alone was down more than 75% due to the capital constraints necessary to fund the Required Deposit [footnoting Brant

5

Declaration] – even before the NSCC's latest hike in Alpine's required minimum deposit. Alpine's Petition for [SEC] Review demonstrated both the enormity of the margin charges and the *devastating impact* they are having on its business. *The irreparable harm to Alpine from these charges is manifest, and frankly undisputed.*

Mandamus Petition at p. 37 (italics added).

16.     Alpine asserted that the NSCC had imposed its charges and deposit requirements to "drive" Alpine "out of business." "The effect, if not the purpose, of the actions of the NSCC would be to drive this firm [Alpine], and others who engage in microcap transactions, out of business." Mandamus Petition at p. 37.

### Alpine's Disclosures of Allegedly Confidential Information in Mandamus Proceeding

17.     In its mandamus petition and exhibits, Alpine disclosed information concerning its revenue, customers, and stock trades which Alpine and Scottsdale have claimed is confidential in their lawsuit against Frankel.

18.     In its mandamus petition, Alpine disclosed details concerning trades for its client, Bezalel, on November 23 and November 26, 2018.

> By way of example, consider the following trades processed by Alpine for clearing through NSCC's CNS system for its client, Bezalel, on November 23, 2018 and November 26, 2018 [footnoting Brant Declaration]. This trade involved a contract to sell 198,000 total shares (99,000 on 11/23/18 and 99,000 on 11/26/18) of PCMB at a price of $0.020 for total proceeds of $4,016.64.

Mandamus Petition at p. 23.

19.     Alpine published pricing details concerning its trade of PMCB stock on November 23 and November 26, 2018 in paragraph 19 of the Brant Declaration:

> By way of example, consider the following trades processed by Alpine for clearing through NSCC's CNS system.
>
>> a.  The first trade involved a contract to sell 99,000 shares of PMCB on November 23, 2018, valued at

$0.020, for a total proceeds amount of $2,008.32. To process this $2,008.32 trade for clearing through NSCC, however, *Alpine was required to deposit $40,803.00,* including:

i.   Illiquid Charge: $34,956.60.

ii.  OTC Volatility Charge:   $5,846.40 (NSCC's rules indicate that the OTC Volatility Charge shall be, at NSCC's discretion, a haircut of not less than 10% of the position.   Here, however, the Volatility Charge was 100% of the transaction amount. Although I am not certain of NSCC's precise method of calculation, because a sub-penny stock was involved, I believe that NSCC imposed a fictional $.01/share price to calculate the Volatility Charge.

iii. OTC Mark-to-Market Charge:   $116,179.78 (although this charge can either be a debit or credit based on the closing price of the security pending settlement, in this case NSCC appears to have used the fictional $.01/share price so it created a mark-to-market-loss charge).

b.   The second trade involved a contract to sell another 99,000 shares of PMCB on November 26, 2018, valued at $0.020, for the same total proceeds amount of $2,008.32. To process this $2,008.32 trade for clearing through NSCC, however, *Alpine was required to deposit $887,372.84,* including:

i.   Illiquid Charge: $868,800.00.

ii.  OTC Volatility Charge: $17,376.00.

iii. OTC Mark-to-Market Charge: $1,196.84.

Paragraph 19 of Brant Declaration at pp. 85 – 86.

20.    Alpine published details concerning trades which Alpine cleared for Power Up and La Jolla on November 29, 2018, and Silver Rock on November 19, 2018, in paragraph 22 of the Brant Declaration:

7

Below are additional recent trades from Alpine's customers wherein the Required Deposit charges are similarly arbitrary and grossly and unfairly disproportionate to the value of the transaction:

    a. Client: Power Up; trade date: 11/29/2018 and 11/30/2018; Symbol: TSOI; Description: Therap Sol

        i. 4,347,826 total shares traded over the two days (3,085, 100 on 11/29/2018 and 1,262,726 on 11/30/2018), valued at $0.003, resulting in a total trade value of $12,710.64 with a total illiquid charge of $262,118.21, total volatility charge of $14,865.85, total Mark-to-Market charge of $51,192.5l, and an NSCC deposit trade proceeds multiple of 25.82.

