No. <u>19-1223</u>

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**In Re ALPINE SECURITIES CORPORATION,**

**Petitioner.**

---

## PETITION FOR WRIT OF MANDAMUS TO THE
## SECURITIES AND EXCHANGE COMMISSION

---

## ORAL ARGUMENT REQUESTED

_____

Thomas Feher (D.C. Bar No. 985161)
Maranda E. Fritz (application to be filed)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291

*Counsel for Alpine Securities Corporation*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES ..........................................................................2

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ..........................................3

   I. Relief Requested..........................................................................................4

   II. Issues Presented .........................................................................................7

   III.  Jurisdictional Statement..........................................................................7

   IV. Factual Background ..................................................................................8

        A.    Background of NSCC ...............................................................9

        B.    Background of Alpine............................................................10

        C.    Overview of the Required Deposit and its Effects .................10

        D.    NSCC Has Again Increased Alpine's Clearing Fund
              Requirement Without Any Rational or Proper Purpose
              and Is Causing Irreparable Injury to Alpine ...........................13

        E.    Substantial Efforts to Obtain Agency Action without
              Court Intervention Have Failed ..............................................14

   V. Argument ................................................................................................15

        A.    The Standard For Mandamus..................................................15

        B.    Alpine is Entitled to an Order Compelling Agency
              Action.....................................................................................17

              1.    NSCC Deposit Requirements are Irrational and
                    Unlawful ......................................................................18

              2.    NSCC Failed to Offer any Justification for its
                    Refusal to Permit the DTC Offset Only Where
                    NSCC Has Assigned a Particular Credit Rating ...........30

              3.    NSCC Has Failed to Offer Any Justification for
                    the Completely Arbitrary Practice of "Rounding
                  Up" Share Price ...........................................................32

        C.    The Damage Done to Alpine by Virtue of the NSCC's
              Irrational and Arbitrary Fees and Charges .............................33

1.      The Imposition of – and Increases In – NSCC
        Deposit and Charges Are Causing Irreparable
        Harm to Alpine ............................................................33

VI. CONCLUSION AND RELIEF REQUESTED .....................................34

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Aiken County*,
  725 F.3d 255 (DC Cir. 2013) ...............................................................15

*In re Cooper Tire & Rubber Co.*,
  568 F.3d 1180 (10th Cir. 2009) .........................................................14

*Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*,
  709 F.2d 1521 (D.C. Cir. 1983) .........................................................14

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) .............................................................14

*Marathon Oil Co. v. Lujan*,
  937 F.2d 498 (10th Cir. 1991) ...........................................................15

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) .....................................................................14, 15

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
  559 F.3d 772 (8th Cir. 2009) .................................................................8

*Semon v. Stewart*,
  374 F.3d 184 (2d Cir. 2004) ...............................................................14

*Telecomms. Research & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) .................................................................7

*Wilbur v. United States*,
  281 U.S. 206 (1930) ...........................................................................15

## Statutes & Rules

5 U.S.C. § 706 ......................................................................................3

5 U.S.C. § 706(1) .................................................................................15

5 U.S.C. §706(2)(A)-(F) ......................................................................15

15 U.S.C. § 78s(f) .................................................................16

15 U.S.C. § 78y ......................................................................6

Securities Exchange Act of 1934 Section 17A(b), 15 U.S.C. § 78q-(b) ..................8

15 U.S.C. § 78q-1(b)(3)(D) .......................................................17

15 U.S.C. § 78q-1(b)(3)(D), (F) and (I), *and* (b)(6) Section 17A ..........................17

15 U.S.C. § 78q-1(b)(3)(F) .......................................................21

15 U.S.C. § 78q-1(d) .............................................................21

15 U.S.C. § 78s(f) Section 19(f) ........................................16, 17, 18, 23

15 U.S.C. § 78s(g) .............................................................21, 22

28 U.S.C. § 1651 ................................................................3, 6

17 C.F.R. § 17Ad-22(e)(1), (23) ...................................................17

17 C.F.R. § 240.17Ad-22(e)(1).....................................................22

## Other Authorities

BusinessWire Release, *DTCC Successfully Closes Out Lehman
    Brothers Bankruptcy* ........................................................26

National Securities Clearing Corporation, *Disclosure Framework for
    Covered Clearing Agencies and Financial Market Infrastructures*
    (December 2018) ........................................................24, 25, 26, 27

## CERTIFICATE AS TO PARTIES

Pursuant to Circuit Rules 21 (d) and 28 (a), Petitioner states the following:

Alpine Securities Corporation, a Utah corporation, is the Petitioner.  The United

States Securities and Exchange Commission is the Respondent.

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1 of the United States Court of Appeals for the D.C. Circuit, Petitioner provides the following disclosures:

Alpine Securities Corporation is a securities clearing firm located in Salt Lake City, Utah.  It is 100% owned by SCA Clearing Corporation, a Nevada holding corporation.

