19-1223

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**In Re ALPINE SECURITIES CORPORATION,**

**Petitioner.**

---

## EXHIBITS IN SUPPORT OF PETITION FOR
## WRIT OF MANDAMUS TO THE
## SECURITIES AND EXCHANGE COMMISSION

---

Tom Feher (D.C. Bar No. 985161)
Maranda E. Fritz (application to be filed)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291

*Counsel for Alpine Securities Corporation*

# INDEX OF EXHIBITS

:

| | |
|---|---|
| Exhibit A | Alpine's Application for Review of Adverse Action, including Rulemaking Petition |
| Exhibit B | Alpine's Motion for an Interim Stay and Incorporated Memorandum of Points and Authorities in Support |
| Exhibit C | Declaration of David Brant, dated December 19, 2018 |
| Exhibit D | NSCC's Opposition to Alpine's Motion for an Interim Stay and Incorporated Memorandum of Points and Authorities in Support |
| Exhibit E | Alpine's Reply Memorandum in Support of Its Motion for an Interim Stay |
| Exhibit F | Petitioner's Renewed Request for Issuance of a Briefing Schedule and Other Appropriate Commission Action |
| Exhibit G | Declaration of Timothy J. Cuddihy, dated January 23, 2019 |

# EXHIBIT A

Brent R. Baker
Aaron D. Lebenta
**CLYDE SNOW & SESSIONS**
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Phone: (801) 322-2516
Fax: (801) 521-6280
brb@clydesnow.com
adl@clydesnow.com
*Attorneys for Petitioner*

Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Phone: (212) 344-5680
Fax: (212) 344-6101
Maranda.Fritz@thompsonhine.com

## UNITED STATES OF AMERICA

### SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| In the Matter of the Application of<br><br>ALPINE SECURITIES CORPORATION, a<br>Utah limited liability company<br><br>For Review of Adverse Action Taken By<br><br>NATIONAL SECURITIES CLEARING<br>CORPORATION | **APPLICATION FOR REVIEW**<br><br><br><br>**Oral Argument Requested** |

To:    The Office of the Secretary
       Securities and Exchange Commission
       100 F Street NE
       Washington, DC 20549

**PLEASE TAKE NOTICE** that Alpine Securities Corporation ("**Alpine**") hereby applies for review, pursuant to Section 19(d) and (f) of Securities Exchange Act of 1934 (the "Exchange Act"), of certain "Required Deposit" charges imposed by the National Securities Clearing Corporation ("NSCC"), a registered clearing agency, which are onerous, discriminatory and otherwise inconsistent with the requirements of the Exchange Act, and which result in a denial or limitation of Alpine's access to services at NSCC, as set forth below.[1]

---

[1] These components include: (1) NSCC's imposition of "Illiquid Charges," including its decision to eliminate the Depository Trust Company ("DTC") inventory offset for members that NSCC claims have weak credit ratings; (2) NSCC's implementation of a secret "Credit Risk Matrix" or "CRRM Rating," which NSCC uses to determine whether to impose an Illiquid Charge, including whether the member qualifies for a DTC inventory offset; (3) NSCC's imposition of "Excess Net Capital Premium" ("ENCP"); (4) NSCC's calculation of the volatility charge for OTC and microcap stocks ("OTC Volatility Charge"), particularly as applied to sub-penny stocks; (5) OTC's calculation of mark-to-market charge for sub-penny microcap and OTC stocks ("OTC Mark-to-Market Charge"). These components are set forth in NSCC's Rules and Procedures, at Rules 1 (defining Illiquid Charge and CRRM).

## APPLICATION FOR REVIEW

Alpine is a small, registered self-clearing broker-dealer, engaged primarily in clearing microcap and over the counter ("OTC") stock transactions for other firms. Alpine is a member in good standing of NSCC. As a member, Alpine is entitled to access NSCC's central-counterparty clearing and settlement services, for which the NSCC requires Alpine to contribute to a Clearing Fund on an ongoing basis in the form of a "Required Deposit."[2]

The challenged components of the Required Deposit, particularly as applied in the aggregate, result in arbitrary, onerous and unreasonable charges that impermissibly limit Alpine's access to NSCC's services, unnecessarily stifle competition, and unfairly discriminate against small broker-dealers in the OTC or microcap market in violation of the Exchange Act. [3]

First, there is an "actual limitation of access" to "fundamentally important services offered by the SRO." [4] As detailed in the Declaration of David Brant, and Alpine's concurrently filed Petition for Rulemaking, Exs. A and B hereto, NSCC's calculation and application of the specified Required Deposit components to Alpine substantially limits Alpine's access to NSCC's essential clearing and settlement services.  Alpine primarily clears liquidation (or sale-side) microcap or OTC stock transactions, including, frequently, stocks with a price less than $.01/share.  To clear such trades, NSCC imposes the Required Deposit, including the challenged components, as "margin."[5]  These "margin" charges, taken individually or collectively, are astronomical, exceeding the market value of the underlying transaction by many times, and are particularly egregious when a sub-penny stock is involved.[6]  The challenged components of the Required Deposit are so onerous they often required Alpine to turn down transactions due to

---

and 4 (discussing Required Deposit), and Procedure XV, at §§ 1(A)(1)(a)(ii) (volatility/haircut), (b) *and* (c) (mark-to-market), (h) (Illiquid Charge), and 1(B)(2) (ENCP).

[2] NSCC Rules and Procedures, at Rule 2, §§ 1 and 2(i), Rule 4 and Procedure XV.

[3] In light of the two-page limitation on this Petition for Review in Rule of Practice 420(c), Alpine incorporates its Petition for Rulemaking herein by reference and attaches it as Ex. B, and requests an opportunity to provide further briefing and evidence, as well as oral argument, to aid the Commission in its consideration of these issues.

[4] *See In re Application of Securities Industry and Financial Markets Association  for Review of Action by Self Regulatory Organizations ("In re SIFMA"),* SEC Release No. 72182, 2014 WL 1998525, at *8-9 (May 16, 2014).

[5] NSCC Rules & Procedures at Rule 2A, § 1(F), Rule 4, §§ 1, 8.

[6] *See* Brant Decl., ¶¶ 19, 22, and 38 for examples of charges and Rulemaking Petition, at pp. 8-25, for full discussion of the challenged components and their impacts on Alpine.

1

regulatory capital constraints,[7] even though Alpine's runs its operations in a manner that should allow it to avoid at least the Illiquid Charge.[8]  As a direct result of these charges, Alpine's liquidation business is down approximately 75%. *See* Brant Decl., at ¶¶ 33, 40.

Second, NSCC's calculation and imposition of the Required Deposit violates the Exchange Act in a number of ways, discussed at length at pages 19-28 of Alpine's attached Rulemaking Petition.[9]  In summary, the CRRM and the charges at issue, and the rules on which they are based: (a) are arbitrary and unsupported by any adequate rationale; (b) result in charges that are onerous and facially unreasonable in relation to the value of the underlying transaction; and (c) impose an unnecessary discriminatory and anticompetitive burden by targeting smaller NSCC members in the OTC and microcap markets.[10]

Alpine is adversely impacted by the rules, and the charges imposed by application of the rules, on a continuous and ongoing basis, and is seeking review and prospective relief within 30 days of receiving the NSCC's Notices of Daily Margin Statement for transactions at issue.[11]

---

[7] Brant Dec., at ¶¶ 31-37 and Alpine's Rulemaking Petition for detailed discussion of the damage from the charges.

[8] As discussed in Alpine's Rulemaking Petition, at pp. 11-12, NSCC imposes the Illiquid Charge on transactions involving OTC or microcap stocks that exceed volume thresholds based on a firm's CRRM rating, which NSCC sets from an undisclosed formula. In determining whether the volume threshold is met, NSCC generally offsets the quantity of shares in the member's sell position against the number of those shares held by the member at DTC (the DTC offset); if the DTC offset places the member below the applicable volume threshold, no Illiquid Charge will be assessed.  Alpine almost always has sufficient shares at DTC to avoid the Illiquid Charge completely.  Brant Decl., at ¶ 13. However, without providing any rationale, NSCC has determined to make the DTC offset unavailable to members with the weakest CRRM rating, such as Alpine.

[9] Specifically, as detailed in Alpine's Rulemaking Petition, at 19-28, the challenged components violate Section 17A, 15 U.S.C. § 78q-1(b)(3)(D), (F) and (I), *and* (b)(6); Section 19(f), 15 U.S.C. § 78s(f); 17 C.F.R. § 17Ad-22(e)(1), (23) (requiring transparency); *id.* at (e)(4), (6) and (7) (requiring NSCC's margin systems and procedures be "reasonably designed," and produce margin levels "commensurate with" the risk), and the APA, 5 U.S.C. 552.

[10] *In re SIFMA,* at *9 (stating, "the applicant must assert a basis that, if established, would lead the Commission to conclude that the fees violate Exchange Act Section 19(f)," and holding that allegations that SRO fees were "onerous" and "supracompetitive" and violated the Exchange Act sufficient for Commission review).

[11] Brant Decl., at ¶¶ 19, 22, 38 (describing recent charges).  *See* 15 U.S.C. § 78s(d)(2) (requiring a petition for review to be filed "within thirty days *after the date such notice was filed* [by the NSCC] with such appropriate regulatory agency and received by such aggrieved person . . . ." (emphasis added)); 17 C.F.R. § 201.420(b) (same). Additionally, it is well-established that statutory timelines "do not foreclose subsequent examination of a rule" brought for review of "further . . . action applying it," because rules "are capable of continuing application." *N.L.R.B. Union v. F.L.R.A.,*, 834 F.3d 191, 196 (D.C. Cir. 1987) (citation omitted); *see also Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145–46 (D.C. Cir. 2014) (same).  Further, even assuming *arguendo* that the original 30-day period to seek review ran from the date of entry of the Orders approving the NSCC rules at issue, extraordinary circumstances exist under Rule 420 of the Commission's rules of practice to extent this period because this Petition involves novel legal factual and legal issues, and because Alpine could not discern the impact of the rules, and whether they would result in a denial or limitation of Alpine's access to NSCC's services, until after NSCC's imposition of the components at issue caused the actual limitation of access that spurred this Petition.

2

DATED this 19th day of December, 2018.

**CLYDE SNOW & SESSIONS**

Brent R. Baker
Aaron D. Lebenta

**THOMPSON HINE**

Maranda E. Fritz

*Counsel for Petitioner*

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of December, 2018, I caused the foregoing to be served by U.S. Mail Certified, Return Receipt Requested, on the following:

The Office of the Secretary
Attn: Brent J. Fields, Director
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

Office of Deputy General Counsel
Attn: Nikki Poulos
National Securities Clearing Corporation
55 Water Street
New York, NY 10041

Brent R. Baker
*Counsel for Alpine Securities Corporation*

{01446595-2 }



RODNEY G. SNOW
STEVEN E. CLYDE
EDWIN C. BARNES
NEIL A. KAPLAN◇
D. BRENT ROSE
J. SCOTT HUNTER
PERRIN R. LOVE
DEAN C. ANDREASEN
ANNELI R. SMITH
WALTER A. ROMNEY, JR.
MATTHEW A. STEWARD
T. MICKELL JIMENEZ
CHRISTOPHER B. SNOW◇
BRENT R. BAKER☆
AARON D. LEBENTA
WAYNE Z. BENNETT
BRIAN A. LEBRECHT☆
ROBERT D. ANDREASEN
TIMOTHY R. PACK
JAMES W. ANDERSON
DIANA L. TELFER
SHANNON K. ZOLLINGER
LISA A. MARCY♯
JONATHAN D. BLETZACKER

JONATHAN S. CLYDE♯
VICTORIA B. FINLINSON
EMILY E. LEWIS☆
PARKER B. MORRILL=◇
SHAUNDA L. MCNEILL
LAURA D. JOHNSON
TRENTON L. LOWE
KATHERINE E. PEPIN
JOSEPH D. WATKINS

OF COUNSEL:
CLARK W. SESSIONS‡
REAGAN L.B. DESMOND=¤
KEITH M. WOODWELL

EDWARD W. CLYDE (1917–1991)

‡ SENIOR COUNSEL
¤ ALSO ADMITTED IN CALIFORNIA
◇ ALSO ADMITTED IN DISTRICT OF COLUMBIA
☆ ALSO ADMITTED IN NEW YORK
= ALSO ADMITTED IN OREGON
♯ ALSO ADMITTED IN WYOMING

ONE UTAH CENTER • THIRTEENTH FLOOR
201 SOUTH MAIN STREET, SUITE 1300
SALT LAKE CITY, UTAH 84111-2216
TEL 801.322.2516 • FAX 801.521.6280
www.clydesnow.com

*Via U.S. Mail Certified – Return Receipt Requested*

December 19, 2018

The Office of the Secretary
Attn: Brent J. Fields, Director
U.S. Securities and Exchange Commission
100 F. Street NE
Washington, D.C. 20549

**Re: Rulemaking Petition Regarding N.S.C.C.**

Dear Mr. Fields:

Pursuant to 5 U.S.C. § 553(e), Rule 192(a) of the SEC's Rules of Practice and Sections 17A(d) and 23(a) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. §§ 78q-1(d) and 78w(a), respectively, Petitioner Alpine Securities Corporation ("Alpine"), through undersigned counsel, submits the following Rulemaking Petition with respect to certain actions, practices and rules of the National Securities Clearing Corporation ("NSCC"). Those NSCC actions result in the imposition of excessive, onerous and discriminatory fees and charges in the use of NSCC's clearing services, effectively deny and limit access to Alpine and others, and contravene the requirements of the Exchange Act and the rules and regulations thereunder.

The specific NSCC actions, practices and rules at issue in this Petition include: (1) NSCC's imposition and calculation of "Illiquid Charges," including the decision to eliminate the Depository Trust Company ("DTC") inventory offset for members that NSCC determines have weak credit ratings; (2) NSCC's development and implementation of secret "Credit Risk Matrix" formula or "CRRM Rating," which NSCC uses to determine, *inter alia,* whether to impose an Illiquid Charge on a member for a particular transaction, including whether the member qualifies for a DTC inventory offset; (3) NSCC's imposition of "Excess Net Capital Premium" or "ENCP" Charges; (4) NSCC's calculation and imposition of the discretionary volatility charge for over the counter ("OTC") and microcap stocks (the "OTC Volatility Charge"), particularly as applied to sub-penny stock transactions; (5) OTC's implementation and calculation of the mark-to-market charge, (the "OTC Mark-to-Market Charge"), with respect to sub-penny stock transactions.

{01445906-2 }

As described below, these rules, practices and actions, particularly when considered in combination, have a discriminatory, inequitable and anticompetitive impact on a specific segment of the market – the OTC and microcap markets – and on a specific type of NSCC participant – small broker-dealers, such as Alpine.  Those discriminatory fees and charges have been imposed without any factual or analytical support for the view that they are reasonable, rational and appropriate.  In this Rulemaking Petition, Alpine respectfully requests the SEC exercise its essential oversight function with respect to NSCC and consider rulemaking designed to ameliorate or eliminate the deleterious and unlawful effects of these NSCC's rules and practices, including by enacting rules that repeal the NSCC rules at issue and/or prevent NSCC from imposing these charges or utilizing the CRRM rating, as presently constituted.

## I.      Background

### *NSCC*

Congress directed the SEC to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions when it added Section 17A to the Exchange Act as part of the Securities Act Amendments of 1975.[1]  "The Commission's ability to achieve this goal and its supervision of securities clearance and settlement systems is based upon the regulation of registered clearing agencies."[2]

NSCC is a securities clearing agency registered with the Securities Exchange Commission under Section 17A(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q-(b). NSCC is a wholly owned subsidiary of the Depository Trust Clearing Corporation ("DTCC"), which also owns, *inter alia,* the Depository Trust Company ("DTC").[3]

NSCC provides centralized clearance and settlement services for its members,[4] and clears and settles nearly all broker-to-broker trades of equity securities in the United States.[5]  The

---

[1]  *See* 15 U.S.C. § 78q-1 and S. Rep. 94-75, 1975 U.S.C.C.A.N 179, at p. 4.

[2]  *See* Clearing Agency Standards, SEC Release No. 34-68080, at 4 (October 22, 2012).

[3] The DTC is the central securities depository in the United States for equity securities. *See* Virginia B. Morris and Stuart Z. Goldstein, Guide to Clearance & Settlement: An Introduction to DTCC, p. 23 ("DTC, as a central securities depository, holds custody of 85% to 90% of all securities in the United States and services those assets for financial firms on behalf of investors.").

[4]  Clearing and settlement is "a process, which, at the end of the day, ensures that sellers are paid for the securities they sold, and buyers receive the securities they bought." The Depository Trust & Clearing Corporation, Following a Trade: A Guide to DTCC's Pivotal Roles in How Securities Change Hands, p. 1. "In the clearance process, the clearing agency compares trades submitted by its broker-dealer 'members' or 'participants.' The clearing agency matches the submitted trades, and verifies that they will 'clear,' that is, the trades submitted by each side are consistent." "101 Key Terms You Need to Know About DTCC and Financial Market Infrastructures," The Depository Trust & Clearing Corporation, p. 3. In the process of "settlement," the seller delivers shares and receives payment, while the buyer sends payment and receives shares.  *Id.* at p. 11.

[5]  *See Pet Quarters, Inc. v. Depository Trust and Clearing Corp.,* 559 F.3d 772, 776-77 (8th Cir. 2009) (stating that "NSCC provides centralized clearance, settlement and information services for virtually all securities transactions in the United States.").

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page | **3**

NSCC interposes itself as central counterparty to each trade and guarantees both ends of the settlement of a trade – *i.e.*, the delivery obligations of every seller, and the payment obligations of every buyer – in the event of a default of one of the original buyers or sellers.[6] The clearing systems requires integration between NSCC and DTC, such that NSCC's clearing firm members are DTC participants that hold securities in depository accounts at the DTC.[7] The actual settlement of trades takes place in the NSCC's Continuous Net Settlement ("CNS") System – an accounting and settling system for broker-dealer who are members of NSCC ("Clearing Members").[8]

DTCC's board is comprised of representatives affiliated with large banking and brokerage firms. For example, the Non-Executive Chairman and Chairman of the Board Executive Committee of DTCC spent nearly 16 years at Citi.[9] Other board members include representatives from UBS, Morgan Stanley, Bank of America, JPMorgan Chase Bank, and TD Ameritrade.[10] There is not a single representative from a small brokerage firm. Without question, such representative interests factor into the types of policy choices and rules passed by the NSCC.

### *Alpine*

Alpine is a small, self-clearing broker-dealer, registered with the SEC. Alpine's business primarily involves clearing and settlement services for microcap and over-the-counter ("OTC")

---

[6] CNS Settlement as Delivery Versus Payment in DTC (CNS for Value), NSCC and DTC White Paper, September 2011.

[7] Because securities are held in street name and ownership records are held in electronic form, delivery in the settlement of a trade takes the form of a book entry movement of securities entitlements from one DTC participant's account to another. Delivery is precipitated when the DTC receives delivery instructions from NSCC, which is authorized to give such instructions for the delivering account. As NSCC is the central counterparty, shares are delivered from a DTC participant's account to NSCC's account or from NSCC's account to a DTC participant's account. The Depository Trust & Clearing Corporation, *Following a Trade: A Guide to DTCC's Pivotal Roles in How Securities Change Hands*, p. 4.

[8] When trades are processed through CNS, all the trades on a given security that are cleared through a particular Clearing Member and are due to settle on a given trade are batched together. That is, all buys and sells for the day are netted out against each other, resulting in a single settlement obligation per security for each Clearing Member. On any one day, the Clearing Member will either have a single obligation to deliver shares to, or a right to receive shares from, the NSCC. NSCC, Rules and Procedures, Rule 11. Because the delivery and receipt of shares is done on a net basis, no Clearing Member directly owes shares to any other Clearing Member. Rather the Clearing Members have a net delivery obligation to, or net receipt from, the NSCC as the central counterparty. If members do not deliver securities to NSCC on a trade's settlement date, unsettled, or "open," positions result: the buyer has an unsettled long ("fail to receive") position, and the seller has an unsettled short ("fail to deliver") position. Such open positions are "marked-to-market" daily, *i.e.*, NSCC credits or debits the money activity accounts it maintains for each participating member to reflect changes in the market price of the particular security until a trade is settled.

[9] *See* http://www.dtcc.com/about/leadership/board (listing biographies of board members).

[10] *Id.*

stock transactions for other brokerage firms.[11]  Brokers who are not members of the registered clearing agency need the services of a clearing broker in order to clear and settle their own trades or the trades of their customers.[12]  A clearing broker provides clearing and settlement services for its correspondent clients ("correspondents" or "clients"), who are generally broker-dealers, and its clients' non-broker-dealer customers ("customers"), who are the beneficial buyers and sellers of a security.

To provide clearing and settlement services and function as a clearing firm for its correspondent firms, Alpine must be a member of NSCC and have access its services.[13] Alpine is a clearing broker member in good standing of the NSCC and a DTC participant.[14]

### *Overview of SEC Oversight Authority and Responsibility Over NSCC*

"The SEC is charged with supervising the exercise of th[e] self-regulatory power [by NSCC and other SROs] in order to assure that it is used effectively to fulfill the responsibilities assigned to the self-regulatory agencies, and that it is not used in a manner inimical to the public interest or unfair to private interests," and to "assur[e] that the self-regulatory organizations follow effective and fair procedures, that their activities are not anticompetitive and that the Commission's oversight powers are ample and its responsibility to correct self-regulatory lapses is unmistakable."[15]

The regulation of clearing agencies begins with Section 17A(b) of the Exchange Act and Exchange Act Rule 17Ab2-1, which require entities to register with the SEC prior to performing the functions of a clearing agency.[16]  The SEC is not permitted to grant registration unless it

---

[11]  *See* Declaration of David Brant, at ¶ 3 ("Brant Decl."), attached hereto as Ex. A.  The designation "OTC stocks" generally refers to securities that do not meet the requirements for trading on a registered national exchange, such as the NASDAQ, or are OTC Bulletin Board or OTC link issues.

[12]  "Most broker-dealers are not members of a clearing corporation or a depository. Only clearing firms, who can meet the membership requirements of substantial assets, liquidity, and capital, are permitted to be clearing agency participants. These clearing firms also must maintain a large back office of expert employees and state of the art information facilities, since most communications between a participant and a clearing agency are by electronic communication. In addition, substantial banking relationships are required for regular movement of money. Because of these infrastructure and capital requirements, the number of clearing agency participants is limited. Broker-dealers who are not clearing agency participants require access through a clearing firm." Paul B. Uhlenhop and Michael Wise (2014), Clearing Arrangements for Introducing Broker-Dealers, Practising Law Institute, Second edition, p. 25-7.

[13]  Brant Decl., at ¶ 6.

[14]  *Id.*

[15]  S. Rep. No. 94-75, at p. 23.

[16]  *See* 15 U.S.C. § 78q-1(b) and 17 C.F.R. § 240.17Ab2-1.

determines that the rules and operations of the clearing agency meet the standards set forth in Section 17A.[17]

Following registration, the SEC has continued responsibility to oversee the clearing agency to ensure and facilitate compliance with the Exchange Act.[18]  For example, Section 17A(d) gives the SEC authority to adopt rules for clearing agencies as necessary and appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Exchange Act, and prohibits a registered clearing agency from engaging in in any activity in contravention of these rules and regulations.[19]  Registered clearing agencies, as self-regulatory agencies, are also subject to the provisions of Section 19 of the Exchange Act.[20] Pursuant to Section 19(g), registered clearing agencies must comply with the Exchange Act, the rules and regulations thereunder and the clearing agency's own rules.[21]  Additionally, SRO rule changes, including those implemented by the NSCC, require SEC approval, contingent on its finding that any proposed rule change is consistent with the requirements of the Exchange Act before approving any such rule changes.[22]  As part of its supervisory authority, the SEC also has the authority to abrogate, amend or delete an existing rule of an SRO, including the rules of the NSCC, as a registered clearing agency.[23]

---

[17]  *See* Section 17A(b)(3), 15 U.S.C. § 78q-1(b)(3).  These standards are discussed in detail, below.

[18]  *See* SEC Release No. 34-68080 (Clearing Agency Standards) (October 22, 2012), at 4; *see also* S. Rep. No. 94-75, at p. 23.

[19]  *See* 15 U.S.C. § 78q-1(d); *see also* S. Rep. 94-75 (indicating Section 17A(d) "would empower the Commission to review the rules of such clearing agencies . . . and to adopt all necessary or appropriate rules for their regulation."); *see also* SEC Release No. 34-68080, at 4-5 (describing SEC's authority).

[20]  15 U.S.C. §78s.  A registered clearing agency, such as NSCC, is defined as a self-regulatory organization under the Exchange Act and is thus subject to Section 19. 15 U.S.C. § 78c(a)(26) ("The term 'self-regulatory organization' means any national securities exchange, registered securities association, or registered clearing agency...").

[21]  15 U.S.C. § 78s(g)(1).

[22]  15 U.S.C. § 78s(b).

[23]  *See* 15 U.S.C. § 78q-1(d) (*supra*); *see also* 15 U.S.C. § 78w(a)(empowering Commission to "make such rules and regulations as may be necessary or appropriate to implement the provisions of this chapter for which [it] is responsible or for the execution of the functions vested in [it] by this chapter . . . .");  15 U.S.C. § 78s(c)(4) ("Nothing in this subsection shall be construed to impair or limit the Commission's power to make, or to modify or alter the procedures the Commission may follow in making, rules and regulations pursuant to any other authority under this chapter."); *see also* S. Rep. No. 94-75, at 127 (stating, "nothing in the bill would interfere with the use of any authority the Commission may have under the Exchange Act or any other law to make rules concerning clearing agencies and transfer agents and to enforce compliance with such rules and the provisions of the Exchange Act by such clearing agencies and transfer agents."); *see also id.* at 31-32 ("In order to avoid any doubt as to the SEC's authority in areas where its direct authority overlaps its indirect authority, Section 19(c)(4) would make clear that where the Commission has direct authority, it would not be required to proceed under Section 19(c) or to follow procedures specified in that section. In such cases, the SEC could rely on its direct authority and follow the usual Administrative Procedure Act requirements for notice and comment rule-making."). Congress continued:

Where the SEC has direct authority with respect to a specific subject matter and a self-regulatory organization also exercises authority in the area, the SEC may change regulatory policy in any one of three ways: (1) by promulgating its own substantive rule preempting self-regulatory rules on the subject . . . ; (2) by promulgating a rule under its grant of substantive authority which imposes conditions on the exercise of

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page| **6**

Finally, the SEC has the authority to review any action by a registered clearing agency that, *inter alia,* denies membership or participation to any applicant, or prohibits or limits any person's access to services offered by the registered clearing agency, and must set aside any such action unless it finds that the action and any SRO rule was, *inter alia,* consistent with the purposes of the Exchange Act and that it does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.[24]  The SEC is also empowered to suspend or revoke registration, impose limitations upon a clearing agencies activities, functions or operations, or impose other sanctions, if the SEC finds that the registered clearing agency has violated or is unable to comply with any provision of the Exchange Act.[25]

## II.   NSCC's Rules and Determinations Regarding Certain Required Deposit Contributions to NSCC's Clearing Fund Are Unreasonable, Not Supported by Substantial Evidence, and Inconsistent with the Exchange Act and Rules Thereunder

### A.   Discussion of the Required Deposit Contribution to the Clearing Fund

#### 1.   *Overview of the Required Deposit and its Effects*

As an ongoing condition to membership, and thus access to NSCC's clearance, settlement and other essential services, NSCC requires members to contribute to a "Clearing Fund," by making "Required Deposits."[26]  In discussing the Required Deposit in a recent publication, NSCC claims it "determin[es] the appropriate Required Deposits to the Clearing Fund and monitor[s] its sufficiency" in order to "manage[] its credit exposure to Members.[27]  NSCC continued:

> The Required Deposit serves as each Member's margin.  The objective of a Member's Required Deposit is to mitigate potential losses to NSCC associated with liquidation of such Member's portfolio in the event that NSCC ceases to act for such Member (hereinafter referred to as a "default").  The aggregate of all Members' Required Deposits constitutes the Clearing Fund of NSCC, which it would access should a defaulting

---

self-regulatory jurisdiction in the area or the utilization of self-regulatory facilities . . . ; or (3) by utilizing section 19(c) to force the self-regulatory organization to change its rules. The bill would not alter the SEC's ability to proceed in these ways.

S. Rep. 94-75, at 131.

[24]  15 U.S.C. § 78s(d), (f).

[25]  *See* 15 U.S.C § 78s(h); 15 U.S.C. § 78u; S. Rep. 94-75 at 34-35 (generally discussing such authority); SEC Release No. 34-68080, at 5 (describing such authority).

[26]  NSCC Rules and Procedures, Rule 2, § 1, Rule 2A, § 1(F), Rule 2B, § 1, Rule 4, § 1.

[27]  *See* SEC Release No. 34-82631, File No. SR-NSCC-2017-808, at 5 (February 5, 2018).

Member's own Required Deposit be insufficient to satisfy losses to NSCC caused by the liquidation of that Member's portfolio.[28]

NSCC admits in its Rules, however, that it also uses the deposits to the Clearing Fund as one of its "two principal sources of liquidity" to "enable it to effect the settlement of its payment obligations as a central counterparty," as well as for "investment purposes."[29]

According to NSCC's Rules and Procedures, the minimum Required Deposit to the Clearing Fund is $10,000. In practice, however, members are required to deposit far more than the minimum amount. The actual amount of each member's Required Deposit is calculated by NSCC according to a complex and inscrutable formula, consisting of multiple discretionary and subjective components – which seemingly increase in number on a yearly basis – set forth in Procedure XV of NSCC's Rules.[30]

As set forth herein, an examination of certain components of the Required Deposit, and the manner in which they are actually calculated and applied by NSCC, demonstrates that they result in onerous, inequitable and arbitrary charges that *so far exceed the amount of the underlying transactions* to be cleared and settled that they cannot be credibly justified as necessary to protect NSCC from credit risk. Indeed, as demonstrated below, the amount of each one of the Illiquid Charge, OTC Volatility Charge or OTC Mark-to-Market Charge individually is frequently in excess of the amount of the underlying transaction by several factors; when assessed together, as they almost always are, Alpine is often required post margin amounts that substantially exceed the underlying transaction value, sometimes by hundreds of times.

These charges, as both designed and applied to microcap or OTC Stocks, impermissibly limit Alpine's access to NSCC's essential clearing and settlement services, and contravene the purposes and requirements of the Exchange Act. They impose an unreasonable and disproportionate burden on small clearing-broker members, such as Alpine, and reflect a discriminatory and anticompetitive policy towards a specific segment of the market – the microcap or OTC market – for which Alpine provides clearing services.

As a direct result of NSCC's Required Deposit charges, Alpine is suffering ongoing harm to its business; Alpine's liquidation business alone is down approximately 75% due to the capital constraints necessary to fund the Required Deposit.[31] Further, the number of independent or small clearing broker members of NSCC providing clearing services for firms and investors holding microcap or OTC stocks overall is also down significantly. Alpine is aware of only a

---

[28] *Id.* (footnotes omitted).

[29] *See* NSCC Rules and Procedures, at Rule 4, § 2, and Rule 4A, § 1. NSCC's other primary source of liquidity is a "committed line of credit." *Id.* at Rule 4A, § 1.

[30] *See* NSCC Rules and Procedures, at Rule 4 and Procedure XV.

[31] Brant Decl., at ¶¶ 33, 40.

handful of firms that currently provide clearing services for these types of stocks.[32] Commission intervention is necessary to prevent NSCC – which is helmed by a "Who's Who" in major financial institutions – from destroying its small broker-dealer constituents and choking off a significant, lawful segment of the market through the imposition of onerous and unjust factors to calculate and impose the Required Deposit charges.

## 2.  *Discussion of Specific Components of the Required Deposit*

The formula used to calculate the Required Deposit, set forth in Procedure XV, is itself long (spanning 16 pages), complex and confusing, incorporating numerous discretionary and interwoven components and fact-specific variables.  For example, for CNS Transactions alone, NSCC calculates and cumulatively imposes (or has discretion to impose) many separate charges based on a variety of components:

> 1. Volatility Component:  NSCC calculates and imposes a "volatility" charge purportedly "designed to measure market price volatility" and to "capture market price risk associated with each Member's portfolio at a 99th percentile level of confidence."[33] The standard volatility formula is complex, to say the least, but essentially imposes a "Value at Risk" charge that is based on the highest of a "core parametric estimation," a "gap risk measure," and "the portfolio margin floor." [34]  NSCC has discretion to impose a different volatility charge for microcap stocks (below $5/share) or OTC or pink sheet issues ("OTC Volatility Charge") consisting of  a multiple of  "the absolute value of such positions [and] a percentage designated by [NSCC], which percentage shall not be less than 10% . . . ."[35]

-plus-

> 2. Mark-To-Market Component: NSCC calculates and imposes a mark-to-market charge generally based on the net of each day's difference between the contract price of the net positions and the current market price for such positions.[36]  Thus, this component could result in either a debit or a credit, if applied as written, based upon the direction in which the current market price fluctuates.

-plus-

---

[32]  *Id.*, at ¶¶ 34-35.

[33]  *See* SEC Release No. 34-82631, File No. SR-NSCC-2017-808, at 6.  The volatility charge formula is set forth at Procedure XV, § 1(A)(1)(a)(i), page 287-290 of the NSCC Rules and Procedures.

[34]  *See* SEC Release No. 34-82631, File No. SR-NSCC-2017-808, at 2 (summarizing charges and components).

[35]  *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii), at p. 288.  NSCC purports to justify the different discretionary charge based on positions in these stocks on the basis that they are "less amenable to statistical analysis." *Id.* NSCC also sometimes refers to this OTC Volatility Charge as a "haircut margin charge." *See* NSCC's Form 19b-4, SR-NSCC-2017-001 (March 22, 2017) (Illiquid Charge), at 4, n. 3, and 5.

[36]  *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(b) and (c), at p. 290.

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page | **9**

3. <u>Discretionary Volatility Component</u>:  NSCC may also impose a "special charge" upon "Members in view of price fluctuations in or volatility or lack of liquidity of any security."  No formula is identified for calculating this charge.  Rather, NSCC states that it "shall make any such determination based on such factors as the Corporation determines to be appropriate from time to time."[37]

-plus-

4. <u>CNS Fail Position Component</u>:  NSCC calculates and imposes a charge for a Member's "aggregate CNS Fails Positions" by multiplying the current market value for such positions by (i) 5% for Members rated 1 through 4 on NSCC's Credit Risk Rating Matrix ("CRRM"); (ii) 10% for Members rated 5 or 6 on the CRRM; or (iii) 20% for Members rated 7 on the CRRM.  NSCC has assigned Alpine a CRRM Rating of 7.[38]

-plus-

5. <u>Margin Requirement Differential Component</u>:  NSCC calculates and imposes a "margin requirement differential component charge" by taking the "sum of the exponentially weighted moving average ('EWMA') of the daily positive changes over a 100-day lookback period in the Member's (i) Regular Mark-to-Market component, (ii) ID Net Mark-to-Market component and (iii) volatility components, times a multiplier calibrated based on backtesting results."[39]

-plus-

6. <u>Coverage Component</u>:  NSCC calculates and imposes a "coverage component charge" calculated as the EWMA of the Member's daily backtesting coverage deficiency amount over a 100 day lookback period."  The Member's "backtesting deficiency amount" for each day is the "difference between the simulated profit and loss on the Member's portfolio and the sum of the Member's (i) volatility component, (ii) margin requirement differential component and (iii) Illiquid Charge."[40]

-plus-

7. <u>Illiquid Charge Component</u>:  NSCC calculates and imposes a charge on "Illiquid Positions."  An "Illiquid Position" means "a Net Unsettled Position in an Illiquid Security that exceeds applicable volume thresholds. For net buy positions in an Illiquid Security, the volume thresholds shall be no greater than 100 million shares based on the Member's

---

[37] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(d), at p. 290.

