No. 19-1223

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**In Re ALPINE SECURITIES CORPORATION,**

**Petitioner.**

---

**PETITIONER ALPINE SECURITIES CORPORATION'S
EMERGENCY MOTION FOR A STAY PENDING CONSIDERATION OF
ITS WRIT OF MANDAMUS TO THE
SECURITIES AND EXCHANGE COMMISSION**

---

**ORAL ARGUMENT REQUESTED**

---

Thomas Feher (D.C. Bar # 985161)
Maranda E. Fritz (application to be filed)
Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291

*Counsel for Alpine Securities Corporation*

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ...................................................................................3

    A.    Background of NSCC ..................................................................3

    B.    Background of Alpine ..................................................................3

    C.    Overview of the Required Deposit and its Effects ...........................4

    D.    Components of the Required Deposit At Issue ..................................6

II.   ARGUMENT .......................................................................................9

    A.    Stay of the Illiquid Charge Should be Granted because there is a
Strong Likelihood that Alpine will Prevail on the Merits,
Alpine Faces Irreparable Harm Absent a Stay, There is No
Prejudice in Entering a Stay to any Other Party, and the Public
Interest Favors a Stay. ..............................................................9

        1.    Alpine has a Strong Likelihood of Succeeding on the
Merits in it Application for Review. .....................................10

            a.    NSCC's Required Deposit Results in an Actual
Limitation on Access. ...............................................11

            b.    NSCC's Required Deposit Violates the Exchange
Act and the SEC's Rules and Regulations. ..................13

            c.    NSCC's Required Deposit Affects Alpine's
Ability to Utilize One of NCSS's Fundamentally
Important Services. ..................................................16

        2.    Alpine Faces Irreparable Injury if a Stay is Not Granted. .......16

        3.    The Stay will not Result in Harm to Any Other Party ............18

        4.    The Public Interest Favors a Stay. ......................................19

        5.    In the Alternative, NSCC's Decision to Not Allow
Alpine to Use the DTC Offset should be Stayed. ...................20

(Page 2 of Total)

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Pet Quarters, Inc. v. Depository Trust and Clearing Corp.*,
    559 F.3d 772 (8th Cir. 2009) .................................................................3

*In re Scattered Corp.*,
    52 S.E.C. 1314, 1997 SEC LEXIS 2748 (Apr. 28, 1997) ..................18

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977)...........................................................18

**Statutes**

15 U.S.C. 78s(f) ......................................................................................13

15 U.S.C. § 78q-1(b)(3)(D)......................................................................13

15 U.S.C. § 78q-1(b)(3)(F) ......................................................................15

15 U.S.C. § 78q-1(d) ...............................................................................15

15 U.S.C. § 78s(f) ....................................................................................11

15 U.S.C. § 78s(f) Section 19(f) ..............................................................11

15 U.S.C. § 78s(g)....................................................................................15

Exchange Act .....................................................................................*passim*

Exchange Act Sections 17A and 19.........................................................14

Exchange Act Section 19(f) .....................................................................11

NSCC's Required Deposit Violates the Exchange Act .............................13

Securities Exchange Act of 1934 Section 19(d) and (f) ............................1

(Page 3 of Total)

## Preliminary Statement

In December 2018, Alpine filed an Application for Review of Adverse Action with the Securities and Exchange Commission ("SEC"), pursuant to Section 19(d) and (f) of the Securities Exchange Act of 1934 (the "Exchange Act"), relating to certain "Required Deposit" charges imposed by the National Securities Clearing Corp. ("NSCC"), which are onerous, discriminatory and otherwise inconsistent with the requirements of the Exchange Act, and which result in a denial or limitation of Alpine's access to services at NSCC.  In painstaking detail, Alpine reviewed each of the various components of NSCC's charges and demonstrated that those monetary demands bore no relation to any rational assessment of risk.[1]  In fact, Alpine established that the charges imposed on Alpine are predicated on both a fiction and an inexplicable "rounding up" of share price, all seemingly designed to impact and even discourage transactions in microcap securities.  In reality, Alpine's particular transactions, which consist solely of selling stock that is already held on deposit at the Depository Trust Corporation ("DTC"), do not expose NSCC to *any* appreciable risk.

With that application to the SEC, Alpine filed a motion for an interim stay, describing both the baselessness and irrationality of the NSCC deposits and

---

[1] Alpine's Application for Review of Adverse Action, which includes as an attachment Alpine's Rulemaking Petition, and Alpine's Motion for an Interim Stay, are attached to the Writ as Exhibits A and B. The supporting Declaration of David Brant is attached to the Writ as Exhibit C.

1

charges, and the damage being done to Alpine by virtue of the NSCC's actions. That motion was fully briefed on February 3, 2019. [2]

Despite numerous communications to the SEC's Office of the Secretary, the SEC failed to take any action on either the application or the motion for a stay. When the NSCC then, in July 2019, increased Alpine's minimum clearing fund requirement from $100,000.00 to $2.6 million, Alpine filed with the SEC a renewal of its application, explaining the further damage to Alpine's ability to conduct trading activities. [3] Still the SEC took no action in relation to the motion or the application.

