UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE HURRY FAMILY REVOCABLE
TRUST, SCOTTSDALE CAPITAL
ADVISORS CORPORATION, and
ALPINE SECURITIES CORPORATION,

     Plaintiffs,

v.                                  Case No. 8:18-cv-2869-T-33CPT

CHRISTOPHER FRANKEL,

     Defendant.

_____/

CHRISTOPHER FRANKEL,

     Counter-Claimant,

v.

THE HURRY FAMILY REVOCABLE
TRUST, SCOTTSDALE CAPITAL
ADVISORS CORPORATION, and
ALPINE SECURITIES CORPORATION,

     Counter-Defendants.

_____/

**<u>ORDER</u>**

This matter comes before the Court upon consideration of
Plaintiffs' Motion for Summary Adjudication (Doc. # 114) and
Defendant's Motion for Summary Judgment (Doc. # 118), filed
on August 23, 2019. The Motions have been fully briefed. (Doc.
## 126, 128, 131, 132). For the reasons that follow, the
Motions are denied.

1

## I.  Background

This case arises from a former employment relationship between Defendant Christopher Frankel and Plaintiffs. Plaintiffs Scottsdale Capital Advisors Corporation and Alpine Securities Corporation are involved in the broker-dealer business and were previously indirectly owned by Plaintiff the Hurry Family Revocable Trust. (Doc. # 61 at ¶ 10; Doc. # 95 at ¶ 10; Doc. # 114 at 2; Doc. # 115 at 25:24 – 26:3).

### A.  Alpine hires Frankel and Frankel signs two non-disclosure agreements

In 2015, Plaintiffs considered hiring Frankel to help run their broker-dealer businesses. (Doc. # 114-3 at 1, ¶ 4; Doc. # 131-1 at ¶ 1). On June 22, 2015, as part of the negotiations and discussions about whether Frankel would join the business, the parties entered into a Non-Disclosure and Confidentiality Agreement (the "Original NDA"). (Doc. # 118-3; Doc. # 115 at 25:16-23; Doc. # 116 at 16:21-18:12). The Original NDA provided that the agreement was between the "Recipient," Frankel, and the "Discloser," defined to be Scottsdale, Alpine, Cayman Securities Clearing and Trading, Ltd.,[1] and "any associated company of the Hurry Family

---

[1] Cayman is an entity associated with Plaintiffs and was originally a plaintiff to the instant action. See (Doc. # 1).

Revocable Trust." (Doc. # 118-3 at 1). The Original NDA contemplated that the "Discloser" would grant Frankel access to "Confidential Information" pertaining to the Discloser's business as part of their employment discussions. (Id.). "Confidential Information" was defined, in pertinent part, as "any data or information that is proprietary to the Discloser and not generally known to the public, whether in tangible or intangible form, whenever or however disclosed[.]" (Id.).

The Original NDA provided that Frankel would not disclose or disseminate "Confidential Information," as that term was defined in the Original NDA. (Id. at 1-2). It also provided that "[w]ithin ten (10) business days of receipt of the Discloser's written request, the Recipient will return to the Discloser all documents, records, and copies thereof containing Confidential Information." (Id. at 2).

Alpine ultimately hired Frankel. (Doc. # 115 at 48:9-25; Doc. # 116 at 22:13-15; Doc. # 131-1 at ¶ 8). Frankel was Alpine's chief executive officer from August 5, 2015, to August 1, 2018, and then served as a consultant to Alpine for an additional three months, until October 31, 2018. (Doc. # 115 at 48:22-25, 61:24-62:6; Doc. # 116 at 14:22-15:2, 22:13-20, 26:4-13; Doc. # 131-1 at ¶ 9).

3

On July 1, 2015, Frankel signed an Employee Nondisclosure and Computer Use Agreement (the "Employee NDA"). (Doc. # 118-4). That agreement was entered into only by Frankel as the "Employee" and Alpine and Scottsdale as the "Company." (Id. at 1). The Employee NDA states that it "supersedes all prior proposals, agreements, representations and understandings." (Id. at 3). The parties agree that the Hurry Trust is not included in the definition of "Company" under the Employee NDA and that, with respect to Alpine and Scottsdale, the Employee NDA replaced the Original NDA. (Doc. # 118 at ¶¶ 24-25; Doc. # 126-1 at ¶¶ 24-25).

The Employee NDA defined "Confidential Information" as "all written or oral information of a proprietary, intellectual, or similar nature relating to Company's business, projects, operations, activities or affairs whether of a technical or financial nature or otherwise." (Doc. # 118-4 at 1). "Confidential Information" was defined to include:

> (a) technical information concerning Company's products and services . . .
>
> (b) information concerning Company's business, including cost information, profits, sales information, accounting and unpublished financial information, business plans, markets and marketing methods, customer lists and customer information,

4

purchasing techniques, supplier lists and supplier
information and advertising strategies;

(c)   information concerning Company's employees,
including salaries, strengths, weaknesses, and
skills;

(d)   information submitted [to Company by third parties]
for study, evaluation or use; and

(e)   any other information not generally known to the
public which, if misused or disclosed, could
reasonably be expected to adversely affect
Company's business.

(Id.).

The Employee NDA specifically excludes from the
definition of Confidential Information any information that
is public knowledge through a source other than the employee
or is lawfully available to the employee from a source outside
the company. (Id.).

Paragraph 2 of the Employee NDA provides in relevant
part:

Employee shall keep Company's Confidential
Information, whether or not prepared or developed
by Employee, in the strictest confidence. Employee
will not disclose such information to anyone
outside Company without Company's prior written
consent. Nor will Employee make use of any
Confidential Information for Employee's own
purposes or the benefit of anyone other than
Company.

(Id.).

5

The Employee NDA also provided for the return of materials as follows: "When Employee's employment with Company ends, for whatever reason, Employee will **promptly** deliver to Company all originals and copies of all documents, records, software programs, media, and other materials containing any Confidential Information." (<u>Id.</u> at 1-2) (emphasis added). The Employee NDA further provided that Frankel's obligation to maintain the security and confidentiality of Confidential Information survived even after his employment ended. (<u>Id.</u> at 2).

