UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE HURRY FAMILY REVOCABLE
TRUST; SCOTTSDALE CAPITAL
ADVISORS CORPORATION;
ALPINE SECURITIES CORPORATION;
and CAYMAN SECURITIES CLEARING
AND TRADING LTD.,

      Plaintiffs,

v.                                                    Case No. 8:18-cv-02869-VMC-CPT

CHRISTOPHER FRANKEL,

      Defendant.

_____/

## Frankel's Renewed Motion for Judgment as a Matter of Law or Alternatively for a New Trial

The defendant, Christopher L. Frankel ("**Frankel**"), through counsel and under Federal Rule of Civil Procedure 50(b), renews his motion for judgment as a matter of law against the plaintiffs, Scottsdale Capital Advisors Corporation ("**Scottsdale**") and Alpine Securities Corporation ("**Alpine**").

The jury had no legally sufficient, evidentiary basis for awarding $932,000 in unjust enrichment damages on Alpine's and Scottsdale's claims for misappropriation of trade secrets. Frankel is entitled to judgment as a matter of law because:

(1)    Alpine and Scottsdale had no trade secrets;

(2)    Alpine and Scottsdale failed to prove, and no evidence showed, that Frankel obtained any unjust enrichment through misappropriation of Alpine's and Scottsdale's alleged trade secret(s); and

(3)    The jury awarded a patently incorrect amount for the jury's unsupported, unjust enrichment award.

Alternatively, Frankel requests a new trial under Federal Rule of Civil Procedure 59(a) on Alpine's and Scottsdale's claims for misappropriation of trade secret(s) to give Frankel a full and fair an opportunity to refute Alpine's and Scottsdale's unpled, undisclosed, damage claims, presented for the first time at trial. Alpine and Scottsdale ambushed Frankel at trial with an undisclosed damage claim that Frankel used Alpine's and Scottsdale's trade secret(s) to induce John Fife and his companies, Chicago Venture Partners, L.P. ("**Chicago Ventures**"), Iliad Research and Trading, L.P. ("**Iliad Research**"), and St. George Investments LLC ("**St. George**"), to do business with Vision Financial Markets, LLC ("**Vision**"). Alpine and Scottsdale further ambushed Frankel, and induced reversible error, by persuading the Court to exclude the testimony of John Fife and David Jarvis, which would have refuted Alpine's and Scottsdale's unpled, undisclosed, unsupported damage claims.

## I.   BACKGROUND

### A.   Alpine and Scottsdale refused to disclose their alleged damages on their unpled claim for Frankel's alleged misappropriation at Vision

Alpine and Scottsdale sued Frankel on November 21, 2018, alleging that Frankel had misused their Confidential Information to try to buy a broker dealer:

> "to solicit capital, establish banking relations, recruit Plaintiffs' clients, and compete with Plaintiffs' businesses. Among other things, Plaintiffs are informed and believe Defendant [Frankel] used the foregoing confidential information obtained from Plaintiffs to make a bid for a broker-dealer in Chicago [Ziv Investment Company]."

Initial complaint (Doc 1) at ¶20 on p. 4 – 5.

Alpine and Scottsdale amended their complaint twice, but their liability allegation – that Frankel had used their Confidential Information and trade secrets to try to buy a broker-dealer – never changed. Alpine and Scottsdale never alleged that Frankel had used their alleged trade secret(s) to compete unfairly in his work with Vision beginning in May 2019.

Instead, Alpine and Scottsdale continued to allege that Frankel had misappropriated their trade secret(s) in trying to buy or create a broker-dealer:

> Plaintiffs are informed and believe that after leaving Alpine, if not earlier, Defendant knowingly and willfully used Confidential Information obtained from Plaintiffs for his own benefit. Specifically, Defendant used Plaintiffs' Confidential Information to solicit capital and establish financial relations so that it [Frankel] could make a bid for a broker dealer in Chicago . . . .

> Defendant further engaged in unfair competition against Plaintiffs by using the Plaintiffs' Confidential Information to create a broker-dealer that could provide fees and services competitive to Alpine and then using Plaintiffs' Confidential Information to solicit their top clients.

Second amended complaint filed May 10, 2019 (Doc 61) ¶¶ 30, 31.; *see also* First amended complaint filed February 26, 2019 (Doc 37) at ¶24.

Frankel did not buy Ziv (Doc 316 at p. 87, lines 14 – 16), and did not create a broker-dealer. Instead, Frankel began consulting with an existing broker-dealer, Vision, in May 2019, and his company, Securities Settlement Solutions, LLC, entered into an independent contractor's agreement with Vision on July 9, 2019. PX 67; Doc 316 at 110:4–7.

