UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE HURRY FAMILY REVOCABLE TRUST, SCOTTSDALE CAPITAL ADVISORS CORPORATION; and ALPINE SECURITIES CORPORATION,

Plaintiffs/Counter-Defendants,

CASE NO.: 8:18-cv-02869-VMC-CPT

v.

CHRISTOPHER FRANKEL,

Defendant/Counter-Plaintiff.
_________________________________/

**OPPOSITION TO FRANKEL'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVELY FOR A NEW TRIAL**

Plaintiffs file this opposition to Frankel's Renewed Motion for Judgment as a Matter of Law or Alternatively for a New Trial [Dkt. 328]. In support, Plaintiffs state:

## INTRODUCTION

Frankel raises three grounds that he contends entitle him to judgment as a matter of law under Rule 50(b). He argues that: (1) "Alpine and Scottsdale had no trade secrets;" (2) "Alpine and Scottsdale failed to prove, and no evidence showed, that Frankel obtained any unjust enrichment through misappropriation of Alpine's and Scottsdale's alleged trade secret(s);" and (3) "[t]he jury awarded a patently incorrect amount for the jury's unsupported, unjust enrichment award." [Dkt. 328]. Alternatively, Frankel seeks a new trial under Rule 59(a) "to give Frankel a full and fair … opportunity to refute Alpine's and Scottsdale's unpled, undisclosed, damage

claims, presented for the first time at trial." *Id*.

Contrary to Frankel's assertions, overwhelming evidence supported Plaintiffs' claims, requiring the Court to submit them to the jury. And because the evidence was overwhelming, the jury returned a verdict in Plaintiffs' favor. Accordingly, Frankel's motion for judgment as a matter of law should be denied. Separately, there is no legitimate basis for a new trial. Plaintiffs repeatedly explained their damages theory throughout this case, and any complaints Frankel may have regarding disclosure of a particular calculation were self-inflicted through his discovery gamesmanship. The Court should deny Frankel's motion for a new trial.

## ARGUMENT AND INCORPORATED MEMORANDUM OF LAW

### I. The Standards of Review.

When evaluating a Rule 50(b) motion, a court must determine whether the evidence is "legally sufficient ... to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A party meets this standard only if the evidence and all reasonable inferences from the evidence, viewed in the light most favorable to the nonmoving party, "point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *United States v. Vahlco Corp.*, 720 F.2d 885, 889 (11th Cir. 1983); *see also Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995). This is a heavy burden. *Marlite, Inc. v. Eckenrod*, 2011 WL 39130, at *2 (S.D. Fla. Jan. 5, 2011).

The Eleventh Circuit has stressed that "[i]t is the jury's task—not [the court's]—to weigh conflicting evidence and inferences, and determine the credibility of

witnesses." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (citations and quotations omitted). Moreover, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000).

Under Rule 59, the Court may grant a new trial after a jury trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Those grounds may include that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair ... and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). However, the jury is the fact-finding body that weighs the contradictory evidence and inferences, judges the credibility of witnesses, and draws the ultimate conclusions. *See Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35 (1944) (citations omitted). It is not the function of a court to search the record for conflicting circumstantial evidence to take the case away from the jury. *Id.*

## II. Alpine and Scottdale own multiple trade secrets.

To qualify as a trade secret, (1) the information at issue must derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) the owners of the trade secret must have used reasonable efforts to maintain its secrecy. *See* Fla. Stat. § 688.002(4); 18 U.S.C. § 1839(4). Throughout this

case, Alpine and Scottsdale identified various documents and information that Frankel misappropriated that qualify as trade secrets.[1]

### *A. Alpine's and Scottsdale's information derives independent economic value from not being generally known to and not being readily ascertainable by other persons who can obtain economic value from its disclosure.*

Contrary to Frankel's assertions, Alpine and Scottsdale demonstrated that most of the documents Frankel emailed himself were trade secrets. They further established that those documents derived independent economic value from not being generally known to other persons who can obtain economic value from their disclosure. Accordingly, this Court was required to submit the question to the jury, particularly when construing all reasonable inferences in favor of Plaintiffs.

