## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

THE HURRY FAMILY REVOCABLE
TRUST, SCOTTSDALE CAPITAL
ADVISORS CORPORATION and
ALPINE SECURITIES
CORPORATION,

     Plaintiffs,

v.                                 Case No: 8:18-cv-2869-CEH-CPT

CHRISTOPHER FRANKEL,

     Defendant.

_____/

## <u>O R D E R</u>

     This matter comes before the Court upon Frankel's Renewed Motion for Judgment as a Matter of Law or Alternatively for a New Trial [Doc. 328], Plaintiffs' Opposition [Doc. 332], Frankel's Reply in Support of Judgment as a Matter of Law [Doc. 343], and the arguments of counsel at the hearing on February 25, 2022.  In his motion, Defendant Christopher Frankel argues that he is entitled to judgment as a matter of law because Plaintiffs' Alpine and Scottsdale had no trade secrets; no evidence showed he was unjustly enriched through misappropriating the purported trade secrets; and the award was patently unjust. [Doc. 328 at p. 1]. The Court, having considered the motion and being fully advised in the premises, will **DENY** Frankel's Renewed Motion for Judgment as a Matter of Law or Alternatively for a New Trial.

# I.   BACKGROUND

Plaintiffs, Scottsdale Capital Advisors and Alpine Securities Corporation are each involved in the broker-dealer business. [Doc. 61 ¶ 10]. Scottsdale is a full-service broker-dealer focused on serving the OTC (over-the-counter) securities market. *Id.* Alpine is a registered broker-dealer that is an industry leader for clearing OTC stock. *Id.* Scottsdale and Alpine were previously indirectly owned and/or controlled by Plaintiff, The Hurry Family Revocable Trust. *Id.* Defendant Christopher Frankel served as Alpine's CEO from approximately July 2015 through July 2018, and then as a consultant from July 2018 through September 2018. *Id.* ¶ 17. He joined Vision Financial Markets, LLC, in June 2019 as VP/Managing Director of Corporate Services Group and Correspondent Services. [Doc. 316 at 87:3-10].

In this action, Plaintiffs asserted claims against Defendant for breach of contract and misappropriation of trade secrets in violation of the Defend Trade Secrets Act and the Florida Uniform Trade Secret Act. [Doc. 61].[1] Defendant filed counterclaims for declaratory judgment—that he did not breach the agreements at issue or misappropriate Plaintiffs' trade secrets and/or confidential information—and

---

[1] Count I is the Hurry Family Revocable Trust's claim against Defendant for breach of the Non-Disclosure and Confidentiality Agreement (Original NDA). In Count II, Scottsdale and Alpine assert a claim against Defendant for breach of the Employee Nondisclosure & Computer Use Agreement (Employee NDA). Scottsdale and Alpine assert that Defendant violated the Defendant Trade Secrets Act in Count III and the Florida Uniform Trade Secrets Act in Count IV. As the motion seeks relief only as to the misappropriation claims, the reference to Plaintiffs is to Alpine and Scottsdale.

malicious prosecution.[2] [Doc. 95]. Defendant moved for summary judgment on August 23, 2019, and the motion was denied on November 25, 2019. [Docs. 114, 139].

The matter was tried before a jury over five days, from April 26, 2021, through April 30, 2021. [Docs. 315, 316, 317, 318, 319]. At the conclusion of the evidence, Defendant moved for a directed verdict, arguing Plaintiffs failed to prove damages and the existence of trade secrets. [Doc 318 at 248:16–249: 17]. The court reserved ruling pending a verdict. *Id.* at 254: 20–255: 3. The jury returned a verdict for Defendant on the breach of contract claims and for Plaintiffs as to misappropriation of trade secrets.[3] [Doc. 302]. As to the breach of contract claims, the jury found that Defendant had breached obligations under the contracts but had caused no damage to Plaintiffs. *Id.* at pp. 1-4. The jury also found that Defendant's misappropriation of trade secrets did not cause any damage, but they found that Defendant had been unjustly enriched in the amount of $932,000 as a result. *Id.* at pp. 4-5. The Court therefore entered a judgment in favor of Defendant on the breach of contract claims and in favor of Plaintiffs for misappropriation of trade secrets. [Doc. 304].

Defendant has renewed his motion for judgment as a matter of law and, in the alternative, seeks a new trial. [Doc. 328]. He argues that he is entitled to judgment as a matter of law because Plaintiffs Alpine and Scottsdale had no trade secrets; they

---

[2] The claim for malicious prosecution was asserted against Cayman Securities Clearing and Trading Ltd.

[3] The Court notes that the verdict form contains one count for misappropriation of trade secrets and does not specify either of the two statutes identified in the complaint. Regardless, as explained below, the elements are the same.

failed to prove, and no evidence showed, that he obtained any unjust enrichment through misappropriation of their alleged trade secrets; and the jury awarded a patently incorrect amount for their unsupported, unjust enrichment award. *Id.* at p. 1. He specifically identifies four documents—the loan term sheet loan [Doc. 369-9]; Ken Ralston's draft employment agreement [Doc. 369-10]; Alpine's list of top 50 clients based on commissions paid during the first half of 2018 [Doc. 369-12]; and JX 5, the anonymous blotter [Doc. 369-16]—and explains why each is not a trade secret. *Id.* at pp. 21-22. As to the award of unjust enrichment, Defendant argues that no evidence showed he used any alleged trade secret to enrich himself; how he enriched himself; when he did so; and what compensation he received as a result. *Id.* at pp. 23-24. Lastly, he argues that the amount awarded for unjust enrichment, $932,000, is patently incorrect as it is the amount Plaintiffs had claimed as actual damages. *Id.* at p. 24. In fact, he argues that Plaintiffs failed to prove the alleged misappropriation generated any compensation over any period of time. *Id.* at p. 24. Lastly, he argues that he is entitled to a new trial because Plaintiffs ambushed him at trial with damage calculations and methodology that was not disclosed prior to trial and chose to exclude his witnesses who could refute their claim. *Id.* at pp. 24-25.

