**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

THE HURRY FAMILY REVOCABLE
TRUST, SCOTTSDALE CAPITAL
ADVISORS CORPORATION and
ALPINE SECURITIES
CORPORATION,

      Plaintiffs,

v.                                    Case No: 8:18-cv-2869-CEH-CPT

CHRISTOPHER FRANKEL,

      Defendant.

_____/

**O R D E R**

This matter comes before the Court upon Plaintiffs' Motion for Entry of a
Permanent Injunction and to Amend the Judgment in Conformity Therewith and
Incorporated Memorandum of Law of Plaintiffs Hurry Family Revocable Trust,
Scottsdale Capital Advisors Corporation, and Alpine Securities Corporation [Doc.
325], Defendant Christopher Frankel's Opposition [Doc. 330], Plaintiffs' Reply [Doc.
340], the arguments of the paries on February 25, 2022, and their supplemental briefs
[Docs. 386, 387, 396]. Plaintiffs request a permanent injunction prohibiting Defendant
from using or disclosing any of their confidential information or trade secrets, among
other things. Having considered the motion and being fully advised in the premises,
the Court will deny Plaintiffs' Motion for Entry of a Permanent Injunction and to

Amend the Judgment in Conformity Therewith and Incorporated Memorandum of Law.

Also before the Court are Defendant's Motion for Judicial Notice of FINRA's Expulsion of Alpine [Doc. 393] and Motion for Judicial Notice [Doc. 404], as well as Plaintiffs' responses in opposition [Docs. 399, 407]. Defendant asks the Court to take judicial notice of various aspects of filings in a FINRA proceeding involving Alpine Securities Corporation ("Alpine"). Upon review and consideration, Defendant's Motion for Judicial Notice of FINRA's Expulsion of Alpine [Doc. 393] is granted, while Motion for Judicial Notice [Doc. 404] is granted-in-part and denied-in-part.

## I.   BACKGROUND

In this action for breach of contract and misappropriation of trade secrets, Plaintiffs Scottsdale Capital Advisors ("Scottsdale"), Alpine, and the Hurry Family Revocable Trust requested injunctive relief as to all four claims against Defendant Christopher Frankel. [Doc. 61¶¶ 38, 45, 54, 55, 64]. Scottsdale and Alpine are each involved in the broker-dealer business. *Id.* ¶ 10. Scottsdale is a full-service broker-dealer focused on serving the OTC (over the counter) securities market. *Id.* Alpine is a registered broker-dealer that is an industry leader for clearing OTC stock. *Id.* Scottsdale and Alpine were previously indirectly owned and/or controlled by the Hurry Family Revocable Trust. *Id.* Defendant served as Alpine's CEO from approximately July 2015 through July 2018, and then as a consultant from July 2018 through September 2018. *Id.* ¶ 17.

As to **Count I** for breach of contract, Plaintiffs requested injunctive relief pursuant to the written Non-Disclosure and Confidentiality Agreement (the "Original NDA") entered into by Defendant in June 2015, when Plaintiffs considered hiring him to help run their broker-dealer business and engaged in discussions with him about their businesses. *Id.* ¶¶ 11-12, 16, 38. The breach of contract claim in **Count II** sought injunctive relief pursuant to an Employee Nondisclosure & Computer Use Agreement ("the Employee NDA"), which Defendant entered into after he was hired by Plaintiffs and "which superseded the Original NDA with regard to protecting Alpine and Scottsdale's numerous trade secrets and confidential information." *Id.* ¶¶ 17-18, 21-23, 45. In **Count III**, Plaintiffs asserted a claim for violation of the Defend Trade Secrets Act and alleged that they are entitled to an injunction to prevent the actual or threatened misappropriation of their trade secrets and/or requiring affirmative actions to protect the trade secrets. *Id.* ¶ 54. Plaintiffs also requested injunctive relief for the Violation of the Florida Uniform Trade Secrets Act claim in **Count IV**. *Id.* ¶ 64.

At trial, Plaintiffs provided evidence that prior to and after Defendant's last day as Alpine's CEO, he forwarded their information to his personal email addresses on multiple occasions. [Doc. 316 at 100:6-101:7, 103:16-104:2, 88:13-89:2, 107:25-108:11, 110:4-111:6, 115:23-116:20]. The information he forwarded included a list of Alpine and Scottsdale's top 50 clients with revenue numbers [Doc. 369-12], a trade blotter [Docs. 369-16, 369-17], a draft Employment Agreement [Doc. 369-10], an Alpine Secured Revolving Credit Facility Term Sheet [Doc. 369-9], and three emails

3

attaching, among other things, Alpine's Written Supervisory Procedures, Alpine's Confidential 2016 Financial Statements with Reports, a document with the number and value of accounts for both Scottsdale and Alpine, Alpine's bylaws, the Hurry Trust's Certificate of Trust, and the First Amendment to the Hurry Trust [Docs. 369-1 through 7, 369-8, 369-19]. In June 2019, Defendant joined Vision Financial Markets, LLC, as VP/Managing Director of Corporate Services Group and Correspondent Services. [Doc. 316 at 87:3-10].

After a week-long trial, the jury determined that Defendant breached his contracts with Plaintiffs, but Plaintiffs suffered no actual damage from Defendant's breach. [Doc. 302 at pp. 1-4]. The jury also found that Defendant misappropriated Plaintiffs' trade secrets and was unjustly enriched by doing so. *Id.* at pp. 4-5. A judgment was therefore entered in Plaintiffs' favor and against Defendant as to the claim for misappropriation of trade secrets. [Doc. 304].

Plaintiffs now seek a permanent injunction to enjoin Defendant from engaging in further unauthorized use or disclosure of their confidential information and trade secrets. [Doc. 325]. They specifically request an injunction:

> (a) Finding, as a matter of law, that the following are Alpine's and Scottsdale's trade secrets:
>
>     a. The top 50 customer list with revenue information;
>     b. The trade blotter;
>     c. Alpine's pricing information;
>     d. Scottsdale's pricing information;
>     e. Alpine's confidential financial statements;
>     f. Alpine's Written Supervisory Procedures; and

(b) Prohibiting [Defendant] from using or disclosing any Confidential Information, as that term is defined in the NDA and the Employee NDA;

(c) Requiring [Defendant] to return in native format and then destroy all Confidential Information, as that term is defined in the NDA and the Employee NDA, still in his possession, custody, or control or in the possession, custody, or control of his attorneys;

(d) Prohibiting [Defendant] from using or disclosing any trade secrets identified in paragraph (a);

(e) Requiring [Defendant] to destroy any copies of any trade secrets identified in paragraph (a) that are in his possession, custody, or control or in the possession, custody, or control of his attorneys and/or agents;

(f) On or before the 30th day from the entry of this Order, requiring [Defendant] to serve on Plaintiffs a written report, under oath, setting forth in detail the steps taken to identify and destroy the Confidential Information and trade secrets still in his possession, custody, or control or in the possession, custody, or control of his attorneys and/or agents;

(g) On or before the 30th day from the entry of this Order, requiring [Defendant] to serve on Plaintiffs a written report, under oath, identifying each person to whom he provided any Confidential Information or trade secrets. The written report must also include the following for each person identified:

    a. a description of all Confidential Information or trade secrets disclosed,
    b. the date(s) on which he disclosed any Confidential Information or trade secrets,
    c. the manner in which he disclosed the Confidential Information or trade secrets (i.e. via email, hand delivery, instant message, etc.)

*Id.* at pp. 23-25. Plaintiffs argue that they have a right to injunctive relief under Florida and federal law for Defendant's misappropriation and under Arizona law for his breach of the agreements. *Id.* at pp. 9-12. They further argue that they are entitled to relief as the four factors considered in granting a permanent injunction weigh in their favor. *Id.* at pp. 12-23.