    b. Client: La Jolla; trade date: 11/29/2018; Symbol: VOID; Description: V Group Inc.

        i. 1,800,000 shares valued at $0.00033, resulting in a trade value of $587.20, with an illiquid charge of $18,000.00, volatility charge of $3,600.00, Mark-to-Market charge of $17,280.00, and an NSCC deposit trade proceeds multiple of 66.21.

    c. Client: Silver Rock; trade date: 11/19/2018 and 11/20/2018; Symbol: PMCB; Description: Pharmacyte

        i. 942,319 total shares traded over the two days (400,000 on 11/19/2018 and 542,319 on 11/20/2018), valued at $0.045, resulting in a total trade value of $42,138.09 with a total illiquid charge of $68,439.11, total volatility charge of $11,604.73, total Mark-to-Market charge of $317.68, and an NSCC deposit trade proceeds multiple of 1.91.

Paragraph 22 of Brant Declaration at pp. 86 – 87.

    21.    In paragraph 38 of the Brant Declaration, Alpine published details concerning trades which NSCC's charges and deposit requirements had prevented Alpine from clearing for its clients, Betty Cam, Black Ridge, and EMA, in November 2018.

Below are recent proposed trade transactions that Alpine could not complete, either due to capital constraints associated with the Required Deposit or because

the customers decided to not trade due to the Required Deposit, and the resultant processing fees (below are the estimates of Alpine's calculation of the Required Deposit fees):

a. Client: Betty Cam; trade date: 11/20/2018; Symbol: COBI

   i. 1,000,000 shares valued at $0.0005 would result in a trade value of $500.00 with an illiquid charge of $2,000.00, volatility charge of $9,500.00, Mark-to-Market charge of $95,000.00, and an NSCC deposit trade proceeds multiple of 213.

b. Client: Black Ridge; trade date: 11/23/2018; Symbol: TORO

   i. 100,000 shares valued at $0.0052 would result in a trade value of $520.00 with an illiquid charge of $34,100.00, volatility charge of $2,200.00, Mark-to-Market charge of $7,590.00, and an NSCC deposit trade proceeds multiple of 84.

c. Client: EMA; trade date: 11/21/2018; Symbol: ZNGY

   i. 4,900,000 shares valued at $0.0003 would result in a trade value of $1,470.00 with a volatility charge of $8,000.00, Mark-to-Market charge of $38,800.00, and an NSCC deposit trade proceeds multiple of 32.

d. Client: EMA; trade date: 11/21/2018; Symbol: BGFT

   i. 3,000,000 shares valued at $0.0004 would result in a trade value of $1,200.00 with a volatility charge of $4,000.00, Market-to-Market charge of $19,200.00, and an NSCC deposit trade proceeds multiple of 19.

e. Client: EMA; trade date: 11/23/2018; Symbol: VYST

   i. 1,000,000 shares valued at $0.0030 would result in a trade value of $3,000.00 with an illiquid charge of $8,000.00, volatility charge of $1,600.00, Market-

to-Market charge of $5,600.00, and an NSCC deposit trade proceeds multiple of 5.

Paragraph 38 of Brant Declaration at pp. 77 – 78.

### Alpine's Damage Representations in SEC / Mandamus Proceedings Refute the Plaintiffs' Damage Claims Against Frankel

22.     On August 7, 2019, Frankel deposed John Joseph Hurry as the representative designated by Alpine, Scottsdale Capital Advisors Corporation ("**Scottsdale**"), and The Hurry Family Revocable Trust ("**Hurry Trust**"), to testify concerning their claims against Frankel. Hurry depo. (Doc 115) at p. 7, 12 – 13; p. 15, 3 – p. 16, 7.

23.     Hurry testified that Alpine and Scottsdale experienced drops in revenue, with the largest drop occurring in June 2019 when Hurry suspected that Frankel had gone to work for Vision, another broker-dealer.   Hurry speculated that the revenue drops corresponded with suspected misconduct by Frankel.   Hurry acknowledged that the plaintiffs had no damage analysis, had not determined any profit loss, and had not determined even what documents should be considered to determine damages.