## I. RELIEF REQUESTED

Petitioner Alpine Securities Corporation ("Alpine") seeks the issuance of a writ of mandamus pursuant to 28 U.S.C. 1651, the Administrative Procedure Act ("APA"), 5 U.S.C. 706, and the Securities Exchange Act of 1934, compelling the Securities and Exchange Commission ("SEC") to take action to adjudicate Alpine's Application for Review of Adverse Action and its Motion for Stay, filed by Alpine on December 26, 2018, and pressed again by renewal of the application on August 2, 2019, in the *Matter of the Application of Alpine Securities Corporation for Review of Adverse Action Taken by National Securities Clearing Corporation,* Administrative Proceeding File No. 3-18979, including directing the SEC to direct transmission of a certified record, scheduling and receipt of briefs, and decision on the issues presented by Alpine. [1]

In its application and motion to the SEC, Alpine identified a host of fees and deposits that are being imposed by the NSCC in relation to Alpine transactions, oftentimes hundreds of times more than the transaction or position value, and

---

[1] Alpine's Application for Review of Adverse Action, including its Rulemaking Petition, and Alpine's Motion for a Stay, are attached to this Writ as Exhibits A and B.  The Declaration of David Brant, submitted in support of that application, is attached as Exhibit C.  Briefing of that motion was completed as of February 3, 2019, and NSCC's opposition and Alpine's Reply are attached as Exhibits D and E.

demonstrated that those charges, particularly in the aggregate, violate the Exchange Act because they are unreasonable and onerous, irrational, redundant and not merely anti-competitive and discriminatory, but affirmatively and gratuitously destructive to the microcap market.  And while the various components of those charges involve arguably complex formulae, one thing is clear: Alpine executes only one kind of transaction, *i.e.*, sale of stock that is already held at its account at the Depository Trust Corporation ("DTC"), and so its transactions present *no risk* to NSCC as it settles the delivery of that stock to the buyer. Alpine also demonstrated that the NSCC has taken and is continuing to take arbitrary and unauthorized action against Alpine that, given NSCC's monopolistic position in the settlement of securities transactions, constitutes an unlawful denial or limitation of service, and threatens the ability of Alpine to conduct business.

This Writ is necessitated by the fact that, although Alpine filed its application and motion for a stay of NSCC's actions in December 2018, on the grounds that NSCC's actions were both improper and were strangling Alpine's business, the SEC has effectively ignored the application, failing to consider the motion or even direct the first step in that process, the filing of the certified record.

As the damage from NSCC's actions became increasingly acute this year, Alpine filed a Renewal of its Application in August 2019.  Alpine's August 2019

Request for Issuance of a Briefing Schedule And Other Appropriate Commission Action is attached as Exhibit F.  Again, Alpine's filing was ignored.

Likely emboldened by the inaction of the SEC, the NSCC has now *again* increased the "minimum" clearing fund requirement that it is arbitrarily imposing on Alpine even as it continues to impose illiquidity and volatility charges that are irrational and that are cutting Alpine off from the essential settlement function performed by the NSCC.  Alpine now turns to this Court, having exhausted all other avenues of relief, to seek an order compelling the SEC to address Alpine's motion.  Given the continuing damage being inflicted on Alpine every day by NSCC's ever-increasing deposit demands, Alpine also seeks from this Court an interim stay pending determination by the SEC of Alpine's application.

## II.  ISSUES PRESENTED

1.  Has the SEC, by failing to address and unreasonably delaying any consideration of Petitioner's application and its motion for a stay of NSCC's unlawful charges and deposit requirements, unlawfully withheld or unreasonably delayed agency action?

2.  Should this Court issue a writ of mandamus to compel the agency to adjudicate Petitioner's application and, because of the unreasonable delay combined with the substantial and ongoing harm being done to Alpine by virtue of the NSCC's arbitrary and irrational imposition of "fund requirements" and various charges and fees, issue an interim stay of the NSCC's imposition of illiquid and volatility charges pending adjudication of the matter by the SEC?

## III.  JURISDICTIONAL STATEMENT

This Court has jurisdiction over the petition under the Securities Exchange Act, the All Writs Act and the APA. Under the Exchange Act, the Circuit Court has original jurisdiction of consideration of the denial or limitation of access to service.   15 U.S.C. §78y.

This Court has jurisdiction under the APA because the SEC has unreasonably and unlawfully withheld and delayed agency action.

This Court also has jurisdiction under the All Writs Act, 28 U.S.C. 1651, because a federal court may "protect its future jurisdiction" to review final agency

action.   "Because the statutory obligation of a Court of Appeals to review on the

merits may be defeated by an agency that fails to resolve disputes, a Circuit Court

may resolve claims of unreasonable delay in order to protect its future

jurisdiction."  *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77-78

(D.C. Cir. 1984).

## IV.  FACTUAL BACKGROUND

In December 2018, Alpine filed an Application for Review of Adverse

Action taken by the NSCC with the Securities and Exchange Commission

("SEC"), pursuant to Section 19(d) and (f) of Securities Exchange Act of 1934 (the

"Exchange Act").  As demonstrated in that submission, NSCC is imposing

monetary requirements and penalties on Alpine that are onerous, discriminatory

and otherwise inconsistent with the requirements of the Exchange Act, and which

result in the unlawful denial or limitation of Alpine's access to services at NSCC.

A copy of that submission, which includes a Rulemaking Petition with detailed

analysis of the fees and charges being imposed by NSCC, is attached as Exhibit A.

At the same time, Alpine specifically requested an interim stay on certain of

the NSCC's fees and charges pending consideration of its motion so that Alpine

would not be driven from business before the issue could be resolved.

Specifically, Alpine sought a stay of the NSCC's imposition of Illiquid Deposit

charges.  In the alternative, Alpine requested a stay of NSCC's denial to Alpine of

use of the DTC offset.  Exhibit B: Alpine Motion for Interim Stay.  The NSCC filed an opposition to that motion in January 2019, and Alpine filed its Reply Brief on February 3, 2019, attached as Exhibit D and E.

It is almost a year later and, notwithstanding the initial application, a renewal of that application in August, and innumerable calls to the Office of the Secretary, the SEC has failed to take any action in relation to Alpine's application. It is not simply a matter of the SEC not yet ruling on the application; *it has not even caused the filing of the certified record by the agency*, nor has it set any schedule for argument or consideration of the motion.