[38] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(e), at p. 290.  The CRRM component is discussed below.

[39] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(f), at p. 290-91.

[40] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(g), at p. 291.

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 18 of 169 PageID 2986
USCA Case #19-1223      Document #1812264      Filed: 10/23/2019      Page 18 of 169

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page| **10**

rating on the Credit Risk Rating Matrix. For net sell positions in an Illiquid Security, the volume threshold shall be no greater than 1 million shares on an absolute value basis, and based on both the Member's excess net capital and the Member's rating on the Credit Risk Rating Matrix."  Additionally, "[i]n determining if the volume threshold is met with respect to a net sell position in Illiquid Securities, [NSCC] shall apply an offset against shares of Illiquid Securities in the Member's inventory at DTC to the quantity of shares in a Member's Illiquid Position. Such offset shall <u>not</u> be applied to (1) net buy positions in Illiquid Securities, or (2) <u>Members that have the weakest rating on the Credit Risk Rating Matrix.</u>"[41] The conditional offset is known as the "DTC Offset."

An "Illiquid Security" is defined as "a security . . . that either (i) is not traded on or subject to the rules of a national securities exchange registered under the Securities Exchange Act of 1934, as amended; or (ii) is an OTC Bulletin Board or OTC Link issue."[42]

Different calculations apply depending on whether the "Illiquid Position" is net "buy" or "sell" position.  For "buy positions in sub-penny Illiquid Securities," the Illiquid Charge is "the aggregate shares in such positions multiplied by $.01."  For "sell positions," if the current market price is "equal to or below $1.00," the Illiquid Charge is "the product of the aggregate quantity of Illiquid Securities in the position and either (i) the One Month High Price, or (ii) the Current Market Price of the Illiquid Securities in the position multiplied by a factor of between 2 and 10,[43] based on the minimum share price, which shall not be less than $0.01."[44]  Thus, for net-sell positions in sub-penny securities, NSCC imposes a price of $.01 to calculate the Illiquid Charge, regardless of the actual price of the stock.  NSCC will use the *lesser* of the "One Month High Price" and "Current Market Price" if the share quantity in the position is less than 100% and greater than or equal to 25% of the average daily trading volume ("ADV"), and the *greater* of One Month High Price and Current Market Price if the share quantity in the position is greater than or equal to 100% of the ADV.[45]

-plus-

---

[41] *See* NSCC Rules and Procedures, Rule 1, at p. 10 (emphasis added).

[42] *Id.*

[43] NSCC appears to have discretion in determining which number to use between 2 and 10 as a multiplier. However, in its Form 19b-4 for the Illiquid Charge, NSCC indicated that "[g]enerally, the factor would be 10 where the market price is less than $0.10"; 5 where the market price is between $0.10 and $0.20; and 2 where the market price is between $0.20 and $1.00.  *See* NSCC Form 19b-4 (Illiquid Charge), SR-NSCC-2017-001, at 8 n. 14.

[44] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(h), at p. 291.  Although not applied as frequently to Alpine because Alpine generally focuses on clearing liquidation transactions with share prices below $1.00, for Illiquid sell positions with a current market price above $1.00, NSCC calculates the "Illiquid Charge as the "product of the aggregate quantity of Illiquid Securities in the position and either (i) the One Month High Price, or (ii) the Current Market Price of the Illiquid Securities in the position rounded up to the next $0.50."  *Id.*

[45] *See id.*

8. Excess Net Capital Premium Component: NSCC calculates and imposes an excess net capital premium ("ENCP") charge where "a Member's contribution to the Clearing Fund," including Illiquid Charges, Volatility Charges, Mark-to-Market Charges, and CNS Fail Charges, "when divided by its excess net capital or capital . . . is greater than 1.0 (the 'Excess Net Capital Ratio'). In such circumstances, NSCC "may require" the member to deposit an ENCP as part of the Required Deposit that is "equal to the product of (a) the amount by which the Calculated Amount exceeds its excess net capital or capital . . . multiplied by (b) its Excess Capital Ratio."[46] In practice, this means that if the member has a clearing fund requirement of $11.4 million and excess net capital of $10 million, its clearing fund requirement would exceed its excess net capital by $1.4 million, its Excess Net Capital Ratio would be 1.14 (or 114%), and thus the applicable ENCP would be 114% of $1.4 million or $1,596,000. If the same member had a clearing fund requirement of $20 million, its Excess Net Capital Ratio would be 2.0 (or 200%) and the applicable ENCP would be 200% of $10 million, or $20 million.[47] NSCC has discretion whether to collect the ENCP.[48]

9. Credit Risk Rating Matrix Component: NSCC's CRRM rating is not an express component of the Required Deposit formula. However, it directly impacts several of the components, including whether the member will face an Illiquid Charge. For example, as indicated, the Illiquid Charge only applies on net sell positions when a member exceeds certain volume thresholds in Illiquid Securities. For a member with a CRRM rating between 1-4, the volume threshold is 1 million shares when the net sell position is equal to or greater than 25% of the ADV in those shares. For members with a CRRM rating between 5-7, who have the same net sell position in the same securities, the applicable volume threshold is 500,000 shares if that member's excess net capital exceeds $10 million. For members with a CRRM rating between 5-7 whose excess net capital is equal to or less than $10 million, the applicable volume threshold is 100,000 shares.[49] Additionally, members with the weakest CRRM rating cannot utilize the DTC Offset to get below the applicable volume threshold.[50]

NSCC's CRRM rating is based on a mix of objective and subjective factors that NSCC assesses in a manner that it has been withheld from the industry on the basis that it is "proprietary."[51] According to the information available, the formula includes consideration of quantitative factors (size, i.e., total excess net capital; capital, leverage,

---

[46] See NSCC Rules and Procedures, Procedure XV, § 1(B)(2), at p. 297.

[47] See SEC Release No. 34-54457, File Nos. SR-FICC-2006-03 and SR-NSCC-2006-03, at 3-5 (September 15, 2006) (using these sample calculations).

[48] See NSCC Rules and Procedures, Procedure XV, § 1(B)(2), at p. 297

[49] See NSCC's Form Rule 19(b)(4) (Illiquid Charge), SR-NSCC-2017-001, at 7.

[50] See NSCC Rules and Procedures, Rule 1, at p. 10.

[51] Brant Decl., at ¶ 17.

liquidity and profitability) and qualitative factors (market position and sustainability, management quality, capital and liquidity management, geographic and business/product diversity, and access to funding).[52]  It is unclear what weight NSCC ascribes to each individual factor within the larger quantitative and qualitative categories to arrive at a CRRM rating for a member.  It bears no relationship to a firm's actual credit rating or, apparently, whether the firm has ever defaulted on any obligation to NSCC.

### B.    Damage to Alpine and Other Small Broker-Dealers

As indicated, NSCC purports to justify each of these various and accumulating charges contained in the Required Deposit on the same basis:  that they are necessary to mitigate potential losses to NSCC associated with member default.[53]  Alpine agrees that some degree of credit risk protection, including a reasonable margin charge, is both laudable and necessary.[54]  However, certain of these components, particularly when applied in the aggregate by NSCC to Alpine and other similarly situated clearing-broker members, result in charges that are so unreasonably high, and have such a plainly anticompetitive and discriminatory impact, that they cannot possibly be justified as necessary or appropriate to alleviate credit exposure from a potential member default.

Specifically, Alpine challenges, and asks the Commission to engage in rule-making to set aside, the following components of the NSCC's Required Deposit as contrary to the Exchange Act and the rules and regulations thereunder: (a) the Illiquid Charge, including the decision to make the DTC Offset unavailable to certain members, such as Alpine, who have received a derogatory credit rating from the NSCC; (b) the ENCP charge; (c) the CRRM; (d) the OTC Volatility Charge, as applied to microcap and OTC stocks; and (e) the OTC Mark-to-Market Charge, as applied to sub-penny microcap and OTC stocks.  As noted above, the Illiquid Charge *alone,* the OTC Volatility Charge *alone,* and the OTC Mark-to-Market *alone* generally equal or exceed the underlying transaction value by several multiples and cannot be justified as necessary or consistent with the Exchange Act even in their individual capacities, let alone as they are applied together.

The impact on Alpine's and its correspondent customers' businesses from these targeted components is devastating, particularly since they are calculated and applied cumulatively by NSCC.  By way of example, consider the following trades processed by Alpine for clearing through NSCC's CNS system for its client, Bezalel, on November 23, 2018 and November 26, 2018.[55]  The trades involved a contract to sell 198,000 total shares (99,000 on 11/23/2018 and 99,000 on 11/26/2018) of PMCB at a price of $0.020 for total proceeds of $4,016.64. To process

---

[52]  *See* NSCC Rules and Procedures, Rule 1, at p. 5.

[53]  *See* SEC Release No. 34-82631, File No. SR-NSCC-2017-808, at 5.

[54]  The SEC requires NSCC to take steps to effectively identify, measure, monitor and manage its credit exposure to its participants. *See* 17 C.F.R. § 240.17Ad-22(e)(4), (6).

[55]  This trade is detailed in the Brant Decl., at ¶ 19.

this $4,016.64 trade for clearing through NSCC, however, *Alpine was required to deposit $928,175.84,* including the following total charges for the two trades:

1.  <u>Illiquid Charge</u>:  $903,756.60.

2.  <u>OTC Volatility Charge</u>:  $23,222.40 (NSCC's rules indicate that the OTC Volatility Charge shall be, at NSCC's discretion, a haircut of not less than 10% of the position.  Here, however, the Volatility Charge was 100% of the transaction. Although NSCC's precise method of calculation remains unclear, because a sub-penny stock was involved, Alpine believes that NSCC imposed the fictional $.01/share price).

3.  <u>OTC Mark-to-Market Charge</u>:  $1,196.84 (although this charge can either be a debit or credit based on the closing price of the security pending settlement, in this case NSCC appears to have used the fictional $.01/share price so it created a mark-to-market-loss charge).

Although the entire exposure associated with the above trades totaled $4,016.64, NSCC's methodology resulted in Alpine being required to deposit a total of $928,175.84 to access NSCC's (CNS) clearance and settlement services.  These two trades resulted in an NSCC deposit trade proceeds multiple of 231.08 (that is, 231 times the value of the underlying trade).  The OTC Volatility Chare and Illiquid Charge exceeded the value of the transaction by several multiples.

These charges are patently unreasonable and frankly absurd.  Yet, Alpine faces similarly egregious and disproportionate Required Deposit charges involving these component charges every single day, particularly when processing a sub-penny stock trade for clearance and settlement through NSCC's CNS system.[56] Several additional examples of similar charges, as applied to recent trades, are set forth in the attached Declaration, including charges that exceeded the underlying transaction value by over 200 times or 20,000 %.[57]

Even under NSCC's methodology, Alpine could have reduced the impact by avoiding the Illiquid Charge on the PMCB trade and almost every other transaction, except that NSCC does not permit Alpine to avail itself of the DTC Offset.  With respect to OTC securities that Alpine processes, Alpine requires that the security position be deposited, cleared and settled at DTC before entering liquidating trades on a regular way basis.[58]  As a result, if the DTC Offset were

---

[56] Alpine has attempted to employ creative solutions to avoid the deleterious impact of these Required Deposit charges.  For example, for a time, Alpine was able to use ex-clearing contra-party clearing partnerships to perform clearance and settlement service manually and thereby avoid clearing trades through NSCC's CNS system altogether.  However, once the last of those ex-clearing partnerships expired at the end of April 2018, Alpine was forced to again utilize NSCC's CNS system to clear transactions, and to post the Illiquid Charge and the other onerous components at issue of the Required Deposit. *See* Brant Decl., at ¶ 32.

[57] *See* Brant Decl., at ¶ 22.

[58] *Id.*, at ¶ 13.

available to Alpine, it would have eliminated the Illiquid Charge completely on the sample transactions, and many, if not all, other transactions, because it would take Alpine below the minimum volume threshold.[59]  However, because NSCC has arbitrarily assigned Alpine the weakest CRRM Rating of a "7" – even though Alpine has not defaulted on any of its obligations to NSCC under current ownership and has no understanding of the basis for its rating, as discussed *infra* – Alpine is not able to utilize the DTC Offset.[60]

The irrationality of the Required Deposit is also exasperated where NSCC imposes a fictional price per share of $.01 to calculate its charges on sub-penny stock transactions because it exponentially and artificially increases the costs to clear and settle microcap and OTC stock transactions through NSCC.   NSCC provided no justification for its decision to set the minimum price per share for transactions at $.01 when it added the Illiquid Charge to its rules.[61]

To the extent NSCC is also rounding-up the value sub-penny stocks to $.01 in calculating the OTC Volatility and OTC Mark-to-Market Charges, Alpine is aware of no authorization for such a practice in NSCC's Rules and Procedures.[62]  Indeed, the Volatility component, as indicated, is described by NSCC as a "haircut" on the absolute value of the microcap or OTC stock positions – i.e., something *less than* the absolute value.  Although NSCC has discretion to set this "haircut" at not less than 10% of the absolute value of the position, in application the reality is that the OTC Volatility Charge frequently exceeds 100% of the absolute value of the position.[63]  Whether this is due to the arbitrary use of a fictional price per share to artificially increase the share price or some other equally arbitrary measure or exercise of discretion – i.e., NSCC simply electing to impose charges in excess of 100% of the transaction – is immaterial: the charges to, and impact on, Alpine are the same.

Similar arbitrariness exists with respect to NSCC's calculation and imposition of the OTC Mark-to-Market Charges.  Simply stated, substituting a rounded-up fictional price-per-share for the actual current market value of the stock in order to compare it to the contract price and calculate the Mark-to-Market will almost invariably ensure there will be a Mark-to-Market Charge imposed (instead of a credit), and one that exceeds the value of the transaction by many orders of magnitude.[64]

---

[59]  *See id.*, at ¶¶ 13, 23.  *See also* Discussion of the Illiquid Charge and CRRM rating, *supra*.

[60]  *See id.* at ¶¶ 11-13 (identifying Alpine's CRRM Rating from NSCC of a "7", and confirming that Alpine has not defaulted on its obligations to NSCC under current ownership – in place since at least 2011 when Alpine was purchased by current ownership); *see also* NSCC Rules and Procedures, Rule 1, at p. 10.

[61]   Although NSCC's Form 19b-4 for the Illiquid Charge rule indicated that it would round up sub-penny securities to $.01 in calculating the Illiquid Charge, it did not provide any rationale for why it could not or would not use the actual value of the securities to calculate the charge. *See* NSCC's Form 19b-4, SR-NSCC-2017-001 (Illiquid Charge), at 6-8.

[62]  *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii), (b) and (c).

[63]  *See* Brant Decl., at ¶ 22 (providing examples).

[64]  *See* discussion above regarding calculation of the Mark-to-Market under NSCC rules.

The use of artificial components to exponentially increase these charges beyond the transaction value is not rationally related to any purported credit risk justification, is not consistent with either the Exchange Act or even NSCC's rules and, as detailed below, is causing significant damage to Alpine and the broader OTC and microcap markets.

Alpine did not incur an ENCP charge with respect to the sample transactions.  In fact, Alpine rarely incurs that charge.  However, this is for a very specific reason:  Alpine has been forced to further limit its business – to turn down customer transactions – in order to avoid paying this onerous charge.[65]  Given that the trades Alpine processes have a relatively low dollar-value, Alpine should have sufficient net capital to provide clearing services for all of its correspondents' potential liquidation transactions.[66]  However, because the Required Deposit charges are added to the absolute value of the transaction, and require a deposit of funds significantly higher than the underlying transaction amount (particularly when a sub-penny stock is involved), Alpine is forced to artificially limit the number of transactions it can clear for its customers per day, including to avoid the ENCP charge.[67]  Alpine also believes, based on discussions with NSCC, that NSCC would take a negative view of a member that was continuously required to post ENCP charges,[68] and that doing so may result in adverse action, such as a downgrade in CRRM rating, placement on the "watch list," or more aggressive adverse consequences, such as a suspension or other additional limitation on services.  Given that Alpine makes a relatively small amount of money per transaction it processes, it has neither the ability nor the motive to post the potentially astronomical ENCP charges and potentially incur further adverse consequences from NSCC.  To operate its business, of course, Alpine has no choice but to post the Illiquid Charge, OTC Volatility Charge and OTC Mark-to-Market Charges.

The cumulative impact of these margin requirements creates a self-propelling downward cycle.  Alpine must devote additional capital to post the Required Deposit each day in order to process OTC and microcap trades through NSCC's CNS system, including the onerous and disproportionate Illiquid Charges, and the similarly exorbitant OTC Volatility and OTC Mark-to-Market charges.  Because of this, Alpine must limit the volume of trades it can process per day, both due to capital constraints and to avoid ENCP charges.  This, in turn, limits Alpine's ability to raise additional capital through its clearing business, and effectively pull out of the cycle.  As a direct result, as would be expected, Alpine's liquidation business is down almost 75% due to the artificial restraints on the number of liquidation transactions it can clear through NSCC per day and attrition of customers who leave or go out of business because they cannot clear their transactions through Alpine.[69]

---

[65] *See* Brant Decl. at ¶ 27.

[66] *Id.* at ¶ 28. Alpine currently has excess net capital of approximately $2.8 million.  Prior to November of 2018, its excess net capital was $1.1 million.  *Id.*

[67] *Id.* at ¶ 29.

[68] *Id.* at ¶ 30.

[69] *Id.* at ¶¶ 33, 40-42.

The impact is not felt by Alpine alone; because NSCC operates a virtual monopoly, all players in the OTC and microcap market – from brokers to issuers to investors – are affected.  As indicated, very few small clearing firms exist today that serve the OTC and microcap securities market, which are most adversely affected by the Illiquid Charges.[70]  Indeed, the Illiquid Charges, and any use of a rounded-up, fictional share price for sub-penny stocks or other mechanism to arbitrarily and disproportionately increase the Required Deposit charges well beyond the transaction value, are intentionally targeted at the OTC and microcap securities markets. Although larger NSCC members – banks, Wall Street firms and online discount firms – likely have sufficient net capital to avoid the ENCP charges or Illiquid Charges (including through use of the DTC Offset), to Alpine's knowledge, very few of these firms are willing to work with OTC stocks and microcap stocks.[71]  Many of these firms do not accept certificates or newly issued securities for microcap issuers, leaving but a handful of firms that operate in this space.[72]

There is yet another aspect to the vicious cycle created by NSCC's discriminatory Required Deposit charges. Those small firms that do serve this segment of the market, such as Alpine, must also charge additional fees to try to offset the immense burden of devoting capital to post the challenged components of the Required Deposit, which cumulatively reduces the value of the trade for all involved.[73]  Given the high amount of the Required Deposit in comparison to the underlying value of the trade, many of Alpine's correspondent broker clients (or their customers – the underlying buyers or sellers – to whom the correspondent brokers pass the fees) are unwilling or unable to pay the additional amounts to sell the shares, leaving the shares effectively untradeable, and worthless.

The ripple effect from these charges also has a profound adverse effect on small companies whose stock trades in the OTC and microcap markets.  Microcap companies depend on issuance of shares to obtain services and finance their growth. Alpine, and other small broker-dealers in this segment of the market, play a critical role in providing liquidity for securities of small companies.  A substantial part of Alpine's customer base consists of institutional lenders to small companies and the key service providers/professionals to small companies – i.e., lawyers, accountants, transfer agents, advisors, etc.[74]  Due to the financial crisis of 2008 and other regulatory concerns, traditional banks do not provide loans to these companies, and, as indicated, the large investment banks, which comprise a majority of the membership of DTC/NSCC, do not serve this segment of market. Without firms willing and able to process these transactions, like Alpine, and without correspondent brokers or investors willing or able to pay the transaction

---

[70] Brant Decl., at ¶ 34-35.

[71] *See id.*

[72] *Id.* In addition to Alpine, this list includes Wilson Davis Securities, Lek Securties, and Wedbush Securities. Alpine is aware of no others.  *Id*. at ¶ 35.

[73] *Id.* at ¶ 36.  To be clear, no fee begins to ameliorate the damage to Alpine from the loss of business volume caused by the Required Deposit.  *See id.* at ¶¶ 33, 40-42.

[74] *See id.*, at ¶ 42.

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 25 of 169 PageID 2993
USCA Case #19-1223      Document #1812264      Filed: 10/23/2019      Page 25 of 169

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page | **17**

fees, professionals and investors will be unwilling to accept stock and these small companies will be cut-off from the capital markets to raise money to grow their businesses. It is simply no longer viable or profitable to be in this segment of the market as an NSCC member, broker, investor or issuer.

These charges not only violate the Exchange Act and result in an unjustified denial or limitation on access to services (as discussed below), they also lack any adequate rationale. There is no support for NSCC's contention that the Required Deposit components at issue, and NSCC's calculation thereof, are necessary to manage its credit exposure to its members. NSCC has presented no evidence, either at the time it added these components or since, that the many other existing margin requirements were insufficient to protect against the credit risk from a member default. For instance, as indicated, each of the Required Deposit components at issue targets trading in the OTC or microcap markets and/or smaller clearing members who tend to have less excess net capital and weaker CRRM ratings. NSCC presented no evidence that smaller members, or those who deal in the OTC or microcap stock markets, tend to default at a greater rate to justify its decision to impose greater margin requirements on these members. Nor did NSCC present evidence demonstrating that it is either necessary or appropriate for NSCC to require a deposit amount many times the value of the transaction to protect a firm the size of NSCC from risk of member default.

Moreover, NSCC's actions appear redundant and even more arbitrary when one considers that two components of the Required Deposit that result in some of the highest charges to Alpine on a per transaction basis – the OTC Volatility Charge and Illiquid Charge – purport to guard against the same risk: volatility in the OTC and microcap markets. The Mark to Market component is also designed to account for price fluctuations. The NSCC has not, nor could it, justify duplicative margin charges that far exceed the underlying transaction value (which have in fact resulted in charges over 200 times the value of the transaction) and effectively prevent the clearing of countless trades. These charges, and any framework or model that leads to such charges, are neither a necessary, reasonable, nor commensurate means to identify, measure, and manage NSCC's credit risk.[75] Further, if there were a specific security or position of concern, NSCC already had (and has) discretion to impose a special volatility charge,[76] in addition to the other margin components detailed above.

Nor can NSCC offer any basis to justify the sheer size of the charges imposed on OTC and microcap stock transactions in relation to the value of the underlying transaction.[77] Rather

---

[75] *See, e.g.,* 17 C.F.R. § 240.17Ad-22(d)(6) (requiring registered clearing agencies to be "cost-effective" in offering services); *id.* at § 240.17Ad-22(e)(4) (requiring covered clearing agencies to "[e]ffectively identify, measure, monitor and measure its credit exposure to participants"); *id.* at § 240.17Ad-22(e)(6)(i) (requiring clearing agencies to establish a "risk-based margin system" that, *inter alia,* "[c]onsiders, and produces margin levels *commensurate with,* the risks and particular attributes of each relevant product, portfolio and market," and uses "an appropriate method for measuring credit exposure . . . ." (emphasis added)).

[76] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(d), at p. 290

[77] Brant Decl., at ¶¶ 19, 22 (discussing the Required Deposit amounts in relation to the underlying transaction amounts).

than design a formula that corresponds to the actual value of the transaction and the associated default risk, NSCC has designed and applied a formula that allows it to extract far more margin that it reasonably needs from just a few members. NSCC's arbitrary use of a fictional price of $.01 for sub-penny stock transactions is illustrative of these excesses,[78] as is its arbitrary imposition of "haircut" OTC Volatility Charges that exceed the value of the transaction, often by several factors. [79]

The Required Deposit components at issue also have an improper disproportionate impact upon small broker dealers – those with small excess net capital, and thus weaker CRRM ratings. For example, NSCC purports to justify the Illiquid Charge on the basis that Illiquid Securities "lack marketability, based on insufficient access to a trading venue, and may have low and volatile share prices."[80] Based on this construct, NSCC claims the Illiquid Charge is "designed to mitigate the risk that NSCC may face when liquidating Illiquid Securities following a Member default and such liquidation is difficult or delayed due to a lack of interest in a particular Illiquid Security or limitations on the share price of the Illiquid Security."[81] However, where the stated risk purports to be inherent in the Illiquid Security itself, it makes no sense for NSCC to allow members with higher CRRM ratings to incur larger positions in these securities before incurring the Illiquid Charge, or to disallow the DTC Offset only for those with the weakest CRRM rating. It is actually counterintuitive and nonsensical because the failure of a large member – those who NSCC tends to assign higher CRRM ratings – would have a much more dramatic impact on NSCC solvency.

The decision to make the DTC Offset available to some members, but not others, is itself discriminatory and baseless. Presumably, NSCC uses the DTC Offset in determining whether an Illiquid Charge will apply because it recognizes that there is less risk in clearing and settling a transaction if the member is long the shares at DTC – as Alpine is with respect to nearly every liquidation transaction it processes.[82] The reduction in risk to NSCC from a member having the offsetting shares at DTC would, of course, be the same regardless of a member's CRRM rating; the two are independent. If anything, allowing members with weaker credit ratings to utilize the DTC Offset would further reduce any purported credit risk to NSCC from positions in the so-called Illiquid Securities because such a member could use the DTC Offset to avoid the Illiquid Charge, and therefore improve its ratio of clearing fund requirement to excess net capital and its overall financial condition by processing more transactions. Such a member would then be *less*

---

[78] That a rational, need-based justification for these decisions could be offered is dubious at best. Certainly, it must be technologically and administratively feasible for NSCC to utilize the actual share value, even though it may be below a penny, in calculating margin, and NSCC has not sought to justify it as unfeasible. From a purported credit risk perspective, it makes no more sense to impose a fictional share price for a sub-penny stock than it does for any other stock. In either circumstance, use of a fictional share price does not accurately measure or ameliorate the risks from the actual position.

[79] *See* Brant Decl., at ¶¶ 19, 22.

[80] *See* NSCC Form 19b-4 (Illiquid Charge), SR-NSCC-2017-001, at 3.

[81] *Id.*

[82] *See* Brant Decl., at ¶ 13, 23.

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 27 of 169 PageID 2995
USCA Case #19-1223      Document #1812264          Filed: 10/23/2019      Page 27 of 169

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page | **19**

likely to default.  Where NSCC has provided no explanation for its disparate application of the DTC Offset,[83] the only rational conclusions are that it has no justification or, worse yet, that it is simply discriminatory.

Finally, the CRRM that NSCC uses to determine the applicability of the Illiquid Charge is itself vague and arbitrary.  As indicated, the CRRM involves a mix of quantitative and qualitative factors.[84]  Not only is a qualitative factor inherently subjective and arbitrary, but the manner in which NSCC actually evaluates and weighs the factors within the overall quantitative and qualitative categories to assign a member a CRRM rating is undisclosed.[85]  About the only thing that is apparent is that NSCC does not, unlike most credit rating systems, take into account recent history of performance of obligations, including an absence of prior defaults to NSCC. Thus, a member has no actual way of determining how its CRRM rating is determined or, more importantly, how to improve it.  This permits arbitrary determinations by the NSCC.  Although Alpine has no quarrel with the use of a credit rating system to evaluate credit risk, NSCC's secret CRRM formula is simply too vague a basis to serve as an adequate justification for actions that have the effect, if not the purpose, of threatening a critical segment of the market.

C.     **NSCC's Rules and Procedures with Respect to the Required Deposit Fail to Comply with the Exchange Act and SEC's Rules**

Sections 3, 17A and 19 of the Exchange Act impose mandatory requirements with which NSCC, as a registered clearing agency and SRO, must comply in desiging, implementing and applying its rules and procedures, and in calculating and imposing charges.[86]  In addition, NSCC is required to comply with any rules and regulations promulgated by the SEC under the Exchange Act, as well as NSCC's own rules.[87]

Section 19(f) requires the Commission to set aside an SRO action denying or limiting access to services if it does <u>not</u> find, *inter alia,* that the SRO's "rules are, and were applied in a manner, consistent with the purposes" of the Exchange Act, or if it finds the prohibition or

---

[83]  *See* NSCC's Form 19b-4 (Illiquid Charge), SR-NSCC-2017-001, at 7-8.

[84]  In its Form 19b-4 filing wherein NSCC proposed adding qualitative factors to the CRRM, NSCC indicated that the weight split between quantitative and qualitative factors would be 60/40, respectively.  *See* NSCC Form 19b-4, SR-NSCC-2017-002, at 7.

[85]  When Alpine asked NSCC for details about how NSCC actually determined a CRRM rating, NSCC refused to answer the question on the basis that its CRRM formula was "proprietary."  Brant Decl., at ¶ 17.

[86]  For example, Section 17A(b) requires, as a condition to registration, that a clearing agency's rules meet certain standards, such as fair and reasonable allocation of fees and nondiscriminatory purpose and effect.  Section 19(g) similarly requires all SROs to comply with the Exchange Act, and Section 19(f) requires, *inter alia,* that any fee constituting a limitation on access be consistent with the Exchange Act. Sections 17A, 19 and 3(f) all proscribe clearing agency rules with an unnecessary anticompetitive burden and effect. Section 3(f) also requires the SEC, in reviewing an SRO rule, to determine whether the action promotes "efficiency" and "capital formation."

[87]  Both Section 17A(d) and Rule 19(g) require SROs to comply with SEC rules and regulations, and Section 19(g) requires SROs to comply with their own rules.

limitation on access "imposes any burden on competition not necessary or appropriate."[88] Excessive fees and charges can constitute a denial of access to services.[89] ***The burden is on NSCC to demonstrate that its rules and actions are consistent with the Exchange Act and the SEC's rules***.[90]

Here, for the reasons stated herein, and in Alpine's concurrently filed Petition for Review pursuant to Section 19(d),[91] the challenged components, particularly when applied in the aggregate, result in disproportionate and onerous charges that create an actual limitation on access to NSCC's essential CNS clearing and settlement services by Alpine and other similarly situated members. Additionally, as demonstrated below, the challenged components violate the Exchange Act, the SEC's rules, and even NSCC's own rules because, *inter alia,* they are unreasonable, discriminatory, and impose an unnecessary and inappropriate burden on competition.[92]

### 1. *Unreasonable and Inequitable Allocation of Fees*

Section 17A(b)(3)(D) requires that the "rules of the clearing agency provide for the equitable allocation of reasonable dues, fees and other charges among its participants."[93]  This statute thus imposes two requirements:  (1) fees, dues and charges must be "reasonable," and (2) they must be "equitabl[y] allocate[d]."  NSCC's rules with respect to the Required Deposit, and the resultant charges that NSCC imposes on Alpine under these rules, meets neither requirement.

As demonstrated above, the challenged components of the Required Deposit combine to impose margin charges on Alpine that are exponentially greater than the underlying transaction amount. This is facially unreasonable for a number of reasons, including: (a) the sheer amount of the charges, (b) the lack of adequate justification to require margin that is so disproportionately high compared to the transaction, and (c) the chilling effect this has upon Alpine's ability to provide clearing services to its customers, including the number of transactions it can clear per day, and upon the OTC and microcap markets in general. The Illiquid Charge alone is unreasonable also because the NSCC employs its secret CRRM rating to eliminate the DTC Offset which Alpine could have used, in almost every circumstance, to avoid the charge altogether.  The unreasonableness of Illiquid Charge, OTC Volatility Charge and OTC Mark-to-Market Charge is further heightened when a sub-penny stock is involved, which result in margin

---

[88]  15 U.S.C. § 78s(f).

[89]  *See Sec. Indus. Fin. Mkts. Ass'n,* SEC Release No. 72182, 2014 WL 1998525, at *8 (May 16, 2014).

[90]  *See* Section 19(f), 15 U.S.C. § 78s(f) and Rule of Practice 700, 17 C.F.R. § 201.700. *See also Sec. Indus. Fin. Mkts. Ass'n,* 2014 WL 1998525, at *9 n. 88.

[91]  Alpine's Petition for Review is attached hereto as Ex. B, and incorporated herein by reference.

[92]  Because Alpine has discussed the challenged components, their impact on Alpine and the flaws in NSCC's purported justifications for these components in detail above, Alpine will address the violations here by reference to the earlier sections of the brief, in a more summary fashion.

[93]  15 U.S.C. § 78q-1(b)(3)(D).

charges that are grossly disproportionate to the transaction value, including where the share value is arbitrarily rounded up to $.01/share, for which, as indicated, NSCC provided no justification.[94]

The ENCP charge is also unreasonable, based on: (a) the punitive amount of the charge (at least 100% of the amount by which the Required Deposit exceeds excess net capital); (b) the fact that the ENCP charge is based on the Required Deposit amount, which in turn already factors in the Illiquid Charge, OTC Volatility Charge and OTC Mark-to-Market Charge; (c) NSCC's failure to establish that the other components of the Required Deposit are insufficient to protect against the purported credit exposure; and (d) the chilling effect the ENCP charge has upon Alpine's ability to provide clearing services to its customers and upon the OTC and microcap markets in general.

The challenged components are also not "equitably allocated." Each of the challenged components is directed at and applied exclusively to members providing services to microcap or OTC markets, and imposes a disproportionate burden on smaller members. Because the purported "risk" to NSCC associated with clearing OTC and microcap stocks has not been justified by citation to actual evidence, and could be adequately addressed through other more appropriate and objective means, including by designing reasonable margin requirements that are commensurate with actual identified risks that are equally applied to all members, this piling-on of discriminatory charges is not equitable.

> ### 2. *The Challenged Components Are Anticompetitive and Restrain Capital Formation*

Promoting competition and capital formation are each central to the purpose of the Exchange Act. As Congress noted in amending the Exchange Act in 1975, which added Sections 17A and 19 to the Exchange Act, "it is in the public interest to assure . . . fair competition among brokers and dealers, among markets and between exchange markets and over-the-counter markets."[95] The goal is not to hinder, but to "enhance competition" and to "allow economic forces, **interacting in a fair regulatory field**, to arrive at appropriate variations in practices and services."[96] Congress continued:

> [T]he ability of individual firms as well as the various exchange and over-the-counter markets to compete with one another will be a critical element in the successful functioning of the national market system. Unfortunately, because of excessive and unnecessary regulatory restraints, competition in the securities industry has not been as vigorous and as effective in advancing the public interest as it could be. . . . [T]he most effective way to foster competition would be to

---

[94] *See Sec. Indus. Fin. Mkts. Ass'n,* SEC Release No. 84432, at p. 28 (October 16, 2018) (holding that the SRO failed to establish its fees were fair and reasonable where SRO failed to present adequate evidence to justify the fees).

[95] S. Rep. 94-75, at 8.