Now, NSCC has, arbitrarily and improperly, again abruptly increased Alpine's clearing fund requirement, this time to $3 million.  Worse, NSCC conveniently timed this most recent increase to follow on Alpine's delivery of an additional $350,000 pursuant to a call, with the NSCC then declaring that, although the transaction had settled, it would not return that money to Alpine because it had, at that precise moment, increased its minimum requirement.

Because the SEC has failed and refused even to consider Alpine's motion and application, and because the damage to Alpine continues to increase, Alpine now turns to this Court and requests that it compel the SEC to address Alpine's

---

[2] The opposition filed by NSCC and Alpine's Reply Brief are attached to the Writ as Exhibits D and E.

[3] Alpine's renewal of its motion is attached to the Writ as Exhibit F.

motion and application.  To prevent the firm from being damaged further by the increasing deposits and fees, Alpine seeks a stay of imposition of certain specific charges pending consideration of its Writ of Mandamus and consideration of its stay application by the SEC.

## I.      BACKGROUND

### A.      Background of NSCC

Pursuant to authority conferred by Congress to facilitate the establishment of a national system for clearance and settlement of transaction, the SEC approved the application of National Securities Clearing Corporation (NSCC) as a registered clearing agency.  NSCC provides centralized clearance and settlement services for its members, and clears and settles nearly all broker-to-broker trades of equity securities in the United States.[4]  The actual settlement of trades takes place in the NSCC's Continuous Net Settlement ("CNS") System – an accounting and settling system for broker-dealer who are members of NSCC ("Clearing Members"). Writ at 9-10.

### B.      Background of Alpine

Alpine is a small, self-clearing broker-dealer, registered with the SEC. Alpine's business primarily involves clearing and settlement services for microcap

---

[4] *See Pet Quarters, Inc. v. Depository Trust and Clearing Corp.,* 559 F.3d 772, 776-77 (8th Cir. 2009) (stating that "NSCC provides centralized clearance, settlement and information services for virtually all securities transactions in the United States.").

and over-the-counter ("OTC") stock transactions for other brokerage firms.[5]
Brokers who are not members of the registered clearing agency need the services
of a clearing broker in order to clear and settle their own trades or the trades of
their customers.  A clearing broker provides clearing and settlement services for its
correspondent clients ("correspondents" or "clients"), who are generally broker-
dealers, and its clients' non-broker-dealer customers ("customers"), who are the
beneficial buyers and sellers of a security.

　　　To provide clearing and settlement services and function as a clearing firm
for its correspondent firms, Alpine must be a member of NSCC and access its
services.  Alpine is a clearing broker member in good standing of the NSCC and a
DTC participant.  Writ at 10.

### C.　　Overview of the Required Deposit and its Effects

　　　As an ongoing condition to membership, and thus access to NSCC's
clearance, settlement and other essential services, NSCC requires members to
contribute to a "Clearing Fund," by making "Required Deposits."[6]  According to
NSCC's Rules and Procedures, the minimum Required Deposit to the Clearing
Fund is $10,000.  In practice, however, members are required to deposit far more
than the minimum amount.  The actual amount of each member's Required

---

[5] *See* Declaration of David Brant, at ¶ 3 ("Brant Decl."), attached to the Writ as Ex.
C.
[6] NSCC Rules and Procedures, Rule 2, § 1, Rule 2A, § 1(F), Rule 2B, § 1, Rule 4,
§ 1.

Deposit is calculated by NSCC according to a complex and inscrutable formula, consisting of multiple discretionary and subjective components – which seemingly increase in number on a yearly basis – set forth in Procedure XV of NSCC's Rules.[7]

An examination of the components of the Required Deposit, and the manner in which they are actually calculated and applied by NSCC, demonstrates that they result in onerous, inequitable and arbitrary charges that *so far exceed the amount of the underlying transactions* to be cleared and settled that they cannot be credibly justified as necessary to protect NSCC from credit risk.  Indeed, the amount of each one of the Illiquid Charge, OTC Volatility Charge or OTC Mark-to-Market Charge (discussed below) *alone* generally exceeds the amount of the underlying transaction by several factors; when assessed together, as they almost always are, Alpine is often required post margin amounts that exceed the underlying transaction value significantly, sometimes by hundreds of times.

These charges, as both designed and applied to microcap or OTC Stocks, impermissibly limit Alpine's access to NSCC's essential clearing and settlement services, and contravene the purposes and requirements of the Exchange Act. They impose an unreasonable and disproportionate burden on small clearing-broker members, such as Alpine, and reflect a discriminatory and anticompetitive

---

[7] *See* NSCC Rules and Procedures, at Rule 4 and Procedure XV.

policy towards a specific segment of the market – the microcap or OTC market –
for which Alpine provides clearing services.