**B.**   **While working at Alpine, Frankel sends documents to his personal email address**

While Frankel was employed by Alpine, on multiple occasions between August 2016 and October 2018, Frankel forwarded documents pertaining to Plaintiffs' business to his personal email address. (Frankel Exhs. 2, 6-19; Hurry Exhs. 7, 8, 20-22).[2] In pertinent part, Frankel forwarded the following documents to his personal email address on these dates:

---

[2] The exhibits to Hurry's and Frankel's depositions were filed under seal. Where the documents are otherwise part of the public record, the NDAs for example, the Court will cite to the publicly available document. Otherwise, the Court will only describe the documents to the extent necessary to render its ruling on summary judgment.

- On August 15, 2016 and October 14, 2016: Alpine's customer fee schedule, with John Hurry's notes and revisions (Frankel Exh. 18; Hurry Exhs. 21, 22);

- On August 28, 2016, October 6, 2016, January 3, 2017, and May 2, 2017: Various correspondence, emails, and documents to and from the Financial Industry Regulatory Authority ("FINRA") (Frankel Exhs. 9, 14, 16, 17);

- On October 13, 2016: A May 1, 2016, internal audit report, prepared by Alpine's Chief Compliance Officer (Frankel Exh. 8);

- On November 8, 2016: Vendor due diligence forms (Hurry Exh. 20);

- On April 12, 2017 and July 13, 2017: Drafts of agreements with various consulting firms; (Frankel Exhs. 13, 15);

- On August 31, 2017: Term sheet for a loan to fund National Securities Clearing Corporation ("NSCC") calls (Frankel Exh. 11);

- On July 31, 2018: Internal emails including a list of Alpine's Top 50 clients based on commissions (Frankel Exh. 10);

7

- On August 8, 2018: A draft employment agreement (Frankel Exh. 7);

- On September 18, 2018: A term sheet prepared by an attorney for a $7.5 million secured revolving credit facility meant to finance Alpine (Frankel Exh. 6); and

- On October 7, 2018: Alpine's blanket fidelity bond and Alpine's audited financial statements and reports for the fiscal year ending September 30, 2016 (Frankel Exh. 12; Hurry Exh. 6);

- On October 7, 2018: Alpine's application to become a nonbank trustee, a "Nonbank Trustee Powers" brochure from Ascensus, Inc., and related correspondence with Ascensus (Hurry Exhs. 7, 8);

- On October 7, 2018: the First Amendment to the Hurry Family Revocable Trust, the Hurry Trust's Certificate of Trust, and portions of the Hurry Trust documents (Frankel Exh. 2).

**C.** **Frankel contemplates purchasing a broker-dealer**

Meanwhile, by early fall 2018 — and continuing through the end of his employment as a consultant to Alpine — Frankel was contemplating purchasing another broker-dealer business.

(Doc. # 116 at 62:16-63:10, 147:19-148:5). Frankel testified that a former client, with whom Frankel worked when he was the CEO of a different firm, contacted Frankel about the opportunity to purchase a broker-dealer in Chicago, Ziv Investment Company. (Doc. # 116 at 33:9-34:12, 104:17-20, 155:8-156:5; Doc. # 118 at ¶ 53; Doc. # 126-1 at ¶ 53). According to Frankel, he obtained a "sample trade blotter" or trade run from Randy Jones, who was at that time an employee of Plaintiffs. (Doc. # 116 at 152:22-153:9); see also (Doc. # 115 at 82:21-24). Frankel called Jones and asked for this information in mid-November 2018, after he had left Alpine. (Doc. # 116 at 153:10-13).

As part of that contemplated purchase, Frankel sent an e-mail to Peter Ziv on November 13, 2018, entitled "FW: Trade Blotter." (Frankel Exh. 20). In the email, Frankel stated that "[a]ttached is a sample blotter of OTC Equity transactions. Please note that this spans two days and is by execution. . . . [M]y expectation is that the dollar amount of trades per day would be somewhere in the $500K-$1 Million range." (Id.). The attachment is named "Copy of SampleTradeBlotterOTCStocks.xlsx." (Id.).

Attached to the email is the information Frankel obtained from Jones. (Doc. # 116 at 152:15-153:9). The

attachment shows a long list of trades, including whether the securities were bought or sold, the quantity, the trading symbol, the CUSIP identification number,[3] the price, and the trade date. (Frankel Exh. 20). The trade dates listed were all from August 27 and August 28 of 2018. (Id.).[4] Frankel admits that he was never able to acquire Ziv and states that he never attempted to raise capital to acquire Ziv. (Doc. # 116 at 29:12-15, 104:21-105:6).

Throughout the end of 2018, Frankel expressed interest in buying a broker-dealer other than Ziv, but that firm "didn't respond." (Doc. # 116 at 29:16-23, 56:9-22). Instead, in approximately May or June 2019, Frankel began working at

---

[3] A CUSIP number identifies most securities, including the stocks of all registered U.S. companies and U.S. government and municipal bonds, and consists of nine characters that uniquely identify a company or issuer and the type of security. Lamm v. State St. Bank & Tr., 749 F.3d 938, 942 (11th Cir. 2014).

[4] Although Plaintiffs submitted evidence indicating, they say, that Frankel sent this trade blotter to other third parties as well, the Court notes that the only proof offered that this same trade run was emailed to those third parties was in counsel's affidavit. (Doc. # 114-2). As explained in the "Preferences" section of this Court's website, lawyers' affidavits are not part of the record on summary judgment. See https://www.flmd.uscourts.gov/judges/virginia-covington. What's more, Frankel was not questioned about these documents during his deposition. Accordingly, the Court will not consider them in making its ruling on summary judgment.

Vision Financial Markets. (Id. at 26:23-24, 29:24-30:2, 57:17-21).

### D.   **The demand letter**

On November 9, 2018, Plaintiffs' counsel sent Frankel a letter, accusing Frankel of breaching the terms of the Original NDA by disclosing confidential information to third parties and using the Plaintiffs' confidential information in connection with a competing business. (Doc. # 95-3 at 1).   In the letter, Plaintiffs demanded that Frankel (1) "immediately cease and desist from any and all further disclosure and/or usage of Confidential Information"; and (2) return all documents and records in his "possession, custody, or control that contain any Confidential Information" no later than November 26, 2018. (Id. at 2). That date was selected because November 26, 2019, was ten business days from the date of the demand, as contemplated in the Original NDA. See (Doc. # 118-3 at 2).