After Frankel started working with Vision in May 2019, Chicago Ventures approached Frankel about opening opening accounts for Fife's companies, Chicago Ventures, Iliad Research, and St. George. Fife's companies had tried unsuccessfully

to open accounts at Vision in January 19, 2019, three months before Frankel began working with Vision. Doc 318 at p. 56, lines 22 – p. 57, line 12. Frankel gave unrebutted testimony that he refused to negotiate Vision's charges with Fife's representative, Chris Stalcup, in opening accounts for Fife's companies on May 22 and 23, 2019. Doc 316 at 121:10–17; PX 58.

Frankel estimated that Chicago Ventures, Iliad Research, and St. George paid Vision "a couple of hundred grand" in commissions per month during the two months before Frankel's initial deposition on August 7, 2019, and that Vision's Corporate Services Group, headed by Frankel, received some revenue credit for commissions (and the commissions paid by other clients cleared through the Corporate Services Group. Doc 316 at 127:18–25; 128:22–24. Frankel had no idea (and Alpine and Scottsdale offered no evidence) how much Chicago Ventures, Iliad Research, and St. George paid Vision in commissions from August 7, 2019 through the start of the trial on April 26, 2021. Doc 316 at 129:23–25.

Frankel testified that his company, Securities Settlement Solutions, got 20% of the profits of the Corporate Services Group, from which Securities Settlement paid Frankel and others. Doc 316 at 129:3–17. Alpine and Scottsdale offered no evidence what portion of the 20% of the Corporate Services Group's profits came from commissions paid by Chicago Ventures, Iliad Research, and St. George.

Frankel testified that Fife, through his companies, is the Corporate Services Group's biggest client. Doc 316 at 133:7–10. Frankel did not know the amount of his compensation which was attributable to commissions paid by Chicago

Ventures, Iliad Research, and St. George to Vision (Doc 316 at 136:5–21), and Alpine and Scottsdale offered no evidence showing the portion of Frankel's compensation attributable to commissions paid by Chicage Ventures, Iliad Research, and St. George.

Alpine and Scottsdale knew early on that Frankel had begun working with Vision, and Alpine and Scottsdale subpoenaed Vision's documents on June 5, 2019. Doc 76–1 at 2. Alpine and Scottsdale never amended their second amended complaint to allege that Frankel had used their Confidential Information or trade secret(s) to compete unfairly at Vision.

At the earliest opportunity in the lawsuit, Frankel began requesting Alpine's and Scottsdale's documents and information supporting their alleged claims including their damages. Despite repeated requests, Alpine and Scottsdale steadfastly declined to disclose any damage computation, analysis, and / or supporting documentation.

On February 1, 2019, the plaintiffs stated in their initial disclosures their "damages and losses arising from Defendant's misconduct … are unknown at this time." Doc. 35-2.

On February 13, 2019, the plaintiffs promised to provide (but never provided) "documents sufficient to show their damages" in responding to Frankel's initial request to produce, which requested, among other things, "[a]ll documents which support the damage allegations in your complaint." Doc. 35-4.

Alpine and Scottsdale concluded early on that David Jarvis was an

"individual likely to have discoverable information" concerning Alpine's and Scottsdale's claims because Alpine and Scottsdale issued an extremely broad subpoena for Jarvis' documents on June 5, 2019. On June 19, 2019, Frankel moved to quash the subpoena as overly broad and invading attorney / client privilege. Doc 76 at 1–2. On June 20, 2019, however, Alpine's and Scottsdale's former attorney agreed to limit the scope of the subpoena for Jarvis' documents, and Judge Tuite "direct[ed] the parties to confer and agree upon subject matter limitations that are reasonable." Doc 97. On July 24, 2019, the parties agreed to limit the subject matter to documents or communications "that referred to, used, incorporated, or attached any information of or related to [the plaintiffs]." Doc 101. Frankel did not object or assert attorney / client privilege to the narrowed subpoena for Jarvis' documents, but Alpine and Scottsdale never issued the subpoena!

On June 7, 2019, in their supplemental response to Frankel's interrogatory 8 requesting information concerning the plaintiffs' alleged damages, Alpine and Scottsdale stated: "Plaintiffs state that Defendant has been unjustly enriched at their expense. Plaintiffs do not presently have an estimate of this damage amount or method of calculation because discovery is continuing .... Further, this information requires expert opinion, and expert reports are not yet due." Doc 118-8. Alpine and Scottsdale never provided an expert opinion and never provided "their estimate of this damage amount or their method of calculation" of their unjust enrichment damage claim.

On August 5, 2019, in their second supplemental response to Frankel's

request for production of damages documents, the plaintiffs again promised to provide (but never provided) "documents sufficient to show their damages." Doc 118-10.