The timeline of events in this case is telling. Frankel knew a "week or two" in advance that his last day as Alpine's CEO was August 1, 2018. [Dkt. 316 at 152:23-153:13]. The day before his final day as Alpine's CEO and in the weeks after, Frankel forwarded several documents to his personal email addresses:

- July 31, 2018 – a list of Alpine and Scottsdale's top 50 clients with revenue numbers [Dkt. 316 at 100:6-101:7; Pls.' Ex. 31];
- August 8, 2018 – a draft Employment Agreement [Dkt. 316 at 103:16-21; Pls.' Ex. 8];
- September 18, 2018 – an Alpine Secured Revolving Credit Facility Term

[1] Alpine and Scottsdale both brought claims under the Federal Defend Trade Secrets Act ("DTSA") and the Florida Uniform Trade Secrets Act ("FUTSA"). However, because the elements of the claims are nearly identical, this Court should analyze the DTSA and FUTSA together. *Hurry Family Revocable Tr. v. Frankel*, 2019 WL 6311115, at *13 (M.D. Fla. Nov. 25, 2019).

Sheet [Dkt. 316 at 88:13-89:2; Pls.' Ex. 3]; and

- October 7, 2018 – three emails attaching, *inter alia*, Alpine's Written Supervisory Procedures, Alpine's Confidential 2016 Financial Statements with Reports, a document with the number of accounts and value of accounts including information for both Scottsdale and Alpine, and Alpine's bylaws. [Dkt. 316 at 107:25-108:7; 110:4-18; 115:23-116:1; Pls.' Ex 1, 2, 48].

As an initial matter, it's reasonable to infer that the information in these documents derive value from not being generally known or readily ascertainable based on the mere fact that Frankel sent the documents to himself prior to leaving Alpine. If the information had no value or was otherwise readily ascertainable from public sources, Frankel wouldn't have sent the documents to his personal email.

Nevertheless, Alpine and Scottsdale established that they spent considerable resources over the years to develop and improve their employment contracts, rules, procedures, and loan term sheets – all documents Frankel took. [Dkt. 318 at 162:6-163:21]. It's no coincidence that the documents Frankel took would provide a tremendous advantage to someone trying to start their own broker dealer. *Id*. Even Frankel admitted that the information he took would be valuable to Alpine's and Scottsdale's competitors. [Dkt. 316 at 108:13-109:1].

The trade blotter Frankel obtained from Randall Jones [Pls.' Ex. 44 and 46] also included trade secret information. [Dkt. 315 at 132:17-135:17; Dkt. 318 at 159:7-14]. Access to the blotter would enable a competitor to get otherwise unobtainable insight into the businesses, including their risks, costs, revenues, margins, and profitability.

[Dkt. 318 at 155-158:13; 164:8-171:10].

Like with any trade secret, if Alpine's and Scottsdale's trade secrets entered the stream of commerce, Alpine and Scottsdale would lose some competitive advantage. [Dkt. 315 at 81:20-82:2]. Specifically with respect to the top 50 customer list, its release would provide competitors a direct map on who to call and how much their business is worth. [Dkt. 318 at 160:2-17].

Worse yet, if someone had both the top 50 customer list and the trade blotter, they would have a massive advantage in determining the best ways to compete with the companies. [Dkt. 318 at 160:23-161:25; 164:8-171:10]. The top 50 clients, which took decades to develop, represent a large portion of the firms' revenues–as much as 80%–and when combined with the trade blotter, a competitor could determine the risk, profitability, and revenues associated with those clients. *Id.* This potent combination of confidential and trade secret information would enable a competitor to take Alpine's and Scottsdale's business. [Dkt. 318 at 161:21-162:5].

Alpine and Scottsdale also established that their pricing structure and offerings are trade secrets. Alpine and Scottsdale confidentially offer different pricing to different customers based on the scale and quality of their business; better customers get better price terms. [Dkt. 315 at 77:5-25; Dkt. 316 at 73:2-74:14].

Frankel's Motion focuses almost exclusively on Frankel's self-serving testimony that nothing he purloined was a trade secret. But under the Rule 50 standard, this Court should disregard all evidence favorable to Frankel that the jury is not required to believe. *Reeves,* 530 U.S. at 151. And the jury was not required to believe Frankel's

testimony because Alpine and Scottsdale impeached Frankel's testimony and introduced ample evidence to the contrary.