    In their response, Plaintiffs contend that because overwhelming evidence supported their claims, the Court was required to submit them to the jury. [Doc. 332 at p. 2].  More specifically, Plaintiffs point to evidence that they spent considerable resources over the years to develop and improve the documents Defendant took and that these documents would provide a tremendous advantage to someone trying to

4

start their own broker dealer-business. *Id.* at pp. 3-7. They also point to evidence of the various methods they employed to protect this information. *Id.* at p. 7. On the issue of unjust enrichment, Plaintiffs contend that the documents Defendant took from them provided him with a huge advantage in starting the Corporate Services Group for his new employer, Vision Financial Markets, LLC, and he used the information to lure customers to Vision, thereby enriching himself unjustly. *Id.* at pp. 8-10. As to the amount awarded for unjust enrichment, they contend that they are required to prove the amount of such loss with only as much certainty as is reasonable under the circumstances and based on the evidence regarding revenue generated from Chicago Venture Partners, Iliad Research, and St. George Investments for the period from July 9, 2019, until April 30, 2021, a jury could reasonably conclude that $932,000 fairly represents the value of the top 50 customer list, especially when combined with some of the other trade secret information taken by Defendant. *Id.* at pp. 10-13.

Plaintiffs further contend that there is no legitimate basis for a new trial as they repeatedly explained their damages theory throughout the case. *Id.* at p. 2. They explain that Defendant was not ambushed by their damages theory as he knew from the onset of the case that they were seeking unjust enrichment damages; they explained in the Joint Pretrial Statement how they would prove unjust enrichment; reiterated their damages theory at a hearing on a motion for sanctions and to reopen discovery; and argued at the June 26, 2020 hearing on Defendant's motion in limine that they were justified in failing to disclose damages calculations pursuant to Rule 26 because Defendant had obstructed discovery on the issue, again indicating their intent to use

Vision documents and questions from Frankel's second deposition in establishing unjust enrichment. *Id.* at pp. 14-18. Furthermore, Plaintiffs specifically contend that Defendant worked diligently to prevent them from discovering damages information and this substantially justified their failure to disclose a damages calculation, to the extent they were required to do so. *Id.* at pp. 18-19. At the same time, Plaintiffs contend that Defendant did not disclose experts Jarvis or Fife in his Rule 26 disclosures and substantial portions of their testimony would have been inadmissible as hearsay, so the Court was well within its discretion to exclude them. *Id.* at pp. 19-20. Plaintiffs further contend that there is no basis to conclude their testimony would have had any significant impact on the outcome of the case such that Defendant was prejudiced by their exclusion. *Id.* at p. 20.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) permits the court to grant judgment as a matter of law against a party "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Pursuant to rule 50(b), a party may renew a motion for judgment as a matter of law after trial, if such a motion is filed no later than 28 days after entry of judgment. Fed. R. Civ. P. 50(b). A court may grant a motion for judgment as a matter of law only if, after examining "all evidence in a light most favorable to the non-moving party," it determines that "there is no legally sufficient evidentiary basis for a reasonable jury to find" for that party. *Aronowitz v. Health-Chem. Corp.*, 513 F.3d 1229, 1236-37 (11th Cir.

6

2008); *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1310-11 (11th Cir. 2019); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004).

In conducting a Rule 50 analysis, the court must refrain from invading the province of the jury. Indeed, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Cleveland*, 369 F.3d at 1193. A court may "not second-guess the jury or substitute" its judgment for that of the jury if the jury's verdict is supported by sufficient evidence. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001); *Luxottica Grp*, 932 F.3d at 1311. "The district court must deny the motion 'if substantial evidence exists in opposition to the motion such that reasonable people, exercising impartial judgment, might reach differing conclusions.' " *United States v. Approximately $299,873.70 Seized From a Bank of Am. Acct.*, 15 F.4th 1332, 1342 (11th Cir. 2021) (quoting *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130 (11th Cir. 2018)).

"Where alternative motions for judgment as a matter of law and for new trial are presented, the court should rule first on the motion for judgment, and 'whatever his ruling thereon he should also rule on the motion for a new trial, indicating the grounds of his decision.' " *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1246 (M.D. Fla. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 253 (1940)). Pursuant to Rule 59(a), Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a

7

new trial on all or some of the issues--and to any party. . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The Supreme Court has noted that a party may seek a new trial on grounds that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward*, 311 U.S. at 251. "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of evidence." *Lipphardt*, 267 F.3d at 1186; *see Redd v. City of Pheonix City, Ala.*, 934 F.2d 1211, 1215 (11th Cir. 1991) ("When there is some support for a jury's verdict, it is irrelevant what we or the district judge would have concluded."). To make this determination, the trial judge must independently weigh the evidence favoring the jury verdict against the evidence in favor of the moving party. *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982). A trial judge should not substitute her own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury. *Id.* at 973, n.7.

## III. DISCUSSION

The Court will first address the request for a judgment as a matter of law on the issues regarding the existence of trade secrets and the award of damages to Plaintiffs for unjust enrichment from Defendant's misappropriation of their trade secrets. As

such, the Court will examine the evidence presented by the parties at the trial in this matter. The Court will then address whether a new trial is warranted.

### Judgment as a Matter of Law

### a. Trade Secrets

The complaint asserts claims for misappropriation of trade secrets in violation of both federal and Florida law. Both statutes require proof of the same elements to establish a trade secret. The information (i) must derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *See* Fla. Stat. § 688.002(4); 18 U.S.C. § 1839(3). "[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.' " *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) (quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1298-99 (11th Cir. 2018)).