Defendant has presented various arguments in response. First, he argues that Rule 13804 of the Financial Industry Regulatory Authority (FINRA) gives FINRA exclusive jurisdiction to issue permanent injunctive relief involving its members, including Plaintiffs. [Doc. 330 at pp. 3-4]. He argues that Plaintiffs must show success on the merits, which they cannot do because the jury did not determine what information was trade secrets or confidential and because the jury returned a verdict in his favor as to the contract claims. *Id.* at pp. 4-9. Additionally, Defendant argues that Plaintiffs cannot establish irreparable harm as the jury found that Plaintiffs suffered no damages and their delay in seeking an injunction refutes their claim of irreparable harm. *Id.* at pp. 9-16. Defendant also asserts that Plaintiffs did not raise for trial issues as to whether he had retained any of their trade secrets or confidential information and did not obtain jury determinations on these issues of fact, barring them from seeking injunctive relief on these issues. *Id.* at p. 16-19. Additionally, Defendant argues that because these issues were not previously raised, awarding injunctive relief on them would violate his due process rights. *Id.*

Plaintiffs filed a reply addressing the Defendant's arguments. [Doc. 340]. They contend that FINRA cannot divest the Court of its authority to enter an injunction

and that Defendant's claim is not supported by FINRA rules or the cases cited in his response. *Id.* at pp. 6-7. As to the claim that they cannot establish success on the merits, Plaintiffs point out that they obtained a verdict on the misappropriation claim and the jury determined that Defendant breached the contracts at issue. *Id.* at pp. 1-2. They further argue that entry of the injunction is consistent with the general verdict rendered by the jury, positing that when a verdict is general, there is a presumption that all issues were decided in favor of the prevailing party. *Id.* at pp. 3-4. Plaintiffs also assert that the decision not to seek a preliminary injunction is not dispositive as to whether they will be irreparably harmed if the permanent injunction is not granted, and that the jury's finding on damages has no bearing on this relief. *Id.* at pp. 4-6. Plaintiffs also indicate Defendant had fair notice because each count sought return of their information and the joint pretrial statement identified their right to injunctive relief—enjoining Defendant's use of their information and requiring return of such information—as an issue to be litigated. *Id.* at p. 6.

At the hearing on February 25, 2022, the Court directed the parties to provide supplemental briefs with citations to the evidence at trial that proved why each piece of information qualified or did not qualify as a trade secret. Both parties provided various record citations purportedly supporting their claims.[1] [Docs. 386, 387]. Defendant also provided arguments in his response brief, including that Plaintiffs are requesting an injunction to protect alleged trade secrets that are available online for

---

[1] The undersigned was not the judge who presided over the trial.

any member of the public to access. [Doc. 387 at pp. 8,9, 11, 13, 18, 24].  Plaintiffs briefly replied. [Doc. 396.]

## II.   MOTIONS FOR JUDICIAL NOTICE

As an initial matter, the Court will address the two motions for judicial notice that Defendant filed in connection with the motion for preliminary injunction.  In the first motion, Defendant requests that the Court take judicial notice of a FINRA panel decision expelling Alpine from FINRA membership, which he states will lead to Scottsdale's inability to trade securities and will render an injunction unnecessary, as well as FINRA's "public treatment of information which Alpine is claiming as trade secret." [Doc. 393 at pp. 8-9.]  In response, Plaintiffs explain that they do not object to the Court taking judicial notice of the FINRA decision itself, but that Defendant is actually seeking judicial notice of the decision's factual findings, which is impermissible. [Doc. 399 at pp. 3-4.]  They further contend that the decision is not final—indeed, both Alpine and Scottsdale continue to operate—and it therefore has no bearing on the motion for permanent injunction. *Id.* at pp. 5-6.

In his second motion, Defendant requests that the Court take judicial notice of some of Alpine's public filings in a proceeding that is pending in the District of Nevada. [Doc. 404.][2]  As an exhibit to its motion to dismiss that proceeding, Alpine attached the FINRA panel decision as well as documents that FINRA compiled in connection with the decision but did not include with it. *Id.* at p. 3.  Defendant argues

---

[2] *United States Securities and Exchange Commission v. Alpine Securities Corp. et al.*, No. 22-cv-1279 (D. Nev).

that these documents are the functional equivalent of the customer list at issue in the instant case, and that their publication conflicts with Plaintiffs' claim that the customer list is a trade secret. *Id.* Responding in opposition, Plaintiffs assert that the filings are not equivalent to the customer list. [Doc. 407 at pp. 5-6.] Further, Defendant's argument would require the Court to make inferences and factual deductions from the public filings, which is an impermissible application of judicial notice. *Id.* at p. 5.

Under Federal Rule of Evidence 201(b), a court may take judicial notice of a "fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "[I]ndisputability is a prerequisite" to taking judicial notice, and "the fact must be one that only an unreasonable person would insist on disputing." *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citations omitted). The court must take judicial notice if a party requests it and the court is supplied with the necessary information. Fed. R. Evid. 201(c)(2).

A district court may take judicial notice of proceedings and documents that were filed in another court, because the fact of such litigation and filings cannot reasonably be disputed. *See Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1241 n.13 (11th Cir. 2014) (overruled on other grounds), citing *Jones*, 29 F.3d at 1553. However, in doing so a court cannot take judicial notice of the factual findings of another court, or of the truth of the matters asserted in the filings. *Id.*; *Grayson v. Warden, Comm'r, Ala. DOC*, 869 F.3d 1204, 1225 (11th Cir. 2017); *Medley v. Dish Network, LLC*, 8:16-cv-2534-

CEH-CPT, 2022 WL 846132, *2 (M.D. Fla. March 22, 2022) (Honeywell, J.) (taking judicial notice of documents generated by clerks in other litigation and documents filed by the SEC to establish the fact of the litigation and filings, but not for the truth of the matters asserted).

With respect to the instant motions, the Court will take judicial notice only of the fact that the documents were filed in the FINRA and Nevada proceedings, but not of the truth of their contents or any inferences thereof—just as it has ruled in its prior orders on judicial notice in this action. *See* Docs. 22, 138, 250.  Whether the information has any relevance to the Court's ruling on the motion for permanent injunction, as the parties dispute, is a separate question that will be addressed in Section III, *infra*.[3]

Plaintiffs do not deny that this Court must take judicial notice of the fact of the FINRA panel decision, a public filing that is not reasonably subject to dispute. *See* Fed. R. Evid. 201; Doc. 399 at p. 3.  Moreover, the Court may take judicial notice of the fact that the FINRA decision contained certain information, although not the veracity of that information.  Contrary to Plaintiffs' characterization, Defendant does not request that the court consider the decision's contents for their truth, but rather for the

---

[3] Defendant also briefly requests that the Court take into account the documents at issue in his second motion for judicial notice in order to "reconsider its denial of Frankel's renewed motion for judgment and/or new trial[.]" [Doc. 404 at p. 6, citing Doc. 403; *see* Doc. 407 at pp. 5, 6-7.]  But Defendant has not filed a motion for reconsideration pursuant to Rule 60(b), and the Court declines to construe his Motion for Judicial Notice as such.  To the extent the Court takes judicial notice of the material at issue in the instant motions for judicial notice, it will consider this material only with respect to Plaintiffs' motion for permanent injunction, which is properly before the Court.

fact that the panel published it, which Defendant argues bears on the question of whether the information is trade secret. *See* Doc. 393 at pp. 8-9; *cf.* Doc. 399 at p. 4. Such a use is distinct from taking judicial notice of the factual findings of another court, which is impermissible. *See Grayson*, 869 F.3d at 1225.  Rather, the fact that the decision contained certain information is just as indisputable as the fact that the decision exists.  It is therefore appropriate for judicial notice. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (a court may properly take judicial notice of the statements publicly filed documents contain, but not the truth of those statements). Defendant's Motion for Judicial Notice of FINRA's Expulsion of Alpine [Doc. 393] is therefore due to be granted.

Similarly, turning to Defendant's second motion, the Court will take judicial notice of the fact of Alpine's public filing of certain documents in the Nevada proceeding. However, to the extent that Defendant asks the Court to take judicial notice of inferences Defendant argues are appropriate to draw from the documents, the Court will not do so.  Defendant's characterization of the documents as equivalent to the customer list at issue in the instant case, Doc. 404 at pp. 1, 5-6, is not beyond dispute and is therefore inappropriate for judicial notice. *See* Doc. 407 at pp. 5-6. While the Court may draw its own conclusions from the fact of the filing of those documents, it cannot take judicial notice of Defendant's conclusions.  Accordingly, Defendant's second Motion for Judicial Notice [Doc. 404] is due to be granted-in-part and denied-in-part.

III.    **MOTION FOR PERMANENT INJUNCTION**

A. **Legal Standard**

A plaintiff who seeks a permanent injunction must demonstrate: "(1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (stating same). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *eBay*, 547 U.S. at 391. The fundamental principle guiding the court is that "injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Garrido v. Dudek*, 731 F.3d 1152, 1159 (11th Cir. 2013) (quotation omitted).

B. **Discussion**

*1. Jurisdiction*

The Court will first address its jurisdiction to issue an injunction. "The jurisdiction of a court over the subject matter of a claim involves the court's competency to consider a given type of case[.]" *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1000 (11th Cir. 1982). "[O]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." *Univ. of S. Ala.*

*v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Pursuant to 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." As Plaintiffs assert a claim pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, this action qualifies as a civil action arising under the laws of the United States.