> **Q You're not able to tell me the amount of**
> **damage that you think that has been caused by Frankel?**
> A It would appear that approximately $700,000
> worth of revenue, give or take, somehow was related to
> the move that he did to Vision [in June 2019]. Now, we don't have that
> empirically set up yet, but there is a super high
> correlation of the move to Vision and a big drop in
> revenue, which all happens -- it's not -- it's more than
> a coincidence.
>
> **Q All right. Well, of course, it's not a drop**
> **in revenue. It's a drop in profit; right?**
> A Those are drops -- well, you can say it
> goes -- in this case, it would go to the bottom line,
> yes.
>
> **Q Okay.**
> A Some of it.

**Q When -- who is going to do, and when are they going to do it, a damage analysis to determine –**

A It's in the process.

**Q -- what you say the damages are?**
A They are in the process, as we get the discovery, of putting that together. We haven't got all the discovery yet.

**Q Okay. And when do you anticipate that that will be done?**
A I hope soon, but we are still missing a lot of discovery.

**Q Okay. And these financial documents that you produced, 29 through 33 [34], are those the documents that you would use to determine what the alleged damaged are?**
A They certainly could be some of them, yes.

**Q Well, what else would you need?**
A We probably want to see all the trade runs and stuff at Vision, which customers were ours, how they got over there, and what kind of commissions they did over there.

Hurry depo. at p. 173, 8 – 174, 18 (testifying concerning Exhibits 29 through 34, which are revenue documents for Alpine and Scottsdale; Exhibits 32 and 34 show that Scottsdale derived almost all of its revenue from Alpine's clearance of stock trades).

24.     Hurry had to speculate even that Frankel may have joined Vision in June 2019!

**Q Okay. What month did Chris Frankel join Vision?**
A I believe it was June, according to the CRD.
We don't have the exact timeline when he agreed to go,
or we can speculate, but on the CRD it says June.

Hurry depo. at 162, 24 – 163, 3. But, of course, Frankel's association with Vision cannot be the basis for the plaintiffs' suit because the plaintiffs sued Frankel 8 months earlier on November 21, 2018, *with no misappropriation evidence*.

11

25.     When asked whether Alpine had suffered any financial adversity, downturns, or set-backs since January 1, 2018, other than the revenue drops which Hurry attributed to Frankel's suspected misconduct, Hurry did not mention NSCC's charges and deposit requirements which had been "strangling" Alpine's business since April 2018 and had become "increasingly acute" during 2019.  After giving an evasive response laced with speculation about Frankel's suspected misconduct, Hurry denied that Alpine had faced any adverse financial factors or circumstances other than Frankel's suspected misconduct during 2018 and 2019.

> **Q What financial adversity, what downturns has**
> **Alpine suffered since, let's say, January 1st of 2018,**
> **other than what you would blame on Mr. Frankel? What**
> **had been the adverse setbacks that the company has had**
> **to deal with other than Mr. Frankel?**
> A The company's always had to deal with
> regulatory issues. So if that's -- that's an ongoing
> issue. The -- the issues in terms of constantly having
> to rebuild the business model, that's been true for --
> since I've been in the business for 28 years.
> So, you know, what's concerning about all this
> and circumstantial evidence is there seems to be a
> pattern between the time that -- that he wasn't buying
> the company and he was out there using our connections,
> I think, unfairly to compete and essentially would
> appear is telling customers not to put any money with
> Alpine or do any business with Alpine, but give the
> money to him, let him buy the firm, steal the business
> out of Alpine.
> The only way he would have known all that
> information is if he had access to trade secrets and
> confidential information. And there is a pattern and
> circumstantial evidence that would lead us to that. You
> know, that's why we brought the suit.
>
> **Q Wasn't the question.**
> **Has Alpine suffered any -- or faced any**
> **adverse financial factors or circumstances other than**
> **what you believe Frankel has caused since**
> **January 1, 2019? For example, regulatory capital, has**
> **that been a problem for Alpine?**
> A Alpine's in regulatory capital, so no.