## A.     Background of NSCC

NSCC is a securities clearing agency registered with the Securities Exchange Commission under Section 17A(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q-(b).  NSCC is a wholly owned subsidiary of the Depository Trust Clearing Corporation ("DTCC"), which also owns, *inter alia,* the DTC. NSCC provides centralized clearance and settlement services for its members, and clears and settles nearly all broker-to-broker trades of equity securities in the United States.[2]  The actual settlement of trades takes place in the NSCC's

---

[2] *See Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 776-77 (8th Cir. 2009) (stating that "NSCC provides centralized clearance, settlement and information services for virtually all securities transactions in the United States.").

Continuous Net Settlement ("CNS") System, an accounting and settling system for broker-dealer who are members of NSCC ("Clearing Members").

## B.    Background of Alpine

Alpine is a small, self-clearing broker-dealer, registered with the SEC. Alpine's business primarily involves clearing and settlement services for microcap and over-the-counter ("OTC") stock transactions for other brokerage firms.[3]  To provide clearing and settlement services and function as a clearing firm for its correspondent firms, *Alpine must be a member of NSCC and access its services*. Alpine is a clearing broker member in good standing of the NSCC and a DTC participant.

The only transactions that Alpine executes for its customers are sales of stock that are held in Alpine's accounts at the DTC.  Alpine does not process sales in which the NSCC would ever have an obligation to go into the marketplace to obtain the security in order to "cover" the position.

## C.    Overview of the Required Deposit and its Effects

As an ongoing condition to membership, and thus access to NSCC's clearance, settlement and other essential services, NSCC requires members to

---

[3] *See* Declaration of David Brant, at ¶ 3 ("Brant Decl."), attached hereto as Ex. C.

contribute to a "Clearing Fund," by making "Required Deposits."[4]  According to

NSCC's Rules and Procedures, the minimum Required Deposit to the Clearing

Fund is $10,000.  In practice, however, members are required to deposit far more

than the minimum amount.  The actual amount of the accumulation of each

member's Required Deposits is calculated by NSCC according to a complex and

inscrutable formula, consisting of multiple discretionary and subjective

components – which seemingly increase in number on a yearly basis – set forth in

Procedure XV of NSCC's Rules.[5]

An examination of the components of the Required Deposit, and the manner

in which they are actually calculated and applied by NSCC, demonstrates that they

result in onerous, inequitable and arbitrary charges that *so far exceed the amount of

the underlying transactions* to be cleared and settled that they cannot be credibly

justified as necessary to protect NSCC from credit risk.  Indeed, the amount of

each one of the Illiquid Charge, OTC Volatility Charge or OTC Mark-to-Market

Charge *alone* generally exceeds the amount of the underlying transaction by many

multiples; when assessed together, as they almost always are, Alpine is often

required to post margin amounts that exceed the underlying transaction value

---

[4] NSCC Rules and Procedures, Rule 2, § 1, Rule 2A, § 1(F), Rule 2B, § 1, Rule 4, § 1.

[5] *See* NSCC Rules and Procedures, at Rule 4 and Procedure XV.

significantly, sometimes by hundreds of times. An analysis of those fees and charges, and the damage that it has done to Alpine's ability to conduct its business, is further explained in the declaration of David Brant, submitted with Alpine's motion for an interim stay and attached to this Writ as Exhibit C.

Because NSCC has a stranglehold on firms like Alpine that must settle transactions through NSCC, these charges impermissibly limit Alpine's access to NSCC's essential services, and contravene the purposes and requirements of the Exchange Act. They impose an unreasonable and disproportionate burden on small clearing-broker members, such as Alpine, and reflect a discriminatory and anticompetitive policy towards a specific segment of the market – the microcap or OTC market – for which Alpine provides clearing services

As a direct result of NSCC's Required Deposit charges, the number of independent or small clearing broker members of NSCC providing clearing services for firms and investors holding microcap or OTC stocks is down significantly. Alpine is aware of only a handful of firms that currently provide clearing services for these types of stocks.[6] Alpine's liquidation business alone is down more than 75% due to the capital constraints necessary to fund the Required

---

[6] Brant Decl., at ¶¶ 34-35.

Deposit.[7]  SEC review of the NSCC's actions, and an interim stay, were sought to prevent NSCC from destroying its small broker-dealer constituents and choking off a significant, lawful segment of the market, including Alpine's business, through the imposition of onerous and unjust factors to calculate and impose the Required Deposit charges.

### D. NSCC Has Again Increased Alpine's Clearing Fund Requirement Without Any Rational or Proper Purpose and Is Causing Irreparable Injury to Alpine

Since Alpine filed the Petition and Motion with the SEC, the NSCC has actually taken further adverse action against the firm, although there has been no change in the extent of the potential risk to DTC associated with Alpine's transactions.  NSCC has astronomically increased the amount of the firm's "clearing fund requirement" from $100,000 to $3 million[8] *and* unlawfully appropriated at least $350,000.00 that was paid by the firm pursuant to a call, and should have been promptly returned to the firm after the transaction settled.

In August, NSCC increased the minimum deposit to $2.6 million.  Then, with Alpine still unable to obtain even a response on its application from the SEC, NSCC proceeded in October to impose yet another increase on Alpine's minimum

---

[7] *Id.* at ¶¶ 33, 40.

[8] Alpine had previously been required to maintain excess net capital within the firm of $1 million, but only maintain $100,000.00 on deposit.

deposit requirement, from $2.6 million to $3 million.  NSCC also conveniently timed that increase to occur just after Alpine met a $350,000.00 call; NSCC used that remarkably timely increase in its deposit to appropriate and refuse to return the funds that were provided in relation to that call.