[96] *Id.* (emphasis added).

charge the Commission with an explicit obligation to eliminate all present and future competitive restraints that cannot be justified by the purposes of the Exchange Act. Following this pattern, various sections of S. 249 would direct the Commission to remove existing burdens on competition and to refrain from imposing, or permitting to be imposed, any new regulatory burden on competition 'not necessary or appropriate in furtherance of the purposes' of the Exchange Act.[97]

Given this critical element, it is unsurprising that Congress' "charge" to the Commission found its way into several provisions of the Exchange Act.  Relevant here, Section 17A(b)(3)(I) requires that the "rules of the clearing agency do not impose any burden on competition not necessary and appropriate in the furtherance of the purposes of this chapter."[98]  Section 19(f) requires the SEC, in reviewing fees or other SRO action for a denial or limitation on access of the SRO's essential services, to set aside any such fees or action that "imposes any burden on competition not necessary or appropriate in the furtherance of the purposes of this chapter."[99] Section 3 requires the SEC, "in the review of a rule of a self-regulatory organization," to "consider or determine . . . whether the action will promote efficiency, competition and capital formation."[100]  Despite being repeatedly emphasized in the Exchange Act itself, in a recent speech, Commissioner Robert J. Jackson lamented the SEC's duty to "ensure[] robust competition" as the "forgotten fourth pillar of the SEC's mission."[101]

Following these directives, the Commission should set aside the challenged components of the Required Deposit as they have a blatantly anticompetitive effect as applied, and serve to limit, rather than promote capital formation.

As indicated, each component is designed to impose, and results in, additional charges and restrictions being applied to smaller, less capitalized members who provide clearing services in the OTC and microcap markets. This directly affects competition and capital formation of those member firms subject to the restrictions because they must use NSCC to provide clearing services, which gives those member firms who do not face these restrictions an unfair

---

[97]  *Id.* at 13.

[98]  15 U.S.C. § 78q-1(b)(3)(I).

[99]  15 U.S.C. § 78s(f).

[100]  *See* 15 U.S.C. § 78c(f).

[101]  *See* Jackson, Robert J., *Competition:  The Forgotten Fourth Pillar of the SEC's Mission* (October 11, 2018), available at https://www.sec.gov/news/speech/speech-jackson-101118#_ftn9.  Commissioner Jackson observed that the current "unprecedented concentration of power in the American economy" in "just a few players of enormous size and scope" raises "real questions" about whether America's stock markets "reflect the competitive marketplaces investors deserve."  *Id.* Commissioner Jackson remarked that the SEC shares the blame for this due to its complacency in fulfilling its mission of promoting competition over the past several decades in reviewing proposed rules. *Id.*

competitive advantage. As a direct result of these charges, as indicated, Alpine is able to process only a handful of trades at a time and its liquidation business is down 75%.[102]

Moreover, corporate entities who issue shares to facilitate their business development, or firms or entities who receive those shares, cannot sell that stock at Alpine once it has reached its artificially imposed daily limit, and more and more there is no other firm *willing to clear OTC stocks.*[103] Even when they find a participant who is willing or able to process the trade, issuers and investors in the OTC and microcap markets often face delays or fees necessary for the clearing broker to clear enough capital to pay the exorbitant Illiquid Charge and other Required Deposit charges applicable solely to OTC and microcap stocks.[104] These are barriers to access simply not faced by securities traded on registered exchanges, further working to concentrate wealth in the few.

Alpine, and other small broker-dealers play a critical role in providing liquidity for securities of small companies that have no other access to capital, such as through loans. Large investment bank members do not typically serve this market segment. Without firms willing and able to process these transactions, like Alpine, these small companies will be cut-off from the capital markets to raise money to grow their businesses. In this regard, the challenged components do not just have an anti-competitive and discriminatory effect, they also impermissibly limit access to services by Alpine's actual and potential customers, in violation of yet another provision of the Exchange Act – Section 17A(b)(6).[105]

These impacts to the market are neither "necessary" nor "appropriate." For the reasons detailed above, NSCC does not need to choke the microcap and OTC markets, or its small clearing members, by imposing excessive charges and restrictions in order to limit its credit exposure. There is no evidence that the risks NSCC claims to justify these discriminatory components exist in fact, or are likely to ever materialize, particularly given the number of additional margin charges and options that exist to guard against the perceived concerns. Certainly, an illusory risk does not warrant the significant, and real, anticompetitive effects.[106]

---

[102] *See* Brant Decl., at ¶¶ 33, 40.

[103] *See id., at* ¶¶ 34-35.

[104] *See id.* Given the high amount of the Required Deposit in comparison to the underlying trade, many customers are simply unwilling or unable to pay processing fees to sell the shares, leaving the shares effectively untradeable, and worthless. *See id.*

[105] *See* 15 U.S.C. § 78q-1(b)(6) ("No registered clearing agency shall prohibit or limit access by any person to services offered by any participant therein.").

[106] It is expected that NSCC would contend, as it did in responding to criticism that the proposal to impose the ENCP was anticompetitive, that there is no right to be a direct member of NSCC. *See* SEC Release No. 34-54457, at 14. However, NSCC misses the point. Alpine *is a member* of NSCC. As a registered clearing agency and SRO, NSCC enjoys a virtual monopoly – nearly all U.S. equities security transactions are, and must be, cleared through NSCC. The cost of this virtual monopoly is that NSCC cannot deny or limit access to its essential services, including through imposition of rules, unreasonable charges and other restrictions that impose any burden on competition not necessary or appropriate in furtherance of the Exchange Act. 15 U.S.C. § 78s(f). Moreover, NSCC's argument also ignores the general lack of members willing to clear OTC and microcap stocks at all.

### 3.    *The Challenged Components are Unfairly Discriminatory*

Section 17A(b)(3)(F) requires, *inter alia,* that the "rules of the clearing agencies are designed" to "protect investors and the public interest," and "are not designed to permit unfair discrimination in the admission of participants or among participants in the use of the clearing agency . . . ."[107]  The challenged components disproportionately impact those small members who focus on the OTC and microcap markets and those issuers and investors in that market segment.  Indeed, they were designed with this very purpose.  There is no justifiable reason – and as demonstrated above, NSCC's "credit exposure" rationale is specious, at best – to single out certain members or market segments for additional margin charges, at devastating impact to their business, just because they provide services to, or within, the OTC and microcap markets and have less capital.

NSCC's development and use of the CRRM is also unfairly discriminatory, separate and apart from the other challenged components of the Required Deposit.  As discussed, because the various quantitative and qualitative factors that make up the CRRM are themselves vague, and the manner in which NSCC weighs these factors to assign a CRRM rating is withheld by NSCC, it allows for arbitrary treatment.  NSCC can use the CRRM to unilaterally classify a member, such as Alpine, as a credit risk, and thereby exponentially increase its Required Deposit, without reference to Alpine's spotless credit history, its record of compliance with NSCC's requirements, or Alpine's profitability, operational and financial capabilities.

### 4.    *The Challenged Components Violate the SEC's Regulations*

Section 17A(d) and Section 19(g) require NSCC to comply with the rules and regulations promulgated by the SEC.[108]  Pursuant to this authority, the SEC has promulgated a rule imposing "Standards for Clearing Agencies."[109]  The challenged components violate several provisions of these standards.

First, the Subsection (e)(1) of the standards imposes transparency requirements mandating NSCC to "establish, implement, maintain and enforce written policies and procedures reasonable designed to . . . [p]rovide for a well-founded, clear, transparent, and enforceable legal basis for each aspect of its activities in all relevant jurisdictions."[110]  Similarly, Section (e)(23)(ii) requires NSCC to provide "sufficient information to enable participants to identify and evaluate the risks, fees, and other material costs they incur by participating in the covered clearing agencies."[111]  NSCC's CRRM rating system, which as indicated employs a secret formula to

---

[107]  15 U.S.C. § 78q-1(b)(3)(F).

[108]  *See* 15 U.S.C. § 78q-1(d) *and* 15 U.S.C. § 78s(g).

[109]  *See* 17 C.F.R. 240.17Ad-22.

[110]  *Id.* at § 240.17Ad-22(e)(1).

[111]  *Id.*at § 240.17Ad-22(e)(23)(ii).

weigh a variety of undefined factors, clearly fails to comply with these transparency requirements.

Second, Alpine acknowledges that the SEC requires NSCC to establish and implement, *inter alia,* a "risk-based margin system" and to identify, measure and manage its credit exposure and liquidity risks.[112]  However, there is language within these provisions that constrains the types of margin requirements that NSCC can impose, in addition to the limits imposed by the Exchange Act itself (discussed above).  Specifically, Subsection (e) of the standards requires that NSCC's written policies and procedures must be "*reasonably designed*" to "*effectively* identify, measure, monitor and manage its credit exposure" and "liquidity risk."[113]  Additionally, while NSCC, as a central counterparty, must establish a "risk based margin system," that system must "consider[], and produce[] margin levels *commensurate with,* the risk and particular attributes of each relevant product, portfolio and market," and "use[] an *appropriate method for measuring* credit exposure that accounts for relevant product risk factors and portfolio effects across product."[114]

In each of these respects, NSCC's design and application of the challenged components falls short.  The margin requirements that NSCC has imposed through the Illiquid Charge and ENCP, or the OTC Volatility Charge and OTC Mark to Market Charge when sub-penny stocks are involved, are not "commensurate" with the credit exposure from these positions.  To the contrary, as demonstrated above, they are unreasonably far in excess of any possible credit exposure from these positions, particularly when Alpine has the shares on deposit at DTC.  Certainly, NSCC has not attempted to justify a need to be so grossly over-secured on these positions.[115]  As a result, they are also not "reasonably designed" and "appropriate" to "effectively" measure and manage credit exposure.

5.     *The OTC Volatility Charge and OTC Mark to Market Charge, as Calculated and Applied to Microcap and OTC Stock Transactions, Are Not Authorized by NSCC's Rules.*

Section 19(g) requires every SRO to "comply with . . . its own rules . . . ."[116]  As indicated, Alpine can find no support in NSCC's Rules or Procedure XV for its practice of imposing OTC Volatility Charges or OTC Mark to Market charges that equal or exceed the

---

[112] *Id.* at § 240.17Ad-22(e)(4), (6) and (7).

[113] *See id.* at § 240.17Ad-22(e)(4), (7) (emphasis added).

[114] *Id.* at § 240.17Ad-22(e)(6)(i), (v) (emphasis added).

[115] By way of example, NSCC could also attempt to manage its credit exposure by trying to impose minimum clearing fund contribution of $5 million per member.  However, this would likely face stiff opposition, and would almost certainly not be approved, because it is patently unreasonable and arbitrary in that it is not tied to any actual evidence that such an amount is appropriate, or an effective and commensurate way to manage the purported risk (although it would be, at least, equitably applied).  Yet, NSCC has acted no less unreasonably and arbitrarily by imposing discriminatory margin charges that are many times the amount of the underlying transaction.

[116] 15 U.S.C. § 78s(g).

underlying transaction amount just because a microcap or OTC stock is involved.[117]  Nor can Alpine locate any authorization in NSCC's Rules or Procedure XV to round-up the price of the stock/positions to the fictional price of $.01/share on sub-penny stock transactions to calculate Volatility Charges or Mark-to-Market.

### III.   THE DIVISION OF TRADING AND MARKETS FAILED TO ENGAGE IN THE REQUISITE INDEPENDENT ANALYSIS PRIOR TO APPROVING NSCC'S ILLIQUID CHARGE, CRRM AND ENCP RULES.

The Commission delegated its authority to approve SRO rules and rule changes, including by the NSCC, to the Director of the Division of Trading and Markets ("Director of Market Regulation").[118] In reviewing and permitting these rule changes, the Director of Market Regulation failed to comply with its obligation to engage in the requisite independent analysis necessary to satisfy the SEC's obligations under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*[119]

The D.C. Circuit's recent decision in *Susquehanna International Group, LLP v. SEC,* 866 F.3d 442 (2017), specifically addressed the SEC's abdication of that responsibility under similar circumstances.  That case involved a challenge to a rule change by a registered clearing agency, Options Clearing Corporation ("OCC"), which was approved by the SEC, to boost its capital reserves and to alter how fees and refunds were calculated.[120]  On a petition for judicial review, the D.C. Circuit analyzed the Order approving the rule change under the "arbitrary and capricious" standard of the APA, which requires the SEC to have substantial evidence for a decision and "to examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and choices made.'"[121]

The *Susquehanna* petitioners argued that that the SEC erred in approving OCC's rule because it violated several provisions of the Exchange Act.[122]  The D.C. Circuit did not reach these arguments, however, but instead held the SEC's Order approving the rule failed in a "more

---

[117]  *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii), (b) and (c).

[118]  *See* 17 CFR 200.30-3(a)(12); *Sacks v. SEC*, 648 F.3d 945, 948 (9th Cir. 2011) (recognizing the delegation).

[119]  The pertinent approval orders include:  SEC Release No. 34-54457, SR-NSCC-2006-03 (September 15, 2006) (ENCP Charge); SEC Release No. 34-80597, SR-NSCC-2017-001 (May 4, 2017) (Illiquid Charge); *and* SEC Release No. 34-80734, SR-NSCC-2017-002 (May 19, 2017) (CRRM). Because NSCC did not follow the required process to alter its formula to impose OTC Volatility or Mark-to-Market charges that equal or greatly exceed the underlying transaction value, or to justify its use of a fictional $.01/share price to calculate those charges for sub-penny stocks, the Division of Trading and Markets had no opportunity to approve such a practice.  NSCC has simply acted without any authority in respect to its calculation of these charges.

[120]  *Susquehanna,* 866 F.3d at 443-44 (discussing OCC's rule changes).

[121]  *Id.* at 445 (citation omitted).

[122]  *Id.* at 445-446 (petitioners argued, *inter alia,* that OCC's rule violated the exchange act because it was designed to permit unfair discrimination among participants in use of the clearing agency and imposed an unnecessary burden on competition).

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 35 of 169 PageID 3003
USCA Case #19-1223     Document #1812264        Filed: 10/23/2019     Page 35 of 169

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page | 27

basic respect: the Commission did not itself 'find[]' or 'determin[e]' that the [OCC rule] met any of those requirements."[123]

> Instead, the SEC effectively abdicated that responsibility to OCC—the proponent of the Plan and the entity whose rule changes the SEC is statutorily obligated to approve or disapprove.  Moreover, the SEC's Order reflects little or no evidence of the basis for the OCC's own determinations—and few indications that the SEC even knew what that evidence was.[124]

The Court continued, "the SEC cannot simply accept what a [self-regulatory agency] has done, but rather is obligated to make an independent review"; "stating that a factor is considered – or found – is not a substitute for considering or finding it."[125] "[T]he SEC's unquestioning reliance on OCC's defense of its own actions is not enough to justify approving the Plan. Instead, the SEC should have critically reviewed OCC's analysis or performed its own," not simply relied on the "self-serving views of the regulated entity." [126] The D.C. Circuit has further observed that, in reviewing a proposed rule, the Commission "has a statutory obligation to determine as best it can the economic implications of the rule."[127]

Here, even a cursory review of the Orders approving the Illiquid Charge, CRRM and ENCP demonstrates that the Director of Market Regulation did not engage in the necessary independent analysis to determine that proposed rule changes complied with the Exchange Act and the SEC's rules, but instead merely took NSCC's word for it.  The Orders approving the Illiquid Charge, ENCP and CRRM changes does little more than track the language that NSCC used to try to justify the rule changes. There appears to be no independent analysis.

For example, the Order approving the Illiquid Charge provides no discussion or evaluation of NSCC's unexplained decisions to impose a fictional minimum price of $.01/share or to allow different volume limitations or the DTC Offset for some members but not others, beyond merely repeating NSCC's description of how it would calculate the Illiquid Charge.[128] There was no analysis done on the economic, competitive or discriminatory impacts of those decisions.[129]  In fact, the Illiquid Charge Order does not discuss the burdens on competition, the impacts on capital formation, or whether it would permit unfair discrimination at all.  The Order instead merely references *some* of these requirements in a cursory footnote that states: "In approving the proposed rule change, the Commission considered the proposals' impact on

---

[123]  *Id.* at 446 (internal citations omitted).

[124]  *Id.* (internal citations omitted).

[125]  *Id.* (internal quotations and citations omitted)

[126]  *Id.* at 447 (quotations and citations omitted).

[127]  *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

[128]  *See* SEC Release No. 34-80597, SR-NSCC-2017-001 (Illiquid Charge), at 5-7, and 9-12

[129]  *Id*.

efficiency, competition, and capital formation."[130]  This is precisely the type of "referencing a requirement," rather than "complying with the requirement," mode of decision-making that was held to be unacceptable in *Susquehanna*.[131] Moreover, because NSCC did not provide any evidence or actual risk to justify the Illiquid Charge or any estimation of the amount of the Illiquid Charges that would be imposed, the Director of Market Regulation did not, and could not, find that the charges were "reasonable" and "equitabl[y] allocate[ed],"[132] or otherwise analyze the "economic implications" of the rule.[133]

Similar flaws exist in the Orders approving the changes to the CRRM and ENCP.  For instance, with respect to the CRRM, there was no discussion of whether NSCC complied with the transparency requirements by not disclosing the manner in which it weighed the quantitative and qualitative factors to determine a CRRM rating.[134]  The Order approving the CRRM also contains the same insufficient, cursory footnote recital that the SEC considered the impact on efficiency, competition and capital formation as the Order approving the Illiquid Charge, and no discussion or mention of discriminatory impacts.[135]

While the Order approving the ENCP Charge does discuss the burden on competition, it merely repeats the statements made by NSCC in responding to comment letters, without any independent analysis.[136]  Once again, no discussion of economic impact or the reasonableness of the ENCP charges exists in the Order.[137]

Therefore, the Orders themselves lack the necessary findings, resulting in arbitrary and capricious decision-making.  As a result of this, and the evidence Alpine has provided demonstrating the unwarranted and impermissible limitations on access, devastating impacts, and violations of the Exchange Act resulting from the application of these rules and charges, the Commission should undertake a comprehensive review and consider the rulemaking proposals below.

## IV.   Proposals

The undersigned, through counsel, petitions the Commission to use its supervisory authority to adopt the following rules with respect to NSCC's Clearing Fund Formula:

---

[130] *Id.* at 13, n. 39.

[131] 866 F.3d at 446.

[132] 15 U.S.C. § 78q-1(b)(3)(D).

[133] *Business Roundtable v. SEC,* 647 F.3d at 1148.

[134] *See* SEC Release No. 34-80734, SR-NSCC-2017-002 (CRRM), at 11.

[135] *Id.* at 14, n. 24.

[136] *See* SEC Release No. 34-54457, SR-NSCC-2006-03 (ENCP), at 13-15.

[137] *Id.*

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 37 of 169 PageID 3005
USCA Case #19-1223      Document #1812264      Filed: 10/23/2019      Page 37 of 169

Rulemaking Petition Regarding N.S.C.C.
December 19, 2018
Page | **29**

1.    THE COMMISSION SHOULD AMEND OR REQUIRE NSCC TO AMEND RULE 1 AND PROCEDURE XV OF THE NSCC RULES AND PROCEDURES TO ELIMINATE THE ONE OR MORE OF THE FOLLOWING COMPONENTS OF THE CLEARING FUND FORMULA: (1) THE ILLIQUID CHARGE AND (2) THE EXCESS NET CAPITAL PREMIUM.

The undersigned petition asks the Commission to use its supervisory authority to adopt a rule amending, or requiring NSCC to amend Rule 1 and Procedure XV of the NSCC Rules and Procedures to eliminate both or either of the Illiquid Charge and the Excess Net Capital Premium on the basis that NSCC's justification for these charges lacks evidentiary support, and the actual calculation and application of the charges leads to unreasonable, inequitable, discriminatory and anticompetitive charges, and an impermissible denial or limitation of access, in violation of the Exchange Act and the rules promulgated thereunder.

2.    THE COMMISSION SHOULD AMEND OR REQUIRE NSCC TO AMEND RULE 1 AND PROCEDURE XV OF THE NSCC RULES AND PROCEDURES TO ELIMINATE THE CREDIT RISK RATING MATRIX, AS CURRENTLY FORMULATED AND APPLIED AS A COMPONENT OF THE CLEARING FUND FORMULA AND/OR REQUIRE NSCC TO DISCLOSE THE SPECIFIC CRITERIA AND MANNER BY WHICH NSCC DETERMINES AND ASSIGNS CREDIT RATINGS BASED ON THE CREDIT RISK RATING MATRIX

The undersigned petition asks the Commission to use its supervisory authority to adopt a rule amending, or requiring NSCC to amend, Rule 1 and Procedure XV of the NSCC Rules and Procedures to Eliminate the Credit Risk Rating Matrix, used to determine the applicability of Illiquid Charge and other components of the Required Deposit, on the basis that it provides for arbitrary, unfair and discriminatory application in violation of the Exchange Act, and fails to comply with the transparency requirements of the SEC Rule 240.17Ad-22(e)(1) and (23)(ii).  Alternatively, the undersigned petition the adopt a rule requiring NSCC to disclose the specific criteria and manner, including the weight given to each component, by which NSCC determines and assigns credit ratings based on the Credit Risk Rating Matrix.

3.    THE COMMISSION SHOULD PROMULGATE A RULE PROHIBITING NSCC FROM CALCULATING ANY REQUIRED DEPOSIT CHARGES FOR SUB-PENNY MICROCAP AND OTC STOCKS EXCEPT THROUGH USE OF THE ACTUAL VALUE OF THE SHARES.

The undersigned petition asks the Commission to use its supervisory authority to adopt a rule requiring NSCC to use the absolute or actual value of the share price in calculating the Required Deposit in OTC and microcap stocks, and to disallow

any practice by NSCC to use artificial share prices or any exercise of discretion to impose Volatility Charges or Mark-to-Market Charges in amounts that would not be imposed based on the actual share value or which impermissibly exceed the value of the transaction. The basis is that NSCC's practices result in unreasonable, inequitable, discriminatory and anticompetitive charges, and an impermissible denial or limitation on access, in violation of the Exchange Act and the rules promulgated thereunder, and NSCC's Rules and Procedures do not authorize the use of a fictional share price to calculate Mark-to-Market or Volatility Charges, or the imposition of Volatility Charges for OTC and microcap stocks that equal or exceed the transaction value.

4.    ALTERNATIVE TO PROPOSAL 1:  THE COMMISSION SHOULD AMEND OR REQUIRE NSCC TO AMEND RULE 1 AND PROCEDURE XV OF THE NSCC RULES AND PROCEDURES TO REQUIRE NSCC, IN CALCULATING THE ILLIQUID CHARGE, TO OFFSET THE QUANTITY OF SHARES IN A EVERY MEMBER'S SELL POSITION AGAINST THE NUMBER OF SHARES IN THE SAME SECURITY HELD BY THE MEMBER AT DTC, REGARDLESS OF THE MEMBER'S CREDIT RATING

In the event the Commission does not adopt Proposal 1, the undersigned petition the Commission, in the alternative, to use its supervisory authority to adopt a rule, or requiring NSCC to amend Rule 1 and Procedure XV of the NSCC Rules and Procedures to require NSCC, in calculating the Illiquid Charge, to offset the quantity of shares in every member's sell position against the number of shares in the same security held by the member at DTC (the DTC Offset), regardless of the member's credit rating, on the basis that NSCC's justification for disallowing the DTC Offset for such members lacks evidentiary support, and leads to unreasonable, inequitable, discriminatory and anticompetitive results and charges, and an impermissible denial or limitation of access, in violation of the Exchange Act and the rules promulgated thereunder.

Sincerely,

**CLYDE SNOW & SESSIONS**

Brent R. Baker
Aaron D. Lebenta

**THOMPSON HINE**

Maranda Fritz

# EXHIBIT B

Brent R. Baker
Aaron D. Lebenta
**CLYDE SNOW & SESSIONS**
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Phone: (801) 322-2516
Fax: (801) 521-6280
brb@clydesnow.com
adl@clydesnow.com
*Attorneys for Petitioner*

Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Phone: (212) 344-5680
Fax: (212) 344-6101
Maranda.Fritz@thompsonhine.com

## UNITED STATES OF AMERICA

## SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| In the Matter of the Application of<br><br>ALPINE SECURITIES CORPORATION, a<br>Utah limited liability company<br><br>For Review of Adverse Action Taken By<br><br>NATIONAL SECURITIES CLEARING<br>CORPORATION | |

## ALPINE'S MOTION FOR AN INTERIM STAY AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

**[Oral Argument Requested]**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................. ii

I.      INTRODUCTION AND BACKGROUND ................................................1

        A.  Background of NSCC ...................................................................1

        B.  Background of Alpine ..................................................................2

        C.  Overview of the Required Deposit and its Effect ........................3

        D.  Components of the Required Deposit ...........................................4

II.     ARGUMENT ............................................................................................9

        A.  A Stay of the Illiquid Charge Should be Granted because there is a Strong Likelihood that Alpine will Prevail on the Merits, Alpine Faces Irreparable Harm Absent a Stay, There is No Prejudice in Entering a Stay to any Other Party, and the Public Interest Favors a Stay ...............................................................................9

            1.  Alpine has a Strong Likelihood of Success on the Merits in its Application for Review ...................................................................10

                a.  NSCC's Required Deposit Results in an Actual Limitation on Access ...11

                b.  NSCC's Required Deposit Violates the Exchange Act and the SEC's Rules and Regulations ..............................................12

                c.  NSCC's Required Deposit Affects Alpine's Ability to Utilize One of NSCC's Fundamentally Important Services .............................15

            2.  Alpine Faces Irreparable Injury if a Stay is not Granted ....................................15

            3.  The Stay will not Result in Harm to Any Other Party ..........................................18

            4.  The Public Interest Favors a Stay .......................................................................18

        B.  In the Alternative, NSCC's Decision to Not Allow Alpine to Use the DTC Offset should be Stayed ...........................................................19

III.    CONCLUSION AND RELIEF REQUESTED .................................................19

# **TABLE OF AUTHORITIES**

## **Cases**

*In re Application of Securities Industry and Financial Markets Association for Review of Action by Self Regulatory Organizations*
   SEC Release No. 72182, 2014 WL 1998525 (May 16, 2014)........................................... 10, 16

*In the Matter of the Application of Michael Earl McCune*
   SEC Release No. 77921, 2016 WL 2997935 (May 25, 2016)................................................ 9

*Pet Quarters, Inc. v. Depository Trust and Clearing Corp.,*
   559 F.3d 772 (8th Cir. 2009) ............................................................................................... 1

*Scattered Corp.*
   52 S.E.C. 1314 (Apr. 28, 1997) .................................................................................... 10, 15

*SEC. Indus. Fin. Mkts. Ass'n*
   SEC Release No. 72182, 2014 WL 1998525 (May 16, 2014)............................................. 11

## **Statutes**

15 U.S.C. § 78q-1 .................................................................................................... 12, 14, 16
15 U.S.C. § 78q-(b)............................................................................................................... 1
15 U.S.C. § 78s(f) ......................................................................................................... 11, 13-16

## **Regulations**

17 C.F. R. § 17Ad-22…………………………………………………………………………16
17 C.F.R. § 201.700 ............................................................................................................ 16
17 C.F.R. § 240.17Ad-22…………………………………………………………………...14

## **Rules**

NSCC Rules and Procedures, Rule 1 ...................................................................... 6, 8, 18
NSCC Rules and Procedures, Rule 2, § 1 .................................................................... 3
NSCC Rules and Procedures, Rule 2A, § 1(F) ......................................................... 3, 12
NSCC Rules and Procedures, Rule 2B, § 1 .................................................................. 3
NSCC Rules and Procedures, Rule 4, § 1 ................................................................. 3, 12
NSCC Rules and Procedure XV ....................................................... 3, 4-5, 6-7, 9, 15
SEC Release No. 34-82631....................................................................................... 5
SEC Release No. 34-54457........................................................................................ 7
SEC Release No. 72182 ........................................................................................... 16
NCSS's Form 19b-4, SR-NCSS-2017-001 (March 22, 2017)............................... 5, 6, 8

Pursuant to Commission Rule of Practice 401, Petitioner Alpine Securities Corporation ("Alpine"), files this motion requesting an interim stay of the implementation and/or assessment by the National Securities Clearing Corporation ("NSCC") of the "Illiquid Charge" or, alternatively, an interim stay of NSCC's decision to not allow Alpine to utilize the Depository Trust Company's ("DTC") offset in calculating the applicable volume limitations for the Illiquid Charge, until Alpine's Application for Review is considered and decided.

## I.     INTRODUCTION AND BACKGROUND

Alpine has filed an Application for Review with the Securities and Exchange Commission ("SEC"), pursuant to Section 19(d) and (f) of Securities Exchange Act of 1934 (the "Exchange Act"), of certain "Required Deposit" charges imposed by NSCC, a registered clearing agency, which are onerous, discriminatory and otherwise inconsistent with the requirements of the Exchange Act, and which result in a denial or limitation of Alpine's access to services at NSCC.  For purposes of this Motion, Alpine is specifically requesting a stay on the NSCC's imposition of Illiquid Deposit charges.  In the alternative, Alpine requests a stay on NSCC's decision to not allow Alpine to use the DTC offset.

### A.     Background of NSCC

NSCC is a securities clearing agency registered with the Securities Exchange Commission under Section 17A(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q-(b).  NSCC is a wholly owned subsidiary of the Depository Trust Clearing Corporation ("DTCC"), which also owns, *inter alia,* the DTC.  NSCC provides centralized clearance and settlement services for its members, and clears and settles nearly all broker-to-broker trades of equity securities in the United States.[1]  The NSCC interposes itself as central counterparty to each trade

---

[1] *See Pet Quarters, Inc. v. Depository Trust and Clearing Corp.,* 559 F.3d 772, 776-77 (8th Cir. 2009) (stating that "NSCC provides centralized clearance, settlement and information services for virtually all securities transactions in the United States.").

and guarantees both ends of the settlement of a trade – *i.e.*, the delivery obligations of every seller, and the payment obligations of every buyer – in the event of a default of one of the original buyers or sellers. The clearing systems requires integration between NSCC and DTC, such that NSCC's clearing firm members are DTC participants that hold securities in depository accounts at the DTC.  The actual settlement of trades takes place in the NSCC's Continuous Net Settlement ("CNS") System – an accounting and settling system for broker-dealer who are members of NSCC ("Clearing Members").

DTCC's board is comprised of representatives affiliated with large banking and brokerage firms.  For example, the Non-Executive Chairman and Chairman of the Board Executive Committee of DTCC spent nearly 16 years at Citi.[2]  Other board members include representatives from UBS, Morgan Stanley, Bank of America, JPMorgan Chase Bank, and TD Ameritrade.[3] There is not a single representative from a small brokerage firm.  Without question, such representative interests factor into the policy choices and rules passed by the NSCC.

### B.     Background of Alpine

Alpine is a small, self-clearing broker-dealer, registered with the SEC.  Alpine's business primarily involves clearing and settlement services for microcap and over-the-counter ("OTC") stock transactions for other brokerage firms.[4]  Brokers who are not members of the registered clearing agency need the services of a clearing broker in order to clear and settle their own trades or the trades of their customers.  A clearing broker provides clearing and settlement services for its correspondent clients ("correspondents" or "clients"), who are generally broker-dealers, and its clients' non-broker-dealer customers ("customers"), who are the beneficial buyers and sellers of a security.

---

[2] *See http://www.dtcc.com/about/leadership/board* (listing biographies of board members).
[3] *Id.*
[4] *See* Declaration of David Brant, at ¶ 3 ("Brant Decl."), attached hereto as Ex. A.

To provide clearing and settlement services and function as a clearing firm for its correspondent firms, Alpine must be a member of NSCC and access its services. Alpine is a clearing broker member in good standing of the NSCC and a DTC participant.

### C.    Overview of the Required Deposit and its Effects

As an ongoing condition to membership, and thus access to NSCC's clearance, settlement and other essential services, NSCC requires members to contribute to a "Clearing Fund," by making "Required Deposits."[5]  According to NSCC's Rules and Procedures, the minimum Required Deposit to the Clearing Fund is $10,000.  In practice, however, members are required to deposit far more than the minimum amount.  The actual amount of each member's Required Deposit is calculated by NSCC according to a complex and inscrutable formula, consisting of multiple discretionary and subjective components – which seemingly increase in number on a yearly basis – set forth in Procedure XV of NSCC's Rules.[6]

An examination of the components of the Required Deposit, and the manner in which they are actually calculated and applied by NSCC, demonstrates that they result in onerous, inequitable and arbitrary charges that *so far exceed the amount of the underlying transactions* to be cleared and settled that they cannot be credibly justified as necessary to protect NSCC from credit risk.  Indeed, the amount of each one of the Illiquid Charge, OTC Volatility Charge or OTC Mark-to-Market Charge (discussed below) *alone* generally exceeds the amount of the underlying transaction by several factors; when assessed together, as they almost always are, Alpine is often required post margin amounts that exceed the underlying transaction value significantly, sometimes by hundreds of times.

These charges, as both designed and applied to microcap or OTC Stocks, impermissibly limit Alpine's access to NSCC's essential clearing and settlement services, and contravene the

---

[5] NSCC Rules and Procedures, Rule 2, § 1, Rule 2A, § 1(F), Rule 2B, § 1, Rule 4, § 1.
[6] *See* NSCC Rules and Procedures, at Rule 4 and Procedure XV.

purposes and requirements of the Exchange Act. They impose an unreasonable and disproportionate burden on small clearing-broker members, such as Alpine, and reflect a discriminatory and anticompetitive policy towards a specific segment of the market – the microcap or OTC market – for which Alpine provides clearing services.

As a direct result of NSCC's Required Deposit charges, the number of independent or small clearing broker members of NSCC providing clearing services for firms and investors holding microcap or OTC stocks is down significantly. Alpine is aware of only a handful of firms that currently provide clearing services for these types of stocks.[7] Alpine's liquidation business alone is down approximately 75% due to the capital constraints necessary to fund the Required Deposit.[8] Commission intervention is necessary to prevent NSCC – which is helmed by a "Who's Who" in major financial institutions – from destroying its small broker-dealer constituents and choking off a significant, lawful segment of the market through the imposition of onerous and unjust factors to calculate and impose the Required Deposit charges.

### D.      Components of the Required Deposit At Issue

The formula used to calculate the Required Deposit, set forth in Procedure XV, is itself long (spanning 16 pages), complex and confusing, incorporating numerous discretionary and interwoven components and fact-specific variables. For example, for CNS Transactions alone, NSCC calculates and cumulatively imposes (or has discretion to impose) many separate charges based on a variety of components, including the following components at issue in Alpine's Petition for Review:

*Volatility Component*: NSCC calculates and imposes a "volatility" charge purportedly "designed to measure market price volatility" and to "capture market price risk associated with

---

[7] Brant Decl., at ¶¶ 34-35, Ex. A.
[8] *Id.* at ¶¶ 33, 40, Ex. A.

each Member's portfolio at a 99th percentile level of confidence."[9]  The standard volatility

formula is complex, to say the least, but essentially imposes a "Value at Risk" charge that is

based on the highest of a "core parametric estimation," a "gap risk measure," and "the portfolio

margin floor." [10]  NSCC has discretion to impose a different volatility charge for microcap stocks

(below $5/share) or OTC or pink sheet issues ("OTC Volatility Charge") consisting of  a

multiple of  "the absolute value of such positions [and] a percentage designated by [NSCC],

which percentage shall not be less than 10% . . . ."[11]

 *Mark-To-Market Component*: NSCC calculates and imposes a mark-to-market charge

generally based on the net of each day's difference between the contract price of the net positions

and the current market price for such positions.[12]  Thus, this component could result in either a

debit or a credit, if applied as written, based upon the direction in which the current market price

fluctuates.