As a direct result of NSCC's Required Deposit charges, Alpine's liquidation
business is down more than 75% due to the capital constraints necessary to fund
the Required Deposit.[8]  Commission intervention is necessary to prevent NSCC –
which is helmed by a "Who's Who" in major financial institutions – from
destroying its small broker-dealer constituents and choking off a significant, lawful
segment of the market through the imposition of onerous and unjust factors to
calculate and impose the Required Deposit charges.

### D.      Components of the Required Deposit At Issue

The formula used to calculate the Required Deposit, set forth in Procedure
XV, is itself long (spanning 16 pages), complex and confusing, incorporating
numerous discretionary and interwoven components and fact-specific variables.
For example, for CNS Transactions alone, NSCC calculates and cumulatively
imposes (or has discretion to impose) many separate charges based on a variety of
components.  The components at issue in Alpine's Application for Review of
Adverse Action and its Motion for an Interim Stay are discussed at length in the
Writ of Mandamus and in the attached Rulemaking Petition at 8-19.  The impact

---

[8] *Id.* at ¶¶ 33, 40.

on Alpine is addressed in those filings and in the Declaration of David Brant, attached to the Writ as Exhibit C.

Also critical to the NSCC's imposition of those charges is the firm's credit rating, the Credit Risk Rating Matrix ("CRRM").   That rating directly impacts whether the NSCC imposes the Illiquid Charge.  For example, an Illiquid Charge only applies on net sell positions when a member exceeds certain volume thresholds in Illiquid Securities.  For a member with a CRRM rating between 1-4, the volume threshold is 1 million shares when the net sell position is equal to or greater than 25% of the ADV in those shares.  For members with a CRRM rating between 5-7, who have the same net sell position in the same securities, the applicable volume threshold is 500,000 shares if that member's excess net capital exceeds $10 million.  For members with a CRRM rating between 5-7 whose excess net capital is equal to or less than $10 million, the applicable volume threshold is 100,000 shares.[9]  Additionally, *members with a low CRRM rating cannot utilize the DTC Offset to get below the applicable volume threshold*.[10]

NSCC's CRRM rating is based on a mix of objective and subjective factors that NSCC assesses in a manner that it has been withheld from the industry on the basis that it is "proprietary."[11] According to the information available, the formula

---

[9] *See* NSCC's Form Rule 19(b)(4) (Illiquid Charge), SR-NSCC-2017-001, at 7.
[10] *See* NSCC Rules and Procedures, Rule 1, at p. 10.
[11] Brant Decl., at ¶ 17.

7

includes consideration of quantitative factors (size, i.e., total excess net capital; capital, leverage, liquidity and profitability) and qualitative factors (market position and sustainability, management quality, capital and liquidity management, geographic and business/product diversity, and access to funding).[12]  It is unclear what weight NSCC ascribes to each individual factor within the larger quantitative and qualitative categories to arrive at a CRRM rating for a member.  It bears no relationship to a firm's actual credit rating or, apparently, whether the firm has ever defaulted on any obligation to NSCC.

Although NSCC's calculation and assessment of the Illiquid Charge, OTC Volatility Charge, OTC Mark-to-Market, ENCP and CRRM are all at issue in Alpine's Application for Review, for the purposes of this Motion, Alpine requests an interim stay of NSCC's assessment of the Illiquid Charges component or, in the alternative, a stay of NSCC's decision to not allow Alpine to use the DTC Offset until Alpine's Application for Review is addressed and decided by the Commission.  A stay of the foregoing components will allow Alpine to continue to operate its business while the Application for Review is considered by the SEC.[13]

---

[12] *See* NSCC Rules and Procedures, Rule 1, at p. 5.
[13] Brant Decl., at ¶ 41.

## II.   ARGUMENT

### A.   Stay of the Illiquid Charge Should be Granted because there is a Strong Likelihood that Alpine will Prevail on the Merits, Alpine Faces Irreparable Harm Absent a Stay, There is No Prejudice in Entering a Stay to any Other Party, and the Public Interest Favors a Stay.

Alpine has already suffered significant damage from the NSCC's arbitrary imposition of its fees and deposits.  Because of the enormous capital commitment required even for a single small trade, Alpine can only execute a limited number of transactions.  As of the last few months, Alpine has been operating at a loss and, unless Alpine can obtain some relief, matters will only become worse.  As stated above, Alpine's liquidation business alone was down more than 75% due to the capital constraints necessary to fund the Required Deposit[14] – even before the NSCC's latest hike in Alpine's required minimum deposit.  Alpine demonstrated not only the enormity of the margin charges and the devastating impact on its business but also that those charges are duplicative, irrational, disconnected from any rational assessment of risk, and discriminatory.  Thus, Alpine is likely to succeed on the merits of is application but the continued imposition and even the increase in deposits and charges is threatening the business of Alpine to the extent that, absent a stay, it may be forced to close before the issues are ever considered.

---

[14] Brant Decl., at ¶¶ 33, 40.