On November 12, 2018, Frankel replied via email to the cease-and-desist letter. (Doc. # 95-5).   Frankel stated that he was "willing to search for any Confidential documents that may be in my possession. Please let me know what documents you believe I have that are confidential and I will provide those to you. If you are not able to provide specifics

11

pertaining to the documents you seek, simply let me know and I will provide a copy of all documents and communication from your clients which are in my possession." (Id. at 1).

Frankel admits that he did not return any documents to Plaintiffs by November 26, 2018, and that the first time he produced the documents at issue here to Plaintiffs was in February 2019 as part of his initial disclosures in the instant case. (Doc. # 35 at 3; Doc. # 35-3; Doc. # 116 at 45:11-46:4, 46:15-25, 50:14-18; Doc. # 131-1 at ¶ 35).[5]

### E.   Procedural history before this Court

On November 21, 2018, the named Plaintiffs, along with Cayman Securities, initiated this action against Frankel. (Doc. # 1). Plaintiffs alleged that Frankel, as Alpine's former CEO and consultant, misappropriated confidential information and/or trade secrets from Plaintiffs in order to solicit clients and compete with Plaintiffs' businesses. See (Id.). On February 26, 2019, Plaintiffs filed an Amended Complaint, which this Court dismissed without prejudice under Federal Rule of Civil Procedure 12(b)(6). (Doc. ## 37, 47).

---

[5] There is some discrepancy in the record about whether Frankel produced these documents on February 1, 2019, or February 11, 2019.

Cayman Securities subsequently dropped all counts and the remaining Plaintiffs filed the Second Amended Complaint alleging four counts: (1) breach of the Original NDA, (2) breach of the Employee NDA, (3) violations of the Defend Trade Secrets Act ("DTSA"), and (4) violations of the Florida Uniform Trade Secrets Act ("FUTSA"). (Doc. # 61).

Both Plaintiffs and Frankel moved for summary judgment, at least in part, on August 23, 2019. Plaintiffs' Motion for Summary Adjudication (Doc. # 114) seeks partial summary judgment on the issue of Frankel's liability for their breach-of-contract claims.  Frankel responded in opposition to the Motion, and Plaintiffs replied. (Doc. ## 131, 132). Frankel's Motion for Summary Judgment seeks summary judgment on all claims. (Doc. # 118). Plaintiffs, in turn, responded to the Motion, and Frankel replied. (Doc. ## 126, 128). The Motions are now ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude

13

a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to

be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is

entitled to judgment as a matter of law on facts that are not genuinely disputed."(quotation omitted)).

**III. <u>Analysis</u>**

Frankel argues that he is entitled to summary judgment on all of Plaintiffs' claims, while Plaintiffs assert they are entitled to summary judgment on their breach-of-contract claims. (Doc. # 114 at 1; Doc. # 118 at 3). The Court will address the breach-of-contract claims and the statutory claims separately.

**A.    <u>Breach-of-Contract Claims</u>**

Both the Original NDA and the Employee NDA state that they are governed by Arizona law. (Doc. # 118-3 at 2; Doc. # 118-4 at 3).

A federal court sitting in diversity must apply the forum state's choice of law rules. <u>Klaxon Co. v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487, 496 (1941). It is well-settled that "Florida courts are obligated to enforce choice-of-law provisions unless a showing is made that the law of the chosen forum contravenes strong public policy or that the clause is otherwise unreasonable or unjust." <u>Gilman + Ciocia, Inc. v. Wetherald</u>, 885 So. 2d 900, 902 (Fla. 4th DCA 2004). No such showing has been made. Accordingly, this Court will apply Arizona law to the facts of this case.

"To bring an action for the breach of [a] contract, the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages." Thomas v. Montelucia Villas, LLC, 302 P.3d 617, 621 (Ariz. 2013) (en banc). "When the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there." Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc., 183 P.3d 513, 518 (Ariz. 2008) (en banc) (internal quotation marks omitted).

The purpose of contract interpretation is to determine the parties' intent and to enforce the agreement accordingly. Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1138 (Ariz. 1993). In order to determine what the parties intended, courts will examine the plain meaning of the words in the context of the contract as a whole. Payson Water Co. v. Prahin, No. 2 CA-CV 2014-0095, 2015 WL 1728789, at *3 (Ariz. Ct. App. Apr. 15, 2015). If the intention of the parties is clear from such a reading, there is no ambiguity, and the contract will be enforced as written. In re Estate of Lamparella, 109 P.3d 959, 963 (Ariz. Ct. App. 2005). A

contract is not ambiguous simply because the parties disagree about its meaning. Id. Rather, "[l]anguage in a contract is ambiguous only when it can reasonably be construed to have more than one meaning." Id. It is for the Court to review, as a question of law, whether a contract is reasonably susceptible to more than one interpretation. Id.; Taylor, 854 P.2d at 1144-45.

## 1. The Original NDA (Count I)

The first documents Plaintiffs allege Frankel misappropriated are the First Amendment to the Hurry Family Revocable Trust, the Hurry Trust's Certificate of Trust, and portions of the Hurry Trust documents. (Doc. # 61 at 6-7). On October 7, 2018, Frankel forwarded an email containing those trust documents from his work email address at Alpine to his personal email address. (Frankel Exh. 2). The original email was dated April 20, 2017, was sent from Alpine's general counsel to an employee at Ascensus, copying Frankel, and was entitled "Nonbank Trustee Application." (Id.; Doc. # 116 at 43:19-44:2). Frankel testified that he forwarded this email to himself in October 2018 "first and foremost, for the contact for the nonbank custodian. It had nothing to do with the attachments[.]" (Doc. # 116 at 44:8-12). Frankel admits

that he did not return these documents by November 26, 2018. (Id. at 46:23-25, 50:4-15).