On August 5 and 6, the plaintiffs produced their alleged "damages" documents, Exhibits 29 to 34 to the deposition of their designated, coporate representative, John Hurry. Hurry Dep. 156:4–157:13 (Doc 115). The plaintiffs' alleged damage documents were worthless, proved nothing, did not support their claims for damages or unjust enrichment. Tellingly, Alpine and Scottsdale offered at trial none of their alleged damage documents, produced at the close of discovery, to prove damages or unjust enrichment.

Just before the close of discovery on August 9, 2019, Frankel deposed John J. Hurry, designated by Alpine and Scottsdale as their corporate representative regarding their claims, on August 9, 2019. Doc 65 (order granting plaintiffs' request to extend discovery cut-off through August 9, 2019); Doc 118 – 2 (Frankel's corporate representative deposition notice). Hurry testified that Alpine and Scottsdale had no evidence that Frankel had used Confidential Information or trade secrets to compete unfairly or unjustly enrich himself at Vision:

> Q. Okay. What is Chris doing now?
> A. I don't know specifically what Chris is doing now. I believe he is trying to unfairly compete with us. Currently at Vision and maybe some other firms.
> Q. Okay. Do you know if he's working at Vision?
> A. I know that he is registered on the CRD at Vision.
> Q. Okay. Is Chris allowed to work at Vision?
> A. Sure.
> Q. Okay. And what is -- what do you contend the restriction is on Chris

working at Vision?

A. No restriction. There is only -- he just can't unfairly compete using our confidential information on trade secrets.

Q. Okay. So you think that perhaps Chris might somehow be competing unfairly with you while he's working at Vision. Is that what youre saying?

A. Yes. He is using -- we believe he is using our trade secrets and confidential information in an unfair manner to compete, yes.

Q. At Vision?

A. We don't know if it's Vision. We suspect it would be Vision today because he's registered at Vision.

Deposition of John Joseph Hurry at pp. 77:6-78:3.

Hurry testified that Alpine and Scottsdale did not know whether Frankel had been using their Confidential Information and trade secrets to solicit Alpine's and Scottsdale's customers.

Q. Who? With whom? Which customers?

A. It would appear that Chris is soliciting those customers.

Q. Which customers is he soliciting?

A. The ones on the top 50 list.

Q. All of them?

A. It would appear so. I don't -- we are in the process of getting that discovery.

Deposition of John Joseph Hurry at p. 81:11-18.

Hurry testified that Alpine and Scottsdale had not done any damage analysis to determine whether Frankel's suspected misuse of Confidential Information had damaged Alpine and Scottsdale.

Q. You're not able to tell me the amount of damage that you think that has been caused by Frankel?

A. It would appear that approximately $700,000 worth of revenue, give or take, somehow was related to the move that he did to Vision. Now, we don't have that empirically set up yet, but there is a super high 14 correlation of the move to Vision and a big drop in revenue, which all happens -- it's not -

- it's more than a coincidence.

Q All right. Well, of course, it's not a drop in revenue. It's a drop in profit; right?

A. Those are drops -- well, you can say it goes -- in this case, it would go to the bottom line, yes.

Q. Okay.

A. Some of it.

Q. When -- who is going to do, and when are they going to do it, a damage analysis to determine –

A. It's in the process.

Q. -- what you say the damages are?

A. They are in the process, as we get the discovery, of putting that together. We haven't got all the discovery yet.

Deposition of John Joseph Hurry at p. 173:8–174:5.

In conceding that Alpine and Scottsdale had not produced documents to support their alleged damages, Hurry testified that Alpine and Scottsdale would need "all the trade runs and stuff at Vision, which customers were ours, how they got over there, and what kind of commissions they did over there" to prove damages.

Q, Okay. And these financial documents that you produced, 29 through 33, are those the documents that you would use to determine what the alleged damaged are?

A They certainly could be some of them, yes.

Q Well, what else would you need?

A We probably want to see all the trade runs and stuff at Vision, which customers were ours, how they got over there, and what kind of commissions they did over there.

Hurry Dep. 174:14-18 (Doc 115). Alpine or Scottsdale offered at trial no Vision trade runs, no Vision commission statements, no evidence that any Alpine customers switched to Vision, and no information about how any Alpine customers got to

Vision.

On August 9, 2019, Alpine and Scottsdale deposed Frankel and asked him about Fife and his companies, Chicago Ventures, Iliad Research, and St. George. Frankel answered Alpine's and Scottsdale's questions, explaining that he had known of Fife before going to work for Alpine, that Frankel had spoken with Fife since leaving Alpine, that Fife's companies had attempted to open accounts with Vision before Frankel started working with Vision, and that Frankel had opened accounts for Fife's companies since Frankel began working with Vision. Doc 116 (First Frankel deposition) at 24:9, 13 – 31; 113:1–20; 169:1–3.