### B. *Alpine and Scottsdale use reasonable efforts to maintain the secrecy of their trade secret information.*

Alpine and Scottsdale employ various methods to protect their trade secret information. For instance, Alpine and Scottsdale: (i) require employees to sign contracts agreeing not to disclose confidential or trade secret information; (ii) require employees to complete compliance questionnaires and undergo training on protecting information; (iii) automatically reset passwords every 60 days; (iv) use firewalls to protect their information technology networks; (v) block problematic websites; (vi) disable features on company computers to prevent burning CDs or loading information onto USB thumb drives; (vii) use physical security systems, requiring employees to use badges to access certain areas within the companies' physical space; (viii) undergo annual security audits; and (ix) engage IT personnel to conduct penetration tests to see if their systems are vulnerable to hackers. [Dkt. 315 at 79:25-82:2; 84:2-21]. Based on these facts, there can be no dispute that the reasonableness of their efforts to protect their trade secrets was an issue to be resolved by the jury. *Godwin Pumps of Am., Inc. v. Ramer*, 2012 WL 1110068, at *7 (M.D. Fla. Apr. 3, 2012) (whether a plaintiff took reasonable steps to protect its trade secrets should be resolved by a fact finder).

### C. *Alpine and Scottsdale developed and possessed trade secrets.*

In conclusion, Alpine and Scottsdale established by the overwhelming weight

of the evidence, including Frankel's own admissions, that they developed and owned multiple trade secrets, each of which Frankel misappropriated. Therefore, the Court should reject Frankel's ludicrous assertion that, as a matter of law, Alpine and Scottsdale "had no trade secrets."

## III. The evidence shows Frankel was unjustly enriched.

Before Frankel lost access to his Alpine email account, he sent himself numerous documents containing Alpine's and Scottsdale's trade secrets. [Pls.' Ex. 1, 2, 3, 8, 31]. And the documents he took provided Frankel a huge advantage in starting Vision's new Corporate Services Group.

Among the trade secrets Frankel took was a list of Alpine's and Scottsdale's top-50 customers, together with the revenues those customers had generated year to date (as of July 2018). [Dkt. 316 at 100:6-101:7; Pls.' Ex. 31]. Frankel then used Alpine's and Scottsdale's trade secret pricing information to entice three of the top 50 customers to Vision by competing on price. [Pls' Ex. 58; Dkt. 316 at 205:3-211:18]. Although Frankel testified that Vision has a fixed, sliding pricing schedule [Dkt. 317 at 133:1-7], he negotiated pricing in an email with the principal of three Alpine and Scottsdale customers and lured them to Vision. [Pls' Ex. 58]. Specifically, Frankel used Scottsdale's pricing as a benchmark and agreed to "rebate the $ back to [them] according to [their] proposal" if they did not find his services to be worth it. [Pls' Ex. 58]. This evidence alone is sufficient for the jury to find that Frankel used Alpine's and Scottsdale's trade secrets to unjustly enrich himself.

Other evidence, along with the reasonable inferences that can be drawn from

the evidence, also showed that Frankel unjustly enriched himself by using Alpine's and Scottsdale's trade secrets. Frankel brought no clients with him when he moved from GunnAllen Securities to COR/Legent, nor did he bring any clients along when he moved from COR/Legent to Alpine. [Dkt. 316 at 211:19-215:3]. Unsurprisingly, things were different when Frankel moved from Alpine to Vision. Armed with Alpine's and Scottsdale's trade secrets, for the first time in his career, Frankel brought millions[2] of dollars of business from Alpine and Scottsdale to Vision. [Dkt. 316 at 215:4-218:23]. Of the clients identified on Alpine's and Scottsdale's top 50 customer list, Frankel admitted that at least 13 of them opened accounts with Vision after his arrival. [Dkt. 316 at 17:12-21:21].

Furthermore, it's reasonable for the jury to infer that Frankel used the other trade secrets he took—such as the employment agreement, credit facility, and written supervisory procedures—to obtain or perform his new job at Vision.

Although Frankel's motion focuses on the fact that he "unequivocally denied using any of Alpine's and Scottsdale's Confidential Information in working with Chicago Ventures, Iliad Research, and St. George, or any other client" (Motion at 23), the jury was free to reject his self-serving testimony that he did nothing wrong, which the jury did in this case. Taking the evidence in the light most favorable to Alpine and Scottsdale, Frankel used trade secrets to lure away at least 13 of Alpine's and

[2] Frankel testified that the three entities controlled by John Fife, all of which were top 50 clients, generated "at least" $100,000.00 per month and "They've had a couple, you know, very large sort of deals that have been done that sort of -- so you probably could look at some months and it might be a little bit less and some months it could be considerably more." [Dkt. 316 at 218:8-23].