### The Information

At trial, Defendant admitted that he forwarded the following items to his personal email address: a list of Alpine and Scottsdale's top 50 clients with revenue numbers [Doc. 316 at 100:6-101:7; Doc. 369-12]; a draft Employment Agreement [Doc. 316 at 103:16-21; Doc. 369-10]; an Alpine Secured Revolving Credit Facility Term Sheet [Doc. 316 at 88:13-89:2; Doc. 369-9]; and emails attaching, *inter alia*, Alpine's Written Supervisory Procedures, Alpine's Confidential 2016 Financial

Statements with Reports, and Alpine's bylaws. [Doc. 316 at 110:4-111:18; 115:20-116:20; Docs. 369-1 through 369-7; Doc. 369-8]. He also acknowledged that he received a trade blotter from Randy Jones, who was working with either Alpine or Scottsdale at the time. [Doc. 316 at 136:12-137:11; Docs. 369-16, 369-18].

### i.    Trade Blotter

Plaintiffs' corporate representative, John Hurry, testified at trial. [Doc. 318 at 177:3-8]. According to the testimony of Mr. Hurry, "a trade blotter is kind of like the blood, the heart of a business." *Id.* at 155:21-22. It would include "the quantity of shares, the price and the symbol, whether it was bought, whether it's sold, . . . trade date, and in some cases settlement date"—but could have more or less information. *Id.* at 155:8-15. Someone in the industry could tell a lot about a business, including its profitability, margins, costs, and revenue sources by looking at the business' trade blotter. *Id.* at 158:2-13. One could use a trade blotter to calculate payments for order flow, estimates for commissions, risks of the business, costs of the business, gross revenue of the business, and transactional fees. *Id.* at 155:19-156:4, 156:21-157:1. Scottsdale and Alpine's General Counsel, Michael Cruz, also presented evidence as to the value of the trade blotter. [Doc. 315 at 69:25-70:18]. He explained that the information in a trade blotter has a lot of significant value to start a business and gives a potential competitor an advantage to step into the marketplace immediately and begin competing. *Id.* at 132:22-134:8.

In reply, Defendant cites testimony from Mr. Cruz that it is impossible to know from the blotter which customer and broker were involved in the trades and the type

of trade. [Doc. 316 at 44:15-46:4]. Additionally, Defendant testified that he does not know who are the customers listed on the blotter. [Doc. 317:15-25]. He also testified that Plaintiffs cleared securities through Vision for quite some time, since at least the beginning of 2020, and offered far more information than is given on the trade blotter, including "detailed trade information about the customer, the price, the security and everything." [Doc. 316 at 50:1-20, 60:11-17].

ii.     *Top 50 Client List*

Mr. Hurry testified that the top 50 client list contained year to date commissions of Plaintiffs' top 50 customers. [Doc. 318 at 159:7-14]. The clients on the list generate "far more than just a simple majority" of Plaintiffs' revenue and the information presented would allow someone to know "who the biggest customers are and their business . . . the risk of the business, the profitability of the business, and the revenue of the business." *Id.* at 161:3-11. It took tens of years to build up the kinds of relationship Hurry had with customers on the list and to generate the kind of business reflected by the list. *Id.* at 161:15-18. Mr. Hurry further testified that the information was considered proprietary and confidential because it would give someone a direct map on who to call on. *Id.* at 160:2-13. In fact, they would never want a competitor to have this information and would never make this information available to the public. *Id.* at 160:14-17; 161:21-25. Mr. Hurry further explained that if someone had possession of this information together with its proprietary trade blotter, they would have a "massive advantage" in competing with Plaintiffs and could just take Plaintiffs' business. *Id.* at 160:18-161:1; 161:21-162:5.

To support his request for judgment as a matter of law, Defendant points to his testimony that the Top 50 Client List is not a special list that is developed by marketing strategy or analysis to identify a particular type of customer that would be inclined to buy or do business with Alpine. [Doc. 317 at 100:17-21, 101:13-15]. In fact, he testified that "who these customers are and the fact that they engage in this type of business is pretty well-known if you're in the space," and "finding them is pretty doggone easy." *Id.* at 100:21-23; Doc. 316 at 254:25-255:6. He knew of at least half of the accounts before he started at Alpine. [Doc. 317 at 99:11-100:2]. Defendant specifically testified that he knew about Chicago Venture because "they had accounts at the firm that [he] was the CEO of, COR Clearing," and because they are regularly engaged in financings in the microcap business. [Doc. 318 at 57:16-58:9]. Additionally, he testified that Chicago Venture had tried to open an account with Vision in January 2019. *Id.* at 56:22-25.

### iii.   *Pricing Structure*

Plaintiffs contend that their pricing structure and offerings are trade secrets and that they confidentially offer different pricing to different customers based on the scale and quantity of their business. [Doc. 332 at p. 6]. Mr. Cruz testified that because a lot of its customers have accounts at other firms, knowledge of "what they do, . . . the stocks they trade in, [and] how they trade" could give Plaintiffs an advantage in negotiating pricing with its customers and how much they do. [Doc. 315 at 77:7-21]. He further testified that while fees stay pretty consistent, Plaintiffs' best customers receive better rates than those published on the website. [Doc. 316 at 73:3-11]. He

12

explains that some customers bring in low quality business that may require more time for due diligence and there is a price that goes into that. *Id.* at 73:13-21. At the same time, he explained that some transactions go smoothly and that Plaintiffs can give those customers a very good rate in order to attract them. *Id.* at 73:21-74:2. Plaintiffs' bigger, better customers are more likely to get better rates. *Id.* at 74:18-22. The schedules or commissions that would be used in those situations would not be published online but are negotiated on a case-by-case basis. *Id.* at 74:3-6. If a competitor had knowledge of this information, they would have a "huge advantage" in being able to undercut Plaintiffs' price to take the business. *Id.* at 74:7-14. In reply, Defendant cites his testimony that Alpine publishes their fee schedule on their website. [Doc. 316 at 52:17-19; Doc. 317 at 28:11-29:13; Doc. 303-1 at pp. 5-6].