Defendant argues that FINRA has exclusive jurisdiction to issue an injunction because Plaintiffs are FINRA members. [Doc. 330 at pp. 1, 3-4]. But this argument is meritless, as neither FINRA Rule 13804 nor the case law relied on by Defendant supports it. Rule 13804(a)(1) provides that parties "[i]n industry or clearing disputes required to be submitted to arbitration under the Code . . . may seek a temporary injunctive order from a court of competent jurisdiction." FINRA, RULE 13804 (2017). Rule 13804(b) then states that "[i]f a court issues a temporary injunctive order, an arbitration hearing on the request for permanent injunctive relief will begin within 15 days of the date the court issues the temporary injunctive order." *Id.*  It is clear from the language of Rule 13804 that it has no application here as this case does not involve a clearing or industry dispute that is required to be submitted to arbitration. In the same vein, Defendant's reliance on *Morgan Stanley Smith Barney, LLC v. Abel*, No. 3:18-CV-141-MMH-MCR, 2018 WL 1725689, at *1 (M.D. Fla. Feb. 5, 2018) is misplaced, as the cases are distinguishable. In that case, "the parties agreed to resolve any disputes in an arbitration before the Financial Industry Regulatory Authority." *Id.* at *1, 3.

As Plaintiffs note in their motion, the statutes and contracts at issue in this action provide for injunctive relief. [Doc. 325 at pp. 8-12]. In *Klay v. United Healthgroup,*

*Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004), the court explained that a federal court may issue a "traditional" injunction as a permanent remedy for certain breaches of common law. The court may also issue a statutory injunction "where a statute bans certain conduct or establishes certain rights, then specifies that a court may grant an injunction to enforce the statute." *Id.* at 1098. The Defend Trade Secrets Act contains the following right to injunctive relief:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—
>
> **(A)** grant an injunction—
>
> > **(i)** to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not--
> > > **(I)** prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or
> > > **(II)** otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;
> >
> > **(ii)** if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and
> >
> > **(iii)** in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited[.]

18 U.S.C. § 1836(b)(3)(A)(i). Likewise, the Florida Uniform Trade Secrets Act provides that "[a]ctual or threatened misappropriation may be enjoined" and that "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order." Fla. Stat. § 688.003(1), (3). The contracts also set forth the right to injunctive relief to restrain misappropriation of trade secrets. [Doc. 61 at pp. 20, 24].[4] Defendant's jurisdictional argument therefore lacks merit.

   2. _Right to Injunction_

   "An injunction is a 'remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.' " _Alabama v. U.S. Army Corps of Engineers_, 424 F.3d 1117, 1127 (11th Cir. 2005) (quoting _Klay v. United Healthgroup, Inc._ 376 F.3d 1092, 1097 (11th Cir. 2004)). Injunctive relief "is designed to bar someone from engaging in some unlawful act or series of acts in the future, or alternatively, to compel someone to undertake some act or series of acts in the future." _Gagliardi v. TJCV Land Tr._, 889 F.3d 728, 734 (11th Cir. 2018).

   "The standard for a permanent injunction is essentially the same as for a preliminary injunction except that the plaintiff must show actual success on the merits instead of a likelihood of success." _Klay_, 376 F.3d at 1097. The parties disagree as to

---

[4] Paragraph 6 of the NDA states that "the Recipient agrees that the Discloser will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have." In Paragraph 7(f) "Employee agrees that Company shall have the right to apply to a court of competent jurisdiction for an order enjoining any such further misappropriation and for such other relief as Company deems appropriate."

whether Plaintiffs establish success on the merits of their claims. The jury in this case found that Defendant misappropriated trade secrets and disclosed, used, or failed to return confidential information. [Doc. 302 at pp. 1, 2, 3, 4]. In opposing the grant of a permanent injunction, Defendant argues that Plaintiffs did not obtain specific factual findings about the subject of the requested injunction, because the jury instructions and verdict form did not require the jury to determine what information was a trade secret or confidential. [Doc. 330 at pp. 5-8].

The Court acknowledges Plaintiff's argument that "when a verdict is general, courts must presume that any and all issues were decided in favor of the prevailing party." [Doc. 340 at pp. 3-4 (quoting *Hicks v. Capitol Am. Life Ins. Co.*, 943 F.2d 891, 895 (8th Cir. 1991)]. *See also Freeman v. Chicago Park Dist.*, 189 F.3d 613, 616 (7th Cir. 1999) ("A general verdict, without more, will of course give rise to the presumption that material fact issues have been resolved in favor of the prevailing party[.]"). However, the Eleventh Circuit recently noted that the district court must make its own factual determinations as to which trade secrets were misappropriated where the jury returns a general verdict. *See Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1281 n.9 (11th Cir. 2021) ("Fintech claims that its 'trade secrets sufficiently identify the conduct [to be] restrained.' But remember, the jury returned a general verdict, so we don't know which trade secrets in particular the jury found iControl had misappropriated. Fintech ignores the fact that even if the district court were to issue an injunction, the court must make its own factual determinations as to which alleged trade secrets were misappropriated. *See McCarthy*

16

*v. Fuller*, 810 F.3d 456, 460 (7th Cir. 2015). The jury verdict alone does not automatically entitle Fintech to an injunction."). As such, the Court must determine whether the items claimed by Plaintiffs actually constitute trade secrets or confidential information.

<u>Trade Secrets</u>

Plaintiffs have asserted misappropriation of trade secret claims pursuant to the federal and Florida statutes. Both statutes require proof of the same elements to establish a trade secret. The information (i) must derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *See* Fla. Stat. § 688.002(4); 18 U.S.C. § 1839(3). However, "not all confidential information rises to the level of a trade secret." *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1411 n.25 (11th Cir. 1998). "[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.' " *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) (quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1298-99 (11th Cir. 2018)). At trial, Plaintiffs individually addressed the value of each of their claimed trade secrets and generally addressed the security measures they employed. Having considered the evidence, the Court concludes that only the customer list meets the requirements of a trade secret.

*a) The impact of public filing on trade secret status*

As a threshold matter, the Court finds that the public availability of some of the alleged trade secrets on the court's electronic docket does not destroy their trade secrecy.   Defendant argues that Plaintiffs' request for a permanent injunction is weakened by the fact that most of the information has been available to the public on the court's internet docket since the clerk filed the trial exhibits on January 24, 2022, yet Plaintiffs have not moved to seal them from public disclosure. [Doc. 387 at 9, 22, 24-25.]   The customer list, the Written Supervisory Procedures Manual, the trade blotter, and the 2016 Audit are all available on the public docket. [Docs. 369-12, 369-3, 369-16, 369-1.]   In response, Plaintiffs cite authority that the disclosure of trade secrets in public court files does not automatically destroy their trade secret status. [Doc. 396.]

"[I]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).   "At the same time, absolute secrecy of trade secrets is not required to prevail on a trade secrets claim; instead, '[t]he secrecy requirement is generally treated as a relative concept and requires a fact-intensive analysis.' " *Kittrich Corp. v. Chilewich Sultan, LLC*, No. CV1210079GHKARGX, 2013 WL 12131376, *4 (C.D. Cal. Feb. 20, 2013), quoting *DVD Copy Control Ass'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (Cal. Ct. App. 2004).

Intentional publication of material will destroy its trade secret status. *See, e.g., Precision Automation, Inc. v. Tech. Svcs., Inc.*, No. 07-CV-707-AS, 2009 WL 116135, *2

(D. Or. April 28, 2009) (plaintiff's posting of information on its own website, however briefly, rendered it not a trade secret); *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706-07 (7th Cir. 2006) (publication of a patent application constituted disclosure of an alleged trade secret). However, "[p]ublication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people, i.e., potential competitors or other persons to whom the information would have some economic value." *DVD Copy Control Ass'n*, 116 Cal. App. 4th at 251; *see also Syncsort Inc. v. Innovative Routines, Int'l, Inc.*, No. CIV. 04-3623 WHW, 2011 WL 3651331, at *15 (D.N.J. Aug. 18, 2011) ("there was no evidence that information published on the internet became widely available or other unauthorized persons accessed or even attempted to access the information.").

Publication that occurs during court proceedings is not "automatically fatal" to the information's trade secret status. *The Equal Rights Center v. Lion Gables Residential Trust*, No. DKC 07-2358, 2010 WL 2483613, *3 (D. Md. June 15, 2010); *see also BondPro*, 463 F.3d at 706 ("the mere fact of mention in a public document is not controlling."). After all, access to even those documents filed on a court's electronic docket is not as simple as a mere Google search. *See HMS Holdings Corp. v. Arendt*, 18 N.Y.S.3d 579 (Table), *8 (N.Y. Sup. Ct. Albany Cnty. 2015) ("it does not follow that the inadvertent e-filing of an unredacted document on [the electronic filing system] necessarily constitutes a posting to the Internet that renders the information generally known."). Rather, courts "have regarded the unsealed filing of a document as a single,

19

non-dispositive factor to be weighed in determining whether the document's contents remain a trade secret," *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 418 (4th Cir. 1999)—in other words, to determine whether the filing renders the information "generally known" or "readily ascertainable" by those who can profit from it. *See* 18 U.S.C. § 1839(3)(B); *Kittrich*, 2013 WL 12131376 at *4 (declining to dismiss trade secret claim where information was disclosed in five court documents and on a webpage, because "more factual development was needed to know whether the secret had become "generally known to the relevant people, i.e. potential competitors or other persons to whom the information would have some economic value.").