12

Hurry depo. at p. 189, 25 – 191, 5.

26.     A few weeks before Hurry's deposition, the Department of Enforcement had filed

a disciplinary complaint against Alpine with the Office of Hearing Officers of the Financial

Industry Regulatory Authority ("**FINRA**") on July 25, 2019.   *See* Exhibit 36 to Hurry's

deposition.  When asked about the Department of Enforcement's allegation that Alpine had been

experiencing mounting financial difficulties since 2018, Hurry testified that he did not know the

basis for the allegation, but Hurry claimed that Alpine's financial condition had "started turning

around" in November 2018.  Hurry testified, as support for the plaintiff's non-existent damages,

that the turn-around coincided with Alpine's termination of Frankel as a consultant at the end of

October 2018.

> **Q The SEC [FINRA] says, "Alpine's experiencing mounting**
> **financial difficulties since 2018." What are those**
> **mounting financial difficulties?**
>
> **MR. SUSMAN:** Objection; calls for speculation.
>
> A Yeah, I don't know. I mean, their business
> certainly dropped like we talked about already today
> around the time that Chris Frankel had been terminated
> both before and after. The turning point was
> approximately, I would say, November, was when the firm
> started turning around.

Hurry depo. at p. 193, 24 – 194, 8 (testifying about disciplinary complaint, Exhibit 36).

27.     But, of course, Alpine had not represented to the SEC that Alpine's financial

condition had "started turning around" in November 2018.  Alpine instead had represented that

NSCC's charges and deposit requirements had been "strangling" Alpine since April 2018 and

had become "increasingly acute" during 2019.  Mandamus Petition at pp. 8 – 9.

**Alpine's Disclosures in Mandamus Proceeding
Refute Confidentiality Contentions Against Frankel**

28.      Alpine and Scottsdale contend that an anonymous trade blotter, which Frankel

emailed to another broker-dealer, Ziv, on November 13, 2018, is confidential.   Frankel's

November 13, 2018 email to Ziv described the blotter as "a sample blotter of OTC Equity

transactions" over two days, August 27 and 28, 2018.  *See* Frankel's email and blotter / Exhibit 5

to Hurry's deposition.

29.      Hurry testified that Alpine considered the blotter to be confidential even though

the blotter did not identify Alpine, Scottsdale, or the customers who made the trades.

> **Q Can you tell me what Exhibit 5 is?**
> A This is an Alpine trade run.
>
> **Q Is trade blotter another name for trade run?**
> A Can be, yes.
>
> **Q Okay. What does that mean, "trade blotter" or
> "trade run"?**
> A It's all the trades that Alpine did --
>
> **Q Okay.**
> A -- on those respective days.
>
> **Q How do you know that it's Alpine that did
> those trades?**
> A We had our operations person, Joe, take a look
> at this and confirm it.
>
> **Q Okay. And this is a document that your
> lawyers obtained by a subpoena to Ziv [other broker-dealer];
> correct?**
> A That's my understanding.
>
> **Q Yeah. Okay. And do you know how Chris [Frankel] got
> this trade blotter?**
> A No, I do not.
>
> **Q Do you consider the trade blotter to be
> confidential?**

A The way it's put together, yes.

**Q What do you mean "the way it's put together"?**
A Specifically all of Alpine's trades on two
specific days.

**Q And what is confidential about that?**
A If you know all the customers and you know all
the trades, you have information that the market does
not have.

**Q Okay. This trade blotter --**
A It's confidential and trade secret.

**Q I'm sorry?**
A That's not publicly readily available.

**Q Okay. I understand that trade blotter may not
be publicly available, but I'm wondering how it's
confidential. It doesn't give the names of customers,
does it?**
A Any information at all, Scottsdale Capital,
or any other firm, how it's compiled, how it's known to
be compiled, put together that would not be known to the
general public who the individuals who picked those
trades, any of that information whatsoever would be
confidential and a trade secret at Alpine, Scottsdale.
So no matter what format it is and how it is doesn't
change that fact.