In its communications relating to its ratcheting up of Alpine's deposit requirements, NSCC has not put forth any articulation of actual increased financial risk *in relation to any Alpine transaction*, and in fact Alpine *only* enters orders to sell stock that is physically held in an account at DTC, effectively eliminating any transactional risk.  Rather, the communications confirm that NSCC is penalizing Alpine for its participation in the disfavored microcap market, for regulatory issues that arise from those same issues, and for other purported deficiencies in Alpine's conduct – issues that have no bearing on the risk calculation that NSCC is supposed to be using to establish fees and charges.

## E.    Substantial Efforts to Obtain Agency Action without Court Intervention Have Failed

Because of the enormity and the irrationality of the deposits and charges imposed on Alpine, it filed its application and its motion with the SEC in December 2018.   Alpine then repeatedly reached out to the Office of the Secretary to get some information concerning its application, but was unable to obtain any information or explanation.

When NSCC acted against Alpine in August, raising its deposit to $2.6 million, Alpine filed with the SEC a renewal of its application.  Again, the SEC simply ignored that request.

Since then, Alpine has continued its efforts to obtain information from the Office of the Secretary regarding the SEC's failure even to address the application or decide Alpine's motion, but has received no responses or information.

## V.  ARGUMENT

### A.    The Standard For Mandamus

Writs of mandamus "may be best known for their traditional application – compelling a government official to perform a nondiscretionary duty owed to a plaintiff."  *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1187 (10th Cir. 2009).  Where a plaintiff challenges an agency's failure to take discrete action, "'[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 706(1)) (alteration in original); *see also Semon v. Stewart*, 374 F.3d 184  (2d Cir. 2004).  This Court  may "compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'"  *Norton*, 542 U.S. at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)) (emphasis in original).

Mandamus is proper if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983). The threshold for mandamus relief is high: as this Court has held, "mandamus is a drastic remedy, to be invoked only in extraordinary circumstances." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (citations and internal quotation marks omitted).

To be enforceable through mandamus, an agency's duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. United States*, 281 U.S. 206, 218 (1930). Mandamus was warranted, for example, to compel the Department of Interior to address permits for shale mining. *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991). Because "Congress intended the defendants to process oil shale mining patent applications," "the writ of mandamus ordering appellants to 'expeditiously complete administrative action' was entirely appropriate."

Here, the standards for APA relief under § 706(1) and for mandamus are identical. *Norton*, 542 U.S. at 63. While this Court cannot compel a particular result, it must compel agency action "unlawfully withheld or unreasonably delayed," *see* 5 U.S.C. § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law; (B) contrary to constitutional

right, power, privilege, or immunity; (C) in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right; (D) without observance of

procedure required by law; (E) unsupported by substantial evidence in a case

subject to sections 556 and 557 of this title . . . or; (F) unwarranted by the facts to

the extent that the facts are subject to trial de novo by the reviewing court." 5

U.S.C. §706(2)(A)-(F).  As this Court concluded in *In re Aiken County*, 725 F.3d

255, 266-67 (DC Cir. 2013), in the face of protracted agency inaction:

> We therefore have no good choice but to grant the petition for a writ
> of mandamus against the Commission. This case has serious implications for
> our constitutional structure. It is no overstatement to say that our
> constitutional system of separation of powers would be significantly altered
> if we were to allow executive and independent agencies to disregard federal
> law in the manner asserted in this case by the Nuclear Regulatory
> Commission. Our decision today rests on the constitutional authority of
> Congress, and the respect that the Executive and the Judiciary properly
> owe to Congress in the circumstances here. …

The petition for a writ of mandamus is granted.

## B.  Alpine is Entitled to an Order Compelling Agency Action

The writ of mandamus is appropriate here to compel agency action.   Section

19(f) *requires* the Commission to set aside an SRO action denying or limiting

access to services if it does <u>not</u> find, *inter alia,* that the SRO's rules "are, and were

applied in a manner, consistent with the purposes" of the Exchange Act, or if it

finds the prohibition or limitation on access "imposes any burden on competition

not necessary or appropriate."  15 U.S.C. 78s(f).  As discussed in further detail in Alpine's Rulemaking Petition, an attachment to Exhibit A, at pages 20-26, NSCC's Required Deposit violates multiple provisions of the Exchange Act, SEC Rules.

### 1.  NSCC Deposit Requirements are Irrational and Unlawful

First, Section 17A(b)(3)(D) requires that the "rules of the clearing agency provide for the equitable allocation of reasonable dues, fees and other charges among its participants."[9]  This statute thus imposes two requirements:  (1) fees, dues and charges must be "reasonable," and (2) they must be "equitabl[y] allocated.  NSCC's rules with respect to the Required Deposit, and the resultant charges that NSCC imposes on Alpine under these rules, meets neither requirement.  The challenged components of the Required Deposit combine to impose margin charges on Alpine that are exponentially greater than the underlying transaction amount.  This is facially unreasonable for a number of reasons, including: (a) the sheer amount of the charge, (b) the lack of adequate justification to require margin that is so disproportionately high compared to the transaction, and (c) the chilling effect this has upon Alpine's ability to provide clearing services to its customers, including the number of transactions it can clear per day, and upon the OTC and microcap markets in general.