 *Illiquid Charge Component*:  NSCC calculates and imposes a charge on "Illiquid

Positions."  An "Illiquid Position" means "a Net Unsettled Position in an Illiquid Security that

exceeds applicable volume thresholds. For net buy positions in an Illiquid Security, the volume

thresholds shall be no greater than 100 million shares based on the Member's rating on the Credit

Risk Rating Matrix. For net sell positions in an Illiquid Security, the volume threshold shall be

no greater than 1 million shares on an absolute value basis, and based on both the Member's

excess net capital and the Member's rating on the Credit Risk Rating Matrix."  Additionally,

"[i]n determining if the volume threshold is met with respect to a net sell position in Illiquid

---

[9] *See* SEC Release No. 34-82631, File No. SR-NSCC-2017-808, at 6.  The volatility charge formula is set forth at Procedure XV, § 1(A)(1)(a)(i), page 287-290 of the NSCC Rules and Procedures.

[10] *See* SEC Release No. 34-82631, File No. SR-NSCC-2017-808, at 2 (summarizing charges and components).

[11] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii), at p. 288.  NSCC purports to justify the different discretionary charge based on positions in these stocks on the basis that they are "less amenable to statistical analysis." *Id.* NSCC also sometimes refers to this OTC Volatility Charge as a "haircut margin charge." *See* NSCC's Form 19b-4, SR-NSCC-2017-001 (March 22, 2017) (Illiquid Charge), at 4, n. 3, and 5.

[12] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(b) and (c), at p. 290.

Securities, [NSCC] shall apply an offset against shares of Illiquid Securities in the Member's inventory at DTC to the quantity of shares in a Member's Illiquid Position. Such offset shall <u>not be applied to (1) net buy positions in Illiquid Securities, or (2) Members that have the weakest rating on the Credit Risk Rating Matrix.</u>"[13] The conditional offset is known as the "DTC Offset."

An "Illiquid Security" is defined as "a security . . . that either (i) is not traded on or subject to the rules of a national securities exchange registered under the Securities Exchange Act of 1934, as amended; or (ii) is an OTC Bulletin Board or OTC Link issue."[14]  Different calculations apply depending on whether the "Illiquid Position" is net "buy" or "sell" position. For "buy positions in sub-penny Illiquid Securities," the Illiquid Charge is "the aggregate shares in such positions multiplied by $.01."  For "sell positions," if the current market price is "equal to or below $1.00," the Illiquid Charge is "the product of the aggregate quantity of Illiquid Securities in the position and either (i) the One Month High Price, or (ii) the Current Market Price of the Illiquid Securities in the position multiplied by a factor of between 2 and 10,[15] based on the minimum share price, which shall not be less than $0.01."[16]  Thus, for net-sell positions in sub-penny securities, NSCC imposes a price of $.01 to calculate the Illiquid Charge, regardless of the actual price of the stock.  NSCC will use the *lesser* of the "One Month High Price" and "Current Market Price" if the share quantity in the position is less than 100% and greater than or equal to 25% of the average daily trading volume ("ADV"), and the *greater* of One Month High

---

[13] *See* NSCC Rules and Procedures, Rule 1, at p. 10 (emphasis added).

[14] *Id.*

[15] NSCC appears to have discretion in determining which number to use between 2 and 10 as a multiplier. However, in its Form 19b-4 for the Illiquid Charge, NSCC indicated that "[g]enerally, the factor would be 10 where the market price is less than $0.10"; 5 where the market price is between $0.10 and $0.20; and 2 where the market price is between $0.20 and $1.00.  *See* NSCC Form 19b-4 (Illiquid Charge), SR-NSCC-2017-001, at 8 n. 14.

[16] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(h), at p. 291.  Although not applied as frequently to Alpine because Alpine generally focuses on clearing liquidation transactions with share prices below $1.00, for Illiquid sell positions with a current market price above $1.00, NSCC calculates the "Illiquid Charge as the "product of the aggregate quantity of Illiquid Securities in the position and either (i) the One Month High Price, or (ii) the Current Market Price of the Illiquid Securities in the position rounded up to the next $0.50."  *Id.*

Price and Current Market Price if the share quantity in the position is greater than or equal to 100% of the ADV.[17]

**Excess Net Capital Premium Component**:  NSCC calculates and imposes an excess net capital premium ("ENCP") charge where "a Member's contribution to the Clearing Fund," including Illiquid Charges, Volatility Charges, Mark-to-Market Charges, and CNS Fail Charges, "when divided by its excess net capital or capital . . . is greater than 1.0 (the 'Excess Net Capital Ratio').  In such circumstances, NSCC "may require" the member to deposit an ENCP as part of the Required Deposit that is "equal to the product of (a) the amount by which the Calculated Amount exceeds its excess net capital or capital . . . multiplied by (b) its Excess Capital Ratio."[18] In practice, this means that if the member has a clearing fund requirement of $11.4 million and excess net capital of $10 million, its clearing fund requirement would exceed its excess net capital by $1.4 million, its Excess Net Capital Ratio would be 1.14 (or 114%), and thus the applicable ENCP would be 114% of $1.4 million or $1,596,000.  If the same member had a clearing fund requirement of $20 million, its Excess Net Capital Ratio would be 2.0 (or 200%) and the applicable ENCP would be 200% of $10 million, or $20 million.[19]  NSCC has discretion whether to collect the ENCP.[20]

**Credit Risk Rating Matrix Component**:  NSCC's CRRM rating is not an express component of the Required Deposit formula.  However, it directly impacts several of the components, including whether the member will face an Illiquid Charge.  For example, as indicated, the Illiquid Charge only applies on net sell positions when a member exceeds certain volume thresholds in Illiquid Securities.  For a member with a CRRM rating between 1-4, the

---

[17] *See id.*
[18] *See* NSCC Rules and Procedures, Procedure XV, § 1(B)(2), at p. 297.
[19] *See* SEC Release No. 34-54457, File Nos. SR-FICC-2006-03 and SR-NSCC-2006-03, at 3-5 (September 15, 2006) (using these sample calculations).
[20] *See* NSCC Rules and Procedures, Procedure XV, § 1(B)(2), at p. 297

volume threshold is 1 million shares when the net sell position is equal to or greater than 25% of the ADV in those shares.  For members with a CRRM rating between 5-7, who have the same net sell position in the same securities, the applicable volume threshold is 500,000 shares if that member's excess net capital exceeds $10 million.  For members with a CRRM rating between 5-7 whose excess net capital is equal to or less than $10 million, the applicable volume threshold is 100,000 shares.[21]  Additionally, members with the weakest CRRM rating cannot utilize the DTC Offset to get below the applicable volume threshold.[22]

NSCC's CRRM rating is based on a mix of objective and subjective factors that NSCC assesses in a manner that it has been withheld from the industry on the basis that it is "proprietary."[23] According to the information available, the formula includes consideration of quantitative factors (size, i.e., total excess net capital; capital, leverage, liquidity and profitability) and qualitative factors (market position and sustainability, management quality, capital and liquidity management, geographic and business/product diversity, and access to funding).[24]  It is unclear what weight NSCC ascribes to each individual factor within the larger quantitative and qualitative categories to arrive at a CRRM rating for a member.  It bears no relationship to a firm's actual credit rating or, apparently, whether the firm has ever defaulted on any obligation to NSCC.

In addition to these components, NSCC imposes, or has discretion to impose a variety of additional margin charges in connection with the Required Deposit,[25] including a second discretionary volatility charge.[26]

---

[21] *See* NSCC's Form Rule 19(b)(4) (Illiquid Charge), SR-NSCC-2017-001, at 7.
[22] *See* NSCC Rules and Procedures, Rule 1, at p. 10.
[23] Brant Decl., at ¶ 17, Ex. A.
[24] *See* NSCC Rules and Procedures, Rule 1, at p. 5.
[25] For example, NSCC also calculates and imposes a charge for (a) a Member's "aggregate CNS Fails Positions" by multiplying the current market value for such positions by . . . 20% for Members [such as Alpine] rated 7 on the CRRM," NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(e); a "margin requirement differential component charge," *id.* at § 1(A)(1)(f); and a "coverage component charge," *id.* at § 1(A)(1)(g).

Although NSCC's calculation and assessment of the Illiquid Charge, OTC Volatility Charge, OTC Mark-to-Market, ENCP and CRRM are all at issue in Alpine's Application for Review, for the purposes of this Motion, Alpine requests an interim stay of NSCC's assessment of the Illiquid Charges component or, in the alternative, a stay of NSCC's decision to not allow Alpine to use the DTC Offset until Alpine's Application for Review is addressed and decided by the Commission. A stay of the foregoing components will allow Alpine to continue to operate its business while the Application for Review is considered by the Commission.[27]

## II.   ARGUMENT

### A.   A Stay of the Illiquid Charge Should be Granted because there is a Strong Likelihood that Alpine will Prevail on the Merits, Alpine Faces Irreparable Harm Absent a Stay, There is No Prejudice in Entering a Stay to any Other Party, and the Public Interest Favors a Stay.

The Commission weighs four factors in deciding whether to grant a stay: (1) "whether there is a strong likelihood that the moving party will succeed on the merits of the appeal"; (2) "whether the moving party will suffer irreparable harm without a stay"; (3) "whether any person will suffer substantial harm as a result of a stay"; and (4) "whether a stay is likely to serve the public interest." *In the Matter of the Application of Michael Earl McCune*, SEC Release No. 77921, 2016 WL 2997935, at * 1 (May 25, 2016). However, the factors are "not accorded equal weight" as "a stay may be granted where there is a high probability of irreparable harm, but a lower probability of success on the merits, or vice versa." *Id.*; *see also Scattered Corp.*, 52 S.E.C. 1314, 1315 (Apr. 28, 1997) (the petitioner need only show "a substantial case on the merits" if the other three factors "strongly favor a stay"). Here, all four factors strongly support a stay.

---

[26] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(d), at p. 290 (stating NSCC may also impose a "special charge" upon "Members in view of price fluctuations in or volatility or lack of liquidity of any security." No formula is identified for calculating this charge. Rather, NSCC states that it "shall make any such determination based on such factors as the Corporation determines to be appropriate from time to time.").

[27] *See* Brant Decl., at ¶ 41, Ex. A.

1.   **Alpine has a Strong Likelihood of Success on the Merits in it Application for Review.**

Sections 3, 17A and 19 of the Exchange Act impose mandatory requirements with which NSCC, as a registered clearing agency and SRO, must comply in designing, implementing and applying its rules and procedures, and in calculating and imposing charges.  For example, Section 17A(b) requires, as a condition to registration, that a clearing agency's rules meet certain standards, such as fair and reasonable allocation of fees and nondiscriminatory purpose and effect.  Section 19(g) similarly requires all SROs to comply with the Exchange Act, and Section 19(f) requires, *inter alia,* that any fee constituting a limitation on access be consistent with the Exchange Act. Sections 17A, 19 and 3(f) all proscribe clearing agency rules with an unnecessary anticompetitive burden and effect. Section 3(f) also requires the SEC, in reviewing an SRO rule, to determine whether the action promotes "efficiency" and "capital formation."

Based on the foregoing mandatory requirements, the Commission has identified three primary considerations that determine whether an SRO's actions, including imposition of a fee, improperly limits access to an essential services: (a) there must be an "actual limitation of access";[28] (b) "the applicant must assert a basis that, if established, would lead the Commission to conclude that the fees violate Exchange Act Section 19(f)";[29] and (c) the denial or limitation must be to the "applicant's ability to utilize one of the fundamentally important services offered by the SRO."[30]  Alpine has a strong likelihood of success on each of the foregoing factors considered by the Commission.

---

[28]*In re Application of Securities Industry and Financial Markets Association for Review of Action by Self Regulatory Organizations ("In re SIFMA"),* SEC Release No. 72182, 2014 WL 1998525, at *8 (May 16, 2014).
[29] *Id.,* at *9.
[30] *Id.*

a.  ***NSCC's Required Deposit Results in an Actual Limitation on Access.***

Section 19(f) requires the Commission to set aside an SRO action denying or limiting access to services if it does <u>not</u> find, *inter alia,* that the SRO's "rules are, and were applied in a manner, consistent with the purposes" of the Exchange Act, or if it finds the prohibition or limitation on access "imposes any burden on competition not necessary or appropriate."[31] Excessive fees and charges can constitute a denial of access to services.[32] The burden is on NSCC to demonstrate that its rules and actions are consistent with the Exchange Act and the SEC's rules.[33]

In this matter, there is an "actual limitation of access" to "fundamentally important services offered by the SRO." [34] As detailed in the Declaration of David Brant, NSCC's calculation and application of the specified Required Deposit components to Alpine substantially limits Alpine's access to NSCC's essential clearing and settlement services.  Alpine primarily clears liquidation (or sale-side) microcap or OTC stock transactions, including, frequently, stocks with a price less than $.01/share.  To clear such trades, NSCC imposes the Required Deposit, including the challenged components, as "margin."[35]  These "margin" charges, taken individually or collectively, are astronomical, exceeding the market value of the underlying transaction by many times, and are particularly egregious when a sub-penny stock is involved because NSCC imposes a fictional price of $.01/share in calculating the Required Deposit.[36]  The challenged components of the Required Deposit are so onerous they often required Alpine to turn

---

[31] 15 U.S.C. § 78s(f).
[32] *See Sec. Indus. Fin. Mkts. Ass'n,* SEC Release No. 72182, 2014 WL 1998525, at *8 (May 16, 2014).
[33] *See* Section 19(f), 15 U.S.C. § 78s(f) and Rule of Practice 700, 17 C.F.R. § 201.700. *See also Sec. Indus. Fin. Mkts. Ass'n,* 2014 WL 1998525, at *9 n. 88.
[34] *In re SIFMA*, *supra*, at *8-9.
[35] NSCC Rules & Procedures at Rule 2A, § 1(F), Rule 4, §§ 1, 8.
[36] Brant Decl., at ¶¶ 19, 22, Ex. A for examples of charges, and Rulemaking Petition, at pp. 18-25, for a full discussion of the challenged components.

down transactions due to regulatory capital constraints,[37] even though Alpine's runs its operations in a manner that should allow it to avoid at least the Illiquid Charge.[38]  As a direct result of these charges, Alpine's liquidation business is down approximately 75%. *See* Brant Decl., at ¶¶ 33, 40, Ex A.

Alpine, and other small broker-dealers play a critical role in providing liquidity for securities of small companies that have no other access to capital, such as through loans.  Large investment bank members do not typically serve this market segment.  Without firms willing and able to process these transactions, like Alpine, these small companies will be cut-off from the capital markets to raise money to grow their businesses. In this regard, the challenged components do not just have an anti-competitive and discriminatory effect, they also impermissibly limit access to services by Alpine's actual and potential customers, in violation of Section 17A(b)(6).[39]

> **b.**     ***NSCC's Required Deposit Violates the Exchange Act and the SEC's Rules and Regulations.***

Section 19(f) requires the Commission to set aside an SRO action denying or limiting access to services if it does <u>not</u> find, *inter alia,* that the SRO's rules are, and were applied in a manner, consistent with the purposes" of the Exchange Act, or if it finds the prohibition or limitation on access "imposes any burden on competition not necessary or appropriate."  15

---

[37] Brant Dec., at ¶¶ 36, 38, 40, Ex. A, and Alpine's Rulemaking Petition, pp. 12-18, for detailed discussion of the damage from the charges.

[38] As discussed in Alpine's Rulemaking Petition, at p. 11, NSCC imposes the Illiquid Charge on transactions involving OTC or microcap stocks that exceed volume thresholds based on a firm's CRRM rating, which NSCC sets from an undisclosed formula. In determining whether the volume threshold is met, NSCC generally offsets the quantity of shares in the member's sell position against the number of those shares held by the member at DTC (the DTC offset); if the DTC offset places the member below the applicable volume threshold, no Illiquid Charge will be assessed.  Alpine almost always has sufficient shares at DTC to avoid the Illiquid Charge completely.  Brant Decl., at ¶¶ 13, 23, Ex. A. However, without providing any rationale, NSCC has determined to make the DTC offset unavailable to members with the weakest CRRM rating, such as Alpine.  *Id*. at ¶¶ 13, 17, Ex. A.

[39] *See* 15 U.S.C. § 78q-1(b)(6) ("No registered clearing agency shall prohibit or limit access by any person to services offered by any participant therein.").

U.S.C. 78s(f). As discussed in further detail in Alpine's Rulemaking Petition, at pages 20-26, NSCC's Required Deposit violates multiple provisions of the Exchange Act, SEC Rules.

First, Section 17A(b)(3)(D) requires that the "rules of the clearing agency provide for the equitable allocation of reasonable dues, fees and other charges among its participants."[40] This statute thus imposes two requirements: (1) fees, dues and charges must be "reasonable," and (2) they must be "equitabl[y] allocated. NSCC's rules with respect to the Required Deposit, and the resultant charges that NSCC imposes on Alpine under these rules, meets neither requirement. The challenged components of the Required Deposit combine to impose margin charges on Alpine that are exponentially greater than the underlying transaction amount. This is facially unreasonable for a number of reasons, including: (a) the sheer amount of the charge, (b) the lack of adequate justification to require margin that is so disproportionately high compared to the transaction, and (c) the chilling effect this has upon Alpine's ability to provide clearing services to its customers, including the number of transactions it can clear per day, and upon the OTC and microcap markets in general.

Second, promoting competition and capital formation are each central to the purpose of the Exchange Act. As Congress noted in amending the Exchange Act in 1975, which added Sections 17A and 19 to the Exchange Act, "it is in the public interest to assure . . . fair competition among brokers and dealers, among markets and between exchange markets and over-the-counter markets."[41] The goal is not to hinder, but to "enhance competition" and to "allow economic forces, **interacting in a fair regulatory field**, to arrive at appropriate variations in practices and services."[42] Following these directives, the Commission should set aside the challenged components of the Required Deposit as they have a blatantly

---

[40] 15 U.S.C. § 78q-1(b)(3)(D)
[41] S. Rep. 94-75, at 8.
[42] *Id.* (emphasis added).

anticompetitive effect as applied, and serve to limit, rather than promote capital formation.  Each component is designed to impose, and results in, additional charges and restrictions being applied to smaller, less capitalized members who provide clearing services in the OTC and microcap markets. This directly affects competition and capital formation of those member firms subject to the restrictions because they must use NSCC to provide clearing services, which gives those member firms who do not face these restrictions an unfair competitive advantage. As a direct result of these charges, as indicated, Alpine is able to process only a handful of trades at a time and its liquidation business is down 75%.[43]

Third, Section 17A(b)(3)(F) requires, *inter alia,* that the "rules of the clearing agencies are designed" to "protect investors and the public interest," and "are not designed to permit unfair discrimination in the protection of admission of participants or among participants in the use of the clearing agency . . . ."[44]  The challenged components disproportionately impact only those small members who focus on the OTC and microcap markets and those issuers and investors in that market segment.

Fourth, Section 17A(d) and Section 19(g) require NSCC to comply with the rules and regulations promulgated by the SEC.[45]  The challenged components violate several provisions of these standards.  For example, NSCC's CRRM rating system, which as indicated employs a secret formula to weigh a variety of undefined factors, clearly fails to comply with transparency requirements found in Subsection (e)(1).[46]

Finally, Section 19(g) requires every SRO to "comply with . . . its own rules . . . ."[47] Alpine can find no support in NSCC's Rules or Procedure XV for its practice of imposing OTC

---

[43] *See* Brant Decl., at ¶¶ 33, 40, Ex. A.
[44] 15 U.S.C. § 78q-1(b)(3)(F).
[45] *See* 15 U.S.C. § 78q-1(d) *and* 15 U.S.C. § 78s(g).
[46] *See* 17 C.F.R. § 240.17Ad-22(e)(1).
[47] 15 U.S.C. § 78s(g).

Volatility Charges or OTC Mark to Market charges that equal or exceed the underlying transaction amount just because a microcap or OTC stock is involved.[48]

### c.   NSCC's Required Deposit Affects Alpine's Ability to Utilize One of NSCC's Fundamentally Important Services.

The third factor the Commission considers is whether the denial impacts the "applicant's ability to utilize one of the fundamentally important services offered by the SRO." *In re SIFMA*, *supra*, at *9. This element is clearly met.  NSCC requires Alpine to pay the Required Deposit, including any applicable Illiquid or ENCP Charges, on a daily basis.  Failure to pay all required amounts results in a member default and an inability to utilize NSCC's clearing and settlement services.  This is *the most* fundamentally important service NSCC offers, and it is essential to Alpine's business.

### 2.   Alpine Faces Irreparable Injury if a Stay is Not Granted.

A stay is merited when the petitioner would otherwise lose the benefit of a successful appeal.  *See Scattered Corp.*, 52 S.E.C. at 1320 (staying a firm's expulsion, an executive's bar, and their respective fines "pending the resolution of this case on the merits" because "[t]he benefit of any possible reduction of [the] bar and fines . . . would be lost, absent a stay at this juncture").

Alpine will suffer irreparable damages if the stay is not entered as a result of the financial burden placed every day upon Alpine through the Illiquid Deposit charges.  As stated above, Alpine's liquidation business alone is down approximately 75% due to the capital constraints necessary to fund the Required Deposit.[49]  Simply, the challenged components of the Required Deposit, particularly as applied in the aggregate, result in arbitrary, onerous and unreasonable charges that impermissibly limit Alpine's access to NSCC's services, unnecessarily stifle

---

[48] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii), (b) and (c).
[49] Brant Decl., at ¶¶ 33, 40, Ex. A

competition, and unfairly discriminate against small broker-dealers in the OTC or microcap market in violation of the Exchange Act.

First, as stated in detail above, there is an "actual limitation of access" to "fundamentally important services offered by the SRO."[50] As detailed in the Declaration of David Brant, NSCC's calculation and application of the specified Required Deposit components to Alpine substantially limits Alpine's access to NSCC's essential clearing and settlement services. *See* p. 11, *supra*.

Second, NSCC's calculation and imposition of the Required Deposit violates the Exchange Act in a number of ways.[51]  The CRRM and the charges at issue, and the rules on which they are based: (a) are arbitrary and unsupported by any adequate rationale; (b) result in charges that are onerous and facially unreasonable in relation to the value of the underlying transaction; and (c) impose an unnecessary discriminatory and anticompetitive burden by targeting smaller NSCC members in the OTC and microcap markets.[52]

By way of example, consider the following trades processed by Alpine for clearing through NSCC's CNS system for its client, Bezalel, on November 23, 2018 and November 26, 2018.[53]  The trade involved a contract to sell 198,000 total shares (99,000 on 11/23/2018 and 99,000 on 11/26/2018) of PMCB at a price of $0.020 for total proceeds of $4,016.64. To process this approximately $4,016.64 trade for clearing through NSCC, however, ***Alpine was required to deposit $928,175.84,*** including a total illiquid charge of $903,756.60, total volatility charge of

---

[50] *See In re Application of Securities Industry and Financial Markets Association for Review of Action by Self Regulatory Organizations ("In re SIFMA"),* SEC Release No. 72182, 2014 WL 1998525, at *8-9 (May 16, 2014).

[51] Specifically, as detailed in Alpine's Rulemaking Petition, at pp. 18-25, the challenged components violate Section 17A, 15 U.S.C. § 78q-1(b)(3)(D), (F) and (I), *and* (b)(6); Section 19(f), 15 U.S.C. § 78s(f); *and* 17 C.F.R. § 17Ad-22(e)(1), (23) (requiring transparency); *id.* at (e)(4), (6) and (7) (requiring NSCC's margin systems and procedures be "reasonably designed," and produce margin levels "commensurate with" the risk).

[52] *In re SIFMA,* at *9 (stating, "the applicant must assert a basis that, if established, would lead the Commission to conclude that the fees violate Exchange Act Section 19(f)," and holding that allegations that SRO fees were "onerous" and "supracompetitive" and violated the Exchange Act sufficient for Commission review).

[53] This trade is detailed in the Brant Decl., at ¶ 19, Ex. A.

$23,222.40, and total Mark-to-Market charge of $1,196.84.  These two trades resulted in an NSCC deposit trade proceeds multiple of 231.08 (that is, 231 times the value of the underlying trade).  The OTC Volatility Chare and Illiquid Charge exceeded the value of the transaction by several multiples.

These charges are patently unreasonable and frankly absurd.  Yet, Alpine now faces similarly egregious and disproportionate Required Deposit charges involving these component charges every single day, particularly when processing a sub-penny stock trade for clearance and settlement through NSCC's CNS system. Several additional examples of similar charges, as applied to recent trades, are set forth in the attached Declaration, including charges exceeding the underlying transaction value by over 200 times or 20,000%.[54]

Even under NSCC's methodology, Alpine could have reduced the impact by avoiding the Illiquid Charge on the BLPG trade and almost every other transaction, except that NSCC does not permit Alpine to avail itself of the DTC Offset.  With respect to OTC securities that Alpine processes, Alpine requires that the security position be deposited, cleared and settled at DTC before entering liquidating trades on a regular way basis.[55]  As a result, if the DTC Offset were available to Alpine, it would eliminate the Illiquid Charge completely on the sample transaction, and many, if not all, other transactions, because it would take Alpine below the minimum volume threshold.[56]  However, because NSCC has arbitrarily assigned Alpine the weakest CRRM Rating of a "7" – even though Alpine has not defaulted on any of its obligations to NSCC under current ownership and has no understanding of the basis for its rating, as discussed *infra* –

---

[54] *See* Brant Decl., at ¶ 19, 22, 38, Ex. A.
[55] *See id*. at ¶¶ 13, 23, Ex. A.
[56] *See id*.

Alpine is not able to utilize the DTC Offset.[57]

Alpine is adversely impacted by the rules, and the charges imposed by application of the rules, on a continuous and ongoing basis.  As a direct result of the Required Deposit, specifically the Illiquid Deposit charges, Alpine's liquidation business is down approximately 75%.[58] Alpine's business is being irreparably harmed due to the financial stress that the Required Deposit has caused.  However, Alpine would be able to continue to operate as a business if the Illiquid Charge is not applied or assessed or, in the alternative, if Alpine were able to apply the DTC Offset when applicable.[59]

### 3.      The Stay will not Result in Harm to Any Other Party.

As detailed above, the Illiquid Deposit charges are arbitrary, unreasonable, and are not rationally related to any calculable potential damages.  Thus, a stay of Illiquid Deposit charges will not result in any damages to any other party.  Moreover, a stay of NSCC's decision to not allow Alpine to use the DTC Offset would likewise not result in any harm to any other party.  If Alpine were allowed to use the DTC Offset, it would forgo the Illiquid Deposit charges on almost every transaction.  Alpine is only denied the benefit of the DTC Offset because NSCC has given Alpine a lower CRRM rating, without any explanation as to how its CRRM rating is calculated.  Alpine's use of the DTC Offset, when it applies based on the volume of share at DTC, notwithstanding its CRRM rating, would not result in any harm to any other party.

### 4.      The Public Interest Favors a Stay.

The public interest favors a stay because of the impact of the Illiquid Deposit charges on the market and Alpine's access to NSCC.  The cumulative impact of these margin requirements

---

[57] *See id.* at ¶¶ 10, 16, Ex. A (identifying Alpine's CRRM Rating from NSCC of a "7", and confirming that Alpine has not defaulted on its obligations to NSCC under current ownership – in place since at least 2011 when Alpine was purchased by current ownership); *see also* NSCC Rules and Procedures, Rule 1, at p. 10
[58] Brant Decl., at ¶¶ 33, 40, Ex. A.
[59] *Id.* at ¶¶ 13, 23, 41, Ex. A.

creates a self-propelling downward cycle.  Alpine must devote additional capital to post the

Required Deposit each day in order to process trades through NSCC's CNS system, including

the onerous Illiquid Charges.  Because of this, Alpine must limit the volume of trades it can

process per day, both due to capital constraints and to avoid ENCP charges.  This, in turn, limits

Alpine's ability to raise additional capital through its clearing business, and effectively pull out

of the cycle.  As a direct result, as would be expected, Alpine's liquidation business is down

almost 75% due to the artificial restraints on the number of liquidation transactions it can clear

through NSCC per day and attrition of customers who leave or go out of business because they

cannot clear their transactions through Alpine.[60]  *See* Brant Decl., at ¶¶ 34-35, 42, Ex. A,

regarding the impact of the Illiquid charges on other broker dealers and ripple effect on small

companies in the market.

> **B.     In the Alternative, NSCC's Decision to Not Allow Alpine to Use the DTC
> Offset should be Stayed.**

As detailed above, Alpine would be able to continue its business without irreparable harm

if the NSCC's decision to not allow Alpine to use the DTC Offset is stayed pending

consideration of Alpine's Application for Review.[61]  Such a decision would negate the Illiquid

Deposit charges but only when the offset calculation was met thereby ensuring that no harm

could come to any other person or entity as a result of Alpine's use of the DTC Offset.

## III.     CONCLUSION AND RELIEF REQUESTED

Alpine requests an interim stay of the implementation and/or assessment by NSCC of the

Illiquid Charge or, alternatively, an interim stay of NSCC's decision to make the DTC's Offset

unavailable to Alpine in calculating the applicable volume limitations for the Illiquid Charge,

until Alpine's Application for Review is considered and decided.

---

[60] Brant Decl., at ¶¶ 33, 40, Ex. A.
[61] *See id.*, at ¶ 41, Ex. A.

DATED this 19th day of December, 2018.

**CLYDE SNOW & SESSIONS**

Brent R. Baker
Aaron D. Lebenta

**THOMPSON HINE**

Maranda E. Fritz

*Attorneys for Petitioner*

## <u>ATTORNEY CERTIFICATION</u>

Pursuant to Rule 154(c) of the Commission's Rules of Practice, I hereby certify that the foregoing document contains 6,612 words, exclusive of the tables of contents and authorities.


Brent R. Baker

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of December, 2018, I caused the foregoing to be served by U.S. Mail Certified, Return Receipt Requested, on the following:

The Office of the Secretary
Attn: Brent J. Fields, Director
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

Office of Deputy General Counsel
Attn: Nikki Poulos
National Securities Clearing Corporation
55 Water Street
New York, NY 10041

Brent R. Baker
*Counsel for Alpine Securities Corporation*

# EXHIBIT A

## DECLARATION OF DAVID BRANT

I, David Brant, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

1.      My name is David Brant and I am a resident of Salt Lake County, Utah, am over 18 years of age, and make the statements herein based on my personal knowledge.

2.      I am the Chief Financial Officer at Alpine Securities Corporation ("Alpine") in Salt Lake City, Utah.

3.      Alpine is a small, self-clearing broker-dealer, registered with the Securities and Exchange Commission ("SEC").  Alpine's business primarily involves clearing and settlement services for microcap and over-the-counter ("OTC") stock transactions for itself and for other brokerage firms.

4.      I am familiar with Alpine's Application for Review and Rulemaking Petition with respect to certain actions, practices and rules of the National Securities Clearing Corporation ("NSCC") and submit this Declaration in support of that Petition.

5.      A clearing broker, such as Alpine, provides clearing and settlement services for itself and for its correspondent clients ("correspondents" or "clients"), who are generally broker-dealers, and its clients' non-broker-dealer customers ("customers"), who are the beneficial buyers and sellers of a security.

6.      In order for Alpine to provide clearing and settlement services and function as a clearing firm for its correspondent firms, Alpine must be a member of NSCC.  Alpine is a clearing broker member in good standing of the NSCC and a Depository Trust Company ("DTC") participant.

7.      As an ongoing condition to membership, and thus use of NSCC's clearance,

settlement and other essential services for Alpine and its customers, NSCC requires members, including Alpine, to contribute to a "Clearing Fund," by making "Required Deposits."

8.     The formula used to calculate the Required Deposit charges is very complex and includes many discretionary and fact-specific variables set forth in Procedure XV of the NSCC's Rules and Procedures.

9.     As detailed below, certain components of NSCC's Required Deposit charges have resulted in extremely high and onerous charges that so far exceed the amount of the underlying transactions to be cleared and settled that they cannot be credibly justified, which has limited and denied Alpine's access to NSCC's essential clearance and settlement services and caused Alpine to lose a significant amount of its liquidation business.

10.     While the Required Deposit has many separate components, the ones that are the most onerous, and impose the greatest hardship on Alpine and limitation of Alpine's access to NSCC's clearance and settlement services in connection with its liquidation or sale-side clearance and settlement of OTC and microcap market transaction for its correspondent brokers and other clients, are: (a) the "Illiquid Charge"; (b) the Excess Net Capital Premium ("ENCP"); (c) the Volatility Charge for microcap and OTC stock transactions (the "OTC Volatility Charge"), particularly as applied to sub-penny stock transactions; (d) the Mark-to-Market Charge as applied to sub-penny stock OTC or microcap stock transactions ("OTC Mark-to-Market Charge"); and (c) NSCC's Credit Risk Rating Matrix ("CRRM"), pursuant to which NSCC assigns to members ratings between 1 and 7, with a rating of "7" being the weakest.  I have reviewed the description and discussion of these Required Deposit components in the Rulemaking Petition, and agree with and adopt them herein.

11.     I note that the CRRM is not itself a charge imposed on members by the NSCC.

2

However, it is my understanding that it directly factors into the NSCC's calculation of the Illiquid Charge, and is thus a component of the Required Deposit. In particular, in calculating and determining the applicability of the Illiquid Charge to a particular transaction, it is my understanding that NSCC imposes different volume thresholds based upon a member's CRRM rating, with members with better CRRM ratings being able to larger net sell positions in the so-called "Illiquid Securities" than members with weaker CRRM ratings. Importantly for Alpine, in determining these volume thresholds, NSCC will first generally "offset" the quantity of shares in a member's sell position against the number of shares in the same security held by the member at DTC. NSCC calls this the "DTC Offset." Thus, if certain members have offsetting shares at DTC, they could fall below the applicable volume threshold after the offset and would not be subject to the Illiquid Charge. However, NSCC has taken the position that the DTC Offset is not available to members with the weakest CRRM Rating.

12.     NSCC has assigned Alpine the weakest CRRM Rating – a "7," and thus does not allow Alpine to utilize the DTC Offset.

13.     This is critically important, because Alpine, as a matter of policy and operations, requires that securities positions on a liquidation transaction be cleared and settled at DTC before entering liquidating trades on a regular way basis. As a result, Alpine almost always would be able to avoid the Illiquid Charge, if it were able to utilize the DTC Offset. I have not heard or located any explanation from NSCC or its representatives as to why NSCC determined to make the DTC Offset unavailable to certain members but not others.

14.     Because Alpine's CRRM Rating is critical to the Required Deposit amounts it will have to post, particularly the Illiquid Charge, Alpine has attempted to understand how its CRRM rating is calculated. However, NSCC has not disclosed to the industry the basis for its

calculation of the CRRM rating.

15.    According to the information available, the formula includes consideration of quantitative factors (size, i.e., total excess net capital; capital, leverage, liquidity and profitability) and qualitative factors (market position and sustainability, management quality, capital and liquidity management, geographic and business/product diversity, and access to funding).  It is unclear what weight NSCC ascribes to each individual factor within the larger quantitative and qualitative categories to arrive at a CRRM rating for a member.  The CRRM rating bears no relationship to a firm's actual credit rating or, apparently, whether the firm has ever defaulted on any obligation to NSCC.

16.    Under current ownership that has been in place since 2011, for example, Alpine has not defaulted on its obligations to NSCC to my knowledge.