These circumstances support the issuance of a stay pending consideration of the Writ of Mandamus.  With respect to the threshold issue, likelihood of success, Alpine has demonstrated its entitlement to a stay and its right to relief on its Application for Review.  See D.C.Cir. Rule 8(a)(1).  The irrationality, redundancy, arbitrariness and discriminatory nature of the charges that the NSCC is imposing on Alpine are evident from a comparison of those charges with the purported rationale.  The damage being done to Alpine is undisputed.  There is no risk or prejudice to NSCC if its imposition of the Illiquid Charge is stayed since Alpine is, in fact, "long," the stock and the NSCC generally does not apply those charges to other similar transactions.  And the public interest is certainly not served by permitting the NSCC to strangle the business of a firm based on demonstrably irrational assumptions and formulas.

### 1.  Alpine has a Strong Likelihood of Succeeding on the Merits in it Application for Review.

The SEC has identified three primary considerations that determine whether an SRO's actions, including imposition of a fee, improperly limits access to an essential services: (a) there must be an "actual limitation of access";[15] (b) "the applicant must assert a basis that, if established, would lead the Commission to

---

[15]*In re Application of Securities Industry and Financial Markets Association for Review of Action by Self Regulatory Organizations ("In re SIFMA"),* SEC Release No. 72182, 2014 WL 1998525, at *8 (May 16, 2014).

conclude that the fees violate Exchange Act Section 19(f)";[16] and (c) the denial or limitation must be to the "applicant's ability to utilize one of the fundamentally important services offered by the SRO."[17]  Alpine has a strong likelihood to succeed on each of the foregoing factors considered by the Commission.

### a.    NSCC's Required Deposit Results in an Actual Limitation on Access.

Section 19(f) requires the Commission to set aside an SRO action denying or limiting access to services if it does <u>not</u> find, *inter alia,* that the SRO's "rules are, and were applied in a manner, consistent with the purposes" of the Exchange Act, or if it finds the prohibition or limitation on access "imposes any burden on competition not necessary or appropriate."[18]  Excessive fees and charges can constitute a denial of access to services.[19] The burden is on NSCC to demonstrate that its rules and actions are consistent with the Exchange Act and the SEC's rules.[20]

In this matter, there is an "actual limitation of access" to "fundamentally important services offered by the SRO." [21] As detailed in the Declaration of David

---

[16] *Id.*, at *9.

[17] *Id.*

[18] 15 U.S.C. § 78s(f).

[19] *See Sec. Indus. Fin. Mkts. Ass'n,* SEC Release No. 72182, 2014 WL 1998525, at *8 (May 16, 2014).

[20] *See* Section 19(f), 15 U.S.C. § 78s(f) and Rule of Practice 700, 17 C.F.R. § 201.700. *See also Sec. Indus. Fin. Mkts. Ass'n,* 2014 WL 1998525, at *9 n. 88.

[21] *In re SIFMA*, *supra*, at *8-9.

Brant, NSCC's calculation and application of the specified Required Deposit components to Alpine substantially limits Alpine's access to NSCC's essential clearing and settlement services.  Alpine primarily clears liquidation (or sale-side) microcap or OTC stock transactions, including, frequently, stocks with a price less than $.01/share.  To clear such trades, NSCC imposes the Required Deposit, including the challenged components, as "margin."[22]  These "margin" charges, taken individually or collectively, are astronomical, exceeding the market value of the underlying transaction by many times, and are particularly egregious when a sub-penny stock is involved because NSCC imposes a fictional price of $.01/share in calculating the Required Deposit.[23]  The challenged components of the Required Deposit are so onerous they often required Alpine to turn down transactions due to regulatory capital constraints,[24] even though Alpine's runs its operations in a manner that should allow it to avoid at least the Illiquid Charge.[25]  As a direct

---

[22] NSCC Rules & Procedures at Rule 2A, § 1(F), Rule 4, §§ 1, 8.

[23] *See* Brant Decl., at ¶¶ 19, 22, for examples of charges, and Rulemaking Petition, at pp. 18-25, Ex. B, for a full discussion of the challenged components.

[24] *See* Brant Dec., at ¶¶ 36, 40, and Alpine's Rulemaking Petition, pp. 12-18, Ex. B, for detailed discussion of the damage from the charges.

[25] As discussed in Alpine's Rulemaking Petition, at p. 11, Ex. A, NSCC imposes the Illiquid Charge on transactions involving OTC or microcap stocks that exceed volume thresholds based on a firm's CRRM rating, which NSCC sets from an undisclosed formula. In determining whether the volume threshold is met, NSCC generally offsets the quantity of shares in the member's sell position against the number of those shares held by the member at DTC (the DTC offset); if the DTC offset places the member below the applicable volume threshold, no Illiquid Charge will be assessed.  Alpine almost always has sufficient shares at DTC to

result of these charges, Alpine's liquidation business is down approximately 75%. *See* Brant Decl., at ¶¶ 33, 40, Ex A.