Plaintiffs argue that Frankel breached the Original NDA as a matter of law when he failed to return the First Amendment to the Hurry Family Revocable Trust and the Certificate of Trust within ten business days after he received Plaintiffs' counsel's demand letter. (Doc. # 114 at 7-8). Further, Plaintiffs argue that Frankel's breach caused them at least nominal damages, which may be awarded under Arizona law where actual damages are slight or difficult to calculate. (Id. at 8).

Frankel responds that the Hurry Trust has no rights under the Original NDA because it was not included within the definition of "Discloser." (Doc. # 118 at 15; Doc. # 131 at 9). Moreover, Frankel argues that he did not breach the Original NDA by failing to return documents to the Hurry Trust because the Hurry Trust "ignored" Frankel's timely offer to return the documents and then sued him before expiration of the ten business days allowed in the Original NDA. (Doc. # 118 at 16; Doc. # 131 at 9-10). Frankel argues that the lawsuit effectively prevented him from performing under the contract. (Doc. # 131 at 10).

19

Plaintiffs counter that Frankel's interpretation of the contract is "absurd" and that his "offer to return" the documents does not meet the contractual requirements that he actually return the documents within ten business days. (Doc. # 132 at 3). Plaintiffs call Frankel's argument that he was prevented from performing "astonishing," arguing that nothing, including the filing of this lawsuit, prevented Frankel from returning the documents. (Id. at 3-4).

The Original NDA states as follows:

> [This Agreement] is made as of June 22, 2015, by Christopher Lee Frankel (the "Recipient") and SCOTTSDALE CAPITAL ADVISORS CORPORATION, an Arizona corporation, Alpine Securities Corporation, [a] Utah corporation, Cayman Securities Clearing and Trading LTD.[,] a Cayman Limited Company and any associated company of the Hurry Family Revocable Trust (the "Discloser").

(Doc. # 118-3 at 1). The parties agree that the Original NDA only protects "Confidential Information" of the "Discloser." (Doc. # 118 at ¶ 20; Doc. # 126-1 at ¶ 20). Beyond that, however, the parties interpret this language differently. Frankel states that, as worded, the Original NDA does not include the Hurry Trust as a "Discloser." Plaintiffs disagree and claim that the Original NDA does encompass the Hurry Trust.

20

Language in a contract is ambiguous when it can reasonably be construed to have more than one meaning. Lamparella, 109 P.3d at 963. Whether contract language is reasonably susceptible to more than one interpretation is a question of law for the court. Id.

Here, both parties' interpretation of the contract language is reasonable. It is reasonable to read "any associated company of the Hurry Family Revocable Trust" both to encompass the Hurry Trust and to exclude it. Hence, the Original NDA is ambiguous as to whether the parties intended for the Hurry Trust itself to be included as a "Discloser" under the agreement. While John Hurry stated in his deposition that the Original NDA was intended to include the Hurry Trust "and any of their businesses," he formed that conclusion from an understanding that the Original NDA included "any company that we were giving [Frankel] access to that was basically beneficially owned by our trusts or where we were the beneficiaries." (Doc. # 115 at 26:1-20). But the Original NDA does not use that language. See (Doc. # 118-3).

And this factual dispute is "material" – if the Hurry Trust is not a "Discloser," then Frankel was under no obligation to return the Hurry Trust's documents following the November 9, 2018, demand letter. If the Hurry Trust is a

21

"Discloser," the question then becomes whether Frankel breached the agreement and whether his nonperformance was prevented or excused by the actions of Plaintiffs.

As such, factual findings are necessary to glean the parties' intentions. Such fact finding is the province of a jury and precludes summary judgment. See McCarthy v. Scottsdale Unified Sch. Dist. No. 48, No. CV18-1351-PHX-DGC, 2019 WL 3997369, at *8 (D. Ariz. Aug. 23, 2019) (concluding that, where a contested contractual provision was ambiguous and both parties presented plausible interpretations, a genuine dispute of fact concerning the parties' intent precluded summary judgment); Hartford v. Indus. Comm'n of Ariz., 870 P.2d 1202, 1207 (Ariz. Ct. App. 1994) ("Whether a contract is ambiguous is a question of law. Any ambiguity is subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact.") (internal citation omitted).

Thus, summary judgment is denied as to both Plaintiffs and Frankel on Count I.

### 2. The Employee NDA (Count II)

Plaintiffs argue that Frankel breached the Employee NDA in three ways. (Doc. # 114 at 9-10). First, they claim that Frankel accessed company documents for purposes other than

22

those related to his employment duties and also transmitted documents to his personal email address, in violation of Paragraph 6 of the agreement ("Computer Access and Use"). (Id. at 9).

Second, in violation of Paragraph 2 ("Nondisclosure of Trade Secrets"), Frankel allegedly used company information for his own purposes or to benefit people other than the company and also disclosed company information to third parties without company consent. (Id. at 9). Specifically, Plaintiffs point to Frankel's transmission of a document showing two days' worth of Alpine's trade runs as a "sample blotter" to Ziv. (Id.).

Lastly, Plaintiffs argue that Frankel breached Paragraph 4 the Employee NDA ("Return of Materials") by failing to return company documents promptly upon his termination. (Id. at 9-10). Plaintiffs allege that they may recover nominal damages for these breaches of the agreement. (Id. at 10).

Frankel responds that there is no evidence that he used for his own benefit or disclosed to third parties confidential information in violation of Paragraph 2 of the Employee NDA. (Doc. # 118 at 17; Doc. # 131 at 10). He argues that Plaintiffs offer only speculation that Frankel misappropriated their information and that, under the Employee NDA, he is not

prohibited from competing with Alpine or Scottsdale or soliciting their clients. (Doc. # 118 at 17). According to Frankel, the trade blotter was not protected by the Employee NDA because he did not receive this information in the performance of his job duties with the Company. (Doc. # 131 at 10). Instead, he requested and obtained the blotter from Randy Jones after his tenure as CEO and consultant at Alpine ended. (Id. at 10-11). He also claims that all the trade data in the trade blotter is publicly available. (Id. at 11).