On August 23, 2019, Frankel moved to strike the plaintiffs' damages expert (Doc 117) because the plaintiffs had not provided the required disclosure for the expert. On September 23, 2019, the Court granted Frankel's motion to strike the plaintiffs' damages expert. Doc 130.

On August 23, 2019, Frankel moved for summary judgment because, among other things, Alpine and Scottsdale had failed to adduce evidence to support their allegations of damages and irreparable harm. Doc 118 (Frankel's summary judgment motion at ¶¶ 54 - 58 on pp. 11 - 12 ("No evidence supports the plaintiffs' damage allegations"; the plaintiffs' alleged damage documents produced before the close of discovery do not support damages; no evidence supports the plaintiffs' allegations of irreparable harm; the plaintiffs admittedly had not done any damage analysis; the plaintiffs had adduced no evidence that any wrongdoing by Frankel had caused Alpine or Scottsdale to suffer any harm or damages).

Frankel filed Jarvis' declaration, among other things, in support of Frankel's summary judgment motion. Doc 128–2. Although Alpine and Scottsdale moved to strike Frankel's summary judgment evidence which they considered improper, they did not move to strike Jarvis' declaration or otherwise argue that he was an undisclosed or prohibited witness. Doc 127.

On September 6, 2019, Alpine and Scottsdale opposed Frankel's motion for summary judgment. Regarding their damage claims, Alpine and Scottsdale argued that their worthless damage documents, produced just before the close of discovery, somehow supported damages and that Frankel's misappropriation could have caused loss of customer goodwill. Doc 126 at 12.

On December 16, 2019, Frankel moved in limine to prohibit Alpine and Scottsdale from referencing or attempting to offer evidence concerning damages because the plaintiffs had failed to adduce any evidence to support damages, had performed no damage analysis, and had disclosed no evidence of damages during discovery. Doc 148 at 1–9.

On January 8, 2020, Alpine and Scottsdale opposed Frankel's motion in limine, again arguing that their worthless damage documents produced just before the close of discovery somehow supported their alleged damages. Doc 158 at 3.

On January 13, 2020, Frankel filed his witnesss list, listing Fife and Jarvis, among others, as potential witnesses. Doc 165–4 at 1–2. Alpine and Scottsdale had refused to disclose damages and had not pled any claim concerning Vision, so Frankel listed Fife and Jarvis, as a precaution, to rebut any new claim and damage

theory which Alpine and Scottsdale might try to advance.

The plaintiffs did not move to strike Fife or Jarvis. The plaintiffs did not claim prejudice, did not request information concerning Fife or Jarvis, and did not request leave to depose either of them.

At the pretrial conference on March 11, 2020, the Court reopened discovery to allow Alpine and Scottsdale to depose Frankel concerning documents produced by Vision after the close of discovery. Doc 193. During the pretrial conference, Alpine and Scottsdale agreed that Frankel's compensation was off-limits. Their counsel stated: "I don't care about [Frankel's] compensation …. [I'm] not trying to find out what he made."

> Judge, let me be clear. *I don't care about his compensation.* What I care about is whether he profited off of clients that would be subject to a nondisclosure, nonsolicitation agreement,[1] trade secrets violation. That's it. *It's not trying to find out what he made. It's trying to find out what our clients paid that entity and if they were clients that he brought over.* It's a very simple, very common damages theory in these cases. So it's not – I think they are misspeaking when they keep saying I'm not allowed to know his comp.

Transcript from Pretrial Hearing on March 11, 2020, at 70:23–71:8 (Italics added).

Alpine and Scottsdale deposed Frankel again on April 3, 2020, and Frankel refused to answer questions about his compensation, which he understandably believed to be off-limits. Alpine and Scottsdale seemingly agreed, because they did not file a motion protesting Frankel's refusal to answer questions about his compensation.

---

1. Frankel did not have a nonsolicitation agreement with any of the plaintiffs.

During the second deposition, Alpine and Scottsdale questioned Frankel again, and Frankel answered their questions again, about Fife, Chicago Ventures, Frankel's prior relationship with Chicago Ventures at COR, and Frankel's interactions with Chris Stalcup in opening Vision accounts for Fife's companies. Frankel's second deposition (4/3/20) at 42:2–55:14, attached hereto as an exhibit. The plaintiffs again did not move to strike Fife, did not claim prejudice, did not request information about Fife, and did not request leave to depose Fife.