Scottsdale's top clients. *See* [Pls' Ex. 58]. In doing so, he unjustly enriched himself.

## IV. The evidence supports the jury's unjust enrichment award.

Determining the proper damages for unjust enrichment in a misappropriation of trade secrets case requires the application of a "flexible and imaginative approach" because "each case is controlled by its own peculiar facts and circumstances." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538-39 (5th Cir. 1974).[3] For that reason, even where "damages are uncertain, ... that uncertainty should [not] preclude recovery; the plaintiff should be afforded every opportunity to prove damages once misappropriation is shown"– assuming, of course, that the plaintiff "introduces evidence by which the jury can value the rights the defendant has obtained." *Univ. Computing*, 504 F.2d at 539, 545. Unjust enrichment damages are not held to the same "reasonable certainty" standard as lost profits. To recover damages for unjust enrichment, "[t]he plaintiff is required to prove the amount of such loss with only as much certainty as is reasonable under the circumstances." *Med. Store, Inc. v. AIG Claim Services, Inc.*, 2003 WL 25669175, at *7 (S.D. Fla. Oct. 17, 2003). Where "some damage is proven and the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Perdue Farms Inc. v. Hook*, 777 So. 2d 1047, 1051 (Fla. 2d DCA 2001) (internal quotations omitted).

Frankel's argument that unjust enrichment damages are limited to his 2019

[3] Fifth Circuit cases decided prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 n.9 (11th Cir. 2007).

compensation demonstrates a fundamental misunderstanding on the law of damages in trade secret cases. The analysis *does not* hinge on how much money went into Frankel's pockets. Rather, there are many ways to measure damages for unjust enrichment. One method is to "measure the value of the secret to the defendant." *Univ. Computing*, 504 F.2d at 536. Another way "awards to the plaintiff the defendant's profits earned on sales that are attributable to the trade secret." *Med. Store, Inc.*, 2003 WL 25669175, at *6. Yet another approach permits the jury to award damages equal to the costs the defendant avoided by misappropriating trade secrets. *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group, Inc.*, 2021 WL 1553926, at *6 (S.D.N.Y. Apr. 20, 2021) (collecting cases).

As discussed above, Alpine and Scottsdale introduced evidence that Frankel used trade secret information to attract three entities to Vision, where, as of the date of Frankel's deposition, they generated approximately $100,000.00 per month in revenue at an approximately 40-50% margin. [Dkt. 316 at 218:8-23; Dkt. 318 at 23:10-24:4; Pls' Ex. 58]. And Frankel testified that the entities continued to do "at least that" amount of business through the date of trial. [Dkt. 316 at 218:8-23].

Frankel joined Vision in June 2019, entered into a contract with Vision dated July 9, 2019, and still worked there while the trial proceeded. [Dkt. 316 at 87:3-10; Pls. Ex. 67]. Looking at the period from July 9, 2019, until April 30, 2021 (the date of closing argument) and assuming that Chicago Ventures, Iliad Research, and St.

George generated about $100,000.00 a month in revenue,[4] those entities would have generated about $2,070,967.74 in revenue. At a 45% margin, those top customers would have generated $931,935.48 in net revenue—or would have generated a similar amount for Alpine and Scottsdale had Frankel not lured them away. Based on that, a jury could reasonably conclude that $932,000.00 fairly represents the value of the top 50 customer list, especially when combined with the trade blotter and the other trade secret information Frankel took.

Whether Frankel actually received the $932,000.00 the jury awarded is immaterial—Frankel's failure to actually realize the benefit of the pilfered information does not insulate him from liability. *Univ. Computing Co.*, 504 F.2d at 536 ("the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves.").

Alpine and Scottsdale also proved that Frankel diverted to Vision another ten clients on Alpine's and Scottsdale's top-50 customer list. [Dkt. 316 at 17:12-21:21]. Given that Frankel has never brought clients with him when changing jobs before, the jury was free to draw the inference that Frankel used trade secret information to do so. Further, the top-50 customer list Frankel misappropriated included the revenues those customers generated for Alpine and Scottsdale from January 1, 2018, through July 31, 2018. This evidence provided the jury with more information it could rely on to infer

[4] Based on Frankel's testimony cited in footnote 3, this number is probably on the lower end of the revenue the entities actually generated. Any precision with these numbers was hampered by Frankel's selective memory on the witness stand at trial.

or approximate the value of the stolen trade secrets.