### iv. *Employment Contracts, Rules, Procedures, and Loan Term Sheets*

Plaintiffs also contend that their contracts, rules and procedures, and financial statements are proprietary and confidential documents. [Doc. 318 at 162:6-12]. These documents "would be really helpful, if not extraordinarily helpful, to start a firm." *Id.* at 162:6-16. Mr. Hurry explained that its <u>contracts</u> are expensive to develop and its rules and procedures involve an ongoing effort as every time something changes they have to be updated. *Id.* at 162:6-163:17. He further testified that if someone wanted to create their own broker-dealer firm to compete with Plaintiffs and had all of those documents, "[t]hey would be at a very big distinct advantage." *Id.* at 163:18-21.

As to the <u>loan term sheet</u> [Doc. 369-9], Cruz explained that it is a term sheet for a secure revolving line of credit and that at the time, Alpine's holding company was

seeking to raise capital to provide funding capacity for Alpine to clear trades. [Doc. 315:116:1-21]. The purpose of the term sheet was to help Alpine meet certain liquidity requirements to clear trades through the Depository Trust and Clearing Corporation, which acts as a national clearing corporation to facilitate the electronic trading of securities. *Id.* 117:23-25; 73:13-74:6. Cruz further testified that "as a matter of practice . . . a term sheet is typically internal, confidential, until it's . . . finalized in the form of an offering document." *Id.* at 118:24-119:6. The record reflects testimony from Defendant that confidentiality never entered his mind as to that document. [Doc. 317 at 217:11-218:4]. However, he admitted that he does not know anywhere in the public where he can get this information if it is not voluntarily disseminated by the owner. *Id.* at 218:23-219:5.

Mr. Cruz also offered testimony that Plaintiffs' <u>Written Supervisory Procedures</u> (WSPs) are pared for their business and regulatory environment. [Doc. 315 at 79:11-24]. He explained that WSPs "grows year after year through regulatory exams and case law that comes out," and becomes a living breathing document. *Id.* at 78:24-79:17]. According to Cruz, if he was working at another firm and had to go create one, he "couldn't just download somebody else's WSPs." *Id.* at 79:18-24. This is because it requires "a lot of legal sort of . . . analysis of the business." *Id.*

To refute Plaintiffs' claim that the Written Supervisory Procedures are trade secrets, Defendant cites Cruz's admission on cross examination that the template used for this document "came from Wolters Kluwer, which is one of the publishers that offers broker-dealers these massive documents that are WSPs." [Doc. 315 at 168:18-

169:12]. Cruz indicated that Defendant helped tweak the form for things unique to the firm. *Id.* at 169:13-17.

As to the <u>financial information</u> at issue, the record reflects that Defendant emailed himself a list of financial documents, including "Alpine Securities 2016 Financial Statements With Reports -Confidential," which described accounts payable, policy numbers of accounts and amounts firm by firm. [Doc. 316 at 110:7-111:6, 117:8-17; Doc. 317 at 213:9-214:7]. At trial, Defendant acknowledged that many of these attachments are confidential. *Id.* at 114: 24-115:9. Cruz presented testimony that Plaintiffs would not disclose either their audit or financial statements to third parties unless there was some business purpose and there was a non-disclosure agreement. [Doc. 315 at 156:3-8].

However, Defendant points out in his reply that Cruz admitted at trial that a short version of Alpine's audit, excluding cashflows and income statement, is published on the Securities and Exchange Commission's website. [Doc. 316 at 52:20-53:15]. Cruz also acknowledged that interim six-month financial statements is published on Alpine's website, which includes balance sheet information and net capital calculation. *Id.* at 53:16-54:20.

<u>Measures to Protect</u>

Plaintiffs provided evidence that they try to prevent their confidential information from entering the stream of commerce. [Doc. 315 at 81:20-82:2]. According to Cruz, Plaintiffs take steps at different levels to protect their confidential information. *Id.* at 79:25-80:3. He explained that "anyone who comes on board . . . is

15

required to sign an agreement, . . . the employee computer use agreement" and that the employee handbook, the WSP manual, reinforces that Plaintiffs' information is important to Plaintiffs and is confidential, and they should protect it. *Id.* at 80:3-11. Additionally, each employee is required to fill out and complete a compliance questionnaire, each year, acknowledging receipt of the WSP manual, that they understand it, that they have not disclosed any confidential information, and that they have complied with their obligations. *Id.* at 80:12-19. Employees also receive annual training in modules including "customer protection information, Reg S-P, [and] privacy." *Id.* at 80:20-81:2.

Cruz further testified that systematic protections are also in place to protect Plaintiffs' information. *Id.* at 81:3. He described these protections as follows:

> We have servers and computer systems from our IT department that are designed with firewalls, we block access to many websites, we restrict access to websites that have personal e-mail and we block them. Like, you know, if you wanted to log into your Gmail account at work, that's -- you know, that's blocked, that's prohibited, unless you have a need for that, and that's approved on a case-by-case basis, but, you know, generally all that is blocked.
>
> Our computers themselves, the CDs, unless you're a compliance person or a legal person like me and you burn CDs to produce to regulators or respond to subpoenas, you know, you don't have access to your CD burner on your computer. Same thing with thumb drives. You know, there's -- you know, there are things that are listed out on both firms' procedures that really spell out all those steps.