One factor that courts consider is whether a court file disclosure was intentional. *See Jackson v. Hammer,* 274 Ill.App.3d 59 (Ill. 1995) (attaching customer list as exhibit to unsealed affidavit was one of several acts that destroyed trade-secret status of customer list); *cf. Smart Profitability Sols., LLC v. Double Check Risk Sols., LLC*, No. 1:18-CV-706-MHC, 2018 WL 6380886, at *12 (N.D. Ga. Aug. 2, 2018) (inadvertent public filing did not nullify confidentiality interest); *Equal Rights Center*, 2010 WL 2483613 at *3 (same). Another factor is whether the plaintiff took measures to remedy the disclosure. *See Tronitec, Inc. v. Shealy*, 249 Ga.App. 442, 450-51 (Ga. Ct. App. 2001) (information did not lose its trade secret status where plaintiff requested sealing after "a few weeks") (overruled on other grounds by *Williams General Corp. v. Stone*, 279 Ga. 428 (Ga. 2005)); *Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 9 F.3d 823, 849 (10th Cir. 1993) (disclosure of information in court during preliminary injunction hearing

did not forfeit trade secret status where plaintiff monitored presence of observers during hearing and later requested the records be held under seal).

Another significant consideration is whether there is evidence that the information, although publicly available, was actually viewed or otherwise disseminated by third parties. *See Smart Profitability Sols.*, 2018 WL 6380886 at *12 (despite the exhibits' public availability "for several months," lack of evidence that they became generally known was dispositive); *Religious Tech. Center v. Netcom On-Line Commc'n. Svcs., Inc.*, 923 F.Supp. 1231, 1254-55 (N.D. Cal. 1995) (documents' temporary availability in open court records in another case, prior to sealing order, did not necessarily forfeit trade secret status without evidence that the secrets became generally known); *cf. DVD Copy Control Ass'n*, 116 Cal. App. 4th at 255 ("The evidence in the present case is undisputed that by the time this lawsuit was filed hundreds of Websites had posted the program, enabling untold numbers of persons to download it and to use it."). To determine whether an electronic court filing destroys trade secret status, one New York state court concluded that courts should consider the means by which access to the filing was available, how long it remained accessible, the class of people who had access to it, and the extent to which the filing was actually viewed, downloaded, indexed, or made searchable on the internet. *Arendt*, 18 N.Y.S.3d at *9, citing Restatement of Torts § 757 cmt. b.

Applying the above principles to the instant action, the Court finds that the filing of Plaintiffs' trial exhibits on the public docket did not destroy their trade secret status, if any. While the filing was not inadvertent, the Court notes that Plaintiffs did not file

the exhibits themselves; they were automatically placed on the public docket after the trial had concluded. *Cf. Jackson,* 274 Ill.App.3d 59 (plaintiff filed document as an unsealed attachment). On the other hand, nearly a year has now passed in which the exhibits have remained publicly available. It is significant that Plaintiffs have not moved to seal the exhibits it asserts are trade secrets in this time period, a factor that will be relevant to the Court's analysis regarding irreparable harm. *Cf. Gates*, 9 F.3d at 849 (plaintiff monitored presence of observers during hearing and requested sealing of public records). However, while technically public, the alleged trade secrets are not easy to access or locate by Plaintiffs' competitors. *Cf. Precision Automation*, 2009 WL 116135 at *2 (plaintiff published material to its own website). Members of the public cannot access any documents on the docket without knowing the case number and location of this action. Further, the alleged trade secrets are unlabeled and are located within a docket entry that contains 28 attachments. *See* Dkt. 369. Finally, there is also no evidence that the materials have actually been accessed and/or disseminated during this time. *See Smart Profitability Sols.*, 2018 WL 6380886 at *12. In all, the publication of the exhibits on the court's public docket does not demonstrate that the alleged trade secrets are "readily ascertainable" or have become "generally known" by those who can profit from them. *See* 18 U.S.C. § 1839(3)(B); *Kittrich*, 2013 WL 12131376 at *4.

In his motions for judicial notice, Defendant also argues that the publication by FINRA and Alpine of documents containing information that is contained in or duplicative of the customer lists, 2016 audit, and pricing information demonstrates that these items are not trade secrets. [Docs. 393, 404.] This factor is not dispositive of

the items' trade secret status. Although there is overlap between the material published in the FINRA panel decision and the information Plaintiffs allege is a trade secret, they are far from identical. The published material requires additional information and/or deductions and inferences to make it equivalent to the alleged trade secrets. For example, there are substantive distinctions between the lists of customers attached to Alpine's motion to dismiss, which did not rank customers by revenue or include specific revenue figures, and the top 50 customer list Plaintiffs assert is a trade secret. *See* Doc. 407 at p. 6. Because of these differences, the fact that the documents are publicly available on the FINRA website or the District of Nevada court docket does not make the information Plaintiffs seek to protect "readily ascertainable" or "generally known" by those who can profit from it. *See* 18 U.S.C. § 1839(3)(B). As a result, it does not destroy the trade secret status, if any, of the customer list, 2016 audit, and the pricing information.

The Court will now individually analyze each item Plaintiffs assert to be a trade secret.

### b)   *The top 50 customer list with revenue information*

"A customer list can constitute a 'trade secret' where the list is acquired or compiled through the industry of the owner of the list and is not just a compilation of information commonly available to the public." *Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*, 310 So. 3d 45, 48 (Fla. 4th DCA 2020) (quoting *E. Colonial Refuse Serv., Inc. v. Velocci*, 416 So. 2d 1276, 1278 (Fla. 5th DCA 1982)), *review denied*, No. SC21-34, 2021 WL 1250869 (Fla. Apr. 5, 2021). Plaintiffs' top 50 client list contained year to date

commission of their top 50 customers. [Doc. 318 at 159:7-14]. The clients on the list generate "far more than just a simple majority" of Plaintiffs' revenue, and the information presented would allow someone to know "who the biggest customers are and their business . . . the risk of the business, the profitability of the business, and the revenue of the business." *Id.* at 161:3-11. It took decades to build up the kinds of relationships it had with customers on the list and to generate the kind of business reflected by the list. *Id.* at 161:15-18. Plaintiffs considered the information proprietary and confidential because it would give someone a direct map on who to call on. *Id.* at 160:2-13. In fact, they would never want a competitor to have this information and would never make it available to the public. *Id.* at 160:14-17; 161:21-25. If someone had possession of this information together with Plaintiffs' trade blotter, they would have a "massive advantage" in competing with Plaintiffs and could just take Plaintiffs' business. *Id.* at 160:18-161:1; 161:21-162:5.

The evidence provided by Defendant that he knew of at least half of the accounts before he started at Alpine and that finding these customers is "pretty doggone easy" does not diminish the value or proprietary nature of the customer list. Plaintiffs provided sufficient evidence to establish that its customer list was not information capable of being easily ascertained by anyone in that line of business and provided valuable information as to the volume of each customer's business. *See State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1229 (11th Cir. 2004) ("The confidential client information was not a mere 'customer list' but was 'a compilation that derives independent economic value, actual or potential, from not being generally

known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.' ").

Plaintiffs provided testimony as to the various methods they employed to maintain the secrecy of their purported trade secrets. Employees who come on board are required to sign an employee computer use agreement. [Doc. 315 at 79:25-80:7]. The employee handbook, the WSP manual, also reinforces that Plaintiffs' information is important to Plaintiffs, is confidential, and employees should protect it. *Id.* at 80:3-11. Additionally, each employee is required to fill out and complete a compliance questionnaire each year, acknowledging receipt of the WSP manual, that they understand it, that they have not disclosed any confidential information, and that they have complied with their obligations. *Id.* at 80:12-19. Employees also receive annual training in modules including "customer protection information, Reg S-P, [and] privacy." *Id.* at 80:20-81:2.

Plaintiffs also utilize systematic protections to protect their information. *Id.* at 81:3. At trial, Plaintiff's General Counsel, Michael Cruz, described these protections as follows:

> We have servers and computer systems from our IT department that are designed with firewalls, we block access to many websites, we restrict access to websites that have personal e-mail and we block them. Like, you know, if you wanted to log into your Gmail account at work, that's -- you know, that's blocked, that's prohibited, unless you have a need for that, and that's approved on a case-by-case basis, but, you know, generally all that is blocked.

25

> Our computers themselves, the CDs, unless you're a compliance person or a legal person like me and you burn CDs to produce to regulators or respond to subpoenas, you know, you don't have access to your CD burner on your computer. Same thing with thumb drives. You know, there's -- you know, there are things that are listed out on both firms' procedures that really spell out all those steps.