Hurry depo. at p. 82, 20 - p. 84, 15 (testifying concerning Exhibit 5 / Frankel's email to Ziv with

attached trade blotter).

30.     Hurry speculated that Frankel knew that the blotter was Alpine's; that Frankel

somehow used Alpine's / Scottsdale's customer list to figure out which customers made the

trades on the anonymous blotter; that Frankel told Ziv that the blotter was Alpine's; that Frankel

identified for Ziv the names of the customers who made the trades; and that Frankel and Ziv

planned to use the blotter, broker, and customer information to lure customers from Scottsdale

and Alpine.

> **Q How -- why did Chris want this information?**
> **Do you know?**
>
> **MR. SUSMAN:** Objection; calls for speculation.
>
> A It looks like, since we are speculating, that
> Chris Frankel is essentially telling Ziv that he's going
> to basically take all of Alpine's business and giving
> them a sample of all the business he's going to take,
> because he knows all the customers and basically ran
> Alpine, has access to all kinds of confidential trade
> secrets that he can just move it over.

Hurry depo. p. 84, 16 – 25.

31.　　Alpine's disclosure of information about Alpine's and Scottsdale's customers, stock trades, and revenue in Alpine's mandamus petition and exhibits refutes Alpine's and Scottsdale's specious contention against Frankel that the anonymous blotter and information concerning Alpine's and Scottsdale's customers, stock trades, and revenue are confidential.

### <u>MEMORANDUM OF LAW</u>

The Court may take judicial notice of facts that are not subject to reasonable dispute in that they are either "(1) generally known within the trial court's territorial jurisdiction or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). The Court may take judicial notice of documents filed in other courts "to establish the fact of such litigation and related filings" and of orders for the purpose of "recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

In this case, the Court should take judicial notice of Alpine's mandamus pleadings filed on October 23, 2019, in which Alpine has claimed that NSCC's charges and deposit requirements (not Frankel's suspected misappropriation) have been "strangling" Alpine's business since April 2018. The Court should also take judicial notice of Alpine's publication of

16

information concerning Alpine's and Scottsdale's customers, stock trades, and revenue as refuting Alpine's and Scottsdale's claim of confidentiality concerning the anonymous trade blotter and information concerning customers, stock trades, and revenue.

Alpine's admissions are opposing party statements under Federal Rule of Evidence 801(d)(2), and the Court should consider these admissions in deciding the pending motions for summary judgment, including Frankel's motion for summary judgment based on the plaintiffs' failure to adduce evidence of injury or damage, and the plaintiffs' failure to adduce evidence of misuse and / or misappropriation of the plaintiffs' allegedly confidential information.

## <u>LOCAL RULE 3.01(G) CERTIFICATION</u>

The undersigned counsel certifies that counsel for the defendant has conferred with counsel for the plaintiffs, and the plaintiffs have not agreed to the relief requested.

*s/ David C. Banker*
David C. Banker (Fla. Bar No. 352977)
J. Carter Andersen (Fla. Bar No. 0143626)
Harold D. Holder (Fla. Bar No. 118733)
BUSH ROSS, PA
1801 N. Highland Avenue
Tampa, Florida 33602
Phone: 813-224-9255
Fax:    813-223-9620
Primary: dbanker@bushross.com;
candersen@bushross.com;
hholder@bushross.com
Secondary:  aflowers@bushross.com
ksalter@bushross.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 1, 2019, all counsel of record who consented to electronic service are being served with a copy of this document via the Court's CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to any non-CM/EFC participants:

Shane B. Vogt, Esquire
Kenneth G. Turkel, Esquire
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, FL  33602
kturkel@bajocuva.com
svogt@bajocuva.com

Charles J. Harder, Esquire
Jordan Susman, Esquire
HARDER LLP
132 South Rodeo Drive, Suite 301
Beverly Hills, CA 90212-2406
charder@harderllp.com
jsusman@harderllp.com
*Attorneys for Plaintiffs*

By:     */s/ David C. Banker*