---

[9] 15 U.S.C. § 78q-1(b)(3)(D)

NSCC's calculation and imposition of the Required Deposit violates the Exchange Act in a number of ways. [10]  The CRRM and the charges at issue, and the rules on which they are based: (a) are arbitrary and unsupported by any adequate rationale; (b) result in charges that are onerous and facially unreasonable in relation to the value of the underlying transaction; and (c) impose an unnecessary discriminatory and anticompetitive burden by targeting smaller NSCC members in the OTC and microcap markets.[11]

By way of example, consider the following trades processed by Alpine for clearing through NSCC's CNS system for its client, Bezalel, on November 23, 2018 and November 26, 2018.[12]  The trade involved a contract to sell 198,000 total shares (99,000 on 11/23/2018 and 99,000 on 11/26/2018) of PMCB at a price of $0.020 for total proceeds of $4,016.64. To process this approximately $4,016.64

---

[10] Specifically, as detailed in Alpine's Rulemaking Petition, at pp. 18-25, the challenged components violate Section 17A, 15 U.S.C. § 78q-1(b)(3)(D), (F) and (I), *and* (b)(6); Section 19(f), 15 U.S.C. § 78s(f); *and* 17 C.F.R. § 17Ad-22(e)(1), (23) (requiring transparency); *id.* at (e)(4), (6) and (7) (requiring NSCC's margin systems and procedures be "reasonably designed," and produce margin levels "commensurate with" the risk).

[11] *In re Application of Sec. Indus. & Fin. Markets Ass'n for Review of Action by Self Regulatory Orgs.*, SEC Release No. 72182, 2014 WL 1998525, at *9 (May 16, 2014) (stating, "the applicant must assert a basis that, if established, would lead the Commission to conclude that the fees violate Exchange Act Section 19(f)," and holding that allegations that SRO fees were "onerous" and "supracompetitive" and violated the Exchange Act sufficient for Commission review).

[12] This trade is detailed in the Brant Decl., at ¶ 19.

trade for clearing through NSCC, however, ***Alpine was required to deposit $928,175.84,*** including a total illiquid charge of $903,756.60, total volatility charge of $23,222.40, and total Mark-to-Market charge of $1,196.84. These two trades resulted in an NSCC deposit trade proceeds multiple of 231.08 (that is, 231 times the value of the underlying trade). The OTC Volatility Chare and Illiquid Charge exceeded the value of the transaction by several multiples.

These charges are patently unreasonable and frankly absurd. Yet, Alpine now faces similarly egregious and disproportionate Required Deposit charges involving these component charges every single day, particularly when processing a sub-penny stock trade for clearance and settlement through NSCC's CNS system. Several additional examples of similar charges, as applied to recent trades, are set forth in the attached Declaration, including charges exceeding the underlying transaction value by over 200 times or 20,000%.[13]

Even under NSCC's methodology, Alpine could have reduced the impact by avoiding the Illiquid Charge on the BLPG trade and almost every other transaction, except that NSCC does not permit Alpine to avail itself of the DTC Offset. With respect to OTC securities that Alpine processes, Alpine requires that the security position be deposited, cleared and settled at DTC before entering liquidating trades

---

[13] *See* Brant Decl., at ¶ 19, 22, 38.

on a regular way basis.[14]  As a result, if the DTC Offset were available to Alpine, it would eliminate the Illiquid Charge completely on the sample transaction, and many, if not all, other transactions, because it would take Alpine below the minimum volume threshold.[15]  However, because NSCC has arbitrarily assigned Alpine the weakest CRRM Rating of a "7" – even though Alpine has not defaulted on any of its obligations to NSCC under current ownership and has no understanding of the basis for its rating, as discussed *infra* – Alpine is not able to utilize the DTC Offset.[16]

Second, promoting competition and capital formation are each central to the purpose of the Exchange Act.  As Congress noted in amending the Exchange Act in 1975, which added Sections 17A and 19 to the Exchange Act, "it is in the public interest to assure . . . fair competition among brokers and dealers, among markets and between exchange markets and over-the-counter markets."[17] The goal is not to hinder, but to "enhance competition" and to "allow economic forces, **interacting in a fair regulatory field**, to arrive at appropriate variations in practices and

---

[14] *See id.* at ¶¶ 13, 23.

[15] *See id.*

[16] *See id.* at ¶¶ 10, 16 (identifying Alpine's CRRM Rating from NSCC of a "7", and confirming that Alpine has not defaulted on its obligations to NSCC under current ownership – in place since at least 2011 when Alpine was purchased by current ownership); *see also* NSCC Rules and Procedures, Rule 1, at p. 10

[17] S. Rep. 94-75, at 8.

services."[18]  Following these directives, the Commission should set aside the challenged components of the Required Deposit as they have a blatantly anticompetitive effect as applied, and serve to limit, rather than promote capital formation.  Each component is designed to impose, and results in, additional charges and restrictions being applied to smaller, less capitalized members who provide clearing services in the OTC and microcap markets. This directly affects competition and capital formation of those member firms subject to the restrictions because they must use NSCC to provide clearing services, which gives those member firms who do not face these restrictions an unfair competitive advantage. As a direct result of these charges, as indicated, Alpine is able to process only a handful of trades at a time and its liquidation business is down 75%.[19]

Third, Section 17A(b)(3)(F) requires, *inter alia,* that the "rules of the clearing agencies are designed" to "protect investors and the public interest," and "are not designed to permit unfair discrimination in the protection of admission of participants or among participants in the use of the clearing agency . . . ."[20]  The challenged components disproportionately impact only those small members who

---

[18] *Id.* (emphasis added).

[19] *See* Brant Decl., at ¶¶ 33, 40.

[20] 15 U.S.C. § 78q-1(b)(3)(F).

focus on the OTC and microcap markets and those issuers and investors in that market segment.

Fourth, Section 17A(d) and Section 19(g) require NSCC to comply with the rules and regulations promulgated by the SEC.[21]  The challenged components violate several provisions of these standards.  For example, NSCC's CRRM rating system, which as indicated employs a secret formula to weigh a variety of undefined factors, clearly fails to comply with transparency requirements found in Subsection (e)(1).[22]

Finally, Section 19(g) requires every SRO to "comply with . . . its own rules . . . ."[23]  Alpine can find no support in NSCC's Rules or Procedure XV for its practice of imposing OTC Volatility Charges or OTC Mark to Market charges that equal or exceed the underlying transaction amount just because a microcap or OTC stock is involved.[24]

That Alpine is entitled to the relief sought is supported by the fact that the NSCC, in its filing before the SEC, failed to offer any rational basis or explanation for the heaps of charges that it is piling on Alpine. According to the NSCC, the

---

[21] *See* 15 U.S.C. § 78q-1(d) *and* 15 U.S.C. § 78s(g).