17.    I have personally participated in several telephonic conferences with representatives of NSCC to discuss Alpine's CRRM rating, including how it is calculated and how it could be improved, and to request relief from the Required Deposit charges at issue from NSCC.  In one such conversation occurring on or around September 6, 2018, a representative of NSCC told me that the CRRM rating is based on a mix of objective and subjective factors that NSCC assesses, but that NSCC will not disclose how each individual factor is weighed or assessed on the basis that such information is "proprietary."  During this conversation, NSCC was also not receptive to Alpine's requests for waiver or other relief from the deleterious impacts of the Required Deposit charges at issue in the Rulemaking Petition and Petition for Review.

18.    As a result of NSCC's implementation of the Required Deposit charges and components at issue, I believe that Alpine's and its correspondent customers' businesses have been unfairly targeted with excessive and arbitrary charges which are non-conducive to entering

into a trade and thus inhibit and discourage market access and participation.

19.    By way of example, consider the following trades processed by Alpine for clearing through NSCC's CNS system.

 a. The first trade involved a contract to sell 99,000 shares of PMCB on November 23, 2018, valued at $0.020, for a total proceeds amount of $2,008.32. To process this $2,008.32 trade for clearing through NSCC, however, *Alpine was required to deposit $40,803.00,* including:

  i. <u>Illiquid Charge</u>: $34,956.60.

  ii. <u>OTC Volatility Charge</u>: $5,846.40 (NSCC's rules indicate that the OTC Volatility Charge shall be, at NSCC's discretion, a haircut of not less than 10% of the position. Here, however, the Volatility Charge was 100% of the transaction amount. Although I am not certain of NSCC's precise method of calculation, because a sub-penny stock was involved, I believe that NSCC imposed a fictional $.01/share price to calculate the Volatility Charge.

  iii. <u>OTC Mark-to-Market Charge</u>: $116,179.78 (although this charge can either be a debit or credit based on the closing price of the security pending settlement, in this case NSCC appears to have used the fictional $.01/share price so it created a mark-to-market-loss charge).

 b. The second trade involved a contract to sell another 99,000 shares of PMCB on November 26, 2018, valued at $0.020, for the same total proceeds amount of $2,008.32. To process this $2,008.32 trade for clearing through NSCC, however, *Alpine was required to deposit $887,372.84,* including:

    i.  <u>Illiquid Charge</u>: $868,800.00.

    ii.  <u>OTC Volatility Charge</u>: $17,376.00.

    iii.  <u>OTC Mark-to-Market Charge</u>: $1,196.84.

20.    Although the entire exposure associated with the above trades totaled $4,016.64, NSCC's methodology resulted in Alpine being required to deposit a total of $928,175.84 to access NSCC's (CNS) clearance and settlement services.  These two trades resulted in an NSCC deposit trade proceeds multiple of 231.08 (that is, 231 times the value of the underlying trade). The OTC Volatility Chare and Illiquid Charge exceeded the value of the transaction by several multiples.

21.    Even under NSCC's methodology, the Illiquid Charge would have been minimal or non-existent on this sample transaction except, as indicated above, NSCC does not permit Alpine to avail itself of the DTC Offset based on Alpine's CRRM rating.

22.    Below are additional recent trades from Alpine's customers wherein the Required Deposit charges are similarly arbitrary and grossly and unfairly disproportionate to the value of the transaction:

    a.    Client: Power Up; trade date: 11/29/2018 and 11/30/2018; Symbol: TSOI; Description: Therap Sol

        i.    4,347,826 total shares traded over the two days (3,085,100 on 11/29/2018 and 1,262,726 on 11/30/2018), valued at $0.003, resulting in a total trade value of $12,710.64 with a total illiquid charge of $262,118.21, total volatility charge of $14,865.85, total Mark-to-Market charge of $51,192.51, and an NSCC deposit trade proceeds multiple of 25.82.

6

   b.    Client: La Jolla; trade date: 11/29/2018; Symbol: VGID; Description: V Group Inc.

      i.    1,800,000 shares valued at $0.00033, resulting in a trade value of $587.20, with an illiquid charge of $18,000.00, volatility charge of $3,600.00, Mark-to-Market charge of $17,280.00, and an NSCC deposit trade proceeds multiple of 66.21.

   c.    Client: Silver Rock; trade date: 11/19/2018 and 11/20/2018; Symbol: PMCB; Description: Pharmacyte

      i.    942,319 total shares traded over the two days (400,000 on 11/19/2018 and 542,319 on 11/20/2018), valued at $0.045, resulting in a total trade value of $42,138.09 with a total illiquid charge of $68,439.11, total volatility charge of $11,604.73, total Mark-to-Market charge of $317.68, and an NSCC deposit trade proceeds multiple of 1.91.

23.    If Alpine were able to utilize the DTC Offset, it would have avoided the large applicable Illiquid Charges, on these transactions as well.

24.    Alpine receives Notices of Daily Margin Statements from NSCC imposing similar charges each business day. The daily cumulative Illiquid Charges alone generally range from $500,000 to $1.5 million on transactions that are a fraction of that amount. Upon request, I can provide many more examples of similarly onerous and disproportionate Require Deposit charges.

25.    When a transaction involves stocks that are below $.01/share, it is my understanding that NSCC generally does not use the actual stock price in calculating the Illiquid Charge, Volatility Charge and Mark-to-Market. Instead, it is my understanding that NSCC

commonly uses a fictional "minimum" price per share of $.01 in its calculations of these components. It is my belief that use of a "rounded up" share value instead of the actual share value results in Required Deposit charges that are grossly disproportionate to the transaction value. By simple illustration, changing a share value from $.001 to $.01 in a formula results in a tenfold increase in the resultant product. Similarly, it almost invariably ensures that there will be a Mark-to-Market charge, instead of a credit, because the current market price will be artificially increased in comparison to the transaction amount. Although it is not completely clear for all the occasions that NSCC's uses a fictional share price in the calculating the Illiquid Charge, OTC Volatility or Mark-to-Market to Alpine, and appears to be inconsistent, I believe that this practice explains some of the more disproportionate charges. Based on my review of NSCC's rules and Procedure XV, I do not see any authorization for NSCC to use a fictional price per share in calculating the OTC Volatility Charges or Mark-to-Market.

26.     I also note that NSCC indicates that it has discretion to impose a different formula for calculating Volatility for OTC and microcap stocks (sub-penny stocks are not mentioned) than for shares traded on registered exchanges or which exceed $5/share. NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii). NSCC indicates that to calculate the OTC Volatility Charge it will impose a "haircut" based on the multiple of the absolute value of such positions and a percentage that NSCC designates that shall not be less than 10%. From these descriptions, I would expect the OTC Volatility Charge to be a fraction of the underlying transaction – i.e., a "haircut." However, as indicated above, in actual practice NSCC's OTC Volatility Charge to Alpine, particularly when sub-penny stocks are involved, is frequently equal to or in excess of the actual value of the transaction, sometimes by many orders of magnitude. This, particularly when combined with the Illiquid Charge and OTC Mark-to-Market Charge, has a devastating

8

impact on Alpine's available regulatory capital and access to NSCC's CNS system for customer transactions, and thus, Alpine's business, as explained further below.

27.    Alpine did not incur an "Excess Net Capital Premium" or "ENCP" charge with respect to the sample transactions above.  In fact, Alpine rarely incurs that charge.  However, this is for a very specific reason:  Alpine has been forced to limit its business – to turn down customer transactions – in order to avoid paying this onerous charge.

28.    Given that the trades Alpine processes have a relatively low dollar-value, Alpine should have sufficient net capital for Alpine to provide clearing services for all of its correspondents' potential liquidation transactions.  Alpine currently has excess net capital of approximately $2.8 million.  Prior to November of 2018, its excess net capital was $1.1 million.

29.    However, because the Required Deposit charges are added to the absolute value of the transaction, and require a deposit of funds significantly higher than the underlying transaction amount (particularly when a sub-penny stock is involved), Alpine is forced to artificially limit the number of transactions it can clear for its customers per day, including to avoid the ENCP charge.

30.    Alpine also believes, based on discussions with NSCC in which I have participated, that NSCC would take a negative view of a member that was continuously required to post ENCP charges, and that doing so may result in adverse action against Alpine such as a downgrade in CRRM rating, or other more adverse actions.

31.    Alpine makes a relatively small amount of money per transaction it processes, particularly in comparison to the Required Deposit amounts.  Given this, Alpine neither has the ability nor the motive to post the potentially astronomical ENCP charges and potentially incur further adverse consequences from NSCC.  To operate its business, of course, Alpine has no

9

choice but to post the Illiquid Charge, OTC Volatility Charge and OTC Mark-to-Market Charges, where applicable. But, as indicated and discussed further below, Alpine is forced to limit its business as a result because it simply does not have all of the available regulatory capital necessary to fund the Required Deposit for all of its transactions brought to it by its customers.

32.      Alpine has attempted to employ creative solutions to avoid the deleterious impact of these Required Deposit charges. For example, for a time, Alpine was able to use ex-clearing contra-party clearing partnerships to perform clearance and settlement service manually and thereby avoid clearing trades through NSCC's CNS system altogether. However, once the last of those ex-clearing partnerships expired at the end of April 2018, Alpine was forced to again utilize NSCC's CNS system to clear transactions, and to post the Illiquid Charge and the other onerous components at issue of the Required Deposit.

33.      The cumulative impact of these margin requirements creates a self-propelling downward cycle. Alpine must devote additional capital to post the Required Deposit each day in order to process trades through NSCC's CNS system when sub-penny stocks are involved. Because of this, Alpine must limit the volume of trades it can process per day, both due to capital constraints necessary to post the Required Deposit and to avoid ENCP charges. This, in turn, limits Alpine's ability to raise additional capital through its clearing business, and effectively pull out of the cycle. As a direct result, as would be expected, Alpine's liquidation business is down almost 75% s due to the artificial restraints on the number of liquidation transactions it can clear through NSCC per day (due to the Required Deposit) and attrition of customers who leave or go out of business because they cannot clear their transactions through Alpine.

34.      Further, it is my understanding that the number of NSCC members who are independent or small clearing brokers providing clearing services for firms and investors holding

microcap or OTC stocks is down significantly, as a result of the Required Deposit charges targeted at the microcap and OTC markets. I am aware of only a few firms that currently provide clearing services for OTC microcap stocks.

35.     The impact is not felt by Alpine alone; I believe it affects all participants in the OTC and microcap market – from brokers to issuers to investors. To my knowledge, very few small clearing firms exist today that serve the OTC and microcap securities market, which are most adversely affected by the Required Deposit charges at issue. Indeed, the Illiquid Charges, and the use of the fictional $.01 price-per-share to exponentially increase the Illiquid Charge and OTC Volatility and OTC Mark-to-Market Charges, appear to be intentionally targeted at the OTC and microcap securities markets. Although larger NSCC members – banks, Wall Street firms and online discount firms – likely have sufficient net capital to avoid the ENCP charges or illiquid charges (including through use of the DTC Offset), to my knowledge, very few of these firms are willing to work with OTC stocks and microcap stock, let alone accept certificates or newly issued securities for microcap issuers, leaving but a handful of firms that operate in this space. To my knowledge, in addition to Alpine, the list of firms that operate in this space includes Wilson Davis Securities, Lek Securities, and Wedbush Securities. I am not aware of any other firms providing clearing services for OTC microcap stocks.

36.     As a direct result of the Required Deposit charges, it is my understanding that the small firms that do serve this segment of the market, such as Alpine, must also charge additional fees to try to offset the immense burden of devoting capital to post the challenged components of the Required Deposit, which cumulatively reduces the value of the trade for all involved.

37.     Given the disproportionately high amount of the Required Deposit in comparison to the underlying value of the trade, many of Alpine's correspondent broker clients (or their

customers – the underlying buyers or sellers – to whom the correspondent brokers pass the fees) are often unwilling or unable to pay the additional amounts to sell the shares, leaving the shares effectively untradeable, and worthless.

38.    Below are recent proposed trade transactions that Alpine could not complete, either due to capital constraints associated with the Required Deposit or because the customers decided to not trade due to the Required Deposit, and the resultant processing fees (below are the estimates of Alpine's calculation of the Required Deposit fees):

    a.    Client: Betty Cam; trade date: 11/20/2018; Symbol: COBI

        i.    1,000,000 shares valued at $0.0005 would result in a trade value of $500.00 with an illiquid charge of $2,000.00, volatility charge of $9,500.00, Mark-to-Market charge of $95,000.00, and an NSCC deposit trade proceeds multiple of 213.

    b.    Client: Black Ridge; trade date: 11/23/2018; Symbol: TGRO

        i.    100,000 shares valued at $0.0052 would result in a trade value of $520.00 with an illiquid charge of $34,100.00, volatility charge of $2,200.00, Mark-to-Market charge of $7,590.00, and an NSCC deposit trade proceeds multiple of 84.

    c.    Client: EMA; trade date: 11/21/2018; Symbol: ZNGY

        i.    4,900,000 shares valued at $0.0003 would result in a trade value of $1,470.00 with a volatility charge of $8,000.00, Mark-to-Market charge of $38,800.00, and an NSCC deposit trade proceeds multiple of 32.

    d.    Client: EMA; trade date: 11/21/2018; Symbol: BGFT

      i.     3,000,000 shares valued at $0.0004 would result in a trade value of $1,200.00 with a volatility charge of $4,000.00, Mark-to-Market charge of $19,200.00, and an NSCC deposit trade proceeds multiple of 19.

    e.    Client: EMA; trade date: 11/23/2018; Symbol: VYST

      i.     1,000,000 shares valued at $0.0030 would result in a trade value of $3,000.00 with an illiquid charge of $8,000.00, volatility charge of $1,600.00, Mark-to-Market charge of $5,600.00, and an NSCC deposit trade proceeds multiple of 5.

39. Upon request, I can provide additional examples of similar transactions Alpine was unable to process due to the Required Deposit.

40. As indicated, Alpine's liquidation business is down approximately 75% as a result as a direct result of the Required Deposit charges targeted at the microcap and OTC market segment. Almost every one of Alpine's large customers is now bringing in significantly less business as a result of fall out due to the Required Deposit charges at issue. To illustrate this, Alpine's revenue from commissions in November 2017 was $555,647. By comparison, Alpine's revenue from commissions in November 2018 was $122,901. As discussed above, Alpine was able to use its use ex-clearing contra-party clearing partnerships to avoid clearing through NSCC, and thus avoid the Required Deposit, prior to April of 2018.

41. Alpine's business is thus being irreparably harmed due to the financial stress from the required deposit. If Alpine were even given relief from the Illiquid Charge or if Alpine were permitted to utilize the DTC Offset, including interim relief while its Petition for Rulemaking or Petition for Review were decided, it would allow Alpine to continue to operate.

42.     It is also my belief, that the Required Deposit charges at issue also have a profound adverse effect on small companies whose stock trades in the OTC and microcap markets.  Microcap companies depend on issuance of shares to obtain services and finance their growth. Alpine, and other small broker-dealers in this segment of the market, play a critical role in providing liquidity for securities of small companies.  A substantial part of Alpine's customer base consists of institutional lenders to small companies and the key service providers/ professionals to small companies – i.e., lawyers, accountants, transfer agents, advisors, etc. Without firms willing and able to process these transactions, like Alpine, and without correspondent brokers or investors willing or able to pay increased transaction fees, professionals and investors will be unwilling to accept stock and these small companies will be cut-off from the capital markets to raise money to grow their businesses.

WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct.

DATED this 19th day of December, 2018.

David Brant

# EXHIBIT C

## DECLARATION OF DAVID BRANT

I, David Brant, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

1. My name is David Brant and I am a resident of Salt Lake County, Utah, am over 18 years of age, and make the statements herein based on my personal knowledge.

2. I am the Chief Financial Officer at Alpine Securities Corporation ("Alpine") in Salt Lake City, Utah.

3. Alpine is a small, self-clearing broker-dealer, registered with the Securities and Exchange Commission ("SEC"). Alpine's business primarily involves clearing and settlement services for microcap and over-the-counter ("OTC") stock transactions for itself and for other brokerage firms.

4. I am familiar with Alpine's Application for Review and Rulemaking Petition with respect to certain actions, practices and rules of the National Securities Clearing Corporation ("NSCC") and submit this Declaration in support of that Petition.

5. A clearing broker, such as Alpine, provides clearing and settlement services for itself and for its correspondent clients ("correspondents" or "clients"), who are generally broker-dealers, and its clients' non-broker-dealer customers ("customers"), who are the beneficial buyers and sellers of a security.

6. In order for Alpine to provide clearing and settlement services and function as a clearing firm for its correspondent firms, Alpine must be a member of NSCC. Alpine is a clearing broker member in good standing of the NSCC and a Depository Trust Company ("DTC") participant.

7. As an ongoing condition to membership, and thus use of NSCC's clearance,

settlement and other essential services for Alpine and its customers, NSCC requires members, including Alpine, to contribute to a "Clearing Fund," by making "Required Deposits."

8.     The formula used to calculate the Required Deposit charges is very complex and includes many discretionary and fact-specific variables set forth in Procedure XV of the NSCC's Rules and Procedures.

9.     As detailed below, certain components of NSCC's Required Deposit charges have resulted in extremely high and onerous charges that so far exceed the amount of the underlying transactions to be cleared and settled that they cannot be credibly justified, which has limited and denied Alpine's access to NSCC's essential clearance and settlement services and caused Alpine to lose a significant amount of its liquidation business.

10.     While the Required Deposit has many separate components, the ones that are the most onerous, and impose the greatest hardship on Alpine and limitation of Alpine's access to NSCC's clearance and settlement services in connection with its liquidation or sale-side clearance and settlement of OTC and microcap market transaction for its correspondent brokers and other clients, are: (a) the "Illiquid Charge"; (b) the Excess Net Capital Premium ("ENCP"); (c) the Volatility Charge for microcap and OTC stock transactions (the "OTC Volatility Charge"), particularly as applied to sub-penny stock transactions; (d) the Mark-to-Market Charge as applied to sub-penny stock OTC or microcap stock transactions ("OTC Mark-to-Market Charge"); and (c) NSCC's Credit Risk Rating Matrix ("CRRM"), pursuant to which NSCC assigns to members ratings between 1 and 7, with a rating of "7" being the weakest.  I have reviewed the description and discussion of these Required Deposit components in the Rulemaking Petition, and agree with and adopt them herein.

11.     I note that the CRRM is not itself a charge imposed on members by the NSCC.

However, it is my understanding that it directly factors into the NSCC's calculation of the Illiquid Charge, and is thus a component of the Required Deposit. In particular, in calculating and determining the applicability of the Illiquid Charge to a particular transaction, it is my understanding that NSCC imposes different volume thresholds based upon a member's CRRM rating, with members with better CRRM ratings being able to larger net sell positions in the so-called "Illiquid Securities" than members with weaker CRRM ratings. Importantly for Alpine, in determining these volume thresholds, NSCC will first generally "offset" the quantity of shares in a member's sell position against the number of shares in the same security held by the member at DTC. NSCC calls this the "DTC Offset." Thus, if certain members have offsetting shares at DTC, they could fall below the applicable volume threshold after the offset and would not be subject to the Illiquid Charge. However, NSCC has taken the position that the DTC Offset is not available to members with the weakest CRRM Rating.

12.     NSCC has assigned Alpine the weakest CRRM Rating – a "7," and thus does not allow Alpine to utilize the DTC Offset.

13.     This is critically important, because Alpine, as a matter of policy and operations, requires that securities positions on a liquidation transaction be cleared and settled at DTC before entering liquidating trades on a regular way basis. As a result, Alpine almost always would be able to avoid the Illiquid Charge, if it were able to utilize the DTC Offset. I have not heard or located any explanation from NSCC or its representatives as to why NSCC determined to make the DTC Offset unavailable to certain members but not others.

14.     Because Alpine's CRRM Rating is critical to the Required Deposit amounts it will have to post, particularly the Illiquid Charge, Alpine has attempted to understand how its CRRM rating is calculated. However, NSCC has not disclosed to the industry the basis for its

3

calculation of the CRRM rating.

15.     According to the information available, the formula includes consideration of quantitative factors (size, i.e., total excess net capital; capital, leverage, liquidity and profitability) and qualitative factors (market position and sustainability, management quality, capital and liquidity management, geographic and business/product diversity, and access to funding).  It is unclear what weight NSCC ascribes to each individual factor within the larger quantitative and qualitative categories to arrive at a CRRM rating for a member.  The CRRM rating bears no relationship to a firm's actual credit rating or, apparently, whether the firm has ever defaulted on any obligation to NSCC.

16.     Under current ownership that has been in place since 2011, for example, Alpine has not defaulted on its obligations to NSCC to my knowledge.

17.     I have personally participated in several telephonic conferences with representatives of NSCC to discuss Alpine's CRRM rating, including how it is calculated and how it could be improved, and to request relief from the Required Deposit charges at issue from NSCC.  In one such conversation occurring on or around September 6, 2018, a representative of NSCC told me that the CRRM rating is based on a mix of objective and subjective factors that NSCC assesses, but that NSCC will not disclose how each individual factor is weighed or assessed on the basis that such information is "proprietary."  During this conversation, NSCC was also not receptive to Alpine's requests for waiver or other relief from the deleterious impacts of the Required Deposit charges at issue in the Rulemaking Petition and Petition for Review.

18.     As a result of NSCC's implementation of the Required Deposit charges and components at issue, I believe that Alpine's and its correspondent customers' businesses have been unfairly targeted with excessive and arbitrary charges which are non-conducive to entering

into a trade and thus inhibit and discourage market access and participation.

19.　　By way of example, consider the following trades processed by Alpine for clearing through NSCC's CNS system.

a.　The first trade involved a contract to sell 99,000 shares of PMCB on November 23, 2018, valued at $0.020, for a total proceeds amount of $2,008.32.  To process this $2,008.32 trade for clearing through NSCC, however, *Alpine was required to deposit $40,803.00,* including:

   i.　Illiquid Charge:  $34,956.60.

   ii.　OTC Volatility Charge:  $5,846.40 (NSCC's rules indicate that the OTC Volatility Charge shall be, at NSCC's discretion, a haircut of not less than 10% of the position.  Here, however, the Volatility Charge was 100% of the transaction amount. Although I am not certain of NSCC's precise method of calculation, because a sub-penny stock was involved, I believe that NSCC imposed a fictional $.01/share price to calculate the Volatility Charge.

   iii.　OTC Mark-to-Market Charge:  $116,179.78 (although this charge can either be a debit or credit based on the closing price of the security pending settlement, in this case NSCC appears to have used the fictional $.01/share price so it created a mark-to-market-loss charge).

b.　The second trade involved a contract to sell another 99,000 shares of PMCB on November 26, 2018, valued at $0.020, for the same total proceeds amount of $2,008.32.  To process this $2,008.32 trade for clearing through NSCC, however, *Alpine was required to deposit $887,372.84,* including:

    i.   Illiquid Charge: $868,800.00.

    ii.   OTC Volatility Charge: $17,376.00.

    iii.   OTC Mark-to-Market Charge: $1,196.84.

20.    Although the entire exposure associated with the above trades totaled $4,016.64, NSCC's methodology resulted in Alpine being required to deposit a total of $928,175.84 to access NSCC's (CNS) clearance and settlement services.  These two trades resulted in an NSCC deposit trade proceeds multiple of 231.08 (that is, 231 times the value of the underlying trade).  The OTC Volatility Chare and Illiquid Charge exceeded the value of the transaction by several multiples.

21.    Even under NSCC's methodology, the Illiquid Charge would have been minimal or non-existent on this sample transaction except, as indicated above, NSCC does not permit Alpine to avail itself of the DTC Offset based on Alpine's CRRM rating.

22.    Below are additional recent trades from Alpine's customers wherein the Required Deposit charges are similarly arbitrary and grossly and unfairly disproportionate to the value of the transaction:

    a.    Client: Power Up; trade date: 11/29/2018 and 11/30/2018; Symbol: TSOI; Description: Therap Sol

        i.    4,347,826 total shares traded over the two days (3,085,100 on 11/29/2018 and 1,262,726 on 11/30/2018), valued at $0.003, resulting in a total trade value of $12,710.64 with a total illiquid charge of $262,118.21, total volatility charge of $14,865.85, total Mark-to-Market charge of $51,192.51, and an NSCC deposit trade proceeds multiple of 25.82.

b.   Client: La Jolla; trade date: 11/29/2018; Symbol: VGID; Description: V Group Inc.

    i.   1,800,000 shares valued at $0.00033, resulting in a trade value of $587.20, with an illiquid charge of $18,000.00, volatility charge of $3,600.00, Mark-to-Market charge of $17,280.00, and an NSCC deposit trade proceeds multiple of 66.21.

c.   Client: Silver Rock; trade date: 11/19/2018 and 11/20/2018; Symbol: PMCB; Description: Pharmacyte

    i.   942,319 total shares traded over the two days (400,000 on 11/19/2018 and 542,319 on 11/20/2018), valued at $0.045, resulting in a total trade value of $42,138.09 with a total illiquid charge of $68,439.11, total volatility charge of $11,604.73, total Mark-to-Market charge of $317.68, and an NSCC deposit trade proceeds multiple of 1.91.

23.   If Alpine were able to utilize the DTC Offset, it would have avoided the large applicable Illiquid Charges, on these transactions as well.

24.   Alpine receives Notices of Daily Margin Statements from NSCC imposing similar charges each business day.  The daily cumulative Illiquid Charges alone generally range from $500,000 to $1.5 million on transactions that are a fraction of that amount. Upon request, I can provide many more examples of similarly onerous and disproportionate Require Deposit charges.

25.   When a transaction involves stocks that are below $.01/share, it is my understanding that NSCC generally does not use the actual stock price in calculating the Illiquid Charge, Volatility Charge and Mark-to-Market.  Instead, it is my understanding that NSCC

7

commonly uses a fictional "minimum" price per share of $.01 in its calculations of these components. It is my belief that use of a "rounded up" share value instead of the actual share value results in Required Deposit charges that are grossly disproportionate to the transaction value. By simple illustration, changing a share value from $.001 to $.01 in a formula results in a tenfold increase in the resultant product. Similarly, it almost invariably ensures that there will be a Mark-to-Market charge, instead of a credit, because the current market price will be artificially increased in comparison to the transaction amount. Although it is not completely clear for all the occasions that NSCC's uses a fictional share price in the calculating the Illiquid Charge, OTC Volatility or Mark-to-Market to Alpine, and appears to be inconsistent, I believe that this practice explains some of the more disproportionate charges. Based on my review of NSCC's rules and Procedure XV, I do not see any authorization for NSCC to use a fictional price per share in calculating the OTC Volatility Charges or Mark-to-Market.

26.     I also note that NSCC indicates that it has discretion to impose a different formula for calculating Volatility for OTC and microcap stocks (sub-penny stocks are not mentioned) than for shares traded on registered exchanges or which exceed $5/share. NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii). NSCC indicates that to calculate the OTC Volatility Charge it will impose a "haircut" based on the multiple of the absolute value of such positions and a percentage that NSCC designates that shall not be less than 10%. From these descriptions, I would expect the OTC Volatility Charge to be a fraction of the underlying transaction – i.e., a "haircut." However, as indicated above, in actual practice NSCC's OTC Volatility Charge to Alpine, particularly when sub-penny stocks are involved, is frequently equal to or in excess of the actual value of the transaction, sometimes by many orders of magnitude. This, particularly when combined with the Illiquid Charge and OTC Mark-to-Market Charge, has a devastating

8

impact on Alpine's available regulatory capital and access to NSCC's CNS system for customer transactions, and thus, Alpine's business, as explained further below.

27.     Alpine did not incur an "Excess Net Capital Premium" or "ENCP" charge with respect to the sample transactions above. In fact, Alpine rarely incurs that charge. However, this is for a very specific reason: Alpine has been forced to limit its business – to turn down customer transactions – in order to avoid paying this onerous charge.

28.     Given that the trades Alpine processes have a relatively low dollar-value, Alpine should have sufficient net capital for Alpine to provide clearing services for all of its correspondents' potential liquidation transactions. Alpine currently has excess net capital of approximately $2.8 million. Prior to November of 2018, its excess net capital was $1.1 million.

29.     However, because the Required Deposit charges are added to the absolute value of the transaction, and require a deposit of funds significantly higher than the underlying transaction amount (particularly when a sub-penny stock is involved), Alpine is forced to artificially limit the number of transactions it can clear for its customers per day, including to avoid the ENCP charge.

30.     Alpine also believes, based on discussions with NSCC in which I have participated, that NSCC would take a negative view of a member that was continuously required to post ENCP charges, and that doing so may result in adverse action against Alpine such as a downgrade in CRRM rating, or other more adverse actions.

31.     Alpine makes a relatively small amount of money per transaction it processes, particularly in comparison to the Required Deposit amounts. Given this, Alpine neither has the ability nor the motive to post the potentially astronomical ENCP charges and potentially incur further adverse consequences from NSCC. To operate its business, of course, Alpine has no

choice but to post the Illiquid Charge, OTC Volatility Charge and OTC Mark-to-Market Charges, where applicable. But, as indicated and discussed further below, Alpine is forced to limit its business as a result because it simply does not have all of the available regulatory capital necessary to fund the Required Deposit for all of its transactions brought to it by its customers.

32.     Alpine has attempted to employ creative solutions to avoid the deleterious impact of these Required Deposit charges. For example, for a time, Alpine was able to use ex-clearing contra-party clearing partnerships to perform clearance and settlement service manually and thereby avoid clearing trades through NSCC's CNS system altogether. However, once the last of those ex-clearing partnerships expired at the end of April 2018, Alpine was forced to again utilize NSCC's CNS system to clear transactions, and to post the Illiquid Charge and the other onerous components at issue of the Required Deposit.

33.     The cumulative impact of these margin requirements creates a self-propelling downward cycle. Alpine must devote additional capital to post the Required Deposit each day in order to process trades through NSCC's CNS system when sub-penny stocks are involved. Because of this, Alpine must limit the volume of trades it can process per day, both due to capital constraints necessary to post the Required Deposit and to avoid ENCP charges. This, in turn, limits Alpine's ability to raise additional capital through its clearing business, and effectively pull out of the cycle. As a direct result, as would be expected, Alpine's liquidation business is down almost 75% s due to the artificial restraints on the number of liquidation transactions it can clear through NSCC per day (due to the Required Deposit) and attrition of customers who leave or go out of business because they cannot clear their transactions through Alpine.

34.     Further, it is my understanding that the number of NSCC members who are independent or small clearing brokers providing clearing services for firms and investors holding

microcap or OTC stocks is down significantly, as a result of the Required Deposit charges targeted at the microcap and OTC markets. I am aware of only a few firms that currently provide clearing services for OTC microcap stocks.

35.     The impact is not felt by Alpine alone; I believe it affects all participants in the OTC and microcap market – from brokers to issuers to investors. To my knowledge, very few small clearing firms exist today that serve the OTC and microcap securities market, which are most adversely affected by the Required Deposit charges at issue. Indeed, the Illiquid Charges, and the use of the fictional $.01 price-per-share to exponentially increase the Illiquid Charge and OTC Volatility and OTC Mark-to-Market Charges, appear to be intentionally targeted at the OTC and microcap securities markets. Although larger NSCC members – banks, Wall Street firms and online discount firms – likely have sufficient net capital to avoid the ENCP charges or illiquid charges (including through use of the DTC Offset), to my knowledge, very few of these firms are willing to work with OTC stocks and microcap stock, let alone accept certificates or newly issued securities for microcap issuers, leaving but a handful of firms that operate in this space. To my knowledge, in addition to Alpine, the list of firms that operate in this space includes Wilson Davis Securities, Lek Securities, and Wedbush Securities. I am not aware of any other firms providing clearing services for OTC microcap stocks.

36.     As a direct result of the Required Deposit charges, it is my understanding that the small firms that do serve this segment of the market, such as Alpine, must also charge additional fees to try to offset the immense burden of devoting capital to post the challenged components of the Required Deposit, which cumulatively reduces the value of the trade for all involved.

37.     Given the disproportionately high amount of the Required Deposit in comparison to the underlying value of the trade, many of Alpine's correspondent broker clients (or their

11

customers – the underlying buyers or sellers – to whom the correspondent brokers pass the fees) are often unwilling or unable to pay the additional amounts to sell the shares, leaving the shares effectively untradeable, and worthless.

38.     Below are recent proposed trade transactions that Alpine could not complete, either due to capital constraints associated with the Required Deposit or because the customers decided to not trade due to the Required Deposit, and the resultant processing fees (below are the estimates of Alpine's calculation of the Required Deposit fees):

   a.     Client: Betty Cam; trade date: 11/20/2018; Symbol: COBI

      i.     1,000,000 shares valued at $0.0005 would result in a trade value of $500.00 with an illiquid charge of $2,000.00, volatility charge of $9,500.00, Mark-to-Market charge of $95,000.00, and an NSCC deposit trade proceeds multiple of 213.

   b.     Client: Black Ridge; trade date: 11/23/2018; Symbol: TGRO

      i.     100,000 shares valued at $0.0052 would result in a trade value of $520.00 with an illiquid charge of $34,100.00, volatility charge of $2,200.00, Mark-to-Market charge of $7,590.00, and an NSCC deposit trade proceeds multiple of 84.

   c.     Client: EMA; trade date: 11/21/2018; Symbol: ZNGY

      i.     4,900,000 shares valued at $0.0003 would result in a trade value of $1,470.00 with a volatility charge of $8,000.00, Mark-to-Market charge of $38,800.00, and an NSCC deposit trade proceeds multiple of 32.

   d.     Client: EMA; trade date: 11/21/2018; Symbol: BGFT

      i.     3,000,000 shares valued at $0.0004 would result in a trade value of $1,200.00 with a volatility charge of $4,000.00, Mark-to-Market charge of $19,200.00, and an NSCC deposit trade proceeds multiple of 19.

   e.    Client: EMA; trade date: 11/23/2018; Symbol: VYST

      i.     1,000,000 shares valued at $0.0030 would result in a trade value of $3,000.00 with an illiquid charge of $8,000.00, volatility charge of $1,600.00, Mark-to-Market charge of $5,600.00, and an NSCC deposit trade proceeds multiple of 5.

39.     Upon request, I can provide additional examples of similar transactions Alpine was unable to process due to the Required Deposit.

40.     As indicated, Alpine's liquidation business is down approximately 75% as a result as a direct result of the Required Deposit charges targeted at the microcap and OTC market segment. Almost every one of Alpine's large customers is now bringing in significantly less business as a result of fall out due to the Required Deposit charges at issue. To illustrate this, Alpine's revenue from commissions in November 2017 was $555,647. By comparison, Alpine's revenue from commissions in November 2018 was $122,901. As discussed above, Alpine was able to use its use ex-clearing contra-party clearing partnerships to avoid clearing through NSCC, and thus avoid the Required Deposit, prior to April of 2018.

41.     Alpine's business is thus being irreparably harmed due to the financial stress from the required deposit. If Alpine were even given relief from the Illiquid Charge or if Alpine were permitted to utilize the DTC Offset, including interim relief while its Petition for Rulemaking or Petition for Review were decided, it would allow Alpine to continue to operate.

42.      It is also my belief, that the Required Deposit charges at issue also have a profound adverse effect on small companies whose stock trades in the OTC and microcap markets.  Microcap companies depend on issuance of shares to obtain services and finance their growth. Alpine, and other small broker-dealers in this segment of the market, play a critical role in providing liquidity for securities of small companies.  A substantial part of Alpine's customer base consists of institutional lenders to small companies and the key service providers/ professionals to small companies – i.e., lawyers, accountants, transfer agents, advisors, etc. Without firms willing and able to process these transactions, like Alpine, and without correspondent brokers or investors willing or able to pay increased transaction fees, professionals and investors will be unwilling to accept stock and these small companies will be cut-off from the capital markets to raise money to grow their businesses.

WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct.

DATED this 19th day of December, 2018.

David Brant

# EXHIBIT D

Admin. Proc. File No.

# UNITED STATES OF AMERICA
## Before The
## SECURITIES AND EXCHANGE COMMISSION
### January 23, 2019

| | |
|---|---|
| In the Matter of | : |
| | : |
| **ALPINE SECURITIES CORPORATION,** a Utah limited liability Company | : |
| | : |
| For Review of Adverse Action Taken By | : |
| | : |
| **NATIONAL SECURITIES CLEARING CORPORATION** | : |
| | : |

REDACTED VERSION

## NSCC'S OPPOSITION TO ALPINE'S MOTION FOR AN INTERIM STAY AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

**SUBJECT TO PENDING APPLICATION FOR CONFIDENTIAL TREATMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................4

      A.    NSCC and Risk Management ...................................................4

      B.    Alpine ...............................................................................8

      C.    The Application And Stay Request ...........................................10

ARGUMENT ...................................................................................................10

    I.    Alpine Has Not Established A Strong Likelihood Of Success On The
Merits. ...............................................................................................11

      A.    Alpine Cannot Challenge The Illiquid Charge Under Section
19(d). ...........................................................................11

          1.    The Application Is Infirm And Untimely. .....................11

          2.    A Rule Approved Under Section 19(b)(2) Cannot Be
Reviewed Under Section 19(d) ....................................12

      B.    Even If The Illiquid Charge Were Reviewable Under Section
19(d), It Is Consistent With The Exchange Act And Rules
Thereunder. .....................................................................14

    II.    Alpine Has Not Established Irreparable Injury. .....................................20

    III.    A Stay Would Have A Substantial Negative Impact On NSCC's Other
Members And The Public Interest. ........................................................22

CONCLUSION .................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allston v. Lewis,*
  480 F. Supp. 328 (D.S.C. 1979), *aff'd,* 688 F.2d 829 (4th Cir. 1982) ..................................22

*Oxford Immunotec Ltd. v. Qiagen, Inc.,*
  271 F. Supp. 3d 358 (D. Mass 2017) .................................................................................23

*U.S. Sec. & Exch. Comm'n v. Alpine Sec. Corp.,*
  2018 WL 6528767 (S.D.N.Y Dec. 11, 2018) ......................................................................9

*U.S. Sec. & Exch. Comm'n v. Alpine Sec. Corp.,*
  308 F. Supp. 3d 775 (S.D.N.Y. 2018), *reconsideration denied,* 2018 WL
  3198889 (S.D.N.Y. June 18, 2018) .....................................................................................9

**STATUTES**

12 U.S.C. § 5463 ............................................................................................................................2

15 U.S.C. § 78c(a)(26) ...................................................................................................................4

15 U.S.C. § 78s(b)(2) .....................................................................................................................2

15 U.S.C. § 78s(b)(3)(A) ..............................................................................................................13

15 U.S.C. § 78s(c) ........................................................................................................................13

15 U.S.C. § 78s(d) ..........................................................................................................................3

15 U.S.C. § 78q–1(f) .......................................................................................................................4

15 U.S.C. § 78q–1(d) ....................................................................................................................13

15 U.S.C. § 78w(a) .......................................................................................................................13

15 U.S.C. § 78y(a) ........................................................................................................................12

**RULES**

17 C.F.R. § 201.401 ......................................................................................................................11

17 C.F.R. § 201.420(b) .................................................................................................................12

17 C.F.R. § 240.17Ad-22, *et seq.* ...........................................................................................passim

NSCC Rule 1 ............................................................................................................6

NSCC Rule 2B, Sec. 4 ...............................................................................5, 6, 8, 18

NSCC Rule 2B, Sec. 4(b) ...................................................................................7, 8

NSCC Rule 2B, Sec. 4(d) ...................................................................................7, 9

NSCC Rule 2B, Sec. 4(f) .........................................................................................9

NSCC Rule 4 .......................................................................................................1, 5

NSCC Rules, Procedure XV ...............................................................................1, 5

**OTHER AUTHORITIES**

*In the Matter of the Application of Ahmed Gadelkareem for Review of
   Disciplinary Action Taken by Finra*, Release No. 34-80586, 2017 WL
   1735943 (May 3, 2017) ...............................................................................21

*In the Matter of the Application of Robert J. Prager for Review of Disciplinary
   Action Taken by NASD*, Release No. 34-50634, 2004 WL 2480717 (Nov. 4,
   2004) ..............................................................................................................21

*In the Matter of the Application of Scottsdale Capital Advisors Corp., John J.
   Hurry, Timothy B. Diblasi, & D. Michael Cruz for Review of Disciplinary
   Action Taken by Finra*, Release No. 34-83783, 2018 WL 3738189 (Aug. 6,
   2018) ..............................................................................................................21

*In the Matter of the Application of Sec. Indus. & Fin. Markets Ass'n for Review of
   Actions Taken by Self-Regulatory Organizations*, Release No. 34-72182 (May
   16, 2014) ............................................................................................12, 13, 14

*Notice of Filing of a Proposed Rule to Change to Describe the Illiquid Charge
   That May Be Imposed on Members*, Release No. 34-80260 (Mar. 16, 2017),
   82 Fed. Reg. 14,781 (Mar. 22, 2017) ...................................................15, 16

*Notice of Filing and Order Granting Accelerated Approval of Proposed Rule
   Changes to Institute a Clearing Fund Premium Based Upon a Member's
   Clearing Fund Requirement to Excess Capital Ratio*, Release No. 34-54457
   (Sept. 15, 2006), 71 Fed. Reg. 55,239 (Sept. 21, 2006) ............................22

*Notice of Filing of Proposed Rule Change To Enhance the Credit Risk Rating
   Matrix and Make Other Changes*, Release No. 34-80381 (Apr. 5, 2017), 82
   Fed. Reg. 17,475 (Apr. 11, 2017) ...............................................................18

*Order Approving Proposed Rule Change to Describe the Illiquid Charge that May Be Imposed on Members*, Release No. 34-80597, 82 Fed. Reg. 21,863 (May 4, 2017) ................................................................................................passim

*Order Approving Proposed Rule Changes to Enhance the Credit Risk Rating Matrix and Make Other Changes*, Release No. 34-80734 (May 19, 2017), 82 Fed. Reg. 24,177 (May 25, 2017).............................................................passim

Order Denying Stay, *In the Matter of the Application of International Power Group, Ltd. for Review of Action Taken by The Depository Trust Company*, Admin. Proc. File No. 3-13687 (Apr. 9, 2010) (decided Mar. 15, 2012, 2012 WL 892229)..............................................................................................11

*Standards for Covered Clearing Agencies*, Release No. 34-78961, 2016 WL 5464605 (Sept. 28, 2016)...........................................................2, 5, 17, 23

*Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures*, *NSCC*, *available at* http://www.dtcc.com/~/media/Files/Downloads/legal/policy-and-compliance/NSCC_Disclosure_Framework.pdf, (last visited on Jan. 18, 2019) .............passim

# INTRODUCTION

Alpine Securities Corporation's ("Alpine") motion for a stay, and the underlying proceeding (the "Application"), are an untimely and procedurally and substantively infirm challenge to rules governing the National Securities Clearing Corporation's ("NSCC") procedures for managing risk, as expressly approved by the Securities and Exchange Commission (the "SEC" or the "Commission") after full rule making proceedings.  Alpine, a small broker/dealer clearing transactions in sub-penny securities, challenges NSCC's Commission-approved "Clearing Fund" rules and procedures,[1] requiring members to post adequate margin to ensure that, in the event of a member default, NSCC, as the central counterparty ("CCP") to the member's trades, would have sufficient margin available to close out the member's unsettled positions.  Claiming NSCC's rules that describe the components of members' required daily deposits to the Clearing Fund (the "Required Fund Deposit") are "facially unreasonable," Alpine's Application seeks to upset the current scheme by reducing its own margin requirements necessary to cover the risk it presents to NSCC and shifting the exposure instead to NSCC and its other members.

Alpine's motion for a stay focuses on one element of the Required Fund Deposit—the "Illiquid Charge"[2]—and seeks to prevent NSCC from assessing the charge on Alpine's positions in "Illiquid Securities" (defined below) during the pendency of this proceeding.

---

[1] *See* NSCC Rule 4; NSCC Rules, Procedure XV.

[2] *See* NSCC Rules, Procedure XV Sec. I(A)(1)(h).

Although virtually ignored by Alpine, the Commission approved the Illiquid Charge by order dated May 4, 2017,[3] as reasonable and consistent with the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations adopted by the SEC thereunder[4].

The implications of Alpine's attack on NSCC's risk management rules should not be understated. As demonstrated below, these rules, as approved by the SEC after full rule making proceedings, reflect the Commission's Congressional mandate, under the Exchange Act and Title VIII of Dodd-Frank,[5] to manage systemic risk[6]. The international financial community has also focused on managing systemic risk, as reflected by the CPMI-IOSCO Principles for Market Infrastructure.[7] Alpine's Application and stay motion are presented in derogation of these concerted efforts and the motion for a stay should be denied:

*No likelihood of success on the merits*: Alpine neglected to participate in the procedure available under Section 19(b)(2)[8] of the Exchange Act to challenge the Illiquid Charge during the rule making process and then failed to challenge the Illiquid Charge Order by judicial review. Moreover, the Illiquid Charge itself is not a denial or limitation of access to service under

---

[3] *See Order Approving Proposed Rule Change to Describe the Illiquid Charge that May Be Imposed on Members*, Release No. 34-80597, 82 Fed. Reg. 21,863 (May 4, 2017) (the "Illiquid Charge Order").

[4] *See* 17 C.F.R. § 240.17Ad-22.

[5] 12 U.S.C. § 5463.

[6] *See Standards for Covered Clearing Agencies*, Release No. 34-78961, 2016 WL 5464605 (Sept. 28, 2016) ("CCA Standards"); *see also Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures, NSCC, available at* http://www.dtcc.com/~/media/Files/Downloads/legal/policy-and-compliance/NSCC_Disclosure_Framework.pdf ("Framework") (describing services NSCC uses to manage risk and to comply with CCA standards) (last visited Jan. 18, 2019).

[7] *See Key Regulatory Standards, International Organization of Securities Commissions, available at* https://www.iosco.org/about/?subsection=key_regulatory_standards (last visited Jan. 18, 2019).

[8] 15 U.S.C. § 78s(b)(2).

# Page 3 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.

# BACKGROUND

### A.    NSCC and Risk Management

NSCC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). It is a clearing agency registered with the Commission pursuant to Section 17A of the Exchange Act, and required to comply with Rule 17Ad-22, thereunder. It is also a self-regulatory organization ("SRO") subject to Section 19 of the Exchange Act.[10] NSCC, acting as a CCP, provides centralized clearance, settlement and information services for virtually all broker-to-broker equity, corporate bond and municipal bond and other securities transactions in the U.S.

As a CCP, NSCC stands in the middle of trades between its member broker/dealers, guaranteeing payment to sellers and delivery to buyers for trades processed through NSCC's Continuous Net Settlement System ("CNS").

As an SRO, NSCC is obligated to act in conformity with its own rules. The Commission is required to approve NSCC rules if it finds them consistent with the Exchange Act and the rules thereunder.[11]

In its role as a CCP, NSCC plays a critical role in reducing systemic risk in the markets it serves, and has been designated a Systemically Important Financial Market Utility ("SIFMU").[12]

---

[10] Registered clearing agencies are SROs under Section 3(a)(26) of the Exchange Act, 15 U.S.C. § 78c(a)(26).

[11] Section 17A(f), 15 U.S.C. § 78q–1(f).

[12] *See Financial Stability Oversight Council, 2012 Annual Report, Appendix A*, at 145, *Department of the Treasury* (2012), *available at* https://www.treasury.gov/initiatives/fsoc/Documents/2012%20Annual%20Report.pdf (last visited Jan. 18, 2019).

Pursuant to Rule 17Ad-22, NSCC has adopted, and the Commission has approved, a comprehensive set of rules and procedures reasonably designed to identify and manage credit, market, liquidity, systemic, operational and other risks for itself, its users, and the marketplace.[13]

NSCC monitors and manages credit and market risk through strict membership admission criteria as well as ongoing monitoring of each member's business, financial, settlement, management, legal and regulatory activity.[14]

NSCC's Commission-approved Clearing Fund rules include procedures pursuant to which NSCC quantifies daily the risks associated with each member's trading activities, and assesses each members' Required Fund Deposit.[15]

NSCC, acting as a CCP, may be required to draw upon the member's Required Fund Deposit, calculated pursuant to a formula that includes a number of components set out in Procedure XV of its rules, to close out the member's unsettled positions in the event it defaults on its obligations to NSCC.  The goal is to contain any loss within the individual member's Required Fund Deposit, without impacting the Required Fund Deposits of NSCC's other members.[16]

NSCC's rules governing the Required Fund Deposit and the Commission orders approving the rules clearly describe the margin requirements, including the Illiquid Charge.

---

[13] *See* Declaration of Timothy J. Cuddihy, sworn to January 23, 2019 ("Cuddihy Decl."); Framework at 12.

[14] NSCC Rule 2B, Sec. 4; Framework at 12; Cuddihy Decl. ¶¶ 6-8.

[15] *See* NSCC Rule 4 and Procedure XV; CCA Standards at 278; Cuddihy Decl. ¶¶ 5-6; *see also* Cuddihy Decl. n. 13 (noting that the Commission requires that one component of the Required Fund Deposit, the Volatility Charge, as defined at page 57 of the Framework, capture the market price risk associated with each member's portfolio at a 99% or greater level of confidence).

[16] Framework at 12.

Indeed, Alpine's papers describe the components of the Required Fund Deposit, including the mechanics of how each component is applied to Alpine's transactions.[17]

The Application (and Alpine's underlying petition for rule making) constitutes a wholesale challenge to NSCC's Clearing Fund rules relating to each member's Required Fund Deposit.[18]  In moving for a stay, however, Alpine carves out one component of the Required Fund Deposit—the Illiquid Charge—and seeks to stay its implementation as to Alpine during the pendency of this proceeding.  Alpine also accuses NSCC of having acted arbitrarily in assigning Alpine the lowest Credit Risk Management Rating ("CRRM") rating of 7, making the "DTC Offset" unavailable to offset the Illiquid Charge.[19]

*The Illiquid Charge.*  NSCC applies the Illiquid Charge[20] if the member's net positions in Illiquid Securities meet a specific volume threshold.

Illiquid Securities are securities that tend to be thinly traded, lack marketability, have limited or no access to a trading venue, and may have low and volatile share prices.[21]  Stocks trading at one cent and less are typically Illiquid Securities and also known as "microcap" securities.

In connection with a member default, the Illiquid Charge mitigates against NSCC's risk that liquidation could be difficult or delayed due to the thin and volatile market for Illiquid

---

[17] *See, e.g.*, Application, Ex. A ("Brant Decl.") at 15.

[18] *See, e.g.*, Application at 9.

[19] *See* NSCC Rule 1, Definitions and Descriptions, "Credit Risk Rating Matrix" and NSCC Rule 2B, Sec. 4 (defining CRRM); 'Illiquid Positions' (defining the DTC Offset); *see also* Illiquid Charge Order at n. 16.

[20] *See supra* n. 2.

[21] Illiquid Securities are defined in NSCC Rule 1 as part of the definition of "Illiquid Positions."

Securities.  The Illiquid Charge may be significantly greater than the net value of the positions because the share price of Illiquid Securities could skyrocket in the event NSCC is forced to buy-in positions in an illiquid market.  For Illiquid Securities trading below $0.01, the potential cost to buy-in the securities could be a substantial multiple of the share price for the underlying transaction.[22]  For the mark-to-market calculation for Illiquid Securities, NSCC's systems round up the price of the sub-penny security to $0.01, which can increase the charge for net sellers, and decrease the charge for net buyers.  This formulation is part of the Illiquid Charge Order.[23]

*The CRRM Rating.*  NSCC's Counterparty Credit Risk Group ("CCR Group") assigns each member a CRRM rating on a scale of 1 to 7, with 1 reflecting the lowest and 7 representing the highest risk of a member default.  The CRRM rating is based on quantitative factors such as capital, assets, earnings, and liquidity, and qualitative factors, such as management quality, market position/environment, and capital and liquidity risk management.[24]  Additionally, the CCR Group considers whether additional qualitative factors (e.g., regulatory history, type of audit opinion issued, and material management changes) warrant a manual override of the model-generated rating.[25]  NSCC's risk management program takes careful account of legal and regulatory matters in evaluating the risk profile of members trading in Illiquid Securities.[26]  Members with the greatest risk of default (CRRM rating 5, 6, or 7) are automatically placed on

---

[22] Cuddihy Decl. ¶¶ 12-14.

[23] *See* Illiquid Charge Order at 21,864; *infra* n. 60.

[24] *See Order Approving Proposed Rule Changes to Enhance the Credit Risk Rating Matrix and Make Other Changes*, Release No. 34-80734 (May 19, 2017), 82 Fed. Reg. 24,177 (May 25, 2017) (the "CRRM Order"); NSCC Rule 2B, Sec. 4(d).

[25] *See generally* NSCC Rule 2B, Sec. 4(b)(ii); Cuddihy Decl. ¶ 19.

[26] NSCC Rule 2B, Sec. 4; Cuddihy Decl. ¶¶ 11, 16, 28.

# Page 8 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.

**Page 9 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.**

prohibited or limited Alpine's access to NSCC's services, provided in accordance with its rules.[39]

### C.     The Application And Stay Request

The Application challenges NSCC's imposition of the Required Fund Deposit as constituting a facially discriminatory and unreasonable "denial of services," in violation of Section 19(d) and (f).   Alpine seeks a stay of one component of the Required Fund Deposit, the Illiquid Charge (the "Stay Motion").   Alpine also challenges the inapplicability of the DTC Offset due to NSCC allegedly acting arbitrarily in setting its CRRM rating at a 7.

Alpine's Application and stay request parallel the rule making petition it filed along with the Application, by which it petitions the SEC to repeal and reformulate various Commission-approved NSCC Clearing Fund rules.

### ARGUMENT

The Commission considers four factors when determining whether to stay an SRO's action: whether (1) the movant has established a strong likelihood that it will eventually succeed on the merits of its case; (2) the movant will suffer irreparable harm without a stay; (3) there is likelihood that another party will suffer substantial harm as a result of the stay; and (4) the impact of a stay on the public interest.[40]   Each of the four factors counsels against granting Alpine's request for a stay.

---

[39] NSCC Rule 2B; Cuddihy Decl. ¶ 26.

[40] *See* Rule 401(d) of the Commission's Rules of Practice, 17 C.F.R. § 201.401; Order Denying Stay, *In the Matter of the Application of International Power Group, Ltd. for Review of Action Taken by The Depository Trust Company*, Admin. Proc. File No. 3-13687 (Apr. 9, 2010) (decided Mar. 15, 2012, 2012 WL 892229).

I.      **Alpine Has Not Established A Strong Likelihood Of Success On The Merits.**

A.      **Alpine Cannot Challenge The Illiquid Charge Under Section 19(d).**

1.      *The Application Is Infirm And Untimely.*

Under Section 19(d), the Commission may review an SRO disciplinary action taken against a member, denial of membership or prohibition or limitation on access to services of the SRO within 30 days of notice of such action filed by the SRO with the Commission.

The Illiquid Charge is not a prohibition or limitation of access to services as contemplated Section 19(d); instead, it is a component of the service itself.  It provides the margin necessary for mitigating the transactional risk.  It is not a fee; it is a deposit that remains part of the member's funds and accrues interest while the member is in good standing.  Alpine's unwillingness to post the SEC-approved margin deposit cannot be deemed an action by NSCC denying or limiting access to its services.

Indeed, if the Required Fund Deposit were considered a prohibition or limitation of services, NSCC and other clearing agencies would be required to file notice with the Commission every time they imposed the charge.  No notice was filed in this instance because the assessment is not a prohibition or limitation on service.

The real issue presented by the Application is not a denial of access, but Alpine's challenge to the alleged "adverse" impact of the Illiquid Charge Order on Alpine due to its alleged "unreasonable design."[41]  Indeed, Alpine's petition for a rule change reflects that the Section 19(d) denial of access claim is a ruse.  It is apparent that after failing to comment on the

---

[41] Application at 2 & n. 9.

proposed Illiquid Charge rule change when under review by the Commission,[42] or even bringing a judicial challenge to the Illiquid Charge Order within 60 days after the Commission approved it,[43] Alpine now incorrectly invokes Section 19(d) to make up for its neglect[44]

Even if Alpine were able to skirt the rule making and judicial review processes, Alpine's Section 19(d) Application is untimely. [45]  Section 19(d) requires that aggrieved parties file their applications within 30 days of the challenged SRO action.  Here, however, Alpine waited almost one and one-half years after the Illiquid Charges (pursuant to the Illiquid Charge Order) were imposed to file the Application and seek a stay.  In the interim, Alpine incurred (and posted) the Illiquid Charge more than 300 times.[46]

### 2. *A Rule Approved Under Section 19(b)(2) Cannot Be Reviewed Under Section 19(d).*

Under any circumstances, Alpine has no right to relief under Section 19(d).  While Section 19(d) may be available to challenge an SRO rule adopted pursuant to Section 19(b)(3),[47]

---

[42] Illiquid Charge Order at 21,863 (noting that the Commission received no comments); *see* 15 U.S.C § 78s(b)(2)(C)(3).

[43] 15 U.S.C. § 78y(a).

[44] Notably, if NSCC proposes a rule change to eliminate the Illiquid Charge and modify the Volatility Charge to better capture the risk associated with Illiquid Securities, Alpine will have yet another opportunity to participate in the notice and comment period as provided for under the rule making process under Section 19(b)(2). *See* Cuddihy Decl. ¶¶ 20-22.

[45] Alpine attempts to excuse its untimeliness, asserting that the Application "involves novel facts and legal issue" that constitute the "extraordinary circumstances" required to waive the 30-day time limitation under 17 C.F.R. § 201.420(b).  Application at 2, n. 11.  Alpine, however, does nothing to identify what constitutes these "novel facts and legal issues," and its request bears no significant similarities to circumstances where the Commission has seen fit to invoke this exception. *Compare, e.g., In the Matter of the Application of Sec. Indus. & Fin. Markets Ass'n for Review of Actions Taken by Self-Regulatory Organizations,* Release No. 34-72182 (May 16, 2014) ("*In re SIFMA*") (finding "extraordinary circumstances" where petitioners filed within 30 days of a highly relevant court decision).

[46] Cuddihy Decl. ¶ 14, Ex. 1.

[47] 15 U.S.C. § 78s(b)(3)(A).

*i.e.*, a rule that is effective upon filing without Commission approval,[48] it is not available to challenge a rule made under Section 19(b)(2), which is effective only upon Commission approval after public notice and a comment period[49].

The Illiquid Charge was not made pursuant to Section 19(b)(3); it was made pursuant to Section 19(b)(2).  The Commission approved it by final order following a full rule making process.[50]  The rationale for permitting a Section 19(d) challenge where the Commission has not yet had an opportunity to determine whether a rule is consistent with the Exchange Act is simply not applicable here, where the Commission reviewed and approved the rule at issue.[51]   As argued by the Commission in *NetCoalition*:

> This contrast between [19(b)(2) and 19(b)(3)] reflects the fundamental difference in the way Congress intended for different types of rules to be treated, an intention that would be frustrated if rules that take effect upon filing and are not suspended are reviewed in the same way as rules that are approved or disapproved by Commission order.[52]

---

[48] *See* Brief of Respondent U.S. Securities and Exchange Commission at *45, filed in *NetCoalition v. SEC*, 715 F.3d 342 (D.C. Cir. 2013) (Nos. 10-1421, 10-1422, 11-1001, 11-1065), 2011 WL 6297923 ("SEC *NetCoalition* Br.") ("Section 19(d) of the Exchange Act provides a mechanism through which the consistency with applicable law of a rule that takes effect upon filing may be determined.").

[49] Ordinarily, the Commission can amend or abrogate an SRO rule adopted in accordance with Section 19(b)(2) only by separate rule making that requires public notice and opportunity for comment by interested parties.  *See* 15 U.S.C. § 78s(c); 15 U.S.C. § 78q–1(d); 15 U.S.C. § 78w(a).

[50] *See* Illiquid Charge Order at 21,865 (proposed rule filed pursuant to Section 19(b)(2)).

[51] *See In re SIFMA* ("[B]ecause we have not initiated the statutory process to determine if the rule should be approved or disapproved, a proceeding under Section 19(d) is not the second proceeding to determine the enforceability of the rule, it is the first.").

[52] SEC *NetCoalition* Br. at *42.

*In re SIFMA*, cited by Alpine, is not to the contrary.[53]  In fact, it demonstrates why Alpine's challenge is *not* cognizable under Section 19(d).  *In re SIFMA* challenged an SRO fee schedule adopted pursuant to Section 19(b)(3).  The Commission's determination under Section 19(d) that the fee was unreasonable did not address the threshold flaw in Alpine's effort here to use Section 19(d) to challenge an SRO rule approved pursuant to Section 19(b)(2).  Moreover, in relying on this case, Alpine's blurs the distinction between a fee and margin requirements.  The applicant in *In re SIFMA* challenged a fee to purchase depth-of-market data, non-payment of which prevented members from obtaining the service.  Here, by stark contrast, there is no "fee," but an SEC-approved margin "deposit"[54] integral to NSCC's clearance and settlement risk management process[55].  Instead of requiring a fee to access its service, the Illiquid Charge is a necessary component of the service NSCC provides.

For all these reasons, Alpine's invocation of Section 19(d) is improper.

      B.      Even If The Illiquid Charge Were Reviewable Under Section 19(d), It Is Consistent With The Exchange Act And Rules Thereunder.

Alpine alleges that the Illiquid Charge, along with its CRRM credit rating and the unavailability of the DTC Offset, are arbitrary, discriminatory and anti-competitive. By virtue of the Section 19(b)(2) rule approval process, however, the Commission found this was not the case.

---

[53] *See* Application at 1, n. 4, citing *In re SIFMA*.

[54] Once the Illiquid Position settles and the CCP risk is alleviated, the margin requirement is adjusted pursuant to NSCC's rules.

[55] *See In re SIFMA* at 1 (describing applications for review SIFMA filed "challenging . . . rule changes affecting fees that a number of SROs charge"); *see also* Cuddihy Decl. ¶¶ 9-14, n. 6.

The Illiquid Charge Order and NSCC's underlying rule change proposal describe the charge in detail.[56]  Both specifically addressed the net buy and net sell Illiquid Positions that trigger the charge, the effect of the member's financial condition or credit rating (1 to 7) on those threshold positions, including the lower thresholds that apply for members with weak credit ratings (5 to 7) and excess net capital of $10 million or less.[57]  These filings also addressed the share price and liquidity factors used to calculate the Illiquid Charge for net sell Illiquid Positions.[58]  They described the valuation of the position,[59] subject to a minimum of $0.01[60].  The filing was clear that the Illiquid Charge required for a net sell illiquid position could be many times greater than the principal amount of the position in the stock—especially for sub-penny stocks—and the SEC approved the proposed rule on this basis.

The Illiquid Charge Order and Illiquid Proposed Rule also provided that the DTC Offset (allowing the member's securities on deposit to offset the net sell position) was not available to members with the weakest credit rating of 7.[61]  The rationale for this formulation is clear:  in the event of an enforcement or insolvency proceeding against an NSCC member, NSCC may not be

---

[56] *See* Illiquid Charge Order at 21,863-64; *Notice of Filing of a Proposed Rule to Change to Describe the Illiquid Charge That May Be Imposed on Members*, Release No. 34-80260 (Mar. 16, 2017), 82 Fed. Reg. 14,781 (Mar. 22, 2017) (the "Illiquid Proposed Rule").

[57] *See* Illiquid Charge Order at 21,864 & n. 10; Illiquid Proposed Rule at 14,783-84.

[58] *See* Illiquid Charge Order at 21,864; Illiquid Proposed Rule at 14,783-84.

[59] *See* Illiquid Charge Order at 21,864 & n. 20; Illiquid Proposed Rule at 14,783 & n. 16.

[60] *See* Illiquid Charge Order at 21,864 ("[i]f a transaction in any security, including an Illiquid Security, with a share price below $0.01 is entered into NSCC's [CNS] system . . . NSCC rounds up the price of the security to $0.01."). Moreover, the notice and approval order both explained that the potential effect would be to reduce the required credit fund deposit for a net illiquid buy position with the potential opposite effect on a net illiquid sell position, *see id.*, and approval was granted in consideration of those effects.  *Id.* at 21,865-66.

[61] *See* Illiquid Charge Order at 21,864 & n. 16; Illiquid Proposed Rule at 14,783.

able to obtain access (or be granted timely access) to the member's securities on deposit at DTC.[62]

The SEC found the Illiquid Charge was consistent with Section 17A(b)(3)(F), which requires the Commission to determine NSCC's rules are designed to further Congress' goals in establishing the National Clearance and Settlement System.[63]  The SEC stated:

> [T]he Illiquid Charge is calculated and collected to help mitigate the potential costs associated with NSCC's potential difficulties or delays in liquidating Illiquid Securities, due to the illiquid nature of such securities, following a member default. . . the Commission believes that the proposed changes related to the Illiquid Charge would help promote the safeguarding of securities and funds that are within NSCC's custody or control.[64]

The Commission also found the Illiquid Charge was consistent with Rule 17Ad-22, which requires NSCC to have written policies and procedures "reasonably designed" to ensure that it meets its obligations as a covered clearing agency.[65]

Rule 17Ad-22(e)(4)(i) requires NSCC to have written policies and procedures reasonably designed to "effectively identify, measure, monitor, and manage its credit exposures to participants and those arising from its payment, clearing, settlement processes, *including by maintaining sufficient financial resources to cover its credit exposure to each participant fully with a high degree of confidence*." (Emphasis added.)  In finding that the Illiquid Charge meets this standard, the SEC stated:

> [T]he Illiquid Charge is designed to help obtain sufficient financial resources to help cover the credit exposures, with a high degree of

---

[62] *See* Cuddihy Decl. ¶¶ 17, 30.

[63] *See* Illiquid Charge Order at 21,865.

[64] *Id.*

[65] *See* CCA Standards at 282.

16

confidence, presented by members that maintain Illiquid Positions.[66]

Rule 17Ad-22(e)(6)(v) requires NSCC, as a CCP, to have policies and procedures reasonably designed to "cover . . . its credit exposures to its participants by establishing a risk-based margin system that, at a minimum . . . '[u]ses an appropriate method for measuring credit exposure that accounts for relevant product risk factors and portfolio effects across products.'"[67] In finding the Illiquid Charge consistent with this requirement, the Commission stated:

> The Illiquid Charge is calculated to address the unique risk characteristics presented by Illiquid Securities, specifically their lack of marketability and their low and volatile share prices, and in consideration of the credit rating of the member holding the Illiquid Position.[68]

With respect to the CRRM rating, NSCC's proposed rule change and the resulting approval order both discussed the quantitative and qualitative factors used to assess a member's credit rating in detail.[69]  Both the quantitative and qualitative factors are the same for all broker-dealers.  The qualitative factors take into consideration changes in each member's organization, management, legal and regulatory risks, among other things.[70]

The Commission found that the CRRM-related enhancements were consistent with the Exchange Act, Section 17A(b)(3)(F),[71] and the rules promulgated thereunder—including Rule

---

[66] Illiquid Charge Order at 21,865.

[67] *Id.*

[68] *Id.*

[69] *See* CRRM Order at n. 6 & 9; *see also Notice of Filing of Proposed Rule Change To Enhance the Credit Risk Rating Matrix and Make Other Changes*, Release No. 34-80381 (Apr. 5, 2017), 82 Fed. Reg. 17,475, 17,477 (Apr. 11, 2017) (the "CRRM Proposed Rule").

[70] *Id.*; *see also* NSCC Rule 2B, Sec. 4.

[71] *See* CRRM Order at 24,176, 24,179.

17Ad-22(e)(3)(i), which requires the clearing agency's policies and procedures to be reasonably designed to "[m]aintain a sound risk management framework for comprehensively managing . . . legal, credit, liquidity . . . and other risks that arise in or are borne by [the clearing agency]," including "risk management . . . systems designed to identify, measure, and manage [those risks]"[72]. As stated by the Commission:

> Because a defaulting member could place stresses on the Clearing Agencies, with respect to the Clearing Agencies' ability to meet their respective clearance and settlement obligations (upon which the broader financial system relies), it is imperative that the Clearing Agencies have a strong understanding of the credit risk presented by their members.[73]

The SEC also determined:

> [T]he [CRRM enhancements] would provide more description regarding the Clearing Agencies' authority to review additional reporting from members regarding their financial or operational condition. . . . Because such authority could enable the Clearing Agencies to better determine whether the member has sufficient financial resources and monitor compliance with the Clearing Agencies' financial requirements on an ongoing basis, the Commission believes this requirement is consistent with Rule 17Ad-22(e)(18).[74]

Alpine's challenge to the Illiquid Charge rule and its CRRM rating are baseless in the face of the Commission's consideration and approval of the rules as consistent with the Exchange Act, and rules thereunder, a process in which Alpine chose not to participate.

Unable to address the extensive rule making history fatal to its case (and, indeed, its papers scarcely mention the rule making), Alpine's essential argument is that the Illiquid Charge

---

[72] *See id.* at 24,180. The SEC also found the CRRM enhancements made the procedure more "clear and transparent" consistent with Rule 17Ad-22(e)(1). *Id.*

[73] *Id.* at 24,179.

[74] *Id.* at 24,180.

greatly exceeds the principal amount of its positions. But the principal amount of Alpine's Illiquid Positions is not the measure of the risk to be margined. The high volatility and illiquid market for penny and sub-penny stocks means that NSCC might be required to pay many times the transaction price to complete the trades in the event of a default.[75] Moreover, Alpine's motivation in reducing the charges—to increase its revenue by clearing more trades in Illiquid Securities through NSCC—would only compound the risk from the reduced Required Fund Deposit. The purpose of the Required Fund Deposit, as required by the Exchange Act and implementing rules, is not to accommodate a member's objective to maintain or grow its business, it is to ensure with a high degree of certainty that NSCC can cover its exposure to the member's existing business in the event of default.[76]

Alpine also argues the Illiquid Charge is discriminatory and anti-competitive because it results in higher charges for smaller members that specialize in penny stocks and other Illiquid Securities.[77] Rule 17Ad-22 requires that NSCC cover its risk exposure to *each* member in relation to the member's business and how it manages its operations. It is not discriminatory or anti-competitive to require members to fund their own risk, rather than shifting it to others.[78]

With respect to its CRRM rating, Alpine baldly asserts that NSCC acted "arbitrarily" in assigning Alpine a 7, thereby preventing it from utilizing the DTC Offset, but offers nothing to

---

[75] Cuddihy Decl. ¶ 12.

[76] Framework at 50.

[77] Notably, NSCC also requires that large members whose default would pose the largest liquidity exposure to NSCC post supplemental liquidity deposits to cover the heightened liquidity exposure. *Id.* at 39.