### b.    NSCC's Required Deposit Violates the Exchange Act and the SEC's Rules and Regulations.

Section 19(f) requires the Commission to set aside an SRO action denying or limiting access to services if it does <u>not</u> find, *inter alia,* that the SRO's rules are, and were applied in a manner, consistent with the purposes" of the Exchange Act, or if it finds the prohibition or limitation on access "imposes any burden on competition not necessary or appropriate."  15 U.S.C. 78s(f).  As discussed in further detail in Alpine's Rulemaking Petition, at pages 20-26, Ex. B, NSCC's Required Deposit violates multiple provisions of the Exchange Act, SEC Rules.

First, Section 17A(b)(3)(D) requires that the "rules of the clearing agency provide for the equitable allocation of reasonable dues, fees and other charges among its participants."[26]  This statute thus imposes two requirements:  (1) fees, dues and charges must be "reasonable," and (2) they must be "equitabl[y] allocated.  NSCC's rules with respect to the Required Deposit, and the resultant charges that NSCC imposes on Alpine under these rules, meets neither requirement.  The challenged components of the Required Deposit combine to

---

avoid the Illiquid Charge completely.  Brant Decl., at ¶¶ 13, 23. However, without providing any rationale, NSCC has determined to make the DTC offset unavailable to members with the weakest CRRM rating, such as Alpine.  *Id*. at ¶¶ 13, 17.

[26] 15 U.S.C. § 78q-1(b)(3)(D)

impose margin charges on Alpine that are exponentially greater than the underlying transaction amount.  This is facially unreasonable for a number of reasons, including: (a) the sheer amount of the charge, (b) the lack of adequate justification to require margin that is so disproportionately high compared to the transaction, and (c) the chilling effect this has upon Alpine's ability to provide clearing services to its customers, including the number of transactions it can clear per day, and upon the OTC and microcap markets in general.

Second, promoting competition and capital formation are each central to the purpose of the Exchange Act.  As Congress noted in amending the Exchange Act in 1975, which added Sections 17A and 19 to the Exchange Act, "it is in the public interest to assure . . . fair competition among brokers and dealers, among markets and between exchange markets and over-the-counter markets."[27] The goal is not to hinder, but to "enhance competition" and to "allow economic forces, **interacting in a fair regulatory field**, to arrive at appropriate variations in practices and services."[28]  Following these directives, the Commission should set aside the challenged components of the Required Deposit as they have a blatantly anticompetitive effect as applied, and serve to limit, rather than promote capital formation.

---

[27] S. Rep. 94-75, at 8.
[28] *Id.* (emphasis added).

14

Third, Section 17A(b)(3)(F) requires, *inter alia,* that the "rules of the clearing agencies are designed" to "protect investors and the public interest," and "are not designed to permit unfair discrimination in the protection of admission of participants or among participants in the use of the clearing agency . . . ."[29]  The challenged components disproportionately impact only those small members who focus on the OTC and microcap markets and those issuers and investors in that market segment.

Fourth, Section 17A(d) and Section 19(g) require NSCC to comply with the rules and regulations promulgated by the SEC.[30]  The challenged components violate several provisions of these standards.  For example, NSCC's CRRM rating system, which as indicated employs a secret formula to weigh a variety of undefined factors, clearly fails to comply with transparency requirements found in Subsection (e)(1).[31]

Finally, Section 19(g) requires every SRO to "comply with . . . its own rules . . . ."[32]  Alpine can find no support in NSCC's Rules or Procedure XV for its practice of imposing OTC Volatility Charges or OTC Mark to Market charges that

---

[29] 15 U.S.C. § 78q-1(b)(3)(F).
[30] *See* 15 U.S.C. § 78q-1(d) *and* 15 U.S.C. § 78s(g).
[31] *See* § 240.17Ad-22(e)(1).
[32] 15 U.S.C. § 78s(g).

equal or exceed the underlying transaction amount just because a microcap or OTC stock is involved.[33]

### c. NSCC's Required Deposit Affects Alpine's Ability to Utilize One of NCSS's Fundamentally Important Services.

The third factor the Commission considers is whether the denial or limitation involves the "applicant's ability to utilize one of the fundamentally important services offered by the SRO." *In re SIFMA*, *supra*, at *9. This element is clearly met. NSCC requires Alpine to pay the Required Deposit, including any applicable Illiquid or ENCP Charges, on a daily basis. Failure to pay all required amounts results in a member default and an inability to utilize NSCC's clearing and settlement services. This is *the most* fundamentally important service NSCC offers, and it is essential to Alpine's business.

### 2. Alpine Faces Irreparable Injury if a Stay is Not Granted.

Alpine will suffer irreparable damages if the stay is not entered as a result of the financial burden placed every day upon Alpine through the Illiquid Deposit charges. As stated above, Alpine's liquidation business alone is down approximately 75% due to the capital constraints necessary to fund the Required Deposit.[34] Simply, the challenged components of the Required Deposit, particularly as applied in the aggregate, result in arbitrary, onerous and

---

[33] *See* NSCC Rules and Procedures, Procedure XV, § 1(A)(1)(a)(ii), (b) and (c).
[34] Brant Decl., at ¶¶ 33, 40.

unreasonable charges that impermissibly limit Alpine's access to NSCC's services, unnecessarily stifle competition, and unfairly discriminate against small broker-dealers in the OTC or microcap market in violation of the Exchange Act.