Frankel also responds that Plaintiffs did not allege in the operative Complaint that he violated Paragraph 6 and, in any event, he did not violate that provision. (Id. at 11-12). As to his failure to return documents allegedly in violation of Paragraph 4, Frankel points out that Plaintiffs only relied on the Original NDA in their November 9, 2018, demand letter, and Plaintiffs then prevented his performance by suing him "without specifying which documents he should return and without allowing Frankel 10 business days to return their documents." (Id. at 12-13; Doc. # 118 at 17).

As to damages, Frankel concedes that Arizona law allows nominal damages when a plaintiff has adduced evidence showing "actual damages" that are "slight or difficult to calculate." (Doc. # 131 at 14). But he argues that Plaintiffs have adduced

24

no evidence showing any harm or damages here. (<u>Id.</u>; Doc. 118
at 17).

### a. Breach of Paragraph 6 of the Employee NDA ("Computer Access and Use")

In their Second Amended Complaint, Plaintiffs only
alleged that Frankel breached Paragraphs 2 and 4 of the
Employee NDA.[6] (Doc. # 61 at 7-11). They nowhere alleged a
breach of Paragraph 6, the Computer Access and Use provision,
nor that any such breach caused them harm or damages. (<u>Id.</u>).

As such, Frankel did not have fair notice of this aspect
of the breach-of-contract claim. <u>See</u> <u>Bell Atl. Corp. v.
Twombly</u>, 550 U.S. 544, 555 (2007) (stating that the purpose
of Rule 8's liberal pleading guidelines is to "give the
defendant fair notice of what the claim is and the grounds
upon which it rests." (ellipsis omitted)). Summary judgment
briefing is not the appropriate time to raise a new claim,
and Plaintiffs' claim that Frankel breached Paragraph 6 of
the Employee NDA is thus not properly before this Court. <u>See
Corey Airport Servs., Inc. v. Decosta</u>, 587 F.3d 1280, 1282
n.2 (11th Cir. 2009) ("Because Corey cannot amend its

---

[6] The operative Second Amended Complaint alleges that Frankel
breached paragraph 3 "by failing to promptly return all
documents containing Confidential Information," making it
apparent that their claim is actually for breach of paragraph
4 ("Return of Materials."). (Doc. # 61 at ¶ 43).

Complaint by adding a new claim in its summary judgment papers, we will not discuss conduct beyond the scope of the Second Amended Complaint."); accord Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Federal Rule of Civil Procedure] 15(a).").

**b.   Breach of Paragraph 2 of the Employee NDA ("Nondisclosure of Trade Secrets")**

Paragraph 2 of the Employee NDA provides:

> Employee shall keep Company's Confidential Information, whether or not prepared or developed by Employee, in the strictest confidence. Employee will not disclose such information to anyone outside Company without Company's prior written consent. Nor will Employee make use of any Confidential Information for Employee's own purposes or the benefit of anyone other than the Company.

(Doc. # 118-4 at 1). Thus, Paragraph 2 prohibits two things: (1) making use of the company's Confidential Information for an employee's own purposes or for the benefit of anyone else, and (2) disclosure to third parties without consent. Plaintiffs argue that Frankel did both.

**i.   Making use of Confidential Information for an Employee's Own Purposes**

Frankel forwarded numerous documents pertaining to Alpine's and Scottsdale's businesses on approximately fifteen

26

dates between August 2016 and October 2018. See (Frankel Exhs. 2, 6-18; Hurry Exhs. 6-8, 20-22).

In his deposition, Frankel testified that, in general, he sent these documents to himself so he could print them from his home computer and work on them. (Doc. # 116 at 81:9-82:10, 85:1-4, 95:4-7, 137:1-3). Plaintiffs' theory as to why Frankel sent these documents to himself is more sinister – that he was siphoning off proprietary information and soliciting Alpine's customers in order to buy or start a competing broker-dealer business. (Doc. # 115 at 68:7-17, 77:23-25, 81:12-18, 119:13-17). As Hurry explained it in his deposition, these documents together gave Frankel "the recipe . . . needed to make the greatest cookie in the world . . . [and] compete with the best cookie in the world." (Id. at 103:5-9). And as Plaintiffs pointed out in their opposition brief, Frankel sent the trade blotter to Ziv **after** Plaintiffs requested the return of their business materials on November 9, 2018. (Doc. # 126 at 11).

There are two instances in which Frankel admitted to some use of the documents for his own purposes. First, on September 18, 2018, he forwarded to his personal email account certain internal company emails containing as an attachment a term sheet for a secured revolving credit facility. (Frankel

Exh. 6). Frankel originally received the term sheet in May 2018, while he was still CEO, and forwarded it to himself four months later, during his term as a consultant. (<u>Id.</u>). Frankel testified that he sent this term sheet to himself in September 2018 because he was "looking at the contemplated structure." (Doc. # 116 at 62:24-63:2). Frankel explained that, at that time, he was contemplating buying a broker-dealer and knew he would have to raise capital. (<u>Id.</u> at 63:3-10). According to Frankel, "I thought about using this template to draft an idea to raise capital. But I never attempted to raise any capital or solicited any capital. It wasn't going to be this exact structure at all. But you know the template in terms of borrower, lender, instrument, maturity, that type of thing." (<u>Id.</u> at 63:10-15). When asked, "So you wanted to use it for your personal use?" Frankel replied, "Yes, the template." (<u>Id.</u> at 63:16-17).

Second, on October 7, 2018, Frankel forwarded certain emails from April 2017 to himself that contained as attachments a number of documents, including Alpine's 2017 blanket fidelity bond and Alpine's audited financial statements and reports for the fiscal year ending in September 2016. (Frankel Exh. 12; Hurry Exh. 6). Also included was a chart showing a list of the number of accounts at various

firms, including Alpine, the market value of the firms' securities, the cash or money market value, and the market value plus cash. (Id.).

According to Frankel, he sent these documents to himself more than a year after first receiving them because he was "looking to help somebody become a nonbank IRA custodian." (Doc. # 116 at 116:22-117:3). Frankel insisted that he forwarded these documents to himself simply to obtain the contact information for certain people he had known "for 20-plus years" and to get "an idea of sort of what was needed to get an application to be a nonbank custodian" and the attachments "had nothing to do with it." (Id. at 117:1-13, 121:10-16).