During the pandemic, the parties discussed a non-jury, Zoom trial, which Alpine and Scottsdale conditioned on reopening discovery for depositions of both sides' witnesses. Frankel rejected the proposal for a Zoom trial, opting instead for live testimony in court. Alpine and Scottsdale did not claim in connection with their proposal for a Zoom trial that Fife, Jarvis, or any other witness should not be permitted to tesify, or that Alpine and Scottsdale would move to exclude them if Frankel did not make them available for depositions.

Alpine and Scottsdale waited in ambush until the first day of trial, during the pretrial conference before jury selection, orally to move to exclude Jarvis, Fife, or any other witness not listed in Frankel's initial disclosures. Alpine and Scottsdale seemingly sprung their ambush as part of their trial plan to conceal their damages until trial, to try their unpled Vision claim, and to exclude the key witnesses with knowledge of the unpled Vision claim including whether Frankel disclosed Confidential Information, why Fife's companies opened accounts with Vision, and Alpine's and Scottsdale's non-existent claims for unjust enrichment damages.

### B.     Frankel's Trial Testimony

Frankel wrote a guide book on clearing micro-cap securities and learned the players in the micro-cap securities business long before going to work for Alpine in 2015. Doc 318 at 232:14–233:3. Frankel's employment as CEO ended on August 1, 2018, and Alpine thereafter retained him as a non-exclusive consultant, with an Alpine email address and Alpine server access, through October 31, 2017. Doc 316 at 227:14–230:7. Alpine never requested or obtained non-competition or non-solicitation agreements from Frankel. Doc 316 242:5–12; 243:19–21.

Alpine was "turning away business every day" when Frankel left in the fall of 2018 because Alpine had lost its "ex-clearing" relationships, had to clear through the Depository Trust Company, and did not have sufficient capital to do so. Doc 318 at 227:5–11.

Alpine and Scottsdale published their fee schedules while Frankel worked for Alpine. Doc 317 at 28:11–31; 43:14; 44:16; DX140; 133:12–23. Identifying clients who trade microcap securities is "pretty doggone easy" because trades and much customer information are publicly available. Doc 316 at 252:22–255:6. Major clients who trade microcap securities seek to open accounts with as many broker-dealers as will accept and / or can handle the clients' business. Doc 317 at 46:12–48:12.

Frankel did not use any confidential information to disadvantage Alpine or Scottsdale. Doc 317 at 49:21–24; Doc 318 at 230:24–231:5. Frankel did not use any confidential information of Alpine or Scottsdale in dealing with any client who has

done business with Alpine or Scottsdale. Doc 317 at 136:6–10; Doc 318 59:7–74:15; 80:6–20.

Frankel did not use the anonymous blotter to disadvantage Alpine or Scottsdale. Doc 318 218:16–20. Alpine has had an ex-clearing relationship with Vision for the past year during which Alpine has shared far more trade information with Vision than the information on the anonymous blotter. Doc 317 at 180:15–181:10. Alpine had no confidentiality agreement with Vision during the past year while Alpine ex-cleared through Vision. Doc 318 at 86:11–15.

Frankel had (and still has) "absolutely no idea" who the customers' are on the anonymous trade blotter. Doc 317 at 186:12–25. Frankel did not know that the anonymous blotter showed 2 days of trades cleared by Alpine in August 2018. Doc 316 at 42:11–13; JX5.

Frankel used Alpine's customer list (PX 31) solely for the benefit of Alpine and Scottsdale. Doc 317 at 98:20–23. Frankel already knew at least half of the clients on Alpine's client list from working with the clients before joining Alpine. Doc 317 at 99:11–100:2.

In May 2019, the owner of a broker-dealer who was also trying to buy Ziv Investments, introduced Frankel to Vision. Doc 316 at 245:4–12; 247:7-25.

Frankel has known about Chicago Ventures since about 2008 because Chicago Ventures is well-known in the microcap securities business and had accounts with COR while Frankel was COR's CEO. Doc 317 at 45:22–46:11; Doc 318 at 57:16–58:9. Chicago Ventures tried to open an account with Vision in

January 2019, but Vision declined Chicago Ventures' application. Doc 318 at 56:22–57: 12.

Chris Stalcup of Chicago Ventures approached Frankel about opening an account with Vision in May 2019; tried to persuade Frankel to reduce Vision's commission rate from 3.5% to 3%; but Frankel refused. Doc 317 at 130:16–133:7; PX 58; Doc. 317 at 220:10–18. Frankel used no confidential information of Alpine or Scottsdale in assisting Chicago Ventures in opening an account with Vision or in persuading Chicago Ventures to accept Vision's non-negotiable fees. Doc 317 at 136:1–5.

Alpine's and Scottsdale's counsel had Frankel extrapolate from the anonymous blotter that if the daily volume of anonymous trades on the blotter could be achieved for a year, the trades could generate $4.8 million dollars in annual commissions if the broker-dealer executing the trades were to charge commissions at 3.5%. Doc 317 at 189:5–12.