Ultimately, Alpine and Scottsdale introduced evidence sufficient for the jury to award a broad range of unjust enrichment damages. There is no set formula to determine the value of the unjust enrichment Frankel enjoyed by misappropriating trade secrets. Alpine and Scottsdale placed evidence before the jury and the jury decided the appropriate number. "The ultimate determination of the amount of damages was in the domain of the jury." *Perdue Farms Inc.*, 777 So. 2d at 1052. Even if the Court disagrees with the jury's assessment of damages, it has no general authority to reduce the amount of a jury's verdict. *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1328 (11th Cir. 1999).

Frankel has failed to meet the heavy burden needed for a judgment as a matter of law. His renewed motion for judgment as a matter of law should be denied.

## V. There is no legally sufficient basis to grant a new trial.

From the early stages of this case, Frankel (and his attorneys) decided to play tactical discovery games in an effort to prevent Alpine and Scottsdale from developing evidence to prove their damages. Despite Frankel's efforts and nominal success in the discovery phase of this litigation, Alpine and Scottsdale elicited the evidence to support their unjust enrichment claim *from Frankel* at trial within the bounds of this Court's orders. Although the damages issue has been previously addressed on multiple occasions, Frankel now claims that Plaintiffs' damages presentation was an "ambush." In truth, Frankel made the tactical decision to engage in discovery gamesmanship rather than allow for full and fair discovery. His decision proved unsuccessful. Frankel

now seeks to avoid the consequences of his strategy decisions by requesting a new trial.

### *A. History of the dispute on damages*

From the outset of this case, Frankel knew Plaintiffs were seeking unjust enrichment damages. On February 1, 2019, Plaintiffs served Initial Disclosures stating that they would seek "[d]isgorgement of Defendant's unjust enrichment." *See* [Dkt. 35-2]. At Frankel's deposition, Plaintiffs learned he generated over $200,000 in business from Alpine/Scottsdale customers while working for Vision. Plaintiffs also served a subpoena on Vison seeking documents that would support Plaintiffs' damages claim. But Frankel had other ideas.

After receiving notice of the Vision subpoena, Frankel emailed Vision advising that he would tell Plaintiffs to "buzz off" and make them go to Connecticut to get a court order. [Pls. Ex. 59]. Vision followed Frankel's advice and effectively told Plaintiffs to "buzz off."

At first, Vision claimed it was preparing emails for production based on the agreed, narrowed scope of the subpoena.[5] Vision then refused to produce documents. As a result, Plaintiffs filed an enforcement action in a different jurisdiction, which was transferred to this district where Judge Tuite ordered Vision to comply with the subpoena. *See* footnote 5 at [Dkt. 29]. On January 21, 2020—months after the discovery cutoff and six months after being served with the subpoena—Vision

---

[5] Following a discovery fight between Frankel and Plaintiffs, the parties agreed on a revised scope of the Vision subpoena that was then conveyed to Vision. *See* Dkts. 76, 101, 102; *The Hurry Family Revocable Trust, et al. v. Frankel,* Case No. 8:19-mc-114-T-33CPT (M.D. Fla.) at Dkt. 4 (attaching emails between Vision and Plaintiffs)

produced documents. When confronted with the "buzz off" email during trial, Defendant outrageously proclaimed he would "do it again in the same way." [Dkt. 316 at 223:4-18].

Prior to Vision's document production, Frankel filed a motion in limine arguing that Plaintiffs failed to disclose any evidence of damages in discovery. [Dkt. 148]. On January 8, 2020, still without the benefit of the Vision documents, Plaintiffs filed a response. [Dkt. 158]. On January 15, 2020— before Vision produced its documents— the parties filed a Replacement Joint Pretrial Statement ("Pretrial Statement") [Dkt. 170] where Plaintiffs described how they would prove unjust enrichment:

> This proof will include the fact that Frankel himself testified that he called on Alpine and SCA customers and in fact did business with them, and attempted to do business with others. Frankel himself admitted doing over $200,000 in business with an Alpine/ SCA customer that he confused [sic] had never known prior to working at Alpine / SCA.