*Id.* at 81:3-16; 94:3-15. Additionally, employees are required to change passwords every sixty days. *Id.* at 84:10-14. Plaintiffs also undergo annual internal audits and

external audits by their regulators where the security processes are tested, including engaging IT personnel to try to hack their systems to determine how vulnerable it is. *Id.* at 84:15-21. Methods are also employed to restrict physical access to Plaintiffs' facilities. *Id.* at 84:1-5. For example, at Alpine, employees are restricted by their badges to certain areas where they work. *Id.* at 84:2-10. The steps taken at Scottsdale are similar to those taken at Alpine.[4] *Id.* at 95:23-96:11.

Analysis

Again, the Court must view "all evidence in a light most favorable to the non-moving party," in determining whether "there is no legally sufficient evidentiary basis for a reasonable jury to find" for that party. *Aronowitz*, 513 F.3d at 1236-37; *Luxottica Grp., S.p.A.*, 932 F.3d at 1310-11. As the jury in this case rendered a general verdict— it did not specify what it found to be a trade secret—the Court need only find sufficient evidence as to one trade secret. *See Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1272 (11th Cir. 2021) ("First, the jury rendered a general verdict—it didn't specify which of the seven alleged trade secrets iControl misappropriated. Accordingly, Fintech needs to show evidence of misappropriation only as to one."). Both the federal and Florida trade secret statutes require that the business information has independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic

---

[4] However, Mr. Cruz notes that Alpine is a lot more restrictive than Scottsdale as it relates to virtual remote log-in.

value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain secrecy. *See* 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4).

Upon consideration of the evidence in this case, a jury could reasonably find that Plaintiffs provided sufficient evidence to establish that their Top 50 Customer List and pricing structure are trade secrets.[5] "A customer list can constitute a 'trade secret' where the list is acquired or compiled through the industry of the owner of the list and is not just a compilation of information commonly available to the public." *Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*, 310 So. 3d 45, 48 (Fla. 4th DCA 2020) (quoting *E. Colonial Refuse Serv., Inc. v. Velocci*, 416 So. 2d 1276, 1278 (Fla. 5th DCA 1982)), *review denied*, No. SC21-34, 2021 WL 1250869 (Fla. Apr. 5, 2021). Mr. Hurry presented evidence that it took tens of years to build up the kinds of relationship Plaintiffs had with customers on the Top 50 Customer List and to generate the kind of business reflected therein, that the list was considered proprietary and confidential because it would give someone a direct map on who to call on, that Plaintiffs would never want a competitor to have this information, and that Plaintiffs would never make this information available to the public. [Doc. 318 at 160:2-17, 161:21-25]. A jury presented with this information could certainly find that Plaintiffs' Top 50 Customer List derived independent economic value from not being generally known to, and not being readily

---

[5] Having found that sufficient evidence was presented for the jury to conclude that the Top 50 Customer List and pricing structure are trade secrets, the Court need not address the remaining items that Plaintiffs assert are trade secrets. As the verdict in this case is general, the Court need only find that there was enough evidence to establish one trade secret. *See Fin. Info. Techs*, 21 F.4th at 1272.

ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

The jury was not required to accept Defendant's testimony that the list is not a special list developed by marketing strategy or analysis, that he knew of at least half of the accounts before he started at Alpine, and that finding these customers in the microcap space "is pretty doggone easy." [Doc. 317 at 99:11-100:2, 100:17-21, 101:13-15; Doc. 316 at 254:25-255:6]. Plaintiffs provided sufficient evidence from which a jury could reasonably find that the customer list was a trade secret. *See Bridge Fin., Inc.*, 310 So. 3d at 48; *East v. Aqua Gaming, Inc.*, 805 So. 2d 932, 934 (Fla. 2d DCA 2001) (holding that there is sufficient evidence to support the trial court's determination that Aqua Gaming's customer list and the other exhibited information qualifies as a trade secret because "Aqua Gaming showed that its customer list was the product of great expense and effort, that it included information that was confidential and not available from public sources, and that it was distilled from larger lists of potential customers into a list of viable customers for its unique business"); *Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*, 310 So. 3d 45, 49 (Fla. 4th DCA 2020) (finding that "[t]he evidence demonstrated that JFA's client list was a trade secret" and reasoning that the client list included not only the clients' names and addresses but also copies of the clients' tax returns and all the information used to prepare those returns and JFA spent a significant amount of time, effort, and money developing the client list, which was kept on JFA's password protected server and was not publicly available), *review denied*, No. SC21-34, 2021 WL 1250869 (Fla. Apr. 5, 2021).

There is a legitimate business interest in protecting one's confidential pricing scheme and business strategies. *See Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 154 (11th Cir. 2021). Here, Plaintiffs provided evidence that their best customers receive better rates than those published on the website. [Doc. 316 at 73:3-74:22]. Those rates would not be published online but are negotiated on a case-by-case basis. *Id.* at 74:3-14. If a competitor had knowledge of this information, they would have a "huge advantage" in being able to undercut Plaintiffs' price to take their business. *Id.* Taking this evidence in the light most favorable to Plaintiffs, a jury could reasonably conclude that Plaintiffs' pricing structure derived value from not being known and not being readily ascertainable.

Additionally, Plaintiffs provided evidence of a host of measures that they employed to maintain the secrecy of their business information. Among other things, all employees are required to sign a computer use agreement, are advised as to the confidentiality of Plaintiffs' information, and must complete compliance questionnaires each year regarding their compliance with their obligations to maintain the confidentiality of Plaintiffs' information. Plaintiffs employed additional safeguards including systematic restrictions that prohibit employees from accessing personal emails and from using CD burners and thumb drives, as well as physical restrictions limiting employee access only to their workspaces. A reasonable jury could not find that Plaintiffs "abandoned all oversight in the security" of its information. *Yellowfin Yachts, Inc.*, 898 F.3d at 1301 (addressing reasonable efforts under FUTSA). Plaintiffs

provided more than enough evidence from which the jury could reasonably find that both their Top 50 Customer List and their pricing structure constitute trade secrets.