*Id.* at 81:3-16; 94:3-15. Additionally, employees are required to change passwords every sixty days. *Id.* at 84:10-14. Plaintiffs also undergo annual internal audits and external audits by their regulators where the security processes are tested, including engaging IT personnel to try to hack their systems to determine how vulnerable it is. *Id.* at 84:15-21. Methods are also employed to restrict physical access to Plaintiffs' facilities. *Id.* at 84:1-5. For example, at Alpine, employees are restricted by their badges to certain areas where they work. *Id.* at 84:2-10. The steps taken at Scottsdale are similar to those taken at Alpine.[5] *Id.* at 95:23-96:11. Plaintiffs employed reasonable measures to safeguard its information from disclosure, transmission, and theft. The Court finds that the top 50 client list is a trade secret.

c) *The trade blotter*

Plaintiffs described a trade blotter as "kind of like the blood, the heart of a business." [Doc. 318 at 155:19-22]. It generally provides information as to trading activity, including "the quantity of shares, the price and the symbol, whether it was bought, whether it's sold, . . . trade date, and in some cases settlement date." *Id.* at 155:8-15. Someone in the industry could tell a lot about a business from its trade

___

[5] However, Cruz notes that Alpine is a lot more restrictive than Scottsdale as it relates to virtual remote log-in.

blotter, including its profitability, margins, costs, and revenue sources. *Id.* at 155:19-156:4, 158:2-13. One could use a trade blotter to calculate payments for order flow, estimates for commissions, risks of the business, costs of the business, gross revenue of the business, and transactional fees. *Id.* at 155:19-156:4, 156:21-157:1. The information in a trade blotter has a lot of significant value to present and start a business and gives a potential competitor an advantage to step into the marketplace immediately and begin competing. *Id.* at 132:22-134:8. The trade blotter in this case covered "two days' business at Alpine Securities by symbol and amounts." [Doc. 315 at 130:5-131:14, 158:16-20]. Additionally, it was "anonymous" as it did not provide information as to the accounts associated with the trades or the broker-dealer doing the trades. [Doc. 316 at 45:3-23]. Regardless, Cruz testified that the information presented still had a lot of significant value for the purpose of presenting and starting a business in the area. [Doc. 315 at 132:22-134:8]. Having considered the evidence presented, the Court agrees that Plaintiffs' trade blotter carries significant value from not being generally known or readily ascertainable and could provide a rival broker-dealer a significant advantage in competing with Plaintiffs.[6]

---

[6] The Court questions the staleness of a blotter containing two days' worth of trades. *See, e.g.*, *Lockheed Martin Corp. v. Boeing Co.*, No. 6:03-CV-796-JA-KRS, 2005 WL 5278461, at *2 (M.D. Fla. Jan. 26, 2005) (reasoning that the requirement of a showing of harm from disclosure of purported trade secrets is designed to prevent the parties from designating information that is too stale to be of current commercial value); *Sullivan v. Gov't Emps. Ins. Co.*, No. 6:17-CV-891-PGB-KRS, 2018 WL 5717430, at *1 (M.D. Fla. Nov. 1, 2018) (same). However, Defendant did not present any evidence that the information was stale when the blotter was taken.

As discussed above, Plaintiffs employed a host of measures to protect their trade secrets. However, Plaintiffs acknowledged that they cleared trades with Vision in 2020, knowing Defendant was working there, and in doing so exchanged far more information than is given on the blotter—including "detailed trade information about the customer, the price, the security." [Doc. 316 at 49:22-50:20]. There is no evidence that they informed Vision that their trades are a trade secret and that their information was disclosed with restrictions on its disclosure or use by Vision. Plaintiffs bear the burden of demonstrating that they have taken reasonable steps to protect the secrecy of this information. *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998). "The trade secret owner who fails to label a trade secret as such, or otherwise to specify in writing upon delivery . . . that information which it contends is confidential and . . . is not to be disclosed, has not taken measures or made efforts that are reasonable under the circumstances to maintain the information's secrecy." *Sepro Corp. v. Fla. Dep't of Env't Prot.*, 839 So. 2d 781, 784 (Fla. 1st DCA 2003). Based on the evidence presented, the Court cannot find that Plaintiff employed sufficient reasonable means to maintain the secrecy of its trading activity such that the trade blotter constitutes a trade secret.

### d) Pricing information

It has long been recognized that trade secrets may relate to operations in the business, such as a code for determining discounts, rebates or other concessions in a price list. *Water Servs., Inc. v. Tesco Chemicals, Inc.*, 410 F.2d 163, 171 (5th Cir. 1969);

*Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1293 (5th Cir. 1970) (stating same).[7] Plaintiffs request injunctive relief as to Alpine's pricing information and Scottsdale's pricing information. [Doc. 325 at p. 23]. The evidence at trial did not distinguish between Alpine's and Scottsdale's pricing. Plaintiffs presented testimony from Cruz that while fees stay fairly consistent, Plaintiffs' best customers receive better rates than the rates published on their website. [Doc. 316 at 73:3-11]. Cruz specifically explained that because a lot of its customers have accounts at other firms, knowledge of "what they do, . . . the stocks they trade in, [and] how they trade" could give Plaintiffs an advantage in negotiating pricing with its customers and how much business they do. [Doc. 315 at 77:7-21].  He further explained that some customers bring in low quality business that may require more time for due diligence and there is a price that goes into that. [Doc. 316 at 73:13-21. At the same time, some transactions go smoothly and Plaintiffs can give those customers a very good rate in order to attract them. *Id.* at 73:21-74:2. Plaintiffs' bigger, better customers are more likely to get the better rates. *Id.* at 74:18-22. The rates given to better customers would be negotiated on a case-by-case basis and would not be published online. *Id.* at 74:3-6. If a competitor had knowledge of this information, they would have a "huge advantage" in being able to undercut Plaintiffs' price to take the business. *Id.* at 74:7-14.

---

[7] "The Eleventh Circuit has adopted as binding precedent all decisions by the former Fifth Circuit through September 30, 1981, and all decisions thereafter by Unit B of the former Fifth Circuit." *Silverstein v. Gwinnett Hosp. Auth.*, 861 F.2d 1560, 1564 (11th Cir. 1988) (citing *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc) and *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982)).

However, while it appears that Plaintiffs derive value from having secret rates for their best customers, there is no evidence that Plaintiffs have employed any specific method for computing those rates or as to what consideration is given to various factors in deciding on a rate—a factor that Florida courts have considered dispositive when determining whether pricing information is a trade secret. *See Lewis Tree Serv., Inc. v. Asplundh Tree Expert, LLC*, 311 So. 3d 206, 212 (Fla. 2d DCA 2020) ("[W]hile a bottom-line bid and its general terms might not constitute trade secret information, if the bid documents reveal information about the bidder's underlying calculations or bid development process, the documents might in some circumstances contain protected trade secrets."). In *Summitbridge Nat. Investments LLC v. 1221 Palm Harbor, LLC*, 67 So.3d 448, 450 (Fla. 2d DCA 2011), for example, the court found that if the information at issue was merely the price for a transaction, rather than a formula resulting in a price, it would not fall within the definition of a trade secret. *See also Lake Worth Surgical Center, Inc. v. Gates*, 266 So.3d 198, 203 (Fla. 4th DCA 2019) (upholding a decision to decline confidentiality restrictions on the amounts paid for services). Plaintiffs have not shown that there is some methodology by which they determine the rate they would offer their services to a good customer.  Without a method or formula, the prices alone do not qualify as a trade secret.

Moreover, the record reflects no evidence that customers were under any obligation to maintain the secrecy of the rates they were offered. In fact, Defendant presented evidence that in negotiating pricing with Vision, Vision's representative informed him of the rate they were paying Scottsdale and provided him with the

agreement reflecting discounted commissions. [Doc. 317 at 136:13-137:15]. The fact that customers are under no duty to maintain the confidentiality of rates offered to them has also led courts to conclude pricing information does not qualify as a trade secret. *See Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1360 (S.D. Fla. 2012) ("To the contrary, the evidence revealed that Hennegan provided Arriola with the pricing information and permitted him to share that information with potential customers without requiring those customers to refrain from disclosing the pricing information to others. In addition, Hennegan did not require Arriola to execute a confidentiality agreement with Hennegan. Accordingly, the Court finds that the pricing lists do not qualify as trade secrets where Hennegan did not take reasonable steps to maintain the confidentiality or limit the dissemination of the pricing information."). Here, too, the Court is not convinced that Plaintiffs have employed sufficient reasonable means to protect the secrecy of their pricing information. For both reasons, Plaintiffs have not proven that the pricing information is a trade secret.