[22] *See* 17 C.F.R. § 240.17Ad-22(e)(1).

[23] 15 U.S.C. § 78s(g).

[24] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii), (b) and (c).

Illiquid Charge (*and* the Volatility Charge) are necessary to mitigate the following risk:  that Alpine could enter into certain sell transactions on behalf of a client, in relation to stock that it holds at DTC, and communicate that trade through CNS on day 1; that on day 2 some event could occur that would interrupt the operations of Alpine; that at the exact same time, something would occur that would prevent DTC from delivering the stock to NSCC on the pending trade; that NSCC, rather than taking appropriate steps to arrange to obtain the stock from DTC, would then go into the market to buy that same stock to cover the delivery obligation; *and* that the price of the stock in the meantime could have "skyrocketed" causing the NSCC to incur costs at exponential multiples of the transaction price.  NSCC Opposition to Alpine's Motion for an Interim Stay, attached as Exhibit D, at 7. The flaws in that rationale are abundant and apparent.

First, it should be noted that not even the NSCC actually asserts that it has ever or *would ever be unable* to access stock held at DTC.  Its Opposition speaks only in terms of a hypothetical possibility that, in the event of Alpine's default or insolvency, NSCC "could" or "may" be unable to access the stock.[25]  Such a speculative "may" or "might" possibility, put forth to justify a demand for Illiquid

---

[25] NSCC Opp. at 6 (stating that "liquidation could be difficult or delayed" and the share price "could skyrocket" in NSCC is forced to buy in positions"); NSCC Opp. at 15 ("in the event of an enforcement or insolvency proceeding against an NSCC member, NSCC may not be able to obtain access" to the stock at DTC); NSCC Opp. at 19 (NSCC "might be required" to pay more than transaction price).

Charge margin payments that alone frequently exceed $ 1 million per day, fails to satisfy the Exchange Act requirement that NSCC demonstrate that "the *specific grounds* on which [NSCC] based its action *exist in fact*."[26]

Second, NSCC has failed to offer any support for the notion that there is any statistically significant risk that it would not be able to access stock held at DTC to deliver to the buyer. Contrary to the NSCC's assertions, DTC's obligations to deliver securities it holds in a member's account to NSCC to close out a selling member's open position is not interrupted because of a member default or even a bankruptcy. NSCC has arrangements and contracts, including cross-guaranty and netting contracts, designed to "permit transactions to flow smoothly between DTC's system and the CNS system in a collateralized environment."[27] NSCC's

---

[26] *See, e.g.*, *In re MFS Sec. Corp.*, Exchange Act Release No. 47626, 2003 WL 1751581, at *4 (Apr. 3, 2003) (emphasis added) (stating that Section 19(f) requires the Commission to set aside an SRO's action unless the SRO proves, *inter alia,* that the "specific grounds on which the [SRO] based its action exist in fact"); *see also* 15 U.S.C. § 78s(f).

[27] National Securities Clearing Corporation, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures,* at p. 40 (December 2018) ("NSCC Disclosure Framework"); *see also* NSCC's Rules & Procedures, Rule 11, § 3 (stating, in connection with CNS operation for a selling (delivering) member, that NSCC "will instruct the Qualified Securities Depository [DTC] . . . to deliver to the Corporation's account at the Qualified Securities Depository on each Settlement Date CNS Securities"). Further, NSCC's rules confirm that once "securities are delivered" to NSCC pursuant to CNS transactions, NSCC has "all of [the] ownership rights" in the securities. NSCC Rules & Procedures, Rule 11, § 1(e).

rules confirm that, even where NSCC has "ceased to act" for a member, it can

"continue to instruct [DTC] . . . to deliver CNS Securities from such Member's

account at [DTC] to [NSCC's] account in respect to such Member's Short

Position."[28]  NSCC confirmed its ability to close contracts, regardless of

insolvency or default of a member, in its Disclosure Framework.[29]

The exceptions and safe harbors contained in FDICIA, the Bankruptcy

Code, SIPA, FDIA and Title II of Dodd-Frank that support the finality of securities

transactions and the closeout of the insolvent Member's open positions provide

---

[28]  NSCC's Rules & Procedures, Rule 18, § 5.

[29]  NSCC identified numerous exceptions and safe harbors in the FDICIA, Bankruptcy Code and SIPA that confirm that NSCC's netting and other agreements with DTC "shall not be stayed, avoided or otherwise limited by any state or federal law." NSCC Disclosure Framework, at 18 (also stating that Section 404(h) of the FDICIA confirms the enforceability of NSCC's contracts with DTC, "notwithstanding that a Member is a failed Member," and that "no stay, injunction, avoidance, moratorium or similar proceeding or order, whether issued or granted by a court, administrative agency, or otherwise, *shall limit or delay* application of otherwise enforceable netting contracts." (emphasis added)); *see also id.* at 19 *and* fns. 23 and 24 (describing exceptions and safe harbors in the Bankruptcy Code and SIPA that "support the finality of securities transactions processed through securities clearing agencies and the clearing agency's closeout of the insolvent member's open positions," including exceptions to the automatic stay, and for SIPC members in particular, that confirm the right "to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more of such contracts or agreements."). NSCC also confirmed in its Disclosure Framework that "protective decrees often recite many of the stay exceptions and safe harbors found in the Bankruptcy Code and SIPA and also contain additional stay exceptions and safe harbors not contained in the Bankruptcy Code and SIPA, including those designed *to enable clearing agencies to timely effectuate a closeout*." *Id.* at 19, fn. 24 (emphasis added).