[78] *See* Illiquid Charge Order at 24,180 n. 38 (finding the Charge not to be anticompetitive). Any decision to base the relief on the CRRM component of the Illiquid Charge also could have ramifications for DTCC's other operating subsidiaries, who are also subject to these rules.

support that contention (except, perhaps, conclusory claims that NSCC disfavors smaller members).[79] Alpine's complaint that "NSCC will not disclose how each individual factor is weighed"[80] rings hollow in light of the criteria laid out in the rules (and addressed in Alpine's papers). And, as described above and detailed in the Cuddihy Decl.,[81] the myriad financial, management, and legal challenges that Alpine has faced, including the securities fraud enforcement action the Commission commenced against Alpine in 2017, all negate Alpine's conclusory claim of "arbitrariness."

For all of these reasons, Alpine does not have a strong likelihood of success.

## II.    Alpine Has Not Established Irreparable Injury.

In order to establish irreparable injury absent a stay, Alpine must demonstrate an injury that is "certain[,] great[,]. . . and not theoretical" and that "directly result[s] from the action [that it] seeks to stay."[82] Alpine cannot meet its burden.

*First*, Alpine alleges only financial injury,[83] which the Commission has ruled is not sufficient to warrant a stay[84]. On this factor alone, Alpine is not entitled to stay the Illiquid Charge.

---

[79] Stay Motion at 17.

[80] Brant Decl. at 17.

[81] *See supra* 8-10; Cuddihy Decl. ¶¶ 23-32.

[82] *In the Matter of the Application of Scottsdale Capital Advisors Corp., John J. Hurry, Timothy B. Diblasi, & D. Michael Cruz for Review of Disciplinary Action Taken by Finra*, Release No. 34-83783, 2018 WL 3738189 (Aug. 6, 2018) (internal quotations and citations omitted).

[83] *See, e.g.*, Stay Motion at 15 ("Alpine will suffer irreparable damages . . . as a result of the financial burden" due to the Illiquid Charge.); *see also, id.* at 18 (suggesting that "financial stress" is irreparable harm).

[84] *In the Matter of the Application of Robert J. Prager for Review of Disciplinary Action Taken by NASD*, Release No. 34-50634, 2004 WL 2480717, at *1 (Nov. 4, 2004) ("financial [harm] does not rise to the level of irreparable injury warranting issuance of a stay"); *see also, In the Matter of the Application of*

*Second,* Alpine cannot show that the Illiquid Charge has caused its purported injury for purposes of obtaining a stay.

NSCC imposes the Illiquid Charge as part of a risk management framework that allows it to guarantee that the transactions it clears will be completed in the event of a firm default. The claim that Alpine's business would benefit if the Illiquid Charge were stayed does not constitute irreparable injury. Rather than demonstrating irreparable injury absent a stay, Alpine has only claimed that it has insufficient capital to support the risks of its trading in Illiquid Securities under the rules approved by the Commission. As recognized by the Commission in a closely analogous context, it is the member's responsibility to meet the clearing agency's capital requirements, and an inability to do so is the responsibility of the member, not the clearing agency:

> While it is possible that the proposed rule changes will force some members of [the Fixed Income Clearing Corporation ["FICC"]] and NSCC to discontinue their direct membership in FICC and/or NSCC, the Act does not provide broker-dealers with the right to be direct members in a clearing agency. *Affected firms have a choice to raise excess regulatory capital or to limit their trading activities so that the risk to which the clearing agency and its other members is exposed is proportionate to the firm's excess regulatory capital.* The Commission finds that the proposed rule changes should not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act in accordance with Section 17A(b)(3)(I).[85]

---

*Ahmed Gadelkareem for Review of Disciplinary Action Taken by Finra*, Release No. 34-80586, 2017 WL 1735943, at *1 (May 3, 2017) ("[I]njuries . . . in terms of money, time, and energy [do not] constitute irreparable harm.") (internal quotations and ellipsis omitted).

[85] *Notice of Filing and Order Granting Accelerated Approval of Proposed Rule Changes to Institute a Clearing Fund Premium Based Upon a Member's Clearing Fund Requirement to Excess Capital Ratio,* Release No. 34-54457 (Sept. 15, 2006), 71 Fed. Reg. 55,239, 55,239-40 (Sept. 21, 2006) (emphasis added) (approving clearing fund premium on NSCC and FICC members whose clearing fund requirements exceeds their regulatory excess capital).

**Page 22 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.**

secured by Alpine, it must ultimately be borne by the clearance and settlement system. NSCC and its members would effectively be forced to subsidize Alpine's business model. Staying the Illiquid Charge would inequitably force NSCC's other members to bear risk that is not theirs, work a competitive disadvantage relative to those members who continue to pay the Illiquid Charge, and undermine the public interest by increasing systemic risk.

Furthermore, if the Commission were to grant Alpine's stay request, it would set an inadvisable precedent. A stay would disable an element of a comprehensive risk management scheme, approved by the Commission, without following the prescribed rule making procedures under the Exchange Act. Essentially acknowledging the infirmity of its invocation of Section 19(d), Alpine simultaneously has filed a rule making petition intended to redesign specific aspects of NSCC's risk management system to its advantage. A stay, however, would operate immediately and indefinitely to provide that ultimate relief, without affording *all* interested parties notice and the opportunity for comment—including parties who, as noted above, would be forced to bear Alpine's risk without the opportunity to object. This is inimical to essential policies underlying the Exchange Act.

## CONCLUSION

Alpine's request for an interim stay should be denied.

New York, NY
January 23, 2019

PROSKAUER ROSE LLP

By: _____
Gregg M. Mashberg
Benjamin J. Catalano
Brian A. Hooven
11 Times Square
New York, NY 10036

*Attorneys for Respondent*
*National Securities Clearing*
*Corporation*

## ATTORNEY CERTIFICATION

Pursuant to Rule 154(c) of the Commission's Rules of Practice, I hereby certify that the

foregoing document contains 6920 words, exclusive of the tables of contents and authorities.

New York, NY
January 23, 2019

By: _____
Gregg M. Mashberg

25

# EXHIBIT E

Brent R. Baker
Aaron D. Lebenta
**CLYDE SNOW & SESSIONS**
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Phone: (801) 322-2516
Fax: (801) 521-6280
brb@clydesnow.com
adl@clydesnow.com
*Attorneys for Petitioner*

Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Phone: (212) 344-5680
Fax: (212) 344-6101
Maranda.Fritz@thompsonhine.com

## UNITED STATES OF AMERICA

## SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| In the Matter of the Application of<br><br>ALPINE SECURITIES CORPORATION, a<br>Utah limited liability company<br><br>For Review of Adverse Action Taken By<br><br>NATIONAL SECURITIES CLEARING<br>CORPORATION | |

## ALPINE'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN INTERIM STAY

**[Oral Argument Requested]**

**[Subject to Pending Application for Confidential Treatment]**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES ............................................................................... ii

ARGUMENT ...................................................................................................... 1

   I.   Alpine Has Raised Serious Legal Questions and Established a Substantial Likelihood of Success on the Merits of Its Petition for Review ................................................................ 1

      A.  The NSCC Has Failed to Articulate an Adequate, Rational Justification for its Imposition of the Oppressive Required Fund Deposit Charges at Issue, Including the Illiquid Charge, Relating to the Transactions of Alpine .................................................. 1

          1.  NSCC Failed to Demonstrate That There is Any Statistically Significant Risk that It Will Be Unable to Access Stock at DTC to Close Net Sell Positions ................. 2

          2.  NSCC Has Failed to Offer any Justification of its Refusal to Permit the DTC Offset Only Where NSCC Has Assigned a Credit Rating of 7 ................................ 5

          3.  NSCC Has Failed to Offer Any Justification for the Completely Arbitrary Practice of "Rounding Up" Share Price .......................................................... 6

      B.  Alpine's Petition for Review is Not Procedurally Infirm ............................................ 7

          1.  NSCC Limited Alpine's Access to NSCC's Essential Clearing and Settlement Services by Imposing Onerous and Discriminatory Margin Charges .................... 7

          2.  Commission Review Under Section 19(d) and 19(f) is Not Limited to SRO Rules Adopted Under Section 19(b)(3) ......................................................... 10

          3.  Alpine's Petition is Not Untimely ....................................................................... 11

  II.  A Stay is Necessary to Avoid Irreparable Harm to Alpine and the Microcap Industry and Will Promote Public Interest by Strengthening the Microcap Market .............................. 13

  III.  In the Alternative, NSCC's Opposition Demonstrates the Need for Expedited Discovery ........................................................................................................ 15

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Bruce Zipper,*
  Exchange Act Release No. 82158, 2017 WL 5712555 (Nov. 27, 2017) ...................................... 1
*Commonwealth Edison Co. v. U.S. Nuclear Regulatory Comm'n,*
  830 F.2d 610 (7th Cir. 1987) .................................................................................................. 12
*Geller v. FCC,*
  610 F.2d 973 (D.C.Cir.1979) ................................................................................................. 12
*In re Application of Securities Industry and Financial Markets Association for Review of Action*
  *by Self Regulatory Organizations ("In re SIFMA"),*
  SEC Release No. 72182, 2014 WL 1998525 (May 16, 2014) .............................. 7, 9, 10, 11, 12
*In re Bloomberg, L.P.,*
  Release No. 49076, 2004 WL 67566 (Jan. 14, 2004) ........................................................... 9
*In re International Power Group, Ltd.,*
  SEC Release No. 66611, 2012 WL 892229 (March 15, 2012) ............................................... 8, 9
*In re Scottsdale Capital Advisors, John J. Hurry,*
  *et al.,* SEC Release No. 83783 ............................................................................................... 14
*MFS Sec. Corp.,*
  Exchange Act Release No. 47626, 2003 WL 1751581 (Apr. 3, 2003) ..................... 2, 10, 11, 12
*Murphy Exploration & Prod. Co. v. Dep't of Interior,*
  270 F.3d 957 (D.C.Cir.2001) ................................................................................................. 12
*N.L.R.B. Union v. F.L.R.A.,*
  834 F.3d 191 (D.C. Cir. 1987) .............................................................................................. 12
*Notice of Application of William Higgins,*
  51 Fed.Reg. 6186–04, 1986 WL 89969 (Feb. 20, 1986) ......................................................... 9
*Scattered Corp.,*
  52 S.E.C. 1314, 1997 SEC LEXIS 2748, at *15 (Apr. 28, 1997) ............................................ 14
*Wash. Metro. Area Transit Comm'n,*
  559 F.2d. ................................................................................................................................ 14
*Weaver v. Fed. Motor Carrier Safety Admin.,*
  744 F.3d 142 (D.C. Cir. 2014) ............................................................................................... 12

**Statutes**

15 U.S.C. § 78q-1(b)(6) .............................................................................................................. 8
15 U.S.C. § 78s(d)(1) .................................................................................................................. 8
15 U.S.C. § 78s(f) ......................................................................................................... 2, 10, 11, 12
15 U.S.C. §§ 78s(d), (f) ............................................................................................................ 10

**Regulations**

17 C.F.R. § 201.420(b) ............................................................................................................. 12

**Other Authorities**

S. Rep. 94-75, 1975 U.S.C.C.A.N 179 ............................................................................ 14

## ARGUMENT

I.  **ALPINE HAS RAISED SERIOUS LEGAL QUESTIONS AND ESTABLISHED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS PETITION FOR REVIEW**

A.  **The NSCC Has Failed to Articulate an Adequate, Rational Justification for its Imposition of the Oppressive Required Fund Deposit Charges At Issue, Including the Illiquid Charge, Relating to the Transactions of Alpine.**

In its motion for a stay, Alpine described a host of margin charges that are imposed by the NSCC in relation to Alpine transactions, oftentimes hundreds of times more than the transaction or position value, and demonstrated that those charges, particularly in the aggregate, violate the Exchange Act because they are unreasonable and onerous, irrational, redundant and not merely anti-competitive and discriminatory, but affirmatively and gratuitously destructive to the microcap market.  In response, NSCC attempts to demonstrate that Alpine's Petition will not succeed on the merits by focusing exclusively on matters related to the Illiquid Charge, claiming that the Illiquid Charge is justified by the need to mitigate the risks confronting NSCC in its role as central counter party ("CCP").[1]  NSCC's purported rationale for the Illiquid Charge, however, substantially undermines any claim that the Illiquid Charge is even justified, much less essential to NSCC's risk management regime.  NSCC's Opposition, as a whole, confirms that Alpine has demonstrated a substantial likelihood of success on the merits, and certainly "raised a serious legal question on the merits" sufficient to warrant a stay.[2]

---

[1] NSCC appears to contend that the "substantial likelihood of success" element should be determined from a single component of the Required Fund Deposit, the Illiquid Charge, because that is the component as to which Alpine seeks a stay. However, that singular focus is not appropriate.  Alpine's Petition for Review challenges numerous components of the Required Deposit, asserting these charges are irrational and invalid, not only when considered individually, but primarily when NSCC applies them collectively to extract exorbitant and unnecessary margin payments from Alpine. Alpine limited its stay request to the Illiquid Charge because it is, at this point, the most damaging and the least justified of the various charges, and a stay of that charge would allow Alpine to conduct some additional trading and obtain those revenues while this matter is pending.  By not even attempting to justify its actions on the other components at issue, NSCC has failed to show it would prevail on Alpine's Petition.

[2] *See, e.g., Bruce Zipper*, Exchange Act Release No. 82158, 2017 WL 5712555, at *6 (Nov. 27, 2017)  (stating that a movant need not necessarily establish that it is likely to succeed on the merits if it raises a "serious legal question on the merits" and the other factors weigh heavily in its favor.  Here, as demonstrated below, the irreparable harm, lack of prejudice to NSCC, and public interest clearly weigh in favor of a stay.

1.   **NSCC Failed to Demonstrate That There is Any Statistically Significant Risk that It Will Be Unable to Access Stock at DTC to Close Net Sell Positions.**

According to the NSCC, the Illiquid Charge (*and* the Volatility Charge) are necessary to mitigate the following risk: that Alpine could enter into certain sell transactions on behalf of a client, in relation to stock that it holds at DTC, and communicate that trade through CNS on day 1; that on day 2 some event could occur that would interrupt the operations of Alpine; that at the exact same time, something would occur that would prevent DTC from delivering the stock to NSCC on the pending trade; that NSCC, rather than taking appropriate steps to arrange to obtain the stock from DTC, would then go into the market to buy that same stock to cover the delivery obligation; *and* that the price of the stock in the meantime could have "skyrocketed" causing the NSCC to incur costs at exponential multiples of the transaction price. Opp. at 7. The flaws in that rationale are abundant and apparent.

First, it should be noted that not even the NSCC actually asserts that it has ever or would ever be unable to access stock held at DTC. Its Opposition speaks only in terms of a hypothetical possibility that, in the event of Alpine's default or insolvency, NSCC "could" or "may" be unable to access the stock.[3] Such a speculative "may" or "might" possibility, put forth to justify a demand for Illiquid Charge margin payments that alone frequently exceed $ 1 million per day, fails to satisfy the Exchange Act requirement that NSCC demonstrate that "the *specific grounds* on which [NSCC] based its action *exist in fact.*"[4]

Second, NSCC has failed to offer any support for the notion that there is any statistically significant risk that it would not be able to access stock held at DTC to deliver to the buyer. Contrary to the NSCC's assertions, DTC's obligations to deliver securities it holds in a member's account to NSCC to close out a selling member's open position is not interrupted

---

[3] Opp. at 6 (stating that "liquidation could be difficult or delayed" and the share price "could skyrocket" in NSCC is forced to buy in positions"); Opp. at 15 ("in the event of an enforcement or insolvency proceeding against an NSCC member, NSCC may not be able to obtain access" to the stock at DTC); Opp. at 19 (NSCC "might be required" to pay more than transaction price"). *See also* Cuddihy Dec. at ¶ 30.

[4] *See, e.g., MFS Sec. Corp.*, Exchange Act Release No. 47626, 2003 WL 1751581, at *4 (Apr. 3, 2003) (emphasis added) (stating that Section 19(f) requires the Commission to set aside an SRO's action unless the SRO proves, *inter alia,* that the "specific grounds on which the [SRO] based its action exist in fact"); *see also* 15 U.S.C. § 78s(f).

because of a member default or even a bankruptcy. NSCC has arrangements and contracts, including cross-guaranty and netting contracts, designed to "permit transactions to flow smoothly between DTC's system and the CNS system in a collateralized environment."[5] NSCC's rules confirm that, even where NSCC has "ceased to act" for a member, it can "continue to instruct [DTC] . . . to deliver CNS Securities from such Member's account at [DTC] to [NSCC's] account in respect to such Member's Short Position."[6] NSCC confirmed its ability to close contracts, regardless of insolvency or default of a member, in its Disclosure Framework.[7]

> The exceptions and safe harbors contained in FDICIA, the Bankruptcy Code, SIPA, FDIA and Title II of Dodd-Frank that support the finality of securities transactions and the closeout of the insolvent Member's open positions provide NSCC with a high degree of certainty as to the effectiveness of its risk management and default management rules and procedures.[8]

Similarly, DTCC – which of course owns and controls both DTC and NSCC – is obligated to ensure the efficient and smooth workings of the markets and remains able to direct and to ensure appropriate and efficient cooperation as between its subsidiaries in the event of any default event. And that appears to be exactly what has occurred in the past. NSCC dealt with

---

[5] National Securities Clearing Corporation, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures,* at p. 40 (December 2018) ("NSCC Disclosure Framework"); *see also* NSCC's Rules & Procedures, Rule 11, § 3 (stating, in connection with CNS operation for a selling (delivering) member, that NSCC "will instruct the Qualified Securities Depository [DTC] . . . to deliver to the Corporation's account at the Qualified Securities Depository on each Settlement Date CNS Securities"). Further, NSCC's rules confirm that once "securities are delivered" to NSCC pursuant to CNS transactions, NSCC has "all of [the] ownership rights" in the securities. NSCC Rules & Procedures, Rule 11, § 1(e).

[6] NSCC's Rules & Procedures, Rule 18, § 5.

[7] NSCC identified numerous exceptions and safe harbors in the FDICIA, Bankruptcy Code and SIPA that confirm that NSCC's netting and other agreements with DTC "shall not be stayed, avoided or otherwise limited by any state or federal law." NSCC Disclosure Framework, at 18 (also stating that Section 404(h) of the FDICIA confirms the enforceability of NSCC's contracts with DTC, "notwithstanding that a Member is a failed Member," and that "no stay, injunction, avoidance, moratorium or similar proceeding or order, whether issued or granted by a court, administrative agency, or otherwise, ***shall limit or delay*** application of otherwise enforceable netting contracts." (emphasis added); *see also id.* at 19 *and* fns. 23 and 24 (describing exceptions and safe harbors in the Bankruptcy Code and SIPA that "support the finality of securities transactions processed through securities clearing agencies and the clearing agency's closeout of the insolvent member's open positions," including exceptions to the automatic stay, and for SIPC members in particular, that confirm the right "to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more of such contracts or agreements."). NSCC also confirmed in its Disclosure Framework that "protective decrees often recite many of the stay exceptions and safe harbors found in the Bankruptcy Code and SIPA and also contain additional stay exceptions and safe harbors not contained in the Bankruptcy Code and SIPA, including those designed ***to enable clearing agencies to timely effectuate a closeout.***" *Id.* at 19, fn. 24 (emphasis added).

[8] *Id.* at 20.

the collapse of Lehman Brothers, and that event further undermines the NSCC's assertions here. NSCC experienced no inability to deliver stock held by DTC on pending contracts. DTCC in fact announced on October 30, 2008 that it had "successfully closed out over $500 billion in market participant's exposure including ensuring that $1.9 billion in securities held at DTC were "used to satisfy open trades at NSCC." As a result of DTC's release of the securities, "NSCC did not need to go to the marketplace to purchase securities to complete those trades."[9] In fact, in December of 2018, NSCC confirmed that "[t]o date, including through the 2008 well-publicized broker-dealer closeouts, NSCC has never invoked its membership loss allocation procedures."[10] The clear realities of the operational integration of DTC and NSCC ensure that NSCC will not be deprived of stock held by DTC that is subject to a locked-in pending trade.

In fact, NSCC has acknowledged that its risks arise where a defaulting firm has open positions that are net *buy* positions – not sell positions covered by stock held at DTC – and NSCC would be required to deliver payment to the seller. According to NSCC, it faces "liquidity needs" which "are driven by the requirement to complete ***end-of day money settlement***, on an ongoing basis, in the event of a failure of a Member."[11] The risk management regime of NSCC, including the various margin charges, are designed and intended to provide "protection" against a buyer defaulting on its payment obligation.[12] The exorbitant margin NSCC is charging Alpine on its sales-side transactions is plainly unsupported by NSCC's avowed need to offset the risk that the *buying member will fail to deliver payment.*[13]

---

[9] BusinessWire Release, *DTCC Successfully Closes Out Lehman Brothers Bankruptcy*, dated October 30, 2008.

[10] NSCC Disclosure Framework, at 12.

[11] *Id.*, at 65 (emphasis added); *id.* at 66 (stating "long (receive) positions drive the potential liquidity risk that is posed to NSCC, since NSCC would be responsible for the payment of cash required to settle those purchases.").

[12] *Id.* at 79 (stating "collection of risk based margin to NSCC's Clearing fund, maintenance of liquidity resources, and the on-going credit risk monitoring of members" are intended to provide "protection" to the delivering (selling) member against the buyer's default on its payment obligation).

[13] The absence of any real risk that NSCC can acquire shares from DTC to close out a *selling* member's open position is precisely why NSCC allows selling members to use the DTC Offset to avoid the Illiquid Charge in the first place. When the shares to cover the position are held at DTC, there is no risk that NSCC will have to go into the market to purchase the so-called "Illiquid Shares" in order to fulfill its CCP obligation to the contra-party. Its justification for allowing this Offset to large members but denying it to small members, such as Alpine, on transactions in the same securities based on a self-assigned "credit" rating is both discriminatory and specious.

Third, the irrationality and redundancy of the Illiquid Charge is, to an extent, admitted by NSCC. It states that the Volatility Charge is intended to capture the risk associated with price volatility to a 99% level of confidence. (Opp., at 5, n. 15.)  But NSCC cites as the basis for the Illiquid Charge the exact same risk of *stock price volatility* – a risk plainly addressed by the Volatility Charge. NSCC even admits it is in the process of eliminating the Illiquid Charge, in favor of the Volatility Charge, once it "tweaks" the calculation of that charge.[14]  Given its own admission that the two charges are duplicative, NSCC cannot claim any significant risk or hardship if the Illiquid Charge is stayed pending a resolution of Alpine's Petition.

Once NSCC's risk-based justification for the Illiquid Charge is properly exposed as illusory, it is further evident that the imposition of this enormous charge, particularly in combination with the Volatility and other charges, is unsupported by any adequate justification and is contrary to the provisions of the Exchange Act. The Illiquid Charge is itself baseless, and is being arbitrarily and discriminatorily applied to Alpine as a tax on OTC securities based, apparently, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Further, because the NSCC charges severely limit the number of transactions that Alpine can process per day for its customers, those charges impermissibly and unnecessarily burden competition between the national exchanges and the OTC market, and between Alpine and larger NSCC members who can avoid the charge altogether through the DTC Offset.[15]

### 2.   NSCC Has Failed to Offer any Justification for its Refusal to Permit the DTC Offset Only Where NSCC Has Assigned a Credit Rating of 7

NSCC is refusing to permit use of the DTC offset, and so imposing that Illiquid Charge on Alpine, based on its assignment to Alpine of its lowest credit rating, a 7. That credit rating, according to the NSCC, is based on a host of factors that are input into a model which then generates the credit rating. But, in Alpine's case, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ based on

---

[14] Cuddihy Decl., at ¶¶ 20-21.

[15] Alpine refers the Commission to its Petition for Rulemaking, at pp. 19-26, attached as Ex. B to Alpine's Petition for Review, for a detailed discussion of the Exchange Act provisions, and SEC Rules, violated by NSCC's practices.

"subjective criteria." Cuddihy Decl., at ¶19.  NSCC provided no evidence or adequate explanation 

The NSCC does not even attempt to explain that discrepancy or the arbitrariness of its actions.

At a more fundamental level, NSCC offers no rational explanation for its decision to refuse to permit the DTC offset to be applied to firms to which it has assigned the lowest credit rating.  It has put forth no basis on which to distinguish a credit rating of 6 from a credit rating of 7; in fact, it has applied both to Alpine during the past year.  It has failed to offer any support for the view that a credit rating of 6 somehow materially alters the risk posed by transactions in Illiquid Securities.  To the contrary, larger better capitalized firms may have substantially larger positions in illiquid stocks and so the risk posed by the need to cover a position with a "skyrocketing" stock price would be far greater.  NSCC's practices with respect to formulation and application of the CRRM are thus also woefully deficient.

### 3.  NSCC Has Failed to Offer Any Justification for the Completely Arbitrary Practice of "Rounding Up" Share Price

NSCC acknowledges – but does not even attempt to justify the fact – that when calculating the Illiquid Charge, it "rounds up the price of the security to $0.01."  According to



the NSCC, there are sophisticated formulae used to calculate the Illiquid Charge on a net sell position of a stock that has a market price of less than $1.00.[17] All of those calculations are abandoned, however, when the stock price is less than $0.01. For no articulated reason, the NSCC substitutes the minimum share price of $0.01.

That substitution of a fictional share price is unexplained, unjustified and enormously impactful. The NSCC does not, and hopefully could not claim that its system is incapable of running calculations at the actual share price, nor does it argue that the alteration of the share price serves any particular risk management purpose. It simply arbitrarily and discriminatory penalizes a firm and its customers in any transaction involving sale of a stock that is priced below $0.01, exponentially increasing the margin charges on those positions. The resulting charges thus do not conform to the Exchange Act's requirements of reasonableness, prohibitions on discrimination, or mandate to preserve competition between firms and markets.

**B.      Alpine's Petition for Review is Not Procedurally Infirm.**

In its effort to avoid scrutiny of the overlapping, arbitrary and redundant components of the Required Deposit, NSCC contends that there are procedural barriers that deprive the Commission of the power to review NSCC's imposition of these charges. Each of NSCC's procedural arguments lacks merit.

**1.      NSCC Limited Alpine's Access to NSCC's Essential Clearing and Settlement Services by Imposing Onerous and Discriminatory Margin Charges.**

NSCC does not contest that its CNS clearance and settlement services are "fundamentally important" services and "central to the function" of NSCC.[18] In fact, it has been granted virtually monopolistic control of settlement of trades. NSCC also does not contest that Alpine is required to post the Required Deposit – including, *inter alia,* the Illiquid Charge, Mark to Market

---

[17] Under that formula, NSCC multiples the volume of shares by the greater of the highest price over 20 trading days (Order at 7) or a factor set by NSCC; where the market price is less than $0.10, that factor is 10.

[18] *See, e.g., In re Application of Securities Industry and Financial Markets Association for Review of Action by Self Regulatory Organizations ("In re SIFMA"),* SEC Release No. 72182, 2014 WL 1998525, at *9 (May 16, 2014) (explaining that a denial or limitation of access subject to review under Section 19 must go to "the applicant's ability to utilize one of the fundamentally important services offered by the SRO").

Charges, Volatility Charges – which is calculated and assessed by NSCC on a daily basis, in order to access NSCC's CNS clearing and settlement services.

Nevertheless, NSCC claims the "Illiquid Charge" cannot be "a prohibition or limitation on access to services as contemplated by Section 19(d)" because it is not a "fee" but "a component of the service itself." (NSCC Opp., at 11.) That claim is nonsensical semantics, and unsupported by any authority. The Required Deposit serves precisely to limit and proscribe access to essential "services," i.e, NSCC's CNS clearance and settlement services. NSCC has formulated and imposes charges that Alpine must post if it wants to access NSCC's clearance and settlement services for its own business and for its customers. Indeed, under NSCC's rationale, NSCC could require Alpine to post any amount – for example, a billion dollars in margin to clear a thousand dollars in trades – and it could never be a limitation on access under Section 19. While an extreme example, this is a logical extension of NSCC's position, and is not what Congress intended in by protecting SRO access rights in Section 19.

As Alpine has alleged in its Petition, and supported by declaration, these charges, particularly in the aggregate, are wildly excessive in comparison to the underlying transactions or positions to be cleared and settled through NSCC, have not been shown to correspond to any actual risk, and artificially restrict the number of trades that Alpine can process every day. Further, NSCC has confirmed that Alpine provides clearing for the majority of all microcap stock in the country and so these excessive microcap margin charges also impermissibly restrict the entire microcap market's – issuers and traders – ability to access services at NSCC that are necessary to trade.[19] These factors are more than sufficient to demonstrate a limitation on access

---

[19] Both Sections 19 and 17A of the Exchange Act also protect <u>nonmembers</u>' indirect rights to access a registered clearing agency's essential services, with Section 19 providing for Commission review of such denials or limitations of access. *See* 15 U.S.C. § 78q-1(b)(6) (prohibiting a registered clearing agency from prohibiting or limiting access by any person to services offered by one of its participants); 15 U.S.C. § 78s(d)(1) (creating a right to Commission review of any SRO action that "prohibits or limits **any person** in respect to access to <u>services offered by such</u> organization [SRO] <u>**or member thereof**</u>." (emphasis added); *cf. also In re International Power Group, Ltd.*, SEC Release No. 66611, 2012 WL 892229 at ** 4, 6 (March 15, 2012) (holding that an issuer, though not a member of DTC, was entitled to protection under Sections 19(d) and (f) against a limitation on access to services at DTC "even if those services are not provided directly to the issuer," because Congress provided protection to "'any person' . . . 'with respect to access to services'" in Section 19(f)).

subject to review under Section 19.[20]

   In this regard, the Required Deposit functions like the fees found to be an impermissible limitation on access in *in re SIFMA* because, in both cases, the SRO conditioned access to its services on the outlay of money.[21] Moreover, contrary to NSCC's insinuation that only a requirement to pay a "fee" could be a restriction on access, the Commission has never interpreted the phrase "limitation of access" so restrictively. For example, in *Bloomberg, L.P.*, the Commission held that NYSE's "imposition and enforcement of" certain restrictions relating to the dissemination of depth-of-book data "effected a denial of access to Bloomberg" of services because NYSE "would not provide Bloomberg access to [that] data unless it disseminated and continue[d] to disseminate" it in accordance with the restrictions.[22] Similarly, the Commission exercised jurisdiction to institute "denial of access" proceedings under Sections 19(d) and (f) to review the NYSE's denial of a member's request to install an unrestricted phone line on the floor of the Exchange to contact customers.[23] Certainly the excessive margin charges imposed by NSCC as a condition of clearing a trade likewise constitute a denial or limitation of access.

   NSCC also puts forth the circular and baseless argument that if the "Required Fund Deposit were a prohibition or limitation on access," it would be required to file a notice before imposing the charge, and because it does not file a notice, it cannot be a prohibition or limitation on access. The Commission has repeatedly confirmed that "the failure of an SRO to file the required notice does not prevent Commission review." The Commission can review any action as to which the SRO was obligated to file notice, regardless of whether it complied with that

---

[20] *See In re Int'l Power*, 2012 WL 892229 at *4 (stating, "loss of or increased costs of doing business, or difficulties in fulfilling market-making obligations" were "negative impacts" on a "Broker-Dealer Participant" that "could be remedied by challenging DTC's denial of the Participant's access to services").

[21] *See In re SIFMA*, 2014 WL 1998525, at *8 *and* n. 76 (holding that SIFMA members could establish an "actual limitation on access" by submitting declarations that they "purchase the depth-of-book products and explaining that those members are aggrieved because the level of the prices charged for those products is so high as to be outside a reasonable range of fees under the Exchange Act," or alternatively, "showing that they were unable to purchase depth-of-book products due to alleged supracompetitive pricing violating the Exchange Act").

[22] *See In re Bloomberberg, L.P.*, Release No. 49076, 2004 WL 67566 at *2 (Jan. 14, 2004).

[23] *Notice of Application of William Higgins*, 51 Fed.Reg. 6186–04, 1986 WL 89969 (Feb. 20, 1986).

obligation.[24]  If anything, NSCC's failure to file the required notices serves to further undermine its argument that Alpine's Petition is untimely.

> ### 2.  Commission Review Under Section 19(d) and 19(f) is Not Limited to SRO Rules Adopted Under Section 19(b)(3).

NSCC next argues that review under Section 19(d) is only available for an SRO rule adopted under Section 19(b)(3) (an immediately effective rule) but not for a rule approved under Section 19(b)(2).  This assertion finds no support in the statutory scheme of Section 19 and, not surprisingly, NSCC cited no statutory or decisional authority to support its position.

Not one provision in Section 19(d) or 19(f) purports to condition the right to review upon the manner in which the SRO rule is proposed or approved under Section 19(b).  *See* 15 U.S.C. §§ 78s(d), (f).  To the contrary, the statutes make clear that the right to review is triggered by the type of action taken by the SRO, irrespective of how or when a rule is passed, i.e. a disciplinary sanction, a denial of membership, or, relevant here, SRO action that "prohibits or limits any person in respect to access to services offered by such organization or member thereof."  *See id.* § 19(d)(1), (d)(2), (f).  In fact, NSCC completely ignores that Section 19(f) requires the Commission to set aside an SRO action that limits access *unless* the Commission finds, *inter alia,* that the "prohibition or limitation is in accordance with the rules of the self-regulatory organization, ***and that such rules*** are, and ***were applied in a manner***, consistent with the purposes of this chapter," and do not impose an undue "burden on competition."  15 U.S.C. § 78s(f) (emphasis added).  By requiring the Commission to find that NSCC "applied" its rules in a manner consistent with the Exchange Act in effecting a limitation on access, and to separately weigh the limitation's effect on competition, Congress plainly made the manner in which those

---

[24] *MFS Sec. Corp.*, Exchange Act Release No. 47626, 2003 WL 1751581, at *6 n.13 (Apr. 3, 2003) ("[T]he failure of an SRO to file the required notice does not prevent Commission review" because "Section 19(d)(2) grants the Commission the authority to review any SRO action 'with respect to which a self-regulatory organization is required … to file notice…, **whether or not such notice is filed**." (emphasis added); *In re Higgins*, 51 Fed.Reg. at 6188, 1986 WL 89969 (same); *In re SIFMA*, 2014 WL 1998525, at *10 (rejecting SRO argument that review is not appropriate where SRO does not know whether to " provide notice to the Commission pursuant to Exchange Act Section 19(d)(1) that the fee constitutes a prohibition or limitation on access to services," because "such uncertainty and potential failure to file do not determine whether an application under Section 19(d) is valid, since we have held that 'the failure of an SRO to file the required notice does not prevent Commission review.'" (citation omitted)).

rules were passed irrelevant.  The Commission has confirmed this time and again.[25]

Rather than cite any actual authority confirming its position, NSCC engages in a convoluted analysis of *In re SIFMA,* arguing that this case limits review to rules passed under Section 19(b)(3).  The *SIFMA* case does nothing of the sort.  Rather, in that case, the Commission only analyzed the availability of Section 19(d) and (f) review for a rule made pursuant to Section 19(b)(3) in order to reject an argument by the SRO that Dodd-Frank stripped the Commission of jurisdiction to review an immediately effective rule filing.[26]  The Commission never stated that Section 19(d) and (f) review was limited to rules passed under Section 19(b)(3).  Nor could it, given the language of the statute and precedent cited above.