Absent relief, the effect, if not the purpose, of the actions of the NSCC would be to drive the firm out of business.   And that will have occurred as a result of NSCC actions that, particularly as applied in the aggregate, result in arbitrary, onerous and unreasonable charges that impermissibly limit Alpine's access to NSCC's services, unnecessarily stifle competition, and unfairly discriminate against small broker-dealers in the OTC or microcap market in violation of the Exchange Act.

In order to maintain its business, Alpine needs and seeks an interim stay of at least the Illiquid Charge, and has even proposed the lesser alternative of a stay limited to NSCC's refusal to allow Alpine to utilize the DTC Offset, which would allow Alpine to avoid the Illiquid Charge because Alpine nearly always has sufficient shares at DTC to cover its positions.[35]  Alpine seeks the same right enjoyed by nearly every other NSCC member on transactions involving the same securities, and a right that even the NSCC afforded to Alpine during 2018 when it increased its credit rating to a 6.  A temporary reprieve from the Illiquid Charge

---

[35] Brant Decl., at ¶¶ 11-13, 21, 23, 28-29, 41. The chart attached to Mr. Cuddihy's declaration proves this as well.  When NSCC, for undisclosed reasons, changed Alpine's CRRM rating in July 2018, the chart shows that Alpine was able to avoid the Illiquid Charge. *See* Ex. 1 to the Cuddihy Decl.

will prevent further and irreparable harm to Alpine and to the microcap market. Conversely, the relief sought poses no actual prejudice or risk to NSCC. This is evident not only because NSCC truly is protected through the DTC Offset, but also NSCC is in the process of eliminating the Illiquid Charge and agrees that it in large part duplicates the Volatility Charge.

Remarkably, NSCC has claimed Alpine's request for a stay should be denied because financial harm is not irreparable harm. NSCC misstates the issue. This is not a matter of mere "financial detriment." Alpine has provided testimony that its survival is on the line; the Illiquid Charge itself is astronomical and threatens to destroy Alpine's business. That is, unquestionably, irreparable harm. As the Commission has previously held, "the destruction of a business, absent a stay, is more than just 'mere' economic injury, and rises to the level of irreparable injury."[36]

### 3.      The Stay will not Result in Harm to Any Other Party.

As detailed above, the Illiquid Deposit charges are arbitrary, unreasonable, and are not rationally related to any calculable potential damages. Thus, a stay of

---

[36] *See, e.g.*, *In re Scattered Corp.*, 52 S.E.C. 1314, 1997 SEC LEXIS 2748, at *15 (Apr. 28, 1997); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 & n.2 (D.C. Cir. 1977) (stating that the destruction of a business constituted "irreparable injury" for purposes of stay of permanent injunction). The Commission granted a stay of the FINRA decision against John Hurry based, in part, on this same rationale. *In re Scottsdale Capital Advisors, John J. Hurry, et al.,* SEC Release No. 83783, at 5 (August 6, 2018).

Illiquid Deposit charges will not result in any damages to any other party.

Moreover, a stay of NSCC's decision to not allow Alpine to use the DTC Offset

would likewise not result in any harm to any other party.  If Alpine were allowed

to use the DTC Offset, it would forgo the Illiquid Deposit charges on almost every

transaction.  Alpine is only denied the benefit of the DTC Offset because NSCC

has given Alpine a lower CRRM rating, without any explanation as to how its

CRRM rating is calculated.  Alpine's use of the DTC Offset, when it applies based

on the volume of share at DTC, notwithstanding its CRRM rating, would not result

in any harm to any other party.

### 4.      The Public Interest Favors a Stay.

The public interest favors a stay because of the impact of the Illiquid Deposit

charges on the market and Alpine's access to NSCC.  The cumulative impact of

these margin requirements creates a self-propelling downward cycle.  Alpine must

devote additional capital to post the Required Deposit each day in order to process

trades through NSCC's CNS system, including the onerous Illiquid Charges.

Because of this, Alpine must limit the volume of trades it can process per day, both

due to capital constraints and to avoid ENCP charges.  This, in turn, limits Alpine's

ability to raise additional capital through its clearing business, and effectively pull

out of the cycle.  As a direct result, as would be expected, Alpine's liquidation

business is down almost 75% due to the artificial restraints on the number of

liquidation transactions it can clear through NSCC per day and attrition of customers who leave or go out of business because they cannot clear their transactions through Alpine.[37]  *See* Brant Decl., at ¶¶ 34-35, 42, Ex. A, regarding the impact of the Illiquid charges on other broker dealers and ripple effect on small companies in the market.