On the one hand, a reasonable jury could look at these documents, and the timing of when Frankel sent them to his personal email address, and come to the conclusion that Frankel was using this information to benefit himself by compiling the data and building blocks needed to start a broker-dealer business that would compete with Alpine and Scottsdale. See Mize, 93 F.3d at 742; Samples, 846 F.2d at 1330. On the other hand, a reasonable jury could believe Frankel's testimony that, for most of these documents, he was

merely working on them from home or otherwise forwarded the documents to himself to further his work at Alpine.

As to the term sheet, Frankel testified that he wanted to use it as a "template," and that, further, he never tried to raise any capital in connection with the purchase of a broker-dealer. A jury could reasonably conclude that Frankel did use the term sheet for his "own purposes." But a jury could also credit Frankel's testimony and reasonably conclude that Frankel's looking at this document as a "template" for another term sheet that Frankel never drafted or used to raise capital is not a "use" of the document for Frankel's "own purposes or [for] the benefit of anyone other than the Company" in violation of the Employee NDA. (Doc. # 118-4 at 1).

As for the documents forwarded on October 7, 2018, including the fidelity bond and the financial statements, a jury could similarly choose to believe or disbelieve Frankel's testimony that he wanted certain emails only for the contact information they contained and did not use or consider the attached documents. Because Frankel testified that he had known these people long before he began working at Alpine, a jury could determine that such information falls outside of the Employee NDA's definition of Confidential

Information.  <u>See</u> (Doc. # 118-4 at 1) (excluding from
protection information that is public knowledge through a
source other than the employee or is lawfully available to
the employee from a source outside the company).

Such determinations of credibility and motive go to the
heart of whether Frankel breached Paragraph 2 of the Employee
NDA by making use of Plaintiffs' confidential information for
his "own purposes or the benefit of anyone other than
[Plaintiffs]."  And such determinations are for a jury to
make.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255 ("Credibility
determinations, the weighing of the evidence, and the drawing
of legitimate inferences from the facts are jury functions,
not those of a judge, whether he is ruling on a motion for
summary judgment or for a directed verdict.").

### ii.  Disclosing Confidential Information to Third Parties

Plaintiffs' principal piece of evidence here is the
trade blotter that Frankel sent to Peter Ziv on November 13,
2018. (Frankel Exh. 20); <u>See</u> (Doc. # 132 at 6) ("Frankel's
most egregious use of Plaintiffs' confidential information
concerns a trade blotter of Alpine's trade runs . . . that

Frankel illegally obtained from an employee after he left Alpine and subsequently sent to numerous third parties.").[7]

As an initial matter, the Court notes that the trade blotter is not included within the list of documents alleged by Plaintiffs in their Second Amended Complaint as violating Paragraph 2 of the Employee NDA. (Doc. # 61 at 7-8). The trade blotter was unearthed by Plaintiffs in subsequent discovery via a third-party subpoena. (Doc. # 114-2 at 2; Doc. # 126 at 12). However, giving the Second Amended Complaint a fair reading, the list of documents included in the Second Amended Complaint was meant to be illustrative, not exhaustive. It included the documents Plaintiffs were aware of at that time, and it is reasonable to expect that other documents that were allegedly wrongfully disclosed would be found in discovery. Thus, the Court will consider the trade blotter in ruling on

---

[7] The Court is aware of the January 24, 2019, email in which Frankel forwarded an Alpine fee schedule to FINRA. (Frankel Exh. 19). Frankel testified that he sent this document to FINRA as part of the regulator's examination of Alpine. (Doc. # 116 at 138:12-140:10). While Plaintiffs note in their opposition brief that Frankel forwarded "confidential internal communications regarding customer fee schedules to FINRA *after* the lawsuit commenced," Frankel also testified that he was required to answer questions from FINRA. (Id. at 141:24-142:9; Doc. # 126 at 11). The parties provide no explanation or context as to how this alleged requirement affects the Employee NDA or whether such disclosure to a regulator could "reasonably be expected to adversely affect" Plaintiffs' business.

the cross motions for summary judgment. The trade blotter is simply another document that Plaintiffs allege Frankel misappropriated and wrongfully sent to third parties. Thus, it falls within the theories of liability pled in the Complaint, unlike Plaintiffs' attempts to shoehorn a new theory of contractual liability under Paragraph 6 into summary judgment briefing, as discussed above.

Here, Frankel undeniably sent the trade blotter to a third party, Peter Ziv. (Frankel Exh. 20). What's more, Frankel admits that he sent the blotter to Ziv as part of his bid to buy Ziv as a broker-dealer. (Doc. # 116 at 152:22-25, 155:8-13). But Frankel denies that this is "Confidential Information" under the Employee NDA because he did not obtain it while he was an employee at Alpine and, in any event, the trade information is publicly available. (Doc. # 131 at 10-11).

Frankel's argument ignores that, under the Employee NDA, he had both an obligation to keep Plaintiffs' confidential information "in the strictest confidence" and a continuing obligation not to disclose Plaintiffs' confidential information, even after his employment ended. (Doc. # 118-4 at 1-2). The larger question is whether the trade blotter is

"Confidential Information" as that term is defined in the Employee NDA.

Again, the Employee NDA defines "Confidential Information" to include "any other information not generally known to the public which, if misused or disclosed, could reasonably be expected to adversely affect Company's business." (Doc. # 118-4 at 1). It does not include, however, information that is public knowledge through a source other than the employee or is lawfully available to the employee from a source outside the company. (Id.).

Here, it is not clear from the face of the contract whether an allegedly proprietary compilation of otherwise publicly available data falls under the rubric of "Confidential Information," as that term is defined in the Employee NDA.

Under Arizona law, parol evidence is admissible to determine the intentions of the parties where the contractual language allows different interpretations and the Court finds that "the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent." Johnson v. Earnhardt's Gilbert Dodge, Inc., 132 P.3d 825, 828, 830 (2006) (citing Taylor, 854 P.2d at 1140).