Vision paid Frankel's company, Securities Settlement Solutions, 20% of the profits earned by the Corporate Services Group, and Securities Settlement Solutions paid Frankel and others from the 20%. Doc 318 at 14:2–7. Frankel received about $264,000 as his share of the 20% of the profits which Vision paid to Securities Settlement Solutions in 2018. Doc 318 at 17:2–8. Frankel did not know what he received as his share of the 20% of the profits which Vision paid to Securities Settlement in 2019 or in 2020. Doc 318 at 21:22–23:3.

Frankel estimated the Corporate Services Group's "margin" on Vision's total

revenue as about 40 to 50%. Doc 318 at 23:24–24:21. Frankel knew of no Alpine clients taken by Vision. Doc 318 at 35:3–9.

### C.   Excluded Testimony of Fife and Jarvis

Frankel tried to call John Fife and David Jarvis as witnesses during Frankel's case, but the Court excluded them. Doc 318 at 240:19–243:23. The Court would not permit Fife and Jarvis to testify because Frankel had not updated his initial disclosures to add them as "individual(s) likely to have discoverable information ... that the disclosing party [Frankel] may use to support its [his] ... defenses, unless the use would be solely for impeachment." Doc 318 at 240:19–243:23; Docs 282, 283, and 287; Fed. R. Civ. P. 26(a)(1)(A)(i). But, Frankel wanted to call Fife and Jarvis to rebut Alpine's and Scottsdale's unpled Vision claim and undisclosed damages, not to support Frankel's defenses. With the plaintiffs' consent and the Court's authorization, Frankel, submitted declarations proffering the testimony of Fife (Doc 293) and Jarvis (Doc 294). Doc 318 at 245:3–25.

Fife swore in his proffer that his companies, Chicago Ventures, Iliad Research, and St. George, had maintained brokerage accounts at many firms over the years, including with Legent/COR Clearing while Frankel served as CEO of Legent/COR Clearing before Frankel joined Alpine, and that Fife's companies routinely had worked directly with Frankel and his deposit team while Frankel was the CEO of Legent/COR Clearing. Doc 293 (Fife proffer) at ¶¶ 1, 4, 5, and 6.

Fife swore that his companies still maintain accounts with Alpine and Scottsdale; that his companies regularly seek out additional relationships with

clearing firms to open accounts for his companies to conduct trading; and that Alpine and Scottsdale have informed Fife and his companies that Alpine and Scottsdale do not have sufficient capital to support all the trades that Fife's companies would like to execute and clear. Doc 293 (Fife proffer) at ¶¶ 7, 8, and 9.

Fife swore that he submitted applications for his company to open an account with Vision Financial Markets LLC in September 2015 and January 2019, months before Frankel went to work for Vision in June 2019; that Frankel did not recruit or solicit Fife or his companies to open an account with Vision; that Fife and his companies instead sought out to Frankel to help open an account with Vision; and that Frankel did not reveal to Fife or his companies any information about The Hurry Family Revocable Trust, Scottsdale Capital Advisors Corporation, or Alpine Securities Corporation that is not available through public sources. Doc 293 (Fife proffer) at ¶¶ 10, 11, 12, 13, and 14.

Jarvis swore in his proffer that he has been an attorney in the securities industry since the late 1990s; that he is familiar with the the clearance and settlement of low-priced or microcap securities, the firms that provide such services, and the clients of such firms; that the clients regularly maintain accounts at multiple clearing firms that process the transactions. Doc 294, ¶¶ 2, 5, 7, 8, 9.

### D. Frankel's Motion for Directed Verdict

The Court deferred Frankel's opportunity to move for directed verdict (i.e., judgment as a matter of law under Rule 50(a)) at the conclusion of the plaintiffs' case, and instead authorized him to move for directed verdict at the conclusion of

all the evidence. Doc 318 at 214:3–215:8. At the conclusion of the evidence, Frankel
moved for a directed verdict because the plaintiffs had failed to prove damages and
the existence of trade secrets. Specifically, Frankel moved for directed verdict
because the plaintiffs had failed to prove damages on any of their claims including
unjust enrichment damages on Scottsdale's and Alpine's trade secret claims, and
had failed to prove that Frankel's misuse of Confidential Information or
misappropriation of trade secrets had caused any clients to switch their accounts
from Scottsdale and Alpine to Vision. Doc 318 at 248:16–249: 17 (No evidence of
actual harm or damages on any claim; no evidence that clients switched to Vision;
no evidence to support award of unjust enrichment damages); at 251:11–252:20
(No damages "causation" evidence that any wrongdoing by Frankel advantaged
him or disadvantaged Scottsdale and Alpine; no "circumstantial" evidence to
support inference that Frankel advantaged himself or disadvantaged Scottsdale
and Alpine; speculation not permitted); at 253:19–254:2 (No evidence to support
"viable" trade secret claim); at 255:18–23 (Frankel "renewed" directed verdict
motion because conclusion of plaintiffs' case and conclusion of evidence coincided
and Frankel reasserted summary judgment arguments that plaintiffs had failed to
adduce evidence to support damages).