The Vision documents established that Frankel failed to produce several relevant emails and withheld his contract with Vision, which included evidence relevant to unjust enrichment damages. Accordingly, on March 9, 2020, Plaintiffs filed a motion for sanctions and to reopen discovery [Dkt. 189] ("Motion for Sanctions") seeking discovery related to Plaintiffs' damages and information regarding Frankel's compensation. *See* [Dkt. 189].

On March 11, 2020—still more than a year before this trial occurred—the Court held a hearing on the Motion for Sanctions, during which Plaintiffs' counsel reiterated Plaintiffs' damages theory based on Frankel's compensation:

> But, Judge, with respect to compensation, let's not talk about his financial

> information in these broad terms. If he moved clients of ours over to Vision and those clients were subject to a commission or bonus agreement that he was paid on because he brought them over and they were originating, they are certainly relevant. It's relevant to unjust enrichment damages, the recission damages. That's the whole premise of hav[ing] a money damages case as opposed to injunctive relief. He moved the clients. He broke the law doing it, and we get the money he made off of it. That's what it would be relevant to, and that's why we asked for it.

Dkt. 203 at 66. Following the hearing, the Court reopened discovery for limited purposes, requiring Frankel to produce certain documents and to sit for a second deposition on limited topics.

On April 3, 2020, Defendant appeared for his supplemental deposition. However, Frankel refused to answer questions about his compensation, not based on an instruction from counsel, but instead based on his unilateral determination that he would not provide certain answers in his deposition.

On June 26, 2020, the Court held a hearing on Defendant's motion in limine related to damages and considered the issue under Rule 37(c).[6] Defendant argued that Plaintiffs should not be able to present any evidence of damages because they failed to disclose damages calculations pursuant to Rule 26—an argument nearly identical to his basis for a new trial—and argued that none of the documents or testimony related to Vision should be permitted at trial. Plaintiffs countered that they were justified in their approach because Defendant had obstructed discovery on the issue, and stated

[6] On December 16, 2019, Defendant filed a motion in limine predicated on Rule 37 arguing that Plaintiffs failed to disclose any evidence of damages in discovery so no such evidence should be permitted. [Dkt. 148]. On January 8, 2020, Plaintiffs filed their response. [Dkt. 158]. Following Defendant's second deposition, Plaintiffs filed a supplement to their response [Dkt. 218] to raise facts and issues created by Defendant's deposition for the Court's consideration when ruling on Defendant's motion in limine.

that they intended to use Vision documents and questions from Frankel's second deposition. Dkt. 232 at 36-37. At the hearing, the Court noted:

> I tend to agree that the Vision documents should be part of the trial based on what I'm hearing today . . . So, for instance, we have got – if document and testimony on damages evidence which were produced during regular discovery and the Vision documents in deposition, I'm not certain what would be wrong with having that be part of the trial.
>
> …
>
> All right. Here's what I think. I think that regular discovery documents that were produced under Rule 26 and Vision documents that were produced after this Court's order can come in. Those documents are part of the case per my order, per Judge Tuite's order. I think anything else with respect to damages that hasn't been produced, it's not coming in. So that's my ruling.

*Id.* at 37-38; 52; *see also* [Dkt. 230].

Notwithstanding the Court's ruling, ten months later at the final Pretrial conference, Frankel argued that Plaintiffs were not allowed to present any evidence of damages at trial. *See* April 23, 2021 Hearing Tr. at 82-88 attached as Exhibit A. Recognizing that the issue had previously been addressed, the Court stated, "I mean, I ruled on these motions in limine. I will look at them again over the next hour so." *Id.* at 87-88.

Undeterred, and on the eve of trial, Frankel filed a new motion to prohibit damages evidence [Dkt. 279], which relied upon Rule 37(c) and raised the same arguments set forth in the motion in limine. Plaintiffs' response in opposition to Frankel's motion [Dkt. 281] explained that Frankel's new motion regurgitated the motion in limine the Court had already ruled on and noted that any failure to disclose a damages computation was substantially justified based on Defendant's discovery conduct.