### b.  Unjust Enrichment

Defendant next argues that he is entitled to judgment as a matter of law because Plaintiffs failed to prove, and no evidence showed that he obtained any unjust enrichment through misappropriation of Plaintiffs' alleged trade secrets. [Doc. 328 at p. 1]. He specifically argues that he unequivocally denied using any of Plaintiffs' Confidential Information in working with Chicago Ventures, Iliad Research, and St. George, or any other client and Plaintiffs offered no evidence to refute this. *Id.* at p. 23. He further argues that Plaintiffs failed to offer any evidence that any client switched to Vision or what he did to enrich himself. *Id.* at pp. 23-24.

The Court first notes that unjust enrichment is not a discrete cause of action in this case. Rather, it was pleaded as a form of relief for Defendant's misappropriation of Plaintiffs' trade secrets. [Doc. 61, Count III at ¶ 54, Count IV ad damnum clause]. Both the federal and the Florida statutes allow for recovery of unjust enrichment. *See* 18 U.S.C. § 1836 (b)(3)(B)(i)(II); Fla. Stat. § 688.004(1). "In pursuing such damages, '[a] plaintiff's burden of proof ... is liberal and is satisfied by showing the misappropriation, the subsequent commercial use, and ... evidence by which the jury can value the rights the defendant has obtained.' " *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017) (citing *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So.3d 640, 644 (Fla. 4th DCA 2012)). As Defendant's basis

for relief is grounded on the evidence as to his use of the trade secrets, the Court will confine its review to evidence of his use.

At trial, Defendant testified that before joining Vision, he did not bring any clients to any of the firms he worked at including Alpine. [Doc. 316 at 211:19-215:3]. He also admitted sending himself a copy of Alpine's Top 50 Customer List on July 31, 2018, the day before his last day at Alpine. *Id.* at 100:6-7. Chicago Venture is the top client on the list based on commissions paid to Alpine. [Doc. 369-12; Doc. 316 at 204:16-22]. Iliad Research is listed as generating the fifth highest commission and St. George Investment is listed as generating the sixth highest commission for Alpine. [Doc. 369-12].  All three entities are owned by John Fife. [Doc. 316 at 215: 15-17]. Almost a year after Defendant left the employ of Plaintiffs, he emailed Vision's pricing schedule to Chicago Venture on May 22, 2019. *Id.* at 205:17-207:22. John Fife was copied on the email. *Id.* at 206:8-10.

In his email, he stated: "As you will see, we are quite a bit less expensive than what you have historically paid. There is no settlement nor execution fee involved." *Id.* at 208:1-20. In a later email on the email chain, he explained:

> I believe I am saving you 1/2 percent over what you are paying at Scottsdale on the first dollar. I think you have been paying 3-1/2 percent commission plus 1-1/2 percent settlement fee, for a total of 5 percent. I'm not sure whether they were hitting you with the additional 2-1/2 percent execution plus the $5,000 a month B.S. I am also saving you a $295 deposit.[6]

---

[6] "[T]he $5,000 a month B.S." referred to was the $5,000 monthly charge to maintain an account at Scottsdale or Alpine. [Doc. 317 at 135:12-15].

*Id.* at 208:21-211:18. Shortly after Defendant joined Vision in around June 2019, Fife opened up accounts at Vision for Chicago Venture, Iliad Research, and St. George. *Id.* at 215:4-6, 216:12-15. Defendant acknowledged that he had most of the initial interaction with Chicago Ventures at Vision. [Doc. 316 at 217:3-5]. As of August 7, 2019, John Fife had brought a couple hundred grand worth of business to Vision. *Id.* at 215:22-25, 216:8-11. The entities create at least a hundred thousand dollars in commissions per month. *Id.* at 218:8-23. Defendant also testified that the commissions paid by John Fife's entities go into the Corporate Services Group revenue bucket, from which he gets a share from 20 per cent of the profits. *Id.* at 217: 7-218:7.

Defendant offered evidence that John Fife's entities reached out to him and that he did not use any of Plaintiffs' confidential information in getting Fife's entities to agree to Vision's fixed schedule. [Doc. 317 at 130:23-132:1, 135:1-136:23]. However, as the trier of fact, the jury was not obligated to accept Defendant's evidence, given the evidence presented by Plaintiffs. *See Hinson v. Clinch Cty., Georgia Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000) ("[W]e must consider the entire record, but 'disregard all evidence favorable to the moving party that the jury is not required to believe.'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000)). As the court noted in *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321 (11th Cir. 2017), "the weighing of conflicting evidence is properly for the jury." A jury could very well find that the evidence showed Defendant used Plaintiffs' Top 50 Clients List and

confidential pricing information in soliciting Vision's business and negotiating rates.[7] This is a reasonable view of the evidence, especially in light of Defendant's testimony that he had not brought clients with him when he left any of his prior firms[8] and his email negotiating rates with Fife's entities—where he specifically compared Vision's rates to that of Plaintiffs. The motion is therefore due to be denied on this basis.

### c. Amount

Defendant's final argument for judgment as a matter of law is that the amount awarded for unjust enrichment is patently unjust. [Doc. 328 at p. 24]. He specifically argues that damages for unjust enrichment could not exceed $264,000, which was the only evidence of his compensation, and that Plaintiffs did not prove the extent to which the commissions paid by John Fife's entities funded the $264,000. *Id.*

> A defendant's unjust enrichment due to the misappropriation of trade secrets may be measured in several ways including "value of the plaintiff's lost profits, the defendant's actual profits from the use of the trade secret, the value a reasonably prudent investor would have paid for the trade secret, the developmental costs the defendant avoided by the misappropriation, and a reasonable royalty."