### e)  Alpine's confidential financial statements

The evidence at trial is that Defendant emailed himself a list of financial documents, including "Alpine Securities 2016 Financial Statements With Reports - Confidential," which described accounts payable, policy numbers of accounts, and amounts firm by firm. [Doc. 316 at 110:7-111:6, 117:8-17; Doc. 317 at 213:9-214:7]. Defendant acknowledged that many of these attachments are confidential. *Id.* at 114: 24-115:9. Plaintiffs' General Counsel testified that Plaintiffs would not disclose either

their audit or financial statements to third parties unless there was some business purpose and there was a non-disclosure agreement. [Doc. 315 at 156:3-8].

Some of this information is publicly available. Cruz admitted at trial that a short version of Alpine's audit, excluding cashflows and income statement, is published on the Securities and Exchange Commission's (SEC) website. [Doc. 316 at 52:20-53:15]. Cruz also acknowledged that interim six-month financial statements are published on Alpine's website, which include balance sheet information and net capital calculation. *Id.* at 53:16-54:20. However, the public availability of some of Plaintiffs' financial information does not prohibit the financial statements from qualifying as a trade secret. *See Digiport, Inc. v. Foram Dev. BFC, LLC,* 314 So. 3d 550, 553 (Fla. 3d DCA 2020) ("[e]ven if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret").

Nonetheless, Plaintiffs have not established that their financial information is trade secret. *See Camp Creek Hosp. Inns, Inc.*, 139 F.3d at 1411 n.25 ("[N]ot all confidential information rises to the level of a trade secret."). While it is clear that some of the information is neither generally known nor readily ascertainable by proper means, the evidence at trial did not establish any independent economic value that is derived from its secrecy. *See Advantor Systems Corp. v. DRS Technical Services, Inc.*, 678 F. App'x 839 (11th Cir. 2017) (remanding for factfinding where it was unclear whether certain information, regardless of its confidentiality, "possessed the necessary 'independent economic value from not being generally known or readily ascertainable' by parties that might benefit from its use.") (quoting Fla. Stat. § 688.002(4)); *compare*

*Office of Insurance Regulation v. State Farm Florida Ins. Co.*, 213 So.3d 1104, 1107 (Fla. 1st DCA 2017) (upholding a finding of trade secret status based on independent economic value where witnesses testified as to precisely how competitors could use plaintiff's confidential data to profit) *with Rasier-DC, LLC v. B&L Service, Inc.*, 237 So.3d 374, 377 (Fla. 4th DCA 2018) (information about Uber's total number of airport pickups and fees paid to county was not a trade secret absent evidence that it would provide an advantage to a competitor or that Uber derives independent economic value from keeping it secret). Here, the only evidence Plaintiffs presented regarding the financial statements' economic value was the testimony of Plaintiffs' corporate representative, John Hurry, that possessing many proprietary documents, including the financial statements, would be "extraordinarily helpful" to a competitor trying to start their own broker-dealer firm. Doc. 318 at 162: 2-16.[8] Such general, conclusory testimony is not enough. *See, e.g.*, *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 688 (11th Cir. 1998) (finding that plaintiff did not meet its burden under the Georgia Trade Secrets Act and reasoning that, *inter alia*, it "failed to explain, beyond the most general of assertions, how a competitor, armed with its own information about the value of the underlying properties and its own financial considerations, could reap economic value from knowledge of CARC's "bid guidelines."). In the absence of

---

[8] Specifically, when answering the question of which documents—"along with" the top 50 customer list and trade blotter—would be useful "if someone was trying to start their own broker-dealer," Hurry identified "contracts, rule and procedures…a sampling of a financial statement, income statement…[and] certain third-party vendors that would…facilitate your business, all of those documents would be really helpful, if not extraordinarily helpful, to start a firm." *Id.*

evidence establishing the independent economic value of the financial statements derived from their secrecy, the Court cannot find that Plaintiffs' financial statements rise to the level of a trade secret.

### f) Alpine's Written Supervisory Procedures

It has long been recognized that the injuries which may be suffered by an employer when a former employee departs and commences work for a business rival may stem from use in a rival business of procedures, methods, and trade practice. *Answer All Tel. Secretarial Serv., Inc. v. Call 24 Inc.*, 381 So. 2d 281, 282 (Fla. 5th DCA 1980). Plaintiffs have asserted that Alpine's Written Supervisory Procedures (WSPs) are trade secrets. At trial, Cruz testified that the WSPs detail the process Alpine employs to ensure regulatory compliance.  [Doc. 315 at 77:22-79:24]. They describe how to deal with the deposit and clearance of securities, including the due diligence required to comply with Section 5 of Securities Act of 1933, pursuant to which Alpine has a responsibility to make an inquiry, investigate red flags, and ensure the securities were legitimately acquired and could be placed on the marketplace and traded. *Id.*

The evidence reflects that Alpine's WSPs were created from a template by Wolters Kluwer, one of the publishers of supervisory procedures for broker-dealers. *Id.* at 168:18-169:12. Alpine's WSPs are pared for its business and regulatory environment and have been tweaked for factors unique to the firm. *Id.* at 169:13-17; 79:11-24. Additionally, the WSP "grows year after year through regulatory exams and case law that comes out," and becomes a living, breathing document. *Id.* at 78:24-79:17. The

evidence indicates that the form Wolters Kluwer document was transformed to a document that specifically addresses Alpine's business.

However, as with the financial statements, the Court finds it is not clear what independent economic value Alpine derives from its WSPs not being generally known to, and not being readily ascertainable by proper means by, other persons. *See, e.g.*, *Finnegan*, 160 F.3d at 688 (finding that Plaintiff's general explanation of value derived from possession of information was not sufficient). Plaintiffs again rely only on Hurry's testimony that a number of documents, including Alpine's "rules and procedures," "would be really helpful, if not extraordinarily helpful" to someone starting their own broker. *See* Doc. 318 at 162:6-16; *see also id.* at 163:18-21 (explaining that a competitor would be "at a distinct advantage" if they had "*all of* those documents" (emphasis added)). This testimony alone does not establish the independent economic value derived from maintaining the secrecy of the WSPs.[9] Without more, Plaintiffs have not satisfied all of the factors necessary to establish Alpine's WSPs as a trade secret.

---

[9] Rather, Hurry and Cruz each explained the value to their *own* business of maintaining WSPs. Responding to the question of why some documents are valuable "to you," Hurry stated, "Rules and procedures…is an ongoing effort. …[E]very time something changes, whether it's in the industry, rule change, has to be updated… that takes a tremendous amount of time. It's also kind of a history book, if you will, of your business and some of the things that you need to do in your business." Doc. 318 at 163:7-12. Similarly, Cruz detailed the work that goes into modifying a WSP template for an individual broker-dealer firm, explaining "[I]f I had to go create one, if I was working at another firm, it would be quite a bit of work, you know, because I couldn't just download somebody else's WSPs…there would be a lot of legal sort of analysis being done, analysis of the business, these WSPs are pared for that business and its regulatory environment." Doc. 315 at 79:18-24. Given the amount of individualization in these descriptions, the WSPs' independent value *to a competitor* is less clear and was not described by the witnesses.

Confidential Information

The jury in this case also determined that Scottsdale, Alpine, and the Hurry Family Revocable Trust all had confidential information. [Doc. 302 ¶¶ 1, 6, 10]. As Plaintiffs point out in their motion, "[t]he term 'Confidential Information' is defined in both the . . . NDA and Employee NDA." [Doc. 325 at p. 4 n.1].[10] Pursuant to the NDA, "Confidential Information means any data or information that is proprietary to the Discloser and not generally known to the public." [Doc. 368-1 at p. 1]. It includes marketing strategies, plans, financial information, or projections, operations, sales estimates, business plans and performance results relating to the past, present or future; plans for products or services; customer lists and account information; any concepts, reports, data, information and trade secrets; and any other information that should be reasonably recognized as confidential information of the discloser. *Id.* The Employee NDA's confidential information provision defines confidential information as follows:

> "Confidential Information" shall mean all written or oral information of a proprietary, intellectual or similar nature relating to Company's business, projects, operations, activities or affairs whether of a technical or financial nature or otherwise.

[Doc. 368-2 at p. 1]. It includes information concerning Alpine's and Scottsdale's business, including cost information, profits, sales information, accounting and unpublished financial information, customer lists and customer information. *Id.* The definition further encompasses any information not generally known to the public

---

[10] Both agreements provide for construction in accordance with the laws applicable in the State of Arizona." [Doc. 368-1 ¶ 9; 368-2 ¶ 7(i)].

which, if misused or disclosed, could reasonably be expected to adversely affect company's business. *Id.*

The evidence reflects that various information taken by Defendant falls within the scope of confidential information. This includes the top 50 client list, the confidential financial statements, and the WSPs. As discussed earlier, the information reflected in these documents is proprietary to Plaintiffs and not generally known. Additionally, evidence was presented that Alpine's bylaws are "very confidential" and are not filed with the Arizona Secretary of State. [Doc. 315 at 217:21-218:21]. Similarly, the Trust documents will not be disclosed until the trustee wants them to be disclosed.[11] *Id.* at 126:21-127:2, 219:22-25, 221:5-224:3; Doc. 316 at 60:3-10. As such, these documents also constitute confidential information.