NSCC with a high degree of certainty as to the effectiveness of its risk management and default management rules and procedures.[30]

Similarly, DTCC – which of course owns and controls both DTC and NSCC – is obligated to ensure the efficient and smooth workings of the markets and remains able to direct and to ensure appropriate and efficient cooperation as between its subsidiaries in the event of any default event.  And that appears to be exactly what has occurred in the past.  NSCC dealt with the collapse of Lehman Brothers, and that event further undermines the NSCC's assertions here.  NSCC experienced no inability to deliver stock held by DTC on pending contracts. DTCC in fact announced on October 30, 2008 that it had "successfully closed out over $500 billion in market participant's exposure including ensuring that $1.9 billion in securities held at DTC were "used to satisfy open trades at NSCC."  As a result of DTC's release of the securities, "NSCC did not need to go to the marketplace to purchase securities to complete those trades."[31]  In fact, in December of 2018, NSCC confirmed that "[t]o date, including through the 2008 well-publicized broker-dealer closeouts, NSCC has never invoked its membership

---

[30]  *Id.* at 20.

[31] BusinessWire Release, *DTCC Successfully Closes Out Lehman Brothers Bankruptcy*, dated October 30, 2008.

loss allocation procedures."[32]  The clear realities of the operational integration of DTC and NSCC ensure that NSCC will not be deprived of stock held by DTC that is subject to a locked-in pending trade.

In fact, NSCC has acknowledged that its risks arise where a defaulting firm has open positions that are net *buy* positions – not sell positions covered by stock held at DTC – and NSCC would be required to deliver payment to the seller. According to NSCC, it faces "liquidity needs" which "are driven by the requirement to complete ***end-of day money settlement***, on an ongoing basis, in the event of a failure of a Member."[33]  The risk management regime of NSCC, including the various margin charges, are designed and intended to provide "protection" against a buyer defaulting on its payment obligation.[34]  The exorbitant margin NSCC is charging Alpine on its sales-side transactions is plainly

---

[32]  NSCC Disclosure Framework, at 12.

[33]  *Id.* at 65 (emphasis added); *id.* at 66 (stating "long (receive) positions drive the potential liquidity risk that is posed to NSCC, since NSCC would be responsible for the payment of cash required to settle those purchases.").

[34]  *Id.* at 79 (stating "collection of risk based margin to NSCC's Clearing fund, maintenance of liquidity resources, and the on-going credit risk monitoring of members" are intended to provide "protection" to the delivering (selling) member against the buyer's default on its payment obligation).

unsupported by NSCC's avowed need to offset the risk that the *buying member will fail to deliver payment.*[35]

Third, the irrationality and redundancy of the Illiquid Charge is, to an extent, admitted by NSCC.  It states that the Volatility Charge is intended to capture the risk associated with price volatility to a 99% level of confidence.  (Opp. at 5 n.15.) But NSCC cites as the basis for the Illiquid Charge the exact same risk of *stock price volatility* – a risk plainly addressed by the Volatility Charge.  NSCC even admits it is in the process of eliminating the Illiquid Charge, in favor of the Volatility Charge, once it "tweaks" the calculation of that charge.[36]  Given its own admission that the two charges are duplicative, NSCC cannot claim any significant risk or hardship if the Illiquid Charge is stayed pending a resolution of Alpine's Petition.

---

[35] The absence of any real risk that NSCC can acquire shares from DTC to close out a *selling* member's open position is precisely why NSCC allows selling members to use the DTC Offset to avoid the Illiquid Charge in the first place. When the shares to cover the position are held at DTC, there is no risk that NSCC will have to go into the market to purchase the so-called "Illiquid Shares" in order to fulfill its CCP obligation to the contra-party. Its justification for allowing this Offset to large members but denying it to small members, such as Alpine, on transactions in the same securities based on a self-assigned "credit" rating is both discriminatory and specious.

[36]  Declaration of Timothy J. Cuddihy in Support of NSCC's Opposition to Aplpine's Motion for Stay ("Cuddihy Decl."), at ¶¶ 20-21, attached hereto as Exhibit G.

Once NSCC's risk-based justification for the Illiquid Charge is properly exposed as illusory, it is further evident that the imposition of this enormous charge, particularly in combination with the Volatility and other charges, is unsupported by any adequate justification and is contrary to the provisions of the Exchange Act.  The Illiquid Charge is itself baseless, and is being arbitrarily and discriminatorily applied to Alpine as a tax on OTC securities based, apparently, on a manual override of NSCC's model-generated CRRM rating.  Further, because the NSCC charges severely limit the number of transactions that Alpine can process per day for its customers, those charges impermissibly and unnecessarily burden competition between the national exchanges and the OTC market, and between Alpine and larger NSCC members who can avoid the charge altogether through the DTC Offset.

> **2.     NSCC Failed to Offer any Justification for its Refusal to Permit the DTC Offset Only Where NSCC Has Assigned a Particular Credit Rating**

NSCC is refusing to permit use of the DTC offset, and so imposing that Illiquid Charge on Alpine, based on its assignment of a particular credit rating to Alpine. That credit rating, according to the NSCC, is based on a host of factors that are input into a model which then generates the credit rating.  But, in Alpine's case, NSCC's Credit Risk Group did a "manual override of the model generated rating" to reduce it to its current rating, based on "subjective criteria." Cuddihy

Decl., at ¶19.  NSCC provided no evidence or adequate explanation of the supposed reasons that it "manually" reduced Alpine's rating – how did it weigh the various factors, were points given for good credit practices by Alpine, or did NSCC just manually rate Alpine based on its views concerning its microcap business?  Further, NSCC's claims regarding specific regulatory matters is plainly inconsistent with the reality: even during the past year, in June 2018, NSCC elevated Alpine's credit rating *and the Illiquid Charges were not imposed*.  The same circumstances cited by NSCC to explain the low credit rating still existed; there had been no material change.  But for one month, June 2018, the credit rating was raised.  The NSCC does not even attempt to explain that discrepancy or the arbitrariness of its actions.