### 3.    Alpine's Petition is Not Untimely.

NSCC argument that Alpine's Petition is untimely should be rejected for two primary reasons.  First, the NSCC charges constitute continual action and impose a limitation on Alpine's access to clearing services each and every day.  Under Sections 19(d) and (f), the time to seek review of a limitation on access runs from the point at which the limitation occurs, whether the limitation is based on the rule itself or on the SRO's application of the rule.[27]  In this Petition, Alpine is not seeking review of NSCC's daily imposition of these charges to Alpine as a condition to access NSCC's CNS system, and the Petition cites and complains of particular instances of harm and unlawful limitation of access that have occurred within the relevant time frame.[28]  That Alpine's petition is timely where it is based on a limitation of access caused by

---

[25] *See, e.g., Higgins,* 51 Fed.Reg. at 6188-89, 1986 WL 89969 ("[S]ection 19(f) provides that an SRO may prohibit access to services offered by an SRO or member thereof only if: (1) The 'specific grounds' for such prohibition 'exist in fact,' (2) the prohibition 'is in accordance with the rules of the [SRO],' (3) those rules **'were applied in a manner consistent with the purposes of [the Act]**,' and (4) the **prohibition** does not impose 'any burden on competition not necessary or appropriate in furtherance of the purposes of [the Act].' **If the prohibition fails to meet any of these standards, the Commission is directed by the Act to 'set aside' the SRO action**." (emphasis added); *In re MFS,* 2003 WL 1751581, at *4 (same).

[26] *See In re SIFMA,* 2014 WL 1998525, at *10 (stating *inter alia,* that "we find it compelling that nothing in the Dodd-Frank Act removed jurisdiction under Section 19(d) for challenges to fee rules at the enforcement stage.").

[27] *See* 15 U.S.C. § 78s(f) (requiring the Commission to find, *inter alia,* the SRO "applied" its rules in manner consistent with the Exchange Act or it must set aside the SRO's actions); *see also id.* § 78(d)(2) (stating the time period runs from the date the SRO provides notice of the limitation of access to the Commission and the aggrieved person; here, Alpine receives daily notices of margin charges from NSCC); *see also fn. 25, supra.*

[28] Alpine acknowledges that it could not challenge margin charges imposed more than 30 days before it filed its Petition for Review, and it is not attempting to do so here.

NSCC's application of its rules is supported by both the Exchange Act and the federal authorities cited by Alpine in its Petition (and ignored by NSCC) holding that statutory timelines "do not foreclose subsequent examination of a rule" brought for review of "further . . . action applying it," because rules "are capable of continuing application."[29]

Second, even if the time to seek review ran from the entry of the orders approving the rules, the Commission has the authority to extend this time period for "extraordinary circumstances."[30] Extraordinary circumstances exist here. This Petition raises novel issues; Alpine is aware of no Commission decision analyzing the validity of NSCC's calculation and imposition of the challenged Required Deposit charges as a denial or limitation of access under Sections 19(d) and (f). Further, as detailed in Alpine's Petition for Rulemaking, in approving the NSCC rules underlying the charges at issue, the Division of Market Regulation conducted no *analysis* of the economic, competitive or discriminatory impacts of those charges.[31] For example, NSCC gave no rationale at all in its Form 19b-4 for making the DTC Offset unavailable to certain members.[32] Nor did the Form 19b-4s reveal the sheer amount of charges NSCC would impose under these rules or detail the manner in which NSCC could ███████ ████████████████ to prevent a firm from relying on the DTC Offset. The Division of

---

[29] *N.L.R.B. Union v. F.L.R.A.,*, 834 F.3d 191, 196 (D.C. Cir. 1987) (the Court continued: "For unlike ordinary adjudicative orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity."); *see also Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145–46 (D.C. Cir. 2014) (observing that, where "Congress imposes of statute of limitations on challenges to regulations . . . those affected may challenge that application on the grounds that it 'conflicts with the statute from which its authority derives.'" (citation omitted)); *accord Commonwealth Edison Co. v. U.S. Nuclear Regulatory Comm'n*, 830 F.2d 610, 614–16 (7th Cir. 1987); *Murphy Exploration & Prod. Co. v. Dep't of Interior*, 270 F.3d 957, 958–59 (D.C.Cir.2001); *Geller v. FCC*, 610 F.2d 973, 978 (D.C.Cir.1979).

[30] *See* 17 C.F.R. § 201.420(b); *see also in re SIFMA*, 2014 WL 1998525, at *11 and fn. 104.

[31] *See* Alpine's Petition for Rulemaking, pp. 26-28, attached as Ex. B to Alpine's Petition for Review.

[32] The Opposition NSCC filed to Alpine's Motion to Stay is the first time NSCC has attempted to justify its practice of making the DTC Offset unavailable to members (like Alpine) with a CRRM rating of "7." This cannot be understated: NSCC had to submit a declaration outside of the administrative record to try to invent a justification for the practice. Not only is NSCC's justification – that it may not be able to access Alpine's shares at DTC in the event of a default – spurious for the reasons stated above, but by straying from the record NSCC has confirmed the need for the Commission to review NSCC's actions in this regard, and to stay NSCC's practice with respect to the DTC Offset while that review proceeds. As it stands, no one at the SEC has ever analyzed whether the "specific grounds on which the [NSCC] based its action exist in fact." *In re MFS*, 2003 WL 1751581, at *4 (citing 15 U.S.C. §78s(f)).

Market Regulation therefore had no opportunity to consider critical components of the rule or evaluate the real impact of NSCC charges.

The demonstrable impact of NSCC's charges also warrants Commission review. The ongoing charges being applied by NSCC threaten not only to destroy Alpine's business, but also to choke the entire microcap market. NSCC's Opposition confirms that Alpine is a keystone of the microcap market – depositing 61% of all sub-penny stocks at DTC in 2017. Any limitation that restricts trading at Alpine restricts the entire microcap market. The sheer magnitude of the margin charges has already significantly reduced trading of microcap stocks through Alpine, to the point where its liquidation business is down 75%. *See* Brant Decl., at ¶¶ 33-42. If this trend continues, if Alpine were to in fact fail because of the unnecessarily excessive margin charges, it would be catastrophic to the microcap market. Given these extraordinary circumstances, the Commission should review these issues, regardless of when the Petition was filed.

## II.    A STAY IS NECESSARY TO AVOID IRREPARABLE HARM TO ALPINE AND THE MICROCAP INDUSTRY AND WILL PROMOTE PUBLIC INTEREST BY STRENGTHENING THE MICROCAP MARKET

Alpine's Petition for Review demonstrated both the enormity of the margin charges and the devastating impact they are having on its business. Indeed, the chart attached to Mr. Cuddihy's declaration demonstrates how substantial the margin charges have become, with the Illiquid Charges alone generally exceeding $1 million per day since April of 2018. The irreparable harm to Alpine from these charges is manifest, and frankly undisputed.

Alpine recognizes that the issues raised in its Petition are complex and that a thorough review by the Commission will take time. Alpine thus sought an interim stay of only the Illiquid Charge, and has even offered to settle for the lesser alternative of a stay limited to NSCC's refusal to allow Alpine to utilize the DTC Offset, which would allow Alpine to avoid the Illiquid Charge because Alpine nearly always has sufficient shares at DTC to cover its positions.[33] Alpine seeks the same right enjoyed by nearly every other NSCC member on transactions

---

[33] Brant Decl., at ¶¶ 11-13, 21, 23, 28-29, 41. The chart attached to Mr. Cuddihy's declaration proves this as well. When NSCC, for undisclosed reasons, moved Alpine to a CRRM rating of 6 in July 2018, the chart shows that Alpine was able to avoid the Illiquid Charge. *See* Ex. 1 to the Cuddihy Decl.

involving the same securities, and a right that even the NSCC afforded to Alpine during 2018 when it increased its credit rating to a 6. A temporary reprieve from the Illiquid Charge will prevent further and irreparable harm to Alpine and to the microcap market. Conversely, the relief sought poses no actual prejudice or risk to NSCC. This is evident not only because NSCC truly is protected through the DTC Offset, but also NSCC is in the process of eliminating the Illiquid Charge and agrees that it in large part duplicates the Volatility Charge.

Remarkably, NSCC claims Alpine's request for a stay should be denied because financial harm is not irreparable harm. NSCC misstates the issue. This is not a matter of mere "financial detriment." Alpine has provided testimony that its survival is on the line; the Illiquid Charge itself is astronomical and threatens to destroy Alpine's business.[34] That is, unquestionably, irreparable harm. As the Commission has previously held, "the destruction of a business, absent a stay, is more than just 'mere' economic injury, and rises to the level of irreparable injury."[35]

The interests of, and continuing harm to, the issuers and customers in the microcap market that Alpine services must also be considered. As Congress stated: "it is in the public interest to assure . . . fair competition among brokers and dealers, *among markets and between exchange markets and over-the-counter markets*."[36] NSCC has confirmed Alpine's critical significance to the effective functioning of this market (61% of all sub-penny microcap stock at DTC), and validated Alpine's concerns regarding both the burdens on competition and discriminatory impact from the margin charges. Given Alpine's role in this market, the public interest is best served by avoiding further and irreparable harm to Alpine.

---

[34] This is not a matter, as NSCC flippantly asserts, of ▮▮▮▮▮▮▮▮▮▮▮. The capital constraints that prevent Alpine from increasing its business and its profitability are caused by the excessive amounts of capital Alpine must devote to pay the unnecessary margin charges to clear trades, including the approximately $1 million per day in Illiquid Charges *that Alpine should be able to avoid through the DTC Offset.*

[35] *See, e.g., Scattered Corp.*, 52 S.E.C. 1314, 1997 SEC LEXIS 2748, at *15 (Apr. 28, 1997); *see also Wash. Metro. Area Transit Comm'n*, 559 F.2d at 843 (stating that the destruction of a business constituted "irreparable injury" for purposes of stay of permanent injunction). The Commission granted a stay of the FINRA decision against John Hurry based, in part, on this same rationale. *In re Scottsdale Capital Advisors, John J. Hurry, et al.*, SEC Release No. 83783, at 5 (August 6, 2018).

[36] S. Rep. 94-75, 1975 U.S.C.C.A.N 179, at p. 8 (emphasis added).

## III.   IN THE ALTERNATIVE, NSCC'S OPPOSITION DEMONSTRATES THE NEED FOR EXPEDITED DISCOVERY.

NSCC's assertion that Alpine has failed to establish its entitlement to a stay is predicated almost entirely on a series of factual assertions, discussed above, that are not borne out by its presentation and that would need to be considered and resolved in connection with the consideration of Alpine's motion.  Most critically, NSCC relies almost entirely on the claim that the enormous charges imposed in relation to a sale of stock are justified by the risk that it would be unable to access stock held at DTC.  Striking, though, is that NSCC has provided no support for that assertion, and its claim appears to be contrary to both historical experience and pertinent regulations.  In the event that the SEC is considering denial of Alpine's request for a stay on the present record, Alpine asks that the SEC direct expedited discovery as to the NSCC's basis for the claim, so that the claim can be evaluated.

The same issue arises in relation to NSCC's acknowledgement of the selective treatment of Alpine, and its claim that its manipulation of Alpine's CRRM rating is somehow justified. Those assertions are made by NSCC without any of the necessary information regarding its model generated rating; ▐██████████████████████████████████████████

▐████████████████▌ ; the NSCC's increase and then the decrease of Alpine's credit rating in 2018, and whether Alpine is the only firm prevented from relying on the DTC Offset.  Further, the purported issues regarding Alpine's relationship with its settling bank are disputed and also warrant discovery.  The SEC cannot evaluate whether the actions of NSCC were rational without further information concerning its process and the seemingly arbitrary fluctuation of the credit rating and so should direct expedited discovery as to these narrow but critical issues.

## CONCLUSION

For the foregoing reasons, Alpine's Motion to Stay should be granted.

DATED this 4th day of February, 2019.

**CLYDE SNOW & SESSIONS**

Brent R. Baker
Aaron D. Lebenta

**THOMPSON HINE**

Maranda E. Fritz

*Attorneys for Petitioner*

## **ATTORNEY CERTIFICATION**

Pursuant to Rule 154(c) of the Commission's Rules of Practice, I hereby certify that the foregoing document contains 6,997 words, exclusive of the tables of contents and authorities.

Aaron D. Lebenta

# EXHIBIT F

Brent R. Baker
Aaron D. Lebenta
**CLYDE SNOW & SESSIONS**
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Phone: (801) 322-2516
Fax: (801) 521-6280
brb@clydesnow.com
adl@clydesnow.com
*Attorneys for Petitioner*

Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Phone: (212) 344-5680
Fax: (212) 344-6101
Maranda.Fritz@thompsonhine.com

## UNITED STATES OF AMERICA

## SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| In the Matter of the Application of<br><br>ALPINE SECURITIES CORPORATION, a Utah limited liability company<br><br>For Review of Adverse Action Taken By<br><br>NATIONAL SECURITIES CLEARING CORPORATION | **PETITIONER'S RENEWED REQUEST FOR ISSUANCE OF A BRIEFING SCHEDULE AND OTHER APPROPRIATE COMMISSION ACTION**<br><br>Admin. Proc. File No. 3-18979 |

Petitioner Alpine Securities Corporation ("Alpine"), though counsel of record, submits this Renewed Request for the Securities & Exchange Commission (the "Commission") to Issue a Briefing Schedule and Take Other Appropriate Action in Connection with Alpine's Pending Application for Review of adverse action taken by the National Securities Clearing Corporation ("NSCC").

### SPECIFIC RELIEF SOUGHT

Alpine respectfully requests that the Commission take the following actions in relation to Alpine's pending Application for Review:

1.      Require NSCC to file a certified copy of the administrative record pursuant to Commission Rule of Practice 420(e) and issue a briefing schedule on Alpine's Application for Review, filed December 26, 2018, pursuant to Commission Rule of Practice 450(a);

2.      Issue a decision on Alpine's Motion for an Interim Stay of certain "Required Deposit" charges imposed by, and/or other actions taken by, the NSCC; and/or

3.      Take such further action as the Commission deems necessary and appropriate with respect to Alpine's Application for Review and Motion for Interim Stay.

## GROUNDS FOR RELIEF

### *Summary of Relevant Procedural Background*

1.      Alpine commenced this proceeding on December 26, 2018, by filing an Application for Review, pursuant to Section 19(d) and (f) of the Securities Exchange Act of 1934, of certain "Required Deposit" charges and other actions that NSCC has imposed or taken against Alpine which have resulted in a denial or limitation of Alpine's access to services at NSCC.

2.      In connection with its Application for Review, pursuant to Rule 401 of the Commission's Rules of Practice, on December 26, 2018, Alpine filed a Motion for an Interim Stay of the implementation and/or assessment by the NSCC of the "Illiquid Charge" or, alternatively, an interim stay of NSCC's decision to not allow Alpine to utilize the Depository Trust Company's ("DTC") offset in calculating the applicable volume limitations for the Illiquid Charge, until Alpine's Application for Review is considered and decided.  NSCC filed a Memorandum in Opposition to Alpine's Motion for Interim Stay on January 23, 2019.  Alpine filed a Reply Memorandum in Support of its Motion for Interim Stay on February 4, 2019. Accordingly, Alpine's Motion for Interim Stay is fully briefed and ready for decision.

3.      On February 1, 2019, the Commission sent a letter to counsel for Alpine acknowledging receipt of the Application for Review and stating that: "[w]ithin 14 days after its receipt of your client's application NSCC is required to file a certified copy of the record in your client's proceeding, alpine with an index to the record," and that "[w]ithin 21 days of the Commission's receipt of the certified record, we will issue a briefing schedule order, setting forth the deadlines for submission by you and NSCC of your briefs."

4.      On February 6, 2019, NSCC filed a response to the Commission's February 1, 2019, letter stating that it was unable to comply with the Commission's order to file a certified copy of the record on the basis that "there was no underlying 'proceeding' and no resulting 'record' to be certified in the matter."  NSCC also argued in this letter that the "record certification process is not applicable."

5.      Alpine filed a response to NSCC's February 6, 2019, letter on February 12, 2019, disputing NSCC's position that no record existed and its legal argument that the record certification requirements of Commission Rule of Practice Rule 420(e) were "not applicable."

6.      Alpine has never received a certified copy of the record from NSCC.

7.      On March 4, 2019, the Commission issued an Order Directing Additional Written Submissions with respect to Alpine's and NSCC's applications, pursuant to Commission Rule of Practice 190, for confidential treatment of portions of their filings.  Alpine and NSCC each filed an additional written submissions in accordance with the Commission's order on March 11, 2019.

8.      As of the date of this filing, the Commission has taken no further action on, and has not provided any further communication with respect to Alpine's Application for Review,

Alpine's Motion for Interim Stay, NSCC's failure to produce a certified copy of the record, or the request for confidential treatment.

### *Request for Commission Action*

This is a matter of significant urgency for Alpine.  As detailed in Alpine's filings, NSCC's onerous Required Deposit charges, which are often 100 times the underlying value of the trade, have caused, and continue to cause, a debilitating denial and limitation of Alpine's access to NSCC's essential clearing and settlement services upon which Alpine relies to conduct its business.  Further reflecting the urgency of the situation, Alpine has sought an interim stay of certain components of the Required Deposit – the "Illiquid Charge" and/or NSCC's arbitrary decision to not allow Alpine to utilize the "DTC offset" to avoid the Illiquid Charge – to gain a measure of relief while the broader issues in Alpine's Application for Review are being considered by the Commission.  However, Alpine has received no word from the Commission on the Motion for Interim Stay in the nearly <u>six months</u> since briefing on that Motion was completed.[1]

Alpine believes that NSCC's failure to produce a certified copy of the record as required by Commission Rule of Practice 420(e) has resulted in an inadvertent stalling of these proceedings.  As indicated, consistent with Rule 420(e), the Commission's February 1, 2019, letter stated that NSCC was required to file and serve a certified copy of the administrative record within 14 days of the date NSCC received a copy of Alpine's Application for Review – a requirement with which NSCC was already delinquent in fulfilling as of the date of its February 6, 2019, letter.  The Commission's February 1, 2019, letter also indicated, in accordance with

---

[1] Recent actions by NSCC have made the situation even more dire.  On July 11, 2019, NSCC notified Alpine by letter that, effective immediately, it was increasing its minimum Clearing Fund Requirement by 130%. NSCC failed to offer any explanation for its calculation of Alpine's new Clearing Fund Requirement or the basis for NSCC's purported determination that it was necessary to abruptly more than double Alpine's minimum Clearing Fund Requirement.

Commission Rule of Practice 450(a)(2) that it would issue a briefing schedule "[w]ithin 21 days of the Commission's receipt of the certified record" from NSCC.  Because NSCC's filing and service of the record is a necessary predicate to issuance of a briefing schedule, which in turn is required to bring Alpine's Application for Review before the Commission for consideration, it appears that NSCC's failure to provide the record has short-circuited the process.

Alpine simply desires to move this matter forward with all possible alacrity. Accordingly, Alpine respectfully requests that the Commission:  (1) require NSCC comply with Rule 420(e) by promptly filing and serving a copy of the certified record; (2) render a decision on Alpine's Motion for Interim Stay; (3) issue a briefing schedule on Alpine's Application for Review; and/or (4) take such further action as the Commission deems necessary and appropriate with respect to Alpine's Application for Review and Motion for Interim Stay.

DATED this 2nd day of August 2019.

**CLYDE SNOW & SESSIONS**

Aaron D. Lebenta
Brent R. Baker

**THOMPSON HINE**

Maranda E. Fritz

*Attorneys for Alpine*

# EXHIBIT G

Admin. Proc. File No.

## UNITED STATES OF AMERICA
### Before The
## SECURITIES AND EXCHANGE COMMISSION
### January 23, 2019

|  |  |
|---|---|
| In the Matter of | : |
|  | : |
| **ALPINE SECURITIES CORPORATION,**<br>    a Utah limited liability Company | :      **<u>REDACTED VERSION</u>** |
|  |  |
| **For Review of Adverse Action Taken By** | : |
|  |  |
| **NATIONAL SECURITIES CLEARING**<br>**CORPORATION** | : |
|  | : |

## DECLARATION OF TIMOTHY J. CUDDIHY

TIMOTHY J. CUDDIHY, declares under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following statements are true and correct:

1.    I am the Managing Director for Financial and Operational Risk Management for the National Securities Clearing Corporation ("NSCC"). I submit this declaration in support of NSCC's opposition to the motion of Alpine Securities Corporation ("Alpine") for an order staying during the pendency of this proceeding the assessment or implementation of one of the

**SUBJECT TO PENDING APPLICATION FOR CONFIDENTIAL TREATMENT**

01/23/2019 WED 19:00 FAX                                                                                    ☒068/114

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 156 of 169 PageID 3124
USCA Case #19-1223      Document #1812264      Filed: 10/23/2019      Page 156 of 169

components of NSCC's Clearing Fund rules, the Illiquid Charge.[1] The Illiquid Charge is

assessed as part of a member's Required Fund Deposit to the NSCC Clearing Fund to manage

risk to NSCC associated with a member's transactions in Illiquid Securities. This declaration is

also submitted in opposition to Alpine's request for what, I am advised, would effectively be an

order affirmatively requiring NSCC to apply what is known as the DTC Offset to the Illiquid

Charge in the event the Illiquid Charge were to remain in effect.[2] I am personally familiar with

the facts stated below.

      2.     I am responsible for risk management, including designing and implementing new

risk modeling, enhancing existing risk systems, counterparty surveillance, educating market

participants, working with regulators on the business approach of DTCC's operating

subsidiaries, including NSCC, to risk management, developing and executing best risk

management practices, and developing, communicating and ensuring adherence to risk policies

and procedures employed by NSCC. I have almost 30 years' experience in risk management in

connection with financial services. I hold a MBA in finance and a BA in mathematics and

statistics from Rutgers University.

---

[1] Capitalized terms used, but not otherwise defined, shall have the meaning set forth in the accompanying Opposition To Alpine's Motion For An Interim Stay And Incorporated Memorandum Of Points And Authorities In Support.

[2] "DTC" refers to The Depository Trust Company, which, like NSCC, is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTC is a registered clearing agency, the nation's central securities depository and the facility where transactions cleared at NSCC are settled in the accounts of DTC's participants.

01/23/2019 WED 19:00 FAX ☐069/114

Case 8:18-cv-02869-VMC-CPT Document 135-2 Filed 11/01/19 Page 157 of 169 PageID 3125
USCA Case #19-1223 Document #1812264 Filed: 10/23/2019 Page 157 of 169

*NSCC's Risk Management System*

3.      NSCC places a special emphasis on risk management due to its primary function as a central counterparty ("CCP") in clearing and settling virtually all broker to broker equity trades in the U.S. marketplace through its continuous net settlement system ("CNS").

4.      As a CCP, NSCC guarantees completion of each broker's unsettled transactions in the event of a firm default, thus potentially exposing NSCC and its members to substantial credit risk. In order to manage this risk, and subject to strict oversight by the U.S. Securities and Exchange Commission (the "Commission" or the "SEC"), and as mandated by Congress, NSCC has adopted a rigorous risk management program designed to protect NSCC, its members and the securities marketplace, against the credit risk stemming from a member default. This program is described in detail in NSCC's risk management disclosure framework.[3]

5.      In managing its credit exposure to members, NSCC determines each member's Required Fund Deposit daily, and monitors its sufficiency, as provided for in NSCC's Commission-approved Rules.[4] The objective of the Required Fund Deposit is to ensure each member's deposits are sufficient to mitigate against potential losses to NSCC arising out of NSCC's liquidation of the member's portfolio if the member were to default in its obligations to NSCC. The aggregate of all members' Required Fund Deposits constitutes the Clearing Fund of

---

[3] *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures, NSCC, available at* http://www.dtcc.com/~/media/Files/Downloads/legal/policy-and-compliance/NSCC_Disclosure_Framework.pdf ("Framework") (last visited Jan. 18, 2019).

[4] *See* NSCC Rule 4 and Procedure XV; *see also* Framework at 43-48.

3

01/23/2019 WED 19:00 FAX ⬜070/114

Case 8:18-cv-02869-VMC-CPT Document 135-2 Filed 11/01/19 Page 158 of 169 PageID 3126
USCA Case #19-1223    Document #1812264    Filed: 10/23/2019    Page 158 of 169

NSCC, which NSCC would access should a defaulting member's Required Fund Deposit be insufficient to satisfy losses to NSCC caused by the liquidation of that member's portfolio.

6.      Pursuant to NSCC's Rules, each member's Required Fund Deposit includes various risk-based components, which are determined and implemented on an integrated basis, with each component charge established in conjunction with the other charges.  Unless drawn upon due to a member default, the Required Fund Deposit remains as member funds and accrues interest.

7.      NSCC employs best practices risk management methods, as approved by the Commission, to contain each member's credit risk within the member's Required Fund Deposit, and thereby avoid mutualizing losses among NSCC members (and thus the securities marketplace).[5]

8.      In determining each member's Required Fund Deposit, NSCC monitors carefully various aspects of the member's financial, management, regulatory, and legal affairs.  This includes, among other things, review of FOCUS reports, financial statements, site visits and interviews, and monitoring of regulatory activities, litigation, and media reports.  The purpose of these activities is to understand the risks that a member poses to NSCC and the clearance and settlement system and to calculate a Required Fund Deposit reflecting that risk.[6]  The level of scrutiny increases for those firms that NSCC has determined pose additional risks to NSCC,

---

[5] *See* Framework at 46.

[6] *Id.*  Note that the Required Fund Deposit changes daily depending on the transactions the member submits to NSCC for clearance.  NSCC advises each member during the morning of each trading day as to whether its funding deposit has gone up or down.

01/23/2019 WED 19:01 FAX @071/114

Case 8:18-cv-02869-VMC-CPT Document 135-2 Filed 11/01/19 Page 159 of 169 PageID 3127
USCA Case #19-1223    Document #1812264    Filed: 10/23/2019    Page 159 of 169

including those firms on NSCC's "Watch List" and those subject to "Enhanced Surveillance" as set out in Rule 2B, Sec. F.

*The Illiquid Charge*

9.     The Illiquid Charge[7] has been in effect for at least 15 years. The rule was most recently updated and approved by the Commission by order dated May 4, 2017[8].

10.     As set forth in the Illiquid Charge Order and Procedure XV, the Illiquid Charge applies if the member's net position in Illiquid Securities meets a specific volume threshold set out in the rule, a volume threshold which is lower for a member with a weak credit rating (such as Alpine). The amount of the charge is determined according to a formula set out in the rule based on the price, volatility, and liquidity of the security. Once the member's position in Illiquid Securities settles and the CCP risk is alleviated, the margin requirement is adjusted pursuant to NSCC's rules.

11.     Illiquid Securities tend to be thinly traded, with high price volatility, and not traded on a national securities exchange. They typically are issued by companies with low market capitalizations and small revenues, and may be susceptible to market manipulation, "pump-and-dump" schemes, and illegal distributions, which may result in criminal prosecutions, SEC enforcement actions, or private litigation. As described below, NSCC

---

[7] *See* Procedure XV, Sec. I(A)(1)(h).

[8] *See* Order Approving Proposed Rule Change to Describe the Illiquid Charge that May Be Imposed on *Members*, Release No. 34-80597 (May 4, 2017), 82 Fed. Reg. 21,863 (May 4, 2017) (the "Illiquid Charge Order").

# Page 6 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.

01/23/2019 WED 19:01 FAX &#x2702;073/114

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 161 of 169 PageID 3129
USCA Case #19-1223      Document #1812264         Filed: 10/23/2019      Page 161 of 169

*The CRRM Rating*

15.     An integral component of NSCC's risk management procedures is the Credit Risk

Rating Matrix ("CRRM"), which provides a numerical rating for each member reflecting its

credit risk to NSCC.  The members with the lowest risk of default are assigned a rating of 1-4;

those with the highest risk of default are rated 5-7.  The CRRM rating system is described in

NSCC's Rules,[10] and was most recently approved by the Commission by order dated May 19,

2017[11].  (The same system is used by DTC and the Fixed Income Clearing Corporation, also

registered clearing agencies and subsidiaries of DTCC.)

16.     There are two principal components of the CRRM rating, one based on

quantitative factors, such as excess net capital, leverage, liquidity and profitability, and the other

based on qualitative factors, including changes in organization structure, news reports, and legal

and regulatory actions.  The quantitative and qualitative factors are blended together (60/40

weighted in favor of the quantitative) to determine the rating.[12]  NSCC also reserves the right to

manually adjust the CRRM rating either up or down if it determines that there are considerations

that are not appropriately factored by the CRRM inputs.  The quantitative and qualitative factors

are set out in NSCC Rule 2B, Sec. 4.

---

[10] *See* NSCC Rule 1, Definitions and Descriptions, "Credit Risk Rating Matrix" and NSCC Rule 2B, Sec.
4; *see also* Framework at 47.

[11] *See Order Approving Proposed Rule Changes to Enhance the Credit Risk Rating Matrix and Make
Other Changes*, Release No. 34-80734 (May 19, 2017), 82 Fed. Reg. 24,177 (May 25, 2017) (the "CRRM
Order").

[12] A third component of the rating system estimates the individual probability of a member's default,
based on statistical analyses.

01/23/2019 WED 19:01 FAX ⌀074/114

Case 8:18-cv-02869-VMC-CPT Document 135-2 Filed 11/01/19 Page 162 of 169 PageID 3130
USCA Case #19-1223 Document #1812264 Filed: 10/23/2019 Page 162 of 169

17. There are several consequences of applying a high risk CRRM rating to a member, including placing the member on NSCC's Watch List, which results in heightened review by NSCC's Counterparty Credit Risk Group ("CCR") and, in the case of a member rated a 7, makes the member ineligible for the DTC Offset to offset the Illiquid Charge (as discussed below).

18. A high risk CRRM rating can also result in Enhanced Surveillance. Enhanced Surveillance can include, for example, imposing adequate assurance requirements, increased on-site visits, or additional due diligence information requests, and may be required to make more frequent financial disclosures, including interim and/or *pro forma* reports.

*The CCR Group*

19. NSCC's CCR Group is composed of risk management professionals, charged with counterparty monitoring and setting the CRRM rating. All decisions to adjust the CRRM rating go through several layers of review, starting with an analyst recommendation and are subject to approval at the level of managing director. The CCR Group analyst, subject to supervisory review, considers additional qualitative factors (*e.g.*, regulatory history, type of audit opinion issued, and material management changes) to determine if a manual override of the model-generated rating is warranted. That is the case regarding adjustments to Alpine's CRRM rating, as discussed below.

8

01/23/2019 WED 19:02 FAX ☑075/114

Case 8:18-cv-02869-VMC-CPT Document 135-2 Filed 11/01/19 Page 163 of 169 PageID 3131
USCA Case #19-1223 Document #1812264 Filed: 10/23/2019 Page 163 of 169

*Anticipated Rule Change Filing Regarding the Illiquid Charge*

20. NSCC regularly assesses its margining methodologies to evaluate whether margin levels are commensurate with the particular risk attributes of each relevant product, portfolio, and market. In that connection, NSCC is contemplating filing a rule change application designed to enhance the definition of Illiquid Securities in order to capture additional risk presented by securities that exhibit illiquid characteristics. The proposed rule change will, among other things, enhance the haircut-based Volatility Charge for Illiquid Securities beyond the current levels of the Illiquid Charge and enable NSCC to collect margin at levels that better reflect the risks presented by net unsettled positions in Illiquid Securities and help NSCC limit its exposures to members.[13]

21. By enhancing the Volatility Charge to base it on the price level and risk profile of Illiquid Securities, NSCC would be able to eliminate the Illiquid Charge, as that charge would no longer be necessary to address the illiquidity risks covered by an enhanced Volatility Charge. Notably, NSCC is contemplating eliminating the Illiquid Charge *only* in conjunction with enhancing the Volatility Charge, which would incorporate (and enhance) the risk management goals underlying the Illiquid Charge. This reflects the interdependent nature of the components of the Required Fund Deposit.

---

[13] The Volatility Charge, for which Alpine does not seek a stay but does challenge in its underlying Application for Review and Petition for Rule Making, applies a parametric VaR (value at risk) model to determine the potential future exposure of a given portfolio based upon historical price movements. For Illiquid Securities, however, which are less amenable to statistical analysis (such as the securities traded by Alpine), a haircut-based volatility charge is applied in lieu of the VaR. The Volatility Charge is designed to capture the market price risk associated with each Member's portfolio at a 99% level of confidence. *See* Procedure XV, Secs. (I)(A)(1)(e) and (I)(A)(2)(d); *Order Granting Approval of Proposed Rule Change to Volatility Charge*, Release No. 34-79598 (Dec. 19, 2016) (order approving Volatility Charge).

9

01/23/2019 WED 19:02 FAX @076/114

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 164 of 169 PageID 3132
USCA Case #19-1223       Document #1812264       Filed: 10/23/2019       Page 164 of 169

# Page 10 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.

01/23/2019 WED 19:02 FAX                                                                 ☒077/114

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 165 of 169 PageID 3133
USCA Case #19-1223        Document #1812264         Filed: 10/23/2019       Page 165 of 169

# Page 11 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.

01/23/2019 WED 19:02 FAX ⌀078/114

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 166 of 169 PageID 3134
USCA Case #19-1223      Document #1812264      Filed: 10/23/2019      Page 166 of 169

# Page 12 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.

01/23/2019 WED 19:02 FAX 　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☑079/114

Case 8:18-cv-02869-VMC-CPT  Document 135-2  Filed 11/01/19  Page 167 of 169 PageID 3135
USCA Case #19-1223　　　Document #1812264　　　Filed: 10/23/2019　　　Page 167 of 169

31.　NSCC has at all times calculated Alpine's Illiquid Charge and CRRM rating based on its careful review of all aspects of Alpine's business, and in compliance with NSCC's Commission-approved Rules.

32.　Notably, there are two potential consequences were the Commission to grant Alpine's motion to stay enforcement of the Illiquid Charge. First, the risk exposure covered by the charge would go uncovered by Alpine. That means in the event Alpine—which, among other problems, just received an adverse court decision in an SEC enforcement action—were to default and its Required Fund Deposit was insufficient to cover the costs of liquidating Alpine's open illiquid positions, the loss would have to be covered by the NSCC Clearing Fund and thereby mutualized among NSCC's other members. This is the result NSCC's Clearing Fund rules are designed to avoid. Second, even in the absence of a default, a stay would be unfair to other NSCC Members who would be placed at a competitive disadvantage in transacting in Illiquid Securities because they would remain subject to the charge, while Alpine would not.

*The Brant Declaration*

33.　I have reviewed the declaration of David Brant, dated December 19, 2018, and wish to point out several errors and misstatements.

34.　As noted above, when calculating the Required Fund Deposit, NSCC nets all buy and sell transactions in the security to one obligation—a net buy or a net sell position. In his discussion of the Required Fund Deposit for Alpine's transactions in PMCB, Mr. Brant has failed to take this into account.

13

01/23/2019 WED 19:02 FAX @080/114

Case 8:18-cv-02869-VMC-CPT   Document 135-2   Filed 11/01/19   Page 168 of 169 PageID 3136
USCA Case #19-1223      Document #1812264      Filed: 10/23/2019      Page 168 of 169

# Page 14 Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.

**Redacted from Fax Copy Pending Application for Confidential Treatment. Mailed Copy Contains Complete Document in Sealed Envelope.**

WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct.

January 23, 2019

Timothy J. Cuddihy