## 5.    In the Alternative, NSCC's Decision to Not Allow Alpine to Use the DTC Offset should be Stayed.

As detailed above, Alpine would be able to continue its business without irreparable harm if the NSCC's decision to not allow Alpine to use the DTC Offset is stayed pending consideration of Alpine's Application for Review.[38]  Such a decision would negate the Illiquid Deposit charges but only when the offset calculation was met thereby ensuring that no harm could come to any other person or entity as a result of Alpine's use of the DTC Offset.

Dated: October 23, 2019                    Respectfully,

                                           /s/ *Thomas Feher*

                                           Thomas Feher
                                           Maranda E. Fritz
                                           Thompson Hine LLP
                                           3900 Key Center
                                           127 Public Square
                                           Cleveland, Ohio 44114-1291

---

[37] Brant Decl., at ¶¶ 33, 40.

[38] *See id.*, at ¶ 41.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 27, the undersigned counsel for Petitioners certifies that this brief:

(i)      complies with the type-volume limitation of FRAP 27 because it does not exceed 20 pages, including footnotes and excluding the parts of the brief exempted by FRAP 27; and

(ii)      complies with the typeface requirements of FRAP 32 and the type style requirements of FRAP 32 because it has been prepared using Microsoft Office Word 2016 and is set in Times New Roman font in a size equivalent to 14 points or larger.

Dated:  October 23, 2019

21

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October, 2019, I electronically filed a copy of the foregoing on the Office of the Secretary by fax and on NSCC counsel Gregg Mashberg by email.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing system through the Court's CM-ECF system.

Dated:  October 23, 2019

22

No. 19-1223

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

### In Re ALPINE SECURITIES CORPORATION,

**Petitioner.**

---

## DECLARATION OF MARANDA E. FRITZ IN
## SUPPORT OF MOTION FOR STAY

---

### ORAL ARGUMENT REQUESTED

_____

Thomas Feher (D.C.Bar 985161)
Maranda E. Fritz (application to be filed)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291

*Counsel for Alpine Securities Corporation*

1

## DECLARATION OF MARANDA E. FRITZ IN
## SUPPORT OF MOTION FOR STAY

MARANDA E. FRITZ, under penalty of perjury, affirms as follows:

1.  I am a partner with the firm of Thompson Hine LLP, counsel to Alpine Securities Corporation ("Alpine") in the above-captioned case, and submit this declaration in support of Alpine's Writ of Mandamus and its Motion for a Stay pending consideration of its Writ.

2.  This application arises from the actions of the National Securities Clearing Corporation ("NSCC"), which is responsible for the ultimate clearing and settling of virtually all securities transactions in this country.  It is a subsidiary of the Depository Trust Corporation ("DTC"), and overseen in the first instance by the Securities and Exchange Commission ("SEC").

3.   In connection with the execution and settlement of a securities transaction, NSCC imposes a combination of various deposit requirements and charges that are purportedly designed to protect NSCC against exposure in the event that a transaction fails to settle.  Over the years, the NSCC has devised a raft of those fees and charges that are now being implemented in a manner that effectively destroys the ability of Alpine to conduct its business.  NSCC imposes, first, a minimum deposit requirement on the firm, an amount that is held continuously by NSCC whether or not transactions are occurring.  In Alpine's case, during the course of the last year – and in the wake of Alpine's filing of its

2

Application for Review with the SEC – the NSCC increased Alpine's minimum

clearing fund deposit requirement exponentially, from approximately $100,000.00

to $3 million, although there had been absolutely no change in the actual risk that

exists in relation to any Alpine transaction.

4.  The most recent hike in its deposit requirement occurred last week, and

NSCC managed to time that increase so that it could capture and hold a total of

$350,000 that Alpine had paid in relation to a call on a particular transaction.

Ordinarily, and because those funds were in excess of Alpine's $2.6 million

deposit requirement, those funds would be returned to Alpine as soon as the

specific transaction settled.  NSCC refused, however, to return the funds, insisting

that it had at just that moment increased Alpine's deposit requirement to $3

million. According to NSCC, therefore, not only was it not returning the funds but

it was demanding an additional amount before Alpine would be permitted to trade.

5.  With respect to each individual transaction, the NSCC imposes various

fees and charges that supposedly pertain to the risk presented by the particular

transaction.  By way of example, it imposes both Illiquidity and Volatility charges;

notably, both of those charges are supposedly predicated on precisely the same risk

and so are duplicative.

6.  The Illiquidity Charge itself is intended to address a risk that NSCC may

be required to "cover" a transaction, i.e., acquire stock in order to satisfy an

agreement to sell a certain security.  Where a firm is actually holding the stock at the Depository Trust Corporation, and so there is no risk that the stock will not be available for delivery to the buyer, NSCC ordinarily does not impose that charge, allowing firms to avail themselves of an "offset" based on the fact that the stock is at DTC.

7.   In Alpine's case, however, NSCC does impose that massive charge, basing it on the fact that it has, through another opaque process, given Alpine a low credit rating.  The process by which they arrive at that conclusion is, according to NSCC, proprietary and so can not be disclosed.  But it is unquestionably and demonstrably arbitrary: during the past year, that rating was changed for a one month period, then changed back, although there was no material change in Alpine's transactions or circumstances.