In his deposition, Frankel testified that the document is merely a sample of trades and that the trade information itself is all publicly available. (Doc. # 116 at 152:22-25, 153:23-154:7, 156:24-25). Hurry, on the other hand, testified that he checked with an Alpine employee and confirmed that these are the exact trades that Alpine did on August 27 and 28, 2018. (Doc. # 115 at 83:2-8). Hurry stated that "the way [the blotter is] put together" is confidential because the way in which the information is compiled is not known to the general public. (Id. at 83:15-84:15). Hurry testified that "one trade by itself in a stand-alone probably wouldn't help [Ziv] much but collectively grouped together with other information is a very powerful thing, and it would be confidential and a trade secret." (Id. at 87:25-88:4). Frankel conceded that a person in the general public could not obtain this information "in its totality"; that a person could get this consolidated information, "but the chances of it coming out in this fashion are, like, slim and none." (Doc. # 116 at 154:21-155:6).

The parties also dispute Frankel's motives behind sending Ziv the blotter. Hurry testified that, in his opinion, Frankel wanted this information to "essentially tell[] Ziv that he's going to basically take all of Alpine's business"

35

and "just move it over to Ziv." (Doc. # 115 at 84:19-25, 86:13-23). Frankel, however, emphasized that the blotter was meant merely as a "representative sample" of the kind of business he would like to generate. (Doc. # 116 at 156:13-17). Frankel explained that he wanted this information because "at the time when I was talking about purchasing Ziv, . . . when you buy a broker-dealer as a regulated entity, if you reach an agreement to purchase, right, you can't just go in there and buy it the next day. You have to go through a regulatory approval process." (Id. at 155:7-13). So, according to Frankel, "the idea was, if we went in there and started working at the firm, was, you know, what would sort of the business look like, what's a representative sample?" (Id. at 155:19-22). Frankel denied that he intended to take Alpine's business and denied soliciting Alpine's customers to move over to Ziv. (Id. at 156:18-157:10)

Several genuine issues of material fact preclude summary judgment on this issue. There is a genuine dispute over whether Frankel meant this to be a "representative sample" or whether he was implying that he would move these customer accounts, or others like them, from Alpine to Ziv. There is also a genuine dispute of material fact as to whether the trade blotter, as a compilation of publicly available facts,

36

falls within the scope of "Confidential Information," as that term is defined in the Employee NDA. See Farnam Cos., Inc. v. Stabar Enters., Inc., No. CV 03-503-PHX-NVW, 2005 WL 3369473, at *8-9 (D. Ariz. Dec. 12, 2005) (in breach-of-contract case involving whether one party was obligated to divulge a trade secret to the other under their agreements, denying cross-motions for summary judgment where, even considering the parties' various parol evidence, both parties interpretations of the contract were reasonable and a jury could reasonably find in favor of each non-moving party).

### c. Breach of Paragraph 4 of the Employee NDA ("Return of Materials")

Paragraph 4 of the Employee NDA provides: "When Employee's employment with Company ends, for whatever reason, Employee will promptly deliver to Company all originals and copies of all documents, records, software programs, media and other materials containing any Confidential Information." (Doc. # 118-4 at 1-2). The contract does not define what "promptly" means, nor is there any record evidence of what the parties intended or understood this term to mean. The Court also notes that this contractual provision for the return of materials is quite different from that in the Original NDA, which specifically stated that materials

37

containing confidential information must be returned to Plaintiffs within ten business days of their request. <u>See</u> (Doc. # 118-3 at 2). Plaintiffs clearly knew how to draft a more tightly worded return-of-materials provision, but chose not to do so in the Employee NDA.

Here, Plaintiffs made their demand that the documents be returned on November 9, 2018.  Frankel returned the documents through discovery in early February 2019 – approximately three months later.

Given these circumstances, it is unclear what the parties meant by a "prompt" return of Plaintiffs' documents and whether a three-month lag would be considered "prompt" under the contract. The parties have presented no evidence on this question and have pointed the Court to no case law clarifying how Arizona courts have interpreted such a contract provision. Thus, there is no evidence before the Court that three months is not "prompt" within the meaning of the Employee NDA. Such a factual determination is for the jury to make. <u>See</u> <u>McCarthy</u>, 2019 WL 3997369, at *8; <u>Hartford</u>, 870 P.2d at 1207.

Thus, summary judgment is denied as to both Plaintiffs and Frankel on Count II.

B.   **Statutory Claims**

Plaintiffs' claims under the federal Defend Trade Secrets Act (DTSA) (Count III) and the Florida Uniform Trade Secrets Act (FUTSA) (Count IV) require very similar showings, namely, the existence of a trade secret and the defendant's misappropriation of that trade secret.

To prevail on a DTSA claim, Plaintiffs must show that (1) they hold a trade secret, (2) the trade secret was misappropriated, and (3) the trade secret implicates interstate or foreign commerce. New Country Motor Cars of Palm Beach, LLC v. Beresford, No. 17-80856-Civ-Marra/Matthewman, 2019 WL 3890456, at *8 (S.D. Fla. May 3, 2019) (citing 18 U.S.C. § 1836(b)(1)).

The term "trade secret" is defined under the DTSA as information that the owner has "taken reasonable measures to keep [] secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information." 18 U.S.C. § 1839(3)(A), (B).

"Misappropriation" under the DTSA includes both the acquisition and disclosure or use of trade secrets. 18 U.S.C.

39

§ 1839(5). More specifically, "misappropriation occurs when: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." Fin. Info. Techs., Inc. v. iControl Sys., USA, LLC, No. 8:17-cv-190-T-23MAP, 2018 WL 3391379, at *4 (M.D. Fla. June 12, 2018).

The FUTSA also provides a cause of action for the misappropriation of trade secrets. Fla. Stat. §§ 688.001-009. To prevail on a claim under the FUTSA, Plaintiffs must show that (1) they possessed a trade secret and (2) the secret was misappropriated. Yellowfin Yachts, Inc. v. Barker Boatworks, LLC, 898 F.3d 1279, 1297 (11th Cir. 2018).

Under Florida law, a trade secret is:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

Misappropriation under the FUTSA is defined as:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

> 1. Used improper means to acquire knowledge of the trade secret; or
>
> 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
>
> > a. Derived from or through a person who had utilized improper means to acquire it;
> >
> > b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> >
> > c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> 3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).