### E.   Alpine's and Scottsdale's Damages Argument / Jury's Verdict

Based on Frankel's estimate that Chicago Ventures, Iliad Research, and St.
George had paid Vision a couple of hundred grand per month in commissions in

the 2 months before Frankel's first deposition on August 7, 2019, and his estimate of a 40 to 50% margin, Alpine and Scottsdale argued that the jury should award $200,000 per month x 50% margin, from July 9, 2019 through April 30, 2021, for Alpine's and Scottsdale's direct damages of $931,935.48 caused by Frankel's alleged misappropriation.

For unjust enrichment, Alpine and Scottsdale argued that the jury should award three years (2019, 2020, and 2021) of Frankel's compensation for 2019, $264,000, for unjust enrichment damages of $792,000. But, of course, Chicago Ventures, Iliad Research, and St. George were not the only Vision clients which paid commissions on trades cleared by Frankel's Corporate Services Group, and Alpine and Scottsdale offered no evidence showing the portion of Frankel's 2019 compensation was attributable to Chicago Ventures', Iliad Research's, and St. George's commissions, and no evidence showing that Frankel has used trade secrets to generate any commissions or compensation.

The jury concluded that Alpine and / or Scottsdale owned valid trade secrets, that Frankel had misappropriated trade secrets, that his misappropriation had caused "$0" actual damage to Alpine and Scottsdale, that Frankel's unjust enrichment resulting from his misappropriation was $932,000, and that Frankel's misappropriation had not been willful and malicious. Doc 302 at pp. 4 – 5. The jury thus rejected Alpine's and Scottsdale's claim for actual damages, but awarded as unjust enrichment damages the amount of $932,000 that Alpine and Scottsdale argued was the computation of their actual damages.

## II.   ARGUMENT

After judgment is entered based on the jury's verdict, Federal Rule of Civil

Procedure 50(b) allows a party to renew their motion for a judgment as a matter

of law under Rule 50(a) and alternatively move for a new trial under Rule 59:

> Under Rule 50, a party's motion for judgment as a matter of law can be
> granted at the close of evidence or, if timely renewed, after the jury has
> returned its verdict, as long as there is no legally sufficient evidentiary basis
> for a reasonable jury to find for the non-moving party.

*AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1366 (11th Cir. 2021)

(quoting *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007)).

### A.   Alpine and Scottsdale Had No Trade Secrets

If there is not a legally sufficient evidentiary basis for a jury to find that

information is a trade secret (and the unrefuted evidence contradicts a finding that

the information is a trade secret), then judgment as matter of law on a claim for

misappropriation of the trade secret should be entered notwithstanding a jury's

verdict. *E.g.*, *AcryliCon USA, LLC*, 985 F.3d at 1366–68 (reversing trial court's

denial of judgment as a matter of law under Rule 50 when claimant failed to prove

that information was a trade secret and jury's verdict on misappriation claim did

not have legally sufficient evidentiary support).

Alpine and Scottsdale offered testimony concerning only four documents,

some of which may have been confidential, but none of which were trade secrets.

PX 3, the loan term sheet loan which New World Fortuity Fund offered to a number

of prospective borrowers, including Alpine, was not a trade secret. Doc 316 at 9:25

–10:3. No evidence showed that New World Fortuity Fund ever made the proposed

loan to Alpine or anyone else.

PX 8, Ken Ralston's draft employment agreement (Doc 316 at 17:21–18:7), was not a trade secret. No evidence showed that Alpine and Ralston ever finalized or adopted the employment agreement. No evidence showed that the employment had independent, economic value which would give a competitor an advantage over Alpine.

PX 3, Alpine's list of top 50 clients based on commissions paid during the first half of 2018, was not a trade secret. Doc 316 at 20:22–24. The customer names were not confidential because the customers were well known in the business; only the commission amounts were confidential. Doc 316 at 21:18–23. Alpine did not develop the list by market analysis or research; the list simply showed 50 of Alpine's clients retrieved by commissions paid. Doc 317 at 100:17–23.

JX 5, the anonymous blotter, was not a trade secret. The blotter was anonymous, *i.e.*, did not show Alpine as the broker, did not show customer names, and did not show commissions or fees, which is why Hurry *assumed* commission rates and fees in his "analysis" of the blotter. Alpine and Scottsdale offered no evidence that the blotter included any trades by Chicago Ventures, Iliad Research, or St. George. Alpine and Scottsdale offered no evidence showing that Frankel used (or how he even could have used) the blotter unfairly to compete for Chicago Ventures', Iliad Research's, or St. George's business.

## B. No Evidence Supports the Unjust Enrichment Award

If there is not a legally sufficient basis for the damages that the jury awards

to the plaintiff, then the Court must enter judgment as a matter of law against the plaintiff, notwithstanding the jury's verdict. *E.g. AcryliCon USA, LLC*, 985 F.3d at 1368 (reversing trial court's denial of judgment as a matter of law and vacating damages award that lacked legally sufficient basis); *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172 (11th Cir. 2002) (reversing trial court's denial of judgment as a matter of law because amount of damages award was based on speculation and not proven with a reasonable degree of certainty).

No evidence showed that Frankel used any alleged trade secret unjustly to enrichment himself. Frankel unequivocally denied using any of Alpine's and Scottsdale's Confidential Information in working with Chicago Ventures, Iliad Research, and St. George, or any other client. Alpine and Scottsdale offered no evidence refuting Frankel's denial.

The Court permitted Alpine and Scottsdale to question Frankel about commissions and bonuses only if Alpine and Scottsdale established that Frankel received commissions and bonuses from former clients of Alpine and Scottsdale who switched to Vision. Docs 288 and 290. Alpine and Scottsdale offered no evidence that any client switched to Vision.

Alpine and Scottsdale needed (but never obtained) "all the trade runs and stuff at Vision, which customers were ours, how they got over there, and what kind of commissions they did over there" to prove damages. Hurry Dep. 174:14-18 (Doc 115). They ambushed Frankel by disavowing the need for his compensation and then hammering him at trial for their failure to obtain the information and

documents which they needed to prove that Frankel had used Confidential Information unjustly to enrich himself while working with Fife's companies.

Alpine and Scottsdale failed to prove what Frankel did unjustly to enrich himself, when he did it, and what compensation he received by reason of his unproven misconduct.

### C. The Jury Awarded a Patently Incorrect Amount for Unjust Enrichment

The jury rejected Alpine's and Scottsdale's claims for actual damages, but awarded as unjust enrichment damages the $932,000 which Alpine and Scottsdale claimed as their actual damages. If Alpine and Scottsdale had proven that Frankel used their trade secrects unjustly to enrich himself, their unjust enrichment damages could not exceed $264,000, the only evidence of Frankel's compensation.

But even $264,000 could not be a proper measure of unjust enrichment damages because Alpine and Scottsdale failed to prove the extent to which commissions paid by Chicago Ventures, Iliad Research, and St. George funded the $264,000, and of course, Alpine and Scottsdale failed to prove that Frankel's misappropriation generated any compensation over any period of time.

### D. Alpine's and Scottsdale's Damage Ambush Warrants a New Trial on Their Misappropriation Claims

Alpine and Scottsdale steadfastly refused to disclose their damage claims and analysis before trial in compliance with Rule 26(a)(1)(A)(iii) and (e). Frankel's counsel had to try to process and defend the damages computation when it was first handed to Frankel's counsel in the minutes before closing argumetns began.

The information and methodology used by Alpine and Scottsdale to support their undisclosed claim was old information which had been available, obtainable, and disclosable long before trial: Frankel's compensation for 2019; Chicago Ventures', Iliad Research's, and St. George's commissions paid to Vision during the 2 months before Frankel's deposition on August 7, 2019; and Vision's "margin" on commissions. Alpine and Scottsdale had ample opportunity and the obligation to disclose their damage calculations and methodology, and instead chose to ambush Frankel and to exclude the witnesses well known to Alpine and Vision who could refute the ambush.

WHEREFORE, Frankel requests the Court to enter judgment against Alpine and Scottsdale on their misappropriation claim, or reduce their misappropriation judgment to zero, or grant Frankel a new trial on the misappropriation claim, or grant any further any relief deemed proper.

### Certificate of Service and Compliance with Local Rule 3.01(g)

I certify that on June 4, 2021, I caused the foregoing to be filed with CM/ECF, which will send electronic notice to all counsel of record. I further certify that on June 3, 2021, counsel for Defendant conferred by telephone with counsel for Plaintiffs and Plaintiffs do not agree to the relief requested herein.

*s/ David C. Banker, Esquire*
David C. Banker (Fla. Bar No. 352977)
J. Carter Andersen (Fla. Bar No. 0143626)
Harold D. Holder (Fla. Bar No. 118733)
BUSH ROSS, PA
1801 N. Highland Avenue
Tampa, Florida 33602
*Attorneys for Defendant*