Although it had previously ruled on the issue, the Court carefully considered the parties' briefs and heard extensive argument from counsel. *See* [Dkt. 315 at 57:14-65:24; Dkt. 316 at 5:7-29:8]. The Court then entered its order on the issue consistent with its ruling months earlier. [Dkt. 288, 290]. The Court's order prohibited damages evidence, other than a narrow exception the Court felt was justified, presumably based on the discovery misconduct. Plaintiffs then laid a foundation and elicited the precise type of testimony contemplated by the narrow exception set forth in Court's order to support its damages claim.

***B. Frankel was not "ambushed" by Plaintiffs' damages theory.***

Frankel has known Plaintiffs' damages theory from the outset of the case. Plaintiffs' initial disclosures explained that they would be seeking unjust enrichment damages. The joint pretrial statement—filed over 15 months before the trial—explained that the damages would include the business Frankel took to Vision. At a hearing 13 months before trial, Plaintiffs explained their unjust enrichment theory. At a hearing ten months before trial, Plaintiffs explained they would use the Vision documents, Frankel's deposition testimony, and testimony about his compensation to prove damages at trial. At that same hearing, the Court ruled that the Vision documents would be part of the damages case. Ambushes rely on the element of surprise; here there was no surprise, just Defendant's failure to prepare his case.

***C. The Court had discretion to permit the damages evidence it allowed.***

Pursuant Rule 37(c), a party cannot use information or witnesses it failed to disclose as required by Rule 26(a) or (e), "unless the failure was substantially justified

or is harmless." "[T]he district court has broad discretion in deciding whether the failure to disclose evidence is substantially justified or harmless under Rule 37(c)(1)." *Engle v. Taco Bell of Am., Inc.*, 2011 WL 883639, at *1 (M.D. Fla. Mar. 14, 2011) (internal quotation omitted).

To the extent Plaintiffs had an obligation to disclose a damages calculation,[7] their failure to do so was substantially justified by Frankel's discovery misconduct. Frankel worked diligently to prevent Plaintiffs from discovering damages information. When Plaintiffs asked for information about Frankel's compensation, he objected. When Plaintiffs subpoenaed Frankel's employer, at Frankel's suggestion, they objected. Then it took six months to get documents from Vision. When Plaintiffs deposed Frankel a second time and asked questions about his compensation, he refused to answer. When Plaintiffs sought to extend discovery deadlines, Frankel objected. Frankel's repeated obstruction of full and fair discovery is apparent.[8] As such, to the extent Plaintiffs' Rule 26 disclosures were deficient, Plaintiffs' failure to supplement those disclosures is substantially justified.

***D. The Court properly excluded Jarvis and Fife.***

Under the same Rule 37(c) standard noted above, the Court has broad discretion

---

[7] The committee notes to Rule 26 provide that a party's obligation to provide a damages calculation applies "only with respect to documents then reasonably available to it" and explain that "a party would not be expected to provide a calculation of damages which . . . depends on information in the possession of another person or party." *See* Rule 26, committee notes. Here, all of the damages evidence elicited at trial was in Frankel's possession and came from Frankel himself. As such, Plaintiffs should not have been expected to provide a damages calculation based on this information.

[8] Nonetheless, Defendant astonishingly suggests that the exact information that he shielded from discovery—Frankel's compensation for 2019, commissions paid to Vision, and Vison's margins on commissions—was "available, obtainable, and disclosable long before trial."

to exclude witnesses who were not disclosed pursuant to Rule 26. Frankel did not disclose Jarvis or Fife in his Rule 26 disclosures. Further, substantial portions of their proffered testimony would have been inadmissible as hearsay and/or expert testimony. Accordingly, the Court was well within its discretion to exclude them from testifying. Moreover, there is no basis to conclude the proffered testimony would have had any significant impact on the outcome of the case; thus, Frankel did not suffer any prejudice or injustice as a result of the Court's ruling and such ruling was harmless.

Frankel has failed to establish he is entitled to a new trial.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request this Court enter an order denying Frankel's motion and granting such further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Kenneth G. Turkel
Kenneth G. Turkel – FBN 867233
E-mail: kturkel@bajocuva.com
David A. Hayes – FBN 96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel: (813) 443-2199; Fax: (813) 443-2193
and

Kristin A. Norse - FBN 0965634
KNorse@kmf-law.com
Katherine Earle Yanes - FBN 0159727
KYanes@kmf-law.com
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, Florida 33601
Tel: (813) 229-1118; Fax: (813) 221-6750
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 25, 2021, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

/s/ Kenneth G. Turkel
Attorney