*Healthplan Servs., Inc. v. Dixit*, No. 8:18-CV-2608-SDM-AAS, 2021 WL 4927434, at *5 (M.D. Fla. May 27, 2021) (quoting *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013), *report and recommendation adopted*, No. 8:18-CV-2608-SDM-AAS, 2021

---

[7] Plaintiffs contend that "[Defendant] used trade secrets to lure away at least 13 of [their] top clients." [Doc. 332 at p. 9].

[8] Defendant admitted that he brought no clients to COR/Legent when he moved from GunnAllen Securities and he brough no clients to Alpine when he left COR/Legent. [Doc. 316 at 211:19-215:3].

WL 4926752 (M.D. Fla. July 22, 2021). As the appellate court explained in *Advantor Sys. Corp.*, a plaintiff's burden of proof in pursuing unjust enrichment damages is liberal and is satisfied by showing, among other things, evidence by which the jury can value the rights the defendant has obtained.  678 F. App'x at 853. "The law of damages as applied in misappropriation of trade secret cases holds that when some damage is proven and the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Perdue Farms Inc. v. Hook*, 777 So. 2d 1047, 1051 (Fla. 2d DCA 2001) (quotation omitted).

In their response to Defendant's motion, Plaintiffs contend that "[t]he analysis does not hinge on how much money went into [Defendant's pockets]." [Doc. 332 at 11]. They presented evidence at trial that Defendant's new employer, Vision, generated approximately $100,000.00 per month in revenue at an approximately 40-50% margin from three of their top clients who went to Vision after Defendant started working there—the Fife entities, and that the entities continued to do "at least that" amount of business through the date of trial. [Doc. 316 at 218:8-23; Doc. 318 at 23:10-24:4]. Based on this information, Plaintiff presented the following argument in closing:

> But what we do know, right, by Mr. Frankel's own testimony is that in I think about a two-month span, you all use your own recollections, but it was whenever he got there through his depo on August 17, 2019, he had said that the three Fife entities had done a couple hundred grand of business, right?
>
> That's  what we have in the way of information to provide to you all in this trial, okay? There are other clients there,

right? You saw that list, you know. But this is the financial information we have, those three clients, right, by his own admission.

So we take that $100,000, right, and we run it forward, right, from when he got there, July 9, 2019, through April 30th, today, 2021, and you see business in the amount of $2,070,967.74 plus the 50 percent margin, right? I asked him what the margin was, do you all remember, sort of towards the end, right, for that reason.

The reason why we extrapolate it forward, okay, is because he said it stayed fairly static. It ebbs and flows, but it generally stays in that area. Some months it may be a little more, a little less. So we used his words, right, for that.

[Doc. 319 at 58:1-22]. The jury awarded Plaintiffs $932,000 for unjust enrichment. [Doc. 302]. As they point out in their response, "[a]t a 45% margin, [the Fife entities] would have generated $931,935.48 in net revenue." [Doc. 332 at p. 12].

Again, a plaintiff's burden of proof in pursuing unjust enrichment damages is liberal and is satisfied by showing evidence by which the jury can value the rights the defendant has obtained. *Advantor Sys. Corp.*, 678 F. App'x at 853. As the court stated in *Perdue Farms*, "recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." 777 So. 2d at 1051. The Court agrees that evidence as to the amounts Vision generated from the Fife entities provided the jury a reasonable basis from which they could approximate the value of the information Defendant took with him to his new employer. In fact, the evidence is that the commissions from these entities went into the revenue bucket for the Corporate Services Group for which Defendant served as VP/Managing Director and from which he received a share of the profits. *Id.* at 217: 7-218:7. As such, the Court

finds that there was evidence from which the jury could reasonably determine the amount for unjust enrichment.

Additionally, the Court finds no merit to Defendant's argument that the correct method for computing unjust enrichment was based on compensation he received that was funded by the proceeds of commission from Fife's entities. It has long been the position that "where the secret has not been destroyed and where the plaintiff is unable to prove specific injury" the accepted approach to computing damages "is to measure the value of the secret to the defendant." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974);[9] *Levine v. Fieni McFarlane, Inc.,* 690 So.2d 712, 713 (Fla. 4th DCA 1997) (damages for unjust enrichment are based on value from standpoint of the recipient of the benefits). There are "many variations in the way th[e] benefit to the defendant can be measured." *Univ. Computing*, 504 F.2d at 536. "[T]he defendant's actual profits can be used as a measure of damages in cases where profits can be proved." *Id.* Here, the jury was presented with evidence from which it could find that Defendant's misappropriation of Plaintiffs' trade secrets resulted in actual profit of approximately $932,000 to his new employer Vision. As such, the argument that the amount awarded was patently incorrect must be rejected. The motion for judgment as a matter of law is therefore due to be denied.

---

[9] The decisions of the former Fifth Circuit, rendered prior to October 1, 1981, are binding upon the Eleventh Circuit, unless and until overruled or modified by the Eleventh Circuit sitting *en banc. Bonner v. City of Prichard,* 661 F.2d 1206, 1209–11 (11th Cir.1981) (*en banc* ).

## New Trial

"[U]nder Rule 59(a), a district court may, in its discretion, grant a new trial 'if in [the court's] opinion, the verdict is against the clear weight of the evidence ... or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.' " *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Montgomery Ward*, 311 U.S. at 251). Defendant raises claims as to the admission and exclusion of evidence as to damages. [Doc. 328 at pp. 24-25]. As the Supreme Court noted in *Montgomery Ward*, that "the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence" may provide grounds for a new trial. 311 U.S. at 251.

Even though Defendant has presented a host of claims relating to the manner in which Plaintiffs presented their case on damages, the motion fails as a threshold matter. Defendant has not specifically identified the legal basis for a new trial or the Court's error which warrants correction. In fact, the motion is devoid of legal argument as to why a new trial is warranted. Defendant claims that Plaintiffs had ample opportunity and the obligation to disclose their damage calculations and methodology, and instead chose to ambush him. The Court construes this as a challenge to the admission of Plaintiff's evidence on damages. Defendant also notes the exclusion of witnesses well known to Plaintiffs who could refute their damages, which the Court construes as a challenge to the exclusion of Defendant's witnesses. These challenges do not warrant relief in this case.

It has long been established that "[t]he trial judge has broad discretion in the matter of admission or exclusion of evidence and will not be overturned absent an abuse of this discretion." *ADP-Fin. Computer Servs., Inc. v. First Nat. Bank of Cobb Cty.*, 703 F.2d 1261, 1266 (11th Cir. 1983) (citing *Salem v. U.S. Lines Co.,* 370 U.S. 31 (1962)).  As to the admission of Plaintiffs' evidence on damages, the issue was carefully considered by the Court on multiple occasions—before and during trial. [Doc. 288; Doc. 290; Doc. 316 at 5:7-29:8].

The record reflects that when Plaintiffs served their Initial Disclosures, they disclosed that they would seek "[d]isgorgement of Defendant's unjust enrichment." [Doc. 35-2 at p. 6].  Later on in the case, Plaintiffs moved to reopen discovery, noting among other things, that "Defendant also withheld his contract with Vision – evidence directly relevant to the unjust enrichment damages [they] seek to recover." [Doc. 189 at p. 2]. They provided further argument at the hearing on this motion, stating as follows:

> [W]ith respect to compensation, let's not talk about his financial information in these broad terms. If he moved clients of ours over to Vision and those clients were subject to a commission or bonus agreement that he was paid on because he brought them over and they were originating, they are certainly relevant.
>
> It's relevant to unjust enrichment damages, the rescission damages. That's the whole premise of have a money damages case as opposed to injunctive relief. He moved the clients. He broke the law doing it, and we get the money he made off of it. That's what it would be relevant to, and that's why we asked for it.

[Doc. 203 at 66:9-20]. Finding merit to Plaintiffs' argument, the Court reopened discovery for further development of the issues with respect to damages, but specifically limited to "the production of documents described at the hearing and an additional deposition of [Defendant] on the limited issues described at the hearing." [Doc. 193].[10]

As the case progressed, the Court heard arguments on motions *in limine*, including Defendant's request to exclude evidence of damages due to the Plaintiffs' lack of disclosure. [Doc. 232 at 10:7-10, 15:22-24, 22:5-16, 24:8-20, 30:25-31:16]. Plaintiffs argued that the lack of disclosure was substantially justified, stating that "[i]f we had the Vision stuff timely, we may have been able to do all this, but we didn't. And then when we ask for it, Judge, their own client won't tell us the numbers." *Id.* at 34:1-37:23, 38:20-41:23. The Court agreed that Plaintiffs should be allowed to present the Vision documents at trial as well as damages evidence which were produced during regular discovery. *Id.* at 37:24-38:8.

The Court again considered the issue upon Defendant's Motion to Prohibit Plaintiffs from Introducing Undisclosed Damages Computations and Soliciting Testimony about Frankel's Compensation. [Doc. 279]. The Court ruled:

> As to the damages computation issue, the Court will not exclude the Hurry Trust documents that were produced under Rule 26 discovery, nor the Vision documents produced at the second deposition of Mr. Hurry. Plaintiffs may reference these documents at trial. However, since

---

[10] In doing so, the Court advised Plaintiffs: "Where we are starting . . . is you get to ask [Defendant] questions about that which they didn't produce and so you didn't have that information at your disposal when you took his deposition." [Doc. 203 at 78:7-8].

Plaintiffs did not previously disclose a numerical computation of damages, Plaintiffs may not expand on the documents or elaborate on a specific dollar amount of lost profits, nor any other kind of damage. As to the issue of Mr. Frankel's compensation, Plaintiffs' questioning is limited to what Mr. Frankel made in commission and/or bonuses. Such questioning may only occur if Plaintiffs establish during questioning that Mr. Frankel received commissions and/or bonuses from former clients of Plaintiffs who switched to Vision.

[Doc. 288; Doc. 290]. The issue came up for consideration again during trial and the Court affirmed its decision following extensive arguments from the parties. [Doc. 316 at 5:7-29:8; 27:7-14, 29:4-7].

Under Rule 37(c), Federal Rules of Civil Procure, "a district court may preclude a party from introducing evidence that was not disclosed as required by Rule 26(a), (e)(1), or (e)(2) unless the failure was harmless or there was substantial justification for the failure." *Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n, Inc.*, 595 F.3d 1203, 1210 (11th Cir. 2010); *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1341 (11th Cir. 2020) (same). The Court was well within its discretion in finding that the discovery related issues justified Plaintiffs' failure to make the relevant disclosures and in allowing Plaintiffs to present evidence produced when discovery was reopened. Defendant's arguments therefore lack merit.[11] Moreover, Defendant has not demonstrated that the verdict is against the great weight of evidence, which must be

---

[11] The Court notes and finds as meritless, Defendant's claim, in passing, that Plaintiffs chose "to exclude the witnesses well known to Alpine and Vision who could refute the ambush." [Doc. 328 at p. 25].

shown to establish entitlement to a new trial on evidentiary grounds. *Lipphardt*, 267

F.3d at 1186

Accordingly, it hereby **ORDERED**:

1. Frankel's Renewed Motion for Judgment as a Matter of Law or

   Alternatively for a New Trial [Doc. 328] is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on August 8, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any