However, the Court notes that while pricing information and trading information in the trade blotter appear to be within the scope of confidential information as defined by the agreements, the voluntary dissemination of this information outside a confidentiality agreement results in the loss of the status of this information as confidential. The same is true of the draft employment agreement. *See, e.g., United States v. Seugasala*, 670 F. App'x 641, 642 (9th Cir. 2016) ("A confidentiality claim is generally lost by voluntary disclosure of the allegedly confidential information to those from whom it would otherwise be

---

[11] On day one of trial, Plaintiffs sought to impeach Cruz with Plaintiffs' interrogatory responses, which purportedly did not identify the trust documents as confidential. [Doc. 224:20-229:25]. The Court heard arguments on the issue and determined that that it didn't appear appropriate to use the interrogatories to impeach Cruz. *Id.* at 232:5-239:16.

withheld."); *Superior Consulting Servs., Inc. v. Steeves-Kiss*, 786 F. App'x 648, 651 (9th Cir. 2019) ("But even if the Agreement did *not* apply to Steeves-Kiss, the information would then have been revealed to her outside a confidentiality agreement, and thus would have lost any arguably confidential nature."). The proprietor of information that is confidential may not unilaterally create a confidential relationship without the knowledge or consent of the party to whom he discloses the information. *AT&T Commc'ns of California, Inc. v. Pac. Bell*, 238 F.3d 427 (9th Cir. 2000) (applying same reasoning in addressing trade secrets). As discussed earlier, there is no evidence that customers were under any obligation to keep special rates confidential and there is also no evidence that Vision undertook any obligations to maintain the confidentiality of any trades it cleared for Plaintiffs. In addition, the record does not reflect that Plaintiffs established whether the attachments relating to the nonbank trustee powers were also confidential. Hence, the confidential status of these items has not been established.

### 3. *Equitable Factors*

Having determined that Plaintiffs' customer list is a trade secret, and their confidential financial statements, WSPs, bylaws, and trust documents constitute confidential information, the Court must assess whether consideration of the equitable factors warrants permanent injunctive relief. Again, Plaintiffs must demonstrate that (i) they have suffered irreparable injury; (ii) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (iii) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (iv) the public interest would not be disserved by a permanent

injunction. *eBay Inc.*, 547 U.S. at 391; *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).[12]

Initially, the Court rejects the argument in Defendant's Motion for Judicial Notice of FINRA's Expulsion of Alpine that the FINRA panel decision "eliminates any risk of future harm to Alpine or Scottsdale because Alpine may no longer conduct business." [Doc. 393 at p. 9.]   As Plaintiffs correctly argue, the FINRA decision to expel Alpine has not yet taken effect, and may never do so, because the proceedings are not final. [Doc. 399 at pp. 5-6.]   The same dispute is also the subject of pending litigation in the District of Nevada, which lends further uncertainty to the outcome. *See* Doc. 404.   The assertion that Scottsdale could not continue to operate without Alpine is even more conjectural. [Doc. 399 at p. 6.]   As such, the Court will not consider the FINRA panel decision in its analysis of the equitable factors.

Turning to the first factor, Plaintiffs contend that Defendant's use of their trade secrets to unjustly enrich himself and disclosure of those trade secrets and other confidential information to third parties is sufficient to establish <u>irreparable harm</u>. [Doc. 325 at pp. 14-15]. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (addressing preliminary injunction); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d 1322, 1330 (M.D. Fla. 2000) (stating same in addressing preliminary

---

[12] Plaintiffs note that "Arizona, Florida, and federal law all apply substantially the same standard to determine whether a permanent injunction is appropriate." [Doc. 325 at p. 13 n.4.].

injunction). The evidence at trial is that Plaintiffs' top 50 client list reflects who their biggest customers are and would give a competitor a direct roadmap on who to call on in competing for business. [Doc. 318 at 159:7-162:5]. "The former Fifth Circuit held that the loss of customers…is an 'irreparable' injury." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (citing *Spiegel v. City of Houston,* 636 F.2d 997 (5th Cir., Unit A, 1981)). *See also Convergent Nonprofit Sols., LLC v. Wick*, No. 6:19-CV-1157-PGB-DCI, 2019 WL 7423549, at *7 (M.D. Fla. Sept. 5, 2019) ("Irreparable harm is presumed when use of customer lists and solicitation of customers occurs."). Likewise, Plaintiffs' confidential financial statements and the WSPs contain confidential information which, if disclosed, could affect their competitiveness. *See Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1278–79 (M.D. Fla. 2020) ("Sewpersaud was privy to Freedom Medical's most sensitive information about its customers, business strategies, territory plans, financial performance, pricing, costs, and other business metrics—and he now works for a direct competitor, has tried to conceal his new role, and has solicited Freedom Medical's former clients.…Sewpersaud's behavior—including soliciting eight Freedom Medical clients and prospects and suggesting changes to Rotec beds that Freedom Medical believed gave it a market advantage—all support a finding of irreparable injury.…Freedom Medical faces irreparable harm absent an injunction."), *order clarified*, No. 6:20-CV-771-RBD-GJK, 2020 WL 3487642 (M.D. Fla. June 25, 2020); *Pharmerica, Inc. v. Arledge*, No. 8:07-CV-486-T-26MAP, 2007 WL 865510, at *8 (M.D. Fla. Mar. 21, 2007) ("[I]f Arledge disclosed any of the confidential information or trade secrets he

misappropriated to Omnicare, PharMerica will suffer damage that cannot be reversed or repaired."). As to the confidential Trust documents, the harm from disclosure is likely irreparable "because once confidential information is disclosed, it cannot be "taken back[.]" *Eugene J. Strasser, M.D., P.A. v. Bose Yalamanchi, M.D., P.A.*, 669 So. 2d 1142, 1145 (Fla. 4th DCA 1996).

Defendant argues that Plaintiffs' delay in seeking injunctive relief to protect their alleged trade secrets and confidential information refutes the claim of irreparable harm. [Doc. 330 at pp. 12-16]. Even though there is no requirement that one seeking to protect trade secrets or confidential information must have sought preliminary injunctive relief to obtain permanent relief, there is some merit to Defendant's argument. As the Eleventh Circuit has stated, "preventing irreparable harm in the future is 'the sine qua non of injunctive relief.' " *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1133 (11th Cir. 2005) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Amer. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). In fact, this Court has ruled that "[i]n determining whether harm is irreparable, courts consider, *inter alia,* the nature of the harm alleged and the delay of the movant in seeking relief." *United States v. Williams*, 476 F. Supp. 2d 1368, 1377 (M.D. Fla. 2007) (ruling on Motion for Summary Judgment and Permanent Injunction). Hence, the Court has ruled on numerous occasions, though in the context of preliminary injunctions, that "[a] plaintiff's failure to act speedily undermines his claim that his injuries are irreparable." *Blue-Grace Logistics LLC v. Fahey*, No. 8:21-CV-2523-KKM-CPT, 2022 WL 356548, at *6 (M.D. Fla. Feb. 7, 2022); *see also Castellano Cosm. Surgery*

*Ctr., P.A. v. Rashae Doyle, P.A.*, No. 8:21-CV-1088-KKM-CPT, 2021 WL 3188432, at

\*9 (M.D. Fla. July 28, 2021) (stating that "the delayed pursuit of the preliminary

injunction discounts any alleged irreparable injury").[13] The Court is aware of no reason

why this principle does not apply where a litigant is seeking permanent injunctive

relief. This is especially the case considering "the standard is essentially the same" for

both—except that for a preliminary injunction the movant must establish likelihood of

success while actual success on the merits is required for the issuance of a permanent

injunction. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006);

*Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 n.16 (11th Cir. 2015) (stating same);

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) (same).

Here, Plaintiffs did not move for preliminary injunctive relief despite their

demonstrated knowledge of Defendant's actions. The record reflects that on

November 9, 2018, Plaintiffs wrote to Defendant requesting that he cease and desist

from breaching the Original NDA by "disclosing Confidential Information to third

parties and using Confidential Information in connection with a competing business."

[Doc. 368-7 at pp. 1-2]. The cease-and-desist letter further demanded that Defendant

return to Plaintiffs "any and all documents, records, and/or copies" in his "possession,

---

[13] Importantly the court in *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 n.5 (11th Cir. 1999),
explained the correlation between the forms of injunctive relief in these terms:

> A Rule 65 TRO often functions to preserve the status quo until a
> court can enter a decision on a preliminary injunction
> application, while a Rule 65 preliminary injunction is often used
> to maintain the status quo until a court can enter a final decision
> granting a permanent injunction or some other final relief.

custody, or control that contain any Confidential Information no later than the close of business on November 26, 2018." *Id.* at p. 2. Plaintiffs filed this action on November 21, 2018. [Doc. 1]. In their original complaint, they alleged that they would suffer irreparable harm absent the entry of an injunction. *Id.* ¶¶ 22, 24, 32, 42, 43, 52, 53, 61. Defendant purportedly returned Plaintiffs' documents with his initial disclosures around February 1, 2019. [Doc. 35-3 at p. 3]. On June 5, 2019, Plaintiffs subpoenaed documents from Vision, which supports Defendant's claim that Plaintiffs knew he was working with their competition at that time. [Doc. 76-1 at p. 2].

Additionally, Hurry acknowledged at trial that at the time of his deposition in August of 2019, he had lots of ideas as to how Defendant was unfairly competing with Plaintiffs. [Doc. 318 at 183:18-21]. At the time, Plaintiffs believed Defendant was soliciting customers on the top 50 client list. *Id.* at 183:22-184:10. He also testified that they saw their trade blotters going to Koonce Securities and the Ziv investment firm. *Id.* at 184:20-185:7. Ultimately, Hurry testified that "[t]he lawsuit started because [Plaintiffs] had evidence that [Defendant] was using confidential trade secret information to unfairly compete." *Id.* at 185:8-13.

Regardless of this knowledge, Plaintiffs did not seek to temporarily or preliminarily restrain Defendant's use of their information. Again, there is no requirement that one seeking permanent injunctive relief must have sought preliminary injunctive relief. However, "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244,

1248 (11th Cir. 2016) (emphasis in original). Also relevant to this factor is Plaintiffs' continued failure to move to seal the trial exhibits, which contained several of the items Plaintiffs assert are trade secrets, nearly a year after the clerk published them on the public docket. *See supra* at Section III(B)(2)(i). In the absence of any "speedy and urgent action on Plaintiffs' part" the Court finds that Plaintiffs have not established irreparable harm.[14]

The second factor, <u>adequacy of remedies available at law</u>, such as monetary damages, to compensate for the injury, also favors Defendant. The Court acknowledges Plaintiffs' claim that there is no amount of money that will make their information confidential again. [Doc. 325 at pp. 21-21]. Generally, this has been found sufficient to establish the inadequacy of remedies at law. *See, e.g.*, *U.S. Sec. Assocs., Inc. v. Campos*, No. 19-24290-CIV, 2020 WL 2494597, at *3 (S.D. Fla. May 13, 2020) ("The harm that Plaintiff has, and will continue to, suffer as a result of its confidential information being misappropriated, threatens the Plaintiff's competitive advantage in the market. Furthermore, the Defendant's continued interference with Plaintiff's client relationships would be detrimental to the Plaintiff's business such that damages alone are inadequate to remedy the Plaintiff's injuries, or

---

[14] The jury's verdict with respect to damages, which will be discussed *infra*, is also highly relevant to this Court's finding regarding irreparable harm. *See Lewis v. S.S. Baune*, 534 F.2d 1115, 1124 ("Often times the concepts of 'irreparable injury and 'no adequate remedy at law' are indistinguishable" in the context of a permanent injunction."); *see also* Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 694 (1990) ("The two formulations are equivalent; what makes an injury irreparable is that no other remedy can repair it.").

to protect the Plaintiff's interests in the future."); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*, No. 11-60621-CIV, 2011 WL 6754058, at *10 (S.D. Fla. Dec. 22, 2011) ("The crux of each of these claims is that Defendants used Plaintiffs' confidential information to steal Plaintiffs' customers. This is clearly an injury, which is not easily quantifiable in monetary terms.").

However, the jury's verdict in this case overcomes the general rule. The jury concluded that Defendant caused no injury to Plaintiffs with respect to either breach of contract or misappropriation of trade secrets, although Defendant had been unjustly enriched in the amount of $932,000. *See* Doc. 403 at 3. Significantly, the jury was instructed that if Plaintiffs had established that they had been damaged but did not prove the amount of damages with reasonable certainty, the jury could award nominal damages—but it chose not to do so. [Doc. 302 at p. 5 ¶ 16; Doc. 301 at p. 15]. In other words, the jury had the opportunity to agree with Plaintiffs' argument that they had been damaged but that those damages were incapable of calculation, yet it declined to do so.  The Court considers this a finding of fact that it is bound by. *See generally BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1151 (11th Cir. 2007) ("It is well settled that where claims at law and in equity are joined and the legal claims are tried separately by a jury, the jury's verdict operates as a finding of fact binding on the trial court in its determination of the equitable claims.") (*quoting Dybczak v. Tuskegee Inst.,* 737 F.2d 1524, 1526–27 (11th Cir.1984). Hence, Plaintiffs have not established

that they were injured by damages that are incapable of calculation, such that damages at law are inadequate.[15]

Plaintiffs have established the final two factors. As Plaintiffs contend, Defendant will suffer no <u>hardship</u> should he be enjoined from further violations of the NDA and required to return or destroy all trade secret and confidential information in his possession. [Doc. 325 at p. 22]. Indeed, Defendant only acquired the information through his employment with Plaintiffs, which he engaged in under a duty of confidentiality. *See Edwards Moving & Rigging, Inc. v. Jenkins*, No. 8:19-CV-1004-CEH-SPF, 2020 WL 7707025, at *19 (M.D. Fla. Dec. 29, 2020) ("A defendant who voluntarily enters into a covenant not to compete and receives substantial benefits from his employment ... cannot now claim that the harm from enforcing the [c]ovenant he agreed to would be too great a hardship on him.") (quotation omitted) (Honeywell, J.). The Court also agrees with Plaintiffs that the granting of injunctive relief would

---

[15] Plaintiffs' reliance on *Platypus Wear, Inc. v. Horizonte Ltda.*, 558 F. App'x 929 (11th Cir. 2014), in its reply is unavailing. In this unpublished opinion, the court held that the district court erred in concluding it did not have the *authority* to enter equitable relief because of the jury's finding of no damages. *Id.* at 931. The district court had considered the jury's finding of no damages as an indication that plaintiff had not succeeded on the merits; success on the merits is a necessary prerequisite to awarding a permanent injunction. *Id.* The Eleventh Circuit reversed, holding that the court was not *precluded* from entertaining the equitable relief because damages are not a necessary element of a cause of action seeking declaratory and injunctive relief; the court noted that it offered no opinion on the result the district court should reach on remand. *Id.* Here, the Court does not find that it is precluded from entering injunctive relief because of the jury's verdict with respect to damages. Rather, the jury's verdict rejecting even unquantifiable damages is a finding of fact that contradicts Plaintiffs' argument that remedies at law are inadequate because their damages are incapable of calculation. The Court therefore concludes, based on the particular facts of this case, that this is one factor supporting a discretionary finding that equitable relief should not be granted. *See Platypus Wear*, 558 F. App'x at 931 ("Equitable relief is to be determined on a case-by-case basis after considering the facts of the particular transactions at issue.").

not disserve the <u>public interest</u>. "[C]onsiderations of the public interest include the need to enforce and provide certainty regarding parties' contractual agreements, and the need to protect the confidentiality of trade secrets and proprietary business information." *Lincare, Inc. v. Tinklenberg*, No. 8:20-CV-1002-KKM-AAS, 2020 WL 10354020, at \*7 (M.D. Fla. June 26, 2020); *but see Klay*, 376 F.3d at 1097 (11th Cir. 2004) (noting that most courts do not consider the public interest element in deciding whether to issue a permanent injunction).

Nonetheless, because Plaintiffs have not established the factors of irreparable harm and an inadequate remedy at law, they have failed to demonstrate that the Court may grant a permanent injunction. *See eBay Inc.*, 547 U.S. at 391 ("[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.").[16] The motion is therefore due to be denied.

Accordingly, it is hereby **ORDERED**:

1. Defendant Christopher Frankel's Motion for Judicial Notice of FINRA's Expulsion of Alpine [Doc. 393] is GRANTED.

2. Defendant's Motion for Judicial Notice [Doc. 404] is GRANTED-IN-PART and DENIED-IN-PART.

---

[16] Because the Court concludes injunctive relief is not warranted, it need not address Defendant's arguments regarding notice and preclusion. *See* Doc. 330 at pp. 16-19.

3. Plaintiffs' Motion for Entry of a Permanent Injunction and to Amend the Judgment in Conformity Therewith and Incorporated Memorandum of Law [Doc. 325] is DENIED.

**DONE AND ORDERED** in Tampa, Florida on January 3, 2023.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any