At a more fundamental level, NSCC offers no rational explanation for its decision to refuse to permit the DTC offset to be applied to firms to which it has assigned a low credit rating.  It has put forth no basis on which to distinguish a credit rating of 6 from a credit rating of 7; in fact, it has applied both to Alpine during the past year.  It has failed to offer any support for the view that a credit rating of 6 somehow materially alters the risk posed by transactions in Illiquid Securities.  To the contrary, larger better capitalized firms may have substantially larger positions in illiquid stocks and so the risk posed by the need to cover a position with a "skyrocketing" stock price would be far greater.  NSCC's practices

with respect to formulation and application of the CRRM are thus also woefully

deficient.

> **3.    NSCC Has Failed to Offer Any Justification for the Completely Arbitrary Practice of "Rounding Up" Share Price**

When calculating the Illiquid Charge, NSCC "rounds up the price of the

security to $0.01."  According to the NSCC, there are sophisticated formulae used

to calculate the Illiquid Charge on a net sell position of a stock that has a market

price of less than $1.00.[37]  All of those calculations are abandoned, however, when

the stock price is less than $0.01.  For no articulated reason, *the NSCC substitutes*

*the minimum share price of $0.01.*

That substitution of a fictional share price is unexplained, unjustified and

enormously impactful.  The NSCC does not, and hopefully could not claim that its

system is incapable of running calculations at the actual share price, nor does it

argue that the alteration of the share price serves any particular risk management

purpose.  It simply arbitrarily and discriminatory penalizes a firm and its customers

in any transaction involving sale of a stock that is priced below $0.01,

exponentially increasing the margin charges on those positions. The resulting

charges thus do not conform to the Exchange Act's requirements of

---

[37] Under that formula, NSCC multiples the volume of shares by the greater of  the highest price over 20 trading days or a factor set by NSCC; where the market price is less than $0.10, that factor is 10.

reasonableness, prohibitions on discrimination, or mandate to preserve competition between firms and markets.

### C.   THE DAMAGE DONE TO ALPINE BY VIRTUE OF THE NSCC'S IRRATIONAL AND ARBITRARY FEES AND CHARGES

#### 1.   The Imposition of – and Increases In – NSCC Deposit and Charges Are Causing Irreparable Harm to Alpine

Alpine has already suffered significant damage from the NSCC's arbitrary imposition of its fees and deposits. Because of the enormous capital commitment required even for a single small trade, Alpine can only execute a limited number of transactions. During the last few months, Alpine has been operating at a loss and, unless Alpine can obtain some relief, matters will only become worse. As stated above, Alpine's liquidation business alone was down more than 75% due to the capital constraints necessary to fund the Required Deposit[38] – even before the NSCC's latest hike in Alpine's required minimum deposit. Alpine's Petition for Review demonstrated both the enormity of the margin charges and the devastating impact they are having on its business. The irreparable harm to Alpine from these charges is manifest, and frankly undisputed.

The effect, if not the purpose, of the actions of the NSCC would be to drive this firm, and others who engage in microcap transactions, out of business. And

---

[38] Brant Decl., at ¶¶ 33, 40.

that will have occurred as a result of NSCC actions that, particularly as applied in the aggregate, result in arbitrary, onerous and unreasonable charges that impermissibly limit Alpine's access to NSCC's services, unnecessarily stifle competition, and unfairly discriminate against small broker-dealers in the OTC or microcap market in violation of the Exchange Act.

## VI.  CONCLUSION AND RELIEF REQUESTED

Alpine requests an order directing the SEC to address Alpine's application and motion and, in the interim, a stay of the implementation and/or assessment by NSCC of the Illiquid Charge or, alternatively, an interim stay of NSCC's decision to make the DTC's Offset unavailable to Alpine in calculating the applicable volume limitations for the Illiquid Charge, until Alpine's Application for Review is considered and decided.

Dated:  October 23, 2019                    Respectfully,

s/ *Thomas Feher*
Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
(216) 566-5500
Tom.Feher@thompsonhine.com

## STATEMENT REGARDING ORAL ARGUMENT

Pending before this Court is a petition for writ of mandamus that presents the question whether the Securities and Exchange Commission has violated its legal duty to adjudicate the Application for Review of Adverse Action, and the Motion for an Interim Stay, filed by Petitioner in December 2018.   That issue, in turn, implicates the validity of deposit requirements and fees being imposed by the National Securities Clearing Corp. ("NSCC").

Petitioner respectfully submit that oral argument may aid the Court's resolution of this matter.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 32(g), the undersigned counsel for Petitioners certifies that this brief:

(i)      complies with the type-volume limitation of FRAP 32(a)(7)(B) because it contains 8116 words, including footnotes and excluding the parts of the brief exempted by FRAP 32(f) and Circuit Rule 32(e)(1); and

(ii)     complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated:  October 23, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October, 2019, I electronically filed

by fax a copy of the foregoing with the Office of the Secretary of the SEC and

counsel to NSCC, Gregg Mashberg, by email.  Notice of this filing will be sent via

email to all parties by operation of the Court's electronic filing system.  Parties

may access this filing system through the Court's CM-ECF system.

Dated:  October 23, 2019