8.   As a result of the NSCC requirement that Alpine deposit substantial amounts in order to conduct a trade – amounts that are often hundreds of times the actual value of the trade – Alpine's ability to conduct business has been strangled. Alpine is now operating at a loss, and it will not be able to continue to operate unless it is able to actually conduct for its customers the trading activity that poses *no risk* to the NSCC.

9.   Alpine has made every effort to pursue its remedies through filings with the SEC, but that effort has been unsuccessful.  I participated in filing, last

4

December, the Application for Review of Adverse Action and the motion for a stay.  The motion was fully briefed as of February 2019, and we repeatedly sought to learn from the SEC the status of that motion.  We were unable to obtain any information, and we received no hearing or decision.

10.   The SEC's failure to act on Alpine's Application for Review and Motion for Interim Stay has put Alpine in an untenable position.  The SEC has a statutory duty to review an action by a self-regulatory organization (SRO), such as the NSCC, that prohibits or limits access to the services offered by the SRO.  *See* 15 U.S.C. § 78s(d), (f).  Alpine has a direct statutory right of review in this Court (or in the Tenth Circuit Court of Appeals) of any final order or rule of the SEC, including an order entered by the SEC on Alpine's Application for Review or Motion for Interim Stay.  *See* 15 U.S.C. § 78y(a), (b). Where the SEC unreasonably refuses to act on Alpine's Application for Review and Motion for Interim Stay, however, the process is frustrated.  Despite its good faith efforts, Alpine can neither exhaust the administrative process before the SEC to obtain relief from the NSCC's unlawful actions, which are destroying Alpine's business, nor obtain review from this Court under the normal statutory review process while the SEC inexplicably remains inert.  It is for this reason that an extraordinary writ is required:  Alpine has no other alternative means of obtaining relief.

11.   NSCC has gotten even more aggressive in the face of the SEC's

continued inaction.  In August, after the NSCC exponentially increased Alpine's deposit requirement to $2.6 million, we filed another application to the SEC in an effort to have our initial application considered.  We received no response and our calls to the SEC were again met with the response that those in the Office of the Secretary had no information regarding consideration of our application.

12.  With its latest increase in the deposit, the NSCC has added insult to injury, appropriating another $350,000 of Alpine's capital and further constricting its ability to trade.

13.  Alpine cannot survive these arbitrary actions of the NSCC, it has demonstrated the invalidity of its actions, and it now comes to this Court in the hope of having the issues properly addressed.

Dated: October 23, 2019

_____
Maranda E. Fritz

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October, 2019, I electronically filed a copy of the foregoing on the Office of the Secretary by fax and on NSCC counsel Gregg Mashberg by email.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing system through the Court's CM-ECF system.

Dated:  October 23, 2019

# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

**333 Constitution Avenue, NW**
**Washington, DC 20001-2866**
**Phone: 202-216-7000 | Facsimile: 202-219-8530**

### CHECKLIST FOR EMERGENCY MOTIONS

Type of motion: Stay _____  When will it be filed? Date: 10/23/19  Time: _____

Disposition needed by: Date: 11-08-2019  Time: _____  Why? Damage to business of petitioner

Will the motion be served by hand? ⦿ Yes ◯ No  If not, why not? _____

Date of Lower Court/Agcy Decision: 12-26-2018  When will copies be provided to the court? 10-23-2019

Status of Lower Court/Agency proceedings: Agency inaction

Any hearings scheduled? ◯ Yes ⦿ No  When? _____

Status of motion for stay/injunction pending appeal filed with lower court or agency? Inaction

Is there a case pending in USCA now? ◯ Yes ⦿ No  Case No. and Caption: _____

When will disclosure statements be filed? 10-23-2019

If a Notice of Appeal or Petition for Review has not been filed, when will one be? _____

Brief description of the case:  (What is happening & when?):
Petitioner has file a writ of mandamus seeking an order directing the SEC to adjudicate applications for
review and a motion for stay, filed in December 2018, of certain fees and deposit requirements pending

Name of counsel: David Wilson and Maranda Fritz, Telephone: (212) 908-3966

Office #:( 202 ) 263-4161  Home #:(____) ____-____  Fax #:( 202 ) 331-8330

Name of opposing counsel: Gregg Mashberg

Office #:( 212 ) 969-3450  Home #:(____) ____-____  Fax #:(____) ____-____

Comments:
description con't - consideration of the application.  Petitioner now seeks a stay from this Court while its
writ is decided.

**FOR CLERK'S OFFICE USE ONLY** Deputy Clerk: _____  Date: _____

Who is notified in LD? _____  Time: _____

### ROUTING

Staff Attorney Assigned: _____  Other: _____

Clerk ____  Ch. Deputy Clerk ____  LD Office ____  Team Leader ____  Supv/Op Unit ____  Intake ____

USCA Form 2
August 2009 (REVISED)