Plaintiffs identify the following information as trade secrets misappropriated by Frankel:

(1) Alpine's annual audit report for the fiscal year ending in September 2016, which included a statement of Alpine's financial condition, statement of

Alpine's income, statement of changes in stockholders' equity, statement of Alpine's cash flow, notes on Alpine's financial statements, computation of Alpine's net capital, computation for determination of customer reserve requirements, and computation for determination of PAB account reserve requirements;

(2) statements of accounts for Alpine and Scottsdale on April 10, 2017, including number of accounts, market value, and cash/money market;

(3) Alpine's blanket fidelity bond for fiscal year ending November 1, 2017;

(4) a May 7, 2018, email from an attorney for Alpine that included a term sheet for a multi-million dollar secured revolving credit facility;

(5) a July 31, 2018, internal email regarding Alpine's fee schedule that included a listing of Alpine's top 50 accounts by commission amount;

(6) an August 21, 2017, email from the general counsel of Scottsdale that included a term sheet for a loan to Alpine to fund the National Securities Clearing Corporation calls;

(7)   an internal audit report dated May 1, 2016, prepared

by Alpine's chief compliance officer; and

(8)   internal emails from September and October 2016 that

included a Financial and Operations Principal's

report dated April 18, 2016.

(Doc. # 61 at ¶¶ 51, 62).

Frankel argues that he is entitled to summary judgment on the DTSA and FUTSA claims because "there is no evidence of Frankel misappropriating trade secrets to make a bid for a broker-dealer in Chicago." (Doc. # 118 at 18). Frankel argues that this opportunity came to him, unsolicited, from a former client, and Plaintiffs offer only speculation that Frankel "must have" misappropriated their information. (Id. at 18-19). Frankel contends that there is no evidence that he "used or disclosed" the documents listed in the Second Amended Complaint as "Confidential Information." (Id. at 19).

What's more, Frankel disputes that these documents are trade secrets. (Id.). He claims that there are "no trade secrets in the business of clearing micro-cap securities" because the process of "clearing" transactions is well known in the industry. (Id.). Finally, Frankel argues that Plaintiffs are not entitled to any remedies because they have

43

no evidence of damages and have no evidence to support their allegations of irreparable harm. (<u>Id.</u> at 19-20).

In response, Plaintiffs point out that after Frankel left Alpine, he emailed Alpine's confidential trade blotter to Ziv and, therefore, there is evidence of him misappropriating Plaintiffs' trade secrets to make a bid for a broker-dealer in Chicago. (Doc. # 126 at 11-12). Plaintiffs dispute that they have no evidence of damages, pointing to their statements of income, trend reports, and profit and loss statements that show "significant losses attributable to Frankel's conduct." (<u>Id.</u> at 12). They also claim that they are entitled to injunctive relief under the statutes. (<u>Id.</u>).

In his deposition, John Hurry insisted that none of the information at issue in this case is generally known to the public and is confidential to Plaintiffs' business. <u>See</u>, <u>e.g.</u>, (Doc. # 115 at 99:5-6, 101:8-10, 123:4-5, 148:17-19). According to Plaintiffs, this information derives its economic benefit from not being ascertainable by competitors and the general public, who could use the information to adopt Plaintiffs' business strategies and/or solicit Plaintiffs' customers. (<u>Id.</u> at 66:7-11, 67:12-68:1, 68:18-69:6, 86:13-87:2).

As the Eleventh Circuit has noted, whether certain information ultimately constitutes a "trade secret" is a question of fact. <u>Penalty Kick Mgmt. Ltd. v. Coca Cola Co.</u>, 318 F.3d 1284, 1291 (11th Cir. 2003). Here, taking the evidence offered by Plaintiffs, as the non-moving party, as true and drawing all reasonable inferences in their favor, <u>see</u> Shotz, 344 F.3d at 1164, there is a genuine dispute of material fact as to whether the documents identified in the Second Amended Complaint and the trade blotter constitute trade secrets. The Court notes that other courts have considered similar proprietary business documents to be trade secrets under DTSA and FUTSA. <u>See</u>, <u>e.g.</u>, <u>Resnick v. City of Troy</u>, No. 2:17-cv-815-ECM, 2019 WL 2092567, at *6 (M.D. Ala. May 13, 2019) (accepting that identities of suppliers, relationships with employees of suppliers, and their pricing information could be a trade secret under DTSA); <u>Marlite, Inc. v. Eckenrod</u>, No. 09-22607-Civ, 2011 WL 39130, at *5 (S.D. Fla. Jan. 5, 2011) (customer lists and pricing information held to be trade secrets under FUTSA); <u>Se. Mech. Servs., Inc. v. Brody</u>, No. 8:08-cv-1151-T-30EAJ, 2008 WL 4613046, at *11 (M.D. Fla. Oct. 15, 2008) (sensitive financial documents are trade secrets).

Thus, whether these documents are trade secrets under the respective statutes is a question for the jury. See Godwin Pumps of Am., Inc. v. Ramer, No. 8:11-cv-580-T-24AEP, 2012 WL 1110068, at *7 (M.D. Fla. Apr. 3, 2012) ("Courts hesitate to grant summary judgment when faced with the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable protective steps. Generally, such determinations should be resolved by a fact finder after both sides have fully presented their evidence.") (internal citation omitted); see also Lear Siegler, Inc. v. Ark-Ell Springs, Inc., 569 F.2d 286, 288-89 (5th Cir. 1978) (recognizing that whether certain items are trade secrets is typically resolved by the fact finder).

There is also a genuine issue of material fact on the issue of misappropriation. Specifically, the evidence that Frankel sent the trade blotter to Ziv after he left Alpine and after Plaintiffs requested the return of their allegedly confidential material creates a genuine issue of material fact about whether he misappropriated both the blotter and the other documents named in the Second Amended Complaint.

For these reasons, summary judgment is denied to Frankel on Counts III and IV.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Plaintiffs' Motion for Summary Adjudication (Doc. # 114)

is **DENIED.**

(2)   Defendant's Motion for Summary Judgment (Doc. # 118) is

**DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

<u>25th</u> day of November, 2019.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE